```
 1                   IN THE UNITED STATES DISTRICT COURT

 2                      EASTERN DISTRICT OF MICHIGAN

 3   UNITED STATES OF AMERICA          ) Bay City, Michigan
                                       ) February  28, 2019
 4       vs.                           ) 8:29 a.m.
                                       )
 5   JAMES D. PIERON, JR.,             )
                                       ) Case No. 18-20489
 6       Defendant.                    )
     _____  )
 7

 8                     TRANSCRIPT OF TRIAL - VOLUME 2
                  BEFORE THE HONORABLE THOMAS L. LUDINGTON
 9                     UNITED STATES DISTRICT JUDGE

10   APPEARANCES:

11   For the Government:   JANET L. PARKER
                           JULES M. DEPORRE
12                         United States Attorney
                           Eastern District of Michigan
13                         101 First Street
                           Suite 200
14                         Bay City, MI 48708

15   For the Defendant:    MICHAEL L. MINNS
                           ASHLEY B. ARNETT
16                         Minns & Arnett
                           9119 South Gessner; Suite One
17                         Houston TX 77074

18   For the Defendant:    KENNETH SASSE
                           Attorney at Law
19                         27 E. Flint Street; 2nd Floor
                           Lake Orion, MI  48362
20                         (248) 821-7325

21
     Court Reporter:    Carol M. Harrison, RMR, FCRR
22                      1000 Washington Avenue
                        Bay City, MI  48708
23

24              Proceedings reported by stenotype reporter.
           Transcript produced by Computer-Aided Transcription.
25
```

```
 1                           INDEX

 2    Opening statement by Ms. Parker                    18

 3    Opening statement by Mr. Minns                     33

 4
     WITNESSES FOR THE GOVERNMENT:
 5
     ROBERT MILLER
 6        Direct Examination By Ms. Parker               76
          Cross-Examination By Ms. Arnett               131
 7

 8

 9   EXHIBITS:                                         RCVD

10    GX 13    2005 FBAR Filing                          85
      GX 14    2006 FBAR Filing                          85
11    GX 15    2007 FBAR Filing                          85
      GX 17    2008 FBAR Filing                          85
12    GX 18    2009 FBAR Filing                          85
      GX 21    2010 FBAR Filing                         104
13    GX 39    2007 Form 1040                           111
      GX 40    2008 Form 1040                           112
14    GX 42    2009 Form 1040                           112
      GX 65    2007 Saxo Bank Acct Stmt                 121
15    GX 67    2008 Saxo Bank Acct Stmt                 121
      GX 68    2009 Saxo Bank Acct Stmt                 121
16    GX 70    2010 Saxo Bank Acct Stmt                 121
      GX 89    2009 FBAR - AHP                          103
17    GX 93    IRS Notice - Balance Due 2009            128
      GX 94    IRS Notice - Balance Due 2008            128
18    GX 119   Credit Suisse JDFX Acct Stmts            126
      GX 120A Jun 2009 Acct Stmt - IB Tech               95
19    GX 120B Oct 2009 Acct Stmt - IB Tech               95
      GX 120C Nov 2009 Acct Stmt - IB Tech               95
20    GX 120D Apr 2010 Acct Stmt - IB Tech               95
      GX 120E Jan 2011 Acct Stmt - IB Tech               95
21    GX 120F Feb 2011 Acct Stmt - IB Tech               95
      GX 120G Jul 2011 Acct Stmt - IB Tech               95
22    GX 120H Aug 2011 Acct Stmt - IB Tech               95
      GX 121A Aug 2009 Acct Stmt - Komplique            130
23    GX 121B 2010 Acct Stmt - Komplique                130
      GX 121C 2011 Acct Stmt - Komplique                130
24    GX 129   IB Tech Wire Transfer - PNC Bank          95
      GX 188   UBS Acct Stmts                           125
25
```

1              P R O C E E D I N G S

2              (At 8:29 a.m., proceedings commenced.)

3              (Defendant present.)

4              THE CLERK:  United States of America versus James

5    Pieron, Jr., Case No. 18-20489.

6              THE COURT:  Good morning, counsel.  If we could have

7    your introductions, please.

8              MS. PARKER:  Good morning, Your Honor.  Janet Parker

9    for the United States.  Also with me is Jules DePorre,

10   Assistant US Attorney, and Scott Hollabaugh, IRS criminal

11   investigation special agent.

12             THE COURT:  Good morning.

13             MS. PARKER:  Do you want me to do Ms. Barkiewicz

14   also.

15             THE COURT:  Certainly.

16             MS. PARKER:  Debbie Barkiewicz who is our technical

17   support person.

18             THE COURT:  She truly keeps the train moving.

19             MS. PARKER:  At least the images.

20             THE COURT:  And good morning.

21             MR. MINNS:  Good morning, Your Honor.  I'm going to

22   do this right this time.  Michael Minns for James Pieron,

23   defendant, Ashley Arnett, Ken Sasse, and Ron Braver is our

24   summary witness, and he's a former Internal Revenue Service

25   special agent.  We've given the CV and everything to the

```
 1  Government.
 2            THE COURT:  Good morning to you.
 3            MR. SASSE:  Just as a minor point, can we use our
 4  computers in the courtroom?
 5            THE COURT:  Yes.
 6            MR. SASSE:  Thank you.
 7            THE COURT:  Government ready to proceed?
 8            MS. PARKER:  Your Honor, the Government would like to
 9  move for sequestration pursuant to Rule 615.
10            THE COURT:  Do we have any known fact witnesses that
11  are present in the courtroom?
12            MS. PARKER:  Yes.  I believe so, and I believe there
13  are attorneys for multi witnesses, multiple attorneys for
14  multiple witnesses, and I would ask that it extend to them so
15  that the purpose of the sequestration is not frustrated.
16            THE COURT:  Any opposition?
17            MR. MINNS:  Sequestration to the opening arguments,
18  Your Honor?  Is that -- if that's the norm, I don't have --
19  we -- I'm not used to that.  I thought the sequestration was
20  just so they can't hear witnesses, but I have no position in it
21  really.
22            THE COURT:  Then we're in agreement that we'll
23  sequester witnesses, including opening statements.
24            Any other issues that counsel would like raised
25  before we entertain the jury?
```

1          MR. SASSE:  Just for clarification on that, I assume

2    the Government has their case agent they intend to keep in the

3    courtroom, and we would also ask that Mr. Braver be allowed to

4    stay in the courtroom.

5          MS. PARKER:  We weren't objecting to Mr. Braver.

6          MR. SASSE:  Thank you.

7          MS. PARKER:  We do have a summary witness, who we

8    also would like to have in the courtroom for the reason that

9    she's a summary witness potentially.

10          MR. MINNS:  I do object to the Government having two

11   witnesses.  They've asked for sequestration; we haven't.  They

12   have two witnesses.  They should pick one of them to be in, but

13   they're not entitled to two I don't believe.

14          THE COURT:  One I understand is a case manager and

15   case witness, the other is a summary witness.

16          MR. MINNS:  But they're also named witnesses, both of

17   them.

18          MS. PARKER:  So are the two people sitting at counsel

19   table who are not attorneys.  We're not objecting to that.

20          MR. MINNS:  One's the party.

21          THE COURT:  I would respectfully agree.  Those two

22   parties may remain.

23          MR. MINNS:  I understand, Your Honor.

24          THE COURT:  Any other issues that we need to resolve

25   before we entertain the jury?

1           My understanding is that we have preliminary

2    instructions to provide to the jury.  I have organized those,

3    including the instruction on direct and circumstantial

4    evidence.

5           MS. PARKER:  Thank you, Your Honor.

6           THE COURT:  And then would anticipate, after the jury

7    is sworn, proceeding directly to opening statements.

8    Government, ready to proceed?

9           MS. PARKER:  The Government is ready, Your Honor.

10          THE COURT:  Defense?

11          MR. MINNS:  Yes, Your Honor.

12          MS. PARKER:  Judge, do you want to address the motion

13   in limine.

14          THE COURT:  No.

15          MS. PARKER:  Okay.

16          THE COURT:  It was filed, I read it early this week,

17   and the defense timely filed a response at 6:45 this morning.

18   I'm about three pages into it, and the advantage of opening

19   statements will give me the opportunity to gain some additional

20   context concerning the filing.

21          I'm comfortable with a certain amount of factual

22   background related to the defendant being introduced

23   contextually to explain his capabilities, his circumstances in

24   working in Europe as well as some background on the technical

25   work that he was doing at that point.

1          We'll take up, I believe, a little bit more of the

2    discussion concerning particular dates of tax payments and

3    their relevance later on, but we'll -- the opening statements

4    will provide us with some context in which to understand some

5    of the motions -- the motion in limine and the response.

6          Anything else that you'd like to cover before we

7    entertain the jury?

8          MS. PARKER:  Well, as to what the Court just

9    indicated, that -- the timing of payments would impact one of

10   the charts that defense counsel showed us they intended, excuse

11   me, to use during opening, and I would ask that it not be used.

12         THE COURT:  He -- he may use that at the risk that it

13   may be ruled inadmissible at some point.  I mean, that's --

14   that's the risk that anyone takes when you use materials in

15   opening statement, presuming that they may be admissible.  We

16   have not had the question framed at this point; and,

17   respectfully, I suspect that there was a reasonable amount of

18   debate, even within the Government, as to whether or not you

19   wanted to eliminate the dates of those payments.  They are

20   valuable to the defendant in terms of one argument.  They're

21   also valuable to the Government as well, and both sides take

22   some risks with respect to the introduction of that

23   information.

24         We're ready on the preliminary instructions.  The

25   jury is assembled.  I had asked Mr. Haines to provide you a

1    quick email on one of the responses that we had received from a

2    juror.  He was less than excited, upon reflection, about the

3    responsibility, but notwithstanding that fact was in the

4    building when I got here at 7:50 this morning, and is ready to

5    go so far as we understand.

6           So we will entertain the jury, give them the

7    instructions, and I'm looking forward to your opening

8    statements.  All rise for the jury.

9           (At 8:36 a.m., jury arrives.)

10          THE COURT:  Please be seated.  My name is Tom

11   Ludington.  I'm the trial judge assigned to the case.  We'll be

12   spending a little bit of time together over the next couple of

13   weeks.  I appreciate the fact that you were all here promptly

14   this morning.  Our practice is to be organized as quickly as

15   possible in order to eliminate any additional time that we

16   would ask of you.  I also want to thank Judge Morris for her

17   effort in selecting such a fine group of people as our jury for

18   the case.  It's a pleasure to have you here.

19          Our order of events this morning will be to provide

20   you some preliminary instructions that apply to all criminal

21   cases and give you a little bit of background about the

22   expectation that you can have of us and of counsel during the

23   course of the trial.  We will then have you sworn as the jury

24   in the case and go directly to opening statements from the

25   Government and from the defense if they elect to furnish an

1    opening statement at this time.  They may wait until later on

2    during the course of the case.

3            So to get started, I want to speak to you briefly

4    about the function of the judge in a criminal trial and your

5    function as the jurors.  You will be sworn as the jury to try

6    this case.  By your verdict you will decide the disputed issues

7    of fact that exist between the parties.  The Court will decide

8    the questions of law that arise during the trial and before you

9    retire to deliberate at the close of the trial, we will provide

10   you instructions on the law that you are to follow and apply in

11   reaching your verdict.

12           It is my responsibility to conduct the trial in an

13   orderly, fair and efficient matter, to rule upon questions of

14   law that arise during the course of the trial and to instruct

15   you about the law that applies to the case.

16           You can look upon my function, that is the function

17   of the Court, is that of a referee or umpire.  I have no

18   personal or professional interest in how this case is decided.

19   My job is to see to it that only legally admissible evidence is

20   received in court and to tell you what the law is during and at

21   the end of the trial, as well as to settle any disputes that

22   may exist between the attorneys that arise during the course of

23   the trial.

24           The seats that you are in are the seats that you will

25   take whenever you are in the courtroom.  It's important that

1    you try to keep a good understanding of what your order is.

2    It's easiest -- it's easiest to organize yourself in the jury

3    room and on your way in so that you avoid the problems that are

4    kind of associated with moving around.  You've had practice on

5    that now, and I have every confidence that you're going to nail

6    it the next time you're in the courtroom.

7            You will be provided, indeed you have, badges.  We

8    would ask that you keep those on whenever you are in the

9    vicinity of the court, and by that I mean even outside of the

10   court as you enter.  It's important for us, both court

11   employees, as well as the parties that are involved with the

12   case, that we know who you are and that we also understand what

13   your role here is as impartial decision makers.

14           You will find, for example, that if you are

15   approaching a door at the entry, and any of the parties that

16   are involved in the case are there, they will maintain their

17   distance.  That's not because they're old and mean people.

18   That's because they're following through on their obligation to

19   respect your impartiality in deciding the questions that are

20   here.  They want to avoid any kind of personal contact so as

21   there's no suggestion of any kind of partiality.  The badges

22   help all of us know that.

23           My understanding is that Judge Morris would have gone

24   over the time periods that we have calendared.  I will actually

25   try to make a arrangements for you to have a printed copy of

1    those, if you do not, so that you can have that available to

2    you.

3            We will on occasions, depending on witness

4    availability, maybe go a little bit longer at various periods

5    of time.  The more we can accomplish in a single day, the fewer

6    days we ask of you, but before we go beyond any one of those

7    time periods, we will ask you in advance if you have any

8    conflicts before we do so.

9            You will notice that we have 14 jurors.  Two jurors

10   are alternates.  I do not know who they are, they will be

11   selected at the conclusion of the trial before deliberation.

12   We do this because we know in the ordinary experience of life

13   that people can be sick and have accidents or emergencies, so

14   we have two extra jurors to be sure that the required number

15   will be available when you retire to deliberate.  When you

16   retire to deliberate, the case will be decided by a jury of 12

17   people.

18           You will be permitted to take notes during the course

19   of the trial.  You're not obligated to take notes.  If you do

20   take notes, you should not careful not to be influenced by the

21   notes of another juror.  You should reply primarily on your own

22   memory and recollection of the evidence and the testimony in

23   the case.  Note taking must not be allowed to distract you from

24   what happens here in court.

25           Let me briefly explain the general order of procedure

1    in the trial.  First, the Government will be, by counsel,

2    making an opening statement in which they outline their theory

3    of the case.  The attorney for the defendant may then make an

4    opening statement, or he may reserve it until later on during

5    the case.  The opening statements are not evidence.  They are

6    only intended to assist you in understanding the viewpoints and

7    the claims of the parties.

8            After opening statements, we will begin the process

9    of taking evidence.  The Government will present their evidence

10   first.  They will call witnesses and will offer exhibits, such

11   as documents or also possibly physical objects into evidence.

12   The attorney for the defendant will have a right to

13   cross-examine any witness called by the Government in order to

14   test the truth and accuracy of their testimony, as well as to

15   elicit any testimony that might be favorable to the defendant.

16           Following the Government's presentation, the

17   defendant will have an opportunity to present evidence.  You

18   should clearly understand that a defendant in a criminal case

19   is not obligated to produce any evidence whatsoever.  The law

20   does not require a defendant in a criminal case to prove his

21   innocence or to produce any evidence at all.  Similarly,

22   however, the attorney for the Government will have a right to

23   cross-examine any witness that is called by the defendant.

24           After all the evidence is presented, we will give

25   preliminary final instructions that will outline the law that

 1  applies to the case and the questions that we will ask you to

 2  answer.  After we've provided you the instructions, both of the

 3  attorneys will have an opportunity to present closing arguments

 4  in support of their case.  You are again reminded that the

 5  statements of the attorneys in closing arguments, as in opening

 6  statements, are not evidence.  They're intended to assist you

 7  and provide you a guideline of the evidence in the case as well

 8  as the theory of each party.  You must base your decision only

 9  on the evidence.

10          Following the closing arguments, I -- as I explained,

11  I'll give you detailed instructions on the manner of your

12  deliberations.  You will then retire and deliberate on your

13  verdict.  You will do that by applying the law as I give it to

14  you, to the facts as you find them to be.  The function of the

15  jury is to determine the facts.  You are the sole and exclusive

16  judges of the facts, and you alone determine the weight, the

17  effect and the value of the evidence, as well as the

18  credibility of the witnesses that will appear before you.

19          You must consider and weigh the testimony of all

20  witnesses who appear, and you alone are to determine whether to

21  believe any witness and the extent to which any witness should

22  be believed.  It is your responsibility to consider any

23  conflicts in testimony which may arise during the course of the

24  trial.  Your decision as to any fact in this case is final.  On

25  the other hand, it is your duty to accept the law as the Court

1   states and provides it to you.

2           Your determination of the facts must be based only on

3   the evidence which is offered and received in the courtroom.

4   Evidence consists of the sworn testimony of the witnesses, and

5   may also include the exhibits or other physical objects which

6   are submitted into evidence.

7           From this point forward, you must not discuss the

8   case with anyone, not even members of your own family or fellow

9   jurors.  It would be unfair for you to discuss the case among

10  yourselves or with family and friends before you retire to

11  consider your verdict.  So you may tell your family and friends

12  that you have been selected as a juror, but then you must tell

13  them that you are under instructions from the Court that you

14  are not to discuss the case with them until the Court permits

15  you to do so.

16          After the case is submitted to you for deliberations,

17  you must still discuss it only when the Court instructs you to

18  do so, and only in the jury room, and only in the presence of

19  all of your present -- fellow jurors.  When the trial is over,

20  you may discuss the case with anyone that you wish.  Until that

21  time, we ask that you control the natural desire to discuss the

22  case both here and at home.

23          The only information that you should receive about

24  this case should come to you while you are altogether as the

25  jury in the presence of the Court, the attorneys that are

1   involved in the case, the defendant and all other present

2   witnesses.

3           You must not consider any information which might

4   come to you from outside of the courtroom.  You should not read

5   any newspaper articles, if there are any, relating to the

6   trial.  You must not listen or watch television or listen to

7   radio accounts, if there are any during the course of the

8   trial's progress.

9           Please do not visit the scene that may be mentioned

10  in the evidence.  If for any reason doing so would be necessary

11  or helpful to your understanding of the evidence in the case,

12  we would do so under controlled circumstances.  I do not

13  believe there is a high likelihood of that with respect to this

14  case.

15          You must also not make any investigations on your own

16  about the case, the witnesses, the parties or the attorneys.

17  Let me emphasize this.  I know that many of you have computers,

18  smart phones, iPads and equivalents and that you use them in

19  daily life to research many issues.  For example, you might use

20  them to learn information about the case, about the attorneys,

21  about witnesses or anything like that.  That will be prohibited

22  here for the reasons that we outlined earlier, which is that

23  it's important that any information that you learn about the

24  case or associated parties should come to you only in the

25  courtroom and only in a way that's consistent with the Rules of

1  Evidence which govern the information that you may use in

2  reaching conclusions in the case.  So, please, do not do any

3  research about the case or use any of that technology to

4  communicate with anyone outside of the jury.

5          A trial follows long established rules of procedure

6  and evidence.  The attorneys are trained in these rules, and

7  from time to time will make objections and likely motions.  I

8  will rule on these during the -- during the trial.  Most of

9  these -- most of the time I will make rulings in your presence.

10 There are occasions where we may need to consider a wider range

11 of information, and we may excuse you from the courtroom while

12 we make those decisions.  We will be careful and prompt in

13 resolving any of those issues understanding that we are working

14 on your time.

15         I'd like to talk briefly about some of the evidence

16 that may be brought to your attention during the course of the

17 trial.  You may have heard the terms direct evidence and

18 circumstantial evidence.  Direct evidence is simply evidence,

19 like the testimony of an eyewitness, which, if you believe it,

20 directly proves a fact.  If, for example, a witness testified

21 that he saw it raining outside and you believed the witness,

22 that would be direct evidence that it was raining.

23         Circumstantial evidence, by contrast, is simply a

24 chain of circumstances that indirectly proves a fact.  For

25 example, if someone walked into the courtroom wearing a

1   raincoat covered with drops of water and carrying a wet

2   umbrella, that would be circumstantial evidence from which you

3   could conclude that it was raining.  It is your job to decide

4   how much weight to give the direct and circumstantial evidence.

5   The law makes no distinction between the weight you give to

6   either one and does not conclude that any type of evidence is

7   better than the other.  You should consider all the evidence,

8   both direct and circumstantial, and give it whatever weight you

9   believe it deserves.

10          Please let me know immediately by raising your hand

11  if you cannot hear a witness or see what's being demonstrated.

12  Also if at any point in time you need a break, and I haven't

13  extended it, don't hesitate to put your hand up, let me know,

14  and we should be able to accommodate you.  If you have any

15  particular requests in terms of accommodations or assistance

16  that we can provide during the course of the trial, please do

17  not hesitate to let Mr. Haines or me know.

18          That was the instructions I had organized for this

19  morning.  Counsel, any additions or corrections?

20          MS. PARKER:  No addition or corrections from the

21  Government, Your Honor.  Thank you.

22          THE COURT:  Sir?

23          MR. MINNS:  No, Your Honor.

24          THE COURT:  The Government ready to proceed to

25  opening statement?

1          MS. PARKER:  No, Your Honor.  I believe the jury
2     needs to be sworn.
3          THE COURT:   I think that's an excellent instruction.
4          MS. PARKER:  Every once in a while, I come up with a
5     good one.
6          THE COURT:  If you'd please swear the jury.
7          THE CLERK:  Please stand and be sworn.
8          (At 8:56 a.m., jury sworn by the clerk.)
9          MS. PARKER:  May it please the Court, ladies and
10    gentlemen of the jury, first all, I'd like to welcome you back.
11    I know you had a day off in between here to try and recover
12    from the shock of being selected as a juror, and hopefully
13    you're ready to get going today on this case.
14          I'd also like to introduce those that are at my table
15    again for all of you.  First of all, we have the case agent
16    Scott Hollabaugh.  His office is in Lansing.  He's a criminal
17    investigator.  He's a cop for the IRS.  There are other kind of
18    people who work for the IRS that don't have law enforcement
19    authority, but this is a criminal case and he's the case agent.
20          Also Jules DePorre; Jules is another US attorney as I
21    am.  We have an office just over on the river a couple blocks
22    away, and Debbie Barkiewicz is our magician at the computer who
23    makes our exhibits appear once they're admitted into evidence,
24    and they'll be -- we should all be here working to get this
25    case presented to you.

1          Now, Judge Ludington has given you some instructions

2     that outline the various stages of the case and some of the

3     grounds rules of how you need to act and we need to act towards

4     you and also some of the evidentiary ground rules, too.  The

5     judge's instructions are very important to you.  Keep those in

6     mind throughout the case.  Pay attention to those both now and

7     those that he will give at the end of the case as well.

8          And I just want to reemphasize, the judge said that

9     we will be keeping our distance as we come in the building,

10    like when we get to the security station.  Same thing if we

11    happen to run into you at Meijer's or something like that.

12    Don't come up and try to talk to us, and we won't try to talk

13    to you.  It's not that we have anything against you or anything

14    like that, we just know that it would be inappropriate for us

15    to do that.

16         I believe the Court also instructed you that

17    statements are -- and if he hasn't already, he will -- that

18    statements of counsel are not evidence, and that's an important

19    thing to keep in mind, because what you need to decide -- or

20    use to decide in this case the guilt or innocence of the

21    defendant is the evidence, and that's going to be the testimony

22    that you hear from the witness stand, the exhibits that are

23    received by the Court, and also your reason and common sense

24    evaluating those things, putting the evidence and the law

25    together that the judge gives you to arrive at a verdict in

1    this case.

2           So the instructions that the judge has given you and

3    he will give you, those are the law that you will need to

4    follow in applying the evidence to the charge in this case and

5    arriving at a verdict.

6           Now, you should take the law from the judge, not from

7    any other source.  Sometimes TV gives a notion, you know,

8    people see things that -- as you heard the judge just now

9    instruct, that certain kinds of evidence are better than

10   others.  That's not what the judge will instruct you.  Anything

11   that he allows you to see or hear is proper evidence for you to

12   consider.

13          You have to decide what you believe and what you

14   don't believe and how it -- that factors in is your conclusion

15   to make, not anybody else's, but don't second-guess the judge's

16   rulings.  I've on occasion talked to jurors after a verdict and

17   they said, well, we thought that was hearsay.  Well, the rules

18   of hearsay are a little complex, and the judge knows them, and

19   we try to follow them as attorneys, but you shouldn't try to

20   say, well, I don't like that because I think that's hearsay.

21   If he's allowed you to see or hear the evidence, it's

22   appropriate evidence for you to use whatever way you see fit in

23   the case.

24          And the judge also talked about direct and

25   circumstantial evidence, and talked about a person with a

```
 1   raincoat and testimony regarding rain.  I'd like to give you

 2   another example, since we're all familiar with it, snow.  We

 3   all know if you go to bed and there's no snow, and you get up

 4   in the morning and there's snow on the ground, that it snowed

 5   overnight.  You didn't see it happen, but you know it happened

 6   because you see the evidence of it.  That's a reason and common

 7   sense.  That's drawing conclusions from things that are known

 8   to the rational conclusion that that leads to.

 9            But that can go even further.  Say you went to bed

10   there was no snow, you got up in the morning, there's snow, and

11   there's also some footprints in the snow.  And most of us know

12   that a footprint that's of a boot was probably made by a

13   person, but little prints maybe going over your car might have

14   been made by a cat, might have been made by the neighbor's cat,

15   whatever, but there are different things that you can draw from

16   it.

17            You can tell from the prints which direction the

18   person or the cat or whatever traveled, even though you never

19   saw that person, you never saw that cat.  And those are the

20   kind of reasonable things you will be asked to do in this case.

21   Why is that?  Because you will have to decide if the

22   defendant's actions were willful.  You're not going to have a

23   witness who's going to get on the stands an say, I, James D.

24   Pieron, Jr., willfully will spend years avoiding paying my 2008

25   and 2009 taxes.
```

 1            MR. MINNS:  Excuse me, Your Honor, I have to object
 2    on the comment.  It violates the restriction against commenting
 3    on the Fifth Amendment.
 4            MS. PARKER:  I said there's not going to be a witness
 5    that says that.
 6            THE COURT:  Overruled.
 7            MS. PARKER:  Likewise, there's not going to be a
 8    document that says, here's my plan.  This is how I'm going to
 9    evade taxes for years, for 2008 and 2009.
10            Willfulness is the state of the defendant's mind, and
11    you will have to figure that out, decide what his mental state
12    was when he did the things he did over a period of years and
13    decide if that was willfully evading or trying to avoid the
14    payment of his taxes.
15            And, ladies and gentlemen, that's this case in a
16    nutshell.  The one thing you have to decide in this case --
17            MR. MINNS:  May I be permitted to --
18            THE COURT:  Yes, sir.
19            MR. MINNS:  Thank you.
20            MS. PARKER:  I did show it to counsel prior to
21    proceeding, Your Honor.
22            Evasion of payment of taxes for 2008 and 2009.
23    That's this case.  Plain and simple.  What it's not.  It's not
24    a charge that he failed to file returns.  There was some
25    reference to that earlier during jury selection, but that's not

1    what we're going to prove.  In fact, the evidence will be that

2    defendant filed a fairly substantial stack of returns.  Some of

3    them were late, yes, you'll see the evidence that many of his

4    tax returns were filed out of time, but that's not the issue.

5         Likewise, there's no charge that he filed false

6    returns.  Again, you will probably see evidence in this case

7    that may lead you to think that some parts of his returns were

8    false, but that is not the charge.  The charge is evading the

9    payment of the taxes that he owed for 2008 and 2009.

10        What you will see is that Mr. Pieron did file tax

11   returns for 2008 and 2009.  He filed them quite late, but you

12   don't have to decide anything relating to the lateness of the

13   returns at all.  That's not the issue.

14        You don't have to decide anything about the

15   truthfulness of the return.  Again, that's not the issue.  You

16   don't even have to decide how much he owed.  Why?  Because

17   we're going to take him at his word.  We're going to accept

18   what he said to the IRS he owed when he filed his tax returns.

19   Because when he filed them, he didn't submit any payment.

20        He owed.  He owed lots of money, and at one point he

21   owed $444,880.  That's what he said on a form that he sent to

22   the IRS.  That's what he owed.  So the only real issue here,

23   again, is what did Mr. Pieron do to avoid paying those taxes?

24   That's the only real question.  Did James Pieron, Jr. try to

25   avoid paying taxes that he had the ability to pay?

1        Now, the background events in this trial that give

2   rise to that question, they happened before 2008 and 2009,

3   because before 2009, Mr. Pieron had been living overseas in

4   Europe, mostly in Switzerland.  You will see he was running

5   businesses and moving around millions of dollars.  We're not

6   talking chump change here.  We're talking millions of dollars.

7   He had a business with employees.  He had Swiss bank accounts.

8   He had other foreign bank accounts in other countries.  He had

9   business, personal bank accounts and lots of money going in and

10  out of those accounts for several years.

11       So you will see bank statements and wire transfer

12  records that show lots of money being moved in and out of the

13  accounts that Mr. Pieron controls.  He's in charge.  Sometime

14  around 2009 he decided to move back to the US and actually to

15  move back to Michigan.  He knew, or at least learned, that he

16  should have filed tax returns for the years that he was living

17  and working overseas, so he asked some relatives to help him do

18  those returns.

19       And the relative does some years of returns for

20  Mr. Pieron, but basically says he can't or won't do the returns

21  for some years, including 2008 and 2009.  They're more

22  complicated or whatever than he is willing or able to do.

23       So James Pieron then goes to a tax resolution company

24  called American Tax Solutions, Incorporated.  That's a place in

25  Chicago.  Even though he's in Michigan, he chooses this place

1  in Chicago, and gets tax returns done for him for 2007, 2008,

2  2009, 2010.  And, again, he files those returns with the IRS

3  but he does not pay the taxes that are owed as reported on

4  those returns.  It turns out that Mr. Pieron does owe a lot of

5  unpaid taxes, not to mention penalties and interest.

6        By the way, when you look at those taxes, you'll see

7  that he did get credit on his US taxes for the taxes he paid in

8  Switzerland to the Swiss government, but that's not enough of a

9  tax reduction of the taxes that are owed by Mr. Pieron to

10  satisfy him.

11       So he does things to keep trying to reduce the taxes

12  he owes but has not paid.  One of the things he does, ladies

13  and gentlemen, is he goes to still more tax preparers.  You

14  will see that he had tax returns done by different people or

15  tax preparation firms for the same years, again, multiple

16  times.  As I said, there will be a stack of returns that he had

17  prepared and submitted to the IRS.

18       He gives those tax preparers, Mr. Pieron does, gives

19  those tax preparers a little different information on different

20  occasions to try to get a result that he thinks is better for

21  him tax wise.  He wants a much lower tax obligation.

22       However, and this is the key, he's still not paying.

23  He's still not paying what he owes on those returns prepared

24  for him, particularly for 2008 and 2009.  What else is he

25  doing?  He's spending money on things he wants to have or to

1  invest in rather than paying his taxes, and you will see

2  multiple examples of this.  I will give you a few.

3       One example out of many; 2008, 2009 taxes, those are

4  unpaid, but he goes out and he buys a brand new Mercedes Benz.

5  He pays over $100,000 for it in 2009, rather than pay his

6  taxes.  As you will see, he pays for that Mercedes Benz up

7  front.  There's no lien on it.  He pays for it in full and

8  drives it off the lot.

9       And another thing, ladies and gentlemen, another

10 thing, he puts the car title not in his name, but in the name

11 of one of his businesses, a business that I may not be

12 pronouncing it correctly, but we pronounce it Komplique,

13 K-O-M-P-L-I-Q-U-E.  That's a company that he owns.  He's

14 100 percent owner of that company at the time.  He puts the

15 title to that 100,000 plus dollar Mercedes Benz into the

16 company's name, so that's another important part of the case.

17      You will see that Mr. Pieron doesn't own a lot of

18 stuff in his own name.  No way.  He knows if you owe taxes, and

19 you haven't paid those taxes, and you have assets, the

20 Government, the IRS, can come and seize what you own.  So he

21 doesn't own much, it's his companies that he owns that owns the

22 property.  He puts almost everything in the name of his

23 businesses.

24      Look at his own bank account, couple hundred bucks,

25 may get up to a couple thousand, but there's millions, millions

1  in accounts in the names of his businesses, and he controls

2  those accounts.

3         So over the course of this trial, you'll also see

4  that he was required to report his foreign bank accounts, both

5  his personal bank accounts and his business bank accounts.  The

6  reporting form is called an FBAR report, F-B-A-R report.  He

7  didn't do those in the years when they were due, but when he

8  came back to the United States he finally did do his FBAR

9  reports.  But you will see he did not do that with complete

10 accurately.  He took steps to make sure that his FBAR reports

11 were not accurate.  For example, the FBAR reports require a

12 person to put on the form what was the highest dollar amount in

13 each account for the year in issue.

14        Now, Mr. Pieron hired a firm to help him, paid a firm

15 to help him prepare these forms, but he didn't give them all

16 the information.  He didn't give him -- he didn't give the

17 firm, I should say, the statements for all times for those

18 foreign bank accounts.  The firm that was doing that was --

19 it's called Anderson Hooper Pavlik, that's AHP, because that's

20 a little easier to say, but he didn't give them all the

21 statements for the month in particular that had the highest

22 dollar amount in it, that had the highest dollar amount

23 reflected on the statement, and that's the number that's

24 supposed to be on the FBAR report.

25        The statement that they didn't get would have

1   reflected that he had over -- or he had a quarter of a million

2   dollars in that account.  And how do we know that?  We don't

3   know because we haven't seen the statement either, but we have

4   the wire transfer of three-quarters of a million dollar coming

5   out of that account and going into one of his business accounts

6   here in the United States.

7           The records for the bank here show the incoming wire

8   transfer for three-quarters of a million dollars.  That's not

9   on his FBAR report, and that's his responsibility, not the

10  responsibility of the people helping prepare the report.

11  That's his.  He didn't give them that information.  And you

12  will get to see the evidence of that wire transaction.  The

13  money coming from his foreign bank account into his business

14  account, not his personal account.

15          And you will see that Mr. Pieron did that kind of

16  thing over and over and over, hiding his money in his business

17  accounts.  He also has the companies buy the things he wants;

18  everything from meals up to pianos and other expensive things.

19  The companies by those items.  Instead of calling those

20  purchases income to himself, which they were, he tries to claim

21  that the money was repayment of a loan to the company.

22  Meanwhile his taxes remain unpaid.

23          So in January of 2011, Mr. Pieron decides to make an

24  offer to the IRS to pay off his tax debts for back taxes for

25  2007, 2008 and 2009.  He says he owes $444,880, and we're going

1   to take him at his word on that for this trial.  And he offers

2   to pay the IRS $1,500 a month to pay off those back taxes.

3        You'll get to see that form and get to see that, and

4   it's important when you look at that form, you will see that he

5   tells the IRS that he has a Volkswagen, which, in fact, he

6   does, and it's paid off in full.  And he says he has two

7   companies, and they're each worth $1,000, and a few dollars in

8   his personal accounts.

9        He doesn't mention the 2009 Mercedes Benz that is

10  titled in the name of one of those companies.  That and other

11  things Mr. James Pieron left off the form when he asked the IRS

12  too accept his installment plan, but that's not all in this

13  case.  James Pieron essentially tells the IRS he can only

14  afford to pay that $1,500 a month towards his back taxes.

15       But a couple months after he files that form, in

16  January of 2011, what does he do?  He goes out and buys a brand

17  new motorcycle.  He pays $18,900 and change for that

18  motorcycle.  Pays for it in full.  And you have to decide, was

19  that money that he could have been using to pay off the taxes?

20  Should he pay his taxes or go out and buy himself a big

21  customized motorcycle; again, free and clear of all liens.  He

22  decides not to pay the taxes.  He decides to buy that bike

23  rather than pay the taxes.

24       Well, he does, in fact, make a few of those $1,500

25  payments, but not many, and then he stops.  And time continuing

1   to go by and the taxes continue to remain unpaid.  And money

2   continues to go in and out of his business accounts, and the

3   business continues to pay for things that Mr. Pieron wants and

4   uses, but the IRS doesn't get paid by Mr. Pieron.

5           So in 2014 Mr. Pieron decides now I'm going to make

6   an offer and compromise to the IRS.  He says he'll pay the IRS

7   a princely sum of $30,000 to pay off years of back taxes, not

8   just 2008, 2009, but several years, including 2008 and 2009.

9   Again, he fills out a form listing his assets, much like the

10  other form I've already talked to you about.

11          And you will see, when you look at that form from

12  2014, it doesn't list the 2009 Mercedes Benz, and there's a

13  good reason for that.  It's because he doesn't own it anymore.

14  His company doesn't own it anymore.  Other evidence will show

15  you the reason he doesn't have that 2009 Mercedes Benz is he

16  traded it in on a 2013 Mercedes Benz that cost him $140,000,

17  while he's not paying his taxes.

18          And, again, he buys that motorcycle -- or, excuse me,

19  that 2013 Mercedes Benz free and clear of liens; and, again,

20  it's not titled in his name.  It's titled to a company.  And

21  that Mercedes Benz, the 2013 one, is also not on that 2014 form

22  listing assets.  Even though that's just the very next year,

23  he's still got the car because that's a luxury item he's

24  driving around, but it's titled to a company.

25          He didn't want the IRS to know about it.  Didn't want

1   the IRS to seize that car.  Didn't want the IRS to seize other

2   things.  These are all some parts of the way -- of the many

3   ways that Mr. Pieron sought to avoid paying the taxes that he

4   himself reported he owed.  And as I said at the outset,

5   avoiding paying the taxes, that's what Mr. James Pieron did.

6   That is what the evidence in this case will be about, and

7   that's what you need to focus on.

8          Don't be confused by claims that the defendant didn't

9   know he had to file tax returns while working overseas.  That's

10  not the issue.  We've heard that in jury selection, but that's

11  really not at all the point of this trial.  Don't be confused

12  by that.  It simply doesn't matter.  He's not charged with that

13  in any way.  He's not, as I said before, charged with lying on

14  his returns; and, frankly, in this case, you don't have to try

15  to figure out what his taxes should have been.  Just like I

16  said, we're going to take him at his word.

17         So don't be distracted and confused by extraneous

18  matters.  Decide this case on the law that Judge Ludington

19  gives you throughout the trial, what he's already given you and

20  at the end of the trial and on the evidence that you hear from

21  the witness stand, you see in the documents that are the

22  exhibits, and the reasonable conclusions that you make based on

23  evidence.  If you pay attention to the evidence, and apply the

24  law, in light of this one question, at the end of this trial,

25  ladies and gentlemen, you'll have no difficulty finding James

1  Pieron guilty of evading his 2008 and 2009 taxes and remaining

2  years.

3       I thank you for your attention to my opening

4  statement, and I look forward to presenting this case along

5  with my partners over here for the balance of the trial.  Thank

6  you.

7       THE COURT:  Thank you, ma'am.

8       Mr. Minns, does the defense wish to offer an opening

9  statement at this time?

10       MR. MINNS:  Yes, very much, Your Honor.

11       THE COURT:  Your floor, sir.

12       MR. MINNS:  And we have three charts, but I'm going

13  to start talking and then set the timeline chart up if we can

14  in a second.

15       THE COURT:  Is it available electronically?

16       MR. MINNS:  I don't know, Your Honor.  I'm a complete

17  computer incompetent.

18       MS. ARNETT:  Yes, it is.

19       THE COURT:  Are you prepared to present it in that

20  manner?

21       MR. MINNS:  I haven't prepared at all.  I just

22  used -- I just used the boards, but it's exactly what I gave

23  the Court and what I gave to the -- one change I just hand

24  wrote a car on there.

25       THE COURT:  Yeah, I don't want to interrupt your

1   presentation.  If you'd like to do it, as they would say, old

2   school, we're comfortable with that.

3         MR. MINNS:  Yes, sir.  We'll show the white side

4   first because I want to give a little background information,

5   and the reason I'll show the white side first is because it's

6   more interesting than I am, and you won't listen to me.

7         So I'm not going to introduce everybody to you again.

8   The only important person -- really important person at our

9   table is the guy you're judging, Jim Pieron, and you know him,

10  you've seen him, that's Jim Pieron.  And I apologize, but --

11  for not introducing everybody but I don't see the value in the

12  time.

13        James' background briefly; he was born in Livingston

14  County out of Detroit.  Graduated from high school in 1987.

15  Nobody in his family had ever had a college degree until his

16  mother married one of the witnesses in this case many years

17  later who had the first college degree.

18        James finished high school and his best friend Gordon

19  says, we're going to join the Army, so James wasn't as tall and

20  healthy then.  He grew a foot in the Army.  He was a little

21  kind of spry kind of a guy, and God knows how he survived it.

22  He didn't see action in war.  I'm not suggesting that, and when

23  James was given a medal, he tried to turn it down because he

24  didn't think he deserved it, and I'll get into that in a

25  second.

34

1          So James goes into the Army.  He does testing and

2   they say, you need to be in computer school.  They send him to

3   Germany first before the testing.  In Germany they're figuring

4   out the logistics for Desert Storm and other areas, and the

5   whole computer breaks down, so the commanding officer can't get

6   anybody to get the computer up, so nobody can be sent where

7   they're supposed to be sent.  The planes are stuck.  The men

8   are stuck.  Nobody's transferred.  Germany's where they're

9   transferring everybody.

10          So the commander says, I need help.  Somebody fix it.

11   I don't care who you are, whether you're qualified or anything

12   else, and at this time, James wasn't qualified, but he said

13   he'd give it a shot.  So five days and nights he gets the

14   computers back on, he gets a medal.  He says he didn't earn the

15   medal, he didn't do what other people had done, but they give

16   it to him anyway.

17          He spends one year helping the FBI analyze computers

18   and fingerprints and then gets a job offer in Switzerland,

19   which is mind blowing to him.  It's with UBS Bank.  It's

20   exciting, it's exotic, and he goes to Switzerland, and he works

21   for UBS Bank for many years.

22          Now the timeline.

23          THE DEFENDAN:  Do you need some help?

24          MR. MINNS:  Yes, please.  Ron, could you help us,

25   too, please.

1          MR. BRAVER:  Yeah.

2          MR. MINNS:  Thank you very much.  In order to

3   understand all this stuff, you got to kind of go through the

4   timeline of what happened.  This is the timeline of what

5   happened, and I stuck this in here -- you can see I'm not an

6   artist.  I want to talk about Komplique, because the Government

7   has made a big deal about that Mercedes and said James should

8   have turned the Mercedes over to the Government.  I'm going to

9   get to that.

10          So he's in Switzerland, almost all the time for 10

11  years.  He files Swiss tax returns.  He pays Swiss taxes.  He

12  does not know he's supposed file American taxes, and most

13  people don't.  The Taxpayer Bill of Rights requires the

14  Government to tell us these things, but they don't do it, so we

15  guess when we're in an exotic situation, and we bump into walls

16  or we hire experts.  James hired an expert.  Ph.D. expert,

17  Switzerland, knows everything, and the expert screwed it up

18  horribly.  I'll get into that in a second.

19          One year James moved back to the United States,

20  before he went back to Switzerland, and in that one year he

21  files and pays taxes in the United States and doesn't file and

22  pay taxes in Switzerland.  Then he goes back to Switzerland and

23  continues to do -- follow Swiss law, paying taxes, filing tax

24  returns, he doesn't prepare tax returns.  He doesn't know how.

25          Now a period of time comes out later where his father

1  in law -- his stepfather, excuse me, is talking to him and he

2  says, you might owe taxes in the United States, and you might

3  have to file a United States tax return.  So he gives him a

4  power of attorney, and his father-in-law had been -- his

5  stepfather would be the most highly educated person in his

6  family, he'd been in banking, he's a smart guy, and he does the

7  research.

8          Later, his father-in-law contacts him and says you do

9  have to file in the United States.  Now, this shocked him to

10  death because the Swiss expert didn't tell him that.  Didn't

11  tell him you need a US CPA, even though you haven't stepped

12  foot on US soil except for one year in the last 10.  The Swiss

13  guy tells him he's paid everything he's supposed to do, and

14  he's done everything he's supposed to do.

15          Well, he goes with his stepfather over the expert.

16  His stepfather files the returns for 2001 to 2006 for him, and

17  pays the taxes that are due on them.  But then his stepdad also

18  says, son, this 2007 and eight is way too complicated, hugely

19  complicated, and I can't do it.  You're going to have to find

20  somebody else.

21          Now why is it hugely complicated?  Well, when you are

22  starting a startup, and 80 percent of startups fail in the

23  first year, and most of James' had failed, but some of them had

24  succeeded, and everybody losses all their money, but when

25  you're starting a startup, normally you will trade stock for

1    investment capital, and it goes directly into the company, and

2    there's no taxes paid.

3            The Swiss guy told him you get the money and then put

4    it in the company.  Well, if he gets the money, and then puts

5    it in the company, it is taxable.  It caused a huge tax

6    liability that James had no clue he owed, and the first thing

7    the Government will fail to prove, beyond any doubt, but they

8    only have to prove it beyond a reasonable doubt, is that James

9    understood the tax laws.  Because nobody, nobody would

10   intentionally misdo the paperwork and owe taxes if you can do

11   it correctly and avoid the tax.

12           And a few times Ms. Parker accused Jim of avoiding

13   taxes.  That is legal.  It is evading taxes that is illegal.

14   Every CPA that gets hired is told get me the best deal you can

15   honestly, and that's their job.  And, yes, you can create

16   things that increase your taxes.

17           Now, I agree with Ms. Parker on this, and the judge

18   will give us our instructions and our orders.  We may agree or

19   disagree with the confusion in the law itself.  It doesn't make

20   sense why if you do your paperwork right, you owe no taxes, and

21   if you do your paperwork wrong, you owe $500,000.  It doesn't

22   make sense.  That's not for us to deal with.  The only question

23   is did he understand fully and completely his obligations, and

24   knowing them, decide to screw himself up so that he owed more

25   money than anybody else would give it.

1          Later on you're going to find with better tax
2   advisors, he doesn't owe the money.  There's no possible way.
3   The Government would have to say that he's an idiot, and he is
4   no idiot, to intentionally pay more taxes than he owes, to
5   intentionally create paperwork that makes him pay more than he
6   owes.  That's the basis of the case.
7          So James is preparing to move back -- oh, the name.
8   I think I said this the other day, but he's been Jim Pieron all
9   his life.  Then he got in the Army and he became Jim Pieroini
10  (ph), because that's what the commanding officer called him.
11  Pieron.  You don't get to choose in the service what the
12  commanding officer calls you, and so he's James to them, and
13  he's kept his legal name since then, so you may see some
14  confusion; sometimes he's Jim, sometimes he's James.  That's
15  the reason why.  He's not trying to hide his identity.
16         So Jim has to find someone to prepare the complex
17  returns where one investor, over a period of four years, put
18  $15 million into his company.  Now, part of that money -- one
19  of the companies that he got 35 percent ownership, and I'll
20  guarantee, when an investor puts money in a company for stock,
21  you don't get to say, I'm going to do whatever I want with the
22  Mercedes.  You don't get to do that.  You don't get to say to
23  the investor, I'm going to use your money to pay my taxes.  You
24  don't get to do that.
25         So he hires a company, finds a company called ATS

1    which advertises a lot and says we can do just about anything,
2    and we've got the best preparers and the best lawyers and
3    everything, and he doesn't know this, many people have turned
4    him down.  Some of the people have turned him down because the
5    investor -- he had several investors, and the investors wanted
6    huges amount of paperwork, huges amount of stuff, a lot more
7    stock, and one investor wanted almost nothing, and so he took
8    that investor, and he said I'll move instantly.
9         So the utilities had been turned off, the
10   refrigerator was empty and he took the guy that says just sign
11   this tiny piece of paper.  Well, that guy was not an honest
12   man, and when that guy got involved, the bank that was doing --
13   I'm going to talk about two main business areas for James.  The
14   bank that was doing -- working on his -- on his algorithm said,
15   I'm sorry, we like you, but we're not going to do business with
16   you anymore and it put the company under.
17        So there's two things that James was doing in this
18   time.  One of them was -- he's doing so many businesses it's
19   not funny.  When the Government complains that money is moving
20   back and forth, money's not moving to Switzerland.
21        If the Government -- the Government is claiming --
22   we've all seen the movies about people going to Switzerland and
23   moving their money to Switzerland.  The money's coming from
24   Switzerland to the United States.  If you're going to cheat on
25   your taxes, you don't -- thank you.  Thank you.  Sorry about

1  that.  Thank you very much, sir.

2        If you're going to cheat on your taxes, you don't

3  move money from Switzerland to the United States.  You move

4  money from the United States to Switzerland.  He wasn't trying

5  to cheat on his taxes.  He was trying to get -- raise as much

6  money as he could to run his different brands.

7        One of the brands -- and that's what I did up here --

8  the Government said that he had this luxury car, a Mercedes.

9  Well, it's a pick-up truck, and it was owned by Komplique,

10 which he no longer had dictatorial control over, and Komplique

11 designed women's swimwear and women's swimwear had luxury

12 events.  James would play during some of the events the piano.

13 He learned to do that in the military.

14        James had to have a certain level of high quality to

15 get the swimwear sold.  The swimwear brand, yes, it owned

16 the -- the company did own the Mercedes, and the Government

17 knows that.  The Government's been following this guy for 10

18 years now.  Everything he does.  They followed the office

19 manager in that Mercedes as she drove to the hair salon, nail

20 place, and they followed her there, and that's in this

21 gentleman's -- who's sitting at the table, he followed her

22 there.  They're following everything and their family.  They're

23 followed everybody and him.  They followed the Pieron family in

24 Germany, and it turns out -- and there's records on that -- and

25 they weren't related to Jim in anyway, but they've been

1   followed.

2           So they know that it was owned by Komplique, and they

3   know that it was used by Komplique, and did James ever haul the

4   boards and bags and boxes and swimsuits and stuff in that?

5   Yes, he did.  That's what it was for.  It was intended to be a

6   luxury brand.  The investor knew about it and approved of it.

7           But when the Government says that James lied on his

8   report -- first of all, they said he lied and said the company

9   was worth $1,000 and they own a Mercedes.  That's just not --

10  that's just not fair math.  The company had -- was not worth

11  $1,000.  It had negative value.  It was worth a minus value.

12  They had salaries they had to pay.  They had bills they had to

13  pay.  They had sort -- huge obligations, and the -- the -- the

14  car -- if you own a house and you have a $100,000 home, you

15  have $50,000 worth of debt, you have $50,000 worth of value.

16          If you own a home that you paid -- borrowed $100,000

17  for, or paid cash for it, and it drops in value to 50,000, you

18  don't have -- you don't have $50,000 worth of value, and that's

19  just not an honest accounting.  But here's the thing, it's kind

20  of throwing us off the whole case.  It doesn't matter what you

21  put on the statement, it doesn't raise your taxes a penny or

22  lower them a penny, so it's kind of a rabbit trail.

23          And when the Government complains that he didn't get

24  all the materials to the first taxpayer -- to the first tax

25  preparer, that doesn't mean anything either.  He told her he

1    had $9 million of capital gains.  That's it.  Anything you

2    don't add to that lowers your taxes; doesn't raise your taxes.

3    So most of us aren't prepared to go back six, seven, eight

4    years and prepare tax returns.  He did it.  And he -- when he

5    did it, it was a red flag to the IRS.  An honest person doesn't

6    send red flags to the IRS -- a dishonest person doesn't send

7    red flags to the IRS, an honest person might.

8         So he hires ATS and Carol Nathan gets it, and I've

9    never met her, I've never talked to her.  I wouldn't be able to

10   recognize her, you know, in the courtroom until I get an

11   introduction, but what we know about Carol Nathan is that she

12   never told Jim, after he talked to the highfalutin salesman,

13   she never told Jim she was not a CPA.  She never told Jim she

14   was not an enrolled agent.  She never told Jim that her total

15   tax education was at one of those window shops H & R Block or

16   Hewlett, whatever -- I'm getting the name wrong -- but she had

17   worked for them, and they take a short course, and she had one

18   accounting course in college, which did not include taxes.  She

19   was an education major.

20        And I'm not saying she wasn't competent to do simple

21   tax returns.  I just don't know.  I am saying she was not

22   competent to do this tax return, no way possible.  And James

23   had talked to the highly sophisticated lawyer salesman, and he

24   hired that firm.  He was desperate to get someone to get this

25   stuff done, and he thought that he might owe some taxes because

1   he had on earlier years, and I've got another chart for you.

2          He started as early as 2010 overpaying the taxes, all

3   these payments, every year, and the 1,500 that Ms. Parker was

4   gracious enough to say that he was offering to pay each month.

5   He paid that for a while, in addition to all the other tax

6   payments, and every year he overpaid his taxes, and every year

7   the Government took that and applied it to what they thought

8   might be owed or might not be owed, all these, and they never

9   contacted him.  They never said anything was wrong.  They never

10  responded to him.

11         The Taxpayer Bill of Rights requires them to answer

12  you, and it requires them to answer you politely, which we know

13  sometimes they fail to do.  So he's made massive amounts of

14  payments before the return was filed, because he had trouble

15  getting someone that would file the return for him, and after

16  the return was filed, the payments never stopped.  The $1,500 a

17  month payments were made because Mr. Pavlik told him -- and he

18  was nervous about Ms. Nathan.  He was nervous, and he told her,

19  I need -- I want to talk to a CPA, do you mind?  She says, no,

20  go ahead, but I can do it all.  I don't need the help of a CPA,

21  and he's in contact with one of the top CPA's in the state of

22  Michigan, and he's trying to get him to take over.

23         And Mr. Pavlik is very good, has a great reputation,

24  has top flight credentials.  He's also hard -- he's also hard

25  to hire, but when James met him he knew this was a man he could

1  trust.  This was a man who had all the credentials, so he's

2  asking them to get touch, and she doesn't think she needs any

3  help, she's not in over her head, but -- and she doesn't bring

4  in any of the attorneys but she -- oh, this is a huge

5  organization, which is now out of business, and operates -- all

6  the people operate under different names now, a huge

7  organization doing lots of advertising, we can fix anything,

8  we're experts in anything, and they don't have any CPA's

9  working for them.

10         All the tax returns in this huge organization go to

11  Ms. Carol Nathan.  She's the one that's supposed to do all the

12  work.  Nobody knows that.  They don't tell you that when you go

13  and hand them your money and hire them.  So he wants to get

14  that return filed, he's desperate to get a return filed, and

15  what Ms. Carol Nathan should have done is attached, as

16  Mr. Pavlik did to everything he wrote, attach an explanation to

17  the tax return.  The top flight people do that when it's

18  confusing or aggressive or unusual.  They will type out their

19  theories and reasons why the return will have to be amended.

20         You want to get it on file as fast as you can.

21  There's penalties and interest for filing late, which he's

22  paid.  There's penalties and interest for not filing, which

23  he's filed, and there's penalties and interest on paying late.

24  The more you get filed, the sooner you lower the penalties and

25  there, but they're huge.  They're humongous penalties and

1    interest, so he's desperate to get stuff in and to start

2    payments out.

3              So even before this return is filed, he's starting to

4    make payments.  He doesn't think he'll owe much.  He can't

5    imagine how he could owe much because he's already had five

6    years where he owed almost nothing.  He's paying himself the

7    largest wage he's ever made in his life; $7,500 a month, and

8    he's also withholding every check on that 1,700, and he's

9    thinking, you know, I'm overwithholding, I'm safe.

10             He wasn't safe.  The return gets filed.  He's in a

11   huge panic.  Mr. Pavlik says, I will work on it.  Now, the IRS

12   has something called a 1040X.  We didn't create this form.

13   It's for when the return has to be amended.  Because millions

14   and millions of mistakes are made every year on tax returns and

15   Congress has given us the ability to amend the return,

16   sometimes twice, three, four, five times.  An amended return is

17   common.  I do not believe any CPA that you would hear from has

18   never amended returns.  They do it all the time, and it's in

19   the law and the statutes.

20             Now, if you amend the returns, you go by the amended

21   return.  IRS refused to do that.  He hires Mrs. Pavlik in

22   December of 2010, but Mr. Pavlik's ability to get the work

23   filed and everything else would be later.  It takes time to get

24   this stuff done.

25             Now, here's what happens in 2011, and this is

1   something that most of us don't know about.  We all have a

2   computer file in Martinsburg, West Virginia, where the IRS has

3   everything we've every filed, all the information on us

4   attached into a computer file.  If they type in "freeze code

5   Z914" you're not allowed to -- they're not really allowed --

6   the law doesn't allow them to stop talking to you, but

7   everything at the IRS is told we can't talk to you, because

8   we're going to try to put you in prison.

9        But they don't tell us that.  It's secret.  We don't

10  know about it.  It shouldn't be.  It should have been changed

11  the when they passed the Taxpayer Bill of Rights, and you may

12  hear from some experts that say that, that this is no longer

13  appropriate, but it was done.

14       So now with this freeze code on, after him, January,

15  2012, Mr. Pavlik files the first amended return, and here's the

16  interesting thing.  He has more information, so the tax return

17  for 2008, which he's going to amend again, he's told the

18  client, shows more taxes due than the original return in 2008.

19  The tax return in 2009 shows less taxes due than the original

20  return in 2009, and so the IRS accepts the higher one here, and

21  the higher one here and refuses to process the correct ones in

22  either year, but they don't -- refusal is a polite word.  They

23  won't talk to him at all.

24       Mr. Pavlik files an installment agreement and he

25  tells James, we're going to start out, pay somewhere between

```
1   1,000 to 2,000 a month and sit down at a table and figure it
2   out what can make everybody happy.  So James, being the
3   computer guy, what's between 1,000 and 2,000?  It's 1,500.  The
4   very next month James starts making $1,500 payments, in
5   addition to the excess payments he's already making every month
6   on the board which we saw.
7            Now --
8            THE COURT:  Mr. Minns --
9            MR. MINNS:  Yes, sir.
10           THE COURT:  -- if I could take just a moment.
11           I've not been introduced to Juror No. 14, would be
12  Mr. Brancheau, am I saying that correctly?
13           JUROR NO. 14:  Yeah.
14           THE COURT:  It doesn't appear to me that you're
15  completely appreciating the opening remarks.
16           JUROR NO. 14:  No, I wasn't appreciating getting
17  selected.
18           THE COURT:  Pardon me?
19           JUROR NO. 14:  I wasn't appreciating getting selected
20  for jury.
21           THE COURT:  Yes.
22           JUROR NO. 14:  Yeah, I don't get involved in that
23  stuff.
24           THE COURT:  Well, you are now.  You've been through
25  the selection process.  Is there a way that we can make this
```

```
 1  process easier for you to pay attention?
 2          JUROR NO. 14:  No.
 3          THE COURT:  I want to make sure --
 4          JUROR NO. 14:  No.
 5          THE COURT:  -- that you --
 6          JUROR NO. 14:  No.
 7          THE COURT:  Understanding, of course, that you are
 8  selected and will remain, correct?
 9          JUROR NO. 14:  I don't know.
10          THE COURT:  I do.  I want to make sure that you are a
11  good effective juror and if there's anything that we can do to
12  assist you in that process, we will do it, within reason.
13  Would you like a break?
14          JUROR NO. 14:  I'd like to get out of here.  I don't
15  like this sitting in a courtroom all day.
16          THE COURT:  You had your opportunity to express that
17  during jury selection.  Is there anything that we can do at
18  this the stage to --
19          JUROR NO. 14:  No, I just don't like hearing gossip.
20          THE COURT:  You don't like hearing?
21          JUROR NO. 14:  Gossip, yep.
22          THE COURT:  Well, shortly we'll be hearing testimony.
23          Mr. Minns, I apologize for interrupting.  We will
24  take a break here in a little bit, but I wanted to make sure
25  we'd had a discussion with the gentleman.  I apologize for the
```

interruption.

MR. MINNS: No. Thank you, Your Honor. And this might be an appropriate time to take a short break, and then we could have -- if the Court would allow a sidebar, please.

THE COURT: Certainly.

We will take about a 10 to 15-minute morning break. Please rise for the jury.

(At 9:54 a.m., jury leaves; Juror No. 14 remains.)

THE CLERK: Sir, if you want to come around this way.

JUROR NO. 14: No, I want out of here.

THE COURT: You need to follow the rest of the jurors out, sir.

JUROR NO. 14: I want the fuck out of here. Got better things to do than come in here.

(Juror No. 14 leaves.)

THE COURT: Record will reflect the fact that we are outside of the presence of the jury.

MR. MINNS: I don't know the people in the audience, Your Honor. Would it be all right if we approached at side -- I don't know who's still in the audience. I'd rather --

THE COURT: We can handle it at sidebar.

MR. MINNS: Thank you.

(Sidebar conference as follows:)

THE COURT: All right. I'm really happy that I'm not responsible for this selection.

```
 1              MR. SASSE:  Are you aware that 13 and 14 are the
 2   alternates?  He's the second alternate, which is why nobody
 3   really --
 4              MR. MINNS:  I asked the Government if they would
 5   agree to strike him and could not get a positive response.
 6              MS. PARKER:  Well, I don't want him reading lips or
 7   anything.  I didn't know if he could see us.  We can address it
 8   but --
 9              MR. MINNS:  I have something else to add, too, if the
10   Government chooses to object to strike him, we watched when the
11   clerk administered the oath, every juror but him raised their
12   hand.  Every juror but him seemed to move their mouths and say
13   something.  He was not looking at the Court.  He did not raise
14   his hand, and he did not move his mouth.  He is not sworn in.
15   I move to thank and excuse that alternate.
16              THE COURT:  I don't think we need to thank him for
17   much, but --
18              MR. MINNS:  Well, I just don't want to be picking on
19   a juror --
20              THE COURT:  Sure.
21              MR. MINNS:  -- in front of the other jurors.
22              THE COURT:  I appreciate that.  I think it's
23   reasonably apparent, based on the behavior that he exhibited
24   with the clerk yesterday, in which I asked them to summarize so
25   that you were ma least aware of that set of circumstances, that
```

1 we have not only someone that is not going to be receptive in

2 an impartial way, but is by all appearances not competent to

3 assist in understanding any of the information.

4        He is avoiding eye contact.  He's covering his eyes.

5 He's not going to be a good juror for anyone, notwithstanding

6 the fact that we're unfortunately going to have to exercise

7 early in the case where we don't necessarily know who else may

8 have emergent problems.

9        Government have any opposition to excusing him?

10        MS. PARKER:  No, Your Honor --

11        THE COURT:  Only other question from my point of view

12 is how we handle that.  I want to make sure that we aren't

13 providing an opportunity --

14        MS. PARKER:  Incentive.

15        THE COURT:  Incentives for other -- for other folks

16 to develop unexpected problems.  And I'm also concerned that,

17 at least on the way he exited the courtroom, that he has the

18 ability to get physical.  He was -- so one approach would be

19 simply to call him directly into the courtroom, excuse him,

20 have the court security officers see him to the exit, return

21 with the jury, explain that it became readily apparent to us

22 that he was going to be an ineffective juror and they're to

23 disregard any of his comments during the course of their

24 contact.

25        MR. SASSE:  That's fine.

1          MR. MINNS:  I have one unrelated thing that I don't

2   think I brought up with the Court.  I have a medical condition

3   that I'm -- sometimes I can go 15 minutes, on a good day I can

4   go an hour, an hour and a half, and sometimes I'm normal, but I

5   have to go to the bathroom frequently.  I have been to Mayo

6   Clinic, and it's a challenging problem.  It doesn't really --

7   I'm healthy, but I would like --

8          THE COURT:  And age doesn't help.

9          MR. MINNS:  No, it's worse now than it was 10 years

10  ago.

11         THE COURT:  Not surprised.

12         MR. MINNS:  But on occasion I --

13         THE COURT:  Would you like to go to the bathroom,

14  Mr. Minns?

15         MR. MINNS:  Very good, Your Honor.  But what I'm

16  saying is this:  If on occasion when Ken is taking a witness or

17  Ashley is taking a witness, if I can very quietly walk out to

18  the bathroom and come back without interrupting in any way, I

19  would appreciate that.

20         THE COURT:  And I think we can explain to the jury

21  that there's a medical necessity for you to take a break.

22  Comfortable with that?

23         MR. MINNS:  Yes, Your Honor.  I don't really want

24  them to see me.  I try to go out because I don't want to --

25         THE COURT:  We won't let them into the bathroom, if

US v. Pieron, Jr. - TRIAL - VOLUME 2 - February 28, 2019

1   that was your concern.

2              MR. MINNS:  Thank you, Your Honor.

3              THE COURT:  You're welcome.

4              MS. PARKER:  Judge, to go back to your question, your

5   proposal, at least from my perspective, I think is a very sound

6   one, and I expect will be accompanied with some sort of warning

7   to the rest of the jurors that his behavior was exceptional and

8   we're not trying to reward bad behavior.  We expect everybody

9   else to soldier on, shall we say.

10             MR. MINNS:  I think he has a medical problem, and I

11  think that the jurors could say -- one of the jurors said very

12  substantial medical problem that was not picked up the other

13  day, but --

14             MR. SASSE:  I think it was beyond a medical problem.

15             MS. PARKER:  I think it's attitudinal, but it is a

16  problem --

17             MR. SASSE:  It's a problem.

18             MS. PARKER:  -- of whatever magnitude or origin.

19             THE COURT:  Okay.  Let's see, anybody have the

20  correct pronunciation of his name?

21             THE CLERK:  Brancheau.

22             MS. PARKER:  There you go.

23             THE COURT:  Are you comfortable with us handling the

24  disposition of Mr. Brancheau.

25             MR. MINNS:  Absolutely, with either of my cocounsel

1  or both of them.

2  THE COURT:  Very good.

3  (Sidebar conference concluded.)

4  THE COURT:  Would you gentlemen assist us with

5  retrieving Mr. Brancheau.

6  (Juror No. 14, Mr. Brancheau, arrives; outside the

7  presence of the remaining jury.)

8  THE COURT:  Mr. Brancheau?

9  JUROR NO. 14:  Yeah.

10  THE COURT:  You appear to be a reluctant juror.

11  JUROR NO. 14:  Right.

12  THE COURT:  How did you get through the day?

13  JUROR NO. 14:  I -- I told them that I was a

14  diabetic.  I don't feel good before they select me, and they

15  still selected me.  I don't feel good and my stomach and --

16  I -- I had the runs today, and I don't know, today's my day I

17  don't feel good, you know.  I take medicine.  I take shots.

18  THE COURT:  How did you got to court?

19  JUROR NO. 14:  Bus.

20  THE COURT:  You have a concern with respect to your

21  medical condition and your ability to focus on the evidence?

22  Is it going to be hard for you to listen?

23  JUROR NO. 14:  Yeah, it is sometimes -- sometimes my

24  foot hurts here.  I got pain pills at home I take.

25  THE COURT:  Do you have a way home?

1           JUROR NO. 14:  Yeah.

2           THE COURT:  I've had a chance to speak with the

3  attorneys, both for the Government as well as the defendant.

4  We believe that it's appropriate to excuse you from service on

5  the jury.

6           JUROR NO. 14:  Okay.  Thanks.  Because, you know,

7  sometimes -- sometimes I get dizzy, or sometimes I get tired,

8  like I'm tired today.  And I got to go to the bathroom, you

9  know, and -- thank you.  Yeah, I got toes amputated.  I had to

10 retire two years ago.  I don't know if I'm coming or going

11 sometimes.

12          THE COURT:  Well, we appreciate your attendance.

13 These gentlemen will see you out.  You'll be excused from the

14 further service on the jury.  Thank you.

15          JUROR NO. 14:  Okay.  Thank you.

16          THE CLERK:  Do you have anything else in the jury

17 room?

18          JUROR NO. 14:  I got my jacket and sweatshirt, so

19 they'll take me back.

20          (At 10:08 a.m., Juror 14 excused.)

21          THE COURT:  We'll take our brief recess right now.

22 Just to update counsel, the gentleman had essentially locked

23 himself into the men's room, was not responsive to any of the

24 inquiries.  As a result, the jury, either on their own motion

25 or otherwise, simply went out to one of the other narthex

1  sections of the building where they remained until he exited,

2  and they will be at this stage going back to the jury room for

3  a short period of time, while we take a recess because they

4  want to get back to Mr. Minns' opening statement.

5        MR. MINNS:  Thank you, Your Honor.

6        THE COURT:  So about five minutes and we'll return.

7        Record's closed.

8        (At 10:10 a.m., court recessed.)

9        THE COURT:  Counsel, before we entertain the jury,

10  pursuant to our discussion at sidebar, we'll try to provide the

11  jury with an explanation for our decision that, as I believe

12  one of you said, doesn't furnish an incentive for other jurors

13  to develop problems, and then we will pick up with your opening

14  statement, sir.

15        MR. MINNS:  One more thing, Your Honor, I apologize,

16  this just came off -- I've shown it to the Government, but we

17  don't -- the client's staff made this, and we just got it a few

18  minutes ago, and it's one chart that we don't have a small one

19  to hand the Court.  It's a list of fees and things he paid CPAs

20  and attorneys to help him with that.

21        MS. PARKER:  I don't know the relevance of it.  I

22  mean, I don't -- he apparently wants to use it in his opening

23  statement?

24        MR. MINNS:  State of mind is this whole case and if

25  someone's trying to follow the law, paying a whole bunch of

1  money to people to tell him what the law is is extremely

2  exculpatory.

3          THE COURT:  I don't -- if you don't have any

4  difficulty with the accuracy of the information --

5          MS. PARKER:  I do.  I have no idea the foundation for

6  any of it.

7          THE COURT:  All right.

8          MS. PARKER:  We have nothing supporting this.  We

9  have no reciprocal discovery that enumerates anything that's on

10 that chart.

11         THE COURT:  You'll have a chance to review it in

12 preparation for closing statements, then.  We will please not

13 use that until the Government has had a chance to review it --

14         MR. MINNS:  Yes, sir.

15         THE COURT:  -- and I'm assuming that in reciprocal

16 discovery that there has been supporting evidence for those

17 numbers furnished to the Government?

18         MS. PARKER:  There has not.  There has been no

19 reciprocal discovery supporting any of those charts that have

20 been provided and shown already two of them to the jury.

21         MR. MINNS:  I disagree with that.  I -- this may be

22 the case but, yes, most of those records came from the

23 Government.

24         THE COURT:  The jury, please.

25         (At 10:25 a.m., jury arrives.)

1          THE COURT:  I told you you'd get a handle on it.  You

2    nailed it.  We are at this point without Juror No. 14.  My

3    understanding is that he was a bit less than cordial to you,

4    and that as a result of that and our conclusion that he was not

5    going to be an effective and impartial juror, we excused him

6    from service.

7          I do want to make a note, however, that that should

8    not be considered an incentive on your part.  You are sworn as

9    the jury to try the case, and absent a true legitimate

10   emergency, you're with us for the balance here.  So please be

11   seated.

12         Mr. Minns, we apologize for the interruption, if

13   you'd like to continue, sir.

14         MR. MINNS:  Thank you.

15         May it please the Court, I get the word wrong so I

16   had to write it down, derivatives.  This is not going to be a

17   brilliant explanation of what derivatives are, but it's what

18   James has done since he started his own company.  It is not the

19   fashion business, which he no longer has any interest in.  He

20   still has an interest in it.  It was just bought out.  He

21   doesn't own any of it, and it was bought out for next to

22   nothing.

23         But derivatives.  So when we say we want to buy a

24   share of stock, say it's Apple or Google or whatever, someone

25   says I offer -- this isn't the correct figure, $200 for the

1   Apple stock, and someone says I will sell my Apple stock for

2   $199.95, and what you see on the boards are the highest offer

3   and the highest sale price, and they connect.  They meet and

4   then a sale is conducted, but there's something called

5   derivatives, and they don't work that way.

6          And the stock market is tiny compared to the

7   derivative market.  The derivative market moves dollars into

8   pesos, pesos into Swiss francs, dollars into British pounds,

9   and it is 100 times larger than -- the derivative market is 100

10  times larger, but it's not so clean.  There could be a thousand

11  different prices in one minute, in one nanosecond for Swiss

12  francs, and at the same time three or 4,000 for dollars and you

13  don't get to see them.  There's no central organizing

14  mechanism.

15         So what James completed, and his military computer

16  work, his college, it all came into that, he completed an

17  algorithm which would allow a near instantaneous connection

18  with the best price.  The UBS Bank made a fortune waiting

19  tenth, hundreds of a second to buy or sell, so if you put your

20  money to them, a dollar, and I want to have the same amount in

21  Swiss francs, maybe it's 99 cents, and they hold it a

22  nanosecond, and it goes down to 98.999, and they make that

23  money.  They hold it that nanosecond routinely.  But if it goes

24  up, they say, oh, we can't make your offer, it went up to

25  999.00001, and as normal consumers we don't see that.  It's so

 1   fast we can't see it.

 2          So James invented an algorithm which would allow

 3   people to see it in realtime, and the algorithm went in

 4   milliseconds, that means a thousand computations a second, many

 5   milliseconds.  That's humongous.  That's old fashioned now, but

 6   milliseconds allowed him to create this device, and it was

 7   worth a fortune.  You couldn't use it unless you had a lot of

 8   money, because you had to have a connection with a major bank

 9   that had connections with all the different banks, and you had

10   to have many millions of dollars to have the money on file to

11   get it.

12          But Terry, the billionaire that ended up buying this

13   at a fire sale for a quarter of a million dollars, it saved him

14   more than 7 million a year, so it was very valuable.  It wasn't

15   valuable for me or you all if you want to go to Mexico because

16   you've got to have millions and millions of dollars, and James

17   was bothered by that.  And several years later he came up with

18   a solution once computers could calculate in microseconds,

19   millions of computations a second, and he created an algorithm

20   which fit on an iPhone, and it's being sold in Hong Kong as we

21   sit here, but it is not available to American citizens.  James

22   missed the grand opening because he was not able to leave

23   because of the IRS investigation, so he missed -- he missed

24   that.

25          I'm -- it's important to understand these things are

1   valuable, and people weren't making huge investments through

2   something that didn't have a great deal of value and great deal

3   of uniqueness, and there's a huge demand if you want to go to

4   Mexico or Canada and you want to convert your money and not

5   sending that money off to let the large bank -- and those of

6   you who've gone through airports, you know that they go huge,

7   huge differences, you can't even keep track of it.  So this

8   algorithm allows people to keep track of it.  There's people

9   that don't want to it on the market; there's people that want

10  to own it, so now I'm backing up on the -- I'm backing up on

11  there.

12          At this time, there's a time period where James is

13  actively -- major business is in the earlier version, and it is

14  making money, and he is employing people, and the state of

15  Michigan has asked him to -- one of the reasons he came back,

16  they've asked him to come here and set his business up in

17  Michigan.  This is his home.  And he employed a whole bunch of

18  his Army buddies and people that he admired greatly who had

19  done things that he had not done, and he wanted to help them

20  out.

21          And we're at this period now where Pavlik has filed

22  the 1040X.  Now, the Government has said they accept the

23  validity of the returns, even though they're not accurate, and

24  that's one thing that we agree on.  The Carol Nathan returns

25  were not accurate.  The Pavlik returns were extremely accurate,

1    but they did not take advantage of unique new law, which

2    Mr. Pavlik can explain far better than I can.

3            And in January of 2012, Mr. Pavlik filed the

4    installment agreement, and according to the Taxpayer Bill

5    Rights, the IRS is required to say yes, no, or we'll take this

6    or we don't like this on your agreement, we won't do this.

7    They refused to respond.  Now, no one new exactly why, but the

8    reason, they had frozen him out.  I apologize.  What did I do

9    with my red pen?  Sorry.  I apologize.

10           The freeze code, the secret freeze code, they had not

11   responded, but they still had an obligation to tell Mr. Pavlik

12   we won't take it.  At that point in time, March 2013, James was

13   on the verge of the second, far more useful to us, but not as

14   useful to the big people, the millisecond, and he tried to sell

15   the company, because there was a period shortly around there

16   where his wife had a miscarriage, and he was upset.  He wanted

17   this over with.  He didn't care what it cost, or what he had to

18   do to get it.

19           He had law firms working on it.  He had -- this is

20   five -- no, this is six years ago, more than six years ago.

21   No, about -- well, it'll be six years ago when we hit March.

22   He's trying to solve this problem.  He's hired Mr. Pavlik, who

23   is one of the finest CPA's in the state of Michigan.  Highly

24   recommended.  Some of you may have remembered the rave reviews

25   that he got from some of the other members of the jury on the

1 first day, who are not with us anymore.  But Mr. Pavlik is a

2 highly qualified CPA, expert, has never had an amended return

3 rejected in his career.

4 　　　　The IRS doesn't even respond.  James is having panic

5 attacks.  I don't want this over my life.  We want to have

6 kids.  We want to get moving, and he can't sell the company

7 because no one will buy the company because it isn't working

8 yet.  The algorithm on the iPhone isn't working, and it won't

9 work.  It won't work until all the way into July 2018.  He will

10 not have cracked that and figured it out how to make it work

11 until then, so he can't even -- he can't get anything for it.

12 　　　　Now, Mr. Pavlik files another amended return for the

13 2011 year saying that this company was worth a fortune and he'd

14 lost it because the banking contact got dismissed, and he lost

15 it because of the person who had been the original investor and

16 he gets nothing for it.  So he files this --

17 　　　　THE COURT:  Sir, I'm not sure, because of the break,

18 that you've had a chance to actually identify the name of the

19 business for the jury.

20 　　　　MR. MINNS:  I'm sorry, Your Honor.  The -- may I go

21 to counsel table?

22 　　　　THE COURT:  Sure.

23 　　　　(Off-the-record discussion.)

24 　　　　MR. MINNS:  ILQ.  Thank you, Your Honor.  That was

25 malpractice, I apologize.

1          The business that he's trying to get now is ILQ, and

2    he has tons of funding for it.  People want this invention, and

3    the same billionaire that paid $250,000 for the earlier -- is

4    financing the thing, and he's financing this ILQ business, and

5    he expects it to succeed, and, in fact, it is now on the verge

6    of success in Hong Kong, and God willing it'll be a success in

7    the United States.

8          So -- oh, and this is really important, too, no tax

9    is due for the investment this time, because it's done

10   correctly.  Because he's met experts who know how to do it

11   correctly, and no tax is due and he pays his -- gets his salary

12   from the company and pays.  So if -- if Mr. Pavlik or any of

13   the other experts had been representing him back here, we

14   wouldn't be here.  We wouldn't be here because no tax would

15   have been due ever.

16         And -- and right or wrong, that's the law, and ILQ

17   doesn't cost taxes when this investment money comes in, and for

18   the Government to suggest just because he received the

19   investment money he can do anything he wants with it, pay his

20   taxes, do that, that's just not so.

21         The Government has said he bought a motorcycle.  He

22   bought a motorcycle with the money that he had from his $7,500

23   a month, which is not a small amount of money, but the -- the

24   amended return that Mr. Pavlik creates and files -- and the

25   Government said we're accepting all his returns.  I don't know

1  what they mean by that.  I think what they mean is they accept

2  the returns if they like them, and it says they owe a lot of

3  money, but if they don't like the return, they don't accept or

4  reject.  They don't say anything.

5          Mr. Pavlik files this return, and no response at all

6  from the IRS.  We're waiting.  Do you agree with us?  Do you

7  disagree with us?  Do we still owe this money that we

8  incorrectly claimed earlier?  What's the deal?  Talk to us,

9  please.  No.

10         So in 2014, Mr. Pavlik tries to reach out to them

11  again.  He files a doubt as to liability, another form,

12  offering to pay a small amount of money because he says we

13  don't owe anything.  If you get a penny, you're getting more

14  than is owed, and this is a form created by the Federal

15  Government, and what does the IRS do?  They say, nope.  Yes.

16  Well how about this?  Let's sit at a table.

17         And remember, they're required under the Taxpayer

18  Bill of Rights to sit down and talk with us in a pleasant and

19  decent manner, and to listen to what our experts say.  They

20  don't have to agree with us, but they're required -- no, we

21  will not talk to you about this.  We will not respond.  We will

22  not process this.  We're just going to hold it, and we're going

23  to keep sending you bills for one 2008 return and one 2009

24  return, and we're choosing the amount that is highest on each

25  one.

1          Yes, you raised it for one year, we accept that.  We

2    processed that.  We -- you lowered it for the other, we reject

3    that.  Once you said you owed these two figures, we will never

4    let you file the 1040X.  We're treating you a little

5    differently than we're going -- than the law says to treat you.

6    We're treating you -- we're giving you the freeze code.

7          So now the Government's investigation continues.

8    There's no surprise.  There's no communication, but they're

9    following his family members.  They're following people that

10   have the unfortunate habit of having the same last name but no

11   relationship.  They're following his office manager to the

12   beauty parlor.  They're following everybody, so they know

13   something's not good.  And all of a sudden, the Government, in

14   2015 -- can you imagine that -- they say, hey, we can't compute

15   stuff.  We're not going to talk to you.  We're not going to

16   listen to your experts.  We're not doing anything, but we want

17   all your Swiss records.  We can't get them.  We want all of

18   them.  We're going to calculate things.  They don't tell them

19   why they want it really.  They just say we want all of them.

20         Now, what would a crook do?  He'd say, no.  He'd say

21   no.  No.  Jim gives them every page he has, every page he can

22   finds; 4,526 pages of bank records, he hands them over to them.

23   This is almost four years ago.  And he says, oh, thank God.

24   They're at least asking for something.  Maybe this thing will

25   come to some kind of conclusion, and I've got my -- no, I don't

1  this is a correct day.

2          Nothing happens for two years.  No response on the

3  return that you don't owe anything.  No response on the

4  installment agreement.  No response on the amended return.  Two

5  more years.  We're starting -- no response on all this extra

6  money.  IRS said why are you sending in extra money.  No

7  responses at all.

8          Now, the Government says to Mr. Pieron, they say,

9  Mr. Pieron, we want you to spend an entire day with two special

10  agents and a handwriting exampler (ph).  Would you do this and

11  drive out there and spend the time with them making handwriting

12  pages over and over and over and over again?  I can't honestly

13  tell you what I would have done if I had been representing him

14  at that time.  I never knew his name or never knew the

15  algorithms or understood anything at all about it, so this is

16  before any of the current team is available.  He goes into the

17  office and spends an entire day.  One of the gentleman is

18  sitting at the counsel table here, and there's another IRS

19  special agent sitting there all day long and he does that all

20  day long.

21          Now, we're moving closer to the present and, finally,

22  James' invention is getting really close, and the same

23  billionaire that funded that is wanting more of the company and

24  he makes an agreement with James.  If you sell me control and

25  let me move it to Australia, I'll give you some money.  And

1  James said he'd do that as long as he didn't close down the

2  Michigan office and let go all his -- all his military buddies,

3  so they made the deal and got the money.

4          Shortly after he got the money, there's a bill from

5  IRS for 2008.  Now, it's not the original 400 anymore.  The

6  bill is $627,244.62.  Bear in mind, Mr. Pavlik does not believe

7  he owes that.  Jim does not believe he owes that.  He pays it

8  anyway.  He uses the sweat from his business, and he pays it,

9  the whole thing, and that was the next to last figure on that

10  long, long chart of payments that he's been making to get this

11  off his back since 2010.

12          It's still a concern to him, and at this time you can

13  throw us in or tell him you don't talk to these people under

14  any circumstances, but he says, I need security.  All the other

15  lawyers and CPA's didn't get it for me, and he goes to the IRS

16  office, and he sits there for an entire day.  Employees, 70

17  people not having the boss around, but he stays there all day

18  trying to get an appointment with someone to figure out if he

19  owes something else, or if they claim -- not if he owes, he

20  doesn't believe he owes, but he doesn't care anymore.  He wants

21  this off his back.  So if I owe something, if you say I owe

22  something, I want to pay it.

23          And at the end of the day they give him a toll free

24  number.  They say, we can't help you here.  Now, is that

25  because of the freeze code?  Is that because of something else?

```
 1  We don't know.  He finally gets somebody on a telephone who
 2  gives him a number, and he writes out a check for that number
 3  in September, but that's after the indictment.  That's for
 4  2009.  He writes that check out.  Now, during the phone call
 5  they hang up on him.  He's not certain what he's heard or not
 6  seen.  He can't get anybody else on the phone now, so that's
 7  what he does.
 8          And on July 18th, very important day, two things
 9  happen; our Government indicts him for criminal conduct,
10  threatening everything that he has, and he gets a receipt from
11  the IRS computer congratulating him, you don't owe anything for
12  2008.  You're paid in full for 2008.
13          And there's something else that happens on that same
14  day, which is four months after the payment has come in.  The
15  gentleman sitting at the table there is asked, has he paid his
16  taxes?  Because we're talking about 2008 and 2009.  And the
17  question is asked, that gentleman sitting at the table -- it's
18  not really a question, it's kind of an answer.  He's telling
19  him what to say.  "He has not fully paid his tax liabilities,"
20  and the gentleman under oath say, "He has not."
21          The gentleman under oath does not say to the grand
22  jury, well, he's paid 2008, every penny we've asked him for.
23  He doesn't say that.  He doesn't say, there's some he hasn't
24  paid, we don't agree with him.  His answer is, "He has not."
25  And the next question is, "Has he ever made full payments of
```

1   those taxes?"  And the answer, under oath, which is not true,

2   is, "No."  Except that's the same day that four months later

3   the IRS is sending him a tax for the calendar year 2008 saying

4   he's paid in full.

5          This is a disputed balance.  He doesn't owe a penny

6   in tax under anybody's calculations.  The IRS has decided if

7   you file a bad tax return owing up to more than you actually

8   owe, we will process it.  And if James files a good tax return,

9   they will ignore it.  I mean ignore it.  They won't talk to

10  him.  They won't talk to his representatives.  They won't do

11  anything.  The only real response that he ever got was this

12  indictment.

13         So the Taxpayer's Bill of Rights says that taxpayers

14  have a right to know what they need to do to comply with the

15  tax laws.  They're entitled to clear explanations of the laws

16  and IRS procedures and all tax forms.  They have the right --

17  taxpayers have the right to receive prompt, courteous and

18  professional assistance in their dealings with the IRS, to be

19  spoken to in a way they can easily understand, to receive clear

20  and easily understandable communications from the IRS and to

21  speak to a supervisor about inadequate service.

22         Taxpayers have the right to raise objections and

23  provide additional documentation.  The 1040X is additional

24  documentation.  To expect the IRS will consider their

25  objections and documentation promptly and fairly, and to

1  receive a response if the IRS does not agree with them.

2          Taxpayers are entitled to fair and impartial

3  administration -- administrative appeal of most IRS decisions,

4  including penalties and have the right to receive a written

5  response regarding the office of appeals' decision.

6          So as we sit here in the courtroom today, we've put

7  the cart in front of the horse, because there is no audit.

8  They've never agreed to one.  There is no appeal.  They've

9  never agreed to even give him his appellate rights.  There is

10  no agreement that he owes a tax.

11          And the first thing that he understood this complex

12  law, beyond all reasonable doubt, and intentionally tried to

13  break this complex law, we know for certain that's not even

14  possible.  Because if he knew when he first set these companies

15  up that he would not have to pay a penny in tax if he filed the

16  paperwork correctly, he wouldn't have filed it incorrectly.  So

17  he's paid money that he shouldn't have owed, that other people

18  in the same position have not paid.  He's paid it.  He's made

19  payments.  He's been tormented for a decade now, he and his

20  employees, they're followed wherever they're going.

21          And just as an end result, he never stopped paying,

22  but when he sold controlling interest of his invention, he paid

23  this humongous bill.  And bear in mind, this is not even what

24  the IRS said he originally owed, 627,000.  This is what he --

25  this is what the incorrect return said in 2010, 400,000.  This,

1    is a 50 percent penalty and interest on that alone.  There's no

2    possibility that this man owes an income tax.  There's no

3    possibility that this man tried to run away.

4             Is there mistakes in paperwork?  Constantly.

5    Absolutely.  Over and over again mistakes in paperwork, but

6    there's no mistake in the income.  He has told them what he

7    got.  The mistakes in paperwork hurt him.  It doesn't hurt the

8    Government, and none of these mistakes lowered -- lowered the

9    tax.  The mistakes raised the tax.  None of these mistakes

10   increased his availability.

11            We have no burden to prove anything.  The Government

12   must prove -- the Government has alleged in its indictment that

13   as of current date, the current date may have been July 18th,

14   2018, or it may be today, it's not very clear to me, but it's

15   been read to all of us, and it'll be read again, that he has

16   not paid because he's trying to skip out of his 2008 and 2009

17   tax return.

18            And the Government wants some jealousy from us.  They

19   want jealousy.  They say his company had this Mercedes, when

20   the billionaire financed it.  The billionaire bought a Mercedes

21   for the new company that James doesn't even have controlling

22   interest in.  Why didn't James grab that stuff?  Well, it just

23   doesn't -- doesn't work that way, and it wouldn't make a

24   difference anyway.

25            When you're talking about $627,000, $18,000 is a drop

1  in the bucket, particularly when you have the right, you have

2  the right to installment payments.  If they don't agree, they

3  have to say no.  You have the right to negotiate if there's not

4  a clear circumstance of tax debt, so all of his civil rights

5  have been violated.  All of his tax responsibilities -- the

6  Government has said no to every responsibility that they've had

7  to him.  We're not going to answer for it.  We're not going to

8  give a reason.  We're just going to ignore you, haunt you,

9  shadow you, chase you, ruin your family's life, and we're not

10 going to answer, but that's not the way it's set up.

11         It's set up to where we file a return, if there's a

12 mistake, or if the person didn't do it right, we can file as

13 many amended returns as we want.  If we think we don't owe, we

14 have a right to tell them that.  We don't owe this.  We have

15 that right.  And they've taken it all away from him.  They've

16 taken his rights away from him.

17         This trial, God willing, has to end in not guilty,

18 then hopefully they'll give him his audit, and then they'll

19 either agree with his audit, or they'll disagree, and if they

20 disagree, and then he refuses to pay more than they've already

21 asked for, maybe then there's some justification behind

22 criminal charges.

23         This is an honest man, who grew up real fast.  He had

24 the ability to do something that nobody could figure out, and

25 he had the stubbornness to keep working on it and failing and

1  failing and failing over and over again.  He created an

2  algorithm that could make everybody's life better if it gets to

3  the American market, and it's all on the verge of destruction,

4  the business, everything else.

5       And you're here and he's here, because on July 18th,

6  2018, under oath, the IRS's position was has he ever made full

7  payment of those taxes, meaning 2008 or 2009, and the answer --

8  and the answer should be, yes, he's made 100 percent full

9  payment more than he has, but the answer for 2008 is

10 100 percent certain, no guessing.  Yes, he'd paid.  He's paid

11 with his 10 years of toil over the one successful company that

12 he had, and giving up control of, but he's still fighting to

13 make this thing finish and work.

14      I thank you for your service here.  God willing we

15 get to keep doing this for the rest of my life, and we can't

16 have a free country without jurors.  Thomas Jefferson said that

17 the jury system was intended to bind the Government up in

18 chains to prevent them from doing the mischief that governments

19 so often like to do, and I may have misstepped some of the

20 words.

21      I thank you very much.  There is no alternative but a

22 not guilty on this, and they have to prove beyond all

23 reasonable doubt that he knew somehow what the law was when he

24 got messed up, that he's known all the way through here, and

25 that he's trying to break the law, and there's no possibility

```
 1  of that.   The facts are just overwhelming.   Thank you.
 2              THE COURT:   And thank you, sir.
 3              Government, first witness, please.
 4              MS. PARKER:   Thank you, Your Honor.   The Government
 5  calls Robert Miller.
 6              (At 10:59 a.m., sworn by the Court.)
 7              THE COURT:   The witness stand in this courtroom is on
 8  your far left.   If you could have a seat there, please, sir.
 9  The other thing I would note is that the chair does not move in
10  the witness box, but the microphone does.   We find that if it's
11  about 10 inches away from where your mouth is, it works best
12  for the jury's hearing and understanding of your testimony.
13              THE WITNESS:   All right.   Thank you.
14              MS. PARKER:   Your Honor, could we have quick sidebar.
15              (Sidebar conference as follows:)
16              MS. PARKER:   Your Honor, I don't know who the people
17  are who are in the courtroom.   Several people we've subpoenaed
18  because they were associated with the defendant refused to meet
19  with us, so --
20              MR. SASSE:   I know the two that are on our side are
21  relatives of my client, who have not received subpoena as to
22  our knowledge.
23              MS. ARNETT:   That's correct.   That's correct.   I
24  don't know the left side.
25              MS. PARKER:   The one --
```

Miller - Direct                                              76

```
1              MR. SASSE:  I know one --
2              MS. PARKER:  You know the other one, she's been on
3   cases.
4              THE COURT:  The one in the corner needs to go.
5              MR. SASSE:  I would agree.
6              MS. PARKER:  Too bad he doesn't have any good work to
7   do.
8              THE COURT:  So we have two --
9              MS. PARKER:  Relatives.
10             THE COURT:  Who have not been subpoenaed?
11             MS. PARKER:  I don't know who they are.  I have to --
12             MR. SASSE:  Yeah, they are not on either list.
13             MR. MINNS:  Non-testifying relatives.
14             THE COURT:  All right.  Good.
15             MS. PARKER:  Thanks.  That's what I needed.
16             MR. MINNS:  Thanks.
17             (Sidebar conference concluded.)
18             THE COURT:  Ms. Parker, your floor.
19                       ROBERT MILLER,
20        GOVERNMENT'S WITNESS, SWORN AT 10:59 a.m.
21                     DIRECT EXAMINATION
22  BY MS. PARKER:
23  Q.   Would you state your name for us, please.
24  A.   My name is Robert Miller.
25  Q.   And just to make sure everybody understands correctly your
```

Miller - Direct

1   name, would you spell it for us.

2   A.   R-O-B-E-R-T, M-I-L-L-E-R.

3   Q.   And how are you employed, sir?

4   A.   I am an employee of the Internal Revenue Service.

5   Q.   And what are your current job duties?

6   A.   My current occupation, my current job duties, are I work

7   as a revenue agent and technical advisor.  I work with agents,

8   other agents, as well as doing examinations myself, so we take

9   a tax return that somebody filed and verify that the

10  information put in that tax return actually agreed with the

11  information that they put on that return.  So if they receive

12  tax documents, we verify that those tax documents match up.

13          As technical advisor, I work with many people who

14  have foreign bank accounts, as well as offshore transactions,

15  and advise other agents on how to work those particular issues

16  as well.

17  Q.   When you say that you're a revenue agent, is that

18  different from a special agent like Scott Hollabaugh?

19  A.   It is.  I simply work on the civil side of things, so the

20  tax computations and verifying the information that's on the

21  return is actually accurate.

22  Q.   What sort of other duties have you held within the IRS?

23  A.   As -- as of 2014 or '15, I can't remember the exact year,

24  but an FBAR coordinator -- or earlier than that I think.  I

25  became an FBAR coordinator in 2011, whenever the position was

1  created for IRS employees.  So as FBAR coordinator that's a

2  report that's filed for foreign bank accounts.  I work with

3  agents that have either discovered that a taxpayer client has a

4  foreign bank account, or they are looking at documents and they

5  have this report that's on their tax return and they're trying

6  to figure out how does that work with the information that's on

7  that return.  So I advise them, try to help them as they work

8  through these foreign bank account issues.

9  Q.   So that's another aspect of your work with offshore tax

10 issues, would that be fair to say?

11 A.   It is.  Really it's a piece of that whole thing, so really

12 I work with people who have offshore tax issues is really the

13 predominant portion of my job now.

14 Q.   And do you have responsibilities that are related to

15 dealing with those offshore tax obligations?

16 A.   Yes, I'm an offshore coordinator.  I run various programs

17 that -- or help run various programs that people have offshore

18 assets, offshore accounts, offshore businesses that they need

19 to report that they have not reported in the past.

20 Q.   And what kind of training or educational background have

21 you had that qualifies you for this type of work?

22 A.   I went to the University of Michigan in Flint and received

23 a bachelor's in business administration and got a degree in

24 accounting.  And right after that, that's when I came to work

25 for the IRS after I graduated.  So I've been a revenue agent

1   for approximately 13, 14 years; closer to 14, going on 14.

2            While I was at the IRS, I determined I wanted more

3   tax knowledge, so I ended up going back to college and received

4   a master's degree in taxations from Welch College in Troy, and

5   then also received a CPA license, hold a CPA license now.

6   Q.   And CPA stands for what?

7   A.   Certified public accountant.

8   Q.   And have you done any teaching or instructing in tax

9   related fields?

10  A.   Yes.  I taught for three -- two and a half years as a

11  community college teaching federal income tax.  I've also

12  taught numerous classes on international issues for the IRS

13  internally, teaching new agents exactly what they need to look

14  at from an international standpoint.

15  Q.   And you -- when you refer to new agents, are you talking

16  to revenue agents or special agents who are criminal

17  investigators?

18  A.   I'm speaking of revenue agents, and generally it's revenue

19  agents who have some experience but this is a new area in which

20  they're learning, so an offshore component.  So it's

21  experienced agents, revenue agents, who just don't have this

22  offshore experience yet.

23            MS. PARKER:  Your Honor, with the Court's permission,

24  I would proceed to obtain some opinion or elicit some opinion

25  testimony from this witness regarding his understanding of

1  offshore taxes and FBAR related matters.

2        THE COURT:  Noting -- noting that you may have

3  objections with respect to specific inquiries of the witness,

4  any objection to the solicitation of opinion testimony?

5        MR. MINNS:  Your Honor, we don't -- he is an expert,

6  if that's -- if she's offering him as an expert, we don't know

7  what the opinions are yet.

8        THE COURT:  Certainly.  You may proceed.  In the

9  event that there is an opinion that you believes escapes the

10  foundational information concerning his expertise, we'll take

11  up the question.

12  BY MS. PARKER:

13  Q.   All right.  Mr. Miller, are you -- as you've just

14  explained, you are familiar with the requirements for US

15  citizens and overseas tax obligations?

16  A.   I am.

17  Q.   All right.  And what are the requirements as you

18  understand them for US citizens living overseas to file US

19  federal income tax returns?

20  A.   The Internal Revenue Code says any US person must file a

21  return if they meet certain conditions.  Generally that

22  condition is a low threshold dollar amount, typically the

23  exemption amount.  But if they meet that exemption amount, they

24  must file a return, and that's regardless of whether they're

25  living in the US or living in some foreign jurisdiction.

Miller - Direct

1  Q.  All right.  And does the requirement to file basically

2  mean you have to file like the next year?

3  A.  Similar to what an individual would file.  There's a due

4  date, and it's usually between four to six months after the end

5  of the year so, for instance, if we came to the end of the year

6  2019, that return would be due sometime four to six months

7  after the end of that year, so it would be April of -- at the

8  end of '19 it would be April of 2020 to July of 2020.

9  Q.  All right.  And you used the term before of FBAR.  What is

10  that?

11  A.  It's a report.  It's not filed with the tax return but

12  it's a report that is separately filed.  That report itself is

13  a document that the taxpayer -- that the -- an individual who

14  has a foreign bank account should fill out to report their

15  foreign accounts.  So it's really a listing of what foreign

16  accounts a person may have.

17  Q.  Does that apply to people who are living in the US?

18  A.  It does.  It applies to people that are living in the US

19  but it also applies to people that are outside the US.

20  Q.  All right.  And when is that form required?

21  A.  That form is required to be filed by June 30th of the

22  following year, so similar to what our tax return is.  It's due

23  four months after the close of the year.  This form would be

24  due six months after the close of the year.

25  Q.  And is there some sort of information that is required --

Miller – Direct                                                    82

1   what -- let me put it this way:  What kind of information do

2   you need to put on an FBAR form?

3   A.   Whenever you're filling out the form, there's a top

4   section and that information identifies who specifically owns

5   the bank account, or who specifically is a filer of the

6   document I should say, so it identifies who's filing this

7   document.

8          The second half of that information identifies the

9   bank account that they have signature authority or control of

10  or ownership, and it identifies the bank account and also the

11  balance of what's in that bank account.

12  Q.   Is there anything specific about the balance aspect of

13  that disclosure statement?

14  A.   There is.  Because -- there's a threshold for it because

15  the Government set a standard, a dollar amount, to verify that

16  if you exceeded that dollar amount, you had to file an FBAR, so

17  as long as your accounts were less than $10,000, 10,000 or

18  less, you did not have to file an FBAR.  But if they were more

19  than $10,000, and that's whether it's one account or multiple.

20  You add them altogether, and if at any point during that year

21  it exceeded $10,000, you would have to file an FBAR.

22  Q.   So if you had $10,000 in one account, you have to file an

23  FBAR; if you have 10,000 -- or $1,000 in 10 different accounts,

24  you need to file an FBAR?

25  A.   That's -- that's correct.

Miller - Direct

1   Q.   And is there any kind of disclosure you need to make about

2   what is in those accounts?

3   A.   The -- there is a disclosure that you have to make.

4   There's the disclosure for the FBAR.  You have to disclose the

5   dollar value that's in there, but there's also an indicator of

6   what type of -- what type of account it is.

7   Q.   Well, with regards to the dollar value, what type of

8   information is required as to that?

9   A.   Specifically we want -- the form requires you to put in US

10  dollars the amount that is in that account.  At one point

11  historically they had ranges where they would ask you for a

12  range, but then at some point they specifically -- I think it's

13  2008 and forward, they specifically want to know the exact

14  dollar amount which was your highest balance in your account.

15  Q.   All right.  So the highest balance or maybe the high water

16  mark over the course of the year for which you're reporting?

17  A.   Correct.  For instance, if I held a bank account and

18  during the year I only held $1 in it, but as of January 15th, I

19  put a million dollars in that bank account, and then I pulled

20  that money out the same day, that bank account has reached a

21  million dollars, more than 10,000.  So even for just that

22  little bit of time that that money was in there, I would have

23  to file an FBAR to report that account.

24  Q.   Historically have there been times when banks,

25  particularly in Switzerland, wouldn't cooperate with the US

1  Government in order to obtain foreign bank account information?

2  A.   Yes, historically that's been an issue dating to before

3  2015.   2015 there was a little bit of a change in the

4  agreements, the cooperation between the US Government and the

5  Swiss Government.

6            MS. PARKER:  May I approach, Your Honor?

7            THE COURT:  Yes.

8  BY MS. PARKER:

9  Q.   I'm going to hand you some exhibits that are marked as

10 Government's Exhibit 13, 14, 15, 17, and 19, and I'd ask you to

11 take a look at those.

12 A.   Do you want me to look at all of them now or just as we go

13 through them?

14 Q.   As a group, do you recognize what type of document they

15 are?

16 A.   Yes, I'm familiar with the documents.

17 Q.   And what are they?

18 A.   They are foreign bank account transcripts, so they're

19 transcripts of the document that an individual would file with

20 the Department of Treasury.

21 Q.   Are they, in fact, transcripts of FBAR filings for a

22 specific individual?

23 A.   They are.  They're for a specific individual.

24 Q.   And who are they?

25 A.   James Pieron, Jr.

Miller - Direct                                                    85

1           MS. PARKER:  And, Your Honor, I'll offer Government's

2    Proposed Exhibits 13, 14, 15, 17 and 19.

3           MS. ARNETT:  No objection.

4           THE COURT:  Received.

5    BY MS. PARKER:

6    Q.   All right.  I'd like to ask you to take a look at that

7    very first one, Exhibit 13.  May we have that permission to

8    display, Your Honor?

9           THE COURT:  Yes.

10          MS. PARKER:  Thank you.

11          THE COURT:  And for those of you that are in the jury

12   box, if you would be careful, I would appreciate it, but the

13   screens can be lifted about 6 to 8 inches, and that will enable

14   the folks that are in the second row to be able to see the

15   exhibits a little bit better.  And we'll make sure you're

16   compensated for your work.  Thank you.

17   BY MS. PARKER:

18   Q.   All right.  Can you, first of all, just explain to us

19   briefly what a transcript.

20   A.   Sure.  When somebody files a document with the Government,

21   there's an original copy of it, and then there's a transcript

22   that's made.  A transcript really is computer generated

23   information that's on there.  So really it takes the

24   information that the person input on a form and puts it into a

25   formatted computerized version of this, which is what this

Miller - Direct

1  transcript is.

2  Q.   And you said previously this transcript is for James

3  Pieron?

4  A.   That's correct.

5  Q.   And for what years?

6  A.   Specifically the one I'm looking at right this second, it

7  is for year -- tax year -- or calendar year 2005.

8  Q.   All right.  And for -- what banks are being reported,

9  there?  What accounts?

10 A.   There are two different banks, and you can see that down

11 at the bottom half of that.  It lists account one of two and

12 two of two.  The first account one is at the Union Bank of

13 Switzerland, and the second one is also at the Union Bank of

14 Switzerland.

15 Q.   Does the Union Bank of Switzerland kind of often go by an

16 acronym?

17 A.   It does.  It does.  It's well known as UBS.

18 Q.   And what is reported as the high dollar or maximum dollar

19 amount for those two accounts for 2005?

20 A.   For -- on the transcript for this first UBS, Union Bank of

21 Switzerland, account, the maximum account value is listed as

22 $100,000.  And on the second one there is -- it just says to be

23 determined.

24 Q.   And when was that form for 2005 bank accounts filed?

25 A.   It was filed August 6th, 2012.  That's the first

Miller - Direct                                                87

1   information on there.

2   Q.   All right.  Let's go on to Exhibit 14, please.  Another

3   FBAR transcript you've already said?

4   A.   Correct.

5   Q.   What year is that one for?

6   A.   This one is for 2006.

7   Q.   And still for James Pieron, Jr.?

8   A.   It is.

9   Q.   And what kind of account is -- or accounts are being

10  reported on that form?

11  A.   In this one there are three accounts that are listed here.

12  You can see on page 2 at the top there's a Credit Suisse

13  account.  On -- also on page 2 is a UBS account, Union Bank of

14  Switzerland.  And on page 3, it's a Union Bank of Switzerland

15  account.

16  Q.   Let's go on to -- again, sorry, when was that one filed?

17  A.   That one was filed late on August 6th, 2012.

18  Q.   Let's go on to Exhibit 15, please.  That's another FBAR

19  transcript for Mr. Pieron?

20  A.   It is.

21  Q.   Pieron I should say, I'm sorry.  And what bank accounts

22  are reported there?

23  A.   There are eight total that are individually owned.

24  They're listed as financial accounts.  They are Union Bank of

25  Switzerland, JDFX Fund Limited, Union Bank of Switzerland.  On

1  page 4 is another Union Bank of Switzerland.  Page 5 is a

2  Credit Suisse account.   Page 6 is a Saxo bank account, and page

3  7 is another Union Bank of Switzerland account.  And then page

4  8 is a Union Bank of Switzerland account.  So eight total

5  accounts that are personally owned, but this FBAR transcript is

6  a little different.  This also has two accounts in which he has

7  signature authority as well.

8  Q.   All right.  And where -- what page of the form is that on?

9  A.   That is on page 8, and that starts at the bottom half of

10  page 8.  It says, information on financial accounts where filer

11  has signature authority but no financial interest in the

12  account.

13  Q.   All right.  So you have eight individual accounts and then

14  two business accounts?

15  A.   Correct.

16  Q.   And what are those two business accounts?

17  A.   Are -- could you -- ask that again.

18  Q.   What's the institution where those two business accounts

19  are located?

20  A.   The -- both of those accounts are held at JPMorgan.

21  Q.   And what's the name on those accounts?

22  A.   The name of the -- the last -- on the bottom half of -- or

23  top half of page 9, it lists the owner last name or

24  organization name of the account, and that is JDFX Fund

25  Limited.  And on account two, there's the exact same thing;

Miller – Direct

1  owner, last name or organization name, essentially the owner of

2  the bank account, JDFX Fund Limited, so both of those are owned

3  by JDFX Fund Limited.

4  Q.   What's the significance to the information that Mr. Pieron

5  has signature authority but claims no personal interest in the

6  assets in those two accounts?

7  A.   Typically what it means is they have a -- most often what

8  we see is somebody has a business interest in that account,

9  meaning they have some sort of authoritarian role, director,

10 CEO or operator of an account, but that money is owned by that

11 corporate entity, but they have the ability to sign checks and

12 be able to spend the money as they need to.

13 Q.   All right.  And is there a title given to the person,

14 Mr. Pieron, as he files this form?

15 A.   There is.  So on this form there is a section for the

16 filer.  It lists who the filer is, and that's James Pieron.

17 But at the bottom of that it says who -- what is the filer's

18 title with this owner.  So more -- essentially asking what is

19 the filer's relationship to this business entity, and it says

20 director for both bank accounts, both corporate bank accounts.

21 Q.   And what are the balances that are reported for, first of

22 all, the eight personal accounts, please?

23 A.   In the first account at UBS, United Bank of Switzerland,

24 there's $50,000 in that account.

25         On page 2 at the bottom half of that document there

Miller - Direct

1   is a -- an account at JDFX Fund Limited, and that account has

2   $8,850,000 in it.

3          On page 3 there's a bank account at Union Bank of

4   Switzerland, and it shows that there's $8 million in that

5   account.

6          On page 4 there's an account at Union Bank of

7   Switzerland as well.  That one the maximum value is 100,000.

8          On page 5, Credit Suisse, there is a maximum value of

9   9,250,000 in that account.

10         In -- on page 6 there is an account at Saxo Bank, and

11  that account has 2. -- 2,600,000 in that account.

12         On page 7, Union Bank of Switzerland, there is

13  200,000 in that account.

14         And on page 8, Union Bank of Switzerland, the report

15  shows that the maximum value was 100,000 in that account.  And

16  those are the personal accounts.  The business accounts also

17  had a maximum value as well.

18  Q.   And what are those?

19  A.   The first account at JPMorgan on page 8 shows a high

20  balance, maximum balance, of 7,500,000.

21         The second account at JPMorgan shows a -- which is on

22  page 9, shows a balance of 19,900,000.

23  Q.   All right.  Going on then to Exhibit 17, can you locate

24  that one?

25  A.   Yes, I have it here.

Miller – Direct

91

1  Q.   That should be the FBAR transcript for 2008?

2  A.   It is, correct.

3  Q.   Does that appear to list the same personal accounts as the

4  previous one?

5  A.   Yes, it does.

6  Q.   All right.  And what are the account balances in those

7  eight accounts -- the high balance reported for 2008?

8  A.   On page 2 it shows Union Bank of Switzerland had as a

9  maximum balance 4,250,000.

10         On -- also on page 2, JDFX Fund had 2,600,000.

11         On page 3, Union Bank of Switzerland had 300,000.

12         Page 4, Union Bank of Switzerland had a million --

13  $1 million listed as the high balance.

14         Page 5, Credit Suisse listed 9,250,000 as the high

15  balance.

16         Page 6, Union Bank of Switzerland had 170,000 listed

17  as the high balance.

18         Page 7, Saxo Bank had 2,614,000 listed as a high

19  balance.

20         And on page 8, Union Bank of Switzerland had

21  2,250,000 listed as a high balance, and those are the personal

22  accounts.

23  Q.   All right.  And what was listed in terms of corporate or

24  business accounts on that 2008 FBAR?

25  A.   There are -- there are three corporate bank accounts

1   listed this time, and there are -- on page 8 there's -- the

2   first one is Deutsche Bank and that is a high balance of

3   10 million.

4          The second one on page 9 is JPMorgan, and the high

5   balance is 5,500,000.

6          And the third bank is JPMorgan with a high balance of

7   660,000.

8   Q.   And what's the title of the filer for that 2008 FBAR?

9   A.   The filer James Pieron.

10  Q.   And the title?

11  A.   The title of the person filing it is director.

12  Q.   Okay.  Then go on to Exhibit 19, please.  That would be a

13  2009 FBAR report, I believe?

14  A.   It is.

15  Q.   Again, what personal accounts are reported there?

16  A.   It looks like the same -- let me make sure, but it looks

17  to be the same accounts that were listed previously, and they

18  are.  And there is one additional account here, so do you want

19  me to go through what accounts are listed?

20  Q.   Yeah.  Why don't you at the same time give what account is

21  listed and what the dollar -- high dollar report is.

22  A.   Okay.  On page 2 of this document it shows at the top

23  half, Union Bank of Switzerland and it shows a high balance of

24  a million dollars.

25         The second half of that page it shows Union Bank of

1  Switzerland and it shows 2,250,000.

2           On page 3 there is Saxo Bank, and that shows a

3  balance of 2,100,000.

4           On page 4 is Union Bank of Switzerland and that shows

5  a high balance of 300,000.

6           On page 5 it's Union Bank of Switzerland again, and

7  that shows a balance of 3,800,000.

8           On page 6 is Credit Suisse and that shows a balance

9  250,000.

10          Page 7 shows Banque Cantonale Vaudoise with a high

11 balance of 23,000.

12 Q.  Let me just stop you there, because I know we're going to

13 need to get a spelling.  Can you spell that bank.

14 A.  Yes.  The bank name is B-A-N-Q-U-E, Cantonale is

15 C-A-N-T-O-N-A-L-E, and Vaudoise, V-A-U-D-O-I-S-E.

16 Q.  Couldn't have done that without you.  Thank you.

17 A.  Yep.

18 Q.  And I don't know, did you state the value of that one,

19 please.

20 A.  Yes.  The value in that account was 23,000 according to

21 the report here.

22 Q.  And --

23 A.  Then there was one final personal account, and that was

24 Union Bank of Switzerland, and that had $100,000 in it.

25 Q.  And what was reported for business accounts on this 2009

Miller - Direct

1  FBAR?

2  A.    Once again, there were three business accounts; one at

3  JPMorgan that had 7,250,000 in it; one at Deutsche Bank which

4  had $1 million in it; and one at JPMorgan again with 660,000 in

5  it.

6  Q.    All right.  And, again, who was the filer?

7  A.    The filer of this is listed as director.

8  Q.    Okay.  And for the Exhibits 15, 17 and 19, when were each

9  of those FBARs filed.  Fifteen is for 2007, correct?

10  A.    Exhibit 15 is that what you're asking?

11  Q.    Yes.

12  A.    Yes.

13  Q.    And when was that filed?

14  A.    August 6th, 2012.  It's at the top of that form.

15  Q.    All right.  Exhibit 17 for 2008.

16  A.    Once again, at the top of that form it was August 6th,

17  2012.

18  Q.    And Exhibit 19 for 2009?

19  A.    Once again, it shows a filing date on that form at the top

20  of August 6th, 2012.

21  Q.    I'm going to hand you two more sets of exhibits.  One will

22  be Exhibit 129 and the other Exhibit 120A through H.

23          MS. PARKER:  Your Honor, I'd offer those pursuant to

24  the certificates of authenticity.  They are bank records.

25          MS. ARNETT:  No objection.

1       THE COURT:  They're received into evidence.

2    BY MS. PARKER:

3    Q.    Can you take a look at Exhibit 129 for us, please.

4    A.    Yes.

5    Q.    Is that a folder with several wire transfer records?

6    A.    Yes.

7    Q.    And do those wire transfers involve JDX Fund transfers?

8    Let me ask you to refer specifically to what will be Bates

9    numbered as 10773.

10   A.    Yes, it reflects transaction with JDFX Fund.

11   Q.    10773?

12   A.    It does and where I'm seeing that is in that bottom

13   left-hand section, that, for lack of a better term, paragraph

14   where it starts at "send."  At the very bottom of that it

15   lists, O-R-I-G, which is short for originator, and that's JDFX

16   Fund Management Limited there.

17   Q.    All right.  And can you see the date of that wire

18   transfer?

19   A.    I do.  It's directly at the top there.  And that transfer

20   reference number, that's November 18th, 2009.  It's written

21   different than how you would typically read a date, but it's

22   November 18th, 2009.

23   Q.    Are you familiar with that sort of convention in date

24   usage?

25   A.    Yes.  We see it in the banking industry often with foreign

Miller - Direct                                                96

 1  accounts.  They date them differently than we do in the US.

 2  Q.   All right.  They sometimes list year and then month and

 3  then day?

 4  A.   Correct.

 5  Q.   And so -- I'm sorry, what was the date of this wire

 6  transfer?

 7  A.   November 18th, 2009.

 8  Q.   All right.  And do you see the account number for that

 9  account?

10  A.   There -- there are two account numbers.  There's one where

11  the money's coming out of the bank account and one to where the

12  account is going to.  I see both of those account numbers.

13  Q.   All right.  For the account that is sending the wire

14  transfer, do you see the account number for that?

15  A.   I do.  It's sender reference number, and then it has an

16  account number there.  So it's about in the middle of that

17  bottom left side paragraph.

18  Q.   And how much is the wire transfer?

19  A.   The wire transfer is for $749,975.

20  Q.   And you said that was a transfer in 2009?

21  A.   It was.

22  Q.   Looking back at Exhibit 19, which is the FBAR from 2009.

23  A.   I have it.

24  Q.   Do you see that account number on that FBAR?

25  A.   I see one that is substantially similar to it, yes, on

1  page 6 of that FBAR transcript.

2  Q.   All right.  But is it the same?

3  A.   It is the same eight numbers, and then at the end there's

4  a 1-1.  It appears that possibly it may be a misprint on that

5  because the bank matches, Credit Suisse is the bank, and that's

6  the bank listed on both the wire document and also on the

7  FBAR --

8  Q.   Right.

9  A.   -- and the account -- the first eight numbers of the

10 account number match, so I would presume that these are one in

11 the same accounts.

12 Q.   Okay.  And what, again, was the amount that was reported

13 on the FBAR was the maximum dollar amount in that account in

14 2009?

15 A.   For 2009, this report reflects the highest balance in this

16 account during 2009 is $250,000.

17 Q.   But the wire transfer is coming out of that account,

18 correct?

19 A.   It is, correct.

20 Q.   In 2009?

21 A.   Correct, in 2009.

22 Q.   And what's the amount of the wire transfer again?

23 A.   It is $749,975.

24 Q.   Does that give you reason to question the accuracy of that

25 FBAR?

1   A.   Yeah, the number on the FBAR would be false if there was

2   that much money to be able to pull out of -- be able to wire to

3   a different bank account.

4   Q.   And what is the effect on the IRS if there's not accurate

5   reporting on that FBAR?

6   A.   It really limits the ability for the IRS to be able to

7   know the assets and really the ability to try to collect

8   information or collect assets, money from that individual.

9   Q.   Is that one of the uses of the FBAR information, to try to

10  identify the location of assets so if collection activities are

11  necessary they can be pursued against those personal accounts?

12  A.   It is.   It's one of the elements of it.   It's the

13  reporting requirements so, one, we can know what assets there

14  are so the income can be reported correctly; but, two, whenever

15  there are assets out there it's so that the IRS has an ability

16  to be able to notify -- have notice of those assets in

17  collectibility type issues.

18  Q.   I also offer -- or gave you previously a collection of

19  exhibits 120A through H.   Can you locate Exhibit 120C, please.

20  A.   I have 120C.

21  Q.   All right.   What -- that's a bank statement?

22  A.   It is, a Nationality City, a US bank statement.

23  Q.   All right.   And it's for what time period --

24  A.   It is for --

25  Q.   -- looking at the first page.

Miller – Direct

1  A.    It is for the period October 31st, 2009 to November 30th,

2  2009.

3  Q.    And on that bank statement, do you see a transaction that

4  corresponds with the wire transfer that you were testifying

5  about recently?

6  A.    I do.  I see the very same dollar amount, $749,975, that

7  is wire transferred into this bank account, so this is a

8  receiving bank.

9  Q.    But, again, that money coming from that foreign account

10 into the thing was not reported on the 2009 FBAR?

11 A.    It was not reported on the FBAR.

12 Q.    I'll show you Government's Proposed Exhibit 89.  Does that

13 appear to be a copy of an FBAR?

14 A.    It does.  We had talked earlier about a transcript and the

15 original document.  This appears to be a copy of an FBAR

16 document.

17        MS. PARKER:  Your Honor, I'd offer Government's

18 Proposed Exhibit 89.

19        MS. ARNETT:  I have an objection.  The filing that

20 AHP provided, which is what he's looking at, included an

21 additional statement attached to the FBAR, and the Government's

22 exhibits don't include that statement.

23        MS. PARKER:  I think if they can provide a foundation

24 for the admission of that, that's fine, they can offer it in

25 their case.  We've offered --

1           MS. ARNETT:  It gets filed with the FBAR.

2           MS. PARKER:  I don't think that alters its -- the

3   hurdles that arise under 801.

4           THE COURT:  Do you have a proffer on the

5   supplementary information that you suggest was filed with the

6   FBAR return?

7           MS. ARNETT:  Yes.

8           THE COURT:  Would you like to examine the witness

9   concerning the supplemental information?

10          MS. ARNETT:  Yes.

11          THE COURT:  Your floor.  If you'd like to -- my

12  assumption is that that particular portion of the exhibit is

13  not in front of the witness?  Am I --

14          MS. ARNETT:  That's correct, Your Honor.

15          THE COURT:  If you'd like to make sure that he's

16  furnished a copy of that, please.

17          MS. ARNETT:  May I approach?

18          THE COURT:  Yes.

19          MS. ARNETT:  I'm sorry, which year FBAR do you have?

20          THE WITNESS:  This is the 2009.

21          MS. ARNETT:  Okay.  I have to get 2009.  2009, right?

22          THE WITNESS:  Yes.

23          MS. ARNETT:  May I proceed?

24          THE COURT:  You may.

25          MS. ARNETT:  You're a CPA correct, sir?

1          THE WITNESS:  Correct.

2          MS. ARNETT:  And have you filed FBARs for other

3  individuals?

4          THE WITNESS:  I have not.

5          MS. ARNETT:  Have you filed any returns for other

6  individuals?

7          THE WITNESS:  Family members through Turbo Tax or

8  something like that, yes, but not FBAR forms.

9          MS. ARNETT:  And in those filings that you even do on

10  tax returns, sometimes you attach additional statements,

11  correct, explaining a position one way or the other in the tax

12  return, right?

13          THE WITNESS:  You sometimes -- some of the software

14  allows you to, yes.

15          MS. ARNETT:  And as a technical advisor and an

16  instructor with the IRS, you're aware that FBAR filings

17  sometimes have additional statements giving explanations about

18  the FBARs, correct?

19          THE WITNESS:  I have seen some additional statements,

20  yes.

21          MS. ARNETT:  If you could turn to page 5 of Defense

22  Exhibit 1013, which you should have in your hands.

23          THE WITNESS:  Yes, I do.

24          MS. ARNETT:  Does this appear to be the type of

25  statement that would be included with an FBAR filed by a CPA?

Miller – Direct                                                   102

```
 1              THE WITNESS:  One second, let me read it just to make
 2    sure.
 3              MS. ARNETT:  Yes, sir.
 4              THE WITNESS:  Okay.  Now will you repeat the
 5    question, please.
 6              MS. ARNETT:  Yes, sir.  Does this appear to be
 7    similar to an explanation statement or a statement providing
 8    additional information that would be attached to an FBAR?
 9              THE WITNESS:  It certainly looks like it could be
10    something that somebody would attach to an FBAR.
11              MS. ARNETT:  And are you the IRS representative that
12    pulled the records for the Government in this case?
13              THE WITNESS:  No, I did not.
14              MS. ARNETT:  Do you have any idea why this wasn't
15    included with the records that were pulled?
16              MS. PARKER:  Objection, Your Honor, relevance.
17              THE COURT:  What we're attempting to do at this point
18    is to authenticate presumably the supplementary information
19    that you're furnishing here.  I assume that you don't have a
20    similar certificate of authenticity which would be the
21    predicate for authentication here; is that correct?
22              MS. ARNETT:  Yes, Your Honor.  I have -- the
23    Government -- we rely on the Government in tax cases to pull
24    the IRS records, and these came from the Government in the
25    production, so it was included in the production with the FBAR
```

Miller – Direct

1  filings, and as Mr. Miller testified, they're normally

2  statements filed, it's a normal course of business to file

3  explanative statements with FBARs and tax returns.

4          THE COURT:  I appreciate your point --

5          MS. PARKER:  Your Honor --

6          THE COURT:  -- but I think you've gone about as far

7  as you can go with this witness at this stage.

8          MS. ARNETT:  Yes, sir.

9          THE COURT:  It's going to require foundational

10 information probably from another witness.

11         MS. ARNETT:  Thank you, Your Honor.

12         THE COURT:  You may continue.

13         MS. PARKER:  All right.

14         May Exhibit 89 be received, Your Honor?

15         THE COURT:  Eighty-nine will be received, subject to

16 the objection of the defense.

17         MS. ARNETT:  Thank you.

18         MS. PARKER:  And again our objection is 801.

19         THE COURT:  Noted.

20 BY MS. PARKER:

21 Q.  All right.  Can you take a look at Exhibit 89?

22 A.  Yes.

23 Q.  That is the FBAR for Mr. Pieron for 2009?

24 A.  Yes, it appears to be.

25 Q.  And anywhere listed -- oh, when was that one filed?

Miller – Direct

1   A.    I do not see a -- oh, I'm sorry, there is a filing date on

2   here.  May 17th, 2012.

3   Q.    And do you see the high watermark of $749,975 reported on

4   the actual form that was submitted?

5   A.    No, I do not.  On page -- third page of this document, it

6   shows a high balance of $250,000.

7   Q.    Next I'd like to show you Government's Proposed

8   Exhibit 21.  Is that another FBAR for Mr. Pieron for 2010?

9   A.    Yes, it's an FBAR transcript, so we're back to the

10  transcript now.

11  Q.    I'm sorry, transcript, yes.  Thank you for that.  And how

12  many personal accounts are listed there?

13  A.    There are six personal accounts listed on here.

14  Q.    And what are the balances in those accounts?

15  A.    On page --

16         MS. PARKER:  I'm sorry, Your Honor.  I forgot to

17  offer it, I believe.  I should do that before I ask that

18  question.

19         MS. ARNETT:  No objection to the transcript.

20         THE COURT:  Received.

21  BY MS. PARKER:

22  Q.    Thank you.  Now, please, answer the question.

23  A.    On page 1 it lists that filer information, that's James

24  Pieron, but on the bottom -- or on page 2, it lists the

25  account, first account, at Credit Suisse with an account

105

1   balance of 350,000 a high balance.

2           Also page 2 it lists Union Bank of Switzerland with a

3   high balance of 300,000, and page 3 it's Banque Cantonale

4   Vaudoise with a high balance of 840,000.

5           Page 4, Saxo Bank with a high balance of 2,100,000.

6           Union Bank of Switzerland on page 5 with a balance of

7   200,000.

8           And on page 6, Union Bank of Switzerland, with a high

9   balance of 10,000.

10  Q.   All right.  And are there business accounts on that

11  disclosure form, FBAR?

12  A.   I'm sorry, I did not hear the question.

13  Q.   I'm sorry.  I was -- are there business accounts on there

14  also?

15  A.   Yes, there are.  There's two business accounts listed.

16  Q.   And what are they, and what are their account balances

17  that are reported?

18  A.   One account is at JPMorgan and has a balance of 160,000,

19  and one --

20  Q.   And for what entity, I'm sorry?

21  A.   That is for JDFX Fund Limited, and the second account,

22  which is also for JDFX Fund Limited, that has a bank balance on

23  page 7 of 660,000.

24  Q.   And, again, when was that 2010 FBAR filing done?

25  A.   This filing was done on August 6th, 2012.

1   Q.   All right.  Are you familiar with a form 5471?

2   A.   Yes.

3   Q.   What kind of -- that's an IRS form I should say?

4   A.   It is an IRS form.

5   Q.   And what is that used for, that form?

6   A.   That -- if an individual owns and controls a foreign

7   corporation, a corporation that's created in a foreign

8   jurisdiction, the Form 5471 has to be filed with either

9   their -- whoever that owner is.  So if it's an individual that

10  owns that foreign corporation, attached to their 1040 they

11  would file this form, and it would tell the Government about

12  that corporation, including the income that it earned as well

13  as the assets that it possesses.

14  Q.   So when is a person required to file a 5471?

15  A.   There's -- there's multiple categories of filers.  One of

16  the more common ones we see is whenever they have control,

17  meaning more than 50 percent control of that corporation, by

18  voting power or by stock ownership, if they have that, they

19  have to file the 5471 with their return.

20  Q.   And, again, that's information that goes to the IRS?

21  A.   It is.  Unlike the FBAR, the FBAR is filed separately from

22  the tax return; 5471's are directly attached to the 1040 tax

23  return.

24  Q.   And the 1040 is your individual tax return?

25  A.   Correct.  It's the one you would normally file for an

1 individual.

2 Q.   How does the Form 5471 relate to an individual's 1040,

3 their personal tax return?

4 A.   So, much like domestic corporations, foreign corporations,

5 if they're doing business, that business is earned by that

6 corporation and it doesn't impact the individual's return.  But

7 if an individual receives dividends or distributions, takes

8 money out of that foreign corporation, they have to report it,

9 and it gets reported as dividends and should be on a tax return

10 as a dividend.

11           So the 5471 lists that information, the income

12 earned, as well as money that was distributed, and then the

13 1040 reflects that distributed money that was distributed to

14 the owner.

15 Q.   If the person who has that ownership in the foreign

16 business takes money out of that business for his or her

17 personal use, would there be a tax implication for that?

18 A.   There would.  If somebody pulls money out of a foreign

19 corporation, they should report that, either as a dividend or

20 return of capital, or as a capital gain.  There should be some

21 taxable event.  There should be some recognition of that.

22 Q.   I'm going to show you Government's Proposed Exhibits 39,

23 40, 41, 42, and 48.  Can you look at those, sir, and tell me if

24 those are all certified copies of 1040 or 1040X, that is

25 personal tax returns for James Pieron?

Miller – Direct

1  A.    Yes, they are.

2  Q.    And are they all -- a 1040X is what kind of form?

3  A.    A 1040X is called an amended return.  It's whenever you

4  have changes that you need to make to your original return.

5  Somebody would file that to make those changes.

6              MS. PARKER:  Your Honor, I offer Government's

7  Proposed Exhibits 39, 40, 41, 42, and 48.

8              MS. ARNETT:  May we approach at sidebar, please?

9              THE COURT:  Yes.  And actually, while we're doing

10  that, I'd like to see if we can get about a five minute recess

11  in for the jury, so that they're able to stretch.  Maybe this

12  would be a good time for us to do that.  Any objection to --

13              MS. PARKER:  Of course not, Your Honor.

14              THE COURT:  Mr. Haines should be on his way.

15              (At 11:53 a.m., jury leaves.)

16              THE COURT:  Record will reflect the fact that we're

17  outside of the presence of the jury.  You maybe seated.

18              You had an issue you wished to raise, ma'am?

19              MS. ARNETT:  Yes, Your Honor.  We were provided

20  discovery, but I haven't actually seen the certified records

21  from the IRS so, I mean, I don't know if I'll have a problem

22  with them, but I would like to have the opportunity to compare

23  them to what has -- was on the exhibit list marked because I

24  don't know -- you know, sometimes you get certified records

25  from the IRS, and there's some additional pages.  I would just

1  like an opportunity to inspect them.

2          MS. PARKER:  No -- I can show them to her if you

3  want.

4          THE COURT:  Sure.

5          MS. ARNETT:  Thank you.

6          THE COURT:  In fact, you'll have a good five minutes

7  here.

8          MS. ARNETT:  Perfect.  May I approach the witness and

9  retrieve them?

10          THE COURT:  You may.

11          MS. PARKER:  And for now, Judge, I'll just offer 39,

12  40 and 42.

13          MS. ARNETT:  Should I go ahead and take a look at 41

14  and 48 if you're going to.

15          MS. PARKER:  It's up to you, but I would prioritize

16  things.

17          MS. ARNETT:  Okay.  Gotcha.

18          THE COURT:  Record's closed.

19          (At 11:56 a.m., court recessed.)

20          THE COURT:  Can we have the jury, please.

21          (At 12:09 p.m., jury arrives.)

22          THE COURT:  Please be seated.  Ms. Parker, if you'd

23  like to continue.

24  BY MS. PARKER:

25  Q.   All right.  One quick thing I need to circle back on if I

Miller - Direct                                                110

1   could.  Could you pull up Exhibit 19, please.

2           Again, Exhibit 19 is the FBAR transcript for 2009?

3   A.   That's correct.

4   Q.   And you were asked some questions a little while ago by

5   one of Mr. Pieron's defense attorneys about a statement.  Is --

6   is there typically on a transcript form any sort of notation

7   regarding statements if they are submitted with returns?

8   A.   Yes.  In that filing information section right at the top,

9   if somebody submits written information, which is not that

10  uncommon, especially if they're late-filed FBARs, there will be

11  an information section in there that will transcribe exactly

12  what was submitted with the delinquent FBARs, so that the

13  Government would be able to read whatever information is

14  supposed to be transcribed there.

15  Q.   All right.  And with regards to that 2009 FBAR in

16  Exhibit 89 -- or excuse me, in Exhibit 19, is there a notation

17  of an attached statement?

18  A.   There's no notation of that.

19  Q.   What about the other FBAR transcripts that you've

20  testified about today?

21  A.   I did not see any notations, any notes, that were added

22  with any of the FBAR transcripts that I've seen so far.

23  Q.   Okay.  Thank you for clarifying that for us.

24          I'd ask you now to direct your attention to

25  Government's Proposed Exhibits 39, 40 and 42.  Are those tax

Miller - Direct                                                           111

```
 1   returns?
 2   A.    They are.
 3   Q.    In fact, you have certified copies of them?
 4   A.    Correct.
 5   Q.    Are they for Mr. Pieron?
 6   A.    They are.
 7   Q.    And what year is 39 for?
 8   A.    It is for the tax year 2007.
 9   Q.    Do you see a Form 54 -- excuse me, I will offer that,
10   first.  I'll offer Exhibit 39.
11             THE COURT:  Is it the 5471?
12             MS. PARKER:  No, it's the 1040.
13             MS. ARNETT:  No objection, Your Honor.
14             THE COURT:  Received.
15   BY MS. PARKER:
16   Q.    Exhibit 40, is that a 1040 for what year?
17   A.    You -- Exhibit 40 is what you're asking?
18   Q.    Yeah, I'm just trying to get them all admitted first.
19   A.    Okay.  That is an original return for 2008.
20   Q.    Okay.  And 42?
21   A.    That is an original return for 2009.
22             MS. PARKER:  Your Honor, I'll also offer Exhibits 40
23   and 42.
24             MS. ARNETT:  No objection, Your Honor.
25             THE COURT:  Received.
```

1   BY MS. PARKER:

2   Q.    Okay.  With regards to -- now circle back to Exhibit 39,

3   which was a 1040 for Mr. Pieron for 2007?

4   A.    Correct.

5   Q.    Is there a 5471 accompanying or a part of that 1040

6   return?

7   A.    No, there is not.

8   Q.    All right.  Let's just say for the sake of discussion, if

9   there had been a 5471 reflecting that someone had taken money

10  out of a foreign corporation, where, again, would that go on

11  the 1040 form?

12  A.    It's -- it's -- the form itself would be attached just as

13  an attachment, but the income, if he withdrew money from that

14  account, would go on line 9A of that front page.  So the

15  section we have up now, in the income section, that middle

16  section, assuming he had the ability to withdraw the -- had

17  earnings and profits, it would go on qualified dividends line,

18  line 9B is the qualified dividend line.

19  Q.    All right.  And are there any -- is there anything

20  reported there?

21  A.    There is not.

22  Q.    For 2007?

23  A.    Correct, there is not.

24  Q.    All right.  Let's look at the next tax return, Exhibit 40

25  for 2008.  Is there a 5471 form included in that tax return?

Miller - Direct                                          113

1  A.    There is not.

2  Q.    And is there dividend income reported on the first page of

3  the 1040?

4  A.    There is not.

5  Q.    How about Exhibit 42, the 2009 1040?

6  A.    There's not a 5471 attached.

7  Q.    Is there dividend income reported on the first page?

8  A.    There is not.

9  Q.    Okay.  Are you familiar with a W8 form?

10  A.    Yes, I am.

11  Q.    Are you familiar with a W8BEN form?

12  A.    I am.

13  Q.    I would like to approach with Government's Proposed

14  Exhibit 115, which would be Peregrine Financial Group records

15  provided under certificate of authenticity.  I propose to offer

16  Exhibit 115.

17          MS. ARNETT:  Oh, I have an objection.  I'm sorry, I

18  thought we were reviewing it.  I do have an objection to

19  this -- to any exhibits coming in from Peregrine Financial.  We

20  were provided Bates documents with missing Bates ranges, so I

21  don't know if we have been given the complete Peregrine

22  Financial file.  I don't even know what is with Peregrine

23  Financial, so the Bates ranges are all over the place, but

24  there are huge gaps in these numbers.

25          THE COURT:  Who is the signatory to the return?

1          MS. ARNETT:  I'm sorry, what she's offering is bank

2    records from a Peregrine Financial.

3          THE COURT:  Okay.

4          MS. PARKER:  Judge, there's a W-8BEN form that is

5    part of this.  There is also an online banking application.

6    These were records that were provided, and we told them which

7    specific -- we provided more than we selected for use as

8    exhibits based on what was relevant.  I don't think that limits

9    the admissibility.

10          THE COURT:  At this juncture, neither the jury nor I

11    know what the entity is that has just been referred to.

12          MS. PARKER:  It's a -- sorry.  From what I

13    understand, it was an entity that did forex trading, currency

14    trading.

15          THE COURT:  We're going to need a foundation.

16          MS. PARKER:  Pardon?

17          THE COURT:  We're going to need a foundation from a

18    relevancy perspective at this stage.

19          MS. PARKER:  Well, I think -- I'd be happy to do

20    that.

21    BY MS. PARKER:

22    Q.   Can you refer to the W-8BEN form in there?

23    A.   Yes, I can.

24          MR. SASSE:  What's the exhibit number?

25          MS. PARKER:  It's part of 115.

```
 1  BY MS. PARKER:
 2  Q.   Is that a form that was completed by the defendant?
 3  A.   It is.  It lists him as the beneficial owner on this
 4  document, yes.
 5          MS. ARNETT:  Objection.  I don't know how he has
 6  knowledge if he completed the form or not.
 7          MS. PARKER:  I think he gave an answer that was
 8  better than my question.
 9          MS. ARNETT:  Okay.
10          MS. PARKER:  That was appropriate.
11          THE COURT:  His response was reflective of his
12  observation of the document in front of him.
13          MS. ARNETT:  Thank you.
14  BY MS. PARKER:
15  Q.   And does it -- is that the form that you're familiar with?
16  A.   Yes, it is a form I'm familiar with.
17  Q.   And is it a type of IRS form?
18  A.   It is.
19  Q.   What context is that form used?
20  A.   It is used for non-US persons who have US-sourced income.
21  So somebody who doesn't live in the US and has no connection to
22  the US, but has earned income from someplace in the US.
23  Q.   And the date of that form?
24  A.   It is July of 2009.  I can't read the middle dates, the
25  days.
```

Miller - Direct                                                116

1   Q.   All right.   That's good enough for our purposes at the

2   moment.   And whose name is on the form or what name is on the

3   form?

4   A.   James Pieron.

5   Q.   And when that form is completed, how is that used by the

6   entity that obtains that form?

7   A.   The entity that obtains this form, so the banking

8   institution that receives it, they need to know whether or not

9   this individual is a US person or a foreign person, so the

10  W-8BEN is filled out by non-US people to inform the bank that

11  they potentially may need to be withheld against, but typically

12  at a treaty or reduced rate.

13  Q.   Is -- does that form have implications in -- is there

14  an -- let me ask you this way:   Is there a different form that

15  is used for US citizens?

16  A.   Yes, there is.

17  Q.   And what would that form be?

18  A.   That is a W-9.

19  Q.   All right.   So in the same context, a US citizen would

20  file a W-9, a non-US citizen files a W-8?

21  A.   W-8BEN, correct.

22  Q.   And in this context, it's the W-8BEN form is being used by

23  Mr. Pieron?

24  A.   That is correct.

25          MS. PARKER:   Your Honor, I think that satisfies the

1    relevance in terms -- if I understand the Court's concern.

2           MS. ARNETT:  Your Honor, I don't see how there's any

3    foundation laid.  This gentleman works for the IRS.  This is

4    not a document that's filed with the IRS.  It's used by the

5    banks, and I object to him offering any sort of foundation for

6    this document.  They have two people from Peregrine on their

7    witness list, and if they want to offer a foundation with them,

8    then that is a different story.

9           MS. PARKER:  I think he can still testify based on

10   his qualifications regarding the use of this form and how that

11   would affect --

12          THE COURT:  And I agree with you, he can offer expert

13   testimony.  On the other hand, what he can't do is to

14   authenticate the document, which is an evidentiary problem at

15   this point.  I would sustain the objection.

16          MS. PARKER:  There is a certificate of authenticity,

17   Judge.

18          THE COURT:  If I understand accurately, there are

19   only informational statements that are furnished to the US

20   Government.  The actual document goes to the foreign

21   institution that has a reporting obligation.

22          MS. PARKER:  No, it's a domestic entity.

23          THE COURT:  Well, depending on which one you're

24   referring to.

25          MS. PARKER:  Well, the company -- the business that

```
 1  maintained this record is Peregrine Financial Group, and

 2  they're the ones who provided the certificate of authenticity,

 3  so I think that does authenticate it.

 4          THE COURT:  But was it furnished to the Government or

 5  to the institution where the account was maintained?

 6          MS. PARKER:  It was the institution who maintained

 7  this record in their -- as part of their business records that

 8  provided it to the Government.

 9          THE COURT:  Then I would respectfully agree with the

10  defense that we need to close the loophole on the authenticity.

11          MS. PARKER:  All right.

12  BY MS. PARKER:

13  Q.   In any case, let's go back to where we were, sir.  You

14  said that a W-8 would affect -- well, let me put it this way,

15  let me back up.

16          A W-8 is that -- W-8BEN, is that something that the

17  IRS actually receives?

18  A.   No.

19  Q.   Is it something that the IRS requires the account entity

20  to maintain?

21  A.   It is.

22  Q.   Why?

23  A.   Because if the US Government were to audit that individual

24  or that corporation that received the W-8BEN, they would look

25  at a list of individuals who are receiving US-sourced income,
```

1  and if it has a US person, they would expect a 1099 or some

2  sort of income information document.  So more or less, if a US

3  person owned a bank account at some institution, they would

4  have to be notified that they had dividend interest or whatever

5  type of income from that particular institution.

6  Q.  All right.  So for a US person, the proper form would be

7  what?

8  A.  A W-9.

9  Q.  And when a person fills out a W-9 and gives it to the

10  institution, the financial institution, that institution, at

11  the end of the year, generates information?

12  A.  It does.

13  Q.  And I think you said a 1099?

14  A.  Correct.

15  Q.  And that information goes both to the person or entity

16  that holds the account and the IRS?

17  A.  It goes to both, correct.

18  Q.  All right.  But if there's a W-8BEN, how does the

19  financial institution handle the account information for that?

20  A.  The information on the individual who filled out the

21  W-8BEN would never be given -- they would never give

22  information to the US Government about the individual who filed

23  that form.

24  Q.  And would -- would the IRS then know about that account

25  holder's interest in their account in that financial

1    institution?

2    A.    They would not.

3    Q.    And, by the way, what is a 1099?

4    A.    A 1099 is a document that lists certain types of income,

5    so most of us have a bank account, and that bank account we get

6    a 1099-INT, and that's an interest document, so that document

7    is filed with the IRS and with whoever has an interest in that

8    account so that the Government knows how much income you earned

9    for the year, as well as you know how much income you earned

10   for the year, so you can put it on a tax return.

11   Q.    Let me ask you this question:  If a person who is a US

12   citizen uses a W-8BEN form in connection with a financial

13   account, what is the impact of that on the IRS and its

14   collection activities?

15   A.    Well, if a US citizen filled out a W-8BEN and gave it to a

16   US institution, the US Government would never know that they

17   had an interest in it, never know that they had an interest in

18   a financial account or whatever they're filing the W-8BEN for,

19   so it would preclude the Government from knowing that asset

20   really existed under that individual's name.

21   Q.    And are there Social Security numbers on W-8BEN forms?

22   A.    There are not.

23   Q.    What about on W-9?

24   A.    Yes, there is on W-9s.

25   Q.    So if the IRS doesn't learn about someone's interest in an

1   account, financial account here because they've used the W-8

2   instead of the W-9, does that affect the ability to assess a

3   tax for the IRS?

4   A.   It would -- it would certainly limit the ability for the

5   IRS to assess a tax because the IRS would never be notified

6   that there was income that had been earned.

7   Q.   Would it impact the ability to collect on a tax?

8   A.   It would.  If there was -- if they filled out that

9   information, from a collection standpoint, the IRS would know

10  about that account and could take certain actions to try to

11  collect on that particular account.

12  Q.   I've handed you a couple more folders of proposed

13  exhibits, Exhibit 65, 67, 68 and 70.  Are those Saxo Bank

14  account statements?

15  A.   Yes, they all are.

16  Q.   Are they for years, 2007, 2008, 2009 and 2010

17  respectively?

18  A.   Yes.

19         MS. PARKER:  Your Honor, I offer Government's

20  Proposed Exhibits 65, 67, 68 and 70.

21         MS. ARNETT:  No objection.

22         THE COURT:  Received.

23  BY MS. PARKER:

24  Q.   All right.  Can you take a look at Exhibit 65, please.

25  A.   Yes.

1  Q.   What time period is covered by this account?

2  A.   It is in the top section there; it says January 1st, 2007

3  until December 31, 2007.

4  Q.   And what name is on the account?

5  A.   It is James Dayton Pieron, Jr.

6  Q.   And what is the address of Saxo Bank?

7  A.   Saxo Bank is a -- it has a Denmark address.

8  Q.   And that would be a foreign country?

9  A.   It is a foreign country.

10 Q.   It's a foreign bank account that would then need to be

11 reported?

12 A.   It is.  It's a foreign bank account that should be

13 reported on an FBAR.

14 Q.   What about Exhibit 67?  That's a bank statement for Saxo

15 Bank for what time period?

16 A.   For January 1st, 2008 to December 31st, 2008.

17 Q.   And, again, the name on the account?

18 A.   It is James Dayton Pieron, Jr.

19 Q.   And Exhibit 69 -- excuse me, 68, I misspoke.  I'm sorry.

20 What time period is covered for that?

21 A.   January 1st, 2009 until December 31st, 2009.

22 Q.   And whose name on that account?

23 A.   It is James Dayton Pieron, Jr.

24 Q.   And do exhibits 67 for 2008 and 68 for 2009 show money in

25 those accounts?

1   A.   They both do, yes.

2   Q.   Exhibit 70, that's a Saxo Bank account statement for what

3   time frame?

4   A.   January 1st, 2010 until December 16th, 2010.

5   Q.   And, again, the name on the account?

6   A.   It is James Dayton Pieron, Jr.

7   Q.   And, by the way, looking at this, does this provide the

8   information in US dollars?

9   A.   It does.  It indicates it in the top left-hand corner.  It

10  says currency, USD.

11  Q.   And was that true for the other statements?

12  A.   It was.

13  Q.   And does that -- that -- those account statements for 2010

14  indicate that there was money in that account in Denmark?

15  A.   It does.

16  Q.   Belonging to James Pieron?

17  A.   It does.

18  Q.   Take a look at Exhibit 67 again and look in the time frame

19  of April, 2009 when the 2008 tax return would have been

20  filed --

21  A.   Okay.

22  Q.   -- around there.

23  A.   Yeah, I see that on page 2 right about the middle.

24  Q.   All right.  Specifically, in April of 2009, was there

25  money in the account at that time?

1  A.   Yes.   There's -- as of April, there's $2,394,190 in that

2  account.

3  Q.   Same thing, you said April to June time frame?

4  A.   Yeah, the money's there from April to beginning of May.

5  The money is there between April and May, as well as more

6  throughout the years.

7  Q.   All right.   But it's there for a period of time when

8  the -- well, when the 1040 tax returns should have been filed

9  and paid in April of 2015, correct?

10 A.   Generally, some foreign individuals do have an automatic

11 extension until two months, so it could be June.

12 Q.   But there's money in the account?

13 A.   Yes, between April and June there's more than $2 million

14 it looks like everyday.

15 Q.   Well, look at the 2010 statements, again the 2009 returns

16 would have been filed between April, May, June of 2010; is that

17 correct?

18 A.   That's correct.

19 Q.   Look at the account for that time period, look at the

20 statements.   Is there money in the account statements during

21 that time?

22 A.   Between April and June of 2010, yes, there -- it looks

23 like the minimum balance -- minimum balance would have been

24 $522,827 in that account it looks like from April.

25 Q.   How much was that again, I'm sorry?

Miller - Direct                                                    125

1   A.   I'm sorry, it's $517,847 appears to be the lowest balance

2   between April and June.

3   Q.   But there was money available in the account when the

4   taxes would have been due?

5   A.   Yes, more than a half a million.

6   Q.   I show you Government's Proposed Exhibits 118, 119.

7   Exhibit 18 [sic] is account statements for what kind of

8   account?

9   A.   For a bank account at UBS.

10  Q.   Which means what?

11  A.   United Bank of Switzerland.

12  Q.   And for what time period?

13  A.   It is for -- it looks like November, 2008.  I don't know

14  how far they go, but -- November, 2008 to November 30th, 2009.

15          MS. PARKER:  Your Honor, I offer Government's

16  Proposed Exhibit 118?

17          MS. ARNETT:  No objection.

18          THE COURT:  Received.

19  BY MS. PARKER:

20  Q.   In April of 2009 when Mr. Pieron's 2008 tax returns would

21  have been due, was there money in that UBS account?

22  A.   There was.  In April of 2009 there was $1,962, but as of

23  May 26th, 2009 there was more than a million deposited in

24  there.

25  Q.   And that's the time frame, again, when the taxes should be

Miller - Direct

1  filed and paid?

2  A.    Correct.

3  Q.    For 2008?

4  A.    Correct.

5  Q.    Excuse me, Exhibit 119.  Is that a Credit Suisse -- are

6  those Credit Suisse bank account statements?

7  A.    They are.

8  Q.    I should have asked you this:  Whose name was on the UBS

9  account?

10 A.    For Exhibit 118?

11 Q.    Yeah, I'm sorry, yeah.

12 A.    JDFX Holding-AG.

13 Q.    And for Exhibit 119, the Credit Suisse accounts are for

14 what entity?

15 A.    JDFX Fund Management Limited.

16 Q.    And what time period do they cover?

17 A.    March 31st, 2007 -- or, I'm sorry, January 1st, 2007 to it

18 looks like the last balance I have is September 30th, 2009.

19        MS. PARKER:  Your Honor, I offer Government's

20 Proposed Exhibit 119.

21        MS. ARNETT:  No objection, Your Honor.

22        THE COURT:  Received.

23 BY MS. PARKER:

24 Q.    And looking at that account statement for the time period

25 when the 2009 tax return should have been filed and taxes paid

Miller - Direct

1  for Mr. Pieron, what do you see in terms of account balances?

2  A.   I'm sorry, can you repeat the question?

3  Q.   All right.  For the time frame when the 2008 1040 return

4  and any taxes owed should have been sent to the IRS, which

5  would have been in the spring of 2009, correct?

6  A.   Correct.

7  Q.   Was there money in that account?

8  A.   Bates 10478, that shows the April balance, and that

9  account had $159,804 in it at the beginning of April.

10  Q.   I think you also have still Exhibit 120D.

11  A.   I do.  I have 120D.

12  Q.   And what, again, is the time period of that statement?

13  A.   This is a statement April 1st, 2010 until April 9, 2010.

14  Q.   And in April of 2010 was there money in that account?

15  A.   There was.

16  Q.   And how much?

17  A.   There was -- at the beginning of April, April 1st, 2010,

18  there was $312,798.51.

19  Q.   And, again, that's the time frame when tax returns should

20  be filed, correct?

21  A.   Correct, the tax return for the 2009 tax year.

22  Q.   I'm going to show you or hand you Government's Proposed

23  Exhibits 93 and 94.  Do you recognize what those documents are?

24  A.   I do.

25  Q.   Are -- what are they?

Miller - Direct

1  A.    They are documents that are sent out to collect on a

2  liability that an individual would owe.

3  Q.    By whom?

4  A.    These ones identify James Pieron, Jr.

5  Q.    And who sends those documents out?

6  A.    The IRS does in their normal course of business.

7  Q.    And what years are they for?

8  A.    They are for tax year 2009, and the other is tax year

9  2008.

10        MS. PARKER:  Your Honor, I offer Government's

11  Proposed Exhibits 93 and 94.

12        MS. ARNETT:  No objection, Your Honor.

13        THE COURT:  Received.

14  BY MS. PARKER:

15  Q.   All right.  Let's take a look, first of all, at

16  Exhibit 94, please.

17  A.    Uh-huh.

18  Q.    What was the date on that?

19  A.    The date of issuance is February 14th, 2011.

20  Q.    And for what year?

21  A.    For tax year 2008.

22  Q.    And what amount is reported there as owed?

23  A.    It's right in the middle, $379,617.86.

24  Q.    How about on Exhibit 93?  Is that for 2009?

25  A.    Yes, it is for 2009.

1  Q.   Was it issued the same day?

2  A.   Yes, February 14th, 2011.

3  Q.   And what was the amount of that one?

4  A.   It was for -- the total liability owed is $166,584.07.

5  Q.   Can you take a look at Exhibit 120F for us, F as in Frank.

6  A.   Yes, I have it.

7  Q.   And, again, what is 120F?

8  A.   120F is a bank statement for PNC Bank.

9  Q.   And the name on the account?

10 A.   IB Technologies, Inc., also lists James D. Pieron, Jr. as

11 well.

12 Q.   And is that for February of 2011?

13 A.   Yes, February -- yes, February 1st to February 28th, 2011.

14 Q.   What are the beginning and ending balances on that

15 account?

16 A.   It's at the bottom.  The bottom shows beginning balance of

17 $435,182.13.  It shows an ending balance of $440,182.13.

18 Q.   Next I'll show you Government's Exhibit 121A through C.

19 Are those account statements?

20 A.   They are.

21 Q.   And for -- for what or whom?

22 A.   For Komplique, Inc.

23        MS. PARKER:  Your Honor, I offer Government's

24 Proposed Exhibits 121A, B and C.

25        MS. ARNETT:  No objection, Your Honor.

Miller - Direct

1    THE COURT:  Received.

2  BY MS. PARKER:

3  Q.   Can you take a look at Exhibit 121C.  Do you see that

4  account?

5  A.   One second.  I'm looking for it.  I've got a big stack of

6  papers here.

7         Yes, I see it now.

8  Q.   All right.  That's for what time period?

9  A.   This is for January 1st, 2011 to January 31st, 2011, as

10  well as other monthly statements, I believe.  One second, let

11  me check.  Yes.

12  Q.   Look, if you would, at the account statements for 2011,

13  please.

14  A.   Okay.

15  Q.   What kind of money do you see in that account over the

16  course of the month of February, 2011?

17  A.   For February, 2011, it shows balances between $604,559 and

18  $661,370.

19  Q.   So between the last two accounts, the -- sorry, the IB

20  Tech account and this Komplique account, in February of 2011,

21  when those two tax notices come out, how much money

22  approximately is between the two of them?

23  A.   Between the two, if my math's right, more than a million

24  dollars.

25         MS. PARKER:  Thank you, Your Honor.  I'll pass the

Miller - Cross

1    witness.

2              THE COURT:  Cross?

3              MS. ARNETT:  Yes, Your Honor.

4                      CROSS-EXAMINATION

5    BY MS. ARNETT:

6    Q.    Good afternoon, Mr. Miller.

7    A.    Good afternoon.

8    Q.    So as a revenue agent, you work for the civil side of the

9    IRS, right?

10   A.    I do.

11   Q.    But we're here today on the criminal side, right?

12   A.    Correct.

13   Q.    And those are two different things, correct?

14   A.    They are.

15   Q.    And civil we talk about penalties and interest and

16   penalties for not filing or penalties for underpayment,

17   correct?

18   A.    Correct.

19   Q.    And on the criminal side, we talk about jail, right?

20   A.    That's potentially on outcome, yes, in civil -- criminal

21   investigations.

22   Q.    Now, the criminal IRS agent that investigates is called a

23   special agent, right?

24   A.    Correct.

25   Q.    And they can put what's called a freeze code on a

Miller - Cross                                                      132

 1  taxpayer's account?

 2  A.    They can.

 3  Q.    And that freeze code is an intentional code that they have

 4  to enter, right?

 5  A.    Yes.   There's a deliberate thing to put that code in, yes.

 6  Q.    And it cuts off all communication, so there's no meetings

 7  with civil side, there's no information coming from the IRS,

 8  right?

 9  A.    That's -- in my understanding, yes, that's -- there's no

10  more communication that comes from the civil side.

11  Q.    But the taxpayer -- they don't reject information from the

12  taxpayer?   They'll continue to take the taxpayer's information?

13  A.    Correct.

14  Q.    And are you familiar with the Taxpayer's Bill of Rights?

15  A.    I have seen the Bill of Rights, yes.

16  Q.    If I could -- not publish it, because it's not admitted,

17  but I'm going to show you what we have marked as Defense

18  Exhibit 1031.   Does that come up on your screen?

19  A.    No.

20  Q.    Let me check.

21          THE COURT:   Are you using front source or rear source

22  from the defense table?

23          MS. ARNETT:   I think I'm up front.   I'll just get a

24  paper copy.

25          THE WITNESS:   Okay.

Miller - Cross

1        MS. ARNETT:  May I approach, Your Honor?

2        THE COURT:  You may, and I would suggest that we can

3   coordinate this so that we can switch over a little bit more

4   rapidly this afternoon.

5        MS. ARNETT:  Yes, sir.

6   BY MS. ARNETT:

7   Q.   Do you have the Taxpayer's Bill of Rights?

8   A.   I do.

9   Q.   And this is the document that you're familiar with, right?

10  A.   Yes, ma'am.

11  Q.   And could you read the first entry there, the right to be

12  informed.

13       MS. PARKER:  Objection.

14       THE COURT:  I actually don't know the legal status of

15  the Taxpayer's Bill of Rights.  I don't know whether it's an

16  aspirational document from the Service, whether it is

17  incorporated into a statute passed by Congress or how it

18  otherwise relates to the IRS code.

19       MS. ARNETT:  It's a publication issued by -- or

20  Mr. Miller, the expert, might know, but it's a publication

21  issued by the IRS.  It's on IRS.gov.

22       THE COURT:  Perhaps you can explore that with the

23  witness to see if you can establish that.

24       MS. ARNETT:  Okay.

25  BY MS. ARNETT:

Miller – Cross

134

1   Q.   Are you familiar with the Taxpayer Bill of Rights?

2   A.   I am.

3   Q.   And it's published by the Internal Revenue Service,

4   correct?

5   A.   It is a document published by the IRS.

6   Q.   And it has its own particular publication number, right?

7   A.   It does.

8   Q.   And catalog number?

9   A.   Correct.

10  Q.   And it's what the IRS says that the taxpayers are supposed

11  to receive, correct?

12  A.   Correct?

13           MS. ARNETT:  I offer Exhibit 1031.

14           THE COURT:  Any objection?

15           MS. PARKER:  Yes.

16           THE COURT:  And that is?

17           MS. PARKER:  I don't see the relevance.

18           THE COURT:  We'll provide some latitude at this stage

19  given its reference in the context of the opening statements.

20  I believe it could be connected up and relevant.  Overruled.

21           MS. ARNETT:  Thank you.

22  BY MS. ARNETT:

23  Q.   When the freeze code gets attached to a taxpayer's

24  account, how are -- how does the IRS continue to provide the

25  Bill of Rights that they say they're supposed to offer the

Miller - Cross

1    taxpayers?

2    A.   If there's a freeze code on the -- his module, which is

3    what we call it, his account, there would be no communication

4    from the civil side.

5    Q.   Even though it's required in the Bill of Rights?

6            MS. PARKER:  Well, Your Honor, I think that's a

7    misuse of the word "required," and I object to that.  This is,

8    at best, a policy statement.  It's not a law.  It's not a legal

9    requirement.

10           MR. MINNS:  It is a law.  It was mandated by

11   Congress, Your Honor.

12           MS. PARKER:  There have been no foundation for that

13   assertion.

14           MR. MINNS:  Huge congressional hearings on it.

15           MS. PARKER:  Judge, I don't want to have --

16           MR. MINNS:  I apologize.

17           THE COURT:  We're close enough to 1:00 that we can

18   take up the discussion that shouldn't necessarily involve the

19   jury at this stage.

20           MS. PARKER:  Exactly.  Thank you.

21           THE COURT:  It's a good place.

22           MS. ARNETT:  I was going to move on after that

23   question, but we can break, if that's what you're suggesting.

24           THE COURT:  Let's do that.

25           MS. ARNETT:  Thank you.

1          THE COURT:  We appreciate your time and attention

2    today.  You're obviously free to go about your business this

3    afternoon, and we'll look forward to seeing you in the morning.

4    Coffee pot will be on by eight, right, Mr. Haines.

5          THE CLERK:  Correct.

6          THE COURT:  Please rise for the jury.

7          (At 12:56 p.m., jury leaves.)

8          THE COURT:  We're outside of the presence of the

9    jury.  Please be seated.

10          MS. PARKER:  Judge, do you want the witness here or

11   not for this?

12          THE COURT:  I don't have any objection to the witness

13   being present with respect to this discussion, unless the

14   defense does.

15          MR. MINNS:  No.  Is it -- I don't want to -- it's

16   Ashley's witness, but since there's no jury here I thought I

17   might be permitted to join in the discussion with the Court on

18   this, if there's --

19          THE COURT:  Oh, it would be a pleasure.

20          MR. MINNS:  Thank you, Your Honor.

21          THE COURT:  And, sir, you're done from the witness

22   stand, at least at this juncture.

23          Simple question at this stage is do we know what the

24   force or authority of the Taxpayer's Bill of Rights is?  I'm

25   certainly quite familiar with the reference to it.  My

1    understanding is that it never made -- it does not carry the

2    force of law, that it an aspirational expression by the Service

3    of what they believe taxpayers should be entitled to.  Do we

4    know?

5             MR. MINNS:  And we're -- we're going to get a

6    definitive answer in the morning, Your Honor, because we don't

7    want to say something and be proven wrong, but this is my

8    recollection of the extensive hearings that took place in

9    Congress.

10            There was a lot of improper things that happened,

11   seizures that shouldn't have happened, things like that, and it

12   was created right after that, so there was a Taxpayer Bill of

13   Rights presented before Congress.  I thought it had passed, but

14   we will know for certain tomorrow morning, and I have -- we

15   have a special agent who was in charge of Illinois, and he

16   doesn't know off the top of his head.  I thought he would.

17            But it's definitely a publicly registered statement

18   by the Internal Revenue Service, and they're definitely

19   supposed to follow it.  It's my understanding --

20            MS. PARKER:  Judge -- I'm sorry.

21            MR. MINNS:  It's my understanding -- and I remember

22   talking with Paul DesFosses when he was testifying before

23   Congress on this for the Taxpayer Bill of Rights.  It was my

24   understanding that it was passed, but I don't want to -- I

25   would prefer when we -- if we could get here at 7:55 tomorrow

Miller - Cross                                        138

1  and we can say yes or no that it is law itself, I would prefer

2  that, but I believe it, but that doesn't mean I'm right.

3             THE COURT:  Wouldn't that be wonderful?  I will be

4  here at 7:55, and we'll look forward to learning what you have

5  learned.  Okay.  We may do a little digging on that on our own.

6             I've got a couple other things because we've got a

7  little bit of time here, and it may be appropriate to excuse

8  the witness.  I'd like to talk about the motion in limine for a

9  little bit, so that I can get some background on that.

10             MS. PARKER:  I'm just going to grab the exhibits

11  so --

12             THE COURT:  Yes, thank you.

13             And one thing that I've been doing during the course

14  of the testimony, as well, is taking a look a little bit more

15  carefully at the motion in limine and the associated exhibits

16  that were attached to it.  One of the assertions that's made in

17  the motion in limine arises out of the portion of the brief on

18  page 5 where it reads as follows:

19             Pieron -- and I apologize for my mispronunciation of

20  your name if it is a mispronunciation.  How do you pronounce

21  your name correctly?

22             THE DEFENDANT:  Pieron, like the old --

23             THE COURT:  Pieron.

24             THE DEFENDANT:  Pierre, the character in Peter and

25  the Wolf an old Russian nursery rhyme, I think it was, but it

Miller - Cross                                                        139

1  was Pierre, so it's Pieron.

2              THE COURT:  That's helpful.  Thank you.

3              THE DEFENDANT:  Yes, sir.

4              THE COURT:  Pieron did not invest his funds with Cook

5  but he still had sought to portray himself as a victim and even

6  claimed a substantial theft loss deduction on his amended

7  personal income tax returns for 2008 and 2009.

8              It goes on, nevertheless, if this portion of the

9  current motion is granted, the Government will not seek to

10 present evidence in its case in chief that Pieron falsely

11 claimed a theft loss deduction because he was not a victim of

12 theft under Section 165(c), which allows certain casualty

13 losses or losses from theft.  Rather the Government will accept

14 the amended tax returns reflecting the theft loss for purposes

15 of trial.

16             On my review of the documentation at this stage, I

17 don't understand what that means.  It's -- if I understand the

18 offer that was made by the defendant, the effect, if the

19 calculations on the loss were accurate, would eliminate the tax

20 liability.  That obviously is not the Government's assessment.

21             MR. DEPORRE:  Correct, Your Honor.

22             THE COURT:  Why is that?  Because as I understand

23 acc -- at least the accusation that -- was when Mr. Cook made

24 his investment in the stock, there was -- he was not issued

25 treasury stock from the holding company.  The defendant

1   actually sold stock that he held directly to Mr. Cook, which

2   would be potentially a taxable transaction as opposed to the

3   issuance of treasury stock.  That creates a potential capital

4   gain, and then the remaining question, either under the Claim

5   of Right Doctrine or 1331 would be whether there's an

6   offsetting loss that would be appropriately deducted against

7   that gain.

8           Why -- how is it that you can contend that even if

9   that loss did not occur, there are was still actionable tax

10  evasion?

11          MR. DEPORRE:  Based on the first amended returns that

12  the defendant filed --

13          THE COURT:  Okay.

14          MR. DEPORRE:  -- he took a theft loss for both

15  '08 and '09 in those years and still had additional income that

16  was reflected and that resulted in substantial tax.

17          THE COURT:  Now, one thing that's notable, at least

18  from the offer of proof, is that there are tax calculations

19  that were presumably done by the accountant, but there's no

20  source documentation that would support any of those adjusting

21  entries that were necessarily included with any of the

22  material.  Is that true?

23          MR. DEPORRE:  That is true.

24          THE COURT:  Is that true?

25          MR. MINNS:  This is -- this is my understanding, Your

 1    Honor, from -- my -- and the entire area doesn't make a great

 2    deal of sense to me, but there's been recent Circuit Court

 3    opinions apparently supporting Mr. Pavlik's position, so he was

 4    prescient rather than -- there wasn't a lot at the time he took

 5    this stand.  But what Mr. Pavlik's position was that the

 6    reputation caused damages, and reputation damages because of

 7    Cook got them fired from the bank.  And Mr. Pavlik should be

 8    the source of this, because if I'm misinterpreting it, I

 9    apologize to the Court.

10            When the relation -- and there's some similarity to

11    this between the stuff with Bernie Madoff.  When the

12    relationship with him was publicized, the bank -- with

13    Mr. Cook, the bank cut off --

14            THE COURT:  Credit.

15            MR. MINNS:  -- their ability to trade and closed them

16    down immediately, and the business, which had a substantial

17    value, had zero value the next day.

18            And it is my understanding that Mr. Pavlik prepared

19    the returns based on that and that there are loss of reputation

20    as a result of the damages.  You may not have source documents

21    showing them exactly, because it's not -- it's not -- it's not

22    a mathematical computation as I understand it.

23            So the ability of the -- to claw back the money was

24    in existence.  The money was gone --

25            THE COURT:  Because they were insolvent?

Miller - Cross                                              142

1          MR. MINNS:  Pardon?

2          THE COURT:  Because they were insolvent?

3          MR. MINNS:  Yes, sir.  And then there's two thought

4    processes; one, if you don't -- if you receive -- when they owe

5    it back, it's like receiving a loan.  If you don't pay the loan

6    back, it's income, but that was -- that's the first position.

7    But the second position is that it is excused because of the

8    statute I believe that Mr. Pavlik found.  It is excused just as

9    Congress passed some laws when you lost your home, you didn't

10   have to pay taxes on that for a period of time on the unpaid --

11   unrepaid mortgage note, so these things happen, so --

12         THE COURT:  If the calculations that Mrs. Pavlik

13   tenders as a part of the offer are not based on economic losses

14   and, therefore, there is no source documentation for expenses

15   for example that Mr. Pavlik turned up that the former preparer

16   did not, how does he get reputational loss figures in order to

17   include those in the offer?

18         MR. MINNS:  I don't know, Your Honor.  We have two

19   experts on this who can testify to that.  One of them was an

20   appeals officer for 43 years, Professor Gavin, I believe, and I

21   don't know.  It's -- it's -- I think I'm above average on

22   taxes, but this is over my head.

23         And my understanding -- my understanding right now is

24   that it would probably pass audit, so he would probably pass

25   audit based on that.  I -- I would not be able to prepare these

Miller - Cross

143

1  tax returns.  I wouldn't even be able to read them, and I have

2  more than a layman's understanding of tax law.

3         Mr. Pavlik -- and our burden is not to prove that

4  it's -- that the tax return will pass audit or should pass

5  audit or anything else.  Our burden is to prove the intent of

6  James Pieron.  He relied on a very qualified expert, who more

7  likely than not was right, but until the audit takes place, no

8  one will know if he was right or wrong.

9         THE COURT:  What I'm trying to get my finger on at

10  this point is the extent to which there is a difference of

11  opinion between Mr. Pavlik and the Service as a matter of

12  principle concerning the application of the doctrine or 1331,

13  or there's a difference of opinion of fact concerning the

14  actual losses associated with the collapse of the enterprise.

15         MR. MINNS:  From what we have been hearing, there is

16  a difference of opinion in fact.  The Government does not think

17  that Mr. Cook was responsible for the downfall, but they have

18  to speak for themselves.  I don't have an opinion whether he

19  was responsible for the downfall or not, so if Mr. Cook was not

20  responsible for the downfall, then we might not be entitled

21  to --

22         THE COURT:  Well, and when we say "the downfall,"

23  we're talking about -- it's an enterprise, there are four of

24  them, with four letters, JDFX.  What information do you have

25  concerning the actual fact of the insolvency of that entity

1  which became a predicate for you saying that there was a

2  reputational loss?

3          MR. MINNS:  Could Ms. Arnett speak to that, Your

4  Honor.

5          MS. ARNETT:  Sure.  We have the statements from the

6  trading account where you can see when the information about

7  Trevor Cook's indictment and all that investigation comes out

8  where they start cutting it off, and they completely cut off

9  the trading capabilities of JDFX, and it lines up with the time

10 frame for when the Cook stuff came out and when the banks

11 pulled their accounts.

12         THE COURT:  And most of this was currency trading,

13 wasn't it?

14         MS. ARNETT:  Yes, Your Honor.

15         THE COURT:  And so there's a point in time at which

16 the documentation in your view would support the notion that

17 the trading clients simply stopped looking to JDFX and, as a

18 result, the entity collapsed from insolvency?

19         MS. ARNETT:  Well, and the banks.  The banks pulled

20 the credit line, so they have to have the credit line to do the

21 trading and when all the stuff came out, the bank cut off the

22 credit line.

23         THE COURT:  So it was --

24         MS. ARNETT:  They couldn't trade, and then they froze

25 the account for a certain period of time so then the customers

Miller - Cross                                                    145

 1   pulled their -- pulled their accounts --

 2           THE COURT:  So it was the loss --

 3           MS. ARNETT:  -- and everybody.

 4           THE COURT:  It was the loss of a line of credit which

 5   was necessary to continue the trading, as opposed to clients no

 6   longer being willing to trade?

 7           MS. ARNETT:  It's a combination.  It's a combination

 8   of both.

 9           THE COURT:  Any of that -- any of the information

10   that would support your suggestion that the insolvency occurred

11   as a result of these losses of credit shared with the

12   Government during the course of the exchange of reciprocal

13   discovery?

14           MS. ARNETT:  Yes, Your Honor.  In fact, I think it

15   came from their records.

16           THE COURT:  True?

17           MR. DEPORRE:  We received records from the accountant

18   firm, Andrews Hooper Pavlik, that didn't substantiate but

19   had -- they were in the form of work papers rather than source

20   documentation.

21           MS. ARNETT:  Oh, I'm referring to the Deutsche Bank

22   records that you all provided us.

23           MR. DEPORRE:  And those would be for the trading, the

24   traders?

25           MS. ARNETT:  It's the -- you can watch the trades and

Miller - Cross

1    there's a significant -- you can clearly see it in the trades

2    where it cut off, and it corresponds in time with the Cook --

3              THE DEFENDANT:  Not just that -- they interviewed --

4    sorry.

5              THE COURT:  Did Deutsche Bank or a  representative of

6    Deutsche Bank ever give a explanation for their withdrawal of

7    the line?

8              MS. ARNETT:  We have the -- yes.  We have the

9    termination letter from Deutsche Bank.  It's actually on our

10   exhibit list.

11             MR. DEPORRE:  But, Your Honor, that termination

12   letter is from 2010, so it's outside the years that we're

13   talking about.

14             MS. ARNETT:  2010 is when you owe your 2009 taxes.

15             MR. DEPORRE:  But if he's saying the theft loss arose

16   in 2008 or 2009, that doesn't make sense.  The theft loss has

17   to be taken in the year that the theft is discovered, and if

18   they're saying that the theft, which isn't a theft, but a

19   reputational harm by Deutsche Bank pulling --

20             MS. ARNETT:  A line credit.

21             MR. DEPORRE:  A line of credit.

22             MS. ARNETT:  It's difference also than the day they

23   terminate.

24             MR. DEPORRE:  That would be in 2010.

25             MS. ARNETT:  Well, the termination letter is not the

```
 1    same time that they pull the line of credit.  They pull the

 2    line of credit and then terminate later, but --

 3              THE COURT:  And when you say pulled, they were

 4    essentially no longer letting them draw?

 5              MS. ARNETT:  Right.

 6              THE COURT:  Is there anything that reflected what

 7    their obligations were when they were no longer able to draw on

 8    the line?  Has there been any development of any of those

 9    financial records?

10              MS. ARNETT:  Outside of Deutsche Bank records, not

11    that I'm aware of.

12              THE COURT:  Back to the proposition that you had

13    advanced in the motion in limine, I'm trying to understand, at

14    least at this juncture, why the assertion that you're making

15    concerning the loss and its impact on the reporting for 2009,

16    2010 where you make the suggestion nevertheless, if this

17    portion of the motion is granted, the Government will not seek

18    to present evidence in its case in chief that the information

19    falsely claimed the theft loss deduction.

20              If that's true, that means there's still actionable

21    misconduct, true?  I mean, putting aside the loss.

22              MR. DEPORRE:  Putting aside the loss, yes, there's

23    still actionable misconduct.

24              THE COURT:  And what is that?

25              MR. DEPORRE:  The evasion of payment.  So the loss on
```

1    the -- I think there are two distinct theories.  The first is

2    the theft loss deduction, which is reflected in the first

3    amended returns for '08 and '09.

4              THE COURT:  Yep.

5              MR. DEPORRE:  The second is a claim of right position

6    which is reflected in an offer and compromise -- or, excuse me,

7    an offer and compromise as to doubt as to liability, and also

8    in an amended 2011 return that is filed and the -- around the

9    same time as the offer and compromise.

10             The theft loss -- if we take the defendant at his

11   word for the theft loss, there's still a balance due for those

12   tax returns for both '07 -- or, excuse me, '08 and '09, and so

13   there's still actionable misconduct following that.

14             THE COURT:  And that is?

15             MR. DEPORRE:  That is that there's a tax due and

16   owing, and that the tax isn't paid, and that the defendant does

17   things to put assets outside the reach of the IRS, and that the

18   defendant files false information in the form of a false

19   collection information statement with the IRS.

20             THE COURT:  Which we've, in part, reviewed today --

21             MR. DEPORRE:  Correct.

22             THE COURT:  -- through the witness?

23             What do you think of that?

24             MS. ARNETT:  Well, if they want to accept the returns

25   that the defendant filed, then that's great.  The 2014 return,

1    amended return, the 2011 amended return that was filed in 2014

2    wipes out the tax for 2008 and 2009.  This is an evasion of

3    payment case, and there's no tax due and owing if you want to

4    accept the returns that the defendant filed.

5         THE COURT:  Well, that begs the question, which is

6    tax due and owing when?  Is it tax -- is -- is it tax evasion

7    if at the time you file a return you simply don't include a

8    check?

9         MS. ARNETT:  No.

10        THE COURT:  Do you agree?

11        MR. DEPORRE:  No, I believe that can be tax evasion.

12        THE COURT:  Well, isn't that, actually putting aside

13   some of the more interesting arguments, one very basic

14   question, which is when.  And I don't know the answer.

15        MR. DEPORRE:  Well, I also don't -- I don't think we

16   need to go there.  I think that the fact that the defendant

17   never files another amended return for 2008 or 2009, besides

18   that first amended return, he submits an offer and compromise

19   saying here's my theory why this liability should be less, but

20   he never files a 1040X for '08 and '09 based on the claim of

21   right theory.  It simply isn't --

22        THE COURT:  But how can he do that, given the nature

23   of the timing of events?  As I recall, you've got three years

24   to file an amended return from the time that it is due.  And in

25   this case it would encompass, presumably, the initial tax that

Miller - Cross

1   he probably -- I don't know that he did or did not do this,

2   would have reflected on his return from the sale of the stock

3   that he owned.

4           Inherent in these transactions is that the insolvency

5   occurs after the creation of the tax liability, so he can --

6   does the adjustment go on the later return or -- or do you have

7   to go back and amend for the earlier return?  It's again a

8   question that I'm not familiar with.

9           MR. DEPORRE:  Could I ask somebody?  Phone a friend?

10          THE COURT:  Call a friend.

11          MS. ARNETT:  I think that this goes to knowledge,

12  too, right; the intent of the defendant, I mean, you have to

13  have intent.

14          THE COURT:  Sure.

15          MS. ARNETT:  Yes.

16          THE COURT:  And this would not be the first defendant

17  that we have seen who missed the implications of selling the

18  stock which he owned as opposed to the issuance of some

19  treasury stock with a zero basis.  Presumably the initial basis

20  that he would have had in the stock that he owned was

21  substantially less than that of the proceeds that he received

22  from Mr. Cook and would have generated potentially a fairly

23  significant liability.

24          So then the question becomes, if that's true, how one

25  handles fact that that liability exists at time period A, but

Miller - Cross

 1 | at time period C you have an independent set of events that
 2 | make the stock largely worthless, even though it started out to
 3 | zero, went to 15 million when Mr. Cook bought it, and if your
 4 | assertion is accurate, went to zero as a result, from your
 5 | perspective, of a misunderstanding by Deutsche Bank's
 6 | understanding of Mr. Cook and your client's relationship
 7 | driving the entity into insolvency, and I don't know the answer
 8 | as to how you handle the reporting on that.
 9 |        MR. MINNS:  The interesting thing, Your Honor, is
10 | this, the gentleman sitting -- the tax -- at the Government
11 | table is an expert in tax on his own.  He's knowledgeable.
12 | They have prepared this case, and as they sit here right now,
13 | they don't -- he's going to have to ask another expert to
14 | figure this out, so the question is whether our client could
15 | have even known this.
16 |        And in -- the first time he could have known even the
17 | possibility of this giant amount of money was in -- when it was
18 | calculated and the first time it was calculated was in 2011, so
19 | he had no way of even knowing about it until it was calculated.
20 | In 2011 he did not --
21 |        THE COURT:  Well, let me -- so that I understand
22 | correctly --
23 |        MR. MINNS:  Yes.
24 |        THE COURT:  -- when he accepts the 15 million more or
25 | less from Mr. Cook --

1          MR. MINNS:  Yes, Your Honor.

2          THE COURT:  -- in exchange for the stock --

3          MR. MINNS:  Yes.

4          THE COURT:  -- does he ever report that capital

5     transaction?

6          MR. MINNS:  He doesn't file a US tax return at that

7     time, and Switzerland doesn't charge you taxes on capital gains

8     so --

9          THE COURT:  I appreciate -- I appreciate that's true

10    under Swiss law --

11         MR. MINNS:  Yes.

12         THE COURT:  -- but I guess my point is that that is

13    not true under US law for a US citizen abroad.  Does he ever

14    reflect the potential liability for that capital transaction

15    and, if so, when?

16         MR. MINNS:  He reflected -- it's reflected in the

17    notes of Carol Nathan, that he told her he had a $9 million

18    capital gain, and later he told Mr. Pavlik I think you've left

19    some money off.  I think there was more money than this, and

20    Mr. Pavlik increased the amount of debt on the next tax return,

21    because the taxpayer, who is the only one that could have known

22    that, actually asked him -- he said I don't -- this is not the

23    full amount.  So, yes, the correct amounts of income were

24    reported to the tax -- to the tax preparers, and they're the

25    experts that prepared the tax returns.

Miller – Cross                                              153

1           THE COURT:  Well, on your view of the circumstance

2      the loss -- you call it reputational loss -- really isn't a

3      dispute about the applicability of the tax loss.  It's simply

4      as a result of the fact that it was insolvent, true?

5           MR. MINNS:  I believe so, Your Honor, and I'm not

6      competent to testify about that tax return, but that is my

7      understanding.  The witnesses who are competent will -- have

8      both been traded -- they're on the Government's list, and I

9      assume the Government will call them; if they don't, we'll call

10     them.

11          THE COURT:  Is there documentation other than the

12     Deutsche Bank documentation of their withdrawal on the line and

13     their termination of the line that would substantiate the

14     connection between JDFX's insolvency and the events related to

15     Mr. Cook?

16          MS. ARNETT:  Mr. Pavlik required Mr. Pieron to give

17     him a write-up of the situation and how it affected him, and

18     that is included in AHP's documents which we received from the

19     Government.

20          THE COURT:  Okay.  Helpful to me to try and catch up

21     with you and my understanding of the situation.

22          At least for our brief meeting at 7:55 tomorrow,

23     we'll have an opportunity to take a look at the legal force of

24     the Taxpayer's Bill of Rights and pick up with testimony on

25     cross-examination.

Miller - Cross                                                    154

1              Anything else we ought to cover before we close for

2    the day?

3              MS. ARNETT:  No, Your Honor.

4              MS. PARKER:  Nothing for the Government, Your Honor.

5    Thank you.

6              THE COURT:  The record's closed.  Thank you.

7              (At 1:26 p.m., court recessed.)

8

9

10

11                         * * * * *

12                   C E R T I F I C A T E

13        I certify that the foregoing is a correct transcript
          from the proceedings in the above-entitled matter.

14

15                         _Carol M. Harrison_____

16   Date: 3-22-2019    Carol M. Harrison, RMR, FCRR
                        Official Court Reporter
17                      United States District Court
                        Eastern District of Michigan
18                      1000 Washington Avenue
                        Bay City, MI  48708
19

20

21

22

23

24

25

US v. Pieron, Jr. - TRIAL - VOLUME 2 - February 28, 2019