```
1                    IN THE UNITED STATES DISTRICT COURT
                         EASTERN DISTRICT OF MICHIGAN
2
   UNITED STATES OF AMERICA              ) Bay City, Michigan
3                                        ) March  1, 2019
       vs.                               ) 8:17 a.m.
4                                        )
   JAMES D. PIERON, JR.,                 )
5                                        ) Case No. 18-20489
       Defendant.                        )
6  _____    )

7
                     TRANSCRIPT OF TRIAL - VOLUME 3
8             BEFORE THE HONORABLE THOMAS L. LUDINGTON
                      UNITED STATES DISTRICT JUDGE
9
   APPEARANCES:
10
   For the Government:  JANET L. PARKER
11                      JULES M. DEPORRE
                        United States Attorney
12                      Eastern District of Michigan
                        101 First Street
13                      Suite 200
                        Bay City, MI 48708
14
   For the Defendant:   MICHAEL L. MINNS
15                      ASHLEY B. ARNETT
                        Minns & Arnett
16                      9119 South Gessner; Suite One
                        Houston TX 77074
17
   For the Defendant:   KENNETH SASSE
18                      Attorney at Law
                        27 E. Flint Street; 2nd Floor
19                      Lake Orion, MI  48362
                        (248) 821-7325
20

21 Court Reporter:      Carol M. Harrison, RMR, FCRR
                        1000 Washington Avenue
22                      Bay City, MI  48708

23

24          Proceedings reported by stenotype reporter.
            Transcript produced by Computer-Aided Transcription.
25
```

1                              INDEX

2

WITNESSES FOR THE GOVERNMENT:

3

ROBERT MILLER
4        Cross-Examination, Cont'd By Ms. Arnett          19
         Redirect Examination By Ms. Parker              32
5        Recross-Examination By Ms. Arnett               33

6   CHRISTINE MASON
         Direct Examination By Mr. Deporre               34
7        Cross-Examination By Mr. Sasse                  52
         Redirect Examination By Mr. Deporre             63
8        Recross-Examination By Mr. Sasse                67

9   ANDREA ODIER
         Direct Examination By Ms. Parker                69
10       Cross-Examination By Mr. Minns                  75

11  CAROL NATHAN
         Direct Examination By Ms. Parker                79
12       Cross-Examination By Mr. Minns                 112
         Redirect Examination By Ms. Parker             142
13       Recross-Examination By Mr. Minns               147

14  JEFFREY CORNWELL
         Direct Examination By Mr. Deporre              149
15       Cross-Examination By Ms. Arnett                152

16  ZACHARY SCHWEDER
         Direct Examination By Mr. Deporre              154
17

18

19

20

21

22

23

24

25

```
 1   INDEX, CONT'D:

 2   EXHIBITS:                                               RCVD

 3     GX 43    Pieron 2010 form 1040                         106
       GX 52    2007 Payment Vouchers                         110
 4     GX 53    2008 Payment Vouchers                         110
       GX 54    2009 Payment Vouchers                         110
 5     GX 55    2010 Payment Vouchers                         110
       GX 56    Client Contact Log                             96
 6     GX 57    Email to Carol Nathan                          92
       GX 58    Email to Carol Nathan                          82
 7     GX 61    2008 Initial Spreadsheet - Capital Gains       86
       GX 62    2009 Initial Spreadsheet - Capital Gains       86
 8     GX 63    2007, 2008, 2009 Revised Spreadsheet           86
       GX 64    Swiss Record of Foreign Income,                89
 9              Withholdings
       GX 135   Signature Card - IB Tech                       43
10     GX 137   Signature card - Komplique                     45
       GX 138   Wire Transfers - Wells Fargo                   70
11     GX 170   Purchase Records for 2013 Mercedes            150
       GX 171   2009 Mercedes Title                           150
12     GX 172   Komplique Corporate Resolution               150
       DX 1002  IRS Bill - Feb 2018                            27
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2              (At 8:17 a.m., proceedings commenced.)

 3              (Defendant present.)

 4              THE CLERK:  United States of America versus James

 5    Pieron, Case No. 18-20489.

 6              THE COURT:  Good morning, counsel.

 7              MS. PARKER:  Good morning, Your Honor.

 8              THE COURT:  Record will reflect the fact that counsel

 9    are all present and ready to proceed.  We had one discussion

10    point that we assigned for our morning session before we

11    entertain the jury, and that was a question of the legal status

12    of the Taxpayer's Bill of Rights.

13              I've had a little bit of research done on the

14    question, and I notice that we also had a copy of the 2015

15    statute furnished to us this morning.  It appears to have force

16    of law.  Will Government agree?

17              MS. PARKER:  Yes, Your Honor.  We don't agree,

18    however, that it's relevant.  We think it's 403 evidence at

19    best.  Whatever force of law, it's my understanding -- we've

20    done some looking into this, too -- this is something that is

21    presented to people who are undergoing a civil audit.  It

22    doesn't -- it doesn't apply into a criminal investigation.

23              I would note, as you just said, it was enacted in

24    2015, which this is a case which is -- pretty much most of the

25    events occurred before then, but it's just -- it's -- in a
```

1  criminal case, we have Rule 6(e) of the Federal Rules of

2  Criminal Procedure, and we have a different whole course of how

3  informing is handled and how things are done, and this was a

4  criminal investigation before that statute was ever enacted.

5      So I think it's likely to confuse the jury.  It's not

6  helpful in addressing the relevant issues because whatever

7  noncompliance could be presented as to the Taxpayer Bill of

8  Rights certainly would not be a defense to not paying your

9  taxes.  That's -- it's a disconnect, and it is really of --

10 doesn't go to the credibility of the witness that's testifying

11 or any other witness that I can anticipate.

12     It can cause unnecessary waste of time and put us in

13 a position where we have to then come back with other evidence

14 which will, again, just take more time to refute information

15 that is essentially irrelevant in the context of this case.

16     THE COURT:  My reading reflected the fact that, at

17 least from the few courts that have taken a look at it, that

18 the Taxpayer Bill of Rights was reflected as a compilation of

19 already existing rights contained within the code and that it

20 was an effort to compile and restate those rights and not

21 necessarily to create any additional obligations on the part of

22 the Service.

23     So it was for purposes of clarification, and

24 aspirational apparently, but nevertheless grounded in the code

25 and obligations of the Service.

1          MS. PARKER:  Yes, but I would say, Your Honor, as

2    looking at the -- I'm sorry, let me get the right -- looking at

3    the directions that are given to the IRS personnel, this is

4    something that is actually presented to people at the

5    initiation of a civil audit.  It's not something that -- I

6    mean, as a general aspirational thing, I think that's true, but

7    it doesn't make it relevant in this context of -- for anything

8    that's going to help the jury decide whether or not the

9    defendant evaded taxes.

10          There is an Internal Revenue Manual that directs how

11    and when -- how to present that to defendants --

12          THE COURT:  And --

13          MS. PARKER:  -- I mean, excuse me, to people

14    undergoing civil audit, I'm sorry.

15          THE COURT:  I'm trying to catch up and do -- and do

16    my reading as we go, at least as the information comes to me,

17    and on that point, is it possible that I might get an exhibit

18    summary?  I'm trying to keep up, particularly with respect to

19    the FBAR filings that were introduced into evidence yesterday,

20    but if there is an exhibit book that might be available so that

21    I can actually stay up with you while you're examining the

22    witness, it would be appreciated.

23          MS. PARKER:  I have don't have a paper book at this

24    moment.  We delivered a CD with the exhibits on it last week.

25          THE COURT:  All right.  I'll double check and see if

 1  we can get downloaded that printed, because it would be helpful
 2  to me.
 3        MS. PARKER:  I certainly understand that, Judge.
 4        THE COURT:  Yes.  But back to the point, at least
 5  from my perspective as I understand it, we end up with '08, '09
 6  returns filed, as I understand it, in January of 2011,
 7  apparently by ATS, and then we have two different sets of
 8  amended returns that were filed by Pavlik, if I understand
 9  accurately.  Is that the case?
10        MS. PARKER:  Depending on the specific entity, there
11  were some additional ones that were done by other people, but
12  as to the defendant's personal returns, I believe that's
13  accurate.
14        THE COURT:  And are any of these --
15        MS. PARKER:  There was just one amended return that
16  was filed.
17        THE COURT:  But the ATS returns do get filed in
18  January of 2011?
19        MS. ARNETT:  Yes, Your Honor.
20        MS. PARKER:  Yes.
21        THE COURT:  And then Pavlik files in January of 2012.
22  I assume that was identified as an amended return?
23        MS. PARKER:  Yes.
24        THE COURT:  And then in March 21st, 2014, in effect
25  the third filing for that time period?

1          MS. ARNETT:   Correct.   It was an amended 2011 return

2    that related back to the '08 and '09 taxes.   That's the claim

3    of right return.

4          THE COURT:   Do any of those returns include

5    passthrough income, or are all of the entities that the

6    defendant was involved in separate entities?   Has he made any

7    S-elections on the LLCs?

8          MR. DEPORRE:   Komplique had an S election.

9          MS. ARNETT:   I think an 1120S was filed for

10   Komplique.

11         MR. DEPORRE:   Komplique, sorry.

12         MS. PARKER:   I'm told it was Navitas was the

13   passthrough entity.

14         MR. MINNS:   I don't think you can file 1120S for

15   foreign corporations.

16         MS. ARNETT:   Komplique was a --

17         MR. MINNS:   It was first foreign and then American,

18   so my understanding is it may have been 1120S when it was an

19   American corporation, but when it was a Swiss corporation I

20   don't think it's possible for it to be an 1120S.

21         THE COURT:   The comparison between the currency

22   trading and the swimwear is a fascinating dichotomy?

23         MS. ARNETT:   Yes, it is.

24         MS. PARKER:   Navitas was a different entity, and I

25   may be putting the accent on the wrong syllable, but it's

1  N-A-V-I-T-A-S.

2          MS. ARNETT:  I think it's Navitas.

3          THE COURT:  Mr. Minns, why do you think that in

4  examining the witness you should be able to refer to the

5  Taxpayer's Bill of Rights in terms of the response you think

6  that the Government should have had to anyone of these three

7  filings?

8          MR. MINNS:  And, first of all, this was the third

9  Taxpayer Bill of Rights.  The two others passed, so there were

10 two others passed, considerably passed in these times.  The

11 reason is this:  First of all, there's -- it's a twofold thing.

12 The taxpayer has a right to know what the law is, and the

13 Government has a duty to assist them when they're making

14 inquiries to them.  If the Government is failing to return

15 calls in violation of the law, it's very hard for the taxpayer

16 to comply.

17         THE COURT:  But the Service -- the Service is not a

18 kind kindergarten teacher assisting the taxpayer in preparation

19 of their return.  The taxpayer is, notwithstanding the

20 complications of the code, obligated on their own to understand

21 that, are they not?

22         MR. MINNS:  They're obligated to -- if they do not

23 understand it, obligated to seek expert advice to assist them

24 in compliance with the law.  And the very statements in the

25 *Cheek* case which controls everything since that decision, is

```
 1   that law is -- ignorance of the law is a defense.  The law is
 2   too confusing, therefore, they do not -- and this goes all the
 3   way back to the Murdock case.  It hasn't changed.  It's been
 4   the law in the United States since 1933.  The law in this
 5   regard on taxes is too confusing.  If it's too confusing in
 6   1933, it's certainly too confusing now.
 7           It's too confusing so we have to -- the Government
 8   has the burden of proving that the taxpayer understood the law
 9   and violated it, so the taxpayer has the right -- I mean,
10   when -- and this is -- this is not the taxpayer -- it's through
11   his agents.  The agents have the right to do what the law tells
12   them to do and expect the law to come back to them so that they
13   can give correct advice to their client.  That never happened,
14   and it shocks the conscience.
15           If it had happened, we would not be here.  If it
16   had -- or if it had happened, and then having the meeting of
17   the minds, they refused to obey the law, then that's a clear
18   and unequivocal violation of the law.
19           THE COURT:  Well, the Service has three returns
20   sitting in front of it.  What should they have done?  Rung up
21   your client on the phone and said what are you doing?
22           MR. MINNS:  No, they should have said what -- and
23   what they do 99 percent of the time, this is -- this is the
24   type of stuff that was in Congress, but most cases are not the
25   type of stuff that was before Congress.  What they do is
```

1   contact the person who's filed the power of attorney, they say,

2   yes, no or counter.  With every single document they do that.

3          They cut him off.  In all probability, the freeze

4   code, since the second Taxpayer Bill of Rights and this one, is

5   probably illegal.  They shouldn't be still doing that, and

6   there's a lot of former agents saying that.

7          The amended return included an installment agreement.

8   The taxpayer -- the law tells the taxpayer and his group people

9   tell the taxpayer, you don't need to do anything else now,

10  wait, the Government is required to respond, and when they

11  respond they may say yes, they may say no or they may counter.

12         When they fail to respond, the taxpayer can't do

13  anything else.  He still did.  They kept filing other requests.

14  They filed requests as to doubt as to liability, and there's

15  several that I believe -- I believe the Government knows this.

16  They've met with Mr. Pavlik far more than we have had the

17  opportunity to.  Mr. Pavlik kept expecting that meeting.  It's

18  the first time in his 40-plus career that the meeting never

19  occurred, and there was no response on any of his overtures.

20         So when the intent issue -- if the taxpayer is hiring

21  experts who are marking overtures constantly to the Government,

22  and they're violating the law and ignoring all of the

23  overtures, it's -- it goes straight to the issue of intent.

24         THE COURT:  Am I correct in understanding that the

25  SEC receiver never sued your client?

1      MR. MINNS:  Yes, Your Honor.  Well, wait -- no, I'm

2  incorrect -- may Ms. Arnett -- she's -- I don't know that

3  issue.  If she could speak?

4      MS. ARNETT:  They -- he never sued him, but they met

5  several times, and he did get some money back out of some money

6  that he had of Cook's.

7      THE COURT:  Your client returned money to Cook or

8  Cook returned money to your client?

9      MS. ARNETT:  My client returned money to the receiver

10  of Cook's.

11      THE COURT:  There's a reference to -- within a

12  memorandum, I believe it was a DOJ counsel that had written it,

13  that's attached to the motion in limine, and they quote an

14  estimate of the amount of business that your client's firm was

15  doing with Cook's enterprise.  Is that a reasonable estimate?

16  It was a substantial portion of your client's business?

17      MS. ARNETT:  I haven't verified the numbers, but I

18  can do that on a break.

19      THE COURT:  Well, we're at a point where I'm going to

20  extend the defense some latitude in their examination of the

21  witness concerning the propriety of the Government's response

22  to inquiries by the taxpayer.

23      MS. PARKER:  Your Honor, I don't think that's

24  appropriate as to this witness.  I mean, are we then to be

25  allowed to bring in the Internal Revenue Manual to go into what

```
 1   it is that people are instructed not to do once there's a
 2   freeze code on?  I mean, we're going to open the door to that.
 3           THE COURT:  Sure.  I -- I'm -- I'm of the belief that
 4   given the way the issues were framed, that we really sort of
 5   have do, don't we?
 6           MS. PARKER:  No, I don't think we have to, and I
 7   don't think we even should.  Just because somebody wants to
 8   frame an issue in a certain way, doesn't mean -- none of this
 9   goes to the defendant's state of mind.
10           THE COURT:  How --
11           MS. ARNETT:  I disagree.
12           THE COURT:  -- how so, I mean?
13           MS. PARKER:  Because there's no basis now for him to
14   conclude -- there's no basis for the jury to conclude that he
15   was aware of the Taxpayer Bill of Rights and he was relying on
16   this in his decision not to pay his taxes when he knew he had a
17   balance due.  He can present evidence to that and maybe we'll
18   have a different context.
19           THE COURT:  Well, he says there's no balance due.
20           MS. PARKER:  No, he hasn't.  There's no evidence of
21   that in this record.  That may be what he says in his opening
22   statement, but until there's a foundation for that -- and at
23   that time --
24           THE COURT:  My understanding is that the March filing
25   by Pavlik reflects no taxes due.
```

```
 1          MS. ARNETT:  Correct.

 2          MS. PARKER:  But we're talking about a different time

 3   frame.

 4          THE COURT:  Sure.

 5          MS. PARKER:  He's trying to apply this to the entire

 6   time frame and that's part of my concern, Your Honor, you know,

 7   to go into this.  And what -- I understand that the defendant's

 8   state of mind is relevant, but whether Mr. Miller has anything

 9   to do with the defendant's state of mind, I submit the

10   fundamental fact is he does not.

11          THE COURT:  And I appreciate that, but I think the

12   question about the propriety of the service's response has an

13   impact on the defendant's state of mind.

14          MS. PARKER:  How so?  I mean, he has no -- he's not

15   testified that he thought they were mistreating him.  If that

16   were to be the testimony, perhaps that's the case, but just

17   Mr. Minns' opening statement doesn't give an evidentiary

18   foundation for cross-examination that's supposed to suggest the

19   defendant's state of mind when there's no evidence as to it.

20          THE COURT:  Well, you want to infer from the three

21   filings that the factual information supporting that three

22   returns reflects a state of mind on the defendant's part that's

23   mischievous, that he is furnishing incorrect data.  It appears

24   to me that there isn't a significant dispute over the accuracy

25   of the data, but over the application of the Internal Revenue
```

1  Code to -- to that data.  And that begs the question, in my

2  mind, which is if the Government disagrees with you, how do you

3  obtain a conversation if they disagree with you?

4          MS. PARKER:  Well, that being all accepted, that

5  really has nothing to do with the proposed cross-examination,

6  which, by the way, if I can, in the absence of the jury, I do

7  want to object to Mr. Minns, when he's not doing the cross exam

8  then jumping in, which he did in the presence of the jury while

9  the witness was still on the stand.  I mean, we weren't at a

10 sidebar.  My understanding is there normally is one attorney

11 per witness for both sides.  If that's not going to be the

12 ground rule, I'd like to know it.

13         THE COURT:  That is the ground rule.

14         MR. MINNS:  I -- I --

15         MS. PARKER:  But --

16         MR. MINNS:  I have not made a single objection in

17 this client -- and I apologize for this, the only thing I did

18 say, and she's correct on this, is the Court looked at me and I

19 said we -- he's obviously an expert.  That's what I said,

20 and --

21         MS. PARKER:  I'm not going do debate that.  I believe

22 he jumped in with more than that, but the bottom line is, if we

23 have a ground rule I'm satisfied with that.

24         But the real issue before us is whether it's

25 meaningful in addressing the very question you pose to have a

 1    discussion with a witness who is testifying to FBARs and

 2    foreign income tax reporting as to the contents of the Taxpayer

 3    Bill of Rights and how that helps the jury decide the issues of

 4    intent.

 5            Because what the IRS did or didn't do is what the IRS

 6    did or didn't do, or what they should have done, that doesn't

 7    change the defendant's intent in terms of --

 8            THE COURT:  And limited to the question of the FBAR

 9    reporting, I would probably agree, because the application of

10    that law is really fairly straightforward to the reporting, and

11    I think you made that point fairly emphatically in terms of the

12    testimony yesterday.  But when we get to the point of actually

13    examining the personal returns themselves, different question I

14    think, and I'm going to provide the defense with some latitude

15    in exploring that with the witness.

16            If we need to take it up on -- in the context of

17    particular questions, we will.

18            MS. PARKER:  Thank you, Your Honor.

19            THE COURT:  If we could have the jury, please.

20            MR. MINNS:  Could I ask one more indulgence?  I think

21    it will save a great deal of time, Your Honor.

22            THE COURT:  I'm sorry?

23            MR. MINNS:  I have one more thing to offer that could

24    save a half a day of time.  We all agree what the tax returns

25    are.  If we could agree to enter them -- we're having

```
 1   trouble -- the IRS has not given us the certified copy of the
 2   2014 amended return.  If all the correct records that were
 3   actually filed with the IRS could be entered, otherwise, we're
 4   forced to ask the witnesses to bring them.  Under Brady they
 5   were supposed to bring them and they have not.  We don't want
 6   to be going back and forth with objections and everything and
 7   sidebars.  We should have those four tax returns here in the
 8   courtroom with an agreement which returns were filed.
 9            THE COURT:  And I'm assuming, based on your
10   assertion, that your client didn't maintain copies?
11            MR. MINNS:  Well, they've been -- they -- when
12   Ms. Arnett was trying to lay the groundwork for the returns
13   that had actually been filed on the FBAR, the IRS had separated
14   them and said that the other part isn't there.  We would like
15   to have the full records that the IRS recognizes.  We -- we do
16   have copies we could put into evidence, but they're not
17   certified by the Internal Revenue Service.  We want the
18   certified copies.
19            We can serve a subpoena on them and ask them of the
20   special agent.  The Manual requires him to bring everything up
21   to date as of Brady, and it has not been brought up to date.
22   We only have the records up through 2015.  All we're asking is
23   that we not waste this Court's time while we go back and forth
24   battling over things which we all know are true, which we all
25   know should be in the record, and predicate issues and
```

1    foundation on --

2            THE COURT:  I appreciate your point.  I would assume

3    that was accomplished.

4            MS. PARKER:  I really don't follow what his concern

5    is frankly, because we gave them copies of the certified tax

6    returns that we have.  We don't dictate what's in the

7    certification.  We got the certification, and they have copies

8    of them.  They don't have the actual certification page.  If

9    they want a photocopy of that, I'll give it to them.  I don't

10   know what the issue is.

11           MS. ARNETT:  I have an issue.  I don't know exactly

12   what returns they pulled for certification.  For example, that

13   amended return that was filed in 2014 doesn't appear on their

14   exhibit list.  So I don't have any way of knowing if they

15   actually pulled a copy of that 2011 return, so I would request

16   a certified copy of the amended 2011 return filed in 2014.

17           The other issue that I have are the account

18   transcripts, and that's what Mr. Minns is referring to that

19   goes up to 2015.  Under the Internal Revenue Manual, Part 9 it

20   dictates that the special agent, before trial, pull a current

21   copy of the account transcripts.  I don't have a current copy

22   of the account transcripts, and I don't have a certified copy

23   of the account transcripts up to 2015, so those are the

24   particular issues that we have.

25           THE COURT:  And that seems reasonable.

Miller - Cross                                                    19

1          MS. PARKER:  I'm sorry?

2          THE COURT:  That seems reasonable.

3          MS. PARKER:  All right.

4          MS. ARNETT:  So you all will pull a current account

5    transcript up to 2018, and a certified copy of it, and a

6    certified copy of the 2011 return filed in '14.

7          THE COURT:  Jury, please.

8          (Off-the-record discussion.)

9          (At 8:43 a.m., jury arrives.)

10         THE COURT:  Good morning.

11         THE JURY:  Good morning.

12         THE COURT:  Please be seated.  Ma'am, if you'd like

13   to continue with the examination of the witness, and if the

14   witness would like to retake the witness stand, please.

15         MS. ARNETT:  May I proceed, Your Honor?

16         THE COURT:  Yes, ma'am.

17                      ROBERT MILLER,

18         GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

19              CROSS-EXAMINATION, Cont'd

20   BY MS. ARNETT:

21   Q.   Thank you.  Good morning, Mr. Miller.

22   A.   Good morning.

23   Q.   So yesterday you talked a lot about FBARs, right?

24   A.   Correct.

25   Q.   And the original purpose of this FBAR was actually a

US v. Pieron, Jr. - TRIAL - VOLUME 3 - March 1, 2019

Miller - Cross                                                          20

1   counterterrorism purpose, right?

2   A.    It served a dual purpose.

3   Q.    And it's an information form, right?  It's just a

4   gathering of information?

5   A.    It is.  It's a form to gather information.

6   Q.    And the IRS didn't create a position about -- with regard

7   to FBARs until about 2011 you said?

8   A.    No.

9   Q.    Okay.

10  A.    No, I did not say that.

11  Q.    What did they do in 2011 with regard to FBARs?

12  A.    They -- the FBAR's been in place since 1976.  It's a form

13  that's been expected that somebody would file individually --

14  separate from their tax return.  Prior to '76 they had a

15  different form that got attached to your tax return I think

16  from 1970 until '76.

17  Q.    And you're a CPA, right?

18  A.    I am.

19  Q.    And are you -- do you subscribe to any CPA preparation

20  software?

21  A.    Not to preparation software, no.  I use a -- I mentioned

22  yesterday I used a Turbo Tax software.

23  Q.    And it wasn't until around 2000 that the FBAR -- you know,

24  CPA programs and Turbo Tax, you have to check some boxes as you

25  go through the software, right?

Miller - Cross                                          21

1   A.    Correct.

2   Q.    And it wasn't around until the early 2000s that it even

3   popped up a request for an FBAR, any information to check about

4   FBARs, right?

5   A.    I wouldn't know.

6   Q.    Now, FBARs also carry a different criminal statute, right?

7   A.    They do.  There's two; a civil and a criminal statute for

8   it.

9   Q.    And in this case, there is no FBAR charge.  Mr. Pieron

10  isn't charged with any sort of criminal charges relating to

11  FBARs, correct?

12  A.    To my knowledge, that's correct.

13  Q.    Now, the FBAR transcripts that you reviewed yesterday,

14  some of those FBAR transcripts had to do with Mr. Pieron's

15  personal accounts?

16  A.    Yes.

17  Q.    And some of them had to do with his business accounts,

18  right?

19  A.    That's correct.

20  Q.    And the information that's reported on the FBARs is the

21  highest value of an account for the year?

22  A.    It is.

23  Q.    So if 364 days out of the year, you say, for example, only

24  had $1,000 in the account, and one day out of the year you had

25  250,000, you would have to report 250,000 on that FBAR, right?

1  A.    That's correct.   That's the number you would report.

2  Q.    And if you moved that $250,000 from your personal account

3  to a business account, you would have to report it on both

4  accounts, even though it is the same money, right?

5  A.    That is correct.

6  Q.    So all of the money that was reported on the FBARs could

7  have been sometimes double and quadruple reported because of

8  the number of accounts, correct?

9  A.    There's -- I don't have evidence to say that, but that is

10 a possibility.

11 Q.    Well, you reviewed some of the bank records, right?

12 A.    I did.

13 Q.    And you saw the transfers of those money -- some of the

14 monies that matched up to and from those bank records, right?

15 A.    I saw one transfer for 750, and that came to a domestic

16 account, though, not to a foreign account.

17 Q.    And when filling out the FBARs, it could -- you could

18 easily make a mistake, right?  If you're going back and filling

19 out --

20         MS. PARKER:  Objection, Your Honor.

21         THE COURT:  Sustained.

22 BY MS. ARNETT:

23 Q.    If you're filling out FBARs -- late-filed FBARs eight or

24 nine years down the road, and you're reviewing bank statements,

25 and you don't have all of the bank statements, you could make a

Miller - Cross                                                  23

1   mistake in the reporting on that FBAR, correct?

2           MS. PARKER:  Same objection.

3           THE COURT:  Sustained.

4           MS. ARNETT:  Yes, sir.

5   BY MS. ARNETT:

6   Q.   Yesterday you also talked a lot about citizens living

7   abroad, right?

8   A.   Yes.

9   Q.   And their requirement to file US tax returns.

10  A.   Correct.

11  Q.   How many millions of citizens living abroad know that

12  they're supposed to file tax returns?

13          MS. PARKER:  Objection.

14          THE COURT:  Sustained.

15          MS. ARNETT:  He's an expert witness on filing

16  requirements for overseas.

17          THE COURT:  Not on the knowledge of --

18          MS. ARNETT:  Yes, sir.

19          THE COURT:  -- Americans living abroad.

20          MS. ARNETT:  Yes, sir.  Thank you.

21  BY MS. ARNETT:

22  Q.   And you also talked about Form 5471 that's attached to a

23  1040.

24  A.   Correct.

25  Q.   And that's a very technical area of law, right?

Miller - Cross                                                      24

```
 1            MS. PARKER:  Objection.
 2            THE COURT:  Sustained.
 3  BY MS. ARNETT:
 4  Q.   The structure of the foreign corporation could change
 5  what's filed on the 5471, correct?
 6            MS. PARKER:  Objection.
 7            THE COURT:  Overruled.  That's an interpretation of
 8  the Code itself.  The witness can respond.
 9            THE WITNESS:  If you can clarify what you mean, the
10  structure of it.
11  BY MS. ARNETT:
12  Q.   Depending on -- the corporate structure of the overseas
13  corporation could change how it's reported on the 5471, or if
14  it's reported on the 5471?
15  A.   The structure of the -- the structure of the entity itself
16  could change which form it goes on, so it may not be on a 5471.
17  It could be on a different form, a Form 8865 or a multitude of
18  other forms.
19  Q.   I'm going to show you what has been marked as Defense
20  Exhibit 102, and I might need some help because it shouldn't be
21  published to the jury, but just appear on his screen.  It
22  hasn't been admitted yet.
23            THE COURT:  On whose screen?
24            MS. ARNETT:  I'm sorry, the witness's.  I don't want
25  to turn it on because it will pop up and it hasn't been
```

Miller - Cross                                          25

1  admitted.

2          THE COURT:  I have to acknowledge that I cannot

3  control that aspect of it, and it's not because the system

4  isn't capable of it.

5          MS. ARNETT:  Okay.

6          THE COURT:  It's because I'm not.

7          MS. ARNETT:  Okay.

8          THE COURT:  Do you have a copy of the -- a hard copy

9  of the exhibit so that the Government has an opportunity to --

10          MS. ARNETT:  I absolutely do.  I'll get both of them

11  because I'm going to give you two.

12          THE COURT:  Thank you.  And I will refresh my memory

13  before tomorrow so that I'm able to control the -- this

14  particular location.

15          MS. PARKER:  But will you remember on Monday?

16          THE COURT:  Yes, Monday.

17          MR. MINNS:  I just think that's at least one vote for

18  the old way of doing these things.

19          MS. ARNETT:  This is 102 and this is 105.  We will

20  start with 102.

21          MR. SASSE:  Just to be clear 1002?

22          MS. ARNETT:  Yes, sorry, 1002; 102 is the Government

23  number.

24  BY MS. ARNETT:

25  Q.   You're a custodian of records for the IRS, right?

```
1  A.    No.
2  Q.    Are you familiar with the synopsis of your trial
3  testimony?
4  A.    It's -- yes.
5  Q.    It says that you'll serve as a custodian of IRS records?
6  A.    Yes.  I guess I was confusing it with whether or not I was
7  the one that was going to come in to testify as to the
8  certified 1040 returns.
9  Q.    I understand.  So -- but you're a revenue agent, right?
10 A.    Correct.
11 Q.    And you're familiar with the types of IRS letters that the
12 IRS sends out, correct?
13 A.    I am.
14 Q.    And could you review Defense Exhibit 1002.
15 A.    Yes, ma'am.
16 Q.    And does this appear to be copy of a CP49 notice?
17 A.    It is a copy of a CP49 notice.
18 Q.    That was sent to Mr. Pieron?
19 A.    Yes, it was sent to him.
20 Q.    And you recognize it as a form that's sent out in the
21 normal course of business for the IRS?
22 A.    Yes, ma'am.  They're sent out in the normal course of
23 business.
24        MS. ARNETT:  I offer Defense Exhibit 1002.
25        THE COURT:  Any objection from the Government?
```

Miller - Cross                                                27

1          MS. PARKER:  None, Your Honor.

2          THE COURT:  Received.

3   BY MS. ARNETT:

4   Q.   And this is a letter from the IRS to Mr. Pieron dated

5   February 19th, 2018 telling him that he owes $627,000, correct?

6   A.   Yes, ma'am.

7   Q.   And could you turn to Defense Exhibit 1005.

8   A.   Yes, I have it.

9   Q.   And this is another letter that the IRS sent out to

10  Mr. Pieron, correct?

11  A.   One second, let me read it, so I understand what it is

12  that's the way it appears, but let me look at it first.

13  Q.   Yes, sir.

14  A.   Yes, ma'am.  It looks like the type of letter we would

15  send out, IRS would send out.

16  Q.   In the normal course of business for the IRS, correct?

17  A.   Yes, ma'am.

18          MS. ARNETT:  I offer Defense Exhibit 1005.

19          THE COURT:  Any objection?

20          MS. PARKER:  Well, Your Honor, this was the subject

21  of a motion, and the Court has not ruled on it.

22          THE COURT:  Well, I'm still gathering information to

23  address that.  Is there a specific -- do you want to --

24  probably a brief sidebar conversation, make sure that we're on

25  the same page.

1              (Sidebar conference as follows:)

2              THE COURT:  Let's talk a little bit about -- you

3    sought a ruling in limine with respect to these issues?

4              MS. PARKER:  Yes, and they know that.

5              THE COURT:  Oh, I appreciate that.  And I'm still

6    struggling to understand why because --

7              MS. PARKER:  Well, because --

8              THE COURT:  -- it was kind of an offer to essentially

9    consider the later filing as inaccurate.  Is that fair?  I'm

10   trying to actually articulate the rationale for the limitation.

11             MS. PARKER:  Because at that point he knew he was

12   under investigation.  He'd signed the tolling agreement.  He

13   had already had meetings to try to negotiate a plea in the

14   criminal case, and he just did this to forestall the criminal

15   case, and this is offered to prove his mental state, which is

16   not true.  It is -- to say that he doesn't owe money because he

17   paid it, or that he wasn't trying to evade taxes because he was

18   willing to pay it.

19             It's -- he knew he was under investigation.  He knew

20   he was understand investigation before then, but we engaged in

21   pre-indictment plea negotiations, and he had signed the tolling

22   agreement saying that the criminal charges were authorized and

23   we would otherwise proceed, so in that context, I don't believe

24   this should be offered.

25             THE COURT:  Because it's relevant to his state of

1   mind at the later period of time?

2           MR. DEPORRE:  Correct.

3           MS. PARKER:  Yes.  I mean, it's not done because --

4   he's trying to evade prosecution.  He's not trying to pay

5   taxes --

6           MR. MINNS:  If I can --

7           MS. PARKER:  -- and --

8           MR. MINNS:  If I can respond.  This is sent in

9   February.

10          MS. ARNETT:  No.  I'm sorry.  This is sent in July 18

11  of 2018.  Their indictment alleges conduct continuing up and

12  through the present.  It doesn't cut off at the date of the

13  beginning of the tolling agreement.  That indictment says

14  through the present.  This is the same day as the indictment.

15          MR. MINNS:  And -- and --

16          MS. ARNETT:  We just offered the letter of the

17  matching figure, so they can take it when they want but not

18  when they don't.

19          MS. PARKER:  I didn't ask you to offer that.

20          MR. MINNS:  And -- and --

21          MS. ARNETT:  But you didn't object.

22          MR. MINNS:  -- if I could -- if I could --

23          THE COURT:  You have to ask her.

24          MS. ARNETT:  Go ahead.

25          MR. MINNS:  This is a bill sent --

Miller - Cross                                          30

1          MS. ARNETT:  No, this is the zero.

2          MR. MINNS:  Okay.  The bill sent in January.

3          MS. ARNETT:  In February.

4          MR. MINNS:  In February.  He pays it in March.

5  What's his state of mind in March?  They put it into question

6  not just in March, April, May, June July.  They're saying he

7  continued to completely --

8          THE COURT:  They've got a very good argument, at

9  least at this stage factually, that he's trying to clean things

10 up, and they're going to make that argument.

11         MS. ARNETT:  Okay.

12         MR. MINNS:  It is an argument.  I can't tell them to

13 stop with the argument.

14         THE COURT:  But the relevant time period is not when

15 he's trying to clean things up, when he's on the run.  It's

16 when the earlier return is filed.

17         MR. MINNS:  Well, the relevant time period unless --

18 we were unsuccessful in getting the indictment thrown out, but

19 the indictment said he was committing the crime of not paying

20 and evading payment on July 18th.  It says to present date, so

21 that either means today or it means the day of the indictment.

22         THE COURT:  We're going to spend sometime with this

23 question, but -- I think we're obligated to.  I'm going to

24 overrule the objection.  The evidence comes in.

25         MS. ARNETT:  Thank you.

Miller – Cross                                                    31

1              (Sidebar conference concluded.)

2              THE COURT:  If you'd like to proceed, please.

3              MS. ARNETT:  Yes, Your Honor.

4    BY MS. ARNETT:

5    Q.   So if you could turn back to Defense Exhibit 1005.

6    A.   I'm there.

7    Q.   Okay.  And this is an IRS letter, correct?

8    A.   It is.

9    Q.   To Mr. Pieron?

10   A.   Correct.

11   Q.   And it's July 18, 2018?

12   A.   Yes, it is.

13   Q.   And could you read the first sentence.

14   A.   Thank you for your correspondence dated March 15th, 2018

15   and your payment of $627,244.62.

16   Q.   Thank you.  So this is a letter from the IRS telling

17   Mr. Pieron that they received his payment and they've applied

18   it, correct?

19   A.   Correct.

20   Q.   For 2008?

21   A.   For the 2008 liability, correct.

22   Q.   And when did they apply that payment?

23   A.   The second line shows that your payment was applied to

24   your account on March 26th, 2018.

25   Q.   And you have no balance for tax year 2008, correct?

1  A.    That's -- did you say 2009 or eight, I'm sorry?

2  Q.    If I said nine, I meant eight.

3  A.    Okay.  I couldn't hear completely.  It says you currently

4  have no balance for tax year 2008.

5          MS. ARNETT:  One moment, Your Honor.

6          (Off-the-record discussion.)

7          MS. ARNETT:  I pass the witness.

8          THE COURT:  Redirect?

9          MS. PARKER:  Yes, Your Honor.  Thank you.

10                     REDIRECT EXAMINATION

11  BY MS. PARKER:

12  Q.    Mr. Miller, what was the date of the letter?

13  A.    Of which letter?  There's two different letters.

14  Q.    I'm sorry, the Defense Exhibit 1005.

15  A.    The letter was dated July 18th, 2018.

16  Q.    Can you do the math to tell me how many years that is from

17  2009 when the tax was due?

18  A.    The payment would have been due April of 2009, so that's a

19  little over nine years.

20  Q.    And in your previous testimony, you were asked that the

21  FBAR -- whether the FBAR forms were informational?

22  A.    Correct.

23  Q.    What, again, is the purpose of collecting that

24  information?

25  A.    To be able to know the assets of an individual so that the

1   Government can try to tax and collect on those assets.

2   Q.   And if the information is incorrect or withheld, does that

3   affect the Services's ability in that regard?

4   A.   It does.  The IRS, Federal Government, would not be able

5   to tax or collect on that income.

6            MS. PARKER:  Thank you, Your Honor.

7            MS. ARNETT:  One quick question.

8            THE COURT:  Any concluding cross?

9            MS. ARNETT:  Yes.

10                        RECROSS-EXAMINATION

11  BY MS. ARNETT:

12  Q.   You reviewed Mr. Pieron's 2008 and 2009 tax returns,

13  correct?

14  A.   I did while we were in court here, yes.

15           MS. PARKER:  Your Honor, that's beyond the scope of

16  my redirect.

17           THE COURT:  Sounds like it.

18           MS. ARNETT:  Well, she asked when -- okay.  Thank

19  you, Your Honor.

20           I pass.

21           THE COURT:  You're excused, sir, at least for now.

22  If the Government would like to call their next witness,

23  please.

24           MR. DEPORRE:  Your Honor, the Government calls

25  Christine Mason.

Mason - Direct                                                    34

1          THE COURT:  The gentleman's got a couple of exhibits
2    that need to be retrieved.
3          Good morning.  If you could stop for just a moment,
4    raise your right hand.
5          (At 9:04 a.m., sworn by the Court.)
6          THE COURT:  The witness stand is on your far left
7    over here on the side of the room.  The chair does not move;
8    the microphone does.
9          THE WITNESS:  Okay.
10         THE COURT:  We find it best if you're able to kind of
11   move the microphone about 10 inches away from your mouth.
12         Sir.
13                    CHRISTINE MASON,
14            GOVERNMENT'S WITNESS, SWORN AT 9:04 a.m.
15                  DIRECT EXAMINATION
16   BY MR. DEPORRE:
17   Q.   Good morning, Ms. Mason.
18   A.   Good morning.
19   Q.   What is your married name?
20   A.   Christine Mason.
21   Q.   And what was your maiden name?
22   A.   Christine Phillips.
23         THE COURT:  We're going to need to get that
24   microphone a little closer.  I can tell right now.  There we
25   go.

            US v. Pieron, Jr. - TRIAL - VOLUME 3 - March 1, 2019

1          THE WITNESS:  Is this better?

2          THE COURT:  That's better.

3   BY MR. DEPORRE:

4   Q.   Ms. Phillips -- Ms. Mason, excuse me, do you know James

5   Pieron?

6   A.   Yes.

7   Q.   And how do you know him?

8   A.   I worked for him.

9   Q.   When did you begin working for James Pieron?

10  A.   2006.

11  Q.   And where were you living at the time?

12  A.   Switzerland.

13  Q.   What was the name of the company that Mr. Pieron was

14  running in Switzerland?

15  A.   JDFX.

16  Q.   And what type of company is that?

17  A.   Forex company.

18  Q.   Could you explain to us -- or explain to the jury what

19  forex means.

20  A.   Foreign currency exchange.

21  Q.   And what exactly -- foreign currency exchange.  How does

22  that -- could you give a little bit more detail as to what sort

23  of business that is.

24  A.   Can you repeat that?

25  Q.   Sure.  Could you give a little bit more detail about what

Mason - Direct                                        36

 1  sort of business foreign currency exchange is.

 2  A.   I'm having a hard time answering that, I'm sorry.

 3  Q.   Well, were you involved with the foreign currency trading

 4  done by JDFX?

 5  A.   I wasn't involved in that.

 6  Q.   What was your role in the company?

 7  A.   An assistant.

 8  Q.   And who were you an assistant to?

 9  A.   James.

10  Q.   Do you recognize James?

11  A.   Yes.

12  Q.   And would you identify him for the purpose of the record.

13  A.   (Pointing.)

14  Q.   The gentleman standing up?

15  A.   Yes.

16       MR. DEPORRE:   Would the record reflect that she

17  identified Mr. Pieron.

18       THE COURT:   The witness has identified the defendant.

19  BY MR. DEPORRE:

20  Q.   Was James Pieron the owner of JDFX?

21  A.   Yes.

22  Q.   And was he the one who made all the decision regarding the

23  company?

24  A.   Yes.

25  Q.   Did he -- did he have anybody above him that made

Mason – Direct

1   decisions?

2   A.   I don't know.

3   Q.   Was he accountable to a board of directors, if you know?

4   A.   Yes.

5   Q.   And who were the directors for JDFX?

6   A.   I don't recall.

7   Q.   Was -- what sort of work would Mr. Pieron do on a daily

8   basis for JDFX?

9   A.   He worked with the tech guys, the tech employees.

10  Q.   Was it -- would you refer to it as software development?

11  A.   Yes.

12  Q.   Besides JDFX, did Mr. Pieron have another company in

13  Switzerland?

14  A.   Yes.

15  Q.   What was the name of that company?

16  A.   Komplique.

17  Q.   And what sort of work did they do?

18  A.   It was a swimwear company.

19  Q.   And did they -- did they make swimsuits while they were in

20  Switzerland?

21  A.   They?   I mean, he didn't make them.

22  Q.   Did Komplique sell any swimsuits while the company was in

23  Switzerland?

24  A.   No, no.

25  Q.   How much money did you make as an assistant to Mr. Pieron?

1   A.   Monthly?  Four --

2   Q.   What was your monthly salary?

3   A.   4,000 Swiss franc.

4   Q.   And were you employed by a specific company or were you

5   paid cash?

6   A.   Paid cash.

7   Q.   And was there any withholding for that cash?

8   A.   I don't know.

9   Q.   How about when -- at some point did you come to the United

10  States?

11  A.   Yes.

12  Q.   And when was that?

13  A.   2009.

14  Q.   Do you recall which month it was or at least the season?

15  A.   Fall; July, August.

16  Q.   You say fall, but July, August, late summer?

17  A.   Yeah, late summer.

18  Q.   All right.  And where did you end up going?

19  A.   Mt. Pleasant, Michigan.

20  Q.   Did you continue to work for Mr. Pieron?

21  A.   Yes.

22  Q.   And did he basically move his companies from Switzerland

23  to Mt. Pleasant?

24  A.   No.

25  Q.   Did he start new companies?

Mason - Direct

1   A.   Yes.

2   Q.   All right.  And were the companies that he started, what

3   were the names of them?

4   A.   IB Technologies and ILQ Institutional Liquidity and

5   Komplique.

6   Q.   And did you become an employee for IB Technologies?

7   A.   Yes.

8   Q.   Were you an employee for Komplique.

9   A.   No.  I did a little bit of work for it, but I wasn't an

10  employee for Komplique.

11  Q.   And were you an employee for ILQ --

12  A.   Yes.

13  Q.   -- Institutional Liquidity?

14  A.   Yes.

15  Q.   Was IB Tech -- what sort of work did IB Tech do?

16  A.   I mean, there were several different things.  My role?

17  Are you asking about my role?

18  Q.   No, I'm asking what line of busy IB Tech was in.

19  A.   Foreign currency exchange.  It was a brokerage.

20  Q.   All right.  Was it similar to the work that JDFX did?

21  A.   Somewhat similar.

22  Q.   And was Komplique in the United States doing similar work

23  to the Komplique that was in the Switzerland?

24  A.   Yes.

25  Q.   And what was that work again?

Mason - Direct

1   A.    It was a swimwear company.

2   Q.    All right.  Did you have the same role when you came to

3   the United States?  Were you working basically as a personal

4   assistant for Mr. Pieron?

5   A.    For a short time, yes, and then I changed roles.

6   Q.    And when was that that you changed roles?

7   A.    2011, 2012.

8   Q.    So from 2009 to 2011 or 2012 you were Mr. Pieron's

9   personal assistant?

10  A.    I don't recall the dates, to be honest.

11  Q.    Did you work ever at 1880 Lorena Drive in Commerce

12  Township?

13  A.    No.

14  Q.    Did IB Tech have an office there?

15  A.    No.

16  Q.    Are you familiar with that address?

17  A.    Yes.

18  Q.    What is that address?

19  A.    My grandmother's house.

20  Q.    And at some point did you use that address for filings

21  with the state of Michigan for IB Technologies and Komplique?

22  A.    No -- I guess yes, I'm sorry.  We used the address to

23  start up the companies, because we were relocating, so we

24  didn't have the location locked down, so we used that address

25  to start up the company.

1    Q.    But that's your grandmother's address?

2    A.    Yes.

3    Q.    And are you related to Mr. Pieron?

4    A.    No.

5    Q.    So he didn't use his grandmother's address?

6    A.    No.

7    Q.    You used yours?

8    A.    Yes.

9    Q.    Why?

10   A.    Because we didn't have the actual company location locked

11   down.  Well, we didn't have that location, and you were unable

12   to use a PO box, so we used that address to start filing to set

13   up the company.

14   Q.    And did you get paid directly from Komplique?

15   A.    No.

16   Q.    Who paid you?  Who paid your wages?

17             THE COURT:  Sir, a couple of things; when you say

18   "paid," if you can identify the employer, and it would also

19   potentially be helpful if we could establish the citizenship of

20   the witness, as well.

21             MR. DEPORRE:  Thank you, Your Honor.

22   BY MR. DEPORRE:

23   Q.    Are you a US citizen?

24   A.    Yes.

25   Q.    And in 2009, in the summer of 2009, after you returned,

Mason - Direct

1   who was your employer?

2   A.    IB Technologies.

3   Q.    And did you receive a paycheck from IB Technologies?

4   A.    Yes.

5   Q.    Are you paid a monthly salary?

6   A.    Yes.

7   Q.    And is it -- what amount are you paid?

8   A.    3,000 US dollars.

9   Q.    Yeah, in US dollars.  I'm assuming at that point you're in

10  the United States?

11  A.    Yes.

12  Q.    Okay.  So how much in US dollars are you paid monthly,

13  when you return to the United States, by IB Technologies?

14  A.    $3,000.

15  Q.    And are taxes taken out of that?

16  A.    Yes.

17  Q.    Are you ever paid by Komplique?

18  A.    No.

19  Q.    All right.  There are two folders next to you.  They're

20  marked Government Exhibit 137 and 135.  Could you open those

21  and take a look at them, first at 135.

22          Do you recognize document exhibit or Government

23  Proposed Exhibit 135?

24  A.    Yes.

25  Q.    And can you say what it is.

Mason - Direct                                                    43

1  A.   And account registration and agreement.

2  Q.   All right.  And that's commonly known as a signature page,

3  correct?

4  A.   Yes.

5  Q.   Are you on that signature page?

6  A.   Yes.

7  Q.   All right.  I'll direct you to -- it's -- at the bottom

8  it's stamped 10839.

9  A.   Yes, I see it.

10  Q.   What company is Exhibit 135 -- the account for Exhibit

11  135, what company is that held by?

12  A.   IB Technologies.

13         MR. DEPORRE:  All right.  Your Honor, at this point,

14  I'd move for the admission of Government Exhibit 135.

15         MR. SASSE:  Can I look at it just for a second, Your

16  Honor?

17         No objection.

18         THE COURT:  Received.

19  BY MR. DEPORRE:

20  Q.   Going to page 10839, could you focus in on the very top.

21  Do you recognize that as the account holder, IB Technologies?

22  A.   Yes.

23  Q.   And now in the -- at the bottom, the signature page, do

24  you see your name there as an authorized signer for IB

25  Technologies?

Mason - Direct                                                44

1   A.   Yes.

2   Q.   And who -- who are the other people listed there?

3   A.   James Pieron, William Zehnder, and Brenda Garver.

4   Q.   And who is Mr. Zehnder?

5   A.   He was an accountant for IB Technologies.

6   Q.   And who is Ms. Garver?

7   A.   She was an employee, I forget her title.

8   Q.   Did she do bookkeeping work for the company?

9   A.   I don't recall.

10  Q.   Ms. Mason, you and I have not spoken before about this

11  case, have we?

12  A.   I don't recall.  I don't think so.

13  Q.   You don't remember if we've spoken?

14  A.   I'm sorry, I don't remember.

15  Q.   Okay.  In fact, you decided not to speak with the

16  Government in preparation for your testimony, correct?

17  A.   Correct.

18  Q.   Did you transfer money at Mr. Pieron's direction on behalf

19  of IB Technologies?

20  A.   Maybe.

21  Q.   Did he tell you at times to transfer funds in and out of

22  IB Technologies and into his personal accounts?

23  A.   I don't -- I don't think so.

24  Q.   You don't recall whether or not he asked you to transfer

25  funds between personal accounts and IB Technologies?

Mason - Direct                                              45

1   A.   I don't remember.  I don't think so though.

2   Q.   Do you know if he asked to you transfer funds between

3   Komplique and his accounts?

4   A.   No.

5   Q.   No, you don't recall?

6   A.   No, I don't recall.

7   Q.   Could you take a look at Government Exhibit 137, and would

8   you tell me what it is.

9   A.   The account registration and agreement.

10  Q.   Just the first page, at the very top, in the left what

11  does it say there?

12  A.   Business signature card.

13  Q.   Who is the account holder for Government Exhibit 137?

14  A.   Komplique.

15  Q.   Who are the authorized signers?

16  A.   Myself, James Pieron, and Jason Cooley.

17       MR. DEPORRE:  At the time, Your Honor, I'd move for

18  the admission of Government Exhibit 137.

19       MR. SASSE:  No objection, Your Honor.

20       THE COURT:  Received.

21  BY MR. DEPORRE:

22  Q.   Why were you a signer on the account?

23  A.   When I was setting up the companies, I believe you had to

24  have at least two signers on there, so I was one of the signers

25  on top of James when setting up the companies.

1  Q.   Did you ever purchase a piano from the Komplique account?

2  A.   I did not.

3  Q.   Did you ever purchase a Mercedes Benz from the Komplique

4  account?

5  A.   I did not.

6  Q.   Did you ever drive a -- are you familiar with the 2009

7  Mercedes Benz that was purchased from the Komplique account?

8  A.   I think so.

9  Q.   Do you not know whether or not it was purchased from the

10 Komplique account?  You seem -- you say "I think so."

11 A.   Can you repeat that?

12 Q.   Sure.  You said you think you know the 2009 Mercedes Benz

13 was purchased from the Komplique account.  Were there multiple

14 vehicles that were purchased from the Komplique account?

15 A.   I don't know.  If you're referring to the vehicle that was

16 James', that one I'm aware of.

17 Q.   And so James had a 2009 Mercedes?

18 A.   I don't know the exact make and model and the year, but I

19 believe so.

20 Q.   It was a nice Mercedes Benz?

21 A.   Yes.

22 Q.   So you're aware of the manufacturer?

23 A.   Okay.  Yes.

24 Q.   And would you describe that.  What sort of car was it?

25 Was it a pickup truck?

1  A.   No.  It was a white sort of like an SUV.  It wasn't a car.

2  It was sort of a truck, I guess.

3  Q.   Would you describe it as a boxy SUV?

4  A.   Yes.

5  Q.   And do you know how much it cost?

6  A.   No.

7  Q.   Did you ever charter flights out of the -- using the

8  Komplique account?

9  A.   I don't remember.

10  Q.   You don't remember if you have chartered a private plane

11  and paid for it using Komplique's account?

12  A.   I don't remember what account it -- I don't remember.

13  Q.   Did you ever pay for personal expenses for Mr. Pieron?

14  A.   No, I don't think so.

15  Q.   Did you ever use the Komplique account or the IB

16  Technologies account to pay Mr. Pieron's personal expenses?

17  A.   I don't believe so.

18  Q.   And when did you stop working for Mr. Pieron?

19  A.   January, 2014, I believe.

20  Q.   Do you recall in 2013 if Mr. Pieron got a new Mercedes?

21  A.   I don't recall.

22  Q.   When you left the company, was he still driving the

23  Mercedes that he had purchased in 2009?

24  A.   I don't know.

25  Q.   When you worked for JDFX back in Switzerland, do you

1  remember transferring money from Mr. Pieron's personal accounts

2  to JDFX accounts?

3  A.    I may have.  I don't remember.

4         MR. DEPORRE:  All right.  May I approach the witness,

5  Your Honor?

6         THE COURT:  Yes, and if we could establish the

7  witness, if she can, the nature of the European entities.

8  We've covered the US entities, I'm not familiar yet with the --

9  the nature of those organizations in Europe.

10        MR. DEPORRE:  By that do you mean the legal -- like

11  whether it's an LLC or a -- the corporate structure or --

12        THE COURT:  Yes.  Whether they're organized under

13  Swiss law, whether they're organized under US law, if the

14  witness has any background.  I assume from your question that

15  the JDFX was a Swiss entity, and I could be wrong.

16  BY MR. DEPORRE:

17  Q.    Ms. Mason, was JDFX organized under Swiss law?

18  A.    I believe so, yes.

19  Q.    And were there actual several entities with JDFX in the

20  name?

21  A.    Yes.

22  Q.    And did they all have accounts, bank accounts?

23  A.    Yes, I believe so.

24  Q.    Was Komplique also -- when you were in Switzerland, before

25  July of 2009, was that Komplique organized under Swiss law?

Mason - Direct

1   A.   Yes.

2   Q.   Ms. Mason, I don't want you to read this aloud, but I

3   would like you to read paragraph 8, and when you're done if you

4   could look up.

5           MR. SASSE:  Could I look at it?

6           MR. DEPORRE:  I'll give you one.

7   BY MR. DEPORRE:

8   Q.   Are you done?

9   A.   (Nodding.)

10  Q.   And does this refresh your recollection as to whether or

11  not you transferred money between personal accounts for

12  Mr. Pieron and corporate accounts at JDFX?

13  A.   Can you rephrase the sentence?  Regarding this section 8?

14  Q.   Yep.  Does paragraph 8 there refresh your memory as to

15  whether or not you transferred money from Mr. Pieron's personal

16  accounts to JDFX accounts?

17  A.   No.

18  Q.   It doesn't -- doesn't refresh your recollection?

19  A.   No.

20  Q.   Okay.  But does it refresh your recollection as to whether

21  or not you told an IRS special agent that you did transfer that

22  money?

23          MR. SASSE:  Has she been asked that?

24          MR. DEPORRE:  Okay.  That's a good -- fair enough.

25  BY MR. DEPORRE:

1  Q.   Did you tell IRS special agent that you transferred money

2  on behalf -- at Mr. Pieron's direction between JDFX accounts

3  and Mr. Pieron's personal accounts?

4  A.   I don't recall telling him.

5  Q.   All right.  Ms. Mason, you mentioned your maiden name was

6  Ms. Phillips, Christine Phillips?

7  A.   Yes.

8  Q.   Who are you married to?

9  A.   James Mason.

10  Q.   And was James Mason a friend, close friend, of

11  Mr. Pieron's brother?

12  A.   Yes.

13  Q.   Why did you refuse to meet with the Government to prepare

14  your testimony?

15  A.   Because it was so long ago.

16  Q.   Wouldn't that lead you to want to prepare to help refresh

17  your memory for today?

18  A.   No.

19  Q.   Were you told not to prepare with the Government?

20  A.   No.

21  Q.   So your testimony today is that you didn't want to prepare

22  because the events happened a long time ago?

23  A.   Yes.

24  Q.   Not because someone told you not to meet with the

25  Government?

Mason - Direct                                                   51

1   A.    Yes.

2   Q.    And with regard to the -- whether or not you transferred

3   money on -- at Mr. Pieron's direction between his entities, you

4   simply don't recall whether or not he asked you to transfer

5   money?

6   A.    I mean, regarding the question I feel like you were asking

7   before was different than just in general, if he had me

8   transfer monies.

9   Q.    Okay.  In general, did he have you transfer money between

10  his personal accounts and business accounts?

11  A.    Possibly, yes.

12  Q.    And did he direct you to do that?

13  A.    Yes.

14  Q.    And do you recall which accounts that was for?

15  A.    No.

16  Q.    Do you recall where you were -- what country you were in

17  or what continent you were on when you made those transfers?

18  A.    Yes.

19  Q.    Where were you?

20  A.    Either Switzerland or the United States.

21  Q.    Were you in both locations?  Were you in Switzerland when

22  you made some transfers?

23  A.    It's possible, yeah.

24  Q.    And were you also in the United States when you made

25  certain transfers?

1    A.    Yes, it's possible.

2    Q.    And were those transfers always at Mr. Pieron's direction?

3    A.    Yes.

4    Q.    Did you have to account for the movement of money

5    somewhere in bookkeeping software?

6    A.    No.

7    Q.    You just would transfer the money at his direction?

8    A.    Yes.

9            MR. DEPORRE:  All right.  Nothing further, Your

10   Honor.

11           THE COURT:  Cross.

12                     CROSS-EXAMINATION

13   BY MR. SASSE:

14   Q.    Ms. Mason, were you the bookkeeper for James Pieron?

15   A.    No.

16   Q.    Was it your job to make records of the transfers if -- as

17   I understand it, you think you may have made some transfers of

18   money between his personal accounts and his business accounts;

19   is that correct?

20   A.    Yes.

21   Q.    You have no clear recollection as to any particular

22   transfer; is that correct?

23   A.    I don't remember, no.

24   Q.    I'm sorry?

25   A.    No.

1   Q.   And, in fact, you were not the bookkeeper; it was not your

2   job to keep records; is that correct?

3   A.   That's correct.

4   Q.   The prosecutor asked you about not meeting with them.

5   Where do you live?

6   A.   Florida.

7   Q.   And they have served you with a subpoena I take it to come

8   up here; is that correct?

9   A.   Yes.

10  Q.   Now, you have, in fact, talked to one or more

11  investigators about this matter in the past, have you not?

12  A.   Yes.

13  Q.   And, in fact, you were interviewed as long ago as I

14  believe 2012.  I don't recall if you recall the year, but

15  several -- many years ago about some of the same things you

16  testified about today; is that true?

17  A.   Yes.

18  Q.   And that was by people from the Internal Revenue Service?

19  A.   Yes.

20  Q.   And you sat down and did you refuse to talk to them about

21  anything, or did you answer every question they gave you?

22  A.   I answered their questions.

23  Q.   And you're aware -- you don't work for James Pieron any

24  motion, correct?

25  A.   No, I don't.

1    Q.    You're not related to him, correct?

2    A.    Correct.

3    Q.    You are, though, aware that he has been the subject of

4    something going on for many, many years, is that fair?

5    A.    Yes.

6    Q.    When -- let me back up.  You're married to James Mason,

7    correct?

8    A.    Yes.

9    Q.    Have any children?

10   A.    Yes.

11   Q.    How many children do you have?

12   A.    Two.

13   Q.    2006, you were not married with Mr. Mason at that time; is

14   that correct?

15   A.    Yes.

16   Q.    You went to Switzerland in part because he was going

17   there; maybe totally because he was there; is that correct?

18   A.    Yes.

19   Q.    In fact, he also was working for JDFX or one of the JDFX

20   companies; is that correct?

21   A.    Yes.

22   Q.    And you went without a job but eventually also began

23   working for JDFX, correct?

24   A.    Yes.

25   Q.    By the way, you're hesitating in answering.  Is it in part

1  because all these things were so long ago?

2  A.   Yes, and I'm a little nervous.

3  Q.   You said you were an assistant, did you ever have a job

4  title?

5  A.   Yes.  I was his assistant and, I mean, I guess executive

6  assistant.

7  Q.   And the sorts of things you did were paperwork sometimes,

8  correct?

9  A.   Yes.

10 Q.   Go get things when they needed to be purchased sometimes?

11 A.   Yes.

12 Q.   Just whatever needed to be done; is that correct?

13 A.   Yes.

14 Q.   These were startup companies you were working with; is

15 that correct?

16 A.   Yes.

17 Q.   You indicated on direct exam that James Pieron was always

18 working with the tech guys, is that fair?

19 A.   Yes.

20 Q.   And when I say "always", I'm not saying 100 percent of the

21 time, but that was the majority of the time, correct?

22 A.   That's correct.

23 Q.   And he did not focus much, to your knowledge in seeing

24 him, on the books and the bookkeeping and that sort of thing,

25 is that fair?

1  A.    That's fair.

2  Q.    In fact, he would be handed things to sign and assume they

3  were correct, because they were people that were helping him

4  and just sign them, would that be correct?  You saw that at

5  times, did you not?

6  A.    Yes.

7          MR. DEPORRE:  Objection, Your Honor.

8          THE COURT:  Sustained.

9          MR. SASSE:  I'm sorry?

10         THE COURT:  Sustained.

11         MR. SASSE:  She can't testify that she saw him sign

12 things that were just handed to him without looking at it?

13         THE COURT:  She can but not in a speculative sense.

14 If there's --

15         MR. SASSE:  I'm asking from her own experience, Your

16 Honor.

17         MR. DEPORRE:  Well I think the question asks what

18 James Pieron was assuming about the validity of the documents

19 that were being presented to him.

20         MR. SASSE:  No, I'm asking -- I'm asking -- the

21 question is did she herself witness him being handed a document

22 and signing it without reading it.

23         THE COURT:  That's a fair question.

24         MR. SASSE:  I'm sorry?

25         THE COURT:  That's an appropriate question.

Mason - Cross                                                    57

1           MR. SASSE:  Thank you.

2           THE COURT:  Witness can respond.

3  BY MR. SASSE:

4  Q.   And did you, in fact, witness that?

5  A.   Yes.

6  Q.   Many times; is that true?

7  A.   Many times.

8  Q.   I'm going to show you what has been marked for

9  identification purposes as Defendant's Proposed Exhibit 1019,

10 and I'm not going to seek to introduce it at this point, Your

11 Honor.  I just want to see if she can identify some handwriting

12 on the very first page.

13          Do you recognize that handwriting?

14 A.   Yes.

15 Q.   And whose handwriting do you believe that is?

16 A.   I believe it's James Mason's handwriting.

17 Q.   Your husband, correct?

18 A.   That's correct.

19 Q.   You worked for James Pieron for a number of years,

20 correct?

21 A.   Yes.

22 Q.   Is it fair to say that he was very proud of his service

23 that he had for his country?

24          MR. DEPORRE:  Objection, Your Honor.

25          THE COURT:  Sustained.

1            MR. SASSE:  Sustained, Your Honor?

2            THE COURT:  Yes.

3   BY MR. SASSE:

4   Q.   Is it fair to say that he was proud to be a US citizen?

5            MR. DEPORRE:  Objection, Your Honor same objection.

6            THE COURT:  Sustained.

7   BY MR. SASSE:

8   Q.   Now, you told us a little bit about the way the

9   companies -- the different companies.  Over in Switzerland

10  there was JDFX, which was actually several different companies

11  all related to each other involved with currency trading; is

12  that correct?

13  A.   Yes.

14  Q.   And there was also a company called Komplique which was

15  intended to sell swimwear; is that correct?

16  A.   Yes.

17  Q.   In fact, it was intended to sell what we might call high

18  end, very expensive swimwear; is that true?

19  A.   Yes.

20  Q.   Now, at least in Switzerland, are you aware of whether

21  they even sold one swimsuit?

22  A.   I'm not aware.

23  Q.   And there came a time when you left Switzerland and came

24  to the United States and began working for some companies over

25  here; is that correct?

1   A.   Yes.

2   Q.   And initially one of the companies you worked for was

3   called IB Technologies; is that right?

4   A.   Yes.

5   Q.   And IB Technologies, you indicated, did something similar

6   to what JDFX had done over in Switzerland, correct?

7   A.   Correct.

8   Q.   And you were -- you have identified your signature on a

9   couple of bank accounts that were opened over here.  At the

10  time that you came over, were there a whole bunch of people

11  that came over with you?

12  A.   I mean, a whole bunch?  There was a few people.

13  Q.   How many were there if you recall?

14  A.   I mean a handful of people who came over slowly.

15  Q.   And, in fact, you were amongst the first to try to set up

16  the things over here, were you not?

17  A.   Yes, I was.

18  Q.   Were you involved in trying to find office space and

19  trying to figure out where this thing was going to go,

20  gathering equipment and things like that?

21  A.   Yes.

22  Q.   And opening bank accounts; is that correct?

23  A.   Yes.

24  Q.   And you -- one of the bank accounts that you opened was

25  for IB Technologies apparently, according to the exhibit there,

Mason - Cross                                                    60

1   correct?

2   A.    Correct.

3   Q.    And another bank account was for the Komplique company,

4   correct?

5   A.    Correct.

6   Q.    Now, the Komplique over here was reincorporated.  There's

7   a Komplique SA, which was Switzerland; is that correct?

8   A.    Yes.

9   Q.    And then there's a Komplique, Inc., Incorporated, which

10  was formed in the United States, correct?

11  A.    Correct.

12  Q.    You never were employed buy Komplique -- either Komplique;

13  is that true?

14  A.    Yes.

15  Q.    You were asked about an address that was put down on one

16  or both of those bank accounts, and you indicated it was your

17  grandmother's address.  Did you have anything other than Post

18  Office box as an address for these companies when they were

19  first being formed?

20  A.    Did I have anything -- can you repeat that?

21  Q.    Yeah.  I mean, did they have an office that you could have

22  used as an address?

23  A.    No.

24  Q.    And the only thing they had was a post office box; is that

25  correct?

1  A.   That's correct, at first.

2  Q.   And could you use that Post Office box in filling out

3  those forms?

4  A.   No, they wouldn't let me.

5  Q.   You needed an address?

6  A.   That's correct.

7  Q.   Do you remember who it was that suggested we use my

8  grandmother's address until we get a real address?

9  A.   Myself.

10 Q.   Okay.  These were startup companies in the United States

11 just as they had been in Switzerland, correct?

12 A.   Yes.

13 Q.   The Komplique swimsuit company in the United States, were

14 you aware that money was being spend on that company?

15 A.   Yes.

16 Q.   Were you aware that shows were being put on?

17 A.   Yes.

18 Q.   Were you aware that there were camera shoots of models to

19 use as publicity for these swimsuits?

20 A.   Yes.

21 Q.   Were you aware that cruise ships -- that they did the

22 shoots on cruise ships because it was the most economical way

23 to do it?

24 A.   Yes.

25 Q.   Did you ever go on one of those during one of those

Mason — Cross                                                          62

 1   shoots?

 2   A.   Yes.

 3   Q.   And, in fact, it was a business pursuit of the

 4   corporation, to the best of your knowledge; is that correct?

 5   A.   When you -- yes.

 6   Q.   You're aware that they sponsored -- they were trying to

 7   promote themselves as a high end sort of swimsuit company,

 8   weren't they?

 9   A.   Yes.

10   Q.   In your dealings going back now several years and being

11   investigated, being interviewed by the Internal Revenue

12   Service, and now being asked to testify here in court, has

13   James Pieron ever told you don't cooperate with the Government?

14           MR. DEPORRE:  Objection --

15           THE WITNESS:  No.

16           MR. DEPORRE:  -- Your Honor.

17           MR. SASSE:  I think in response to their questions, I

18   should be allowed to bring this out.

19           THE COURT:  Overruled.

20           MR. DEPORRE:  It is hearsay.

21           THE COURT:  But it's also legitimate

22   cross-examination based on the earlier statement.

23   BY MR. SASSE:

24   Q.   Has he ever told you don't cooperate with the Government?

25   A.   No.

1            MR. SASSE:  I have no other questions, Your Honor.

2   Thank you.

3            THE COURT:  Redirect.

4                    REDIRECT EXAMINATION

5   BY MR. DEPORRE:

6   Q.   Ms. Mason, you're represented by an attorney today,

7   correct?

8   A.   Correct.

9   Q.   Did you pick that attorney?

10  A.   No.

11  Q.   Who did?

12  A.   I'm not sure.

13  Q.   Did you pay for that attorney?

14  A.   I didn't myself.

15  Q.   Who did?

16  A.   I don't know.

17  Q.   So there's an attorney that represents you, you didn't

18  pick, and you didn't pay?

19  A.   Correct.

20  Q.   Did you meet with defense counsel prior to testifying

21  today?

22  A.   Yes.

23  Q.   Even though you live in Florida?

24  A.   Yes.

25  Q.   So you made that long trip from Florida to Michigan, you

1  were able to meet with defense attorneys?

2  A.   Yes.

3  Q.   Can you say that you never transferred money for --

4  between Mr. Pieron's personal accounts and his business

5  accounts?

6  A.   No.

7  Q.   In fact, you probably did is your testimony, correct?

8  A.   Maybe, it's possible.

9  Q.   Did you set up an account for Mr. Pieron at a company

10 called Peregrine Financial Group?

11 A.   No.

12 Q.   Do you know if Mr. Pieron is a US citizen?

13 A.   Yes.

14 Q.   You know?

15 A.   I know.  He is.

16 Q.   He is?  Did you ever have an account at Peregrine

17 Financial Group?

18 A.   No.

19 Q.   Have you seen -- you testified on cross-exam that you've

20 seen Mr. Pieron sign things hundreds of times?

21 A.   Yes.

22 Q.   Are you familiar with his signature?

23 A.   Yes.

24      MR. DEPORRE:  All right.  Your Honor, I'd like to

25 approach the witness with Government Exhibit 115.

1            THE COURT:  For purposes --

2            MR. DEPORRE:  Purposes of identifying the defendant's

3    signature.

4            THE COURT:  You may.

5            MR. DEPORRE:  Thank you.

6    BY MR. DEPORRE:

7    Q.    Could you take a look at that.  I'm not going to ask you

8    to admit the exhibit, but would you describe it for the jury.

9    A.    It appears to be like a new account application form.

10   Q.    And is it for Peregrine Financial Group?

11   A.    Yes.

12   Q.    Who's the account holder?

13   A.    James Pieron.

14   Q.    And what's the address of the account holder on that form?

15   A.    Universitatstrasse, it looks like 112, Zurich.

16   Q.    Do you recognize that address?

17   A.    Yes.

18   Q.    What is it?

19   A.    James Pieron's address.

20   Q.    When he was in Switzerland?

21   A.    I'm sorry, I'm trying to remember.  I don't know

22   100 percent if this is the exact address.

23   Q.    But you think it probably is?

24   A.    112, I don't know.  I don't want to say yes or no.

25   Q.    Was it your address?

1  A.    No.

2  Q.    Was it James Mason's address?

3  A.    No.

4  Q.    Would you flip -- may I approach the witness, Your Honor.

5        Could you take a look at that page, the Bate stamp at

6  a bottom right-hand corner is I think 193; is that correct?

7  A.    This one says 1593.

8  Q.    1593.  Thank you.  Do you recognize the handwriting on

9  that page?

10 A.    Yes.

11 Q.    Whose handwriting is that?

12 A.    James Pieron.

13 Q.    And do you recognize the signature on that page?

14 A.    Yes.

15 Q.    Whose signature is that?

16 A.    James Pieron.

17 Q.    Would you read the top of that page, please, for us.

18 A.    Peregrine Financial Group.

19 Q.    And then go to the next line.

20 A.    New accounts department.

21 Q.    Thank you.  Would you turn to page 1594.  Do you recognize

22 the signature on that page?

23 A.    Yes.

24 Q.    Whose signature is that?

25 A.    James Pieron.

1  Q.   All right.  And at the top of the page, does that indicate

2  that it's a form W-8 BEN?

3  A.   Yes.

4  Q.   At the top of the page does it state under the

5  instructions, do not file this form if you are a US citizen.?

6           MR. SASSE:  Your Honor, now he's reading from the

7  exhibit.  I mean, he has been for quite a while, but I would

8  object.

9           THE COURT:  Sustained.

10          MR. DEPORRE:  Nothing further.

11          THE COURT:  Have you offered the exhibit, I'm sorry?

12          MR. DEPORRE:  I have not.  I intend to do that with

13 another witness.  I could, but I would have to mark it

14 separately.  I'll do it with another witness.

15                         RECROSS-EXAMINATION

16 BY MR. SASSE:

17 Q.   Did you come all the way up here from Florida to meet with

18 me to discuss this case?  Is that why you came up here from

19 Florida?

20 A.   No.

21 Q.   Is it fair to say you came up here from Florida because

22 you were subpoenaed by the Government?

23 A.   Yes.

24 Q.   And to testify at this trial, correct?

25 A.   Correct.

1  Q.   And that I asked to speak with you a few days ago, and you

2  agreed to do that; is that correct?

3  A.   Yes.

4  Q.   We had never spoken, you or anybody else on behalf of my

5  client, until then; is that correct?

6  A.   That's correct.

7           MR. SASSE:  No further questions.

8           THE COURT:  Are we at a conclusion with this witness?

9           MR. DEPORRE:  Nothing further, Your Honor.

10          THE COURT:  Witness is excused from the stand.  Thank

11 you very much, ma'am.

12          THE WITNESS:  Thank you.

13          THE COURT:  Good place for us to take a morning

14 recess.  About 10 minutes, and then we'll be back.  Please rise

15 for the jury.

16          (At 9:57 a.m., jury leaves.)

17          THE COURT:  Record's closed.

18          (At 9:57 a.m., court recessed.)

19          THE COURT:  Jury, please.

20          (At 10:15 a.m., jury arrives.)

21          THE COURT:  Please be seated.  Government like to

22 identify their next witness, please.

23          MS. PARKER:  Yes, Your Honor, Andrea Odier.

24          THE COURT:  Good morning.  If you can stop for just a

25 moment and raise your right hand.

Odier - Direct                                                                    69

```
 1               (At 10:16 a.m., sworn by the Court.)

 2               THE COURT:  The witness stand is on your far left.

 3    It's -- the chair doesn't move, the microphone does.  About

 4    10 inches away is very helpful to us.  Thank you.

 5                         ANDREA ODIER,

 6          GOVERNMENT'S WITNESS, SWORN AT 10:16 a.m.

 7                      DIRECT EXAMINATION

 8    BY MS. PARKER:

 9    Q.   Could you state your name and spell it for us, please.

10    A.   Yes, Andrea Odier, A-N-D-R-E-A, O-D-I-E-R.

11    Q.   And are you currently employed by Wells Fargo?

12    A.   Yes.

13    Q.   And in that capacity, do you have access to the records

14    made and maintained by Wells Fargo in the ordinary course of

15    its business?

16    A.   Yes.

17    Q.   And amongst the records that you have access to, would it

18    include wire transfer records?

19    A.   Yes.

20    Q.   And are you familiar with the contents of your wire

21    transfer records such that you could interpret them for us?

22    A.   Yes.

23    Q.   I'd like to direct your attention to Government's Proposed

24    Exhibit 138.  It should be on the box right in front of you.

25    A.   Oh, thank you, sorry.
```

Odier – Direct                                                           70

```
 1    Q.   Are those wire transfer records made by -- or made and
 2    maintained by Wells Fargo?
 3    A.   Yes.
 4    Q.   And there's 12 of them there, and do they all relate to
 5    JDFX Fund or JDFX Management?
 6    A.   Yes.
 7              MS. PARKER:  Your Honor, I'm going to offer
 8    Government's Proposed Exhibit 138.
 9              MR. MINNS:  No objection, Your Honor.
10              THE COURT:  138 is received.
11    BY MS. PARKER:
12    Q.   All right.  I'd like to direct your attention to the first
13    page of that, and do you see that on the monitor?
14    A.   Yes.
15    Q.   Do you mind if I take back the paper copy because I can't
16    see the monitor.
17    A.   Yes, sorry.
18    Q.   That's okay.  This is a document that reflects one wire
19    transfer?
20    A.   Yes.
21    Q.   And the date of this wire transfer is where -- what excuse
22    me?
23    A.   March 20, 2007.
24    Q.   All right.  It says 07-03-20, but you recognize that this
25    is in European or whatever date?
```

1   A.   Correct.

2   Q.   All right.  This particular wire transfer involved JDFX

3   Fund Management?

4   A.   Yes.

5   Q.   And do you see that on about the top half of the page?

6   A.   Yes.

7   Q.   And where did that wire transfer come from?

8   A.   That came from the account of Trevor Cook, d/b/a PFG Coin

9   & Bullion in Burnsville, Minnesota.

10  Q.   All right.  And where was JDFX Fund Management?

11  A.   That was in Zurich Switzerland.

12  Q.   And going down on the page, do you see the amount of that

13  wire transfer?

14  A.   Yes, this was 150,000.

15  Q.   Briefly what is a wire transfer?

16  A.   It is an electronic means of sending money from one

17  account to another account at a different bank.

18  Q.   Rather than taking a check from one account to the other,

19  you do it electronically; is that correct?

20  A.   Yes, yes.

21  Q.   All right.  Let's go on to the next page of this exhibit,

22  please.  What was the date of this wire transfer.

23  A.   That was December 17th, 2008.

24  Q.   I'm sorry, what was the date you had?

25  A.   December 17th, 2008.

1  Q.   What's the page number on the one that you're looking at?

2  A.   35982.

3  Q.   All right.  Let's look at that one.  And on that

4  transaction who is the sender?

5  A.   It was initiated by Trevor Cook, and it came out of the

6  account Market Shot, LLC in Burnsville, Minnesota.

7  Q.   What was the amount of that transaction?

8  A.   2,100,000.

9  Q.   All right.  We'll take a look at another one of the wire

10  transfers.  What was the date?

11  A.   March 30th, 2007.

12  Q.   And the sender?

13  A.   This also came from Market Shot, LLC in Burnsville,

14  Minnesota.

15  Q.   And the recipient?

16  A.   The beneficiary was JDFX Funds Management, LTD in Zurich,

17  Switzerland.

18  Q.   And the amount of the transaction?

19  A.   $5 million.

20  Q.   Next we go to page 10850, please.  This was another wire

21  transfer to JDFX Fund Management?

22  A.   Yes.

23  Q.   And the date?

24  A.   March 20th, 2007.

25  Q.   The sender?

1  A.   Trevor Cook, Burnsville, Minnesota.

2  Q.   And the amount of the transaction?

3  A.   $1 million.

4  Q.   All right.  The next one, page 10851.  That was another

5  transaction going into JDFX Fund Management in Geneva,

6  Switzerland?

7  A.   Yes.

8  Q.   And the date and the amount?

9  A.   December 1st, 2006, $500,000.

10 Q.   The next one also to JDFX Fund Management in Credit Suisse

11 account in Geneva, Switzerland?

12 A.   Yes.

13 Q.   And the amount of that wire transfer?

14 A.   $500,000.

15 Q.   Next one, February 22nd, 2007; is that correct?

16 A.   Yes.

17 Q.   JDFX Fund Management, Credit Suisse account in Zurich,

18 Switzerland?

19 A.   Yes.

20 Q.   And the amount?

21 A.   $500,000.

22 Q.   Next page, please.  March 19th, 2007?

23 A.   Yes.

24 Q.   Zurich, Switzerland account for JDFX Fund Management?

25 A.   Yes.

74

```
1   Q.   And the amount?

2   A.   $1 million.

3   Q.   Next one, please.  March 20th, 2007, also the Zurich

4   Switzerland account for JDFX Fund Management?

5   A.   Yes.

6   Q.   And the amount?

7   A.   $350,000.

8   Q.   Next one, please.  Is that April 12th, 2007?

9   A.   Yes.

10  Q.   Zurich, Switzerland account for JDFX Fund Management?

11  A.   Yes.

12  Q.   And the amount?

13  A.   $1 million.

14  Q.   Okay.  Next one, January 23, 2009.

15  A.   Yes.

16  Q.   This one for JDFX Holding?

17  A.   Yes.

18  Q.   And where was that account?

19  A.   I'm sorry, repeat the question.

20  Q.   Where was the account?

21  A.   Oh, sorry.  Stamford, Connecticut.

22  Q.   All right.  And the amount of the transfer?

23  A.   $2,125,000.

24  Q.   Can you look above where it stays Stamford, Connecticut?

25  A.   Yes, yep.
```

Odier - Cross                                                                    75

1    Q.   Do you see the Zurich address?  UBS AG, Zurich.

2    A.   Yes, sorry, yes, Zurich, Switzerland, country of

3    residency, yes.

4    Q.   And what would that be?

5    A.   That would be the final destination of the wire transfer.

6    Q.   So the Connecticut -- what was the Connecticut

7    institution?

8    A.   That could be an intermediary bank.

9    Q.   And the final one, May 26th, 2009, JDFX Holding?

10   A.   Yes.

11   Q.   Is that correct?

12   A.   Yep.

13   Q.   And the amount being sent?

14   A.   $1,025,000.

15        MS. PARKER:  Thank you, Your Honor.  Pass the

16   witness.

17        THE COURT:  Cross.

18        MR. MINNS:  Yes.  Thank you, Your Honor.

19                      CROSS-EXAMINATION

20   BY MR. MINNS:

21   Q.   Good morning, Ms. Odier or --

22   A.   Odier.

23   Q.   I'm really bad with names.

24   A.    No problem.

25   Q.   Thank you.  I'm Michael Minns.  I represent James Pieron

Odier - Cross                                                      76

```
 1  and it's a pleasure to meet you.

 2          I'm going to ask just a very few questions.  First,

 3  if we can put Government 138, Bates No. 10848, on the screen.

 4  Oh,man, I can't see it very well.  And I apologize, I'm going

 5  to turn my back, because I can't --

 6  A.   Absolutely, yeah.

 7          MS. PARKER:  Counsel, would it help if you had paper

 8  copies?

 9          MR. MINNS:  Yes, ma'am.  It would let me not be rude.

10  I appreciate it.  That would be wonderful.

11          Well, I'm going to have to do it anyway because you

12  haven't highlighted what we want to focus on, but thank you.

13  BY MR. MINNS:

14  Q.   The highlighting up there, it's -- that's -- thank you

15  very much though.

16          We've highlighted the figure $5 million.  That's a

17  large sum of money.  And that came in in the year 2007?

18  A.   Correct.

19  Q.   Okay.  So it only appears in bank records for 2007?  It

20  won't appear in bank records for 2008 or 2009?

21  A.   Not that particular $5 million, correct.

22  Q.   Yes, ma'am, I'm sorry.  How many of the numbers that you

23  just read out occurred in 2007 and how many of them in 2008 and

24  '09?

25  A.   I would have to have the documents again.
```

1  Q.   Could we hand her the documents, please.   Thank you.

2  A.   Thanks, sorry.   And your question was how many was in 2007

3  and how many was in 2009?

4  Q.   Well, what I'm looking for -- in the courtroom today we're

5  dealing with 2008 and 2009, and there's a bunch of them that

6  were in 2007, so for the -- I know no one's explained that to

7  you, but for our purposes and for the jury, I'd like to know if

8  you can count the number of transactions that occurred in 2007,

9  and then we'll combine 2008 and 2009.

10  A.   Okay.

11  Q.   So two numbers.

12  A.   Thanks.   Give me just a moment, here.

13  Q.   Take all the time you need.

14          And I want to suggest something to you and I don't

15  want you to agree with me if I'm wrong and I'm not going to

16  slow you down.

17  A.   Okay.

18  Q.   We think there was one in 2006, eight in 2007, one in

19  2008, and two in 2009.   And may I have permission to show her

20  my handwritten notes so she doesn't have to memorize this, Your

21  Honor?   And if her figures are the same as ours, we'll --

22  A.   I just wrote it down.   Do you want to repeat it again?

23  Was it one in 2006, eight in 2007, one in 2008 and two in 2009?

24  Q.   Yes, ma'am.

25  A.   Okay.   That is correct.

Odier - Cross

1  Q.   So -- and if we're talking about 2008 and 2009, most of

2  the entries, nine out of 12 entries, did not occur in 2008 or

3  2009?

4  A.   That is correct.

5          MR. MINNS:  Ms. Odier, thank you so much for coming

6  down here and testifying for us.  Appreciate meeting you.  I

7  pass the witness.

8          MS. PARKER:  Nothing further for this witness, Your

9  Honor.

10         THE COURT:  Thank you very much, ma'am.

11         THE WITNESS:  Thank you.

12         THE COURT:  Government's next witness, please.

13         MS. PARKER:  Carol Nathan, Your Honor.

14         THE COURT:  Good morning.

15         MS. NATHAN:  Good morning.

16         THE COURT:  If could you stop for just a moment,

17  raise your right hand.

18         (At 10:34 a.m., sworn by the Court.)

19         THE COURT:  In this courtroom the witness stand is

20  way over on the left-hand side.  If you can please have a seat.

21  The chair does not move, but the microphone does, and we try to

22  get it at about 10 inches to 12 inches away from your mouth so

23  that the jury can hear what you have to say.

24         THE WITNESS:  Okay.  Can you hear me?

25

1                          CAROL NATHAN,

2            GOVERNMENT'S WITNESS, SWORN AT 10:34 a.m.

3                        DIRECT EXAMINATION

4   BY MS. PARKER:

5   Q.   State your name for us, please.

6   A.   Carol Nathan.

7   Q.   And would you spell your first and last name for us,

8   please.

9   A.   C-A-R-O-L, N-A-T-H-A-N.

10  Q.   Was there a time when you worked for a company known as

11  American Tax Solutions, Incorporated?

12  A.   Yes.

13  Q.   Was that commonly called ATSI or ATS?

14  A.   Actually it was commonly called Tax Defenders.

15  Q.   All right.  What was the nature of the business of

16  American Tax Solutions or Tax Defenders?

17  A.   It was a tax resolution company.

18  Q.   What -- what does that mean?

19  A.   It means people who have -- well, literally owe the IRS

20  money, and they need a resolution.  They want a resolution.

21  Q.   A resolution that doesn't involve paying everything that's

22  owed often?

23  A.   Well, usually, right, getting it down or doing something

24  to -- you know, sometimes they need tax returns prepared.

25  Q.   All right.  If you know, did American Tax Solutions

1  advertise as a tax resolution service?

2  A.   I guess that would have been it, a tax resolution, because

3  it's tax resolution.

4  Q.   Was preparing tax returns a big part of their business?

5  A.   No.

6  Q.   And what was the time frame in which you worked for

7  American Tax Solutions?

8  A.   I started there in November of 2004 and I retired May,

9  2015.

10  Q.   And if you don't mind me asking, how old are you now?

11  A.   Seventy-four.

12  Q.   All right.  And what were your duties at American Tax

13  Solutions?

14  A.   Just to do tax returns.

15  Q.   Do you recall dealing with a client by the name of James

16  D. Pieron --

17  A.   Yes.

18  Q.   -- or some variation of that pronunciation?

19  A.   Yes.

20  Q.   Did you ever meet him in person?

21  A.   No.

22  Q.   How did you communicate with him?

23  A.   Via phone or email.

24  Q.   And what was the job that you were supposed to do for him?

25  A.   Prepare tax returns.

81

```
 1  Q.   And when you communicated with him, either by email or by

 2  phone, did you do that so you could get information from him?

 3  A.   Yes.

 4  Q.   What kind of information did he provide to you?

 5  A.   His income and expenses.

 6  Q.   What form did he use to provide that?

 7  A.   He created his own spreadsheets.

 8  Q.   Did he give you source documents?

 9  A.   A few, but mostly it was his spreadsheets.

10  Q.   Mostly it was his what?

11  A.   His own spreadsheets.

12  Q.   All right.  What is a source document?

13  A.   Oh, it would be like -- it could be a W-2, you know, bank

14  statements, you know, stock statements.

15  Q.   Okay.  And a spreadsheet would be just a listing of

16  information, not the documents it came from?

17  A.   Right, just like a summary I guess you call it.

18  Q.   And do you recall approximately when it was that you were

19  assigned to work on his tax return?

20  A.   I can't remember the beginning, but I know his tax returns

21  were dated July, 2011.

22  Q.   All right.  And for what years did -- on July, '11 you

23  signed off on the tax returns?

24  A.   Yes.

25  Q.   Do you remember what years they were for?
```

Nathan - Direct                                                      82

```
 1  A.   2007, '08, '09 and '10, I think, yeah.

 2            MS. PARKER:  Your Honor, may I approach the witness?

 3            THE COURT:  You may.

 4  BY MS. PARKER:

 5  Q.   I'll show you Government's Proposed Exhibit 58.  Is that

 6  an email exchange between you and Mr. Pieron?

 7  A.   Yes, right.  It's from James --

 8  Q.   Okay.  Go ahead.

 9  A.   Yes, it's from James.  It's to me at the top.

10  Q.   All right.  And the date?

11  A.   The date is December 14th, 2010.

12            MS. PARKER:  All right.  I offer Government's

13  Proposed Exhibit 58.

14            MR. MINNS:  No objection at all, Your Honor.

15            THE COURT:  Received.

16  BY MS. PARKER:

17  Q.   We're going to put this on the monitor so you can take a

18  look at it.  Can you read it there?

19  A.   Yeah.  Yeah.

20  Q.   All right.  On the top it says it's from James Pieron to

21  you, correct?

22  A.   Yes.

23  Q.   And its subject is tax preparation; is that correct?

24  A.   Uh-huh.

25  Q.   Is that a yes?
```

83

1   A.   Yes.

2   Q.   I'm sorry.  Do you recall the context in which you were

3   having this email exchange?

4   A.   No.

5   Q.   Let me ask you this:  Do you recall that Mr. Pieron was

6   sent a set of questions and answers, a Q and A sheet?

7   A.   A Q and A -- we always send everybody a question and

8   answer form for them to fill out information for each year.

9   Q.   And had you been trying to get Mr. Pieron to complete that

10  form and send it to you?

11  A.   Yes.

12  Q.   And what types of information was on that form?

13  A.   Oh, it would be everything.  It would be all forms of

14  income and then, of course, their expenses.

15  Q.   All right.  And why did you want that information?

16  A.   That's in order to prepare the tax return.

17  Q.   Okay.  And on -- in this email, did he tell you that

18  80 percent of the form did not apply to him?

19  A.   That's probably -- that's probably, yes, you know.  That's

20  probably what that meant, that 80 percent of that doesn't apply

21  to me, so --

22  Q.   All right.  And then he said he typed the information

23  below, correct?

24  A.   Where does it say that?  Oh, so I've typed the information

25  below.  Okay, yeah, so he sent me his information on his own.

1  Q.   Let's go down below.

2  A.   Oh, no to all questions.

3  Q.   All right.

4  A.   Okay.

5  Q.   And do you see where he listed his foreign income?

6  A.   Yes.

7  Q.   Did -- CHF earned, did you understand that to mean the

8  earning in Swiss francs?

9  A.   Yes.

10 Q.   And then the information going to the right for the years

11 2007, '08 and '09 was the tax paid to Switzerland?

12 A.   Yes.

13 Q.   And then the conversion?

14 A.   Yes.

15 Q.   And then the US dollars?

16 A.   Uh-huh.

17 Q.   And then next to that -- or below US dollars, what did he

18 have US dollars earned in 2007?

19 A.   US dollars in 2007 was 181,906.67.

20 Q.   And next to that it says US dollars tax.  What did you

21 understand that figure to mean?

22 A.   I just thought that he did his own estimation of what the

23 tax would be in US tax -- because he hadn't done any tax

24 returns.

25 Q.   All right.  So that's not a -- that was a number that came

1  from him?

2  A.   Yes, all the numbers came from him.

3  Q.   And was that a number that you understood he wanted you to

4  use on the returns?

5  A.   No.  I didn't feel like -- I felt like I would do the

6  returns and whatever came up, came up.  That's what it would

7  be.

8  Q.   All right.  What was the earnings in US dollars figure

9  that he gave you for 2008?

10  A.   90,995.26.

11  Q.   And for 2009?

12  A.   $54,001.93.

13  Q.   Did he provide any US income for 2009?

14  A.   No.

15  Q.   And up above, do you see where it says donation, Hartland

16  High School?

17  A.   Yes.

18  Q.   Above that it say what?  Yes --

19  A.   Yes, to own my own business, capital gains, dividend

20  income and charitable donations.

21  Q.   Or contributions?

22  A.   Contributions, charitable contributions, sorry.

23  Q.   Next I'd like to show you Government's Proposed Exhibits

24  61, 62 and 63.  Those are spreadsheets containing information

25  regarding Mr. Pieron?

Nathan - Direct                                          86

 1   A.    Yes.

 2   Q.    And he provided that information to you?

 3   A.    Yes.

 4          MS. PARKER:  Your Honor, I offer Government's

 5   Proposed Exhibits 61, 62 and 63.

 6          MR. MINNS:  No objection, Your Honor.

 7          THE COURT:  They're received.

 8   BY MS. PARKER:

 9   Q.    And did you make some marks on those documents?

10   A.    Yes.

11   Q.    So the handwriting on those documents, would that all be

12   yours?

13   A.    Yes.

14   Q.    And did you use those documents to work on the tax

15   forms --

16   A.    Yes.

17   Q.    -- for the defendant?

18   A.    Yes.

19   Q.    All right.  Let's take a real quick look at 61.

20   A.    Okay.

21   Q.    Is it easier to look at the paper or the monitor?

22   A.    Well, let me see.  Well, I'll look at the monitor.

23   Q.    All right.  What type of information, again, was he

24   providing you there?

25   A.    He was providing me his income and he called it capital

1   gains income.

2   Q.   All right.  And, again, did he provide --

3   A.   And then there were the expenses down below, so

4   underneath.  The top was capital gains.

5   Q.   All right.  And then you also had information for

6   Komplique?

7   A.   Yes.

8   Q.   And JDFX Fund?

9   A.   Yes.

10  Q.   Did you use that information to prepare the tax returns

11  for 2007?

12  A.   Yes.

13  Q.   Okay.  Let's take a quick look at -- sorry, that was

14  2008 --

15  A.   2008.

16  Q.   -- I'm sorry.

17  A.   2008.

18  Q.   Let's go to 2009 anyway.  This is for 2009?

19  A.   Yes.

20  Q.   And, again, he provides you a list of capital gains?

21  A.   Yes.

22  Q.   And expenses?

23  A.   Yes.

24  Q.   Did he explain to you his relationship to JDFX?

25  A.   I thought it was his company.

Nathan - Direct

1  Q.   All right.  And what about Komplique, Komplique or

2  Komplique or whatever?

3  A.   I thought that was also like his business, company.

4  Q.   And that's important to know and understand for doing the

5  tax returns?

6  A.   Yes.

7  Q.   This is the type of information he's provided you, for the

8  most part?

9  A.   Yes.

10  Q.   Next I'd like to show you Exhibit 164 [sic].

11  A.   Do you want this?

12  Q.   Yes.  Was --

13  A.   Oh, yeah, okay.

14  Q.   Do you remember that?

15  A.   Yes.

16  Q.   All right.  I don't want you to testify in great detail

17  yet.  Was that something that Mr. Pieron sent to you?

18  A.   Yes.

19  Q.   For use on the tax returns?

20  A.   Yes.

21       MS. PARKER:  Your Honor, I offer Government's

22  Exhibit 64.

23       MS. ARNETT:  164 or 64.

24       MS. PARKER:  Sixty-four, did I say something else?

25       MR. MINNS:  Yes, ma'am.  We have to pull it up so I

89

1  can see what the witness is looking at.

2          We have no objection.

3          THE COURT:  Received.

4  BY MS. PARKER:

5  Q.   All right.  Ma'am, what is -- is that a letter?

6  A.   It looks like it's a statement, if I could read the

7  foreign language.

8  Q.   All right.  Was that one of the documents that was

9  provided to you?

10 A.   Yes.

11 Q.   By Mr. Pieron?

12 A.   Yes.

13 Q.   What was it he told you that that was about?

14 A.   I assume it was -- I can't really remember.  It looks

15 like, you know -- I can't -- I can't really remember at this

16 time what that was exactly about.

17 Q.   You said it was in a foreign language, correct?

18 A.   Yes.

19 Q.   Did you get a translation?

20 A.   No.  I -- I -- I can't help but believe that I would have

21 asked him about it, and he probably -- I don't know, if he said

22 it was a --

23          MR. MINNS:  Pardon me, I do ask that the witness not

24 speculate.

25          THE WITNESS:  Oh, okay.

1   BY MS. PARKER:

2   Q.   Let me ask it this way:  Did he, if you recall, give you

3   an explanation of what the letter stood for?

4   A.   I can't recall.  I can't recall if he gave me an

5   explanation.  I can't believe he didn't, but I can't recall it.

6   Q.   Let me ask you this:  Did you, in preparing his tax

7   returns, use information regarding his foreign taxes in

8   preparing that return?

9   A.   I don't really recall.

10          THE COURT:  Are you referring specifically to Swiss

11  returns or to other information?  I'm not -- that wasn't clear

12  to me.

13          MS. PARKER:  I was referring to Swiss -- yes, payment

14  of Swiss taxes being reflected on the returns that she

15  prepared.

16  BY MS. PARKER:

17  Q.   All right.  I'm going to show you Government's Proposed

18  Exhibit 57 -- before I do that, let's go back to 64, the second

19  page which is 005405.  Do you see that, ma'am?

20  A.   Yeah.

21  Q.   Do you see some handwritten notations there?

22  A.   Oh, okay, yes.

23  Q.   Do you know whose handwriting that is?

24  A.   That's mine.

25  Q.   And do you see where you wrote in withholding tax?

91

```
1   A.   Right, so I -- yes.
2   Q.   So it was your understanding -- when you wrote that in,
3   what was your understanding?
4   A.   Right, that I was probably -- he probably explained it to
5   me.
6   Q.   And what was the explanation?
7   A.   That --
8            MR. MINNS:  Excuse me, pardon me, Your Honor, the
9   answer was he probably explained it to me, meaning speculative
10  and now she's asking what his explanation was.
11           THE COURT:  And the witness may be able to respond.
12           MR. MINNS:  Yes, but -- but -- well, I then just move
13  to strike the part about "probably told me," if the witness
14  does not remember.  I'll move to strike that, those three
15  words.
16           THE COURT:  Overruled.
17           MR. MINNS:  Thank you, Your Honor.
18  BY MS. PARKER:
19  Q.   All right.  Now let's go on to Exhibit 57.  Is that
20  another email sent to you?
21  A.   Yes.
22  Q.   And is it from Mr. Pieron?
23  A.   Yes.
24  Q.   And the date of it is December --
25  A.   Seventeenth of 2010.
```

1   Q.   All right.   And was that an email that was sent with

2   additional attachments?

3   A.   Yes, it was additional information.

4           MS. PARKER:   All right.   Your Honor, I offer

5   Government's Proposed Exhibit 57.

6           MR. MINNS:   No objection, Your Honor.

7           THE COURT:   Received.

8   BY MS. PARKER:

9   Q.   All right.   Looking at the first page, which is the actual

10  email --

11  A.   Yes.

12  Q.   -- do you see in there a section that says "attachments?"

13  A.   What did you say?

14  Q.   On the top of the email, do you see where it says

15  attachments?

16  A.   Yes.

17  Q.   And below there it says various -- like Saxo, 2007?

18  A.   Yes, 2000 -- uh-huh.

19  Q.   And are those the attachments that -- the documents that

20  followed the emailed and the exhibit?

21  A.   Yes.

22  Q.   Now, looking back, please, at the email part of this

23  exhibit, did you see where it's typed in Saxo capital loss?

24  A.   Yes.

25  Q.   And below there there's information for 2007, '08, '09 and

93

1   '10?

2   A.   Yes.

3   Q.   Again, is that information that Mr. Pieron was sending to

4   you?

5   A.   Yes.

6   Q.   Did that appear to you to summarize the information that

7   was in the attachments?

8   A.   Yes.

9   Q.   And did you use that information in preparing the tax

10  returns?

11  A.   Yes.

12  Q.   In what way?

13  A.   He has an opening -- open close -- well, that's the

14  beginning amount, and then the balance at the end, and then the

15  P and L is profit or loss and he showed loss in '07, '08 and

16  '09, and capital loss, and then gain in 2010, according to

17  this -- his summary of these documents -- the documents here

18  from Saxo.

19  Q.   And would that -- would that information wind up flowing

20  through to his own personal income tax returns?

21  A.   Yes.

22  Q.   Did you do any business returns for Mr. Pieron?

23  A.   No.

24  Q.   Just his personal ones?

25  A.   Right, just his 1040, yeah.

Nathan - Direct

1  Q.   I'm going to hand you Government's Proposed Exhibit 56.

2  Do you recognize that?

3  A.   Oh, this is -- yes.

4  Q.   Is that a kind of a log of entries or records made by

5  American Tax regarding Mr. Pieron as a client?

6  A.   Yes.

7  Q.   And was that the ordinary way that you kept records on

8  clients?

9  A.   Yes.

10  Q.   And once the records were made, you kept them for further

11  use in the business?

12  A.   Yes.

13  Q.   Were they basically kept on like a computer?

14  A.   Yes.

15       MS. PARKER:  Your Honor, I offer Government's

16  Proposed Exhibit 56.

17       MR. MINNS:  Pardon me.  Your Honor, I have no

18  objection to it being offered to remind the witness of certain

19  things, but these are statements from a dozen different people

20  that's being added -- adding in their testimony apparently

21  representing the truthfulness of the statements in the

22  testimony.  Just because it's a business record does not

23  automatically eliminate the hearsay rule.

24       There'll be, it looks like, 12 people up here who I

25  will not have any ability to cross-examine.  I do not mind the

1   witness refreshing her memory from these or making any of the

2   statements that she made.  I would not object if they redacted

3   it, just use it for that purpose or redact it from the

4   statements that this witness did not make, but the other people

5   who we will not -- have never met, will never get a chance to

6   cross-examine.

7           THE COURT:  Would you agree with me that the witness

8   is qualified as a business record?

9           MR. MINNS:  Yes, I would, Your Honor.

10          THE COURT:  Does it contain opinions that you believe

11  to have been made outside of the course of ordinary business?

12          MR. MINNS:  I'm struggling with that, Your Honor.  I

13  think it is a business record.  If the Court gives instructions

14  that it cannot be considered for the truth of the matter

15  asserted therein, the business record -- if the people are not

16  being sworn in.  It's a hearsay document.  It can be admitted

17  as a business record, but the statement's not being told in

18  this courtroom should not be admitted for the truth therein

19  because we cannot cross-examine the witnesses.

20          THE COURT:  Respectfully, that is the point of the

21  exception.

22          MR. MINNS:  That -- the Court's correct.  Frequently,

23  though, when there's marked hearsay in the document, there are

24  portions of business records taken out.

25          THE COURT:  I appreciate your objection.  It's

1  overruled.  I will, however, entertain any specific concerns

2  that you might raise concerning particular entries that could

3  affect the witness's testimony.

4             MR. MINNS:  Thank you, Your Honor.

5             THE COURT:  Ma'am.

6             MS. PARKER:  I take it the document's received, Your

7  Honor.

8             THE COURT:  It is.

9             MS. PARKER:  Thank you, Your Honor.

10  BY MS. PARKER:

11  Q.   I'd like to go to page 00521, and do you see on that page

12  an entry --

13  A.   Are you going to enlarge it so I can see?

14  Q.   I'm sorry, yeah.  Do you -- do you see an entry for

15  July 6th or 7/6 of 2010?

16  A.   Okay.  Yes, I see it.

17  Q.   An entry for 1:48 p.m.?

18  A.   Yes.

19  Q.   What does that first thing there say?

20  A.   "Called client."

21  Q.   Called client, in this case Mr. Pieron?

22  A.   Yes.

23  Q.   And what does the rest of the entry say?

24  A.   "Still no emails.  Also requested the promissory note he

25  wrote to himself.  BT," that is an attorney, Brian Thompson,

1   "says that note won't hold up with IRS.  Can't write yourself

2   an IOU and then claim a loss when it's not paid back."

3   Q.   And did you tell that to Mr. Pieron?

4   A.   I would think so.  It's not in that note.

5   Q.   All right.  Let's go to page 520, the entry for July 9th,

6   2010 at 2:22 p.m.

7   A.   Okay.

8   Q.   What does that first entry say?

9   A.   The one from 2:22 p.m?

10  Q.   Yes.

11  A.   "Email to client.  Hi, James.  I still have not received

12  the documents you were going to send to me regarding the

13  carryback of losses.  Losses incurred in any year for business

14  expenses can be carried back for two years.  New rulings in

15  2008 and then again in 2009 allowed for losses in those years

16  to be carried back up to five years.  You can choose five years

17  or four years or three years or two years.  That ruling is not

18  in place for 2010, at this point anyway."

19  Q.   All right.  So is that the actual text of the email that

20  you sent Mr. Pieron?

21  A.   Yes.

22  Q.   And why were you sending him that?

23  A.   Giving him information that -- I guess he wanted to

24  carryback some losses, I assume.  I remember.  Wanted to

25  carryback losses, but you can't unless they're business losses.

1   Q.   All right.  Can you say that a little louder.

2   A.   I can't carry back -- only business losses, not capital

3   gains losses.

4   Q.   So let's go on to an entry for December 13th, 2010 at

5   4:48.

6   A.   Okay.

7   Q.   All right.  How does this entry begin?

8   A.   "Client called."

9   Q.   And so that was an incoming call to you?

10  A.   Yes.

11  Q.   And you would have made this entry?

12  A.   Yes.

13  Q.   As to the other two that we've already looked at also?

14  A.   Yes, because my name's at the end.

15  Q.   And that was a note you made after speaking to Mr. Pieron?

16  A.   Yes.

17  Q.   And what was the note that you made to your records for

18  the business?

19  A.   "Client called.  Is perpetually going over ways that we

20  can try to reduce the tax he will owe for 2007.  Such angst."

21  I shouldn't put a little -- my note in there.  "But he will be

22  sending the prep QA over with all the numbers.  Payment of

23  2,100 via Mastercard, EMJB", who is the accountant, the person

24  who took the money in, I guess, Joanne.

25  Q.   What was the -- what was that money for?

1  A.    I assume it was for tax prep.

2  Q.    That was the business fee, correct?

3  A.    Yes, that was -- I guess he told me he was going to be

4  sending the payment.  I usually don't get that information.

5  Q.    All right.  But he didn't give you money to give to the

6  IRS, did he?

7  A.    Oh, no.  It was to pay our company.

8  Q.    Let's go on to an entry for June 29th, 2011 at 8:23.  All

9  right.  This was an entry also in the file?

10  A.    Yes.

11  Q.    And what does this part that's on the monitor say?

12  A.    "Investigation report."

13  Q.    And the next thing says what, the next sentence?

14  A.    "Client has only paid us for prep work at this point.

15  CN" -- that's me -- "completed returns for '07 through '10, and

16  it appears client will owe about $441,000."

17  Q.    Okay.  Continue.

18  A.    "It does not appear that the balances have yet posted.

19  His income figure is all over the place, mainly because he has

20  interest in a few companies and gets capital gains income each

21  year.  As a W-2 employee, he makes about 4,375 per month.

22  According to last year's return, his capital gains totaled

23  252,000 giving him an add" -- she probably means additional --

24  "21,000 per month.  When comparing last year to previous years

25  in 2009 he made 844,000 in capital gains.

 1              Needless to say, there's lots of income moving around

 2    here.  When looking at a two-year average, IRS could see 76,000

 3    disposable income.  With the 2010 figures, IRS could see about

 4    17,000 disposable income.  Ouch.  With his W-2 income alone,

 5    he's sitting on about 400 NAS -- I don't really know what that

 6    means -- "disposable income."

 7    Q.   DI refers to disposable income?

 8    A.   Yeah, DI is disposable income.  "He told HD" -- I don't

 9    know what that person is -- "that he doesn't expect capital

10    gains this year, but he has made -- turned a profit each year

11    since '08.  In '08 he made 1.7 mill, so I find that odd.

12    Realistically, this guy is moving money around and has an

13    ability to pay."

14    Q.   Let's go down just a little bit further on this entry, the

15    second paragraph.  All right.  Can you read this next

16    paragraph.

17    A.   "In terms of assets, we did not get a full accounting on

18    any bank accounts, investments that the client owns.  It

19    appears that he rents, so might not be any real property.  But

20    the interest in the bizes is a huge asset."

21    Q.   Then go down.  All right.

22    A.   "He is not an OIC or CNC case because of the projected

23    income and biz evaluation, so this is not a settlement case, so

24    he needs to wrap his head around the fact that there's not

25    going to be a big savings here."

Nathan – Direct

1  Q.   Do you know what OIC means?

2  A.   No, I can't remember.

3  Q.   Do you know what CNC means?

4  A.   Something to do with collections, but I can't remember

5  what those -- that abbreviation means now.

6  Q.   But it's an abbreviation that relates to collection?

7  A.   Yes, CNC is some kind of collections.  Oh, OIC is offer

8  and compromise, I remember now.

9  Q.   All right.  Thank you.

10  A.   And CNC is currently noncollectable.  It came back to me.

11  Q.   These things happen to us.  So he was not offer and

12  compromise or currently not collectable case, would that be --

13  A.   Right, that's what she's saying.

14  Q.   Further down in the middle of the page, do you see down

15  there in the middle of the page starting with "we recommend" --

16  A.   Yeah, uh-huh, okay.  "We recommend that he start making

17  voluntary payments of 2,500 to 3,000 per month or more if he

18  can swing it.  Obviously a lot of what we can -- what he can

19  pay will depend on how the bizes are doing this year.

20  Currently his case is not in collections."

21  Q.   Okay.  I'm going to show you Government's Exhibit 39.

22       Your Honor, that's already in, I just wanted to make

23  sure before I went too far.

24       That's a certified copy of a tax return, correct?

25  A.   Yes, okay, yes.

Nathan - Direct

1  Q.   Do you recognize that one?

2  A.   Yes.

3  Q.   How is it that you're able to recognize it?

4  A.   I signed it.

5  Q.   All right.  And this is a 2007 return for Mr. Pieron?

6  A.   Yes.

7  Q.   And what was the date that you signed it?

8  A.   1/7/11.

9  Q.   All right.  And once you signed it, what happened with it?

10 A.   I sign it, we keep copies, we make a copy for the client,

11 mail him the original and a copy with instructions to sign it,

12 date it, and we usually told him to walk it into the IRS, but

13 sometimes they mailed it.

14 Q.   All right.  But who actually then filed that tax return?

15 A.   James Pieron.

16 Q.   All right.  Did you give him credit for foreign tax

17 payment?

18 A.   Yes, I did.

19 Q.   And what was the tax that you computed for him as far

20 as --

21 A.   He owed $5,777.

22 Q.   And did he have any withholdings reported for that year?

23 A.   No.

24 Q.   Show you Exhibit 50 -- excuse me 40.

25 A.   Forty.

Nathan - Direct

1  Q.   Let's start with Exhibit 40, please.

2  A.   Okay.

3  Q.   Is that the tax return, another tax return, that you

4  prepared for Mr. Pieron?

5  A.   Yes.

6  Q.   And for what year?

7  A.   2008.

8  Q.   And when did you sign and date it?

9  A.   January 7th, 2011.

10 Q.   And, again, on that, was there a form 1116 to give him a

11 foreign tax credit?

12 A.   Nope, it's not on this return.

13 Q.   Were capital gains reported?

14 A.   Yes.

15 Q.   And this was, again, for what year?

16 A.   2008.

17 Q.   And what did he tell you about the capital gains?

18 A.   What did he tell me?

19 Q.   Yeah.

20 A.   I don't remember what he would have told me.

21 Q.   Did he tell you -- well, did he -- did he provide you the

22 amount that was on that form?

23 A.   Yes, he provided me all the numbers.

24 Q.   Did he have any discussion about wanting to take it in a

25 different time frame?

1   A.   Yes.  I think that -- I believe he said he wanted to do

2   that.  It was an idea to carry it back.

3   Q.   And what -- what was he suggesting to you?

4   A.   To carry back the capital losses, well, capital gains.  He

5   can't do that, though.

6   Q.   Did you tell him that he can't do that?

7   A.   Right.  It's just definitely not --

8   Q.   And what was the amount of the tax owed by Mr. Pieron for

9   2008 in this tax return?

10  A.   Are you asking me how much he owed?

11  Q.   Yes.

12  A.   Okay.  268,445.

13  Q.   And, again, on that year did he have any withholdings?

14  A.   No.

15  Q.   So would that have been the amount of the payment that

16  should have been made on that tax return?

17  A.   Yes.

18  Q.   And just like the other one, that would have gone out in

19  the mail to him --

20  A.   Yes, yes.

21  Q.   -- for filing?

22  A.   Uh-huh.

23  Q.   All right.  I think you also have Exhibit 42.

24  A.   Yep.

25  Q.   And that's another tax return?

Nathan - Direct

1   A.   Yes.

2   Q.   Is it one you prepared for 2009?

3   A.   Yes.

4   Q.   For Mr. Pieron?

5   A.   Yes.

6   Q.   And did this have your signature?

7   A.   Yes.

8   Q.   And the date of signing that one?

9   A.   January 7th, 2011.

10  Q.   And on that one did you compute a tax owed?

11  A.   Yes, a tax owed of 125,490.

12  Q.   And were there capital gains and foreign earned income

13  reported on that?

14  A.   There were capital gains and foreign earned income, I

15  think so.  I did that for him.  Foreign earned income in 2009,

16  yes.  There's a form.

17  Q.   And this tax return would have been sent by mail to

18  Mr. Pieron?

19  A.   Yes.

20  Q.   Did you also prepare a tax return for the next year, 2010?

21  A.   Yes.

22  Q.   And was that one eFiled?

23  A.   Yes.

24  Q.   And you have that?

25  A.   Yes.

```
 1              MS. PARKER:  All right.  Your Honor, I'll offer
 2    Government's Proposed Exhibit 43, the 2010 return.
 3              MR. MINNS:  Can I ask if this is eight pages long?
 4    We don't have the certified copy.  I just --
 5              MS. PARKER:  She's got it.  It's on the witness
 6    stand.
 7              MR. MINNS:  Could we have a copy of the certified
 8    copy, so we can go --
 9              MS. PARKER:  You have a copy of the same pages.  I
10    just -- you just don't have the sheet.  You can take a look at
11    it and compare.
12              MR. MINNS:  Would that be permitted, Your Honor?
13              THE COURT:  Yes.
14              MR. MINNS:  We have no objection.
15              MS. PARKER:  May this be received, Your Honor?
16              THE COURT:  It may.  It's received into evidence.
17    BY MS. PARKER:
18    Q.   Ms. Nathan, that's the tax return for 2010, correct?
19    A.   Yes.
20    Q.   And that one was eFiled.  Do you recall why that one was
21    eFiled?
22    A.   Because that's the year we were doing the tax return,
23    2010.  You could do it in 2011, you know what I mean, so that's
24    probably -- it was current.
25    Q.   All right.  So you can only eFile for the current year?
```

Nathan - Direct

107

```
 1  A.   At that time, yes.

 2  Q.   All right.  And did that show a tax owed?

 3  A.   A tax owed, yes.

 4  Q.   And what was that?

 5  A.   41,376.

 6  Q.   And did -- were there any withholdings against the taxes

 7  for 2011?

 8  A.   No.

 9  Q.   All right.  So that would have been the full amount owed?

10  A.   Yes.

11  Q.   I'm going to show you Government's Proposed Exhibits 52,

12  53, 54 and 55.  Do you recognize those?

13  A.   Oh, okay.  These look like they are the payment vouchers

14  that would have gone along with the returns.

15          MS. PARKER:  All right.  Your Honor, I offer

16  Government's Proposed Exhibits 52, 53, 54 and 55.

17          MR. MINNS:  No objection.  Your Honor, if I could --

18  I'm having a little problem, and I don't want to interrupt her,

19  if I could inquire of approximately how long the Government

20  feels this will be with this witness.

21          MS. PARKER:  Probably longer than your speech -- or

22  shorter than your speech I should say.

23          MR. MINNS:  That I just did?

24          MS. PARKER:  Yeah.

25          MR. MINNS:  Oh, I apologize, Your Honor.  I would
```

```
 1   request a short break after the conclusion with this witness.
 2              THE COURT:  But your objection was --
 3              MR. MINNS:  I have no objection, Your Honor.  I
 4   apologize.
 5              MS. PARKER:  I'm not objecting either, Judge.
 6              THE COURT:  All right.  Good point for a recess.
 7              MS. PARKER:  Well, fine.
 8              THE COURT:  I was understanding your suggestion to be
 9   that your questions would take -- that your examination would
10   take some additional time?
11              MS. PARKER:  No, I was meaning to say that the
12   discussion about taking a break is longer than what's left of
13   my exam.
14              THE COURT:  Okay.  Nevertheless, I; still think it's
15   a good point for a break.
16              MS. PARKER:  That's fine.
17              THE COURT:  Please rise for the jury.
18              (At 11:26 a.m., jury leaves.)
19              THE COURT:  Record's closed.
20              (At 11:26 a.m., court recessed.)
21              THE COURT:  Jury, please.
22              MS. PARKER:  Judge, can we bring up a quick
23   scheduling matter?
24              THE COURT:  Yes.
25              MS. PARKER:  We have multiple witnesses who are here
```

1  from out of state, and after this witness, there's three of

2  things.  They're very short, in time, not stature.  I don't

3  know how tall they are, but they're not very lengthy in their

4  testimony; and, if at all possible, we'd ask the Court and

5  opposing counsel and the jury's latitude to finish up those

6  people so they can go home.

7        THE COURT:  Will you promise equivalently that you

8  will be succinct and direct.

9        MR. DEPORRE:  Your Honor, I'm covering those

10  witnesses, and --

11        MS. PARKER:  So there's a --

12        MR. DEPORRE:  -- I promise.  Two of them are records

13  custodians.

14        MR. MINNS:  Could we just know who they are so we

15  know which lawyers to take them.

16        MR. DEPORRE:  One is Motor Cars International

17  custodian of records.  That guy's name is -- the witness's name

18  will be Jeff Cornwell.

19        The other witness is Zachary Schweder from Peregrine

20  Financial Group, and if we can get to Chris Werwega, he would

21  be the third.

22        MR. MINNS:  No objection.

23        MR. SASSE:  We can try.  I mean, I don't know.

24        MS. ARNETT:  I don't know if they're going to be that

25  short.

1            THE COURT:  We'll see what -- are you anticipating

2   going past one?

3            MR. DEPORRE:  It's possible.

4            MS. PARKER:  Potentially, and that's why we're

5   raising it.

6            THE COURT:  We'll take it up at another point where

7   we have a break.  We need to respect the jury's time and

8   they're here.

9            (At 11:45 a.m., jury arrives.)

10           THE COURT:  Please be seated.  If you'd like to

11  continue.

12           MS. PARKER:  Your Honor, I believe shortly before the

13  break I moved the admission of Government's Proposed Exhibits

14  52, 53, 54 and 55 which were payment vouchers.

15           MS. ARNETT:  We have no objection.

16           MS. PARKER:  All right.

17           THE COURT:  They're received.

18           MS. PARKER:  Thank you, Your Honor.

19  BY MS. PARKER:

20  Q.   Ms. Nathan, can you take a quick look at those four

21  exhibits there, 52, 53, 54, and 55.

22  A.   Yes.

23  Q.   Is 52 a payment voucher for 2007?

24  A.   Yes.

25  Q.   Fifty-three a payment voucher for 2008?

1   A.    Yes.

2   Q.    Fifty-four for 2009 and 55 for 2010?

3   A.    Fifty-four for 2009, yes; and 55, 2010, yes.

4   Q.    All right.  And were those documents that were prepared by

5   American Tax Solutions?

6   A.    Yes, it's part of the program, the tax program.

7   Q.    And by the way, where's American Tax Solutions located?

8   A.    In Chicago.

9   Q.    Then those vouchers would have been sent to the taxpayer,

10  in this case, Mr. Pieron?

11  A.    They would have gone with the return.

12  Q.    All right.  And that's so that what?

13  A.    So they could pay the tax due and include the voucher,

14  make sure it's for that year and goes with that return.

15  Q.    To make sure the payment gets connected to the return that

16  it relates to?

17  A.    Right, yeah.

18  Q.    Is that a fair statement?

19  A.    Uh-huh, yeah.

20  Q.    The other ones are similar; all the vouchers pretty much

21  look alike except for the year?

22  A.    Yes.

23  Q.    All right.  Let's go back to Exhibit 43 for just one

24  second.

25  A.    What did you say?

Nathan - Cross                                                    112

1   Q.    Forty-three.

2   A.    Okay.

3   Q.    We'll have it displayed.  On the second page of that, do

4   you see line 61?

5   A.    Yes.

6   Q.    Was there some withholding there?

7   A.    Yes.

8   Q.    And those were W-2 or 1099 withholdings?

9   A.    Yes.

10  Q.    And what was the amount?

11  A.    $10,087.

12  Q.    All right.  So after that is deducted from the tax owed,

13  the tax amount owed that still needed to be paid was what?

14  A.    41,376.

15          MS. PARKER:  Thank you, Your Honor.  Pass the

16  witness.

17          THE COURT:  Cross.

18          MR. MINNS:  Yes, please, Your Honor.

19                    CROSS-EXAMINATION

20  BY MR. MINNS:

21  Q.    It's still morning, good morning --

22  A.    Good morning.

23  Q.    -- Ms. Nathan.  We've never met before, correct?

24  A.    Correct.

25  Q.    You don't know if I'm James Pieron?

1   A.   No, I don't know if you're James -- not James Pieron.

2   Q.   I'm not.  I'm Michael Minns, and I am James Pieron's

3   attorney.

4   A.   Okay.

5   Q.   And pleased to meet you.

6   A.   Nice to meet you.

7   Q.   I would imagine that you have discussed this case with the

8   people that you used to work with?

9   A.   Not necessarily.

10  Q.   So I'm -- you haven't discussed it with anybody that

11  you've worked with?

12  A.   No.

13  Q.   You didn't discuss it at the time when the IRS special

14  agent was coming to the office to interview people at the

15  office?

16  A.   Well, I don't know.  Actually they didn't discuss it.  It

17  was just that we were responding to the IRS.  We didn't sit

18  down and discuss his tax situation.

19  Q.   Do you remember meeting with Special Agent Hollabaugh?

20  A.   Yes.

21  Q.   Do you remember him?  Can you pick him out at the table?

22  A.   Yes.

23  Q.   Which one is he?

24  A.   The gentleman on the far left side?

25  Q.   This gentleman right here?

Nathan - Cross

1  A.    Yes, that's Mr. --

2  Q.    Is there anybody else in the courtroom that you can

3  identify?

4  A.    No.

5  Q.    How many opportunities did you have to meet with Special

6  Agent Hollabaugh?

7  A.    One, I think.

8  Q.    Okay.  How many opportunities did you have to meet with

9  any other Government agents on this case or people working for

10  the Government?

11  A.    Well, just that one time when we had an interview, except

12  for the marshals who delivered the notice of subpoena for grand

13  jury, I guess.

14  Q.    And am I mistaken if I'm guessing that you also met with

15  them since you came to Bay City that you have --

16  A.    Yes, yes, just recently, yes.

17  Q.    Yes.  And you had an extensive conversation about what the

18  testimony would be?

19  A.    Yes, uh-huh.

20  Q.    And if you can -- if you can go back -- do you know what,

21  if we can put the -- it's Government Exhibit 56, Bates stamp

22  00504, if we could get that on the board, and if we can

23  highlight the last three sentences of the date 4/12/12 where it

24  starts out "he also asked."  If we could blow that up when we

25  get to that.  Can we make it a little bigger?  Is it possible?

1   Could you -- could you read that Ms. Nathan?

2   A.   The highlighted part?

3   Q.   Yes, ma'am, please.

4   A.   "He also asked that we not disclose the subpoena or the

5   grand jury investigation to the client since that could impede

6   the investigation.  Told him we wouldn't."

7   Q.   Now, your firm also did legal work for Mr. Pieron, and

8   there's some legal advice that you read from a lawyer earlier?

9   A.   What I read earlier was from a lawyer?

10  Q.   Some of it was from a lawyer with the firm giving him

11  legal advice?

12  A.   What I read earlier from Beth Duncan?

13  Q.   Is Beth Duncan a lawyer?

14  A.   No, she's an EA.

15  Q.   Are there any lawyers listed on here?

16  A.   Well, AH is Alex Harris.

17  Q.   Is he a lawyer?

18  A.   Yes.

19  Q.   Did he give legal advice?

20  A.   I don't know.

21  Q.   Well, your firm did charge Mr. Pieron $30,000 for the

22  legal advice; you know that, correct?

23  A.   I don't know.

24  Q.   Do you know how much they charged him for the legal advice

25  and legal work?

```
1   A.    No, I don't.

2   Q.    So your firm was representing him as a taxpayer and with

3   lawyers from the firm and -- oh, I need that back up, please --

4   and at the same time that you were representing him, the

5   Government asked you to hide information from him because they

6   said it would impede the investigation?

7              MS. PARKER:  Your Honor, I'm going to object to this

8   line of questioning.  I don't think there's anything

9   inappropriate, and I don't think it's appropriate to have that

10  suggestion put before the jury.

11             MR. MINNS:  I didn't want it in front of the jury,

12  but it is here, and she questioned her extensively, and I

13  think --

14             MS. PARKER:  Well, you were the one who put it there.

15             THE COURT:  I'm short on some factual information and

16  I would like to take that up at sidebar.

17             (Sidebar conference as follows:)

18             THE COURT:  What type of legal advice was being

19  solicited?

20             MR. MINNS:  I think they actually filed motions on

21  his behalf in regard to -- I don't know if he was soliciting

22  legal advice but he was billed a substantial amount for the

23  legal advice.  This is a firm with lawyers and one accountant,

24  and so they were giving him both accounting advice and legal

25  advice.  They actually appeared, I believe -- they tried to --
```

Nathan - Cross

1  they filed a motion.

2           MS. PARKER:  Tried to quash a subpoena, Judge.

3           MR. MINNS:  In federal court.

4           THE COURT:  But in conjunction with the SEC

5  receivership?

6           MS. PARKER:  No, this was in part of this criminal

7  investigation, but she doesn't know anything about all this.

8           MR. MINNS:  She was asked to testify to all sorts of

9  things on here by other people that she doesn't know anything

10 about.

11          MS. PARKER:  There was service of a grand jury

12 subpoena.  The agent asked that they not disclose the

13 subpoena --

14          THE COURT:  Right.

15          MS. PARKER:  -- to the client, Mr. Pieron.  That's

16 what he's trying to -- what's the highlighted version.  They

17 did a motion to quash, which was referred to the magistrate.

18 There was a ruling, things went on from there, but that is

19 nothing within her knowledge, and it's not relevant to the

20 jury.

21          What we have is what was produced pursuant to the

22 subpoena after whatever was allowed to be protected, but the

23 fact that the attorneys had chose to --

24          MR. MINNS:  It's extremely relevant, Your Honor.  A

25 large part of our case is the competency and ethical qualities

Nathan - Cross                                          118

 1  of this firm.  We don't think they were competent or ethical,
 2  and they were getting money for legal fees and accounting fees.
 3  Under the accounting rules by the ethics of the Internal
 4  Revenue Service Circular 230, they're required to give full
 5  disclosure to their client.
 6          MS. PARKER:  No.
 7          MR. MINNS:  If the Government tells them not to,
 8  they're required to give it to them anyway.  They're not
 9  allowed to withhold information from their client.  As an
10  attorney, you have to give full disclosure.  I think this --
11  and it's in front of the jury.
12          MS. PARKER:  That is --
13          MR. MINNS:  They're going to read it because the
14  Government put it in over my objection.  I want -- my
15  question -- my next question --
16          THE COURT:  What was the predicate for the objection
17  to the subpoena?
18          MR. MINNS:  It was frivolous, in my opinion, but I
19  haven't read --
20          MS. PARKER:  I thought it was frivolous, too, but I
21  mean, that has nothing to do with the merits of the case,
22  whatever ATSI did with regards --
23          THE COURT:  All right.  I'm starting to catch up.
24  What -- what is your objection with respect to the introduction
25  of that information?

119

1          MS. PARKER:  Putting it in a context -- as he's

2  arguing that it's inappropriate to tell the recipient of a

3  subpoena of a financial institution or this subpoena not to

4  tell the client.  That is totally appropriate.

5          THE COURT:  And --

6          MS. PARKER:  It's a grand jury investigation against

7  criminal conduct.

8          THE COURT:  Was the motion to quash filed by an

9  attorney who was employed by this service or by a law firm on

10 behalf --

11         MR. MINNS:  This service.

12         MS. PARKER:  Law firm on behalf of the service.

13         MR. MINNS:  I thought it was a lawyer that worked for

14 the service.

15         MS. PARKER:  No.

16         MS. ARNETT:  Everybody's saying the same thing.

17         MS. PARKER:  It's outside counsel.

18         MS. ARNETT:  Yeah, it's a counsel for ATS.  I think

19 everybody's --

20         MS. PARKER:  But they're outside counsel.  That's the

21 question.

22         MS. ARNETT:  I wasn't in --

23         MR. MINNS:  I thought --

24         MS. ARNETT:  I wasn't involved in the case at that

25 point clearly, but my understanding is that ATS filed whether

Nathan - Cross

1    the --

2              THE COURT:  That's an important distinction.

3              MS. ARNETT:  Yes, I don't know if the attorneys that

4    work for ATS filed it, or if they hired counsel.  That I don't

5    know.

6              MS. PARKER:  It was Johnson and Moore, and I'm trying

7    to come up with the Johnson name.

8              MR. MINNS:  We were of record, but we do know this,

9    our client was billed $30,000 for this --

10             MS. PARKER:  But that's irrelevant.

11             MR. MINNS:  -- by this company, so whether the lawyer

12   works for this company or was an independent contractor hired

13   by this company --

14             THE COURT:  But the attorney/client privilege is not

15   implicated.

16             MR. MINNS:  I don't know, Your Honor.

17             MS. PARKER:  No.

18             MR. MINNS:  The -- the -- there's legal advice by an

19   attorney given in this document which is put in front of the

20   client.

21             MS. PARKER:  That's different.

22             THE COURT:  Yeah, I agree.  Overruled.

23             MR. MINNS:  But -- but -- just even -- it's in the

24   record.

25             THE COURT:  Overruled.

Nathan - Cross

1        MS. ARNETT:  Her objection is overruled.

2        MR. MINNS:  Oh, oh, I'm sorry.

3        THE COURT:  You can inquire concerning the language,

4   but no argument or inference with respect to their obligation,

5   simply the fact that the inquiry --

6        MR. MINNS:  Okay.

7        MS. ARNETT:  Can he ask about Circular 230?  She's a

8   tax return preparer.  She's required to follow Circular 230.

9        THE COURT:  This is complicated by the fact of the

10  later subpoena --

11       MS. ARNETT:  Sure.

12       THE COURT:  -- but I think the answer is no.

13       MS. ARNETT:  Okay.

14       THE COURT:  Because it's relevant, if at all, to the

15  later inquiry and challenge to the subpoena.

16       MS. ARNETT:  But her duties while she was preparing

17  the tax returns under Circular 230 he can question her about?

18       THE COURT:  But they're not going to relate in any

19  respect to this later conversation?

20       MS. ARNETT:  Right, okay.

21       MR. MINNS:  Yes.

22       THE COURT:  Thank you.

23       (Sidebar conference concluded.)

24       THE COURT:  You may continue.

25  BY MR. MINNS:

Nathan - Cross

1  Q.   May it please the Court, so when Special Agent Hollabaugh

2  told you and your firm not to give this information to your

3  client, did you tell him that you wouldn't give the information

4  to your client?

5  A.   I -- I was un aware of this.  It said that I got an EM --

6  I got an email from Brian, but I don't recall it.  I probably

7  wouldn't have thought to talk to the client.

8  Q.   Okay.  If we could put -- well, let me go through this

9  document for a little bit.  If we could move to page -- on this

10  same exhibit to 0503 to 5/2/12 note.

11         MS. ARNETT:  Could you repeat the Bates number.

12         MR. MINNS:  00503.

13         MS. ARNETT:  503, okay.

14  BY MR. MINNS:

15  Q.   And really if we could -- if we could highlight first --

16  if we could highlight first 5/12/12, 3:45 p.m. note.  At

17  3:46 p.m.  I think this is in kind of reverse chronology, isn't

18  it, ma'am?

19         I think it might be easier if I start at the bottom

20  of the page, because I'd like to start where it says 4/23/12,

21  11:50 and then we'll work our way up, so first -- I apologize.

22  In the old days we used to have it chronology --

23  A.   Right.

24  Q.   -- and now it's the reverse?

25  A.   I don't know why.

Nathan – Cross

1  Q.   But I'm going to -- for you and me and the jurors that are

2  our peers, we're going to start in chronology.  4/23/12, 11:50,

3  so let's first highlight 4/23/12, 11:50.  And this says that

4  there's an incoming call from Scott Hollabaugh.  He's

5  calling -- can you read that, please.

6  A.   "He's calling to follow-up on the subpoena.  Told him I

7  never got it.  He said he faxed it on 4/12."

8  Q.   And who is Brian Thomas?

9  A.   An attorney for the -- in the company.

10 Q.   An attorney in your company?

11 A.   Yeah.

12 Q.   Okay.  And then let's go up to the next one, 4/23/12.  It

13 looks like seven minutes later.  If we could highlight the

14 4/23, and if you could read that.

15 A.   Okay.  "Received" -- do you want me to read it?

16 Q.   Yes, ma'am.

17 A.   Yeah, "Received fax from Special Agent Hollabaugh, seven

18 pages including fax."

19 Q.   And that's the attorney Brian Thomas that took that down?

20 A.   Yes, he's saying he received it.

21 Q.   Does the client get billed for these calls or are they

22 free?

23 A.   I don't think they get billed.  They don't bill on the

24 hour.  In -- I don't know about this.  I -- they -- we have

25 clients and they pay for resolution.  It is kind of like a sum

1  they pay.  And if they need tax returns, then that's an extra

2  little sum, but usually there's a set price for a resolution.

3  They don't do like lawyerly work in the hourly lawyerly work.

4  Q.   So they're lawyers who do work that's not lawyerly?

5  A.   Well, for instance, they like to have lawyers working for

6  the company because they have the right to call the IRS on

7  behalf of a client, so they want people who have those

8  qualifications, so I -- Brian was a lawyer, but he would work

9  on the resolution.  I mean, that's what everybody did who was a

10 lawyer.  They would work on a resolution.  And, I mean, I in

11 my -- I've never heard of anyone doing like an hourly lawyer,

12 you know, billing.

13 Q.   Let's move on to four -- the next 4/27/12, 3:19 p.m. note,

14 let's highlight that.  Can you read that one, please.

15 A.   "If client calls or emails forward to AH voicemail."

16 Q.   And who said that?

17 A.   Alex Harris.

18 Q.   What kind of person -- is he a lawyer or a CPA?

19 A.   He's a lawyer, and he's the owner -- an owner, a partner

20 in the company.

21 Q.   He's a partner in the company?

22 A.   Yes.

23 Q.   Is he the partner that sold the services to Mr. Pieron?

24 A.   No, I would think it was a salesperson.

25 Q.   A salesperson?

Nathan - Cross                                                125

1   A.    There's a sales department and a resolution department.

2   Q.    And they're pretty good salesmen, weren't they?

3   A.    That's what they would -- they would -- I guess they were

4   good salesmen.

5   Q.    They brought in a lot of business, right?

6   A.    The salespeople brought in all the business.

7   Q.    And if I'm interpreting that correctly, it sounds like

8   that if the client, meaning James Pieron --

9   A.    Yes, it sounds --

10  Q.    -- calls --

11  A.    Yeah, if he calls.

12  Q.    No one's supposed to take his call.  They're supposed to

13  be forwarded to voicemail.  Am I misunderstanding that?

14  A.    No.  It looks like -- it says that's what Alex wants.

15  Q.    And this is a client that you've told the jury had a lot

16  of angst, a lot of suffering, correct?

17  A.    Well, he was -- right.  He wanted to get those tax returns

18  done, that's what --

19  Q.    As any honest citizen would want, correct?

20  A.    Yeah.  He wanted his --

21          MS. PARKER:  Objection, Your Honor.

22          THE COURT:  Sustained.

23  BY MR. MINNS:

24  Q.    And this client of your firm, by order of the owner of the

25  firm, Alex Harris, whenever he sends an email in now, whenever

US v. Pieron, Jr. - TRIAL - VOLUME 3 - March 1, 2019

1  he sends a call begging for help, is going to be sent to

2  voicemail land?

3  A.   Well, this is after we've completed the returns, so the

4  returns have been mailed to the client.

5  Q.   So you all --

6  A.   The date is the 12th -- I mean, April, 2012.

7  Q.   You all no longer wanted to have anything to do with him?

8  A.   I don't think that he hired us for resolution after he

9  received the returns.

10  Q.   Why not tell him we're not taking your calls, to quit

11  sending emails, quit calling, we're not taking your calls?

12  A.   I don't know.  I don't really know why.  I was not privy

13  to what they were doing.

14  Q.   Sure.  But, you know, the probability is that

15  Mr. Hollabaugh told them not to say things to the client?

16          MS. PARKER:  Your Honor --

17          THE WITNESS:  Well, I didn't know about that.

18          THE COURT:  The inquiries of the witness has to be

19  limited to information of which she has personal knowledge.  At

20  this point, we're speculating.

21  BY MR. MINNS:

22  Q.   So right after that, on -- if we could highlight 5/12/12,

23  the very next instance on there, could you read that to the

24  jury, please.

25  A.   "FBI call.  Special Agent Hollabaugh called.  AH" --

```
 1   that's Alex Harris -- "was out of office.  He took name and

 2   number, said we would call back and the EM was to -- EM to AH,"

 3   Alex, "with the info."

 4   Q.    What does that mean?

 5   A.    Probably a note to Alex to call back Special Agent

 6   Hollabaugh.

 7   Q.    And Matthew Miller, who is that?

 8   A.    He's probably -- I don't even remember him.  He's probably

 9   an admin who answered the phone.

10   Q.    And then last one on that date, 5/12, 3:46, if we could

11   highlight that last one, and if you could read that, please.

12   A.    "Special agent called in, sent to AH," to Alex Harris.

13   Q.    And who took -- who took that note?

14   A.    Brittany, another admin.

15   Q.    Were you able to meet personally with Mr. Hollabaugh, the

16   special agent at the table?

17   A.    I don't think I ever met him until we had a meeting.

18   Q.    In -- in Bay City?

19   A.    No, in Chicago.

20   Q.    In Chicago?

21   A.    Uh-huh.

22   Q.    Pardon me, these are -- these are copious.  If we could go

23   to the same exhibit, Bates stamp -- Bates stamp 00521, and if

24   we could -- I still can't -- is that Bate stamp 00521?  I can't

25   see it.
```

128

```
 1              Can we blow -- I'm sorry.  Can we blow up 7/7/10,
 2   2:54 p.m. and highlight that.  No, I mean, the --
 3              MS. ARNETT:  I got it.
 4   BY MR. MINNS:
 5   Q.   7/7/10, 2:54 p.m. is what -- 2:54 p.m.  Okay.  And
 6   highlight the paragraph where it says -- no, highlight the
 7   $9 million -- Carol Nathan $9 million, highlight that.  Okay.
 8              Now, could you read that full paragraph.
 9   A.   "Client called.  He wanted my email.  Will email him so he
10   has my address" -- well, I meant email address.  "Client
11   insists his $9 million in 2007 is capital gain.  He says he
12   sold shares of his company to an investor.  He has the number
13   of shares sold, sale price, and all the info to be entered on
14   Schedule D.  He will email his 2006 tax return."
15   Q.   So if I'm understanding this correctly, Mr. Pieron -- and
16   this is -- this -- you were the person that received this?
17   This is before he was sent to voicemail.  This is when you were
18   taking his calls, correct?
19   A.   Right.  This is before the -- it was in January of 2011
20   that I finished the returns, so this is July of 2010.
21   Q.   All right.  And while you were taking his emails and
22   calls, he tells you that he made $9 million in one of the
23   calendar years.
24   A.   That's what he -- whatever I wrote, that's what he said to
25   me.
```

Nathan - Cross

129

```
 1   Q.   So that's a lot of money, correct?
 2   A.   Yes.
 3   Q.   And if he hasn't kept careful records, or if he can't get
 4   all the careful records, those records are probably deductions,
 5   not additional income, correct?
 6   A.   Could you repeat that question.
 7   Q.   Yes, ma'am.  Let me see if I can rephrase it.  Sometimes I
 8   fumble and mess up.
 9          Your client, James Pieron, is telling you that he
10   made $9 million, right?
11   A.   Right.
12   Q.   And you're going to put that on the tax return because he
13   told you he made $9 million?
14   A.   In capital gain, yeah.
15   Q.   Right.  And --
16          MS. PARKER:  Your Honor, I'm going to object.  I
17   believe we're calling for speculation here.
18          THE COURT:  I don't know yet, but based on the
19   earlier question, I'm thinking it might be, but we'll give you
20   some latitude.
21   BY MR. MINNS:
22   Q.   After you have all of the income or most of the income --
23   A.   After he furnishes me the information?
24   Q.   Yes, ma'am.
25   A.   Okay.
```

Nathan - Cross

130

1  Q.   The next thing you want the client to do is find you the

2  expenses?

3  A.   Yes.

4  Q.   Because the expenses lower the net tax he will owe?

5  A.   Yes.

6  Q.   So if the client doesn't get you the records for the

7  expenses, or include them, he's likely to pay more taxes than

8  he really owes?

9  A.   Yes.

10 Q.   And when people have tax returns that are way late, that's

11 an unfortunate problem?

12         MS. PARKER:  I'm going to object.

13         THE COURT:  I -- I don't understand how your inquiry

14 is related to the factual assertion in this entry.

15         MR. MINNS:  Well, Your Honor, the Government's saying

16 that he didn't keep good records, he didn't get them all the

17 records, and what I am suggesting from this witness, who makes

18 a living doing this, is that that hurt him and didn't help him.

19 He's reported $9 million worth of income, so if he doesn't have

20 all the records, his taxes are going to be higher than normal.

21         And I believe this witness is qualified to testify to

22 that, and that a lot of their clients ended up paying more

23 taxes than they owed because there were a lot of late paid

24 clients which is, I think, is the entity they fish for business

25 out of.

Nathan - Cross

1      THE COURT:  That is -- there's no connection between

2  that assertion and this entry, is there?

3      MR. MINNS:  Well, yes, Your Honor, this is income.

4      THE COURT:  It's capital gain.

5      MR. MINNS:  The Government's suggestion is that the

6  client has the state of mind to make mistakes on records, and

7  I'm seeing if this witness can say those mistakes hurt him,

8  they don't help him, so it would not be his intent to make

9  those mistakes to raise his own income tax.

10      THE COURT:  No.  Objection's sustained.

11      MR. MINNS:  Thank you, Your Honor.

12      THE COURT:  The entry nor the inquiry of the witness

13  relate to expenses or associated accounting information.

14      MR. MINNS:  But the question that -- the answer to

15  the question that he told her he made $9 million in capital

16  gains stays, correct, Your Honor?

17      THE COURT:  Certainly.

18      MR. MINNS:  Thank you.

19  BY MR. MINNS:

20  Q.   You filled out an affidavit for the Government also,

21  correct?

22  A.   Yes.

23  Q.   Have you seen that affidavit recently?

24  A.   Yes, I did.

25  Q.   And the Government first typed out what they wanted to be

Nathan - Cross

132

1  in the affidavit, correct?

2  A.    They -- they had -- I think the affidavit was a summary of

3  what we -- our meeting --

4  Q.    Yes, ma'am.

5  A.    -- where they asked me questions.

6  Q.    And then they handed it to you to sign, correct?

7  A.    Yes.

8  Q.    And some of the things that were in the affidavit you did

9  not agree with, so you crossed some of them out and changed the

10  answer in handwriting, correct?

11  A.    I didn't do it.  My -- I was with an attorney who did, not

12  from our company, though.

13  Q.    You had your own attorney?

14  A.    Well, the company got an attorney.  I didn't hire an

15  attorney.

16  Q.    Why did the company feel you needed an attorney?

17        MS. PARKER:  Objection, calls for speculation.

18        THE COURT:  Sustained.

19  BY MR. MINNS:

20  Q.    Did you want an attorney?

21  A.    I didn't know anything.  I just got a subpoena and my boss

22  took over, you know, taking care of me.

23  Q.    The -- pardon me.  Approximately how many tax returns did

24  you prepare each year that dealt with American citizens living

25  in Switzerland earning their income from Switzerland?

1  A.    Probably zero.  Zero.  I never had a client that was

2  living in Switzerland.

3  Q.    And approximately how many clients did you have that told

4  you they had made over $9 million in one calendar year?

5  A.    None other.  I never had anyone that had that much money,

6  that much income information.

7  Q.    So if you had -- you're not a CPA, correct?

8  A.    Correct.

9  Q.    You had one accounting class in college?

10 A.    Yes.

11 Q.    And it didn't deal with taxation?

12 A.    No, it was straight accounting.

13 Q.    You worked at Jackson Hewitt for a while, correct?

14 A.    Yes, two tax seasons.

15 Q.    And in those two tax seasons, how many international tax

16 returns did you fill out?

17 A.    None.

18 Q.    How many corporate returns did you fill out?

19 A.    For -- at Jackson Hewitt?

20 Q.    Yes, ma'am.

21 A.    None.

22 Q.    So would it be fair to say that you do not have a lot of

23 experience with this particular type of tax return?

24 A.    That would be correct.

25 Q.    And you know what an enrolled agent is?

Nathan - Cross

1  A.   Yes.

2  Q.   And you have not taken the enrolled agent course?

3  A.   I have not.

4  Q.   Did you take the enrolled agent classes?

5  A.   I started, but quit.

6  Q.   They were difficult or just too time-consuming?

7  A.   I didn't -- I wasn't interested really.

8  Q.   You weren't.  And the purpose, for the jurors whose don't

9  know a lot about taxation, enrolled agents are given licenses

10  to prepare and defend tax returns, correct?

11  A.   Yes, I think so.

12  Q.   Okay.

13  A.   All I know is they have the right to call the IRS on

14  behalf of a client.

15  Q.   They have the right to a CAF number?

16  A.   Yes, that's right.

17  Q.   And you don't have a CAF number?

18  A.   No, no, no.

19  Q.   You're not really allowed to do that, because you don't

20  have the license?

21  A.   Right.

22  Q.   So when a really complicated tax return comes into the

23  business, I would imagine you talk with one of the CPAs that

24  work at the Tax Defenders?

25  A.   No, I didn't, and we didn't have any CPA's working there

Nathan – Cross

1  at that time.

2  Q.   Well, then I would imagine you would talk with one of the

3  enrolled agents that worked for the company?

4  A.   I didn't.

5  Q.   How big was this company?

6  A.   You mean how many employees?

7  Q.   Yes, ma'am.  That's a good --

8  A.   I think 30 possibly.

9  Q.   How many of them were salespeople?

10  A.   Pardon me?

11  Q.   How many of the 30 were salespeople?

12  A.   Well, maybe half.

13  Q.   Half of the staff were salespeople?

14  A.   Yeah.  Well, maybe less.  I mean, I'd have to sit here and

15  count, you know, but --

16  Q.   Certainly.

17  A.   -- not 50.  We didn't have 50 employees, and it was

18  flexible.  I mean, people left, we hired, you know, so I'd say

19  there was 25 or 30, and actually, let me think, maybe there

20  were really maybe 15.  At a time there could have been 15

21  salespeople.

22  Q.   Did they work on a commission?

23  A.   Yes.

24  Q.   So if they could sell a big case they would -- it would be

25  good for them?

136

```
 1   A.    Yes.   They would --
 2              MS. PARKER:   Objection, Your Honor, to relevance.
 3              THE COURT:   Overruled.
 4              MR. MINNS:   Thank you.
 5              I apologize to the jurors and Your Honor, but if I
 6   collect this stuff and get it out of my way, I'll be faster.
 7   BY MR. MINNS:
 8   Q.    Could we put Government Exhibit 57 up, please.   Is this an
 9   email to Ms. Nathan?
10   A.    Yes.
11   Q.    And does it have attached bank statements from Saxo Banks?
12   A.    Yes, I think -- I think I saw that, right, earlier.
13   Q.    And these -- and these are source documents, correct?
14   A.    His statements from Saxo, yeah, were his sources, his
15   statements.
16   Q.    So how many -- I don't -- if I've asked this, again, I
17   apologize.   How many tax preparers worked for the Tax
18   Defenders?
19   A.    Only me, one.
20   Q.    So you did all the tax preparation for the entire company?
21   A.    Yes.
22   Q.    Must have been a lot of work?
23   A.    Yes.
24   Q.    I didn't mark the section where they said note won't hold
25   up.   Do you know where it is?   Okay.   I can't find it either.
```

Nathan - Cross

1    Pardon me, I'm going through -- I'm running through

2  this to try to figure out -- I think I understood you to say

3  that -- well, if you can swing it -- is there a part in here in

4  these records where you're saying it would be good for him to

5  pay the money if he can swing it?

6  A.   I didn't write that investigation report.

7  Q.   Okay.  Do you know who did?

8  A.   Beth Duncan.

9  Q.   Well -- I apologize, I'm thumbing through.

10         MS. ARNETT:  It's Bates page 514.

11         MR. MINNS:  Page 514.  Thanks, Ashley.  I would be

12  incompetent to be here without Ashley.

13  BY MR. MINNS:

14  Q.   Okay.  Can we highlight the sentence, "we recommend that

15  he start making voluntary payments of 2,500 to 3K or more a

16  month if he can swing it.  Obviously a lot of what he can pay

17  will depend on how the bizes are going this year."  Can we

18  highlight that part and blow it up.

19         Now, Beth Duncan made this statement into this record

20  you've been testifying from, correct?

21  A.   Right.

22  Q.   But what -- if you know, what did she mean when she said

23  "if he can swing it.  Obviously a lot of what he pay -- can pay

24  will depends on how the bizes are doing this year?"  What did

25  she mean by that?

Nathan - Cross

138

1   A.   She meant that --

2           MS. PARKER:  Your Honor, I think it calls for

3   speculation.   The document speaks for itself.

4           THE COURT:  Sustained.

5   BY MR. MINNS:

6   Q.   Do you know whether or not there was some concern in your

7   company that he did not have the personal financial ability at

8   that time to pay the tax?

9   A.   I don't know.

10  Q.   If we could move to Bates stamp 00515, highlight the

11  first -- at the very top where it says Beth Duncan, super

12  awesome comp.

13  A.   Where are you?

14  Q.   I'm sorry.

15  A.   Oh, Beth.

16  Q.   Ashley's finding it for you, but I can come over.  Oh,

17  it's on the screen.

18  A.   I see that, okay.

19  Q.   Yes, ma'am.  Could you read that and -- could you read

20  that to the jury, please.

21  A.   "Beth Duncan, Super Awesome Comp, 555 Made Up Street,

22  Nowhere, Illinois 55555."

23  Q.   Is this a joke on this company paper or what is it --

24  A.   I absolutely never saw that before.

25  Q.   Can we go down to the next line, 5/27/11, 3:35 p.m. to do

139

1    and done, and then the message behind it and the name, Jamel

2    Corora.

3    A.    Do you want me to read that?

4    Q.    Yes, and the name, too, if we could highlight that.

5    A.    "Client call.  Set upsell appointment with BL."  That's a

6    salesman, and Jamal is a -- she was an admin, you know, taking

7    calls and setting appointments I guess.

8    Q.    The word upsell is in all caps, correct?

9    A.    Right.

10   Q.    What does that mean?

11   A.    That means -- when a client would come to us with

12   resolution, even if they didn't need tax returns, they would

13   become our client, and then we would investigate.  The

14   resolution department would investigate, and call IRS, get the

15   income information, and see what they owe, and investigate the

16   client based on information from the client, and there would

17   possibly be an upsell if the case was more complicated.

18   Q.    I'm -- I'm -- I apologize.  I'm not in the sales business,

19   so I'm not sure I -- what does the word "upsell" mean?

20   A.    It means probably from the initial, you know, quote for

21   taking care of resolution, there might be an upsell, you know,

22   the next step.

23   Q.    More money for the firm?

24   A.    No, it would be probably -- not for returns, no.  The

25   returns were a set price.  It's all about resolution.  That's

1  their business.

2  Q.    So it would be transferred from you?

3  A.    To me.

4  Q.    No?

5  A.    I do the returns, they're put in the file, and that's --

6  I'm done.

7  Q.    And then someone tries to upsell them, sell them something

8  more expensive than your services?

9  A.    Well, right.  Usually people came to us because they had

10  an issue with the IRS.  James Pieron had no issue with the IRS.

11  He came to us in an unusual mode.  He said, I want to do my tax

12  returns, I think I'm going to owe money, I think I'll need a

13  resolution.  So they said, well, okay.  We can do your tax

14  returns, and we'll see, and he agreed to that.  And then I got

15  that job.  And then I was done, and then, you know, they

16  proceeded with whatever else they're going to do, and they

17  scheduled an upsell.

18  Q.    When you did tax returns, was there ever a time in the 10

19  years or so that you were working with these companies that you

20  prepared a return and showed it to the client and they go, oh

21  my gosh?  Did that ever happen?

22  A.    Sometimes they did.  Sometimes they did, you know; not

23  often, you know.  They all accepted that that's the tax they

24  owed.  You see, because maybe they didn't file their returns,

25  and the IRS had their income information and was taxing them

Nathan - Cross

1   based on their income information.  They needed their returns

2   done to show their expenses, or capital expenses to lower that

3   tax that the IRS has assessed.  So most of the times they were

4   pretty happy with their returns showing less tax due.

5   Q.   But sometimes it was a shock that there was more tax than

6   they thought they owed?

7           MS. PARKER:  Your Honor, I'm going to object.

8           THE COURT:  Sustained.

9           THE WITNESS:  I don't know about shock.

10          MS. PARKER:  Don't answer.

11          THE WITNESS:  Sorry.

12  BY MR. MINNS:

13  Q.   Your lawyer received a call from our investigator, and

14  they told him it was all right for him to talk to you and you

15  to talk to him, do you remember that?

16  A.   Yes.

17  Q.   And he got on the phone with you and he asked you if you

18  would be able to talk with me before you got on the witness

19  stand?

20  A.   Yes.

21  Q.   And you -- you know that I'm representing your former

22  client, James Pieron?

23  A.   Yes.

24  Q.   And you know these are very serious -- this is a very,

25  very serious situation, you know that?

142

1  A.   I really don't know the situation.

2  Q.   You called somebody after you talked to Mr. Braver and

3  then said you would be unwilling to talk to me.  Do you

4  remember that?

5  A.   Yes.

6  Q.   Who is it that you talked to before you came back and said

7  you were unwilling to talk to me?

8  A.   I talked to Janet Parker.

9  Q.   Janet Parker?

10  A.   Uh-huh.

11  Q.   Well, thank you for speaking with me now.  It's been a

12  pleasure meeting you.  I know this is stressful, and I thank

13  you for coming and telling the truth to the best of your

14  knowledge after all these years.  Godspeed.

15          MR. MINNS:  I pass the witness.

16          THE COURT:  Redirect.

17                    REDIRECT EXAMINATION

18  BY MS. PARKER:

19  Q.   Ms. Nathan, you called me yesterday, right?

20  A.   Yes.

21  Q.   And what did I tell you?

22  A.   You said that it's perfectly all right if I would talk to

23  the defense attorneys, it would be totally up to me.  It always

24  is my decision.

25  Q.   So you made that decision?

Nathan - Redirect

1  A.   Yes, I did.

2  Q.   When you -- you did meet with Mr. DePorre, myself and

3  Mr. Hollabaugh one time in preparation for your testimony,

4  correct?

5  A.   Yes.

6  Q.   How would you describe that meeting?

7  A.   We just went over the tax returns and some of the notes

8  that are -- you know, Tax Defender's notes, and we went over

9  the returns, very much what we did this morning.

10 Q.   Would you call that extensive?

11 A.   Extensive?

12 Q.   Yes.

13 A.   It just kind of what -- going over what I did, the

14 returns.

15 Q.   Preparing you so you could testify here?

16 A.   Yeah.

17 Q.   Right.  I'd like to ask you, do you recall when you

18 started working on Mr. Pieron's tax returns?

19 A.   I couldn't give you a date.

20 Q.   Let's go to Exhibit I believe 56 on page 00521, the very

21 last entry there.  Is that for June 30th, 2010?

22 A.   Yes, June 30th of 2010.

23 Q.   And did you make that entry?

24 A.   Yes, it's me.  Do you want me to read it?

25 Q.   Well, I just want to ask you, so you started work at least

1    by June 30th, 2010.

2    A.    Right.  Called client, told him I'm preparing returns.

3    That was the initial call.

4    Q.    And you completed the returns and signed them --

5    A.    Yes.

6    Q.    -- when?

7    A.    That was January.

8                MR. MINNS:  Excuse me, Your Honor -- pardon me,

9    ma'am.  This is not going back to my questions.  She started

10   redirect over again.

11               MS. PARKER:  No, I think it's in response to some of

12   his questioning, Your Honor.

13               MR. MINNS:  Which you objected to.

14               MS. PARKER:  No --

15               MR. MINNS:  Okay.

16               MS. PARKER:  -- not on this.

17               THE COURT:  I'll give you some latitude, but it's a

18   frequent objection that I'm used to from the Government.

19               MS. PARKER:  I mean -- yes, Your Honor.  I understand

20   it, but I'm trying to just establish the time frame, because

21   there was some cross-examination on that.

22               THE COURT:  Okay.  I understand your point.

23               MS. PARKER:  That's all I'm trying to do, pretty

24   much.

25   BY MS. PARKER:

Nathan - Redirect                                                      145

1   Q.   So as least by June 30th, 2010, you started working on the

2   returns and you finished them in January of the next year?

3   A.   Yes.

4   Q.   All right.   During that time frame, in between at least

5   the end of June and the time you completed the returns, did you

6   have repeated communications trying to get the Q&A filled out,

7   the question and answer form?

8   A.   I always want that but, you know, he didn't -- he didn't

9   give that to me.   I don't know if I had repeated -- I assume I

10  asked.   I think in the notes I asked a few times.

11          MR. MINNS:   And I didn't object to the question,

12  which was exactly the same as she asked on direct, because I

13  didn't want to interrupt, and I don't mind the answer, but I do

14  object to her continuing to reask the same questions.   We'll be

15  here longer than we need to be if she continues asking the same

16  questions she asked on direct.   So I object to anymore

17  questions being repeated on redirect that have already been

18  asked on direct.

19          MS. PARKER:   Your Honor, I think -- as I said, I'm

20  just trying to establish or I think correct the impression that

21  might have been left that he -- that Mr. Pieron was anxious to

22  have his tax returns done, at the same time he wasn't supplying

23  the information that was being requested by the preparer.

24          THE COURT:   Overruled.

25  BY MS. PARKER:

Nathan – Redirect

1   Q.   I think we can move on from that question.

2          Other than the Saxo Bank records and that one letter

3   that was in a foreign language, did he, that is Mr. Pieron,

4   provide you any other original source documents that you

5   recall?

6   A.   No.

7   Q.   And I'd like to ask you to look at 519, the entry for

8   December 13th, 2010 at 4:48.

9   A.   Okay.

10  Q.   You were questioned about him having angst?

11  A.   Yeah.

12  Q.   When you made that entry regarding angst, was he having --

13  what was he having angst about?

14  A.   He just -- he kept trying to -- wanted to reduce the tax

15  he owed.  I hadn't completed the returns yet, but he was

16  interested in making -- wanting to pay the lowest tax possible.

17  Q.   But the angst was over lowering the tax, not getting the

18  returns in quickly?

19  A.   No, I think it was -- yeah, it was a combination probably,

20  lowering the tax, let's get done, let's be done.

21  Q.   All right.  And when you did those tax returns, did you

22  give him the benefit of every deduction or credit that you had

23  sufficient information for?

24  A.   Yes.

25          MR. MINNS:  Pardon me, Your Honor.  I've been

1  prohibited for asking about deductions, and now she's asking

2  about deductions, and I've been prohibited.

3          THE COURT:  You weren't prohibited.  The inquiry that

4  were you making was unconnected with the entry that you were

5  asking the witness about --

6          MR. MINNS:  Thank you.

7          THE COURT:  -- that I could understand.

8          MR. MINNS:  So my question was inarticulate, I

9  apologize.

10 BY MS. PARKER:

11 Q.   Ms. Nathan, did you have any need to talk to an enrolled

12 agent in this case?

13 A.   No.

14 Q.   And when you were interviewed in Chicago by

15 Mr. Hollabaugh, how did he treat you?

16 A.   Fine.  Good.

17 Q.   Was he unprofessional or abusive in anyway?

18 A.   No, no.

19         MS. PARKER:  Just one moment, Your Honor.

20         Thank you, Your Honor.

21         MR. MINNS:  Just a couple on that last question.

22         THE COURT:  Yes, sir.

23                        RECROSS-EXAMINATION

24 BY MR. MINNS:

25 Q.   Ma'am, sorry, I'll be through in a minute.  You just

1  answered the Government's question that you had no reason to go

2  to a tax attorney or an enrolled agent, and I want to question

3  that a little bit.  You didn't tell the client he needed to

4  file FBARs, right?

5  A.    Right.

6  Q.    You didn't even know what an FBAR was, correct?

7  A.    Correct.

8  Q.    You didn't tell him he needed to file a Form 5471?

9          MS. PARKER:  Your Honor, this is beyond the scope of

10  direct.

11          MR. MINNS:  It's directed at that precisely and

12  it's --

13          THE COURT:  Overruled.  We'll take the witness's

14  answer.

15  BY MR. MINNS:

16  Q.    You didn't tell the client about the Form 5471 that he was

17  required to file?

18  A.    I don't know what that form is.

19  Q.    And that's certainly understandable, but that is the

20  reason why you should have talked to a tax attorney or an

21  enrolled agent, isn't it?

22  A.    I didn't know.  Maybe so, I don't know.  I didn't do it.

23          MR. MINNS:  Okay.  Thank you very much, ma'am.

24          THE WITNESS:  Okay.

25          THE COURT:  Are we at a conclusion with this witness?

1          MS. PARKER:  Yes, Your Honor.  Thank you.

2          THE COURT:  Thank you, ma'am.  We appreciate your

3    attendance.

4          THE WITNESS:  I'm done?

5          THE COURT:  Yes, ma'am.

6          (At 12:46 p.m., witness excused.)

7          THE COURT:  Good afternoon, sir.  If you could stop

8    for just a moment, raise your right hand.

9          (At 12:46 p.m., sworn by the Court.)

10         THE COURT:  Witness stand is over on the far left

11   sir.

12                     JEFFREY CORNWELL,

13           GOVERNMENT'S WITNESS, SWORN AT 12:46 p.m.

14                     DIRECT EXAMINATION

15   BY MR. DEPORRE:

16   Q.   Good afternoon.  Would you please state your name and

17   spell it for the court reporter.

18   A.   Jeffrey Cornwell, J-E-F-F-R-E-Y, C-O-R-N-W-E-L-L.

19   Q.   Where do you work, Mr. Cornwell?

20   A.   Motor Cars International in Springfield, Missouri.

21   Q.   And how long have you worked there?

22   A.   Thirteen years.

23   Q.   All right.  Next to you there are three Manila folders.

24   Will you open them up and take a look at those.  The first

25   one's marked Government Exhibit 170, the second is Government

Cornwell - Direct

1   Proposed Exhibit 171, and the third is Government Proposed

2   Exhibit 172.  I direct your attention first to Exhibit 170.

3   Can you tell us what that is.

4   A.    Purchase agreement on a car that we sold.

5   Q.    Okay.  Can you tell us what Government Exhibit 171 is?

6   A.    Copy of the title on the vehicle that was traded in on the

7   purchase.

8   Q.    All right.  And 172?

9   A.    This was a form that we had to obtain since the title on

10  the vehicle that was purchased and the trade-in was in a

11  company name.

12  Q.    And are all these records kept in Motor Cars International

13  business records?

14  A.    Yes, they are.

15          MR. DEPORRE:  Your Honor, I'd move for the admission

16  of Government Exhibits 170, 171 and 172.

17          MS. ARNETT:  No objection.

18          THE COURT:  Received.

19  BY MR. DEPORRE:

20  Q.    Directing your attention to Government Exhibit 170, if we

21  could pull that up, and focus in on the top part of the

22  exhibit.  What sort of car -- you said that this was a purchase

23  agreement?

24  A.    Correct.

25  Q.    And what sort of car was being purchased?

Cornwell – Direct                                                151

```
 1  A.    2013 Mercedes G63.

 2  Q.    Is that a luxury car?

 3  A.    Luxury SUV.

 4  Q.    And who was the purchaser of the vehicle?

 5  A.    James Pieron, I believe it was, under Krescent Media.

 6  Q.    All right.  What was the cost of the car?

 7  A.    $139,325 plus our admin fee.

 8  Q.    And how much was the admin fee?

 9  A.    $175.

10  Q.    Is that a fee that goes towards -- towards you?

11  A.    No, it covers titling, paperwork, things like that,

12  FedEx's.

13  Q.    Was there also a trade-in with this vehicle?

14  A.    There was.

15  Q.    And was the trade-in of the other vehicle used to reduce

16  the cost -- the cash paid for the 2013 --

17  A.    Yes, it was.

18  Q.    -- Mercedes?

19        What vehicle was traded in?

20  A.    A 2009 Mercedes vehicle.

21  Q.    All right.  I direct your attention to Government

22  Exhibit 171.  Is this the certificate of title for the 2009

23  Mercedes?

24  A.    Yes, it is.

25  Q.    And did Motor Cars take title of it?
```

Cornwell – Cross                                                        152

```
 1  A.    Yes.

 2  Q.    Who was the seller?

 3  A.    It was under the Komplique.

 4  Q.    And who signed on behalf of Komplique?

 5  A.    James Pieron.

 6  Q.    And then, lastly, Government Exhibit 172, would you

 7  describe -- if you could focus in on the top of Government

 8  exhibit -- the header of Exhibit 172.

 9          What is Exhibit 172?  What is it?

10  A.    This was showing that Mr. Pieron was able to sign in the

11  name of the company.

12  Q.    All right.  And I'd ask you to go to the second page of

13  that exhibit, 25523, and focus in on the signature line and the

14  preceding sentence.

15          Is that Mr. Pieron's name as the sole director?

16  A.    Yes, it is.

17          MR. DEPORRE:  Thank you, Your Honor.  Pass the

18  witness.

19          THE COURT:  Cross?

20          MS. ARNETT:  Yes, Your Honor.

21                    CROSS-EXAMINATION

22  BY MS. ARNETT:

23  Q.    Good afternoon.

24  A.    Hello.

25  Q.    You sell cars, correct?
```

1    A.    Correct.

2    Q.    And you sell cars to corporations, right?

3    A.    Yes.

4    Q.    And that's a lawful thing to do; it happens in the normal

5    course of business, right?

6    A.    Correct.

7              MS. ARNETT:  Pass the witness, Your Honor.

8              MR. DEPORRE:  Your Honor, Government will call our

9    next witness.

10             THE COURT:  Which means you get to go.  Thank you.

11             THE WITNESS:  No complaints here.

12             (At 12:52 p.m., witness excused.)

13             MR. DEPORRE:  And we would -- at this time, Your

14   Honor, the Government calls Zachary Schweder.

15             THE COURT:  And I'd like to inform the jury that the

16   Government's attempting to complete the testimony on a number

17   of witnesses whose testimony will be relatively short because

18   of scheduling issues.  If we went to 1:15 today, would that

19   create any problems for the jury?  We'll shorten it in the end.

20             Good.  We'll take our next witness, please.

21             Good afternoon.  If could you stop for just a moment,

22   raise your right hand.

23             (At 12:53 p.m., sworn by the Court.)

24             THE COURT:  Witness stand is on the far left, sir.

25

154

```
 1                        ZACHARY SCHWEDER,

 2            GOVERNMENT'S WITNESS, SWORN AT 12:53 p.m.

 3                      DIRECT EXAMINATION

 4   BY MR. DEPORRE:

 5   Q.   Would you please state your name and spell it for the

 6   court reporter.

 7   A.   Zachary Schweder, Z-A-C-H-A-R-Y, S-C-H-W-E-D-E-R.

 8   Q.   Mr. Schweder, are you familiar with a company named

 9   Peregrine Financial Group?

10   A.   Yes.

11   Q.   Did you work for that company?

12   A.   I did.

13   Q.   When did you start?

14   A.   May, 2007.

15   Q.   And how long did you work there?

16   A.   A little over five years.

17   Q.   When did you leave?

18   A.   July of 2012.

19   Q.   And during that time period, what was your title?

20   A.   Compliance manager.

21   Q.   What sort of company is Peregrine Financial -- or was

22   Peregrine Financial Group?

23   A.   It was a futures commission merchant, which is a brokerage

24   form that specialize in commodities, futures and forex trading.

25   Q.   And does it take -- does it open investment accounts on
```

155

1  behalf of clients?

2  A.    Yes.

3  Q.    Is it a domestic company?  In other words, was it a

4  company organized within the United States?

5  A.    Yes.

6  Q.    And is it regulated?

7  A.    Yes.

8  Q.    What's the regulatory agency?

9  A.    So it was regulated by the Commodity Futures Trading

10  Commission, the CFTC, as well as the National Futures

11  Association, the NFA.

12  Q.    Okay.  Thank you for giving us the full names of those and

13  not just acronyms.  I'd ask you to go to Government Exhibit

14  115.  It's in one of the Manila folders up there.

15  A.    Okay.

16  Q.    If you would look at that, do you recognize that document?

17  A.    Yes.

18  Q.    Can you say what it is.

19  A.    These are copies of account opening paperwork that would

20  be used from an account that was open through our online

21  account opening system.

22  Q.    And are these records kept by Peregrine Financial Group?

23  A.    Yes.

24  Q.    Would you look at Government Exhibit 116.

25  A.    Okay.

Schweder - Direct                                      156

1    Q.   Would you describe what this is.

2    A.   This is a monthly account statement for a forex trading

3    account.

4    Q.   Is this also a company record for Peregrine?

5    A.   Yes.

6    Q.   And then 117.

7    A.   Okay.

8    Q.   And what is this?

9    A.   This is a copy of wire transaction details from the

10   banking -- bank statements.

11          MR. DEPORRE:  All right.  Your Honor, I'd move for

12   the admission of Government Exhibits 115, 116, and 117.

13          MR. SASSE:  Can I voir dire, Your Honor?

14          THE COURT:  Yes.

15          MR. SASSE:  Can I see the -- do we have a copy?

16   BY MR. SASSE:

17   Q.   Sir, looking at -- you still have a copy of 115 in front

18   of you; is that correct?

19   A.   Yes.

20   Q.   This document contains about six or seven pages that would

21   be in a file for a new account; is that correct?

22   A.   Yes.

23   Q.   And as the compliance manager, are you familiar with the

24   sorts of paperwork that are required in a new account file?

25   A.   Yes.

Schweder - Direct                                          157

1   Q.   Would there be -- there would ordinarily be other

2   paperwork in a new account file other than the six or seven

3   pages we have here?  For example, would there be a copy of a

4   passport?  Would there be an application, those sorts of

5   things?

6   A.   There would be a copy of a passport.  The first two pages

7   in this document is a copy of the application since it was

8   filled out through the online account opening system.  There

9   would be no paper application.

10  Q.   Sir, I'm going to show you what has been marked for

11  identification as Defendant's 1019, and just take a look at the

12  first page.  Are you familiar with that form?

13  A.   Yes.

14  Q.   And is that an application form which is routinely that

15  people fill out to open an account with your company?

16  A.   Yes, this is -- looks to be the hard copy application

17  form.

18  Q.   And would that ordinarily be kept by your company as well?

19  A.   Yes.

20  Q.   Are you -- are you familiar with James Pieron?

21  A.   I'm familiar with the name only.

22  Q.   You don't know -- you've never met him, to your knowledge?

23  A.   To my knowledge, no.

24  Q.   Is it fair to say, though, that there has -- you as the

25  company are required to know the client who is opening the

1    account to some degree; is that correct?

2    A.   There are know your customer requirements under the AML

3    policies.

4    Q.   And that's why you have to have a passport, correct?

5    A.   Yeah, that's one of the documents we use to verify

6    identity of the application.

7    Q.   And if -- and that would be kept in the file; is that

8    correct?

9    A.   Yes.

10   Q.   Did you at some point in time respond to a subpoena by

11   providing -- if you look at Government's Proposed Exhibit 115,

12   do you see a Bates stamp that your company put on this, the

13   bottom of that?

14   A.   I see a Bates stamp in the bottom right corner.  I'm not

15   aware of specifically how it got there.

16   Q.   Were you involved in supplying matters to a grand jury?

17   A.   I don't recall.

18   Q.   You have no personal recollection?  If -- is it the

19   practice when you supply matters to the grand jury to Bate

20   stamp them so you know what it is you sent out?

21   A.   All the documents, after they were gathered, would be

22   provided to our legal department, and if that is -- if that was

23   a practice that they did to put the stamps on them to then send

24   them off to the -- to satisfy the request, I'm not completely

25   aware of what they did.

1    MR. SASSE:  Your Honor, I'm going to object to these

2  documents because they're incomplete.  He has acknowledged that

3  there are more documents in the -- in the file, including the

4  passport of the person doing it.  And for the purpose that this

5  is, I believe, being offered, I think we have to have the

6  complete file.

7    THE COURT:  And I do need some help on understanding

8  for -- the justification for the Government offering.

9    MR. DEPORRE:  The Government, if I may, the

10  Government is offering these exhibits, it's a personal account

11  opening at Peregrine Financial Group.  There are also business

12  accounts that were open there.  The personal account, which was

13  opened in 2009, in July of 2009, the account opening

14  statement -- may we sidebar, Your Honor?

15    THE COURT:  All right.

16    (Sidebar conference as follows:)

17    MR. DEPORRE:  By operation of law, tax liability

18  arises for the defendant in June of 2008 for the 2008 period.

19  In July of 2009 -- or, excuse me, 2009 for the 2008 tax year.

20    In July of 2009 he opens an account at Peregrine

21  Financial Group, and using the online application it states he

22  is not a US citizen, and that's -- he does not have a Social

23  Security number.  That means that they don't issue 1099s to the

24  IRS.  There's also a form W-8BEN that's included with those

25  applications, that application, that's signed by the defendant.

Schweder - Direct                                                    160

 1              MR. SASSE:  Your Honor, he had done business with

 2     that company for a number of years.  They knew him personally.

 3     They knew he was a US citizen.  He had to provide his -- every

 4     time he opened an account, he had to provide his passport.

 5     They knew exactly who he was.

 6              The fact that they've got a couple documents that --

 7     one of which he apparently signed because it's the wrong

 8     document, if taken out of context, is extremely prejudicial.

 9     Now, if they want to bring the right people in here with the

10     full file and have them testify correctly, we'll deal with it.

11              MR. DEPORRE:  Your Honor, this is --

12              MR. SASSE:  This man doesn't even know him.

13              MR. DEPORRE:  This is the right witness for records

14     custodian.

15              THE COURT:  Well, can this witness testify that these

16     are the only documents that were responsive to the subpoena and

17     included in the file.

18              MR. DEPORRE:  No, and they weren't, and Mr. Sasse has

19     the other documents.

20              MR. SASSE:  Your Honor, we are missing all kinds of

21     stuff from that Bates stamping.  Now, I don't know what the

22     story is, but I'm curious.

23              MS. PARKER:  What we marked as exhibits is different

24     from what we provided.

25              MR. SASSE:  Oh, I know.  I've got 50 pages, and the

Schweder – Direct                                        161

```
 1   Bate stamps go up to at least 500 and something.
 2            MS. PARKER:  But those aren't the records regarding
 3   the account opening, and that's the relevant thing that we're
 4   offering.
 5            MS. ARNETT:  He testified that part of the account
 6   opening is know your client, which is -- or know your customer,
 7   in his words, which is a passport, which should be included in
 8   the file.  And it's not in any of the files that we received
 9   from the Government for Peregrine.
10            MR. MINNS:  There are also the --
11            THE COURT:  Well, but I need to clarify that.  I
12   mean, is that factual.
13            MS. PARKER:  I don't know that that --
14            MS. ARNETT:  Yes.
15            MS. PARKER:  -- that's factual.  I don't know one way
16   or another, but I do know that when it's a non-US citizen they
17   don't require a passport, and the other ones are corporate
18   accounts.
19            MR. SASSE:  That's not true from what I understand.
20            MS. ARNETT:  Well, in 2000 --
21            MS. PARKER:  Well, then that's not on the record.
22            MS. ARNETT:  In 2007 he tells him --
23            THE COURT:  The other thing that's a little bit
24   bizarre is that, if I understand accurately, the defendant
25   owned Peregrine?
```

US v. Pieron, Jr. - TRIAL - VOLUME 3 - March 1, 2019

162

```
 1              MS. PARKER:  No.

 2              MR. DEPORRE:  No, he did not.  He invested in a

 3    Peregrine account.

 4              THE COURT:  Only?

 5              MS. PARKER:  There's an IP address on the application

 6    that shows that it's coming from Zurich --

 7              MR. MINNS:  The --

 8              MS. PARKER:  -- and that's what he followed-up on.

 9              MR. MINNS:  The point is what is the truth.  The

10    truth is he told them he was a US citizen.  He gave them his

11    social security number.

12              THE COURT:  How do you know that?

13              MR. SASSE:  We've got the forms.

14              MR. MINNS:  We have the forms, but they're going to

15    try to put the false impression.  If it all comes --

16              MS. PARKER:  They can put the forms in if they think

17    they show that.

18              MR. MINNS:  If it all comes -- what their purpose is

19    to try to say that he told them he was a non-US citizen and

20    that he wanted them to believe that.  There's several forms

21    that said he was a US citizen and he gave him his Social

22    Security number.

23              THE COURT:  Does his signature appear on the app?

24              MS. ARNETT:  Not on that one.

25              MR. MINNS:  The only one they're trying to get in is
```

1    out of context, a mistake that he didn't fill out.  He didn't

2    fill out any of them, but he signed several forms which his

3    correct Social Security number and citizenship.

4            His broker had his passport.  They should put the

5    real broker on here no question that he's an American citizen.

6    This form is incorrect.  It should never be given to a

7    non-American citizen.

8            MR. SASSE:  Your Honor, can we inquire -- the broker

9    is on their witness list.  If he's going to testify --

10           MS. PARKER:  He's not going to testify today.  This

11   is the guy who --

12           MR. DEPORRE:  We were only going to call him.  We

13   didn't want to bring in two people.

14           THE COURT:  Whose certifications?

15           MS. PARKER:  Peregrine.

16           MR. DEPORRE:  Peregrine is certifying the business

17   record signed by James Pieron.

18           MR. MINNS:  But they're bringing it in to portray a

19   falsehood.  They're bringing it in to try to tell this jury

20   that he didn't give them his social security number, didn't say

21   he was a US citizen and didn't operate honestly when all the

22   people in the broker knew it, he has his passport and they have

23   several documents with it in.  They're only offering this.  We

24   wouldn't mind if they all came in at the same time.  They went

25   to send --

1              MS. ARNETT:  We don't have all of them.

2              MR. MINNS:  Well, we don't have all of them, we're

3    missing many, many pages, but we don't want this jury to go

4    home for Friday believing he never told of his correct Social

5    Security number, that he wasn't an American citizen and that

6    the only person who dealt with him knew he was an American

7    citizen and had his passport in the file.

8              THE COURT:  If that's all the case, then where the

9    heck does this come from?

10             MR. MINNS:  It makes no sense.  We know who filled it

11   out and it was handed to him and he signed it.  I mean, I'm of

12   course --

13             MR. SASSE:  We think we know.

14             MR. MINNS:  We think we know, but the point of the

15   matter is that they would be left with a false impression all

16   weekend.

17             THE COURT:  All of which you could cover in your

18   examination of this witness.

19             MR. SASSE:  But once -- once -- once this comes in to

20   this jury, that he -- it's -- it's -- they're taking us down a

21   road that we can't win, even though we should win.  They're

22   going to be sitting --

23             THE COURT:  Well, who, in your view, is accountable

24   for this, what you concede is an error?  If it isn't him?

25             MR. SASSE:  Oh, he signed it.  I don't -- as far as

1   him signing the document that was wrong, yeah.  But we got to

2   have it in context where -- if it all comes in and they

3   understand the context, yeah, it's not a big problem, but I

4   don't have the other stuff for this particular file to show

5   that he also completed the same stuff in this file.

6           MS. PARKER:  Judge, this is the one personal account.

7   All the other stuff --

8           MR. DEPORRE:  Are corporate accounts.

9           MS. PARKER:  -- are done by corporate accounts.  They

10  don't necessarily link the individual with all those corporate

11  accounts.

12          THE COURT:  Sure.  And I appreciate that, but I do

13  want to give them an opportunity to at least address, in the

14  context of this witness, the fact that the correct factual

15  information was in the office.  I don't know who's accountable

16  for this.

17          MS. PARKER:  He may not know that.

18          THE COURT:  I recognize that, but I'm going to give

19  them the weekend to at least give it some thought and review

20  their records.

21          MR. MINNS:  And they have --

22          THE COURT:  But I do believe this comes in.

23          MR. SASSE:  Your Honor, well --

24          MR. MINNS:  It should come in only with all the

25  records.

1          THE COURT:  I don't agree.  I do agree that you are

2    entitled to cross-examine the witness concerning the fact that

3    the additional information was within Peregrine.

4          MR. MINNS:  So do they have to give it to us, all the

5    Bate stamps that we are missing?

6          THE COURT:  They say that they did.

7          MS. PARKER:  As far as I know we gave you everything

8    that was --

9          MR. SASSE:  I can show you the Bates stamps we've

10   got.

11         MS. PARKER:  We can double check.

12         MR. DEPORRE:  Well, we should compare.  We'll make

13   sure.

14         MS. PARKER:  We'll double check.  We're not trying --

15         MR. SASSE:  Secondly, Your Honor, I would like to

16   make a real clear Brady demand, if they have talked to, or any

17   of the agents have talked to, the broker, who is Bruce Pollack,

18   who's on their witness list, and Bruce Pollack has provided

19   information that is inconsistent with what they are trying to

20   prove --

21         MS. PARKER:  He has not.

22         MR. DEPORRE:  I will say this on the record, he has

23   not, and we have spoken with him.  And he has not provided any

24   information inconsistent with what we're trying to prove here.

25         THE COURT:  We're at a point where we understand

1 where we are.  In terms of timing -- here is something I would

2 never have guessed.

3             MR. DEPORRE:  In a tax case?

4             THE COURT:  Are we at a good point to conclude?

5             MS. PARKER:  No, I think you ought to admit the

6 record.

7             THE COURT:  I'm not.  Not today.  I want to give them

8 an opportunity to better prepare and understand what additional

9 information Peregrine may have had.  It is a problem for the

10 defendant.

11            MR. SASSE:  Agreed.

12            THE COURT:  But I want to make sure you at least have

13 an opportunity of trying to identify who was the source of it.

14            MR. SASSE:  Okay.

15            THE COURT:  Good.

16            MS. PARKER:  We don't -- I don't think we have

17 anything that will help with that to be honest.

18            MR. DEPORRE:  Is the Court -- and to be clear, is the

19 Court requiring the Government to call the broker?

20            THE COURT:  No.

21            MR. DEPORRE:  Okay.

22            MR. MINNS:  Don't release him though.  Can we ask

23 that he not be released.

24            THE COURT:  This gentleman?

25            MR. MINNS:  No, the broker because we will have to

 1  call him to clear this up, so we don't -- they subpoenaed him.

 2  We don't want him released from his subpoena.

 3           MS. PARKER:  We haven't released him.  I think we did

 4  tell him we were not likely to need him.

 5           MR. MINNS:  We will definitely need him now.

 6           THE COURT:  Okay.  Good.

 7           (Sidebar conference concluded.)

 8           THE COURT:  The point at which I was grinning was the

 9  note that I received that said, "The jury is tired," because it

10  came as a surprise to me, and one of the attorneys at sidebar

11  said, what, in a tax case?

12           We're at a point where we will break for the week, as

13  well as for the day.  We hope you have a good weekend.  We will

14  pick up on Monday morning.  Any logistical questions from any

15  members of the jury?

16           MS. PARKER:  Judge, I just wanted to note that the

17  schedule for Monday goes until two instead of until one.

18           THE COURT:  Yes.  And I believe that they -- the jury

19  was actually furnished a schedule.

20           MS. PARKER:  Okay.  I'm just saying, maybe more

21  coffee.  If they get tired at 1:10, then we've got to get

22  something that will go to two.

23           THE COURT:  We'll see if we can find something with a

24  lot of sugar.

25           Please rise for the jury.

1              (At 1:13 p.m., jury leaves.)

2              THE COURT:  Please be seated.  I've got just a couple

3    of -- and, sir, you're excused from the witness stand.

4              In part, I've got a brief question that I just want

5    to introduce the parties to -- how shall we call this -- line

6    drawing.  And I'm trying to understand in the context of the

7    case the point at which witnesses might be testifying about the

8    tax law and its application is a matter for an opinion witness

9    on the one hand, or actually an issue for the Court to the

10   extent that it involves an interpretation of the tax law and

11   its application to a particular set of facts.

12             Let's assume for purposes of discussion I either

13   agreed or disagreed with Mr. Pavlik's interpretation of the tax

14   law.  Whose role is it to make a decision concerning the

15   accuracy and compliance with those interpretations?  Is it the

16   Court, or is it a matter for expert opinion?

17             MS. PARKER:  Your Honor, I would submit based on the

18   case of *United States versus Zipkin*, that essentially the Court

19   has to provide the law, and I don't think it's appropriate for

20   an opinion witness to say anything beyond, in his or her view,

21   this should have been done differently.  I don't think it's

22   appropriate for an opinion witness to say this is right, this

23   is wrong without having it qualified, as in that person's

24   opinion, based on their training and experience, but ultimately

25   the law has to come from the Court and not the witness box.

1        THE COURT:  That is the question concerning the

2   application of the theft loss -- the application of 1331 is

3   also, I presume, what Mr. Pavlik will testify he thought was

4   appropriate and correct in outlining the material in

5   conjunction with his offer.  But the -- and so presumably

6   Mr. Pavlik can testify, but will there be other opinion

7   witnesses concerning the question of whether Pavlik's

8   interpretation and application of the law was correct or

9   incorrect?

10       MR. MINNS:  Yes, Your Honor.  Professor Gavin will

11  testify to that, and his opinion is that it's more likely than

12  not that this would pass appeals.  He was an appeals officer

13  with the Internal Revenue Service for some 40 years.

14       THE COURT:  Well, and how does he arrive at that

15  conclusion, other than to do the very same thing that I would

16  do, which is to research the application of the tax law and

17  apply it to the facts?  Do it all the time in other settings.

18       MR. MINNS:  I don't have the citation, but I have the

19  name in my head because I didn't know we were going to be asked

20  this.

21       THE COURT:  Sure.

22       MR. MINNS:  But the -- and it has a great deal of

23  similarity to some of these issues.  It's *United States versus*

24  *Garber*.  I believe it's G-A-R-B-E-R.  I'm not certain.  It's a

25  Fifth Circuit case.  Some lawyers call it the vampire case,

Schweder - Direct

1  because Ms. Garber sold her blood and got money for it, and the

2  IRS said we want to tax it, and she didn't pay taxes so she's a

3  criminal.

4        And the Fifth Circuit said she has to pay taxes on

5  it, but you cannot convict her of a crime because this is

6  not -- this was an unsettled issue, and so until the law has

7  been fully settled, you can't charge someone with it.

8        I think we have an unsettled issue, and I don't think

9  there -- the cases tend to lean towards the acceptance of this

10  theory, but I don't think it is fully completely settled, and I

11  don't think this was ripe for an indictment in the first place,

12  but that's the closest I can come to anything like that.

13        I think expert opinions can and should testify about

14  what is likely to happen.  Of course, the expert, is about as

15  good an opinion as anybody can give on taxes and we've had --

16  we've had lots of experts looking at it, and they seem to be

17  divided about 50/50 on this, so --

18        THE COURT:  Well, you would agree with me that --

19  that neither your client nor, if I remember the acronym of the

20  company --

21        MR. MINNS:  I have the cite.

22        THE COURT:  -- JDFX.

23        MR. MINNS:  I'm sorry.

24        THE COURT:  Outside of the ordinary course of

25  business, never paid Mr. Cook's entity anything.

172

1           MR. MINNS:  No.  Well, no.  They -- a lot of -- some

2    of it was grappled back by the receiver, so they paid it to the

3    receiver.  Whatever was left was paid to the receiver.

4    Mr. Cook no longer had a right to get the money or have an

5    ownership, so any ownership or anything else reverted to the

6    receiver.  Some money was turned over to the receiver.

7           THE COURT:  But that was as a result of the

8    insolvency?

9           MR. MINNS:  I --

10          THE COURT:  Mr. Cook never took anything from JDFX,

11   to my understanding.

12          MR. MINNS:  Was a bankruptcy insolvency, or was it a

13   receiver.  I don't know, Your Honor.

14          THE COURT:  Well, the line of credit was pulled from

15   JDFX and, as a result, they -- it became insolvent, but not as

16   a result of Mr. Cook taking anything from JDFX.

17          MR. MINNS:  No, no, that's correct.

18          THE COURT:  In fact, the numbers that are included in

19   the offer, which would date back to the problematic year of

20   2007, were Mr. Pavlik's numbers, true?

21          MR. MINNS:  I may be mistaken, and the order that

22   this has happened is confusing.  I don't believe that they've

23   accounted for 2007.  I think they put money in 2008 that

24   belonged in 2007 and increased, incorrectly increased, the

25   taxes for 2008, but --

1              THE COURT:  There was actually a carryback.

2              MR. MINNS:  Carryback of the income.

3              THE COURT:  There was a carryback to cover the $9,000

4    capital gain, at least that's the way I'm reading Pavlik's

5    materials, but there was never any -- never any payment by the

6    defendant or the enterprise to Mr. Cook or any of his

7    affiliates.

8              MR. MINNS:  Correct.  That's correct.  I'm certain on

9    that.

10             THE COURT:  Now, if that's true, then there's

11   really -- there's no theft loss, is there?

12             MR. MINNS:  I think that the -- I think that the two

13   potentially successful offers -- options in the appeals would

14   not be the theft loss, but the right of -- claim of right and

15   also substance over form, that the original intent was not

16   handled, but --

17             THE COURT:  So there was an intent at the time that

18   the stock was sold that they would have to pay something back

19   to Mr. Cook?

20             MR. MINNS:  At the time the stock was sold, it was

21   the belief, based on every expert that looked at it in

22   Switzerland, and I don't think they were competent to look at

23   it, that or -- that there was no -- and maybe it's just because

24   Swiss law is different than US law, they don't pay taxes on

25   capital gains, so our client was misinformed.  But it was

1  nobody's belief -- nobody had the belief until sometime around

2  2011 or -- that there even was a significant tax due and owing.

3          Once the first return was prepared in 2011, then

4  there was a belief that there's a possibility that there's a

5  substantial tax due and owing --

6          THE COURT:  Sure.

7          MR. MINNS:  -- and fear that there was a substantial

8  tax due and owing --

9          THE COURT:  Yes.

10          MR. MINNS:  -- and a lack of confidence in the

11  preparer, who was not competent to handle it, so Mr. Pieron was

12  trying simultaneously to get something filed --

13          THE COURT:  Sure.

14          MR. MINNS:  -- and it should have had an addendum to

15  it saying that Mr. Pavlik was going to look at it for potential

16  amending, and he was already dealing with Mr. Pavlik, and it

17  should have been turned over to Mr. Pavlik.

18          THE COURT:  Well, let's assume I disagreed with

19  Mr. Pavlik's interpretation.

20          MR. MINNS:  Okay.  If you disagreed and were prepared

21  to find as a matter of law that Mr. Pavlik is wrong --

22          THE COURT:  Then the question becomes an issue

23  concerning the difference of opinion between the witness, who

24  is a CPA, and his client, who's the defendant.

25          MR. MINNS:  If the Court finds as a matter of law

1   that Mr. Pavlik is wrong, which is a possibility, I mean it's a

2   legal possibility.  This has not been carefully determined,

3   then -- then there's a period of time that the IRS could show

4   from -- well, the period of time after '14, when Mr. Pavlik's

5   return is filed, up to '18.  There's four years that they --

6   that our client would have exposure if he believed Mr. Pavlik

7   was wrong.  If he believes Mr. Pavlik is correct, he is still

8   innocent whether or not Mr. Pavlik's work is --

9           THE COURT:  And I recognize that's a possibility.  It

10  would essentially place full responsibility on Mr. Pavlik.

11  Should we be warning him about his Fifth Amendment rights

12  before he testifies?

13          MR. MINNS:  I mean, I'm -- I'm not his counsel.  I

14  don't think he did -- he gained nothing by doing this.

15          THE COURT:  And I understand.  I understand your

16  perspective.

17          MR. MINNS:  Yeah, I don't -- I can't imagine,

18  particularly when we have an expert that supports his position.

19  So, I mean, I guess -- gosh, I guess -- I mean, this witness

20  could have been warned about Fifth Amendment rights, too.  I

21  mean, yes, I mean, fundamentally, I mean, even in -- even when

22  we did voir dire and they ask the juror members if they --

23  potentially if they smoke marijuana, I guess they should have

24  all been read their rights, too, Fifth Amendment.  It's a

25  federal crime to smoke marijuana, but several jurors truthfully

1  answered they smoke marijuana.  I don't know.

2          THE COURT:  We've had them acknowledge having done so

3  within an hour of entering the building.

4          MS. PARKER:  And it's also protected.  They're

5  required to answer truthfully.

6          THE COURT:  Well,my point here is I think through a

7  couple of the different scenarios, as we go into the next week,

8  was to at least share some of the questions that I had in my

9  mind as we went -- as we proceeded.

10         So have a good weekend.  We'll look forward to seeing

11 you Monday morning.

12         MR. MINNS:  Yes, Your Honor, and thank you for that.

13         THE COURT:  Pardon me?

14         MR. MINNS:  I said, Your Honor, thank you.  I mean,

15 it helps us a great deal.

16         THE COURT:  Well and it helps me.  I appreciate it.

17         (At 1:27 p.m., court recessed.)

18

19

20

21

22

23

24

25

Schweder - Direct                                                          177

1                          * * * * *

2                    C E R T I F I C A T E

3        I certify that the foregoing is a correct transcript
         from the proceedings in the above-entitled matter.
4

5                              *Carol M. Harrison*

6    Date: 3-22-2019      Carol M. Harrison, RMR, FCRR
                          Official Court Reporter
7                         United States District Court
                          Eastern District of Michigan
8                         1000 Washington Avenue
                          Bay City, MI  48708
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25