1              IN THE UNITED STATES DISTRICT COURT

2                   EASTERN DISTRICT OF MICHIGAN

3    UNITED STATES OF AMERICA          ) Bay City, Michigan
                                       ) March  4, 2019
4       vs.                            ) 8:38 a.m.
                                       )
5    JAMES D. PIERON, JR.,             )
                                       ) Case No. 18-20489
6       Defendant.                     )
     _____  )

7

8                    TRANSCRIPT OF TRIAL - VOLUME 4
                  BEFORE THE HONORABLE THOMAS L. LUDINGTON
9                    UNITED STATES DISTRICT JUDGE

10   APPEARANCES:

11   For the Government:    JANET L. PARKER
                           JULES M. DEPORRE
12                         United States Attorney
                           Eastern District of Michigan
13                         101 First Street
                           Suite 200
14                         Bay City, MI 48708

15   For the Defendant:     MICHAEL L. MINNS
                           ASHLEY B. ARNETT
16                         Minns & Arnett
                           9119 South Gessner; Suite One
17                         Houston TX 77074

18   For the Defendant:     KENNETH SASSE
                           Attorney at Law
19                         27 E. Flint Street; 2nd Floor
                           Lake Orion, MI  48362
20                         (248) 821-7325

21
     Court Reporter:     Carol M. Harrison, RMR, FCRR
22                       1000 Washington Avenue
                         Bay City, MI  48708
23
                 Proceedings reported by stenotype reporter.
24          Transcript produced by Computer-Aided Transcription.

25

```
 1                          INDEX

 2
    WITNESSES FOR THE GOVERNMENT:
 3
    ZACHARY SCHWEDER
 4      Direct Examination, Cont'd By Mr. Deporre        21
        Cross-Examination By Mr. Sasse                   29
 5      Redirect Examination By Mr. Deporre              55
        Recross-Examination By Mr. Sasse                 63
 6
    CHRISTOPHER WERWEGA
 7      Direct Examination By Mr. Deporre                66
        Cross-Examination By Mr. Sasse                   78
 8      Redirect Examination By Mr. Deporre              84

 9  WILLIAM ZEHNDER
        Direct Examination By Ms. Parker                 86
10      Cross-Examination By Mr. Sasse                  107
        Redirect Examination By Ms. Parker              115
11
    MELANIE JEFFREY
12      Direct Examination By Mr. Deporre               117

13  DANIEL PARKER
        Direct Examination By Ms. Parker                123
14      Cross-Examination By Ms. Arnett                 141

15  LYNETTE DEWLEY
        Direct Examination By Mr. Deporre               142
16
    ADAM TOMAKICH
17      Direct Examination By Mr. Deporre               153
        Cross-Examination By Mr. Minns                  156
18      Redirect Examination By Mr. Deporre             157
        Recross-Examination By Mr. Minns                157
19

20

21

22

23

24

25
```

```
 1  INDEX, CONT'D:

 2  EXHIBITS:                                              RCVD

 3   GX 27    Komplique 2009 Form 1120                       94
     GX 34    Pieron 2001 Form 1040                          70
 4   GX 35    Pieron 2003 Form 1040                          70
     GX 36    Pierson 2004 Form 1040                         70
 5   GX 37    Pieron 2005 Form 1040                          70
     GX 38    Pieron 2006 Form 1040                          70
 6   GX 91    IB Tech Loan and Capital Account               96
     GX 102   2009 Mercedes Purchase Agreement              104
 7   GX 103   Copy of Check to Exotic Motors                133
     GX 104   Cashier's Check                               143
 8   GX 106C  IB Tech Check                                 135
     GX 106A  Deposit Ticket                                143
 9   GX 106B  IB Tech Check                                 143
     GX 107A  Deposit Ticket                                143
10   GX 107B  IB Tech Check                                 143
     GX 108A  Deposit Ticket                                143
11   GX 108B  Komplique Check                               143
     GX 109   2010 Statement - ILQ                          143
12   GX 110   Signature Card                                143
     GX 111   Signature Card                                143
13   GX 112   Signature Card                                143
     GX 115   Peregrine Acct Opening/W-8BEN                  22
14   GX 116   August 2009 Stmt - Peregrine                   23
     GX 117   Wire Transfers Document - Peregrine            24
15   GX 122   July 2011 Acct Stmt Komplique                 134
     GX 124   Check                                         101
16   GX 125   IB Tech Withdrawal                            130
     GX 126   IB Tech Check                                 132
17   GX 127   IB Tech Check                                 132
     GX 128   IB Tech Check                                 132
18   GX 130   Komplique Check #1086                         137
     GX 131   Complique Checks #1121, #1155                 136
19   GX 132   Komplique Check #1226                         136
     GX 133   Komplique Check Cash                          136
20   GX 134   Komplique Wire Transfer Documents             126
     GX 136   Signature Card IB Tech                        124
21   GX 168   Komplique Statement                           139
     GX 169   Komplique Statement                           139
22   GX 174   Volkswagon Purchase Agreement                 138
     GX 175   Navitas Statement                             143
23   GX 176   Full Throttle Records                         118
     DX 1019  Peregrine Financial Records                    33
24   DX 1030  8821 for Chris Werwega                         81

25
```

1                    P R O C E E D I N G S

2              (At 8:38 a.m., proceedings commenced.)

3              (Defendant present.)

4         THE COURT:  Good morning.

5         MS. PARKER:  Good morning, Your Honor.

6         THE COURT:  Please be seated.

7         THE CLERK:  United States of America versus James

8  Pieron, Case No. 18-20489.

9         THE COURT:  Counsel ready to proceed?

10         MS. PARKER:  Government is ready, Your Honor.  Thank

11  you.

12         THE COURT:  Defense?

13         MR. SASSE:  As I'm sure the Court is aware, we filed

14  a motion to dismiss, which we would certainly prefer to have a

15  ruling on, but if the Court wants us to, we can proceed with

16  the witness.

17         THE COURT:  Well, the challenge right now is as to

18  the tender into evidence of the W-8 BEN, which is being offered

19  by the Government, as I understand it, because it reflected a

20  misrepresentation in their view of the citizenship of the

21  defendant.  Is that a fair assertion.

22         MR. DEPORRE:  Yes, Your Honor.  The Government was

23  moving to admit Government Exhibits -- Proposed Exhibits 115,

24  116, and 117.  Exhibit 115 includes an application from the

25  Peregrine Financial Group software program that indicates that

1   James Pieron is not a US citizen and does not have a Social

2   Security number.  Along with that, the Government was also --

3   had included in that exhibit the W-8 BEN where that

4   certification is made that he is not a US citizen.

5           THE COURT:  Now, the assertion that's being made in

6   the defense's motion to dismiss is that, quote, on March 1,

7   2019, 957 Bate stamped pages were turned over.  Included in

8   these documents were the 46 pages previously provided, a cover

9   letter from Peregrine to Hollabaugh, which apparently

10  accompanied the documents and was dated May 11th.

11          The primary assertion that they are making here is

12  that the documents include at least -- at least 11 copies of

13  the defendant's United States passport, overwhelming evidence

14  that he did not intentionally intend to mislead Peregrine.

15          I guess the first question is, is that accurate, that

16  the Government had not furnished copies of the passports in

17  discovery, and I guess the second question is if -- if true,

18  and I guess this is for the defense, why is it not something

19  that can't be handled in the context of cross-examination of

20  the witness?  The source documents on those would have been

21  from the defendant himself.

22          So let's take up the first question, which is were

23  copies of the passports that were included in the Peregrine

24  materials furnished late to the defense?

25          MR. DEPORRE:  I'm certainly prepared to answer that.

1  Ms. Parker is answering questions with respect to the motion to

2  dismiss, if that's okay, Your Honor.

3          THE COURT:  Okay.

4          MR. DEPORRE:  But as to that question, no.  The

5  copies of the passports were not furnished until March 1st.

6  Following our sidebar discussion, the Government reviewed

7  materials that it had collected and realized that those had not

8  been produced, and then produced them immediately.

9          THE COURT:  And, indeed, that was the assertion

10  defense counsel was making at sidebar, that there were

11  significant additional or collateral materials that would have

12  contradicted the representations in that -- let's just call it

13  the W-8 filing.

14          MR. DEPORRE:  The Peregrine new account application,

15  I suppose.

16          THE COURT:  Okay.  So it was not a surprise to the

17  defense, they were just surprised that it had not been

18  contained in any of the materials furnished by the Government

19  during discovery.

20          MR. DEPORRE:  That's my understanding.

21          THE COURT:  Addressing just the first question, which

22  is the provision of the materials in discovery.  The Government

23  appears to concede the fact that that was the first time those

24  materials were furnished to the defense, and I assume you agree

25  with that.

1          MR. MINNS:  It was the first time they were turned

2    over to the defendants, yes, we do agree with that.  There

3    was -- there was materials that would have been useful in both

4    of the dismissed witnesses for cross-examination that we didn't

5    have, in addition to the Peregrine documents.  And the real

6    problem with this Peregrine document is it -- the purpose of it

7    is to perpetrate a fraud on the jury.

8          The -- everybody knows that he represented himself to

9    be an American citizen.  The Government has stated that this

10   form is sent to the IRS.  That's not true.

11         THE COURT:  No, it isn't, and nor is that the

12   representation that's been made.

13         MR. MINNS:  I may have misunderstood them.  The

14   Government has also represented that this form prevents

15   withholding, and the opposite is true.  If you are not an

16   American citizen, the form mandates withholding, so there

17   wasn't anything to withhold, because there wasn't any income,

18   but this form, which should never have been filled out, would

19   have created a 20 percent withholding for a non-American.

20         We don't have that for the American citizenship

21   because they're in the United States.  We're afraid that people

22   come in, buy and sell things, profit and take the money, and

23   they were doing that in vast amounts in the Netherlands,

24   Antilles and Cayman and other offshore havens.  So that form

25   was created to prevent money from leaving the country, so it

     1    has the exact opposite effect as the Government has represented

     2    to the jury that it has.

     3         The purpose -- if one juror thinks that our client

     4    intentionally lied about his citizenship, that juror will vote

     5    against us.  That -- that's a prejudice that cannot be

     6    overcome, and I can't imagine that one won't buy the

     7    Government's argument on that.  Maybe the other 11 will explain

     8    it, maybe they won't.  And it is put in there -- it has no tax

     9    ramifications what --

    10         THE COURT:  Let's back up.  You and I recall the

    11    representations concerning the recipient and the function of

    12    the W-8 differently, but putting aside that point, a couple of

    13    questions as a matter of fact:  Tell me about Peregrine.  Who

    14    owns it?

    15         MR. MINNS:  I don't know.  I don't even think it

    16    exists anymore, and I think they were in a major scandal, too.

    17         THE COURT:  I thought that at some point in my

    18    reading as we've begun through the case that the defendant had

    19    some association with Peregrine.

    20         MR. MINNS:  No.  No.

    21         THE COURT:  He was simply an account owner?

    22         MR. MINNS:  No, simply an account owner.  He had no

    23    association, and I may be mistaken, but I think someone there

    24    may have introduced him to Cook.

    25         Someone at Peregrine introduced him to crook -- Cook

1   so Peregrine was crooked and Cook was crooked, and they both

2   introduced him to them, and association with either entity is

3   not helpful to anybody in business.

4          THE COURT:  Now, do you have any particular

5   explanation for why the W-8 was completed with a

6   misrepresentation of the defendant's citizenship?

7          MR. MINNS:  Yes, Your Honor.  First of all, it's a

8   confusing form.  Secondly, I -- we don't know.  My client signs

9   tons of stuff.  He doesn't read any of these returns or any of

10  them, and someone put it in front of him.  When the form that

11  is in his hand --

12         THE COURT:  Your suggestion is it was just a mistake

13  in fact?

14         MR. MINNS:  Yes, absolutely, Your Honor, and --

15         THE COURT:  And the mistake in fact is, in fact,

16  corroborated by the presence of the copies of his passports in

17  the Peregrine -- in the Peregrine records?

18         MR. MINNS:  Yes.  And his handwritten form to that

19  same place in his handwriting saying -- giving his correct

20  citizenship, his correct Social Security number to Peregrine.

21         THE COURT:  So isn't your explan -- that it is

22  appropriate for the Government to tender the form to reflect

23  the fact that it was a misrepresentation concerning his

24  citizenship, and your argument to the jury ultimately that it

25  was a mistake of fact, corroborated by the fact that they --

```
1   you are going to be able to introduce the passport documents on
2   cross-examination of the witness.
3               MR. MINNS:  Well, the purpose of it, Your Honor, is
4   tremendously prejudicial.  It has no probative value of any
5   kind.  There's no reason -- if Peregrine thinks he's a Swiss
6   citizen or a French citizen or an American citizen, it would
7   have had no effect on an account that did not -- wasn't --
8   didn't make any money, has no taxable exchanges, and it would
9   have prevented money -- if he was a Swiss citizen and he did
10  make profits, it would have prevented money from leaving the
11  United States, 20 percent.
12              THE COURT:  Well, it would have assisted in the
13  evasion of payment to the extent that the United States
14  Government was unaware of -- of the -- of the information
15  furnished on the form itself.
16              MR. MINNS:  They wouldn't have received the
17  information.  The forms not sent into the --
18              THE COURT:  I agree.
19              MR. MINNS:  Once the investigation begins, they would
20  have seen, and they did see, overwhelming evidence that he had
21  told the accurate statement when he used his own handwriting;
22  inaccurate when someone else typed it in, and they did see
23  that, and they do know that, and they still want to purport to
24  the jury that he lied about his citizenship, and it's wrong.
25              The probative effect is zero towards the tax return
```

1    or towards anything that would have prevented anything.   I

2    mean, they would have seen the correct record.   I -- I am

3    staggered by the -- I mean, I -- the fact that they were going

4    to close with that witness without giving us the proof that the

5    passport records were in there, is without the -- without the

6    exculpatory information, is unsettling.

7              THE COURT:   Well, and that's why we broke where we

8    were in order to at least give some consideration to your

9    assertion --

10             MR. MINNS:   Yes, Your Honor.

11             THE COURT:   -- that there would have been additional

12   material, corroborative of the defense's explanation for the

13   form.

14             Ms. Parker, did you wish to briefly address

15   specifically the motion to dismiss, that this is a -- that our

16   discussion that we've had so as far is directly related to.

17             MS. PARKER:   Your Honor, I see that there are three

18   parts to the motion; one relating to the American Tax Solutions

19   six pages of those documents, the certified FBARs which contain

20   a statement, and then this group of Peregrine documents.   If I

21   understand the Court correctly, you just want me to address the

22   Peregrine documents?

23             THE COURT:   Yes.

24             MS. PARKER:   All right.

25             THE COURT:   Yes.

```
1          MS. PARKER:  I'll be -- I just want to focus on that.
2  Your Honor, first of all, it should be understood, the factual
3  basis here.  First of all, these -- the documents that were
4  disclosed were disclosed in October of 2018, and they had the
5  Peregrine Bates numbers on them.  It was obvious to the defense
6  and, in fact, the defense has demonstrated that they knew that
7  there were additional documents.  They didn't ask for them.
8  They didn't do anything until in the middle of trial to say,
9  wait a minute, we're missing documents, which they know exist.
10 That is not a Brady violation.
11         There are plenty cases that says Brady applies only
12 to information that is in the possession of the Government and
13 is unknown to the defendant.  Just to cite two of things,
14 United States versus Boling, B-O-L-I-N-G.  869 Fed2d 965 -- let
15 me see, I forgot to write down the page number -- at page 974.
16 That's a Sixth Circuit, 1989 case.
17         Coe versus Bell, another Sixth Circuit case, this one
18 from 1998 -- excuse me, that can't be the right year -- but 161
19 F.3d 320 at 343-344.
20         THE COURT:  I'm not going to have a chance to go run
21 and look at those materials, immediately.
22         MS. PARKER:  Well, I think the Court knows that it's
23 very well established that Brady applies to information that is
24 unknown to the defense and is in the exclusive possession of
25 the Government.  First of all, they obviously knew about it
```

1  because they raised it.

2          Second of all, they had notice that there were

3  additional pages because when we produced the pages we did

4  produce back in October, they were Bate stamped; and, as they

5  pointed out, there were gaps in the number.  They said nothing

6  about that through November, December, January and February.

7  March they raise the issue for the first time, so they have

8  basically tried to set this up.

9          Second of all, if the information is known to the

10 defendant, whether or not defendant communicates to his

11 counsel, it's not a Brady violation.  So let me go back a bit

12 for what these consist of.

13         The vast majority of these documents, and I will

14 tender them to the Court, a copy for you and a copy for your

15 clerk, of the documents that were provided to defense counsel

16 Friday night.  You can review them.  The vast majority of them

17 relate to other Peregrine accounts controlled by the defendant.

18         The defendant did have his own personal account.

19 When he opened his personal account, he did so online.  He

20 filled out an online screen representing he was not a US

21 person, that he had no Social Security number, and there was an

22 IP address for that online activity that went back to Zurich,

23 Switzerland.  That is what prompted Peregrine to send him the

24 form for foreign nationals.

25         When he signed and returned the form, he did so -- he

1   did the W-8BEN and he provided an illegible copy of his

2   passport.  Later on, he provided a legible copy, but if you

3   look at what I've just handed you, which is a copy of an

4   excerpt of what was provided, it shows that people from

5   Peregrine are asking for ID they can read, and so when they

6   open the account, they were under the impression that he was a

7   foreign national.

8            Later in connection with this account, and other

9   accounts that are separate, he did provide US passports, copies

10  that were legible, but at the time the account was being

11  opened, there was no legible copy of his US passport.  But

12  anyway, he filled out online and signed the BA -- or, excuse

13  me, W-8BEN form.

14            So if you look at those documents, yes, he later on

15  provided correct information, but at the time he did it, and

16  the consequences of that, contrary to the representation made

17  by Mr. Minns, what the witness said was the lack of accurate

18  information on this results in it impedes the IRS's ability to

19  assess taxes and to collect unpaid taxes, because they don't

20  get a 1099.  If he had filled out a form saying he was a US

21  citizen, there would have been a 1099 to the defendant and a

22  1099 to the IRS.  So the implications of the form do facilitate

23  the evasion of taxes, which is why we're offering it.  And that

24  account remained in that status, as far as I no, as an account

25  of a foreign individual, his personal account, which he opened

1   in 2009 when he was still in Zurich.

2           So, Your Honor, I don't -- I submit there is no Brady

3   violation there, and there was also an assertion, I believe, in

4   the pleadings that this was discussed in the Government's

5   opening.  I went back through my notes.  I made no mention of

6   this, nor would I have.  It's -- it's more complicated than

7   something I would have brought up in my opening.

8           But most of what was in those 900 pages are account

9   statements for his account, which presumably he's aware of, he

10  can communicate to his attorney about, and also his statements

11  and information for other accounts that were held in the names

12  of entities and not his personal account.

13          THE COURT:  And do we know how many that would have

14  been.

15          MS. PARKER:  How many what?

16          THE COURT:  Accounts maintained at Peregrine in

17  affiliate names?

18          MS. PARKER:  I know there was JDFX Fund account, and

19  I -- at least two, JDFX-type accounts, I think one was Fund and

20  one was Management, which were -- those were opened, and in

21  opening those accounts, they were open at a different time --

22  and, yes, at that time the defendant provided accurate

23  nationality and Social Security, but as the account manager

24  type thing.

25          THE COURT:  Were these accounts for currency trading

1  or for securities trading?

2          MS. PARKER:  I understand them be to be forex.

3          I stand corrected, by the way, it was one for IB Tech

4  and one for JDFX, the Peregrine business accounts.  But as I

5  understand it, they were both forex trading accounts opened by

6  Mr. Peregrine -- I'm sorry, Mr. Pieron.

7          THE COURT:  Yes.  I appreciate your argument.

8  Mr. Sasse, we've brought you to your feet.

9          MR. SASSE:  Yes, Your Honor.  I've been the attorney

10 on this side that was primarily responsible looking at the

11 Peregrine stuff.  First of all, the Peregrine 46 pages that we

12 got were in the middle of massive discovery in this case, over

13 25,000 pages.  They were all Bate stamped by the Government.

14 Those were the Bate stamp numbers we were looking at and

15 organizing things and so on.

16         It was not until recently that we started looking --

17 that I started look closely as the Peregrine thing and

18 wondering why the Peregrine, which also had the Bate stamps,

19 why there appeared to be some numbers missing.  So this is not

20 something that we knew for months and months.  It was something

21 that we just very recently discovered and I scratched my head

22 and wondered what that was about.

23         I expected, when they brought somebody in from

24 Peregrine, that they were going to clear this up, that this was

25 not something that was an intentional act on our client, and we

 1   still may.  I have now spent the weekend looking through these

 2   900 some pages.  There are not two accounts, there are not

 3   three accounts, there are 11 separate accounts.  I believe nine

 4   of them are JDFX accounts, corporate accounts from a Swiss

 5   corporation.

 6            As to each one of those corporate accounts there is a

 7   W-8 BEN, which I'm not even sure that that's proper for those

 8   accounts, but they were filled out.  The initial one is

 9   correctly done.  It says that they are not subject to US taxes

10   signed by my client.  For some reason there are copies of this

11   one -- this document that he did much later in the files of

12   those accounts which were opened much earlier, and the witness

13   can try to explain that if he can.

14            There are -- every single one of those accounts has a

15   copy of a passport, his passport, his picture, except that the

16   first one -- the very first account that was opened is -- you

17   can't tell whose, at least I couldn't tell whose passport it

18   was.  Every single one of those accounts has a written

19   application setting forth his name, his Social Security

20   company, and a box that says he's a US citizen.

21            One account was opened, apparently it's a personal

22   account, and that may very well have been a mistake that they

23   opened it, it was done in that fashion, but in any event it's a

24   personal account.  That's the one that they have this

25   particular W-8 BEN document in, it also has his passport.  It

1  also has the application showing he's a US citizen.

2          And that particular account shows one trade, which

3  apparently I'm told -- I don't know this stuff, but it probably

4  was a test trade.  It traded for I think euros -- US dollars

5  for euros and immediately they bought euros and then

6  immediately sold euros.  There was a profit of 3 cents on that

7  deal.  That was the only trade ever made by that account.  In

8  fact, later on there's a question of -- there's an email can we

9  change this account into a corporate account, and they said,

10  no, you have to open a new account, and they did.  The last

11  account that's opened, the 11th account, is his American

12  company after he came back here to Michigan, and it's opened as

13  a US account, again with him saying, yes, we are US citizens.

14          We can go through it with this man.  If we want to

15  put him on here, we're going to go through a whole lot of

16  documents to show what this was about, but the idea -- No. 1,

17  the idea that we should be responsible for them not turning

18  this over is ridiculous.  They have yet to explain why they

19  didn't turn it over.  They said, yeah, we didn't, but they

20  should have known so, therefore, it's our fault.

21          And if they want to waste the Court's time, we'll do

22  it.  We don't want to do it.  We don't want to do it because,

23  as Mr. Minns says, if one juror sticks in his head that he was

24  denying he was a US citizen, that juror will vote to convict.

25  We are -- we are convinced of that, and no matter what the

```
 1   other evidence says, and that's why we don't want this in front
 2   of the jury at all.  But if we have to we will -- we will deal
 3   with them to show what was going on here was not any attempt by
 4   our client to lie about his citizenship.
 5            The other thing which I think is confusing, my
 6   understanding -- and I know less about tax law than anybody in
 7   the front of this courtroom, maybe anybody in the whole
 8   courtroom, but my understanding of these forms is that it
 9   alerts the company that this is a foreign entity, this is not a
10   US citizen, and because of that -- now, they report it either
11   way.  They report the income either way, if there's income,
12   whether you're a US citizen or not, but if it is not a US
13   citizen, then they withhold.  They take withholdings.  So it's
14   actually to a taxpayer's disadvantage to be not a US citizen
15   and fill out this form.
16            So, again, their whole theory that this somehow is
17   trying to evade taxes, I mean, it collapses at every turn, but
18   if they want to go down this route, and if the Court permits
19   it, our motion is to dismiss the case.  And if the Court is
20   not, at least at this juncture, willing to do that, I would ask
21   that they exclude this testimony, and -- because it's not going
22   to go anywhere.  It's not going to prove anything, but if they
23   want to and the Court allows it, we'll deal with it.
24            THE COURT:  Their suggestion, putting aside the
25   timing of the disclosure, is that there is significant evidence
```

1    which would demonstrate that the W-8 form that was tendered on

2    Friday was a mistake of fact, and they're prepared to address

3    that through their cross-examination of the witness so they are

4    concerned about the potential prejudice.  Is the document still

5    going to be tendered by the Government?

6              MS. PARKER:  Yes, Your Honor.

7              THE COURT:  Then we will spend sometime with the

8    additional materials on cross-examination.

9              If we could have the jury, please.

10             Do we have our witness?

11             MR. DEPORRE:  The Government will resume its calling

12   of Zachary Schweder.

13             THE COURT:  Good morning, sir.

14             THE WITNESS:  Good morning.

15             THE COURT:  We have a special place for you.  You may

16   resume the witness stand.  You understand that you remain under

17   oath, correct?

18             THE WITNESS:  I do.

19             THE COURT:  Please have a seat.

20             (At 9:07 a.m., jury arrives.)

21             THE COURT:  Good morning.

22             THE JURY:  Good morning.

23             THE COURT:  I apologize for being a little late in

24   getting started.  We had a couple issues that we needed to

25   clarify.  Please be seated.

 1          The witness has been refreshed that he remains under

 2  oath and you may continue with the examination, sir.

 3          MR. DEPORRE:  Thank you, Your Honor.

 4                      ZACHARY SCHWEDER,

 5          GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

 6                     DIRECT EXAMINATION

 7  BY MR. DEPORRE:

 8  Q.   Mr. Schweder, would you remind the jury how you were

 9  employed between July, 2012 and -- excuse me, May, 2007 and

10  July, 2012?

11  A.   Yes, I was the compliance manager at Peregrine Financial

12  Group.

13  Q.   And as part of your responsibilities as the compliance

14  manager, were you familiar with business records kept by

15  Peregrine Financial Group?

16  A.   Yes.

17  Q.   I'd ask you to take a look at Government Exhibit 115.

18  A.   Okay.

19  Q.   Do you recognize that exhibit?

20  A.   Yes.

21  Q.   And there are a series of pages there.  The first two,

22  what is that -- what is that, the first two pages of the

23  exhibit?

24  A.   The first two pages are a printout of the data collected

25  during the online account opening process.

Schweder – Direct                                                22

1  Q.   All right.  And if you would flip to the last page of that

2  exhibit.

3  A.   Okay.

4  Q.   And would you explain what that is.

5  A.   The last page is a -- I believe it's an IRS form.  It is

6  W-8BEN.

7  Q.   You characterize this as an IRS form.  Is this a form that

8  is sent to the IRS, or is this a form that is maintained by

9  Peregrine?

10 A.   This form is collected from customers and maintained by

11 Peregrine.

12 Q.   Is this form ever sent over to the IRS?

13 A.   Not that I'm aware of.

14      MR. DEPORRE:  Your Honor, at this time I would move

15 for the admission of Government Exhibit 115.

16      MR. SASSE:  Your Honor, I have -- as the Court is

17 aware, I objected to this, but I have no additional objections,

18 Your Honor.

19      THE COURT:  The objection's noted.  The exhibit will

20 be received into evidence.

21 BY MR. DEPORRE:

22 Q.   All right.  Looking at Government Exhibits 116 and 117;

23 first at 116, do you recognize this?

24 A.   Yes.

25 Q.   And what is it?

23

1   A.    This is a monthly account statement for a forex trading

2   account at Peregrine Financial Group.

3   Q.    And is this a record that would have been maintained by

4   Peregrine Financial Group?

5   A.    Yes.

6   Q.    Would it also have been sent to a customer of the

7   Peregrine Financial Group?

8   A.    Yes.

9           MR. DEPORRE:  Your Honor, at this time I would move

10  for the admission of Government Exhibit 116.

11          MR. SASSE:  No objection, Your Honor.

12          THE COURT:  116 is received.

13  BY MR. DEPORRE:

14  Q.    And lastly, looking at Exhibit 117, do you recognize this

15  exhibit?

16  A.    Yes.

17  Q.    Can you tell me what Exhibit 117 is?

18  A.    This is a view of wire transfer activity, the details

19  specifically of wire transfers received.

20  Q.    All right.  At this time, Your Honor -- and is this a

21  record that would have been kept by Peregrine Financial Group?

22  A.    Yes.

23          MR. DEPORRE:  Your Honor, at this time I would move

24  for the admission of Government Exhibit 117.

25          MR. SASSE:  No objection to that, Your Honor.

1          THE COURT:  Received.

2    BY MR. DEPORRE:

3    Q.   All right.  If we could display Government Exhibit 115 and

4    focus in on the top portion.  You mentioned that this is a

5    printout from the Peregrine computer system, correct?

6    A.   Yes.

7    Q.   How is this information entered into -- how does Peregrine

8    receive this information?

9    A.   This is received through our online account opening

10   website, so the potential client would go on to the website,

11   fill out the questions in all the required fields and then

12   submit this, and then this is all the data that's collected

13   through that process, and this is a view of all the information

14   that was collected.

15   Q.   And in the middle of the page where it says "customer

16   information," if you could zoom in down there.  Who is the

17   customer identified with respect to this account?

18   A.   James Pieron is.

19   Q.   What is the address provided?  Actually, if you could just

20   say -- it would be a little bit difficult maybe to pronounce

21   the street name, but the city and country.

22   A.   Sure, it is Zurich, and then the -- it's flagged as

23   non-US.

24   Q.   All right.  Below that where it says US citizen, do you

25   see that?

Schweder - Direct                                              25

1   A.    Yes.

2   Q.    And what is entered there?

3   A.    No.

4   Q.    And where it says Social Security number, what is entered?

5   A.    No number was entered.

6   Q.    All right.  I direct your attention above that customer

7   information area where it says "account email."

8   A.    Yes.

9   Q.    And do you see an email account provided there?

10  A.    Yes.

11  Q.    What is that account?

12  A.    It says JP@JDFX.com.

13  Q.    All right.  And then above that there's an IP address, do

14  you recognize that?

15  A.    Yes.

16  Q.    Now, is the IP address something that the customer enters,

17  like that other information, or how does Peregrine receive

18  information regarding the IP address?

19  A.    The IP address is not entered by the customer.  It is

20  captured at the time the account -- online account application

21  is submitted.  I believe it's captured automatically based on

22  the location of the internet connection that the person is

23  using at the time they submit the application.

24  Q.    And do you know where this particular IP address came back

25  to?  Can you explain what an IP address actually is for the

1  jury.

2  A.    Sure.   An IP address is a data point that's collected.

3  It's associated with specific either internet companies or the

4  place that you obviously obtain your access to the internet,

5  and then it is sort of geo located based on the area that

6  that's in, so it's meant to designate a specific place that the

7  individual was at the time that the account application was

8  submitted.   So this particular IP address was linked back to

9  Switzerland.

10  Q.    Do you see below there's a section of the form that says

11  "financial information?"

12  A.    Yes.

13  Q.    And could you zoom in on that bottom portion.

14        At the top there's a line that says "annual income."

15  A.    Yes.

16  Q.    And would you read what it says there.

17  A.    Over $100,000.

18  Q.    How about net worth?

19  A.    Over $100,000.

20  Q.    And liquid net worth?

21  A.    Over $50,000.

22  Q.    And is this information provided by the customer?

23  A.    Yes.

24  Q.    I'd ask you to turn to the second page of the document.

25  There at the bottom there's a risk disclosure?

Schweder - Direct                                              27

1   A.    Yes.

2   Q.    What is the purpose of a risk disclosure?

3   A.    It is for the user to sign off that they understand the

4   risks associated with the trading account and also to make sure

5   that, for regulatory purposes, we're capturing the right

6   information from the customer.

7   Q.    And what are the risks associated with a currency trading

8   account?

9   A.    Risk of loss for sure of the funds that you've invested if

10  the trades are not successful.

11  Q.    So for regulatory purposes, does there have to be some

12  sort of signature or electronic signature with the risk

13  disclosure?

14  A.    Yes.

15  Q.    And do you see a signature here?

16  A.    Yes, this is an electronic signature because it was done

17  through the website.

18  Q.    What's the name of the eSign?

19  A.    James Pieron.

20  Q.    And what is the date?

21  A.    July 7, 2009.

22  Q.    In addition to the risk disclosure, does Peregrine collect

23  other information about its customers for regulatory purposes?

24  A.    Yes.

25  Q.    Do you have to collect identification?

28

1   A.   Yes, we collect copies of identification, especially for

2   the accounts that are opened through the internet online.

3   Q.   And do you also collect tax reporting information?

4   A.   Yes.

5   Q.   And I'd ask you to turn to the last page of the exhibit.

6   It's marked as page 01594.

7   A.   Okay.

8   Q.   This is a -- what you described earlier as a W-8BEN,

9   correct?

10  A.   Correct.

11  Q.   Was this submitted through the online portal?

12  A.   No.

13  Q.   Do you know how this was submitted?

14  A.   I don't know specifically how it was submitted, no.

15  Q.   Looking at the bottom of the exhibit, the very bottom

16  line.

17  A.   Okay.

18  Q.   Do you recognize that?

19  A.   Yeah, it would appear to be fax information from when

20  something is faxed from a fax machine.

21  Q.   All right.  And then on the very far right it says P003

22  slash 004.  What's your understanding of what that means?

23  A.   My understanding would be that this is page 3 of 4.

24  Q.   So there were other documents that accompanied this

25  particular fax, correct?

1  A.    I would assume so, yes.

2  Q.    All right.   What is the purpose -- what does Peregrine do

3  in response to a W-8BEN?

4  A.    The purpose is whenever an individual would fill out an

5  application and indicate they were not a US citizen and not

6  providing a Social Security number, because they are

7  representing that they will not be taxable, we're asking for

8  additional documentation so that we have something on file that

9  we feel comfortable we will not provide a 1099 form, which is

10  typically provided to traders for tax purposes.

11  Q.    And a 1099 form is something that Peregrine submits to the

12  IRS?

13  A.    1099 forms are submitted to the customers and then I know

14  a file was sent to the IRS representing that information.

15  Q.    If there's a W-8BEN that Peregrine has, do they also send

16  a 1099 for those customers?

17  A.    No.

18            MR. DEPORRE:   Government passes the witness, Your

19  Honor.

20            THE COURT:   Cross-examination.

21                        CROSS-EXAMINATION

22  BY MR. SASSE:

23  Q.    Good morning, Mr. Schweder.   I think you may have told us

24  where you're presently employed but I don't recall.   Where do

25  you work now?

Schweder - Cross

```
1   A.    I work for Beam Suntory.

2   Q.    Where is that located?

3   A.    Chicago, Illinois.

4   Q.    And you live, I assume, either in or near Chicago?

5   A.    I live in the suburbs, yes.

6   Q.    I want to apologize.  I know -- I suspect you thought were

7   you going to be on and off Friday and done with this matter,

8   but you were forced to come back today.  Did you -- were you

9   able to go home for the weekend?

10  A.    Yes.

11  Q.    Now, you indicated that you worked at Peregrine until, I

12  think, 2012; is that correct?

13  A.    Correct.

14  Q.    And your position was as compliance manager?

15  A.    Correct.

16  Q.    And did you work in Chicago?

17  A.    Yes.

18  Q.    And, in fact, Peregrine had -- their headquarters are

19  actually in Cedar Falls, Iowa, correct?

20  A.    Correct.

21  Q.    And am I correct that your employment ended there -- first

22  of all, what kind of corporation -- what kind of business was

23  Peregrine?  What did they do?

24  A.    They were a futures commission merchant, so it was a

25  brokerage firm that held trading accounts for commodities,
```

Schweder - Cross                                                    31

 1  futures, options, forex.

 2  Q.    A rather large firm, correct?

 3  A.    Yeah.

 4  Q.    Controlled millions of dollars, maybe hundreds of millions

 5  of dollars?

 6  A.    Of customer funds?  Yes.

 7  Q.    Yes.  And when you left there, did you leave at the end of

 8  Peregrine, when Peregrine ceased to exist?

 9  A.    Yes.

10  Q.    In fact, it happened pretty quick, didn't it?

11  A.    Yes.

12  Q.    The -- it turned out that there was some recordkeeping

13  that wasn't quite accurate at Peregrine, true?

14  A.    Yes.

15  Q.    And turned out that a lot of customers' money was stolen,

16  correct?

17  A.    Yes.

18  Q.    And the chief financial -- the chief officer of Peregrine,

19  the head of Peregrine, attempted suicide, eventually got

20  convicted and went to prison over the whole thing, isn't that

21  true?

22  A.    Yes.

23  Q.    On Friday afternoon -- may I approach the witness, Your

24  Honor?

25            THE COURT:  You may.

1  BY MR. SASSE:

2  Q.    Friday afternoon I showed you what the defense had been

3  provided, which was 46 documents of Peregrine documents, and

4  asked you some questions about what appeared to be some missing

5  Bate numbers, and you didn't really recall what had been

6  supplied to the Government; is that true?

7  A.    Correct.

8  Q.    And that was Proposed Exhibit 1019.  I'm now going to show

9  you what has been marked as Proposed -- Defendant's Proposed

10  Exhibit 1032.  Can you look at the first couple pages of that?

11  A.    Okay.

12  Q.    And, in fact, does that appear to be, first all, your

13  certification that these records were authentic; is that

14  correct?

15  A.    Correct, yes.

16  Q.    And a cover letter even before that from somebody named

17  Rebecca Wing.  Do you know who Rebecca Wing is?

18  A.    Yes.

19  Q.    And she's -- works at Peregrine -- or did work at

20  Peregrine back then is; is that correct?

21  A.    Yes.

22  Q.    And, in fact, I'm going to -- that's -- there's a few more

23  pages in there than what I had showed you on Friday, would that

24  be fair?

25  A.    Yes.

1          MR. SASSE:  Your Honor, I'm going to represent to the

2   Court that this is what we received after Friday as the

3   Government -- the records that they received from Peregrine,

4   and I'm going to move their admittance.

5          THE COURT:  Any objection?

6          MR. DEPORRE:  No objection, Your Honor.

7          THE COURT:  They're received.

8   BY MR. SASSE:

9   Q.    And when were those records provided to the Government?

10  When did you sign your certificate?  When does the cover letter

11  indicate they were sent to the Government?

12  A.    May 11th, 2012.

13  Q.    2012; is that correct?

14  A.    Correct.

15  Q.    And who were they sent to, does the cover letter tell you

16  who they were sent to?

17  A.    Yes, Special Agent Scott Hollabaugh.

18  Q.    Now, those particular -- that particular exhibit I have

19  placed some tabs in there to try to make it a little easier to

20  go through, and I think they're A through -- I don't know what

21  the last one is K or L or something like that; is that correct?

22  A.    K, A through K.

23  Q.    And for your information I have attempted to -- this

24  exhibit appears to be -- when you sent the items, they were

25  segregated by according to account, and I'm trying to make it

1   easier to get into the different accounts.  I've put the tabs

2   in there, but I'd like to go through with you briefly, if we

3   could, just what is involved -- what kind of documentation

4   Peregrine was requiring in an account to be opened, and if you

5   could look at tab A, the very first account.

6   A.   Okay.

7   Q.   And the account number is -- each account has a different

8   number, I would assume; is that correct?  And I'm just at page

9   1 here, and I'm using your Bates -- the Peregrine Bate stamp

10  numbers here.

11  A.   Okay.

12  Q.   That is Account FA495; is that correct?

13  A.   Correct.

14  Q.   And if you could look at page 3, and this appears to be an

15  account application on behalf of a company called JDFX.  Do you

16  see that, JDFX Fund Limited?

17  A.   Yes.

18  Q.   And that's at the top, at the -- then there's a middle

19  portion where it indicates the -- an individual's name that was

20  involved with this corporation.  Do you see that?

21  A.   Yes.

22  Q.   And that person is who?

23  A.   James D. Pieron.

24  Q.   And are we able to blow up that middle part?

25           MS. ARNETT:  Yes.

 1  BY MR. SASSE:

 2  Q.    And it asks on there -- one of the questions -- it gives

 3  an address, a telephone number, and it also asks for Social

 4  Security number.  Do you see that?

 5  A.    Yes.

 6  Q.    And it says 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, correct?

 7  A.    Correct.

 8  Q.    And on the next line it asks number of dependents, do you

 9  see that?

10  A.    Yes.

11  Q.    And then it asks citizenship.

12  A.    Yes.

13  Q.    And what does that say?  What does he check?

14  A.    The box "yes" is checked.

15  Q.    And so he is indicating, and this is the very first

16  account, that he is a US citizens and he provides his Social

17  Security number; is that correct?

18  A.    Correct.

19  Q.    If could you look at the next page.  Is there a signature

20  on that form?

21  A.    Yes.

22  Q.    And I suspect -- could we blow up the signature?  It's

23  pretty hard to read the signature, but right below it it says

24  James Pieron, does it not?

25  A.    Correct.

36

1    Q.    And the date on it, what date is that?

2    A.    September 24, 2007.

3    Q.    And it's backwards from the way we usually do things in

4    this country, but it's typical of the European method; is that

5    correct?

6    A.    Correct.

7    Q.    So back on September 24th, 2007, opening the first account

8    that we have records of with your company, he submitted

9    documentation in which he acknowledged he was a US citizen and

10   give you Social Security number; is that correct?

11   A.    Correct.

12   Q.    Now, looking -- just to go through briefly what some of

13   the other documents that were required to open an account.  If

14   you could look at the next page, page 5, something called a

15   customer agreement; is that right?

16   A.    Correct.

17   Q.    And that's a many page document, correct?

18   A.    Correct.

19   Q.    If you could go to page 13.  Have you ever read that

20   document, by the way, that customer agreement?

21   A.    I'm sure I did in the past, yes.

22   Q.    Okay.  Do you know how many of your customers actually

23   read that document?

24   A.    I don't.

25   Q.    But this one is signed, again, is it not?

1    A.    Yes.

2    Q.    And it's signed by who?

3    A.    The print name below is James Pieron.

4    Q.    There's also a document which follows, page 15, entitled

5    risk disclosures.

6    A.    Yes.

7    Q.    And then on the page 16, that document is signed, I

8    believe.

9    A.    Yes.

10   Q.    Also apparently by Mr. Pieron, correct?

11   A.    Correct.

12   Q.    And these are documents that are expected to be provided

13   at the time that the file is open, correct?

14   A.    Correct.

15   Q.    Page 17, something called an options disclosure statement;

16   again a few page document, correct?

17   A.    Correct.

18   Q.    Page 20, document called electronic trading and order

19   routing systems disclosure statement.  Do you see that?

20   A.    Yes.

21   Q.    Page 21, risk disclosure statement for security futures

22   contracts.  Do you see that?

23   A.    Yes.

24   Q.    And that document goes on for a number of pages as well,

25   doesn't it?

1    A.    Yes.

2    Q.    Page 31, an arbitration agreement.  That's signed as well;

3    is that correct?

4    A.    Yes.

5    Q.    Page 32, a corporate resolution, and that's signed.  I

6    can't tell from here whether it's -- is it signed on that page?

7    A.    Yes.

8    Q.    Page 41, can you tell us what this form is.

9    A.    Yes.  This was a form used to question any time we had

10   corporate or legal entity accounts to ask the question if those

11   funds represented funds that belonged to the corporation or if

12   they were traded on behalf of any customers or any sort of a

13   pooled investment vehicle.

14   Q.    And it was a form that -- a statement that you -- your

15   company wanted in the files to understand this customer; is

16   that correct?

17   A.    Correct.

18   Q.    Now, one of the things that you told us, I think, was that

19   you wanted some kind of a documentation as to who the person

20   was, some kind of identification, correct?

21   A.    Correct.

22   Q.    And if you could look at 42, can you tell what that is.

23   A.    A poorly scanned version of a passport.

24   Q.    I'm sorry, of a what?

25   A.    Of a passport.

1  Q.    It appears to be a passport, but you can't tell who or

2  what or where; is that correct, and that's in that original

3  file?

4  A.    Correct.

5  Q.    We're going to get back to passports in a minute, but if

6  you could go to 43.  This is a form that you talked about on

7  direct exam, although this is a different copy.  This is not

8  the one you talked about then.  Who is the individual or -- it

9  says name of individual or organization that is beneficial

10 owner.  Do you see that?

11 A.    Yes.

12 Q.    And in this particular document it's JDFX Fund, Limited;

13 is that correct?

14 A.    Correct.

15 Q.    And if in fact JDFX Fund, Limited is a foreign

16 corporation, it's not incorporated in the United States, would

17 they fill out this particular form?  Would this form be filled

18 out by them?

19 A.    Yes.

20 Q.    And at the bottom of this form there's a signature, and

21 if, in fact, that is the signature of James Pieron and, in

22 fact, that corporation was not a US corporation, this would be

23 accurate; is that correct?

24 A.    That is my understanding, yes.

25 Q.    And this was submitted on September 26th, 2007; is that

1    correct?

2    A.    That's the date it's signed, yes.

3    Q.    Date it's signed in any event.   It's -- let me strike

4    that.

5              Also in the file, the original file we're looking at,

6    if we could go to page 44, there's a certificate of good

7    standing, do you see that?

8    A.    Yes.

9    Q.    And that's for JDFX, correct?

10   A.    JDFX Fund, Limited, yes.

11   Q.    And 56 is a valuation summary detail, and that is signed

12   as well; is that correct?

13   A.    Yes.

14   Q.    Beginning at page 57, there are financial reports from the

15   company; is that correct?

16   A.    Yes.

17   Q.    Now, beginning at page 116, there are monthly statements

18   which would show, I assume, the activity of that account after

19   it was opened.   Is that what that reflects?

20   A.    Yes.

21   Q.    And there are a number of pages.   I'm not going to make

22   you count the number of pages, but it goes for a while just on

23   that one account; is that correct?

24   A.    Correct.

25   Q.    And those were the accounts -- those were the documents

1  that are included and most, perhaps all, of which are required

2  to open an account or were required by Peregrine; is that

3  correct?

4  A.    Yes.   The customer statements are not part of the account

5  opening.   That would be just the records of the account after

6  it was opened.

7  Q.    Now, I ask you to look at the next account, page 199.

8  A.    Okay.

9  Q.    And this account is labeled FD753, correct?

10 A.    Correct.

11 Q.    And if you could look at the next page, does that document

12 tell you when this account was opened?

13 A.    I don't see a date specifically in the body of the email,

14 but it's meant to be an email that is sent at the time the

15 account is set up and opened.

16 Q.    And when was the email sent?

17 A.    February 11th, 2008.

18 Q.    So on February 11th or thereabouts, 2008, this new account

19 was opened, correct?

20 A.    Correct.

21 Q.    When Peregrine opened an account, were they required to

22 have the kind of documents that we just talked about, we went

23 through on the first account?

24 A.    Yes.

25 Q.    And you indicated that at least some financial things they

1  might not be required, but they certainly were required to have

2  the W-8BEN, correct?

3  A.   If it was a non-US account, yes.

4  Q.   They certainly were required to have identification, proof

5  of identity; is that correct?

6  A.   Correct.

7  Q.   Could we look at page 205.

8  A.   Okay.

9  Q.   And this is the W-8BEN for that account; is that correct?

10 A.   For which account?

11 Q.   For FD753.

12 A.   I don't know.  There's no account numbers associated with

13 this form.

14 Q.   It was provided in the discovery under the -- that

15 particular account from your company back in 2012, though,

16 correct, as part of that file?

17 A.   Yes.

18 Q.   And the date on that W-8BEN is what?

19 A.   The signature date is July 7th, 2009.

20 Q.   And the account was opened, as we talked about a minute

21 ago, around February 11th, 2008.  Can you explain why the

22 W-8BEN would be for much later?

23 A.   It doesn't look to me like this W-8BEN goes to that

24 account.

25 Q.   Now, we talked about the one application that showed

 1  Mr. Peregrine's [sic] checking the citizenship box and

 2  providing the Social Security number.  Do you know whether

 3  other account applications, amongst these other accounts that

 4  were opened, also have that information?

 5  A.   I don't know without looking at it.

 6  Q.   Okay.  Am I correct that you have not been provided with a

 7  copy of what that -- that big binder that I gave you until I

 8  handed it to you?

 9  A.   Correct.

10  Q.   So you hadn't seen it since it was put together back in

11  2012, correct?

12  A.   This binder?

13  Q.   I'm not talking about the binder, but the documents in the

14  binder?

15  A.   The documents in it?  I've seen a few documents that

16  were --

17  Q.   A few documents, just the few that the Government handed

18  you --

19  A.   Correct, correct.

20  Q.   -- that have now been admitted into evidence for the most

21  part?

22  A.   Correct.

23  Q.   Okay.  I would like you to look through a few of the files

24  and see if we can find an application that gives an indication

25  of whether Mr. Pieron was hiding his citizenship.  Can you

1  look -- let's start at the one we were at, FD753.  Can you look

2  at page 202.

3  A.   Okay.

4  Q.   And am I correct that on that document, he provides his

5  Social Security number and he checks off "I am a US citizen;"

6  is that correct?

7  A.   Correct.

8  Q.   If you could go to file FD754, which I believe starts at

9  page 217, and then go to page 219, please.

10  A.   Okay.

11  Q.   And does that file again contain Mr. Pieron's statement

12  that he is a US citizen and provide his Social Security number?

13  A.   It does.  These appear to be the same documents as the

14  other copies.

15  Q.   And if we could go to account FD755 at page 232.  And

16  these are all account applications for accounts for JDFX Funds

17  Limited, by the way, are they not?  You checked that on 234 on

18  the account application?

19  A.   Yes, I think it's the same application.

20  Q.   Same application, another account, also includes within

21  the documents provided to the Government the statement by James

22  Pieron that I'm a US citizen and provides his Social Security

23  number; is that correct?

24  A.   Correct.

25  Q.   Account FD756, page 254, and then go to page 256.

1   A.   Okay.

2   Q.   Same form, same information, yes, I am a US citizen, yes,

3   this is my Social Security number; is that correct?

4   A.   Correct.

5   Q.   Account No. FD757, page 289, page 291, the account

6   application.

7   A.   Okay.

8   Q.   Same information, correct?  I am a US citizen, this is my

9   Social Security number, true?

10  A.   Correct.

11  Q.   Which one was I on, 757?

12  A.   Yes.

13  Q.   Can you go to 758, FD758, page 310, and then page 312 is

14  the account application.

15  A.   Okay.

16  Q.   Same information provided, he again provides his Social

17  Security number and checks US citizen, and that's a document

18  that was included in this; is that correct?

19  A.   Correct.

20  Q.   Account FD864, page 326, and go to page 328.

21  A.   Okay.

22  Q.   Same information again, correct?

23  A.   Correct.

24  Q.   Account FD865, page 435, and then I want you to go to 437

25  for the account application.

46

1  A.    Okay.

2  Q.    And, again, Mr. Pieron provides the information that he is

3  a US citizen and provides his Social Security number, correct?

4  A.    Correct.

5  Q.    Now I'm going to skip the next account for a minute.

6  We're going to get back to it.  That's the one the Government

7  directed your attention to.  I'm going to get back to it, but

8  account 557, the very last one -- I'm sorry account FS431 at

9  page 557, and then look at page 561.

10 A.    Okay.

11 Q.    And this particular account is not for JDFX Funds; is that

12 correct?

13 A.    Correct.

14 Q.    Can we look at the top customer information.  This is for

15 a company in the United States, in Mt. Pleasant, Michigan, is

16 that what is on there?

17 A.    Yes.

18 Q.    And that's for IB Technologies, Incorporated; but, again,

19 the individual No. 1 is James Pieron and, again, he provides

20 his Social Security number and, again, he checks that he is a

21 US citizen; is that correct?

22 A.    Correct.

23 Q.    And if you could go to the second page of that particular

24 document to see when that one was signed.

25 A.    Yes, this was signed on September 16th, 2009.

1   Q.    September of 2009.   Now, we also talked about passports.

2   In fact, when I tried to -- when I was examining you briefly

3   Friday afternoon, I asked about passports so -- or some proof

4   of identification, and you indicated that there normally would

5   be one, there should be one, that the broker had to know who

6   the person was, but that amongst the documents we had, there

7   were no passports; is that correct?

8   A.    Correct.

9   Q.    And we looked a few minutes ago at the very first account,

10  and we looked at page 42, and this was account FA495, and there

11  was a passport, something that appears to be passport, but we

12  really couldn't tell whose it was; is that correct?   Do you

13  remember that?

14  A.    Correct.

15  Q.    Now I'd like you to look at, again, back at account FD753,

16  and the account begins at page 199, but I would like to direct

17  your attention to 201.

18  A.    Okay.

19  Q.    Can you tell me what that is.

20  A.    A copy of a United States passport.

21  Q.    And it's a passport for who?

22  A.    James Pieron.

23  Q.    And it's a United States passport, correct?

24  A.    Correct.

25  Q.    And this was in the file provided to the Government back

```
 1  in 2012; is that correct, to the best of your knowledge?
 2  A.   Correct.
 3  Q.   If you could turn to the application -- or the account
 4  documents for account FD754, and I direct your attention to
 5  page 222 within that account.
 6  A.   Okay.
 7  Q.   Not quite as good a copy, but it's a copy of a passport,
 8  correct?
 9  A.   Correct.
10  Q.   And it appears to be a copy of the passport of James
11  Pieron, Jr., correct?
12  A.   Correct.
13  Q.   Page 224, a couple pages later, same account.  Can you
14  tell us what we see.
15  A.   Copy of a US passport.
16  Q.   Another copy of the same passport it appears to be,
17  correct?
18  A.   Correct.
19  Q.   Account FD755, the account begins at page 232, and I'd
20  like you to look at page 236, and what do you see there?
21  A.   Can you clarify the page number again?
22  Q.   I have 236 in my note.
23          MS. ARNETT:  237.
24  BY MR. SASSE:
25  Q.   237 I'm told.
```

49

1  A.    Okay.

2  Q.    And what do you see there?

3  A.    Copy of the same US passport.

4  Q.    Account FD756 and begins -- the account documents begin at

5  254, I'd like you to look at 258.

6  A.    Can we check the page number again?

7  Q.    Maybe my -- 259 I'm told.  I may be off here on everything

8  now, 259.

9  A.    Okay.

10 Q.    And what does that appear to be?

11 A.    A copy of the same US passport.

12 Q.    Account number F -- or account number FD757, I believe the

13 account -- I'm afraid of my own numbers now -- begins at page

14 289 and it's 295, I think.

15          MS. ARNETT:  Yes.

16 BY MR. SASSE:

17 Q.    I got one right.

18 A.    Okay.

19 Q.    And, again, we see a passport in that file, a copy of a

20 passport in that file of James Pieron, correct?

21 A.    Correct.

22 Q.    United States passport?

23 A.    Correct.

24 Q.    Account number -- or account FD758, the account begins at

25 page 310, I'd like you to look at 316.

Schweder – Cross                                                    50

1  A.    Okay.

2  Q.    Again a passport?

3  A.    Correct.

4  Q.    Account FD864, account documents begin at page 326 and I

5  would like you to look at 332.

6  A.    Okay.

7  Q.    And again is a passport, a copy of a passport of James

8  Pieron, correct?

9  A.    Correct.

10  Q.    Account FD865, the account documents begin at page 435.

11  I'd like you to look at page 441.

12  A.    Okay.

13  Q.    And, again, it's a passport, the same one we've looked at

14  repeatedly, correct?

15  A.    Correct.

16  Q.    Next I want to talk about Account FQ562, and that's the

17  account that the Government has brought you here to testify

18  about and has directed -- has introduced some exhibits.  First

19  of all, if you could look at -- I think it's Exhibit 115, the

20  first page?

21  A.    Okay.

22  Q.    And that was the page that -- that was the page that you

23  told us was filed electronically; is that correct?

24  A.    Correct.

25  Q.    And I assume -- you never met James Pieron, correct?

1   A.   Not that I'm aware of.

2   Q.   And you don't have any idea of how his business operated,

3   who filled out forms in his business, how that whole thing was

4   done, is that fair?

5   A.   That's fair.

6   Q.   So you don't know who actually sat at a computer and

7   plugged in the information on this particular form, is that

8   fair?

9   A.   That is fair.

10  Q.   Now, let's go to the last page here, again, Government

11  Exhibit 115.  You told us that this document was submitted.  It

12  was part of your file, correct?

13  A.   Correct.

14  Q.   And it's a document which has some importance as to

15  knowing where -- who your customer is, whether it's a foreign

16  customer or a domestic -- or US citizen, correct?

17  A.   Correct.

18  Q.   And this document, if you carefully read it, you

19  understand that it's not to be completed if you're a US

20  citizen, is that fair?

21  A.   That is fair.

22  Q.   And this particular document is a part of a fax that came

23  out, and the Government brought this out, at the very bottom it

24  says what appears to be page 3 slash 4, which normally means

25  there's four pages total, and this is the third page, correct?

Schweder - Cross                                                    52

1   A.    Correct.

2   Q.    Could you go back to the binder I gave you and go to page

3   515.

4   A.    Okay.

5   Q.    And that appears to be the same document the Government

6   has admitted into evidence; is that correct?

7   A.    Correct.

8   Q.    Can you -- can you turn back a page to 514.

9   A.    Okay.

10  Q.    And I don't have that in front of me, but this also

11  appears to be, if you look at the bottom right, this is page 2

12  of four; is that correct?

13  A.    Yes.

14  Q.    And does that appear to match up in terms of date and time

15  with the one that is page 3 of 4, which is the next page?

16  A.    Yes.

17  Q.    Now, could you turn to the page that follows the form

18  we've been talking about, which would be page -- there's 514,

19  515 is this form that's not supposed to be filled out if you're

20  a US citizen, and this is 516.  Do you have see that?

21  A.    Yes.

22  Q.    And that is page 4 of 4, which would indicate that it

23  was -- came in the very same fax submission as the form that

24  we've been talking about; is that correct?

25  A.    Correct.

53

1   Q.   And what is that particular page?  Can you tell?

2   A.   It appears to be a copy of a passport.

3   Q.   Copy of a United States passport; is that correct?

4   A.   Yes, it appears to be.

5   Q.   Now let's go to page 506 of the same account.

6   A.   Okay.

7   Q.   And do you, again, recognize the passport of James Pieron?

8   A.   Yes.

9   Q.   And that particular passport is in the very same file as

10  that W-8BEN form that the Government brought you in to testify

11  about; is that correct?

12  A.   Correct.

13  Q.   This particular account, by the way, if you could go to

14  page 551, and there shows a -- I believe it shows a trade on

15  that account; is that correct?

16  A.   There's no trade on 551.

17  Q.   Okay.  How much -- how much is deposited into that

18  account?

19  A.   The balance in this account on page 551 is $50,000.03.

20  Q.   And are there -- is there a document around there that

21  shows any trades?

22  A.   Yes.

23  Q.   And what page is that?

24  A.   548.

25  Q.   And 548, what -- what does that show?  What kind of a

Schweder – Cross                                                          54

1  trade does that show?

2  A.   It shows a trade in the euro/US dollar currency pair.

3  Q.   And how much was that -- how much was involved in that

4  trade?

5  A.   The trade profited 3 cents.

6  Q.   How much was put up in US dollars or euro dollars?

7  A.   Oh, it was -- $100 was the trade amount in the euro and

8  that was $142.26 in US dollars.

9  Q.   And, in fact, there are two trades, are there not; one

10  trading one way and immediately a trade the other way, correct?

11  A.   Yeah, a buy and a sell.

12  Q.   A buy and a sell.  Are you familiar with a test trade?

13  A.   I'm familiar with the concept, yes.

14  Q.   And when open a new account, they might do a test trade

15  just to see if the thing -- everything works correctly, would

16  that be fair?

17  A.   That's fair.

18  Q.   And they might buy something and then immediately sell it

19  not expecting to make or lose a whole lot of money but just to

20  make sure the mechanics are correct?

21  A.   Correct.

22  Q.   And in this particular case, it was a profit of 3 cents.

23  Other than that 3 cent profit, is there any indication in that

24  material I've given you for that particular account that there

25  was ever any trading activity by that account?

55

1  A.    No, that appears to be the only trade.

2  Q.    So we have a form that was submitted that shouldn't have

3  been submitted because if he's a US citizen, correct; that's

4  the W-8BEN?

5  A.    Correct.

6  Q.    We have passports and applications galore in the files of

7  your company saying that he is a US citizen, correct?

8  A.    Correct.

9  Q.    And we have an account that this pertains to that had one

10 trade with a profit of 3 cents; is that correct?

11 A.    Correct.

12           MR. SASSE:  No other questions, Your Honor.

13           THE COURT:  Redirect.

14                        REDIRECT EXAMINATION

15 BY MR. DEPORRE:

16 Q.    Can I have the copy of that exhibit, the binder that you

17 have there.  This is defense Exhibit 1032.  You know what, this

18 is difficult to read.  I'm going to ask you to just read it for

19 us.

20           Looking on page 548, can you tell how much money is

21 in the personal account for James Pieron?

22 A.    Yes, the balance in the account is $50,000.03.

23 Q.    And flipping through the statements there, can you see how

24 long that money stays in the account?

25 A.    There's a wire out of the account on April 5th, 2010.

56

1   Q.    I had previously handed you Government Exhibit 117.   Do

2   you still have that up there?

3   A.    Yes.

4   Q.    Would you take a look at it.

5   A.    Okay.

6   Q.    And looking at that bottom entry -- if you could pull that

7   up -- what does that bottom entry show?

8   A.    It shows wire transfer details for a wire done on

9   August 26, 2009.

10  Q.    And how much is that transfer?

11  A.    $50,000.

12  Q.    Where is the money being transferred to?

13  A.    The money is being transferred to Peregrine Financial

14  Group.

15  Q.    And where is it being transferred from?

16  A.    It is coming from UBS.

17  Q.    Do you know what UBS is?

18  A.    A bank.

19  Q.    And where is it located, this account?

20  A.    Zurich, Switzerland.

21  Q.    So that $50,000 then stays in the account from August

22  until April of 2010?

23  A.    Correct.

24  Q.    And remind us, whose account is that?

25  A.    James Pieron.

1  Q.   And it's identified, as least in Peregrine's record, as

2  being an account for a foreign individual, correct?

3  A.   Correct.

4  Q.   So none of that information is provided to the IRS?

5  A.   That's my understanding, correct.

6  Q.   I'd like you to go back to some pages.  Actually, go back

7  to page 202, and I am going to put this one up on the screen.

8  I'm displaying Government -- or, excuse me, Defense

9  Exhibit 1032, and specifically page 0202.  Would you describe

10 what you see at the top -- the defense attorney had shown you

11 this earlier, but could you tell us what this is.

12            THE WITNESS:  This is the top corner of the paper

13 account application form for JDFX Fund, Limited.

14 BY MR. DEPORRE:

15 Q.   There's a bunch of numbers there written in the top

16 corner.  Do you see those?

17 A.   Yes.

18 Q.   And what are those numbers?

19 A.   Those are all additional trading accounts that were opened

20 for this using essentially the same paperwork that was already

21 filled out once.

22 Q.   So it all -- all these accounts had the same application?

23 A.   Correct.

24 Q.   And all of them had the same photocopied passport?

25 A.   Correct.

1   Q.   They weren't submitted over and over and over, correct?

2   A.   To the company, to Peregrine Financial Group you mean?

3   Q.   Yeah.

4   A.   No.

5   Q.   There was one application, correct?

6   A.   Correct.

7   Q.   One form W-8BEN?

8   A.   Correct.

9   Q.   And then one US passport with like a folded page?

10  A.   Yeah, there were a couple copies, but some were better

11  than others, I know.

12  Q.   And how many accounts do you see there?

13  A.   Ten.

14  Q.   So I think when the defense attorney went through the

15  accounts for JDFX, those were all for the same -- that was all

16  the same application and passport and W-8, correct?

17  A.   Correct.

18  Q.   Now, I'd ask you to just turn the page and look at page

19  0203.

20  A.   Okay.

21  Q.   And what's the date on that application?

22  A.   September 24, 2007.

23  Q.   All right.  Would you just skip ahead to page 218.

24  A.   Okay.

25  Q.   And what's the date there?

1    A.    The date of the email for the new account is Feb --

2    Q.    I'm sorry.  Go ahead, what is the date, though?

3    A.    February 11, 2008.

4    Q.    I think you testified that you don't know why there was a

5    delay between the account application and the email; is that

6    correct?

7    A.    On the email that's there?

8    Q.    Correct, the email that you -- on page 218.

9    A.    I think the account -- the delay is if that's an

10   additional account.  The paperwork, the original paperwork, is

11   signed from when it was signed in 2007, and that's an

12   additional account being opened using that paperwork so it's

13   whatever the date that that account was opened.

14   Q.    So is it fair to say that JDFX opened one account back in

15   September?

16   A.    Correct.

17   Q.    And then did they add additional accounts?

18   A.    I believe so.

19   Q.    Now, I'm going to show you Government -- or, excuse me,

20   the defense Exhibit 0220 and 0219 -- actually, why don't you

21   flip back to 218.

22   A.    Okay.

23   Q.    218, is that the email?

24   A.    Yes.

25   Q.    For a new account?

1   A.    Yes.

2   Q.    Then would you turn the page to 219.

3   A.    Okay.

4   Q.    What is 219?

5   A.    The paper account application for JDFX Fund.

6   Q.    And is that the same application that you've seen over and

7   over?

8   A.    Yes.

9   Q.    All right.  And would you flip to the next page.

10  A.    Okay.

11  Q.    And what's the date on the application?

12  A.    September 24, 2007.

13  Q.    So that's how you know that the same application is used

14  for all 10 accounts, correct?

15  A.    Correct.

16  Q.    I'd like you to go to Government Exhibit 115.

17  A.    Okay.

18  Q.    Now, is this a different new account application than the

19  ones for JDFX?

20  A.    Yes.

21  Q.    And how do you know that this is different?

22  A.    Two reasons; one, it's opened through our online account

23  application system rather than a paper hard copy form; two,

24  this is for an individual account.  The others were for a

25  corporation, I believe.

1    Q.   And when we looked at the W-8BEN's for the corporation,

2    who was the beneficial owner on the W-8 BEN records for the

3    JDFX account?

4    A.   Can we look at it?

5    Q.   Please do.  To speed it up, you can go to page 43.

6    A.   Okay.  The beneficial owner is JDFX Fund, Limited.

7    Q.   And could we pull up Government Exhibit 115, and go to the

8    last page, 1594.  Do you see on the screen who the beneficial

9    owner for James Pieron's personal account is?

10   A.   James Pieron.

11   Q.   All right.  May I approach?  On Government Exhibit 115, it

12   states "country" for the beneficial owner.  Do you see the

13   country in this case?

14   A.   Yes.  Switzerland.

15   Q.   And on the W-8BEN for Peregrine, excuse me, for JDFX there

16   on page 43, do you see the country indicated there?

17   A.   Yes, BVI, British Virgin Islands.

18   Q.   Now, going down to part 2 of Government Exhibit 115,

19   page 515, do you see a box checked under where it says part

20   two?

21   A.   Yes.

22   Q.   And which box is checked there?  Is it the top box?

23   A.   Yes, line A.

24   Q.   And then what does that box say?

25   A.   The beneficial owner is a resident of Switzerland within

1 the meaning of the income tax treaty between the United States

2 and that country.

3 Q.   All right.  I'd like you to look at page 43 for the JDFX

4 W-8BEN.  Is the same box checked?

5 A.   No.

6 Q.   And which box is checked there?

7 A.   It's line D.

8 Q.   What does it say?

9 A.   It says the beneficial owner is not an individual claiming

10 tax -- or claiming treaty benefits for dividends received from

11 a foreign corporation or interest from a US trade or business

12 of a foreign corporation and meets qualified resident status.

13 Q.   I'd like you to look at -- in that binder, page 516.

14 A.   Okay.

15 Q.   And would you tell us what's on page 516.

16 A.   It appears to be a copy of a United States passport.

17 Q.   Can you tell who that passport is for?

18 A.   No.

19 Q.   All right.  Is that the same passport copy that was faxed

20 in with the W-8BEN?

21 A.   I believe so.

22 Q.   Is there a way you can check right now?

23 A.   Yes, the page numbers are sequential in the fax document.

24 Q.   All right.  And now I'd like you to go to page 506.

25 A.   Okay.

63

1   Q.    And that is also a copy of a passport, correct?

2   A.    Correct.

3   Q.    And is there a folded page on that copy?

4   A.    Yes.

5   Q.    Is there any way for you to say when that copy was sent

6   in?

7   A.    No, I don't believe so.

8   Q.    So that could have been just a record that was in -- could

9   it have been a record that was in the Peregrine files?

10  A.    Yes.

11  Q.    And is it the same copy -- does it appear to be the same

12  photocopy as the photocopies that you looked at for the JDFX

13  documents?

14  A.    Yes.

15  Q.    In that binder, are there any account statements for JDFX?

16  A.    I believe so.  Yes, there appear to be account statements

17  for multiple of the trading accounts.

18  Q.    May I approach, again?

19              MR. DEPORRE:  Nothing further, Your Honor.

20              THE COURT:  Concluding recross.

21                          RECROSS-EXAMINATION

22  BY MR. SASSE:

23  Q.    You were just asked about the poor copy of the passport,

24  which was, I think, page 516, which came in the same fax

25  apparently as the W-8BEN that we've been discussing, and in

1  fact in that same file there is another passport, which is page

2  506, which is clearly Mr. Pieron's passport, correct?

3  A.    Correct.

4  Q.    And we don't know where that passport came, whether they

5  asked him for another copy of the passport or whether they just

6  dug a copy out of the other 10 files they had, each of which

7  contained a passport; is that true?

8  A.    Correct.

9  Q.    But we do know that they knew he was a -- that they had

10  documentation in that file that he was a US citizen, correct?

11  A.    Correct.

12  Q.    Now, you were asked about the personal account and how

13  there was $50,000 that apparently came into the account from

14  the bank in Zurich, correct?

15  A.    Correct.

16  Q.    And you were asked about the fact that none of the

17  information would have been provided to the IRS.  First of all,

18  would any information be provided to the IRS if it came from

19  somebody who was a US citizen?

20  A.    Just the money being sent in?

21  Q.    Money being sent in, money being sent out, anything that

22  happened in that account, what would be reported to the IRS, to

23  your knowledge?

24  A.    To my knowledge, just trading profit and loss.

25  Q.    Just the trading profit and loss.  So the amount of the

 1  money coming in or sitting there or whatever would not have

 2  been reported, to your knowledge?

 3  A.    To my knowledge, no.

 4  Q.    And the -- your company has a responsibility to know your

 5  customer, correct?

 6  A.    Correct.

 7  Q.    And they did know he was a US citizen, because he -- there

 8  were copies in all of these files of that passport and of the

 9  applications, correct?  I mean that information was in front of

10  them?

11  A.    I mean, all of the accounts had different legal setups, so

12  two appear to be corporate accounts and one was an individual.

13  Q.    And as to the individual account, they had the

14  information, not only inside that account but all the other

15  accounts, that he was a US citizen from the passports and the

16  application, correct?

17  A.    Correct.

18             MR. SASSE:  No further questions.

19             THE COURT:  Any additional questions, sir?

20             MR. DEPORRE:  No, Your Honor.

21             THE COURT:  Thank you very much, sir.  You're excused

22  from the stand.  We should probably retrieve the defense

23  exhibit, and we'll take about a 10-minute recess and then

24  return for your next witness, sir.

25             Please rise for the jury.

```
 1                    (At 10:35 a.m., jury leaves.)

 2                    THE COURT:  Record's closed.

 3                    (At 10:35 a.m., court recessed.)

 4                    THE COURT:  Our next witness for the Government will

 5      be?

 6                    MR. DEPORRE:  Christopher Werwega.

 7                    THE COURT:  And available presently?

 8                    MR. DEPORRE:  He is, Your Honor.  We will call him to

 9      the stand.

10                    THE COURT:  Good.  If we can have the jury, please.

11                    (At 10:55 a.m., jury arrives.)

12                    THE COURT:  You may be seated.  If the Government

13      could identify our next witness, please.

14                    MR. DEPORRE:  Certainly.  Government calls

15      Christopher Werwega.

16                    (At 10:55 a.m., sworn by the Court.)

17                    THE COURT:  The witness stand is on your far left.

18      If you could have a seat, please.  The chair does not move; the

19      microphone does.

20                          CHRISTOPHER WERWEGA,

21              GOVERNMENT'S WITNESS, SWORN AT 10:55 a.m.

22                          DIRECT EXAMINATION

23      BY MR. DEPORRE:

24      Q.   Good morning, sir.

25      A.   Good morning.
```

1  Q.   Would you please state your name.

2  A.   Chris Werwega.

3  Q.   And would you spell your last name for the court reporter.

4  A.   W-E-R-W-E-G-A.

5  Q.   Mr. Werwega, are you currently employed?

6  A.   No.

7  Q.   Are you retired?

8  A.   I am.

9  Q.   And what was your occupation before you retired?

10 A.   Well, I retired twice.  The first time I was employed with

11 the state of Michigan as a bank examiner for 29 years, and I

12 subsequently after that, couple years after that, did some

13 contract work for the Federal Reserve Bank of Atlanta.

14 Q.   And do you have an accounting background?

15 A.   I do.

16 Q.   Are you a CPA?

17 A.   I am not.

18 Q.   What is your accounting background?

19 A.   I graduated a four year degree out of Eastern with an

20 accounting major, and then I've worked in the banking industry

21 for almost 40 years.

22 Q.   Have you ever worked professionally as a tax preparer?

23 A.   I have not.

24 Q.   Do you occasionally prepare taxes for others?

25 A.   I prepared my own for as long as I can remember, and I've

1  also done my children's tax returns if they've asked or wanted

2  it.

3  Q.   How many children do you have?

4  A.   Six.

5  Q.   And does that include stepchildren?

6  A.   Yes.

7  Q.   Is James Pieron your stepson?

8  A.   He is.

9  Q.   How long have you known Mr. Pieron?

10  A.   Since, oh, I want to say around '93 or '94.  I think he

11  just -- I met him when he got out of the service.

12  Q.   Where was he living at that time?

13  A.   I think he was going to school in Mt. Pleasant.

14  Q.   At some point did he move abroad?

15  A.   Yes.

16  Q.   Where did he move to?

17  A.   Zurich.

18  Q.   And when was that?

19  A.   I'm a little fuzzy on the dates.  I'm not really sure.

20  Q.   Do you remember if it was around 2001?

21  A.   I don't recall.  I -- I don't recall.

22  Q.   Did you ever live with Mr. Pieron?

23  A.   No.

24  Q.   So he never lived in your home, in the same home with you?

25  A.   He did not.  He was pretty independent once he got out of

69

1   the service.

2   Q.   And would he visit?

3   A.   Visit, not very frequent.

4   Q.   Do you recall in 2008, around Christmas, did you -- did

5   Mr. Pieron come back from Switzerland to visit?

6   A.   We had several visits.  I don't know if it was, you know,

7   it would be Christmas or a holiday, 4th of July, Christmas.

8   Q.   And in particular in 2008, do you recall him coming back

9   to the United States at that point?

10  A.   I believe it was sometime in that time frame.

11  Q.   Do you recall a conversation about filing tax returns?

12  A.   Vaguely, yes.

13  Q.   What do you recall?

14  A.   Discussion came about, and I don't know how it originated,

15  but discovered that he had not filed tax returns, and I -- you

16  know, we discussed it, and I said -- you know, I volunteered to

17  help him get his taxes in order.  I thought that he should

18  be -- get his taxes current.

19  Q.   I'm going to approach with a couple folders here.  They're

20  marked Government's Exhibit 34, 35, 36, 37, 38.  I guess I'd

21  like you to first take a look at Government Exhibit 34.

22  There's a copy in there with a blue piece of paper and an

23  exhibit sticker on it.  I direct your attention to that one.

24  Do you recognize that document, sir?

25  A.   It looks like my -- it looks like my -- some handwriting.

1  Q.   What is Government Exhibit 34?

2  A.   What is this?  A 2001 tax return.

3  Q.   All right.  And is this one that you worked on and

4  prepared?

5  A.   I believe so, yes.

6  Q.   Would you also look at Government Exhibits 35, 36, 37, and

7  38.

8  A.   Okay.

9  Q.   Are these all tax returns that you prepared?

10 A.   With the exception of this 2006 -- I'm not sure that I

11 recognize what's -- I'm not sure if I recognize these numbers

12 that are on the front page of this.

13 Q.   All right.  Aside from the numbers on the front page of

14 that document, was it a return that was prepared by you?

15 A.   Yes, I believe I assisted Jim in putting together this

16 information.

17         MR. DEPORRE:  At this time I would move for the

18 admission of Government Exhibits 34, 35, 36, 37 and 38.

19         MR. SASSE:  Those are 2001 through?

20         THE COURT:  Six.

21         MR. DEPORRE:  2001, 2003, 2004, 2005, 2006.

22         MR. SASSE:  No objection.

23         THE COURT:  Received.

24 BY MR. DEPORRE:

25 Q.   If we can put Government Exhibit 35 up on the screen, and

1  right at the top, focus in there.  Do you recognize your

2  handwriting on this tax return?  It should be on the screen,

3  sir.

4  A.   Oh, okay.  Yes, I do.

5  Q.   And is that your handwriting where it says 1916 Churchill

6  Boulevard?

7  A.   I'm sorry, say -- what was the question?

8  Q.   Do you see your handwriting there at the top where it says

9  1916 Churchill Boulevard?

10  A.   Yes, that looks like my handwriting.

11  Q.   And who is this return for?

12  A.   For James Pieron.

13  Q.   I'd like you to look at the last page and the very bottom

14  part where it says third-party designee.  And there where it

15  says third party designee, did you identify yourself as --

16  A.   Yes.

17  Q.   Below that, do you recognize the signature?

18  A.   Do I recognize that signature?

19  Q.   Yeah.

20  A.   I'm assuming that it's James'.  That's kind of hard to

21  tell.  I'm not that familiar with his signature.

22  Q.   Do you see a date there that says 20 December '08?

23  A.   Yes.

24  Q.   And is that about the time in which you prepared this

25  return?

1   A.   I would rather doubt it.

2   Q.   When do you think prepared the return?

3   A.   I remember spend considerable amount of time putting this

4   return together.  The reason I'm on here is because when I

5   asked Jim for information to get these taxes filed, he didn't

6   have any and didn't know when he'd filed his last tax return so

7   he made me -- gave me power of attorney to try to get some

8   financial information in place for him.  He was overseas.  I

9   was here in the United States.

10  Q.   And did you get financial information from him?

11  A.   Some of it.  I also requested the information from the

12  IRS.

13  Q.   And you prepared the returns based on the information you

14  got from both him and the IRS?

15  A.   Correct.

16  Q.   Was there any other source of information that you used to

17  prepare these returns?

18  A.   I don't think so, no.

19  Q.   About how long did it take for you to get all that

20  information?

21  A.   It was -- it took sometime, you know.  I would say six to

22  eight months before I got everything.  That's just an estimate.

23  Q.   So if this return is dated December 20th, 2008, your

24  estimation is that you started working on it sometime six to

25  eight months before then?

1   A.    I -- as best I can recall, yes.

2   Q.    Would you turn to the front of the return.  And in the

3   part where it says, adjusted -- right above where the line

4   where it starts saying "adjusted gross income," if you can zoom

5   in there's a stamp right there, if you would zoom in there.

6   Can you see that on the screen, sir?

7   A.    Yes.

8   Q.    And what does that say?

9   A.    The date received.

10  Q.    And what is the date?

11  A.    I can't fully read it here, 2009.  I can't make it out.

12  Q.    Can you make out the --

13  A.    Let me see if I can --

14  Q.    Go ahead.

15  A.    If it's on this copy if I can read it better.

16          MR. SASSE:  Which exhibit are we looking at?

17          MR. DEPORRE:  Thirty-five.

18  BY MR. DEPORRE:

19  Q.    Well, there's a stamp above it on the paper copy.  Why

20  don't you go ahead and look at that paper copy.  I think

21  there's a stamp above it that says Kansas City statute on the

22  first page.

23  A.    Okay.  I see it November 7th, 2009.

24  Q.    And looking -- there are several stamps on the first page.

25  If you could tell me which one is the earliest stamp on there,

1    I'd appreciate it.

2    A.    I'm still having a hard time reading that, the other

3    stamp.  The one that's on the screen, I can't make out the

4    date.

5    Q.    All right.  Prior to preparing this return, you had a

6    conversation with Mr. Pieron about filing returns, correct?

7    A.    Yes.

8    Q.    And did he come to you and ask you to file returns?

9    A.    I don't know exactly how it worked out.  The fact that he

10   hadn't filed them, there was discussion between us, and we

11   agreed that it would be a good idea for him to try to get his

12   taxes current.

13   Q.    So at least -- it's fair to say at least six to eight

14   months, I think, prior to December of '08, he knew that he

15   should get his taxes current?

16   A.    I'm thinking that's the date.  It could be somewhere in

17   that time frame.  I'm not sure.  I would say more specifically

18   he gave me that power of attorney, and I submitted a request to

19   the IRS shortly thereafter, so that ought to be the time frame,

20   whatever that period of time was.

21   Q.    Did you discuss with Mr. Pieron preparing his -- well, you

22   know him as James --

23   A.    Jim.

24   Q.    -- Jim.  Did you discuss with him preparing his 2007 and

25   2008 return as well?

 1  A.    There was some discussion.

 2  Q.    And did you end up preparing an '07 and an '08 return?

 3  A.    No.

 4  Q.    Why not?

 5  A.    Because of the complexity.

 6  Q.    Did -- did he have capital gains those years from stock

 7  sales?

 8  A.    I think he might have had some capital gains, and I wasn't

 9  knowledgeable on the details of the transaction.  I had no

10  documentation as to what transpired for that transaction.

11  Q.    And were you able to get any documentation from the IRS

12  about that transaction?

13  A.    No.

14  Q.    How do you go about getting information from the IRS?

15  A.    I filled out a form requesting any financial information

16  that was the -- that the IRS had recorded, whether it be, you

17  know, W-2s or 1099s, and I -- I don't know the name of the form

18  but it was a request for information.  And I didn't know the

19  years, so I -- you know, I made it kind of all encompassing for

20  the years because not knowing when he last filed or the

21  information.  He didn't have any financial information for the

22  years he was in the states.

23  Q.    Did the -- did the IRS mail you some information?

24  A.    Yes.

25  Q.    And did they mail you like in a box or how did you receive

76

1  that?

2  A.    I thought in an envelope.

3  Q.    And they didn't write you a letter saying that they

4  couldn't give it to you, did they?

5  A.    No.

6  Q.    They provided you the information that they had?

7  A.    As far as I recall, yes.

8  Q.    But the IRS, did they have information about the sale of

9  stock in 2007, 2008?

10  A.    I have no idea.

11  Q.    Did James Pieron?

12  A.    I don't know if that was -- I may not have requested

13  '07 and '08.  I don't recall if I requested that information

14  from the IRS.

15  Q.    Did you request that information from Mr. Pieron?

16  A.    Nothing to do with the -- any sale of stock or capital,

17  no.

18  Q.    So the information you got from the IRS didn't deal with

19  it, didn't deal with the sale of stock, nor did the information

20  from Mr. Pieron?

21  A.    I don't -- I would say that's accurate.

22  Q.    What information did the IRS provide?

23  A.    They gave me some -- I believe they gave me W-2

24  information, earnings information.  I don't recall them giving

25  me anything on any 1099s interest, and they indicated, I think,

1   what years they had recorded for him, any years that he did

2   file.  I think they provided me that information because I

3   was -- it was kind of an open -- open-ended question on my

4   part, which years did they have information or tax filings or

5   not.

6   Q.   Would you say you received the bulk of the information

7   that you used to prepare the returns from the IRS?

8   A.   I think with the exception of the last one or two years

9   that I filed.  I think -- I'm not sure about the '05 and '06.

10  I think he was out of the country then, so I got some

11  information from his earnings when he was in Switzerland.

12  Q.   But for '07 and '08, you didn't get -- did you get wage

13  information from Mr. Pieron for those years?

14  A.   I can't remember if I got wage information.  If I did, I

15  didn't use it in the preparation, because I wasn't going there

16  and doing anything for '07 or '08.

17  Q.   And that was because those were complex returns?

18  A.   Correct.

19  Q.   Ultimately you decided not to file -- or not to help

20  prepare in the '07 and '08 returns?

21  A.   Correct.

22          MR. DEPORRE:  Pass the witness, Your Honor.

23          THE COURT:  Cross.

24

25

```
 1                      CROSS-EXAMINATION
 2   BY MR. SASSE:
 3   Q.    Do you recall exactly when -- well, let me back up a
 4   little bit.
 5             You're married to Sandra; is that correct?
 6   A.    Yes, Jim's mother.
 7   Q.    And she is Jim's mother.  And Sandra has, what, three
 8   children altogether?
 9   A.    Four.
10   Q.    Four.  And they are your stepchildren.  You also have how
11   many children before you got married to Sandra?
12   A.    Two.
13   Q.    Two.  And where do you reside, what city and state?
14   A.    Hernando Beach, Florida.
15   Q.    And you got married to Sandra how many years ago or in
16   what year.  I don't want to embarrass you.
17   A.    Let me check the inside of my ring -- no, it's September
18   '95.
19   Q.    And you're still living with Sandra, correct?
20   A.    Yes, yes.
21   Q.    When you're not up here in Bay City sitting around waiting
22   to testify?
23   A.    Correct.
24   Q.    You first met James back in the early '90s, is that when
25   you think it was?
```

79

1   A.    I met James before I married his mother.

2   Q.    And that was -- but he was already out of the service by

3   that time, is that your recollection?

4   A.    He was just coming back from the service, sometime in the

5   early '90s.

6   Q.    And he became a student at Central Michigan University?

7   A.    Yes.

8   Q.    Eventually graduated from that, to your knowledge?

9   A.    Yes.

10  Q.    Degree in computer science --

11  A.    I believe so.

12  Q.    -- computers of some sort.

13        Didn't have a degree in accounting that you know of?

14  A.    Nope.

15  Q.    Do you know whether he had any training at all in business

16  classes?

17  A.    I do not.

18  Q.    Now, do you know exactly when -- or do you recall when,

19  what years, he was in Switzerland, when he first went there?

20  A.    I -- I really can't.  I want to say either late '90s --

21  Q.    I don't want you to guess if you don't have a --

22  A.    Yeah, I really don't recall.

23  Q.    The tax returns in question that you prepared for him, is

24  it possible that all of those -- through each of those years he

25  was in Switzerland for those years?

1  A.   That may have been, but I thought that I had received some

2  information from the IRS on his income, but I could be

3  mistaken.

4  Q.   Is it possible you prepared an earlier return, other than

5  the ones that are in front of you today, that would have

6  involve a year that was before he ever went to Switzerland?

7  A.   No, no, I don't think so.

8  Q.   You don't think so?

9  A.   No.

10  Q.   In any event, at some point in time, you and he had a

11  discussion regarding the fact that he had not filed tax returns

12  for a few years, correct?

13  A.   Correct.

14  Q.   And you were aware, correct me if I'm wrong, that a United

15  States citizen living abroad was still required to file tax

16  returns in the United States?

17  A.   That was my understanding, even though I believe there's

18  some exemptions that they have as far as their tax liability,

19  but it was my understanding that you still needed to file a tax

20  return or should.

21  Q.   In fact, if you recall, you shared that information with

22  Jim, that he should have been filing tax returns for the years

23  he was in Switzerland; is that correct?

24  A.   Yes.

25  Q.   I'm going to show you what has been marked for

81

1   identification purposes as Defendant's Proposed Exhibit 1030,

2   ask you to take a look at that.  You have mentioned or you have

3   testified that you recall getting some sort of power of

4   attorney from Jim in order to act on his behalf with the IRS;

5   is that correct?

6   A.   Yes.

7   Q.   And do you recognize that form?

8   A.   Yes, this looks familiar.

9   Q.   And does that appear to be the form that was signed to

10  allow you to check with the IRS?

11  A.   Yes.

12          MR. SASSE:  I would move to admit Defendant's

13  Exhibit 1030.

14          MR. DEPORRE:  No objection, Your Honor.

15          THE COURT:  Received.

16  BY MR. SASSE:

17  Q.   And could we see 1030?

18          MS. ARNETT:  I think they tested the screen and now

19  it's not working on our side.

20  BY MR. SASSE:

21  Q.   I don't know if there's anything that's essential for the

22  jury to look at, but what it is it's called a tax information

23  authorization; is that correct?

24  A.   Yes.

25  Q.   And it was signed to allow you to get information,

1  correct?

2  A.    Yes.

3  Q.    And it was signed by Jim, correct?

4  A.    Yes.

5  Q.    And is there a date on it?

6  A.    July 8th, 2008.

7  Q.    And it pertains to income tax between the years 1998 and

8  2007, income tax information, correct?

9  A.    Yes.

10  Q.   And so it's fair to say that you were authorized as of

11  July 8th, 2008, to -- to at least obtain information on his

12  behalf, correct?

13  A.    Yes.

14  Q.   And it's likely shortly thereafter that you contacted the

15  IRS and asked for information?

16  A.    Correct.

17  Q.   What -- what sorts of things did you have to do to prepare

18  the returns that have now been admitted into evidence in this

19  case?

20  A.    Well, it's a matter of trying to accumulate any income

21  that Jim had in the United States, trying to find out what

22  years he filed, what years he didn't.  Trying to ascertain the

23  income that he had earned overseas in Switzerland.  Trying to

24  take that information and then get the exchange rate on that to

25  convert it to US dollars.  I'm quite sure that there was some

1    tax -- taxes paid to Switzerland during those years.  I can't

2    tell you what -- what years, but there was some taxes paid

3    which then became a credit.  Jim was able to receive credit on

4    his income tax for his US tax liability.

5    Q.    And you had to figure out the exchange rate in order to

6    figure out how much he received and how much -- and the

7    exchange rate back at the time he received it, I assume; is

8    that correct?

9    A.    Correct, yeah.

10   Q.    And you were able to prepare his tax returns up to 2006

11   with a reasonable confidence that they were -- they were

12   complete and accurate; is that correct?

13   A.    I did, and -- and they didn't appear to be overly

14   complicated at that point.

15   Q.    But when it got into 2007 and 2008, there was another

16   dynamic which is that there had been a major investment in his

17   firm and problems -- I won't get into the problems, but there

18   was a lot of matters that you simply weren't sure what the

19   answers were?

20   A.    Well, I didn't have the -- any information on the

21   transaction itself.  You know, there was -- we didn't get there

22   the documentation, how it was structured.  I didn't know the

23   ownership of the company.  I didn't know the manner it was

24   handled accounting wise.  I --

25   Q.    And is it fair to say that Jim was a little confused as to

Werwega - Redirect

```
 1  how the whole transaction has been handled for financial

 2  purposes?

 3  A.    Well --

 4            MR. DEPORRE:  Objection, Your Honor.

 5            THE COURT:  Sustained.

 6            THE WITNESS:  I think that --

 7            MR. SASSE:  I'm sorry.  There's been an objection

 8  sustained so --

 9            THE COURT:  Yeah.

10            THE WITNESS:  Oh, sorry.

11  BY MR. SASSE:

12  Q.    But in any event, you determined that it was too complex

13  for you to do it and that he should -- should look to hire

14  presumably an accountant who was capable of handling that sort

15  of thing; is that correct?

16  A.    Yes.

17            MR. SASSE:  I have no other questions, Your Honor.

18            THE COURT:  Redirect.

19                       REDIRECT EXAMINATION

20  BY MR. DEPORRE:

21  Q.    Did you get any spreadsheets related to the 2007, 2008

22  stock sale transfers?

23  A.    No.

24  Q.    Did you get a bill of sale or a share purchase agreement?

25  A.    No.
```

1  Q.   Did you ask for that information?

2  A.   No.

3  Q.   I think on cross you were asked about filling out returns

4  for when Mr. Pieron lived in the United States.  Did you

5  complete returns for that time period as well as returns for

6  when he lived abroad?

7  A.   Here again I'm not sure on the dates as far as when he was

8  in Europe and when he wasn't, but the information that we

9  requested was from 1998 through 2007 from the IRS, so I --

10 whatever information I got, and I don't recall it at this point

11 in time, what the IRS provided me on this request, but I was

12 looking for any tax liability and any information they had on

13 his income.

14 Q.   Did you ask the defendant when -- did you ask him when he

15 lived in the United States and when he lived in Switzerland?

16 A.   I don't recall.

17 Q.   And do you recall discussing with him that he would likely

18 owe taxes in '07 and '08 because of the stock sale?

19 A.   I thought that there was a good possibility.

20 Q.   Did you tell that to him?

21 A.   That he would owe taxes?

22 Q.   That there was a good possibility?

23 A.   I -- I probably did.

24        MR. DEPORRE:  Nothing further.

25        MR. SASSE:  No further questions, Your Honor.

86

 1            THE COURT:  Thank you, sir.  You are excused from the

 2   witness stand.

 3            MS. PARKER:  Your Honor, next we call William

 4   Zehnder.

 5            THE COURT:  Good morning.  If you could take just a

 6   moment, please, raise your right hand.

 7            (At 11:31 a.m., sworn by the Court.)

 8            THE COURT:  The witness stand is on the far left,

 9   sir, if you could have a seat.  The chair does not move, but

10   the microphone does.  Thank you.

11                         WILLIAM ZEHNDER,

12            GOVERNMENT'S WITNESS, SWORN AT 11:31 a.m.

13                         DIRECT EXAMINATION

14   BY MS. PARKER:

15   Q.   Thank you, Your Honor.

16            Mr. Zehnder, would you state your name and spell it

17   for all of us, please.

18   A.   It's William Zehnder, W-I-L-L-I-A-M, Z-E-H-N-D-E-R.

19   Q.   And was there a time when you were employed by a James

20   Pieron?

21   A.   Yes.

22   Q.   When was that approximately?

23   A.   September of 2010 to September of 2012.

24   Q.   And what was the nature of your qualifications that led to

25   you being employed by him?

1   A.   I'm an accountant, degreed accountant, and I was the

2   controller for the company.

3   Q.   What company?

4   A.   Institutional Liquidity.

5   Q.   You said you're a degreed accountant?

6   A.   Yes.

7   Q.   What does that mean?

8   A.   I went to Michigan State University and got a four year

9   bachelor's degree and received a certification as a certified

10  management accountant.

11  Q.   And what is a certified management accountant?

12  A.   Certified management accountant is one that's taken a

13  series of tests, four tests that you have to take over a period

14  of time, and you have to pass those tests to become certified,

15  and then you have continuing education requirements every year.

16  Q.   Is that something of a special license for accounting

17  work?

18  A.   Yes, it's a designation.

19  Q.   Of a particular kind?

20  A.   A management accountant.

21  Q.   And how is that different from being a CPA or a certified

22  public accountant?

23  A.   Certified public accountant can do attest engagements,

24  such as audits, reviews and compilations; a management

25  accountant can't render opinion on those.

Zehnder - Direct

1  Q.   All right.  You also said you are a -- you were the CFO

2  for Institutional Liquidity?

3  A.   The controller, yes.

4  Q.   All right.  What does it mean to be a controller?

5  A.   The head accountant.

6  Q.   And you did that for approximately how long?

7  A.   Approximately two years.

8  Q.   And what were your duties as controller of Institutional

9  Liquidity?

10  A.   Starting up the company and putting together the

11  accounting systems, the accounts payable and receivables,

12  general accounting.

13  Q.   And other than the education and the licensing that you

14  just described, did you have other experience that were part of

15  your qualifications for that job?

16  A.   I had to take a test through the CFTC, which is the

17  Commodities Futures Trade Commission, and had to pass those

18  tests in order to be able to submit the reports to the National

19  Futures Association, which is the watchdog agency for the CFTC.

20  Q.   All right.  Let's try to get on the jury on the same page

21  here for what we're talking about.  You said you took an exam

22  for commodity futures trading?

23  A.   Yes, in order to be the person that signs the reports that

24  are being submitted.

25  Q.   And what is commodity futures trading?

1  A.    They also have oversight over the foreign exchange

2  trading, which is what Institutional Liquidity was doing.

3  Q.    What type of trading?

4  A.    Foreign exchange.

5  Q.    Which deals with?

6  A.    Foreign currencies.

7  Q.    All right.  Not trade in automobiles or cotton anything

8  like that?

9  A.    No.

10  Q.    And the National Futures Association, what is that?

11  A.    It's the watchdog group for the CFTC, and they come out

12  and they audit future commission merchants, which is what we

13  were, and report back to the CFTC.

14  Q.    Which is the Commodity Futures Trading Commission?

15  A.    Yes.

16  Q.    And one of the requirements was that you keep track of

17  certain account balances on a daily basis?

18  A.    Yes.

19  Q.    Can you explain what you had to do for -- on a daily basis

20  for Institutional Liquidity while you were employed there?

21  A.    We had to submit a daily report which had the capital

22  requirements, and depending upon how much -- how many -- how

23  much money you had, you had to have a certain amount -- level

24  of equity in the bank, and for a futures commission merchant

25  that we were, we had to have at least $20 million, and then

1  there was a percentage of the funds that we were holding for

2  the customers.

3  Q.   When you say you had to have at least $20 million, how

4  were you to treat that 20 million?

5  A.   That was set up in a separate account, and it was

6  basically, you know, one that you don't really ever touch.

7  Q.   So it was kind of a reserve account in case something went

8  bad you'd have money to do what?

9  A.   Yes, that's -- to make the customers whole.

10 Q.   Can you explain how it was that you were hired by

11 Mr. Pieron.

12 A.   I had just taken a position with a public accounting firm

13 in Mt. Pleasant, and one of my strengths was being able to be a

14 controller of different companies, and at the time James and

15 his company were looking for somebody that they thought would

16 be a part-time controller and so they had sent me over there to

17 help out and start finding out what they needed.

18 Q.   Let me just stop you here a second.  Who is "they" sent

19 you?

20 A.   The public accounting firm, Boge, Wybenga & Bradley.

21 Q.   All right.  Can you spell that for our court reporter.

22 A.   B-O-G-E, Wybenga is W-Y-B-E-N-G-A, and Bradley is

23 B-R-A-D-L-E-Y.

24 Q.   All right.  So that firm sent you over to meet whom?

25 A.   James and the person was Larry Calcegeroni (ph).

1  Q.   Do you know how to spell that?

2  A.   No.

3  Q.   All right.  Where did you go to meet them?

4  A.   To their office.

5  Q.   Which was located in what community?

6  A.   On Central Michigan's campus in their research park.

7  Q.   And did you actually meet with Mr. Pieron?

8  A.   Yes, met with him and Larry and after we had --

9  Q.   And, excuse me, what did he tell you about the business

10 that he was working on, Institutional Liquidity?

11 A.   He was working on a company that was going to trade in

12 foreign currencies and actually that they were going to take a

13 percentage off the buy and the sell of those currencies.

14 Q.   So they were to make money how off of these trades?

15 A.   Taking a commission off of the buying of those pairs and

16 also on the sell end.

17 Q.   And at that time, was that approximately September of

18 2010?

19 A.   Yes.

20 Q.   Was Institutional Liquidity actually functioning?

21 A.   No, they were in the process.

22 Q.   All right.  And what happened at that meeting after you

23 had some discussion about the nature of the business and their

24 controller needs?

25 A.   Actually they said that they didn't really want just a

1   part-time controller, that they really were going to look for a

2   full-time controller.  And I told them that it was the first

3   day I was working for Boge & Wybenga, that it could be the

4   first day working for Institutional Liquidity.

5   Q.   All right.  So --

6   A.   So then we talked after, more after lunch, and agreed, and

7   then we went and talked with Dan Boge from Boge & Wybenga and

8   told him the news, and we made some arrangements that -- so I

9   could fulfill some of the obligations that I had already agreed

10  to with the firm.

11  Q.   All right.  We'll come back to that a little bit later.

12  Ultimately you left Institutional Liquidity about two years

13  later, why was that?

14  A.   The nature of the business had changed.  Futures

15  commission merchant can also take risk against those trades

16  that are being done, and it was just something that I guess I

17  wasn't used to seeing, and I decided that I wanted to go to a

18  different company.

19  Q.   And all in all, how long have you been working in the area

20  of finance and accounting?

21  A.   Since 1978.

22  Q.   Are you familiar with an entity called IB Tech?

23  A.   Yes.

24  Q.   What is IB Tech or technologies?

25  A.   It was a company that James had when I started with them.

```
 1  Q.   And when you say James had it, you're referring to who?
 2  A.   James Pieron.
 3  Q.   And when you say he had that company, what do you mean by
 4  that?
 5  A.   It was a company in existence when I started with him.
 6  Q.   Did he have an ownership interest in it?
 7  A.   As far as I know, yes.
 8  Q.   Pardon?
 9  A.   Yes.
10  Q.   How much?
11  A.   As far as I know, he owned 100 percent.
12  Q.   And was there a relationship between that company and
13  Institutional Liquidity?
14  A.   Only that James had started IB Tech before he went into
15  Institutional Liquidity, and basically got out of IB Tech as
16  Institutional Liquidity became more of a company.
17  Q.   Were you aware of another company called Komplique or
18  Komplique?
19  A.   Yes.
20  Q.   And what, if any, responsibilities did you have for that
21  company?
22  A.   I had no real responsibilities to that company.
23  Q.   Did you ever do a tax return for that company?
24  A.   I did.  I did their 2009 tax return.
25            MS. PARKER:  May I approach, Your Honor?
```

1    THE COURT:  You may.

2  BY MS. PARKER:

3  Q.   Can you take a look at that, and it's Government's

4  Proposed Exhibit 27.  Do you recognize that as the tax return

5  for 2009 that you prepared for Komplique?

6  A.   Yes.

7          MS. PARKER:  Your Honor, I offer Government's

8  Proposed Exhibit 27.

9          MR. SASSE:  No objection, Your Honor.

10          THE COURT:  Received.

11  BY MS. PARKER:

12  Q.   I'd like you to take a look at what's page marked in the

13  lower corner as page 161, see part 2 of that.  Do you see where

14  it indicates the ownership interest?

15  A.   That's on page 160.

16  Q.   I'm sorry, I maybe wrote down the wrong number, sorry.

17  A.   Yes.

18  Q.   All right.  What does it say there as to who owns

19  Komplique or Komplique?

20  A.   Oh, I'm sorry, on 161 it does have that.  It's James

21  Pieron, 100 percent.

22  Q.   And so he was 100 percent owner of that, and 100 percent

23  owner of IB Tech at the same time?

24  A.   Yes.

25  Q.   And what did you use to prepare that tax return?

Zehnder - Direct                                              95

```
 1   A.    I used a QuickBooks statement.

 2   Q.    And QuickBooks is a?

 3   A.    It's an accounting package.

 4   Q.    Pardon me?

 5   A.    It's an accounting package.

 6   Q.    It's software, so you enter the stuff on a computer,

 7   right?

 8   A.    Correct.

 9   Q.    And it can sort the information as you direct it to and

10   things like that?

11   A.    Correct.

12   Q.    And did you also use bank statements?

13   A.    Yes.

14   Q.    Checkbooks?

15   A.    Yes.

16   Q.    Those are what are often called source documents?

17   A.    Correct.

18   Q.    And are those customarily used to prepare tax returns?

19   A.    Yes.

20   Q.    Did you find that Mr. Pieron invested in his own

21   businesses?

22   A.    Yes.

23   Q.    And I'd like to show you Government's Proposed Exhibit 91.

24   Do you recognize that?

25   A.    Yes.
```

1   Q.   What is that?

2   A.   It's a schedule from the QuickBooks program that shows the

3   loan and capital contributions.

4   Q.   And does it show the loan and capital account

5   contributions made to IB Tech by Mr. Pieron?

6   A.   Correct.

7          MS. PARKER:  Your Honor, I offer Government's

8   Proposed Exhibit 91.

9          MR. SASSE:  No objection, Your Honor.

10         THE COURT:  Received.

11  BY MS. PARKER:

12  Q.   If we can display that, please.  Again, how would you have

13  prepared this?

14  A.   This would have been from records that they had when I

15  joined the company.

16  Q.   All right.  Let's go to the top part and where it says

17  loan payable shareholder JP.

18  A.   Yes.

19  Q.   What are "loan payable shareholder JP" to you?  What does

20  that mean?

21  A.   They're loans payable to James Pieron.

22  Q.   By?

23  A.   IB Tech.

24  Q.   Would that be based on him loaning money to the company?

25  A.   Correct.

Zehnder – Direct                                                    97

```
 1  Q.   That would be his own money?
 2  A.   I would assume so, yes.
 3  Q.   All right.  And you were able to identify these loans as,
 4  it looks like, transfer, general journal or check, correct?
 5  A.   There was, yeah, a funds transfer.
 6  Q.   That's how the money was moved?
 7  A.   Yes.
 8  Q.   And when you say "transfer," what kind of --
 9  A.   My guess would be a wire transfer.
10  Q.   Some sort of electronic transfer?
11  A.   Yes.
12  Q.   As opposed to a check where you write it out --
13  A.   Correct.
14  Q.   -- and redeposit it?  Do you remember what the general
15  journal entry was?
16  A.   That was for interest.
17  Q.   So the next column over is the date.  Would that be the
18  date of the transfer of the money from Mr. Pieron to Komplique?
19  A.   Should be, yes.
20  Q.   So where you see a trans -- next to transfer you see
21  04/05/2010, and going across it says "James Pieron, setup of
22  ILQ Holdings Company, $250,000," right?
23  A.   Yes.
24  Q.   So that would have been a date in April of 2010 when a
25  quarter million dollars was transferred by Mr. Pieron to his
```

98

1  company?

2  A.   Correct.

3  Q.   That he owns solely, correct?

4  A.   Yes, at that time, yes.

5  Q.   All right.  Likewise, just above it, the first transfer is

6  November 18th of 2009.  That's also a funds transfer?

7  A.   Funds transfer in, yes.

8  Q.   And that's basically $5 short of three-quarters of a

9  million?

10  A.   Correct.

11  Q.   Might be the wire transfer fee knocking down the transfer

12  amount a bit?

13  A.   Yes.

14  Q.   All right.  And the rest are checks and things of that

15  nature, correct?

16  A.   Correct.

17  Q.   And then things happen to make the balance go down in that

18  account to $81,000, correct?

19  A.   Correct.

20  Q.   And some of those are monies going back to Mr. Pieron?

21  A.   Yes.

22  Q.   In fact, given all the money that went into the account,

23  most of it went back to Mr. Pieron?

24  A.   It would be because that's the loan account.

25  Q.   All right.  But for a period of time, he had basically

1  1.25 million in Komplique, and then he eventually took most of

2  that out.

3  A.    Okay.

4  Q.    Is that right?  Is that a correct interpretation?

5  A.    I didn't know he had 1.25 in Komplique.

6  Q.    I'm sorry?

7  A.    I did not know the amount of money that was in Komplique.

8  Q.    All right.  I'm sorry, I was adding the first two, and I'm

9  told I shouldn't; But, in any case, those kind of sums went in

10  and out of Komplique at Mr. Pieron's direction?

11  A.    It came in and out of IB Tech.

12  Q.    I'm sorry, IB Tech, at Mr. Pieron's direction?

13  A.    Yes.

14  Q.    Now, let's go down to the second half of this form, and it

15  says "capital contributions."  What does that mean?

16  A.    That means he's putting equity into the company.

17  Q.    What's the difference between making a loan and a capital

18  contribution?

19  A.    Making a loan, you can get the money out probably easier

20  than you can with a capital contribution; capital contribution

21  is usually longer in nature.

22  Q.    And, again, where did the money from the capital

23  contributions come from into IB Tech?

24  A.    It says it's from a wire transfer.

25  Q.    But these were Mr. Pieron's capital contributions, though?

1  A.    I would assume so, yes.

2  Q.    Let's go back up to the top of this form now.   Do you see

3  a transaction for $350,000?

4  A.    Yes.

5  Q.    And did that occur on July 28th, 2011?

6  A.    That's the dates that's on there, yes.

7  Q.    All right.   And, again, that was a transaction going from

8  whom?

9  A.    From IB Tech to James Pieron.

10 Q.    To whom?

11 A.    To James Pieron.

12 Q.    I'll show you what's been marked as Government's Proposed

13 Exhibit 124.   Is that a check?

14 A.    Yes, it is.

15 Q.    Is it from IB Tech account?

16 A.    Yes, it is.

17 Q.    And who is the check payable to?

18 A.    Komplique.

19 Q.    And what is the date of that?

20 A.    July 15 of 2011.

21 Q.    And the amount of the check?

22 A.    350,000.

23         MS. PARKER:   Your Honor, I offer Government's

24 Proposed Exhibit 124.

25         MR. SASSE:   No objection, Your Honor.

```
 1              THE COURT:  Received.
 2    BY MS. PARKER:
 3    Q.   Was there a time when you were paying the bills for IB
 4    Tech while you were working there?
 5    A.   Yes.
 6    Q.   And was there a time when Mr. Pieron received a bill from
 7    IB Tech for various services provided by Boge Wybenga?
 8    A.   Boge & Wybenga, yes.
 9    Q.   And did Mr. Pieron tell you whether or not to pay that
10    bill?
11    A.   Yes.
12    Q.   And what did he say?
13    A.   Not to pay it.
14    Q.   And what was the nature of the services that they had
15    provided that he told you not to pay them for?
16    A.   I believe it was for tax services.
17    Q.   Did you become aware of a firm named Navitas while you
18    were employed by Mr. Pieron?
19    A.   Yes.
20    Q.   And what was that?
21    A.   It was a holding company for Institutional Liquidity.
22    Q.   And in 2012, what was the value of Mr. Pieron's interest
23    in Navitas, January of 2012?
24    A.   That I don't remember to tell you the truth.
25    Q.   What was the nature of his interest then in Navitas?
```

102

1   A.    He was a part owner.

2   Q.    And was that the firm or the entity that you said owned

3   what?

4   A.    It was a holding company for Institutional Liquidity.

5   Q.    So what, if any, services or whatever did Navitas provide?

6   A.    Navitas was the funding company for Institutional

7   Liquidity, that he and his partner would put money into

8   Navitas, and Navitas would fund the needs of Institutional

9   Liquidity.

10  Q.    During the time that you were employed by Mr. Pieron, what

11  kind of vehicle did he drive?

12  A.    A Mercedes RV.

13  Q.    Mercedes what?

14  A.    A Mercedes SUV.

15  Q.    All right.  And how much did he pay for that?

16  A.    It was 107,000.

17  Q.    And how do you know that?

18  A.    Because it was in the books and records of Komplique when

19  I did the tax return.

20  Q.    Did he have other vehicles that he drove, to your

21  knowledge?

22  A.    Not to my knowledge.

23  Q.    Do you remember a motorcycle?

24  A.    Yes.

25  Q.    Do you remember anything about that motorcycle?

Zehnder – Direct

1  A.   Yes, he didn't have it for very long.  He had an accident

2  with it.

3  Q.   And in 2012, did Mr. Pieron put over a million dollars of

4  his own assets into Institutional Liquidity.

5  A.   Yes.

6  Q.   And when -- you were involved with closing out IB Tech?

7  A.   I'm sorry?

8  Q.   Were you involved in --

9  A.   Yes, I was involved with it.

10 Q.   I'm sorry?

11 A.   Yes, I was involved.

12 Q.   And when IB Tech was closed up, did defendant get money

13 out of that account?

14 A.   Yes.  We paid off as much of the note that we could.

15 Q.   And did he get approximately $80,000 out of it?

16 A.   I can't tell you the exact dollar amount but, yeah, I

17 think it was between 70 and 80.

18 Q.   And that went to Mr. Pieron?

19 A.   Yes.

20 Q.   I'd like to show you Government's Proposed Exhibit 102.

21        Your Honor, this was a document that was provided

22 pursuant to a certificate of authenticity, and I would like to

23 present it through this witness.

24        I'll show you Government's Proposed Exhibit 102, and

25 I'll offer it for admission, Your Honor.  It's an Exotic Motors

1   purchase record.

2           MR. SASSE:  We have no objection, Your Honor.

3           THE COURT:  It's received.

4   BY MS. PARKER:

5   Q.   Can you take a look at the first page of Exhibit 102.

6   That says it's from Exotic Motors, please?

7   A.   Yes.

8   Q.   And the date on that document?

9   A.   8/25/09.

10  Q.   And in the upper right corner, does it have a name of

11  Komplique?

12  A.   Yes, it does.

13  Q.   And the Mt. Pleasant address, are you familiar with that?

14  A.   Yes, that's where the research park is.

15  Q.   And that's where their offices were located at that time?

16  A.   Yes.

17  Q.   And the amount or the purchase price of the vehicle?

18  A.   The total price was 110,000.

19  Q.   All right.  And below that, that's -- that's with about

20  $3,000 of fees and things thrown in?

21  A.   Yeah, from a credit card.

22  Q.   Okay.  So was that the deposit?

23  A.   That's what it says, yes.

24  Q.   All right.  And then the total due was 107,000?

25  A.   That's correct.

Zehnder – Direct

105

```
1   Q.   And do you see up at the top below the address it says
2   care of, C slash O?
3   A.   Yes, care of James Pieron.
4   Q.   Okay.  Let's go -- does it say what kind of vehicle it is?
5   Can you tell from that?
6   A.   Yes.  It says it's a Mercedes.
7   Q.   And was it a 2009 Mercedes?
8   A.   2009, SUV.
9   Q.   And it indicates the odometer reading is what?
10  A.   7,800.
11  Q.   Miles?
12  A.   I would assume so, yes.
13  Q.   All right.  So slightly used but not too hard?
14  A.   Right.
15  Q.   All right.  Let's go to the next page.  And let's go to
16  the page of that, please.  And what is there, the third page?
17  A.   It's a copy of a passport.
18  Q.   For whom?
19  A.   For James Pieron.
20  Q.   And when I asked you previously if Mr. Pieron had equity
21  in Navitas, you said you couldn't recall.
22  A.   I said that he was a part owner, yes.
23  Q.   All right.  But you -- I asked you --
24  A.   I didn't -- I couldn't remember the amount.
25            MS. PARKER:  All right.  Your Honor, may I approach
```

Zehnder – Direct

1   for purposes of refreshing?

2         THE COURT:  You may.

3   BY MS. PARKER:

4   Q.  I don't want you to read it out loud, but read to yourself

5   that.  Does that refresh your memory?

6   A.  Yes.

7   Q.  All right.  And having had a chance to refresh your

8   memory, what was Mr. Pieron's equity interest in Navitas?

9   A.  Over a million.

10   Q.  Over a million dollars?

11   A.  Yes.

12         MS. PARKER:  Thank you, Your Honor.  Pass the

13   witness.

14         THE COURT:  Probably a good place to take a recess.

15   The gentleman will be here shortly to see the jury to the jury

16   room.  Please rise for the jury.

17         (At 12:06 p.m., jury leaves.)

18         THE COURT:  Record's closed.  Gentleman's excused

19   from the witness stand.

20         (At 12:07 p.m., court recessed.)

21         THE COURT:  Jury, please.

22         MR. DEPORRE:  Would you like the witness on the

23   stand, Judge?

24         THE COURT:  Certainly as soon as the jury's back.

25   You can step forward, sir.

1              (At 12:29 p.m., jury arrives.)

2              THE COURT:  Please be seated.  I remind the jury that

3    we're working until two today.  We may take one other short

4    recess, depending how fresh you look, and just to remind you

5    and the witness that he remains under oath.

6              Mr. Sasse.

7                       CROSS-EXAMINATION

8    BY MR. SASSE:

9    Q.   We draw straws with each witness, and I got the short

10   straw repeatedly here so.

11             Sir, as I understand it, you worked for James

12   Pieron's companies from September of 2010 until September of

13   2012 --

14   A.   That's correct.

15   Q.   -- is that correct?

16             And the main concern you worked for was Institutional

17   Liquidity.  Is that accurate?

18   A.   That's correct.

19   Q.   Now, when you started in September 2010, was Institutional

20   Liquidity up and running at that point, do you know?

21   A.   No, it was not.

22   Q.   And a company you've also referred to called IB

23   Technologies was kind of the company that was handling currency

24   trading and the computer side; is that correct?

25   A.   Yes.

1  Q.    And just to be clear, the Komplique company you never were

2  employed by, correct?

3  A.    That is correct.

4  Q.    You did a tax return which is now in evidence?

5  A.    Correct.

6  Q.    But it was -- it had nothing to do with the currency

7  trading or the computer work is; is that correct?

8  A.    That is correct.

9  Q.    The company, going back to the Institutional Liquidity,

10  was located in Mt. Pleasant, correct?

11  A.    Yes.

12  Q.    And about how many employees did it have while you were

13  working there?

14  A.    I think we started out with about eight, and I think

15  before -- just before I left I think there was about between 25

16  and 30.

17  Q.    Can I ask you to speak a little closer to the microphone.

18  I'm -- my hearing is not the best, so --

19  A.    Sure.

20  Q.    But up to about 25 or 30; is that correct?

21  A.    At the end, yes.

22  Q.    And had Institutional -- I'm sorry, had IB Technologies,

23  basically ceased to exist by the time you left?

24  A.    Yes.

25  Q.    And when did Institutional Liquidity actually begin --

1  well, let me strike that.

2          Institutional Liquidity needed to get certain

3  licenses and things; is that correct?

4  A.   Yes.

5  Q.   And that was what you had to wait for before it could

6  become operational, true?

7  A.   Correct.

8  Q.   And when did it actually become operational?

9  A.   I think it was May of 2011.

10  Q.   And these companies, whether it's Institutional Liquidity,

11  Komplique, IB Technologies, would all be considered startup

12  corporations, right?

13  A.   Yes.

14  Q.   Now, what were your duties?  What did you do on a daily

15  basis there?

16  A.   My daily basis, even before we became Institutional

17  Liquidity, was operational.  I submitted reports to the NFA.

18  We still had reporting requirements, even though we weren't in

19  operation.  And then at the other part of it was getting the

20  accounting systems in place so that we could do the complete

21  accounting for Institutional Liquidity.

22  Q.   And NFA is the National Futures Association?

23  A.   Correct.

24  Q.   And they regulate -- it's a highly regulated area, is that

25  fair?

Zehnder - Cross

1   A.   Yes, very highly.

2   Q.   Were withholding returns done by the company?

3   A.   Yes.

4   Q.   And who did those?

5   A.   My assistant did those.

6   Q.   Were you -- now, at the time you started, was everything

7   in an orderly fashion as far as the books and records and the

8   business end of it?

9   A.   No.

10  Q.   And am I correct that a big part of your job was to try to

11  make them that way?

12  A.   Yes.

13  Q.   And you -- were you successful, in your opinion?

14  A.   Yep.

15  Q.   Some of the work had been done by people who were not

16  trained accountants, is that fair to say when you started?

17  A.   Yes.

18  Q.   Who wrote the checks for the company?

19  A.   Brenda, my assistant, would prepare them, and I would sign

20  them for Institutional Liquidity.

21  Q.   And did -- did James also have authority to write the

22  checks?

23  A.   I don't remember James ever signing a check.  I don't even

24  know if he had signature authority.

25  Q.   Now, you indicated that there was a -- that he -- James

1  was a part owner of, is it, Navitas?  Navitas?

2  A.    Navitas.

3  Q.    Navitas.  And Navitas is the holding company for

4  Institutional Liquidity, correct?

5  A.    Correct.

6  Q.    And do you know who else owned Navitas?

7  A.    Yes.  Yes.

8  Q.    And who?

9  A.    Harald McPike.

10  Q.    And Harald McPike was a big investor --

11  A.    Yes.

12  Q.    -- in that company?

13  A.    Yes.

14  Q.    In fact, he -- you're aware that his investment was many

15  times more than what James put into the company?

16  A.    Many times more.

17  Q.    While you were working, you were the chief financial

18  officer, correct?

19  A.    Correct.

20  Q.    And what was -- would James do?  Was he there by your side

21  helping you put the books together and do the books?

22  A.    No, no James wasn't involved in putting together the books

23  at all.

24  Q.    What would he be doing?  What would you see him --

25  A.    He was out recruiting talent for the Institutional

 1  Liquidity, and talent meaning the computer programmers, the IT

 2  people, salespeople, talking to independent brokers at some

 3  point in time.

 4  Q.    He was more involved in the sales and the tech ends than

 5  he was in the bookkeeping, is that fair?

 6  A.    That's very fair.

 7  Q.    And to get licensed by the NFA, they had to do -- they had

 8  to vet, they had to check out the lead people in the company;

 9  is that correct?

10  A.    That is correct.

11  Q.    That would include James?

12  A.    Yes.

13  Q.    And that would include Mr. McPike?

14  A.    Yes.

15  Q.    As a startup company, was Institutional Liquidity making a

16  lot of money while you were there?

17  A.    No.  They didn't make money except for one month.

18  Q.    You testified a little bit about required levels of

19  liquidity, which I think you mentioned that they had to have, I

20  think, $20 million; is that correct?

21  A.    Right, that was the minimum, yes.

22  Q.    And that's required by the National Futures Commission or

23  some such body, correct?

24  A.    Correct.

25  Q.    And you have to have that $20 million each and everyday;

1  it's not just now and then get to 20 million, correct?

2  A.    Correct.

3  Q.    And if you didn't have 20 million, what would happen to

4  your business?

5  A.    You have a certain period of time to cure it, and if you

6  didn't cure it within, I think it was only a day or two, you

7  were shut down.

8  Q.    And the $20 million that Institutional Liquidity had, do

9  you know where that account was?

10  A.    Yes, it was at Citibank.

11  Q.    And was James Pieron, to your knowledge, allowed to get

12  into that money?

13  A.    No, nobody was; only Harald McPike and Craig Mawdsley

14  (ph), which is one of his employees.

15  Q.    Mr. McPike and one employee of Mr. McPike; is that

16  correct?

17  A.    Yes.

18  Q.    And they were the only -- they were -- had put the money

19  up, is that fair?

20  A.    That's correct.

21  Q.    You didn't have -- you didn't work for Komplique, the

22  swimsuit -- swimwear company, and you -- did you have much

23  involvement in it at all?

24  A.    I had no involvement in it.

25  Q.    Other than you did prepare a tax return?

114

1   A.    Other than that one tax return.

2   Q.    Do you remember how much money that company made the year,

3   2009, when you prepared the tax return?

4   A.    They lost money, 16,000.

5   Q.    Were you aware that Komplique was putting on swimwear

6   shows?

7   A.    Yes.

8   Q.    To your knowledge, did Komplique have their own offices?

9   A.    No.

10  Q.    Now, did you ever do any of the tax returns for

11  Institutional Liquidity?

12  A.    No, I did not.

13  Q.    Do you know who did?

14  A.    A firm of Andrews Hooper and Pavlik.

15  Q.    And were you involved in providing information to that law

16  firm --

17  A.    Yes.

18  Q.    -- or accounting firm, sorry?

19  A.    Accounting firm, yeah.

20  Q.    What sorts of information would you provide to them?

21  A.    The general ledger, any original documents if we had any,

22  anything that they wanted to look at.  They would look at the

23  payroll tax returns and that.

24  Q.    Do you have -- do you have personal knowledge as to how

25  James Pieron became connected with that accounting firm?

1  A.    Yes.  We chose them to be our auditors for Institutional

2  Liquidity, and I also recommended Kim Pavlik of that firm to

3  James.

4  Q.    And why did you recommend him?

5  A.    Because I knew him to be a knowledgeable tax person.

6  Q.    You told us about Mr. Pieron purchasing a motorcycle and

7  then crashing it shortly thereafter, correct?

8  A.    Correct.

9  Q.    Did he own a house that you know of?

10  A.    He did not own a house that I know of.

11  Q.    Any other real estate that you know of?

12  A.    Not that I know of.

13         MR. SASSE:  I have no other questions, Your Honor.

14         THE COURT:  Any redirect?

15         MS. PARKER:  Just one second.

16                    REDIRECT EXAMINATION

17  BY MS. PARKER:

18  Q.    Mr. Zehnder, you said that the number of employees went

19  from about eight to 200 -- or excuse me, 25 to 30?

20  A.    Yes.

21  Q.    Were those old Army buddies of the defendant, Mr. Pieron?

22  A.    Not that -- not that I know of, no.

23  Q.    All right.  And you said that you wrote the checks on

24  the -- I'm sorry, it was on the IB -- IB Tech accounts?

25  A.    I believe so, yes.

1   Q.   Who directed you when to write a check?

2   A.   Nobody really directed when to write a check.  As we had

3   bills coming due, I would have wrote them.

4   Q.   All right.  But other than paying the bills, if there was

5   money to go, say, to loan to Komplique or something like that,

6   would it be Mr. Pieron who directed you to write the check?

7   A.   Yes.

8   Q.   And on that tax return that you prepared, up in the -- I'm

9   looking at Exhibit 27, does it show the total assets of being

10  $63,711?

11  A.   Yes.

12          MS. PARKER:  All right.  Nothing further, Your Honor.

13  Thank you.

14          MR. SASSE:  No questions, Your Honor.

15          THE COURT:  Witness is excused from the stand.  Thank

16  you, sir.

17          THE WITNESS:  Thank you.

18          THE COURT:  Government identify their next witness,

19  please.

20          MR. DEPORRE:  Your Honor, the Government calls

21  Melanie Jeffrey.

22          (At 12:43 p.m., sworn by the Court.)

23          THE COURT:  If you could please have a seat.  The

24  witness stand is on the left-hand side.  The chair does not

25  move; the microphone does.  Sir.

117

```
 1                        MELANIE JEFFREY,

 2            GOVERNMENT'S WITNESS, SWORN AT 12:43 p.m.

 3                       DIRECT EXAMINATION

 4  BY MR. DEPORRE:

 5  Q.   Ms. Jeffrey, good morning -- or good afternoon.  Would you

 6  please state your name and spell it for the court reporter.

 7  A.   Melanie Jeffrey, M-E-L-A-N-I-E, Jeffrey, J-E-F-F-R-E-Y.

 8  Q.   Ms. Jeffrey, how are you currently employed?

 9  A.   I work for Full Throttle Motorsports.

10  Q.   Where is that located?

11  A.   In Dimondale, Michigan.

12  Q.   What sort of business is Full Throttle.

13  A.   It is a motorsports dealership.  We sell motorcycles,

14  ATV's, snowmobiles, side-by-sides.

15  Q.   More snowmobiles this time of year?

16  A.   Yes.

17  Q.   I handed you a folder there, and it's marked Exhibit --

18  Government Proposed Exhibit 176.  Can you take a look at that.

19  A.   Yes.

20  Q.   Are those business records from Full Throttle Motorsports?

21  A.   Yes, I actually brought the originals.

22  Q.   Thank you.  Just if you don't mind flipping through

23  Government Exhibit 176.

24  A.   Uh-huh.

25  Q.   Do those records match the records you brought with you
```

 1  today?

 2  A.   Yes.

 3       MR. DEPORRE:  Your Honor, at this point I would move

 4  for the admission of Government Exhibit 176.

 5       MS. ARNETT:  Could you tell me what the Bates pages

 6  are?

 7  BY MR. DEPORRE:

 8  Q.   Certainly.  Would you read the first Bates page for

 9  Government Exhibit 176.

10  A.   The first Bates page?

11  Q.   Yeah, I'm sorry.  Let me direct your attention to it.

12  Bottom right-hand corner.  At the bottom right-hand corner,

13  these numbers are called Bates numbers.

14  A.   Okay.

15  Q.   If you would read that first number.

16  A.   25545.

17       MS. ARNETT:  I'm sorry, it wasn't on you all's

18  exhibit list.

19       MR. DEPORRE:  What's that?

20       MS. ARNETT:  It was missing from the exhibit list, so

21  I don't have that exhibit pulled.

22       MR. DEPORRE:  Would you like to see it?

23       MS. ARNETT:  Yeah.  No objection.

24       THE COURT:  Received.

25  BY MR. DEPORRE:

119

1   Q.   All right.   On that -- would you describe what that number

2   that you read, that Bates number at the bottom, would you

3   describe the first page of the document that we're looking at.

4   A.   You're looking at a handwritten bill of sale.   This is --

5   Q.   All right.   Would you --

6   A.   Go ahead.

7   Q.   Would you turn to the second page.

8   A.   That is a partial payment receipt, non-refundable.

9   Q.   And it's a receipt for what sort of motorcycle?

10   A.   ZX-14.   It's a Kawasaki.   It's a liter bike.

11   Q.   Can you tell us what a liter bike is.

12   A.   A thousand CC's or more.   It's a liter.   It's L-I-T-E-R,

13   not leader, L-E-A-D-E-R.

14   Q.   The court reporter thanks you.

15            And why is it called a liter bike?

16   A.   Because of the CC's of the bike.

17   Q.   So is that considered a larger or more high powered

18   motorcycle?

19   A.   It is one of the fastest.   Anything over your 1000 CC's.

20   This one in particular, being a ZX-14, would have been 1398

21   CC's.

22   Q.   And was this the fastest motorcycle Kawasaki manufactured

23   in 2012?

24   A.   Yes, yes.

25   Q.   Do you know what the top speed of the bike is?

Jeffrey - Direct

1  A.   I don't.  It's -- the odometer I think goes to 120.

2  Q.   Would you turn to the page marked 25553.  And would you

3  zoom in there at the top.  Could you tell us what this is.

4  A.   Yep.  It's a state of Michigan RD-108.

5  Q.   And what is an RD-108?

6  A.   It's a vehicle title and registration application for the

7  Secretary of State.

8  Q.   And does that pertain to that 2012 motorcycle?

9  A.   Yes.

10  Q.   What is the date at that the -- of the purchase of the

11  vehicle?

12  A.   4/21/2012.

13  Q.   And on this form, do you see the owner of the vehicle?

14  A.   I do.

15  Q.   Who is it?

16  A.   It says James, and I apologize for -- if I mispronounce

17  it, but I would say Pieron.

18  Q.   All right.  Does it say the purchase price?  Looking at

19  the form, maybe scrolling down a little bit to the middle of

20  the page.

21  A.   Yep, it's on line 11.  It's $18,901.64.

22  Q.   And is this a -- this bike being titled specifically to an

23  individual or to a business?

24  A.   To an individual.

25  Q.   And is there a lien on this title?

Jeffrey – Direct

121

```
 1  A.    No.

 2  Q.    So what does that mean?

 3  A.    That means the customer brought in either cash, cashier's

 4  check, wrote a check or paid with a Visa debit card.

 5  Q.    Would you turn to Bates page 25560.  Could you tell us

 6  what this is.

 7  A.    This is an invoice.  These are parts sold to a major unit.

 8  Customers, typically when they want to purchase additional

 9  accessories, they're billed and attached electronically to the

10  VIN number of the vehicle the customer purchased.

11  Q.    And in this instance, there were some additional

12  accessories?

13  A.    Correct.

14  Q.    Can you identify what they were?

15  A.    Yeah, it looks like a helmet, jacket, gloves, actually two

16  pairs of gloves it looks like.

17  Q.    At the bottom, do you see where it says the amount?

18  A.    Uh-huh.

19  Q.    How much did these other accessories cost?

20  A.    It looks like 593.75.  And actual --

21  Q.    Go ahead.

22  A.    I'm sorry.  The way that it was set up then, if you look

23  at invoice total, 593.75 were for the stuff that we had in

24  stock.  He actually had to -- he had one special ordered, so

25  there was an additional 284.84 across from that.
```

Jeffrey – Direct                                                          122

1   Q.    Okay.

2   A.    So you would add those together.

3   Q.    And that would have been paid at a later time?

4   A.    Yes, when the part came in.

5   Q.    You mentioned a part.  I'd like you to flip three more

6   pages along to page 25563.  Do you recognize the name of the

7   person who received the email in this -- the subject line of

8   this email?

9   A.    Bob Staton.

10  Q.    And that email address, is that an email address at Full

11  Throttle Motorsports.

12  A.    It was when he was there, yes.

13  Q.    Who was Bob Staton?

14  A.    He's a salesperson that used to work there.

15  Q.    And if you would look at the email at the first line, what

16  is this email pertaining to?

17  A.    It's pertaining to the customer was requesting parts.  He

18  was explaining to Bob what he wanted done to the vehicle, and

19  he was pretty particular.

20  Q.    And with regard to the paint, did he want it painted a

21  different color.

22  A.    Not only did he want it painted a different color, but he

23  wanted the fender taken off to put an exhaust underneath there.

24  It gives it a more sportier look, if you will.

25  Q.    And are these extra charges?

Parker – Direct

1   A.   Yes.

2           MR. DEPORRE:  Nothing further, Your Honor.

3           THE COURT:  Cross?

4           MS. ARNETT:  Thank you.  No questions.

5           THE COURT:  You're excused, ma'am.

6           Government's next witness, please.

7           MS. PARKER:  Dan Parker, Your Honor.

8           THE COURT:  Good afternoon.  If you could stop for

9   just a moment, raise your right hand.

10          (At 12:54 p.m., sworn by the Court.)

11                      DANIEL PARKER,

12          GOVERNMENT'S WITNESS, SWORN AT 12:54 p.m.

13                    DIRECT EXAMINATION

14  BY MS. PARKER:

15  Q.   Would you state your name and spell your last name for us.

16  A.   Daniel Parker, P-A-R-K-E-R.

17  Q.   We're not related are we?

18  A.   No, no relation.

19  Q.   How are you employed?

20  A.   I'm the loss prevention manager for greater Michigan

21  market of PNC Bank.

22  Q.   PNC Bank is a bank that took over National City Bank at

23  sometime?

24  A.   Correct.

25  Q.   And you said you're a loss prevention manager?

1   A.    Yes.

2   Q.    Are you a person who has access to the records made and

3   maintained by PNC Bank in the ordinary course of its business

4   and the business that it acquired from National City?

5   A.    Yes.

6   Q.    And how long have you been working in that capacity?

7   A.    Ten years.

8            MS. PARKER:  Your Honor, may I approach?

9            THE COURT:  Yes.

10  BY MS. PARKER:

11  Q.    I'm going to show you Government's Exhibits 135, 136 and

12  137 and ask you if those are signature cards?

13  A.    135, yes; 136, yes and 137 the same, yes.

14           MS. PARKER:  Your Honor, I offer Government's

15  Proposed Exhibits 135, 136 and 137.

16           MS. ARNETT:  I think 135 and 137 are already

17  admitted.

18           MS. PARKER:  That is correct actually.

19           MS. ARNETT:  And we have no objection to 136.

20  BY MS. PARKER:

21  Q.    All right.  Let's take a quick look at 135, that signature

22  card.  What's the entity?  What's the name on the account?

23  A.    IB Technologies.

24  Q.    And is it a checking account?

25  A.    Yes.

1  Q.   And what are the last four digits of that checking

2  account?

3  A.   9901.

4  Q.   And on -- excuse me, Exhibit 136, is that also a signature

5  card for IB Technologies?

6  A.   Yes, it is.

7  Q.   This time for a savings account?

8  A.   Yes.

9  Q.   And the signatories on that account?

10  A.   James Pieron, William Zehnder, and Brenda Garver.

11  Q.   And what are the last four digits of that account?

12  A.   9616.

13  Q.   And then on Exhibit 137, again, the name on the account

14  and the signatories to that account?

15  A.   Komplique, Inc., I'm not sure if that's how it's

16  pronounced.

17  Q.   And the names on the account as signatories?

18  A.   Christine Phillips and James Pieron.

19  Q.   Is that a checking account?

20  A.   Yes, it is.

21  Q.   And are the last -- what are the last four digits?

22  A.   This is 137, 4031.

23  Q.   I'm going to hand you Government's Proposed Exhibit 129

24  and 134.  Are those records of wire transfers?

25  A.   129, yes; 134, yes, as well.

```
 1            MS. PARKER:  All right.  And 129 is already in
 2  evidence; 134 I'd like to offer that.
 3            MS. ARNETT:  No objection.
 4            THE COURT:  Received.
 5  BY MS. PARKER:
 6  Q.   I'd like you to take a look at 129.  On the first page
 7  should be 10765.  Can you tell us what the source was for that
 8  wire transfer.
 9  A.   It was from UBS AG Bank in Zurich, Switzerland.
10  Q.   And the date?
11  A.   Date is June 8th, 2009.
12  Q.   And the amount?
13  A.   $100,000.
14  Q.   And it's from?
15  A.   James Pieron.
16  Q.   To?
17  A.   To IB Technologies.
18  Q.   Page 10768, where was that wire transfer coming from?
19  A.   It is coming from UBS Bank in Zurich, Switzerland.
20  Q.   Going to?
21  A.   Going to IB Technologies.
22  Q.   And the date?
23  A.   October 15, 2009.
24  Q.   And it's from?
25  A.   From JDFX Holding.
```

Parker - Direct                                                    127

1   Q.   And the amount?

2   A.   $500,000.

3   Q.   And 10770, the date of that wire transfer?

4   A.   October 19, 2009.

5   Q.   The amount?

6   A.   $250,000.

7   Q.   The source?

8   A.   IB Technologies.

9   Q.   And it's going from?

10  A.   Going from PNC Bank -- would have been National City at

11  the time.

12  Q.   All right.  To?

13  A.   To PFG, Inc.

14  Q.   And I'm sorry did you say the amount?  I believe you did.

15  A.   250,000.

16  Q.   On -- do you know what PFG, Inc. is?

17  A.   I'm sorry, PFG, Inc., I do not know what that stands for,

18  no.

19  Q.   10773, please.

20  A.   Okay.

21  Q.   The source?

22  A.   Source is Credit Suisse Bank in Zurich, JDFX Fund

23  Management.

24  Q.   Going to?

25  A.   Going to IB Technologies.

1   Q.   The amount and the date?

2   A.   The date is November 18, 2009, the amount $749,975.

3   Q.   10775 -- excuse me 10777; again, the source?

4   A.   Source is IB Technologies.

5   Q.   Located where?

6   A.   Mt. Pleasant, Michigan.

7   Q.   To?

8   A.   To UBS Bank, to JDFX Holding AG UBS Bank in Zurich.

9   Q.   The amount?

10  A.   $500,000.

11  Q.   The date?

12  A.   November 19th, 2009.

13  Q.   10787; again the source and from whom?

14  A.   The source is Peregrine Financial Group.  It's going to IB

15  Technologies for $203,185.22 on April 5th of 2010.

16  Q.   And 10788?

17  A.   Okay.  Source is IB Technologies for $250,000 to James

18  Pieron on April 5th, 2010.

19  Q.   All right.  Let's also take a look at the wire transfers

20  in Exhibit 134, and same type of questions.  What was the

21  source?

22  A.   The source was Komplique, Inc.

23  Q.   Going from where to where?

24  A.   Going from Komplique, Inc., sorry, to Manuela Uribe,

25  Stoneleigh-Burnham School.

Parker - Direct

1  Q.   Going where?

2  A.   The final beneficiary is at -- in Greenfield,

3  Massachusetts, Manuela Uribe, Stoneleigh-Burnham School.

4  Q.   All right.  Stoneham Burnham school did you say?

5  A.   S-T-O-N-E-L-E-I-G-H.

6  Q.   And the amount?

7  A.   $21,000.

8  Q.   And the date?

9  A.   Date is 7/16/2010, July 16, 2010.

10 Q.   The next one.

11 A.   Okay.  This is coming from James Pieron.

12 Q.   To?

13 A.   To Komplique in Mt. Pleasant.

14 Q.   And where was it coming from?

15 A.   Lausanne, Lausanne, I think that's Switzerland, I believe.

16 Q.   Okay.  And the amount?

17 A.   $799,977.

18 Q.   And the date?

19 A.   The date was November 30th, 2010.

20 Q.   Was there a time when Mr. Pieron also had an account at

21 PNC Bank for Institutional Liquidity?

22 A.   Yes, we did have a relationship with Institutional

23 Liquidity.

24 Q.   What happened with that account?

25 A.   The account ended up being closed.

1  Q.    I'm sorry?

2  A.    We ended up closing the account.

3  Q.    And why was that?

4  A.    Just wire transfer activity that didn't fit our risk

5  profile.

6  Q.    And was Mr. Pieron a signer on that account?

7  A.    I believe so.  I don't have the signature card in front of

8  me, but --

9  Q.    Next I'd like to show you Government's Proposed

10  Exhibits 120A through H.  Are those a serious of account

11  statements?

12  A.    Yes, checking account statements.

13  Q.    And what time period do they cover?

14  A.    May, 2009 through August, 2011.

15  Q.    And I'd like to direct your attention to the account

16  statement for 120G, and also ask you to take a look at

17  Government's Proposed Exhibit 125, ask you if you see that

18  transaction on 120G, the statement.

19  A.    Oh, yes, it was withdrawal done on July 29th, 2011.

20          MS. PARKER:  All right.  Your Honor, I offer

21  Government's Proposed Exhibit 125.

22          MS. ARNETT:  No objection.

23          THE COURT:  125 is received.

24          MS. PARKER:  Can you display that for us.

25  BY MS. PARKER:

Parker - Direct

1   Q.   Again, what was the amount of the transaction?

2   A.   $8,625.

3   Q.   And what was the nature of the transaction?

4   A.   It was a withdraw from the account.

5   Q.   And on what date?

6   A.   On July 29th, 2011.

7   Q.   All right.  And, again, what account was this?  It's the

8   one ending in 9901, what kind?

9   A.   It's a checking account for IB Technologies.

10  Q.   So all these, 120A through H, are statements for that

11  account?

12  A.   Correct.

13  Q.   All right.  Also I'd like you to take a look at

14  Government's Proposed Exhibit 126.  Is that a document that you

15  can connect to Exhibit 120H?

16  A.   120H?

17  Q.   H as in horse.

18  A.   Yes, it was a -- it's a $5,000 check that we would call a

19  convenience check, or a counter check, drawn off the account on

20  August 9th of 2011.

21  Q.   And, likewise, can you connect Government's Proposed

22  Exhibit 127 to that statement?

23  A.   It's for -- yep.  Check No. 1420, yes, on 8/18/2011 for

24  $5,000.

25              MS. PARKER:  Your Honor, I offer Government's

1   Proposed Exhibit 126 and 127.

2           MS. ARNETT:  No objection.

3           THE COURT:  Received.

4   BY MS. PARKER:

5   Q.   Likewise I'd like to show you Government's Proposed

6   Exhibit 128.  Would that be another check drawn on the account?

7   A.   Yes, drawn off of IB Technologies for $6,684.24.

8           MS. PARKER:  Your Honor, I offer Government's

9   Proposed Exhibit 128.

10          MS. ARNETT:  No objection.

11          THE COURT:  Received.

12  BY MS. PARKER:

13  Q.   And what was the date and the amount of that?

14  A.   That was November 28th, 2011 for $6,684.24.

15  Q.   And you said that some of those checks were convenience

16  checks, what are those?

17  A.   It's basically a counter check.  If you don't have a

18  supply of checks, you can come into the bank and buy one with

19  your account number on it and write it as if you had purchased

20  it from --

21  Q.   I also show you Government's Proposed Exhibit 103, and

22  I'll give just for reference if you need it, but you may not,

23  Exhibits 121A through C, which are statements that are also in

24  evidence, okay.

25  A.   This is 102.

Parker - Direct                                                    133

1   Q.   I'm sorry.  Do you recognize 103 as a check drawn on the

2   Komplique checking account?

3   A.   It's a cashier's check with the remitter as Komplique,

4   yes.

5          MS. PARKER:  Your Honor, I offer Government's

6   Proposed Exhibit 103.

7          MS. ARNETT:  No objection.

8          THE COURT:  Received.

9   BY MS. PARKER:

10  Q.   Can we take a look at that, please.  What is the date of

11  this check?

12  A.   August 28th, 2009.

13  Q.   Who is the check payable to?

14  A.   Exotic Motors.

15  Q.   And the amount of the check?

16  A.   $107,000.

17  Q.   And who is listed as the remitter?

18  A.   Komplique, Inc.

19  Q.   All right.  I'm going to hand you some more exhibits.  To

20  save time, I'm going to give you another group and not walk

21  back and forth all the time.

22  A.   Okay.

23  Q.   Starting with Government's Proposed Exhibit 122, is that

24  an account statement?

25  A.   Yes.  It's a savings account statement for Komplique, Inc.

1    Q.    And is it for July of 2011?

2    A.    Yes.

3    Q.    For the savings account?

4    A.    Correct.

5            MS. PARKER:  Your Honor, I offer Government's

6    Proposed Exhibit 122.

7            MS. ARNETT:  No objection.

8            THE COURT:  Received.

9    BY MS. PARKER:

10   Q.    And I also handed you I believe Government's Exhibit 124.

11   A.    Yes.

12   Q.    Is that a -- that's already in evidence as a check from

13   Komplique to James Pieron?

14   A.    It's payable to Komplique with James Pieron listed in the

15   memo line.

16   Q.    You also have before you Government's Proposed

17   Exhibit 106C.

18   A.    Yes.  Yeah, it's a check drawn off of IB Technologies for

19   $15,000, payable to James Pieron.

20           MS. PARKER:  And, Your Honor, I offer Government's

21   Proposed Exhibit 106C.

22           MS. ARNETT:  No objection, Your Honor.

23           THE COURT:  Do you have a fair number of others?  I'm

24   wondering if there's a way of aggregating the tender.

25           MS. PARKER:  I can try to do that.  Is that received?

```
 1              THE COURT:  Pardon me?

 2              MS. PARKER:  Is that one received?

 3              THE COURT:  It is.

 4  BY MS. PARKER:

 5  Q.   And, again, what was 106C?

 6  A.   That is a counter check or convenience check for $15,000

 7  off of IB Technologies to James Pieron, July 11th -- I'm sorry,

 8  July 29th, 2011.

 9  Q.   And do you also have the statement which is Exhibit 122,

10  page 10744?

11  A.   Yes.

12  Q.   And do you have Exhibit 124.

13  A.   Yes.

14  Q.   All right.  And is there a relationship between those

15  checks and the statement, page 10744?

16  A.   I can't say for sure.  It's a $350,000 check that was

17  payable to Komplique and this is an account for Komplique and

18  there was a $636,000 deposit that day.  It could be a part of

19  that deposit, but I can't say 100 percent for sure it is.

20  Q.   Okay.  Let me show you -- you have a copy of the $350,000

21  check, correct?

22  A.   Correct.

23  Q.   I'll show you another check.

24  A.   This is another check payable to Komplique for

25  $285,948.90, which when added to the 350 would make up the
```

 1  amount of the deposit.

 2  Q.   All right.  So that other check plus the $350,000 is the

 3  deposit of how much reflected on that bank statement?

 4  A.   $635,948.90.

 5  Q.   I'll show you a group of three proposed exhibits, 131,

 6  132, and 133.  Are those Komplique checks?

 7  A.   131, yes; 132, yes, as well; and 133, yes.

 8          MS. PARKER:  All right.  And I'll offer 131, 132, and

 9  133.

10          MS. ARNETT:  No objection.

11          THE COURT:  Received.

12          And, Ms. Parker, I think maybe the excitement has

13  been overwhelming.

14          MS. PARKER:  I know.

15          THE COURT:  I think it would be a good idea if we get

16  about a three to five minutes break, and then we'll finish up

17  the day.

18          MS. PARKER:  Okay.

19          THE COURT:  Bailiff is on his way.  Please rise for

20  the jury.

21          (At 1:21 p.m., jury leaves.)

22          THE COURT:  Max of five minutes and then we'll finish

23  up.  The record's closed.  Thank you.

24          (At 1:22 p.m., court recessed.)

25          MS. PARKER:  Your Honor, do you want the witnesses

1   back on the stand.

2           THE COURT:  Please.  Thank you, sir.

3           (At 1:30 p.m., jury arrives.)

4           THE COURT:  Please be seated.  Witness will be

5   reminded that he remains under oath.

6           Ms. Parker, if you'd like to continue.

7   BY MS. PARKER:

8   Q.   I've added to the exhibits that you have up there.  One of

9   them is Exhibit 130.  Is that a check drawn on the Komplique

10  account?

11  A.   Yes, it is.

12          MS. PARKER:  I'll also offer 130, Your Honor.

13          MS. ARNETT:  No objection.

14          THE COURT:  It is received.

15  BY MS. PARKER:

16  Q.   All right.  Can you take a quick look at Exhibit 130.

17  That's a check drawn on the Komplique account, ending in 1086?

18  A.   Correct.

19  Q.   It's payable to whom and in what amount?

20  A.   Air Services is the payee for $29,805.79.

21  Q.   All right.  The next one is 131, that's a Komplique check

22  payable to whom?

23  A.   131 is check No. 1121, payable to M-Z Air for $8,400.

24  Q.   And No. -- or, excuse me exhibit 132.

25  A.   Yes, that's a check drawn off Komplique, Inc., Check

1  No. 1226, to Central Michigan Piano on May 4th, 2011 for

2  $20,000.

3  Q.   And 133.

4  A.   133 is a check drawn off the Komplique account payable to

5  cash for $39,797.

6        MS. PARKER:  Your Honor, next I'd like to go to

7  Exhibit 174, which is -- I offer pursuant to a certificate of

8  authenticity to connect with this witness?

9        MS. ARNETT:  No objection.

10        THE COURT:  Received.

11  BY MS. PARKER:

12  Q.   The check that you were just looking at, 133, was for a

13  cash check for $39,797, correct?

14  A.   Correct.

15  Q.   174 is -- appears to be a purchase agreement for a VW

16  automobile; is that correct?

17  A.   Yes.

18  Q.   And what's the date of the purchase?

19  A.   7/23/2011.

20  Q.   And what's the amount of the purchase?

21  A.   $39,787.

22  Q.   And what's the name of the purchaser?

23  A.   James Pieron.

24  Q.   And does that check appear to make -- pay that purchase

25  off in its entirety so there's no lien?

139

1  A.    I'm sorry, I --

2  Q.    Does that check amount constitute the complete purchase

3  price so there's no lien on the vehicle?

4  A.    Correct.

5  Q.    All right.  Next and at last I'd like you to go to

6  Exhibits 169 and 168, which also should be in front of you.

7  A.    Yes.

8  Q.    169 is an account statement and signature card?

9  A.    Yes.  It's for a money market account for Komplique for

10 the -- the statement and the signature card, yes.

11 Q.    All right.  On -- and 168 is the account statement for

12 March 30th, 2013 to April 30, 2013?

13 A.    Correct.

14 Q.    And a check?

15 A.    Yes.  It's a check for $50,000 drawn off of Kresent Media

16 operating account.

17          MS. PARKER:  All right.  I'd like to offer 168 and

18 169.

19          MS. ARNETT:  No objection.

20          THE COURT:  Received.

21 BY MS. PARKER:

22 Q.    Looking at 169, the signature card, who is a signatory to

23 this account?

24 A.    James Pieron.

25 Q.    Is there anyone else on that account?

1   A.    No.   That's the only name on the signature card.

2   Q.    But it appears to be a personal account?

3   A.    It's a business account in the name of Komplique, Inc.

4   Q.    All right.   I'm sorry, but he's the only one on that

5   account?

6   A.    Right, he's the only signer.

7   Q.    And the statement period is 12/31/11, to 1 -- or

8   January 31, 2012?

9   A.    Correct.

10  Q.    Is there money in that account at that time?

11  A.    Yeah, the beginning balance was $216,938.41, and the

12  ending balance was $130,229.79.

13  Q.    So during the month of basically January, 2012, there were

14  significant amounts of money in that account?

15  A.    Yes.

16  Q.    Let's take a look at 168.   That, again, has a statement

17  which covers March 30th, 2013 to April 30, 2013?

18  A.    Correct.

19  Q.    And is there money in that account in that time period?

20  A.    It began with a negative balance of $83.31 and there was

21  an additional 50,400 in deposits; more deductions ended up with

22  a balance of $25,340.94.

23        MS. PARKER:   Thank you, Your Honor.   Pass the

24  witness.

25        MS. ARNETT:   Just a couple of questions, Your Honor.

Parker - Cross

1          THE COURT:  Cross-examination.

2                    CROSS-EXAMINATION

3    BY MS. ARNETT:

4    Q.    Good afternoon.  The checking and savings accounts that we

5    looked at were corporate accounts, right?

6    A.    Yes.

7    Q.    There were no personal accounts, right?

8    A.    No.

9    Q.    And what's in a corporate account doesn't also tell you

10   what the other side of that is, and that's the corporate

11   liabilities, right?

12   A.    I'm sorry?

13   Q.    So corporation's liabilities could far exceed what's in

14   their bank account, correct?

15   A.    Correct.

16          MS. ARNETT:  I pass the witness, Your Honor.

17          MS. PARKER:  Nothing further, Your Honor.

18          THE COURT:  Thank you very much.  I appreciate your

19   attendance, sir.

20          MR. DEPORRE:  Your Honor, the Government call Lynette

21   Dewley.

22          (At 1:38 p.m., sworn by the Court.)

23                    LYNETTE DEWLEY,

24       GOVERNMENT'S WITNESS, SWORN AT 1:38 p.m.

25                    DIRECT EXAMINATION

US v. Pieron, Jr. - TRIAL - VOLUME 4 - March 4, 2019

1  BY MR. DEPORRE:

2  Q.   Good afternoon, Ms. Dewley.

3  A.   Hello.

4  Q.   Would you please state your full name and spell your last

5  name -- actually spell your first and last name for the court

6  reporter.

7  A.   Lynette Dewley, L-Y-N-E-T-T-E, and my last name is Dewley,

8  D-E-W-L-E-Y.

9  Q.   How are you employed?

10  A.   I work for Fifth Third Bank.  I am a retail risk and

11  administration manager.

12  Q.   Are you familiar with Fifth Third Banking records as part

13  of that job?

14  A.   Yes.

15  Q.   I've handed you a stack of folders next to you.

16  A.   Yes.

17  Q.   First I'd like you to look at the ones marked Exhibits

18  110, 111, and 112.

19  A.   Okay.

20  Q.   In addition to those records, I've also handed up

21  Government Exhibit 104, 106A and B, 107A and B, 108A and B,

22  Government Exhibit 109, 110, 111, 112 and 175.

23       Your Honor, I move for the admission of all of those

24  exhibits at this time.

25       MS. ARNETT:  No objection.

Dewley - Direct

```
 1              THE COURT:  Received.
 2  BY MR. DEPORRE:
 3  Q.   Government Exhibit 110, could you zoom in on 1335.
 4  A.   This is a signature card for a checking account -- a
 5  business checking account opened at Fifth Third Bank for
 6  Institutional Liquidity.
 7  Q.   And who is the signer on the account?
 8  A.   James Pieron, Jr.
 9  Q.   What's the date of the signature card?
10  A.   April 6th, 2010.
11  Q.   All right.  And would you look at Government Exhibit 111.
12  A.   Okay.
13  Q.   Is that also a signature card?
14  A.   Yes, it is.
15  Q.   And what sort of account is that?
16  A.   That is a interest checking account, a personal account.
17  Q.   Who is the account holder?
18  A.   James Pieron, Jr.
19  Q.   So that is not a business account, correct?
20  A.   Correct.
21  Q.   And then Government Exhibit 112.
22  A.   It is a signature card.
23  Q.   And for what sort of account?
24  A.   This is a savings account, a personal savings account.
25  Q.   What are the last three or four numbers of that savings
```

1  account?

2  A.    It is 0031.

3  Q.    And who is it for?

4  A.    James Pieron, Jr.

5  Q.    What's the date on that?

6  A.    January 8, 2010.

7  Q.    Was he the only signer on the account?

8  A.    Yes, he is.

9  Q.    What's the purpose of a signature card?

10 A.    It identifies who has ownership of the account, what type

11 of account it is and the ownership directly involved with the

12 account; trust, individual, business.

13 Q.    Is it fair to say it controls who can take money out or

14 who can write a check based on that?

15 A.    Absolutely.

16 Q.    All right.  Would you now direct your attention to

17 Government Exhibit 114.

18 A.    Okay.

19 Q.    All right.  And I'm going to have you flip in a couple

20 pages to where it says at the bottom the Bates stamp number,

21 1442.

22 A.    Okay.

23 Q.    Can you tell us what Government Exhibit 114 is?

24 A.    So this is a record of wire transfers completed,

25 electronic record.

1  Q.   Okay.  And looking at 1442, 1443 and 1444, are those

2  records for all the same transfers?

3  A.   Yes.

4  Q.   All right.  I'd like you to look at the first row.  It's a

5  transfer -- thank you for zooming in.  What's the date of that

6  transfer?

7  A.   So it's January 13th, 2010.

8  Q.   And the amount that's being transferred?

9  A.   $75,000.

10 Q.   And then you may have to flip, but can you tell us --

11 well, can you tell us from this what bank is sending those

12 funds?

13 A.   It looks like it is coming from UBS AG.

14 Q.   And so over that where it says UBS AG, there's something

15 says DBT underscore name one.

16 A.   Yep.

17 Q.   Does that -- is that to indicate the bank that's sending

18 the funds?

19 A.   Yes.  That's the debit name of the bank and the debit ID

20 is the routing number of that bank it's coming from.

21 Q.   All right.  Turning the page, there's another column that

22 says CDT ID, and then CDT name one.  Do you see that there on

23 the screen?

24 A.   Yes.

25 Q.   And what do those numbers refer to?

1  A.   The account number, the credit ID is that's the account

2  that was credited.

3  Q.   All right.

4  A.   And the credit name is the individual, that's who owns the

5  account.

6  Q.   So all these wire transfers are going into an account that

7  ends in 0031, correct?

8  A.   Correct.

9  Q.   And do you recall who the owner of that account is?

10 A.   It lists -- listed under the credit names is James Pieron,

11 Jr.

12 Q.   All right.  And is that Mr. Pieron's savings account that

13 you saw in Government Exhibit --

14 A.   0031, yes.

15 Q.   -- 112?  So on the second row of -- or, excuse me, on the

16 third row on page 1442, the wire transfer on April 5th, 2010,

17 do you see that?

18 A.   Yes.

19 Q.   And what's the amount of that transfer?

20 A.   250,000.

21 Q.   And the originating bank?

22 A.   National City.

23 Q.   And that goes into James Pieron's account?

24 A.   Yes.

25 Q.   His personal account, correct?

1  A.    Correct, personal savings.

2  Q.    All right.  And then on April 15th, 2010, there's another

3  transfer and how much is that?

4  A.    65,000.

5  Q.    And who is the account sending that -- those funds?

6  A.    The bank would be Northern Trust International Banking

7  Corporation.

8  Q.    And that money, again, goes into Mr. Pieron's personal

9  account, correct?

10 A.    Personal savings.

11 Q.    All right.  On the front first page -- again, these are --

12 the first three pages are also wire transfers, correct?

13 A.    Is this 1439?

14 Q.    Page --

15 A.    Yep.

16 Q.    -- sorry, 1439, Government Exhibit 114.

17 A.    Yep.

18 Q.    All right.  And turning to the second page, 1440.

19 A.    Yes.

20 Q.    Again, the -- there's a CDT name one.

21 A.    Yes.

22 Q.    Is that the account holder that's receiving the funds?

23 A.    Yes.

24 Q.    And going back to CDT ID on the first page.

25 A.    That is the account that was credited.

148

1  Q.   Okay.  So that -- those are -- when you say credited,

2  those are the person -- that's the account receiving the money?

3  A.   Yeah.  If you look at this page, too, the source credit,

4  that F-E-D, the fed, fed wire, that indicates it's an incoming

5  wire so, yes.

6  Q.   Okay.  So these are all wires going into Mr. Pieron's

7  personal account?

8  A.   Correct.

9  Q.   And that account ends in 6659?

10  A.   Correct.

11  Q.   Do you know if that is his checking account?  Could look

12  at Government Exhibit 111.

13  A.   Yeah, I would have to -- yes, that account ends in 6659.

14  That's his individual checking account.

15  Q.   All right.  And there two are wires there, correct?

16  A.   Correct.

17  Q.   All right.  We've had enough fun with wires.  Now we're

18  going to go to checks.  Can you look at Government Exhibit 104.

19  Could you pull that up, please.  And on the screen there's --

20  you can just look at the screen or the -- either way.  Would

21  you describe what's on the screen.

22  A.   So that is a cashier's check from Fifth Third Bank made

23  payable to Central Michigan Pianos.

24  Q.   And who is the account drawn on, so who is the person

25  purchasing or the purchaser of that piano?

Dewley - Direct

1  A.   It indicates it's purchased by a James Pieron, Jr.

2  Q.   All right.  Would you look at Government Exhibit 106B,

3  please.

4  A.   Okay.

5  Q.   And would you describe what this is.

6  A.   So this appears to be check.  It's drawn off PNC.

7  Q.   And so PNC is the account where the check was written

8  from?

9  A.   That's what this looks like, yes.

10 Q.   Can you tell from this record whether or not it was

11 deposited into a Fifth Third account?  Maybe if you zoom out?

12 A.   Yes.  So this is our record, the information below, like

13 the posting date.

14 Q.   And how much money is deposited into the account?

15 A.   15,000.

16 Q.   And do you recall -- do you see the account number there?

17 A.   Yes.  On what I have --

18 Q.   Could you zoom out.

19 A.   -- it's going into his personal checking account.

20 Q.   All right.  Would you also look at Government

21 Exhibit 107B -- oh, how much was that last check for?

22 A.   15,000.

23 Q.   Thanks.  107B.

24 A.   Yes.

25 Q.   And that is also a check, correct?

Dewley - Direct

150

1  A.   Yes.   That is another PNC check being deposited.

2  Q.   And is that being deposited into a Fifth Third personal

3  account?

4  A.   Correct.

5  Q.   And what's the amount on that check?

6  A.   12,050.

7  Q.   And what's the date?

8  A.   Of the deposit?  It was done on August 29th, 2011.

9  Q.   And then the last I think I'd like you look at is -- maybe

10  not -- Government Exhibit 108B.  Last check anyway.

11  A.   Yes.

12  Q.   And is that a check that is being deposited into a Fifth

13  Third account?

14  A.   Yes, it is.

15  Q.   And is that a personal account?

16  A.   Yes, personal checking account.

17  Q.   All right.  And how much is it for?

18  A.   42,000.

19  Q.   And the date?

20  A.   December 28th, 2010.

21  Q.   All right.  Now, if you would pull up Government

22  Exhibit 109.

23  A.   Yes.

24  Q.   And could you describe what Government Exhibit 109 is,

25  just looking at the top.  This is a bank statement, correct?

Dewley - Direct                                          151

1  A.    Yes, it is.

2  Q.    And who is -- whose account is this for?

3  A.    It looks like it's an account for Institutional Liquidity

4  Holdings.

5  Q.    All right.  So it's a business account, correct?

6  A.    Correct.

7  Q.    All right.  On -- where it says deposits and credits,

8  there's a -- in the middle of the page, if you would zoom in

9  there, do you see a deposit or credit dated April 6?

10 A.    Yes.  It looks like a transfer from the save -- a savings

11 account.

12 Q.    And do you recognize that number 0031?

13 A.    Yes.  We just reviewed that as his personal savings

14 account.

15 Q.    All right.  So he's transferring 250,000 from his personal

16 account into a business account?

17 A.    Correct.

18 Q.    And the date on that is April 6th, but what's the year?

19 A.    So at the top of the statement it shows this is a

20 statement from April 6th, 2010 to April 30th, 2010.

21 Q.    Thank you.  Would you also look at Government Exhibit 175.

22 A.    Okay.

23 Q.    Now, this is a different company.  Could you tell us what

24 company this statement is for.

25 A.    Navitas Investments, LLC.

Dewley - Direct

152

```
 1  Q.   All right.  And, again, that's a business account?
 2  A.   Yes, it is.
 3  Q.   All right.  Looking at that line for deposits and credits,
 4  do you see a deposit made on August 4th?
 5  A.   Yes.  It's a transfer from his personal savings account.
 6  Q.   And how much money is he transferring out of savings and
 7  into this business account?
 8  A.   107,500.
 9  Q.   And what is the date again, the year?  I know it's
10  August 4th but what year?
11  A.   2010 is the statement date up at the top.
12          MR. DEPORRE:  Pass the witness, Your Honor.
13          MS. ARNETT:  Thank you.  I have no questions.
14          THE COURT:  Thank you very much, ma'am.
15          THE WITNESS:  Thank you.
16          THE COURT:  What do you think?
17          MR. DEPORRE:  We could -- we're certainly happy to go
18  forward.  We have a witness that we anticipate will be fairly
19  quick.
20          THE COURT:  We'll --
21          MR. DEPORRE:  Government will Adam Tomakich.
22          THE COURT:  How long would you estimate direct
23  examination?
24          MR. DEPORRE:  Five minutes.
25          (At 1:55 p.m., sworn by the Court.)
```

1        THE COURT:  As everyone in the courtroom could inform

2   you, the chair does not move but the microphone does.  Thank

3   you.  Sir.

4        MR. DEPORRE:  Thank you.

5                         ADAM TOMAKICH,

6            GOVERNMENT'S WITNESS, SWORN AT 1:55 p.m.

7                     DIRECT EXAMINATION

8   BY MR. DEPORRE:

9   Q.   Would you please state your name and spell your last name

10  slowly for the court reporter.

11  A.   It is -- my name is Adam Tomakich.  My last name is

12  spelled T-O-M-A-K-I-C-H.

13  Q.   Mr. Tomakich, how are you employed?

14  A.   I am employed as a special agent with the IRS.

15  Q.   And how long have you been a special agent with the IRS?

16  A.   I've been an agent for four years.

17  Q.   As part of your work in this case, do you occasionally

18  obtain what are known as handwriting exemplars?

19  A.   Yes.

20  Q.   And have you done that in this case?

21  A.   Yes.

22  Q.   I'd like you to take a look at what's been marked as

23  Government Exhibit 178.  Do you recognize that?

24  A.   Yes, I do.

25  Q.   And could you explain what a handwriting exemplar is.

Tomakich – Direct                                                 154

1  A.   Handwriting exemplar is a handwriting sample taken from an

2  individual that is given to the lab for comparison, the

3  forensic lab.

4  Q.   And this particular handwriting exemplar in Government

5  Exhibit 178, who is that from?

6  A.   This is from James Pieron.

7  Q.   And did you -- were you present when these handwriting

8  exemplars were taken?

9  A.   Yes.

10        MR. DEPORRE:  Your Honor, I move for the admission of

11  Government Exhibit 178.

12        MR. MINNS:  No objection, Your Honor.

13        THE COURT:  Received.

14  BY MR. DEPORRE:

15  Q.   You stated you were present while Mr. Pieron wrote out

16  some items in his own handwriting?

17  A.   Yes.

18  Q.   Would you describe what you directed him to write?

19  A.   I directed him to write letters of the alphabet in capital

20  and lowercase, names and titles of individuals, some various

21  words, paragraph, days of the week and dates and numbers,

22  figures.

23  Q.   Did he also have to fill out an IRS collection information

24  statement?

25  A.   Yes, he did.

Tomakich - Direct                                    155

1   Q.   And did you tell him what to write on that statement?

2   A.   No.

3   Q.   Did you tell him what portions of the statement to write

4   on?

5   A.   No.

6   Q.   So he was able to write whatever on that statement?

7   A.   I believe he had to copy from something.

8   Q.   Okay.

9   A.   Yeah.

10  Q.   So he had something to copy --

11  A.   Right.

12  Q.   -- that you provided him with the item that he was

13  supposed to copy?

14  A.   Right.

15  Q.   After you collected these -- well, how long -- where did

16  you collect these handwriting exemplars?

17  A.   This was at the IRS office in East Lansing.

18  Q.   That's in Michigan?

19  A.   Yes, in Michigan.

20  Q.   And on what date did you collect them?

21  A.   It was July 10th, 2017.

22  Q.   How long was the amount of time that Mr. Pieron was asked

23  to write?

24  A.   Approximately an hour and a half.

25  Q.   And after you collected those written samples, what did

1  you do with them?

2  A.   They were forwarded to the forensic lab for analysis.

3        MR. DEPORRE:  Nothing further, Your Honor.

4        THE COURT:  Cross.

5                    CROSS-EXAMINATION

6  BY MR. MINNS:

7  Q.   I think I'll beat the time.  Special Agent Tomakich.

8  A.   Yes, that's right.

9  Q.   I'm Michael Minns.  I represent Jim Pieron.  You've never

10 met me before, correct?

11 A.   No, I haven't.

12 Q.   Who was in the room with Mr. -- with my client, Jim, and

13 you in this hour and a half?  Were you -- is it just the two of

14 you in the room alone?  Was his lawyer in the room with him?

15 Who was in the room?

16 A.   Just me and Agent Scott Hollabaugh.

17 Q.   And Agent Scott Hollabaugh is this gentleman sitting right

18 here at the table?

19 A.   Yes.

20 Q.   And you have a weapon but you didn't need to draw it to

21 get my client to handwrite all this stuff, correct?

22 A.   No.

23 Q.   And his lawyer, where was he sitting in the room?

24 A.   His lawyer wasn't present.

25        MR. MINNS:  Thank you very much.  Pass the witness.

```
 1                    REDIRECT EXAMINATION
 2   BY MR. DEPORRE:
 3   Q.   Was Mr. Pieron allowed to bring a cell phone into the
 4   room?
 5   A.   Yes.
 6   Q.   And at some point did he place a phone call to his lawyer?
 7   A.   Yes, he did.
 8           MR. DEPORRE:  Thank you.  Nothing further.
 9           MR. MINNS:  One follow-up.
10                    RECROSS-EXAMINATION
11   BY MR. MINNS:
12   Q.   This conversation with his lawyer, it lasted less than a
13   couple minutes, correct?
14   A.   Yes.
15   Q.   And then he continued right on doing whatever you wanted
16   him to do, correct?
17   A.   Yes.
18           MR. MINNS:  Thank you.
19           MR. DEPORRE:  I think we're done.
20           THE COURT:  Good.  The witness is excused from the
21   stand, and we will secure the efforts of our bailiff.  He's
22   here.  Please rise for the jury.  Remember, tomorrow morning,
23   don't come at 8:00.  We'll see you at 10.  Sleep in.  We'll
24   work until three tomorrow.  Please rise for the jury.
25           (At 2:01 p.m., jury leaves.)
```

Tomakich - Recross

```
 1              THE COURT:  Record will reflect the fact that we are
 2   outside of the presence of the jury.  Sir, you're excused from
 3   the witness stand.
 4              We touched on -- shall we say we focused on the
 5   Peregrine documents this morning that were the primary focal
 6   point of the defendant's motion to dismiss.  There were two
 7   other aspects of that.  We have also begun a discussion on the
 8   Government's initial motion in limine, specifically directed
 9   towards the -- ultimately the tax carryback loss for 2007 on
10   the defendant's return.
11              We're a little bit further into the case at this
12   point, and I think there's a point at which we ought to give
13   that a little bit more direction and reach some conclusions
14   there.  Now, I've got some flexibility this afternoon, but my
15   guess is that I'm not alone in suggesting that I'd love to get
16   a little bit of a lunch before I did any further work on the
17   case.
18              Would you be available, let's say, sometime after the
19   next 45 minutes to an hour to see if we can spend a little bit
20   more time, because I think we're going to need a little bit of
21   direction as we go into the next day's testimony?
22              MR. MINNS:  We stand ready to do whatever the Court
23   wants.  We have witnesses we're trying to prepare.
24              THE COURT:  Sure.
25              MS. PARKER:  So do we, but we can accommodate the
```

1  Court.

2          THE COURT:  2:45?  Does that enable people to gather

3  some food -- well, we can make it an even 3:00.  Why don't we

4  do that.  We will see you then.

5          MS. ARNETT:  Thank you.

6          MS. PARKER:  Okay.

7          (At 2:04 p.m., court recessed.)

8          THE COURT:  Good afternoon, counsel.  I assume

9  everyone had a chance to get a little bit of food, a little bit

10 of rest.  Earlier this morning, a little after eight, we took

11 up the motion that was filed by the defense seeking a dismissal

12 of the indictment.  It is, for the record, at ECF 39 which was

13 filed on March 3rd.

14         We gave a fair amount of attention prior to

15 entertaining the jury concerning the series of documents that

16 have been furnished by the defendant to Peregrine in his

17 capacity as an officer.  It was -- most of those materials

18 would have been furnished by the Government, as I understand

19 it, this past Friday reflecting the defendant as a noncitizen.

20         We gave a fair amount of attention to that earlier

21 this morning.  Is there -- do any of the parties wish a further

22 record on that?  The additional materials were used

23 extensively, I thought, in cross examination, but I want to

24 make sure that if any of you have remaining concerns concerning

25 those particular records, we've at least addressed them.

1          MR. MINNS:  Part of those records -- and the Court is

2   correct, we got extensive cross-examination on it.  Mr. Sasse

3   gave up his entire 72 hours nonstop in order to do that, but we

4   did not get any opportunity to cross-examine Miller on the FBAR

5   materials, which we learned were attached as Ms. Arnett had

6   said, and the Government said they were not attached.  They

7   went into direct, cross, redirect.  They're not part of it, and

8   those were exculpatory.

9          The fact that Mr. Pavlik had attached an explanation

10  of what -- what happened with the FBARs is exculpatory, and the

11  same thing will be true on the other tax return, so he got to

12  testify inaccurately that those -- and we didn't get it into

13  evidence either.  They were part of the tax return.

14          THE COURT:  Now, if -- here's my problem.  The only

15  information that I've got in the motions provides that at the

16  time the documents were offered, counsel for defendant

17  questioned whether there was a missing attachment, and I do

18  recall that.

19          MR. MINNS:  Yes.

20          THE COURT:  It continues:  The Government and its

21  expert Miller assured counsel and the Court repeatedly that

22  these documents were certified and complete.  They were not.

23  The documents now obtained each contain the page defense

24  counsel believed had been submitted with the FBAR filings and

25  are important to understanding these filings.  I have no idea

 1  from that information what was in the additional page for each

 2  of the FBAR filings and why it was important to Miller's

 3  testimony.

 4          MR. MINNS:  Well, Ms. Arnett -- could Ms. Arnett

 5  respond, Your Honor?

 6          MS. ARNETT:  The statement that was attached to the

 7  FBAR that didn't come into evidence explained why it wasn't

 8  filed timely, and it -- why the FBAR wasn't filed timely by

 9  Mr. Pieron.  It was a whole statement explanation as to why it

10  didn't come -- why the FBAR was filed late, and it was attached

11  to every single FBAR.

12          THE COURT:  But my understanding was that the FBARs,

13  as they are relevant to this case, were not relevant because

14  they were late, they were relevant because they were

15  inaccurate?

16          MS. ARNETT:  No, there's an accusation that the

17  Government has made that he only filed the FBARs once he

18  learned he was under criminal investigation.

19          THE COURT:  Accurate?

20          MS. ARNETT:  I'm pretty sure it's in their bill of

21  particulars, Your Honor.

22          MS. PARKER:  Well, Judge, I don't think that is

23  accurate, that it's -- the only relevance is that they were

24  filed after the investigation, and I think -- first of all, I'd

25  like to go back to what the statement is and what Mr. Minns

 1  said about it.  It's an exculpatory statement.  It's not

 2  admissible under 801.

 3              MR. SASSE:  It's part of the filing.

 4              MR. MINNS:  It's part of the return.

 5              MS. PARKER:  That doesn't make it admissible.

 6              MR. MINNS:  It's part of the actual return.

 7              MS. PARKER:  *United State versus McDaniel*, Sixth

 8  Circuit case, 398 Federal Reporter 540.  I know the Court is

 9  familiar with it.  We did not offer it deliberately, but they

10  had it.  They knew about it.  It is part of what was provided

11  by AHP, and we -- we don't intend to offer it, and we will

12  object to it being offered without a witness, which is what the

13  Court said at the time.  You can only get that in with a

14  different witness, and I agree, if they provide the appropriate

15  witness.  But you don't bootstrap in the exculpatory statement,

16  which is what they characterize it is, by attaching it to a

17  filing.

18              THE COURT:  Anybody have a copy of the actual

19  language that was attached?

20              MS. ARNETT:  Well, I have it electronically.  It's

21  the issue -- that's not the main issue.  The issue is that the

22  Government represented that the attached filing was a complete

23  accurate copy of the filing.  The document that they gave us

24  dated February 28th, which they had on March 1st when Ms.

25  Parker redirected him and asked about the transcript and said

Tomakich - Recross

1  if there was a statement attached, it would appear on this

2  transcript, she had the complete file, and he said, no, even

3  though knowing that there was a statement attached.

4        MS. PARKER:  That is not true.  I did not have the

5  complete file.  It arrived in our office while we were here in

6  court.  We only received it after we left court.  And --

7        MS. ARNETT:  He was here two days.

8        MS. PARKER:  No, it came in that day.

9        MS. ARNETT:  It's dated February 28.  He testified --

10       MS. PARKER:  It didn't arrive February 28.

11       MS. ARNETT:  Well, it was in the discovery, and that

12  was part of the conversation.

13       THE COURT:  Counsel, slow down.  I mean, we're making

14  a mess of the record for the stenographer.  It's getting to

15  look and sound like a tennis match.

16       MS. ARNETT:  I apologize, Your Honor.  This is the

17  statement attached.

18       THE COURT:  Do I get to keep your computer.  Thank

19  you very much.  I appreciate that.

20       MS. ARNETT:  Thank Michael.  It belongs to the

21  office.

22       THE COURT:  All right.  I'm going to hold onto that

23  for a minute.  Has anybody got a printed copy of it?

24       MS. PARKER:  Yes, Your Honor.

25       THE COURT:  Excellent.

```
 1              MR. MINNS:  Certified copy should have it.
 2              MS. ARNETT:  The certified copy that we received does
 3   have it.
 4              THE COURT:  Okay.  Let's get back to the
 5   justification for the original offer of the FBAR -- of the FBAR
 6   reports.  My understanding was, through the testimony, that
 7   those were be offered not to reflect the timing of the report
 8   but it's accuracy.  Am I wrong?
 9              MS. PARKER:  The accuracy and the fact that the
10   information would have been useful to the IRS both for
11   assessing tax and collecting tax, and by not providing it
12   timely, completely and accurately, he was impeding the ability
13   of the IRS to perform those two functions; the objective being
14   the evasion of taxes.
15              THE COURT:  At the time, you were of the belief that
16   the certification was complete when we were in the courtroom.
17   Is that true?
18              MS. PARKER:  Yes, we had transcripts, which according
19   to the witness -- I don't -- I couldn't interpret it, but what
20   he explained to me was that if there was an attachment, it
21   should be noted with a code, which he did not see.  But the
22   content of that information, they tried to offer it, we had a
23   sidebar, and the Court's ruling at the time was, you can -- you
24   have to have a different witness to get this in.
25              THE COURT:  Well, not with respect to the substance
```

1  of this information.  We didn't know it, and my understanding

2  is that you didn't either at the time of the sidebar.

3         MS. PARKER:  That -- whether or not that was

4  attached, that is correct, but the -- my point is that this

5  information was known.  The content of it is part of what was

6  disclosed in discovery, not as the certified copies of the

7  FBARs, but is what we obtained from AHP and disclosed in

8  discovery.  The exhibit that we were working from was a

9  transcript which came from the IRS, but the substance of this

10 information, they knew about it.  That's why they were asking

11 where is it, because they knew it was part of the AHP version

12 of the documents and, therefore, they had the information.

13        THE COURT:  But the certified information that you

14 had at the time did not include it?

15        MS. PARKER:  That is correct.

16        MS. ARNETT:  Yes, there was a certified copy and the

17 transcript, and they said that the certified copy, which was a

18 copy of the FBAR, which should have included the statement, was

19 a complete and accurate filing of the FBAR, and it wasn't.  We

20 got that information Friday afternoon.  The complete filing of

21 the FBAR includes the statement, and if I would have had the

22 cert -- the actual complete certified copy of the FBAR, I could

23 have questioned their FBAR expert about it.  He was the expert

24 from the Government who was to talk about FBARs.

25        MS. PARKER:  Judge, if -- I'm sorry.

1          THE COURT:  Slow down.  How are you going to examine

2    the agent concerning your client's statement attached to the

3    filing?

4          MS. ARNETT:  It discusses what he -- the steps that

5    he went through to try to get an accurate accounting of the

6    bank records, and that's one of their complaints, that the bank

7    records aren't complete.  They're -- what happened is he was

8    missing a quarter of one of the bank statements, and so that's

9    how this -- I don't know how much the amount was, but it got

10   left off of one of the bank accounts.  One bank account was

11   messed up because he was missing the fourth quarter, and so I

12   could have asked this man, who was also a CPA about that

13   information.

14         MS. PARKER:  I don't think she can, but that's the

15   fundamental problem.  I don't think she can question him; but,

16   Judge, it doesn't -- her argument that I had the certified

17   transcripts with that complete makes no sense, because if I had

18   it, I wouldn't have asked that question.  I wouldn't want to go

19   down that path, because it's obviously not accurate.  We did

20   not get those certified versions of those FBAR filings until we

21   left court and went back to our office.

22         MS. ARNETT:  And Mr. Miller came back the next day.

23         MS. PARKER:  No, that was Friday.

24         MS. ARNETT:  He was here on the 28th and on the 1st.

25         MR. DEPORRE:  But we received them on Friday.  We did

 1   not receive them on the 28th.  They were put in Federal -- or

 2   UPS or whatever to us on the 28th from whoever certified them.

 3   They weren't certified here.

 4          MS. ARNETT:  I don't know how that --

 5          THE COURT:  Were the initial returns with this

 6   language disclosed in discovery as the ones that had been

 7   prepared by the accounting firm?

 8          MS. ARNETT:  Yes.  That's where I got them.  I got

 9   them from the Government, and they wanted to argue that they

10   weren't attached to the filings --

11          THE COURT:  And --

12          MS. ARNETT:  -- and they succeeded.

13          THE COURT:  So let's transition, then, to the

14   question.  You've got -- the document says Mr. Pieron was

15   involved with several entities while in Switzerland and was

16   unaware of the filing and reporting requirements of the foreign

17   bank accounts.  Out-of-court statement; agreed?

18          MS. ARNETT:  Sure.

19          THE COURT:  Once made aware of the filing

20   requirements, he immediately took steps to comply by searching

21   through several years of records to obtain the required

22   information.  Same statement, right?  Same conclusion?  It's

23   a -- it's a statement made to explain the late filing?

24          MS. ARNETT:  I agree.

25          THE COURT:  Not required by the form?

1          MS. ARNETT:  It's not required, but it is part of the

2    filing.

3          THE COURT:  Included on form TDF90-22.1 is one

4    personal account, two business accounts of which Mr. Pieron was

5    a greater than 50 percent owner.  It would actually be

6    information that would have been consistent with the

7    information required by the form, correct?

8          MS. ARNETT:  Yes, Your Honor.

9          THE COURT:  I am not seeing how you would be able to

10   admit the information.  Part and parcel of the same set of

11   circumstances where we see offers -- partial entry of offers

12   that are admissions, and therefore not hearsay, can be done

13   selectively.  In this particular circumstance the -- this

14   information wouldn't qualify as either non-hearsay or for an

15   exception that I'm aware of.

16         MR. MINNS:  The form itself is hearsay, Your Honor --

17         MS. ARNETT:  Right.

18         MR. MINNS:  -- and it is good -- the highest

19   practice, practitioners who are trying to maintain total

20   transparency, do this all the time.  They attach an explanation

21   that doesn't fit into the body of the form.  All of the

22   reporting is hearsay.

23         MS. ARNETT:  It would come in under business records.

24   That's why they have the certification.

25         THE COURT:  That's different, I think, in terms of

 1  authentication; but, respectfully, I'm not -- I am not seeing

 2  the exception of this as being problematic, either from the

 3  standpoint of the fact that the Government had the information

 4  at the time that representations were made in the courtroom.

 5  And even if it was, and they had intentionally excluded it, I'm

 6  not seeing how you would have qualified this information for

 7  use with the witness.

 8          MS. ARNETT:  Well, the information would have come in

 9  if the certified copy that they provided was the complete copy

10  of the FBAR.

11          THE COURT:  Right.

12          MS. ARNETT:  Now if we would have started an

13  examination of the witness and they objected, then maybe

14  questions wouldn't have been allowed in, but as that form is

15  completed with the certification from Vincent, it would have

16  come in, whether questions -- you know, I don't know, because

17  it's past the weekend, a couple days later, where we would have

18  been question wise and where they would have objected.

19          MS. PARKER:  We would not have offered it unredacted,

20  so we would not have offered the certified.

21          MR. MINNS:  Where it stands right -- part of this is

22  the honesty of Mr. Pavlik.  The best practitioners attach

23  explanations in doubtful conditions or concerns or lateness to

24  explain to the person who receives the form that there may be a

25  problem.

 1          THE COURT:  And if the Service wants to take that up

 2    and make its decision on that basis, that may be perfectly

 3    pragmatic and reasonable, but once we're in a courtroom, we

 4    have to deal with the question of qualifying it as evidence.

 5          MR. MINNS:  Well, the -- it's evidence of the

 6    transparency and honesty of Mr. Pavlik and the client waving a

 7    red flag.  It is giving a red flag when you have an attachment

 8    to -- and the reason you do that is because you don't want to

 9    end up in court.  You want to end up in a civil proceeding, you

10    want --

11          THE COURT:  But the red flag was as to the late

12    filing, not a red flag as to its inaccuracy, correct?

13          MR. MINNS:  Those are two red flags, but it's very

14    rare that anybody has a problem with a late filing, except for

15    penalties and interest, and there aren't any penalties and

16    interest on the FBAR.  There's penalties for -- there's

17    different types of penalties but they're totally unrelated to

18    the tax code.  There are FBAR penalties.

19          The point of the matter is that it is part of the

20    return.  Government -- the jury is of the opinion, because of

21    the sworn testimony elicited by the Government, that it was not

22    part of the return.  Ms. Arnett was trying to explain that it

23    was part of the return, and the witness said, no, it is not,

24    and the witness was incorrect.  It also challenges the

25    witness's competency if he's making an expert opinion, and his

1  expert opinion is wrong, it challenges his competency, too.

2        THE COURT:  Well, how else is the jury ever going to

3  know about the fact of these -- the addendum?

4        MR. MINNS:  How else are they -- well, they don't

5  know now.  It's been pulled off just as -- they've pulled the

6  part off of the return that they represented to this Court and

7  to the jury was the one that was filed by our client and

8  Mr. Pavlik.  They've pulled it off, so the representation is

9  not true.  Representation of what was actually filed is not

10 true, as it sits in this courtroom right now.

11        THE COURT:  Right.  And we've kind of covered that

12 issue, but the point that I'm trying to get at is -- if your

13 point is that the jury will believe at some point that it

14 wasn't an appropriately certified return, how will that issue

15 ever arise?

16        MR. MINNS:  Well, it has increased the credibility of

17 the witness who said something that was incorrect and just

18 decreased the credibility of my co-counsel who said that it

19 was -- that it was leaving that off, and the jury has heard

20 that, and as it sits right now, they think Mr. Miller was

21 correct when he was wrong; they think Ms. Arnett was wrong when

22 she was correct, and the jury judges us on our truthfulness --

23        THE COURT:  Sure.

24        MR. MINNS:  -- as we sit in front of them, too, and

25 we make representations to them.

1          THE COURT:  The only other way that I would

2    anticipate the issue arising would be if Mr. Pavlik was

3    inquired of on either direct or cross concerning the FBAR

4    returns and their accuracy or timeliness.

5          MR. MINNS:  He's on the Government's witness list.

6    They haven't told us what day they're calling him.  He's on our

7    witness list, too, is he not?  Or, no, we put down everybody on

8    the Government's witness list, and we have the right to call,

9    too, so I'm presuming they're about to call him.

10         THE COURT:  Well, that is the one point at which we

11   may -- we might run into the question, and I'll be sensitive to

12   the issue arising.

13         The last item that was addressed in the motion were,

14   quote, six pages from the American Tax Services.  They are

15   described as -- as might having -- might have been useful with

16   respect to Carol Nathan, and I don't know what the six pages

17   were and I don't know why they might have been useful.

18         MS. PARKER:  Judge, I can -- give me a second --

19   summarize them and I'll provide you a copy.  First of all,

20   there are two pages that are emails about his state of Michigan

21   taxes, because, as you may recall, in 2009 Mr. Pieron moved

22   from Switzerland back to the United States and Michigan

23   prorates your taxing on your income based on your residency,

24   and it was going back and forth about that.

25         The next two pages were emails about wanting to --

 1  should I file the returns I have?  Her saying I haven't signed

 2  them yet, and they're going back and forth regarding the

 3  federal returns that she had sent to him, but she hadn't signed

 4  because they apparently weren't finalized, and then the last

 5  two pages are some sort of graphic or spreadsheet sort of thing

 6  which I can't tell you what they are about.  I really don't

 7  have any clue.  Let me get you a copy, Judge.

 8          MR. MINNS:  And I -- the lion's share of this work

 9  has been done by Mr. Sasse.  I haven't read the comments.  All

10  I know is that I have a key witness, it's my witness, and I

11  haven't seen these things at the time, so what's in the motion

12  is that they may have been -- I mean, when you have direct

13  statements -- I was not allowed to question her on statements

14  that other people made on the record that I objected to being

15  put in that gave hearsay statements from other people.  But

16  these were statements that she made herself, so I feel certain

17  I would have been allowed to question her on the statements

18  that she made herself.

19          THE COURT:  They were statements made in an email to

20  your client?

21          MS. PARKER:  Correct.

22          MR. MINNS:  That's my understanding.  I -- I have

23  not -- I -- they're statements of hers.  I haven't read them

24  yet, Your Honor.

25          MS. PARKER:  They're her --

1          MR. MINNS:  We got them at 9:00 at night on the

2    second -- one of the filings at 9:00 at night Friday night, and

3    we were working all weekend, and --

4          MS. PARKER:  Judge -- I'm sorry.

5          MR. MINNS:  -- I think the point is when the

6    Government is -- and it keeps happening -- the Government

7    dismisses a witness, and does not give us, I mean, not even --

8    not even -- less than an hour's notice, not even notice after

9    they're still under -- in the courtroom under subpoena.  Get it

10   only after they say this material does not exist, and then it

11   exists.  It's -- I've never -- I'm not accustomed to that type

12   of discovery process where you get discovery on a witness after

13   the witness has been dismissed.

14         I can look -- it's in front me right now, Your Honor,

15   I can --

16         MS. PARKER:  Judge, the first thing is they're his

17   client's --

18         MR. MINNS:  Can you please -- wait.

19         MS. PARKER:  -- emails; and, second of all, it's his

20   client's spreadsheet.  They were sending this stuff -- he was

21   sending it to Carol Nathan by email.

22         MR. MINNS:  Well, I would have questioned her on

23   this:  "Hi, Carol, can you please send me the IRS address.  I

24   would like to sign and send the forms today."  I would have

25   questioned her on that.

1           The Government made a big deal that the forms took a

2    long time to be signed and sent into the IRS.  I think -- I

3    think the real point of the motion is it is not appropriate for

4    the Government to hide *Jencks* and *Brady* until they deem it

5    proper and they only deem it proper after the witness has been

6    dismissed.

7           THE COURT:  How would you characterize that as *Brady*

8    evidence?

9           MR. MINNS:  "Can you please send me the IRS address."

10   That's Brady.  It's indicating that the client wants to have

11   the IRS address.  "I would like to sign and send the forms

12   today."  That's *Brady*.  It's indicating that the client wants

13   to send the forms today.  That's my understanding of *Brady*.

14   It's exculpatory.

15          THE COURT:  Isn't it -- when did he sign and send

16   them.

17          MR. MINNS:  I don't know.  Ashley will have to go

18   back --

19          THE COURT:  So then it becomes Government impeachment

20   of the defendant.

21          MR. MINNS:  I'm sorry?  Pardon?  So -- well, yes,

22   it's all potential -- they can use it for impeachment, too.

23   It's only been arrived in time if I put my client on the stand

24   that they can use it for impeachment of my client, by I can't

25   use it for impeachment of their witness.

1          MS. PARKER:  How does it impeach her though?  I mean,

2    it's not -- first of all, it's not *Brady*.  I'm sorry.

3          THE COURT:  First of all, it's an out-of-court

4    statement --

5          MS. PARKER:  Right.

6          THE COURT:  -- being offered by the declarant, and

7    it --

8          MR. MINNS:  But it's a record -- it's a business

9    record and that's what a business record is.  And that whole

10   business record has out of state -- court statements by

11   numerous different people.  That's an exception to the hearsay

12   rule.

13         MR. SASSE:  Judge, I would just add that all of this

14   is Rule 16 material, discoverable.  Whether it's *Brady* or not,

15   it's discoverable and should have been discoverable months ago,

16   should have been produced months ago.

17         THE COURT:  Why do you believe it's Rule 16 material?

18         MR. SASSE:  It's documents within the presence --

19   that the Government has that are relevant to the defense.

20   Normally they have to turn over all those documents; if it's a

21   document, they have to turn it over, other than their own

22   witness statements that are protected under *Jencks*.  All of

23   these kind of records, business records that they obtained,

24   from ATS or from Peregrine, were clearly Rule 16 documents.  It

25   should have been turned over long, long, long time ago, and

1  they don't have to be Brady.  They don't have to be Brady.

2  They don't have --

3          THE COURT:  I agree that they don't have to be *Brady*,

4  but Rule 16 is --

5          MR. SASSE:  Much broader than Brady.

6          THE COURT:  Depending on.

7          MR. SASSE:  It's different than *Brady*, right.

8          THE COURT:  It's different than Brady.

9          MS. PARKER:  Rule 16 is you have to give them

10  everything under the sun except for *Jencks*.  That's not Rule

11  16, and that's -- that's a specious argument, and I reiterate,

12  Judge, we're talking six pages that were provided by the

13  defendant.  He was exchanging them.  He's the computer expert

14  of all times we're told, and yet he doesn't have his own emails

15  and a two-page spreadsheet that he attaches to them?

16          We provided those, but the content of them -- I'm

17  sorry, I just can't seem to put my hands on it, I probably put

18  it into a different file, but the content of them are simply

19  emails about Michigan taxes and how to prorate them.  Asking

20  for the IRS address, as the Court's already noticed, is not

21  *Brady* or any Rule 16, and a spreadsheet of his making that is

22  undecipherable relevance.

23          THE COURT:  I'm -- I agree.  Back to the Government's

24  motion in limine.

25          MR. SASSE:  Your Honor, just -- before we leave the

 1   motion to dismiss, there was one major part of that motion

 2   which has not been addressed, and that is the whole idea that

 3   it is fundamentally unfair and a violation of due process to

 4   put this defendant on trial on a claim that he didn't pay his

 5   taxes when the Government has repeatedly refused to meet with

 6   him to, No. 1, determine whether, in fact, he owes taxes; and,

 7   No. 2, to decide whether there's a payment plan that can be

 8   made or some sort of arrangements that can be made to pay those

 9   taxes.

10        I think they have violated all notions of fundamental

11   fairness by the way they have proceeded in this case.  The

12   Court hasn't heard the entire record yet.  There's more

13   evidence on what he did to try to get the Government to meet

14   with him on his taxes and determine what -- whether he, in

15   fact, owes any taxes or not.

16        But the fact of it is, we've already seen some

17   indication that they haven't ruled on things, and they have not

18   ruled on things since 2012, I believe.  And now to turn around

19   and say, okay, now we're going to charge you as a criminal, and

20   now we're going decide in court whether you owe taxes, rather

21   than going through what we have promised, which statutorily he

22   was entitled to, which is a determination on these things long,

23   long, long, long time ago.  And my argument is, and that motion

24   in part argues, that it's a violation of due process to proceed

25   in the manner that they have proceeded in this case.

1        THE COURT:  Well, I appreciate the tenor of your

2    argument.  It's -- it struck me as an unusual record in the

3    sense that there was an unusually quick jump between the civil

4    filings and then -- excuse me, the filing of the returns and

5    the jump to a criminal proceeding.  Normally there would be a

6    period between assessment and there would be communication

7    between the taxpayer and the Government.

8        But it's also an unusual set of facts in the sense

9    that we have, if I recall correctly, the initial filing that

10   would have been done by -- prepared by Ms. Nathan, a later

11   filing by Mr. Pavlik, which actually would have increased the

12   tax liability from 2008, 2009, and then a later one which

13   reduced it to zero.

14       At what point would it -- is it your contention that

15   as a matter of substantive due process, the Internal Revenue

16   Service had an obligation to ask him why he had three amended

17   returns filed.

18       MR. SASSE:  Your Honor, I'm sure there are gray --

19   going to be -- there are gray areas as to when they can charge

20   you criminally, and you -- and they have not allowed you to

21   argue it out civilly.  I don't see this as a gray area.  I see

22   it as black and white, where he for years and years has said --

23   now we've been since 19 -- or 2014 when he filed it taking a

24   position that he owes no taxes on it, and inviting -- inviting

25   an audit, inviting them to respond to him and get a

1    determination, and they have absolutely refused to for five

2    years.   And now they're going to come in and say, ah, you

3    should have paid your taxes, which we never sat down with you

4    and really told you you do owe during that period of time.

5              I just think that, on the facts of this case, that

6    it's denial of due process.   I don't doubt that we can come up

7    with hypos that say, well, what if this had happened or that

8    had happened, and how long do they have to give you and so on,

9    but I think under the facts of this case, it's just very unfair

10   for them now to be able to come in before the jury and say he

11   should have been -- he should have done this, this and this,

12   even though we didn't do any of the things that we were

13   required to do under the statute.

14             THE COURT:   That's a good segue to the last argument

15   advanced in the Government's motion.   On that -- on that

16   motion, let me say that I think we've addressed the suggestion

17   that the prior military law enforcement service should not be

18   admitted.   It was.   Evidence of the payments that were advanced

19   after counsel was engaged is the last issue that I'd like to

20   address, but would like to get back to the final return that

21   was filed with Mr. Pavlik's assistance.

22             The Government's motion doesn't ask the Court really

23   to limit the amount of testimony related to that return.   It

24   almost kind of tips the ball up and asks the defense whether --

25   whether they want to go down that hole or not, and if I

1  understand accurately, the defense has been we've got to go

2  down that hole, it's our opportunity to prove to the jury that

3  there really is no tax owing.  Do I understand that accurately?

4             MR. MINNS:  The -- it's a twofold issue.  One is the

5  Government has the burden of proving beyond all reasonable

6  doubt that a tax is due and owing.  That is their burden.

7  There are experts, Mr. Pavlik and others, who say no tax is due

8  and owing.  That wouldn't -- that -- we wouldn't be here right

9  now on that issue if they had let the civil process go through

10  because the civil process would have said there is or is not a

11  tax due and owing.  They refused to do that, but the issue of

12  state of mind, if an expert, Mr. Pavlik is a renowned expert,

13  says this is the fact, you do not owe a tax.  All citizens have

14  a right to rely on that.

15             So Mr. Pavlik's position is -- is twofold; one, the

16  position is no tax is due and owing, and if that's the case,

17  then even if someone wants to violate law, they can't.  If they

18  are accused of not paying a tax that is due, and there's no tax

19  due, there cannot even be the beginning.

20             But if a tax is due, and he has a reason and *Cheek*

21  speaks to that.  The reason can be ridiculous, and *Cheek*'s

22  recent was ridiculous.  He had seen six -- he lost six tax

23  court cases.  He'd seen friends of his put in prison for not

24  filing tax returns, and he was a highly educated airline pilot,

25  so the Supreme Court threw out his conviction because the jury

 1   is to hear whatever it is, the substance of it, and judge

 2   whether it is subjectively real, not objective.  It can be

 3   objectively ridiculous and the tax person, payer, can still

 4   believe it, and that was the decision of the *Cheek* Court, and

 5   it was pretty much the same thing in the 1933 *Murdock* case, so

 6   it's pretty much always been this way since tax court cases

 7   have been criminally litigated in the United States.

 8          The Seventh Circuit had argued and had case law

 9   saying, no, if you do -- if you say the moon is made -- I don't

10   remember the exact reason, but the moon is made of green

11   cheese, the fringes of the flag -- certain arguments that had

12   been ruled to be frivolous hundreds of times, hundreds of days,

13   and the Seventh Circuit said you can't ever raise any of these.

14   If you raise them as a matter of law, you're guilty.

15          None of the other circuits had agreed we that.  The

16   Supreme Court had to decide between the circuits and they

17   balanced it in *Cheek* and they said, no, no matter how

18   ridiculous the theory is, if it's super ridiculous, then the

19   jury may take that into consideration that they don't believe

20   you sincerely believe it, but you don't get to throw it out.

21          In this situation, we're dealing with really the

22   undermining thoughts of *Cheek*.  I -- this is a real situation

23   with a very good CPA with a very legitimate opinion that --

24   that -- it would pass the objective test that the Seventh

25   Circuit had imposed before the Supreme Court told them they

1  couldn't.

2      THE COURT:  Well, let -- let's see if we agree on the

3  facts, and I'm reading right now from the memorandum that had

4  been compiled by the agent and that's attached to the motion,

5  and it provided, according to Pieron, all the money transferred

6  to the JDFX entities, approximately 15.3 million, was for the

7  purchase of purchasing shares amounting to 35 percent interest

8  in the JDFX entities from Pieron personally.  500,000 was for

9  repayment of the loan.  The remaining 22.3 million was used by

10 Cook for currency trading and JDFX accounts.

11     We do agree, do we not, that there was 15.3 million

12 advanced to your client?

13     MR. MINNS:  In that neighborhood, and one other side

14 fact, Your Honor, which -- which has been -- it bugs me, but

15 doesn't seem to be of interest to any of the experts, the money

16 was paid in 2007, so I don't see how -- the 10 million, 9

17 million something.  I don't see how that 9 million gets moved

18 into 2008, and that's the year of our inquiry right now.  But

19 the experts have all put it in 2008 on the tax returns, but the

20 money was received in 2007, so I'm -- I'm not an expert like

21 they are, but that's another issue, too, and I'm --

22     THE COURT:  Well, I'm looking at your brief in

23 opposition, it provided that over a four-year period, Cook

24 invested approximately 15 million in JDFX but doesn't say what

25 the four year time period was.

1     MR. MINNS:  I think -- I could be mistaken.  I think

2   the biggest year was 2007; some of it was in 2006 and some of

3   it was in -- I don't know.  I don't have a breakdown for you,

4   Your Honor.  I just know from the testimony that came into the

5   Court through Ms. Nathan's sheets, it was 9 million in 2007, if

6   I'm -- unless I'm mistaken.  Am I mistaken.  Yes, I'm told I'm

7   correct.

8         From the evidence that exists in this courtroom right

9   now, the majority of the income is in 2007, the largest

10  portion, but there is 5 million in the future years.  There

11  might not be -- there's another theory that there might not be

12  a tax due in 2008 and '09 because they've got nine plus million

13  in 2007 added into '08 and '09, and that's something that I

14  think I can argue based on the record, but that's my -- that's

15  my layman's opinion of it.

16        All individuals are cash -- are -- we -- we're not

17  S-corporations, and we're not off year, and we're not -- we're

18  not -- what's the word for it when you don't -- accrual.  We're

19  not accrual, we're cash.  So Mr. Pieron is a human being and

20  he's cash, and if this money was supposed to be used in 2008,

21  it wasn't put into a trust fund.  It was put into his hands in

22  2007, so I see an argument that there's -- that this income

23  doesn't belong in 2008 at all.  There's so much malpractice in

24  the original --

25        THE COURT:  It belongs in '07.

1          MR. MINNS:  I see that as an argument, Your Honor,

2    and if the Swiss people had handled it right, it doesn't belong

3    anywhere, but they didn't and we're stuck with -- civilly we're

4    stuck with that.  If you have malpractice and you owe a million

5    dollars in tax that you shouldn't have to pay, you still have

6    to pay it.

7          We also have an expert opinion that that's substance

8    over form, and we should go with the substance of the issue,

9    which wouldn't have a tax debt either, but I don't feel

10   comfortable with that because people choose what vehicle

11   they're in, like a trust.  One couple dies and they have --

12          THE COURT:  Well, let's back up --

13          MR. MINNS:  Yes, sir.

14          THE COURT:  -- you agree, and as would your client,

15   that there was $15 million advanced to him in at least

16   2007/2008.

17          MR. MINNS:  2006, '07, '08 and '09, and the

18   question -- all of it eventually went into the companies, so --

19   and that was the intent of the investor that he turned down to

20   take this investor instead, who didn't require as much

21   paperwork as the investor that he turned down.  And --

22          THE COURT:  But you also don't disagree that it was

23   advanced to him personally?

24          MR. MINNS:  Yes.  I -- I mean, that's inescapable.

25   He got -- it went into his hands originally.  It should have

Tomakich – Recross

```
 1  gone into a company hands, and it didn't.

 2          THE COURT:  Whether report -- putting aside the

 3  argument of the year of receipt --

 4          MR. MINNS:  Oh, I'm wrong, Your Honor.  Could I --

 5          THE COURT:  Sure.

 6          MR. MINNS:  I -- you should -- she was interrupting

 7  me because I just said something to the Court that was wrong.

 8          THE COURT:  That's okay.  Go ahead and confer.

 9          MR. MINNS:  I'd rather have her address the Court on

10  that.

11          MS. ARNETT:  It went to the company.

12          MR. MINNS:  It went to the company?

13          THE DEFENDANT:  The paperwork.

14          MR. MINNS:  The paperwork was in his name; the money

15  went to the company.  Is that correct?

16          THE DEFENDANT:  That's correct.

17          MR. MINNS:  So he didn't take personal possession of

18  the money, but the paperwork put the money in his name.  The

19  money went to the company.

20          THE COURT:  Where did the stock go?

21          MR. MINNS:  The stock went to the investor, Cook.

22          THE COURT:  From whom?

23          MR. MINNS:  It came from Mr. Pieron.  It should have

24  come from the company.

25          THE DEFENDANT:  Yeah, yeah, that was a mistake.
```

1            THE COURT:  That would have been helpful.

2            MR. MINNS:  I think he's stuck with it civilly, Your

3    Honor.

4            THE COURT:  Now, putting aside the fact of the amount

5    of cash that was involved in the initial transaction, this is

6    the way you describe the later set of circumstances for JDFX,

7    with the US move in progress, news of Cook being involved in a

8    Ponzi scheme surfaced.  The news resulted in the immediate

9    termination of JDFX prime brokerage account with Deutsche Bank,

10   its credit lines with over a dozen money centered banks and its

11   clearinghouse.  Shortly thereafter, James lost his primary

12   customer, chief programmer and partner, ultimately losing even

13   his brother who went to work for a competitor.

14            The understanding that I have in the courtroom so far

15   from argument is that the -- when it lost its primary brokerage

16   accounts with Deutsche Bank and credit lines, JDFX folded; it

17   was insolvent.  At least it was unable to continue doing

18   business at that juncture.

19            MR. MINNS:  Yes.

20            THE COURT:  I'm struggling with the application of

21   the theft loss rules or even the suggestion that at the time

22   the initial 15 million was advanced there was any condition or

23   even possibility of an obligation on Mr. Pieron's part to

24   return the 15 million.  There was never any commitment on his

25   part to return those funds, was there?

 1              MR. MINNS:  Well, the returns were -- some of the

 2    funds were seized by the receiver, because Mr. Cook didn't have

 3    a right to make the investment in the first place.  And if the

 4    company had stayed open, they would have been required to pay

 5    it back, or if they had the financial ability to pay it back,

 6    they would have been required to pay it back to the receiver.

 7              THE COURT:  True.  He then had a security with no

 8    value?

 9              MR. MINNS:  Yes.  He had -- he had shares in a

10    company that had no value.

11              THE COURT:  But that had a value at a prior period of

12    time --

13              MR. MINNS:  Yes, sir.

14              THE COURT:   -- equal to the consideration that he

15    received for it?

16              MR. MINNS:  One suspects far more than equal to the

17    value he received for it.  Our client has informed us that the

18    employee of the company that left that took a copy of the

19    algorithm, that a copy was sold to the investor, the

20    billionaire, Harry Pike to the tune of $50,000, and the person

21    that worked for him became a competitor, opened up another

22    store competing, and his business from that product is worth

23    over $150 million.

24              So I don't -- nobody -- nobody's evaluated any of

25    these businesses, sat down and tried to evaluate them, and

Tomakich - Recross

 1  they're not public companies, so they don't have a -- they

 2  don't have public disclosures and SEC rules, so we don't

 3  really -- I mean, nobody sat down and evaluated them.

 4          One of the reasons there's so many theories,

 5  different unrelated theories, is because of defense and what

 6  could have happened is because the bookkeeping was so atrocious

 7  all the way through this.  It's mind bogglingly incompetent.

 8  There's no real -- real road map.

 9          THE COURT:  I appreciate your remarks.  Government.

10  We've got two issues that we've confronted here that I think

11  haven't been addressed yet by the Government.  The first of

12  which is the defendant's suggestion that as a matter of

13  process, the transition between the filing of the returns,

14  civil consideration of the propriety of the tax reporting and

15  transition to criminal proceedings was truncated and

16  unnecessarily eliminated the defendant's entitlement to engage

17  the Government in the propriety of the assessment.

18          The second argument obviously relates to the

19  propriety -- or at least the motion in limine's attention to

20  introduction of testimony concerning Mr. Pavlik's later

21  characterization of the loss with the carryback.

22          Let's start with the first one.  The defendant

23  suggests as a matter of due process that they have unfairly

24  been lim -- unfairly prohibited from any kind of engagement

25  with the Government concerning the accuracy of the returns.

1  The argument is that the process so far has been unfair and

2  that the Government hasn't engaged in a way in which, certainly

3  under the Taxpayer Bill of Rights, they suggest it should have.

4  Fair or unfair?

5           MR. DEPORRE:  I think the defense is reading a due

6  process right where none exists, for the purposes of evasion of

7  payment, even if -- I think the Court last week addressed an

8  issue of timing, and the question that the Court posed was if a

9  subsequent loss carryback, for instance, were to eliminate an

10 obligation, a tax obligation, and yet there were still all the

11 elements of evasion to set up while a tax was due and owing,

12 would that be a violation?  Would that be a charge ripe for

13 prosecution?  And the answer the Government said was, yes, and

14 that's supported by Circuit law, not Sixth Circuit, but other

15 circuits that have examined that issue.

16          I think the question, therefore, is when would -- for

17 the Government is when would the due process right -- when

18 would the defendant have a right to due process as to a due

19 process right to an audit, for instance?  I don't believe that

20 there is any constitutional recognized right, though it's

21 called the Taxpayer Bill of Rights, it's not the -- it's not

22 into the Constitution, and I think if we're talking about Fifth

23 Amendment due process, we're going beyond the Taxpayer Bill of

24 Rights, and it has to be a recognized right by the Supreme

25 Court, and I don't -- I don't know of any recognized right to

1  an audit, particularly in a situation where the taxpayer has --

2       THE COURT:  And we agree.  We agree.  There's no

3  constitutional right to an audit that I'm aware of.  But I've

4  never -- I'm not familiar with a process that has operated in

5  as expedited a fashion in transition between assessment and

6  criminal tax evasion proceedings.  Is it your suggestion that

7  that there is nothing fundamentally flawed about the process in

8  this instance, that there is nothing that -- no obligation on

9  the part of the Government to have responded in any particular

10 fashion beyond the manner in which they have?

11      MR. DEPORRE:  That is my contention, and as has been

12 raised in the trial, early after I believe -- in about March of

13 2012, there was what's been characterized as an IRS freeze code

14 put on the account, which indicated to civil IRS personnel not

15 to engage in contact with the defense, with the defendant.

16 However, that did not preclude the defendant from speaking, or

17 his counsel, from speaking with the IRS criminal investigation,

18 and they had opportunities to speak with Special Agent

19 Hollabaugh at the time that the claim of right return was filed

20 in 2014 --

21      MR. MINNS:  No.

22      MR. DEPORRE:  -- the amended 2011 return.  Mr. Pavlik

23 called the IRS, and he was told by IRS personnel that there was

24 an open criminal investigation, and the IRS civil personnel

25 provided Mr. Pavlik the phone number for Mr. Hollabaugh.

Tomakich - Recross

192

```
 1          So this is not a situation where there has been a

 2   complete limitation on communication between the taxpayer and

 3   the Government.  Even if it were, I don't think there's any

 4   right -- though it may be unusual, there is no due process

 5   right to pretrial negotiations or to, you know, discussions of

 6   tax liability or right to an audit, and so I can't envision

 7   that ever arising to a Fifth Amendment violation.

 8          THE COURT:  The next issue, and that is the argument

 9   that you advanced in your motion in limine, what I basically

10   understood that to mean was that if the defense agreed, you

11   would not challenge, for purposes of trial, the second Pavlik

12   return and the assertion of a theft loss that was advanced in

13   the offer.  Is that a fair summary?

14          MR. DEPORRE:  That's a fair summary that if the Court

15   were to grant the motion to exclude that testimony --

16          THE COURT:  You really weren't -- you weren't seeking

17   a limitation, you're asking the defendant if they would agree

18   to limit proofs related to that, at least that was the language

19   of the motion as I understood it?  Is that --

20          MR. DEPORRE:  And perhaps we should have been more

21   explicit.  We are asking the Court to limit the defendant from

22   eliciting testimony that this was, in fact, a theft loss or

23   this was, in fact, income where a deduction would arise under

24   the claim of right doctrine.

25          Mr. --
```

1            THE COURT:  If Mr. Pavlik thought that was the case,

2    and advised his client that that was a fair application of the

3    tax law, and in reliance on that advice, the return is filed,

4    isn't he entitled to that defense?

5            MR. DEPORRE:  I think under *Cheek* he's entitled to

6    the defense of willfulness, so if -- if the defendant were to

7    find admissible evidence regarding his state of mind and why he

8    decided not to pay a tax, that he believed he didn't owe, he

9    would be entitled to present that defense, like I said, through

10   admissible evidence.

11           What I'm suggesting is that, in the context of *Cheek*,

12   and I think it is applicable here, where there is an outside --

13   a non-legally viable defense, such as the frills on the flag or

14   a sovereign citizen defense, that that defense, while it may be

15   a defense as to the element of willfulness, and the defendant

16   in *Cheek* can get up and say, well, I didn't know that I had to

17   pay the tax because there are frills on the US flag, certainly

18   doesn't mean that we need to have expert testimony, or other

19   testimony, presented in court to actually say that this is a

20   viable theft loss or that this is a viable -- that this is, in

21   fact, a theft loss or that this is, in fact, a deduction under

22   the claim of right doctrine.

23           If the defendant wants to, for instance, take the

24   stand and discuss his own willfulness, and talk about his

25   beliefs and why he didn't pay the tax, I think *Cheek* allows

```
 1  that.  I don't think that *Cheek* goes so far as to say that
 2  expert testimony, or other testimony that supports a
 3  non-legally viable position, has to be admitted.
 4          THE COURT:  Well, let's take that apart in two
 5  pieces --
 6          MR. MINNS:  Your Honor --
 7          THE COURT:  Just a second, we'll get there.
 8          MR. MINNS:  No, could I use the restroom, I'm sorry,
 9  I'm -- I'm -- I'm having tiny accidents.  I don't want to miss
10  a second of this.
11          THE COURT:  Please.
12          MR. MINNS:  I'm actually enjoying it thoroughly.
13          THE COURT:  Please run.
14          MR. MINNS:  Thank you.  I'll be back in 60 seconds.
15          THE COURT:  We'll give the poor gentleman a break.
16          (Brief pause.)
17          THE COURT:  One question got raised -- I have been
18  asked questions here over the course of the last day, how we
19  think we're doing on our -- the presentation of the case in
20  terms of timing?  Because we're trying to gauge a number of
21  things as we get out towards the 12th, in part representations
22  that we've made to at least one juror.
23          MR. DEPORRE:  I do think that depends to a large
24  extent on the ruling today of the Court.
25          THE COURT:  Okay.  We haven't discussed anything
```

1   while were you out, Mr. Minns.

2        MR. MINNS:  I'm sorry, Your Honor.  I'm so drawn into

3   this discussion, I didn't want to miss a minute of it.

4        THE COURT:  Sure.  But before we left the Government,

5   I want to make sure that there's one point at which they can't

6   clarify.  It appears that we have agreement that there was

7   someplace between 15 million and 15.3 million advanced, more

8   likely than not in 2008 by Mr. Cook to Mr. Pieron, perhaps as

9   early as 2007, with the further qualification that it might

10  have occurred over a period of four years, but there doesn't

11  seem to be any difference of opinion that the 15 million was

12  advanced.  It was in consideration for the stock of JDFX, that

13  the stock was personally owned by the defendant, and that is

14  was not an issue of treasury stock.

15       I don't see where the 15 million ever shows up in the

16  return, and I don't know how it turned up as a $6 million

17  figure in the amount -- in the return that had been filed by --

18  the initial return for 2008, 2009 by Ms. Nathan.  Does anybody

19  know where the difference went between the 15 million and the

20  reported six -- excuse me, nine?

21       MR. MINNS:  We --

22       MR. DEPORRE:  Your Honor, as part of the submissions

23  that the defendant made to Ms. Nathan, he made representations

24  regarding the initial basis that he had in the stock.  This was

25  a startup company.  He did not have any basis in the stock

1    sold, so I believe that that accounts for the difference.  The

2    entire 15 million is reflected for the years '08 and '09.

3            THE COURT:  So a tax basis of six?

4            MR. DEPORRE:  Or thereabout or maybe nine.

5            THE COURT:  And is that -- is the background for the

6    6 million for -- assigned to the basis addressed in the return

7    and I -- if so, I haven't located it?

8            MR. DEPORRE:  I'm told that it is, the basis is

9    reflected in the return.

10            THE COURT:  Okay.  I'll look at it a little bit more

11    closely.

12            The Government's position would nevertheless be the

13    full 15 million was reflected, however, in the initial return.

14            MR. DEPORRE:  It was reflected, though it was

15    incorrectly accounted for.

16            THE COURT:  Okay.  Sir?

17            MR. MINNS:  Thank you, Your Honor.  I -- the way the

18    Government has been discussing willfulness is that it's our

19    burden to prove -- to disprove willfulness.  It is not our

20    burden.  They must prove willfulness.  And the way that

21    willfulness is disproven, the two first cases that came out

22    after *Cheek* dealt with what kind of evidence you get to put on

23    to prove your subjective intent, and one of the leading cases

24    was *United States versus Powell*, which was in the Ninth

25    Circuit.

 1          Mrs. Powell was a schoolteacher and she relied on a

 2   statute that said the IRS shall prepare a return, a substitute

 3   return, and in the statute, the "shall" meant "may."  The

 4   Courts had said it means may, it doesn't mean shall.  It was

 5   6020(b).  The judge refused to let her show that statute to the

 6   jury, and Mrs. Powell went to the law library and researched it

 7   and found me, and I handled her appeal in the Ninth Circuit,

 8   and the Ninth Circuit Court of Appeals said that it was error

 9   not to let her show the jury what she relied on.

10          And that's pretty much been how -- how it's been

11   handled in every circuit in the United States, with some

12   exceptions in the Tenth Circuit, which has a different

13   standard, and a two to one decision in the *Willey* (ph) case,

14   and I can talk about that if the Court wants.  I'd rather not

15   because it's the only one that doesn't -- if forced the Powell

16   doctrine.

17          So the defense doesn't have to -- the Government --

18   and I objected to this in their opening when they said

19   Mr. Pieron isn't going to get up on the stand and say I

20   willfully did something.  And I objected because it was a

21   comment on his Fifth Amendment rights, and I lost -- I lost

22   that objection; but, nevertheless, he's not required -- the law

23   does not require him to prove that he is not willful, they must

24   prove he's willful, and the law allows us to show what he

25   relied on, and they are not allowed -- the Government is not

1  allowed to comment on whether he takes the stand or not.

2         THE COURT:  True.

3         MR. MINNS:  And so that's of particular importance

4  that we don't lose that.  Mr. -- there's -- when that return

5  comes into evidence, it is --

6         THE COURT:  Well, let's look at the issue a slightly

7  different way.

8         MR. MINNS:  Yes, sir.

9         THE COURT:  How far should we permit the Government

10  to go to substantiate the fact that there was no theft by

11  Mr. Cook from your client -- let's leave it at that.

12         MR. MINNS:  Well, I -- our theory --

13         THE COURT:  Is there any -- any reasonable limitation

14  on the Government, if that door is open, to substantiate the

15  fact of Mr. Cook's conviction and his association with your

16  client, who he agreed through counsel that, quote, a

17  substantial majority of JDFX Fund's foreign currency trading

18  business involved the transactions executed by Mr. Cook.

19         How extensive a right does the Government have to

20  substantiate the fact that the defendant is not a victim of

21  Mr. Cook, and as a result the applicable line of argument that

22  Mr. Pavlik advanced really makes no sense on these facts?

23         MR. MINNS:  Well -- and I could be wrong, I think the

24  original returns dealt with the theft loss, and the amended

25  returns dealt with the right of claim loss, and I think they're

 1    based on the same fact situations so, you know, I mean, I -- as

 2    far as -- as far as my client's state of mind, it's based on

 3    seeing Ms. Nathan, feeling insecure, going to Mr. Pavlik, even

 4    before the return was filed and saying, I think I have the

 5    wrong tax provider.  I've already made that mistake once

 6    before, and his person that works for him sent him to

 7    Mr. Pavlik.  I think he thought the same thing, perhaps, of

 8    Ms. Nathan, and so Mr. Pavlik takes over and he gets a fast

 9    return on file as quick as he can.

10            THE COURT:  Well, let me read part of your brief back

11    to you again.  "The news resulted in the immediate termination

12    of JDFX's prime brokerage account with Deutsche Bank, its

13    credit lines with over a dozen money center banks, et cetera."

14            There's no reference in the context of that paragraph

15    to anything other than third parties responding to findings

16    concerning Mr. Cook.  Mr. Cook isn't himself personally doing

17    anything to JDFX.  It happens as a result of the response of

18    third parties, true?

19            MR. MINNS:  Yes, absolutely, absolutely.

20            THE COURT:  Can the Government introduce those facts

21    or would you object?

22            MR. MINNS:  May I confer with counsel?  I --

23            THE COURT:  I'm just making sure that if we're going

24    to go down the hole, we all agree what's in it.

25            MR. MINNS:  I don't -- the real -- the real thing

1  there is the Government -- probably why this thing started, and

2  probably why -- and I have a case on the other thing, the

3  duty -- the right of defendant to dispute assessments, and it's

4  an Eighth Circuit case, in a criminal trial, the earlier

5  question of the Court, but Ashley will respond to that when I'm

6  through.

7          The -- the original -- the original thought process

8  when I first got this case was the Government has -- there's

9  got to be some reason why the Government denied him all of his

10 due process.  The Government probably thought he -- or

11 suspected or decided he was in bed with Cook.  He was not in

12 bed with Cook, so he got mixed up in that, and rather than give

13 him his normal civil due process, they said, you took money

14 from Cook, we're going to take you down.  Then they realized --

15 they spent a lot of money and a lot of time and they realized

16 he wasn't in bed with Cook, he was a victim of Cook.  Had he

17 not gone with Cook, had he gone with Pike, the billionaire

18 that's financing the new generation thing, he wouldn't -- he

19 would have been successful and the company would have stayed

20 open and everything.

21          So in that regard he was a victim of Cook, and -- but

22 the Government -- if the Government says Cook is a crook, we

23 agree that Cook is a crook.  I don't see a problem going down

24 there.  If the Government says, he's in bed with this crook,

25 and tries to insinuate that he's a crook without any evidence,

1  because there is no evidence, because he's not a crook, that

2  would be the problem.  I mean, we're in unity with the

3  Government that Cook is a crook, and --

4          THE COURT:  Can the Government introduce the

5  statement that was made to Mr. Hollabaugh that Pieron

6  acknowledges that a substantial majority of JDFX foreign

7  currency trading business involved the transactions executed by

8  Mr. Cook?  Admissible?

9          MR. MINNS:  I don't see what -- how -- what effect it

10  has on this, although, I mean, our client was referred to

11  Mr. Cook -- or was referred to Mr. Cook by Peregrine?

12          MS. ARNETT:  Yes.

13          MR. MINNS:  Peregrine referred our client to

14  Mr. Cook.  Peregrine was crooked.  They are deceased now.

15  Cook's company isn't doing any -- Cook is in jail, and if you

16  unwittingly deal with criminals, your future can be bleak.  And

17  because of that, and because of the linkage, it destroyed his

18  company, Deutsche Bank would not do business with him anymore.

19  He had an excellent reputation with them, but because of the

20  Cook scandal, it destroyed his business.

21          So if the Government seeks to prove another untrue

22  fact, and that is that he was in bed with Cook, yes, we would

23  object completely to that.  If the Government says -- if the

24  Government says Cook is a crook, we've already said that

25  ourselves, and we don't have any objection to Cook is a crook.

Tomakich - Recross                                           202

 1   That is a fact.  He confessed -- did he confess?

 2            THE COURT:  And nobody disputes that.

 3            MR. MINNS:  Pardon?

 4            THE COURT:  I said no one disputes that fact.

 5            MR. MINNS:  Yes.

 6            THE COURT:  The question that will be placed before

 7   the jury in part is the question of whether or not your client

 8   was innocent of an act of theft by Mr. Cook as opposed to

 9   incidental damage as a result of decisions made by Deutsche

10   Bank and related capital parties.

11            MS. ARNETT:  So I just think something needs to be a

12   little bit clearer in that the value for the company was the

13   tech and the connections that were necessary to run the

14   technology, run the algorithm.  Because of the issues that came

15   out with Cook, those connections were lost because Deutsche

16   Bank shut down the trading firm.

17            So there is -- the idea that Cook is out there is

18   only in the sense that the connections that were necessary to

19   run the company were broken and the reputation.  I don't know

20   if that helps.

21            THE COURT:  I think it clarifies facts concerning the

22   propriety of the offer and compromise and the merits, because

23   the offer -- the theories offered in support of the offer and

24   compromise have to rest on those facts so, yes, I agree that it

25   is --

1          MS. ARNETT:  Okay.

2          THE COURT:  -- important.

3          MR. MINNS:  And my inadequacy of explaining the claim

4   of right is because I don't understand it.  And there are two

5   experts that both say that it is valid; one is Professor Gavin,

6   and one is the man that created the tax return.  I don't

7   understand it.  I understand substance over form.  I think it's

8   unfortunate.  I don't agree with it because if -- but I

9   understand that is a valid theory, but I don't understand

10  this -- I don't understand it.  People that know more about tax

11  do understand it.  There's some case law dealing with it.  It's

12  the people that were damaged by Madoff in different ways and

13  that's how this started coming about.

14         THE COURT:  Sure.  There were innocent investors that

15  lost their investment because of Madoff's theft.

16         MR. MINNS:  Yes, sir.  And collateral damage, and I

17  don't -- I don't understand that, and I didn't follow --

18         THE COURT:  In this case --

19         MR. MINNS:  I didn't follow Madoff anymore than just

20  reading it in the newspapers, that's -- like everybody else,

21  but I don't have any details on it.  I just know that that has

22  something to do -- that -- there were people that are using

23  this claim on taxes, and I don't know how they are using it.

24  This is the only case I've ever had that dealt with it.

25         THE COURT:  Interestingly enough, the argument might

 1  have been advanced by Mr. Cook concerning his loss of the

 2  15 million invested in JDFX.

 3          MR. MINNS:  Well, but he's the cause of it.  I don't

 4  see -- I mean, I -- I --

 5          THE COURT:  I appreciate your point.  But I think the

 6  answer is, at this point, we're going down that hole, and so

 7  we're not granting any limitation at this point either with

 8  respect to the defendant's ability to advance the defense, or

 9  the Government's ability to take on the propriety of it, either

10  legally or factually.

11          Last issue that I have need a little bit of -- need

12  to give a little bit more thought and attention to is the

13  Government has to prove the loss, but the questions becomes at

14  what time.  The defendant argues, at least in part in the

15  motion in limine -- or at least the Government -- excuse me,

16  the Government argues in the motion in limine that the later

17  payments made after counsel was engaged should be legally

18  irrelevant and not admissible to the jury, because of the

19  potential for confusion insofar as they reflect the defendant

20  at least making those payments.

21          At what point must -- is the loss relevant?  Is it

22  after the return is filed and the admission is made by the

23  defendant, which we know would be the case here, because

24  Ms. Nathan's return reflected a tax liability that was unpaid.

25          The tax liability that would have been furnished on

Tomakich - Recross

1  the initial return by Mr. Pavlik was not paid.  What is the

2  relevant period of time that an unpaid tax is relevant?  Should

3  we exclude the later payments that were made by the defendant

4  because they're legally irrelevant to the relevant time period

5  for the proof of the loss or not?  And I don't have an answer

6  to that question.  I haven't had a chance to get to that.  Sir?

7           MR. MINNS:  Does the Court want response?

8           THE COURT:  Yes, and I'm not, on that particular

9  point, asking you to necessarily shoot from the hip, but it

10  seems to me a necessary -- that we necessarily need an answer

11  to that question as a matter of law to answer the one remaining

12  question that we have before us, and I think it also is

13  relevant to the defenses to some extent because if, before the

14  final Pavlik return is filed, the proof of an unpaid tax is

15  already made, then maybe you don't want to go down that hole

16  for another reason.

17           MR. MINNS:  Well, and here -- we did file a motion

18  challenging the indictment itself for vagueness, and I would --

19  the problem with it, most indictments are on or about a

20  specific time or date.  This is on or about a 10-year period of

21  time, and they didn't even say that.  They said that we were

22  continuing to commit the crime, and the indictment says, I

23  think, as of today and -- or to current date, which could

24  either be defined as the day we're in the courtroom or the day

25  of the indictment.  There's no other way to define it.

1          That means we were actively -- and they have to

2     prove -- they can't just prove omission, failure to pay.  They

3     have to prove a commission, so they were saying that

4     commissions were occurring all the way up to the minimum

5     July 18th.  So anything that is the opposite of a commission,

6     that is an action, the opposite of a commission, is absolutely

7     admissible.  And the case law on these things -- some cases

8     have specific situations where they stopped them, and some

9     cases say, no, all the way up to the date of trial payments can

10    be in evidence.  It must be judged on the case itself on the

11    facts as they're applied in front of the Court and the facts --

12    and in the indictment.

13         So we have to be able to defend ourselves up to and

14    including July 18th, 2008.  They haven't said in the indictment

15    what -- they -- the bill of particulars, which the Court ruled,

16    I guess, cured that defect in the indictment, which we

17    disagreed with and lost, but the bill of particulars suggests

18    certain things that are happening over the time, but they --

19    the indictment says all the way up to that current day.  So I

20    don't -- and the other thing is this, if it's a continuing

21    course of conduct, it started as early as 2010.

22         THE COURT:  So you think the limiting factor is the

23    outside time identified in the indictment as opposed to the

24    notion that the payment needs to be made at the time the return

25    is filed or some reasonable time thereafter.

1           MR. MINNS:  Well, I think the Government defined the

2    reasonable time thereafter as the date that the -- that our

3    client understood the difference between civil and criminal and

4    that there was a criminal action against him, and I -- that's a

5    fact question.  I mean, I don't know that it will be resolved

6    in this case at all, or if right -- I think right now, being in

7    a criminal courtroom, I think he clearly understands the

8    difference in a criminal violation and civil violation of the

9    tax code, but it was -- it was his understanding that -- and it

10   is extraordinarily common with entrepreneurs and starting

11   businesses, and we counsel them constantly, do not use the IRS

12   funds to pay your bills, because they're the most expensive

13   funds you will ever pay in your lifetime.

14           You know, I mean, you're better off going to the

15   Mafia and borrowing money, so -- but we don't -- we don't

16   typically get -- if we get -- if a case comes into our door at

17   that presence, it's not going to come into your courtroom,

18   so --

19           THE COURT:  They are the easiest to borrow from,

20   slowest to act, but the most powerful of any creditor you could

21   choose.

22           MR. MINNS:  Yes, Your Honor, absolutely.

23           THE COURT:  Well, if we were to allow in your payment

24   schedule because you believe that all that is relevant is the

25   outside time of the -- identified in the indictment, as opposed

1   to some other identification of when the loss -- or, excuse me,

2   the unpaid tax existed, are they also able to offer in response

3   the particular circumstance that the defendant was in in terms

4   of his relationship with the Service at the time he wrote the

5   check?

6          MR. MINNS:  I -- I'd like to keep that out, but I

7   don't see an argument that can.  I think that they are entitled

8   to that.  I think under their argument the only -- the only --

9   yeah, I mean, obviously, Your Honor, the jury's supposed to

10  determine the subjective belief.

11         There's a very limited time period where they can

12  argue anything, and that limited time period is between the

13  2012 filing -- or the 2000 -- the date that the return was

14  filed, I don't remember, it's 2011 or 2012, where Carol Nathan

15  filed an inaccurate and inadequate tax return because she was

16  not competent to be file it, but it did suggest that he owed

17  some money.

18         So from that time until the new Pavlik return, they

19  could argue the possibility that he knew he owed a debt if, in

20  fact, he owed a debt.  They can't even argue the possibility,

21  but in the indictment they've charged us with defending against

22  all of his actions, up to and including July 18th.

23         So typically the indictment would say on or about and

24  give us a target time, and we've been defending against a

25  10-year span, and the evidence has gone through the whole

```
 1   10-year span, too.  And I don't think that's reasonable, and I
 2   don't think it protects uses from double jeopardy, too, because
 3   we don't actually know the exact on or before time.  I'm guess
 4   that the only rational on or before time is from the incorrect
 5   Carol Nathan return and the Pavlik return, because any time
 6   outside of those parameters --
 7            THE COURT:  Which Pavlik return?
 8            MR. MINNS:  The final Pavlik return.  The first
 9   Pavlik return suggested that we owed money.
10            THE COURT:  Yes.
11            MR. MINNS:  The second Pavlik return suggested that
12   we don't owe money, but the other thing is this, typically, the
13   cases that they've cited are the people pay at the very last
14   minute.  The cases that they have not -- there's no case on
15   record where a single payment was kept out, if it was part of a
16   schedule of extra payments, and we have a schedule of more
17   payments than are due from 2010 all the way up to the last
18   payment in 2018.
19            He was overpaying, and that overpayment was going --
20   the IRS was taking every year, 16,000, 17,000, 19,000, so he --
21   he was worried that he might owe something.  He was never -- in
22   his wildest imagination didn't think it would be as large as it
23   would be, but he was worried he might owe something, so he was
24   overpaying, and then he also overpaid on top of that.  The
25   $1,500 payment was not the only overpayment that he made for a
```

```
 1   period of time when Mr. Pavlik said pay something between a

 2   thousand and 2,000, so he picked 1,500.

 3          He has a history, from 2010, before this

 4   investigation began, even before the secret -- we're guessing

 5   that the secret investigation started in 2012 or '11 when the

 6   freeze code was put on.  What year was this?

 7          MR. DEPORRE:  It was March of 2012, Your Honor.

 8          MR. MINNS:  So we're guessing that the secret

 9   investigation began in 2012.  He began making payments two

10   years before the secret investigation even started, and he

11   couldn't have known the day that the secret investigation

12   started, so sometime between then, and until very recently, he

13   did not understand the -- this is a very common thing.  Every

14   lawyer knows the difference in the criminal and the civil tax;

15   most layman do not.  They think that if you try to make your

16   payments, there's no possibility of a criminal charge being

17   made against you and so -- and there are Code provisions for

18   penalties and interest, and he -- history of bad bookkeeping

19   and a history of paying huge penalties and interest, and --

20          THE COURT:  We've gone as far as I think we can

21   today --

22          MR. MINNS:  Thank you.

23          THE COURT:  -- and I -- that is the one question that

24   remains open so far as I'm concerned is to gain a little better

25   understanding on that one point.
```

211

1          MR. DEPORRE:  May I ask a couple points of

2    clarification, Your Honor --

3          THE COURT:  Yes.

4          MR. DEPORRE:  -- as to the -- the discussion

5    regarding the theft loss and the claim of right doctrine, does

6    the Court -- the Government said that we understand the

7    defendant's ability to defend on willfulness grounds against

8    that.  Does the Court envision -- I guess, I'd like to clarify,

9    but also argue, that it -- the Government doesn't view it as

10   appropriate for an expert witness to get up and say the claim

11   of right doctrine is -- was applied correctly in this case

12   when, in fact, it was not.  And so if -- if there's testimony

13   by Mr. Gavin, or Dr. Gavin, that the defendant never relied on,

14   it doesn't really make sense that -- that doesn't go to the

15   defendant's willfulness.

16         THE COURT:  Well, the interesting issue at this point

17   is that to a large extent, on the facts of the case, because

18   the -- they would like to prove the fact that there's no

19   payment owing at all for the time period based on that later

20   return.  I believe, and see if you agree, that they are at

21   least entitled to the CPA's opinion that was advanced in the

22   offer of compromise.

23         MR. DEPORRE:  I would not agree with that, but --

24         THE COURT:  And why not?  On what basis?  Even --

25   even if I disagree with the CPA, if the CPA were quite willing

1    to enter the courtroom and say the facts -- factual information

2    that I received from the client was, by all appearances, sound

3    and this is my interpretation of the tax law and I told him

4    that, that is a legitimate defense for the defendant, wouldn't

5    you agree?

6              MR. DEPORRE:  Not unless the defendant can add to

7    that that I reasonably then relied on --

8              THE COURT:  Sure.

9              MR. DEPORRE:  -- his preparation, and so what the

10   Government doesn't want is to have Mr. Pavlik come in but not

11   marry up that second part regarding reliance.  For Mr. Pavlik

12   to come in and opine that this was his view of the theft loss

13   deduction, or this was his view of the claim of right doctrine,

14   and not combine that with testimony from the defendant that he

15   took that advice and filed this return and thought there was no

16   balance due, I think that would confuse and prejudice the jury.

17             MS. ARNETT:  So they have to prove a tax due and

18   owing.  If our 2011 amended return is correct, and a claim of

19   right doctrine is correctly applied, we're making the defense

20   that there is no tax due and owing.

21             THE COURT:  Correct.

22             MS. ARNETT:  They're -- we're absolutely entitled to

23   put on that return, and we're absolutely entitled to put on

24   Mr. Gavin who will testify that it was correctly applied.

25             THE COURT:  There's two different issues I think.

213

1              MS. ARNETT:  Yes, sir.

2              THE COURT:  I tend to agree with you with respect to

3    Mr. Pavlik --

4              MS. ARNETT:  Uh-huh.

5              THE COURT:  -- which is who I think is in a position

6    to be able to testify, of personal knowledge, that the

7    information was furnished to him by the client and of his

8    belief in the application of the legal theory to justify the

9    zero tax return because the defendant is entitled to say I

10   relied in good faith on the opinion that I received from the

11   CPA.

12             I think the second question is, can the defense

13   buttress the accuracy of the Pavlik return with an opinion

14   witness that I disagree with?  And that's what I was saying

15   last Friday, we have some line drawing to do.  I essentially

16   meant boundaries between what an expert witness can testify

17   about concerning the application of what is essentially a legal

18   theory concerning the application of the Internal Revenue Code,

19   if I, on the other hand, would reach an entirely different

20   conclusion, and that is the line drawing that I'm still

21   wrestling with in my own mind.  And I don't have any problems

22   at this juncture that the CPA is appropriately -- may

23   appropriately testify.

24             MR. MINNS:  Well, the burden of *Cheek* -- *Cheek* gives

25   all taxpayers the ability -- a little bit more safety, but the

1  burden *Cheek* also gave the taxpayers was that they have to --

2  it's up to the jury to decide if their subjective opinion is so

3  absurd that they don't believe the person because the opinion

4  is so absurd.

5          So the fact is if an expert -- if a practicing expert

6  in the field believes that the opinion is not absurd, that is

7  useful to the jury to decide if this -- if the -- if Pavlik's

8  opinion is acceptable to other experts, that gives the jury

9  reason to believe that it is more objectively reasonable.

10         We don't have to -- we -- objectivity is not the

11  burden of the taxpayer, but if you can show objectivity you

12  have a better chance of convincing the jurors, and you have the

13  right to show as much objectivity as possible.  I think if the

14  Court finds that Professor Gavin is not qualified, if the Court

15  finds that he is -- that he is not reasonable, the Court could

16  deal with that, but I -- I think the Court's going to find that

17  he is qualified and his opinion is reasonable.

18         THE COURT:  One concluding observation, and that is

19  if anybody turns up any case law concerning the question of the

20  timing of the lack of payment of the tax that would moot out

21  the second Pavlik finding, such that the second filing doesn't

22  help the defendant by getting the tax to zero, it would be

23  helpful to know that before you make the decision.

24         MR. MINNS:  Well, there may be -- there can't --

25  there can't -- there is no case that deals with the situation

1   where he is required to defend himself on or about a decade and

2   where the Government can say we have decided, we're accusing

3   you of criminal conduct throughout the entire decade.  Our

4   opinion is that we have acts of honesty going all the way

5   through starting from 2010, so it's a continuing course of

6   conduct.  It's --

7           THE COURT:  I understand your argument.  Sir,

8   anything --

9           MR. DEPORRE:  There are two cases.  I believe they're

10  in the evasion of assessment category, which puts them somewhat

11  distinguishable from the facts in this case, but they are

12  *Willingham v. United States*, 289 F.2d, 283, pages 287 and 288,

13  Fifth Circuit, 1961.  If you would like me to say that again

14  slower --

15          THE COURT:  You can ask Mr. --

16          MR. DEPORRE:  You got it?  And then *United States v.*

17  *Keltner*, K-E-L-T-N-E-R, 675 F.2d 602 at 604, which is a Fourth

18  Circuit case from 1982.

19          And, lastly Mr. Minns suggested that the Government

20  had -- in its bill of particulars had limited the scope between

21  the -- the initial return filed by Carol Nathan to March of

22  2014.  We would agree that March of '14, 2014, is an

23  appropriate ending point.  We would disagree with the beginning

24  point, and we would say that a tax should arise at the time

25  that a return is due.  So if there is tax due and owing, and no

 1  return filed for the year 2008, and the defendant has to file a

 2  return by April 15th of 2009, then that is the period of time

 3  at which the tax is due and owing, and that starts the scope

 4  for when acts of evasion are relevant.

 5          MR. MINNS:  Well, this is a Sixth Circuit case,

 6  *Heindel*, H-E-I-N-D-E-L *versus United States*, 150 F.2d 493,

 7  Sixth Circuit, 1945.  The Sixth Circuit reversed on the basis

 8  of bad jury instructions and added the Court should have

 9  admitted evidence of prompt payment of additional tax shown by

10  the amended return.

11          We received a bill from the IRS in February of 2018.

12  This was the first date that he had the cash to pay because he

13  had just sold his business 30, 60 days earlier, and he paid it

14  within immediately.  So when the IRS sends you a bill for 2008,

15  in February of 2018, and you pay it in March of 2018, that is

16  evidence of intent to follow the law and to make them happy,

17  even though at that time he didn't believe he owed it.  They

18  may -- the -- I mean --

19          THE COURT:  We have accomplished what we're going to

20  today.

21          MR. MINNS:  Thank you, Your Honor.

22          THE COURT:  I would compliment counsel on examination

23  of the witnesses today.  While perhaps at points not exciting,

24  it was nevertheless very efficient, very productive, and we'll

25  look forward to a similar day tomorrow.  We'll see you at

217

1  10:00.  Thank you.

2           MR. MINNS:  Thank you.

3           (At 4:47 p.m., court recessed.)

4

5

6

7

8                    *  *  *  *  *

9              C E R T I F I C A T E

10     I certify that the foregoing is a correct transcript
       from the proceedings in the above-entitled matter.

11

12                    *Carol M. Harrison*

13     Date: 3-25-2019    Carol M. Harrison, RMR, FCRR
                          Official Court Reporter
14                        United States District Court
                          Eastern District of Michigan
15                        1000 Washington Avenue
                          Bay City, MI  48708

16

17

18

19

20

21

22

23

24

25

                US v. Pieron, Jr. - TRIAL - VOLUME 4 - March 4, 2019