1              IN THE UNITED STATES DISTRICT COURT

2                 EASTERN DISTRICT OF MICHIGAN

3   UNITED STATES OF AMERICA        ) Bay City, Michigan
                                    ) March  5, 2019
4       vs.                         ) 10:11 a.m.
                                    )
5   JAMES D. PIERON, JR.,           )
                                    ) Case No. 18-20489
6       Defendant.                  )
    _____ )

7

8                  TRANSCRIPT OF TRIAL - VOLUME 5
               BEFORE THE HONORABLE THOMAS L. LUDINGTON
9                   UNITED STATES DISTRICT JUDGE

10  APPEARANCES:

11  For the Government:   JANET L. PARKER
                         JULES M. DEPORRE
12                       United States Attorney
                         Eastern District of Michigan
13                       101 First Street
                         Suite 200
14                       Bay City, MI 48708

15  For the Defendant:   MICHAEL L. MINNS
                         ASHLEY B. ARNETT
16                       Minns & Arnett
                         9119 South Gessner; Suite One
17                       Houston TX 77074

18  For the Defendant:   KENNETH SASSE
                         Attorney at Law
19                       27 E. Flint Street; 2nd Floor
                         Lake Orion, MI  48362
20                       (248) 821-7325

21
    Court Reporter:      Carol M. Harrison, RMR, FCRR
22                       1000 Washington Avenue
                         Bay City, MI  48708
23
                  Proceedings reported by stenotype reporter.
24          Transcript produced by Computer-Aided Transcription.

25

1                              INDEX

2  WITNESSES FOR THE GOVERNMENT:

3  DALE VANCONETT
       Direct Examination By Ms. Parker              5
4      Cross-Examination By Mr. Minns               22
       Redirect Examination By Ms. Parker           57
5      Recross-Examination By Mr. Minns             70

6  JUDITH GUSTAFSON
       Direct Examination By Ms. Parker             71
7      Cross-Examination By Mr. Minns               87

8  CHARLES LAKE
       Direct Examination By Ms. Parker             88
9      Cross-Examination By Ms. Arnett             102

10 MEGEAN GIOLITTI
       Direct Examination By Mr. Deporre           107
11     Cross-Examination By Ms. Arnett             123
       Redirect Examination By Mr. Deporre         125
12     Recross-Examination By Ms. Arnett           126

13 EXHIBITS:                                      RCVD

14  GX 18    2008 Transcript of Account            89
    GX 20    2009 Transcript of Account            89
15  GX 22    2010 Transcript of Account            89
    GX 45    Form 9465 Installment Agreement       10
16  GX 46    Offer of Compromise                   10
    GX 47    Collection Information Statement       10
17  GX 92    Installment Agreement Prep File       15
    GX 95    K-1 Kresent Media 2013                 8
18  GX 173A  Handwriting Chart                     74
    GX 173B  Handwriting Chart                     74
19  GX 179   Komplique IRS Transcript              89
    GX 180   Account Transcript                    89
20  GX 181   Account Transcript                    89
    GX 182   Account Transcript                    89
21  GX 183   Account Transcript                    89
    GX 184   Account Transcript                    89
22  GX 185   Account Transcript                    89
    DX 1003  March 2018 Payment                   104
23  DX 1006  September 2018 Payment               104
    DX 1007  File Notes VanConett                  39
24  DX 1008  Power of Attorney                     47
    DX 1026  Pavlik Letter to IRS                  46
25  DX 1027  Pavlik Letter to IRS                  45
    DX 1034  Amended Return                        32

P R O C E E D I N G S

1          (At 10:11 a.m., proceedings commenced.)

2          (Defendant present.)

3     THE COURT:  Good morning.

4     MS. PARKER:  Good morning, Your Honor.

5     MR. MINNS:  Good morning.

6     THE COURT:  The record will reflect the fact that

7  counsel and all principals are present.  Ready to proceed to

8  the jury?

9     MS. ARNETT:  We had a quick issue, our side did.

10     THE COURT:  Yes.

11     MS. ARNETT:  So we have two expert notices from the

12  Government, a Megan -- and I can't pronounce her last name --

13  and a Mr. Miller who already testified.  We learned yesterday

14  that their summary witness who's been in the courtroom is not

15  Megan who we thought was the expert because that's whose resume

16  we have.  So we have no notice of anything to do with their

17  summary witness.  We don't have a synopsis.  We don't have a

18  resume, and I think that violates Rule 16.

19     MS. PARKER:  Your Honor, we don't think -- it's

20  Ms. Rousseau.  I know you've seen her in other trials.  We

21  don't believe she's a 702 witness; and, quite frankly, that's

22  the bottom line there.  She's not going to be doing anything of

23  that nature.

24     THE COURT:  She's not an opinion witness?

```
 1              MS. PARKER:  Not in the Government's case in chief.
 2              THE COURT:  Okay.
 3              MS. ARNETT:  Okay.
 4              THE COURT:  Government's next witness is?
 5              MS. PARKER:  Dale VanConett, Your Honor.
 6              THE COURT:  If we could have the jury, please.
 7         Have resumes been exchanged on identified witnesses?
 8              MS. ARNETT:  From our side they have --
 9              MS. PARKER:  Your Honor --
10              MS. ARNETT:  -- including our summary witness.
11              MS. PARKER:  -- also from the Government.
12              MS. ARNETT:  With -- with the exception of Ms.
13 Rousseau.
14              THE COURT:  Noted.
15              MS. ARNETT:  Thank you.  We would still like the
16 resume, even if we don't get a synopsis.
17              (At 10:14 a.m., jury arrives.)
18              THE COURT:  Well, you all look rested and relaxed and
19 ready to go.  If the Government would like to identify their
20 next witness for the jury, please.
21              MS. PARKER:  Yes, Your Honor, Dale VanConett.
22              THE COURT:  Is the witness in the courtroom?
23              MS. PARKER:  We sent the agent to retrieve her.
24              MR. DEPORRE:  My understanding is the witness is in
25 the restroom.
```

```
 1              (Brief pause.)

 2              THE COURT:  Good morning.  If you could stop for just

 3  a moment and raise your right hand.

 4              (At 10:17 a.m., sworn by the Court.)

 5              THE COURT:  The witness stand is on the far left.

 6  The chair does not move; the microphone does.

 7              Ms. Parker, your witness.

 8              MS. PARKER:  Thank you, Your Honor.

 9                         DALE VANCONETT,

10            GOVERNMENT'S WITNESS, SWORN AT 10:17 a.m.

11                      DIRECT EXAMINATION

12  BY MS. PARKER:

13  Q.   Would you state your name, please, and spell it for us.

14  A.   Dale VanConett, D-A-L-E, V-A-N-C-O-N-E-T-T.

15  Q.   And how are you employed?

16  A.   I am employed with Andrews Hooper and Pavlik, CPA,

17  manager.

18  Q.   All right.  How long have you been with -- is that often

19  called AHP?

20  A.   Yes.

21  Q.   How often have you been with -- or how long have you been,

22  excuse me, with AHP.

23  A.   Since 2005, so 13 years.

24  Q.   And you said you're a CPA?

25  A.   Yes.
```

VanConett - Direct

```
 1  Q.    Is AHP a CPA firm?

 2  A.    Yes.

 3  Q.    An accounting firm?

 4  A.    Yes.

 5  Q.    And can you just tell us briefly what a CPA is.

 6  A.    It's a certified public accountant with a four year

 7  bachelor's degree, with 150 hour college requirement that has

 8  passed all four parts of the CPA exam and has a year of

 9  accounting experience.

10  Q.    And what are your duties at AHP?

11  A.    I prepare, review tax returns, business, individual, trust

12  returns.  I assist with employees benefit plan audits and other

13  audits.  I help mentor newer staff.

14  Q.    And you said earlier that you're a manager?

15  A.    Yes.

16  Q.    So that's something of a supervisory position?

17  A.    Yes.

18  Q.    All right.  Did there come a time, approximately three

19  years ago, when you, in the course of your duties, met James

20  Pieron?

21  A.    Yes.

22  Q.    And when was the last time that you talked to him?

23  A.    It's been at least two years.

24  Q.    And what was the context in which you got to know

25  Mr. Pieron?
```

1  A.   I was assisting with tax planning for business tax

2  preparation.

3  Q.   And did you, in fact, participate in preparing some tax

4  returns for him?

5  A.   Yes.

6  Q.   And in preparing tax returns, as a CPA, what type of

7  information do you typically rely on?

8  A.   1099 reporting statements, W-2, business financial

9  statements.

10 Q.   Bank records --

11 A.   Yes.

12 Q.   -- financial records, things of that kind?

13 A.   Yes.

14 Q.   Is it a fair statement that you essentially have to rely

15 on the information provided by your client?

16 A.   That is correct.

17 Q.   If the client provides you a set of information, that's

18 what you go on in doing what you do, generally?

19 A.   Yes.

20 Q.   And so the returns you prepare are as accurate as the

21 information provided by your client?

22 A.   Yes.

23          MS. PARKER:  May I approach, Your Honor?

24          THE COURT:  You may.

25 BY MS. PARKER:

VanConett – Direct

1  Q.   Let me show you Government's Proposed Exhibit 95.  Do you

2  recognize that?

3  A.   Yes.

4  Q.   What is that?

5  A.   This is a partner's share of business income from a

6  partnership.

7  Q.   And is it for James Pieron?

8  A.   Yes, it is.

9          MS. PARKER:  Your Honor, I offer Government's

10  Proposed Exhibit 95.

11          MR. MINNS:  No objection, Your Honor.

12          THE COURT:  Ninety-five is received.

13  BY MS. PARKER:

14  Q.   Can we have that displayed, please.

15          All right.  I believe you said this is a K-1?

16  A.   Yes.

17  Q.   What is a K-1 as compared to a W-2 or a 1099?

18  A.   It is a partnership, a partner's share of his income from

19  the partnership return that flows into his 1040 individual

20  income tax return.

21  Q.   And what is the entity that this partnership form relates

22  to?

23  A.   There is Kresent Media.

24  Q.   And does it indicate on this document what Mr. Pieron's

25  ownership interest in that entity is?

VanConett - Direct

1   A.   Yes.

2   Q.   And what is it?

3   A.   99.995 percent.

4   Q.   Not quite 100 but pretty close, is that a fair statement?

5   A.   Yes.

6   Q.   And below that there's a box.  If you could take a look at

7   that, what does it say in box L regarding those various lines

8   there?

9   A.   That he contributed capital of 236,000, he had a loss of

10  217,000, withdrawals of 146,000, ending capital a negative

11  127,000.

12  Q.   And what is the year of this K-1?

13  A.   It's 2013.

14  Q.   And what is a withdrawal, do you know what happened to

15  that withdrawal?

16  A.   Distributions.

17  Q.   What does that mean?

18  A.   Personal money taken out.  Distributions of income or of

19  the capital contributed.

20  Q.   I'm sorry?

21  A.   Or the capital contributed.

22  Q.   So he took money back out of the corporation?

23  A.   Partnership.

24  Q.   Partnership, yes, but he took money back out of it?

25  A.   Yes.

1   Q.   And he's a 99.99 percent ownership of that?

2   A.   Yes, you have to have two partners in a partnership.

3   Q.   I'd like to show you Government's Proposed Exhibits 45, 46

4   and 47.  Can you take a quick look at each of those.  Do you

5   recognize each of those documents?

6   A.   Yes.

7   Q.   And are those documents relating to Mr. Pieron that you

8   assisted in preparing for him?

9   A.   Yes.

10  Q.   Is 45 a form 9465 installment agreement?  Is that correct?

11  A.   Yes.

12  Q.   Forty-six, an offer of compromise?

13  A.   Yes.

14  Q.   And 47 a collections statement?

15  A.   Yes.

16        MS. PARKER:  Your Honor, I offer Government's

17  Proposed Exhibits 45, 46 and 47.

18        MR. MINNS:  No objection.

19        THE COURT:  Received.

20  BY MS. PARKER:

21  Q.   All right.  Let's have a look at those, please.  All

22  right.  Looking at the first page again, this is for whom?

23  A.   James Pieron.

24  Q.   All right.  And can you explain to the jury what kind of

25  form this is.

VanConett - Direct                                           11

1   A.   It is a request to make payments on the balance owed on

2   tax returns in installments.

3   Q.   And how was it you came to be involved in preparing this

4   form?

5   A.   As requested by the in charge partner, Kim Pavlik.

6   Q.   And where did you get the information that you used to

7   prepare this form?

8   A.   Mainly from Kim, from James Pieron.

9   Q.   All right.  Again you said it was for Mr. Pieron.  Was his

10  address at that time in Mt. Pleasant, Michigan?

11  A.   Yes, it was.

12  Q.   All right.  And below there it has typed in various

13  financial information.  Do you see that?

14  A.   Yes.

15  Q.   That's the address, I wanted below that, sorry.

16            Indicated he had a bank account where?

17  A.   Fifth Third Bank.

18  Q.   And for what years was this installment agreement being

19  proposed, what tax years?

20  A.   2007, '08 and '09.

21  Q.   And when was that proposal being made by Mr. Pieron?

22  A.   The year 2012, January of 2012.

23  Q.   All right.  And you know that, it appears to have a date

24  of Mr. Pieron signing it; is that correct?

25  A.   Yes.

1   Q.   And looking at line seven on this form, what is the tax

2   obligation that's reported there?

3   A.   440,000 -- $444,880.

4   Q.   And what was that based on?

5   A.   I would think it would be on the amended returns, but I'm

6   not certain if that's -- if it's before or after.

7   Q.   All right.  And looking below that where it says $1,500,

8   what is typed in there?  What is that?

9   A.   What is the $1,500?  Is that what you're asking?

10  Q.   Yes.

11  A.   It's how much money he could afford to make each -- or pay

12  each month on the tax liability.

13  Q.   Let's go to the next page of this document, please.  All

14  right.  Can you see the information that's provided on block A?

15  A.   Yes.

16  Q.   And what is the information that Mr. Pieron is providing

17  to the IRS in 2012, January?

18  A.   That he -- the balances in his checking accounts with

19  Fifth Third Bank and PNC Bank.

20  Q.   And what did he report those as being?

21  A.   Fifth Third Bank, $500; PNC Bank, $3,000.

22  Q.   All right.  Going down below there, in box C, do you see

23  that?

24  A.   Yes.

25  Q.   What's the information he provided there?

1  A.   That he had a car, a 2011 car, and the value of it in

2  equity was 25,000.

3        The value of Navitas Investments was a thousand, and

4  Komplique was also a thousand.

5  Q.   And what kind of car does it -- do you see the

6  parenthetical there?

7  A.   It looks like it's a Volkswagen.

8  Q.   All right.  And the information, again, this came from

9  Mr. Pieron that you used to fill this form out for him?

10 A.   Yes.

11 Q.   And let's go on to Exhibit 46.  Again, you said you

12 recognize this document --

13 A.   Yes.

14 Q.   -- as one that you helped prepare?

15 A.   Yes.

16 Q.   And it's for Mr. Pieron?

17 A.   Yes.

18 Q.   And it's called an offer in compromise, doubt as to

19 liability?

20 A.   Yes.

21 Q.   And can you, again, tell us how it was that you came to

22 work on preparing that form?

23 A.   By the direction of my tax partner, Kim Pavlik.

24 Q.   All right.  And just, if you would, explain to us what's

25 the purpose of completing this type of form.

1  A.   This is to agree -- or to offer an amount lower than the

2  amount of tax liability owed as a result of a doubt as to the

3  liability of the tax owed.

4  Q.   All right.  And this was prepared in a different time

5  frame?

6  A.   What do you mean?

7  Q.   Well, can you see the date stamps on it of 2014?

8  A.   A different time from when?

9  Q.   From the previous, sorry, offer -- I mean, installment

10 agreement that was filed?

11 A.   Yeah, it looks like it's subsequent to that.

12 Q.   All right.  In that regard, let me show you Government's

13 Proposed Exhibit 92.  Do you recognize that?

14 A.   Yes.

15 Q.   And what is that?

16 A.   That's an installment agreement that we just discussed

17 previously.

18 Q.   Do you need to take another look at it?

19 A.   Yes.

20 Q.   It has different tax years on it?

21 A.   I don't think it does, '07, '08 and '09, it looks like

22 this was a working copy.  This was a start of a copy with

23 information filled in; this was a finalized copy.

24 Q.   All right.  Let's look at the other pages.  Just compare

25 without speaking out loud, okay.

VanConett – Direct                                              15

```
 1  A.   This is a working copy.  This is a complete copy.
 2          MS. PARKER:  All right.  Your Honor, I offer
 3  Government's Proposed Exhibit 92.
 4          MR. MINNS:  No objection, Your Honor, but I'd like it
 5  to be noted for the jury that it is not the one that was filed;
 6  it was a working copy.
 7          THE COURT:  Noted and received.
 8  BY MS. PARKER:
 9  Q.   All right.  Sorry.  Let's go back to Exhibit 32 [sic]
10  then.  You indicated that that was a working copy?
11  A.   What number?
12  Q.   Ninety-two.
13  A.   Okay.  The one you just took away?
14  Q.   Yeah, I can give it back to you.
15  A.   Okay.
16  Q.   We can display it for you.  What is a working copy?
17  A.   Where we start to put in the information, but we really
18  need information from the client to prepare the finalized copy.
19  We wouldn't submit something like this.
20  Q.   All right.  And would this have been used to type up the
21  one that's the Exhibit 45?
22  A.   Yes.
23  Q.   All right.  And looking at this, there are certain changes
24  that were made on this form, 92?
25  A.   Yes.
```

1  Q.   For example, in box 6, what is entered there as typed in

2  originally?

3  A.   IN Technologies, Inc.

4  Q.   And what is handwritten in?

5  A.   ILQ.

6  Q.   Was it your understanding that this typed information was

7  sent to Mr. Pieron, and then he made the handwritten -- most of

8  the handwritten changes and sent it back?

9           MR. MINNS:  Pardon me, the Government is leading to

10 an answer, and not even -- there's no need for a witness.  The

11 Government's statement is her own answer.  I object to the

12 leading.

13          THE COURT:  Sustained.

14 BY MS. PARKER:

15 Q.   All right.  Can you explain the process of how this form

16 was used.

17 A.   We probably put the basic information in; his name, his

18 address, his phone number, his Social Security number, you

19 know, what the amount of the tax liability and the installment

20 payment that we were going to request, and then we send the

21 information -- we send the statement to the client to complete

22 the rest of the information, and to check what information we

23 have on there and make any changes and get it back to us.

24 Q.   Is there some handwriting or numbering on this first page

25 that you can identify as being yours?

1  A.   Yes.  The numbers on the -- well, actually, in box 7, the

2  444,880, it is the summation of the handwritten amounts on the

3  bottom for each year, '07, '08 and '09.

4  Q.   And that information in the box below where it says '07,

5  '08 and '09, was that your writing?

6  A.   Yes.

7  Q.   And, likewise, who wrote in -- well, let's look at that

8  for a second.  That -- those were the tax amounts that you

9  understood Mr. Pieron owed at that time in January of 2012?

10  A.   Yes.

11  Q.   And what was your understanding of what he owed for 2007?

12  A.   $5,526.

13  Q.   For 2008?

14  A.   $365,082.

15  Q.   And 2009?

16  A.   74,272.

17  Q.   And that gave rise to the total of?

18  A.   $444,880.

19  Q.   And going to the right of that figure, what are those

20  other entries that you made?

21  A.   We were doing a calculation because I think the

22  installment agreements only can be for five years, so we were

23  figuring out what the cost would be -- the repayment would be

24  for a year, and then 12 months, and then it would be 7,415 a

25  month.

VanConett – Direct

1   Q.   All right.   In order to pay off the $444,880 over a five

2   year span?

3   A.   That's correct.

4   Q.   The payments would have to be $7,415.

5   A.   Yes.

6   Q.   And, again, Mr. Pieron was offering to make what amount

7   for monthly payments?

8   A.   $1,500.

9   Q.   And up at the top where it says for tax years, there's a

10  hand entered 2009, is that your writing?

11  A.   Yes.

12  Q.   And the next page of this exhibit has written on it 2007,

13  is that your writing?

14  A.   Yes.

15  Q.   And then "WP only," what does that mean?

16  A.   Work paper only.

17  Q.   All right.   So is this the tax page for the 2007 return?

18  A.   Yes.

19  Q.   And you entered a slightly lower number on the first page,

20  where this says 5,777 is owed, you put 5,526 on the first page?

21  A.   Right, that's without any penalty or interest, the actual

22  tax liability before that.

23  Q.   All right.   Let's go on to the third page.   That's another

24  page of the installment agreement request?

25  A.   Yes.

1  Q.   And, again, that has handwritten entries?

2  A.   Yes.

3  Q.   Do you recognize who wrote those?

4  A.   No.

5  Q.   Going on to the next page, again there are handwritten

6  entries there.  Do you recognize those?

7  A.   I would think that would come from James -- James --

8  Q.   Okay.

9  A.   -- getting the form and completing what he could.  There

10 are entries on the bottom for the businesses that are Kim's,

11 Kim Pavlik's.

12 Q.   All right.  The one for Navitas and Komplique at the very

13 bottom in box C.

14 A.   Yes.

15 Q.   Okay.  Going on to the next page.

16 A.   That is information from James Pieron.

17 Q.   Listing his gross pay per period in box E?

18 A.   Yes.

19 Q.   And taxes that are withheld?

20 A.   Yes.

21 Q.   How much did he say were his wages and his withholdings at

22 that time, 2012.

23 A.   Per month, 7,500 gross pay; federal withholding, a

24 thousand; state of Michigan, 500.

25 Q.   All right.  And he lists various expenses in box G such as

1   food, housekeeping et cetera?

2   A.    Yes.

3   Q.    What did he list for food for a month?

4   A.    A thousand.

5   Q.    And down below on -- again, in box H, line three, the

6   proposal to pay how much a month?

7   A.    $1,500.

8   Q.    Let's go back to Exhibit 46, and you said this was again

9   from a later time period?

10  A.    Yes.

11  Q.    All right.  And what tax years are covered by that?

12  A.    2007, 2008, 2009, 2010, and 2011.

13  Q.    And on this one, there's an offer to do what?

14  A.    Offer to pay 30,000 for payment of the tax years 2007

15  through 2011.

16  Q.    So all of those years would have been resolved if the IRS

17  had accepted $30,000 in payment for that time period?

18  A.    Yes.

19  Q.    And going on to the second page of that at the bottom, is

20  that signed?

21  A.    Is that the second page?  Yes.

22  Q.    I'm sorry, the third page of that, is that signed?

23  A.    Is that the third page?  It looks like it's signed section

24  six.

25  Q.    All right.  And what's the date?

1   A.   March 27th of 2014.

2   Q.   All right.  Let's go on to Exhibit 47.  Is that a

3   collection information statement that goes along with that 2014

4   offer in compromise?

5   A.   Yes, it is.

6   Q.   Again for Mr. Pieron?

7   A.   Yes.

8   Q.   And in this, how much is listed as being in his PNC Bank

9   account in box -- or he just lists a PNC Bank account in box 8;

10  is that correct?

11  A.   Yes, $108.

12  Q.   And then going down to C, box C, what are the assets he

13  lists there?

14  A.   The car at 25,000, the Navitas investment of a thousand,

15  Komplique of 250,000, and used fitness equipment of 20,000.

16  Q.   On the car, what year did he give as the date of the car?

17  A.   2011.

18  Q.   Okay.  Do you see any 2013 Mercedes Benz listed there?

19  A.   No.

20  Q.   Let's go back to Exhibit 45 for a second and just look at

21  that same box C.  Do you see any 2009 Mercedes Benz listed

22  there?

23  A.   I have the page 1 of the installment agreement request on

24  my screen.

25          No, I do not.

VanConett – Cross                                                22

1   Q.   All right.  Going back to Exhibit 47, then.  Again, in box

2   F, there's financial information about his gross pay; is that

3   correct?

4   A.   Yes.

5   Q.   And what does he list there?

6   A.   7,500 per month, a thousand federal withholding, and 500

7   Michigan withholding.

8   Q.   Okay.  And in box H, again, there's living expenses; food,

9   rent, things of those nature listed?

10  A.   Yes.

11  Q.   And, again, is this form signed?

12  A.   Yes.

13  Q.   And is it dated?

14  A.   Yes.

15  Q.   And what is the date on the form?

16  A.   March 27th, of 2014.

17          MS. PARKER:  Thank you, Your Honor.  I'll pass the

18  witness.

19          THE COURT:  Cross-examination.

20          MR. MINNS:  Yes.  Your Honor.

21                      CROSS-EXAMINATION

22  BY MR. MINNS:

23  Q.   I'll start.  This is a lot of material.

24          Ms. Dale VanConett?

25  A.   VanConett.

 1  Q.    VanConett.  Did I pronounce it right that time?

 2  A.    Yes.

 3  Q.    I'm sorry.  It's a great pleasure to meet you.

 4  A.    You, too.

 5  Q.    I'm Michael Minns, and I represent our mutual client Jim

 6  Pieron.  We've never had the opportunity to meet before, and I

 7  apologize for not reaching out to you.  I did not know that you

 8  would be the witness that would be on the stand today, and I

 9  apologize.

10          The firm that you work for, it -- the name is -- what

11  is the name of the firm?

12  A.    Andrews Hooper and Pavlik.

13  Q.    And it is one of the top firms in Michigan, if not the top

14  firm for CPA work?

15          MS. PARKER:  Your Honor, I'm going to object.

16          THE COURT:  Sustained.

17  BY MR. MINNS:

18  Q.    You have to be a very good CPA to get a job at your firm,

19  is that not correct?

20  A.    Yes.

21  Q.    You guys have the pick of the litter; you get the very

22  best people available, correct?

23  A.    Yes.

24  Q.    And you're very proud of your work product, correct?

25  A.    Yes.

 1  Q.   And Mr. Pavlik is one of the --

 2           MS. PARKER:  Go ahead, but --

 3           MR. MINNS:  Well, I'm supposed to stop until the

 4  objection is raised.

 5           MS. PARKER:  All right.

 6  BY MR. MINNS:

 7  Q.   Mr. Pavlik is one of the most highly regarded.

 8           MS. PARKER:  Now I'll object.

 9           THE COURT:  Sustained.

10  BY MR. MINNS:

11  Q.   Do you have a high regard for Mr. Pavlik?

12  A.   Most definitely.

13  Q.   Does everybody you know have a high regard for Mr. Pavlik?

14           MS. PARKER:  Objection.

15           THE COURT:  Sustained.

16  BY MR. MINNS:

17  Q.   Are you aware of Mr. Pavlik's general reputation in the

18  accounting community?

19  A.   Yes, I am.

20  Q.   Would you share that with the jurors, please.

21           MS. PARKER:  Objection.

22           THE COURT:  Overruled.

23  BY MR. MINNS:

24  Q.   The judge has overruled, so you may tell the jurors the

25  reputation that Mr. Pavlik enjoys in the accounting community.

VanConett – Cross                                          25

1  A.    Okay.   I've worked with Kim for 14 years.   He was one of

2  the founding partners of Andrews Hooper & Pavlik in 1993.   He

3  worked for Ernst & Young before then.   He has been a CPA and

4  preparing taxes for like 40 years.

5           MS. PARKER:   Your Honor, I don't think this is

6  responsive to the question.

7           THE COURT:   It is not.

8           THE WITNESS:   Can you rephrase that again.

9  BY MR. MINNS:

10 Q.    Yes, ma'am.   His reputation in the accounting community,

11 can you tell the jurors what it is; good, bad, the best of all

12 times, use your phrase to describe Mr. Pavlik's reputation --

13          MS. PARKER:   Well never mind.

14 BY MR. MINNS:

15 Q.    -- in the accounting community?

16 A.    He is highly respected, very knowledgeable, very

17 experienced.

18 Q.    Would it be fair to say he's one of the go-to,

19 top-of-the-line people that accountants all over the state,

20 even the country, go to to ask questions on complex tax issues?

21          MS. PARKER:   Objection, lack of foundation.

22          THE COURT:   Sustained.

23 BY MR. MINNS:

24 Q.    When your firm took this file over from a company that has

25 multiple different names, including The Tax Defenders, it was a

VanConett - Cross                                          26

```
 1  mess, was it not?

 2          MS. PARKER:  Objection.

 3          THE COURT:  Sustained.

 4  BY MR. MINNS:

 5  Q.   Is -- the returns that you've talked about and that we'll

 6  talk about in a few minutes, these are not returns that should

 7  be generally prepared by someone with no accounting training or

 8  background?

 9          MS. PARKER:  Objection.

10          THE COURT:  Sustained.

11  BY MR. MINNS:

12  Q.   Jim Pieron's account was not a big account for your firm,

13  was it?

14  A.   No, it wasn't.

15  Q.   It's one of the smaller accounts, correct?

16  A.   Yes.

17  Q.   And you accepted this to help him out, correct?

18          MS. PARKER:  Objection.

19          THE COURT:  Sustained.

20          MR. MINNS:  Your Honor, I'd like to approach the

21  witness with Exhibit 1034.

22          MS. PARKER:  Your Honor, this is beyond the scope of

23  direct.

24          THE COURT:  The gentleman can call the witness at

25  another time.
```

1          MS. PARKER:  Yes, but he has to examine in a

2     different fashion.

3          THE COURT:  Indeed.

4          MR. MINNS:  Your Honor, the complete tax returns that

5     this firm filed is part of the thing, and this tax return was

6     left out.  I think we're entitled to complete in

7     cross-examination the tax return that they chose to leave out,

8     so I think the jury's entitled to see all the tax returns and

9     there's one big one that this firm prepared.

10          MS. PARKER:  Your Honor, I'm going to object to a

11     narrative discussion.  If we want to take it up at sidebar.

12          THE COURT:  And who is the taxpayer on this return

13     and for what year?

14          MR. MINNS:  This is the 1040X 2011, amended return.

15          THE COURT:  Let's have a brief conversation at

16     sidebar.

17          (Sidebar conversation held as follows:)

18          THE COURT:  All right.  I'm not tracking yet.  Where

19     are you headed?

20          MR. MINNS:  Well, it explains why $30,000 is

21     reasonable, because it says that there's no tax due and owing.

22     It's part of the complete filing that they were offering.  They

23     were offering the -- they put into evidence the $30,000 offer.

24     If you believe that you owe a million dollars, $30,000 is not a

25     reasonable offer; if you believe that you owe nothing, $30,000

1    is a very high initial offer, and --

2              MS. PARKER:  Judge, it covers multiple years, and he

3    wants to use one tax return that I think came after the offer

4    to justify the offer.

5              MS. ARNETT:  It was -- it was simultaneous, but if

6    I'm going to guess where Michael's going to go, he's going to

7    enter all of the tax records from this firm, because --

8              MR. MINNS:  To get it done, save time.  First of all,

9    it's directly related.  It's part of the records sent in with

10   the records that are already in evidence that we didn't object

11   to.  We can do this fast.  To have to recall -- witnesses are

12   seldom recalled when it same an enormous amount of time and

13   continuity is in effect, but this will -- I don't want to go

14   through two, three hours of documents, and I didn't object to

15   them when they put a bunch in at a time.  I want to get --

16             THE COURT:  I'm trying to unwind the relevance of the

17   2011 return, except for the fact that it is included within the

18   time period within the offer.

19             MR. MINNS:  It's the same period.  It explains it.

20             MS. ARNETT:  It's the return that shows there's no

21   tax due and owing.

22             MS. PARKER:  For one year, Judge, but this --

23             MS. ARNETT:  2008 and 2009.

24             MS. PARKER:  But this is an offer of compromise that

25   covers multiple years.

1          THE COURT:  Sure.  To the extent that's true, I don't

2    understand why the 2011 wouldn't be actually necessary for the

3    jury to understand the offer.

4          MS. PARKER:  Well, for one thing, it's -- I think

5    it's a self-serving statement at this point.

6          THE COURT:  It may be.

7          MS. PARKER:  And I think it's inadmissible hearsay in

8    that regard.

9          THE COURT:  I don't agree.  You may admit it.

10         MS. PARKER:  And I -- the other thing is, I don't

11   know that she had any part in the preparation of this return.

12         MS. ARNETT:  I don't know that she had any part in

13   the preparation of the offer in compromise, and she's also --

14         THE COURT:  Let's -- let's --

15         MS. PARKER:  She did.

16         THE COURT:  Let's explore it first with the witness.

17         MS. ARNETT:  Is she also the custodian of records for

18   AHP?  She's -- okay.

19         (Sidebar conference concluded.)

20         THE COURT:  You may continue, sir.

21         MR. MINNS:  Thank you, Your Honor.

22   BY MR. MINNS:

23   Q.   Ma'am, what do you have in front of you?  And I forgot and

24   gave you my copy, I don't have the exhibit number.

25         MS. ARNETT:  1034.

 1  BY MR. MINNS:

 2  Q.    1034, can you tell the jurors what you have in front of

 3  you.

 4  A.    I have a 1040X, which is an amended individual income tax

 5  year for the year 2011.

 6  Q.    Okay.  And was this prepared by your firm?

 7  A.    Yes, it was.

 8  Q.    And was it sent in -- was it sent in the same time that

 9  these offer in compromises and doubt as to liability were sent

10  in?

11  A.    Yes.  April of 2014.

12  Q.    And it -- the Government asked you about an offer in

13  compromise, and actually it's at the top has been labeled doubt

14  as to liability, correct?

15  A.    Yes.

16  Q.    And the reason there's a doubt as to liability, and the

17  reason it made sense for your firm to make the initial offer of

18  30,000 is because of this document, correct?

19           MS. PARKER:  Objection, Your Honor.

20           THE COURT:  Sustained.

21           MR. MINNS:  I'm not sure what the objection was, Your

22  Honor, so to figure out how to --

23           THE COURT:  It's asking the witness to furnish a

24  response without a foundation.

25           MR. MINNS:  Okay.  Thank you, Your Honor.

1  BY MR. MINNS:

2  Q.   Does this Exhibit-- well, first of all, we offer to admit

3  Exhibit No. 1034.

4           MS. PARKER:  Your Honor, I would submit that only the

5  1040 portion and not additional portions should be admitted if

6  at all.

7           THE COURT:  Rationale?

8           MS. PARKER:  I think the rest is 801.  It's a

9  narrative statement.  It's self-serving.

10           THE COURT:  Is it -- is it the component of -- the

11  rationale component of the offer of compromise?

12           MR. MINNS:  Yes.

13           MS. PARKER:  It may be, but it's not part of the

14  amended return in the sense of it's not a necessary component,

15  and it's offered back door to just get something that otherwise

16  is inadmissible before the jury.

17           THE COURT:  Why inadmissible?

18           MS. PARKER:  Because it's an out-of-court statement,

19  not under oath -- well, offered to prove the truth of the

20  matter, so it's hearsay.  And it's that of the proponent not

21  the party opponent.

22           THE COURT:  I would respectfully disagree that it is

23  hearsay insofar as it's recorded for a particular purpose.  It

24  has independent legal significance.  I'd overrule the

25  objection.

1            MR. MINNS:  So we offer Exhibit 1034, Your Honor.

2            THE COURT:  Admitted.

3            MR. MINNS:  Thank you.

4  BY MR. MINNS:

5  Q.   1034 is an amended return which your firm prepared and

6  filed indicating that Jim Pieron owed no income tax, correct?

7  A.   It says that here.  It says total tax 29,911; federal

8  withholding, 17,000; and then the Internal Revenue Code Section

9  1341 was applied in the amount of 436,446, so that added to the

10 payments, the total payments were 453,642, so he had an

11 overpayment with the right of claim.

12 Q.   Thank you very much.  And since he had overpaid, you had a

13 reason to believe that the IRS would be happy to get --

14            MS. PARKER:  Objection.

15            THE COURT:  Agencies don't have characteristics of

16 individuals.

17            MR. MINNS:  I'll rephrase, Your Honor.

18 BY MR. MINNS:

19 Q.   Since he had overpaid, it was a reasonable accounting -- a

20 reasonable accounting procedure to offer them $30,000?

21            MS. PARKER:  Objection.

22            THE COURT:  Sustained.

23 BY MR. MINNS:

24 Q.   Has your firm ever dealt with a 914 freeze code?

25 A.   A 914?

1    Q.   Yes, ma'am.

2            MS. PARKER:  Again, Your Honor, this is beyond the

3    scope of direct.

4            THE COURT:  Sustained.

5            MR. MINNS:  Your Honor, we'd like to offer

6    Government's Exhibit -- these are Government exhibits?

7    Government Exhibit 28, 30, 31, 32 and 33.

8            They object to their own exhibits?

9            MS. PARKER:  On relevance grounds?

10           MR. MINNS:  The relevancy is that these explain all

11   of the values that they've cross-examined this witness on since

12   she's been here and explain why the values exist.  All -- this

13   witness is competent to go through these.  I can ask her

14   questions, and you'll see that these companies were losing

15   money every year.  That's the reason for the values.  They've

16   questioned the values that are on those 433s.  This proves

17   that.

18           THE COURT:  What is your -- I don't understand the

19   accusation they've questioned your values.

20           MR. MINNS:  Well, they were -- they were insinuating

21   that -- and have been in opening, and they were insinuating on

22   their examination of this --

23           THE COURT:  Respectfully, I'm going to sustain the

24   objection.

25           MR. MINNS:  May I make an offer at sidebar then, Your

1  Honor, so -- for the record?

2          THE COURT:  I think you have adequately, in my view.

3  It's just that I disagree with you.

4          MR. MINNS:  What -- I'm trying to address the grounds

5  for the objection so that I can get around Ms. Parker's

6  objection.  This is the custodian of the records.  May I prove

7  these up through the custodian of the records?

8          THE COURT:  The issue is relevance.

9          MS. PARKER:  It's not a foundational objection, Your

10  Honor, sorry.

11          THE COURT:  The issue is relevance.

12          MR. MINNS:  Your Honor, if the Government is not

13  questioning the valuations made --

14          THE COURT:  Let's pick up the conversation at

15  sidebar.

16          MR. MINNS:  Thank you.

17          (Sidebar conference as follows:)

18          MR. MINNS:  Well, the Government has elicited

19  testimony from this witness, and has given their opening

20  argument, that there are fake -- false evaluations of these

21  companies, that the thousand dollars were high, because they

22  have some assets in them, but they've neglected all the

23  liabilities.  These documents prove that they're worthless

24  because they were losing millions of dollars every year, and

25  this witness can testify to that and correct the mistaken

 1   impression that the Government has left.

 2           These companies eventually went out of business but

 3   they were losing millions of dollars each year.  It also

 4   explains where a lot of this money went to, but I'm left -- the

 5   jury's left with the impression that somebody lied on these

 6   forms evaluating that at a thousand dollars.  $1,000 was more

 7   than the company was worth.  It was put down there as a nominal

 8   value.  These companies were worthless.

 9           MS. PARKER:  Judge, I don't think that makes any

10   sense, but --

11           THE COURT:  I don't ever remember the accusation that

12   they were undervaluing.

13           MR. MINNS:  Well, she said --

14           MR. SASSE:  Can we make it clear, then, that the

15   Government is not alleging that those figures were wrong?

16           THE COURT:  They were simply alleging they were

17   figures that were furnished by the defendant.

18           MR. SASSE:  Accurate figures?

19           THE COURT:  I don't think they're taking a position.

20           MS. PARKER:  I'm not vouching for the defendant's

21   accuracy.

22           MR. SASSE:  But, in any event, they are not

23   challenging those numbers on those documents he submitted?

24           MS. ARNETT:  We've gone through multiple bank records

25   to show all of these transfers to and from the companies --

1          THE COURT:  Yeah.

2          MS. ARNETT:  -- and this is to show that the company

3    was losing money.  It's what we have to show.

4          MR. SASSE:  Big money.

5          MS. ARNETT:  Lots of money, to show that the

6    companies were losing money.

7          THE COURT:  They were swimming in it.

8          MS. ARNETT:  They were swimming in losses, too.

9          THE COURT:  But I guess my point is is that I'm not

10   still understanding the relevance because I do not understand

11   their accusation that he undervalued these in the context of

12   the offer of compromise to be a legally relevant question.

13         MS. ARNETT:  They're also making the argument that he

14   had assets available and he had money available to pay the

15   taxes, and --

16         THE COURT:  Sure.

17         MS. ARNETT:  -- this shows that he doesn't because of

18   the losses.

19         MS. PARKER:  No, that doesn't show that.  That's the

20   disconnect.

21         MS. ARNETT:  That's my position.

22         MR. MINNS:  You're entitled to make, under the law,

23   to make an offer in compromise.  You're entitled under the law

24   to make a monthly payment plan.

25         THE COURT:  Sure.

1          MR. MINNS:  They're entitled to say -- they're

2    required by law to say yes, no or counter.  If they say, no,

3    you're entitled to make another.  The fact that you have cash

4    does not take away your right, if you need the cash for your

5    liquidity, to make an offer and monthly payments.  It's done

6    every day.

7          THE COURT:  And I'm not disagreeing.

8          MS. PARKER:  Yeah.

9          THE COURT:  Just that there's no connection between

10   that assertion and this evidence.

11         MR. MINNS:  The only purpose of proving up the

12   Mercedes is to say that this company is very valuable and the

13   fact of the matter is, that it was not.

14         MS. PARKER:  That's not the only purpose.

15         THE COURT:  Simply that there was cash available.

16         MR. SASSE:  And there wasn't.  That's what this goes

17   to.

18         THE COURT:  Well, how?

19         MR. SASSE:  Because it shows where the money -- that

20   these companies have been losing money and that they were in

21   the hole.  He couldn't have sold that -- he can't have sold

22   assets from those companies.  They had liabilities which

23   exceeded the assets.

24         MR. DEPORRE:  The liabilities were mostly to him.

25   They were shareholder loans that he had the lines.

1          MS. PARKER:  He didn't have to buy the Mercedes-Benz.

2          THE COURT:  Based on the tender that I have right

3   now, I'm ruling it as irrelevant.

4          MR. MINNS:  Okay.

5          THE COURT:  Pick it up.

6          MR. MINNS:  Yes.

7          (Sidebar conference concluded.)

8          THE COURT:  If you'd like to continue, please, sir.

9          MR. MINNS:  Thank you, Your Honor.

10          If i can -- I'm going to put these over there so I

11   don't pick them up again by mistake.

12          THE COURT:  Sure.

13   BY MR. MINNS:

14   Q.   I'd like Exhibit -- Defense Exhibit 1007 to be produced

15   for the witness, please.

16          MS. ARNETT:  May I approach?

17          THE COURT:  Yes.

18   BY MR. MINNS:

19   Q.   Exhibit 1007 is a list of multiple calls that you put into

20   the Internal Revenue Service that were not returned, correct?

21          MS. PARKER:  Objection, Your Honor.  First of all,

22   that's not 1007 -- or if it is, I guess I -- may I just look at

23   it for a second.

24          MR. MINNS:  She already has a copy, Ashley.

25          MS. PARKER:  No, it's a different -- it's different

 1  from -- I'm sorry, I need to look at it for just a second.  Go

 2  ahead for now.

 3              THE COURT:  Well, why don't we have the witness

 4  identify what it is rather than confirm.

 5  BY MR. MINNS:

 6  Q.   Yes, sir.  Can you identify this summary, please.

 7  A.   Yes, this is a listing of when I started to call the IRS

 8  about the 2011 amended return processing, and I kept a running

 9  log of what occurred because it wasn't getting processed.  At

10  one point, the case got closed.

11              MS. PARKER:  Your Honor, I think we're going beyond

12  foundational information at this point.

13              THE COURT:  True.

14              MR. MINNS:  Your Honor, we offer Exhibit --

15  Defendant's Exhibit 1,007 into evidence, please.

16              MS. PARKER:  Quick question, is this your log or a

17  multiple person entry log.

18              THE WITNESS:  No, this is my log as directed by Kim

19  Pavlik.

20              MS. PARKER:  No objection.

21              THE COURT:  No objection?

22              MS. PARKER:  No objection.

23              THE COURT:  Received.

24  BY MR. MINNS:

25  Q.   How many -- how many -- well, it starts off at the top, if

 1  we can publish it.  The first time you asked them about the

 2  amended, you called on January 14th, 2015 to ask about the 2011

 3  return, correct?

 4  A.    Yes.

 5  Q.    And someone -- it had been assigned to someone but not

 6  finalized?

 7  A.    Right, yes.

 8          MS. PARKER:  I think, Your Honor, that calls for

 9  going beyond the scope of it and interpreting what else is

10  going on.

11          MR. MINNS:  The document is in evidence?

12          THE COURT:  And the witness has personal knowledge of

13  the circumstance, overruled.

14          MS. PARKER:  Okay.

15  BY MR. MINNS:

16  Q.    You were told there's some kind of a hold on the account

17  related to collection and it had been on hold since 2012 but

18  they did not explain that to you in anyway, correct?

19          MS. PARKER:  Objection, form of the question.

20          THE COURT:  Sustained.

21          MR. MINNS:  I'm entitled to lead the witness, am I

22  not, Your Honor?

23          THE COURT:  True, but not necessarily to furnish the

24  response.

25  BY MR. MINNS:

1    Q.   Were you trying to get the Internal Revenue Service to

2    process the 10 -- the 2011 amended return?

3    A.   Yes.

4    Q.   And were you having a great deal of difficulty getting a

5    human being to talk to you to process this?

6    A.   Yes.

7              MS. PARKER:  Objection, relevance.

8              THE COURT:  Overruled.

9    BY MR. MINNS:

10   Q.   And were you calling over and over and over again, trying

11   to get someone from the Internal Revenue Service to process

12   that return and talk to you about it?

13   A.   Yes.

14   Q.   And did they?

15             MS. PARKER:  Objection.

16             THE COURT:  Asked and answered.

17             MS. PARKER:  I'm going to object to counsel

18   characterizing things in that manner for future reference.

19   BY MR. MINNS:

20   Q.   There's more than a dozen phone calls listed on this --

21   this document that you created, correct?

22             MS. PARKER:  Again, objection, leading.

23             MR. SASSE:  It's cross.

24             THE COURT:  Overruled.

25   BY MR. MINNS:

1    Q.    I'll repeat it, I apologize.

2          There's more than a dozen on here, is that not true?

3    A.    Yes.

4    Q.    You never got a response to any of these, did you?

5    A.    Well, there was various responses.  I mean, like I said,

6    the case was closed out at one time because the IRS said they

7    had sent correspondence to the client that didn't receive a

8    response, but they didn't send us the correspondence and we

9    were the power of attorney for the client.  So we wrote a

10   letter and they reopened the case, and they still hadn't

11   processed it after that.

12   Q.    And the Internal Revenue Service is required by law --

13          MS. PARKER:  Objection.

14          MR. MINNS:  May I continue, Your Honor?

15          THE COURT:  You may.

16   BY MR. MINNS:

17   Q.    The Internal Revenue Service is required by law to

18   correspond with you as the power of attorney, correct?

19   A.    Yes.

20   Q.    And if they're sending stuff around you, without copying

21   you, that is inappropriate, is it not?

22          MS. PARKER:  Objection, relevance.

23          THE COURT:  Sustained.

24          THE WITNESS:  Yes?

25   BY MR. MINNS:

1   Q.   Could the witness be shown Defendant's Exhibit 27 -- 1027,

2   I'm sorry, 1027 --

3              MS. ARNETT:  And 1026.

4              MR. MINNS:  -- and 1026?

5              MS. ARNETT:  May I approach, Your Honor?

6              THE WITNESS:  Which one do you want me to look at

7   first?  The oldest one?

8   BY MR. MINNS:

9   Q.   Yes, ma'am.

10  A.   Twenty-seven.

11  Q.   Is Defendant's Exhibit 1027, is it a letter from your firm

12  trying to get answers and cooperation from the Internal Revenue

13  Service?

14             MS. PARKER:  Objection, Your Honor.  I'm not sure the

15  purpose for which this is offered.

16             MR. MINNS:  We just went through 17 phone calls.  Now

17  we're going through a couple of letters.

18             MS. PARKER:  Well, there's no testimony by the

19  witness stand that there were 17 phone calls.  I object to the

20  form of the response.

21             MR. MINNS:  I think my question was more than a

22  dozen, the answer was, yes, but I think if they count --

23             THE COURT:  Well, let's stop the discussion

24  concerning the phone calls.

25             MR. MINNS:  Yes, Your Honor.

 1            THE COURT:  The document is into evidence.  I do not

 2  understand the foundation for where you're going with respect

 3  to 1026 or 1027, and I'm not familiar with the exhibits, so see

 4  if we can -- what we can accomplish with the witness.

 5            MR. MINNS:  Thank you, Your Honor.

 6  BY MR. MINNS:

 7  Q.   Exhibit 1027, this is a letter that went to the IRS from

 8  your firm, correct?

 9  A.   Yes.

10  Q.   And you're a custodian of the records of your firm,

11  correct?

12  A.   Yes.

13  Q.   And this letter was -- served some of the same purpose as

14  the phone calls that are already in record, trying to get the

15  attention and cooperation of the Internal Revenue Service,

16  correct?

17            MS. PARKER:  Objection, Your Honor, to the form of

18  the question.

19            THE COURT:  Overruled.

20  BY MR. MINNS:

21  Q.   This letter had the same purpose as this other information

22  that you've given to the jury, trying to get the attention and

23  cooperation of the Internal Revenue Service?

24  A.   Yes.

25  Q.   Yes, ma'am?

1   A.   Yes.

2          MR. MINNS:  We offer Exhibit 1027 into evidence, Your

3   Honor?

4          MS. PARKER:  I object.

5          THE COURT:  Noted, overruled.  It's admitted.

6          MR. MINNS:  Could we publish it, please.  If we could

7   highlight the second paragraph of the letter on 1027.

8          MS. PARKER:  Your Honor, I submit these are

9   self-serving statements that should not be presented to the

10  jury.

11         THE COURT:  I respectfully disagree.  They have

12  independent legal significance given the law that governs the

13  agency.

14         MS. PARKER:  Thank you, Your Honor.

15  BY MR. MINNS:

16  Q.   If you could explain the paragraph that we've bolded up

17  there and explain why it was necessary to send this

18  communication to the Internal Revenue Service.

19  A.   To get them to open the case back up so we could have the

20  amended return processed.

21  Q.   And it says the taxpayer did not receive any

22  correspondence or information request from the IRS.  Is that

23  normal?

24         MS. PARKER:  Objection.

25         THE COURT:  Sustained.

1  BY MR. MINNS:

2  Q.   If we could show plaintiff's -- Defendant's Exhibit 1026

3  to the witness, please.

4           MS. ARNETT:  She has it.

5           MR. MINNS:  Oh.

6  BY MR. MINNS:

7  Q.   Can you, as custodian of the records of your company,

8  identify this letter, June 13th, 2017?

9  A.   This was sent to the IRS in regard to the balance due for

10  the December 31st, 2009 tax return saying, you know, that that

11  shouldn't have a balance on it.  It should be eliminated

12  because of the amended 2011 return that was filed.  And we

13  requested that they calculate the amounts due from all tax

14  period after processing the amended 2011 return, and if the IRS

15  had any questions, that they should contact and reach out to

16  Kim Pavlik.

17           MR. MINNS:  We offer Defendant's Exhibit 1026, Your

18  Honor.

19           MS. PARKER:  Your Honor, I do think that -- I object

20  or ask that limiting instructions be provided.

21           THE COURT:  Your objection's noted, overruled, and

22  the exhibit's admitted.

23  BY MR. MINNS:

24  Q.   If we could publish Exhibit 1026, please.  Could we

25  highlight the second paragraph, please.  And as we sit here

47

 1  today, in this courtroom, in 2019, they've still never answered

 2  this letter, have they?

 3  A.   Not to my knowledge.

 4          MS. PARKER:  Objection -- I'm sorry, I'll let her

 5  answer that.  Sorry.

 6          THE COURT:  Did you withdraw your objection?

 7          MS. PARKER:  I believe her answer was not to her

 8  knowledge, which is acceptable, so I do withdraw it with that.

 9          THE COURT:  Okay.  Thank you.

10  BY MR. MINNS:

11  Q.   Could the witness be shown Defendant's Exhibit 1008,

12  please.  Can you tell the jury what Exhibit 1008 is.

13  A.   It is a power of attorney and a declaration of

14  representative for Kim Pavlik and I to represent James Pieron

15  in his tax returns, his individual tax returns for 2007 to

16  2012, and the offer in compromise for the same period.

17  Q.   And was this filed with the Internal Revenue Service?

18  A.   Yes.

19          MR. MINNS:  Your Honor, we offer Exhibit 1008,

20  please.

21          MS. PARKER:  No objection, Your Honor.

22          THE COURT:  Received.

23  BY MR. MINNS:

24  Q.   And the purpose of this was to tell the IRS that Jim

25  Pieron was represented by your CPA firm and in particular by

48

 1  you and Mr. Pavlik?

 2  A.    Yes.

 3  Q.    And you were expecting -- you were doing this on the offer

 4  in compromise and on the income tax returns, correct?

 5  A.    Yes.

 6  Q.    And you were trying to negotiate with the Internal Revenue

 7  Service as to whether there should be payments, if so what the

 8  payments should be and whether or not he owed any money at all,

 9  correct?

10          MS. PARKER:  Your Honor, I'm going to object.

11          THE COURT:  Sustained.

12          MR. MINNS:  Should I divide them up, Your Honor, is

13  that --

14          THE COURT:  You can ask another question.

15  BY MR. MINNS:

16  Q.    You wanted to negotiation whether or not a tax was due,

17  correct?

18  A.    Yes.

19  Q.    You wanted to negotiate whether or not monthly payments

20  should be made, correct?

21  A.    Yes.

22  Q.    You wanted to negotiate how much they had to be if they

23  agreed to monthly payments, correct?

24  A.    Yes.

25          MS. PARKER:  Your Honor, this is way beyond the scope

 1  of my direct, and I believe at this point it's unacceptable for

 2  all this leading.

 3          THE COURT:  Overruled.

 4  BY MR. MINNS:

 5  Q.   And the Government asked you questions about a Mercedes

 6  which was purchased by the corporation Komplique.  Is it

 7  generally acceptable accounting principles --

 8          MS. PARKER:  Go ahead, sorry.

 9  BY MR. MINNS:

10  Q.   Is it generally acceptable accounting principles to

11  commingle corporate checking accounts with personal checking

12  accounts?

13  A.   No.

14  Q.   And as a matter of fact, that would be inappropriate?  And

15  it happens and you have to fix it, correct?

16  A.   You have to assist the taxpayer.

17  Q.   There are taxpayers who accidentally do this?

18          MS. PARKER:  Objection, Your Honor.

19          THE COURT:  Sustained.

20  BY MR. MINNS:

21  Q.   The Government -- this car, it was in the name -- it was

22  owned by the corporation Komplique, correct?

23          MS. PARKER:  Objection, lack of foundation as to

24  knowledge.

25          THE COURT:  Establish the personal knowledge of the

VanConett – Cross                                              50

```
 1  witness.
 2  BY MR. MINNS:
 3  Q.   Do you know the owner of the Mercedes that the Government
 4  was asking questions about?
 5  A.   I don't recall.
 6  Q.   Okay.  So we aren't going to get the answer anyway, but
 7  thank you.  Hold on.
 8            MR. MINNS:  May I approach the bench, Your Honor?
 9            THE COURT:  I assume that opposing counsel would also
10  be welcome.
11            MR. MINNS:  Yes, of course, Your Honor.
12            MS. PARKER:  I didn't understand that.
13            (Sidebar conference as follows:)
14            MR. MINNS:  This is the complete FBAR.  I think it
15  should come in through this witness, but in light of the
16  Court's prior rulings, I don't know if I'm permitted to do
17  that.
18            THE COURT:  That would include the second page?
19            MR. MINNS:  Yes, sir.  This witness can testify that
20  it was sent in from her, and it's also a certified record that
21  it was separated and now it's --
22            THE COURT:  And that part I don't have any difficulty
23  with.  The difficulty I have is the factual assertion that is
24  made in -- in that document.
25            MR. MINNS:  It's the actual return filed.
```

VanConett - Cross                                              51

 1              THE COURT:  I understand that, and it's authentic, I
 2  agree.
 3              MR. MINNS:  May I offer it into evidence?
 4              THE COURT:  The problem is the hearsay objection with
 5  respect to the content of the additional page.
 6              MR. MINNS:  The additional page is part of the tax
 7  return.
 8              THE COURT:  I understand that.  I get that.
 9              MR. SASSE:  Isn't the first two pages hearsay, too?
10              THE COURT:  Nope.
11              MR. MINNS:  Well, it is, but --
12              THE COURT:  It's responsive as a result of it having
13  independent legal significance because it's being responsive to
14  the law.
15              MR. MINNS:  Well, this is the certified record, and
16  this purpose of this is to --
17              THE COURT:  I get that.  I agree it's authentic.
18              MR. MINNS:  So --
19              THE COURT:  It is a statement not required by the law
20  or the form offered by the defendant has an explanation.
21              MR. SASSE:  Doesn't it also go to state of mind,
22  though, rather than --
23              MS. PARKER:  As he said yesterday, it's exculpatory.
24  It doesn't come in under 801.
25              MR. SASSE:  Is that the rule?  If it's exculpatory,

VanConett – Cross                                                    52

 1   it doesn't come in?

 2              MS. PARKER:  It doesn't come in under 801.

 3              MR. SASSE:  Is that a rule of evidence?

 4              MS. PARKER:  No, but I mean, it's not -- it's offered

 5   by the party, not the party opponent, so it doesn't come in

 6   under a hearsay exception.

 7              THE COURT:  And that's my view.

 8              MR. MINNS:  Then I -- that's why I came sidebar.

 9              THE COURT:  Would you please be careful.

10              MR. MINNS:  I thought the Court had ruled that way,

11   I.

12              THE COURT:  There's nothing wrong with taking another

13   run at it.

14              MR. MINNS:  Yes, sir.

15              (Sidebar conference concluded.)

16              THE COURT:  You may continue, sir.

17              MR. MINNS:  Thank you, Your Honor.

18   BY MR. MINNS:

19   Q.  If the Mercedes was owned by Komplique, if -- I'm not

20   saying that it was --

21              MS. PARKER:  Your Honor, I don't think there's

22   grounds for offering a hypothetical here.

23              THE COURT:  I don't know yet.

24   BY MR. MINNS:

25   Q.  If the Mercedes was owned by Komplique Corporation, it

1  would be improper to put it on Jim's asset column, correct?

2          MS. PARKER:  Your Honor, I'm going to object.  First

3  of all, there's no certainty as to -- there's two Mercedes that

4  we're discussing, and I think the record would show that they

5  were titled in different entities' names, and so --

6          THE COURT:  And I will agree to the extent that the

7  question is not specific with respect to a particular vehicle.

8  BY MR. MINNS:

9  Q.   I've just been informed, and it's my mistake, by counsel

10  that the title is already in evidence, so if I could find that

11  exhibit and show it to the witness, she would be able to

12  testify whether or not it is in the name of Komplique.

13          MS. PARKER:  Judge, we'll -- that's not the issue.

14  The question is what information he wants to elicit.  We'll

15  acknowledge that the record reflects there are two different

16  Mercedes and who they're titled to, but I think this question

17  goes beyond that, and that's also objectionable.

18          MR. MINNS:  I'd like to ask the question.

19          THE COURT:  My understanding, and I would assume that

20  at least you would stipulate that at least one of the Mercedes

21  vehicles was titled in that corporation and --

22          MS. PARKER:  Yes.

23          THE COURT:  -- in that LLC.  Yes.

24          MS. PARKER:  So what time frame, I mean, the -- if

25  she's a documents custodian, this question is way beyond that,

VanConett - Cross

1  and it's way beyond the scope of direct, and I think

2  fundamentally the form of the question is inappropriate.

3          MR. MINNS:  That's only one of her functions that the

4  Government put her up there for was document custodian.

5          THE COURT:  Let's see if we can get a foundation --

6          MR. MINNS:  Yes, Your Honor.

7          THE COURT:  -- from this witness for a response.

8          MR. MINNS:  It's on 1120, what exhibit number is

9  1120?

10         MS. ARNETT:  Government Exhibit 33.

11  BY MR. MINNS:

12  Q.  If we could put --

13         MS. ARNETT:  It's not admitted right now.

14         MR. MINNS:  Can you find the page that it's on that?

15         MS. ARNETT:  I have the page.

16         MR. MINNS:  Okay.  Could we -- we'd like to publish

17  already in evidence Government Exhibit 120, and I'd like to

18  take the full 120 up to the witness.

19         MS. PARKER:  I don't think that was admitted, Judge,

20  and --

21         MR. MINNS:  Oh, it's not in evidence, I apologize.

22         MS. PARKER:  Judge, to try to make this as simple as

23  possible, we'll stipulate that the 2009 was purchased by the

24  defendant and titled in the name of Komplique, and the 2013 was

25  purchased by the defendant and titled in the name of Kresent.

 1   That's -- we don't have an issue with that.  Where we go from

 2   there, it yet to be seen I guess.

 3             THE COURT:  You have a stipulation now with respect

 4   to the title of both vehicles.

 5             MR. MINNS:  Thank you, Your Honor.

 6   BY MR. MINNS:

 7   Q.   So you are allowed now to assume that the two Mercedes

 8   were not -- neither one was put in the name of James Pieron;

 9   one was put in Komplique and other was put in Kresent, two

10   corporations.  If Jim Pieron represented for any reason that

11   those two automobiles were assets of his, that would be

12   improper, would it not?

13             MS. PARKER:  Objection.

14             THE COURT:  Sustained.

15   BY MR. MINNS:

16   Q.   These returns were extremely time-consuming and difficult

17   and the management to do it with a top flight firm extremely

18   expensive, correct?

19             MS. PARKER:  Objection.

20             THE COURT:  Sustained.

21   BY MR. MINNS:

22   Q.   Can you -- can you tell the jurors approximately what was

23   necessary to charge for the services that your firm rendered?

24   A.   I don't recall.

25   Q.   When -- when the CPA signs a return, they're representing

1  that -- to the -- well, first of all, if the CPA finds that

2  their client is not being honest with them, they will not file

3  the return, correct?

4            MS. PARKER:  Objection.

5            THE COURT:  Sustained.

6  BY MR. MINNS:

7  Q.   Your firm will not file a return if you do not believe

8  that the tax preparer is being honest with you, will you?

9            MS. PARKER:  Objection.

10           THE COURT:  Sustained.

11 BY MR. MINNS:

12 Q.   Don't the rules of the -- under Circular 230 require you

13 to decline work for a client that is not giving you honest

14 information?

15 A.   Yes.

16 Q.   And so you could be right or you could be wrong, but you

17 will not sign a return if you do not believe that you received

18 honest information?

19 A.   Yes.

20 Q.   And you try the very best of your ability to know your

21 customer, correct?

22 A.   Yes.

23 Q.   And when the client signs the return, he is accepting your

24 work product and relying on it?

25 A.   Yes.

1              MS. PARKER:  Objection.

2              THE COURT:  Overruled.

3              MR. MINNS:  I thank you for your competent and honest

4    testimony, and, Your Honor, I pass --

5              MS. PARKER:  Objection, Your Honor.

6              THE COURT:  Sustained.

7              MR. MINNS:  I pass the witness Your Honor.

8              MS. PARKER:  I would ask that that be stricken.

9              THE COURT:  It will be stricken.  Redirect?

10             MS. PARKER:  Pardon?  Yes, Your Honor.

11             THE COURT:  If you could give us just kind of an

12   estimate of how much time you anticipate on redirect.

13             MS. PARKER:  Five, 10 minutes --

14             THE COURT:  If you'd like to --

15             MS. PARKER:  -- depending on the answers obviously,

16   but yes.

17                      REDIRECT EXAMINATION

18   BY MS. PARKER:

19   Q.   When you were asked about Mr. Pavlik, you were all ready

20   to give his biography, weren't you?

21   A.   Not completely.

22   Q.   You're represented by counsel here?

23   A.   Yes.

24   Q.   And who's paying for the counsel?

25   A.   My firm.

VanConett - Redirect                                                    58

1   Q.    And you're trying to protect your firm?

2   A.    Yes.

3   Q.    And with regards to the 1040X, what was -- that's now

4   defense Exhibit 1034, what was your role in the preparation of

5   that?

6   A.    Are you talking about 2011?

7   Q.    No.   I'm talking about the -- it's a 1040X for 2011,

8   okay --

9   A.    Okay.

10  Q.    -- that's in evidence as 1034.   Do you have that?

11  A.    Yes.

12  Q.    When was that one prepared?

13  A.    It was prepared in March of 2014.

14  Q.    And were there other intermediate 1040Xs prepared for that

15  same year?

16  A.    No.

17  Q.    All right.   What was your role in the preparation of --

18  that 1040X is an amended tax return, correct?

19  A.    Correct.

20  Q.    What was your role in the preparation of it?

21  A.    I entered the original information from the 2011 return

22  into the amended return.   And then I entered the amended

23  information that was provided to me by Kim Pavlik and the

24  worksheets that he directed me to prepare, and we prepared an

25  amended return.

VanConett – Redirect                                    59

1  Q.   All right.  So you were directed by Mr. Pavlik to do this?

2  A.   Yes.

3  Q.   And you said there was a worksheet, did that come from

4  him?

5  A.   Yes.

6  Q.   From Mr. Pavlik that is?

7  A.   With the guidance and assistance of information he got

8  from James Pieron.

9  Q.   All right.  And you took that information and inputted it

10 in the form?

11 A.   Yes.

12 Q.   Did you develop concerns about the way the form was being

13 completed?

14 A.   No.

15 Q.   Did you tell me during prep -- when we met in order to

16 prepare for your testimony, that you had some concerns about

17 the way that 1040X was being completed?

18 A.   No.

19 Q.   There's a lengthy statement that's attached to this, did

20 you prepare that?

21 A.   I typed it for Kim Pavlik.  He did the initial research.

22 I may have assisted him with some research if he requested me

23 to.

24 Q.   All right.  But the research was directed by him?

25 A.   Yes.

1  Q.   And fundamentally he was responsible for the content of

2  that information?

3  A.   Yes.

4  Q.   And you said that there was a $436,446 change in the taxes

5  that should be reflected on that return; is that correct?

6  A.   Yes.

7  Q.   And is that dependent on the accuracy of that statement?

8  A.   Yes.

9  Q.   So if the statement was not appropriate, then that 436,446

10  reduction in tax liability would not apply?

11  A.   Possibly.

12  Q.   And then tax would be owed?

13  A.   Yes.

14  Q.   And, again, at this time, when was this amended return

15  submitted?

16  A.   March of 2014.

17  Q.   And at that point, were Mr. Pieron's taxes for 2008 and

18  2009 paid?

19  A.   I think he was making payments on them.

20  Q.   How so?

21  A.   The installment payments.

22  Q.   Do you know how many -- that $1,500 payments?

23  A.   Yes.

24  Q.   Do you know how many payments he, in fact, made?

25  A.   I don't recall.

1  Q.   Do you know he quit making those payments?

2  A.   No.

3  Q.   Did you know he had stopped making them at the time that

4  you did the work on the 2014 offer of compromise?

5  A.   No.

6  Q.   What is Section 1341?

7  A.   It's kind of complex.  Per the statement in here, which

8  I --

9  Q.   I don't want you to read the statement.  Can you, from

10  your own knowledge and information, answer that question?

11  A.   Well --

12  Q.   You're looking at the statement, aren't you, ma'am?

13  A.   Yeah, I am.

14  Q.   Okay.  I'm going to ask you to set it up, put it aside.

15  A.   Okay.  All right.

16  Q.   From your own knowledge and information, what does 1341

17  provide?

18  A.   It's a right of claim that you have to report a

19  transaction of gross income when you have receipt of it, even

20  though maybe then the next year, you know, you -- you don't

21  actually have receipt of it.  This right of claim let's you

22  take the deduction for it.  It is a complex matter.

23  Q.   And what is Pub 17?

24  A.   Taxpayer Guide, Publication 17, is that what you're

25  saying?

1   Q.   Yes.

2   A.   It's a 1040 guide.

3   Q.   And how does it relate to Section 1341?

4   A.   I don't know.  This was six, seven years ago.

5   Q.   And in 2017, some letters were sent by your firm to the

6   IRS?

7   A.   Do you have an exhibit?

8   Q.   Yes.  Defendant's Exhibit 1026 and 1027.

9   A.   Yes.

10  Q.   Those were both letters sent by your firm to the IRS?

11  A.   Yes, signed by Kim Pavlik.

12  Q.   I'm sorry?

13  A.   Signed by Kim Pavlik.

14  Q.   All right.  At that time, were Mr. Pieron's 2008 and 2009

15  taxes paid in full?

16  A.   I'm not aware that they were.

17  Q.   You said that you made multiple calls to the IRS?

18  A.   Yes.

19  Q.   You said you did that pursuant to a power of attorney?

20  A.   Can you rephrase that?

21  Q.   I understood to say -- you to say that you made those

22  calls pursuant to a power of attorney?

23  A.   Yes.

24  Q.   Are you an attorney?

25  A.   No.

1   Q.   Is Mr. Pavlik an attorney?

2   A.   No.

3   Q.   There is a difference, is there not --

4   A.   Yes.

5   Q.   -- between a CPA and an attorney?

6   A.   Yes.

7           MR. MINNS:  I object, Your Honor.  The form is for

8   CPA's and this is misleading.

9           THE COURT:  I'm going to sustain the objection.  The

10  question calls for a legal conclusion based on the title of the

11  document.  It's an opinion, and I don't think the witness is

12  qualified to respond to.

13  BY MS. PARKER:

14  Q.   All right.  Let me ask you this:  You were interviewed by

15  Agent Hollabaugh?

16  A.   Yes.

17  Q.   And you knew at the time he was a criminal investigator?

18  A.   Yes.

19  Q.   And was it after that time that you were making phone

20  calling to the IRS?

21  A.   I don't recall.  I think that was like three or four years

22  ago, at least.

23  Q.   Well, your phone log says 2017, which would be two years

24  ago, right --

25  A.   Yes.

1  Q.    -- '15, '16 and '17?

2  A.    Yes, I guess, yes; 2000 and -- yes, yep.

3           MS. PARKER:  Just one second, Your Honor.

4           I'll come back to that, if I may, Your Honor.

5  BY MS. PARKER:

6  Q.    In one point in your cross-examination testimony you said

7  something about the IRS having corresponded with the client,

8  correct?

9  A.    Yes.

10 Q.    And you said that the information you had that the IRS had

11 not received a response from the client?

12          MR. MINNS:  This was on direct, not on cross.

13          MS. PARKER:  No, it's on -- it was on his

14 cross-examination.

15          THE COURT:  Overruled.  Witness can respond.

16          THE WITNESS:  Would you repeat that.

17 BY MS. PARKER:

18 Q.    Yes.  You indicated that you were told by the IRS that the

19 client, that is Mr. Pieron, had not responded to their

20 correspondence?

21 A.    Yes, which we didn't receive the correspondence at AHP

22 either.

23 Q.    Yes, but nevertheless there was correspondence between the

24 IRS and Mr. Pieron and he did not respond?

25 A.    I don't know that for sure.

VanConett - Redirect                                    65

```
 1  Q.   Well, that was your understanding, correct?
 2  A.   Yes.
 3           MS. PARKER:  Judge, I need to locate an item, and I
 4  need just a moment to do that.  Would this be a good time for a
 5  short break?
 6           THE COURT:  I doubt you have an objection to that,
 7  Mr. Minns.
 8           MR. MINNS:  No, Your Honor, I do not.
 9           THE COURT:  The bailiff should be on his way.
10           Please rise for the jury.
11           (At 11:53 a.m., jury leaves.)
12           THE COURT:  Record's closed, about 10 minutes.
13           (At 11:53 a.m., court recessed.)
14           (At 12:10 a.m., break concluded.)
15           THE COURT:  Jury, please.
16           MS. PARKER:  Judge, do you want the witness to resume
17  the stand?
18           THE COURT:  Yes, please.
19           (At 12:13 p.m., jury arrives.)
20           THE COURT:  Witnesses may retake the stand with the
21  understanding that you remain under oath, ma'am and you may
22  continue.
23           MS. PARKER:  Thank you, Your Honor, and thank you for
24  the break.
25  BY MS. PARKER:
```

1  Q.   Ma'am, does Publication 17 give guidance as to preparing

2  1040 returns?

3  A.   I think that's the publication.  I can't -- I don't know

4  if it's 17 or 18.  I can't remember that.

5            MR. MINNS:  I didn't ask a question --

6  BY MS. PARKER:

7  Q.   You don't know one way or another?

8            MR. MINNS:  Pardon me.  I didn't ask a question about

9  Publication 17.  The Government did on direct.  Now they're

10 going back into 17, and I didn't ask anything on 17 in

11 cross-examination, so I ask that the redirect be limited to the

12 cross-examination.

13           THE COURT:  That was not my memory of the order of

14 events.

15           MS. PARKER:  It's not mine either, Your Honor.

16           MR. MINNS:  I don't even know what Publication 17 is,

17 so I can guarantee I didn't bring it up.

18           MS. PARKER:  Well, his knowledge is not the relevant

19 issue, however.

20           THE COURT:  Yes.

21           MR. MINNS:  But the Government did bring it up in

22 direct.

23           THE COURT:  They did.

24           MR. MINNS:  And now they're bringing it up when it

25 was not discussed in cross.

1           THE COURT:  And that is where we disagree.

2           MR. MINNS:  Oh, I apologize, Your Honor, I'm

3  mistaken.

4           THE COURT:  You may continue.

5           MS. PARKER:  Thank you.

6  BY MS. PARKER:

7  Q.   Well, do tax preparers, including CPA's like yourself, use

8  Publication 17 in preparing returns?

9  A.   They can.  They have various resources and certain form

10 instructions, you know; 1040 instructions, Schedule A, Schedule

11 B, Schedule C, you know, I go to the specific instructions.

12 Q.   Well, let me ask you this, ma'am:  You made reference to a

13 right of claim doctrine.  Is it, in fact, the claim of right

14 doctrine?

15 A.   Yes.

16 Q.   Do you know what publication contains instructions

17 regarding that?

18 A.   No, I don't offhand.

19          MS. PARKER:  Okay.  May I approach, Your Honor?

20          THE COURT:  Yes.

21 BY MS. PARKER:

22 Q.   You said earlier that you did not recall when it was that

23 you were interviewed by the IRS criminal agent.  I'm going to

24 just show you memorandum of your interview.

25 A.   Long time ago, six years --

1  Q.   Well, let me ask you --

2  A.   -- five years.

3  Q.   -- does that refresh your memory?

4  A.   Yes.

5  Q.   All right.  And when was it that you were interviewed?

6  A.   May of 2013.

7  Q.   All right.  And it was after that that you and your firm

8  were involved in preparing the 2014, March 2014, offer in

9  compromise, correct?

10 A.   Yes, ma'am.

11 Q.   And you knew from the fact that you were being

12 interviewed, had been interviewed almost a year before, that

13 there was a criminal investigation?

14 A.   Yes.

15 Q.   And so at that time, nevertheless, in 2014, the defendant

16 was -- Mr. Pieron was offering to pay $30,000 to absolve all of

17 his tax arrearages?

18 A.   Yes.

19 Q.   Who came up with that $30,000 figure?

20 A.   That would have been between Kim Pavlik and his client,

21 James Pieron.

22 Q.   All right.  You didn't make that number up?

23 A.   No, I'm only the tax preparer.

24 Q.   All right.  And after that interview, you had contact with

25 Mr. Pieron, right, the interview with the IRS, correct?

1  A.   Years past about business tax returns, and 1040 returns.

2  Q.   Did you tell him you'd been interviewed by criminal agents

3  from the IRS?

4  A.   I don't recall.

5  Q.   Then you might have, right?

6  A.   I don't recall.

7  Q.   Well, if you don't recall, you could have, or you might

8  not have?

9          MR. MINNS:  Objection, Your Honor.  This is

10 harassment of her own witness, repeated and answered three

11 times now.

12         THE COURT:  The witness has answered the question.

13         MS. PARKER:  Okay.

14         THE WITNESS:  You know, the client communication was

15 between Kim Pavlik --

16 BY MS. PARKER:

17 Q.   I'm sorry.  I'm sorry.

18 A.   -- and James Pieron.

19 Q.   Ma'am, you're not allowed to just volunteer information.

20 A.   Okay.

21 Q.   Have you had other clients who were under criminal

22 investigation?

23 A.   No.

24 Q.   Would there have been a reason why you would not have told

25 Mr. Pieron, when you dealt with him on other matters, that

 1   you'd been interviewed by criminal agents from the IRS?

 2   A.   It was not my -- my right.   I didn't have the client

 3   contact with James; Kim did.

 4              MS. PARKER:   Thank you, Your Honor.

 5              THE COURT:   Any concluding recross?

 6              MR. MINNS:   Just a couple questions, Your Honor.

 7              THE COURT:   Yes, sir.

 8                          RECROSS-EXAMINATION

 9   BY MR. MINNS:

10   Q.   The Government when she was questioning you, questioned

11   why your firm had hired counsel?

12              MS. PARKER:   I -- well --

13   BY MR. MINNS:

14   Q.   The jury probably has figured out already, but these guys

15   can be intimidating, can't they?

16              MS. PARKER:   Objection.

17              THE COURT:   Sustained.

18              MR. MINNS:   Pass the witness.

19              MS. PARKER:   Nothing further, Your Honor.

20              THE COURT:   Thank you, ma'am.   You're excused from

21   the witness stand.

22              Government's next witness, please.

23              MS. PARKER:   Judith Gustafson, Your Honor.

24              THE COURT:   Good afternoon.   If you could stop for

25   just a moment and raise your right hand, please.

71

1              (At 12:20 p.m., sworn by the Court.)

2              THE COURT:  Please have a seat in the witness stand.

3    The chair does not move, but the microphone does.

4              THE WITNESS:  Okay.

5                        JUDITH GUSTAFSON,

6         GOVERNMENT'S WITNESS, SWORN AT 12:20 p.m.

7                      DIRECT EXAMINATION

8    BY MS. PARKER:

9    Q.   Ma'am, would you state your name and spell it for us,

10   please.

11   A.   Judy Gustafson, J-U-D-Y, G-U-S-T-A-F-S-O-N.

12   Q.   And how are you employed?

13   A.   I'm employed by the US Treasury Department, IRS National

14   Forensic Laboratory in Chicago, Illinois.

15   Q.   How long have you been working for the IRS?

16   A.   Approximately 27 years.

17   Q.   And what are your duties at the forensic lab?

18   A.   I'm a forensic document examiner that --

19   Q.   Go ahead.

20   A.   May I go ahead?

21   Q.   What is a forensic document examiner?

22   A.   Sure.  Yeah, that involves the examination and comparison

23   of questioned handwriting, hand printing and numerals for the

24   purpose of determining authenticity or authorship and, in

25   general, any problem concerning a document.

Gustafson – Direct

72

```
 1   Q.   And when you say "handwriting," does that include
 2   printing, numbers or numerals, things of that nature?
 3   A.   Yes, it does.
 4   Q.   I'm going to show you what I believe has already been
 5   admitted into evidence as Exhibit 178.  Do you recognize those,
 6   ma'am?
 7   A.   Yes, I do.
 8   Q.   Are those handwriting exemplars?
 9   A.   Yes, they are.
10   Q.   And are there handwriting exemplars that were provided to
11   you for purposes of making an analysis?
12   A.   Yes, they were.
13   Q.   And formulating opinions?
14   A.   That is correct.
15   Q.   And were you able to conduct an analysis and formulate
16   some opinions?
17   A.   Yes, I was.
18            MS. PARKER:  Your Honor, I would intend to proceed to
19   present those opinions.
20            MR. MINNS:  She's clearly an expert, Your Honor.
21            THE COURT:  You may proceed.
22   BY MS. PARKER:
23   Q.   Can you give us just a general idea of what it was you
24   were asked to do?
25   A.   I was asked to compare this known writing with 14
```

1  documents.  It was 15 pages total.  There was one two-page

2  paper.  There were a couple 1040s, a couple 1040Xs, collection

3  document, installment document, some check -- copies of checks,

4  certificate of title, and a purchase agreement.

5          And I was asked to compare the written entries on

6  that list of documents that I just described, with the known

7  writing that I was also submitted, to determine whether or not

8  that person had written those documents.

9  Q.  All right.  And were you able to draw some opinions from

10 your efforts?

11 A.  Yes, I was.

12 Q.  And were you also able to prepare some charts to help

13 explain those opinions to the jury?

14 A.  Yes, I did.

15          MS. PARKER:  May I approach, Your Honor.

16          THE COURT:  You may.

17 BY MS. PARKER:

18 Q.  I want to place some other exhibits, but first I'd like to

19 direct your attention to exhibits -- Proposed Exhibits 173A and

20 B.  Are those paper size versions of a chart that you prepared?

21 A.  Yes, they are.

22          MS. PARKER:  All right.  Your Honor, I will offer

23 Government's Proposed Exhibits 173A and B for demonstrative

24 purposes.

25          MR. MINNS:  I have no objection entering them for any

1  purposes.  I have no objection to them at all.

2          MS. PARKER:  I'll take them for all purposes, then,

3  that's fine.

4          THE COURT:  They're received.

5  BY MS. PARKER:

6  Q.  All right.  I've placed before you -- well, let's take a

7  look at 173A.  Again, you said that's a chart that you

8  prepared?

9  A.  Yes, it is.

10 Q.  And can you kind of introduce us to what you've put on

11 this chart.

12 A.  All right.  Sure.  In the questioned area at top, the

13 "Fifth Third" and the "1114 North Mission Street" that's on the

14 bottom line in the questioned area, that's from the installment

15 document, and the remaining entries in the questioned area are

16 from the collection document.

17         In the known area, that's all writing by one person,

18 that writing that was submitted me as having been written by

19 James Pieron.

20 Q.  All right.  Let's take a look at Exhibit 92, the first

21 page.  Is that a document that you were making the analysis or

22 comparison on?

23 A.  Yes, it was.

24 Q.  All right.  Now, with regards to -- if I could direct your

25 attention to the address portion of this document on the first

1  page, page 01020.  Is that one of the areas that you focused

2  on?

3  A.   Yes, it is.

4  Q.   Let's go back to 173A, and can you explain for the jury

5  the analysis that you did with regards to the address section

6  of Exhibit 92 and what conclusions you arrived at, but start

7  with the analysis, please.

8  A.   Okay.  Would you like me to point things out on the chart

9  or just describe.

10  Q.   Yes, if you can do that from there.  I believe we've got

11  that technical ability; if not, we have --

12  A.   We'll give it a try, yeah.

13  Q.   -- the old school chart.

14  A.   Yeah, in this examination, as in any handwriting

15  examination, what we're looking at is the specific details of

16  the way the person forms the letters, the connecting strokes

17  between the letters, the spacing, the slant, the height

18  relations, punctuation, ending strokes, comparing them between

19  the questioned and the known writing.

20       In the Fifth Third Bank area right off to the --

21  let's see, look at this here -- there's an interesting height

22  relation that I'd like to point out.  If you look at the -- if

23  you look at the word "bank" you can see that the B is taller

24  than the A is taller than the N.  Then it comes up again to

25  form the K.

1           Now if you look through the known writing, you can

2   see this is a pretty consistently repeated habit.  You have the

3   B being taller than the A being taller than the N, then it

4   comes up again in the K.  Kind of an interesting height

5   relation, a good example of the type of thing that we look at.

6           If you look at the A by itself, it's characterized

7   having a very long cross bar, and it also comes up to touch the

8   top of the N, if you're looking at the questioned example.

9           Let me see if I can erase this here.  Clear, okay.

10          Yeah, okay we're looking at the A's here, and

11  particularly right where the A crossbar touches the top of the

12  N.  You can see that the A connects there and it touches at the

13  top.

14          Now the N is -- begins with a downstroke right here,

15  okay, but then it comes down into the center in a small -- in a

16  curve.  So you have a downstroke, then it comes up, then you

17  have a curve into the center, and then the stroke on the right

18  is separate and that comes down, and that's very consistently

19  presented in the -- here's one down here, too -- in the knowns.

20          Now, the K is characterized by having a very long --

21  a long ending stroke on the lower right.  Comes out very far to

22  the right, and it also curves down a little bit.

23          Let me clean this off here.

24          And the top arm of the K, the one that goes off to

25  the right, here we go, that extends a little bit higher than

1   the staff of the K.  You can see that through here.

2          Now, if you look at the K over in "checking" over

3   here, you can see some similar habits where you have this very

4   long ending stroke coming off to the right, except when the K

5   is in the middle of the word, as in the world checking, it

6   curves up a little bit.  You've got -- let me see if I can

7   outline one here.  It's a little bit more like that, whereas

8   when the K is written at the end of the word, it has a tendency

9   to curve down a little bit.

10          I thought that was kind of an interesting habit.  It

11  depends on the context of the K.  When the K is at the end of

12  the work, it curves down; when it's in the middle of the word,

13  it curves up.

14  Q.   So is it a fair statement that part of what you do is

15  looking at consistencies in habits?

16  A.   That's correct.

17  Q.   And why is that significant to you?

18  A.   Well, no two people write exactly alike, and within each

19  person's handwriting there's a set of these distinct habits and

20  characteristics, and it's the combination of these, taken all

21  together, that makes a person's handwriting unique and

22  different from everybody else's and, therefore, identifiable.

23  Q.   All right.  Did you also look at box A on -- let's go, A,

24  B and C on the Exhibit 92.  I'm sorry, another page, go to the

25  next page, I'm sorry.

1            All right.  Did you take a look at that portion of

2   the document?

3   A.    Yes, I did.

4   Q.    And, again, were you involved in making observations of

5   what was on that questioned document and the known writing of

6   Mr. Pieron?

7   A.    Yes, I was.

8   Q.    And did you make similar observations?

9   A.    That's correct.

10  Q.    All right.  And with regards to this part of the exhibit,

11  what was your conclusion?

12  A.    I concluded that there was a high probability that James

13  Pieron wrote those entries.

14  Q.    All right.  And when you say "high probability," do you

15  ever say you're absolutely certain?

16  A.    Yes, we do have a positive identification also.

17  Q.    All right.  And how does "high probability" compare to

18  that?

19  A.    It's a very strong conclusion, but this is a copy, and we

20  do not identify photocopies in our lab.  They don't produce the

21  sufficient detail of line that we like to form the basis for a

22  positive ID.

23  Q.    All right.  So do you ever say positive with regards to a

24  photocopy?

25  A.    No, we do not.

1   Q.   All right.   What is the highest ranking of certainty that

2   you give with regards to photocopies?

3   A.   The high probability finding.

4   Q.   So this is as good as it gets for a photocopy?

5   A.   That is correct.

6   Q.   Likewise as to the address on the first page of this

7   document, what was your conclusion?

8   A.   I concluded that there was a high probability that James

9   Pieron wrote those entries also.

10  Q.   Can we go to page 01024.   Did you take a look at that page

11  of the document?

12  A.   Yes, I did.

13  Q.   And what was your analysis as to that page?

14  A.   I concluded that there was a high probability that James

15  Pieron wrote those entries, excluding the taxes per pay period

16  line, the "1,000," and the "500," I had a no conclusion on

17  those entries.   There were some characteristics in those that I

18  could not resolve based on the known writing, but the rest of

19  the page I concluded high probability that James Pieron wrote

20  those.

21  Q.   And the two that you couldn't say for sure, or couldn't

22  say high probability for, were his withholdings, both for

23  federal and state purposes?

24  A.   Yes, it was the "1,000" and the "500."

25  Q.   All right.   Can we go back to page 01023.   And I'd like to

1  go to the box at the bottom there.  Did you examine that also?

2  A.   Yes, I did.

3  Q.   And what was your analysis as to that portion of this

4  exhibit?

5  A.   I concluded that there was a high probability that James

6  Pieron wrote the line beginning with "car" and the "VW" in

7  parenthesis and the rest of that line.

8       The remaining two lines below that, I had a no

9  conclusion on that.  The quality of the copy was too poor to

10 form the basis for an analysis, and I also had a lack of

11 printed lowercase letters to compare that to, so that was no

12 conclusion.

13 Q.   But the "car VW" part, what was your conclusion as to

14 that?

15 A.   That was high probability that James Pieron wrote those

16 entries.

17 Q.   Did you -- you also have before you Government's

18 Exhibit 102.  Did you also do an analysis with regards to that?

19 A.   Is that one of the ones up here in the --

20 Q.   Yes.

21 A.   Which exhibit?

22 Q.   102.

23 A.   Yes, I did examine that.

24 Q.   And did you also prepare a chart with regards to that

25 document?

1  A.   Yes, I did.

2  Q.   And is that Exhibit 173B as in boy?  Can you display that,

3  please, 173B.

4  A.   Yes, that's the chart.

5  Q.   All right.  All right.  Let's go -- well, let's go back to

6  102, and what parts of this document were you involved in

7  examining?

8  A.   I examined the entire document.

9  Q.   And did you come to focus on a particular part of that

10 document?

11 A.   I had conclusions on all of the entries.

12 Q.   All right.  And with regards to the entries on this

13 document, what conclusions did you draw?

14 A.   I concluded that there was a high probability that James

15 Pieron wrote the signature and the date at the bottom; that

16 there were indications that he did not write the remaining

17 entries, the printed entries, on the document, excluding the --

18 there was a cursive signature on the manager's approval line,

19 and a cursive line above it that I said no conclusion on,

20 because I did not have comparable cursive writing to compare to

21 that entry.

22 Q.   But your high probability conclusion was as to the

23 signature and the date for Mr. Pieron?

24 A.   That is correct.

25 Q.   All right.  And using Exhibit 173B, can you explain to us

1  how you got there.

2  A.   Yes, the signature in the questioned area is from that

3  purchase agreement, and the known area, once again, this is all

4  writing submitted to me as having been written by James Pieron.

5  Now, it's basically an illegible signature but the "J" is right

6  here, and we have a little -- I'm pointing down to a straight

7  line, that's the "ames" in James.

8            Okay.  Here's the "D," this letter right here.  And

9  the "P" is right here and the "ieron", part of the Pieron name,

10  is really just reduced to a simple line right here.  Let me

11  erase that here.

12            So this is a stylized signature, as opposed to a

13  text-based signature.  A text-based signature is one where you

14  can read all of the letters in it, and a lot of people develop

15  these stylized signatures if they write a lot or in business

16  agreements, so -- but, you know, they're perfectly identifiable

17  just like any other signature.

18            The "J" is kind of an interesting J.  It's

19  characterized by having this kind of a narrower top piece here.

20  You can see it right here, and a good agreement in the shape.

21  What I'm showing you here on this chart, here's some other J's,

22  you can see they're all a little bit different.  This is what's

23  known as range of variation.

24            Because we're not machines, we do not produce things

25  with a machine-like precision.  They're not going to be exactly

1  alike.  You probably know that you don't write your own name

2  the same every day, but there is a basic theme you can see in a

3  lot of these letters.  You've got the -- let me start over

4  here.

5           Yeah, you've got the staff being made here, and then

6  a large area off to the right, and then ending out this way.

7  Repeated here you can see it's a little bit pointier on this

8  one, but it's the same basic theme.

9           This one here, it looks a little different, but it is

10  still the same movement.  It is basically kind of around like

11  this, so let me clear this off.

12           So we have good agreement in the movement, and then

13  the "ames", this is this part right here, it is touching the

14  edge of the "J" right there.  Well, it's right there actually,

15  and then come and it's touching the "D."  He does vary this a

16  little bit.  Sometimes there's a separation between the "J,"

17  the "ames" and the "D," but we have very good agreement in

18  these examples.

19  Q.   And the known ones, again, are taken from the handwriting

20  examplars, correct?

21  A.   Yes, yeah.  And the "D" is characterized by being the

22  shortest letter in the name.  Once again, it's an interesting

23  height relation.  We've got -- the "P" is pretty consistently

24  the tallest letter in the name.  The "J" is second and then the

25  "D" is very small.

1          The "D" is characterized by having a big -- kind of a

2   good size gap in the bottom.   There's another one right there.

3   Then it comes up into a little point, and then ends in a little

4   bit of a loop, a very tight narrow little loop.   Well

5   represented here.

6          He occasionally will put a printed "D" in there, so

7   if you are looking through some of the other documents, you

8   will see some printed letters mixed in with there, but we've

9   got some very good agreement in the shape and the configuration

10  of this "D."   Let me clean that off again.

11         The "P" is characterized by this long staff.   This

12  one's curving, kind of like in the questioned, little bit more

13  of a curve.   Kind of a detailed little movement down here,

14  little notch.   Like I said, he's got a little range in that.

15  This is a very simple one.   This is almost a little bit of a

16  loop, but we do have good agreement in the notch right here,

17  and then it ends with a very tiny loop.

18  Q.   All right.   You've already indicated that the -- looking

19  at the known handwriting of Mr. Pieron, and the signature on

20  the purchase agreement, which was Exhibit 102, you felt that --

21  you concluded there was a high probability he wrote that.   Did

22  you also look at signatures on exhibits -- Government's

23  Exhibits 40 and 42, which I believe are on the witness stand

24  before you?

25  A.   Yes, I did look at those.

1  Q.   Go ahead.  I'm sorry, they're already in.

2         And looking at the second page of Exhibit 40, which

3  is a 2008 1040; is that correct?

4  A.   Yes, that's correct.

5  Q.   Were you able to arrive at a conclusion regarding the

6  signature of the taxpayer on that form?

7  A.   Yes, I did.

8  Q.   And what was that?

9  A.   I concluded that there was a high probability that James

10 Pieron wrote that signature.

11 Q.   Okay.  If you would go on to Exhibit 42, which is a 2009

12 1040 for Mr. Pieron, can you go to the second page of that

13 also.

14 A.   Yes.

15 Q.   And, again, did you, using the observation type things

16 that you've already described, arrive at a conclusion regarding

17 the origin of the signature on that return for the taxpayer?

18 A.   Yes, I did.

19 Q.   And what was that?

20 A.   That is -- I concluded there's a positive identification

21 that James Pieron wrote that signature.

22 Q.   And when you say it was a positive identification, is that

23 even better than high probability?

24 A.   Yes, it is stronger.

25 Q.   And you were able to make that how?

1   A.   Based on the similar examination of the fine character --

2   characteristics and they're repeated throughout the known

3   writing.

4   Q.   And did you have access to the original form for that?

5   A.   I did, yes.

6   Q.   Likewise for the other Exhibit 40?

7   A.   Yes, I did.

8   Q.   Also I've handed you Government's Exhibit 45, which is an

9   installment agreement.  Do you see that?

10  A.   Okay.

11  Q.   It should be on top of the -- the corner of the box,

12  sorry.

13  A.   Oh.  Yes, I do see that.

14  Q.   And looking at Exhibit 45, and using the techniques that

15  you've already described for us, were you able to draw a

16  conclusion regarding the signature on that document next to the

17  date?

18  A.   Yes, I was.

19  Q.   And what was your conclusion?

20  A.   I concluded that there was a high probability that James

21  Pieron wrote that signature.

22  Q.   And high probability, again, were you working from a

23  photocopy that time?

24  A.   Yes, that was a photocopy.

25          MS. PARKER:  I will pass the witness, Your Honor.

1          THE COURT:  Cross-examination.

2                    CROSS-EXAMINATION

BY MR. MINNS:

3

4  Q.   Good afternoon, Ms. Anderson.

5  A.   Gustafson.

6  Q.   Pardon?

7  A.   Gustafson did you say?

8  Q.   I'm sorry.  I apologize.

9  A.   That's okay.

10 Q.   I don't -- sorry.  You're both a scientist and an artist,

11 correct?

12 A.   Yes, I guess I would say that.

13 Q.   This field kind of lends itself to that type of dynamic,

14 correct?

15 A.   Well, yeah.  That is often said about questioned document

16 examination.

17 Q.   Is it possible to make an identification of something that

18 you haven't studied already in your laboratory?  Is it possible

19 to do that on the fly, or would that be unfair?

20 A.   That's -- that's not really a proper way to examine a

21 document.  You know, we need our proper setting with our

22 magnifiers and lighting and sufficient time.

23          MR. MINNS:  Well, then I thank you for your

24 testimony, and I have no further questions.

25          I guess I have no questions.  Have a nice day.

1        MS. PARKER:  I have no further questions, Your

2   Honor --

3        THE COURT:  Thank you, ma'am.

4        MS. PARKER:  -- for this witness.

5        THE COURT:  Yes.

6        MS. PARKER:  Your Honor, if I may, I would call

7   Charles Lake.

8        THE COURT:  Good afternoon.  If you could take just a

9   moment, raise your right hand.

10        (At 12:50 p.m., sworn by the Court.)

11        THE COURT:  The witness stand is on the far left in

12   the courtroom, sir.  You may have a seat.

13                    CHARLES LAKE,

14        GOVERNMENT'S WITNESS, SWORN AT 12:50 p.m.

15                  DIRECT EXAMINATION

16   BY MS. PARKER:

17   Q.   Would you spell your name for the record, please, and --

18   or state it and then spell it, please.

19   A.   My name is Charles lake, L-A-K-E.

20   Q.   How are you employed?

21   A.   I'm employed with the Internal Revenue Service as a tax

22   fraud investigative assistant.

23   Q.   And how long have you been with the IRS?

24   A.   I've been with the IRS for around seven years.

25   Q.   And what are your duties currently?

1  A.    I'm -- currently I'm a tax fraud investigative assistant.

2  I assist with special agents with their cases, and I'm

3  collateral duty of a field office court witness, which I'm here

4  today as.

5  Q.    As a field office court witness; is that right?

6  A.    Correct, yes.

7  Q.    And what does a field office court witness do?

8  A.    We pull data that's requested for trials, and we certify

9  and authenticate them and produce documents.

10         MS. PARKER:  Your Honor, we've had some discussions

11 relative to this witness, and what I would propose to do is to

12 present and offer Government's Proposed Exhibits 18, 20, 22,

13 180, 181, 182, 183, 184 and 185, and also 179.

14         MS. ARNETT:  No objection.

15         THE COURT:  Received.

16 BY MS. PARKER:

17 Q.    I'm sorry, I'm going to repeat those numbers, so we keep

18 our records right.  I'll hand you Government's exhibits 18, 20,

19 22, 180, 181, 182, 183, 184, 185, and 179.  And you can display

20 18, please, if you want.

21         As a group, except for Exhibit 179, are those all

22 document transcripts?

23 A.    Yes.

24 Q.    What is a transcript?

25 A.    Account transcripts are an account of what has happened to

1  the taxpayer's account.  It's to keep track of what's going on.

2  Q.   And Exhibit 18 is for what year?

3  A.   2008.

4  Q.   And going to the bottom of that page, of that exhibit on

5  the first page I should say, below where it says "transactions"

6  what does the account transcript -- well, first of all, for

7  what individual?  Are these James Pieron's?

8  A.   Yes.

9  Q.   And what does the 2008 transcript say as to when the tax

10 return was filed?

11 A.   This would be February 14th, 2011.

12 Q.   Sorry, the first actual page is the certification page

13 that you had, but the substantive page where it says

14 transactions down at the bottom?

15 A.   Yes.  Where it says the 150 tax return filed, it would be

16 February 14th, 2011.

17 Q.   And what was the amount of the return?

18 A.   That would be $267,829.

19 Q.   I'll show you also Government's Exhibit 40.  Is that a

20 2008 tax return?

21 A.   It is a 2008 individual tax return.

22 Q.   And does that amount on that return correspond with the

23 amount that's reflected on Exhibit 18 as the amount owed?

24 A.   It's a little different.

25 Q.   Pardon?

1  A.    It's a little different.

2  Q.    And what's the difference?

3  A.    On the tax return it's 268,445 for the 2008.

4  Q.    So on this it's a slightly lower amount on the 18 --

5  Exhibit 18?

6  A.    Yes.

7  Q.    Was any money or payment made with the filing of that 2008

8  return in February of 2011?

9  A.    No.

10 Q.    When was the very first payment of any kind made against

11 that 2008 obligation?

12 A.    Payment or transfer, credit transfer?

13 Q.    Credit -- either one.

14 A.    There is a credit transfer in April 15th, 2011.

15 Q.    All right.  And what is a credit transfer?

16 A.    That would be where there's an amount that -- or a refund

17 from another return, and it would be transferred to pay for the

18 amount paid -- or for 2008.

19 Q.    All right.  So the first money that was ever applied to

20 that tax obligation was applied in April of 2015?

21 A.    Correct.

22 Q.    And that came from the refund that was claimed on a 2010

23 return?

24 A.    Correct.

25 Q.    And what was the amount of that?

1   A.    That would be $3,441.69.

2   Q.    I'm sorry, what was the date of that, I'm sorry?

3   A.    That is April 15th, 2011.

4   Q.    All right.  So the 2010 return is actually made in 2011,

5   and based on that, there's a refund that is applied to the 2008

6   obligation?

7   A.    Yes.

8   Q.    All right.  The next one, next amount that's applied to

9   this 2008 tax obligation is what.  I suggest you look in the

10  middle of the page.

11  A.    Yeah, right here it's another credit transfer from the

12  2011 year 1040, so it would be another refund that was moved to

13  this year.

14  Q.    All right.  So what was the date of that?

15  A.    This one's April 15th, 2012.

16  Q.    And what is the amount at that time?

17  A.    $17,196.

18  Q.    And, again, would that be the refund, instead of being

19  returned to Mr. Pieron, being applied to the back taxes?

20  A.    Correct.

21  Q.    All right.  Let's go up to the middle of the page -- or

22  excuse me, above the middle of the page where there's a code

23  670, and next to that it says payment.

24  A.    Yes.

25  Q.    And what is the date of that?

Lake - Direct

93

```
 1  A.    That would be May 4th, 2012.

 2  Q.    And the amount?

 3  A.    $1,500.

 4  Q.    And is that the first payment that was made by any means

 5  other than the IRS withholding the refund claimed?

 6  A.    Yes.

 7  Q.    Are there other payments of that nature of $1,500?

 8  A.    There are.

 9  Q.    All right.  You said the first payment was May 4th,

10  2012 -- excuse me, I said that wrong.  Yes, May 4th, 2012,

11  $1,500, correct?

12  A.    Correct.

13  Q.    And the next one is made when?

14  A.    There's June 11th, 2012.

15  Q.    The next one.

16  A.    July 9th, 2012.

17  Q.    And, again, both of those were $1,500?

18  A.    Correct.

19  Q.    Do you see one August 16, 2012?

20  A.    Yes.

21  Q.    Also for $1,500?

22  A.    Yes.

23  Q.    And going below there, do you see one for September?

24  A.    There's an October 4th for 1,500.

25  Q.    But none for September?
```

1   A.   No.

2   Q.   And actually do you see two in October?

3   A.   Correct, there's a 4th and a 5th.

4   Q.   And they're both $1,500?

5   A.   Correct.

6   Q.   After that, are there any other $1,500 payments that are

7   applied to this 2008 obligation?

8   A.   No.

9   Q.   All right.  Going down, then, near the bottom, do you see

10  the next payment that's applied?

11  A.   The credit transfer?

12  Q.   Yes.

13  A.   Yes.  There's 2000 -- wait, which one are you talking

14  about?  There's several.

15  Q.   One in April of 2013.

16  A.   There's several April transfers.  There's one for $18,732,

17  and that was for the 2012 year refund.  Would you like me to

18  keep going with the others?

19  Q.   All right.  But let's make sure we're clear.  There's one

20  for April 15th, 2013?

21  A.   Correct.

22  Q.   And that -- the source of that payment was what?

23  A.   That's the refund from the year 2012 that was applied to

24  the 2008 year.

25  Q.   All right.  And the amount of that payment on -- by

95

1   withholding the refund is what?

2   A.    That was $18,732.

3   Q.    Okay.  Below that, do you see another April 15 transaction

4   but for 2014?

5   A.    Correct, and that would be transferred from the 2013 year

6   tax return and that's 1,000 -- or, pardon me, $16,472.

7   Q.    All right.  Below that, there's a 706 code.  It says

8   credit transferred in from, and it's got the date and the

9   amount, correct?

10  A.    Correct, the date transfers over to the next page.

11  Q.    All right.  Before we go to the next page, though, what's

12  the date of that transaction?

13  A.    That one would be April 15th, 2015.

14  Q.    And the amount?

15  A.    $3,970.

16  Q.    And, again, where did that come from?

17  A.    That one's from the 2014 tax return refund.

18  Q.    And that's automatically done by the IRS?

19  A.    To my experience, yes.

20  Q.    All right.  Going -- staying on the second page, there's

21  three more transactions at the top.  Let's take the first two

22  that have the 706 code.  Do you see those?

23  A.    You say on the top?

24  Q.    Yep. April 15, 2016?

25  A.    That's on the third page?

1  Q.    I'm sorry?

2  A.    That's the third page?

3  Q.    All right.  April 15th, 2016?

4  A.    Correct.  And that's a transfer in from 2015 tax refund

5  for --

6  Q.    And the amount?

7  A.    $82.

8  Q.    And below that, the next entry for April 15th, 2016 also?

9  A.    Correct, that's a transfer in from the year 2015 for

10  $2,987.

11  Q.    And did that also come from the 2015 tax return?

12  A.    It did.

13  Q.    And now let's go to the next one there which has the

14  payment entry.

15  A.    The 670?

16  Q.    Yes.

17  A.    Okay.  That's a payment that was received March 26th,

18  2018, for $627,244.62.

19  Q.    Is that the first payment other than from a refund offset

20  since October of 2012?

21  A.    Since October, yes.

22  Q.    All right.  Going down that page further there's another

23  spot where it says payment?

24  A.    Yes, there's a payment 670, and that one is October 3rd,

25  2018, for $242,872.52.

1  Q.   All right.  And below that, there is a place where it says

2  credit transferred out, can you see that?

3  A.   Yes.  That's for the -- it went to the 2009 year, and that

4  was October 3rd, 2018 for 240,540 -- or $41.48.

5  Q.   So those last two transactions were both dated

6  October 3rd, 2018, correct?

7  A.   Yes.

8  Q.   So the payment, correct me if I'm wrong, of $242,000, was

9  applied to finish what was owed or pay off what was owed on the

10  2008 taxes --

11  A.   Yes.

12  Q.   -- is that correct?  And then what was left over was

13  transferred to another obligation?

14  A.   That's correct.

15  Q.   And what was that?

16  A.   That would be for the 2009 tax year.

17  Q.   All right.  So the difference is there was about 2,000

18  that was still owed, but the rest was transferred over to 2009?

19  A.   Yes.

20  Q.   Let's go on then, please, to Exhibit 20, and Exhibit 20 is

21  for tax year 2009?

22  A.   It is.

23  Q.   And when was the tax return filed for 2009?

24  A.   That would be February 14th, 2011.

25  Q.   Is that the same date as the 2008 return, Exhibit 40?

Lake - Direct

```
 1  A.    You said Exhibit 40?

 2  Q.    I believe you have that.

 3  A.    Could you ask that again, please.

 4  Q.    I'm sorry?

 5  A.    Could you ask that again.

 6  Q.    Was the date of the 2009 return being filed the same as

 7  the date of the 2008 tax return?

 8  A.    Yes.

 9  Q.    And focusing your attention back on Exhibit 20.

10  A.    Okay.

11  Q.    What was the amount owed on that return?

12  A.    That would be $125,490.

13  Q.    Was payment made when that return was filed in 2011 for

14  tax year 2009?

15  A.    No.

16  Q.    Okay.  Let's go over to the next page of this exhibit.

17  When was the first payment made as to that 2009 tax obligation?

18  A.    There is a credit transfer in from the 2008 return, and

19  that would have been October 3rd, 2018.

20  Q.    All right.  And is that the -- this transcript reflecting

21  the money that was applied to finish off 2008, and then

22  transferring it to the 2009 outstanding taxes?

23  A.    Yes.

24  Q.    And below that there's another credit transfer?

25  A.    Yes.  There's a credit transfer from 2017 year return on
```

1  January 14th, 2019 for $11.54.

2  Q.    Check the date again, please.

3  A.    January 24th, 2019.

4  Q.    All right.  And then something was transferred in from the

5  refund for 2017?

6  A.    Yes.

7  Q.    Okay.  Let's go on then to Exhibit 22, which is the

8  account transcript for 2010.

9  A.    Okay.

10  Q.    All right.  Again, the 2010 return was filed when?

11  A.    June 6th, 2011.

12  Q.    And what was the amount reported owed on that return?

13  A.    That would be $51,463.

14  Q.    And going to the next page of the exhibit, near the top,

15  the second line, what is the entry there?

16  A.    The code 276?  Is that --

17  Q.    No, 806.  I'm sorry, the 806 code.  Do you see that?

18  A.    I do.

19  Q.    All right.  And what's that entry?

20  A.    That would be the W-2 or 1099 withholding, that would be

21  April 15th, 2011, and it's $10,087.

22  Q.    And going down further to where there is that 826 code, do

23  you see that?

24  A.    I do.

25  Q.    All right.

1  A.   That is a transfer out to 2008 year, and that would be for

2  April 15, 2011 for 344 -- pardon me, $3,441.69.

3  Q.   And was that the amount that was reflected on the

4  transcript which is Exhibit 18 for 2008 being one of the

5  credits?

6  A.   Yes.

7  Q.   All right.  Let's move on to Exhibit 180.  Is that the

8  transcript for 2011?

9  A.   It is.

10  Q.   And 81 is the transcript for what year?

11  A.   That would be 2012.

12  Q.   Eighty-two?

13  A.   2013.

14  Q.   Eighty-three?

15  A.   2014.

16  Q.   Eighty-four?

17  A.   2015.

18  Q.   And 85?

19  A.   2016.

20  Q.   Next I'd like you to look at Exhibit 179.  This is a

21  little bit different document in that it's not for James Pieron

22  personally?

23  A.   Correct.

24  Q.   Is it for Komplique?

25  A.   It is.

1  Q.   And what type of information is provided on Exhibit 179?

2  A.   This is a history of what business returns were filed for

3  that entity.

4  Q.   And the business returns being form 1120s?

5  A.   In this case, would be 1120s, 941s, 940s.

6  Q.   All right.  How many 1120s do you see having been filed on

7  behalf of Komplique?

8  A.   There are five here.

9  Q.   And for what years?

10  A.   2009, '10, '11, '12 and '13.

11  Q.   Do you see any indication on that form that Form 940s or

12  941s were filed --

13  A.   No.

14  Q.   -- by Komplique?

15  A.   No.  That would be a different code for the MFT.

16  Q.   And what are 940 and 941 forms?

17  A.   That would be withholdings from income tax.

18  Q.   I'm sorry, withholdings from what?

19  A.   I'm sorry, withholdings from payments.  It's for -- my

20  general information that I know from it is for like Social

21  Security and that kind of thing.

22  Q.   Withholdings from employee salaries?

23  A.   Correct.

24       MS. PARKER:  Thank you, Your Honor.  I'll pass the

25  witness.

Lake - Cross                                                                102

```
 1              THE COURT:  How extensive do you anticipate cross?

 2              MS. ARNETT:  Ten minutes.

 3              THE COURT:  Your floor.

 4                          CROSS-EXAMINATION

 5  BY MS. ARNETT:

 6  Q.   Good afternoon, Mr. Lake.

 7  A.   Good afternoon.

 8  Q.   Did you testify that you assist special agents?

 9  A.   I do.

10  Q.   So you're aware of a freeze code, correct?

11  A.   I know of them.

12  Q.   And you know that when there's a freeze code in place,

13  when the service center gets a filing on behalf of the

14  taxpayer, they contact the special agent, correct?

15  A.   As far as I know, yes.

16  Q.   And then that special agent makes a decision about whether

17  or not to process a return, for example, correct?

18              MS. PARKER:  Objection, unless she shows foundation

19  for knowledge.

20              THE COURT:  You just -- inquire of the witness'

21  ability to respond with personal knowledge.

22              MS. ARNETT:  Yes, Your honor.

23  BY MS. ARNETT:

24  Q.   You assist special agents, correct?

25  A.   I do.
```

Lake - Cross

1   Q.   And you're aware of a freeze code, correct?

2   A.   I know that they exist.

3   Q.   And are you aware of what happens when a freeze code is in

4   place on a taxpayer's account?

5   A.   Not completely, no.

6   Q.   Do you know if a special agent is notified by the service

7   center when a tax return gets filed with a freeze code?

8   A.   Not all the time, I don't know.

9   Q.   Okay.  I'll move on, Your Honor.

10         If we could turn to -- I will show you what's already

11   been entered and that is Government Exhibit 18, and on the last

12   page you discussed a couple of payments, correct?

13   A.   Yes, transfers.

14   Q.   I'm talking about the entries next to the 670's, the

15   payments.

16   A.   Yes.

17         MS. ARNETT:  May I approach the witness Your Honor?

18         THE COURT:  You may.

19   BY MS. ARNETT:

20   Q.   I've handed you what's been marked as Defense Exhibits

21   1003 and 1006.

22   A.   Yes.

23   Q.   And those -- can you identify the amount of those checks

24   and tell me if they correspond to the payments on Exhibit 18.

25   A.   1003 would be 670 -- or $627,244.62, and then 1006 would

Lake – Cross

1   be $242,872.52.

2            MS. ARNETT:  I move to admit Defense Exhibits 1003

3   and 1006.

4            MS. PARKER:  No objection.

5            MS. ARNETT:  Thank you, Your Honor.

6            THE COURT:  Received.

7   BY MS. ARNETT:

8   Q.   This is Defense 1003, correct?

9   A.   Correct.

10  Q.   And it corresponds to the payment we've already discussed,

11  right?

12  A.   The numbers match up.

13  Q.   And this payment came from Mr. Pieron, correct?

14  A.   I don't know.

15  Q.   The name at the top?

16  A.   That does say James D. Pieron.

17  Q.   Thank you.  And 1006, same thing?

18  A.   The numbers do correspond and that is his name.

19  Q.   And if we could go back to Government Exhibit 18,

20  Mr. Pieron paid late, right?

21  A.   The payments were late.

22  Q.   And he got charged quite a bit of interest for those late

23  payments, correct?

24  A.   There is interest penalties on the account.

25  Q.   Multiple entries for penalties and interest, right?

1   A.    Yes.

2   Q.    One entry is $97,000 in interest, correct?

3   A.    $97,310.39.

4   Q.    And the penalty for that?

5   A.    $33,466.27.

6   Q.    And, again, on -- flip back one page.  How much penalty is

7   he charged in 2011 for filing the tax return after the due

8   date?  It's the first line on the screen, I don't know if that

9   helps.

10   A.    Oh, it does.  Thank you.

11   Q.    Yes, sir.

12   A.    That would be 60,261.52.

13   Q.    And he also had some credits applied from other years,

14   correct?

15   A.    Yes.

16   Q.    Starting with tax year 2010?

17   A.    Yes.

18   Q.    And so every year he overwithholds his taxes and the

19   refund that he should have gotten is what's applied to the

20   tax -- taxes that he owed for 2008, correct?

21          MS. PARKER:  Objection.  I don't think he has the

22   knowledge of overwithholding.

23          THE COURT:  Let's find out.

24          MS. PARKER:  Exactly.

25   BY MS. ARNETT:

Lake – Cross

```
 1  Q.   If a credit is on a taxpayer's account, and it comes from

 2  their W-2 statement or a 1099 payment, it's because they've

 3  overwithheld, right, they've overpaid the IRS?

 4  A.   I don't know.

 5           MS. ARNETT:  One second, Your Honor.

 6           I pass the witness, Your Honor.

 7           MS. PARKER:  I have nothing further for this witness

 8  Your Honor.  Thank you.

 9           THE COURT:  Good.  We'll take a break for about 10

10  minutes, and then return to the courtroom.  Bailiff should be

11  on his way.

12           (At 1:25 p.m., jury leaves.)

13           THE COURT:  Record's closed.

14           (At 1:25 p.m., court recessed.)

15           THE COURT:  Jury, please.

16           Next Government witness will be.

17           MR. DEPORRE:  Megan Giolitti.  We'll have here enter

18  the courtroom.

19           THE COURT:  Thank you.

20           MR. MINNS:  Is that the last Government witness?

21           MR. DEPORRE:  That is the last Government witness,

22  Your Honor.

23           MR. MINNS:  Do you have an estimate of time?

24           MR. DEPORRE:  Oh, man, 20 minutes.

25           THE COURT:  It is the last Government witness?
```

```
 1              MR. DEPORRE:  What's that?

 2              THE COURT:  The last Government witness?

 3              MR. DEPORRE:  It is.

 4              (At 1:46 p.m., jury arrives.)

 5              THE COURT:  Please be seated.  If we could identify

 6  the next witness, please.

 7              MR. DEPORRE:  Your Honor, the Government calls Megan

 8  Giolitti.

 9              THE COURT:  Thank you.  Ma'am, if you could step

10  forward, please.  Stop for just a moment, raise your right

11  hand.

12              (At 1:47 p.m., sworn by the Court.)

13              THE COURT:  Please have a seat in the witness stand.

14              Sir?

15                        MEGEAN GIOLITTI,

16            GOVERNMENT'S WITNESS, SWORN AT 1:47 p.m.

17                       DIRECT EXAMINATION

18  BY MR. DEPORRE:

19  Q.   Good afternoon.

20  A.   Good afternoon.

21  Q.   Would you please state your name.

22  A.   Megean Giolitti.

23  Q.   And would you spell both your first and your last name for

24  the court reporter.

25  A.   Yes, Megean, M-E-G-E-A-N, Giolitti, G-I-O-L-I-T-T-I.
```

Giolitti - Direct                                                      108

1   Q.   And Ms. Giolitti, I would ask you to put that microphone

2   up just a little bit, so everybody can hear you very well.

3   A.   Better?

4   Q.   Thank you.   How are you currently employed?

5   A.   I'm a revenue officer with the Internal Revenue Service.

6   Q.   And would you explain to the jury what a revenue officer

7   is.

8   A.   Yep, the main duties of a revenue officer are

9   investigating delinquent tax return accounts, analyzing

10  financial documents, and determining the taxpayer's ability to

11  pay.

12  Q.   Do you arrest people?

13  A.   No, I do not.

14  Q.   So you work with civil collection, correct?

15  A.   Correct.

16  Q.   Have you ever heard the term of a revenue agent?

17  A.   I have.

18  Q.   And what is a revenue agent?

19  A.   To my best knowledge, a revenue agent deals with audits

20  and assessing tax.

21  Q.   And so your job is distinct from the assessment of tax;

22  you're focused on collection?

23  A.   That's correct.

24  Q.   How long have you been a revenue officer?

25  A.   A little over 12 years.

109

1   Q.   And what is the -- sort of training did you have to become

2   a revenue officer?

3   A.   In the beginning of our job, we received extensive

4   training.  It was in16 week increments, and then every year we

5   do a 40 hour what's called CPE, which is called continuing

6   professional education.

7   Q.   And the 40 hours is annually?

8   A.   Yes, sir.

9   Q.   And it's required?

10  A.   Yes.

11  Q.   What sort of topics are covered?

12  A.   They change every year.  The -- it goes by the -- part --

13  some of them are like installment agreements, analyzing ability

14  to pay.  They range -- there's a large variety of topics.

15          MR. DEPORRE:  Your Honor, at this time I would move

16  to proceed under Rule 702 based on experience.

17          THE COURT:  Any objection to the solicitation of

18  opinion witness?

19          MS. ARNETT:  No objection, Your Honor.

20          THE COURT:  Excuse me, opinion testimony.  You may

21  continue.

22          MR. DEPORRE:  Thank you.

23  BY MR. DEPORRE:

24  Q.   You said that you're currently a revenue officer.  Are

25  there different grades for revenue officers?

1    A.    Yes, there are.

2    Q.    And what is the starting grade of a revenue officer?

3    A.    The starting grade is a grade 7.

4    Q.    And what grade are you?

5    A.    I'm a grade 13.

6    Q.    What sort of cases do you cover as a revenue officer?

7    A.    At this time?

8    Q.    Yeah.

9    A.    At the time I deal with the division called abusive tax --

10   or, I'm sorry, abusive taxpayer avoidance transaction taxpayers

11   and I deal mainly with high dollar and evasive tax returns and

12   high priority cases.

13   Q.    And based on that you're familiar with IRS collection

14   methods?

15   A.    I am.

16   Q.    And are you familiar with Internal Revenue Service

17   installment agreements?

18   A.    I am.

19   Q.    Are you familiar with collection information statements?

20   A.    I am.

21   Q.    I'm going to display what's been marked as, and admitted,

22   as Government Exhibit 94.  If you could zoom in there at the

23   top half of it.  What is Government Exhibit 94?

24   A.    This is a CP notice, CP14 notice, dated February 14th,

25   2011 issued to a James D. Pieron, Jr.

1  Q.   When you said it's a CP14, that's a -- there's a notice

2  number in the top right-hand corner, and that's where you're

3  reading that from?

4  A.   Yes, sir.

5  Q.   What is a CP14?

6  A.   A CP14 is systemically issued by the service center and

7  it's the first notice that there is an assessment owed.

8  Q.   Okay.  So there's an assessment of the tax; that's

9  distinct from your job, correct?

10  A.   Yes.

11  Q.   And then this letter is issued?

12  A.   Correct.

13  Q.   And what is the purpose of issuing this letter?

14  A.   The purpose is to notify the taxpayer of the liability and

15  to give the taxpayer the option to resolve the liability within

16  the notice.

17  Q.   How much did it say was owed -- well, what tax year is

18  this particular CP14, this balance due notice?  What year is it

19  for?

20  A.   This applies to a 1040 return for December 31st, 2008.

21  Q.   And when was the letter sent?

22  A.   The letter is dated February 14th of 2011.

23  Q.   What is the total balance due?

24  A.   As of March 1st, 2011 the balance is $379,617.86.

25  Q.   Does that just include tax?

1   A.    No.

2   Q.    What other things are included in that balance?

3   A.    That balance would include penalties and interest.

4   Q.    All right.  I'm going to ask you to turn to the Bate stamp

5   page 1032 of that form, and if you would zoom in there at the

6   middle.  Do you recognize what this is?

7   A.    Yes.

8   Q.    What is it?

9   A.    It's a payment voucher.

10  Q.    And what is the purpose of including a payment voucher

11  with a CP14?

12  A.    The payment voucher allows the taxpayer to submit the

13  payment voucher along with his payment for the tax owed.

14  Q.    Would you scroll down below.  And the payment voucher

15  includes information about the amount that's owed, correct?

16  A.    Yes, sir.

17  Q.    I'd like you to look at -- or pull up Government

18  Exhibit 93, as well, please.  Is this also a balance due

19  notice?

20  A.    It is.

21  Q.    And what year is this one for?

22  A.    This applies to the 1040 return for 2009.

23  Q.    And how much is due?

24  A.    The balance owed as of March 1st, 2011 is $166,584.07.

25  Q.    And the name of the taxpayer?

1   A.    Is James D. Pieron, Jr.

2   Q.    And would this also include those payment vouchers?

3   A.    Yes.

4   Q.    Now, sometimes a taxpayer may not have the funds available

5   to pay the full amount, is that fair?

6   A.    Sure.

7   Q.    And so what sort of options would a taxpayer have if they

8   didn't have cash on hand to pay that amount?

9   A.    Well, some of the options to resolve the case would be to

10  make voluntary payments until you were into a formal case

11  resolution.  A formal case resolution is an installment

12  agreement where they have the option to file an offer in

13  compromise.  Those are the basic things that the taxpayer could

14  do until they were into a formal agreement.

15  Q.    Let's take first the installment agreement.  Would you

16  pull up Exhibit 45.  Do you recognize Government Exhibit 45?

17  A.    I do.

18  Q.    And what is Government Exhibit 45?

19  A.    This is Form 9465, and it's an installment agreement

20  request.

21  Q.    And you said the -- what is the purpose exactly of an

22  installment agreement request?

23  A.    To request -- the purpose would be to propose a monthly

24  payment to repay the debt.

25  Q.    How much -- does this form indicate what the debt is?  How

Giolitti – Direct

1   much is owing?

2   A.    There is an amount owed listed.

3   Q.    And how much is that?

4   A.    That is $444,888.

5   Q.    And what are the years that are owed for?

6   A.    That applies to the 1040 liabilities for 2007, 2008 and

7   2009.

8   Q.    How much payment is offered?

9   A.    The taxpayer is offering to pay $1,500.

10  Q.    And that would be on -- how periodic would that payment

11  be?

12  A.    Monthly.

13  Q.    Would that pay off the balance?

14  A.    That would not pay off the balance within the statute.

15  Q.    Okay.  You reference the statute.

16  A.    Yes.

17  Q.    What is the statute?

18  A.    The statute is called a collections statute expiration

19  date, and the Government on normal terms has 10 years from the

20  date of an assessment to collect those funds.

21  Q.    All right.  So the Government has 10 years, and if the

22  defendant -- or, excuse me, a taxpayer paid $1,500 a month,

23  that still wouldn't pay off the amount shown?

24  A.    Not that amount listed, no.

25  Q.    So does the IRS request other forms to be filed along with

1  the installment agreement?

2  A.    Yes.

3  Q.    And what form is requested?

4  A.    It's called a collection information statement.

5  Q.    All right.  I'd like for you to look at the next page of

6  that same exhibit.  Is this a collection information statement?

7  A.    It is.

8  Q.    What is the purpose of a collection information statement?

9  A.    A collection information statement determines or

10 identifies the taxpayer's income and expenses as well as their

11 assets, and it helps us to determine the taxpayer's ability to

12 pay.

13 Q.    Do you rely on the information in the collection

14 information statement?

15 A.    Yes, it is the foundation of our investigation.

16 Q.    If information in a collection information statement is

17 wrong, how might that affect your assessment of a person's

18 ability to pay their tax?

19 A.    The assessment or the determination --

20 Q.    Not the assessment in terms of the form, your judgment

21 regarding a person's ability to pay the tax.

22 A.    I'm sorry, so if -- can you restate your question, please.

23 Q.    Absolutely.  If information in a collection information

24 statement is incorrect, does that impact your ability to

25 determine the taxpayer's ability to pay?

Giolitti – Direct

116

1   A.   Yes.

2   Q.   How so?

3   A.   Well, if the assets are not identified to us, we refer to

4   that as hindering collection, and we locate asset -- we have

5   other means to locate assets, but on this form, they're

6   required to identify all assets and income and expenses.

7   Q.   And if they undervalue certain assets, would that also

8   impact the ability to decide whether they can pay off the tax

9   liability?

10  A.   Yes.

11  Q.   Is that also true if they misstate their income --

12  A.   Yes.

13  Q.   -- or their expenses?

14  A.   Yes.

15  Q.   What sort of information should typically appear on a

16  collection information statement?

17  A.   Well, as the form goes, you go in chronological order and

18  it would identify the taxpayer's residence, their phone

19  numbers, their bank accounts, any real estate that they had

20  rights to or interest to, any assets, and then their income and

21  their expenses and their bank accounts and investments.

22  Q.   Now, could a taxpayer have assets titled in the name of

23  another entity?

24  A.   Yes.

25  Q.   And what happens in that case?

Giolitti – Direct

1  A.   They're required to -- if they have interest to assets

2  that are titled to anybody else, they are required to disclose

3  those assets.

4  Q.   What if the taxpayer has a sole proprietorship?

5  A.   A sole proprietorship is -- it's called one in the same.

6  We refer to it as the taxpayer is the business and the business

7  is the taxpayer.

8  Q.   So if they have a wholly owned corporation, do they have

9  to disclose their interest in that company?

10  A.   Yes.

11  Q.   How about if they have a 99.995 percent interest in a

12  company?

13  A.   Any interest would have to be disclosed.

14  Q.   And if they're a single member LLC?

15  A.   It's the same as sole proprietorship.

16  Q.   If they're a -- the sole shareholder of an 1120?

17  A.   Yes.

18  Q.   Aside from the 433, the collection information statement,

19  what sort of tools do you have to verify a person's assets and

20  income?

21  A.   As far as income, we use an internal system that

22  determines and identifies any income documents that are

23  reported to the Government.

24  Q.   And so does that system provide you information about

25  W-2's that are provided to the Government for a taxpayer?

Giolitti – Direct

118

1   A.   Yes.

2   Q.   How about for 1099s?

3   A.   Yes.

4   Q.   If a 1099 was issued for -- from a bank, what then would

5   you do with that information?

6   A.   If the taxpayer did not disclose that bank account, I

7   would issue a summons to that bank account.

8   Q.   What if it wasn't a bank account but perhaps an investment

9   account?

10  A.   Same procedure.

11  Q.   You said you would issue a summons.  What -- could you

12  explain to the jury what a summons is?

13  A.   Sure.  A summons is a document that's referred to also as

14  a subpoena, and we request certain documents on the summons.

15  And if we're requesting bank statements, we request bank

16  statements that the taxpayer had signature authority on, and we

17  would request all those documents, and then the subpoena goes

18  to -- the summons, I'm sorry, goes to our management for

19  approval, and then the bank will issue us the documents that

20  the -- all the accounts that the taxpayer has signature

21  authority on.

22  Q.   So you're asking the bank to provide you information about

23  the taxpayer?

24  A.   Correct.

25  Q.   Do you also use FBAR information --

Giolitti - Direct

1    A.    We do.

2    Q.    -- to verify a taxpayer's assets or income?

3    A.    We do.

4    Q.    And could you explain how you use the information from an

5    FBAR to assess a taxpayer's assets?

6    A.    We would use those to identify any assets that are held

7    outside of the country.

8    Q.    If information on an FBAR was incomplete, or didn't

9    provide disclosure to full amounts of the accounts, would that

10   impact your assessment?

11   A.    Yes.

12   Q.    And if a 1099 wasn't issued by an investment account,

13   would that impact your ability to assess the taxpayer's ability

14   to pay?

15   A.    Yes.

16   Q.    Will you pull up Government Exhibit 47.  Well, let's start

17   with 46, sorry.  What is Government Exhibit 46?

18   A.    Government Exhibit 46 is Form 656-L, which is an offer in

19   compromise doubt as to liability.

20   Q.    Is this a form that you're familiar with?

21   A.    Yes.

22   Q.    And what is the purpose of a taxpayer filing a 656-L form?

23   A.    The purpose is to -- well, the main purpose is to resolve

24   the debt for less than the amount that's assessed.

25   Q.    Now, in cases where the offer in compromise is as to doubt

1   as to liability, do you decide whether or not the taxpayer

2   actually -- whether or not there actually is a doubt regarding

3   the taxpayer's liability?

4   A.   Not necessarily.

5   Q.   Okay.  Could you explain who -- who then would make that

6   decision?

7   A.   So as a revenue officer, when I receive an offer in

8   compromise, my job is to review it, confirm that the required

9   information is submitted with the package, and then I forward

10  it to a different department.

11  Q.   And what does that department then do?  What's the name of

12  that department?

13  A.   It's called the centralized offer in compromise unit, also

14  known as the COIC unit.

15  Q.   Lot of acronyms?

16  A.   Lots of acronyms.

17  Q.   Lot of form numbers?

18  A.   Yes.

19  Q.   The offer in compromise -- the central offer in compromise

20  unit then would look at the materials submitted?

21  A.   Yes.

22  Q.   Now, if the offer in compromise included a collection

23  information statement, would you be responsible for reviewing

24  that?

25  A.   I would review it, yes.

121

1   Q.   And I'd like now to go to Government Exhibit 47.  Do you

2   recognize what this is, Government Exhibit 47, if we could zoom

3   in at the top.

4   A.   I do.

5   Q.   Would you tell the jury what it is.

6   A.   I'm sorry, it's a collection information statement.

7   Q.   When was this one received by the IRS?

8   A.   It is date stamped April 3rd, 2014.

9   Q.   And I'd like you to look at the assets -- I'm going to

10  actually ask you to take a look at the paper copies.  I'm going

11  to hand you Government Exhibits 45 and 47.

12  A.   Thank you.

13  Q.   First looking at Government Exhibit 45, when was that

14  filed?

15  A.   Exhibit 45 has multiple date stamps on it, and it looks

16  like the first date stamp is on January 30th of 2012.

17  Q.   What's the purpose of the date stamp?

18  A.   It shows receipt by the IRS.

19  Q.   And is the first date stamp typically when the first --

20  the date that that item actually gets mailed in?

21  A.   When it gets mailed it or it gets received.

22  Q.   When they receive it through the mail?

23  A.   Yes.

24  Q.   All right.  You said January 30th, 2012.  How about for

25  Exhibit 47?

Giolitti – Direct

1    A.   Exhibit 47 is date stamped April 3rd of 2014.

2    Q.   All right.   Now, I'd like you -- are they for the same

3    person?

4    A.   Yes, they are.

5    Q.   I'd like you to compare where it lists the assets on the

6    form.

7    A.   So Exhibit 45 lists a car, a 2011 vehicle, that is valued

8    at 25, which is consistent with Exhibit 47.

9            Exhibit 45 has an asset of Navitas Investments with a

10   current value of $1,000 and equity of a $1,000, which is

11   consistent with the Exhibit 47.

12           Exhibit 45 has Komplique incorporated which has a

13   current value of $1,000 and equity of $1,000.

14           Exhibit 47 has the current value listed at $250,000,

15   and the equity is $250,000.

16   Q.   Now is that the sort of difference that would -- would

17   that make a difference in terms of making a determination

18   regarding a taxpayer's ability to pay a tax?

19   A.   Yes.

20   Q.   All right.   Last I'm going to approach with what's been

21   marked as Government Exhibit 186.   It's a proposed exhibit.

22           MR. DEPORRE:   No further questions, Your Honor.

23           THE COURT:   Cross-examination.

24           MS. ARNETT:   Thank you.

25

CROSS-EXAMINATION

1

BY MS. ARNETT:

2

3  Q.   Thank you.  Thanks.  Hi.  Good afternoon, Ms. Giolitti.

4  A.   Giolitti, yes, good afternoon.

5  Q.   Giolitti, okay, thank you.

6        You're a revenue officer, right?

7  A.   I am.

8  Q.   And so you actively review the documents that you've

9  testified about today, correct?

10 A.   Yes.

11 Q.   You didn't review the ones in this case, right?

12 A.   I reviewed a couple of documents on this case, yes.

13 Q.   Only for testimony?

14 A.   Correct.

15 Q.   You didn't sit down with anybody, any power of attorneys

16 on file for Mr. Pieron or Mr. Pieron himself, correct?

17 A.   Correct.

18 Q.   And nobody has sat down with Mr. Pieron on the offer in

19 compromise or the installment agreements with him, correct?

20 A.   I do not know that.

21 Q.   If I could show you Government Exhibit 45, this is the

22 433-F statement attached to the installment agreement, correct?

23 A.   Yes.

24 Q.   Is it signed by Mr. Pieron?

25 A.   This document is not signed.

1    Q.    And this is the one that was received by the IRS, correct?

2    A.    The second page is stamped, yes.

3    Q.    So you don't know if Mr. Pieron looked at this, this

4    433-F, and approved it or not, correct?

5    A.    I do not know.

6    Q.    And on Government Exhibit 47, there's a place to list his

7    assets and his companies, correct?

8    A.    There is, yes.

9    Q.    And when you sit down with the taxpayer to review the

10   433-F, you would take a look at the 1120s, the corporate

11   returns for the tax returns, correct?

12   A.    Yes.

13   Q.    And if those tax returns for the corporations showed a net

14   loss of say $3.5 million, for example, they could possibly be

15   overvalued on this form, correct?

16   A.    There's other items to consider, but it's possible.

17   Q.    And what does COIC stand for again?

18   A.    COIC is centralized offer in compromise.

19   Q.    And when the COIC receives an offer in compromise, they're

20   supposed to reach out to the taxpayer's representative, right?

21   A.    I'm not sure of their policies.

22   Q.    Now, one of the tools that you have whenever you receive

23   an offer -- well, not the offer in compromise, the installment

24   agreement and the 433-F, is something called an information

25   documentation request, correct?

1   A.   No.

2   Q.   An IDR, you don't send IDRs out to taxpayers to collect

3   information?

4   A.   No.

5   Q.   But you can collect information from taxpayers, right, to

6   verify what's in the 433-F?

7   A.   We deal mainly with the 433-A, but, yes, we can request

8   information from a taxpayer.

9   Q.   So you don't deal with the 433-F that you've testified

10  about today?

11  A.   No, I deal with it.

12  Q.   And do you send out document requests?

13  A.   I -- no.

14          MS. ARNETT:  One second, Your Honor.

15          I pass the witness.

16          THE COURT:  Redirect?

17          MR. DEPORRE:  Just briefly.

18                    REDIRECT EXAMINATION

19  BY MR. DEPORRE:

20  Q.   On Government Exhibit 45, if you would flip to the last

21  page of the collection information statement, you noted that

22  this page is unsigned this collection information statement?

23  A.   Correct.

24  Q.   And was this part of a -- was this included in a filing

25  that was a request for an installment agreement?

1   A.    Can you --

2   Q.    Do you have the paper copy up there?

3   A.    I do --

4   Q.    Okay.

5   A.    -- yes.

6   Q.    Would you -- would you look at that paper copy and see if

7   an earlier page includes a request for an installment

8   agreement.

9   A.    It does.

10   Q.    Would you look to see if that has a signature on it?

11   A.    It does.

12   Q.    And where is that signature?

13   A.    Under "your signature" on the very bottom.

14         MR. DEPORRE:  All right.  Nothing further.

15                    RECROSS-EXAMINATION

16   BY MS. ARNETT:

17   Q.    The installment agreement that's signed is separate from

18   the 433-F, correct?

19   A.    It was submitted --

20   Q.    Two separate documents?

21   A.    Yes.

22   Q.    And they're two separate places for signatures, correct?

23   A.    That is correct.

24   Q.    And only one of them is signed?

25   A.    Yes.

Giolitti - Recross                                              127

1           MS. ARNETT:  Pass the witness.

2           MR. DEPORRE:  Nothing further.

3           THE COURT:  Thank you very much.  You're excused.

4      Government have any additional witnesses?

5           MS. PARKER:  We do not have additional witnesses.  We

6  do have one matter, which I thought we had an agreement on, and

7  then perhaps I misunderstood.  Could we just address it at

8  sidebar briefly?

9           THE COURT:  Yes.

10          (Sidebar conference as follows:)

11          MS. PARKER:  Your Honor, there's perhaps a couple

12 different ways of doing this, but at this point we want to

13 do -- either have just simply a stipulation that by January of

14 2018 the defendant knew that criminal charges had been

15 authorized by DOJ Tax Division, or we're going to offer the

16 tolling agreement, and we're going to just have the witness

17 read the first -- the entry on the first paragraph and say it's

18 date and signed.  I'm not sure what your preference is

19 mechanically as to that, if any.

20          THE COURT:  Defendant want to weigh in?

21          MR. MINNS:  My understanding was Janet that wanted to

22 read this one paragraph, and I had no objection to her reading

23 it without testimony or anything around it.  And I have no

24 objection to the tolling agreement entering.

25          MR. DEPORRE:  She also wanted to read the date that

1  it's signed by the parties.

2          MS. PARKER:  The date it's signed, but that's all.  I

3  would read this part, too.

4          MR. MINNS:  The entire document would come into

5  evidence.

6          MS. PARKER:  I mean, I don't need to have that, if we

7  just --

8          MR. MINNS:  Well, the context isn't clear with that.

9  I'll troubled by the whole -- I said I would do it under those

10 circumstances, and so I will not change my word on that.  But I

11 am troubled by the whole concept of putting in confidential

12 agreements that the Government enters in with the parties to

13 extend the statute of limitations for any purposes.  But I've

14 given you my word, that you can put 186 in, I will not object,

15 and you can read without comment those three lines, and I will

16 add to my word the date.

17         MS. PARKER:  These two also?  I mean, that's -- that

18 was what I --

19         MR. SASSE:  I haven't even looked at it, so --

20         MS. PARKER:  These two and that.

21         MR. MINNS:  I think it's --

22         MS. PARKER:  Because we agreed as to that.

23         MS. ARNETT:  I don't think -- I don't think you can

24 allow.  I don't think it can come in under Federal Rule 410.

25         MS. PARKER:  It's not -- there's nothing in the

1    agreement as to 410.

2          MS. ARNETT:  Yeah, but that was in conjunction with

3    pleas.  It was all one thing.  It was all -- I mean, the only

4    reason why the statute was signed was because of plea

5    agreements, otherwise there would have been no statute of

6    limitations signed.  That's the only purpose for that statute

7    of limitations waiver.

8          MS. PARKER:  I don't think so.  I mean, I think --

9    there's nothing in this agreement that says he's reserving the

10   right under 410.

11         MR. MINNS:  Well, if --

12         MS. ARNETT:  It's in connection with the discussion

13   of a plea.

14         MR. MINNS:  It is plea bargaining agreement.  It is

15   not admissible.  If the Court rules it's admissible, I will not

16   object.  If the Court rules this is a plea bargain document is

17   admissible, I will not object, and I will not object to the

18   reading of these two, if the Court rules that the plea

19   bargaining document is admissible.

20         THE COURT:  Are we better off with the reading of the

21   language and the date?

22         MS. PARKER:  That would be my preference.

23         THE COURT:  Satisfies your concern.

24         MS. ARNETT:  It doesn't satisfy my concern at all.

25         MS. PARKER:  Because it doesn't say that it's plea

1  negotiations or anything.

2       MR. MINNS:  No, the problem with that is this whole

3  thing --

4       MS. ARNETT:  The entire thing is plea negotiation.

5       MR. MINNS:  -- we wouldn't have agreed to any of this

6  if we had been counsel of record.

7       MS. PARKER:  But nevertheless --

8       MR. MINNS:  It was agreed to, and it extends the

9  statute of limitations.

10       MS. ARNETT:  For the purposes of plea agreements.

11       MR. MINNS:  Yes.

12       MS. ARNETT:  Only for the purpose of plea agreements.

13       MR. MINNS:  There's no other purpose for this, and if

14  they're going to do that --

15       THE COURT:  The other thing is, wholly apart from

16  this agreement, you could just agree on the stipulation of fact

17  as to the defendant's --

18       MR. MINNS:  I'm not willing to do that, because I do

19  not think that that --

20       MS. ARNETT:  They have to prove willfulness, and I

21  don't want to stipulate to anything that goes to willfulness.

22       MR. MINNS:  If the Court finds this is admissible, I

23  won't object, but I will object otherwise, and I will not

24  object to her reading these two things, if the Court finds this

25  plea bargaining instrument as a whole is not objectionable.  I

 1  will object to parsing it out.

 2          THE COURT:  Well, the sole issue is their effort to

 3  substantiate the fact that he was aware that at a particular

 4  period of time he was under investigation by the criminal

 5  division.

 6          MS. PARKER:  And that's relevant to when he made the

 7  payments.  The Court's allowed that in --

 8          THE COURT:  Sure.

 9          MS. PARKER:  -- and I understand that.  I would just

10  think, as the Court said at the time, that would open the door

11  to other things --

12          THE COURT:  Sure.

13          MS. PARKER:  -- and I believe this is what it opened

14  the door to.

15          MR. MINNS:  Well, I do object to it being parsed;

16  either the whole thing or nothing --

17          THE COURT:  Well, then choose.

18          MR. MINNS:  -- because it's got his signature on it.

19          THE COURT:  Then choose.

20          MR. MINNS:  If I have --

21          MS. ARNETT:  No, you object to it coming in period.

22          MR. MINNS:  Okay.

23          MS. ARNETT:  It's part of the negotiations, Michael.

24          THE COURT:  Between you and him?

25          MS. ARNETT:  I know.

1          MR. MINNS:  That's I guess --

2          THE COURT:  The long and the short of it is that the

3    law is fairly clear, in multiple circuits, that evidence of

4    payments after the defendant's knowledge of investigation are

5    actually inadmissible, or alternatively the Government has the

6    opportunity to prove the defendant's knowledge of the

7    investigation.

8          MS. ARNETT:  I think that payments coming in after an

9    investigation can't, on their face, negate willfulness, but

10   they are allowed to come in as continuing course of conduct and

11   a continuing course of what is in that defendant's mind.

12         THE COURT:  We read the law differently.

13         MS. ARNETT:  Okay.  Thank you.

14         MR. MINNS:  Well, it sounds like the Court has ruled

15   that it's admissible, so if it's admissible, then our

16   objection's overruled.  The whole document comes in.

17         THE COURT:  I've ruled that it's a relevant fact.

18   How it's substantiated to the jury is still an open question.

19         MS. PARKER:  Which is why I'd just as soon do a

20   stipulation that is clean.

21         MR. MINNS:  I don't think it's clean.  If it's coming

22   in, the objection comes -- the document comes in, then I have

23   no objection to her reading those two paragraphs and a date.  I

24   do object -- I object to any commenting outside of closing

25   argument and theorizing on it.

```
 1          THE COURT:  I don't -- for the reasons that she's
 2   outlined, I don't want to see this document itself come into
 3   evidence and be available to the jury.
 4          MR. MINNS:  Well, the context of this is that he's
 5   discussed all this with his attorneys.  He's satisfied with it.
 6   He -- he thinks they're tolling the whole criminal thing and
 7   then he gets a bill the next day and he pays it.  He doesn't
 8   understand this.  So if it's putting in for his personal
 9   understanding, if that's the purpose of it --
10          THE COURT:  Uh-huh.
11          MR. MINNS:  -- it doesn't do that, because he doesn't
12   understand any of this.  He -- he reads things and understands
13   what he wants to understand.
14          THE COURT:  You know him better than I do.
15          MR. MINNS:  Yes, sir.
16          THE COURT:  And I'll accept that as an assertion of
17   fact.
18          MR. MINNS:  And I -- but he understands things
19   differently than the normal person reading and writing English
20   would understand it.
21          THE COURT:  This is sufficiently important point, I
22   don't really want this document going to the jury.  They are
23   entitled an offer of proof in some manner because it's relevant
24   information the point at which he knew that he was under
25   investigation.
```

Giolitti — Recross

134

1          MS. ARNETT:  And they attempted to do that with Dale

2   VanConett, I think I mispronounced her last name.  They asked

3   about her communications with the special agent and whether or

4   not she told Mr. Pieron about it, and she said she couldn't

5   remember.

6          MS. PARKER:  Which is far short of --

7          MS. ARNETT:  That was your witness.

8          MS. PARKER:  But that doesn't mean we can't come at

9   it a different way.

10          MR. MINNS:  The reason for confidential plea

11   bargaining information is that nothing that comes around it or

12   surrounds it is generally admissible.

13          THE COURT:  I get that, but as a result of the

14   admission of the dates of payment, they are entitled to

15   substantiate the fact that they post date his knowledge that

16   he's under criminal investigation, and there's a number of ways

17   in which that could be handled.  One of the ways that I don't

18   want to do it is to admit this exhibit into evidence.  That's

19   problematic for your client.

20          MR. MINNS:  Well, that's the reason the Government

21   wants to admit it.

22          MS. PARKER:  I actually prefer a stipulation rather

23   than the document, but I can't make you stipulate.

24          MR. MINNS:  I think --

25          THE COURT:  Question, we've got the jury hanging out

 1   while we're having the debate --

 2           MR. MINNS:  Yes.

 3           THE COURT:  -- is this the last witness?

 4           MS. PARKER:  Yes.

 5           THE COURT:  Do you want a little bit of time to

 6   consider some alternatives here?

 7           MR. MINNS:  I think we --

 8           MS. ARNETT:  Yes.

 9           MR. MINNS:  Okay.

10           MS. PARKER:  She just made up your mind I think, if I

11   see this correctly.

12           MR. SASSE:  I haven't looked at it, Judge, and

13   usually if both of us disagree with him, he comes around.

14           THE COURT:  How do you want to handle the balance of

15   the day?  Do you want to call it a day?

16           MR. SASSE:  Yeah.

17           MR. DEPORRE:  It's 2:30.

18           THE COURT:  Are you comfortable representing to the

19   jury that we're very close to the Government resting?

20           MS. PARKER:  Yes, absolutely.

21           THE COURT:  I will say nothing about the defense.

22           MR. SASSE:  Okay.

23           THE COURT:  Let them go for the day and hash it out.

24           MS. ARNETT:  Thank you.

25           (Sidebar conference concluded.)

1          THE COURT:  Well, we had a good discussion.  The net

2    result of that discussion, I can tell you is that we have one

3    item that we need to spend a little bit of time on outside of

4    your presence.  You should understand that we are very close to

5    the Government resting their case.  At least I'm trying to

6    inform you, give you a little bit of an understanding of where

7    we are in terms of the progress we're making.

8          But, however, because we need to give attention to

9    that one question outside of the your presence, we're going to

10   do something that I hope you appreciate; adjourn early.

11         Please rise for the jury.  We'll see you tomorrow

12   morning at eight.

13              (At 2:31 p.m., jury leaves.)

14         THE COURT:  We're outside of the presence of the

15   jury.  I think best, actually the most productive effort here

16   might be to take a break, allow you to confer, at least as a

17   threshold manner among the respective committees for the

18   Government and the defense, and then see if we are able to

19   arrive at a conclusion with respect to the one final matter.

20         MS. ARNETT:  I do have a quick suggestion.  They have

21   evidence that Mr. Pieron sat down with Special Agent Hollabaugh

22   for the handwriting exemplar, and I'm sure that he introduced

23   himself as a special agent criminal investigation division from

24   the IRS.  I think it's plenty for the Government to argue about

25   when he knew or might have known about a criminal

 1    investigation.

 2            THE COURT:  Well, that will give the Government

 3    counsel a chance to talk with the agent while we take our

 4    break.

 5            MS. ARNETT:  And delivery of subpoenas, but that's

 6    not in evidence.  Thank you.

 7            THE COURT:  Unless you'd like to.

 8            MS. ARNETT:  No, no, sir.

 9            THE COURT:  Record's closed.  We'll talk to you in

10    about five minutes.

11            (At 2:32 p.m., court recessed.)

12            THE COURT:  Have we reached a conclusion?

13            MS. PARKER:  I think we have, Your Honor, and Ashley

14    Arnett gets the credit for inspiring the solution.

15            The handwriting exemplars were taken -- are you

16    following still?  The handwriting exemplars were taken from the

17    defendant by the agents in 2017.  I think we can use that to

18    resolve the issue.

19            THE COURT:  Ms. Arnett.

20            MS. PARKER:  And obviously the issue will be open for

21    cross-examination and --

22            MR. MINNS:  Cross-examination?

23            MS. PARKER:  On various defense witnesses, if any

24    there be.

25            MR. MINNS:  I thought you meant --

```
 1              THE COURT:  Ms. Arnett gets a star for the day.

 2              MS. ARNETT:  Thanks.

 3              THE COURT:  Do we anticipate any additional argument

 4   before you proceed to proofs?

 5              MR. MINNS:  Rule 29; when the Government closes, Rule

 6   29.

 7              THE COURT:  Well, it sounds like we're there.

 8              MS. PARKER:  I think Mr. Minns is very concerned

 9   about me not having formally closed, so for the sake of

10   Mr. Minns' ability to make that motion, I will move -- I mean,

11   excuse me, I will rest the Government's case, reserving the

12   right to so state before the jury.

13              MR. MINNS:  I have no objection to that.

14              THE COURT:  Now, I'm not in a position to entertain

15   that today because of some other obligations.  On the other

16   hand, we've got the jury coming back tomorrow morning at eight,

17   so I'm trying to figure out the best way to handle that.  And

18   one way we've handled it in the past is to accept what I would

19   call a short written Rule 29 motion that would fundamentally

20   just be an outline of the argument that way we have a record of

21   it, but on the other hand, lessen the amount of courtroom time

22   that we have to dedicate to that.

23              What do you think of that, Mr. Minns?

24              MR. MINNS:  I don't want to waive, if I can't -- I've

25   never done it that way, but if -- is that -- is that okay to do
```

```
 1   it that way?  I mean, it has to be made immediately upon the
 2   close of the Government's case.
 3           THE COURT:  True.  Well, it can be made at a number
 4   of times.
 5           MR. MINNS:  If we -- don't we waive it, if we don't
 6   make it?
 7           THE COURT:  You do.
 8           MR. MINNS:  Well, I don't want to waive it.
 9           THE COURT:  Yes, and I'm not asking you to waive it.
10           MR. MINNS:  Yes, sir.
11           THE COURT:  All I'm asking you to do is to complete a
12   written short motion in writing that's docketed.
13           MS. ARNETT:  Tonight.  Tonight?
14           MR. MINNS:  Okay.
15           THE COURT:  I couldn't hear her ruling?
16           MS. ARNETT:  Oh, I'm sorry, I said my understanding
17   is tonight?  You want it on file before tomorrow morning?
18           THE COURT:  Yes.  And --
19           MS. ARNETT:  Can we clarify short?
20           THE COURT:  I'm thinking less than five pages.
21           MS. ARNETT:  Okay.  Thank you, Your Honor.
22           MR. MINNS:  Could I confer with counsel, please, Your
23   Honor?
24           THE COURT:  She's your lawyer.
25           MR. MINNS:  No, no, I mean with local counsel.
```

Giolitti - Recross                                                    140

```
 1              THE COURT:  Oh, with Mr. Sasse?  Yes.

 2              Well, the only other thing that was a consideration

 3    for me was timing as it might impact the ability of the

 4    Government to respond, just a strategic matter, but I'll leave

 5    that to you and Mr. Sasse.  Do you want to confer with him

 6    briefly?

 7              MR. MINNS:  Yes, please, Your Honor.

 8              (Off-the-record discussion.)

 9              MR. MINNS:  Yes, Your Honor.  We will agree to do it

10    that way.

11              THE COURT:  Good.  Record's closed.

12              (At 2:49 p.m., court recessed.)

13

14

15                         *  *  *  *  *

16                    C E R T I F I C A T E

17        I certify that the foregoing is a correct transcript
          from the proceedings in the above-entitled matter.
18

19                         Carol M. Harrison

20    Date: 3-25-2019      Carol M. Harrison, RMR, FCRR
                           Official Court Reporter
21                         United States District Court
                           Eastern District of Michigan
22                         1000 Washington Avenue
                           Bay City, MI  48708
23

24

25
```

US v. Pieron, Jr. - TRIAL - VOLUME 5 - March 5, 2019