```
 1                IN THE UNITED STATES DISTRICT COURT

 2                    EASTERN DISTRICT OF MICHIGAN

 3  UNITED STATES OF AMERICA          ) Bay City, Michigan
                                      ) March  6, 2019
 4      vs.                           ) 8:25 a.m.
                                      )
 5  JAMES D. PIERON, JR.,             )
                                      ) Case No. 18-20489
 6      Defendant.                    )
    _____  )

 7

 8                   TRANSCRIPT OF TRIAL - VOLUME 6
                 BEFORE THE HONORABLE THOMAS L. LUDINGTON
 9                   UNITED STATES DISTRICT JUDGE

10  APPEARANCES:

11  For the Government:  JANET L. PARKER
                        JULES M. DEPORRE
12                      United States Attorney
                        Eastern District of Michigan
13                      101 First Street
                        Suite 200
14                      Bay City, MI 48708

15  For the Defendant:  MICHAEL L. MINNS
                        ASHLEY B. ARNETT
16                      Minns & Arnett
                        9119 South Gessner; Suite One
17                      Houston TX 77074

18  For the Defendant:  KENNETH SASSE
                        Attorney at Law
19                      27 E. Flint Street; 2nd Floor
                        Lake Orion, MI  48362
20                      (248) 821-7325

21
    Court Reporter:     Carol M. Harrison, RMR, FCRR
22                      1000 Washington Avenue
                        Bay City, MI  48708
23
                  Proceedings reported by stenotype reporter.
24          Transcript produced by Computer-Aided Transcription.

25
```

```
 1                              INDEX

 2

 3   Preliminary Jury Instructions by The Court        30

 4   Closing Argument by Ms. Parker                    46

 5   Closing Argument by Mr. Minns                     61

 6   Rebuttal Closing Argument by Ms. Parker           90

 7   Final Instructions by The Court                   97

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2              (At 8:25 a.m., proceedings commenced.)

 3              (Defendant present.)

 4              THE CLERK:  United States of America versus James

 5    Pieron, Jr., Case No. 18-20489.

 6              THE COURT:  Record will reflect the fact that we have

 7    counsel present and the fact that it is so warm you would

 8    almost feel like you're in Dallas.

 9              Defendants have filed their Rule 29 motion.  I've had

10    a chance to briefly examine it.  What I was hoping to do is to

11    be fairly brief in our address on the Rule 29 motion.  It is a

12    matter, indeed, that we can take under advisement under

13    subsection B.  My primary interest here is maximize the time

14    that we have with the jury.

15              Anything that you'd like to comment on that is not

16    appropriately covered in the written motion for the defense?

17              MR. SASSE:  No, Your Honor.  We'll stand by the

18    motion at this point.

19              THE COURT:  Indeed.

20              Brief response from the Government.

21              MS. PARKER:  Well, Your Honor, the Government submits

22    that there is evidence in the record that would allow a

23    reasonable jury to find the defendant guilty.  There's evidence

24    relating to each of the elements of the offense.  If the Court

25    wishes me to elaborate further, I will.
```

1        THE COURT:  Respectfully, I don't believe that is

2  necessary.  The primary elements, those of acts of evasion,

3  intent are an established jury question in my view based on the

4  evidence that has been tendered during the course of the

5  Government's case.

6        The fact is that we have indeed three different

7  returns furnished to the Government with three different

8  measures of AGI and taxation and no payment of that until a

9  substantially later period of time.

10        In addition, the bill of particulars laid out the

11  factual information that addressed additional alleged acts of

12  evasion, and the evidence that's been introduced at this point

13  substantiates a jury question in my view.  I would respectfully

14  deny the motion.

15        We have a separate motion that was filed by the

16  Government seeking a *Daubert* hearing, a separate hearing, if I

17  understand it accurately concerning the two opinion witnesses

18  that the defense has identified.

19        MS. PARKER:  That is correct, Your Honor.  As I'm

20  sure the Court is well aware, *Daubert* recognizes the Court's

21  gatekeeping function in terms of witness testimony, and while

22  *Daubert* is focused in large part on a scientific evidence, I

23  think it's all the more important to have that gatekeeping

24  function recognized when the testimony, as I understand it, is

25  that the defendant's experts would tender opinions on the law

1    and the application of the law to information that they believe

2    to be the facts in the case.

3            And I think that's particularly disconcerting, and

4    there is some case -- there's a case cited in our brief which

5    says that you can't do -- have -- present an opinion witness to

6    say the conduct of a defendant or a party did or did not

7    violate the law, and I think that's the purpose -- one of the

8    purposes, and the other is, frankly, to bolster the testimony

9    of Mr. Pavlik.

10           And I recognize, and I think this is understood by

11   all of us, that there may be a good faith reliance on the

12   advice of an accountant to some lesser or greater degree that

13   we asserted in this case, but then to bolster the testimony of

14   the accountant by having two or one other witnesses say the

15   accountant was correct, it is particularly problematic, and it

16   really doesn't go to the good faith versus willfulness of the

17   defendant.  It goes -- it's an after the fact bolstering,

18   nothing on which the defendant relied in proceeding as he did

19   and signing various tax returns and providing information to

20   tax preparers over a period of time.

21           So I think there's a particular concern in this case

22   that the misinformation -- the information regarding the law

23   should not be provided to the jury from the witness box in any

24   case, and it's particularly disconcerting in this case,

25   because, as I think the Court's already expressed, it's quite

 1  likely misinformation, and it would be confusing to the jury,

 2  could potentially be misused by the jury, and it's really not

 3  probative of the issues that are presented to the jury.

 4          THE COURT:  The type of case where we run into those

 5  types of issues most often are legal malpractice cases where we

 6  have to draw a line, if you will, between the decisions that

 7  need to be made by the Court in terms of instructing the jury

 8  on the law that applies but, on the other hand, permitting the

 9  jury to make determinations concerning both duty and breach of

10  duty, and we regularly accept opinion witnesses on the law and

11  particularly with respect to breach of duty in those

12  circumstances.

13          Is this any different, do you think?

14          MS. PARKER:  Yes, it is, for two different reasons.

15  That is not an issue in this case, whether there's a duty or a

16  breach of duty.

17          THE COURT:  Sure.

18          MS. PARKER:  Second all, this is a criminal case

19  where we're not talking about a preponderance type standard.

20  We're talking where the risk of misleading and misinformation

21  could tip the scales in the direction just enough to basically

22  prevent the jury from finding proof beyond a reasonable doubt,

23  so the margin for error in that regard is -- the impact of

24  error is substantially greater.

25          And the third thing I would say, and I think this is

1  of importance, and that's the civil case of malpractice, what's

2  at stake is -- to the parties is different, and in this case if

3  there's an error, there's no remedy for the Government.  In a

4  civil case, there is remedy, both parties can appeal, but --

5          THE COURT:  I assume that the civil case and the

6  civil issues for the defendant have probably not come to a

7  conclusion.

8          MS. PARKER:  I'm sorry?

9          THE COURT:  I assume that the civil issues with

10  respect to the Internal Revenue Service and the defendant are

11  not completely resolved.

12          MS. PARKER:  I know, but I think that's a totally

13  different thing, whether or not there's a civil thing, and if

14  that was a civil tax case, then perhaps it would be different,

15  but I would still admit -- or submit to the Court, as to these

16  experts, they are not qualified to offer the opinions that they

17  wish to offer.

18          THE COURT:  And why not?  I've taken a look at their

19  CV's.  They look like both have masters, as I recall, in fields

20  of both accounting as well as taxation.

21          MS. PARKER:  Well, I think, again, what they're going

22  to offer are legal opinions, and they're not lawyers and

23  they're not the parties.  I mean, there's a variety of cases

24  that say, particularly in the criminal cases, *Zipkin* is one

25  I've cited, there was another one cited in the brief, that the

1   Court must provide the law to the jury, and I think this is a

2   line that has to be maintained, otherwise the Court isn't

3   providing particular --

4           THE COURT:  Your draft jury instructions do not

5   include instructions with respect to the application of Section

6   1331.  Should they?

7           MS. PARKER:  Well, we frankly didn't think that this

8   was going to be an issue.  I mean, I think the Court has taken

9   the trial in a different path.  As you know, our contention is

10  we weren't intending to litigate the propriety of either the

11  theft loss or the claim of right.  We were to take the Form

12  433-F that says he owes $448,880 at his word and not look

13  behind that to other matters.  The Court's ruled otherwise, and

14  if the Court wants us to work on an instructions, we would be

15  happy to do that.

16          We did submit some additional instructions last

17  night, not as to that section, per se, but, I mean, it does

18  address -- the first one does -- we submitted it through

19  utilities, through the -- both the theft loss and the claim of

20  right, and I think that's important because the law on those

21  two tax concepts I think is not -- would not allow the

22  deductions in this case, if -- if you take the facts.  There

23  was no theft loss because as the Court's already observed --

24          THE COURT:  And I agree, I understand the argument

25  with respect to the facts there.

1              MS. PARKER:  All right.  So to allow the jury to hear

2    testimony that's based on some conclusion that's not consistent

3    with the facts or the law, as even the Court says, the Court

4    recognizes it to be, is to me completely inappropriate.  It --

5    the jury should not be subjected to that, and the only thing

6    they can do with it, it's misinformation and they can misapply

7    it.

8              And I don't think there's a cautionary instruction

9    that can say you heard him testify, they're wrong, but you

10   heard him testify anyway.  I mean, the whole reason that these

11   witnesses are being offered is to bolster the opinion of one of

12   their witnesses, and they're trying to bolster him with

13   misinformation.

14             THE COURT:  Well --

15             MS. PARKER:  It's factually.

16             THE COURT:  -- you'll be available for

17   cross-examination both of the accountant as well as the opinion

18   witnesses.

19             MS. PARKER:  Well, that's definitely true, but that

20   doesn't change the fact it's not relevant, it's not probative,

21   it's unduly confusing to the jury.  Because -- I mean, it

22   allows them to bolster the testimony of a witness and to try to

23   say, through how many hours of testimony, that this was a

24   correct thing to do on behalf of the defendant, when the facts

25   don't support it nor do -- and the facts don't support the

1  legal analysis.

2         And, fundamentally, to go down the path and say we

3  can offer it just because the Government can cross-examine it,

4  I don't think is a good use of the Court's time.  I don't think

5  it's unfair to the defendant to say you can't present testimony

6  that is fundamentally incorrect.

7         THE COURT:  Appreciate your argument.  Mr. Minns.

8         MR. MINNS:  Thank you, Your Honor.  I -- I'm

9  primarily arguing in the defense of the reputation of two

10 former public servants and two highly educated people because

11 when a *Daubert* motion is filed, every other time they give a

12 deposition, every other time they're called to the witness, it

13 becomes cross-examination, so it's essential for their

14 reputation, and they gave us their good faith.  I have to stand

15 by them.  They're -- it's essential that the Government lose

16 *this Daubert* motion for the reputation of these two very highly

17 educated, well qualified experts.

18        The Government put on a series of experts with no

19 qualifications whatsoever, no reports whatsoever, no CV's, and

20 we gave CV's on both of ours.  We've actually filed the first

21 record.

22        So it is important because this creates a legislative

23 history.  Each one of these two fine people, when they get on

24 the stand, someone will say, were you challenged, and they need

25 to be able to truthfully testify, it was unsuccessful.

1          THE COURT:  Here's the question I have because,

2     respectfully, while I acknowledge our gatekeeping

3     responsibility under *Daubert*, that doesn't necessarily mean

4     that once that challenge is made that a separate hearing

5     necessarily has to be -- has to occur.  That gatekeeping

6     function will continue throughout the course of those

7     witnesses' testimony.

8          The issue that I would struggle with in this set of

9     circumstances is the extent to which you will be using opinion

10    witnesses to substantiate presumably the reasonableness of the

11    conclusion of the tax preparer on the offer in compromise.

12         Do we need to go the next step in informing the jury

13    concerning the application of the tax code?  Should they be

14    making the determination concerning the reasonableness of the

15    application of the law; and, if not, why are we furnishing them

16    testimony on the question?

17         MR. MINNS:  Well, to shortcut it, Your Honor, because

18    much of it is moot, as the Government said, a major reason for

19    the testimony was to support the testimony of Mr. Pavlik.  I've

20    spent a week in Michigan interviewing witnesses, almost none of

21    whom were put on the stand.  Mr. Pavlik was not put on the

22    stand.  So the reason for that expert to buttress what he is

23    saying to support him is irrelevant, because Mr. Pavlik never

24    took the stand.  I don't have anything to buttress.

25         We don't have any -- to get to the bottom of it, the

 1  Government's motion on this -- it must be denied for the
 2  reputation of these two experts who are outstanding, but it's
 3  moot, because we're not planning -- at this point there's
 4  nothing to refute.  I don't -- there was nothing put into the
 5  record that would -- that would bring either one of these
 6  experts -- my summary witness, there was nothing in their -- in
 7  their -- their summary witness didn't even say a tax was due
 8  and owing so --
 9          THE COURT:  Your client's tax returns did.
10          MR. MINNS:  Yes, Your Honor, that is true, but the
11  summary witness didn't.
12          THE COURT:  And Mr. Pavlik and his opinion is
13  necessary to get you to no tax.  Agreed?
14          MR. MINNS:  Yes, Your Honor, absolutely.  But -- but
15  I'm not planning on putting either of these -- I do plead with
16  the Court to deny their motion, but I'm not going to put either
17  one of them on the stand.  I do that for the reputation of
18  these men, because they both are practicing their tools, and if
19  a *Daubert* motion is granted, it will injure their future.  It
20  will slander them.
21          My understanding is the Court wasn't going in the
22  direction of disqualifying them anyway, but I'm -- this is moot
23  because I am not putting either of these two gentlemen on the
24  stand.  I don't have anything to refute.  The Government didn't
25  put Mr. Pavlik on the stand.  I don't have anything -- I guess

1  I could theoretically put someone on the stand to support the

2  uncontradicted tax return, but find that to be futile and a

3  waste of time.

4            THE COURT:  The uncontradicted tax return?

5            MR. MINNS:  Yes.

6            THE COURT:  Which one are you referring to?

7            MR. MINNS:  Oh, well, I tried to -- if I was

8  unsuccessful, I apologize to my client and the Court, I tried

9  to contradict the Carol Nathan tax returns, but there was no

10  testimony contradicting any of the other tax returns.

11            MS. PARKER:  Your Honor, if I may.  If counsel is

12  stating that he's not calling experts in his case, then the

13  motion is moot.

14            THE COURT:  That's true.

15            MS. PARKER:  And whatever -- I don't think the --

16  that a motion should be denied on the merits because it might

17  harm the reputation of someone, but we're not seeking to do

18  that.  And I think, if he is stating on the record he's not

19  calling the witnesses at issue, then the motion is moot.

20            THE COURT:  And I understand the way the parties are

21  framing the issues.

22            As I indicated earlier, putting aside the question of

23  whether or not the witnesses are actually called, our

24  gatekeeping responsibility continues nevertheless.  And to the

25  extent that there is an issue that could arise, as we see the

1  way in which the defense is presented, we'll take up those

2  issues, depending on the witnesses that's involved.

3          We'll proceed to the jury.  Are you ready to go?

4          MR. MINNS:  Yes, Your Honor.

5          THE COURT:  If we could have the jury, please.

6          MS. PARKER:  Judge --

7          THE COURT:  Yes.

8          MS. PARKER:  -- I'm sorry, one quick thing since --

9  rather than shuffle the jury in and out.  The Court normally

10  conducts a colloquy with the defendant regarding it being his

11  own decision whether or not to testify.

12          THE COURT:  Certainly.  But I don't think we're

13  probably there yet.

14          MR. MINNS:  We probably are there, Your Honor.

15          THE COURT:  All right.

16          MR. MINNS:  We probably are.  Counsel refuses to put

17  the client on the witness stand, and the client has been

18  thinking he needs to testify, and he has three lawyers who will

19  not put him on the witness stand.  We believe he has agreed

20  with us not to take the witness stand, but it is his

21  constitutional right, and I cannot take it away from him.  If I

22  could, I would.

23          THE COURT:  So --

24          MR. MINNS:  It is necessary, Your Honor, and this

25  would be an appropriate time to get it over with.

1          THE COURT:  Mr. Pieron, I'm not exactly clear, is it

2    your decision to furnish testimony to the jury or not?

3          THE DEFENDANT:  It's my decision to take the advice

4    of my counsel.  Just as I can't fly an airplane, I don't know

5    what to do in this situation, so I have to take the advice of

6    the pilots around me, if that makes any sense.

7          THE COURT:  Sure.  As equivalently I don't fix my own

8    car either.  I appreciate your point.  But what's important to

9    us at this stage is to make sure that you understand that while

10   taking the advice of your attorneys is sound, at the end of the

11   day, the question of the decision as to whether you furnish

12   testimony or not is yours; and, incidentally, it is a right

13   that's protected on both sides, which is to say that you have

14   an absolute right to furnish testimony if you choose to do so.

15   But, equivalently, we -- if you choose not to do so, we will

16   furnish the jury with a fairly specific instruction and

17   indicating that you have an absolute right not to testify and

18   they cannot draw any inferences concerning your guilt or

19   innocence as a result of your election in that -- in making

20   that decision.

21         So to be sure at this stage, you've -- it's an issue

22   that you've reviewed with your attorneys with care, correct?

23         THE DEFENDANT:  Yes, sir.

24         THE COURT:  And you're satisfied at this stage that

25   in choosing not to furnish your testimony, it would be a well

1   educated and sound decision and it's a decision that you have

2   made personally?

3           THE DEFENDANT:  Well, I just finalized my decision

4   with your own words, that it's a sound decision, and I've

5   watched a week of critical thinking from the Court and your

6   words, I think, are the right ones, the right decision.

7           THE COURT:  You've made that decision yourself.

8           THE DEFENDANT:  Yes, sir.

9           THE COURT:  Good.  You're leaving me with a little

10  bit of a question about where the defendant's case will be

11  going.  Do you have other witnesses?

12          MR. MINNS:  No, Your Honor.

13          THE COURT:  Oh, so you're full of surprises.

14          MR. MINNS:  We struggled with this all night, with

15  the Government's threats to deal with this -- this Cook

16  situation and all the other things, and we went back and forth,

17  and we spent a lot of time and effort prepping six witnesses,

18  and the decision that we made, and is now finalized, would have

19  been whether Jim Pieron went against our advice and took the

20  stand, so at this point in time, we will be resting.

21          THE COURT:  May I suggest that what we do is have

22  both of you rest in front of the jury, excuse the jury for

23  about an hour and a half, resolve the final jury instructions

24  and have them back for closing arguments?

25          MR. MINNS:  Excellent, Your Honor.

1        THE COURT:  Agreeable to the Government?

2        MS. PARKER:  Judge, we have not seen a draft at all

3   of the jury instructions, other than the ones that were -- that

4   we submitted and were submitted by the defense.  We did, again,

5   I would reiterate, submit a couple supplemental ones last

6   night.

7        THE COURT:  I don't think that the conference is

8   going to be extensive.  I think we're going to reach

9   conclusions on those instructions pretty rapidly.  All right.

10  We'll entertain the jury to permit both the Government and

11  defense to rest, and to provide them some instructions on when

12  they need to be back in attendance.  What I'm anticipating

13  would be back at 10:30?

14       MS. ARNETT:  For the jury to come back, I understand?

15       THE COURT:  Good.  Jury, please.

16       (At 8:51 a.m., jury arrives.)

17       THE COURT:  Good morning.

18       THE JURY:  Good morning.

19       THE COURT:  Please be seated.  Government have any

20  additional witnesses to call?

21       MS. PARKER:  No, Your Honor.  I would like to go over

22  the exhibit list with the Court, but the Government has no

23  additional witnesses and the Government rests.

24       THE COURT:  Does the defense wish to introduce any

25  evidence?

1           MR. MINNS:  No, Your Honor.

2           THE COURT:  The defense rests?

3           MR. MINNS:  Yes, Your Honor.

4           THE COURT:  That leaves us with the next step in the

5   case being our instructions to you and the law that governs the

6   case and that will govern your decision making.  We need to

7   spend a little bit more time finalizing some of those

8   instructions that we will give you.  After that, we'll

9   entertain the closing statements from the attorneys and the

10  case will be yours.

11          Because we need a little bit of time on the

12  instructions, what we were going to do is just simply release

13  you for a period of time while we resolve that.  We were

14  thinking having you back at 10:30, at which point we will

15  provide you the instructions that govern the case and go

16  directly into closing arguments.

17          Does that create any logistical problems for the

18  jury?  You'd be free to go until 10:30.  And the -- she was

19  just reminding me to remind you that once you are in

20  deliberations, we will continue until you reach or verdict or

21  5:00; if you don't reach a verdict, we'll have you back in the

22  morning for coffee.

23          Any logistical problems with that outline from any

24  members of the jury?  Good.  Where did Mr. Haines go?

25          (At 8:53 a.m., jury leaves.)

```
 1              THE COURT:  We are outside of the presence of the
 2   jury.  About five minutes, and we'll meet in chambers and see
 3   if we can get our instructions ironed out.  Is that agreeable?
 4              MS. PARKER:  Yes, Your Honor.
 5              MR. MINNS:  Your Honor?
 6              THE COURT:  Sir?
 7              MR. MINNS:  May I have permission to begin working on
 8   my opening --
 9              MS. ARNETT:  Closing.
10              MR. MINNS:  -- and have Ashley and Ken handle the
11   instructions, and will we have instructions so that I can
12   use -- quickly enough so that I can work them into my closing?
13              THE COURT:  Yes.  I don't think that will be a
14   problem.
15              MR. MINNS:  Okay.  Thank you, Your Honor.  So we get
16   a copy of the instructions?
17              THE COURT:  Yes.  You will have more than one.
18              MR. MINNS:  Okay.  Thank you, Your Honor.  I
19   apologize, I'm -- I'm -- I need to spend some time going over
20   my notes.
21              THE COURT:  Sure.
22              MR. MINNS:  Thank you, Your Honor.
23              THE COURT:  We'll see you in chambers in about five
24   minutes.
25              (At 8:55 a.m., court recessed.)
```

1           THE COURT:  Record will reflect the fact we are

2    outside the presence of the jury.  We have had a chance to meet

3    in chambers, to finalize instructions.  Those have been

4    completed and are available to the jury.

5           What I'd like to do at this juncture is to provide

6    you an opportunity to create a record on any differences of

7    opinion concerning the instructions.

8           Ms. Parker, would you like to begin.

9           MS. PARKER:  Yes, Your Honor.  One of the discussions

10   that we had in chambers was regarding the good faith

11   instruction that was both proposed by the defense and modified

12   by the Government.  The Government objects to the giving of

13   that instruction for the reason that there really is no

14   evidence regarding the defendant's good faith one way or

15   another, that could be relied upon the jury in applying that

16   defense to the defendant's conduct.

17          And the problem with giving that instruction, in

18   light of the fact that there really is no evidence of the good

19   faith reliance of the defendant, is that the Government cannot

20   comment on the defendant's lack of presentation of proofs.

21          THE COURT:  At trial.

22          MS. PARKER:  At trial.  And this is, you know, where

23   I would be in a position of trying to explain to the jury that

24   there's no evidence that the defendant relied on an accountant

25   or professional tax advisor if you find he's made a full

1   disclosure of the facts to the accountant or advisor.  I would

2   want to argue there's no evidence of full disclosure; and,

3   frankly, I can't argue that, I believe.  I think if I -- if the

4   defense wants this instruction, it's basically forcing me into

5   a position of doing what I know I ought not to do.

6          THE COURT:  We've spent sometime with this, and it

7   seems to me that we have to draw a distinction between the

8   defendant's right not to testify, but his obligation to furnish

9   full disclosure to the CPA as a condition of his entitlement to

10  rely on that information.  I don't see any particular problem

11  with your focused attention on the lack of full disclosure to

12  his accountant based on the inconsistency of the factual

13  information.

14         MS. PARKER:  Well, I think, Your Honor, that the

15  Government has the burden of proving willfulness, and

16  willfulness is the antithesis of good faith, and if we prove

17  evidence -- or present evidence proving willfulness to the

18  satisfaction of the jury, that would be an absence of good

19  faith.  But to say that there is good faith reliance when there

20  is no evidence on that, no evidence on full disclosure, and

21  because there simply has been no presentation on that issue, is

22  to really give the defendant more than he's entitled to.

23         He is entitled to have the Government prove

24  willfulness beyond a reasonable doubt, but he's not entitled to

25  force the Government to prove a defense and then point to the

1   Government's, you know -- put us in that trick box of saying,

2   well, you didn't negate the defense that we didn't present.

3          THE COURT:  Well, the trick box has one other aspect

4   to it and that is that there's two parties to the preparation

5   of the return, that is the accountant and the defendant.  The

6   defendant can exercise his Fifth Amendment right with respect

7   to trial.  The one other party who could have been called by

8   either party, either the Government or the defense, there was

9   an election not to call.

10          MS. PARKER:  That is true, but that wouldn't -- even

11   if the accountant had been called, I don't think that would be

12   addressing the concern because whether the accountant -- if he

13   believes he had the information he needed, that's not the same

14   as saying I had full disclosure.  I had the same information

15   that he gave the other accountants, I had things of that

16   nature.  And to me, they -- as the Court's pointed out, the

17   defense also could have called the accountant.

18          THE COURT:  Sure.

19          MS. PARKER:  They elected not to do so.  They had

20   that ability, but I can't point out they could have called him,

21   too.  That's my problem.

22          THE COURT:  Well, we're at a point where I want to

23   take the defense's response to that, because the ruling with

24   respect to the instruction is fairly critical to the ruling

25   that we will make concerning the arguments that can be advanced

1    in closing arguments.

2          Now, while the Government cannot comment on the

3    defendant's election not to testify, they are, in my view,

4    entitled to suggest or to argue factually concerning the lack

5    of evidence of full disclosure to the accountant.

6          MR. MINNS:  Mr. Sasse will address this, but I do

7    have something that -- I apologize, I just have something to

8    put in here.  I find it -- that the Government -- I find it

9    astounding that the Government did not call Mr. Pavlik.  All

10   the conversations were between Mr. Pavlik and our client.

11         For me -- for the Government to say that I could have

12   put on witnesses that would have helped them prove up their

13   case is astonishing.  That's not the burden on me at all or on

14   defense.  They chose not to put Mr. Pavlik on the stand, so the

15   record doesn't talk about what happened between the two of

16   them.  I was unprepared for the witness that came on.  I was

17   expecting Mr. Pavlik to be put on the stand.  And for them to

18   claim surprise that they didn't call the witness preparing the

19   return, I interviewed Mr. Pavlik twice; they interviewed him

20   four times, so -- I should stop?

21         MS. ARNETT:  I said five.

22         MR. MINNS:  They interviewed him five times.  I

23   interviewed him twice.  I didn't interview the witness that

24   actually took the stand because I did not -- I thought -- they

25   had a burden -- if they want to dispute the evidence of the tax

 1   return, they have a burden of -- we don't have the positive

 2   burden of showing that we gave everything or that the

 3   accountant didn't or whatever.  They have the burden of just

 4   proving anything -- they have the burden of proving everything,

 5   and they chose to abandon that burden, and I chose not to put

 6   him on to open the door.

 7           THE COURT:  Well, the conundrum arises from the fact

 8   that the initial obligation by law of any taxpayer is to make

 9   full disclosure to any assistant, and we have to square that

10   with the Fifth Amendment in the context of a tax evasion case.

11   It's -- that's the line that we have to draw here that is even

12   more interesting given the absence of the preparer's testimony.

13           So we've crafted the instruction as best we can to

14   draw that distinction, and you have our best efforts at

15   accomplishing that in the instruction.

16           Now, there was one additional instruction that we

17   also included that Mr. Sasse had an objection on.

18           MR. SASSE:  The conduct of the -- standards of

19   conduct for the IRS instruction, is that what you --

20           THE COURT:  Yes.

21           MR. SASSE:  Yes, Your Honor.  We are objecting to

22   that instruction.  It tells the jury or reminds the jury that

23   there were -- has been testimony, we think an exhibit,

24   introduced with respect to the Taxpayer Bill of Rights, and

25   then tells them that there's a litany of other laws and stuff,

 1  which may -- that they should also consider.

 2          Well, the problem is that there's been no --

 3  virtually no evidence in this case as to why any of these other

 4  laws, if they do exist, would have prevented the IRS from

 5  giving this man the rights that he was supposedly guaranteed

 6  under the Taxpayer Bill of Rights, and I think this instruction

 7  is inappropriate in the facts of this case.

 8          THE COURT:  And the instruction is being given to the

 9  jury so as to be sure they understand that in addition to the

10  Taxpayer's Bill of Rights, there is also an Internal Revenue

11  Code with many other associated provisions.  It's important

12  that they understand that in context, in my view.

13          MR. MINNS:  May I -- I'm leaving this in my capable

14  hands, may I use the restroom and not stop this proceeding.

15          THE COURT:  Certainly.

16          MS. PARKER:  Wait, I think it's important that

17  Mr. Minns be here for what I have to say.

18          THE COURT:  But it's also important that he's in the

19  bathroom.

20          MR. TURKELSON:  I understand that, but --

21          (Brief pause.)

22          MR. SASSE:  Your Honor, there was another objection

23  we had that Mr. Minns probably doesn't have to be here.

24          THE COURT:  Yes.

25          MR. SASSE:  We had an objection to the Court's not

```
 1  including an instructions on the statute of limitations, and we

 2  had submitted pretrial a defendant's proposed instruction No. 1

 3  which addressed this, and it argued that the jury should be

 4  instructed that they must find an affirmative act of evasion

 5  within what would be the six year period plus actually it's

 6  greater than six year because --

 7          THE COURT:  Six years plus the tolling.

 8          MR. SASSE:  And I would, again, urge the Court to

 9  give that instruction.  I think it's -- he does have statute of

10  limitations protections, and that that would assure the jury

11  consider that.

12          THE COURT:  Quickly, Government?

13          MS. PARKER:  Well, Your Honor, the Government submits

14  that there is evidence in the record that would allow the jury

15  to find that.  There wasn't really any bringing of that issue

16  to their attention in the defendant's opening statements, and

17  then to -- I don't think it's necessary under the record in

18  this case, especially since it really hasn't been a litigated

19  issue, and now ask the jury to go back and think about the

20  evidence in light of a question that was never made known to

21  them that they were going to have to consider.  To throw that

22  out as a jury instructions at this point, I think there has to

23  be factual -- a different factual predicate for giving the

24  instruction.

25          THE COURT:  And, respectfully, I do not understand
```

1    there to be disputes of fact concerning events as outlined in

2    the bill of particulars that would have been within --

3    actionable within the statute of limitations, and for that

4    reason, I've elected not to furnish that instruction to the

5    jury.

6         We want to finish up with Mr. Minns' presence, and

7    the record will reflect his returning, with respect to the one

8    issue that --

9         MS. PARKER:  Actually there are three issues.  I

10   believe they'll be quick.  One, we have a dispute regarding

11   whether the Taxpayer Bill of Rights was admitted as an exhibit,

12   and I understand third hand, but I hope it's reliable hearsay,

13   that the court reporter cannot find in her records that the

14   Taxpayer Bill of Rights was admitted as an exhibit.  That is my

15   recall and the recall of people at counsel table, but I

16   understand there's a dispute, and I think that has to be

17   clarified before closing arguments are made and making

18   reference to something that's not in evidence.  I'd rather not

19   object to that.

20        In the same vein, there's a chart that was used in

21   opening, and I understand it's over there.  I would object to

22   Mr. Minns using it, because it isn't based on the evidence that

23   was presented in this case.

24        And, thirdly, and lastly, I'd just like to bring to

25   the attention of Mr. Minns the Sixth Circuit case in *United*

1    *States versus Blakemore*, 489 Fed2d 193, which essentially says

2    that counsel cannot make reference or argue the absence of a

3    witness in closing argument without obtaining the permission of

4    the Court and sets the standards for doing that.  I don't want

5    to object to a missing witness argument.  I'd rather make him

6    aware of it and hopefully he governs himself accordingly.

7         MR. MINNS:  Am I precluded from talking about

8    Mr. Hollabaugh who was injected throughout this trial and every

9    meeting?  Am I precluded from discussing him?

10        THE COURT:  You're precluded from discussing the

11   absence of any witness.

12        MR. MINNS:  Okay.  I can -- I can say that there's

13   been no witness to testify to X, Y or Z that was required to

14   prove from the Government though?

15        THE COURT:  In a similar fashion.

16        MR. MINNS:  And I do intend to use the chart unless

17   the Court orders me not to.  I've always --

18        THE COURT:  My notes -- my notes reflected the fact

19   that we introduced the Taxpayer Bill of Rights; apparently not

20   particularly clearly.

21        And I don't have any objection to your using that as

22   demonstrative evidence, but I will instruct the jury that in

23   considering any demonstrative evidence, it's necessary that

24   they evaluate the accuracy of that information based on their

25   evaluation of the facts.

1       MR. MINNS:  My timeline, Your Honor, I've always used

2  one to close and open with, and the Government has said -- has

3  objected to it.  I don't understand why.  Most of everything I

4  was going to go through it and show the things that were

5  specifically proven up by different witnesses in the trial.

6       THE COURT:  Sure.

7       MS. PARKER:  Well, I object to using something that's

8  not in evidence and consistent with the evidence.  If the

9  timeline was supported by the evidence, I would have no

10  objection, but --

11       THE COURT:  And we're going to -- we're going to tell

12  the jury that it's demonstrative information.  It is not in

13  evidence, and it's -- its use should be governed by their

14  understanding of the facts during trial.

15       MS. PARKER:  It's also argumentative.  I mean, it

16  says --

17       MR. MINNS:  This is argument.

18       MS. PARKER:  I mean, I know it's argumentative, but a

19  summary of a timeline shouldn't be -- it should be a sequence

20  of events, not argument, but --

21       THE COURT:  The gentleman may use it.

22       We have the instructions.  They are available for the

23  jury.  My intention at this juncture would be to entertain them

24  and then proceed to instructions and the Government's closing

25  argument; probably take a break after that, return for the

1   defense argument and rebuttal.

2           MR. MINNS:  Thank you, Your Honor.  Thank you.

3           THE COURT:  If we could have the jury, please.

4           MR. MINNS:  Your Honor, in this court, we are

5   permitted to read directly from the instructions?

6           THE COURT:  Yes.

7           MR. MINNS:  Thank you.

8           THE COURT:  They will have a copy of them as well.

9           MR. MINNS:  Okay.  It changes from -- some judges say

10  don't do it until afterwards, and --

11          (At 10:57 a.m., jury arrives.)

12          THE COURT:  Welcome back.  You will note that there

13  is a copy of the instructions on your seat.  I point that out

14  so you don't sit on them, but you may be seated.  And I

15  apologize for the fact that it took us a little bit longer than

16  we had anticipated to resolve a few issues that we needed to do

17  without -- outside of your presence.

18          I'm going to be furnishing you, reading essentially,

19  the instructions that you have in front of you.  You will be

20  able to maintain these instructions during deliberation and

21  you're free to follow along as we furnish the instructions.

22          Members of the jury, now is the time for me to

23  instruct you about the law that you must follow in deciding the

24  case.  I will start by explaining your duties and the general

25  rules that apply in every criminal case.  Then I will explain

 1    some rules that you must follow in evaluating particular

 2    testimony and evidence.   Then I will explain the elements or

 3    parts of the crime that the defendant is accused of committing,

 4    and, last, I will explain the rules that you must follow during

 5    your deliberations in the jury room and the possible verdicts

 6    that you may return.

 7              Please listen carefully to everything I say.   I have

 8    given each of you a copy of the instructions for your use while

 9    deliberating.   They are available to each of you.   If you have

10    questions about the law or your duties as jurors, you should

11    consult the copy of the instructions as given to you.

12              You have two main duties as jurors.   The first one is

13    to decide what the facts are from the evidence that you saw and

14    heard here in court.   Deciding what the facts are is your job.

15    It's not mine, and nothing that I've said or done during the

16    trial was intended or meant to influence your decision about

17    the facts in anyway.

18              Your second duty is to take the law that I give you,

19    apply it to the facts, and decide if the Government has proved

20    the defendant guilty beyond a reasonable doubt.   It's my job to

21    instruct you about the law, and you are bound by the oath that

22    you took at the beginning of the trial to follow the

23    instructions that I give you, even if you personally disagree

24    with them.   This includes the instructions that I gave you

25    before and during the trial and these instructions that I am

 1  now providing.  All the instructions are important, and you

 2  should consider them together as a whole.

 3          The lawyers may talk about the law during their

 4  arguments, but if what they said is different from what I say,

 5  you must follow what I say.  What I say about the law controls.

 6  Perform these duties fairly.  Do not let any bias, sympathy or

 7  prejudice that you may feel towards one side or the other

 8  influence your decision in anyway.

 9          As you know, the defendant has pled not guilty to the

10  crime charged in the indictment.  The indictment is not any

11  evidence at all of guilt.  It is just the formal way that the

12  Government tells the defendant what crime he is accused of

13  committing.  It does not raise any suspicion of guilt.

14          Instead, the defendant starts the trial with a clean

15  slate with no evidence at all against him, and the law presumes

16  that he is innocent.  This presumption of innocence stays with

17  him unless the Government presents evidence here in court that

18  overcomes the presumption and convinces you beyond a reasonable

19  doubt that he is guilty.

20          This means that the defendant has no obligation to

21  present any evidence at all or to prove to you in anyway that

22  he is innocent.  It is up to the Government to prove that he is

23  guilty, and this burden stays on the Government from start to

24  finish.  You must find the defendant not guilty unless the

25  Government convinces you beyond a reasonable doubt that he is

1   guilty.

2           The Government must prove every element of the crime

3   charged beyond a reasonable doubt.  Proof beyond a reasonable

4   doubt does not mean proof beyond all possible doubt.  Possible

5   doubts or doubts based purely on speculation are not reasonable

6   doubts.  A reasonable doubt is a doubt based on reason and

7   common sense.  It may arise from the evidence, the lack of

8   evidence or the nature of the evidence.  Proof beyond a

9   reasonable doubt means proof which is so convincing that you

10  would not hesitate to rely and act on it in making the most

11  important decisions in your own lives.

12          If you are convinced that the Government has proved

13  the defendant guilty beyond a reasonable doubt, say so by

14  returning a guilty verdict.  If you're not convinced, say so by

15  returning a not guilty verdict.

16          If you decide that the Government has proved the

17  defendant guilty, then it will be my job to decide what the

18  appropriate punishment should be.  Deciding what the punishment

19  should be is my job; it is not yours.  It would violate your

20  oath as jurors to even consider the possible penalty in

21  deciding your verdict.  Your job is to look at the evidence and

22  decide if the Government has proved the defendant guilty beyond

23  a reasonable doubt.

24          You must make your decision based only on the

25  evidence that you saw and heard here in court.  Do not let

rumors, suspicions or anything else that you may have seen or

heard outside of the court influence your decision in anyway.

The evidence in this case includes only what the witnesses said

while they were testifying under oath, and the exhibits that

have been allowed into evidence.  Nothing else is evidence.

The lawyers' statements and arguments are not evidence.  Their

questions and objections are not evidence, and my legal rulings

are not evidence, and my comments and questions are also not

evidence.

During the trial, I did not let you hear the answers

to some questions that the lawyers asked, and sometimes I

ordered you to disregard things that you saw or heard or I

struck things from the record.  You must completely ignore all

of these things.  Do not even think about them.  Do not

speculate about what a witness might have said.  These things

are not evidence and you are bound by your oath not to let them

influence your decision in anyway.  Make your decision based

only on the evidence as I've defined it here and nothing else.

You are to consider only the evidence in the case.

You should use your common sense in weighing the evidence.

Consider the evidence in light of your everyday experience with

people and events, and give it whatever weight you believe it

deserves.  If your experience tells you that certain evidence

reasonably leads to a conclusion, you are free to reach that

conclusion.

1          In our lives we often look at one fact and conclude

2    from it that another fact exists.    In law we call this an

3    inference.    The jury is allowed to make reasonable inferences

4    unless otherwise instructed.    Any inferences you make must be

5    reasonable and must be based on the evidence in the case.    The

6    existence of an inference does not change or shift the burden

7    of proof from the Government to the defendant.

8          Some of you have heard the terms direct evidence and

9    circumstantial evidence.    Indeed you would have heard those

10   terms when we began the case.    Direct evidence is simply

11   evidence, like the testimony of an eyewitness, which, if you

12   believe it, directly proves a fact.    If a witness testified

13   that he saw it raining outside and you believed him, that would

14   be test -- that would be direct evidence that it was raining.

15         Circumstantial evidence is simply a chain of

16   circumstances that indirectly proves a fact.    If someone walked

17   into the courtroom wearing a raincoat covered with drops of

18   water and carrying a wet umbrella, that would be circumstantial

19   evidence from which you could conclude that it was raining.

20         It is your job to decide how much weight to give the

21   direct and circumstantial evidence.    The law makes no

22   distinction between the weight that you should give to either

23   one and does not say that one is any better evidence than the

24   other.    You should consider all the evidence, both direct and

25   circumstantial, and give it whatever weight you believe it

 1    deserves.

 2           Another part of your job as jurors is to decide how

 3    credible or believable each witness was.  This is your job;

 4    it's not mine.  It is up to you to decide if a witness's

 5    testimony was believable and how much weight you think it

 6    deserves.  You are free to believe everything that a witness

 7    said or only part of it or none of it at all, but you should

 8    act reasonably and carefully in making these decisions.  Let me

 9    suggest to you a few things that you may consider in evaluating

10    each witness's testimony.

11           Ask yourself if the witness was able to clearly see

12    or hear the events.  Sometimes even an honest witness may not

13    have been able to see or hear what is happening and may make a

14    mistake.  Ask yourself how good the witness's memory seemed to

15    be.  Did the witness seem able to accurately remember what

16    happened?  Ask yourself if there was anything else that may

17    have interfered with the witness's ability to perceive or

18    remember the events.

19           Ask yourself how the witness acted while testifying.

20    Did the witness appear honest, or did the witness appear to be

21    lying?  Ask yourself if the witness had any relationship to the

22    Government or the defendant or anything to gain or lose from

23    the case that might influence the witness's testimony.  Ask

24    yourself if the witness had any bias or prejudice or reason for

25    testifying that might cause the witness to lie or to slant the

testimony in favor of one side or the other.

Ask yourself if the witness testified inconsistently while on the witness stand, or if the witness said or did something, or failed to say or do something, at any other time that is inconsistent with what the witness said while testifying.  If you believe the witness was inconsistent, ask yourself if this makes the witness's testimony less believable. Sometimes it may; other times it may not.  Consider what the inconsist -- consider whether the inconsistency was about something important or about some unimportant detail.

Ask yourself if it seemed like an innocent mistake or if it seemed deliberate, and ask yourself how believable the witness's testimony was in light of all the other evidence. Was the witnesses' testimony supported or contradicted by other evidence that you found believable?  If you believe that a witness's testimony was contradicted by other evidence, remember that people see -- sometimes forget things and that even two honest people who witness the same event may not describe it exactly the same way.

These are only some of the things that you may consider in deciding how believable each witness was.  You may also consider other things that you think shed some light on the witness's believability.  Use your common sense and your everyday experience in dealing with other people, and then decide what testimony you believe and how much weight you think

1    it deserves.

2          A defendant has an absolute right not to testify or

3    present evidence.  The fact that he did not testify or present

4    any evidence may not -- cannot be considered by you in anyway.

5    Do not even discuss it in your deliberations.  Remember that it

6    is up to the Government to prove the defendant guilty beyond a

7    reasonable doubt.  It is not up to the defendant to prove that

8    he is innocent.

9          You've heard testimony from witnesses who are police

10   officers or agents.  That testimony is to be judged by the same

11   standards you use to evaluate the testimony of any other

12   witness.  You've also heard the testimony of Robert Miller,

13   Judith Gustafson and Megean Giolitti.

14          MS. PARKER:  Giolitti.

15          THE COURT:  We all know who we're talking about --

16   who testified as opinion witnesses.  You do not have to accept

17   their opinions.  In deciding how much weight to give to opinion

18   testimony, you should consider the opinion witness's

19   qualifications and how the witness reached his or her

20   conclusions.  Also consider the other factors discussed in

21   these instructions for weighing the credibility of witnesses.

22   Remember that you alone decide how much of a witnesses's

23   testimony to believe and how much weight you believe it

24   deserves.

25          Another point about the witnesses, sometimes jurors

 1    wonder if the number of witnesses who testified makes any

 2    difference.  Do not make any decisions based only on the number

 3    of witnesses who testified.  What is important is how

 4    believable the witnesses were and how much weight you think

 5    their testimony deserves.  Concentrate on that, not on the

 6    evidence.

 7              During the trial, you have seen or heard summary

 8    evidence in the form of charts, calculations, testimony or

 9    similar material.  The summary was admitted into evidence in

10    addition to the material -- material it summarizes because it

11    may assist you in understanding the evidence that has been

12    presented, but the summary itself should not -- is not evidence

13    of the material it summarizes, and it is only as valid and

14    reliable as the underlying material it summarizes.

15              On a related point, and I'm departing from the

16    materials in front of you right now.  I am going to permit the

17    attorneys in closing arguments to use what we would refer to as

18    demonstrative exhibits.  They're summary materials that they

19    have presented, and it's not admitted into evidence.  What I

20    want you to clearly understand is that information in that

21    demonstrative materials is to be evaluated by you viewed

22    against the evidence.  It's the ultimate -- ultimately the

23    evidence admitted during the course of the trial that is the

24    governing information, not necessarily the lawyers' summary of

25    that material.  So please remember that in considering the

1  demonstrative evidence that they may use in closing arguments.

2       The law does not require any party to call as

3  witnesses all persons who may have been present at any time or

4  place involved in the case or who may appear to have some

5  knowledge of the matters in issue at the trial, nor does the

6  law require any party to produce as exhibits all papers and

7  things mentioned in the evidence in the case.

8       It has been brought out that an attorney has talked

9  with a witness.  There's nothing wrong with an attorney or

10 agent talking with a witness for the purpose of learning what

11 the witness knows about the case and what testimony the witness

12 will give.

13      There's one more general subject that I'd like to

14 talk to you about before I begin explaining the elements of the

15 crime charged.  The lawyers for both sides have objected to

16 some things they were said or done during the trial.  Do not

17 hold that against either side.  The lawyers have a duty to

18 object whenever they think that something is not permitted by

19 the Rules of Evidence.  Those rules are designed to make sure

20 that both sides receive a fair trial.

21      Do not interpret my rulings on their objections as

22 any indication of how I think the case should be decided.  My

23 rulings were based on the Rules of Evidence, not on how I feel

24 about the case.  Remember that your decision must be based only

25 on the evidence that you saw and heard here in court.

1            That concludes the part of my instructions explaining

2    your duties and the general rules that apply in every criminal

3    case.   In a moment, I will explain the elements of the crime

4    charged, the crime that the defendant is accused of committing.

5            Before I do that, I want to emphasize that the

6    defendant is only on trial for the particular crime charged in

7    the indictment.   Your job is limited to deciding whether the

8    Government has proved the crime charged.   Also keep in mind

9    that whatever -- whether anyone else should be prosecuted and

10   convicted of the crime charged is not a proper matter for you

11   to consider.   The possible guilt of others is no defense to a

12   criminal charge.   Your job is to decide if the Government has

13   proved the defendant guilty.   Do not let the possible guilt of

14   others influence you in any other -- in anyway.

15           The indictment charges that from approximately April

16   of 2009 and continuing through July 18 of 2018, James D.

17   Pieron, Jr. willfully attempted to evade and defeat the payment

18   of the income taxes due and owing by him to the United States

19   for the calendars years 2008 and 2009, in violation of federal

20   law.

21           For you to find the defendant guilty of attempting to

22   evade and defeat the payment of income taxes for the years 2008

23   and 2009.   The Government must prove each of the following

24   elements beyond a reasonable doubt:

25           First, that income tax was due from defendant.

1          Second, the defendant committed an affirmative act

2     constituting an evasion or attempt to evade or defeat his tax

3     obligation.

4          Third, in evading or attempting to evade or defeat

5     his tax obligation, the defendant acted willfully.

6          Any conduct that is likely to have a misleading or

7     concealing effect, such as hiding assets, covering up sources

8     of income, or handling ones affairs using means designed to

9     avoid creating the usual type of records of one's financial

10    transactions and any conduct the likely effect of which would

11    be to mislead or conceal can constitute an affirmative act.  A

12    lawful act can serve as an affirmative act if it is done with

13    the intent to evade income tax.

14         And act or failure to act is willful for purposes of

15    tax evasion if it is a voluntary intentional violation of a

16    known legal duty rather than the result of an accident, mistake

17    or negligence.

18         If you're convinced that the Government has proved

19    all of the elements, say so by returning a guilty verdict.  If

20    you have a reasonable doubt about any one of these elements,

21    then you must find the defendant not guilty.

22         During the trial, you've heard references to a law

23    that has been referred to or called the Taxpayer Bill of

24    Rights.  That's not the only law that governs the conduct of

25    the Internal Revenue Service and it's personnel.  IRS personnel

must also comply with laws governing the conduct of criminal
investigations, including laws governing the secrecy of
criminal investigations, ethical rules regarding contact with
people who are represented by a lawyer, and also the
constitutional right of a defendant to be protected from
compelled self-incrimination.

I say this to you not because you need to understand
and apply the different standards in arriving at a verdict in
this case, but because it is fair that you know that different
standards apply to the conduct of the Internal Revenue Service
in different contexts.

The good faith of the defendant, Mr. Pieron, is a
defense to the tax charge in Count One of the indictment
because good faith is simply inconsistent with willfully
attempting to evade or defeat any tax.  While the term "good
faith" has no precise definition, it means, among other things,
an honest belief, a lack of malice, and the intent to perform
all lawful obligations.

In assessing the defendant's good faith, you may
consider his reliance on an accountant or professional tax
advisor if you find that he has made a full disclosures of the
facts to the accountant for advisor.

Next, I want to explain something about proving the
defendant's state of mind.  Ordinarily there is no way that a
defendant's state of mind can be proved directly because no one

1  can read another person's mind and tell what that person is

2  thinking, but a defendant's state of mind can be proved

3  indirectly from the surrounding circumstances.  This includes

4  things like what the defendant said, what the defendant did,

5  how the defendant acted, and any other facts or circumstances

6  in evidence that show what was in a defendant's mind.

7       You may also consider the natural and probable

8  results of any acts that the defendant knowingly did or did not

9  do and whether it is reasonable to conclude that the defendant

10  intended those results.  This, of course, is all for you to

11  decide.

12       Shortly, we will hear the closing arguments of the

13  attorneys.  Please pay attention to the arguments, but remember

14  that the closing arguments are not evidence.  They are only

15  intended to assist you in understanding the evidence and the

16  theory of each party.  You must base your decision only on the

17  evidence.

18       Let me finish up by repeating something that I said

19  to you earlier.  Nothing that I have said or done during the

20  trial was meant to influence your decision in anyway.  You

21  decide for yourselves if the Government has proved the

22  defendant guilty beyond a reasonable doubt.

23       We will complete the balance of the instructions

24  after the closing arguments from counsel.

25       Any additions or corrections, Government?

1          MS. PARKER:  Apparently, yes.

2          THE COURT:  Sorry.

3          MS. PARKER:  Yes.

4          MR. DEPORRE:  Just one brief one.  Regarding the

5    instruction on the number of witnesses, the last sentence I

6    think was misspoke, and it should not concentrate on the -- how

7    important -- I think you misstated, when you said concentrate

8    on that not the "evidence," and it should be not the "numbers."

9          THE COURT:  Indeed.

10          Any other additions or corrections?

11          MR. MINNS:  No, Your Honor.

12          MS. PARKER:  Could we have one quick sidebar point of

13    clarification?

14          THE COURT:  Yes.

15          (Sidebar conference as follows:)

16          MS. PARKER:  I may have been focusing on something

17    else, did you set a time parameter for closings?

18          THE COURT:  I have not.

19          MS. PARKER:  Okay.  I just didn't want to be --

20          THE COURT:  I'm anticipating they wouldn't exceed an

21    hour.

22          MR. MINNS:  I'd be surprised if I did.

23          MS. PARKER:  I don't think mine will either, I just

24    wanted to --

25          THE COURT:  What if I tell you when you get to 50

1    minutes.

2              MR. MINNS:  If that's the Court's ruling.

3              THE COURT:  Okay.  We'll do that.

4              MR. MINNS:  So we will have a 10 minute warning?

5              THE COURT:  Yeah.

6              MS. PARKER:  And then I just didn't hear right, did

7    you say that the Bill of Rights exhibit is in?

8              THE COURT:  Is in.

9              MS. PARKER:  Okay.  Just wanted to --

10             THE COURT:  Okay.  Thanks.

11             (Sidebar conference concluded.)

12             THE COURT:  Okay.  Entertain closing statement on

13   behalf of the Government.

14             MS. PARKER:  Thank you, Your Honor.  First let me

15   begin by thanking you for your attendance and also your

16   attention throughout this trial.  I know that tax cases are not

17   always the most juicy cases, but somebody has to do them, and I

18   appreciate your undertaking in that regard.

19             As the Court has already indicated to you,

20   deliberations are soon to begin in this case, and you've heard

21   most of the Court's instructions on the law that you must use

22   in deciding this case.  I'm not going to reread the law to you.

23   You've got it in front of you.  The Court's given it to you.  I

24   would only take on the risk of not reading it correctly, so I'm

25   not going to do that, but you must use that law that the Court

 1  has given you and will give you in deciding this case.

 2          I ask you to keep in mind the instructions that says

 3  that the statements of counsel are not evidence.  This is true

 4  for everything I say, for anything that was said in opening

 5  statements, anything that's about to be said in closing

 6  statements, and things that were said in -- during the course

 7  of the trial.

 8          The statements of counsel, no matter which attorney,

 9  simply are not evidence.  That includes, as the Court's already

10  mentioned, various charts or things like that that might be

11  used, and I anticipate Mr. Minns is going to be using that

12  timeline chart he showed you in opening during his closing

13  argument.

14          But if there's anything on that chart, and I submit

15  that there are things on that chart that are not part of the

16  evidence, it's your job to disregard them in order to comply

17  with the Court's instructions, because that chart's not

18  evidence and Mr. Minns' statements about it or my statements

19  about it are not evidence.

20          So let's get down to what is the evidence.  The

21  evidence shows that the defendant, James D. Pieron, had income

22  in 2008 and 2009, and that he evading paying the federal income

23  tax on that income for years.  It took him literally until 2018

24  to pay what he owed for 2008 and 2009.  And it took Mr. Pieron

25  leaving -- learning, excuse me, that he was about to be charged

1   criminally for a tax offense to get him to pay that tax, those

2   taxes he owed for 2008 and 2009.

3          And he apparently thinks he can write a couple of

4   checks and make the charge go away, but what those checks show

5   you, ladies and gentlemen, those two big checks he wrote in

6   2018, shows that he had the money, he could have paid his taxes

7   all along, but he chose not to because he was evading the

8   payment until he thought paying might get him out of where he

9   is today.

10          There really is no dispute over a few certain facts

11   in this case.  It is undisputed that Mr. Pieron lived in and

12   ran big dollar businesses in Switzerland for several years

13   before 2009.  He handled huge sums of money, and he was the

14   sole owner of multiple businesses.  Sometime in 2009, it's not

15   clearly established when, he decides to come back to the United

16   States and live in Michigan.

17          And he sends various wire transfers of money to move

18   his money from his various European bank accounts to the United

19   States.  Almost all the money goes into his business accounts,

20   not his personal accounts, but he has control over both, both

21   his business accounts and his personal accounts.

22          Mr. Pieron can use those business accounts to buy

23   luxury items for himself.  Two, count them, two, Mercedes Benz

24   SUVs, each costing over $100,000.  The company he owns buys

25   those cars, paid in full, but he gets to drive them.

1          Mr. Pieron makes a decision to use money that he

2     could have used to pay his federal income taxes and instead

3     loans -- and I put that in quotes -- money to his companies and

4     has his companies buy things for him.

5          Exhibit 134, you'll look at that.  That shows some of

6     the money that is going between the accounts, a $100,000 wire

7     transfer loan to Komplique.  He loans the money to the company,

8     the company buys him a car.

9          Now, I submit to you, ladies and gentlemen, that

10    purchase of that car was a choice he made to buy the car rather

11    than to pay taxes.  It's not a necessary expense, look around

12    you.  There are millions of us Michiganders managing to live

13    and do business without $100,000 plus Mercedes Benz SUV, and we

14    manage to survive, manage to thrive.  Most of us go our whole

15    lives without even riding in a Mercedes Benz car much less have

16    the use of one provided to us by our company that we own.

17         Oh, but when Mr. Pieron gives the IRS a list of his

18    assets in 2012, and in 2014, Exhibits 45 and 47, he does not

19    list any Mercedes Benz.  Of course not.  The Mercedes Benz is

20    not titled in his name.  The 2009 one which he owned when he

21    filled out that first form, it's entitled to Komplique, and

22    when he fills out the second form, he has a 2013 Mercedes Benz,

23    but that one's entitled to Kresent, another company.  I believe

24    it said on that return he owned 99.995 or something percent of

25    that business.

1          Now, ladies and gentlemen, that shows you his tax

2    sophistication.  He structured that transaction that way.  He

3    loaned the money to the company, and has the company buy him

4    the cars.  He knows exactly what he's doing.  Think about it.

5    Could have not loaned the money to the company, bought the car,

6    it would have cost the same, but, no.  He puts the money into

7    the company, whichever one we're talking about, and has the

8    company buy the car, so the asset isn't his.  So that when he

9    fills out a form, he says, well, I don't have to list that.

10   All I have to list is the other car, because those things are

11   titled to the company.

12         From that, ladies and gentlemen, you see much of the

13   defendant's willfulness, his lack of good faith dealing.

14   Because he's making the decision to divert resources that he

15   could use to pay his taxes to instead buying a car and titling

16   it to his company.

17         And, again, he owns those companies.  He owns

18   100 percent of Komplique, and all but the minutest fraction of

19   Kresent.  And as you've heard, Komplique winds up going out of

20   business.  It loses money under him, Mr. Pieron's ownership and

21   management, but it still has money to spend on Mr. Pieron,

22   buying him things like -- not just that car, but other things

23   you saw.  You saw two checks going to piano company, Central

24   Michigan Piano.  Two pianos?  Or what else?  I mean, these were

25   thousands of dollars that go to Central Michigan Piano for

```
 1   Komplique.  Komplique can't play a piano, but it bought one,
 2   with the money that Mr. Pieron loans to the company and gets
 3   the company to buy things for him, because he's in charge.  He
 4   manages it.  He owns it.
 5            But Mr. Pieron tells Komplique [sic] that the IRS
 6   [sic] is not worth much.  He doesn't tell the IRS it would be
 7   worth a lot more if it didn't spend money on Mercedes Benzes
 8   and presumably gas insurance but all these other things, and
 9   you see -- we showed you several checks for different
10   expenditures.  But Mr. Pieron does tell the IRS he owns a
11   Volkswagen, it's VW, on the form.
12            Now, remember, however, how he got the money for that
13   Volkswagen.  That came out of Komplique, too.  He used -- we
14   had Mr. Parker on the stand.  He took money out of one
15   Komplique account, the 39,000 and whatever to -- in cash and
16   used that to buy a cashier's check, and he used that cashier's
17   check, which is if you look at Exhibits 174 and 133, he uses
18   the cashier's check to pay off that car, because he can.
19            Komplique and their other bank accounts are just his
20   additional bank accounts, but he knows his name's not on them,
21   so it makes it hard for the IRS to go after those assets.  And
22   he gets a car paid in full.  Notice that Mr. Pieron never
23   finances anything.  All of his stuff is paid in full.  Must be
24   nice, but you can do that if you've got all this money and
25   you're not paying taxes on it.  You can do that.  Why bother to
```

1    take out a loan to buy a car, if you can just shuffle the money

2    through the bank account and magically it comes out as your own

3    car free and clear.

4           Now, Mr. Pieron wants you to think perhaps that he's

5    doing business running the technical side of things, and he

6    doesn't have time to figure out his tax obligations.  Well, the

7    way he structures these transactions tell you he's figured it

8    out.  He's figured it out to a T.  He knows what he's doing,

9    and what he's doing is making sure he's not paying year after

10   year after year what he owes to the IRS, particularly for 2008

11   and 2009.  His manipulation of his affairs tells you he does

12   know what he's doing and what he's doing is evading taxes.

13   He's hiding his money in his various businesses and, again,

14   arranging for those businesses to buy things for him.

15          There are others exhibits.  He loans, Mr. Pieron that

16   is, loans IB Technical, one of his businesses, $750,000, which

17   is Exhibit 129.  IB Tech is a company that supposedly develops

18   software.  So if you look at Exhibit 104, why does a software

19   company pay $18,000 to a piano company?  Why?  Because

20   Mr. Pieron has it figured out, how to get these things done,

21   get what he wants, and put it off on a technical -- on his

22   companies.

23          That's not the only check to the piano company.  As I

24   said before, there are thousands of dollars -- Exhibit 132,

25   Komplique also pays $20,000 to that same piano company.  All

1   written off business expenses.  But the taxes that Mr. Pieron

2   owes for 2008 and 2009, he can wait to pay those.

3          Take a look at Exhibit 121C, and when you get into

4   the jury room, you'll have a chance to look at these exhibits.

5   They'll be sent in with you.  That's a bank statement for

6   Komplique.  Look at the February and March entries.  See

7   payments to Flickinger's -- I'm going to destroy that, I think

8   it's F-L-I-C-K-I-N-G-E-R Wines.  $16,000 in February or March

9   for wines.  It's a shell game.  Takes money into his accounts,

10  buys things -- these business account, buys things for himself.

11  And doesn't pay his taxes.

12         He loans IB Tech large sums of money.  He takes out

13  $350,000.  If you look at Exhibit 91, that's a loan to

14  shareholder.  He takes a loan payment out, but what does he do?

15  He shifts it over to Komplique.  He's hiding his money, just

16  moving it from one account to the other, but he owns both.

17  He's a sole owner of both.

18         But he avoids keeping money like that in his personal

19  account where the IRS collection folks might find it.  So when

20  he fills out those forms listing his assets to the IRS, asking

21  for an installment agreement, he says I got 108 bucks in my

22  account.  My business isn't worth anything, but I've loaned it

23  gobs and gobs of money I didn't have to loan it, but it's

24  there, so you can't get it.

25         Check out the wire transfer in Exhibit 134.  It's at

page 10832.  This is a wire transfer from Komplique to
Stoneleigh-Burnham School for the benefit of Manuela Uribe,
$21,000.  Ask yourself, doesn't that look like he's paying the
tuition for somebody at a school, out of Komplique funds, not
his own funds.  And he can do that because he's in charge of
Komplique.  He can have wire transfers sent because he's got
access and control over the account.  Put your money in there,
send it wherever you want, whatever luxury items you might
want.  That's all fine and good, but you're still not paying
your taxes.

Another thing to consider, Peregrine Financial Group.
He opens business accounts there.  As you recall, approximately
10 different accounts, using his US passport, but when it comes
to his personal account, does things a little differently.
Take a look at Exhibit 115.  When he fills out that online
application, and he does it in a different time frame, he does
it online.  The IP address says he's in Zurich, Switzerland.
The address he gives for himself, I can't pronouns it right
now, but it's a place in Switzerland.  He says he's not a US
citizen, and there's no Social Security number.  Then he
completes the W-8BEN.  It says right on the very top, just
right near the top, "not to be completed by a US citizen."  And
then down at the bottom, above the jurat, there's another part
that says it's not for US citizens, people who are not subject
to US tax withholdings.

1           And then there's the jurat.  That's the part that we

2    all sign when we sign our tax returns.  Where it say we're

3    signing subject to the penalties of perjury.  It's right there.

4    He signs it.  Now, ladies and gentlemen, this is, according to

5    the testimony that was elicited regarding the defendant by

6    defense counsel, he's a technical wizard.  He's a really smart

7    guy and, in fact, he shows he's smart in this case.

8           This form is not hard to understand.  It's not a 400

9    page document.  It's less than a full page.  It's not hard to

10   read.  It's not hard to understand, but it's not something

11   that's unimportant.  It is important.  Anytime you sign

12   something subject to the penalties of perjury, you know it's

13   important.  How often have you signed that?  When you filled

14   your tax returns out?  When you made your loan applications?

15   Maybe some other instances, but when you know it's right there

16   saying, stop, wait, this is important, you're going to be bound

17   by this statement.  That's why each witness who came into this

18   courtroom had to stop, raise their right hand and take an oath

19   to tell the truth, because it's important.

20           And what is the consequence of Mr. Pieron's lie on

21   his W-8BEN form?  The consequence is that Peregrine Financial

22   Group will not report any earnings on his account to the IRS,

23   so the IRS never has a way to know that he has that money, and

24   if you look at it, he put $50,000 in there.  He put $50,000

25   into that account and left it there for months.  And there -- a

1  big deal was made out of the fact that he earned 3 cents of

2  interest.

3  　　　　　Well, that's not the point.  He's got $50,000 hidden

4  there and there's no way for the IRS to know it's there,

5  because he's covered it up.  He's filled out a very simple form

6  online and a simple form called the W-8BEN and said, no, I'm

7  not a US citizen.  I'm not subject to your taxation.  I'm going

8  to rely on the treaty laws of the place where I live, where I'm

9  a citizen, Switzerland.

10  　　　　　And remember he took that money back out of there,

11  that $50,000.  He takes it out in April.  Now, isn't that

12  somewhat significant.  April is the month when our taxes are

13  due, and everybody knows you can't turn on the TV without

14  seeing some sort of tax service commercial or something like

15  that.  When he takes that money out, does he use it to pay his

16  taxes that are already years overdue for 2008, 2009?  No.  We

17  know he doesn't it.  We don't know what he does do, but we know

18  for sure he does not do that.  It's just another incident of

19  him moving the money around and spending it but keeping it out

20  of the reach of the IRS.

21  　　　　　Let's talk a little bit about spending money, too.

22  Remember he entered into that installment agreement?  In 2012

23  he sends in saying this is all I can afford to pay, 1500 bucks

24  a month.  Well, you saw the transcript.  I know it was boring

25  yesterday, but we went through it with Charles Lake.  He made a

1    grand total of six $1,500 payments on that account under that

2    agreement.   Everything else that went on to the 2008 tax return

3    was refunds that were taken away and applied to that -- not at

4    his direction, by automatic operation of IRS procedures, but he

5    makes six $1,500 payments of a period of about six months, in

6    2012.

7         But while protesting that that's the most he can pay,

8    he goes out and buys himself that big 1,000 CC Kawasaki

9    motorcycle.   He pays $18,901 and change and pays to have that

10   bike souped up, repainted, gets this fancy customized bike.   At

11   the same time between -- when he says I can't pay, and he

12   finally starts making that big $1,500 payment, he goes out and

13   buys the bike, the motorcycle.

14        And, again, no lien on it.   It's free and clear.   Of

15   course, it doesn't last long, because he crashes it, but that's

16   not the point.   The point is that Mr. Pieron, again, decides,

17   rather than paying taxes that he owes, and has owed for years,

18   he uses a substantial sum of money to buy himself another

19   luxury item, a motorcycle.

20        All of the things in evidence just discussed, ladies

21   and gentlemen, show you what you need to know.   I'm not going

22   to -- I'm not summarizing everything that was presented, but

23   those are some of the highlights.   But what you need to know is

24   that defendant owed taxes, and that he willfully failed to pay

25   them.

1        He admitted that he owed taxes when he filed his 2008

2   and 2009 tax returns.  He admitted he owed taxes when he signed

3   the information statement saying he owed $444,888 in 2012.  He

4   admitted he owed taxes when he offered to pay $1,500 a month to

5   make that -- pay off that tax arrearage, and he admitted he

6   owed taxes when he offered to pay $30,000 to end his tax

7   problem accumulated for several years.

8        And he admitted he owed taxes when in March of 2018,

9   a year ago, he paid over $600,000 when he knew he was about to

10  be charged in a criminal case.  How did he know that?  Well,

11  people he dealt with at AHP had been interviewed.  He, himself,

12  had sat down with federal agents and done handwriting exemplars

13  so they could be sure he's the one signing these tax returns

14  where he admits he owes money.  And he knew it when he paid the

15  other big check-in October of 2018 for over $2,000 -- $200,000

16  excuse me, which was after he had been charged.

17        Now, the defense will want to make much of the fact

18  that he filed a 1040X, and that's an amended return in 2014,

19  which, if correct, would substantially reduce his taxes.  But

20  he files several returns.  Signing each return attesting to

21  their truthfulness, under the penalty of perjury.  He gives

22  different information to different accountants over different

23  time frames or different preparers and gets different results.

24        And note, he's still trying to get out of it, paying

25  his taxes, by filing something saying doubt as to liability.

1   Pieron says, I'm not sure if I owe, I have doubts, but I'll

2   give you $30,000 just to make sure.  But, ladies and gentlemen,

3   what you see in this case is he only says that because it's to

4   his benefit.  He hopes he can get the IRS to let him off the

5   hook by paying $30,000, and he's willing to spend that much to

6   make them go away.

7           But even that is an act of evasion.  He knows he

8   owes.  That is why, when the heat's on, and he knows he's going

9   to be charged, now he's ready to pay.  He finally pays up in

10  2018 because he does know, he doesn't have a doubt, he knows,

11  you don't pay those large sums of money if you don't think

12  you're going to owe them.  And he pays them, hoping and

13  praying, that paying will get him out of the criminal case.

14          But that's not how it works, ladies and gentlemen,

15  and you should not construe those payments as anything other

16  than evidence that the defendant knows he owed and wasn't going

17  to pay until he absolutely had to.  He spent nine years

18  evading, but that's -- you don't get out of a criminal charge

19  by paying back.  If you stole money, you don't get out of that

20  charge by giving the money back, and you don't get out of tax

21  evasion by giving -- paying up when you finally have that as

22  your last hope for avoiding being in trouble.

23          A lot of people would not pay taxes if you could get

24  out of paying them until you're charged, get charged and then

25  your problem with the criminal law goes away.  So don't let the

1  fact that he paid that money give you any reasons to question

2  his guilt on the charge before you.

3          Don't be fooled.  That's not how things work.  Paying

4  taxes nine years after they are due is simply not a defense to

5  the years of evasion, and, in fact, it's evidence of the

6  evasion, because it shows he had the ability to pay.

7          Likewise, the Taxpayer Bill of Rights is not a

8  defense.  It's a distraction.  It's an attempt to divert you

9  over here.  Look.  Don't look at me.  Look at what the IRS did

10  or didn't do.  That's a distraction, a diversion.  Focus on

11  what the defendant did and the defendant didn't do.  You don't

12  have to find -- you're going to have a verdict form.  It's not

13  going to ask you a question about how things went under the

14  Taxpayer Bill of Rights.  It's going to ask you if you find the

15  defendant guilty of evasion, so don't be distracted and don't

16  be confused or fooled by that.

17          Trying to use the Taxpayer Bill of Rights as a

18  defense is like trying to tell -- or get out of a traffic

19  ticket for going 20 miles over the limit by saying, well,

20  somebody else was speeding too; doesn't work that way.

21          Rather, ladies and gentlemen, focus on the elements

22  that the judge has just read to you.  Those are the things that

23  have to be proven, and focus on the evidence that proves that

24  those elements have been proven beyond a reasonable doubt.  If

25  you take the law given by the Court, and look at the evidence

 1   that was presented, that's the exhibits, that's the testimony

 2   from the witness stand.  Again, not testimony or statements by

 3   counsel, because what counsel say is not testimony, it's not

 4   evidence.  Ladies and gentlemen, you'll have no problem finding

 5   that defendant is guilty of evading the taxes he owed and he

 6   admitted he owed in 2008 and 2009.

 7            THE COURT:  Thank you.  We're going to take a brief

 8   recess so that you can clear your mind.  We will return after

 9   that to closing arguments on behalf of the defendant.

10            I would remind you, please, there should be no

11   discussion concerning the case until it's actually submitted to

12   you with the completion of closing statements so, please, no

13   discussion of the case during the recess.  Please rise for the

14   jury.

15            (At 11:55 a.m., court recessed.)

16            THE COURT:  About 10 minutes and we will return for

17   closing arguments from defense.

18            (At 11:56 a.m., court recessed.)

19            (At 12:11, p.m., court resumed.)

20            THE COURT:  Jury, please.

21            (At 12:12 p.m., jury arrives.)

22            THE COURT:  Please be seated.  Mr. Minns, closing

23   statement on behalf of the defendant.

24            MR. MINNS:  May it please the Court, ladies and

25   gentlemen of the jury, I'm going to start with the end, go to

1    the beginning, and then go through my time chart again.  The

2    very end, April 2009 continuing until July 18th, 2018, in other

3    words, the Government is saying he's still committing a crime

4    on July of 2018.

5              And Ms. Parker said that every day for nine years

6    that he did not pay a tax, he was committing a crime.  Every

7    day for nine years when he overwithheld on every single

8    paycheck from 2009, 2000 -- no, from -- starting in 2010, '11,

9    '12, '13, '14, '15, '16, '17, '18, you see all the 17,000,

10   18,000, long chart.  I won't be using my chart, I'll be using

11   the Government transcript which we don't completely agree with

12   but it's in evidence and it'll show massive amounts of payment

13   over the nine years.

14             Every time he overpaid, that was a trick, too.  Every

15   time he got a refund of 17,000, put to the 2008, 2009 returns,

16   that was a crime.  And when he paid off everything they said he

17   owed, even though he owed nothing, that was a crime.  So when

18   he pays, he's committing a crime; when he doesn't pay, he's

19   committing a crime.  When he negotiates with them, begging them

20   to sit down at the table with him, he committed a crime.

21             When he decides to make voluntary payments in

22   addition to the excess that he's paying every payroll, which he

23   knows he is, each year they're saying you don't get this refund

24   back, you don't get that, they call that a crime.  And they say

25   he violated the agreement.  That's just stunning because there

1 never was an agreement.  He could never get their attention.

2 He couldn't get their attention there CPA's.  He couldn't get

3 their attention through lawyers, anything.  He couldn't get

4 their attention, so there's no agreement.  These are voluntary

5 payments.  Each voluntary payment, the Government says, aha, he

6 paid, that's means he's a criminal; aha, he paid again, that

7 means he's a criminal; aha, he sold his company and paid us off

8 completely, that means he's a criminal.

9          There is nothing he could have done, nothing he could

10 have done.  Everything that he does that is what a normal

11 honest taxpayer would do, they call it a crime.  Everything.

12 So if he pays, we're going to indict him.  If he doesn't pay,

13 we're going to indict him, and we're going to tell you that he

14 is continuing to break the law on July18th, 2018.  We'll talk

15 about that in a minute.

16          You know, they have the expression make a federal

17 case of it.  That's the worst thing you can do to anybody's

18 life.  That's why we say, don't make a federal case of it.  God

19 knows nobody wants someone to make a federal case of anything

20 in our lives.

21          Now my recollection, and I'll go through the chart,

22 too, in a minute, when I started this trial, when we started

23 together, putting tax returns on the board that my client had

24 signed, and I'll go through them in a minute.  In trial I asked

25 Ms. Dale VanConett if the named partner signature on the 1040,

```
 1   which wiped out all the taxes meant he believed it was a good
 2   return, and if my client, Jim Pieron's, signature on it meant
 3   he accepted and believed it was a good return, and she said
 4   yes.
 5           So I found the handwriting expert's testimony to be
 6   very interesting.  I enjoyed looking at it.  She's both a
 7   degree in biology and a degree in art.  It was very unusual
 8   combination, very intelligent and interesting person, and she
 9   agreed with us.  We've never denied that.  In my opening, I
10   said that's his signature on there, and she agreed with us, and
11   we agree with her.
12           There's something else that she said which agrees
13   with another witness, and that is that this is the hasted
14   signature of a business executive.  I never would have picked
15   up on this.  A business person writes quickly when they're
16   moving through mass amounts of paperwork and not reading them.
17   And our -- our formal office manager got up on the stand, and
18   she was very scared, and they -- they kind of made fun of her
19   for being afraid, but she truthfully said that I was his office
20   manager, I got promoted up until I was running things, and
21   James would just come in and sign these stacks of paper without
22   reading them.
23           So all of that goes to talk about this one piece of
24   paper.  There's all of the evidence that Peregrine gave the
25   Government, which they hid secretly until Friday night, and the
```

1    first time anybody got to look at it --

2             MS. PARKER:  Objection, Your Honor.  This is way

3    beyond the scope of the evidence.

4             THE COURT:  Sustained.  With respect to that

5    representation.

6             MR. MINNS:  We received the package, that's in

7    evidence, Your Honor, Mr. Sasse asked the witness, and they

8    were put in in two separate -- I'm not going to say the word

9    the Court's stricken, but I am --

10            THE COURT:  The delivery date is not --

11            MR. MINNS:  Pardon?

12            THE COURT:  The delivery date is not relevant.

13            MR. MINNS:  All right.  When the witness received --

14   the Government went through their package and handed the

15   witness these pages, and this is all the witness had to testify

16   from.  The company didn't exist.  It had been closed down a

17   long time.  It was not even at that record place, and this is

18   what they gave him.  And on one of the exhibits, it said page 1

19   of 4, 2 of 4, 3 of 4, and there was no 4 of 4.

20            Well, it turns out that if you spend a weekend

21   looking through the actual exhibits that the company had turned

22   over, page 4 of 4 is the United States of America passport of

23   Jim Pieron.  And if you remember Mr. Sasse when he explained on

24   cross-examination question after question after question, there

25   were -- I might get the numbers wrong, 10 or 11 accounts, every

```
 1   single account had his correct Social Security number in it,
 2   his correct name, his citizenship, United States of America,
 3   and in case there was any doubt what he was conveying to these
 4   people, it said -- it had his United States of America
 5   passport.  So if you're trying to hide your citizenship, you
 6   don't hand somebody your United States of America passport.
 7              So what the Government did, out of context, they took
 8   one erroneous form, which should not -- it isn't for an
 9   individual, it's for a foreign corporation and part of whoever
10   filled that out did it correctly.  It was a Swiss company.
11   They took that out of context.  There's no possibility that was
12   a mistake.
13              What it was is an effort to destroy the reputation of
14   and American veteran and to say that he is not proud of his
15   American citizenship, and it is an absolute unconditional lie
16   proven uncontestably, when Mr. Sasse questioned that witness
17   and showed the real documents and went through all of these.
18              It's an outrage, and the mere fact that the
19   Government would try to trick us all with an absolute
20   unconditional lie to slander a veteran, that is enormous
21   reasonable doubt at the very beginning, with one of the longest
22   witnesses who was on this stand.  We all saw it.  We all know
23   it.  It was wrong.
24              They feel like they have to prove this case through
25   dishonest representations to you, and they feel like they can
```

 1   snow you guys with this, and God help you, please examine that

 2   carefully.   Please remember not -- remember it all, all the

 3   testimony.   Remember the testimony when the Government was

 4   asking him, is it in here, any evidence of his citizenship, and

 5   when Mr. Sasse got back up there and proved beyond any doubt,

 6   and we're not required to prove anything, that he had told them

 7   11 out of 12 times, and even in that one package he gave them

 8   his passport.   There's no stronger way to say I am an American

 9   citizen, and I'm proud of it, than to show someone your

10   passport.

11           Let me go through my time line now.   Ron, could you

12   help me or maybe I can do it myself.

13           May it please the Court, ladies and gentlemen --

14           THE COURT:   I would just interrupt long enough to say

15   that if counsel wishes to move so that they're able to observe

16   the gentleman while he's using the exhibit, you may.

17           MS. PARKER:   Thank you, Your Honor.

18           THE COURT:   You may continue.

19           MR. MINNS:   We moved it to this location at the

20   request of the Government.

21           THE COURT:   Yes.

22           MR. MINNS:   Is this working, yes.   Thank you.

23           Okay.   Numerous witnesses testified to him residing

24   in Switzerland.   Government Exhibit 7 proves that also, and it

25   shows that he filed tax returns in Switzerland when he lived in

1  Switzerland, and it shows the taxes under the supervision of an

2  expert.  He moved back one year, there's testimony to that, and

3  in the one year he moved back, he filed and paid United States

4  taxes.

5            Now, we had the testimony of his stepfather proving

6  that he was concerned because most people don't know, and most

7  people living abroad don't know, he was concerned that he had a

8  duty to file US taxes, and his stepfather, who prepares tax

9  returns for his other children, too, volunteered to help him.

10 He gave him a power of attorney to ask the Government for forms

11 and to check and get everything that he could get.

12           And his stepdad is no -- no small guy in the brain

13 department.  He knows more taxes than probably most of the

14 people in this courtroom.  He was a banking examiner.  He

15 prepared his family returns and his children's returns, and he

16 prepared the returns up to 2007.  And this very wise man said

17 to his stepson, Jim, this next couple of years is over my head,

18 so you've got to find someone else to do it.

19           And God help him, the person he found was The Tax

20 Defenders.  The Tax Defenders is an organization that's changed

21 its name a few times and doesn't exist anymore and it has 15

22 full-time salesmen in their national campaign to tell people

23 they can do anything magically with taxes, and a slick salesman

24 gets him, gets his money, and then he's turned over to a very

25 sweet woman who undoubtedly has the ability to handle a

1   noncomplicated 1040.

2         She has no corporate experience, no international tax

3   experience.  Even today, or a couple days ago in our courtroom,

4   she was the only one -- everyone on the jury today, and

5   everybody in the courtroom today, knows more about FBARs than

6   this so-called expert on these materials.  She testified she

7   didn't know what an FBAR was.

8         Now, I'm not blaming her.  I think this organization

9   probably took advantage of her.  One tax preparer for this

10  national organization.  She has no credentials.  She has no

11  education in tax, she has no CPA, no enrolled agent, no

12  continuing education, and they give it all to her, and that's

13  in evidence.

14        After meeting the slick salesperson, we see the

15  conversation that there's a point in time, even before the

16  return was filed, that Jim's not certain about her expertise,

17  and he is asking, and you heard testimony from his former

18  comptroller, that he sent him to what he regarded as a super

19  fine, honest, competent CPA firm with one of the named partners

20  was Mr. Pavlik.

21        And Mr. Pavlik is working with this, and then they

22  tell you, the woman -- the CPA who's the floor manager, highly

23  qualified who the Government put on the witnesses stand, tells

24  you this was complicated.  This was extremely complicated.

25  This took enormous amount of time and work to get together.

1          She testified that Mr. Pavlik worked together with

2     Jim to come up with all the recordkeeping, and it was still

3     extremely difficult.  It was bad recordkeeping before, and --

4     but we finally figured it out, and we figured it out and filed

5     an amended 1040X, which is in evidence, and the -- well, first

6     to fix things.

7          Now, the freeze code, you've heard the testimony on

8     that.  This froze him out, from all the civil process and

9     everything, and no one was ever told that it was on there, and

10    it's a secret.  They don't share it with the CPA firms or

11    anybody else.  It's a secret at the IRS table.  At this point

12    in time, they had decided they weren't going to give him any of

13    his rights, but they never told him.  They never told his CPA

14    firm.  They never told -- well, they kind of told Ms. Nathan.

15         If you remember, Ms. Nathan said that they told her,

16    don't talk to your client that's paying you, freeze them out,

17    and she cooperated by putting them in voicemail hell.  Whenever

18    he calls, he has angst.  He's really worried.  He wants to get

19    in compliance with the law.  She testified to all that, and

20    whenever he calls send him to voicemail.  No one is to return

21    his calls.  No one is to return his messages.  He is in

22    voicemail hell.  What a cruel and unkind thing for the

23    Government to secretly do behind Jim Pieron's back and his

24    family's back.

25         So he files for an installment agreement.  This is

 1   the right of his client, the right of all of us.  It's covered

 2   by the Taxpayer Bill of Rights, and he says we want an

 3   installment agreement.  If you remember the testimony of the

 4   witness, you don't have to prove you're indigent to ask for it,

 5   by the way.  You may want to save some liquidity.  You may want

 6   to have to -- have to have funds to keep your business running.

 7           The IRS has to say yes or no or here's something

 8   different.  They never answered.  They didn't just put the cart

 9   before the horse, they killed the horse.  So no response on

10   this installment agreement, and Government has said they had an

11   agreement.  They were begging for an agreement, but there was

12   no response for it at all.  They don't know what's going on.

13   They're in limbo.

14           And the Government says, well, the fact that he asked

15   for an installment -- and, let's face it, this is a bargaining

16   situation, which the Taxpayer Bill of Rights gives us.  If

17   we're trying to hold on to our capital, we will offer -- we

18   hope they'll accept it, but we'll offer a low amount, and they

19   will come back and disagree, and you will sit across from the

20   table with them, and this is what our laws provide for, and

21   they say no.  They say, in fact, the fact that he asks under

22   his Taxpayer Bill of Rights for the installment agreement,

23   that's an act of criminal conduct.  No response.  None.

24           March 21st, 2014 Mr. Pavlik files, with our client's

25   signature, we're not denying that's his signature, we're

1   shouting it out that that's his signature.  Our client signs

2   the return prepared by the CPA Kim Pavlik and no taxes are

3   owed.  There's no taxes owed.

4        As we sit here today, all the money that he paid

5   extra from 2010 into 2014 is probably due to be refunded.  So

6   no taxes are due.  Now, there is a -- there's no response from

7   the IRS at all of any kind, and remember the testimony of

8   Ms. VanConett.  Can we put that exhibit up, Ashley, please, the

9   chart of all the calls that she made to the Internal Revenue

10  Service.

11       If you look at the chart of all of the calls and all

12  the reasons, and this is in evidence, and this is -- what

13  exhibit number -- Exhibit 1007.  If we look at that, we see a

14  competent, honest tax professional beseeching the Government,

15  on behalf of her client, to give her answers, to follow the

16  law, and we see -- you could see her frustration from the

17  stand.

18       She wants to do her job.  She wants an answer.  She

19  wants a response.  The law says they must respond.  They don't

20  tell her he's been frozen out, we're not going to give him a

21  response, we don't care what his rights are.  And I -- I -- I

22  don't know -- I know it's more than a dozen; one, two, three,

23  four, five, six, seven, eight, nine, ten on that page, so I

24  know it's more than 10.  No calls returned.

25       The IRS says, well, the fact that she's trying to get

1   together with them proves that they're all criminals.  That's

2   just ridiculous.  It's ridiculous even beyond all reasonable

3   doubt.  It's ridiculous.  It's insulting to this esteemed tax

4   preparation firm.

5         And check the difference in the credentials.  They're

6   all good people.  I'm not denying the decency of both

7   preparers, but the Pavlik return is created by a masters, with

8   high degrees, with CPAs, with a huge firm.  They don't have 15

9   advertising commission salespeople.  They don't have commission

10  salespeople.  They're lined up with business, and our client

11  isn't a big case for them.  They care about all of their

12  clients, but the $9 million in 2007 is not a big account for

13  them.  She told you that truthfully.  It's the largest account

14  in the entire history of the other company.  That tells you

15  something about the competency.

16        And the Government says -- really what they're

17  saying, even -- even now, I don't know if they're going to

18  change their answer on their final closing, I won't have an

19  opportunity -- you'll have to listen to the evidence to see if

20  you agree with it, but even now we don't care whether he owes a

21  tax or not.  We don't care.  This is a tax case, and we don't

22  care whether he owes a tax.

23        We're not going to give him an audit.  We're not

24  going to let him go to civil appeals.  We're not going to sit

25  down at the table with him and his representatives.  We don't

```
 1   care, and that was five years ago.  Because we decided in 2011
 2   we're going to give him -- put him in the middle of a federal
 3   case.  We just don't care.  We don't care what the truth is.
 4   We don't care if he doesn't owe a tax.  We don't care.
 5              Mr. Pavlik is so honest about this --
 6              MS. PARKER:  Your Honor, I'm going to object to
 7   vouching.
 8              THE COURT:  We can't -- the statement about
 9   Mr. Pavlik is not in evidence.
10              MR. MINNS:  I'll change the word to transparency,
11   will that work, Your Honor?  Transparency.
12              Mr. Pavlik is so transparent about this, a month
13   after he doesn't get an answer, a month after his partners
14   asked 17 times -- or it looks like 11, a month after she's
15   called 11 times, they're still trying to get a response, and he
16   files a doubt as to liability, and he gives all his reasons in
17   black and white print attached to the doubt of liability, which
18   is in evidence, Defendant's Exhibit 1034.  Could we put that on
19   the stands -- up on the screen?
20              MS. ARNETT:  That's --
21              MR. MINNS:  Is that the wrong one?
22              MS. ARNETT:  Yes, it's the amended return.
23              MR. MINNS:  It's in the return?
24              MS. ARNETT:  The amended return.
25              MR. MINNS:  Okay.  He tells them we don't owe
```

1    anything.  Please read my reasons.  If you disagree with them,

2    please call me, contact me, I'm willing to sit with you at any

3    time and show you my beliefs, and this is what I do for a

4    living.  And what do they do?  They ignore him.  And what does

5    the Government do in this trial?  They say that's a sign of

6    guilt.  Why would anybody say, I don't think I owe anything.  I

7    will pay you $30,000 if you will give me my life back, but I

8    don't think I owe anything.  Doubt as to liability.  Even on

9    the checks you'll notice it says bond, because he didn't ever

10   believe he owed the money, still doesn't believe he owes the

11   money today.

12           The evidence in front of you is only that he does not

13   owe the money.  There is no evidence that anything is wrong

14   with that tax return.  The evidence is that the IRS has known

15   for five years he didn't owe a penny.  They owed him money.

16   The evidence -- can we put up on the screen the IRS transcript

17   of all the payments and refunds and things that they agree they

18   have received?

19           MS. ARNETT:  It's Government Exhibit 18.

20           MR. MINNS:  Government Exhibit 18, which came into

21   evidence, which is showing -- and you'll have it in the jury

22   room, it's showing almost every year a refund that went to the

23   Government, that the client did not ask for and did not get

24   back, that he doesn't know if he owes anything, he doesn't

25   believe that he owes anything, but he's overpaying every month.

1  They say that's acts of criminal conduct.  That doesn't make

2  any sense.

3        So you'll see the Government receives the

4  handwriting.  That's in evidence today.  Here's a man who is

5  being harassed.  His company's being harassed, and only his

6  ex-lawyers and God knows why he agreed to go down and meet with

7  two IRS agents, one of which has been identified and you met,

8  and the other one was on the stand, and spent an hour and a

9  half with them doing whatever he wants, whatever they want.

10        And, yes, he called his lawyer who told him, go right

11  ahead.  And I have to tell you, I would never let my client,

12  any client, straight off the street I know nothing about them,

13  I would never let them alone in the room with one IRS special

14  agent let alone two.  It's insane.  But this trusting man, this

15  veteran, he gives up his rights.  He goes into the room and

16  he's with them for as long as they want, and he does what they

17  want.

18        You see all those letters that he wrote and all that.

19  This is not the action of someone trying to hide something.

20  Government says that's more evidence of his guilt.  Good Lord

21  how can you -- how -- he's -- thank God we live in America and

22  you don't have to prove your innocence, but if you had to, what

23  more evidence could you have than total complete cooperation.

24        You saw the Swiss records put into evidence, and you

25  saw them because Mr. Pieron got them from Switzerland and the

 1  Government says give them to us, and he gives them to them.

 2  Does whatever they ask him to do, and they say he's doing that

 3  because he thinks something's wrong, we might be trying to

 4  arrest him.

 5          This man, this gentleman that I have been honored to

 6  represent, has shown that he has a high IQ.  He's shown that

 7  he's good with computers, but God bless him, I have to tell you

 8  this, the evidence shows overwhelmingly that when it comes to

 9  law and taxes and defending his own rights, as opposed to our

10  rights as a veteran, defending his own rights, he's an idiot.

11  He doesn't defend any of his rights.

12          He hires, except for the Pavlik firm, a lot of really

13  incompetent people, and they drop him in the grease each time.

14  Some of them join into a collusion with the Internal Revenue

15  Service not to even tell him that they've been contacted.  Can

16  you imagine your lawyer or your accountant or CPA hiding

17  information from you when your very freedom was at stake?

18          Now, please post Defendant's Exhibit 1002.  This --

19  after he's given them complete cooperation, over and over, all

20  the way, he's never not cooperated, this is a bill in February

21  for the first time -- oh, and bear in mind, you can own a

22  corporation.  You can own none, you can own 10 percent,

23  99-point something percent, which is obviously an estimate, but

24  you can't commingle corporate funds with personal funds.  You

25  cannot do that.

1           The investors did not give him this money to pay his

2    taxes.  He would be stealing from them.  Did the investors

3    agree that he should have a Mercedes truck to haul around the

4    luxury items?  Yes, but he didn't own it.  He couldn't put it

5    in his own name.  I find this to be remarkable.  If he had put

6    it in his own name, the Government would have said, oh, he put

7    it in his own name, and it wasn't his money, he says a crook.

8    But it's put in the name of the company, and they say, oh, he

9    didn't put it in his name, he's a crook.  He put it in the name

10   of the company that is using it.

11           The two companies that were using him as a pianist

12   and him to play at these events, they're crooked, too.  I mean,

13   why should that company that needs music for their

14   presentations have music?  It doesn't make any sense.

15           What I -- you know, you didn't hear from the

16   Government, he owns a Volkswagen in his own name.  He doesn't

17   own -- he doesn't own a home.  He's a tenant.  And many of us

18   are tenants, and most of us have not been able to own homes at

19   some period of time in our life, and some of us don't own

20   homes, but I'll bet we've never met anybody whose had as much

21   money and as much opportunities that doesn't own a home.

22           They're putting all these assets up.  I'm surprised

23   they didn't put his underwear and his pants up, too.  So they

24   have two interesting assets that aren't anywhere near as

25   valuable as a home, and this man, who has created two amazing

 1  algorithms, doesn't own his own home.  He and his wife don't

 2  sleep under a roof that they own.

 3          And yet the Government talks about the fact that he

 4  was involved with a swimsuit company.  It went out of business.

 5  It was worth nothing.  This is something that's just insane.

 6  The Government says these -- a company that owns a Mercedes is

 7  worth more than 100,000 if the Mercedes is worth 70.  We know

 8  it's 70 because that's what it was sold for eventually.

 9          Well value does not equal assets.  If any of us go

10  into a bank, and we say I have a car paid off, and I want you

11  to loan me money, and the banker will say, well, what are your

12  liabilities?  What do you owe?  The liabilities were millions

13  and millions of dollars.  The companies were losing millions of

14  dollars a year.  Jim put his life savings, everything he had

15  into them and lost it all.  The companies kept losing money.

16          So he believed in them, he worked for them, and he

17  put his money into them and he lost the money.  He's probably

18  entitled to more deductions for that that the first tax

19  preparer did not pick up.  But the Government's position is

20  that a value is the asset, and the liability should not be

21  considered, and they didn't put in evidence of liabilities

22  because they didn't want you to know the value.  Assets minus

23  liabilities equals value.  They must think that we're all

24  idiots.

25          So they received this IRS bill February 2018 after

```
 1  sale of major corporate profits and has cash in his hand that
 2  belongs to him, it doesn't belong to the investors, and
 3  immediately he pays the bill to the penny.  Within less than 30
 4  days of the receipt of that bill, when he has the money, he
 5  pays.  That's defendant's 1003.  He puts bond on it, because he
 6  doesn't believe he owes it.  The Government --
 7            MS. PARKER:  Objection, Your Honor.
 8            THE COURT:  Sustained.
 9            MR. MINNS:  The Government now has that money, and so
10  the disputed balance is paid off -- and if we could post
11  Defendant's Exhibit 1005.  The Government claims that he is
12  still violating the law, that he still owes the tax that he
13  does not owe, on the same day when the Government, through
14  another arm of the Government, the computer figures out he
15  doesn't owe anything, and the computer says IRS receipt, zero
16  tax.  That's the same day.  It took the computer four months to
17  do it.  Four months after he's paid in full the disputed debt,
18  which he did not owe, and will not owe, if they will ever give
19  him his audit, ever give him his appeals right.  Mr. Pavlik
20  will win that.  There's no evidence.  No one has suggested that
21  Mr. Pavlik --
22            MS. PARKER:  Objection, Your Honor.
23            THE COURT:  Sustained.
24            MR. MINNS:  May I approach at sidebar, Your Honor?
25            THE COURT:  The argument concerning whether or not
```

1   Mr. Pavlik will win, there's no evidence related to that, sir.

2   That's your own commentary.

3          MR. MINNS:  But we presume innocence, Your Honor, and

4   the Government has the burden of putting evidence on that he

5   will not win.

6          THE COURT:  Correct.

7          MR. MINNS:  The Government has the burden of proving

8   beyond all reasonable doubt that if the Government gives him

9   his legal rights, he will lose and --

10         MS. PARKER:  Objection, Your Honor.

11         THE COURT:  No.

12         MR. MINNS:  And then, after losing, he will want to

13  commit a crime, the Government cannot prove that because it is

14  an absolute impossibility, and the Government has put on not

15  one question mark of evidence that he will lose, not one iota

16  of evidence that he will lose.

17         MS. PARKER:  Objection.

18         THE COURT:  Sustained.

19         MR. MINNS:  But even then, even barring all of that,

20  the Government's obligations to us is greater than that.  Not

21  only must they prove he will lose, they must prove he knew in

22  advance that his CPA was completely wrong.  In other words,

23  they must prove that he did not rely on the information that

24  the CPA gave him and did not believe that he did not owe a tax.

25         MS. PARKER:  Objection.

```
 1            THE COURT:  The line of argument will be stricken,
 2  sir.
 3            MR. MINNS:  Am I permitted to say if he did not
 4  believe he owed a tax, he is innocent?
 5            MS. PARKER:  Objection.
 6            THE COURT:  Your client did not testify.  You cannot
 7  testify about what he would say.
 8            MR. MINNS:  Am I permitted to say the presumption of
 9  innocence presumes the Government has the duty and the burden
10  to prove that he does not believe he -- that he believes he was
11  owed -- that he owed a tax?
12            THE COURT:  Sir, we covered this extensively in
13  chambers in conjunction with crafting the instructions.  That
14  line of argument is not available.
15            MR. MINNS:  I apologize, Your Honor.
16            So starting in 1998 and 2008, has the Government
17  proved beyond all reasonable doubt that Jim Pieron understood
18  these complicated tax laws on his own clearly and decided to
19  break them?  There's no evidence of that.  In fact, the only
20  evidence is that if he had understood, he wouldn't be here.  It
21  would've be filed correctly.  No taxes would have been due.
22            Has the Government proven beyond all reasonable
23  doubt -- I just don't -- its an impossibility that they cannot
24  prove.  They cannot prove that he believed he was breaking the
25  law when he wasn't.  They cannot prove -- they have not
```

1  proven -- they haven't even shown us the correct application of

2  the law.  They haven't even shown us -- their entire case is

3  based on an incompetent tax return filed by a company that is

4  not using CPAs, not using tax preparers.

5         Their entire case is based on the -- they're saying

6  you must accept that as true.  You don't have to accept

7  anything of the facts as true.  You make up your own minds.

8  They're telling you you have to accept as true that Carol

9  Nathan was right, and you have to accept as true that

10  Mr. Pavlik was wrong, and you have to accept as true that my

11  client, Jim Pieron, is a tax genius and knew all this even

12  better than the tax preparers themselves, even better than any

13  of us with evidence that he didn't even know about at the time

14  line.  It's an absolute impossibility.  This is not going --

15  this is not even -- this is not clearing up all reasonable

16  doubt.  This is an impossibility.  There's absolutely no

17  possibility.

18         Forty-one years of doing this, I've never seen so

19  many impossibilities.  It is impossible that he knew what he

20  was doing and tried to ruin his life.  It is impossible that he

21  knows more tax than Mr. Pavlik.  He doesn't even know more tax

22  than Ms. Nathan.  He just knows that he did not feel

23  comfortable with her and that he went to the people that -- the

24  department with one of the CPAs, Ms. -- not Carol --

25         MS. ARNETT:  Dale.

1           MR. MINNS:  Dale.  Last name?

2           MS. ARNETT:  VanConett.

3           MR. MINNS:  VanConett.  Dale VanConett, you heard

4    her, you saw her.  You decide if she was telling the truth or

5    if she had a motive to lie.  There's no motive that she had to

6    lie.  This was a client that they went to bat with.  These were

7    tax returns that they stood up for that was not as profitable

8    as their normal clients.  I apologize if I've not made that

9    clear.

10          The Government -- it's the Government's job to draw a

11   timeline proving the truth.  It's not our job.  I was kind of

12   surprised in the beginning that they made no effort to show a

13   timeline.  The purpose of a timeline is to show as much clarity

14   as we can with the evidence that we have or believe will come

15   into evidence, exactly what happened.  Government doesn't want

16   clarity in this case.  Clarity is their enemy.

17          I'd like to speak a moment about the charges and some

18   of the language that I would ask that you read when you get

19   back in the jury room.  Our judge has defined an act of or

20   failure to act is willful for purposes of tax evasion if it is

21   voluntary, intentional violation of a known legal duty rather

22   than the result of accident, mistake or negligence.

23          Did the Government prove beyond -- first of all, they

24   didn't prove that there was an act of not paying the taxes or

25   even owing the taxes, beyond any -- they didn't even put on any

1   evidence that a tax is due.  The IRS has a form that says 1040X

2   because mistakes are made constantly.  The 1040X itself is

3   evidence of a mistake, an honest mistake.

4            So they haven't proved that, and they haven't proved

5   known legal duty.  They haven't proved that Jim Pieron knew at

6   any of these stages what his -- even today what his legal

7   obligation is.  If he doesn't owe any tax at all, which is the

8   state of the evidence right now according to what the

9   Government has put on.  The Government must eventually --

10  perhaps that's it.  He gets convicted, he gets charged, company

11  goes down, and then he gets his audit, and he didn't owe a tax

12  in the first place.  That's putting the cart before the horse.

13  This is not -- this is not a cart or a horse that should be

14  arrested in the first place.  This is not where we should be

15  spending our valuable resources.

16           And they have not proven -- they haven't even -- they

17  suggested it.  Well, he knows what he's doing.  He's -- he's

18  the arch tax genius.  He doesn't know anything about taxes.

19  Well, he knew what he was doing when he walked in there and

20  talked to two special agents of the IRS.  He knew what he was

21  doing when he didn't have a lawyer in there with him.  He knows

22  what he's doing.  That's absurd.  They're really -- really

23  insulting -- insulting our intelligence with these accusations.

24  They're beyond ridiculous.

25           Did they prove that he knows this stuff?  No.  In

 1   fact, they proved he didn't know it, and it's not just a little

 2   bit of proof, it's beyond all reasonable doubt.  It's the

 3   highest level of proof that is done in any court of law

 4   anywhere in the United States.  It's the highest in the world.

 5   It's the highest standard.  It's the reason we have veterans,

 6   the reason we defend our Constitution is because we believe in

 7   that, and we stand for that.

 8           And as I said earlier, it was the reason why Thomas

 9   Jefferson felt these things were so important that you, you

10   were so important.  It is your job and your duty when the

11   Government goes nuts, when the Government does really bad

12   things, it's your job and your duty to protect us when there is

13   no other body in our Constitution.

14           THE COURT:  You're at 50 minutes, sir.

15           MR. MINNS:  Pardon?

16           THE COURT:  Fifty minutes.

17           MR. MINNS:  Thank you very much, Your Honor.

18           Good faith.  While the term good faith has no precise

19   definition, it means, among other things, an honest belief, a

20   lack of malice and the intent to perform all lawful

21   obligations.  In assessing defendant's good faith, you may

22   consider his reliance on an accountant or professional tax

23   advisor, if you find that he has made disclosure of the facts

24   to that accountant or advisor.

25           The Government said that Komplique can't play the

1  piano, that it's actually corporations just -- it's just paper.

2  A corporation is just paper.  Paper can't do anything, except

3  through people that own it or run it or work for it and, yeah,

4  paper can't play the piano, but an employee of the company can

5  play the piano, and that's how they do it.  Komplique is a

6  piece of paper.

7       The Government says his name isn't on the account.

8  That's just not true.  You look at the accounts.  He's got

9  signing authority along with several other people.  He's never

10 hidden that from anybody.  It is not his money to do with as he

11 wishes.  I'm sure everybody that works for somebody else wishes

12 that their money could be used for paying taxes and things,

13 even if you don't owe the tax.  The Government says it

14 magically became his car.  No, it never became his car.  Many

15 people ride in company cars.  You heard from the witness up

16 there that it is a common thing.

17      Negotiation is not an act of evasion.  Negotiation is

18 what we do, and what we said at the very beginning, ignorance

19 of the law -- it isn't a defense in the traffic case -- it

20 ought to be -- but ignorance of the law is a defense if

21 willfulness is an issue, and the Court has instructed you that

22 you must find willfulness in order to go with the Government

23 and give them the conviction that they are asking you to do.

24      Life isn't like the movies and the TV shows and

25 everything that the Government discussed in their opening.  In

1   real life, sometimes the good guy gets destroyed.  Sometimes

2   big powerful interests end up destroying them.  Lots of

3   inventors who come up with things don't end up owning their

4   inventions because of this difficulty in commerce and

5   capitalism, which needs at least a little bit of watching over.

6           In boxing, which I liked the reasonable doubt there.

7   In boxing, reasonable doubt, it's the Government, the other

8   side, has gotten a knockout, just beyond any reasonable doubt.

9   They're on the canvas, they're lying down, referee counts 10

10  seconds.  That's beyond reasonable doubt.  Well, they haven't

11  even landed an honest blow, and some of the blows have been way

12  below the belt.  They should have had to throw in the flag a

13  long time ago, throw in the towel.  They would have been

14  disqualified from an honorable duel with that stuff about his

15  citizenship.

16          One of the greatest lawyers of all time, John Adams,

17  second president of United States in 1770 when he was -- before

18  we became a country, when he was defending British soldiers who

19  had fired on and killed colonists, and he won the case.  He was

20  a brilliant lawyer.  Obviously the colonists weren't very happy

21  about what had happened, but he reminded them of the tradition,

22  which became a part of our laws, a part of our Constitution of

23  presuming innocence.  The man is innocent until proven guilty,

24  and beyond all reasonable doubt because it is more important in

25  our country to free 20 guilty people than to put one innocent

1    person in prison.

2         He closed that argument, which lasted, it appears,

3    two days, I can't imagine being given two case nowadays for

4    closing argument, echoing these things, which later on became

5    part of our very existence and our Bill of Rights in 1789 and

6    is part of our national faith, whether those of us who are

7    religious, those of us who are not, it became a part of our

8    national culture, which the entire world respects and admires.

9    And when they're trying to, when they want freedom, they try to

10   emulate us, so you must presume Jim Pieron innocent, but sadly

11   there's no evidence of his guilt at all; even without that, he

12   should be found not guilty.

13        I hope that the cross-examination was able to

14   elucidate the truth that he is not guilty, but if you think

15   he's probably guilty, you must find him not guilty.  I hope

16   that didn't happen.  I wouldn't want to practice law again if I

17   failed to communicate that, but even if you think he's probably

18   guilty, you must find him not guilty.

19        The only time the Government's wishes can be obeyed

20   by a jury of American citizens is when they have proven beyond

21   all reasonable doubt the knockout.  The guy's not moving.

22   There's no movement.  They're ready to cart him off.  Now, if

23   he gets up after the 11 count, then you can presume that

24   they've proven something.  They haven't even gotten a count one

25   on this thing.  It's just wrong, and they started off with

 1  dishonesty and deceit, which is beneath -- which is beneath our

 2  Government.

 3          Thank you for -- on behalf of Jim and his family, and

 4  his workers and these people, and thank you on behalf of my

 5  defense team.  God give you the wisdom -- these are the words

 6  of John Adams -- to come out with the correct verdict of not

 7  guilty.  Thank you.

 8          THE COURT:  Thank you, sir.

 9          Government, brief rebuttal.

10          MS. PARKER:  Once again, ladies and gentlemen, we're

11  getting even closer to that final stage of the case where you

12  can go into the jury room, deliberate and decide this case;

13  and, again, I'm going to ask you to pay close attention.  You

14  took an oath to decide this case based on the law given to you

15  in court and the evidence provided to you.

16          And the reason I reiterate that is probably obvious

17  to you already.  You heard a whole lot of stuff just now, as

18  you did in other phases in this case, that aren't based on the

19  evidence, things that aren't based on the facts, allegations of

20  what was said or done that just simply are not part of the

21  evidence.

22          Now, I hate to have to interrupt defense counsel with

23  objections in closings.  As the Court says, we have an

24  obligation to object when things are not being done properly.

25  Don't be taken in by that line of nonsense that was just fed to

1  you because that's what it is; 99 percent distraction and

2  misrepresentation, distortion of the record.  That's what you

3  heard.

4          Mr. Minns, he tells you he's been practicing for 41

5  years.  He knows what proper argument is.  He knows what proper

6  questioning is, but he wants to push the line.

7          MR. MINNS:  Excuse me, Your Honor.  I do object to

8  her commenting on my making objections.  I abided by the Court

9  rulings every time.

10          THE COURT:  I agree.  Let's get back to the facts,

11  please.

12          MS. PARKER:  The real person, though, at issue, and

13  this is the real point, it's not Mr. Minns, and it's not

14  Mr. Minns' crazy allegations.  The real point is the conduct of

15  the defendant.  The jury instructions don't say you have to

16  decide what you think about the IRS.  This is not a civil case

17  where A sues B and B sues A and you have to assess, excuse me,

18  the conduct of both parties A and B.

19          The judge will tell you, and he has told you, what

20  you have to consider, whether the defendant committed the

21  crime, whether the Government has established evidence that

22  there was a willful failure to pay the taxes that were owed by

23  the defendant for 2008 and 2009.

24          The rest is a distraction.  There are allegations

25  that we wanted to slander the defendant, even though he's a

1   veteran.  Why would we want to do that?  There's no desire to

2   deceive you.  It was the defendant who was trying deceive.  He

3   was trying to deceive the IRS and now he's trying to deceive

4   you.

5           At various times he does various things, which I've

6   already discussed, and I won't go into those in great detail,

7   but the whole thing about the Peregrine stuff, you don't need

8   300 pages, and if you look at the one copy of the passport that

9   came with his personal -- his personal account application, you

10  can't make it out.  He had to get a second one sent in at a

11  later date, lo and behold, it's the same one -- the same one

12  with the folded page that he used to open his business

13  accounts.

14          Now, this is the computer whiz, okay.  He had that

15  other one, that other copy of his passport, but that's not the

16  one he sends in when he sends in the application for the

17  account where he says he's not a US citizen, he doesn't have a

18  Social Security number, and he's going to rely on the treaty

19  with Switzerland to not have tax obligations in the United

20  States.  You take a look at it, so who's deceiving who?  He's

21  hiding his interest in that account from the IRS.

22          Got to attack American Tax Solutions or Tax

23  Defenders.  Defendant chose that entity.  They're in Chicago.

24  How many CPAs or other tax preparers are in Michigan?  He

25  didn't go to those.  He goes to American Tax Solutions because

1  they advertise, they have salespeople, we will get you out of

2  your taxes.  That's why he goes there.  He goes there looking

3  to get out of those taxes, not to the local CPA in Mt. Pleasant

4  or Pavlik in Saginaw, anybody in Michigan.  He wants those

5  people that say I can get you out of this.

6        And when they sign -- prepare tax returns, he signs

7  them saying they're accurate.  He provides the information, and

8  they show millions of dollars.  And his angst isn't about

9  getting his tax return filed.  You look at the notes from Carol

10  Nathan's testimony.  Look at those notes.  Such angst about

11  trying to get the taxes reduced.  Doesn't say taxes filed.  The

12  taxes are prepared.  He now knows he owes a lot.  The angst is

13  over getting it reduced.

14        So he's not looking to pay the tax or get the taxes

15  filed.  He's looking to get out of the tax, and that's what

16  this whole case is about.  And he's already late on getting the

17  returns done.  He's years late.

18        So, again, that's a distraction, and then the whole

19  thing about the IRS, that's a distraction.  No where in the

20  instructions will the judge tell you that you should consider

21  all that distraction about the IRS.  Rather, he'll give you

22  very brief instructions, and then you can see it, read it,

23  reread it, he read it to you once, about the conduct of the

24  IRS.

25        It's not as simple as someone perhaps would like to

1   make you think, but I'm not going to paraphase the judge's

2   instructions.   I just ask you to keep that in mind because

3   there are lots of claims made by the IRS, or regarding the IRS

4   in the previous hour that are not part of the evidence in this

5   case, and even if they are, they're not part of what you have

6   to consider.   They're a distraction.

7            You took an oath, ladies and gentlemen, again, to

8   decide this case on the law and evidence, but also to decide it

9   without sympathy or bias, and that's what the attacks on the

10  IRS are.   It's an attempt to make sympathy for the defendant.

11  Sympathy that really isn't part of what you should consider.

12           You should consider the law and the evidence, and

13  there's no evidence that the defendant does not believe that he

14  owes taxes.   On the contrary, he signs tax returns saying he

15  owes taxes, and even that 1040X, it's not a certainty, it's a

16  doubt.   He says, if you believe this theory, then I don't owe.

17  It's a doubt.

18           So, ladies and gentlemen, don't accept

19  characterizations as to who was truthful or not truthful with

20  regards to the various witnesses because, as the Court told

21  you, that is for you to decide, not even the judge decides who

22  is truthful or not truthful.   You decide who you believe.   You

23  decide how much of their testimony to believe.

24           Now, one of the things was kind of interesting in

25  that regard, Ms. VanConett was honest in a very important way

1  in that she acknowledged that she was trying to testify in a

2  way that would protect her firm, so she had a motivation.  The

3  Court will tell you, you consider the motivations when you

4  consider the testimony of the witness, but she did agree that

5  that was the case.

6          And it's not true that you cannot mingle -- commingle

7  personal and corporate funds.  It's true that you cannot do it

8  legally, but that's not the same as saying it's an

9  impossibility.  In fact, it is done, and it was done in this

10 case, and that's exactly the point.  That's what the defendant

11 did.  He commingled the business funds, most of which were

12 businesses he solely owned and controlled, and he did it for

13 the purpose of hiding his own assets.

14         Similarly, the fact that he doesn't own a home,

15 that's his choice.  That's not a point of anything other than

16 it's his choice and why does he make that choice?  Well, he

17 doesn't have a house as an asset that can be seized.  That

18 would be something, if he was the sole owner of the house, that

19 the IRS could take.  But you don't have your asset -- I mean,

20 you can't seize a rental house, so fine.  You don't want to

21 have that.  You're driving around in a Mercedes Benz.  You're

22 doing other things.

23         Meanwhile your taxes are not paid.  That is

24 Mr. Pieron's taxes are not paid for years and years and years,

25 and they're not paid in full.  If you remember the testimony

1  correctly, until October 2018, which is after he's indicated.

2        THE COURT:  Ten minutes, ma'am.

3        MS. PARKER:  I'm almost done, Your Honor.  Thanks.

4        He signed tax returns admitting that he owed those

5  taxes and then -- so that's not the dispute here.  The dispute

6  is whether he evaded taxes, and he went on a course of conduct

7  to show that he did.  And it's -- it's hard to deal with all of

8  these things, and I won't even try to address it all, but the

9  suggestion was made that an employee of Komplique could play

10  the piano.  Is there evidence of that?  No.  Is there evidence

11  that Komplique had withholdings for employees?  No.  There's

12  evidence they did not have withholdings for employees.  So what

13  employees were playing the piano?  There wasn't any

14  withholdings for them.  There wasn't any employees.  This is

15  all a series of explanations, but they're not based on the

16  evidence.  They contradicted by the evidence, and you, ladies

17  and gentlemen, took an oath to decide this case on the

18  evidence.

19        Now, I will need to wrap-up here, but I would like to

20  use Mr. Minns' boxing analogy when he says it's a clear win

21  when somebody goes down for the count.  We agree.  That's not

22  the only way boxing matches are won.  Not all boxing matching

23  end with a knockout.  The judge doesn't say you have to have a

24  10 count on the mat.  He says it has to be proof beyond a

25  reasonable doubt.  He defined that for you.  He explains it to

 1    you, and you will decide using that standard, not the 10 count

 2    standard or any other standard.

 3          You'll decide this case on the law and the facts, the

 4    facts, ladies and gentlemen, which are the evidence, not the

 5    imaginary assertions, and the unfounded claims, but the facts,

 6    and when you do that, you'll find the defendant guilty as

 7    charged.  Thank you, Your Honor.

 8          THE COURT:  Thank you.

 9          Ladies and gentlemen, we'll pick up in the portion of

10    the remaining portion of the instruction that we did not read

11    earlier.

12          Let me finish up by explaining some things about your

13    deliberations in the jury room and your possible verdicts.  The

14    first thing that you should do in the jury room is to choose

15    someone to be your foreperson.  This person will help to guide

16    your discussions and will speak for you here in court.

17          Once you start deliberating, do not talk to the jury

18    officer or to me or to anyone else except each other about the

19    case.  If you have any questions or messages, you must write

20    them down on a piece of paper, sign them and then give them to

21    the jury officer.  The officer will give them to me and I will

22    respond as soon as I can.  I may have to talk to the lawyers

23    about what you have asked, so it may take me sometime to get

24    back to you.  Any questions or messages normally should be sent

25    to me through your foreperson.

1          Do not ever write down or tell anyone how you stand

2     on your votes.  For example, do not write down or tell anyone

3     that you are split 6/6 or 8/4 or whatever your vote happens to

4     be.  That should be -- remain secret until you are finished.

5          During your deliberations you must not communicate

6     with or provide information to anyone by any means about the

7     case.  You may not use any electronic device or media such as a

8     telephone, cell phone, a computer or any other similar device

9     to communicate with anyone any information about this case or

10    to conduct any research about this case, until I accept your

11    verdict.

12         I will send the exhibits into the jury room when it

13    is time for you to begin your deliberations.  As I told you at

14    the start of the trial, a written transcript of testimony does

15    not currently exist.  Excerpts of the trial testimony will be

16    read to you or made available to you during your deliberations

17    only absent exceptional circumstances.

18         Remember that you must make your decision based only

19    on the evidence that you saw and heard here in court.  Do not

20    try to gather any information about the case while you are

21    deliberating.  For example, do not conduct any experiments

22    inside or outside the jury room.  Do not bring any books, like

23    a dictionary, or anything else with you to help you with your

24    deliberations.  Do not contact or conduct any independent

25    research, reading or investigation about the case and do not

1    visit any of the places that were mentioned during the trial.

2             Make your decision based only on the evidence that

3    you saw and heard in the court.  Some of you have taken notes

4    during the trial.  Whether or not you took notes, you should

5    not be influenced by the notes of another juror, but you should

6    rely on your own memory of what was said.  Notes are only an

7    aid to recollection.  They are not entitled to any greater

8    weight than actual recollection or the impression of each juror

9    as to what the evidence actually is.  Whether you took notes or

10   not, each of you must form and express your own opinion as to

11   the facts of the case.

12            Your verdict, whether it is guilty or not guilty,

13   must be unanimous.  To find the defendant guilty, every one of

14   you must agree that the defendant [sic] has overcome the

15   presumption of innocence with evidence that proves the

16   defendant's guilt beyond a reasonable doubt.  To find him not

17   guilty, every one of you must agree that the Government has

18   failed to convince you beyond a reasonable doubt; either way,

19   guilty or not guilty, your verdict must be unanimous.

20            Now that all the evidence is in, and the arguments

21   are completed, you are free to talk about the case in the jury

22   room.  In fact, it is your duty to talk with each other about

23   the evidence and to make every reasonable effort you can to

24   reach unanimous agreement.  Talk with each other, listen

25   carefully and respectfully to each other's views and keep an

1    open mind as you listen to what your fellow jurors have to say.

2            Try your best to work out your differences.  Do not

3    hesitate to change your mind if you are convinced that other

4    jurors are right and that your original position was wrong, but

5    do not ever change your minds just because other jurors see

6    things differently or just to get the case over with.  In the

7    end, your vote must be exactly that, your own vote.  It is

8    important for you to reach unanimous agreement, but only if you

9    can do so honestly and in good conscience.

10           No one will be allowed to hear your discussions in

11   the jury room, and no record will be made of what you say, so

12   you should all feel free to speak your own minds.  Listen

13   carefully to what the other jurors have to say and then decide

14   for yourself if the Government has proved the defendant guilty

15   beyond a reasonable doubt.

16           Each of you has been furnished with a copy of the

17   verdict form to aid you in your deliberations.  However, when

18   you reach your decision, your foreperson should complete only

19   the official verdict form.  The official verdict form will be

20   presented to you in a brown folder by the bailiff along with

21   the exhibits admitted during the course of the trial.

22           If you decide that the Government has proved the

23   charges against -- the charge against the defendant beyond a

24   reasonable doubt, say so by having your foreperson mark the

25   appropriate place on the official form if you decide that the

1   Government has not proved the charge beyond a reasonable doubt,

2   say so by having your foreperson mark the appropriate place on

3   the form.  Your foreperson should then sign the form, place the

4   date on it, and it will be returned to me in the courtroom when

5   you return.

6          Remember that the defendant is only on trial for the

7   particular crime charged in the indictment.  Your job is

8   limited to deciding whether the Government has proved the crime

9   charged.  Also remember that whether anyone else should be

10  prosecuted and convicted for the crime is not a proper matter

11  for you to consider.  The possible guilt of others is no

12  defense to a criminal charge.  Your job is to decide if the

13  Government has proved this defendant guilty.  Do not let the

14  possible guilt of others influence your decision in anyway.

15         Any additions or corrections, Government?

16         MS. PARKER:  Yes, Your Honor.  On the unanimous

17  verdict instructions there was a point in which you, I believe,

18  said "defendant" rather than the "Government."  I would suggest

19  just rereading the instruction.

20         THE COURT:  No harm.  Returning to that portion of

21  it.

22         Your verdict, whether it is guilty or not guilty,

23  must be unanimous.  To find the defendant guilty, every one of

24  you must agree that the Government has overcome the presumption

25  of innocence with evidence that proves the defendant's guilt

1    beyond a reasonable doubt.

2         To find him not guilty, every one of you must agree

3    that the Government has failed to convince you beyond a

4    reasonable doubt; either way, guilty or not guilty, your

5    verdict must be unanimous.

6         Have we covered the concern that you had?

7         MS. PARKER:  Yes, Your Honor.  Thank you.

8         THE COURT:  Any other additions or corrections?

9         MS. PARKER:  None from the Government.

10        THE COURT:  Mr. Minns.

11        MR. MINNS:  None, Your Honor.

12        THE COURT:  Juror No. 12, I don't have my seating

13   chart immediately in front of me.  Mr. Foss, the bailiff

14   indicated earlier that you weren't feeling well.

15        JUROR NO. 12:  I have the beginning of a cold.

16        THE COURT:  The key concern that I've got here is

17   that the -- we will be making a decision concerning an

18   alternate.  The alternate will be excused from deliberations

19   unless necessary ultimately to complete them.  Are you

20   comfortable that you're healthy enough that you can stay with

21   us if you're on the jury?

22        JUROR NO. 12:  Probably.

23        THE COURT:  Okay.  Can I have a brief discussion with

24   counsel at sidebar.

25        (Sidebar conference as follows:)

1         THE COURT:  I had thought, based on what I had heard

2    from the bailiff, that he was not feeling well at all and did

3    not want to participate.  The only question I've got is whether

4    you would want to utilize him as the alternate, or if you want

5    to go -- start with the way that you originally approached it?

6         MR. MINNS:  I think it would be better to keep him

7    and then if he gets sick bring the alternate in, but I don't --

8    I've been coughing myself.

9         THE COURT:  Is it -- the alternate then would be

10   No. 13, Mr. Morris.

11        MR. MINNS:  Not alternate No. 7?

12        MS. PARKER:  Yeah I think it's --

13        MR. DEPORRE:  It's -- the alternates were 13 and 14.

14        MR. MINNS:  Well, I --

15        MS. ARNETT:  Well, I thought the -- okay.

16        MS. PARKER:  We discussed that variation, but I

17   thought --

18        MS. ARNETT:  Yeah I thought we ended up with --

19        THE COURT:  No. 13, Mr. Morris, right, Kenneth

20   Morris.

21        MR. MINNS:  Which one is --

22        MS. ARNETT:  I thought the alternates were seven --

23        MR. SASSE:  Farthest to the right that's left.

24   There's an empty seat next to him, which is the one we lost.

25        THE COURT:  Okay.

1          MR. MINNS:  Well, do we want to let him --

2          MR. SASSE:  I don't care.

3          MS. ARNETT:  I don't have a position.

4          MR. MINNS:  I have no objection.

5          MS. PARKER:  I'm fine with excusing No. Seat 12 or

6   13, whatever the defense wants.

7          MR. DEPORRE:  I would --

8          MR. MINNS:  I have no objection.

9          THE COURT:  All right.  We'll excuse 13.

10          MS. ARNETT:  Yeah, but if you don't have an

11   alternate, what if something happens?

12          MS. PARKER:  Yeah, I think it would be better to have

13   healthy jurors than unhealthy jurors.

14          THE COURT:  Well, I'm fully comfortable with that.

15   It makes some sense to me.

16          All right.  We'll excuse Mr. Foss, No. 12.

17          MR. MINNS:  If we lose a juror, we still have an

18   alternate, they can start over again, and we don't start the

19   trial over again; they just start deliberations over again.  If

20   we don't have an alternate, then --

21          MS. ARNETT:  Right.

22          MR. DEPORRE:  Are you suggesting permanently excusing

23   No. 12, or are you suggesting designating him as an alternate,

24   because I agree with defense counsel.

25          THE COURT:  He will be an alternate.

1          MR. SASSE:  Subject to being recalled?

2          THE COURT:  Subject to being recalled.

3          MR. DEPORRE:  Then I'm okay with that.

4          MR. SASSE:  Judge, while we're here, I just want to

5     make clear that while we agree that the instructions you gave

6     were as we understood them to be, we still want to maintain our

7     objections.

8          THE COURT:  Sure, no waiver.

9          MR. SASSE:  Exactly.

10         (Sidebar conference concluded.)

11         THE COURT:  Mr. Foss, we kind of came to the

12    conclusion that it probably makes sense, if you're not feeling

13    well, to excuse you as the alternate.  You will still be

14    subject to recall, if it were necessary for us to have a full

15    complement of 12 jurors if there was a problem with any of the

16    other members.

17         What we will do is to excuse you now to go to the

18    library where we'll get contact information for you so that if

19    we needed you, we can get in touch with you.  We will also call

20    you and inform you when the jury's reached a verdict, so that

21    you would know that your obligation's at an end.

22         Is the other clerk available?  Sir, we will excuse

23    you, and thank you for the investment that you have made.

24         (Juror No. 12, excused.)

25         (At 1:33 p.m., bailiff sworn by the clerk.)

```
 1              THE COURT:  Ladies and gentlemen of the jury, you may

 2   retire to the jury room to deliberate your verdict.  Please

 3   rise.

 4              (At 1:34 p.m., jury leaves.)

 5              THE COURT:  We are outside of the presence of the

 6   jury.  Counsel, will you remain available in the building or do

 7   you wish a period of time to leave in order to get something to

 8   eat.

 9              MR. SASSE:  Probably going to want to get something

10   to eat, speaking just for myself.

11              MS. PARKER:  Will the jury be eating I assume.

12              THE COURT:  Yes.

13              MR. DEPORRE:  I think that'll give us sometime.

14              THE COURT:  What we'll do is just simply let them

15   know that you won't be available for approximately an hour so

16   that if they have questions they will understand that they

17   can't be responded to.

18              The one concern that I do have is that the schedule

19   that we initially gave them, while we did tell them that they

20   would remain with us in court until deliberations are

21   completed, we did probably throw a bit of a wrench into their

22   schedule, so we may end up with some logistical problems that

23   that may need attention, we'll see.

24              We'll let them know that we will be unavailable for

25   an hour during the first part of their deliberations.  We'll
```

1    see you at approximately 2:30.

2            Record's closed.

3            MS. PARKER:  Judge, we have our exhibits to send

4    back, and I'm sure defense does also.

5            MS. ARNETT:  We did.  We've already looked at each

6    other's exhibits.

7            MS. PARKER:  I didn't look at them but --

8            MS. ARNETT:  Yeah.

9            MR. DEPORRE:  We squared them.

10           MS. PARKER:  Okay.

11           THE COURT:  And you will organize those so that

12   Mr. Haines can get those into the jury, your exhibits.  They're

13   all done.  And the Government's.

14           MR. DEPORRE:  Just this box.

15           THE COURT:  We'll get them to the jury as soon as

16   possible.  Record's closed.  Thank you.

17           (At 1:36 p.m., court recessed.)

18                        *  *  *  *  *

19                   C E R T I F I C A T E

20       I certify that the foregoing is a correct transcript
         from the proceedings in the above-entitled matter.

21

22                          _Carol M. Harrison_____

23   Date: 3-26-2019      Carol M. Harrison, RMR, FCRR
                          Official Court Reporter
24                        United States District Court
                          Eastern District of Michigan
25                        1000 Washington Avenue
                          Bay City, MI  48708

