UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 18-CR-20489 |
| Plaintiff, | Thomas L. Ludington |
| v. | United States District Judge |
| | Patricia T. Morris |
| JAMES D. PIERON, JR., | United States Magistrate Judge |
| Defendant. | |
| _____/ | |

**GOVERNMENT'S SUPPLEMENTAL BRIEF ON TAX-LOSS ISSUES**

In March of 2019, a jury convicted defendant James D. Pieron, Jr., of one count for attempting to evade the payment of his 2008 and 2009 federal income taxes. The Court has directed the parties to submit supplemental briefing to address certain issues related to the calculation of Pieron's criminal tax loss under the sentencing guidelines. (R. 110, Order Directing Supplemental Briefing, PgID 1780-81).

**Relevant Factual Background**

In 2008 and 2009, James Pieron, a United States citizen, lived in Switzerland where he owned and ran a currency trading company called JDFX Fund, as well as several related companies held by JDFX Holding, AG. Pieron was the founder of the JDFX companies, and he did not purchase JDFX Holding or its subsidiaries from anyone else.

1

In 2006, Pieron met Trevor Cook, the owner of a company called Market Shot, LLC, which operated as a Ponzi scheme. (Govt. Ex. 200, SEC Memo of Interview with James Pieron on November 3, 2009, at bates stamp 00480). Over time, Cook's company Market Shot, LLC, agreed to purchase shares of JDFX Holding AG stock, which were owned and held by James Pieron. (Govt. Ex. 200: SEC Memo of Interview with James Pieron at bates stamp 00481; Govt. Ex. 201: Sale and Purchase Agreement for 20% equity, at bates stamp 1035-1038; Govt. Ex. 202: Sale and Purchase Agreement for additional 15% equity, at bates stamp 1039-1042).

Market Shot, LLC, purchased its first twenty percent of equity by making several deposits prior to the purchase agreement's closing date of January 1, 2008. (Govt. Ex. 203: 12/22/2010 Email from Pavlik to Pieron, at bates stamp 00919; Govt. Ex. 200: SEC Memo of Interview with James Pieron at bates stamp 00481). The payments were accomplished by wire transfers from Market Shot accounts to JDFX accounts. (Govt. Ex. 138: Wire Transfer Documents from Wells Fargo Bank). In 2009, Market Shot, LLC purchased an additional fifteen percent equity in JDFX Holding from Pieron. (Govt. Ex. 202: Sale and Purchase Agreement for additional 15% equity, at bates stamp 1039-1042). Instead of keeping his proceeds of the stock sale in his own accounts, Pieron "loaned a substantial portion of the

capital gains back to JDFX as working capital." (Govt. Ex. 204: Pieron Letter to Pavlik regarding JDFX's failure, at bates stamp 01159).[1]

Sometime before July 8, 2008, while Pieron was still living in Switzerland, his stepfather, Christopher Werwega, told him that he would have to file personal income taxes for the income he earned while living in Switzerland. (R. 53: Tr. Werwega, PgID 704). Werwega completed returns for several years up to 2006, but he did not complete Pieron's 2007, 2008, or 2009 income tax returns, because those returns were too complicated for him and because Werwega did not have the information to prepare them. (*Id*. at 697). Werwega probably told Pieron that it was likely Pieron would owe taxes for 2007 and 2008. (*Id.* at 707).

In late 2009, Pieron returned to the United States. In 2010, Pieron contacted American Tax Solutions, a tax resolution firm, where he worked with a tax return preparer named Carol Nathan. (R. 52: Tr. Nathan, PgID 525). Using information that Pieron gave to her, Ms. Nathan prepared tax returns for Pieron for 2007, 2008 and 2009, and told Pieron to mail the returns. (*Id.* at 526, 547-550).

While Pieron was working with Nathan, he also began working with a CPA named Kim Pavlik. Mr. Pavlik explained to Pieron that the payments that Market

---

[1] At a discussion during trial, Pieron and his counsel admitted that the paperwork for the stock sale deal indicated that Pieron personally sold the stock, but that the money for the stock sale was transferred to JDFX. Michael Minns, Pieron's trial counsel noted, "I think he's stuck with it civilly, Your Honor." (R. 53, Tr. Tomakich recross, PgID 807-809.)

Shot made in 2007 for its purchase of Pieron's stock, could be treated as income in 2008 as opposed to 2007. (Govt. Ex. 203: 12/22/2010 Email from Pavlik to Pieron, at bates stamp 00919). This allowed Pieron to offset his capital gains with losses that he incurred in 2008, and mitigate what Pavlik described as a "whip-saw effect" caused by the fact that an individual may not carry back a capital loss. Nathan made a note to memorialize Pavlik's idea of including the 2007 payments as capital gain income in 2008. (Govt. Ex. 205: Carol Nathan note, at bates stamp 00502).

Despite the fact that Pieron had begun working with Pavlik on his 2008 and 2009 tax liabilities, he decided to file the returns that Nathan prepared for him. (Govt. Exs. 39, 40 & 42: 2007, 2008 & 2009 Form 1040 tax returns). Pieron filed his first Form 1040 returns for 2007, 2008 and 2009 in January 2011. Pieron did not submit payment with the 2008 or 2009 returns and did not enter into a payment plan. (Govt. Ex. 18: 2008 Account Transcript; Govt. Ex. 20: 2009 Account Transcript).

Pieron continued to work with Pavlik on his 2008 and 2009 income tax liabilities, along with other tax obligations. Pavlik prepared amended income tax returns for 2008 and 2009 using Form 1040X. Those returns claimed a theft-loss deduction based on a novel argument that Pieron was a victim of Trevor Cook's

Ponzi scheme. (Govt. Ex. 41: 2008 Form 1040X; Govt. Ex. 48: 2009 Form 1040X).

In 2014, Pieron had still not paid his 2008 and 2009 tax liabilities, so Pavlik prepared a Form 1040X for the year 2011, which sought to reduce the 2008 and 2009 taxes based on the claim-of-right doctrine. Pavlik also prepared an offer-in-compromise based on a "doubt as to liability" which similarly requested the IRS to reduce Pieron's 2007 to 2011 tax liabilities based on Pavlik's claim-of-right argument. In March of 2014, Pieron signed the 2011 Form 1040X amended return and the offer-in-compromise and mailed them to the IRS. (Govt. Ex. 206: 2011 Form 1040X Return; Govt. Ex. 207: Offer-in-compromise).

## Discussion

*<u>The government correctly used the 2008 and 2009 Form 1040X amended returns as a starting point to calculate Pieron's criminal tax-loss amount.</u>*

The Court's order for supplemental briefing directed the government to address two issues. The first question is why the government based its criminal tax calculation on the amended returns (Form 1040X) for 2008 and 2009, that were prepared by Pavlik and filed in 2012, and why the government did not base its calculations on the original 2008 and 2009 returns that were prepared by Carol Nathan, or the offer-in-compromise which was prepared by Pavlik and mailed in 2014.

The Form 1040X returns filed in January 2012 are more accurate than the initial returns prepared by Carol Nathan. The 2008 and 2009 1040X amended returns include income reflected in the available bank records. This is likely because Pieron provided far more information and source documents (including bank records) to Pavlik and his accounting firm than he did to Carol Nathan, who prepared the original returns for 2008 and 2009 which were filed in January of 2011.

One example of a difference between Pieron's original 2008 Form 1040 return and the 2008 Form 1040X amended return is that the original return only reported a stock sales price of $9,346,617, instead of the accurate stock sale price of $10 million, which was correctly reported in the 2008 From 1040X amended return. Similarly, the original 2009 return only reported a stock sale price of $4,450,460, rather than the accurate stock sale price of $5,250,000, which was correctly reported in the 2009 Form 1040X amended return.

The 2008 and 2009 Form 1040X amended returns that were filed in 2012 appear to accurately report Pieron's income. The government's issue with the amended returns is that they also claim a frivolous theft-loss deduction, which has the effect of wiping out much of Pieron's income.

To claim a theft-loss deduction, the taxpayer must be the victim of a theft or scheme whereby somebody illegally took the taxpayer's property. *Greenberger v.*

*United States*, No. 1:14-CV-01041, 2015 WL 4076976, at *4 (N.D. Ohio June 19, 2015). Pieron does not meet the criteria for a theft loss, because Cook never took any of Pieron's property, illegally or otherwise. Pieron was simply not a victim of Cook's Ponzi scheme. Pieron did not lose any funds in Cook's Ponzi scheme. To the contrary, Cook invested Ponzi scheme funds in Pieron's companies.

In claiming a theft-loss, Pieron claimed that in 2009 JDFX's major lenders, including Deutsche Bank, became aware that Trevor Cook/ Market Shot, LLC, was an investor in JDFX Holding and that Cook/Market Shot, LLC, were also involved in a Ponzi scheme. (Govt. Ex. 204: Pieron Letter to Pavlik regarding JDFX's failure, at bates stamp 01159; Govt. Ex. 207: Offer-in-compromise, at p. 6). Because Deutsche Bank did not want to lend to a company associated with a Ponzi scheme, it terminated its Prime Brokerage agreement, which caused other banks to stop lending to JDFX. (Govt. Ex. 204: Pieron Letter to Pavlik regarding JDFX's failure, at bates stamp 01159). Pieron claimed that this caused him to personally lose the capital that he had re-loaned to JDFX. (*Id.*)

Assuming the truth of Pieron's claims about Deutsche Bank ending the Prime Brokerage agreement and the after-effects of that decision, the value of Pieron's stock in JDFX and the value of his shareholder note to JDFX declined significantly. But Pieron could not claim a capital loss for this, because under the tax code, an individual may only claim up to $3,000 for capital losses, 26 U.S.C. §

1211(b), and capital losses may not be carried back. 26 U.S.C. § 1212(b)(1). So Pieron and Pavlik tried to re-characterize the capital loss as a theft loss. *See* 26 U.S.C. § 165. [2]

When Pieron and Pavlik's first attempt to get a frivolous deduction failed to wipe out Pieron's liabilities, they tried a different argument. In March of 2014, Pieron signed and mailed a Form 1040X amended return for 2011, and an offer-in-compromise of Pieron's 2007 to 2011 tax liabilities based on "doubt as to liability." Both documents made the same claim-of-right argument. Because the argument is frivolous, the government has not relied on either document when calculating Pieron's criminal tax loss.

The claim-of-right doctrine applies in situations where a taxpayer has obtained funds which another person claims. If the taxpayer reports the funds as income in the year that the taxpayer receives the funds, but the taxpayer later becomes obligated to repay the funds to the other claimant and <u>actually repays the funds</u>, then the taxpayer can recompute his or her liability for the year in which the taxpayer reported the funds as income. See 26 U.S.C. § 1341; *Aloca, Inc. v. United States*, 509 F.3d 173, 181-82 (3rd Cir. 2007) (A taxpayer must show that he or she "is no longer entitled to keep money [that was] included in an earlier return, [and]

---

[2] The parties discussed Pieron's theft-loss claims during argument at trial (R. 51 Tr. Miller, PgID 437-439).

also that [the taxpayer] has 'restored' it.") A taxpayer may only recompute liability for a year if it "appeared that the taxpayer had an unrestricted right to" the funds. 26 U.S.C. § 1341(a)(1); *see also Robb Evans & Assoc. v. United States*, 850 F.3d 24, 34-35 (1st Cir. 2017).

In Pieron's case, he received $15 million from Trevor Cook for the sale of JDFX stock, but that money was never subject to a claim by anybody else; Pieron was never obligated to repay the $15 million; and Pieron never repaid the $15 million. By the time Pieron filed his initial income tax returns for 2008 and 2009, Pieron was aware that Cook and Market Shot had been implicated in a Ponzi scheme because Deutsche Bank had already terminated its Prime Brokerage agreement, (Govt. Ex. 204: Pieron Letter to Pavlik regarding JDFX's failure, at bates stamp 01159), and Pieron had met with the SEC and the SEC receiver (Govt. Ex. 200, SEC Memo of Interview with James Pieron on November 3, 2009, at bates stamp 00480). Pieron cannot claim that his right to the $15 million that Market Shot paid him appeared any different in 2011, when he initially filed his 2008 and 2009 Form 1040 returns, than it did in 2014 when he filed the amended 2011 Form 1040X return.

Pieron's claim-of-right argument asserts that the SEC receiver did not pursue him because he was insolvent, but that otherwise, Pieron would have been obligated to repay the $15 million to the SEC receiver. (Govt. Ex. 207: Offer-in-

9

compromise, at page 12, "If Pieron still had any liquid assets in 2011, the [SEC] trustee would have tried to claw those funds back."). The fact remains that Pieron was never obligated to return any of the $15 million, and he never did repay any of it. Instead, he transferred at least a portion of the remaining JDFX funds to an account for IB Technologies, a U.S. entity that Pieron solely owned. (*See* Govt. Ex. 129: IB Technologies, Inc., Wire Transfer Documents- PNC Bank, at bates stamp 10773).

In summary, the government has used the 2008 and 2009 Form 1040X returns that were filed in January 2012 as the starting-point for its tax-loss calculation, but it has rejected the frivolous theft-loss deduction claimed in those returns. The 2008 and 2009 returns prepared by Carol Nathan did not include all of the income that Pieron received as reflected in the bank records, and the offer-in-compromise that was filed in 2014 was based on a frivolous claim-of-right argument.

*Pieron did not have a significant cost basis in the stock he sold to Market Shot.*

The Court's order for supplemental briefing also directed the government to explain its conclusion that Pieron had no cost basis in the JDFX stock that he sold to Market Shot.

As a general rule, a taxpayer's cost basis in stock is the purchase price of the stock plus any capital contributions. 26 U.S.C. §§ 1011 & 1016. As noted above,

Pieron was the founder of JDFX Holding and its entities, and he did not purchase the stock from anybody. The government is not aware of source documents reflecting any capital contributions that Pieron made to JDFX Holdings prior to the stock sales, and there are no significant bank transfers from Pieron's personal accounts to any JDFX account. Pieron sent two different sets of spreadsheets to Nathan and Pavlik in which he claimed to have basis in the JDFX Holding stock, but the spreadsheets were inconsistent with one another and with source documents such as bank records. The Form 1040X amended returns for 2008 and 2009, did not reflect the figures on Pieron's spreadsheets.

Pieron's 2008 Form 1040X return included a cost basis of $710,129 for the stock that he sold to Market Shot for ten million dollars.

| 7 Net short-term capital gain or (loss). Combine lines 1 through 6 in column (f) | | | | 7 | -110,434 |
|---|---|---|---|---|---|
| Part II Long-Term Capital Gains and Losses—Assets Held More Than One Year | | | | | |
| (a) Description of property (Example: 100 sh. XYZ Co.) | (b) Date acquired (Mo., day, yr.) | (c) Date sold (Mo., day, yr.) | (d) Sales price (see page D-7 of the instructions) | (e) Cost or other basis (see page D-7 of the instructions) | (f) Gain or (loss) Subtract (e) from (d) |
| 8 JDFX | 1/14/04 | 2/04/08 | 10,000,000 | 710,129 | 9,289,871 |

(Govt. Ex. 41: 2008 1040X, at bates stamp 00306). His 2009 Form 1040X return did not claim a basis for the stock that he sold to Market Shot for 5.25 million dollars.

11

| Part II | Long-Term Capital Gains and Losses – Assets Held More Than One Year | | | | | |
|---|---|---|---|---|---|---|
| | (a) Description of property (Example: 100 sh. XYZ Co.) | (b) Date acquired (Mo., day, yr.) | (c) Date sold (Mo., day, yr.) | (d) Sales price (see page D-7 of the instructions) | (e) Cost or other basis (see page D-7 of the instructions) | (f) Gain or (loss) Subtract (e) from (d) |
| 8 | JDFX | 01/14/04 | 10/13/09 | 5,250,000 | | 5,250,000 |
| 9 | Enter your long-term totals, if any, from Schedule D-1. | | | | | |

(Govt. Ex. 48: 2009 1040X, at bates stamp 25475.)

Based on the bank records and the lack of evidence showing capital contribution by Pieron, the government has concluded that Pieron did not have any significant basis in the stock he sold in the 2008 transaction. This conclusion is also supported by the fact that Pieron's income tax returns for 2003-2007 only report $386,092 in gross income.

| Trial Exhibit No. | Tax Year | Gross income from all income sources |
|---|---|---|
| 35 | 2003 | $5,925 |
| 36 | 2004 | $70,900 |
| 37 | 2005 | $48,640 |
| 38 | 2006 | $78,720 |
| 39 | 2007 | $181,907 |
| | Total gross income | **$386,092** |

Based on his reported income, it is highly unlikely that Pieron spent over $700,000 in capital contributions to JDFX prior to January 1, 2018, when the sale of the stock became effective. It is more likely that the bulk of JDFX's initial start-up capital was largely in the form of loans by lenders who were impressed by the claims that Pieron made regarding JDFX's trading capabilities and speed.

*Currently the government only plans to call one witness to establish Pieron's tax-loss amount.*

Lastly, the Court directed the parties to identify the witnesses they will call at the sentencing hearing. The government has construed this as relating to witnesses regarding Pieron's criminal tax-loss amount, because at this point there is no pre-sentence report and it is unclear what objections the parties will make to the PSR when it is received. If the government has to present evidence to support its criminal tax-loss calculations, the government will likely call IRS Revenue Agent Sherry Rousseau and estimates forty minutes for direct examination.

                                                        Respectfully submitted,

Date: July 8, 2019                                   Matthew Schneider
                                                       United States Attorney

s/Jules M. DePorre                          s/Janet L. Parker
Jules M. DePorre (P73999)               Janet L. Parker (P34931)
Assistant U. S. Attorney                  Assistant U.S. Attorney
600 Church Street                           101 First Street, Suite 200
Flint, Michigan 48502-1280              Bay City, MI 48708
(810) 766-5026                                 (989) 895-5712
jules.deporre@usdoj.gov                  janet.parker2@usdoj.gov

<u>Certificate</u>

On July 8, 2019, I filed this pleading by using the Clerk of the Court's ECF system. The ECF system will automatically serve counsel of record.

                                                        s/Jules DePorre