UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,                    Case No. 18-CR-20489

                         Plaintiff,                    Thomas L. Ludington
            v.                                         United States District Judge

JAMES D. PIERON, JR.,

                         Defendant.
_____/

GOVERNMENT'S OPPOSITION TO MOTIONS FOR
JUDGMENT OF ACQUITTAL AND NEW TRIAL

Defendant James D. Pieron, Jr., has filed motions for a judgment of

acquittal, (R. 66: Motion, 1262-79), and for a new trial (R. 68: Motion, 1404-36).

The government opposes those motions in this consolidated response.

Brief

## I.    Motion for Judgment of Acquittal

James D. Pieron, Jr., claims that he is entitled to a judgment of acquittal

because "no rational juror could have found the government met its burden of

proving an affirmative act of evasion occurred within the limitations period (on or

after January 9, 2012)."  (R. 66: Motion, 1267).  Contrary to Pieron's claim, the

jury was presented with sufficient evidence to support its verdict of guilty.

**Pieron has not shown that the jury's verdict was "so insupportable as to fall
below the threshold of bare rationality."**

1

"A convicted defendant bears a 'very heavy burden' to show that the government's evidence was insufficient." *United States v. Tragas,* 727 F.3d 610, 617 (6th Cir. 2013), quoting *United States v. Kernell*, 667 F.3d 746, 756 (6th Cir. 2012).  In reviewing a sufficiency of the evidence claim, "the relevant question is whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  Circumstantial evidence alone is enough to support a conviction. *United States v. Garcia*, 758 F.3d 714, 718 (6th Cir. 2014).  "'[I]t is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial.'" *Coleman v. Johnson*, 566 U.S. 650, 651 (2012), quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011).  Consequently, "every reasonable inference from the evidence must be drawn in the government's favor."  *United States v. Woods*, 877 F.2d 477, 479 (6th Cir. 1989).  If the jury is convinced of the defendant's guilt, "the only question under *Jackso*n is whether that finding was so insupportable as to fall below the threshold of bare rationality." *Colema*n, 566 U.S. at 656.

A major error in Pieron's analysis is that, in reality, he asks the court to view the evidence in the way Pieron wanted the jury to see the evidence, rather than evaluating the evidence in the light most favorable to the government, and

affording every reasonable inference to the government.  Based on the evidence

presented at trial, a reasonable jury could and did find that Pieron engaged in

conduct designed to assist him in his quest to evade his obligation to pay all he

owed on his federal income taxes for 2008 and 2009, and that he did so

continuously at least until he was indicted in the summer of 2018.  A non-

exhaustive discussion of some of the evidence of Pieron's evasive tactics is below.

**Summary of the Government's Evidence**

James D. Pieron, Jr., lived in Switzerland for approximately a decade prior

to 2009.  (*See*, R. 52: Tr., 480-84; R. 53: Tr., 690, 701-02).  While there, he ran

various businesses, and created wealth for himself, but he did not file federal

income tax returns or report his interests in foreign bank accounts, as required by

U.S. law. (Govt. exs. 34-40, 13-15, 17, 19; R. 51: Tr., 371-75; R. 52: Tr., 480; R.

53: Tr., 691-99, 701-02).

When Pieron returned to the United States in 2009, he transferred millions of

dollars from his foreign bank accounts to financial accounts he controlled but held

in the names of his domestic companies. (Govt. exs. 129, 134, 135, 136, 137; R.

52: Tr., 492-93, 496-97, 515-20; R. 53: Tr., 746-52, 764-67).  One of his sources of

his income while in Switzerland, as well as a source of the funds he transferred to

his business accounts in the U.S., was his sale of some of the stock he held in one

of his companies, JDFX, a foreign currency trading company. (*E.g*., R. 52: Tr.,

480-81, 515-20).  The purchaser of some of Pieron's stock, Trevor Cook, paid

Pieron over $15 million for that stock. (Govt. ex. 138. See also R. 52:Tr., 515-20;

R. 53: Tr., 805-08).  Though he had reason to believe that he owed taxes because

of his stock sales, Pieron did not file his 2008 and 2009 federal income tax returns

when they were due.  (*Id*., 706-07; Govt. exs. 18, 20).

In the spring of 2010, Pieron had account balances of at least six figures in

his multiple foreign bank accounts.  (Govt. exs. 65, 67, 68, 70, 118, 120D; R. 51:

Tr., 412-18).  On April 15, 2010, the date that his 2009 income tax return was due,

Pieron transferred $65,000 between two personal bank accounts, but did not use

any of the funds to pay the taxes he owed at that time.  (Govt. ex. 114; R. 53: Tr.,

768-69).  On November 26, 2010, approximately six weeks prior to filing his 2008

and 2009 returns, Pieron withdrew $820,626.24 from one of his personal bank

accounts, but did not use any of those funds to pay the federal income taxes he

owed for 2008 or 2009. (Govt. ex. 70, 18, 20).  On November 30, 2010, Pieron

transferred $800,000 from his personal Swiss bank account to an account for his

solely owned business entity, Komplique, Inc.  (Govt. exs. 121B, 134).  Pieron did

not use any of those funds to pay the federal income taxes that he owed for 2008 or

2009.  (E.g., R. 54: Tr., 929-31, 936-37).

Pieron finally filed his 2008 and 2009 personal tax returns in January of

2011, reporting, but not paying, income taxes owed of $268, 445 for 2008 and

$125, 490 for 2009.  (*Id*.; R. 52: Tr., 548-50; Govt. exs. 40, 42).[1]  He gave his tax preparer, Carol Nathan of American Tax Solutions, his own accounting of his income and capital gains for 2007 and 2008.  (Govt. exs. 57, 61, 64; R. 52: Tr., 531-39, 544, 548).  The ATS notes for Pieron's file observed that the tax resolution firm "did not get a full accounting on any bank accounts, investments that the client owns," but from the available records, it was evident that Pieron was "moving money around and ha[d] the ability to pay."  (*Id*., 545; Govt. ex. 56).

By February 14, 2011, Pieron knew that he owed the IRS $379,617.86 for 2008 and $166,584.07 for 2009, because the IRS sent him demands for payments of those taxes.  (Govt. exs. 93, 94; R. 51: Tr., 418-40; R. 54: Tr., 949-52).  Moreover, in the winter of 2011, Pieron had over $1 million in bank accounts under his control.  (R. 51: Tr., 420-21; Govt. exs. 120F, 121A-C).

On January 30, 2012, Pieron submitted a Form 1040X amended personal income tax return to the IRS for 2008 showing a tax due of $365,082 and a Form 1040X for 2009 showing a tax due of $74,272.  (R. 54: 850-51, 856).  When Pieron submitted his 2008 and 2009 Forms 1040X, he again did not send the IRS any payment towards his 2008 or 2009 income tax obligations. (Govt. exs. 18, 20).  He

---

[1] The first "payment" on Pieron's 2008 tax obligation was not "made" until April 15, 2015, when the IRS applied a 2010 refund claimed by Pieron to the 2008 taxes he owed.  (R. 54: Tr., 930-31.  See also *id*., 931-39).

also did not submit Form 547, reporting his ownership of foreign corporate interests for those years.  (R. 51: Tr., 397-404; Govt. exs. 39, 40, 42).  Rather, in January of 2012, he mailed a Form 9465 installment agreement request and a Form 433-F collection information statement to the IRS. (Govt. ex. 45; R. 54: Tr., 849-52; 854-60).  The collection information statement did not fully disclose Pieron's assets, thus impeding the collection efforts of the IRS.  (*Id*., 954-58).

For example, Pieron did not disclose on his collection information statement a valuable Mercedes Benz automobile, purchased by Pieron for $110,000 and paid in full in August of 2009, but titled at Pieron's direction in the name of one of his solely-owned business entities.  (Govt. exs. 102, 171; R. 53: Tr., 724-27, 755). Pieron also significantly understated the value of his business entities on his collection information statement:  Prior to filing his amended returns, Pieron had received substantial personal loan repayments from one of his business entities, IB Technologies.  (*Id*., 746-47; Govt. ex. 91).  Pieron deposited a $350,000 "loan repayment" from IB Tech to Pieron into his accounts for Komplique, Inc. in 2011, and in 2010, made a similar $250,000 deposit from IB Tech into his personal account, but immediately transferred that money into his Navitas/Institutional Liquidity or ILQ account, all to keep the funds out of his personal account and thereby evade collection by the IRS on his unpaid taxes for 2008 and 2009.  (R. 53: Tr., 708-16, 719-23, 746-47, 757-58, 765, 768, 772-74; Govt. ex. 91, 124, 129).

Partly as a result of those deposits, in December of 2011, when Pieron and his accountant prepared Pieron's Form 433-F, Pieron had over $200,000 available to him in his bank account for Komplique, Inc. (Govt. ex. 169). Pieron did not disclose that asset on his collection information statement nor did he use those funds to pay his 2008 or 2009 tax liabilities. (Govt. ex. 45). Instead, he offered to pay the IRS just $1,500 per month on his 2008 and 2009 tax obligation. (*Id*.). Pieron's offer, if it had been accepted by the IRS, would not have allowed the IRS to collect the amount owed by Pieron during the statutory 10-year tax collection period, but it would have allowed Pieron to evade the payment of his full tax obligation. (R. 54: Tr., 952-54).

Moreover, in April of 2012, the same timeframe when Pieron claimed to the IRS that he could only afford to make monthly installment payments of $1,500 on his tax arrearages, Pieron bought himself a high-powered, customized motorcycle and paid $18,901 in cash for that discretionary purchase, taking some of the funds for the purchase from a Komplique account. (Govt. ex. 176; R. 53: Tr., 739-45).

On August 6, 2012, Pieron filed a Foreign Bank Account Report (FBAR) for 2009 on which he falsely stated that the maximum value for one of his business accounts, a Credit Suisse Account for JDFX Fund Management Ltd. ending in 1211, was $250,000. (Govt. ex. 19, 89, 120C, 129; R. 51: Tr., 383-90, 394-95). In fact, on November 18, 2009, the balance in that account was at least $750,000, as

demonstrated by a wire transfer Pieron made from the foreign account into his solely-owned business, IB Tech, that day. (Govt. ex. 129; R. 52: Tr., 484; R. 53: Tr., 714-16; 746).

Similarly, on April 3, 2014, Pieron filed a Form 656-L offer in compromise (doubt as to liability) for his personal income taxes for 2008 and 2009, and several other years.  The attachments submitted with Pieron's Form 656-L also contained false and misleading information, and an offer to resolve all of his taxes by making a single payment of only $30,000. (Govt. ex. 46, 47; R. 54: Tr., 852-53, 859-61). As was the case with Pieron's Forms 443-F, the false and misleading information on his Form 656-L would have impeded the collection efforts of the IRS if the agency had relied on the information provided by Pieron.  (*Id*., 958-61).

As he continuously sought to evade paying his 2008 and 2009 tax obligation, throughout the relevant timeframe, Pieron used his business financial accounts to hide his personal funds and to buy a wide assortment of luxury items for his own enjoyment, while keeping very few funds in his personal financial accounts.  (*E.g*., Govt. exs. 121B, 121C, 130-133; R. 53: Tr., 752-58, 770-73).  He opted to make "loans" of as much as $750,000 to his businesses, rather than pay his outstanding tax obligation, and thereby hide his assets from the IRS.  (E.g., *Id*., 717-20, 725, 728; Govt. ex. 91).  After putting his money into his businesses, he used his business interests to buy and hold title to, among other things, two

8

Mercedes Benz SUVs each of which cost over $100,000. (*E.g.,* R. 52: Tr., 595-97; R. 53: Tr., 725-27; Govt. exs. 170, 171, 172). Those luxury vehicles, and a Volkswagen titled in Pieron's name but purchased with funds drawn from Komplique, (Govt. exs. 133, 174), were used personally by Pieron, (E.g., R. 52: Tr., 490-92; R. 53: Tr., 724, 760-61), since based on his lack of employee withholdings, he apparently had no employees (R. 54: Tr., 940). Pieron arranged to have his software company, (IBTech), and his swimsuit company that never sold a swimsuit (Komplique, R. 52:Tr., 482, 503), pay $18,000 and $20,000, respectively, to a piano company, apparently to buy a Steinway piano. (Govt. exs. 104, 132. *See*, R. 53: Tr., 759-60, 770-71).[2] He also arranged for his businesses to make available to him tropical cruises and charter airplane flights, and to pay tuition for a third party, apparently his girlfriend. (*Id.*, 750-51, 759-62; Govt. exs. 121B, 121C, 130-133). Likewise, in a two-month period, Pieron used Komplique funds to buy over $16,000 worth of wine. (Govt. ex. 121C). He also hid $50,000 in a personal currency trading account with Peregrine Financial Group by applying for the account on-line from Switzerland in July of 2009, and falsely telling PFG that he was not a U.S. citizen and did not have a social security number. (R. 52:

---

[2] Not surprisingly in light of his evasion efforts, Pieron reported assets of over $63,000, but a loss for Komplique on its tax return. (R. 53: Tr., 735-38; Govt. ex. 27).

Tr., 509-12, 600-03; R. 53: Tr., 643-51, 660-61, 677; Govt. ex. 115).  He even falsely swore on a W8-BEN for that account that he was not a U.S. citizen.  (*Id.*).  Consequently, Pieron's possession of $50,000 in his PFG account was hidden from the IRS.  (Govt. exs. 116, 117).

## Analysis

The government expects that Pieron will disagree with the government's interpretation of his actions given above.  That disagreement can only be maintained by interpreting the evidence in a light that is favorable to the defendant, rather than the government, however.  More important, that disagreement was resolved by the jury during Pieron's trial.

Pieron also contends in his motion that only three affirmative acts of evasion were listed in the government's bill of particulars, and that only the proofs of those acts can be used to sustain the jury's verdicts (R. 66: Motion, 1270), but that contention is again based on analytical errors.

First, Pieron overstates *United States v. Haskins*, claiming that only the acts listed in the bill of particulars could have been used to demonstrate affirmative acts of evasion.  *Haskins* itself holds that a variance from a bill of particulars is not grounds for reversal unless the defendant demonstrates prejudice from the variance.  The court in *Haskins* found that a variance between the bill of particulars and the trial evidence had been established, but that the variance did not prejudice

the defendant.  Likewise, in *United States v. Green*, 202 F.3d 869, 873 (6th Cir. 2000), the Sixth Circuit held that a variance is immaterial if it does not impede the defendant's ability to defend himself, and in *Geboy v. Brigano*, 489 F.3d 752, 764 (6th Cir. 2007), the Sixth Circuit applied a "prejudicial surprise" standard.

In Pieron's case, it must be remembered that the government voluntarily provided a bill of particulars and extensive discovery.  The trial proofs were consistent with the bill of particulars and the discovery.  For his part, Pieron has not alleged or demonstrated a prejudicial variance, and it is his burden to "demonstrate that the variance prejudiced 'substantial rights' and that the variance took him by surprise or placed him at risk of double jeopardy."  *Green*, 202 F.3d at 873.  Pieron has not carried that burden.  Indeed, Pieron has not identified an actual variance.

Caselaw demonstrates that a variance is not simply proof of facts not specifically alleged in the bill of particulars.  For example, in *United State v. Puttick*, 288 F. App'x. 242, 245-46 (6th Cir. 2008) (quoting cases), the Sixth Circuit held that testimony that included facts not alleged in the bill of particulars was not a variance because the testimony did not contain "facts materially different from those alleged in the indictment."  A bill of particulars is not intended to be a detailed disclosure of all of the government's evidence.  *United States v. Salisbury*,

983 F.2d kresce1369, 1375 (6th Cir. 1993); *United States v. Crayton*, 357 F.3d 560, 568 (6th Cir. 2004).

Second, Pieron cannot assert prejudice from an alleged variance in his post-trial motion because "[a]n objection to an alleged variance between a bill of particulars and proof offered at trial must be made when the evidence is offered[.]" *United States v. Williams*, 962 F.2d 1218, 1225 (6th Cir. 1992), quoting *Haskins* with approval.[3]  Thus, even if Pieron had asserted that he was actually prejudiced at trial, Pieron's attempt to claim a variance now is untimely.

Third, contrary to Pieron's claim that only acts alleged in the bill of particulars can be considered in addressing his sufficiency of the evidence claim, the court must assess the sufficiency of the government's evidence on the basis of the record, rather than on the evidence that a defendant claims should or should not have been admitted.  *See*, *United States v. Garcia*, 758 F.3d 714, 721 (6th Cir. 2014) (The court is "confined to weighing the sufficiency of the evidence the government presented to the jury [and] may not consider the potential magnitude of the evidence not presented.").

---

[3] In *United States v. Konstenius*, 2 F.3d 1152, 1993 WL 307088, *3 (6th Cir. 1993), the Sixth Circuit observed, "The proper response to an objection based on a variance from a bill of particulars is amendment of the bill of particulars, which is freely available under Fed.R.Crim.P. 7(f)."

Further, Pieron's variance claim is factually unfounded. Pieron acknowledges that the operative date for statute of limitations purposes is January 9, 2012. (R. 66: Motion, 1270). As discussed above, Pieron continued to engage in acts of evasion after January 9, 2012. He submitted incomplete, inaccurate and false information to the IRS on his request for an installment agreement, his two collection information statements, on his FBAR, and when he claimed in April of 2014 that he could only afford to pay the IRS $30,000 when he submitted his offer in compromise. He provided false information to CPA Pavlik, claiming both a theft loss and an inflated basis for the stock he sold to Trevor Cook, and thereby sought to reduce his true tax obligation.[4]

In addition, Pieron continued to engage in acts of evasion until shortly before the indictment was returned. Not only did he continue to use his business interests to conceal his personal assets, but he also made a partial payment on his taxes in mid-March of 2018, because he knew he was about to be indicted for tax evasion. Pieron's futile attempt to convince the government to be satisfied with the bone he had thus thrown the IRS was yet another part of his relentless efforts at tax evasion.

---

[4] See the government's discussion regarding tax loss in R. 112: Brief, 1786-97.

In his motion for acquittal, Pieron attempted to blunt the impact of some of the government's evidence, claiming that certain acts individually were insufficient to constitute sufficient proof of evasion. That argument confuses the import of the government's evidence. While any given act single act or transaction, considered in isolation, may not be sufficient proof of evasion, the aggregate effect of the defendant's actions was to evade paying the taxes he owed for 2008 and 2009 until after he was indicted. Thus, while failing to file timely tax returns, standing alone, is not sufficient to prove evasions, Pieron's failure to file his 2008 and 2009 tax returns when the returns are due, and his refusal to use the money available to him to pay his taxes rather than diver money to his personal priorities, are still evidence of Pieron's willful intent to evade his 2008 and 2009 tax obligations.

Pieron bases his insufficiency argument on three claims, none of which are sufficient to demonstrate that the government's proofs were insufficient. Initially, Pieron claims that the false information he provided on his January 16, 2012 could not constitute an affirmative act of evasion. To make that claim, he alleges, for example, that the Mercedes Benz automobiles were corporate assets. However, the jury was saw evidence that Pieron purchased the 2009 Mercedes SUV for $107,000 in 2009 with money from his the corporate accounts and placed the title in the name of Komplique. (Govt. exs. 171, 102). In October of 2013, he bought a the 2009, getting $69,500 on the trade-in of the 2009 and paying an additional

$70,000 for the 2013 Mercedes Benz, which he titled in the name of Krescent Media, yet another one of his companies.  (Govt. exs. 170, 171; R. 53: Tr., 761-62; R. 54: 847-49).  In addition, the government presented undisputed evidence that Pieron drove the Mercedes Benz (R. 53: Tr. 724), and that, as evidenced by the absence of any withholdings paid by Pieron on behalf of employees (R. 54: Tr., 940), he did not have any employees who would drive the "company car."  From the aggregate of such evidence, the jury was entitle to conclude that Pieron was the beneficial owner of the luxury SUVs that he caused his companies to buy for him and pay for him to operate.

In turn, the evidence gave the jury reason to conclude that Pieron's January 16, 2012 installment agreement request was an affirmative act of evasion in that Pieron did not disclose his ownership of the 2009 Mercedes Benz, which was still valued at $69,500 almost two years later when he traded it in for the 2013 model. The jury could also conclude that the purchase of the 2013 Mercedes Benz in October of 2013 was yet another affirmative act of evasion.  Further, the jury reasonably could conclude that Komplique, the company that Pieron valued at $1,000 on his 2012 installment agreement request, was either worth more than

$1,000 or would have been worth more if it had not been used by Pieron as his piggy bank to fund his personal wants, such at the 2009 Mercedes Benz.[5]

Pieron also claims that filing a false FBAR in August of 2012 by omitting over a half a million dollars from just one of his foreign financial accounts, and arranging to have that $500,000 disappear after it arrived in the United States via a wire transfer in 2009, somehow is not an act of evasion that could make it hard for the IRS to attach his assets. However, information regarding the initial location and subsequent relocation of half a million dollars under Pieron's control in 2009, a year for which Pieron's taxes were still unpaid when the FBAR was filed, is hardly irrelevant to collection efforts, as he now claims. Collection efforts are not conducted merely in a fixed moment, but instead, often require the IRS to unwind a complex set of transactions that tax evaders like Pieron have deliberately tangled precisely to evade and defeat IRS collection efforts.

Pieron's third argument is that the offer in compromise that he made in April of 2014 was not an affirmative act of evasion. He focuses that argument on the

---

[5] Pieron's reliance on *Porta-John v. United States*, 4 F.Supp.2d 688 (E.D.Mich. 1998), to support his claim that the government was required to establish that Komplique was his alter ego to pursue civil collection of his personal tax debt from that entity actually supports the government's contention that by using his business interests as his repository for his money, Pieron was deliberately acting to make it harder for the IRS to collect the 2008 and 2009 taxes owed by Pieron. However, Pieron's argument is *post hoc*, and does not support his motion for an acquittal.

information that he provided on his financial statement, ignoring, as he did

regarding the January 16, 2012 financial statement, that the jury had much

evidence before it that gave the jury reason to believe that Pieron was living off of

the money that he kept in his business rather than his personal accounts, and

therefore had far more than the $108 he reported in his personal account to pay

toward his unpaid 2008and 2009 taxes.  (Govt. ex. 46)  In addition, the jury could

consider the fact that Pieron offered in April of 2014 to pay merely $30,000 to

resolve his personal unpaid tax obligations for 2007, 2008, 2009, 2010 and 2011

(Govt. ex. 46), even though approximately two years before, in 2012, he had

acknowledged than that he owed $444,880 just for 2008 and 2009 tax years.

(Govt. ex. 45).  Though Pieron's $30,000 offer was not accepted by the IRS, that

was not because of a lack of an attempt on Pieron's part to evade paying a far more

substantial sum toward his unpaid tax debt for five years, including 2008 and 2009.

The jury could reasonably infer from Pieron's act of making such an incredibly

low offer, hoping to convince the IRS to accept a $30,00 payment in full

absolution of his substantially larger tax debt incurred over a five-year period, all

while having access to significantly more resources than he disclosed, was yet

another affirmative act of evasion.

Thus, the acts that Pieron identified in his motion for a judgment of acquittal

were indeed acts that the jury could rely on in finding that Pieron committed

affirmative acts of evasion within the limitations period.  In addition, as discussed above, Pieron committed several other acts of evasion after January 9, 2012.  To cite just one additional example that negates Pieron's statute of limitations claim, the court can recall that in April of 2013, while Pieron was maintaining his claim to the IRS that he could not pay the taxes he owed, Pieron paid $18,901 in cash for a customized motorcycle.  Once again, Pieron took part of the money for that purchase out of the Komplique account that he regularly used as a hiding place for his personal funds.

The government's proofs thus showed that throughout the relevant time, Pieron consistently hid his personal assets in his businesses by "lending" them large sums of money.  Pieron then caused his businesses to buy things for him, whether those things were wine, a piano, a customized motorcycle, automobiles (including the Volkswagen that he claimed as a personal asset with the IRS), or to pay school tuition for his friend, even though his businesses consistently reported losses that kept them from paying taxes.  This evidence allowed the jury to see that Pieron willfully evaded his tax obligation by manipulating his affairs to achieve that end.  By focusing on individual acts or separate transactions, rather than the extended course of conduct that allowed the evasive component of those acts to be revealed and understood, Pieron has failed to comprehend the sufficiency of the evidence that supported the jury's verdict.

18

Viewed in the context of the totality of the evidence, Pieron's conduct relative to his longstanding unpaid tax obligations for 2008 and 2009, including his post-January 9, 2012 conduct described above, gave the jury every reason to find that Pieron's conduct constituted a continuing course of evasion of his tax obligations obligation.  Based on the totality of that evidence, the jury reasonably found Pieron guilty.

## II.    Motion for a New Trial

The standard that Pieron must meet to obtain a new trial under Rule 33 of the Federal Rules of Criminal Procedure, based on grounds other than newly discovered evidence, is well-established: A district court may grant a motion for a new trial if the court finds that the verdict is against the great weight of the evidence.  *United States v. Ashworth*, 836 F.2d 260, 266 (6th Cir. 1988).  However, it is also well-established that a motion for a new trial should only be granted in those few exceptional cases where the evidence "preponderates heavily" against the verdict(s) rendered by the jury.  *Id.*  That standard has not been met in this case.

Legions of courts have observed that Rule 33 motions should be granted only in "extraordinary circumstances" to avoid a "manifest injustice."  *E.g.*, *United States v. Hughes*, 505 F.3d 576, 593 (6th Cir. 2007); *United States v. Turner*, 490 F. Supp. 583, 593 (E.D. Mich. 1979); *United States v. Southern Union Co.*, 643 F.

Supp. 2d 201, 220 (D. R.I. 2009);[6] *United States v. Ramerez*, 313 F. Supp. 2d 276,

279-80 (SDNY 2004); *United States v. Paulino*, 299 F. Supp. 2d 332, 343 (SDNY

2004) (collecting cases).  Not only are new trial motions disfavored, but the

defendant must bear the burden of demonstrating that a new trial is required by that

Rule 33 motion standard.  *United States v. Seago*, 930 F.2d 482, 488 (6th Cir.

1991).  Courts should not interfere with the jury's verdict unless it is "quite clear

that the jury has reached a seriously erroneous result."  *United States v. Rothrock*,

806 F.2d 318, 322 (1st Cir. 1986) (quoting other authorities).  This court has no

reason to find that the jury's guilty verdict was erroneous in this case.

**The jury was properly instructed.**

Pieron claims that the court erred by not giving the instruction he requested

regarding the statute of limitations.  However, Pieron did not present a defense

based on the statute of limitations during his trial.  Though Pieron gave a lengthy

opening statement, he did not make any reference to a statute of limitations

defense, nor otherwise alert the jury to a need to be cognizant of a lack of evidence

relating to acts of evasion committed after January 9, 2012.  (R. 51: Tr., 324-38,

---

[6] "An example of exceptional circumstances is where testimony is 'patently
incredible or defies physical realities,' although the district court's rejection of trial
testimony by itself does not automatically permit Rule 33 relief."  *United States v.
Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001).

349-66).[7]  Likewise, his defense throughout the trial was not founded on a statute of limitations challenge.

Citing *United States v. Williams*, 952 F.2d 1504, 1512 (6th Cir. 1991), Pieron now claims in his new trial motion that the court's decision to not give the defendant's requested statute of limitations instruction substantially impaired his defense.  Other than making that inadequate and conclusory allegation, Pieron did not attempt to satisfy the *Williams* test.

In his new trial motion, Pieron did not identify any part of the trial record where his defense was substantially impaired by the absence of a statute of limitations instruction.  That is readily understandable, for the court never prevented Pieron from presenting evidence in support of a statute of limitations claim.  In addition, Pieron did not know until the evidentiary portion of the trial was concluded that the court would not be giving Pieron's requested statute of limitations instruction.  (R. 55: Tr., 1005-06).  Thus, the court made that decision based on the lack of record support for giving a statute of limitations instruction, but that decision had no impact on the presentation of Pieron's defense.

In addition, the defense Pieron presented at trial was premised on claims that he did not owe any tax, that he did not knowingly and willfully evade his tax

---

[7] Pieron's opening statement consumed approximately 32 pages of transcript, more than twice the length of the government's opening, spanning 14 pages.

obligations, that he received bad tax advice while in Switzerland and from American Tax Solutions/Carol Nathan, and that the IRS had acted unfairly or even illegally toward him.[8] (*E.g.*, *Id*., 1040-69).  While Pieron attacked the conduct of the IRS and the sufficiency of the government's proofs, particularly regarding willfulness, and sought to establish his good faith defense, Pieron simply did not attempt to contradict the government's evidence regarding his post-January 9, 2012 conduct.  Furthermore, as discussed above in response to Pieron's post-trial claim that the evidence was insufficient to establish an affirmative act of evasion within the limitations period, the government presented ample evidence that Pieron engaged in a course of conduct designed to evade his tax obligations for 2008 and 2009, and that he continued to engage in that conduct after January 9, 2012.

Thus, Pieron has failed to show a substantial impairment of his defense, as required to satisfy the *Williams* test, and obtain a new trial.

**Pieron's ineffective assistance of counsel claim is unavailing.**[9]

---

[8] Over the government's objection, the court allowed Pieron to use an inaccurate and at time totally without support in the record, so-called timeline throughout his closing argument.  (R. 55: Tr., 1008).  That timeline did not, however, support a statute of limitations defense.

[9] The premise that appears to underlie Pieron's ineffective assistance of counsel claim is that current counsel would have made different arguments or pursued different strategies at trial.  Such differences of professional opinions simply do not constitute constitutional ineffective assistance of counsel.  In addition, defendants

Pieron claims that his trial counsel was ineffective.  That claim is remarkable for a variety of reasons, not the least of which is that Pieron was represented throughout the investigation, the pre-indictment plea negotiations, and the trial by a seemingly endless stream of lawyers and tax consultants of his choosing.  Among the attorneys Pieron hired and fired before trial were such prominent attorneys as John M. Fedders, (a former SEC enforcement director), Caroline D. Ciraolo (former Acting Assistant Attorney General for the Department of Justice Tax Division), and Jan Geht (with whom the court is quite familiar).  During his trial, Pieron was represented by a team of multiple retained counsel who,[10] in turn, were assisted by consultants with master's degrees in taxation and CPA licenses (R. 55: Tr., 986), including a person that was identified as a former IRS supervisory agent and tax expert, Ron Braver, who sat at counsel table throughout the trial.  (*Id*., 1046; R. 51: Tr., 326).  Trial counsel also retained the services of tax experts, one of whom was Professor Gavin, who reportedly had been an IRS civil appeal officer

------

are not entitled to new trials simply because they want to try to convince a new jury of their innocence with newly minted defenses after an unsuccessful first trial.

[10] Michael Minns, Ashley Arnett, and Kenneth Sasse were attorneys who sat at counsel table throughout the trial.  Other attorneys sat in the public seating and consulted with table counsel on "breaks," including a jury consultant and a tax attorney.

for 43 years.  In any case, Pieron's claim that his trial counsel was ineffective is refuted by the record.

Pieron claims that his legion of attorneys did not discover that Pieron did not owe taxes for 2008 and 2009.  The record shows that trial counsel repeatedly claimed that Pieron did not owe any taxes for those years, however.  (*E.g.*, R. 51: Tr., 329, 336, 355, 358-59, 361, 363-65; R. 53: Tr., 801, 803, 831, 834; R. 54: Tr., 886-71, 885; R. 55: Tr., 990-1041-43, 1051, 1053-54, 1059-64, 1066).[11] Moreover, the trial judge clearly understood Pieron's claim that his tax obligation was absolved if his claim-of-right doctrine theory was accepted by the IRS, but appeared to be disinclined to find that doctrine applicable to the facts in Pieron's case.  (*E.g.*, R. 52: Tr., 619-20; R. 53: Tr., 832-35).

Further, as explained in the government's tax loss brief (R. 112: Brief, 1786-97), Pieron's new claim that he did not have capital gains from his stock sales to Cook is both inaccurate and in direct conflict with the position Pieron took during his trial.  At trial, Pieron at least acknowledged accurately that he personally sold

---

[11]Contrary to the claim made by Pieron in his post-trial tax calculations, and referenced in his ineffective assistance of counsel claim, Pieron himself told his tax return preparers that he had capital gains on his stock deal with Trevor Cook. (*E.g.*, R. 51: Tr., 332-33).  Consequently, Pieron's tax preparers reported gains on his various tax returns.  (Govt. exs. 40, 42 (trial exhibits) and 41, 48 (sentencing exhibits)).

the stock to Cook and then caused much of the money to go into one of his businesses. Though Pieron did not testify at trial, the record shows that Pieron repeatedly claimed through counsel that he had intentionally structured the transaction that way to avoid taxation under Swiss tax laws, based on the advice of his Swiss tax expert. (*E.g*., R. 51: Tr., 326, 328, 362-63; R. 52: Tr., 618-19; R. 53: Tr., 805-08; R. 55: Tr., 1056).[12]  Indeed, Pieron personally told the court in the absence of the jury that "the paperwork was in his name and the money went to the company." (R. 53: Tr., 808). When defense counsel said that the stock came from Pieron when it should have come from the company, Pieron personally affirmed that representation and said that it was a mistake to have done the transaction that way. (*Id*.).

"A defendant cannot seemingly acquiesce in his attorney's defense and after the trial has resulted adverse to him obtain a new trial because of the incompetency

---

[12] It appears that the advice of Pieron's Swiss tax expert was correct under Swiss law, since capital gains are not treated as income to individuals, but corporations are taxed if they realize a capital gain from asset sales. http://www.mondaq.com/x/145980/Corporate+Tax/Introduction+Of+The+Capital+Contribution+Principle+In. Also, Swiss corporations are subject to a "securities issuance stamp tax" on shareholder contributions to a Swiss company. The tax is triggered when a shareholder's total contribution exceeds 1 million CHF. This explains why Pieron has insisted that he "loaned" the stock sale proceeds he received from Cook back to JDFX instead of making capital contributions. https://uk.practicallaw.thomsonreuters.com/9-501-6176?transitionType=Default&contextData=(sc.Default)&firstPage=true&comp=pluk&bhcp=1.

of his counsel." *Gambill v. United States*, 276 F.2d 180, 181 (6th Cir. 1960).  That concept is especially applicable to Pieron, based on the record, including his own statements to the court.  Pieron's current claim that the stock proceeds went first to the company rather than him personally merely avoids the relevant fact that the money from Cook went to JDFX at Pieron's direction.  The documents relating to the stock sale undeniably establish that Pieron was the seller of the stock.  (See government's tax loss brief and referenced attachments, R. 112: Brief, 1786-97, with Govt. exs. 40 (R. 112-5, 1819-30), 41 (R. 112-6, 1831-51), 42 (R. 112-7, 1852-62), 48 (R. 112-8, 1863-94), 201 (R. 112-11, 1911-14), 202 (R. 112-12, 1915-18), 204 (R. 112-14, 1921)).

Pieron also complains now that his trial attorneys failed to object to supposedly inadmissible evidence.  That complaint is premised on a misunderstanding of what is admissible evidence.

Not every act that furthers an illegal scheme must itself be illegal.  A person may legally buy a ski mask, a pillow case, and a fast car, but if that person uses those legally purchased items to rob banks, the evidence of those purchases are admissible at trial.

Likewise, the government is not limited to presenting only evidence of distinct and affirmative acts of evasion in a tax prosecution.  Evidence of conduct that is not itself an affirmative act of evasion, such as choosing to buy oneself a

customized motorcycle rather than use the available money to pay income taxes, is still admissible. Indeed, such evidence not only helped to prove that that Pieron's conduct constituted a continuing course of evasion of his tax obligations, but it also enabled the jury to see the willfulness of Pieron's evasion and to reject his claim of good faith.

Pieron's contention that evidence of his non-payment of his 2008 and 2009 tax obligations until 2018 was not admissible defies all logic and is not consistent with the rules of evidence. The government acknowledges that such evidence, alone, would not be enough to convict in a tax evasion case. *Spies v. United States*, 317 U.S. 492, 499 (1943). Nevertheless, Pieron has not and cannot demonstrated that failing to pay taxes when one has both the means and the obligation to do so is irrelevant or inadmissible. Indeed, avoiding payment is the primary objective of any tax evasion scheme, including Pieron's.

Similarly, Pieron claims incorrectly that evidence of his scheme to evade that pre-dated his filing of his 2008 and 2009 tax returns in January of 2011 was inadmissible. His reliance on *United States v. Mal*, 942 F.2d 682 (9th Cir. 1991), is misplaced. In *Mal*, the Ninth Circuit considered whether 26 U.S.C. §7201 created two offenses (evasion of assessment and evasion of payment), or merely one offense. The Ninth Circuit held that §7201 created one offense of tax evasion.

*Id.*, at 686-89.  More important for this case, the court in *Mal* did not in any way indicate a limitation on the admissibility of evidence in §7201 cases.

In the present case, the government properly presented evidence that Pieron was informed by his step-father sometime before July of 2008 that he needed to file returns and pay taxes on income received while living in Switzerland.  (R. 53: Tr., 704).  Consequently, in 2009, Pieron filed U.S. income tax returns for 2001, 2003, 2004, 2005, 2006, claiming to owe no tax or a very modest tax amount, and in one instance even claiming entitlement to a refund, in those years.  (Govt. exs. 34 (refund), 35 and 36 (no tax owed), 37 and 38 (reducing amount owed by claiming Swiss tax credit)).  Pieron did not file timely U.S. tax returns for 2008 and 2009 because he knew that he had substantial income from his stock sales to Cook, as he acknowledged in signing his tax returns for those years.  (Govt. exs. 40, 42).  Pieron was sophisticated enough to know that that income would result in a substantial tax liability for him for 2008 and 2009, and that knowledge gave him a reason to evade that tax obligation.[13]  Thus, the evidence regarding Pieron's conduct of his affairs before he finally filed his initial 2008 and 2009 tax returns was properly admitted.

---

[13] Pieron's knowledge of the U.S. income tax consequences of his stock sales with Cook gave Pieron a motive to evade his tax obligations by a variety of means, including fabricating a basis for the stock he sold to Cook to reduce the taxable income derived from those sales.

Pieron also claims that evidence of anything not included in the bill of particulars was inadmissible, and that his trial attorneys were ineffective for failing to object to the admission of that evidence at trial. The reasons for rejecting that claim have been discussed above in response to his motion for an acquittal.

Thus, because the evidence about which Pieron complains post-trial was properly admitted during his trial, Pieron's trial attorneys were not ineffective for failing to successfully object to the government's evidence. Likewise, because the government's evidence was properly admitted at trial, Pieron's trial attorneys were not ineffective for failing to object to the government's opening statement and closing argument based on that proper evidence. Pieron is not entitled to a new trial based on his ineffective assistance of counsel claim.

**The jury's verdict was amply supported by the weight of the evidence.**

Pieron's final contention in his motion for a new trial is that the jury's verdict was against the weight of the evidence. In rather intriguing fashion, he noted the somewhat different standard of review that applies to motions for a new trial based on such claims, but his only analysis of the weight of the evidence was attempted by adopting his motion for a judgment of acquittal.

The evidence discussed above in opposition to Pieron's sufficiency of the evidence challenge in his motion for an acquittal withstands the unsupported "against the weight of the evidence" claim by Pieron in his new trial motion.

While it is true that Pieron did vigorously cross-examine several government witnesses, and introduced exhibits during the government's case-in-chief, he did not present a case of his own during his trial. More important, in his new trial motion, Pieron did not identify the evidence that supposedly outweighs the evidence presented by the government nor "preponderates heavily" against the jury's verdict. *Ashworth*, 836 F.2d at 266. Accordingly, Pieron's contention that the jury's verdict was against the weight of the evidence fails.

Conclusion

For the reasons given above, James D. Pieron's motions for a judgment of acquittal and for a new trial should be denied.

Respectfully submitted,

Date:  July 8, 2019

Matthew Schneider
United States Attorney

s/Jules M. DePorre
Jules M. DePorre (P73999)
Assistant U. S. Attorney
600 Church Street
Flint, Michigan 48502-1280
(810) 766-5026
jules.deporre@usdoj.gov

s/Janet L. Parker
Janet L. Parker (P34931)
Assistant U.S. Attorney
101 First Street, Suite 200
Bay City, MI 48708
(989) 895-5712
janet.parker2@usdoj.gov

Certificate

On July 8, 2019, I filed this pleading by using the Clerk of the Court's ECF system. The ECF system will automatically serve counsel of record.

s/Janet L. Parker