UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                                    Case No. 18-20489

v                                                     Honorable Thomas L. Ludington

JAMES D. PIERON, JR.,

        Defendant.
_____/

**ORDER DIRECTING ADDITIONAL BRIEFING FROM
GOVERNMENT AND DEFENDANT**

On July 18, 2018, an indictment was returned against Defendant James D. Pieron for tax evasion. ECF No. 1. It provided:

> From approximately April 2009 and continuing through the present, in the Eastern District of Michigan and elsewhere, JAMES D. PIERON, JR., willfully attempted to evade and defeat the payment of income taxes due and owing by him to the United States of America for the calendar years 2008 and 2009, by committing affirmative acts of evasion, all in violation of 26 U.S.C. §7201.

On August 1, 2018, the Government filed a seven-page Bill of Particulars more specifically explaining the allegation that Defendant "willfully attempted to evade paying the federal income taxes he owed for 2008 and 2009." ECF No. 5 at PageID.9; *see also* ¶¶ 3, 6, 11, 12, 13, 14, 15, 17, 19.

On March 7, 2019, a jury found Defendant guilty of the offense. That is, the jury found the following elements of the offense to have been proven beyond a reasonable doubt:

(A) First, income tax was due from the defendant.

(B) Second, the defendant committed an affirmative act constituting an evasion or an attempt to evade or defeat his tax obligation.

(C) Third, in evading or attempting to evade or defeat his tax obligation, the defendant acted willfully.

Amended Jury Instructions, ECF No. 49 at PageID.283. Implicit in the jury's verdict was its rejection of the Defendant's defense of "good faith" which was explained to the jury in the following instruction:

(1) The good faith of Defendant James Pieron, Jr. is a defense to the tax charge in Count 1 of the indictment because good faith is simply inconsistent with willfully attempting to evade or defeat any tax.

(2) While the term "good faith" has no precise definition, it means, among other things, an honest belief, a lack of malice, and the intent to perform all lawful obligations.

(3) In assessing the Defendant's good faith, you may consider his reliance on an accountant or professional tax advisor if you find that he has made a full disclosure of the facts to the accountant or advisor.

*Id.* at PageID.284.

In April 2019, a status conference was conducted. The primary purpose for the conference was to address the Federal Sentencing Guideline issues that the parties anticipated would need to be resolved. Part T to Chapter 2 of the Federal Sentencing Guidelines applies to Offenses Involving Taxation. The Introductory Commentary provides as follows:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

Federal Sentencing Guidelines Manual, Introductory Commentary, §2T1 (Nov. 1, 2018). §2T1.1 provides that the base offense level for the offense of tax evasion is to be determined from the §2T4.1 Tax Table "corresponding to the tax loss."

The tax table at §2T4.1 of the Sentencing Guidelines, as it is relevant to Defendant's case, provides as follows:

|     |                      | Offense Level | Sentencing Table[1] |
|-----|----------------------|---------------|---------------------|
| (A) | $2,500 or less       | 0-6           | 0-6                 |
| (B) | More than $2,500     | 8             | 0-6                 |
| (C) | More than $6,500     | 10            | 6-12                |
| (D) | More than $15,000    | 12            | 10-16               |
| (E) | More than $40,000    | 14            | 15-21               |
| (F) | More than $100,000   | 16            | 21-27               |
| (G) | More than $250,000   | 18            | 27-33               |
| (H) | More than $550,000   | 20            | 33-41               |
| (I) | More than $1,500,000 | 22            | 41-51               |
| (J) | More than $3,500,000 | 24            | 51-63               |

At sentencing, the burden of proof for Guideline issues of fact is proof by a preponderance of the evidence. The burden generally falls to the government to prove the initial offense level and then shifts to the party seeking an adjustment to that initial offense level. *See U.S. v. Rodriguez*, 896 F.2d 1031, 1032–33 (6th Cir. 1990) ("[T]he government bears the burden of proof to establish facts that would enhance a sentence and [] the level of proof is by a preponderance of the evidence for contested facts."); *U.S. v. McGhee*, 882 F.2d 1095, 1097–99 (6th Cir. 1989).

## I.

During trial, the Government primarily focused its argument and its presentation of the evidence on the conflicting information furnished by the Defendant to his income tax return preparers and the accuracy of his reports of Foreign Bank and Financial Accounts ("FBARs").[2]

---

[1] The table applies to a defendant with no criminal history and no offense variable in addition to the base offense level.

[2] For example, the Defendant's initial set of income tax returns for 2008 and 209 were filed in January of 2011. Amended returns were filed in January of 2012. Schedule D reporting the sale of the Defendant's JDFX stock was reported as follows:

The Sixth Circuit requires the Government to show a substantial tax deficiency with respect to the years charged in the indictment. *U.S. v. Burkhart*, 501 F.2d 993, 995 (6th Cir. 1974); *U.S. v. Bencs*, 28 F.3d 555, n. 9 (6th Cir. 1994). And, of course, willfulness of evasion can be demonstrated by a defendant's failure to furnish a tax return preparer with accurate and complete information. *See U.S. v. Bishop*, 291 F.3d 110, 1106-08 (9th Cir. 2002); *U.S. v. Brimberry*, 961 F.2d 1286, 1290-91 (7th Cir. 1992); *U.S. v. Chesson*, 933 F.2d 298, 304-05 (5th Cir. 1991). Accordingly, however, the evidence offered during the trial did not focus on the Defendant's specific transactions which were the primary subjects of the returns.

## II.

During 2008 and 2009, the Defendant, a United States citizen, resided in Switzerland where he owned and operated a currency trading company called JDFX and several related companies. The Defendant was the founder and organizer of JDFX. According to the Defendant's income tax returns, the most significant financial transaction he engaged in in 2008 and 2009 was the sale of a portion of his JDFX stock to a Mr. Trevor Cook and a company named Market Shot controlled by Cook.

The Defendant was interviewed by the SEC in November of 2009. The following excerpt from the interview transcript is a summary of the Defendant's description of his transactions with Cook and Market Shot during the relevant time period:

> JDFX consists of three companies: Holdings, Tech, and Risk and Management Services ("RMS"). JDFX has two products: ITP – allows traders to trade at best price and it is used by various entities, including, JPMorgan, Barclay, Tresner, UBS, Deutche, and Bank of America and its function is to route orders at

|      |      | Acquired | Sold    | Price        | Basis       | Gain        |
|------|------|----------|---------|--------------|-------------|-------------|
| 2011 | 2008 | 1/14/04  | 2/4/08  | $9,346,617   | $6,675,034  | $2,671,583  |
|      | 2009 | 1/14/04  | 10/13/09| $4,450,460   | $3,276,786  | $1,173,674  |
| 2012 | 2008 | 1/14/04  | 2/4/08  | $10,000,000  | $710,129    | $9,289,871  |
|      | 2009 | 1/14/04  | 10/13/09| $5,250,000   | $0          | $5,250,000  |

- 4 -

best price; Kontrol – risk management product which allows retail brokers to run business from one station, it controls executions, risk trends and hedges at best price.

JDFX Holdings (formed in 2007) owns the two subsidiaries - Tech (formed in 2006) and RMS (formed at end of 2007 or early 2008). Tech is where the development takes place, it has workers and bills, takes cares of work permits and visas. RMS was created with the idea of being the vendor for the product like a marketing and sales entity. JDFX has not launched the Kontrol program because of regulatory issues. All JDFX entities were formed by Pieron and are based in Switzerland.

JDFX Fund is an entity incorporated in the Virgin Islands which holds brokerage relationship with Deutche Bank – who credits. JDFX Fund is a regulated entity by Financial Services Commission ("FSC"). JDFX Fund Manager manages JDFX Fund. Neither of these entities have any legal relationship with JDFX Holdings. The JDFX name came from "James" – "David" (attorney who helped Pieron form JDFX) and FX. Pieron is the CEO, founder and majority holder of all of the JDFX entities. JDFX Funds was formed in 2005.

JDFX Holdings owners are: Market Shot 35%; James Pieron 52.5%; and Clyde Diethelm 12.5%. Market Shot (Cook's company) increased its % ownership in 2009 from 20 to 35% and Diethelm earned its share thru time.

Pieron met Cook thru Nolan S. from PFG, Inc of Chicago. Pieron got a telephone call from Nolan telling him Cook was in town (in Switzerland) and wanted to meet with him. Cook showed up in Zurich around Sept or Oct 2006. Pieron later met Beckman thru Cook in his office in St. Paul around 2007. Cook wanted to meet with Pieron because he was making a tour of several FX companies. There was no purpose for the meeting; Cook was looking at FX companies. They talked about technology and Pieron gave Cook a demonstration of the ITP which was 90% developed and Kontrol's prototype. Cook did not say why he was interested in Pieron's products. Pieron was trying to do business with PFG and met Cook as a favor. The meeting was around l0 PM, and it was very inconvenient for Pieron.

Pieron doesn't recall when he spoke with Cook after than – sometime between Sept to December 2006. Cook was very impressed with the technology and was interested in trading in his platform and in investing in the company. At that time, Pieron was negotiating with FXOQ for an investment in the JDFX entities and they had done an evaluation. When Cook said he wanted to buy part of the company, Pieron had two deals on the table (Cook and FXOQ). The difference between the deals is that Cook wanted a bigger piece of the company and sent up a deposit immediately to show he was serious. The evaluation made for JDFX was for $50 million. [Per Fedders - the evaluation may be less; they don't know the value of JDFX as of today.]

> Cook's said he wanted to invest in JDFX because he wanted to personally diversify himself. Cook wanted to invest twice as much as FXOQ. There were no representation made by Cook, he was interested in trading in JDFX's platform because he will be savings millions per year. Cook's offer was $10 million for 20% ownership. Cook didn't say where the money was coming from – he sent half million deposit. [Per Fedders - the deposit came from UBS Diversified Growth ("UBS Diversified") account on 12/4/06.] There were several transfers after the initial deposit - it ended up being $10 million for 20% of company. From December 2006 (deposit) through the end of 2008 or early 2009 Cook invested $15.2 million to buy stock from Pieron in the name of Market Shot for its current ownership of 35%. [Per Fedders - most checks came from UBS Diversified, 2 from Cook and 2 from Market Shot.]
>
> Not all money received from Cook represented purchase of shares, some of the money to the Holding company. [Per Fedders – Cook was buying 35% investment, other money to trading platform for trading and Cook exercised own discretion without Pieron's input. Beginning in 3/6/07 up to June 2007, Cook transferred money (including some from Beckman's entity). Cook deposited for trading was about $22.3 million and withdrew $13 million. Cook had some success trading and was up 30% at some point but suffered losses of about $9.5 during 2007-2009. Balance on the account is now between $123-125,000. Cook took 2 withdraws back to back: 1/20/09 for $5 million and 1/26/09 for $7 million *{bank records show this withdrawal on 6/26/09}* and had previously taken out $1 million on 6/28/07.] Cook didn't say why he was withdrawing funds.
>
> Funds for the stock purchase went mostly to JDFX Holdings' two accounts at Credit Suisse and UBS. but because JDFX Holdings didn't exist when Cook started sending funds for his investment, the funds were sent to JDFX Management at Credit Suisse. Funds for the trading platform were sent to JPMorgan-London. Funds from Cook to UBS AG and Credit Suisse were for stock and funds to JPMorgan were for trading. [Per Fedders there were also $500,000 from Oxford Global Advisors ("Oxford Advisors") as loan payback on 4/14/08 – loan payback of $650,000 and $150,000 was returned. There were 3 deposits from Oxford Global FX Growth ("Oxford FX"): 4/20/08 $1 million; 5/8/08 $2 million and 5/19/08 $1 million. Shares were transferred by certificate from Cook.]

ECF No. 112-10 at PageID.1902-1904 (sic throughout).

## III.

Following the April 2019 status conference, the Government was directed to file a Tax Loss Assessment and Defendant was directed to file a response. ECF No. 59. The Government

concluded that Defendant's tax liability for 2008 was $2,517,958 and $777,320 for 2009. ECF No. 59. The Defendant concluded that he had no tax loss for 2008 and 2009. ECF No. 65.

The Government's tax loss assessment was relatively straightforward – it suggested that the income reported on the form 1040s filed by the Defendant on his income tax return filed on January 16, 2012 for 2008 and 2009 is reasonably accurate (without any corroborating financial information included with the submission) – but rejected "the theft loss deduction and the basis for the sale of stock" for the sale of the JDFX stock to Trevor Cook. ECF No. 60 at PageID.1097. The result was $15,250,000 of long-term capital gain for the Defendant's sale of the JDFX stock reported by the Defendant to have occurred on January 4, 2008 and October 13, 2009 with no offsetting tax basis or deduction. According to the Government, the tax due from the Defendant for 2008 and 2009 is $3,295,278.

The Defendant's explanation that he owed no tax for years 2008 and 2009 was traceable, he explained, to three reasons, which notably, involved an entirely new and different explanation of the JDFX stock transaction. First, he explained that the revenue received for the sale of the stock was only $5,250,000 in 2008 and 2009 of the total $15,250,000 received from Cook. Second, Cook did not purchase the JDFX stock from the Defendant. On the contrary, Defendant explained that Cook purchased stock in a JDFX affiliate organized under Swiss law in 2006. No further explanation was included about the Swiss affiliate or its relationship with the other business organizations organized by the Defendant. And third, the Defendant did not receive the proceeds from the sale of the JDFX stock. On the contrary, the "bank records and source documents" (which were not included with the submission) proved that all of Cook's $15,250,000 of funds were deposited into bank accounts owned solely by JDFX and not the Defendant's personal account.

Facing fundamentally inconsistent factual assertions, the Court sought additional information by directing supplemental briefing from the parties on a number of questions.

### IV.

### A.

First, the Government was directed to file supplemental briefing addressing the following matters:

1. Why the July 16, 2012 filed 2008 and 2009 returns were the relevant returns assessing the Defendant's federal income tax liability and why no attention was given to the January 2011 amended returns *or* the Second Amended returns and Offer in Compromise made with the assistance of C.P.A. Pavlik.

2. To explain, factually and legally, why the Government simply concluded that the JDFX stock sold by the Defendant to Mr. Cook had no cost basis.

The Government's supplemental briefing addressed the first question about why it selected the July 16, 2012 returns for 2008 and 2009 by explaining that they believe they are simply "more accurate than the initial returns prepared by Carol Nathan" because they more correctly correspond to the "available bank records." ECF No. 112 at PageID.1791. The answer to the second question, asking the Government to address factually and legally why the Government concluded that the JDFX stock sold by the Defendants to Mr. Cook had no tax basis, was that the Government was "not aware of source documents reflecting any capital contribution that Pieron made to JDFX Holdings prior to the stock sales." ECF No. 112 at PageID.1796. They did not address the legal significance of the Internal Revenue Service's notice of deficiency or the Defendant's Second Amended Return or the Offer in Compromise.

### B.

The Defendant was directed to file supplemental briefing on the following matters:

1. The factual assertion (with the submission of corroborating documents), that the sale of stock reported by the Defendant in two income tax returns filed for 2008 and 2009 was not the Defendant's stock sale, but a capitalization or recapitalization of a JDFX Swiss affiliate and the issuance of stock in the new affiliate.

2. The legal relevance of the amended tax returns filed by Defendant in January 2012, the second amended return filed in March 2014, and the Offer in Compromise filed in April 2014. Additionally, the factual assertion made by the Defendant in the May 2019 Response to the Government's Tax Loss Calculations that Cook only paid $5,200,000 for the JDFX stock in 2008 and 2009. As the Court understood the Internal Revenue Code, after the due date for a 1040 return had passed, the Internal Revenue Service had the discretion to accept or reject amended returns and may proceed to assess the tax by issue of the notice of deficiency. Accordingly, it was unclear why the Court in a sentencing hearing in October of 2019 should give any consideration to the returns filed after July 16, 2012, let alone the new factual assertions made in his Response.

The Defendant responded with documents corroborating in part his suggestion that the funds received from Cook were deposited to JDFX accounts (and not to the Defendant's personal accounts) as well as documents reflecting the creation of a Swiss entity in 2006. He further explained his most recent characterization of the Cook payments for stock in JDFX, stating "[t]he truth does matter and Pieron hopes that the court now concurs." ECF No. 117 at PageID.2516. The explanation did not address the Internal Revenue Service's notice of deficiency nor the Defendant's apparent adoption of the assessment. It did explain that C.P.A. Pavlik's idea of

reporting a theft loss on Pieron's amended 2008 and 2009 returns "…cannot be supported by law." ECF No. 117 at PageID.2512. It did not include a citation to any legal authority for disregarding the Defendant's Internal Revenue Service returns or any legal authority authorizing consideration of his most recent explanation of events.

V.

During the trial, the Government nor the Defendant offered testimony from a certified public accountant or from the Defendant himself addressing the Defendant's 2008 and 2009 tax liability, probably for sound tactical reasons. As a result however, much, if not most, of the Court's developing understanding of the Defendant's financial transactions in 2007, 2008, and 2009 is the result of the Parties' post-trial briefing. Progress can be reported by the Court, but significant legal questions remain about how to resolve this breathtaking gap of information that is likely to have a very material impact on the Defendant's sentence.

The Government, without citation to legal authority, would have the Court simply accept one set of returns filed by the Defendant in January of 2012 solely because "they appear" to be, in the Government's view, most consistent with the Defendant's source documents. But then the Government asks the Court to assume the Defendant's basis in the stock is zero and to allocate the burden of proof to him to substantiate the tax basis in the JDFX stock. What legal authority exists for either proposition? Is the Defendant allocated the burden of proof for the tax basis but otherwise foreclosed from challenging the accuracy of the reporting of the timing of the receipt of the income?

While Defendant suggests that the "truth does matter" the question remains, what truth is he referring to? All of the returns completed by the Defendant for the Internal Revenue Service included his representation by his signature that the returns were true, correct, and complete. And

as different as each return was in reporting the Defendant's financial activity in 2008 and 2009, his most recent response to the Government's tax loss calculation represents a 180-degree departure from his previous representations in all of his filed returns. What is the legal authority for the proposition that a tax payer in a sentencing hearing in October of 2019 for tax evasion is entitled to restate his financial information that occurred more than a decade prior in time? On what basis are all of his prior returns (the Court counts four including his notice of doubt about liability in April of 2014) to be similarly disregarded as legally irrelevant?

## VI.

The Government will be directed to address why the Court, can, let alone should, be considering proof of the Defendant's 2008 and 2009 income and the associated tax basis for the JDFX stock. 26 U.S.C. §6531 governs the timing for prosecution of tax crimes. Attention will be given to that statute later. However, a separate statutory provision 26 U.S.C. §6501(a), as the Court understands it, governs the Internal Revenue Service's ability to assess the tax it believes to be warranted within three years from the date income tax returns are filed – implementing a fundamental principal of finality for the tax payer. And of course, the Internal Revenue Service has the administrative ability to audit individual tax payer's returns during that three-year time period. The Court's understanding is that the Government never sought an audit of any of the returns. Moreover, the Bill of Particulars reflects that the IRS issued a Notice of Balance Due (Deficiency) to Pieron in February of 2011 for the Defendant's 2008 and 2009 income tax liability (the Court has been unsuccessful in locating the Notice). ECF No. 5 at ¶9. Equally important, if the IRS and therefore the Government are not governed by the Internal Revenue Code, what principle of law permits the Government to take up the question of Defendant's tax liability for

2008 and 2009 in a sentencing hearing in 2019, but forecloses the Defendant from furnishing evidence of a lower taxable income?

The Defendant's response also needs to be supplemented. While the filing of a taxpayer's return commences a three-year limitation on the Government's right to assess a higher tax liability, the Notice of Deficiency issued by the Internal Revenue Service (the "90 day letter") authorized by 26 U.S.C. §6212 gives the taxpayer 90 days to file a complaint with the U.S. Tax court to dispute the I.R.S. assessment of the tax liability. However, failing to file a complaint with the Tax Court makes the deficiency final and collection efforts by the Internal Revenue Service can commence. To the Court's understanding, the Defendant let the 90-day time period after the assessment pass without objection. Accordingly, the Defendant will be directed to explain the legal authority for his suggestion that in October of 2019 he is entitled to advance entirely new information about the JDFX stock sale transactions in 2007, 2008, and 2009.

## VII.

Accordingly, the parties are **DIRECTED** to file supplemental briefing addressing the matters identified in this order on or before **October 11, 2019** with responses from each party due by **October 16**. The supplemental briefing shall not exceed 20 pages and the responses shall not exceed 7 pages.

Dated: September 25, 2019                                    s/Thomas L. Ludington
                                                             THOMAS L. LUDINGTON
                                                             United States District Judge