UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,                    Case No. 18-CR-20489

                        Plaintiff,           Thomas L. Ludington
        v.                                   United States District Judge

                                             Patricia T. Morris
JAMES D. PIERON, JR.,                        United States Magistrate Judge

                        Defendant.
_____/

**GOVERNMENT'S FOURTH SUPPLEMENTAL BRIEF ON TAX-LOSS ISSUES**

In the discussion below, the government will address various matters raised

by the court's most recent order for supplemental briefing.  (R. 130: Order, 2884-

90).  However, the government respectfully submits that it is time to restore the

focus of inquiry to what is appropriate for purposes of determining the intended tax

loss for which James Pieron is responsible under the sentencing guidelines.

The task before the court is to make a reasonable estimate, not a precise

determination, of the *intended* tax loss amount for which James D. Pieron, Jr. is

responsible.  USSG §2T1.1, comment. (n. 1).  *E.g.*, *United States v. Olive*, 804

F.3d 747, 758 (6th Cir. 2015).  As has been cogently explained, "neither the

government nor the court has an obligation to calculate the tax loss with certainty

or precision[,]" because "[r]equiring precise calculations which entail the gathering

of documents that are diffuse and/or difficult to obtain would reward a defendant

1

whose tax fraud was particularly complex and/or spanned a significant period of time." *United States v. Spencer*, 178 F.3d 1365, 1368 (10th Cir.1999).[1]

Because the guidelines require the court to focus on the tax loss that Pieron intended to inflict on the IRS, the representations (including omissions) that Pieron made to his many tax preparers, his many attorneys, on multiple occasions to the IRS, and even to this court, must control the analysis used in assessing the loss intended by Pieron.  Pieron's actions and representations, rather than documents that Pieron did not provide to his tax preparers and the IRS in the relevant timeframe, alone have relevance.  That mode of analysis is required by the guidelines, even if the documents now produced by Pieron may seem at times to refute Pieron's prior representations, because the court need only estimate the tax loss intended by Pieron, not determine the actual tax loss that may have been incurred by the IRS, in computing Pieron's base offense score under USSG §§2T1.1(a) and 2T4.1.  *E.g.*, *United States v. Kraig*, 99 F.3d 1361, 1370-71 (6th Cir. 1996); *United States v. Daulton*, 266 F. App'x 381, 387 (6th Cir. 2008).  The concept of intended loss is particularly appropriate in this case, where Pieron stands convicted of *attempted* tax evasion.

---

[1] Not only was Pieron's tax fraud scheme long-running and complex, but it involved his use of numerous foreign entities and foreign financial accounts, including multiple Swiss bank accounts.

In addition, James Pieron is the only person who had (and perhaps has) all of the relevant documents and the contemporaneous knowledge of the transactions that are or should have been reflected on his 2008 and 2009 federal income tax returns. It is understandable that he has elected to exercise his right to not testify. Nevertheless, in the absence of credible testimony by Pieron, the contradictions, gaps and ambiguities in his financial records cannot be satisfactorily explained or resolved to negate the tax loss calculations presented by the government.

## Discussion

**Government ex 138**

James Pieron wrongly asserts that Government exhibit 138 corroborates his claim that he never personally received funds from Cook/Market Shot. (R. 130: Order, at 2887). Government exhibit 138 does not purport to be a complete accounting of where the Cook/Market Shot funds went after Cook wired them to JDFX Management account. Significantly, that exhibit does not show that Pieron took $8.3 million from JDFX Fund Management in two transactions, then wired $7.5 million to personally invest in JDFX Fund Ltd. (Govt. ex 119, at PgId 2286, 2288; Govt. ex 211). (See also discussion regarding Pieron's records, pp. 6-9).

**Judicial estoppel**

In an attempt at mitigating the sentencing consequences of his tax evasion conviction, James Pieron appears to claim that he should be allowed to ignore,

3

revise and even contradict the representations that he, his counsel, his tax preparers, and his sworn tax returns and other documents, made to the IRS, the SEC, and even this court, over the course of many years.  (R. 129: Opinion, 2876, 2878-81).  In that effort, Pieron inaccurately contends that "it is undisputed" that there was a "single transaction" involving stock certificates supposedly exchanged between JDFX (without specifying the particular JDFX entity), that resulted in "all of the proceeds received from Cook/Market Shot" being "invested in JDFX."  (R. 130: Order, 2284, 2889).  As will be discussed further below, the supposedly undisputed allegations are very much in dispute.  However, the dispute need not be resolved because, for multiple reasons, Pieron is barred from foisting yet another fraud, this time on the court, to influence his sentence.

Pieron's claim that he merely made a mistake, or series of mistakes,[2] in his dealings with the IRS is foreclosed for a variety of reasons, only one of which is the judicial estoppel recognized by the court. (R. 129: Opinion, 2876, 2878-81).  The Sixth Circuit has held that for guidelines purposes, "the relevant point in time for determining loss is at the time the crime was detected, rather than at sentencing[.]"  *United States v. Flowers*, 55 F.3d 218, 221 (6th Cir. 1995) (determining loss in fraud context), and *United States v. Maddux*, 917 F.3d 437,

---

[2] The acts that Pieron now seeks to characterize as "mistakes" worked to his benefit at the time when he intentionally committed those "mistakes," whether the mistakes involved avoiding Swiss taxes or assisted him with the SEC.

450 (6th Cir. 2019) (applying *Flowers* in tax fraud case).  Likewise, in *Raymond v. United States*, 511 F.2d 185, 189-91 (6th Cir. 1975), the Sixth Circuit placed the burden on the taxpayer to present contemporaneous evidence, not testimony given years later, regarding the proper characterization of a transaction.  The Sixth Circuit emphasized that the contemporaneous evidence requirement was essential to minimize the danger that taxpayers will wait to characterize transactions until the tax consequences of the characterizations are known.  *See generally*, *Allred v. United States*, 689 F. App'x 392, 395 (6th Cir. 2017) (rejecting a contention that "a better case" fashioned after an adverse ruling [in Pieron's case the jury's verdict], should form the basis of subsequent review).  Thus, Pieron cannot use post-conviction, revisionist-analysis, based on information that was not made available to his tax preparers or the IRS while Pieron pursued his evasion scheme, to influence the intended loss for which he is responsible for sentencing purposes.

Fundamentally, however, the court need not rely on judicial estoppel because Pieron's argument is foreclosed by the jury's verdict.  That guilty verdict necessarily is based on the jury's finding that Pieron willfully attempted to evade his 2008 and 2009 federal income taxes. (R. 47: Verdict form, 261).  Moreover, the government has met its burden of proof on the tax loss intended by Pieron, in large part by presenting Pieron's own statements on his tax returns and elsewhere.

5

**Ambiguity and conflicting information in records**

James Pieron provided very little information, and even fewer source documents, to the preparers of his various returns, Christopher Werwega,[3] Carol Nathan and Kim Pavlik.  Similarly, during the SEC investigation into Pieron's stock transactions with Cook/Market Shot, Pieron's attorney, John Fedders, described the information available to him from Pieron as "scant," observed that there was "little documentation" regarding some corporate matters, and explained that it was difficult even then, *i.e.*, 2011, to provide details regarding Pieron's use of the funds received via the stock sales.  (Govt. ex 208, at PgId 2256).  Recently, however, Pieron has sent a deluge of documents to the court.  Upon inspection of those documents, it is apparent that the information is frequently ambiguous and/or conflicting.  The following examples illustrate the point.

The stock sales agreements (Govt. exs 201, 202, 202a), all of which Pieron eventually presented to Pavlik, conflict with the financial records Pieron withheld from his tax preparers but now has provided to the court.  Information regarding the dates of organization of and dissolution of various companies also conflicts, as seen by comparing Fedders statement to the SEC that JDFX Holdings was formed in 2007 (Govt. ex 200, at PgId 1902), which is <u>after</u> the date of issuance of the

---

[3] Werwega was compelled by the lack of information provided by Pieron to resort to obtaining Pieron's information from the IRS pursuant to a power of attorney signed by Pieron on July 8, 2008.  (Govt. ex 214).

purported 2006 stock certificates now presented by Pieron (stock certificates 1, 2 and 3 [filed under seal] with R. 124: Pieron brief).  Likewise, Pieron now claims that he lost money because of the dissolution of JDFX Holdings, but Pieron told the SEC in 2011 that "all creditors were paid, except for a Swiss tax liability in JDFX RMS."  (Govt. ex 208, at 2856).

With regards to the stock sales, either Pieron made in two stock sales to Cook/Market Shot in 2008 and 2009, upon receiving multiple deposits totaling $15.2 million over time that were applied to those two sales - consistent with his sales agreements and the representations Pieron made to his tax preparers, the SEC and the IRS - or Pieron engaged in far more than four transactions between 2006 and 2009, as reflected in his financial records, but contradicted by the stock certificates issued to Market Shot and Pieron's filed tax returns for those years. Contemporaneous records say that the $15.2 million in deposits received by Pieron were applied towards the stock sales consummated under two sales agreements, which is also the information that Pieron gave to his tax preparers and the IRS prior to his development of his post-conviction motive to revise the transactions.

Contemporaneous documents to support Pieron's claim that he loaned money to JDFX Holdings are also absent.  The government notes the absence of the type of records and other indicia of loan creation required to demonstrate the existence of valid loans from Pieron to the company.  *Raymond*, 511 F.2d at 189-

7

91.  Rather, the July 6, 2010 entry made by Carol Nathan in conjunction with her work on Pieron's returns shows that Nathan asked Pieron to send her a promissory note he supposedly wrote to himself to document the loan, though subsequent entries indicate that Pieron never sent Nathan the promissory note.  (Govt. ex 56, at PgId 2147-51).[4]  Similarly, in a less-than-contemporaneous letter to Pavlik, Pieron said that he loaned "a substantial portion" of his capital gains from his stock sales to JDFX.  (Govt. ex 204), but Pieron did not provide any loan documentation to Pavlik.

As a final example of the folly of trying to reconstruct Pieron's finances today for sentencing purposes, consider the incompleteness of the records that Pieron purports to rely on to substantiate his summary found at tab 27 of the documents he provided on October 29, 2019.  The documents cited as the support for that summary show only part of the transactions because the source of funds included in the summary is unknown or unclear in many instances.  Careful review of the summary and related documents reveals that transactions totaling millions are without source documents.

---

[4] Nathan noted the next day that Pieron "insist[ed]" that he had a capital gain from the sale of his stock and that he would provide her with the information needed to prepare his Schedule D for that transaction. (Govt ex 56, at PgId 2150).

Fortunately, the court need not - and indeed should not - perpetuate the struggle to resolve these conflicts and ambiguities to make a reasonable estimate of the tax loss intended by Pieron prior to his conviction.

**Unreported 2008-2009 income, in addition to $5.2 million from Market Shot**

It has been suggested that, other than his modest wages, Pieron had $5.2 million in income from the sales of stock in 2008 and 2009, but that Pieron might, through various means yet to be determined, off-set that income and any tax obligation for those years.  That suggestion erroneously assumes that Pieron accurately reported all income other than the stock sale proceeds in those years. On the contrary, Pieron took over $2.546 million out of the JDFX Fund Ltd. account on February 4, 2008.  (Govt. ex 212, bates 1481).  On December 1, 2008, Pieron paid a $2.5 million deposit on a bank purchase agreement.  (Govt. ex 215, excerpt of letter).  In 2009, after the bank purchase deal failed, Pieron personally sought the return of his $2.5 million deposit (*id.*), indicating that Pieron had at least $2.546 million in unreported income in 2008.[5]  In addition, Pieron transferred

---

[5] Interestingly, and again conflicting with the roughly contemporaneous information in his letter seeking return of the deposit (Govt ex 215), Pieron claims in his newly-minted summary, tab 27, that he paid the $2.5 million deposit on December 18, 2008 with money paid by Cook/Market Shot for stock transferred in 2009.  However, the $2.1 million wire transfer from Cook was received on December 17, 2008 (Govt ex 138, at PgId 2422), over two weeks after Pieron had paid the deposit for the bank purchase.  Thus, the stock sale proceeds were not used by Pieron to pay the deposit, as he now claims in his summary.

money to companies that he owned, including IB Tech, Komplique, and to his personal accounts, in 2008 and 2009.  (*E.g.*, Govt. ex 129, at PgId 1895-98; Govt. ex 91; Govt. ex 117; Govt. ex 213, bates 1251, 1260.) Those transfers were income to Pieron in the years in which the transaction were made.

**Chelsea Rebeck testimony irrelevant**

Pieron indicated during the conference on October 29, 2019, that his sole witness at an evidentiary hearing would be Chelsea Rebeck, offered to provide opinion testimony demonstrating that Pieron had no 2008 and 2009 income tax obligation.  That testimony is irrelevant because the testimony would rely on documents that Pieron did not provided to his actual tax return preparers and the IRS; is premised on transactions involving funds from unknown sources; does not include all of Pieron's 2008 and 2009 income; and does not recalculate Pieron's tax obligations for earlier years to demonstrate that Pieron actually paid the taxes he owed on the income he supposedly received in those earlier years, thereby allowing Pieron to use that income to off-set his income in 2008 and 2009.  In short, the proffered opinion testimony is merely *post hoc* analysis of ambiguous and conflicting records, carefully selected to support Pieron's latest 2008 and 2009 tax thesis.

Again, it must be remembered that the issue before the court is the tax loss intended by Pieron before his crime was discovered, not any actual loss that can be

10

recalculated 10 years after the transactions at issue on incomplete records and records concealed by defendant from his prior tax preparers and the IRS. The proffered Rebeck testimony, no matter how candid and detailed, will do nothing to clarify the tax loss that Pieron intended before his crime was discovered, and therefore is irrelevant.

**Pieron cannot provide contemporaneous documents supporting the basis on JDFX stock**

Pieron has failed to establish with contemporaneous source documents that he had a basis in the stock he sold to Cook/Market Shot. For the reasons discussed above, Pieron's analysis in his summary is insufficient to establish the necessary facts. More important, Pieron has not demonstrated that any provision in the IRS Code or implementing regulations allows him to deduct basis derived from investments made with untaxed income from earlier years.

**Defendant's statements and representations prior to conviction**

The evidence that is relevant at this juncture is, in large part, the evidence and reasonable inferences from the evidence, regarding the representations made by Pieron to Werwega, Nathan, Pavlik, the SEC, the IRS, and even the court. To the extent that that evidence is subject to clarification or refutation, the one person who might be able to clarify or refute that evidence is James D. Pieron, Jr. Likewise, Pieron is the only person who can attempt to explain the glaring inconsistencies between his various assertions over time and his own financial

records. Pieron is certainly under no obligation to testify, yet in the absence of credible testimony by Pieron, the court must estimate the intended tax loss from the record Pieron created before he was convicted.

**Brief Review and Analysis of Trial Evidence[6]**

As the court observed on October 29, 2019, the documents provided by Pieron seem to have been generated with U.S. tax law in mind after talking to Werwega in 2008.[7] The transactions reflected in Pieron's financial records seem to reflect fraud on Swiss tax authorities, too.

Pieron has demonstrated his awareness of the tax consequences of his activities from the inception of his foreign currency exchange business in 2006, at the latest, to the present. In fact, precisely because of his consciousness of taxation, Pieron structured his business affairs in a way that enabled him and his business interests to avoid taxation under Swiss law.

When Pieron decided to return to the United States, he grudgingly took up the task of getting current on his obligation to file tax returns with the IRS. Pieron

---

[6] A more detailed discussion of the trial record, with record citations, is in R. 133: Govt's Opposition to Motions for Judgment of Acquittal and New Trial, at 1996-2003.

[7] It can be inferred from Werwega's refusal to prepare Pieron's tax returns for 2007, 2008 and 2009, and from the POA signed by Pieron in July of 2008, that Pieron described his stock transactions to Werwega in 2008 and knew from that time on that he owed a substantial tax obligation to the United States. That knowledge gave rise to Pieron's scheme to evade those taxes.

was so unwilling to engage in that obligation that he did not provide any source documents to Christopher Werwega, the person Pieron arranged to have work on his delinquent taxes. Werwega was left to turn to the IRS for information regarding Pieron's income. It is important to keep in mind that fact as Pieron attempts to use documents that would have been available to him at that time to influence the court's sentencing decisions now, a decade later.

Another manifestation of Pieron's intent to evade compliance with U.S. tax laws is the fact that Pieron's tax return preparer, Werwega, signed Pieron's 2001 through 2006 tax returns in December of 2008, but Pieron did not submit the returns to the IRS until November of 2009. (Govt. exs 34-38). Significantly, Pieron used foreign tax credits to avoid having to submit any payment with his 2001 to 2004 returns, and acknowledged owing only $1,345 and $3,997 on his delinquent 2005 and 2006 returns, respectively. (*Id.*).

Exactly when Pieron first became aware of the consequences under U.S. tax law of the transactions he had conducted in Switzerland is unknown. However, it is fair to infer that even if Pieron was not already aware of the U.S. tax implications, his discussions with Werwega not later than 2008 made Pieron aware of his tax problems. Precisely because Pieron was aware of the tax consequences of his Swiss business transactions, Pieron engaged in a series of acts with the intent to achieve his objective of evading the taxes he owed to the IRS.

Among the acts Pieron committed in furtherance of his tax evasion scheme was his repeated filing of false tax returns. Pieron did not report on his 2006 and 2007 tax returns all of the income he had received in those years. Conspicuously absent from Pieron's signed 2006 tax return is the $500,000 in income he now claims that he received in that year, rather than in 2008 or 2009. (Govt. ex 38). As a result, Pieron substantially underreported both his income by at least $1/2 million and the tax he owed for 2006.

Given the significance of $1/2 million to Pieron's business endeavors in 2006, as Pieron now claims, his failure to reveal that income to Werwega can and should be recognized as an intentional act of evasion by Pieron. In like vein, Pieron gave false information to both Carol Nathan and Kim Pavlik when he sought their assistance in preparing tax returns for subsequent years, then signed and submitted to the IRS the false tax returns that based on his false information. Those acts were also part of Pieron's consistent pattern of evasion that continued through his trial.

Years after his 2007, 2008 and 2009 returns were due, Pieron retained the services of a tax resolution service to prepare those returns and to work out a deal to make his tax indebtedness go away. Carol Nathan was assigned to prepare Pieron's delinquent returns. However, Pieron did not provide source documents to Nathan. Consequently, Pieron's 2007 return, submitted to the IRS by Pieron in

14

January of 2011, makes no mention of the $9.5 million Pieron supposedly received in 2007 from the sale of stocks.  (Govt. ex 39).

Still relying almost exclusively on non-source information provided by Pieron, Nathan also prepared Pieron's 2008 and 2009 tax returns.  Pieron also signed those returns and submitted both to the IRS in January of 2011, knowing that his 2008 and 2009 returns contained false information regarding both his income and, with regards to his 2008 return, the unsubstantiated basis he used to offset some of that income.  (Govt. exs 40, 42).  In signing both of those returns, and his 2010 return (Govt. ex 43), Pieron acknowledged that he owed taxes for 2008, 2009, and 2010, and other evidence showed that Pieron had the ability to pay the amounts he owed for his taxes.  Nevertheless, as a further act of tax evasion, Pieron did not tender payment to the IRS with his 2008, 2009 or 2010 tax returns. Instead, Pieron turned to CPA Kim Pavlik in continued pursuit of his scheme to avoid taxation by finding some means to negate the income that Pieron had received in those years.

From Pieron's perspective, he chose the right man for the job when he retained the services of Pavlik.  In January of 2012, Pieron signed his amended tax returns for 2008 and 2009, prepared by Pavlik, and submitted the returns to the IRS.  (Govt. exs 41, 48).  Pieron's amended 2008 tax return reported to the IRS different amounts for both income and (unpaid) taxes owed for those years.

Significantly, Pieron's amended 2009 tax return was premised on a claim that he had a theft loss that reduced his income for that year and the tax he therefore owed.

Pieron was not a victim of a theft loss. Current counsel for Pieron candidly and accurately has acknowledged that Pieron's claim was both legally and factually indefensible. (R. 117: Def's sealed brief, p. 7). Ironically, it is possible that Pieron was motivated to provide some of the false information on his original and amended tax returns for several years because he had already committed himself to various facts underlying the theft claim during an SEC investigation. Pieron's explanation to the SEC quite likely was critical to his successful effort aimed at avoiding being indicted in a Ponzi scheme and being obligated to return funds to the SEC receiver.

Pieron amended his 2008 and 2009 returns in 2012, but the thing that he did not change was his refusal to submit payment with his tax returns. Instead, in January of 2012, Pieron and Pavlik also prepared and submitted a false collection information statement and installment agreement proposal to the IRS. (Govt. ex 45).[8] In that agreement, Pieron acknowledged that he owed $444,880 for his 2007, 2008 and 2009 taxes, but offered to pay only $1,500 per month toward that debt.

---

[8] Pieron did not disclose on his collection information statement a Mercedes Benz automobile, purchased by Pieron for $110,000 and paid in full in August of 2009, but titled at Pieron's direction in the name of one of his solely-owned businesses. (Govt. exs. 102, 171). Pieron also significantly understated the value of his business entities on his collection information statement.

16

Though Pieron had failed to disclose that he had the means to make much larger payments, and probably could have made a lump-sum payment in full, the IRS did not accept Pieron's offer.  And while Pieron made a few $1,500 payments to the IRS, Pieron's evasive measures continued thereafter, including deliberately concealing his interest in his Peregrine Fund Investment account from the IRS and filing an FBAR that under reported the balance his foreign bank account by at least half a million dollars.  (Govt. ex 115; Govt. exs 19, PgId 2055, and 129, PgId 1898).

Working at Pieron's direction and relying on Pieron for information, Pavlik formulated an offer in compromise and collection information statement in April of 2014.  (Govt. exs 46, 47).  In those documents, Pieron offered to resolve his tax indebtedness for 2007, 2008, 2009, 2010 and 2011 with a $30,000 payment, again by providing the IRS with false and incomplete information regarding his finances.

Pieron, again with the assistance of Pavlik, also attempted to foist a "claim of right" doctrine claim on the IRS to negate Pieron's tax obligations.  Though current counsel for Pieron have wisely acknowledged that the claim is factually unsustainable (R. 117: Def's sealed brief, p. 7), the relevant fact is that Pieron provided the information that was used by Pavlik to develop that baseless claim and that Pieron submitted yet another amended return to the IRS premised on that frivolous claim.

Thereafter, Pieron continued to evade his tax obligation. He declined to own any real or substantial personal property in his own name that could be attached by the IRS. He put the title to the high-end vehicles he used in the name of companies he controlled. He hid his personal assets in his solely-owned businesses throughout the relevant timeframe. For example, Pieron used his business financial accounts to hide his personal funds and then used those funds to buy a wide assortment of luxury items, ranging from a Steinway piano, wines, luxurious cruises, charter airplane flights, and tuition payments for a third party, all while keeping very few funds in his personal financial accounts. He also opted to make "loans" of as much as $750,000 to IB Tech and $800,000 to Komplique, his own companies, and thereby hid his assets from the IRS.

Ultimately, in a desperate attempt at avoiding his full tax obligation and the consequences of his acts of evasion that he knew were looming, Pieron finally made a substantial payment to the IRS shortly before he was indicted. When that payment did not have the effect that Pieron had intended, and he was indicted in this case in July of 2018, Pieron made yet another sizable payment on his tax obligation in the fall of that year. However, Pieron cannot invoke those payments now to reduce his guidelines score for his crime of conviction. Indeed, the Sixth Circuit observed in *United States v. Tandon*, 111 F.3d 482, 490 (6th Cir. 1997), that to allow a defendant like Pieron "to nullify much of the burden of his crime

simply by paying the tax liability once the IRS ha[s] begun to audit or investigate"

his crime would yield "perverse result[s]."

## Summary

In the discussion above, the government has sought to address the matters

raised in the court's November 1, 2019 order for additional briefing.  (R. 130:

Order, 2884, at 2889-90).  As to the first question, the government submits that, for

the reasons discussed on pages 2 through 5, above, James D. Pieron, Jr., cannot re-

characterize his stock transactions and the resulting tax consequences post-

conviction.  Pieron is precluded from doing so by a variety of factors, including the

jury's verdict, Pieron's own sworn tax returns and his other consistent, pre-

conviction representations, as well as by judicial estoppel.

As to the second question raised by the court, including the various sub-parts

of the question, the government consistently has maintained above (pp. 6-10), and

throughout this case, that Pieron received income from selling some of his stock in

JDFX Holdings in 2008 and 2009, as reflected in his stock sales agreements and

his multiple sworn tax returns for those years.  The government also has

maintained that Pieron has not and cannot establish a valid basis in his stock.

(*E.g.*, p. 11, above).  Though Pieron caused his personal income from his stock

sales to be deposited into the accounts for his businesses, he maintained personal

control over the money.  That conduct is consistent with Pieron's proven method of evasion-by-concealment over time.

Further, it is true that Pieron received money from Cook, Market Shot and other sources known and unknown over several years via many transactions, and for various purposes, as indicated by some of Pieron's financial records now before the court.  However, an understanding – different from that in Pieron's tax returns – of the relationship between the transactions in those financial records, Pieron's stock sales, and more importantly, Pieron's taxable income for the relevant years, cannot be derived from a source other than Pieron's testimony, if at all.  Therefore, more detailed responses to the various components of the court's second question can only come from James D. Pieron, Jr.

                                                  Respectfully submitted,

Date:  November 7, 2019                    Matthew Schneider
                                                  United States Attorney


s/Jules M. DePorre                          s/Janet L. Parker
Jules M. DePorre (P73999)            Janet L. Parker (P34931)
Assistant U. S. Attorney                   Assistant U.S. Attorney
600 Church Street                            101 First Street, Suite 200
Flint, Michigan 48502-1280            Bay City, MI 48708
(810) 766-5026                               (989) 895-5712
jules.deporre@usdoj.gov              janet.parker2@usdoj.gov

Certificate

On November 7, 2019, I filed this pleading by using the Clerk of the Court's ECF system.  The ECF system will automatically serve counsel of record.

s/Janet L. Parker