# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# NORTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

JAMES D. PIERON, JR.,

        Defendant.

Case No. 18-cr-20489 (TLL)(PTM)

Hon. Thomas L. Ludington

# PIERON'S THIRD SUPPLEMENTAL BRIEF ADDRESSING TAX LOSS

## Background

Pieron was born in southwest Detroit.  After graduating high school, Pieron was encouraged by his grandfathers (both veterans of World War II) to join the U.S. Army.  Pieron completed basic training and graduated with honors from the military police academy.  After graduation, Pieron became a member of a special team that used mainframe computers to automate the allocation of troops and equipment.  The system went live for Desert Storm and is still used today to manage the allocation of troops for the U.S. Army.

Pieron was a Soldier of the Year candidate—an honor that led to a dinner with President George H. W. Bush.  Pieron also received a letter of commendation from the Pentagon that was signed by the U.S. Army's highest-ranking non-commissioned officer, Richard A. Kidd.  During his service, Pieron received

several awards and medals, including the National Defense Service Medal and the

Army Commendation Medal. He is a three-time recipient of the Army

Achievement Medal.

After his military service, Pieron returned home and enrolled at Central

Michigan University, where he received a degree in computer engineering. After

graduating, Pieron was recruited by the Ohio Attorney General to create the first

automated fingerprint identification system—a joint venture with the Federal

Bureau of Investigation. Within its first ninety days, the system led to the

identification and apprehension of suspects in previously unsolved crimes. Pieron

received a letter of recognition from the Ohio Attorney General's Deputy Director,

Michael M. Powers, for this work.

Pieron took a job with the Union Bank of Switzerland. He relocated to

Switzerland and rented an apartment in Zurich where he lived for ten years. Pieron

became interested in the capital markets, specifically derivative trading.

<u>JDFX Was Pieron's "Trade or Business"</u>

In 2006, Pieron was introduced to Trevor Cook, an investment manager,

who ran Market Shot LLC. Cook traded in derivatives and could save trading

costs by trading directly with banks. Pieron contacted a Swiss engineer, Clive

Diethelm. Together, Pieron and Diethelm drafted a technology specification that

became known as the Institutional Trading Platform ("ITP").

2

Cook pledged $10 million in funding and sent $500,000 in 2006.  Using the deposit, JDFX Holding AG was founded.  The ownership was divided as follows: 70% Pieron, 20% Market Shot LLC, and 10% Diethelm.  (Stock Certificates Nos. 1–3, attached hereto as Exhibit A.)  Cook, through Market Shot LLC, sent the remaining $9.5 million to complete the investment by the end of 2007.  (R. 84: Gov. Ex. 138, at PgID 1599–1610; Summary Chart of Gov. Ex. 138, attached hereto as Exhibit B.)  The technology was built, tested, and released to Cook, who began trading directly with banks.  Over the next eighteen months, Cook traded $135 billion in derivatives and saved $18.8 million in trading costs.

Cook would go on to reinvest $5 million to expand the holding company and take a 35% stake in JDFX Holding.  This reinvestment was made by payments from Market Shot LLC to JDFX in 2008 and 2009.  (Id.)  The reinvestment money was used by JDFX for, among other things, the attempted purchase of Banque du Bois.  (Use of Proceeds Summary Chart, attached hereto as Exhibit C; Bank Records Supporting Use of Proceeds Summary Chart, attached hereto as Exhibit D; July 6, 2009 Letter from Niederer Kraft & Frey, attached hereto as Exhibit E.)

ITP gained notoriety.  As a result, Pieron gained recognition, which helped elevate his reputation in the derivatives community.  (E.g., Oct. 2008 e-Forex article concerning JDFX, attached hereto as Exhibit F.)

3

<u>U.S. Taxes and a Criminal Investigation</u>

In 2008, while visiting family, Pieron's stepfather told him he may have a U.S. tax liability. Pieron paid taxes in Switzerland and was unaware he was required to pay tax in both countries on the same income. Pieron granted IRS power of attorney to his stepfather, and the two worked together to file and pay U.S. taxes. Taxes for tax years up to 2006 were filed and paid quickly. Taxes for the remaining years (2007–2009) were held up because the JDFX-Market Shot LLC transaction was not structured. Switzerland does not distinguish between personal and treasury stock transactions, and therefore no structuring was required.

Pieron spoke with several accountants and received vastly different opinions. He was told that the most conservative approach would be to call the JDFX-Market Shot LLC transaction a capital gain. So he did. Pieron then hired American Tax Solutions ("ATS"). After several months, ATS provided preliminary tax calculations. Pieron was confused by the amount of taxes due because he never received Market Shot LLC's investment funds. ATS told Pieron not to be concerned about the amounts, but to be concerned with failure to file.

To get a second opinion, Pieron hired Kim Pavlik. Pavlik is a certified public accountant, a former Ernst & Young partner, and has over thirty-five years of experience providing tax advice. Pavlik agreed with ATS that Pieron should be concerned with failure to file. He advised Pieron to file returns for tax years 2008

4

and 2009 as soon as possible and explained that, after filing, he would audit and amend the returns if necessary.  Pieron directed ATS to file.  (R. 112-4: 2007 Tax Return, at PgID 1806–17; R. 112-5: 2008 Tax Return, at PgID 1819–30; R. 112-7: 2009 Tax Return, at PgID 1852–62.)[1]

In late 2009, Cook was indicted without warning on various criminal charges unrelated to JDFX.  News and media outlets disclosed Cook's ownership in JDFX.  Almost overnight, the trading infrastructure collapsed.  Key employees left the firm, including Diethelm.  JDFX was liquidated in November 2009.  (Swiss Commercial Register re JDFX Holding AG, available at https://zg.chregister.ch (full address on exhibit), last visited Oct. 28, 2019, attached hereto as Exhibit G.)[2]

After returning to the United States, Pieron provided assistance to various government agencies over the next three years concerning the Cook investigation.

---

[1]     As noted in previous briefing, the government urged the jury and this Court to accept Pieron's 2008 and 2009 tax returns as true.  This position was taken despite SA Hollabaugh's testimony that, at least with respect to the 2007 and 2008 tax returns, the $10,000,000 capital gain should have been reported in 2007, not 2008.  (July 18, 2018 Transcript at pp. 13–15, a copy of this transcript was provided to this Court and the government and can be found behind Tab 18 in Pieron's Tax Loss Hearing exhibit binder.)

It should be noted that, although there is no evidence that Pieron received Market Shot LLC's investment funds, SA Hollabaugh testified that he "had bank records showing the wire transfers *to Mr. Pieron* for the $10,000,000 capital gain in two thousand—mostly in 2007."  (Id. at p. 15 (emphasis added).)

[2] This exhibit was translated from German to English using the translation tool available in the Google Chrome browser.

Pieron hired attorney John M. Fedders, former Director of Enforcement of the U.S. Securities & Exchange Commission, to interact with the government.

Pieron attempted to rebuild his derivatives trading business in the United States. Pieron raised capital, built a team, and launched a brokerage named Institutional Liquidity ("ILQ"). Pieron met with government regulators in person to disclose his relationship with Cook, the source of capital, the management team, and the business plan. Shortly thereafter, ILQ received a license to begin operations as a U.S. derivative broker.

Within a year, ILQ became the fastest growing brokerage in the United States. ILQ created seventy jobs in total—fifty in Michigan and an additional twenty in Illinois and Texas. For this, Pieron was named mid-Michigan's Entrepreneur of the Year in 2011 by Central Michigan University.

Concurrently, the IRS criminal division (with lead case agent Special Agent Scott Hollabaugh) targeted Pieron for investigation. SA Hollabaugh interviewed Pieron's friends, family, and neighbors. He conducted surveillance of employees on their way to and from work. He interviewed ATS, Pavlik, and Pavlik's staff. He subpoenaed approximately 40,000 documents and forced the closure of twenty-five corporate and personal bank accounts. As a result, customers, vendors, and banks terminated their relations with Pieron and ILQ. Eventually, ILQ's U.S. brokerage shut down.

In January 2012, Pavlik concluded that the returns filed by ATS were incorrect.  He explained that the theft loss rule applies and should have been used to calculate the 2008 and 2009 returns.  Shortly thereafter, Pavlik amended the returns filed by ATS.  The IRS accepted the 2008 theft loss amendment where the tax due was higher and rejected the 2009 amendment where the tax due was lower. (By any application of the tax code, this result is inconsistent.)

In 2013, SA Hollabaugh interviewed Pavlik a third time.  During the interview, Pavlik told SA Hollabaugh he was filing a position called the "claim of right."  Pavlik explained to SA Hollabaugh that Pieron should not owe tax.  In 2014, Pavlik filed the "claim of right" amendment with the IRS and informed Pieron he should no longer have a tax liability.

In 2015, years into the criminal investigation, the IRS remained unable to obtain financial statements concerning Pieron and JDFX due to Swiss bank secrecy laws.  Pieron voluntarily provided SA Hollabaugh with bank statements for every company and every account going back ten years.

In 2016, Pieron remained concerned about his 2008 and 2009 taxes and met with Pavlik.  Pieron was advised not to worry because the IRS had not issued a notice of deficiency, and Pavlik's firm was checking with the IRS every month. Pavlik informed Pieron that the IRS must rule on the positions taken in the tax

filings or schedule an appeals hearing.  He also informed Pieron he was confident his positions would be upheld in the event of an appeals hearing.

In 2017, although Pieron was represented by counsel, SA Hollabaugh appeared at Pieron's workplace to deliver a subpoena for handwriting samples. Pieron provided the handwriting exemplars.  Pieron was subsequently advised to hire a tax litigator; he retained Michael Minns and Jan Geht.

<u>Pieron Is Indicted and Found Guilty of Payment Evasion</u>

On January 2, 2018, AUSA Parker offered to meet with Pieron, but only on the condition that he agree to extend the statute of limitations.  (Jan. 3, 2018 Email from AUSA Parker re Request for Meeting, attached hereto as Exhibit H.)  Pieron extended the statute of limitations in order to meet.  After he executed a tolling agreement, AUSA Parker changed her position and offered to meet only if Pieron agreed to plead guilty to a felony.  (Feb. 27, 2018 Email from AUSA Parker re James Pieron, Jr. Pre-indictment Plea Meeting, attached hereto as Exhibit I.)  No meeting took place, and in the months that followed, Pieron extended the statute of limitations three more times.

Meanwhile, Geht spoke with an AUSA assigned to Pieron's case.  Geht was told there would be no negotiations.  As a result, Geht advised Pieron to consider paying whether he owed taxes or not.

Pieron called the IRS to determine how much to pay.  He paid $627,000 immediately and $242,000 more within six months.  Pieron was indicted and proceeded to trial.  A jury returned a guilty verdict on one count of evasion of payment of a federal income tax liability for tax years 2008 and 2009.

## Argument

### A.   The Doctrine of Judicial Estoppel Does Not Apply in this Case

Judicial estoppel cannot be applied in criminal sentencing proceeding concerning a disputed issue that will affect sentencing.  And even if the Court could apply judicial estoppel, the doctrine does not apply in Pieron's case.

1.   <u>Judicial estoppel cannot be applied in criminal sentencing proceedings</u>.

This Court is obligated to sentence Pieron on the basis of accurate information under Federal Rule of Criminal Procedure 32(i)(3)(B).  As noted in Pieron's second supplemental brief concerning tax loss, applying judicial estoppel would create procedural error requiring remand for resentencing.

Trial courts have an obligation to rule on disputed factual matters to ensure sentences are based on accurate information.  Fed. R. Crim. P. 32(i)(3)(B); *see United States v. Roberts*, 919 F.3d 980, 988 (6th Cir. 2019).  The doctrine of judicial estoppel, which "imping[es] on the truth-seeking function of the court," runs in tension with these obligations.  *Teledyne Indus., Inc. v. N.L.R.B.*, 911 F.2d 1214, 1218 (6th Cir. 1990).  Because the Sixth Circuit Court of Appeals requires

literal compliance with Rule 32 and it is "procedurally unreasonable" to select a

sentence based on erroneous facts, judicial estoppel cannot bar Pieron from

asserting he did not sell JDFX shares at sentencing.  *See United States v. Roberts*,

919 F.3d 980, 988 (6th Cir. 2019); *United States v. Ingersoll*, No. 14-CR-20216,

2016 WL 5219536, at *13 (E.D. Mich. Sept. 22, 2016) (Ludington, J.) (citing *Gall

v. United States*, 552 U.S. 38, 51 (2007)).

> 2.  <u>The doctrine of judicial estoppel does not apply based on the facts of
> this case</u>.

This Court cites *New Hampshire v. Maine*, 532 U.S. 742 (2001), for the

proposition that the doctrine of judicial estoppel applies.  In *New Hampshire*, the

Supreme Court applied the "discrete doctrine" of judicial estoppel to the "unusual

circumstances" of a border dispute between two states.  *Id*. at 749.

In 1977, New Hampshire argued in a border dispute that the Court should

interpret the phrase "Middle of the River" a certain way.  The Supreme Court

agreed, and New Hampshire "benefitted from that interpretation."  *Id*. at 752.

Twenty-five years later, the Court held New Hampshire was judicially estopped

from advancing a different, inconsistent interpretation of "Middle of the River."

Any other result, the Court observed, would allow New Hampshire to "gain an

additional advantage at Maine's expense" and "risk . . . inconsistent court

determinations."  *Id*. at 755 (quoting *United States v. C.I.T. Constr. Inc.*, 944 F.2d

253, 259 (5th Cir. 1991)).

The Supreme Court set forth factors that "typically inform the decision whether to apply the doctrine in a particular case." *Id.* at 743. First, a party's later position must be clearly inconsistent with its earlier position. *Id.* Second, courts inquire whether the party succeeded in persuading a court to accept that party's earlier position—making acceptance of the new, inconsistent position in a later proceeding create the perception one of the courts was misled. *Id.* Third, courts ask whether the party asserting an inconsistent position would derive unfair advantage or impose unfair detriment on the opposing party if not estopped. *Id.*

To limit the doctrine's application, the Sixth Circuit has held that it applies only when a party attempts to take "a position inconsistent with one successfully and unequivocally asserted by that same party in an earlier proceeding." *Warda v. Comm'r*, 15 F.3d 533, 538 (6th Cir.1994) (citations omitted); *see United States v. Hammon*, 277 F. App'x 560, 566 (6th Cir. 2008); *Zedner v. United States*, 547 U.S. 489, 505 (2006). It is an equitable doctrine, intended to prevent "cynical gamesmanship" by parties who make two inconsistent arguments. *Browning v. Levy*, 283 F.3d 761, 776 (6th Cir. 2002); *In re Commonwealth Institutional Sec.*, 394 F.3d 401, 406 (6th Cir. 2005).

Judicial estoppel is inapplicable here because Pieron never successfully persuaded this Court to accept Pieron sold JDFX shares or obtained capital gains in 2008 and 2009. None of the "representations" Pieron made regarding capital gains

11

was a successful, unequivocal attempt to persuade the Court to accept a factual or

legal argument.  Pieron did not take a "position" regarding capital gains at trial; he

did not put on a defense.  Accordingly, Pieron should be able to present evidence

and argue at his sentencing that he sold no JDFX shares and has no capital gains.

*See New Hampshire*, 532 U.S. at 750–51.

The doctrine of judicial estoppel is inapplicable for the additional reason that

Pieron did not benefit from statements or "representations."  To the contrary, the

statements led to his indictment and conviction.  Pieron will therefore not receive

an unfair advantage if the Court does not apply judicial estoppel—Pieron has not

engaged in the sort of gamesmanship that judicial estoppel exists to prevent.

Finally, this Court should consider the unique procedural posture of Pieron's

case.  *See New Hampshire*, 532 U.S. at 751 ("[W]e do not establish inflexible

prerequisites or an exhaustive formula for determining the applicability of judicial

estoppel.  Additional considerations may inform the doctrine's application in

specific factual contexts.").  During sentencing, there is no risk that Pieron will

impose an unfair detriment on the government by arguing he did not receive capital

gains in 2008 and 2009.  Indeed, the receipt of capital gains in 2008 and 2009 is

the government's burden at sentencing.

Absent application of judicial estoppel, as this Court has noted, "it is

undisputed that there was a single transaction with stock certificates and that all of

12

the proceeds received from Cook/Market Shot were invested in JDFX." (R. 130: Nov. 1, 2019 Order, at PgID 2889.)

It is undisputed that Market Shot LLC/Cook wired funds directly to JDFX in 2006 and 2007. (R. 84: Gov. Ex. 138, at PgID 1599–1610; Exhibit B.) It is undisputed that JDFX used these funds for business purposes. (Exhibits C, D.)

It is undisputed that Market Shot LLC/Cook again wired funds directly to JDFX in 2008 and 2009, which JDFX used for business purposes as before. (R. 84: Gov. Ex. 138, at PgID 1599–1610; Exhibit B.) It is undisputed that JDFX issued share certificates to Pieron, Clive Diethelm., and Market Shot LLC simultaneously in December 2006. (Exhibit A.) It is undisputed that a portion of Market Shot LLC's December 2006, $500,000 payment to JDFX was used, in part, as the initial capital necessary to form JDFX. (Id.) It is undisputed that there is no stock certificate evidencing that shares were once owned by Pieron and then transferred to Market Shot LLC.

These undisputed facts demonstrate, at the very least, that Pieron never received any consideration in return for the JDFX shares purchased by Market Shot LLC. These undisputed facts further demonstrate that the JDFX shares purchased by Market Shot LLC were issued directly from JDFX.

Indeed, regardless of how Market Shot LLC's investment in JDFX was characterized or papered by the parties, any application of tax, corporate, or

contract law requires examining the substance of the transaction over its form. Under the "substance-over-form" doctrine, courts must look to "'the economic realities of the business deal' to determine whether a transaction occurred as the taxpayer labeled it." *Billy F. Hawk, Jr., GST Non-Exempt Marital Tr. v. Comm'r*, 924 F.3d 821, 825 (6th Cir. 2019), cert. denied sub nom. *Hawk v. Comm'r*, 2019 WL 4922799 (U.S. Oct. 7, 2019) (quoting *Summa Holdings, Inc. v. Comm'r*, 848 F.3d 779, 785 (6th Cir. 2017)). Accordingly, this Court must review the substance of Cook's transactions with JDFX to determine Pieron's tax liability.

Based on the undisputed facts recognized by this Court, Market Shot LLC was issued treasury stock. As a result, Pieron has no capital gains in tax years 2008 or 2009. (R. 68-5: Gavin Decl., at PgID 1449–60; R. 83: Redacted Exhibit C to Gavin Decl., at PgID 1593–97.) [3]

## B. "Loans" by Pieron to JDFX Are Business Loans that Result in No Tax Loss

### 1. The government's theory of income

Based on the absence of evidence establishing Pieron actually received consideration for Market Shot LLC's purchase of a 35% ownership interest in JDFX, the government must rely on some theory of income that imputes income for funds never received. The government's theory is that funds paid by Market

---

[3] Line 21 of Exhibit C to the Gavin Declaration contains an error. The amount 54,002 in line 21 should be a negative number (-54,002).

Shot LLC to JDFX are income to Pieron because he was entitled to the funds, but directed the funds to go to JDFX.  Indeed, the government's position is that funds "directed" to JDFX should be considered income to Pieron, which was loaned to JDFX.  (E.g., R. 112: Gov. Supp. Br. on Tax Loss, at PgID 1787–88.)

      2.   <u>The timing of income imputed to Pieron by the government</u>

After imputing income to Pieron for money he never received, the government takes the position that Pieron had $10 million of income in 2008 and $5.25 million of income in 2009 (e.g., R. 112: Gov. Supp. Br. on Tax Loss, at PgID 1791–97; R. 128: Gov. Third Supp. Br. on Tax-Loss Issues, at PgID 2873–76), despite the fact that the evidence in this case establishes these facts are erroneous (R. 84: Gov. Ex. 138; Exhibit B).[4]

It is undisputed that Market Shot LLC sent JDFX $500,000 in 2006, $9.5 million in 2007, $2.1 million in 2008, and $3.15 million in 2009.  (R. 84: Gov. Ex. 138; Exhibit B.)  Yet, the government wants to place the funds received by JDFX as income received by Pieron in 2008, and the funds received by Pieron in 2008 as income in 2009.  It does so by arguing the $10 million received by JDFX in 2006 and 2007 and the $2.1 million received in 2008 were deposits for the sale of stock in 2008 and 2009, respectively.  If there was a sale of stock, these can be characterized as nothing other than advance payments for the sale—they are not

_____

    [4] See n.1, *infra*, concerning the testimony of SA Hollabaugh.

deposits.  *Comm'r v. Ind. Power & Light, Co.*, 493 U.S. 203, 201–14 (1990).

Accordingly, even if this Court imputes the funds received by JDFX as income to Pieron, Pieron received income (and subsequently made loans to JDFX) of $500,000 in 2006, $9.5 million in 2007, $2.1 million in 2008, and $3.15 million in 2009.  (R. 84: Gov. Ex. 138; Exhibit B.)

And even if this Court takes the after-the-fact sale and purchase agreements at face value, the agreement (dated in 2008) confers the benefits of share ownership to Market Shot LLC back to March 1, 2007. (R. 112-11: Gov. Ex. 201, at PgID 1912.)  Regardless of when an agreement is executed, the timing of a sale is determined based on when the benefits of ownership are conferred.  *See Houchins v. C.I.R*, 79 T.C. 570, 590 (1982) ("For purposes of Federal income taxation, a sale occurs upon the transfer of the benefits and burdens of ownership" from seller to buyer.); 26 U.S.C. § 461; Treas. Reg. §1.461.  Accordingly, the 2008 sale and purchase agreement evidences a 2007 sale of stock and the 2009 agreement evidences a 2009 sale of stock.  (R. 112-11, at PgID 1912; R. 112-12: Gov. Ex. 202, at PgID 1915–18.)

3.   Pieron's "loans" to JDFX resulted in a $15.25 million ordinary loss in 2009 that eliminate any gains going back to 2007

Pieron's "loans" to JDFX were business loans.  As a result, when JDFX liquidated in 2009, the loans became bad business debt, creating a $15.25 million

ordinary loss in 2009 that can be carried back to 2007 and eliminate $15.25 million in capital gains.  Accordingly, Pieron has no tax liability in 2008 or 2009.

For tax purposes, Pieron's "loans" must be business debts or non-business debts.  In order to deduct a bad debt under 26 U.S.C. § 166, the taxpayer must prove (i) the existence of a debtor/creditor relationship, (ii) the loan obligation falls within 26 U.S.C. § 166, (iii) the debt's adjusted basis for determining loss, (iv) if the debt represents an item of income, the funds loaned were taken into income, and (iv) the debt became worthless in the taxable year the deduction is claimed.  *See* Tax Management Portfolio 538 2d.:  Bad Debts (2019).

The existence of a debtor/creditor relationship.  As noted above, the government has taken the position that Pieron loaned $15,250,000 to JDFX.

The loan obligation falls within 26 U.S.C. § 166.  Both business and non-business bad debts fall within 26 U.S.C. § 166.  Under that statute, a deduction for non-business bad debt can be taken as a short-term capital loss in the year the debt becomes worthless.  *See* 26 U.S.C. § 166(d)(1).  In contrast, under 26 U.S.C. § 166(a), a business bad debt is *deducted against ordinary income* in the year the debt is determined to be worthless.  And in 2009, this loss could be carried back two years against ordinary income or capital gains.  26 U.S.C. § 172 (2009).

A business bad debt is worthless debt created or acquired in the taxpayer's trade or business.  *See* Treas. Reg. § 1.166.  The Supreme Court held in *United*

*States v. Generes*, 405 U.S. 93, 103 (1972), that "in determining whether a bad debt has a 'proximate' relation to the taxpayer's trade or business, . . . the proper measure is that of dominant motivation." Generally, courts have found, if the taxpayer's dominant motivation in loaning money was to protect a shareholder's investment in the corporation, the debt is classified as a non-business bad debt. *See Hough v. Comm'r*, 882 F.2d 1271 (7th Cir. 1989).

But that is not Pieron's case. Indeed, according to the government, Pieron had no basis in his stock. (R. 112, Gov. Supp. Br. on Tax Loss, at PgID 1797.) He contributed no capital to JDFX according to the government. (See id.) The government has gone so far as to take the position that, based on Pieron's financial situation prior to the formation of JDFX, he could not have contributed any capital to JDFX. (Id.) Accordingly, based on the government's positions, Pieron could not have made loans to JDFX to protect his "investment" because he did not invest.

In several instances, courts have ruled that when the dominant motivation for making loans was to protect the taxpayer's employment, protect a credit rating, maintain a license, protect business reputation, or to broaden a client base, there is a business bad debt. *See Lutz v. Comm'r*, 282 F.2d 614 (5th Cir. 1960); *Litwin v. United States*, 91-1 USTC ¶ 50.229, 1991 WL 75945 (D. Kan. 1991), aff'd, 983 F.2d 997 (10th Cir. 1993); *Lagoy v. Comm'r*, T.C.M. (CCH) 1992-213, 1992 WL 69967; *Smartt v. Comm'r*, T.C.M. (CCH) 1993-65, 1993 WL 47300.

18

Pieron's loans are business bad debts.  He is the man who developed the world's fastest trading software platform for derivatives.  He is known worldwide as a software guru in the derivative world.  If these were loans, the record, combined with the government's positions, allows no conclusion other than that Pieron wanted to protect his future employment, protect his reputation in the derivative world, and expand his client base.[5]

The debt's adjusted basis for determining loss.  The parties agree that, if there were loans to JDFX, $15,250,000 was loaned to JDFX over the years 2006, 2007, 2008 and 2009.  The adjusted basis is $15,250,000 for determining loss.

If the debt represents an item of income the taxpayer is required to prove it was taken into income.  Here, any funds loaned were reported (incorrectly) on tax returns as capital gains of $10,000,000 in 2008 and $5,250,000 in 2009. Accordingly, any income allowing Pieron to loan to JDFX was taken into account.

---

[5]     The government may argue that Pieron cannot treat the loans as business bad debt because he is not in the business of loaning money. But a taxpayer does not have to be in the business of lending money for a loan to constitute a business loan business bad debt.  *See Giblin v. Comm'r*, 227 F.2d 692 (5th Cir. 1955) and *Hickerson v. Comm'r*, 229 F.2d 631 (2d Cir. 1956).

It is possible for a taxpayer to make loans to a business that is not the taxpayer's trade or business if the taxpayer was in the business of loaning money. *See Owens v. Comm'r*, T.C.M. (CCH) 2017-157, 2017 WL 3442610.  Based on the number and amounts of the loans Pieron made to JDFX (according to the government), Pieron could argue that he was in the business of loaning money to JDFX.  But he does not have to because Pieron's loans were to a business entity that was, without dispute, his trade or business.

<u>The debt became worthless in the year the deduction is claimed</u>.  JDFX

Holding AG was liquidated in 2009.  (Exhibit G.)  Given the loans were not paid

back to Pieron, the bad debt must be reported and taken as a deduction in 2009.

If Pieron made loans to JDFX, they were business loans that became

worthless in 2009 when JDFX was liquidated.  Pieron has an ordinary loss of

$15,250,000 in 2009.  That ordinary loss can be applied in 2009.  And any

remaining loss can be carried back to 2007 and 2008 as well.  Accordingly,

whether you place capital gains in 2007, 2008, or 2009, Pieron has no tax liability.[6]

Respectfully submitted,

/s/ Patrick J. Hurford
Patrick J. Hurford
Mark S. Pendery
Honigman LLP
660 Woodward Ave.
Detroit, MI  48226
(313) 465-7000
phurford@honigman.com

Dated:  November 7, 2019

---

[6]     And although the government has not argued this, the only other way
to treat Pieron's income (and for the reasons stated above, he has none) and
direction of income to JDFX are capital contributions in JDFX which create basis
for Pieron.  If the doctrine of judicial estoppel applies in a criminal case, perhaps
now it can be used to prevent the government from arguing the direction of the
money back to JDFX was something other than a loan.  If the government is
permitted to take the position that the direction of funds is not a loan, Pieron
reserves the right to argue that he has no tax liability as a result of the ability to use
sufficient basis to offset any capital gains in 2008 and 2009.

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 7, 2019, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record.

Respectfully submitted,

/s/ Patrick J. Hurford
Patrick J. Hurford
Honigman LLP
660 Woodward Ave.
Detroit, MI  48226
(313) 465-7000
phurford@honigman.com