# NIEDERER KRAFT & FREY

## RECHTSANWÄLTE

Dr. Adolf E. Kammerer, LL.M.
Dr. Hans Niederer, LL.M.
Prof. Dr. Peter Forstmoser, LL.M.
Dr. Walter Meier, LL.M.
Dr. Peter R. Isler, LL.M.
Dr. Ulrich Benz
Dr. Rolf P. Jetzer, H.E.E.
Dr. Ernst Felix Schmid, LL.M.
Dr. François M. Bianchi, LL.M.
Dr. Peter C. Honegger, LL.M.
Dr. Gaudenz G. Zindel, LL.M.
Dr. Markus A. Frey, LL.M.
Dr. Urs Pulver
Dr. Edgar H. Paltzer, LL.M.
Dr. Thomas Graf [1,2]
Dr. Dr. Thomas Sprecher, LL.M.
Dr. Thomas A. Frick, LL.M.
Dr. Andrés A. Gurovits Kohli
Dr. Andreas Casutt, LL.M.
Dr. Philippe Weber, LL.M.
Fürspr. Daniela Schmucki-Fricker [1]

Prof. Dr. Isabelle Romy
Lic. Philipp Haas, LL.M.
Lic. Daniel Eisele, LL.M.
Dr. Christoph Balsiger
Lic. Markus E. Kronauer [1]
Dr. Ulysses von Salis, LL.M.
PD Dr. Sandro Abegglen, LL.M.
Dr. Adrian W. Kammerer, M.M.
Lic. Andreas Kolb
Lic. Debra E. Davatz Hörler
Lic. Andreas F. Vögeli
Lic. Michaela Zehnder [2]
Lic. Edith Kreis-Kolb
Lic. Nicolas Birkhäuser, LL.M.
Lic. Catherine Grun, LL.M.
Lic. Marco Häusermann, LL.M.
Lic. Manuel Werder, LL.M.
Lic. Angela Petzold Theiler, LL.M.
Dr. Valerie Meyer Bahar, LL.M.
Dr. Philipp Candreia, LL.M.
Lic. Andrea Nordin [1,2]

Lic. Ilona Schwarzenbach-Meixner
Lic. Saro A. Grano
Dr. Olivier Bloch, LL.M.
Lic. Carl H. Duisberg
Lic. Andrea Huber, LL.M.
Lic. Patrick Schmutz, LL.M.
Lic. Patrizia Schlatter
Lic. Sanna Maas Thurnherr
Lic. Brigitte Knecht
Dr. Patrik R. Peyer, LL.M.
Lic. Isabelle Debrunner
Dr. Petra Ginter
Lic. Hansjürg Christoffel
Lic. Allegra Sosso
Lic. Stefan Thomann, LL.M.
Dr. Renato Costantini
Lic. Eva R. Leuthold, LL.M.
Dr. Christian Laux, LL.M.
Lic. Gian-Andrea Caprez
Lic. Dominic Studer
Lic. Janine Meier

Dr. Thomas Jutzi
Lic. Corinne Casanova
Lic. Bertrand G. Schott
Mag. Myriam A. Gstoehl [2]
Lic. Arle Gerszt
Lic. Roger Föhn, LL.M.
Mario Erni, MLaw [2]
Lic. Judith Weber
Lic. Oliver Groenewold

Eingetragen im Anwaltsregister

[1] dipl. Steuerexperte
[2] nicht als Rechtsanwalt zugelassen

Konsulenten
Dr. Stefan Kraft, LL.M.
Prof. Dr. René Rhinow
Dr. Jakob Baer

Niederer Kraft & Frey AG
Bahnhofstrasse 13
CH-8001 Zürich

Telefon   +41-58-800-8000
Telefax   +41-58-800-8080
E-Mail    nkf@nkf.ch
Website   www.nkf.ch



**Pre-sent by Email**
Bär & Karrer AG
Mr. Eric Stupp
Brandschenkestrasse 90
8027 Zurich



July 6, 2009
FMB/31334/kem

**Project Mercury - Final request to repay CHF 2.5 Million Deposit**

Dear Colleague

Reference is made to the correspondence between our firms in the above referenced matter of February 2009 (your letters to us dated February 9 and 17, 2009 and our letter to you dated February 12, 2009) as well as various discussions held between representatives of your client Du Bois Holdings Pte Ltd, Singapore ("Du Bois") and our client James Pieron, Zurich, ("Mr. Pieron") and his representatives (meeting of February 17, 2009, held in London, meeting of April 28, 2009, held in Singapore, meeting of June 10, 2009, held in London).

In each of these meetings Mr. Pieron requested either the repayment of the entire deposit in the amount of CHF 2.5 million (the "Deposit") paid on December 1, 2008, or a reasonable settlement in a best effort to avoid litigation. The Deposit is based on the offer letter between Mr. Pieron and Du Bois dated November 25, 2008 (the "Offer Letter") regarding the

NIEDERER KRAFT & FREY
RECHTSANWÄLTE

potential acquisition of all shares in Banque Du Bois AG, Zurich (the "Bank"). Mr. Pieron's requests for the repayment of the Deposit and his several attempts to achieve a reasonable settlement have thus far been ignored indicating the refusal of Du Bois to return the Deposit or to reasonably settle.

In the name and on behalf of Mr. Pieron, we hereby again demand that your client, Du Bois, repay the Deposit as per the instructions set forth at the end of this letter, since Du Bois is not entitled to keep such Deposit for the reasons summarized hereinafter and set forth in more detail below:

## I.   SUMMARY OF THE LEGAL SITUATION

1.   The **Offer Letter, according to its article 1, second paragraph, second sentence, is null and void** due to Du Bois having made material misrepresentations. In particular, on page 37 of the Confidential Information Memorandum of Millenium Associates (the "Information Memorandum") Du Bois positively over-stated the "total shareholder's equity" by non-disclosing that the Bank had not taken into account deferred tax liabilities in relation to the so-called "reserve for general banking risks" in the amount of approx. CHF 1.7 million on such CHF 7.8 million position (if such position at all constitutes hidden reserves, which is contested until documentary evidence is provided), resulting in true shareholder's equity being at least CHF 1.7 million (if not CHF 7.8 million) lower than as confirmed orally and in writing to Mr. Pieron. Further, but equally important, Du Bois did not disclose that Mr. Pieron as per the clear intent of Du Bois upon closing of the transaction would have to secure and finance a bank guarantee issued by the Bank in the amount of CHF 10 million plus interest in favour of Ms. Agneta Pollock, the former owner of the Bank (the "Former Owner") to secure an existing or potential tax liability arising in connection with the purchase by Du Bois of the Bank from the Former Owner. Namely, the pertinent tax indemnity in favour of the Former Owner (which indemnity is guaranteed by the Bank) as set forth on page 38 of the Information Memorandum is not an obligation of the Bank but of Du Bois, and it had not been stated in the Information Memorandum or the Offer Letter or otherwise that the regulatory- and otherwise required back up of such bank guarantee was intended to be terminated by Du Bois and Mr. Sampoerna.

2.   The Offer was agreed to be subject to the completion of satisfactory due diligence. In our due diligence review, together with Mr. Pieron's staff, we detected various material adverse issues including but not limited to those as described herein; accordingly, the **due diligence proved to be far from satisfactory**, leading to the

2

NIEDERER KRAFT & FREY
RECHTSANWÄLTE

**termination of the Offer** and, accordingly, to the obligation of Du Bois to pay back the entire Deposit.

3. Du Bois **unreasonably terminated the transaction** by A) fundamentally changing the key commercial characteristics of, and introducing new severe conditions to, the transaction when compared to what was agreed in the Offer Letter, in particular (i) by – for which documentary evidence exists – insisting on very substantial additional consideration to be made for the purchase of the Bank, amongst other requests by requiring a guarantee or other security in the amount of no less than CHF 10 million to be provided by Mr. Pieron in favour of the Bank, (ii) by refusing to reduce the purchase price by CHF 1.8 million corresponding to the amount of the non-disclosed deferred tax liabilities on the so-called "reserves for general banking risks" (for the correctness of which position no evidence had been provided) as per the end of 2007, although it had been agreed by all parties that the shareholder's equity of the Bank was the basis for the purchase price, and (iii) by requiring additional proof of funds; and by B) making material misrepresentations (as stated above) which according to the Offer Letter lead to its nullity and accordingly the termination of the transaction.

## II.   EXPLANATIONS REGARDING THE LEGAL SITUATION

## 1.   The Offer Letter is null and void due to Material Misrepresentations

### 1.1   Material Misrepresentations

The Offer Letter clearly states the offer price, and, as also stated in your letter dated February 17, 2009 it was the parties' understanding that the offer price represented the shareholder's equity of the Bank. Based on the Information Memorandum and all other information provided, Mr. Pieron did not have any reason to believe that the purchase price would be higher than the actual shareholder's equity calculated in accordance with the Information Memorandum or that the amount he would have to invest or finance to purchase the shares in the Bank would be higher than the price that had been offered in the Offer Letter.

By the incorrect description of respectively the omission to disclose these material issues the amount of the shareholder's equity was overstated respectively Mr. Pieron was not made aware of the fact that the acquisition of the Bank would cost him significantly more than merely the shareholder's equity. Thereby Du Bois did not only positively misrepresent very important aspects but also violated its duty to disclose to the other party all material facts and issues, which are relevant for the other party's decision to enter into the transaction

3

NIEDERER KRAFT & FREY
RECHTSANWÄLTE

(*Aufklärungspflicht*, see also decision of the Swiss Federal Tribunal *BGE 102 II 80*), and due to such violation Du Bois became liable for any damages accrued to Mr. Pieron as a result thereof (see also *Rudolf Tschäni, M&A-Transaktionen nach Schweizer Recht*, Zurich, Basle, Geneva 2003).

The Information Memorandum states that no express or implied representation as to the accuracy or completeness of the information contained in the Information Memorandum is made. However, the Offer Letter was signed after the Information Memorandum had been made available, it refers to the Information Memorandum and explicitly provides in section 1 that the offer is null and void if any material representations made by Du Bois or any of its representatives or affiliates or the Bank in any disclosures were materially inaccurate. It will be shown in detail hereinafter that the disclosures made in the Information Memorandum were not only materially inaccurate, but simply untrue and incorrect. By signing the Offer Letter, Du Bois agreed that Mr. Pieron would have the right to withdraw from the transaction in case any material information provided to him (including, but not limited to, by way of the Information Memorandum) were inaccurate. Furthermore, pursuant to article 199 of the Swiss Code of Obligations a pertinent exclusion is invalid in any case if the material issues had been concealed maliciously (*arglistig*).

## 1.2    Lack of Information and Wrong Information in the Information Memorandum

### 1.2.1    General

In your letter dated February 17, 2009 you asserted that based on the Information Memorandum, which was sent by Millenium Associates to Mr. Pieron on November 12, 2008, Mr. Pieron should have detected the potential for deferred taxes and the existence of the bank guarantee before making the offer of November 25, 2008.

First, we take note that by such assertion Du Bois acknowledges (i) the misleading qualification of the position "value adjustments and provisions" reported in the Bank's statutory accounts as "reserve for general banking risks" in the Information Memorandum, (ii) that this resulted in an incorrect calculation of the shareholders' equity due to the omitted subtraction of the potential tax cost and (iii) the adverse financial implications in connection with the bank guarantee issued by the Bank in favour of the Former Owner.

### 1.2.2    Bank Guarantee and Indirect Partial Liquidation Issue

The Information Memorandum mentions the bank guarantee at two places (on pages 18 and 38) without any further explanation. On page 38 (commenting the liabilities of the Bank) it is simply stated: "From 2006 onwards, the position also contains a CHF 10m position (plus

4

NIEDERER KRAFT & FREY
RECHTSANWÄLTE

interest) provided by the shareholder as a bank guarantee to the original vendor as security for a tax indemnity in favour of the vendor." On page 39 the Information Memorandum states that "The Bank never had any tax disputes or similar and there are no correspondence items from tax authorities worth mentioning."

Hence, no information has been given in the Information Memorandum as regards:

(i) the fact that the Bank has required and obtained tax rulings in 2005 and 2008 addressing the delicate Swiss tax issues resulting from the fact that the Bank issued a bank guarantee to secure the tax position of the Former Owner in favour of the Bank's shareholder Du Bois who was and is the obligor of such duty vis-à-vis the Former Owner;
(ii) the fact that only in November 2008 a dividend payment in the amount of CHF 580'000 took place, which may qualify as an indirect partial liquidation;
(iii) the fact that only a tax ruling could give clarity on whether an indirect partial liquidation has occurred in the past whereby the Bank may become liable under the bank guarantee;
(iv) the fact that in November 2008 the cash collateral was replaced by a personal guarantee by Mr. Sampoerna whereas the commercial value of such personal guarantee is substantially smaller than that of the cash deposit of Mr. Sampoerna that the Bank had originally required as collateral, because the enforcement of such personal guarantee against an individual in Indonesia is not realistically possible within a reasonable period of time or perhaps at all; and
(v) the fact that Mr. Sampoerna intended to terminate the personal guarantee resulting in the requirement that the bank guarantee had to be secured in the amount of CHF 10 million plus interest by Mr. Pieron or another party at Mr. Pieron's costs for an extended period of time.

### 1.2.3   Reserve for General Banking Risks/Deferred Tax Liability

On page 37 of the Information Memorandum a position "reserve for general banking risks" is reported in the amount of CHF 7.81 million per the end of the third quarter 2007 and in the amount of CHF 8.69 million as per the end of 2006 as part of the balance sheet of the Bank. The position "reserve for general banking risks" has been included in the position "Total shareholder's equity". This statement is misleading:

(i) Contrary to the information contained on page 37 of the Information Memorandum, according to the statutory accounts for 2007 and 2006, the position "reserve for general banking risks" amounts to CHF 0 in both years (see balance sheets and the information regarding the balance sheet in the details of equity, *Nachweis des Eigenkapitals*).
(ii) Instead, the Bank has recorded a position "value adjustments and provisions" in the

5

NIEDERER KRAFT & FREY
RECHTSANWÄLTE

amount of CHF 8'690'295 per the end of 2006 and of CHF 8'490'295 per the end of 2007 as part of its liabilities.

(iii) The wrong labelling is acknowledged on page 38 of the Information Memorandum by the statement "The reserve for general banking risk is actually booked as a provision but reflects a silent reserve and is therefore part of the bank's net asset value."

In addition to the above, it is clear that showing the CHF 7.8 million as a "reserve for general banking risks" would only be correct if such reserves had been taxed or if the potential tax liability had been provisioned. This is not the case; accordingly, even if the CHF 7.8 million were hidden reserves and economically equity (proof of which has never been delivered) the shareholder's equity is overstated by at least CHF 1.8 million (amount of the deferred tax liability detected in the due diligence) respectively by at least CHF 1.7 million based on the figures provided in the Information Memorandum:

(a) According to the established practice of the Zurich Cantonal Tax Administration (see for example para VII of the circular of the Zurich Cantonal Tax Administration on taxation of banks and securities dealers dated July 20, 2005, *Merkblatt des Kantonalen Steueramts über die Besteuerung von Banken und Effektenhändler*) reserves for general banking risks which are shown in the statutory accounts have to be added back to the taxable profit and equity in the relevant tax periods.

(b) If the Bank had established a reserve for general banking risks (as claimed on page 37 of the Information Memorandum), it would have been obliged to make an adjustment with regard to taxable profit and equity resulting in a taxed hidden reserve (*versteuerte stille Reserve*).

(c) If the Bank would not have made such correction on its own, the competent tax authorities – upon becoming aware of the situation – would make the correction in a tax audit/assessment.

(d) By using the term "reserve for general banking risk" for the position "value adjustments and provisions" the Information Memorandum implies that such position has been taxed. A reader of the Information Memorandum may assume in good faith that this position does not need to be corrected by taking into account a deferred tax liability.

### 1.2.4 Conclusion

The Information Memorandum contains materially false statements with regard to crucial aspects of the transaction, namely the financials, by incorrectly illustrating the tax situation and the equity position of the Bank. Should the so-called "reserve for general banking risks" constitute hidden reserves (for which no evidence had been provided), (i) such does not change the fact that they are not permitted to be stated on page 37 of the Information

NIEDERER KRAFT & FREY
RECHTSANWÄLTE

Memorandum under the formal and regulatory-wise very important position "reserves for general banking risks" and (ii) then the position "value adjustments and provisions", of course, may not be qualified as equity without taking into account the deferred tax liability. Furthermore, it was omitted to state that there had been correspondence with the tax authorities regarding several issues (e.g. regarding the indirect partial liquidation and a planned loan to an affiliated party).

Hence, based on the information provided in the Information Memorandum, neither (i) the risks associated with the bank guarantee/indirect partial liquidation issue nor (ii) the consequence that the bank guarantee would have to be secured at the cost of Mr. Pieron nor (iii) the deferred tax liability with regard to a so-called reserve for general banking risks could have been detected or assessed.

### 1.3    Asserted Disclosures

In your letter dated February 17, 2009, you contended that Millenium Associates had informed Mr. Pieron that he would need to replace the personal guarantee backing up the bank guarantee. This is strongly contested and rejected. A personal guarantee by Mr. Pieron or other additional security has never been subject to any discussions prior to the making of the offer on November 25, 2008 and until its signing. The very fact that neither the Information Memorandum nor the Offer Letter countersigned by Du Bois disclose or provide that a buyer/Mr. Pieron would have to provide for a bank guarantee or similar security in favour of the bank in the amount of no less than CHF 10 million on top of the purchase price of CHF 46.6 million proves the obvious incorrectness of such assertion. Whether such had been maliciously concealed to Mr. Pieron or omitted because Du Bois – at the time of signing the Offer Letter – had not assessed the resulting costs and tax implications thoroughly is not relevant since in either case it was a – documented – misrepresentation.

Furthermore, you assert that Millenium Associates offered Mr. Pieron the opportunity to conduct a due diligence, but that Mr. Pieron declined to do so. This statement is also heavily rejected; such would be in total contradiction to the structure of the transaction process which, as agreed in the Offer Letter, provided for the due diligence to be made after the signing of the Offer Letter and the making of the Deposit, and not before.

### 1.4    Consequences of the Material Misrepresentations on the Purchase Price

Despite of the above misrepresentations, Mr. Pieron would have been willing to consummate the transaction if the negative financial consequences of the material adverse issues detected were borne by Du Bois; this would have resulted in financial concessions from the

7

NIEDERER KRAFT & FREY
RECHTSANWÄLTE

part of Du Bois, including a decrease of the purchase price. Du Bois was, however, not prepared to make any concessions in the negotiations.

In your letter dated February 17, 2009, you contended that "it was agreed that the purchase price would correspond to the shareholder's equity including the reserves for general banking risks ... of the Bank" and that "none of the alleged issues are relevant for calculation of the shareholder's equity (and thus for the calculation of the purchase price), since they have no impact on the shareholder's equity of the Bank."

We disagree with these contentions. While we agree that the duration of the bank guarantee and the fact that Mr. Pieron would have to secure the bank guarantee, obviously do not have an influence on the shareholder's equity of the Bank, it is clear that due to these factors Mr. Pieron would have had to deploy additional substantial liquid funds to enter into and consummate the contemplated transaction and that the purchase of the Bank would have become substantially more expensive to Mr. Pieron than what has been agreed in the Offer Letter, this due to circumstances for which Du Bois is solely and entirely responsible.

With regard to the potential deferred tax liability, it should go without saying that a respective provision in the amount of approx. CHF 1.7 million when calculating the so-called shareholder's equity would have to be made and that such provision would decrease the shareholder's equity in the respective amount. The same is true for the whole position of CHF 7.8 million to the extent it would not be proven that it truly and exclusively constituted hidden reserves.

## 1.5    Consequences of the Material Misrepresentations on the Validity of the Offer Letter and the Deposit

As set forth in our letter to you dated February 12, 2009, section 1 of the Offer Letter states that the offer is null and void if any material representations made by Du Bois or any of its representatives or affiliates or the Bank were materially inaccurate. Since it is evident that material misrepresentations were made, the Offer Letter is null and void. Therefore, Du Bois does not have any right to keep the Deposit.

Although section 7a of the Offer Letter states that the no shop undertaking and the exclusive option to purchase the Bank are granted in exchange for the Deposit, the Deposit has not been paid *solely* as consideration for the no shop undertaking and the exclusive option to purchase the Bank.

Furthermore, although section 7c of the Offer Letter states certain reasons for which the Deposit shall be returned, it does not state that the Deposit shall *only* be reimbursed in such

8

NIEDERER KRAFT & FREY
RECHTSANWÄLTE

cases, as your letter to us dated February 17, 2009, suggests. As the Offer Letter does not provide for a regime in case of the Offer Letter becoming null and void, it is clear that the consequences will be as set forth by Swiss law for such cases resulting in the obligation to return the Deposit and to reimburse the professional and legal fees.

Finally, your letter dated February 17, 2009, seems to suggest that the timing when the misrepresentations were alleged is relevant or that such allegations have been made too late. In this regard, first, it has to be mentioned that Du Bois extended the exclusivity period until February 6, 2009; second, the rights Mr. Pieron has against Du Bois based on misrepresentations are not linked to the expiry of the exclusive option to purchase the Bank; therefore, the allegation that the claim for misrepresentation was made too late lacks any legal or contractual basis.

## 2.      Non-satisfactory Due Diligence

Pursuant to section 1 of the Offer Letter the offer was subject to the completion of satisfactory due diligence relating to the Bank. For the various material adverse issues discussed in sections 1.1 and 1.2 above and as detected in the course of the due diligence, it goes without saying that the due diligence has not turned out to the satisfaction of Mr. Pieron. Also for this reason, the offer is no longer valid. Accordingly, there is no basis for Du Bois to keep the Deposit, which, according to the Offer Letter, had been made as "good faith down payment" and which consequently shall be returned to Mr. Pieron.

## 3.      Termination of Transaction by Du Bois

As stated in section 1.4 above, Du Bois had been asked by Mr. Pieron to make financial concessions to compensate for the financial consequences of the material misrepresentations as described in sections 1.1 and 1.2 above (requirement of a guarantee or other security in the amount of no less than CHF 10 million to be provided by Mr. Pieron in favour of the Bank, non-disclosed deferred tax liabilities), such as a reduction of the purchase price, but was not prepared to make any such concessions in the negotiations.

By refusing to make any such concessions, Du Bois violated the undertaking of section 7c of the Offer Letter stating that the parties shall work in good faith expeditiously towards a closing and thereby unreasonably terminated the transaction within the meaning of section 7c; with the consequences described in section 1.5 above. In this connection it shall be noted that different from what you contend, "transaction" is not a term defined in the Offer Letter and therefore does not only refer to the undertakings of a signed share purchase

9

NIEDERER KRAFT & FREY
RECHTSANWÄLTE

agreement as suggested by your letter dated February 17, 2009, but also refers to the due diligence and negotiation process of such transaction.

**III. FINAL REQUEST FOR REPAYMENT**
**ACTIONS AGAINST DU BOIS, ITS REPRESENTATIVES AND THE BANK**

This letter represents Mr. Pieron's final request for the repayment of the Deposit. In case the Deposit will not be credited in its entirety to the account no. 0879-937520-51 of Niederer Kraft & Frey AG with Credit Suisse, CH-8070 Zurich (IBAN no.: CH47 0483 5093 7520 5100 0; SWIFT-BIC: CRESCHZZ80A; Reference: "Return of Deposit to Mr. Pieron"), by **July 13, 2009,** we are instructed to initiate legal proceedings without any further warning against Du Bois and potentially its representatives. In such legal proceedings, we will claim, in addition to the repayment of the Deposit, the reimbursement of any and all professional and legal fees accrued in connection with the envisaged acquisition of the Bank amounting to several hundred thousand Swiss Francs. Lastly, Mr. Pieron reserves the right to have the involvement of the Bank in the transaction and in particular the providing of incorrect and/or incomplete information reviewed by the supervisory authorities and to bring to the extent necessary a claim against the Bank.

For the avoidance of doubt, the above is without prejudice or waiving of any rights of Mr. Pieron.

Best regards

François M. Bianchi                    Ernst F. Schmid

10