```
 1                    IN THE UNITED STATES DISTRICT COURT
                          EASTERN DISTRICT OF MICHIGAN
 2
     UNITED STATES OF AMERICA            )  Bay City, Michigan
 3                                       )  November  14, 2019
          vs.                            )  9:18 a.m.
 4                                       )
     JAMES D. PIERON, JR.,               )
 5                                       )  Case No. 18-20489
          Defendant.                     )
 6   _____  )

 7
                              TRANSCRIPT OF HEARING
 8              BEFORE THE HONORABLE THOMAS L. LUDINGTON
                      UNITED STATES DISTRICT JUDGE
 9
     APPEARANCES:
10
     For the Government:   JANET L. PARKER
11                         JULES DEPORRE
                           United States Attorney
12                         Eastern District of Michigan
                           101 First Street
13                         Suite 200
                           Bay City, MI 48708
14
     For the Defendant:    PATRICK J. HURFORD
15                         MARK S. PENDERY
                           Honigman, LLP
16                         660 Woodward Avenue
                           Detroit, MI  48226
17

18

19

20

21   Court Reporter:    Carol M. Harrison, RMR, FCRR
                         1000 Washington Avenue
22                       Bay City, MI  48708

23

24              Proceedings reported by stenotype reporter.
           Transcript produced by Computer-Aided Transcription.
25
```

```
 1                          I N D E X

 2

 3  WITNESSES FOR THE DEFENDANT:                        PAGE

 4  CHELSEA REBECK
        Direct Examination By Mr. Pendery               30
 5      Cross-Examination By Mr. Deporre                88

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

US v. Pieron, Jr. - Hearing - November 14, 2019

1          P R O C E E D I N G S

2               (At 9:18 a.m., proceedings commenced.)

3               (Defendant present.)

4          THE CLERK:  United States of America versus James

5     Pieron, Case No. 18-20489.

6          THE COURT:  Good morning.

7          MR. HURFORD:  Good morning, Your Honor.

8          THE COURT:  If we could have counsel's appearances,

9     please.

10          MR. DEPORRE:  Good morning, Your Honor.  Jules

11     DePorre on behalf of the United States.

12          MS. PARKER:  Janet Parker on behalf of the United

13     States, and with me at counsel table is Scott Hollabaugh, IRS

14     agent.

15          THE COURT:  Good morning.

16          MR. HURFORD:  Your Honor, Patrick Hurford on behalf

17     of defendant James Pieron, who's seated at the table with me.

18          THE COURT:  Good morning to you, gentlemen.

19          MR. PENDERY:  Mark Pendery appearing for Mr. Pieron

20     as well, Your Honor.

21          THE COURT:  Good morning.

22          Government, ready to proceed?

23          MR. DEPORRE:  We are, Your Honor.  I would ask --

24     we'll be proceeding by proffer, and I am ready.

25          THE COURT:  Do you have a witness?

1        MR. DEPORRE: We do not. Our witness was

2 unavailable, and so we will present the evidence -- I don't

3 think it's a witness. She is an IRS -- she prepared the taxes

4 based on the documents that are -- have been presented either

5 at trial or on the record. Her function was strictly

6 mechanical in terms of typing in numbers on a computer program

7 to generate a --

8        THE COURT: Proforma return.

9        MR. DEPORRE: Proforma return. But the information

10 on that return is based on exhibits that have been produced in

11 sentencing memoranda and throughout the trial.

12        THE COURT: More or less identified returns filed by

13 the defendant with some modifications.

14        MR. DEPORRE: Exactly. And so the Government did

15 begin -- because the focus of the Court's inquiry is the tax

16 loss that the defendant attempted to evade or defeat, and so in

17 this case, that loss amount was primarily based on

18 self-reported returns, returns that were filed for 2008 tax

19 year and 2009.

20        The defendant filed, as the Court knows, two sets of

21 returns. He filed a 2008 return, and then filed an amended

22 return for 2008. He filed a 2009 return, and then filed an

23 amended return for 2009. And then in 2013, he also filed an

24 amended return for a different tax year, which would have

25 changed the -- which was not accepted by the IRS, and if it had

 1   been accepted, would have changed the tax due and owing.  That

 2   was the return that made the claim of right argument.

 3          The two --

 4          THE COURT:  So my initial sort of response to that is

 5   to think, from the defendant's perspective, how can we

 6   cross-examine the preparer?  And I guess your response is --

 7   excuse me, the revenue officer who has developed the proforma

 8   returns.  And I suppose your response is, well, the information

 9   contained in the proforma is simply the information from the

10   defendant.

11          MR. DEPORRE:  Exactly.

12          THE COURT:  What do you think of that Mr. Hurford?

13          MR. HURFORD:  I think it's ridiculous, Your Honor.

14          THE COURT:  Tell me why.

15          MR. HURFORD:  There's -- the Government's taken a tax

16   position, if they're -- if their tax position is solely the

17   basis of the returns that were filed by my client, so be it,

18   but I've got two tax returns the Government is putting up that

19   claim there's a tax liability.  There's assumptions in there.

20   There's documents that were reviewed I assume before those were

21   completed.

22          THE COURT:  But those assumptions are entirely

23   predicated on information received from your client.

24          MR. HURFORD:  That's true, Your Honor.

25          THE COURT:  But if -- if that narrative is to be

 1  challenged, their suggestion is you need to challenge it --

 2          MR. HURFORD:  We already --

 3          THE COURT:  -- not them.  They're working with the

 4  best information known to them, which is that furnished by your

 5  client.

 6          MR. HURFORD:  That's true, Your Honor.  It's also

 7  true that there's a lot of documents showing that those returns

 8  are false, incorrect, and I think that there's -- we're having

 9  a sentencing hearing, let's get it right and give us an

10  opportunity to ask that revenue agent that completed those

11  returns how the actual documents, the bank records,

12  Exhibit 138, factor into her tax calculations.  I would like to

13  know on what basis -- other than the tax returns submitted by

14  my client, on what basis she has income of $10 million in 2008

15  and $5.25 million in 2009.

16          If there's no information that she used other than

17  that tax return, I don't think the Government can meet its

18  burden here, and they're going to rely on a trial at which the

19  jury made no finding as to the amount of tax liability.

20          THE COURT:  Well, you think relying on your client's

21  proffered returns, as accurate as to much of the information,

22  is erroneous?  It's an insufficient proffer with respect to the

23  income for the Government to proceed?

24          MR. HURFORD:  Yes.  They have the burden to establish

25  that he made income.

1    THE COURT:  And I respectfully agree that their

2  proffer, based on your client's returns, is sufficient as a

3  prima facie matter to advance the information and that the

4  obligation to challenge the accuracy of that is your client's.

5    MR. HURFORD:  In that case, Your Honor, then,

6  Ms. Parker's going to object, but I'm going to call Agent Scott

7  Hollabaugh to the stand.

8    MS. PARKER:  Your Honor, I do object.  First of all,

9  I think that's exactly the same reason -- he's offered even

10  less authoritative person on the topic, and primarily he -- he

11  is not allowed by *Touhy* to testify.  He really has not been

12  approved.  He could get fired if he were to testify without

13  approval.

14    Mr. Hurford knew that this was the Government's

15  position.  He's not made any effort to overcome that by

16  bringing a motion to compel; and, quite frankly, he has nothing

17  to offer beyond the same thing.  He can look at the documents

18  and see what the documents said, and I think we do meet the

19  burden, as the Court's already indicated, by a prima facie

20  showing by relying on the defendant's tax returns.

21    It's the defendant who knows what happened then, not

22  Mr. Hollabaugh or any other person who can testify as to why

23  the defendant swore to certain pieces of information that he

24  now wishes to recant and say were not true.

25    MR. HURFORD:  I -- Your Honor, this is a bit

1  frustrating for me, because what Ms. Parker just said is beyond

2  misleading.  First of all, I sent a letter.  I sent a subpoena

3  for Agent Hollabaugh, and I sent a letter.  She said, please

4  address *Touhy*, so I looked up the IRS regulations on *Touhy*.

5  What do you have to do to subpoena an IRS agent?  And if it

6  pertains to a criminal matter, *Touhy* doesn't apply according to

7  the IRS.

8        So then I looked up the regulations, because I used

9  to be slightly familiar with them, the Department of Justice

10  regulations, on what I have to do from -- assuming he was a

11  Department of Justice employee, but he's not.  So the

12  Department of Justice *Touhy* regulations don't apply to Agent

13  Scott Hollabaugh, so *Touhy* doesn't apply here.

14        And Ms. Parker, at the last time we were here, she

15  said to me, she's going to object on relevance grounds, not

16  *Touhy*, or that *Touhy* somehow has to do with relevance.  And if

17  you're going to strike Agent Hollabaugh from testifying, I will

18  just simply proffer his grand jury testimony, which says, in

19  effect, that the 2008 and 2009 tax returns filed by my client

20  are wrong.

21        And I think, then, if we're going proceed by proffer,

22  that sworn testimony should be enough, if they're going to have

23  their prima facie case of being able to submit that, to

24  counteract that evidence to suggest that the 2008 and 2009 tax

25  returns that they're relying on, according to their lead case

1   agent testifying under oath in front of a grand jury, is

2   sufficient to rebut any prima facie case that they've made.

3           THE COURT:  We'll take up the question of your

4   calling this gentleman as a witness on motion practice.  I need

5   to get an understanding for the law that would govern the

6   circumstance.

7           Who's your next witness?

8           MR. PENDERY:  Chelsea Rebeck, Your Honor.

9           THE COURT:  And who is that?

10          MR. PENDERY:  She's our expert.

11          THE COURT:  And what factual information does she

12  have that would enable her to form an opinion that would be

13  helpful to us?

14          MR. PENDERY:  Your Honor, the question is whether or

15  not there was $10 million in capital gain in 2008 to James

16  Pieron and 5.25 million in capital gain to James Pieron in

17  2009.  The bank records clearly show -- Government Exhibit 138

18  that was admitted at trial, that James Pieron did not receive

19  one dime of the $15,250,000 that was transferred from -- I'm

20  going to call it Trevor Cook or related entities, to JDFX, a

21  company, not Pieron.

22          THE COURT:  And that's true, so far as I understand

23  the circumstance.

24          MR. PENDERY:  Yes, sir.  So if that's true --

25          THE COURT:  And, to my understanding, the narrative

1  that you would like to advance at this stage, on behalf of

2  Mr. Pieron, but without Mr. Pieron, is that there was actually

3  also no -- no exchange of securities in conjunction with any of

4  those payments after the initial capitalization of JDFX.  There

5  was no capital transaction or sale of any securities that

6  followed that?

7          MR. PENDERY:  That's correct, Your Honor.  You have a

8  copy of the share certificates, 1, 2, and 3.  Mr. Pieron,

9  Mr. Clive Diethelm and Market Shot each received shares.

10  Pieron received 7 million shares, Cook received 2 million

11  shares, Clive Diethelm received 1 million shares the day that

12  JDFX Holding AG was registered.  In our country, we call it

13  incorporated.

14          So it would be impossible for Pieron to have sold him

15  those 2 million shares of stock in JDFX Holding AG when the

16  certificates are dated December 15, 2006 and the incorporation

17  occurred on December 15th, 2006.

18          THE COURT:  Well, if that's all true, why are three

19  sets of returns completely inconsistent with that?

20          MR. PENDERY:  Your Honor, I know this may be hard to

21  believe, but I've been doing this for 36 years, and I have

22  clients come and see me all the time that tell me they got a

23  capital gain, or they think they have a loss, or they think

24  they have some position on a tax return, and they're wrong.

25          THE COURT:  Well, somebody's told you that.  Why or

1  how can I reach the same conclusion if no one's going to tell

2  me that?  And your accountant is only in a position to reach

3  certain conclusions about the application of the tax loss based

4  on factual information that has been furnished to him or her in

5  order for them to reach a conclusion --

6           MR. PENDERY:  That's correct.

7           THE COURT:  -- and that conclusion will be that there

8  are three sets of false returns?

9           MR. PENDERY:  Or I would call them incorrect returns,

10  yes, Your Honor.

11           THE COURT:  Incorrect returns?

12           MR. PENDERY:  Yes, I would say that.  I agree.

13           THE COURT:  It seems to me that without an

14  understanding of the underlying factual information, the

15  narrative that you would like to advance here about the errors

16  that have been made along the way is no better than whoever is

17  giving you information that now explains that all of the events

18  leading to those returns, the incorrect returns, is wrong.  And

19  I don't know how to evaluate that in any other way except to

20  hear the testimony of the person that's changing the narrative?

21           MR. PENDERY:  I understand that, Your Honor.  There

22  is the *Gregory versus Helvering* case from 1933 --

23           THE COURT:  Sure.

24           MR. PENDERY:  -- and the Supreme Court says, look at

25  the substance of the transaction, not what the taxpayer said it

is, or what the documents say it is.  We're going to look at

what really happened here.  And if we look at what really

happened here, he didn't have a capital gain in 2008 and he

didn't have a capital gain in 2009.

THE COURT:  You're telling me that, but that is not

the equivalent of evidence.  It's argument.  At some point, I

have to have evidence that explains why that narrative

contradicting three sets of returns is --

MR. PENDERY:  You need an explanation of what

happened in 2006, '07, '08 and '09.

THE COURT:  Well, the Government's proffering the

very returns that your client advanced to the Internal Revenue

Service to be accurate, complete and true.

MR. PENDERY:  And we can prove that they're not.

THE COURT:  Well, prove it.

MR. PENDERY:  Read the testimony of Agent Hollabaugh

in his grand jury transcript.  He says that 2008 and 2009 tax

returns are wrong.

THE COURT:  Well, and their proffer suggests that

certain parts are right and certain parts are wrong.  They want

to accept the revenue component but reject the notion that

there was a tax basis.

MR. PENDERY:  He says the revenue component is wrong

in his grand jury testimony, Your Honor.  And the reason for

that, and I think the Court's already aware of that -- or this

1   is in 2006 -- everybody's pointed to Government Exhibit 138 as

2   the document that proves the capital gain to Pieron; 500,000 in

3   2006, 9.5 million in 2008, 2.1 million in 2000 -- or, excuse

4   me, 2008 -- 2007 was 9.5 million, 2008 is 2.1 million and in

5   2009 it's 3.15 million.

6           Alls that document shows is that the money goes to

7   JDFX.  It doesn't show that it ever went to Pieron, and the

8   agent testifies to the grand jury, he didn't have $10 million

9   of capital gain in 2008 because the $10 million came in in

10  '06 and '07, if you're going to treat it as a capital gain at

11  all.  So the 2008 tax return that they want to keep pointing to

12  is wrong.  The document proves that it's wrong.

13          THE COURT:  Their document?

14          MR. PENDERY:  Their document.  Government Exhibit 138

15  proves that it's wrong.

16          THE COURT:  I think that they're -- he's quite

17  correct on that point and relying largely on 138, that the

18  proffer on the tax loss calculations is inconsistent with 138

19  on the revenue component.  Would you agree?

20          MR. DEPORRE:  I would agree that 138 regarding the

21  revenue shows revenue -- and this is consistent with Agent

22  Hollabaugh's grand jury testimony, shows financial transactions

23  between Cook and JDFX in 2006 and 2007.

24          The defendant elected to treat those as deposits and

25  claimed that as income in 2008, which is consistent with the

1  sale of the -- sale purchase agreement, the stock transaction

2  agreement closing date for 2008 and then a separate agreement

3  for 2009.

4          Whether or not those are deposits as the defendant

5  claimed when he filed his returns, or something else, isn't

6  information that the Government has.  The defendant, when he

7  filed his returns, took the position that they were deposits,

8  and so if they are something different, that isn't something

9  that we know about.  We know that there was money -- we know

10  that there were transfers made in '06 and '07, but the tax

11  implications in 2008 of those transfers, the defendant's

12  returns say that they were income in 2008 and 2009.

13          THE COURT:  But you agree not received in those

14  returns?  You're relying on the return, not on the source

15  documentation of the receipt of the revenue?

16          MR. DEPORRE:  Correct.

17          THE COURT:  So you agree with the defendant that the

18  return is incorrect with respect to the revenue?

19          MR. DEPORRE:  I would not -- I would not say it's

20  incorrect with respect to the revenue.  I would say that the

21  return can -- is -- could be correct if the revenue is -- if

22  the wire transfers are deposits.

23          THE COURT:  Shouldn't they be able to cross-examine

24  the -- your revenue officer with respect to that information?

25          MR. DEPORRE:  My revenue officer has no idea whether

1   or not those were deposits.  That's -- the person that would

2   have that information is Mr. Pieron and Mr. Cook, the two

3   parties to the transaction.  There are no documents that the

4   Government has ever received to indicate whether they're

5   deposits or whether they are something else.

6           All we have are the sale purchase agreements that say

7   that the closing date of the transaction was January 1st, 2008

8   for the 20 percent transaction and then for the additional

9   January 1st, 2009.

10          THE COURT:  Well, to some extent I think,

11  Mr. Hurford, we're back to where we began, which is if those

12  returns are inaccurate, there's only one person that can

13  explain why and what is correct.

14          MR. HURFORD:  Then I don't agree with that because,

15  as a matter of law, they're not deposits, cannot be deposits

16  under the Government's entire theory that this was a sale of

17  stock.  Payment received in 2007, we cited this in our brief,

18  cannot be deposits.  It's impossible, legally impossible.  They

19  should have been income in the year that the money was received

20  because the only thing that Cook could have done to get the

21  money back was nothing.  Pieron performs under that contract,

22  Cook's not entitled to the money back.  It's called an advance

23  payment.

24          THE COURT:  What was the performance that Mr. Pieron

25  provided to Mr. Cook?

1          MR. HURFORD:  None, Your Honor.  He didn't sell stock

2    in 2007.

3          THE COURT:  I'm sorry, I was -- I thought I was using

4    your language.

5          MR. HURFORD:  You are.  I'm -- the problem is, we've

6    got an initial -- did the sale of stock occur?  Then -- in

7    2008, as according to the share purchase agreement, and when

8    did it happen?  Does it happen in 2008 when the share purchase

9    agreement was entered into?  Did it happen in 2007 when Cook

10   gets shareholder rights, or was there never any sale under the

11   judicial estoppel issue that we've been talking about and

12   briefing to begin with?  And under any of these scenarios, Your

13   Honor, he still has no tax liability, and that's in our brief.

14          And, secondly, I think --

15          THE COURT:  Well, I'm offering you an opportunity to

16   explain why we shouldn't apply the doctrine of judicial

17   estoppel, and there are some other arguments the Government has

18   advanced in their papers.  And, in part, it's similar to an

19   argument that you've made in support of the motion for new

20   trial, which is that there is this alternative reality that

21   former counsel did not advance in conjunction with the trial,

22   but you don't want to tell me what it is, and you don't want to

23   advance any of the underlying factual information that would

24   support it.

25          MR. HURFORD:  I think with --

1        THE COURT:  The plaintiff -- your client is in a

2  circumstance where I'm not sure the Fifth Amendment applies

3  anymore.

4        MR. HURFORD:  I don't agree --

5        THE COURT:  Okay.

6        MR. HURFORD:  -- and I think -- yes, Your Honor, I

7  think in the normal course, is my client able to testify about

8  this stuff at a sentencing hearing?  Yes.  And should he?

9  That's debatable.  There's a lot of issues.  Two of which -- or

10  one of which is the fact that there's a new trial motion

11  pending right now, and it's my professional opinion that on the

12  statute of limitations instruction, and the ineffective

13  assistance of counsel claim, I have extremely meritorious

14  motions.  And so to -- to be presented and be put in a

15  situation right now where I have to decide to put my client on

16  the stand at a sentencing hearing that I think --

17        THE COURT:  Well, let's take up the -- just the

18  question on the ineffective assistance of counsel.  How can I

19  evaluate that?  What information do I have that would suggest

20  that the alternative narrative that counsel should have

21  advanced, but that you don't want to advance even in

22  conjunction with a sentencing hearing after a jury conviction,

23  how do I evaluate that?  What information do I have?

24        MR. HURFORD:  You have asked for four briefs from

25  each side on the tax issue because it's so -- I think it's --

 1          THE COURT:  I understand the tax implications of --

 2   that both parties are advancing.  It depends ultimately on an

 3   understanding factually of what occurred and why those returns

 4   are inaccurate.

 5          MR. HURFORD:  It --

 6          THE COURT:  And I don't know what.  I know what your

 7   arguments are.  I know what some documents that you've attached

 8   materials are.  I don't know where they came from.

 9          MR. HURFORD:  It doesn't though, Your Honor.  It

10   doesn't, because whatever scenario you have --

11          THE COURT:  How do I know they're authentic?  How do

12   I know that there were only three certificates?  How do I know

13   that what the actual purchase price was for the initial advance

14   of stock?  How do I know any of that?  How do I know to

15   evaluate that your argument, that your client was ineffectively

16   assisted during the course of the trial, because there are

17   events and information that you know and I don't, in order to

18   evaluate even the motion?

19          MR. HURFORD:  I don't see how the share purchase

20   certificates, Nos. 1 through 3, are any different than share

21   purchase certificate 1A that was entered into evidence at

22   trial.  Where's the certificate of authenticity for that?

23          What about the -- Exhibit 211, the spreadsheet of

24   transactions.  There's no certificate of authenticity for that.

25   The share purchase agreements are the same.  Where's the

1    certificates of authenticity for that?

2              THE COURT:  Who needs that?

3              MR. HURFORD:  Apparently the Court is asking for it

4    right now.

5              THE COURT:  All I'm suggesting to you is that the

6    Government, I think accurately, is relying on the reported

7    information that were contained in those returns, and if there

8    is an alternative narrative, it is not their obligation to

9    impeach the returns of the defendant.  They can rely on the

10   defendant is at least accurate until they have some reason to

11   disbelieve him based on the suggestion of mistaken reporting.

12             MR. HURFORD:  I think when you have a tax return that

13   your lead case agent testifies -- or two tax returns that your

14   lead case agent testifies under oath at grand jury are

15   incorrect, I think you have -- I think you have some issues

16   submitting that as evidence to a jury and telling them to

17   accept it as true, when you have reason to believe that they're

18   not.

19             And I think you have problems using those at

20   sentencing to ask for a certain tax liability when you have

21   reason to believe they're not true, and this Court now has

22   enough documents in front of it, including Exhibit 138, to

23   question whether or not those tax returns are accurate.  So

24   based on the evidence that's been simply presented at trial,

25   Your Honor, there is enough to question the Government's burden

1   of tax liability at trial and it wasn't done.

2          THE COURT:  Well, let's -- let's put aside their

3   reporting.  You would agree that there's 5 million received in

4   '08 and '09?

5          MR. HURFORD:  Market Shot sent 5.250 million in 2008

6   to 2009 in JDFX, I agree with that.

7          THE COURT:  Yes.  So that information is wrong unless

8   it was received in conjunction with a larger transaction, which

9   would have included the prior years.  What else is wrong with

10  the return?

11         MR. HURFORD:  There's absolutely no credit given to

12  the money they claim was loaned back to the company.  None.

13  It's only -- if JDFX gets the money, what's the theory of

14  income?  It's not our -- it's not our burden to establish

15  income here.  It's our burden to establish credits and

16  deductions and things like that, but the burden is to establish

17  income, and there's no document, other than the tax return.

18  There's no document that proves that Pieron made any money off

19  of the sale, quote unquote, of stock.

20         THE COURT:  You weren't particularly interested in

21  relying on the stock purchase agreements in addition to the

22  return, so there's some explanation for why those are erroneous

23  apparently.

24         MR. HURFORD:  I'm sorry, Your Honor, I'm not sure I

25  under -- is there a question?

1        THE COURT:  Well, all I'm asking is that how you --

2   how you would refute the accuracy of the stock purchase

3   agreements.  I've never heard any explanation for why those are

4   inaccurate --

5        MR. HURFORD:  Well --

6        THE COURT:  -- or how that happened or why we

7   shouldn't rely on it, or why the Government's tender of that as

8   an exhibit is something we shouldn't consider.

9        MR. HURFORD:  I'm not saying don't consider it, Your

10  Honor.  I'm not saying -- I'm not asking you not to consider

11  any evidence.  The Government's asking you not to consider

12  certain evidence; I am not.  I'm saying look at the evidence,

13  and when you look at the evidence in this case, the documents

14  in this case, the tax returns don't make any sense.  And that's

15  why Agent Hollabaugh said they didn't make any sense under

16  oath.

17       THE COURT:  Well, it seems to me we're back to the

18  question of whether or not you want to call the agent and are

19  legally entitled to do so as a part of your case, and whether

20  or not you want to cross-examine the agent, and then the

21  question of whether or not your expert can testify about

22  hypothetical facts without providing us any of the background

23  concerning how he or she located them.

24       So we're not in a position apparently to take any

25  testimony from anybody today.

1        MR. HURFORD:  I'm not -- I don't agree with that,

2   and --

3        THE COURT:  Well, who do you think we should be

4   listening to?

5        MR. HURFORD:  Well, I think what I should have an

6   understanding of, if you're -- if -- you want me to put on a

7   case, or if I'm going to be allowed to put on a case, I would

8   like the Government to tell me what the theory of income is.

9   If -- the tax returns, okay.  Why is -- why does Pieron have a

10  capital gain of $10 million in 2008?  What money went to him at

11  what time and how are they attributing that as income to him?

12       THE COURT:  You would like to examine --

13       MR. HURFORD:  No, I think -- they're making a

14  proffer, so I think they have to proffer what their theory of

15  income is.  I think they have to proffer -- to give me, and

16  take a position on that stuff, so that I can then put on a

17  case.

18       THE COURT:  I disagree.  I mean --

19       MR. HURFORD:  Do they not have --

20       THE COURT:  They are simply relying on three sets of

21  returns that your client has furnished that has always

22  identified those transactions as capital transactions, and the

23  only thing that's changed is the numbers have moved around.

24       Indeed, I agree with you.  The second set of returns

25  substantially increased his tax liability, which appears to me

1    to be incoherent, but there isn't any question about the fact

2    that he has self-reported capital transactions three times, and

3    it's reasonable that the Government relies on that information.

4            MR. HURFORD:  I don't think it's reasonable for the

5    Government to rely on information that they have already

6    testified is false.  I -- I can't get past that.

7            THE COURT:  Well, false only in the sense that there

8    is a question about which tax year it's allocable to under

9    circumstances where $15 million has been reported as a single

10   capital transaction with receipts over different years.  So we

11   have a difference of opinion.

12           I think their reliance on those returns as a

13   threshold matter is a reasonable basis for advancing their

14   burden of proof.  And then any explanation of an alternative

15   narrative of that information falls to the defense.

16           MR. HURFORD:  There's two issues.  One is your

17   factual alternative is challenging the facts.  The other is,

18   based on the Government's position, challenging the law as to

19   whether or not there's a tax liability.  Because we can agree

20   that there's neither -- well, some modicum of basis, and we can

21   agree that the tax returns filed don't take into account any

22   money that would have been put back into the company.  And the

23   only way he can have income from the transfer of money from

24   Market Shot to JDFX, the fact that it stays in JDFX, the only

25   way that it can be income to Pieron, legally income to Pieron,

 1   is that if he somehow directed it to be there --

 2              THE COURT:  Sure.

 3              MR. HURFORD:  -- or left it there.  And the tax

 4   returns are not only inaccurate from the factual issues that

 5   we've discussed already, but they're inaccurate because they

 6   don't treat the money that was put back into the company under

 7   their theory of income, whatever it is, and whether it's basis

 8   or whether it's a loan or now the Government in their last

 9   brief calls it a deposit.

10              Ms. Rebeck can testify as to how there's no tax

11   liability under whatever theory the Government chooses.  So

12   that -- that's -- that's the second part of this.  It's not

13   just putting on a case about the underlying facts.  It's once

14   you figure out that there's income and there's -- or once

15   you -- let me back up.

16              If you operate under the assumption that there's

17   actually consideration received by Pieron --

18              THE COURT:  Yep.

19              MR. HURFORD:  -- the money had to be put back in the

20   company.

21              THE COURT:  It makes its way back there.  If you

22   assume for purposes of argument that there's imputed income to

23   him as a result of him being able to personally direct the

24   proceeds, once received, to JDFX, you then end up with a second

25   transaction, I agree.

1          MR. HURFORD:  And if you're going to do that, he has

2    no tax liability.  There's -- there's an ordinary loss if it's

3    a loan, there's an ordinary loss if it's a deposit, and if it's

4    neither, there's basis.

5          THE COURT:  In what year?

6          MR. HURFORD:  Wouldn't you -- again, Your Honor,

7    that's why I need to understand what the Government's theory of

8    income is.  It doesn't really matter what year, from my

9    perspective.  It doesn't matter if it's in 2000 -- if we take

10   the Government's position that he loaned the money back, if he

11   loaned it in 2007 or 2008 or 2009, it doesn't matter.  There's

12   no tax liability because he has a $15.25 million ordinary loss

13   in 2009 that can be carried back two years back to 2007 and

14   wipes out every single dollar of capital gain.

15         THE COURT:  Based on later events.

16         MR. HURFORD:  That's how ordinary loss -- that's how

17   bad debt works.  It is later events, so the later events are

18   2009, the liquidation of the company in 2009.

19         THE COURT:  But the '08 and '09 returns as filed,

20   based on prior events, were incorrect.

21         MR. HURFORD:  Yes.

22         THE COURT:  But we don't know why.

23         MR. HURFORD:  Because -- because, Your Honor, there

24   was a series of bad, bad, bad mistakes, and in my opinion,

25   accounting malpractice in this case because Pavlik treats

1  this -- comes up with this theft loss and this claim of right

2  doctrine, and what he should have done is treated it as a bad

3  business debt, and the law is pretty clear on that.

4         THE COURT:  At that point in time, I appreciate what

5  your thinking is.

6         MR. HURFORD:  And it's not --

7         THE COURT:  But ultimately -- and, you know, you

8  walked quickly from Mr. Pavlik's theory of theft loss, I think

9  probably quite appropriately, but you still got to deal with

10  the fact that there was information that was furnished to the

11  initial preparer, and to Pavlik, describing these as capital

12  transactions, and I don't know how we walk from that without an

13  explanation, other than a lawyer's argument.

14         MR. HURFORD:  It's quite simple, Your Honor.  If he

15  has income, it went back to the company, and we've got to treat

16  it someway.  If he doesn't have income, he doesn't have income.

17  But if the money is income to him, it went back to JDFX, and

18  we've got to -- regardless of what was said on the tax returns,

19  we're at part of a sentencing hearing to determine how long to

20  put a man in prison, so whatever was said in the past, I think

21  we have an obligation to get it right now.  And we have to

22  treat --

23         THE COURT:  But he doesn't want to explain why.  He

24  wants you to explain why.  He wants an accountant to explain

25  why, and I don't think that that moves the ball.

1          MR. HURFORD:  Your Honor, I --

2          THE COURT:  What we can do at this stage --

3          MR. HURFORD:  Let --

4          THE COURT:  I mean, the Government does not have a

5   revenue officer available that would at least explain the

6   proffered tax returns that were included with their tax loss

7   calculation.

8          You're not prepared to call Agent Hollabaugh given

9   the legal circumstance that he faces as a potential witness,

10  and the only other witness that we potentially have is your

11  expert whose factual foundation for any of her opinion, I

12  believe, has not been disclosed.  We could listen to the -- to

13  him or to her and find out what information was actually

14  furnished to him or to her.  We could do that today.

15         MR. HURFORD:  Just for -- I'd also like to say for

16  the record that service of a subpoena for Agent Hollabaugh was

17  accepted by the Government.  There's been no motion to quash.

18  There's been an objection on relevance grounds, and I said we

19  could resolve the relevance issue before the judge, but there

20  was no motion to quash that it was improperly served under

21  *Touhy*.

22         And now I think the Court has -- we proffered -- we

23  have a binder in front of you.  I -- there's a footnote about

24  Agent's Hollabaugh's testimony in the last brief we filed, and

25  I think that's more than sufficient to rebut the Government's

 1   position that the 2008 and 2009 tax returns are correct.

 2          Secondly, as for the legal positions concerning tax

 3   loss, which is separate from the factual arguments, our expert

 4   is prepared to testify that under whatever factual scenario

 5   imputes income to Pieron, he has no tax liability.  I don't see

 6   how that's irrelevant.  I don't see how that's unhelpful to the

 7   Court.  That's just based on having to make inferences based --

 8   if the Government has a theory of income, based on Pieron never

 9   actually receiving the money, then you can -- you can

10   extrapolate the different scenarios that could exist to impute

11   income to him, and under any of those scenarios, he has no tax

12   liability.  So to get back to the new trial, absolutely, Your

13   Honor.  Just based on what they presented at trial, there were

14   legal arguments that there was no tax liability that were never

15   advanced.

16          THE COURT:  So the suggestion would be that under any

17   factual circumstance, any interpretation of the -- or

18   characterization of those events, the witness will testify

19   there is no tax liability?

20          MR. HURFORD:  Based -- yes, based on -- and, again, I

21   just want to be clear, this all stems from having to come up

22   with some theory of income to Pieron when he doesn't get the

23   money.

24          THE COURT:  Might be interesting testimony.  Let's

25   take a brief break, and we'll come back and hear your witness.

1          MR. HURFORD:  Thank you, Your Honor.

2          (At 10:02 a.m., break taken.)

3          (At 10:14 a.m., break concluded.)

4          THE COURT:  Sir, would you like to call a witness?

5          MR. PENDERY:  Yes, Your Honor.  Chelsea Rebeck.

6          THE COURT:  If you could stop for just a moment.

7          (At 10:14 a.m., sworn by the Court.)

8          THE COURT:  Please have a seat.  The chair does not

9    move.  The microphone does.  We've found that if you're about

10   10 inches away from the microphone it works best.

11         MR. HURFORD:  Your Honor, the -- I'm sorry, the Court

12   has an exhibit binder right there that there's an up date to.

13         THE COURT:  My only concern that there's a lurking

14   workers' comp claim if somebody gets hurt with one of these.

15         MR. HURFORD:  Can I provide the Court with updated

16   tabs for the exhibit that may be referenced.

17         THE COURT:  Sure.  And can you begin with the witness

18   while the gentleman is completing the binder, please.

19         MR. PENDERY:  Sure.

20                    CHELSEA REBECK,

21         DEFENDANT'S WITNESS, SWORN AT 10:14 A.M.

22                  DIRECT  EXAMINATION

23   BY MR. PENDERY:

24   Q.   Can you state your name for the record and spell your

25   first and last name, please.

1  A.   Chelsea Rebeck, C-H-E-L-S-E-A, R-E-B-E-C-K.

2  Q.   Are you employed?

3  A.   Yes.

4  Q.   Where are you employed?

5  A.   I have a law firm by the name of Rebeck and Allen.

6  Q.   Where is that located?

7  A.   Southfield, Michigan.

8  Q.   Let's start with your educational background.  Where and

9  when did you graduate from high school?

10 A.   High school, I went to a correspondence school called

11 American High School.  It was based out of Lansing, Illinois.

12 Q.   What was the name of the high school?

13 A.   American High School.

14 Q.   And where did you -- and when did you graduate?

15 A.   2000.

16 Q.   And after you graduated in 2000, did you go to college?

17 A.   I did.

18 Q.   Where did you go?

19 A.   Baker College.

20 Q.   Located where?

21 A.   The campus was in Auburn Hills, and I took classes there

22 and online.

23 Q.   How long did you attend Baker College?

24 A.   For seven years.

25 Q.   Did you receive a degree?

1  A.    I did.

2  Q.    What was the degree?

3  A.    I received two degrees; one was an associates of business

4  administration with a concentration in accounting, and one was

5  a bachelor's in business administration with a concentration in

6  accounting.

7  Q.    All right.  And what year did you graduate again?

8  A.    2007.

9  Q.    Did you go to any further educational institutions after

10  that?

11  A.    I did.

12  Q.    Where did you go?

13  A.    I went to Cooley Law School for my JD with a concentration

14  in litigation, and then I went to Western Michigan Cooley Law

15  School for my LLM with a concentration in taxation, and I am

16  currently getting a master's in accounting at Welch College.

17  Q.    You have an LLM in taxation.  When did you receive that?

18  A.    2014.

19  Q.    Do you possess any certifications?

20  A.    I am a CPA and a CFE.

21  Q.    And how do you become a CPA?

22  A.    You have to have 150 credit hours of undergraduate

23  education, or a combination of undergraduate and graduate, and

24  you have to have two years of supervised experience under a

25  licensed CPA.

1  Q.    Are there any exams you have to pass in order to be a CPA?

2  A.    Yes, four exams.

3  Q.    And do you have any other certifications besides a CPA?

4  A.    I'm a CFE, which is a certified fraud examiner.

5  Q.    And what's a certified fraud examiner do?

6  A.    Examine for fraud in books and records.

7  Q.    And when did you receive -- when did you receive the CPA

8  certification?

9  A.    I believe it was 2014 also.

10  Q.    And the CFE was received when?

11  A.    I believe that was 2015.

12  Q.    Okay.  Let's talk about your work history.  After high

13  school, where did you work?

14  A.    In 2002 I started working at a CPA firm, and I worked

15  there until 2008.  I was a staff accountant.

16  Q.    What was the name of the firm, for the record?

17  A.    Steven Majie, CPA.  It's M-A-J-I-E.

18  Q.    And where was that located?

19  A.    In Troy Michigan.

20  Q.    And how long were you with the firm?

21  A.    Six and a half years.

22  Q.    And what did you do when you were there for that six and a

23  half years?

24  A.    I did basic financial statement compilations, I did

25  financial statement reviews, and I prepared individual and

1  business tax returns.

2  Q.    On average, how many tax returns would you prepare each

3  year?

4  A.    I would say two to 300 per year.

5  Q.    Were those reviewed?

6  A.    Yes.

7  Q.    Have you prepared simple tax returns?

8  A.    Yes.

9  Q.    What's a simple tax return?

10 A.    I would classify a simple tax return as a W-2, maybe a

11 Schedule A.

12 Q.    Have you prepared complex tax returns?

13 A.    Yes.

14 Q.    What would a complex tax return be?

15 A.    Some of the more complex returns I would say would have

16 additional schedules, including capital gains and losses,

17 rentals, foreign income or the ones that come out of the

18 printer that are like 100 pages.

19 Q.    Have you prepared tax returns that reported capital gains?

20 A.    Yes.

21 Q.    And I'm talking about the six years you were at the Majie

22 accounting firm?

23 A.    Yes.

24 Q.    How about calculating basis?  Did you have to do that in

25 order to report capital gains?

1  A.   Calculating basis and making sure that the basis was

2  accurately reported on the return.

3  Q.   Okay.  Well, let's back up a sec.  So tell the Court what

4  a capital gain is.

5  A.   A capital gain is a gain on the sale of a capital asset.

6  Q.   And can a capital gain be a short-term capital gain or

7  long-term capital gain, loss?  What is it?  What can it be?

8  A.   It can be short or long-term and a capital gain would be

9  the opposite of a capital loss.

10  Q.   All right.  Basis.  What's basis?

11  A.   Basis is the sales -- I'm sorry, the purchase price of the

12  asset or the purchase price plus additional contributions of

13  money to the capital asset.

14  Q.   And give an example in this case.  What would a capital

15  asset in this case be potentially?

16  A.   Sale of stock.

17  Q.   All right.

18       MS. PARKER:  I'm sorry, Your Honor.  I just didn't

19  hear the answer.

20       THE COURT:  Sale of stock.

21       MS. PARKER:  Okay.  Thank you.

22       MR. PENDERY:  Might want to move that a little bit

23  closer because you are trailing off a little bit.

24       THE COURT:  But not in the context of a 351 exchange.

25       MR. PENDERY:  Correct.

1  BY MR. PENDERY:

2  Q.    While you were at the Majie accounting firm, did you have

3  any of your tax returns examined by the Internal Revenue

4  Service?

5  A.    Not that I recall.

6  Q.    Have you ever been assessed a preparer penalty by the

7  Internal Revenue Service for a tax return you've prepared?

8  A.    No.

9  Q.    So you're there at the Majie law -- accounting firm for

10  six years, what did you do after that?

11  A.    I went to another small accounting firm.  I wanted to get

12  some audit experience so I went to a firm that did similar work

13  to what I was doing plus auditing.

14  Q.    What was the name of that accounting firm?

15  A.    Ramie Phillips, CPA.

16  Q.    And where was that located?

17  A.    Rochester Hills, Michigan.

18  Q.    And so give the Court an idea what you did while you were

19  at Ramie Phillips.

20  A.    Exactly what I did with Steven Majie, plus outside of tax

21  season we would do governmental will and nonprofit large

22  audits.

23  Q.    Was the work more complicated than the previous accounting

24  firm you worked at, or was it less complicated?

25  A.    I would say the tax work was a little more complicated,

1  because there were some clients with higher net worth than I

2  had previously dealt with.

3  Q.    Did you prepare tax returns when you were at the Ramie

4  Phillips accounting firm?

5  A.    Yes.

6  Q.    How many tax returns on average would you prepare each

7  year?

8  A.    I would guess two to 300.

9  Q.    Do you know if any of those returns were ever examined by

10 the Internal Revenue Service that you prepared?

11 A.    Not that I'm aware of.

12 Q.    Did there come a time you left the Ramie Phillips CPA

13 firm?

14 A.    Yes.  In 2012, I started working for the Department of

15 Defense as a contract auditor.

16 Q.    And where was that located?

17 A.    Sterling Heights, Michigan.

18 Q.    And what did you do as a contract auditor?

19 A.    I reviewed contract proposals submitted by defense

20 contractors to insure that the pricing and calculations were

21 fair, accurate and in line with the RFP's.

22 Q.    What's an RFP?

23 A.    Request for proposal.  So the government would ask the

24 contractor to submit a proposal for a tank, and the contractor

25 would submit the proposal, and then we would go through the

 1  proposal to make sure that all the numbers were correct.

 2  Q.    How long did you work for the Department of Defense?

 3  A.    I worked there until 2015.

 4  Q.    And what did you do after you left the Department of

 5  Defense?

 6  A.    So while I was working at the Department of Defense I also

 7  had opened my law firm.  Actually I opened the law firm in

 8  2012, and I did some legal work on the side.  And in 2015 I got

 9  busy enough that I had to kind of make a decision, do I stay at

10  the Government or continue practicing law, so I left the

11  Government and worked at my law firm full-time.

12  Q.    And does your practice have a concentration?

13  A.    Yes, I do primarily tax law.

14  Q.    And when you say "primarily tax law," is it federal tax

15  law, state law, local tax law, what is it?

16  A.    All of that, but mostly federal.

17  Q.    And in practicing in a federal tax law area, what do you

18  do as a practitioner?

19  A.    I do tax controversy.  I correct a lot of tax returns.  I

20  prepare unfiled returns.  I give tax advice to people who have

21  not yet filed their tax returns.  I represent people in audits.

22  I go to tax court.

23  Q.    How about collection actions by the IRS?

24  A.    Yes.

25  Q.    So you handle examinations, collections, have you handled

1   any criminal tax cases?

2   A.   Yes.

3   Q.   Have you ever testified as an expert before?

4   A.   I have testified as an expert in a tax evasion case in St.

5   Louis, Missouri.  I testified both at the trial and at

6   sentencing.

7   Q.   Were you qualified as an expert at that particular trial?

8   A.   Yes.

9   Q.   Do you recall the judge's name?

10  A.   I don't off the top of my head.  I knew it earlier.

11  Q.   That's okay.  When did you testify as an expert?

12  A.   That was in 2016 and 2017, so the trial was in '16 and

13  then the sentencing was in '17.

14  Q.   What did you testify about at the trial?

15  A.   I testified about the competence of the tax preparer

16  during the trial.

17  Q.   And what do you mean by that?

18  A.   The tax preparer who prepared the original returns did

19  them incorrectly and --

20  Q.   Excuse me, what did you say?  I didn't hear that.

21  A.   The original tax preparer did the returns incorrectly --

22  Q.   All right.

23  A.   -- and so part of the defense strategy was to go over what

24  tax preparers should do and whether or not that was done in

25  this case.

1  Q.   All right.  And you said you testified at the tax loss

2  hearing as well?

3  A.   Yes.

4  Q.   And what did you testify about at the tax loss hearing?

5  A.   I testified to the tax loss calculation.

6  Q.   Did you prepare your own tax loss calculation for that

7  particular trial?

8  A.   Yes.

9  Q.   Let's move on to this case, okay.

10        Can you tell the Court what you have reviewed in

11  anticipation of your testimony?

12  A.   I reviewed the trial transcripts.  I reviewed quite a few

13  of the filings subsequent to the trial, the motions and briefs.

14  Q.   You mean the tax loss filings?

15  A.   All of -- all of the filings that occurred since the trial

16  happened.

17  Q.   Okay.

18  A.   I just went through the docket and went through the

19  documents.  I reviewed the returns that the Government

20  prepared.  I reviewed the returns that Mr. Pavlik prepared.  I

21  reviewed various memos of interviews and --

22  Q.   And when you say memo of interview, do you mean by the

23  special agent?

24  A.   Yeah, I believe I reviewed the special agent memorandum

25  and a few other ones.

Q.    Have you seen and reviewed a number of the exhibits that
were attached to the tax loss memorandum?

A.    Yes, I did.

Q.    In your professional opinion, did Mr. Pieron have a
capital gain of $10 million in 2008?

A.    No.

Q.    Did Mr. Pieron have -- in your professional opinion, did
Mr. Pieron have a $5.25 million capital gain in 2009?

A.    No.

Q.    Why not?

A.    From all the documents that I reviewed, I did not find any
evidence that he actually received the money himself.  It
appears that it all went into his company.

Q.    You heard the Court this morning talking about the
Government's proffer is that the tax returns for 2008 and 2009
is what they're relying on, correct?

A.    Yes.

Q.    Is that reliance based in reality?

A.    In my opinion, no.

Q.    Why is that?

A.    Because the return as a whole was incorrect.  I mean,
the -- he didn't receive the money in those actual years, and
he didn't actually receive the money at all.  So even if we
were to come up with a hypothetical that the money that the
company received is going to be imputed to him, the actual

 1  years in which it was received are not in line with what was

 2  filed on the tax returns.

 3  Q.    Could you look at what you have as No. 9 in your book.

 4        MR. PENDERY:  And, Your Honor, you have it in your

 5  book as well as No. 9.  It's Government's Exhibit 138.

 6        THE COURT:  I'm familiar with it.

 7        MR. PENDERY:  Please?

 8        THE COURT:  I'm familiar with it.

 9        THE WITNESS:  Your Honor, is it okay if I have water

10  while I'm up here?

11        THE COURT:  Certainly.

12        THE WITNESS:  Thank you.

13        MS. PARKER:  I am struggling to hear her on a regular

14  basis, if she could pull the microphone closer, I would also

15  appreciate it.

16        THE WITNESS:  Absolutely.

17        Okay.  I'm at No. 9.

18  BY MR. PENDERY:

19  Q.    Okay.  And what is No. 9?

20  A.    The title of the document is Wells Fargo Bank, full

21  transaction report.

22  Q.    And down at the bottom of the page, does it say Government

23  Exhibit 138?

24  A.    Yes.

25  Q.    And have you reviewed this document in detail?

1  A.   Yes, I have.

2  Q.   Can you flip in your book to No. 47.  Do you have that?

3  A.   Just a moment.  Okay, 47.

4  Q.   Is this the summary of Government Exhibit 138?

5  A.   Yes.  I reviewed this and reviewed 138 to make sure that

6  the numbers matched.

7  Q.   Okay.  So in 2006, what happened, according to Government

8  Exhibit 138?

9  A.   In 2006 Mr. Cook sent $500,000 to JDFX.

10 Q.   Well, it says UBS Diversified Growth, LLC, parenthesis

11 Cook, right?

12 A.   Correct.

13 Q.   500,000 in 2006?

14 A.   Correct.

15 Q.   How about 2007?

16 A.   In 2007, there were a number of transactions.  A lot of

17 them were from that UBS account also, some from Mr. Cook, some

18 from Market Shot, but the total of those transactions was

19 $9.5 million.

20 Q.   In 2008?

21 A.   2008 there was a transfer of $2.1 million from Market Shot

22 to JDFX.

23 Q.   2009?

24 A.   And then a similar situation in 2009, there was two

25 transfers totaling 3.15 million.

1  Q.   Do you have any evidence that James Pieron received this

2  money personally?

3  A.   No.  I have not seen anything that shows that.

4  Q.   Have you seen any personal bank accounts of James Pieron

5  that would have shown this money going in and out of his

6  personal bank account?

7  A.   No.

8  Q.   Now, the Government says that in 2006 and '07, and Pavlik

9  testified -- or not -- hasn't testified, Pavlik said in some of

10  the documents, that there was a deposit of $10 million in 2006

11  and '07, do you recall that?

12  A.   Yes.

13  Q.   Was there a deposit, in your opinion?

14  A.   So was there a deposit of money into an account or a

15  series of deposits of money into an account?  Yes.  I don't

16  know that the terminology of calling it a deposit is really

17  relevant or correct for purposes of any of these transactions.

18  Q.   And why do you say that?

19  A.   I think of a deposit as like a security deposit.  If you

20  have utilities, and you have to put a security deposit down, I

21  know that there was some case law about that, too, as far as

22  deposits versus advance payments, and I just didn't see how it

23  would be applicable in this case.  And part of that was my

24  review of the stock purchase agreement and the fact that the

25  stock rights were granted on March 1st of 2007, so to me that

1  would negate any potential deposit theory.

2  Q.   Let's go to that document if we could, and that is No. 10.

3  This is the share purchase agreement, Your Honor, and it's

4  Government's Exhibit 201.  Do you have that exhibit?

5  A.   I do.

6  Q.   All right.  And what were you -- you were just referencing

7  something.

8  A.   So in No. 1 in the stock purchase agreement under

9  objective sale, it says that, in the second sentence, "The

10 purchaser agrees to purchase from the seller the shares and

11 qualification for dividends for the first time as of the

12 business year 2007 of the company beginning on March 1, 2007."

13 Q.   So what does that mean to you?

14 A.   It appears that the purchaser would receive all the rights

15 of a shareholder on the date listed in the agreement, so

16 whatever consideration was paid for that, I just can't see how

17 it would be treated as a deposit when he's already gotten his

18 shareholder rights on that date.  So the money that was given

19 would be in exchange for the shares on that date, if that's the

20 way that it was treated.

21 Q.   Have you ever seen a document between Market Shot and

22 James Pieron indicating it was a deposit?

23 A.   I don't believe so.

24 Q.   Do you know if there was an escrow account that this

25 $10 million was supposed to go into in 2006 and 2007?

1   A.    I don't believe so.

2   Q.    Do you know if that money was used in 2006 and 2007?

3   A.    I believe that it was used for operating capital during

4   those years.

5   Q.    Can you look at No. 27, please.  Is this what you're

6   referring to?

7   A.    Yes.

8   Q.    And what is this known as?

9   A.    I believe the term that was used was use of proceeds.

10  Q.    And so what does this document show?

11  A.    Well, when I reviewed it, it appears to be a summary of

12  transactions from underlying bank statements that were

13  provided.

14  Q.    And are those bank statements attached?

15  A.    Not in this tab.

16  Q.    Oh, on what tab is it attached to?

17  A.    Twenty-eight.

18  Q.    All right.  So take me through this if you could.  There's

19  the date column, do you see that?

20  A.    Yes.

21  Q.    Beginning in 2006?

22  A.    Yes.

23  Q.    And do you see the credit come in of 500,000?

24  A.    Yes.

25  Q.    You see all the subsequent payments in the credit column

1   that were in Exhibit 40 -- or No. 47?

2   A.   Yes.

3   Q.   And then you keep going down there's a $2.1 million wire

4   transfer in December of 2008?

5   A.   Yes.

6   Q.   And then the two transfers in 2009?

7   A.   Yes.

8   Q.   And then what's the next column, the debit column,

9   represent?

10  A.   So those appear to be outgoing transactions to other

11  various entities.

12  Q.   All right.  And in looking at this, I don't want to go

13  through each one of these, we'll be here all day, but in

14  looking at exhibit -- or No. 28, is that the supporting

15  document for that summary front sheet or top sheet?

16  A.   When I reviewed that summary sheet, and these documents in

17  28, it does appear that that was made as a summary of the bank

18  statements.

19  Q.   And do you know what -- if you look at the total line,

20  what was the total at the bottom of the page of the summary

21  sheet, 27?

22  A.   The total is $15,440,733.

23  Q.   Okay.

24  A.   And it appeared -- so I would have done that total column

25  a little different with like a running balance, but it appears

1   that total is only the total of the debits.

2   Q.   All right.  And the debits are what, transfers?

3   A.   Yes.

4   Q.   So this is how the money was spent?

5   A.   It appears so.

6   Q.   Okay.  Let's assume for a moment that the money went from

7   Market Shot to JDFX to Pieron and then to Banque Du Bois, that

8   $2.1 million.  Do you recall that?

9   A.   I did review some documents related to the $2.1 million

10  transfer, and some documents that indicated that there was an

11  intent by Mr. Pieron and Mr. Cook to purchase a bank and it

12  appears that that's what that $2.1 million was for.

13  Q.   What documents did you review?

14  A.   I believe there was some sort of letter related to the --

15  someone requesting the money back.

16  Q.   Look at No. 12 in your book.

17  A.   Yes.  This was the letter, Project Mercury.

18  Q.   And this letter was dated what?

19  A.   July 6th, 2009.

20  Q.   And what's the essence of this letter, if you recall?

21  A.   I believe it was an attorney asking the seller of the bank

22  to return the money back to Mr. Pieron.

23  Q.   So how much money was sent by Cook or Market Shot to JDF

24  in 2008?

25  A.   I'm going to reference back to the exhibit so I don't --

1   Q.    Okay.

2   A.    -- say the wrong amount.   $2,100,000.

3   Q.    2 million what?

4   A.    2,100,000.

5   Q.    Okay.  And do you know if that represented the deposit on

6   the Banque Du Bois purchase?

7   A.    Given the timing of the money that was sent and the timing

8   of this transaction, it appears that that was related to that.

9   Q.    Did you read the Trevor Cook memo of interview with the

10  special agent?

11  A.    I did.

12  Q.    Would you go to that, that is 45, No. 45.

13         What did Mr. Cook tell the special agent about the

14  Banque Du Bois issue?

15  A.    Just give me a second.  I have to turn there.  It might

16  have been easier to have two binders.

17  Q.    Yes.

18  A.    I'm just going to need a moment to review it so that I

19  can --

20  Q.    Okay.  Sure?

21  A.    -- see where that was discussed.

22  Q.    You reviewed this letter before?

23  A.    I have, along with a multitude of other documents.

24  Q.    Okay.

25  A.    Okay.  In paragraph 4 I think is where Cook was talking

1  about purchasing the bank, and then towards the middle of the

2  paragraph, a little bit past the middle, it says, Cook said he

3  wired 2.1 million on 12/17/08 and 2.125 on 1/23/09 and 1.025 on

4  5/26/09 to JDFX to be used for the security deposit, and then

5  the beginning of that paragraph was discussing how they wanted

6  to buy this bank in Zurich.

7  Q.  So that -- all those numbers add up to over $5 million,

8  correct?

9  A.  Yeah, that looks like it's specifically the amounts that

10  were treated as capital gains in '09.

11  Q.  Did Cook say in that interview what --

12         THE COURT:  I'm sorry, I'm not understanding the

13  witness's testimony.

14         MR. PENDERY:  Okay.

15         THE COURT:  The capital gains in '09, what is she

16  referring to specifically?  The ones reported on the

17  defendant's returns?  I don't know what she's referring to.

18         MR. PENDERY:  Okay.

19  BY MR. PENDERY:

20  Q.  Do you understand his question?

21  A.  I believe so.  Your Honor, in 2009 there was a little over

22  5 million that was reported as a capital gain, and it appears

23  that these three transfers from Cook for the purchase of the

24  bank are equal to the amount that was reported as a capital

25  gain.

1          THE COURT:  On what return?

2          THE WITNESS:  It was reported on 2009.

3    BY MR. PENDERY:

4    Q.    Why don't we do this:  Why don't you read this paragraph

5    into the record.

6    A.    Sure.

7    Q.    Maybe that'll help, Your Honor.

8    A.    So No. 4 says:  "Cook was shown a copy of a purchase

9    agreement that states Market Shot, LLC, purchased another

10   15 percent ownership interest in JDFX for 5.25 million in 2009.

11   Cook stated he never agreed to purchase more shares of JDFX

12   stock.  Cook stated he did not -- I apologize -- he didn't sign

13   the purchase agreement but he probably authorized Pieron to

14   sign his name on it.  Cook said Pieron told him that he had a

15   chance to buy a bank in Zurich called Banque Du Bois.  Pieron

16   told Cook that if he bought the bank, he would be able to get

17   other larger clients to invest in his hedge fund.  Cook said

18   Pieron told him he needed $5 million security deposit to lock

19   in JDFX as the buyer and he would get the deposit back when the

20   sale was completed.  Cook sent one of his employees, Thomas

21   Richardson, to Zurich to look at the bank before sending the

22   money to Pieron.  Richardson told Cook the bank did exist and

23   had its own international bank number.  Cook said he wired

24   $2.1 million on 12/17/2008, 2.125 million on 1/23/2009, and

25   1.025 million on 5/26/2009 to JDFX to be used for the security

51

1   deposit."

2   Q.   Okay.  That's good.  That's enough.  All right.  So Cook

3   was telling the special agent that the 5.25 million was a down

4   payment for Banque Du Bois, correct?

5   A.   Correct.

6   Q.   So how could that be a capital gain to James Pieron?

7   A.   That's a very good question.  I don't have an answer to

8   that, because I don't believe that it should be.

9   Q.   Okay.  So in your opinion the 2009 tax return is wrong

10  when it reports a capital gain of $5.25 million?

11  A.   Yes.

12  Q.   Okay.  Let's assume that --

13       THE COURT:  Well, walk us through that -- that series

14  of transactions.  Who's the buyer?  Who's the seller.  And on

15  what terms?

16       MR. PENDERY:  Buyer and seller of what, Your Honor?

17       THE COURT:  Well --

18       MR. PENDERY:  The bank?

19       THE COURT:  The bank.  Is the buyer of the bank JDFX

20  or is the buyer of the bank Mr. Pieron and how do we know?

21       THE WITNESS:  May I answer that?

22       MR. PENDERY:  Okay, yeah.

23       THE WITNESS:  One of the sentences that I just read

24  says, "Cook said Pieron told him he needed a $5 million

25  security deposit to lock in JDFX as the buyer."

1          MR. PENDERY:  And -- we do have a document, Your

2   Honor regarding the purchase of the bank.

3          THE COURT:  Okay.

4          MR. PENDERY:  Good to go?  Or -- okay.

5   BY MR. PENDERY:

6   Q.   So let's assume that Pieron loaned the money, this 15.25

7   million, I don't care when it came in, but loaned the money to

8   JDFX.

9   A.   So are we changing the whole scenario now?  It's -- we're

10  moving on from what really happened?

11  Q.   Yes.

12  A.   Okay.

13         THE COURT:  But my understanding is that your

14  contention is that it was initially capitalized with funds in

15  part from Mr. Cook, so there are securities that were initially

16  issued in conjunction with the initial capitalization of JDFX?

17         MR. PENDERY:  That's correct, Your Honor.  I'll

18  question her about that.

19  BY MR. PENDERY:

20  Q.   Would you look at No. 14?

21  A.   Okay.

22  Q.   Have you reviewed this document before?

23  A.   Yes.

24  Q.   Tell the Court what this is.

25  A.   The first page is a share register and then it's followed

```
 1  by share certificates.
 2  Q.    A share register for what?
 3  A.    For JDFX Holding AG.
 4  Q.    All right.   What's the next page?
 5  A.    The next page is a share certificate for Clive Diethelm.
 6  Q.    Spell his last name for the court reporter, please.
 7  A.    D-I-E-T-H-E-L-M.
 8  Q.    And what's the date of the share certificate?
 9  A.    The date is December 15th, 2006.
10  Q.    And how many shares is it?
11  A.    2 million.
12  Q.    And it goes to whom?
13  A.    Market Shot, LLC.
14  Q.    The next document, please.   What is that?
15  A.    This is Certificate No. 2.
16  Q.    Of what?
17  A.    Of JDFX Holding shares.
18  Q.    What's the date of this certificate?
19  A.    December 15th, 2006.
20  Q.    And who received these shares?
21  A.    This one was Clive Diethelm.   I apologize, I was looking
22  at the signature line when I said that for the last one.   So
23  this is 1 million shares to Clive.
24  Q.    And then the next document?
25  A.    Certificate No. 3 of JDFX Holding with 7 million shares
```

1  being issued to James Pieron dated December 15th, 2006.

2          MR. PENDERY:  One minute, Your Honor.

3  BY MR. PENDERY:

4  Q.  All right.  Look at Exhibit 16, please.

5  A.  Okay.  I'm on 16.

6  Q.  Could you tell the Court what this is.

7  A.  The title of the document is commercial register.

8  Q.  Is this a public record document?

9  A.  Yes, it's available on the internet.

10  Q.  Did you find it on the internet?

11  A.  I did.

12  Q.  And can you tell you from this document when JDFX Holding

13  AG was incorporated?

14  A.  It says, towards the top of the first page, entry as of

15  12/28/2006.

16  Q.  All right.

17  A.  And then on page 2, the first journal transaction, which

18  is 15795 is 12/28/2006, and then a little above that there is

19  another date in 2006, 12/15 of 2006.

20  Q.  All right.  Do you see on the first page the number of

21  shares that were issued, registered shares?

22  A.  It looks like 10 million.

23  Q.  10 million shares were issued?

24  A.  Correct.

25  Q.  Does that comport with what you just read in No. 14?

1  A.   Yes.

2       THE COURT:  And are we going to substantiate the

3  capitalization and the source?

4       MR. PENDERY:  The capitalization of the company?

5       THE COURT:  Yes.  I mean, we know we have a company

6  that's been organized and a certain number of certificates have

7  been issued.  But in consideration for what?

8       MR. PENDERY:  The initial -- the initial capital

9  contribution, Your Honor.

10      THE COURT:  Yes, by each of the shareholders.

11      MR. PENDERY:  Well, we only have the initial capital

12 contribution on this document is $100,000.

13      THE COURT:  Okay.

14      MR. PENDERY:  That's what's required in Switzerland

15 to open up a corporation.

16      THE COURT:  But the --

17      MR. PENDERY:  After that, Your Honor -- okay.  Let me

18 keep on going with her, but I'll get to your question.

19      THE COURT:  I'm just interested in understanding what

20 the purchase price was and, as a result, the initial cost basis

21 for each of the taxpayers on the initial capitalization.

22 BY MR. PENDERY:

23 Q.   Do you know what each of the shareholders contributed to

24 the company in order to get their shares?

25 A.   I've seen it in one of the documents, and I don't recall

1    off the top of my head for Mr. Pieron what he put in at the

2    beginning.  And if we take the stock purchase agreement as an

3    indicator, obviously it can't be fully accurate because it's

4    dated for 2007, the company opened in 2006, that's when the

5    shares were actually issued, it appears that Market Shot put in

6    10 million into the company.  Mr. Pieron, I think -- was it

7    100,000?  I'll have to find that as we go through here, and I

8    don't recall what Clive put in.

9    Q.   Do you know if Clive Diethelm put any money in?

10   A.   Off the top of my head, I don't recall.

11   Q.   Have you seen any documents that he put any money in?

12   A.   Not that I recall.

13   Q.   Have you seen any documents that Pieron put actual money

14   in?

15   A.   I felt like maybe there was a small deposit at the very

16   beginning, but you'd have to refresh my memory on what exhibit

17   that was.

18   Q.   But you're saying that Cook initially put in 10 million?

19   A.   Yes.

20   Q.   All right.

21   A.   Under one theory.

22   Q.   Right.  Okay.  Well, that's a good question.  The Court

23   wants to know, what did the three individuals put in in return

24   for their stock?

25   A.   My opinion is that Market Shot put in 10 million at the

1    beginning, but I do understand that there are a lot of

2    questions about how are we categorizing the 10 million and when

3    are we categorizing it as such.  So my opinion is that it

4    appears that when the company was opened, Market Shot was

5    issued those shares that were referenced in the SPA, and in

6    consideration for receiving the shares he contributed

7    $10 million -- or Market Shot contributed $10 million into JDFX

8    the company.

9    Q.   All right.

10            THE COURT:  So that handles at least Mr. Cook.  Let's

11   see if we can focus on Mr. Pieron and his price per share.

12            MR. PENDERY:  Meaning his capital contribution, Your

13   Honor?

14            THE COURT:  Sure.  I assume that the -- because the

15   transaction's on a single date, that the price per share will

16   be relatively equal?

17            MR. PENDERY:  Will be relatively what, Your Honor?

18            THE COURT:  Equal.

19            MR. PENDERY:  Well, should be.  I agree with that.

20   It should be.  I don't think that there's -- I don't believe

21   that there's any documents showing a capital contribution by

22   Clive Diethelm or James Pieron, because they contributed the

23   software, trading platform.  They contributed assets.

24            THE COURT:  Well, we're back into that area where

25   the -- you're telling me something that you know based on some

1    other conversation with someone that I did not participate in.

2             So do you believe Mr. Pieron deposited $100,000 in

3    order to capitalize this enterprise as the witness testified?

4             MR. PENDERY:  I do not.  I think --

5             THE COURT:  Well, maybe you can --

6             MR. PENDERY:  Let me -- let me tell you what I think

7    actually happened.

8             THE COURT:  Well, why don't you ask the witness.  She

9    testified that there was $100,000 that was deposited.

10   BY MR. PENDERY:

11   Q.   Do you know if there was $100,000 deposited into JDFX

12   Holding AG by Mr. Pieron?

13   A.   Your Honor, I seem to recall that somewhere in these

14   documents I saw a small initial capital contribution, but I

15   don't recall where, and I don't know if that recollection just

16   came from seeing this document, so unless I'm able to go back

17   through here and find it somewhere, I -- I'm not -- I'm not

18   sure.

19            THE COURT:  Okay.  And without locating that

20   information, you would be unable to tell us whether or not the

21   price per share was equivalent, and without that information,

22   you wouldn't be able to tell us what Mr. Pieron's tax basis was

23   in the security?

24            THE WITNESS:  So there's a few different ways to

25   calculate the basis of any of the stockholders, and this is

1   directly from the code.  I won't be able to give you the code

2   section because I don't recall which one, but I can look it up

3   once I'm finished here.  And you can use a few different

4   methodologies for calculating your actual basis and it -- the

5   price per share does not have to be an equivalent calculation.

6   Your basis, especially in a non-publicly traded company, can be

7   what you put into the company without saying, well, I have this

8   many shares and you have this many shares, and it's allocated

9   more on a percentage basis and each shareholder has a capital

10  account that is allocated to them.  And it's a little bit

11  difficult, too, with it being a foreign company because they

12  have their own rules on capitalization, but we're following the

13  US tax code here.

14          THE COURT:  Well, the gentleman indicated that -- a

15  couple of things, the first of which is we should track down

16  the actual monetary contribution of Mr. Pieron because that's

17  going to be helpful in establishing basis, correct?

18          THE WITNESS:  Absolutely.

19          THE COURT:  Perhaps the price per share will differ

20  between the different stockholders?

21          THE WITNESS:  Correct.

22          THE COURT:  But that will be as a result of the fact

23  that Mr. Pieron -- and I think the other -- the gentleman's

24  name was Clive --

25          MR. PENDERY:  Clive Diethelm.

1            THE COURT:  -- were actually contributing something

2     that Mr. Cook was not.

3            THE WITNESS:  Correct.

4            THE COURT:  Will we include that in basis?

5            THE WITNESS:  No, not nonmonetary -- the value of

6     your services, if you include it as a basis in your stock, then

7     you would have taxable income at the point when you contributed

8     those services.  You don't get something for nothing, just like

9     you don't pay tax on something you didn't actually get.

10           THE COURT:  Well, the initial capitalization is a

11    nontaxable event under Section 351, correct?

12           THE WITNESS:  Correct.

13           THE COURT:  But to be excluded from that would be any

14    intangible contribution, for example, software?

15           THE WITNESS:  Correct.

16           THE COURT:  Or anticipated services?

17           THE WITNESS:  Correct.

18           THE COURT:  See if we can track down the actual

19    contribution that Mr. Pieron made.

20           THE WITNESS:  Yes, Your Honor.

21           THE COURT:  And Clive.  Do you want to take about

22    five minutes and see if we can do that and we'll come back and

23    continue?

24           MR. PENDERY:  Yes, sir.  Yes, sir.  Thank you.

25           (At 11:05 a.m., break taken.)

1           (At 11:14 a.m., break concluded.)

2           THE COURT:  If you can continue, sir.

3           MR. PENDERY:  Your Honor, we do not have any evidence

4   that Mr. Pieron or Mr. Diethelm had any monetary capital

5   contribution at the inception of the company.

6           THE COURT:  So what was Mr. Cook's price per share?

7           MR. PENDERY:  According to the SPA it was $5 per

8   share.  But then, Your Honor, the second SPA --

9           THE COURT:  Well, we know he contributed 10 million

10  and we know the number of shares of stock?

11          MR. PENDERY:  2 million, $5.  But then the second

12  SPA, Your Honor, for 2009 says it's $5 a share but he only paid

13  5.25 million when he should have paid 7.5 million.

14          THE COURT:  In order for the price per share to

15  equalize?

16          MR. PENDERY:  Correct, yes, Your Honor.

17          THE COURT:  Okay.  So at the conclusion of this

18  transaction, the -- what is the tax basis that Mr. Cook has?

19          MR. PENDERY:  Assuming it's treasury stock being sole

20  to Mr. Cook, at the conclusion of the first transaction, it

21  would be $10 million a basis.

22          THE COURT:  And Mr. Pieron?

23          MR. PENDERY:  Basis would be zero.

24          THE COURT:  Well, how do you account for the

25  difference in the price per share?

Rebeck - Direct                                               62

```
 1              MR. PENDERY:  You can't.

 2              THE COURT:  You can't?

 3              MR. PENDERY:  No.

 4              THE COURT:  Why would Mr. Cook do that?

 5              MR. PENDERY:  Because Mr. Cook wanted the software

 6    trading platform to be developed by JDFX Holding, and

 7    Mr. Pieron knew how to do that.

 8              THE COURT:  Was he actually contributing something

 9    that would be definable intellectual property?

10              MR. PENDERY:  At some point in the future, yes.

11    Remember Cook was enamored with whatever Pieron showed him.

12    That's why he invested the money into the company.  He wanted

13    that company to grow, and he wanted to get ahold of that

14    software so that he could use it to trade.  And when he used it

15    to trade, he traded billions of dollars and it saved him

16    million of dollars using that software.

17              THE COURT:  Well, who owned it?

18              MR. PENDERY:  Who owned the software?

19              THE COURT:  Yeah.

20              MR. PENDERY:  JDFX Holding AG.

21              THE COURT:  How did they get it?

22              MR. PENDERY:  It was developed by Clive Diethelm and

23    James Pieron.

24              THE COURT:  So is that included in the consideration

25    that the two gentlemen contributed to JDFX's capitalization?
```

US v. Pieron, Jr. - Hearing - November 14, 2019

1  Because otherwise they didn't include anything?

2          MR. PENDERY:  Well, at that point in time there was

3  nothing to include.  It wasn't completed.  The software trading

4  platform wasn't done, so it would be fair to assume that their

5  basis would be zero at that point --

6          THE COURT:  Okay.

7          MR. PENDERY:  -- at the inception.  Now, that's if

8  it's treasury stock to Cook.  If it's capital gain to Pieron,

9  then you may have a capital contribution of $10 million by

10  Pieron --

11          THE COURT:  Well, you're going the next step, but

12  let's see if we can corroborate the factual information that

13  you've been telling me.  You got it from some source, and

14  presumably the witness did as well.  Let's make sure that she

15  agrees with you that Mr. Pieron and Clive did not contribute

16  any capital and that their tax basis at the completion of these

17  transactions was zero?

18          MR. PENDERY:  The first transaction or the second

19  transaction.

20          THE COURT:  First.

21  BY MR. PENDERY:

22  Q.  Did you understand the judge's question?

23  A.  I did, Your Honor.  And I think that what I was thinking

24  was a transaction was just that 100,000 that was shown on the

25  register, because when I went back and reviewed the bank

1   records while we were on the break, there was -- there was no

2   money in the account before the initial money came in from

3   Market Shot, so my recollection was incorrect.

4   Q.   So the judge is asking what was the basis of James Pieron

5   and Clive Diethelm at the inception of JDFX Holding AG?

6   A.   They did not have any basis initially.

7            THE COURT:  Did they have any contractual obligation

8   to furnish anything to JDFX?

9            THE WITNESS:  I don't recall seeing any contractual

10  obligations anywhere.  I would like to review the SPA before I

11  fully answer that though.  Could you remind me what exhibit is

12  the SPA?

13  BY MR. PENDERY:

14  Q.   It's Government Exhibit 201.

15  A.   What tab?

16  Q.   Tab 10.  Thank you.

17  A.   Thank you.

18  Q.   And what day are we talking about here?  I just want to

19  make sure we're all clear, Your Honor.  What day are we talking

20  about, the inception date?

21  A.   The inception data, according to the register, which is --

22  I would suppose the official start date is in December of 2006.

23  Q.   Okay.

24  A.   The only contractual obligations I see are that the shares

25  will be furnished to the purchaser, but no obligation for any

1  performance on either of the other two shareholders.

2          THE COURT:  And you have no other ex -- you have no

3  explanation for the difference in the price per share?

4          THE WITNESS:  Only to the extent that the narrative

5  that I'm aware of is the same as Mr. Pendery said, Mr. Pieron

6  was going to work on this software program.  And I'm not aware

7  of what Clive's relationship or function was in this.

8          THE COURT:  And you're satisfied that the price per

9  share being paid by Mr. Cook was satisfactory to him, that was

10  an arm's length transaction?

11          THE WITNESS:  I don't have any reason to believe it

12  wasn't arm's length, and based on my experience with -- I won't

13  say similar companies, but other businesses who bring in

14  investors, I didn't find it unusual that one person is bearing

15  a very large amount of the initial cost while the other ones

16  are just going to be the ones working.  It's quite common.

17          MR. PENDERY:  Your Honor, there's an exhibit, the

18  Government's Exhibit 208, that Mr. Fetters represented to the

19  SEC that the company at the time was worth $50 million,

20  10 million shares, $5 a share $50 million.

21          I can go through that exhibit with her, but I'm just

22  saying that's where a lot of this came from, so at the time

23  this allegedly happened, the company was worth $50 million, if

24  Fetters is to be believed.

25          THE COURT:  Well, our starting point right now, in

```
 1   terms of capitalization, is that we have the shares of stock
 2   issued.   One shareholder has a tax basis of 10 million, the
 3   other two have a tax basis of zero?
 4              MR. PENDERY:  Correct.
 5              THE COURT:  Now we can go forward in time.
 6              MR. PENDERY:  All right.
 7   BY MR. PENDERY:
 8   Q.   Let's assume, Ms. Rebeck, that James Pieron loaned the
 9   money, the $15.25 million.
10              MR. PENDERY:  Let's make it clear that now we're
11   going into the area this was not an issuance of treasury stock
12   to Cook, okay?  So this is what I would call the alternative --
13   I call it the pretend land theory, that this wasn't treasury
14   stock to Cook.  It was treasury stock to Cook, but if the
15   Government's position is -- and I still don't exactly know what
16   it is -- that this was money that Pieron received and put back
17   into the companies, it's going to either be a loan, Your Honor,
18   or it's going to be a capital contribution, one or the other.
19              THE COURT:  Well, I think we're at a point where we
20   have a company initially capitalized with three shareholders.
21   We then know that there's $15 million received by JDFX over the
22   course of the next three years?
23              MR. PENDERY:  Four years.
24              THE COURT:  Four years.
25              MR. PENDERY:  Yes, Your Honor.
```

1          THE COURT:  And that's what we need to talk with the

2   witness about, isn't it?

3          MR. PENDERY:  All right.

4   BY MR. PENDERY:

5   Q.    So in 2009, the Government says the tax loss to -- excuse

6   me, the capital gain in 2009 to James Pieron is 5.25 million;

7   is that correct?

8   A.    That's correct.

9   Q.    But is the tax return that the Government's prepared

10  correct?

11  A.    No.

12  Q.    Why not?

13  A.    The 5.25 million, again going back to our prior

14  discussion, appears to be -- and according to Cook, who is the

15  one who actually sent the money -- was an investment in a bank,

16  and there's just -- there's just no evidence that there was

17  ever a transaction that occurred where Mr. Pieron got

18  5.25 million to have a capital gain.  It just -- it just defies

19  all logic.  It just can't be both ways.

20          So if we -- and I would like to kind of go back to

21  where we were at before, Your Honor, if you don't mind.  If we

22  have an initial capitalization of $10 million, and Mr. Pieron's

23  basis is zero and Clive's basis is zero, then we can't have a

24  $10 million capital gain in 2008 regardless of what he reported

25  on the return, right?

Rebeck — Direct

```
1              THE COURT:  And let me speak to the examiner at this
2   point.  I understand where you're headed with the 5.2 million
3   with respect to the bank, but between that 5.2 million and the
4   initial capitalization, is a $10 million dollar gap.  See what
5   the witness's analysis is with respect to the 10 million
6   apparently received by JDFX, but I don't know what for.
7   BY MR. PENDERY:
8   Q.   Well, what was the $10 million for?
9   A.   If we're operating under the assumption that that was an
10  investment by Market Shot into -- into JDFX, then there is no
11  $10 million transaction in 2008 because that was an investment
12  by Market Shot into JDFX.  It does not affect Mr. Pieron
13  personally --
14             THE COURT:  Well --
15             THE WITNESS:  -- there's an exclusion for that, so --
16             THE COURT:  Let's find out what Mr. Cook received for
17  the additional 10 million.
18             MR. PENDERY:  What additional 10 million?  There was
19  an initial 10 million.  Are you saying there was an
20  additional --
21             THE COURT:  Well, let's go to your -- what was it 47?
22             MR. PENDERY:  Yes, Your Honor.
23             THE COURT:  If I can find it here.
24             MR. PENDERY:  500,000 in '06, Your Honor, and
25  9.5 million in '07, 2007.  That's the first 10 million.  That's
```

1    the 10 million we've been talking about, and then in '08 it's

2    2.1 million and '09 it's 3.15 million.

3              THE COURT:  Okay.  I'm starting to understand.

4    BY MR. PENDERY:

5    Q.   Okay.  So going back to what we were talking about earlier

6    about the bank deposit for Banque Du Bois.  Cook said it was

7    $5.25 million, correct?

8    A.   Correct.

9    Q.   Is that income or capital gain to James Pieron?

10   A.   No, but if -- if it's somehow treated as income, I mean,

11   the -- the money is gone, right, and as much as I don't like

12   Pavlik's theft loss deduction, I think that that would be the

13   only appropriate scenario to use it because they did actually

14   have the money stolen from them effectively.

15   Q.   And what year would they have had the money stolen from

16   them?

17   A.   So there's a theory of a triggering event, right, that

18   kind of decides when you write off something as a bad debt or

19   in that case a casualty or theft loss, and it -- you have to be

20   able to kind of confidently say that you're not going to get

21   the money back at that point.  So when the company shuts down,

22   when JDFX shut down in '09, that would be a good one.  If we

23   were looking at a casualty loss, then the only indication we

24   really have is that remember that was written in '09, right,

25   asking for the money to come back and it didn't.

1    So I think in any event, 2009 would be the time that

2  we would decide that this isn't going to be collectable, any

3  loans made to the company will be worthless, or there's a full

4  sale of all stock in the company, depending on which way you're

5  treating it.

6  Q.    But whose $5.25 million is it?

7  A.    It was Cook's or Market Shot.

8  Q.    And it goes to JDFX Holdings, though, right, according to

9  No. 47?

10 A.    According to No. 47, that's correct, and according Cook,

11 that's correct.  And if Cook is to be believed, then it was for

12 the purchase of the bank, and there's other documentation that

13 shows that, too, so --

14 Q.    Okay.  So take us through -- take the Court through how

15 it's some sort of a loss, and who it would be a loss to then at

16 that point in time.

17 A.    Well, it would be a loss to Cook, but if it's imputed as

18 income to Mr. Pieron, because it went to JDFX, then he's going

19 to have to be able to take the loss, too.

20 Q.    How does that work?

21 A.    So I still don't like the theft loss, and I know that none

22 of us do, but in any event, if it's a business loss, then it's

23 an ordinary loss and it's deductible to the full extent of

24 whatever income that you have for that year.

25 Q.    Well, let's -- let's drill down on that a little bit.

1  What is a business debt?

2  A.   A business debt is something that is associated with your

3  trade or business so --

4  Q.   Give an example.

5  A.   The best way that I can give an example is to give an

6  example of what it's not.  It's not a loan that you make to

7  your friend or something that you do as a hobby --

8  Q.   All right.

9  A.   -- things like that, but if -- if it's a business that

10  you're actively involved in, and you loan money and it doesn't

11  get repaid and we have that triggering event, then at that

12  point it becomes a business loss.

13  Q.   Okay.  So when -- what -- what would you have

14  characterized this?  What do you characterize this 4.25 million

15  then?

16           THE COURT:  Or for whom?

17  BY MR. PENDERY:

18  Q.   And for whom?

19  A.   I don't think that Pieron should have categorized it as

20  anything.  I don't know enough about Cook or Market Shot to

21  make a real determination, but I would guess that he should

22  have probably taken that loss on his tax return?

23  Q.   And by -- what kind of a loss would it have been?  A theft

24  loss or a bad debt loss?  What would it have been?

25  A.   I mean, I think theft loss might work, but I would have to

1  do some more analysis on the events surrounding the situation,

2  but the business bad debt loss would work just as well.

3  Q.   Okay.   Now, explain --

4         THE COURT:   That -- the unusual thing, from my

5  perspective, we're back -- we're back talking about possible

6  facts.   My understanding from the materials that we reviewed

7  just a short time ago was that Mr. Cook advances the

8  5.2 million as a deposit in conjunction with the purchase of

9  the bank by JDFX, but the transaction falls through --

10        MR. PENDERY:   Correct.

11        THE COURT:   -- or someone makes off with the deposit.

12  See if we can determine what the relative sets of circumstances

13  are if -- for JDFX, and for Mr. Cook, and how that transaction

14  ends up on Mr. Pieron's tax returns.

15  BY MR. PENDERY:

16  Q.   Okay.   So let's start out, because I think the judge has a

17  really; good point here.   So if Cook is to be believed, and he

18  sent 2.1 million in '08 to JDFX Holding, and then he sends

19  3.15 million in '09 to JDFX Holding, and the SPA says he gets

20  15 -- 1.5 million shares of stock back from JDFX, what's your

21  analysis of that then?   And the money gets deposited for the

22  security deposit for the sale of Banque Du Bois.

23  A.   So then JDFX is issuing treasury stock to Market Shot or

24  Mr. Cook and any potential -- I mean, there's no tax

25  implication for JDFX as a company because they're issuing stock

1  and --

2  Q.   But whose loss is it though?  Whose loss will it be?  Will

3  it be Cook's or will it be JDFX's?

4  A.   We don't know because there's no -- I mean, I would have

5  to go back through all the Banque Du Bois information to see

6  who was going to be the owner, but according to Cook, JDFX was

7  going to own it, so there's kind of a multi-layered transaction

8  here.  JDFX is going to have a loss and then maybe -- maybe

9  Cook's going to have a loss depending on how it was papered,

10  but --

11  Q.   And what do you mean by papered?

12  A.   Well, I assume that there would be, at some point when

13  they close, some sort of contract.

14        THE COURT:  And let's see if we can work our way

15  through that, because we've got the two -- actually three

16  transactions in '08 and '09, which I understand the witness to

17  be assigning to funding for the acquisition of the bank, but in

18  conjunction with the issuance of additional stock to Mr. Cook.

19  Did that happen, and is there anything that corroborates the

20  additional issuance of stock to Mr. Cook for this additional

21  funds in '08 and '09?

22        MR. PENDERY:  Yes, Your Honor.

23  BY MR. PENDERY:

24  Q.   There's another stock certificate issued.  No. 15.

25  A.   I'm sorry, I was just reading through the interview with

1   Cook, because if we keep going further after No. 4, Cook says

2   he did not buy anymore shares and that that 5 million was

3   strictly for the bank.

4   Q.   Well, look at No. 15 in your book.  What is this?

5   A.   It says JDFX Holding share certificate No. 1A.

6   Q.   And who was it issued to?

7   A.   It is issued to Market Shot.

8   Q.   And what's the date?

9   A.   June 1st, 2009.

10  Q.   Now, look at the stock purchase agreement No. 11.

11  A.   Okay.

12  Q.   Have you reviewed this before?

13  A.   Yes.

14  Q.   What is it?

15  A.   This was another SPA giving shareholder rights beginning

16  on June 1, 2009 with a closure date of June 1, '08.

17  Q.   But haven't you seen a document that the Government has

18  produced showing that there was a closure date of January 1 of

19  2009?

20  A.   Yeah, I believe I saw that.

21  Q.   And it was initialed off on by Mr. Pieron?

22  A.   Yes.

23  Q.   Okay.  When would he have -- when would Market Shot have

24  been given shareholder rights with regard to his investment in

25  this document?

1  A.    June 1, 2009.

2  Q.    All right.  So go back to 47.  2.1 million goes into JDFX

3  Holding when?

4  A.    It was December of 2008.

5  Q.    Now, the remaining 3.1 million goes into JDFX Holding

6  when?

7  A.    January 23rd of '09, 2.125 and May 26th '09, 1.025.

8  Q.    And the SPA says he has shareholder rights as of June 1,

9  2009?

10 A.    That's correct.

11 Q.    Okay.  Does Pieron have a capital gain?

12 A.    No, he does not.

13 Q.    All right.  Let's assume, Ms. Rebeck, that Mr. Pieron

14 directed the money into JDFX and was treated as a loan.  What

15 would your analysis be of that?

16 A.    That loan --

17        THE COURT:  Let's back up.  When Cook contributes the

18 capital, he's getting a certificate.

19        MR. PENDERY:  Yes.

20        THE COURT:  Mr. Pieron is not.

21        MR. PENDERY:  Correct.

22        THE COURT:  So what's Mr. Pieron have to do with the

23 transaction at all?

24        MR. PENDERY:  Nothing.

25        THE COURT:  Why did he report it on his tax return?

 1          MR. PENDERY:  That is a really good question.

 2          THE COURT:  How would we get an answer?

 3          MR. PENDERY:  The only one that can answer that is

 4  Mr. Pieron, Your Honor.

 5          THE COURT:  Well, there's some other people that did

 6  help him out, but that was based on information presumably that

 7  they received from him.

 8          MR. PENDERY:  Based on information from what, Your

 9  Honor?

10          THE COURT:  From him.

11          MR. PENDERY:  Are we assuming that Mr. Pieron was

12  correct in what his information was?

13          THE COURT:  No.

14          MR. PENDERY:  There's no evidence that was ever

15  presented at trial, Your Honor, that Mr. Pieron knew a whit

16  about tax issues.

17          THE COURT:  Well, there was information presented at

18  trial that reflected the information furnished by Mr. Pieron to

19  two different tax preparers.

20          MR. PENDERY:  And those would be the spreadsheets,

21  and if you want to talk about the spreadsheets, I can do that.

22  Everybody's forgetting there's two sides to that scenario.  The

23  Government just wants to look at the capital gains side.  Well,

24  what Pieron also thought is that he had significant losses that

25  would wipe out the capital gains.  So those spreadsheets also

1  show significant, what he believed, wrongly, were large capital

2  losses to offset against those capital gains.

3           THE COURT:  If he could carry it back?

4           MR. PENDERY:  If you could carry it back, but he

5  wouldn't know that.  He wouldn't know whether or not he could

6  carry capital losses backwards or forwards.

7           THE COURT:  I don't know what happened in those -- in

8  the context of those communications.  I don't know what he --

9  what he told the tax preparers about that, if -- your

10 suggestion is that it was simply mistaken communication, as

11 opposed to fraudulent.

12          MR. PENDERY:  Well, why would any taxpayer create a

13 transaction in Switzerland that would create a gigantic capital

14 gain to him when it could have easily been documented as

15 nothing to him at all?  Why would you do that?  That would make

16 no rational sense.

17          THE COURT:  I'm not the defendant.

18          MR. PENDERY:  I know.  Unless -- unless you don't

19 have any idea what you're doing, and you don't know what a

20 capital gain is or a capital loss is or basis or anything else.

21 No one would rationally do that.  I think I'll transact this

22 series of events, that look like it's a sale of treasury stock

23 to Market Shot, but I'm -- I'll going to term it a capital gain

24 to me so that I'm liable for a huge liability in the United

25 States.  That shows superior ignorance on his part at that

1  point.

2        THE COURT:  I don't know.  And I don't think the

3  witness can tell you.

4        MR. PENDERY:  Tell you why he did what he did?  I

5  agree with that.  But she can look at the documents and inform

6  the Court what the documents actually say, and what the

7  documents would actually show, and that that is there wasn't a

8  capital gain to Pieron in 2008 and 5.25 in 2009.  It's just

9  wrong.

10        THE COURT:  And the stock purchase agreement, how

11  will she explain away those?

12        MR. PENDERY:  I don't know how she would explain away

13  those.

14        THE COURT:  Or if she can.

15        MR. HURFORD:  Your Honor, may we have one moment.

16        THE COURT:  Uh-huh.

17        (Off-the-record discussion.)

18        MR. PENDERY:  I would agree that she probably could

19  not respond to the SPA's, Your Honor, and what happened

20  surrounding the SPA's, but why don't we assume that it is money

21  that went to Pieron then for 2006, '07, '08 and '09 and have

22  her tell us what that would be.  Is it a loan or is it a

23  capital contribution which would give him basis?

24        THE COURT:  So we can walk through essentially the

25  two alternatives?

1            MR. PENDERY:  Yes, Your Honor.

2            THE COURT:  We can do that.

3            MR. PENDERY:  I think there's a reality and then I

4    think we're in pretend land now where we're talking about,

5    well, what happens if it was a capital contribution, treated as

6    a capital contribution by Pieron?

7            THE COURT:  Well, when you say "pretend land", I

8    appreciate your point, but recognize that at least at the time

9    Mr. Pieron was talking with his preparers, he didn't think it

10   was pretend.  He thought he was being accurate and complete.

11           MR. PENDERY:  I think he believed he had a capital

12   gain, but I also think he believed he had significant losses

13   that would wipe out the capital gain.

14           THE COURT:  We can walk through with the witness what

15   the different results would be depending on how you

16   characterize the transaction.

17           MR. PENDERY:  That's fair, Your Honor.

18   BY MR. PENDERY:

19   Q.   So if it's classified as a loan by James Pieron, of

20   15.25 million, what's the analysis, in your opinion?  What

21   happens if that's the case?

22   A.   At the time that the company shuts down, the loan becomes

23   worthless.

24   Q.   Okay.  So you got to back up.  So when did the company

25   shut down?

Rebeck - Direct                                                 80

1  A.    2009.

2  Q.    Do you know the date that it shut down.  When you say shut

3  down, do you mean liquidated?

4  A.    According to the commercial register, the business closed

5  on a specific date --

6  Q.    Can you --

7  A.    -- in 2009.  I'd need to go back to that exhibit, though.

8  Q.    It's Exhibit 16.

9  A.    I believe the latest date that was listed --

10 Q.    Look at page 2.

11 A.    Yeah, the latest date that was listed was January --

12 Q.    No.  In --

13 A.    I'm sorry, November, November 30th.

14 Q.    When was it dissolved?

15         THE COURT:  It's on the stock register.

16         MR. PENDERY:  It is.

17 BY MR. PENDERY:

18 Q.    Look at page 2.

19 A.    On November 30th, 2009.  It says by order of 30/11/2009 at

20 9:15 o'clock --

21 Q.    Correct.

22 A.    -- the company is dissolved.

23 Q.    So how does that factor into your analysis if the 15.25

24 million is treated as a loan to James Pieron -- or, I'm sorry,

25 from James Pieron to JDFX?

 1  A.   At that point JDFX is no longer able to repay the loan, it

 2  becomes worthless.  It's a business bad debt, and it's treated

 3  as an ordinary loss in the year that the company's dissolved.

 4  Q.   And what does a bad debt loss come -- what code section

 5  does that come under?

 6  A.   I don't recall the code section off the top of my head.

 7  Q.   166?

 8  A.   It sounds like --

 9       THE COURT:  And how do we substantiate the

10  insolvency?  My understanding is that there would have been a

11  fair number of transactions with funds coming from JDFX to

12  third parties, including Mr. Pieron, that would post-date

13  the -- the last 5.2 million but before the alleged insolvency

14  on November the 30th of 2009?

15       MR. PENDERY:  We can address that, Your Honor.  There

16  were -- I think there was one bank transfer at the end of 2009,

17  and then there were two in 2010, if I recall correctly.

18       THE COURT:  Ultimately, there's -- some of those

19  funds, as I recall, were utilized to set up the trading

20  business in the United States?

21       MR. PENDERY:  That's correct.

22       THE COURT:  Okay.

23  BY MR. PENDERY:

24  Q.   Okay.  Anyway, go ahead.  So --

25  A.   Section 166.

1  Q.    Okay.  So you got to mechanically explain to the Court how

2  this ordinary loss would work.

3  A.    So the ordinary loss is different from a capital loss in

4  that you can deduct the full amount in the year in which it's

5  generated, and anything additional over your income amount for

6  that year either gets carried forward or carried back.  So in

7  order for the carry forward to apply, there's an election that

8  you would have to make on the original return by the due date

9  or the extended due date or else you default to the carryback

10 rule.

11          In 2009 the carryback period was only two years.

12 Actually currently you can't even carry it back anymore, but

13 for the law that applied then, you carry it back two years and

14 whatever is left over will carry forward for future years.

15          So if he has a loan, based on the computations that I

16 did on the, you know, corrected tax returns or -- I think those

17 are in the book at 50 to 53, it would wipe out all of his

18 income for '09.  Goes back to '07, it wipes out any potential

19 income in '07.  Wipes out '08, and then whatever is left over

20 gets carried forward, and I believe there was a small amount

21 left over after '08 to go forward into tax year 2010.

22 Q.    All right.  So would he have a tax liability in 2008 or

23 2009?

24 A.    No.

25 Q.    What happens if it's treated as a capital contribution by

1  Pieron to JDFX Holding AG?

2  A.    If it's treated as a capital contribution, then that

3  increases his basis at that time.

4  Q.    When does -- let me -- let me ask you that.  That's a

5  question I've wondered for a long time about.  So when 500,000

6  comes in in 2006 to JDFX, and that's treated as a capital --

7  it's treated as his money going back into the company, does he

8  get basis for that at that time?

9  A.    If that was imputed as money that went to him directly

10  rather than going to the company --

11  Q.    Uh-huh.

12  A.    -- since it did go into the company, then he has to have

13  some benefit for that contribution, right, so that would

14  increase his basis.  So if you're imputing income to someone,

15  and they're not actually getting it because they're putting it

16  back in the company, every time one of those deposits came in,

17  it would get added into his basis.  And then when the stock is

18  sold, you would take the basis that's sitting there out of it.

19  Q.    Okay.  So let's start with what was his basis at the end

20  of 2006?

21  A.    500,000.

22  Q.    And then what would his basis be at the end of 2007?

23  A.    $10 million.

24  Q.    All right.  So his basis at the end of 2007 is

25  $10 million?

1  A.    That's correct.  Under that scenario.

2  Q.    What happens when the sale gets completed in 2008, then,

3  according to the SPA closing date?

4  A.    Then he's going to subtract his basis from whatever the

5  sale price is.

6  Q.    Okay.  The sale price is $10 million.

7  A.    Then he has 10 million in basis.

8  Q.    But is it $10 million in basis of all of his stock or just

9  part of his stock?

10  A.    I would say his basis would come out of whatever the sale

11  price was that he sold because he didn't put anything in at the

12  beginning, so we're not allocating on a per share basis.

13  Q.    What about 2009?

14  A.    I mean, if we treat the 2.1 and the 3.15 as capital

15  contributions, then those -- since they stayed in the company

16  and then, you know, went to the bank, those get added to the

17  basis also, so they have to be accounted for whenever the stock

18  is sold.

19  Q.    Would he have a tax liability in either one of those years

20  then?

21  A.    No.

22  Q.    Why not?

23  A.    I mean the only way I can really explain this is that

24  logic has to prevail.  If you have to include something as

25  income, and you didn't actually receive it, then you're going

1  to have to get a corresponding deduction.

2  Q.   All right.

3  A.   So he has a capital gain -- if he has a capital gain, it's

4  offset by the basis of the money that stayed in the company.

5  Q.   All right.

6  A.   If he has income, but loaned the money, then it has to be

7  offset by the money that's imputed as income to him when the

8  company shuts down, and it still wipes everything out.

9  Q.   Okay.

10      MR. PENDERY:  That's all I have, Your Honor, unless

11  you have other questions.

12      THE COURT:  Well, I think Mr. Pavlik's papers reflect

13  the problem that they were facing, in part on the limitations

14  of the carryback depending on the timing of the insolvency.

15      But the one thing that we -- that we know at this

16  juncture at least, it seems to me, is that for all of the --

17  all of the funds that were contributed by Mr. Cook, there were

18  treasury securities issued to him?

19      MR. PENDERY:  That's correct.

20      THE COURT:  We also know all of the funds that

21  Mr. Cook contributed were deposited exclusively in JDFX

22  accounts?

23      MR. PENDERY:  That's correct.

24      THE COURT:  And that there were never any

25  certificates of stock issued to Mr. Pieron.  They were only

1    issued to Mr. Cook in conjunction with those deposits?

2              MR. PENDERY:  That would be correct.

3              THE COURT:  And we're still trying to figure out why,

4    given that --

5              MR. PENDERY:  Why?  Big question why.  Why would you

6    report it as a capital gain in 2008 and 2009, that's correct.

7              THE COURT:  I don't know how we answer the question,

8    because I don't think the witness can.  In fact, I think the

9    witness would probably suggest that it doesn't make any sense.

10             MR. PENDERY:  I think you would disagree with me, but

11   I don't think it matters because the documents actually show

12   that he didn't get the money, and the documents actually show

13   Cook got the money and put it in the company and got stock in

14   return.

15             Just because you paper it -- this is *Gregory versus*

16   *Helvering* all over again.  Just because you paper it one way,

17   courts go, guess what, we don't care how you paper it.  I'm

18   going to look at what really happened here.  That's what the

19   Supreme Court said in that case.  We're going to really look at

20   what the taxpayer did here.

21             THE COURT:  Now, are you done with the witness?

22             MR. PENDERY:  I am, Your Honor.

23             THE COURT:  Would you like to cross-examine the

24   witness, or would you like a break before we cross-examine the

25   witness?

1            MR. DEPORRE:  I would like a little break, yes.

2            THE COURT:  Okay.  Let's take a break.

3            (At 11:59 a.m., break taken.)

4            (At 12:13 p.m., break concluded.)

5                        CROSS-EXAMINATION

6   BY MR. DEPORRE:

7   Q.    Hello, Ms. Rebeck.

8   A.    Hi.

9   Q.    At the outset of your testimony, you mentioned you're a

10  certified fraud examiner?

11  A.    Yes.

12  Q.    Have you worked in that role before?

13  A.    I have used my CFE certification in other expert roles.

14  I've been asked to review documents that are part of litigation

15  to determine whether or not fraud was present on several cases.

16  Q.    And have you ever reviewed documents where there have been

17  allegation of a Ponzi scheme?

18  A.    No.

19  Q.    Are you familiar with a Ponzi scheme based on your

20  training?

21  A.    Yes.

22  Q.    And are you aware in this case that Trevor Cook operated

23  Market Shot as a Ponzi scheme?

24  A.    Yes.

25  Q.    About --

88

1  A.   And I need to clarify my answer, I actually have reviewed

2  documents that were alleged to be part of a Ponzi scheme.  I

3  just didn't recall that case until --

4  Q.   What was the purpose of your review for that case?

5  A.   To trace funds.

6  Q.   And the goal was to find out where the funds that were

7  invested in the Ponzi -- where they ended up, correct?

8  A.   No, that was not my goal.

9  Q.   What was your goal?

10 A.   My goal was to determine how much money was taken from a

11 small group of investors, a small group out of a large group of

12 investors.

13 Q.   And who hired you in that case?

14 A.   The client.

15 Q.   And the client's role?

16 A.   One of the investors.

17 Q.   The client was an investor?

18 A.   Yes.

19 Q.   And they wanted you to trace how much money they had

20 contributed to the Ponzi?

21 A.   How much money they had contributed and a few other

22 investors that they were associated with.

23 Q.   And how did you go about doing that?

24 A.   I reviewed the bank records.  I reviewed communication.  I

25 reviewed some documents that were filed.  I don't want to go

1  too in-depth because I don't want to go into any privilege

2  issues with the case, but I reviewed a lot of documents

3  surrounding the transactions and also the financial records

4  associated with it.

5  Q.    You worked on that case as a fraud examiner not as an

6  attorney, correct?

7  A.    I mean, I'm an attorney so I always kind of wear my

8  attorney hat, unless I am sitting here as an expert.

9  Q.    Okay.  So I don't want you to disclose any legal advice

10 that you gave them or anything like that, but in terms of what

11 you were looking for in the -- in the Ponzi scheme case, were

12 you looking to see not only how much money was contributed but

13 then whether or not those investors could recoup some of the

14 funds?

15 A.    No, that was not part of my role.

16 Q.    Okay.  Are you aware that the SEC sometimes does that on

17 behalf of investors?

18 A.    I am generally aware of that.

19 Q.    And are you aware of whether or not that was done with

20 respect to Market Shot?

21 A.    I did not look into a lot of the details surrounding

22 Market Shot's issues.

23 Q.    Well, Mr. Pieron spoke to the SEC receiver looking into

24 the Market Shot issues, and did you review his interview?

25 A.    Yes.

Rebeck - Cross                                                    90

```
 1  Q.   In that interview, he said that he personally sold stock
 2  to -- personally sold stock to Market Shot; is that correct?
 3  A.   I don't recall exactly how the language was.  Could you
 4  point me to that document?
 5  Q.   Sure.  It's Government Exhibit 200.  This is a memorandum.
 6  Would you read the subject line of this memorandum.
 7  A.   Interview of James Pieron on November 3rd, 2009.
 8           MR. HURFORD:  I'd just like the record to be clear,
 9  it does say -- this document we're referring to does say
10  interview of James Pieron, but it is written as though Fetters,
11  his attorney, is speaking the entire time and not James Pieron
12  personally.
13           THE COURT:  Thank you.
14  BY MR. DEPORRE:
15  Q.   Did you review this document in preparation for your
16  testimony and your work on this case?
17  A.   Yes.
18  Q.   And are you familiar with the -- what it states as a
19  general matter?
20  A.   I am generally familiar with it.
21  Q.   Okay.  Do you know who -- on the second page it states who
22  the owners of JDFX Holding are, and it lists Market Shot as a
23  35 percent owner, James Pieron as 52.5, Clive Diethelm as 12.5;
24  is that correct?
25  A.   Yes.  That's what it says.
```

1  Q.   And is that consistent with the findings that you made in

2  your review of this case?

3  A.   I don't believe that the ownership percentage was part of

4  my findings.  It was more the tax calculation based on whether

5  there was basis or not or whether it was treated as a loan or

6  not.

7  Q.   Well -- and to determine whether or not there was basis,

8  you would have to know what percentage of the company

9  Mr. Pieron owned, correct?

10 A.   No.

11 Q.   Why not?  Wouldn't you have to know that in order to

12 determine how to allocate the money that he received for the --

13 A.   No.  No, his basis is based on the value that he put into

14 the company, which we discussed earlier was initially zero, and

15 if he received the 10 million in '08, it stayed in JDFX so

16 that's his basis, but it doesn't have anything to do with -- I

17 mean, the percentages don't really change that analysis.

18 Q.   Did you review Government Exhibit 138?

19 A.   I did.

20 Q.   And where does -- where does the money that's transferred

21 from Cook and his related entities -- where do those funds get

22 wired to?  Who's the account holder?  What's the entity name?

23 A.   I'm going to go back to that.  Is it in your folder?

24 Q.   It is, yep.

25 A.   What number?

1   THE COURT:  Forty-seven is the summary.

2  BY MR. DEPORRE:

3  Q.   Yep, it's 138; 47 in the binder, in the other binder,

4  defendant's binder, doesn't state the name of the entity that

5  receives the funds, and I think that's somewhat important.  But

6  it would be tab 138 in our binder.  That's the exhibit number.

7  A.   Okay.  So which transaction are you referring to

8  specifically?

9  Q.   Do you have that in front of you?

10  A.   Yes.

11  Q.   All right.  I'd like to focus on the transactions that

12  occurred in 2006 and 2007.  Do you see any for 2007 -- 138, we

13  have ours tabbed by exhibit number.

14        MR. HURFORD:  Okay, sorry.

15        MR. DEPORRE:  That's okay.

16        THE WITNESS:  Okay.  So the first one for 2007 that I

17  see is dated, I believe it's 3/30/2007.

18  BY MR. DEPORRE:

19  Q.   Correct.  And that's page 1 of that exhibit.  Page ID

20  number for the record is 2420.  That's on the top right-hand

21  corner; is that correct?

22  A.   I apologize.  That is the -- I was on page 2.

23  Q.   Okay.

24  A.   Okay.  So page 1 is 3/20/2007.

25  Q.   And do you see the company that the money goes to?

1   A.   JDFX Fund Management.

2   Q.   And who owns JDFX Fund Management?

3   A.   From my understanding, Mr. Pieron is one of the -- I don't

4   know if he's the sole owner or one of the owners.

5   Q.   Does Mr. Cook own it?

6   A.   I don't recall.

7   Q.   You don't know?

8   A.   No.  I don't know JDFX Fund Management versus -- there was

9   a lot of entities kind of floating around, so --

10  Q.   And we know that there are documents reflecting shares of

11  stock being sold to Mr. Cook for one entity, correct?

12  A.   Correct.

13  Q.   And what's that entity?

14  A.   JDFX Holdings.

15  Q.   And is that a different entity than JDFX Fund Management,

16  LTD?

17  A.   Yes.

18  Q.   Okay.  Let's look at the next one on page 2.  Where did

19  those funds -- this is a $5 million wire transfer, and it

20  occurred on March 30th, 2007; is that correct?

21  A.   Yes.

22  Q.   And where were those funds transferred to?

23  A.   JDFX Funds Management on behalf of JDFX RMS AG.

24  Q.   Do you know what JDFX RMS AG is?

25  A.   I assume it's another JDFX entity.

94

1  Q.   Is it JDFX Holding?

2  A.   I'm not sure.

3  Q.   Do you know if JDFX Holding did business as JDFX RMS AG?

4  A.   I would have to go back and review some documents to

5  answer that appropriately.

6  Q.   So you don't know?  As you sit here right now, you don't

7  know?

8  A.   No, I don't know off the top of my head.

9  Q.   Okay.  But the money went into JDFX Fund Management LTD's

10 account, correct?

11 A.   That's correct.

12 Q.   Okay.  And, in fact, all the wire transfers from 2006 and

13 2007 went into the JDFX Fund Management account, correct?

14 A.   I'm going to have to go through each one before I answer

15 that.  That's not correct, on January 23rd, 2009, this one

16 says -- I apologize, page 11, ID 2430, this one is JDFX

17 Holding.

18 Q.   And what year is that one for?

19 A.   This is January 23rd, 2009.

20 Q.   Okay.  So that's 2009.  Let's leave that one aside.  I'm

21 focused on '06 and '07.

22 A.   Okay.

23 Q.   Did you find any '06 and '07 that go into JDFX Holdings?

24 A.   All of the pages in here reflect JDFX Fund Management.

25 Q.   And you don't know who the owner of that is?

1   A.    Not off the top of my head, but I know that it's

2   associated with Mr. Pieron.

3   Q.    You haven't seen any stock to show that Mr. Cook owns JDFX

4   Fund Management?

5   A.    No.

6   Q.    You haven't seen any stock from JDFX Fund Management at

7   all?

8   A.    Correct.

9   Q.    All right.  In this case, what have you reviewed for JDFX

10  Holding?  What documents have you reviewed?  What corporate

11  documents have you reviewed?  Have you reviewed articles of

12  incorporation?

13  A.    I don't believe so.

14  Q.    Have you reviewed a general ledger showing shareholder

15  accounts?

16  A.    No.

17  Q.    Did ask you for that?

18  A.    Yes.

19  Q.    And did you get it?

20  A.    No, I did not.

21  Q.    Okay.  Now normally when you would conduct an

22  investigation to try and determine how much basis somebody has,

23  would you want to look at the shareholder accounts?

24  A.    I don't know that I would investigate basis.

25  Q.    Well, say you were doing a tax return and you had to

1  compute someone's basis, would you ask for their books to see

2  what -- whether or not it's reflected on the company books that

3  they have a shareholder account?

4  A.    That would be ideal.  Not everyone keeps great books and

5  records or sometimes any.  A lot of -- a lot of the time I

6  spend calculating things using the actual financial account

7  documents and coming up with compilations of information

8  myself.  Maybe it's as a function of the clients that I work

9  with, but it's not unusual for me not to have a complete set of

10  books and records to make determinations on amounts that go on

11  the tax return or issues with the tax return.  That's kind of

12  typical in my world.

13  Q.    Typical to not have records reflecting transactions that

14  occurred?

15  A.    Not not have records, not have financial statements or

16  something like that already prepared.

17  Q.    And when you would review the returns, when you would --

18  excuse me, prepare a return, would you speak to the client

19  about what happened?

20  A.    Yes.

21  Q.    Because you would want to know their account, correct?

22  A.    Correct.

23  Q.    And they could give you insight into the nature of the

24  transaction, right?

25  A.    Sure.

1  Q.   And, in fact, they'd probably have the best information

2  about what actually happened?

3  A.   Depends on the client.

4  Q.   Okay.  Have you had clients that aren't truthful with you?

5  A.   Sure.

6  Q.   Have you had clients that try and give you false

7  information to -- for some purpose of their own?

8  A.   I'm sure that I have, and I'm sure that I don't always

9  know when they do it, but most of the time the clients come to

10 me because they are confused and they don't know what it is

11 that they need to do with the information that they have.

12 Q.   So they come to you, they have information, they -- in

13 normal -- normal situations, not where the client is trying to

14 do something shady, they come to you with the information that

15 they have, correct?

16 A.    Correct.

17 Q.   And then you prepare tax returns based on their

18 disclosures?

19 A.   I may prepare tax returns.  I may prepare information for

20 them to take somewhere else to prepare their tax return.

21 There's a million different scenarios that could happen after,

22 you know, that kind of engagement.

23 Q.   Have you reviewed information that James Pieron gave to

24 his first tax preparer, Carol Nathan?

25 A.    I reviewed Carol Nathan's memo of interview and her

1  affidavit.  I don't know that I'm super clear on which

2  documents she had at the beginning or didn't have.  I'm a

3  little more clear on Pavlik, but I think I can kind of glean

4  from what happened with Carol Nathan why she reported what she

5  did.

6  Q.   Carol Nathan reported what she did because she spoke with

7  James Pieron and Pieron told her that he had a capital gain,

8  correct?

9  A.   Pieron also -- that's correct, and Pieron also told her

10 that he needed to prepare a summary of his income and expenses

11 in order to report the capital gain, which should have been a

12 trigger for her immediately that he doesn't understand what a

13 capital gain is.

14 Q.   Did you look at -- the documents that you looked at from

15 Carol Nathan, were you familiar with documents that had ATSI

16 stamped on the bottom?  It's like a Bates stamp?

17 A.   You'll have to tell me which documents you're referring to

18 specifically.  I mean, it sounds familiar, but I can't --

19 Q.   Did you review any documents -- do you recall seeing

20 numerous documents that had ATSI written on the bottom?

21 A.   It sounds familiar, but I would have to refresh my memory

22 on that.

23 Q.   And if you were to a tax preparer in Carol Nathan's shoes

24 and the defendant -- or Mr. Pieron told you that he needed to

25 prepare some expenses; is that right?

1  A.    I believe she said he went -- you know what, I don't want

2  to misquote her, so let me go to that.  Is it in your book or

3  no?

4  Q.    I don't think it is, no.

5  A.    Okay.  Just give me a moment.

6  Q.    If I may ask what you're looking at there.

7  A.    I'll let you know as soon as I make sure that I'm going to

8  the right one, but I believe it's either going to be tab 29 or

9  30.

10           So I'm on her affidavit, and it's tab 30 in the

11 defense book.

12 Q.    Just so we can all be on the same page quite literally, I

13 found tab 30 in the defense book, and it has the affidavit of

14 Carol Nathan.

15 A.    So there's a few times in here that she kind of references

16 this concept, but specifically I would say we could start like

17 in paragraph -- or, sorry, line 15.  "Pieron did not provide

18 any promissory notes to me.  I did not understand what Pieron's

19 income was based on the initial spreadsheet he gave me and

20 could not prepare his tax returns based on the information."

21 And then she goes on to say that "Pieron told me he would

22 re-summarize his income and expenses so I could prepare his

23 returns."

24           And doing this for as long as I have, it kind of just

25 triggered to me that either she doesn't or he doesn't or

1  neither of them really understand what kind of transaction it

2  is that they're reporting because you're -- you're using

3  terminology that you would expect to see in a financial

4  statement model, and the numbers that she put on her return

5  lead me to believe, since they don't match up to what this

6  other capital gain amount is, or any sort of basis computation,

7  that she used something that should not have been used at all

8  for that purpose.

9  BY MR. DEPORRE:

10 Q.   Who gave her that something, whatever she used?

11 A.   Mr. Pieron, of course, her client.

12 Q.   So here it says -- have you ever had clients tell you that

13 they have a capital gain?

14 A.   Yes.

15 Q.   And have they provided you with documents to show that

16 capital gain?

17 A.   The majority of capital gain transactions that I see or

18 any other tax preparer sees, including I'm sure Mrs. Nathan,

19 although I'm making an assumption there, are going to be

20 1099-B's from a brokerage house, and it's going to have all the

21 information on there that you need, and it's really just put it

22 on the return and we all move on, right?

23        And so there's always a few clients that have a

24 unique set of circumstances and then there's, you know, a

25 different road that we go down to try to make those

1  determinations.

2  Q.   So there's no 1099-B for the sale of stock in a small

3  Swiss -- not small, but in a closely held, not a publicly

4  traded, Swiss company is there?

5  A.   I do not have that kind of knowledge of Swiss tax law.

6  Q.   In fact, you don't know anything about Swiss tax law?

7  A.   No.

8  Q.   Nothing about Swiss bankruptcy law?

9  A.   No.

10 Q.   Nothing about when discharge of indebtedness would occur

11 under Swiss law?

12 A.   Nope.

13 Q.   Nothing about whether or not a company issuing stock would

14 have to pay any sort of taxes under Swiss law?

15 A.   No.

16 Q.   You know American law, though, and so if you were trying

17 to determine whether or not there was a sale of stock, you

18 would want to see probably a stock purchase agreement or a sale

19 and purchase agreement, right?

20 A.   Definitely.

21 Q.   And you would look at that to determine whether or not

22 there was some sort of financial transaction?

23 A.   Sure.

24 Q.   Did you look at Mr. Pieron's?

25 A.   Mr. Pieron's what, I apologize?

1  Q.   Stock purchase agreement?

2  A.   I did.

3  Q.   And sale purchase agreement?

4  A.   I did.

5  Q.   Does that state who sold stock?

6  A.   I believe it has his personal name on there.

7  Q.   And does it say a closing date of the sale?

8  A.   I need to go back and review and just make sure that I

9  understand which date you're talking about.

10  Q.   All right.  It's Government Exhibit 201 is the first one.

11  A.   I'm sorry, there's a lot of dates on there.  I just don't

12  want to misspeak.

13          Okay.  So the first one, yes, it has a closure date,

14  January 1, '08.

15  Q.   It's hard to flip back and forth between different

16  binders.

17  A.   I understand.

18  Q.   I apologize.  I sympathize with you.  It's hard for me.  I

19  can't imagine.

20          You said it was January 1st, 2008?

21  A.   The closure date, yes.

22  Q.   Now, if you were preparing a return where somebody told

23  you that they had a large capital gain, you would want to look

24  at the sale closing doc, right, the share purchase agreement?

25  A.   Correct.

1  Q.   And you would want to see when the closing date was?

2  A.   I actually disagree on the closing date being indicative

3  based on the -- paragraph 1 giving all of the shareholder

4  rights on a different date.  That would be the date that I

5  would use for -- if I was looking at what Mr. Cook's holding

6  period was, I would use March 1, '07.  I would not use

7  January 1, '08.

8         And on top of that, given the nature and timing of

9  the transactions that were -- where the money was paid, I mean,

10  I think that me personally I would use the '07 date.

11  Q.   Were any dividends paid to Market Shot?

12  A.   I'm not aware of whether they were or not.

13  Q.   Okay.  You have no idea whether dividends were paid?

14  A.   I don't -- no, I'm not aware.

15  Q.   Did Market Shot have a proxy?  Did they have voting powers

16  in March of 2007?

17  A.   I don't know whether or not voting is addressed in here so

18  I'm going to have to review it again, hold on.

19         I don't see anything regarding voting rights at all,

20  and I don't assume that you're trying to trick me.  So I'll

21  just say I don't see anything in there, but, I mean, if we go

22  back to the object of sale paragraph, it literally reads the

23  purchaser agrees to purchase from the seller the shares -- the

24  shares and qualifications for dividends for the first time as

25  of the business year 2007, beginning on March 1, 2007.  So

1  absent any other provision for some other date for voting

2  rights, then it's my opinion that that would be also the date

3  that they would get the voting rights.

4        And going a little further on that, it appears that

5  the closure date is just related to when all of that 10 million

6  needs to be paid, because paragraph 2 says that the purchase

7  price for the shares shall be payable in accordance to the

8  closure, and then we go down to the closer date.  So I -- I

9  can't help but read that as a lawyer thinking that the closure

10 date is like the last day that you can pay this 10 million in

11 order to make sure that, you know, you can maintain your

12 shareholder rights.

13 Q.   Could some rights be -- say that there were payments made

14 or deposits made.  Under Swiss law, would there be any

15 prohibition on the company allowing --

16       MR. HURFORD:  Your Honor, she's already testified --

17 objection, she's already testified she does not -- she's not an

18 expert in Swiss law, so any questions that starts with "under

19 Swiss law" I think we can just skip.

20       THE COURT:  Not necessarily.  I suspect that the

21 initial notion of it being capital transactions arose out of

22 advise concerning Swiss law, which are nontaxable under Swiss

23 law but not under the Internal Revenue code, so the witness can

24 respond.

25       THE WITNESS:  I will just echo that sentiment that I

 1  unfortunately do not know anything about Swiss law.

 2  BY MR. DEPORRE:

 3  Q.    So you don't know whether or not somebody can sell rights

 4  to dividends without actually transferring full -- I don't

 5  know, the seizing of the stock, full -- all the shares of the

 6  stock if they can sell off some sort of right to a dividend?

 7  A.    I have no idea, but there's nothing in here to indicate

 8  that he was selling the right to the dividend.  It says, the

 9  purchaser agrees to purchase from the seller the shares and

10  qualification for dividends.

11  Q.    Right.  And the agreement closure date is January 1st,

12  2008, but it's weird because March 1st, 2007, they have a right

13  to receive dividends, but we don't know if any dividends are

14  actually paid, correct?

15  A.    I don't know that that anyone got dividends.  I just don't

16  know that.

17  Q.    Who would know?

18  A.    I assume Mr. Pieron would know.

19  Q.    Okay.  So if you were Carol Nathan, and you wanted to know

20  when stock was transferred or if there was a capital gain, you

21  would talk to Mr. Pieron?

22  A.    I would talk to Mr. Pieron and review documents because

23  clients are inherently unreliable.  No offense to any of my

24  clients, but --

25  Q.    Not all clients are inherently unreliable?

1  A.   Again, it might just be a function of the work that I do,

2  but I do see quite often that -- and, you know what, I think

3  that in general people don't understand the nuances of the tax

4  code, especially when it's changing all the time.

5  Q.   No, they don't understand the nuances of the tax code for

6  sure, but they know if they sold stock, fair enough?

7  A.   They may or may not.  I would hope that they would.

8  Q.   Yeah, I would hope so.

9       Government Exhibit 56, could you flip to that --

10  actually it's tab 40 -- yeah tab 56 here, sorry.  It's in the

11  Government's blue binder.

12  A.   Oh, I'm sorry, I'm there.

13  Q.   Okay.  Good.  Do you see the Bate stamp at the bottom?  It

14  says ATSI?

15  A.   Yes.

16  Q.   And this one starts at Bates No. 2?

17  A.   Yes.

18  Q.   Do you recognize this document?

19  A.   I can't be sure if I reviewed this or not.

20  Q.   But this is something you would have reviewed in

21  determining whether or not Mr. Pieron had a capital gain,

22  correct?

23  A.   I have no idea what this is.  Can you tell me like what --

24  what is this document?

25  Q.   Sure.  This is a document that -- these are notes from

1  Ms. Carol Nathan, correct?

2  A.   I have -- I apologize I really have no idea if these are

3  notes from Carol Nathan, and I'm trying to find some sort of

4  title on the document or -- all I see is Beth Duncan, super

5  awesome comp, 555 made up street, nowhere Illinois.

6  Q.   Okay.  What I'd like you to do is go to page Bate stamp

7  20 -- ATSI 20.  The page ID is 19 -- oh, excuse me, wishful

8  thinking, 2150.

9  A.   Okay.  It still says Beth Duncan, super awesome comp.

10 Q.   Right.  I want you to go about halfway down the page --

11 A.   Okay.

12 Q.   -- there's -- there's an entry on 7/7/10 at 2:58 p.m.  It

13 says note, and then it -- and it has a little text in the

14 middle of the page, and then in the right-hand column there's a

15 name.  Could you read that name?

16 A.   Carol Nathan.

17 Q.   Okay.  And then below that one, on 7/7/2010, at 2:54 p.m,

18 there's a note, and would you read the name for that one.

19 A.   Carol Nathan.

20 Q.   Okay.  Would you read the note.

21 A.   Which one?

22 Q.   The one on 2:54 p.m.  They're reverse chronological so

23 going down is going earlier in time.

24 A.   "Called CIT [sic] he wanted my email, will email -- will

25 email him so he has my address.  Client insists his 9 million

1   in 2007 is capital gain.  He says he sold shares of his company

2   to an investor.  He has the number of shares sold, sale price

3   and all the info to be entered on Schedule D.  He will email

4   his 2006 tax return."

5   Q.   All right.  So it sounds like Ms. Nathan had a

6   conversation with the taxpayer, correct, Mr. Pieron?

7   A.   That's what it appears to be.

8   Q.   And Mr. Pieron told her that he had a capital gain?

9   A.   In 2007, that's correct.

10  Q.   Well, I think he said he insists that his 9-million in

11  2007 is a capital gain.  Now, it doesn't specifically say that

12  it's taxable as a capital gain in '07 or '08, but certainly

13  there was $9 million, from your review of the bank records, at

14  least 9 million, that was received in 2007, correct?

15  A.   That's correct.

16  Q.   How much total was paid between Cook entities and JDFX

17  Fund Management in 2007?

18  A.   9.5 million.

19  Q.   So more than even what's here?

20  A.   That's correct.

21  Q.   Okay.  And then if you're Carol Nathan and you're

22  preparing returns, you would probably want to look at bank

23  records?

24  A.   Sure.

25  Q.   Did James Pieron give bank records to Carol Nathan?

1    A.    I -- I don't know off the top of my head, I'm sorry.

2    Q.    Did you review her testimony?

3    A.    I did.  I just -- you know, there's a lot of documents.  I

4    just don't remember -- unless you want to refresh me somewhere.

5    Q.    Fair point.  Did -- did Mr. Pieron ever talk to Mr. Pavlik

6    about putting that capital gain in 2008?

7    A.    I'm going to want to turn -- is his testimony or his notes

8    in your binder or just in the other one?

9    Q.    Well, I will direct you to Government Exhibit 204.

10   A.    Okay.

11   Q.    Have you reviewed this before?

12   A.    Yes.

13   Q.    And what is this?

14   A.    It appears to be a letter from James Pieron to Mr. Pavlik.

15   Q.    And in it does he say that he founded a company called

16   JDFX Holding?

17   A.    Yes.

18   Q.    And does it say that in 2008 he sold 20 percent of JDFX

19   Holding to Market Shot?

20   A.    Yes.

21   Q.    And does it say he received a capital gain of 10 million?

22   A.    Yes.

23   Q.    And then does it say one year later he sold 15 percent of

24   JDFX to Market Shot?

25   A.    Yes.

Rebeck - Cross

1  Q.   And does it say he received a capital gain of

2  5.25 million?

3  A.   Yes.

4  Q.   So this goes to Mr. Pavlik, and then does Mr. Pavlik also

5  prepare returns for Mr. Pieron?

6  A.   So I reviewed this letter, and, you know, taken out of

7  context I also would have said, okay, well, now I understand

8  why everyone was doing the things that they were doing with the

9  tax returns, but -- and I'm going to have to go back and find

10 the reference, but this letter was prepared at I believe

11 Mr. Pavlik's direction to attach to some other filing --

12 Q.   How do you know that?

13 A.   -- in order to explain something.

14 Q.   How do you know that this was prepared at Mr. Pavlik's

15 direction?

16 A.   I think I read it somewhere in one of the interviews.

17 That's why I just -- I'm going to need a moment to go back and

18 see.  Either that or it was discussions that I had with --

19 Q.   An interview with Mr. Pieron?

20 A.   No.  I think it was in one of the Pavlik's interview

21 notes.

22 Q.   Oh, with maybe Agent Hollabaugh?

23 A.   Maybe, yeah.  I would like to go back and find it though

24 if you can just give me a moment.

25 Q.   Fair enough.

1   A.   Okay.  So I'm in tab 39 of the defense binder, and I

2   believe it's page 2 of 5 of the memorandum and it's stamped

3   10865.

4   Q.   What paragraph?

5   A.   It is paragraph five.  And if you're there, I'll read it.

6        It says, "Pavlik was shown a copy of a letter from

7   Pieron addressed to Mr. Pavlik that explained the reason JDFX

8   was liquidated.  Pavlik stated Pieron prepared the letter

9   sometime between November, 2011 and January, 2012 at his

10  request.  Pavlik said he told Pieron he needed a written

11  summary of what led to the liquidation of JDFX, the

12  uncollectible loans and the theft loss."

13       So, for that reason, I did not give a lot of weight

14  to this letter from James to Mr. Pavlik.

15  Q.   Well, I want you to keep going.  I want you to keep going.

16  A.   Sure.

17  Q.   Go another sentence.  "Pavlik said it was his decision not

18  to send the letter."

19  A.   "Because he didn't think it was appropriate for the

20  situation."  So I'm going to -- let me just read the whole

21  thing:

22       "Pavlik said it was his decision not to send the

23  letter to the IRS with the amended tax returns because he

24  didn't think it was appropriate for the situation."  And then

25  he goes on to say, "Pavlik stated the letter was consistent

1  with what Pieron was telling him all along."

2          And so reading that, I said, okay, well, now so

3  why -- why is the letter saying these things, and now we're

4  saying, oh, that's what he was saying, so I read all of the

5  memos, and so I'll get to the reason why in a second, but I

6  kind of made the assumption that the comment about consistency

7  was not specific to the capital transactions, because if you go

8  to tab 38 --

9  Q.   Would you repeat that -- repeat that.

10 A.   When he said, "Pavlik stated the letter was consistent

11 with what Pieron was telling him all along."

12 Q.   Uh-huh.

13 A.   And so that made me think, like, okay, well why would --

14 why would he say that if they're not capital transaction, so

15 now, you know, it's very confusing, and I was trying to

16 determine what exactly did Pavlik and Pieron talk about related

17 specifically to the capital transactions.  Because the

18 statement about consistency to me is too vague, so I couldn't

19 determine which part of this letter was supposed to be

20 consistent with what he was telling him all along.

21          So if you go to tab 38 and paragraph 2, I'm not going

22 to read the whole thing, but it's on the first page 10869.

23 "Pavlik said Pieron told him he received some of the 10 million

24 in '07, some in '08.  Pavlik said Pieron never told him he

25 wanted to recognize the capital gain in '08 instead of '07."

1   Q.   Yeah, so they -- Pieron didn't say when he wanted to

2   recognize it to Pavlik?

3   A.   That's what Pavlik was saying, right.  And then I have

4   this letter that seems to be giving step-by-step instructions,

5   and so I determined from that that when Pavlik said that the

6   story was consistent, that he wasn't referring to the capital

7   gains part.  He was just referring to the general -- I don't

8   know, maybe the Ponzi scheme.

9   Q.   Okay.  Can you go to Government Exhibit 203, it's marked

10  in the binder that you're already working from it's Tab 19.

11        THE COURT:  Sir, I've got to find a break here.

12  We've got a long, long afternoon, this afternoon.

13        MR. DEPORRE:  For us or for somebody else?

14        THE COURT:  We've got at least four sentencing

15  hearings to get through, and I've got a little bit of

16  additional reading.  This has been an unusual sort of morning

17  to some extent in the exchanges that we've had with the

18  witness.

19        Do you mind if I ask just a couple of questions to

20  see if I can -- I'm clear in my own mind concerning her

21  testimony.

22        MR. DEPORRE:  Certainly, Your Honor.

23        THE COURT:  My understanding, at least at this stage,

24  is that you're aware of only one transaction involving any

25  share -- any shares of stock that involve Mr. Pieron at all,

1    one issuance of stock?

2              THE WITNESS:  That's correct.

3              THE COURT:  You're not aware of any exchange of stock

4    between Mr. Cook and Mr. Pieron ever?

5              THE WITNESS:  That's correct.

6              THE COURT:  Your understanding would be that as a

7    result of him not contributing any cash at the time that the

8    company was incorporated, he would have a basis of zero?

9              THE WITNESS:  That's correct.

10              THE COURT:  In November of 2009, when the entity

11   would be dissolved under Swiss law, what would be the tax

12   effect on him if he had a basis of zero in the stock

13   certificate.

14              THE WITNESS:  There would be no tax effect just given

15   that limited scenario.  He put nothing in the company, assuming

16   the company shuts down at zero, then there's no -- there's just

17   no tax effect.  You don't need to claim a loss or anything like

18   that.

19              THE COURT:  Let's assume for purposes of discussion

20   that over the course of three years, as the $15 million is

21   being received, that Mr. Pieron loans the funds to JDFX, and

22   the entity becomes insolvent in 2009.  He can't recover the

23   $15 million in loans.  What's the tax treatment of that

24   transaction, in your view?

25              THE WITNESS:  There would be a loss of 15 million.

1  It would be treated as an ordinary loss.  It would offset any

2  income from 2009.  Anything that was additional, since there

3  was no carry forward election made, would go back to '07 first.

4  It would offset any income from 2007.  It would then go to

5  2008, offset any income from 2008, and if there's anything left

6  over, it would then carry forward to 2010 and future years.

7           THE COURT:  Scenario three.  Over the course of three

8  years Mr. Pieron is selling stock to Mr. Cook.  There's no

9  apparent evidence of that that we're familiar with, but let's

10  assume for purposes of discussion that's true.  Each time he

11  receives proceeds and then contributes it, what's the effect of

12  the transaction on his basis?

13           THE WITNESS:  Every time that he gets the proceeds

14  and they go to JDFX, then he has a basis in the stock.

15           THE COURT:  Increases?

16           THE WITNESS:  Correct.

17           THE COURT:  Now, what happens when the entity becomes

18  insolvent at the end of 2009?

19           THE WITNESS:  Nothing would really happen because I'm

20  assuming under this scenario that the -- all the basis and

21  capital gain transactions are offsetting during that time, so

22  it's just zero at the end.

23           THE COURT:  Mr. Pavlik was operating under the

24  assumption that these were capital transactions.  You would

25  agree?

Rebeck - Cross

1           THE WITNESS:  I think so.  It appears -- it appears

2    so.

3           THE COURT:  And he provides at one point, and I'm

4    reading from Exhibit 38 -- Pavlik said, "The whip-saw effect

5    meant that Pieron was going to have a capital gain in any year

6    the transaction was reported."  Went on to say, "if you have a

7    capital gain in one year, and capital losses in the next year,

8    you can't carry the capital loss back."  Is that accurate?

9           THE WITNESS:  That's correct.

10          THE COURT:  And that's the problem from Pavlik's

11   perspective?

12          THE WITNESS:  Correct.

13          THE COURT:  Okay.  In my view, I've found the witness

14   to be extremely helpful, but all of the information is at least

15   either based on documents that have been furnished to her and

16   hypothetical information that she has been furnished by the

17   defendant.

18          MR. HURFORD:  I understand with respect to some of

19   that stuff, but I just want to make a record that she testified

20   concerning a number of documents including interview memorandum

21   of Trevor Cook and bank records, so I don't think that we can

22   characterize --

23          THE COURT:  That's fair.

24          MR. HURFORD:  -- what she's reviewed as completely

25   hypothetical.  And I also think that her testimony concerning

1 the multiple ways that you can view any set of facts here, I
2 think it makes -- I think it makes her testimony important for
3 this Court to understand that whatever the Government's theory
4 is, if we're going to attribute income Pieron, he has no tax
5 liability.
6          THE COURT:  Mr. Pavlik would not agree with you.
7          MR. HURFORD:  May I ask one question of the witness,
8 Your Honor?
9          THE COURT:  No.  We have to come to a conclusion
10 today.  We'll locate another date for continuation of the
11 hearing, but we've got to come to a conclusion today.
12          Ma'am, you're excused from the stands.
13          THE WITNESS:  Thank you, Your Honor.
14          THE COURT:  And record's closed.
15          (At 1:06 p.m., court recessed.)
16
17                         * * * * *
18                     C E R T I F I C A T E
19    I certify that the foregoing is a correct transcript
      from the proceedings in the above-entitled matter.
20
21                      *Carol M. Harrison*
22    Date: 11-25-2019    Carol M. Harrison, RMR, FCRR
                          Official Court Reporter
23                        United States District Court
                          Eastern District of Michigan
24                        1000 Washington Avenue
                          Bay City, MI  48708
25