```
 1                IN THE UNITED STATES DISTRICT COURT

 2                    EASTERN DISTRICT OF MICHIGAN

 3  UNITED STATES OF AMERICA          )  Bay City, Michigan
                                      )  December  3, 2019
 4      vs.                           )  9:13 a.m.
                                      )
 5  JAMES D. PIERON, JR.,             )
                                      )  Case No. 18-20489
 6      Defendant.                    )
    _____ )

 7

 8                      TRANSCRIPT OF HEARING
              BEFORE THE HONORABLE THOMAS L. LUDINGTON
 9                 UNITED STATES DISTRICT JUDGE

10  APPEARANCES:

11  For the Government:  JANET L. PARKER
                         JULES DEPORRE
12                       United States Attorney
                         Eastern District of Michigan
13                       101 First Street
                         Suite 200
14                       Bay City, MI 48708

15  For the Defendant:   PATRICK J. HURFORD
                         MARK S. PENDERY
16                       Honigman, LLP
                         660 Woodward Avenue
17                       Detroit, MI  48226

18

19

20

21  Court Reporter:      Carol M. Harrison, RMR, FCRR
                         1000 Washington Avenue
22                       Bay City, MI  48708

23

24           Proceedings reported by stenotype reporter.
          Transcript produced by Computer-Aided Transcription.
25
```

```
 1                          I N D E X

 2
    WITNESSES FOR THE DEFENDANT:
 3
    CHELSEA REBECK
 4      Cross-Examination, Cont'd By Mr. Deporre          41

 5

 6  EXHIBITS:                                           RCVD

 7   GX 217  Wire Transfer Confirmation                   45

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

US v. Pieron, Jr. - Hearing - December 3, 2019

```
 1              P R O C E E D I N G S

 2            (At 9:13 a.m., proceedings commenced.)

 3            (Defendant present.)

 4            THE CLERK:  United States of America versus James

 5   Pieron, Case No. 18-20489.

 6            THE COURT:  Good morning, counsel.  If we could have

 7   your introductions, please.

 8            MR. DEPORRE:  Good morning, Your Honor.  Jules

 9   DePorre on behalf of the United States.

10            MS. PARKER:  Janet Parker and also Scott Hollabaugh,

11   IRS CI.

12            THE COURT:  Good morning.

13            MR. HURFORD:  Your Honor, Patrick Hurford on behalf

14   of defendant James Pieron who's seated next to me.

15            MR. PENDERY:  Good morning, Your Honor.  Mark Pendery

16   on behalf of the defendant, James Pieron.

17            THE COURT:  And please be seated, gentlemen.

18            Let's see if we can kind of assess what we've learned

19   the last time we were in session.  I think one thing that we

20   can agree on is that if we were going to assess Mr. Pieron's

21   basis in his JDFX stock it would be zero.

22            We've covered the fact that Mr. Cook made a

23   contribution of capital.  Mr. Pieron -- and there was another

24   gentleman.  Clive?

25            MR. PENDERY:  Clive Diethelm, Your Honor.
```

```
 1              THE COURT:  Clive, did not contribute any capital but
 2   inquired as to whether or not there was a formal intellectual
 3   property transfer, and apparently there was not; but, in any
 4   event, the defendant did not contribute any capital and as a
 5   result we are in agreement that his basis would have been zero
 6   if it was a capital transaction.  Do you agree with that,
 7   Mr. Hurford?
 8              MR. HURFORD:  Just in -- I'm not sure I understand
 9   what the Court means by a capital transaction.  If you're -- if
10   you're -- if the -- if we're making a factual assumption -- if
11   we're making a factual assumption that there was no sale of
12   stock from Pieron to Trevor Cook or Market Shot, then I would
13   agree with you, but if we're somehow imputing income --
14              THE COURT:  No.  That was not my point.
15              MR. HURFORD:  Okay.
16              THE COURT:  My point was it was acknowledged by the
17   defense that Mr. Pieron, or the other gentleman, contributed
18   capital in exchange for the securities they originally received
19   when the company JDFX was formed.
20              MR. HURFORD:  I think that's correct, Your Honor.
21              THE COURT:  Okay.  The other thing that I think we
22   concluded was that, in fact, in 2008 and 2009, the payment
23   record of capital being contributed to JDFX was $5,250,000 and
24   not $15,250?
25              MR. PENDERY:  15 million.
```

1          THE COURT:  Billion?

2          MR. PENDERY:  It's 15 million, you said 15,000.

3          THE COURT:  Oh, I'm sorry.  Okay.

4          Government agree?

5          MR. DEPORRE:  I agree with the -- I agree that those

6    transactions occurred in 2008 and 2009.  I disagree that that

7    is income, that Pieron has an unrestricted right to that, that

8    it's not a deposit as he characterized it when he filed his

9    returns on a sale that occurred in 2008.  And I think that's

10   supported by the fact that those payments are not made to JDFX

11   Holding.  They're made to a distinct legal entity, JDFX Fund

12   Management, and JDFX Holding and JDFX Fund Management do not

13   have a subsidiary relationship of any kind.

14          So it's -- it's unclear why the payments are made to

15   JDFX Fund Management, but it certainly supports the view that

16   Mr. Pieron took on his -- well, actually his original 2008 and

17   2009 returns, and then the amended returns, that that sale of

18   stock occurred in -- on January 1st of 2008 and that those

19   payments that occurred in -- really there was a $500,000

20   payment in 2006, the payments in 2007 and then the payments in

21   2008 and 2009 were payments for the stock purchase agreement

22   that was effective on January 1st, 2008.

23          THE COURT:  Well, and I appreciate your point, which

24   is that if you were looking at just the return, he records

25   $15 million worth of gross proceeds in '08 and '09, but when we

```
 1  look at 138, and the summary exhibits that we've looked at
 2  before, we don't know why he did that.  We don't know why.
 3  What we do know is the payments actually made by Cook during
 4  that time period was $5,250,000.
 5          MR. DEPORRE:  And we take no issue with that.  What
 6  we -- those bank records though, when you look at them, the
 7  defense is arguing that Pieron has access to those funds.  I
 8  think one of their alternative arguments is that Pieron would
 9  have access to those funds in 2007 and 2008, and those funds go
10  into a JDFX Fund Management account, not a JDFX Holding
11  account, and it's unclear why they go into the Fund Management
12  account, but that is -- at least my understanding is that's the
13  trading account, and that is an account that can be used.  It's
14  not a -- it doesn't have shareholders.  It has subscribers.  So
15  how those funds are then -- if there's restrictions on the use
16  of those funds, what those restrictions might be, we simply
17  don't know.
18          THE COURT:  Well, let's put that question on the side
19  of the ledger that says, we don't get it yet.  We do not
20  understand the organization of those affiliates or necessarily
21  their later use or later transaction once the capital is
22  received.  We don't know.
23          A couple of things I think we learned from
24  Ms. Rousseau, which is there were at least two -- two ways in
25  which these transactions were easily structured or, as she
```

 1    indicated at one point, papered.

 2          If -- if the payments were actually being made to

 3    Mr. Pieron, and he in turn was making loans to JDFX or, as

 4    defense would now like to argue, that he was actually not

 5    selling stock, but that he was -- that Cook was simply

 6    capitalizing the corporation, have been nontax -- those are two

 7    potentially nontaxable transaction, or at least transactions

 8    where there is potentially no tax liability.  We know that he

 9    could have done that if he elected to do so.

10          MR. DEPORRE:  Yeah, I take -- I take no argument.

11    I -- I would impress upon the Court that if the defendant had

12    elected to issue treasury stock, the way they are now arguing

13    that they did, that would have had other ramifications,

14    including other tax ramifications.  It's my understanding that

15    it would have had an impact under Swiss law perhaps and

16    under -- in the SEC case it would have impacted the ability for

17    the SEC receiver to basically be entitled to all the stock that

18    was capitalized by the Ponzi scheme, and so it could have been

19    structured that way, but certainly Mr. Pieron had an incentive

20    not to structure it that way.

21          THE COURT:  Well, one possibility for this return

22    showing up -- excuse me, the multiple returns showing up the

23    way they did, is that he got started by trying to take

24    advantage of Swiss tax law but in which the structure sank his

25    ship under US tax law.  One possibility.

1          MR. DEPORRE:  And that possibility seems to me to

2  make the most sense, because Pieron has said that he was

3  advised by a -- or Pieron's lawyers have said that he was

4  advised by a Swiss lawyer who was unfamiliar with US tax law.

5  And so when the deal was initially structured, they did it

6  under the -- they did it with attention being paid to Swiss law

7  as opposed to US tax law.

8          And so it -- it is consistent that the deal was

9  structured in a way to avoid the payment of Swiss tax as

10  opposed to avoid the payment of US tax, though I don't disagree

11  that it could have been structured differently.

12          THE COURT:  And if we step back, even a little bit,

13  to some degree this doesn't look like tax evasion.

14  Increasingly this looks like someone who has increased his tax

15  liability under circumstances where he didn't have to.

16          MR. DEPORRE:  This case was -- if I may comment on

17  that, Your Honor?

18          THE COURT:  Sure.

19          MR. DEPORRE:  This case was not charged as an evasion

20  of assessment.  There are two means in which an individual may

21  evade or defeat the payment of -- or attempt to defeat the

22  payment of taxes.  There's evasion of assessment, where the

23  defendant either doesn't file returns, files false returns with

24  the hope that the IRS will not be able to determine the true

25  tax liability that the defendant has.

1          Then there's evasion of payment, which is what the

2    defendant has been charged with and what he was convicted of.

3    And that is once the assessment has been made by the IRS, and

4    the IRS says there's a tax due and owing, that can be done in

5    multiple ways.  It can be done by an IRS examination, like an

6    audit, or the situation which occurred in this case, where the

7    defendant self-assessed by filing his own returns, which the

8    IRS accepts.

9          Then a tax becomes due and owing, and what the

10   defendant was convicted of in this case was not evasion of

11   assessment, which would be the sort where the defendant does

12   something to falsify his return, but evasion of payment, and I

13   think that's a critical distinction.

14          THE COURT:  Well, and I appreciate your point, in

15   part, but -- and I will agree that he was late in filing his

16   returns, but his first return reflects a capital gain of

17   3,800,000, and then he files an amended return showing a

18   taxable capital gain of 14,539,000.  Is that evasion?  Not

19   certainly of assessment.  This is someone who has increased his

20   tax liability under circumstances where Ms. Rebeck has told us

21   two simple ways in which this transaction she thinks could be

22   structured for no tax liability at all.

23          MR. DEPORRE:  No, Your Honor, simply that's

24   inconsistent -- the fact that he increases the amount of his

25   capital gain, standing alone, would be inconsistent with tax

1    evasion.  However, you have to look at the other things that

2    the defendant does in his amended return, which is to take a

3    theft loss deduction, which simply was unwarranted and

4    frivolous.

5              THE COURT:  And that occurs with respect to the third

6    filing with -- and as a result of --

7              MR. DEPORRE:  The second -- I don't mean to interrupt

8    the Court.  That occurs within the 1040x return, the second set

9    where the defendant increases his tax liability to 14 million,

10   the capital gains income to 14 million.  He takes the theft

11   loss in that second one.  It's the claim of right argument that

12   he makes in the third set of returns.

13             THE COURT:  Agreed?

14             MR. PENDERY:  Your Honor, there were not three sets

15   of returns.  There were two.  The original returns were filed

16   in January of 2011.  The second set for '08 and '09 were filed

17   in January of 2012.  There was never a third set of 2008/2009

18   tax returns being amended.

19             THE COURT:  And I believe that's accurate.

20             MR. HURFORD:  I would just like to say two things

21   real quick.  The first is, there has been no expert and there

22   has been no evidence offered by the Government as to what Swiss

23   law is, so to stand up here and say that he would have had tax

24   liability under Swiss law, had this been a capital transaction,

25   an issuance of treasury stock, as opposed to a sale of his own

1    stock, has no -- there's no basis for saying that.

2              And the second thing is, is that we can call the

3    theft loss position frivolous that Pavlik took, that's the

4    words that --

5              THE COURT:  Which you have.

6              MR. HURFORD:   -- were just used, but let's also

7    remember the 2009 theft loss amended return was accepted, so

8    the IRS said, correct, theft loss applies in 2009, but at the

9    same time they rejected the 2008 return, creating this

10   interesting result where you have theft loss in amended returns

11   filed in 2008 and 2009, and they accept theft loss for 2009,

12   and they don't accept it for 2008.  So before we label it

13   frivolous, it's at least a position the IRS accepted with

14   respect to 2009.

15             MR. PENDERY:  Your Honor, I got to correct that.

16   It's the 2008 return that the IRS accepted that contained the

17   theft loss.  The transcripts show that because they assessed an

18   additional tax.  When he filed the amended returns in 2012,

19   meaning Pavlik filed the amended returns, the 2008 tax return,

20   the amended return, had an increase in tax.  The Government

21   accepted that return and assessed that increase in tax.

22             In 2009 the tax return, with the identical theft loss

23   claim in it, reduced the tax liability, and the Government did

24   not process that return.  So they processed the initial return

25   with for -- or the amended return for 2008 with the theft loss

1  in there and assessed an additional tax of penalty and

2  interest, but they didn't process the one where the tax was

3  reduced in 2009.

4          THE COURT:  Now, you will, however, agree with me

5  that he was increasing his reported capital gain between his

6  initial return being filed and the first return that Mr. Pavlik

7  filed?

8          MR. PENDERY:  I agree with you, Your Honor, he did.

9          THE COURT:  Why would he do that?

10         MR. PENDERY:  Well, if you look at the original --

11         THE COURT:  I'm going to ask that in a rhetorical

12  sense because ultimately that becomes important, but I want to

13  circle back to verify one thing with the defense, which is you

14  sought Agent Hollabaugh's testimony because, quote, he

15  previously testified under oath that, among other things, the

16  10 million in capital gains should have been reported in 2007,

17  not 2008, citation.

18         Mr. Hollabaugh also testified that he had bank

19  records showing wire transfers to Mr. Pieron for the $10,000

20  capital gain in 2000 -- most likely in 2007.  That's why you

21  wanted Mr. Hollabaugh to testify.

22         MR. PENDERY:  That's correct, Your Honor.

23         THE COURT:  It seems to me that while the Government

24  is taking the position that the full 15 million that is

25  disclosed in his returns is recorded in 2008 and 2009 in the

1  returns, they agree that it was only 5,250,000 that was

2  actually received in 2008 and 2009, which is the point that you

3  are essentially trying to make with Mr. Hollabaugh's testimony?

4          MR. PENDERY:  That's correct.  That's correct, Your

5  Honor.

6          THE COURT:  But, but -- if the tax basis is zero,

7  because we accept the notion that there was a capital

8  transaction, it's still going to be $5,250,000 with revenue, no

9  basis, but his guideline range is still going to be in excess

10 of $3,500,000, and his base offense level is going to be 14.

11         MR. PENDERY:  As Ms. Rebeck testified, Your Honor,

12 the -- you're forgetting about the $10 million that was

13 received in 2006 and '07.  That became basis to Mr. Pieron that

14 he could use in 2008 and 2009.  If it's treated -- if it's

15 treated as a capital contribution by Mr. Pieron, the money

16 comes into JDFX Fund Management and he turns around and loans

17 it back to his company as a capital contribution, so if it's

18 treated as a capital contribution, that's basis.  That's

19 $10 million worth of basis is what she testified to.

20         THE COURT:  Okay.  So we bounce from 24 to 6.,

21 probably?

22         MR. PENDERY:  You mean, 24 to 6 --

23         THE COURT:  On the base offense level.  Because what

24 you're saying --

25         MR. PENDERY:  I think I'd have to look at it, but I

1  think you're right.

2          THE COURT:  Okay.  But you dispute the notion that

3  that was a capital transaction at all -- or, excuse me, with

4  Mr. Pieron; transaction was with JDFX, and it was Mr. Cook's

5  capital transaction?

6          MR. PENDERY:  Yeah, if it's a capital -- if it's a

7  capital contribution, an investment by -- if you read the

8  Exhibit 200 by John Fetters where he is giving the SEC

9  information about what happened at that time, he repeats over

10 and over that Cook wanted to invest, and he invested

11 15.25 million into the company; in return he got stock.  He

12 correct -- he says something different in a later email, but if

13 you treat --

14         THE COURT:  With some emphasis.  I mean, he's

15 pounding the table in that email.

16         MR. PENDERY:  Yes, I understand that.  Fetters isn't

17 a tax attorney.  Fetters doesn't know what he's talking about

18 when it comes to tax issues.  He's an SEC lawyer, and I think

19 he was the head of enforcement under President Reagan, so here

20 you've got a guy that's making representations to the SEC that

21 doesn't know anything about tax issues.  And that's what's been

22 the problem with this case since day one.  Whether it's the ATS

23 folks -- we've got notes from the ATS folks where they're

24 talking about this being a business bad debt and rolling that

25 debt back two years from 2009 to 2007 and 2008.  That's their

1   Exhibit 56, Your Honor.  This thing was all over the board by

2   accountants and Fetters and other people, but he didn't know

3   what he was talking about, surely.

4         THE COURT:  Well --

5         MR. PENDERY:  And I know.  I know.

6         THE COURT:  -- you're telling me that --

7         MR. PENDERY:  I know.

8         THE COURT:  -- but there's a whole lot of unexplained

9   debris between your argument and daylight it seems to me.

10        MR. PENDERY:  All right.

11        THE COURT:  First of all, Ms. Rebeck was testifying,

12   nearly exclusively, based on information that she either

13   received from Mr. Pieron or from you.

14        MR. PENDERY:  Well, she testified -- okay.  Go ahead.

15        THE COURT:  I mean, you'll recall that the Swiss

16   stock registry is something new since the sentencing hearings

17   began.

18        MR. PENDERY:  So is the SPA.

19        THE COURT:  Well --

20        MR. PENDERY:  That wasn't introduced at trial either,

21   and no one's authenticated that as well.  There's a lot of

22   documents that are now appearing, both for the Government and

23   the defense, that were never introduced as evidence at trial.

24        THE COURT:  When did the stock -- and that was on my

25   list.

1        MR. PENDERY:  All right.

2        THE COURT:  When did the stock transfer agreements

3   surface?  And from where?

4        MR. PENDERY:  I don't know where the Government got

5   them from, Your Honor.  I -- I'm guessing, but I'd be guessing

6   that they were in Pavlik's files, and I'm not sure of that,

7   because they don't have any -- they don't have any Bates number

8   from AHP on them or anything like that, so I don't know where

9   they came from.

10        THE COURT:  Do you have any ideas, sir?

11        MR. DEPORRE:  They were from Pavlik.  He's correct.

12   Defendant sent them to Pavlik in an email.  He sent the first,

13   I think it's Government Exhibit 201, which is the 2008 stock

14   purchase agreement, and then Government Exhibit 202 is the

15   agreement that closes in 2009.  Then there was also 202A which

16   is a corrected version of that with the correct closing date

17   and with Mr. Cook's, I believe, signature, and those were all

18   emailed to Mr. Pavlik from Mr. Pieron.

19        THE COURT:  And was Mr. Pieron in Switzerland at the

20   time, to the best of our knowledge?

21        MR. DEPORRE:  No.  It was after he had come back to

22   the United States.  It was in -- it was at the time that he had

23   engaged with Pavlik and he was already living in Mt. Pleasant

24   at that point.

25        THE COURT:  But why would he do the stock transfer

1   agreements once the business had collapsed in Switzerland and

2   he was back in the United States?

3           MR. DEPORRE:  We don't think he did.  We think that

4   those were agreements that he kept in his possession that

5   showed the stock transfer, but that those agreements were

6   signed and dated on the times that they were signed and dated

7   back in -- they are contemporaneous documents, and they were

8   mailed after the fact to -- or emailed after the fact to

9   Mr. Pavlik.

10          MR. PENDERY:  I don't think they're dated, Your

11  Honor.  I think that's the problem with the agreements.

12          THE COURT:  Do we know the --

13          MR. PENDERY:  I think they're signed, but I don't

14  think there's dated.

15          MR. DEPORRE:  There's a date stamp on --

16          MR. PENDERY:  It says January 14 with no year on it,

17  201.

18          THE COURT:  But we're nevertheless back into the area

19  of surmise in the same way that we were in listening to

20  Ms. Rebeck's testimony, which is she knows no more than

21  Mr. Pieron or you have told her, or some other third party.

22  And under Federal Rule of Evidence 702, her opinion is no more

23  reliable than the source of the information.  She cannot

24  authenticate documents that are handed to her.  She cannot tell

25  you whether there are other documents.  She is unable to

```
 1    provide any information to you other than conclusions based on
 2    the factual information furnished to her.
 3              MR. PENDERY:  She would be no different than an IRS
 4    summary witness that didn't testify, Your Honor.  She reviews
 5    the transcript of the hearing from day one through day four.
 6    She reviewed all the exhibits.  She reviewed all the new
 7    exhibits that have come up since this sentencing hearing first
 8    took place, so she's in the same position as their summary
 9    witness would be to testify.
10              THE COURT:  Well, then let's pull on the thread a
11    little bit.  We don't know where these stock transfer
12    agreements came from, but they sure corroborated, with some
13    minor problems, the tax reporting that Mr. Pieron is -- the
14    story he's telling the Internal Revenue Service.  This is a
15    capital transaction between me and Mr. Cook, not Mr. Cook and
16    JDFX.
17              MR. PENDERY:  But he signs it on -- he signs both
18    agreements on behalf of JDFX Holding AG.  I agree with you
19    there are inconsistencies in those agreements.  There's more
20    problem -- the first agreement says he owns 100 percent of the
21    stock when this transaction is done.  We know that's not true.
22              The second agreement says he owns 100 percent of the
23    stock, when the second transaction's entered into.  That's not
24    possible because he had a first transaction where he allegedly
25    sold 20 percent of his stock, and in the second transaction he
```

1    sells 15.  He couldn't have owned 100 percent, so whoever did

2    these documents -- and I don't know who did the documents --

3    they're just invalid.  They're wrong.  There's something

4    seriously wrong with both agreements.

5              THE COURT:  They're internally inconsistent.

6              MR. PENDERY:  Yes, sir.  And there's other issues

7    with them.

8              THE COURT:  But we also still do not know the author?

9              MR. PENDERY:  I'm sorry, I didn't hear that, Your

10   Honor.

11             THE COURT:  We don't know the author?

12             MR. PENDERY:  We do not.

13             THE COURT:  We don't know how they got into the

14   defendant's position -- or possession such that he was able to

15   communicate them to Mr. Pavlik.

16             MR. PENDERY:  I don't know that he did that.  I don't

17   have an email that he sent to Mr. Pavlik attaching those SPA's.

18             THE COURT:  And we don't know where he gets the -- he

19   has an idea, which you want to criticize today, that these were

20   capital transactions between Mr. Cook and Mr. Pieron.  In fact,

21   for whatever reason he did that, he reported that information

22   to his tax return preparers.

23             Now, if we go back -- and I'm quoting from papers

24   that have been filed on his behalf criticizing former counsel,

25   "He failed to investigate the capital gains characterization

1  and the existence of a tax liability."  ECF 119.

2        Also, "Both preparers, his initial accountant and

3  later CPA, failed to ask the capital gains questions."

4        MR. PENDERY:  It's a simple question to -- it's a

5  $15.25 million transaction.  What did you do with the money?

6  If a client came to me and said, I've got a $15.25 million

7  capital gain in 2008 and 2009, my first question is, show me

8  what you did with the money.

9        THE COURT:  Or maybe your first question is, what are

10  you talking about, and why do you think that is the case.

11        MR. PENDERY:  Agreed.

12        THE COURT:  But recognize you're criticizing a highly

13  accomplished tax attorney, a highly accomplished CPA, and a

14  reasonably accomplished initial tax return preparer.  All of

15  them, from your perspective, bamboozled by the defendant.

16        MR. PENDERY:  I don't think they were bamboozled.

17  First of all --

18        THE COURT:  Look, look at the stage of highly

19  accomplished people that you're saying did not reasonably meet

20  the standard of care of a preparer.

21        MR. PENDERY:  They did not conduct a thorough

22  investigation to determine whether or not he actually had

23  capital gains.  You can say Mr. Minns is highly competent and

24  accomplished, and maybe he was.  I was -- I was here during

25  some of this, and in preparation of some of this, and I can

1  tell you he never investigated that capital gains issue at all.

2          Mr. Pavlik, the Court is saying is an accomplished

3  CPA, but at the same time the Government is saying, ah, he

4  didn't do basis right, theft loss was frivolous, claim of right

5  doctrine was frivolous.  I don't call that highly accomplished

6  either.  I think there's problems in those returns.

7          MR. DEPORRE:  Your Honor, if I may make a point, if

8  Mr. Pendery was here during trial, why didn't he raise the

9  issue?

10          MR. PENDERY:  I was not here during trial.  In

11  preparation of trial, Your Honor, I did raise the issue.

12          THE COURT:  So see if we can backtrack a little bit.

13  If we look at the Government's case, at least in terms of

14  the -- the sentencing issue on a determination of the tax

15  liability, they are -- they are emphasizing the point that your

16  client reported the 15 million in the second return.  They are

17  acknowledging that, in fact, there was only 5,250,000 that was

18  transferred in 2008/2009.  They're reserving their position

19  that it was in conjunction with an earlier agreement that, in

20  effect, these were installment payments, but they're

21  acknowledging the information that you were seeking from Mr. --

22  the agent.

23          MR. PENDERY:  I understand.

24          THE COURT:  And the capital gain could be the amount

25  of the funds received in that time period, less the basis of

1   zeros, or the 10 million, which was unreported in 2007, could

2   increase his tax basis to decrease the tax liability for

3   2008/2009.  We still have that sort of unresolved question, at

4   least in my mind, which is can you increase your tax basis by

5   10 million if you don't report it?

6          MR. PENDERY:  You had asked if there was any case law

7   on that.  I think the first session we had with you in chambers

8   we could find no case law to -- and you thought that would be

9   the case, but we could find no case law that supports or

10  negates that.  But if it's treated as a business bad debt, and

11  he loaned the money to his company, that's treated as a

12  business bad debt by him, as a third alternative, then he has

13  no tax liability when JDFX holding collapses in 2009 because he

14  can carry it back to 2007 and 2008 and has no liability.

15         THE COURT:  And those are two roads that we could go

16  down, but let's switch to your position now, the defense's

17  position, which is forget the returns, we want to explain what

18  we believe actually occurred here, which is two things.

19         Somehow the defendant has stock transfer agreements

20  prepared by someone we don't know.  We don't know what the

21  explanation is.  They actually tend to corroborate, with some

22  internal inconsistencies, the Government's reliance on the tax

23  returns that we actually had a capital transaction between the

24  defendant and Mr. Cook.

25         We don't know how he got the idea in his mind that

```
 1   was sufficient to bamboozle his initial bookkeeper, bamboozle

 2   Mr. Pavlik, and bamboozle Mr. Minns.  We don't know.

 3              MR. PENDERY:  I -- okay.  I don't agree with the "he

 4   bamboozled somebody" or he -- this was a scheme on his part.

 5              THE COURT:  All I'm suggesting --

 6              MR. PENDERY:  I'm not -- I mean --

 7              THE COURT:  -- the underlying proposition that it

 8   seems to me to be important here, because it was the defense

 9   that could have been presented at trial --

10              MR. PENDERY:  Agreed.

11              THE COURT:  -- is that he honestly furnished all of

12   the factual information that was available to him, but you're

13   asking us, after the trial, to believe, without any proofs,

14   we've not heard from Mr. Minns, we've not heard from

15   Mr. Pavlik, we've not heard from the initial return preparer.

16              MR. PENDERY:  We subpoenaed Mr. Pavlik to be here

17   today.

18              THE COURT:  Okay.

19              MR. PENDERY:  I don't know why he's not here.  We're

20   not happy about that, but we fully intended to put him on the

21   stand, Your Honor, so that you could hear from him.

22              MR. DEPORRE:  That's news to us, Your Honor.  You

23   know, the Court asked the defendant to disclose the witnesses a

24   while ago.  They did initially disclose Mr. Pavlik, and then in

25   an email, I think on October 21st, said that the only people
```

1   that would be testifying on their behalf would be Ms. Rebeck

2   and Ruth Murphy.

3           THE COURT:  Well, I anticipated these hearings would

4   be a little bit fluid, and I appreciate your point.

5           When would -- when would you have dropped the

6   subpoena on Mr. Pavlik?

7           MR. PENDERY:  We subpoenaed him before the first

8   hearing, Your Honor.  His attorney accepted service.  He knew

9   about this hearing because I called him and told him he had to

10  be here today at 9:00.

11          THE COURT:  Do you know the gentleman in the back of

12  the courtroom?  I'm not --

13          MR. HURFORD:  Yes, we do.

14          A VOICE:  I'm not he.

15          MR. HURFORD:  It's not Mr. Pavlik.

16          THE COURT:  You don't want to be a witness?

17          A VOICE:  I'd prefer not.

18          MR. PENDERY:  So we've got a little bit of a

19  conundrum.  We looked at each other at 9:00 and said Pavlik's

20  not here, okay.

21          THE COURT:  Well, it's possible that Mr. Pavlik can

22  give us some background, some.  Part of it's going to be

23  hearsay for sure about the share transfer agreements, what he

24  did with those, what the defendant told him about those, if he

25  knows who the author is, why the internal inconsistencies

1   exist, and why -- what the defendant told him that was so

2   compelling about these being capital transactions consistent

3   with the way they've been reported on the first tax returns

4   that, to use your language, he failed to investigate the

5   capital gains characterization and the existence of a tax

6   liability at all.  He could probably help us out with that.

7          MR. PENDERY:  There's some things he could help us

8   out with.  Your Honor, if you look -- if you start in the

9   beginning of the ATS notes and you really look at those notes

10  and through those notes, you can see that there's confusion as

11  to what to do about any of this, and whether it's capital

12  gains, it's a business bad debt, it's a capital loss.

13         And then he goes to Pavlik because he's not

14  comfortable with ATS, and he goes to Pavlik and he explains to

15  Pavlik and gives him allegedly more documents and spreadsheets

16  and things like that, that the Government says his spreadsheets

17  are inherently wrong, but the theme throughout all of these

18  documents is he believed he had a capital gain, but he believed

19  he had losses that would wipe out those capital gains, and he

20  says that repeatedly.  And the only thing everybody seems to be

21  focusing on is that he said he had capital gains.  He said he

22  had capital gains, but he also said he had very large capital

23  losses.

24         THE COURT:  Which Mr. Pavlik explained to him, absent

25  some more creative thinking, were of no value, he couldn't

1     carry them back.

2           MR. PENDERY:  I don't know that Pavlik told him that.

3     He said that he could not do the claim --

4           THE COURT:  It's in the emails.

5           MR. PENDERY:  In the email he says that I cannot use

6     the Claim of Right -- I don't think we can use the Claim of

7     Right Doctrine is what he says, and I know which email you're

8     talking about.  We have it as an exhibit.

9           He doesn't talk -- I don't think I have any

10     documentation -- I could be wrong -- that exists that says that

11     Pavlik tells him, you've got a capital loss and you can't carry

12     it back.  That's in the ATS notes, but I don't know that it's

13     in Pavlik's notes.  But ATS also talks about a business bad

14     debt that can be carried back five years.

15           THE COURT:  I don't see any need -- and I'll leave

16     this question open for the Government, but it seems to me that

17     the relevance of which you sought Mr. Hollabaugh's testimony is

18     an acknowledged fact at this point, and I don't see a

19     particular justification for any additional testimony on their

20     part.

21           You have one way in which we can look at that

22     would -- we would be modifying Ms. Rousseau's draft schedule if

23     we were to accept the payment terms as being the relevant

24     numbers.  The tax basis is zero unless the 10 million -- the 10

25     million that is received is a contribution to his basis --

1          MR. PENDERY:  That's correct, Your Honor.

2          THE COURT:  -- and the answer to that question is

3    either going to put him in offense level 6, or offense level

4    24.  It's the difference -- it's a heck of a swing in terms of

5    the advisory guideline range turning on one question.

6          But, in any event, I think the Government is done.

7    Am I correct?

8          MR. DEPORRE:  Yes, we're done.  The three

9    possibilities that the defendant mentioned, whether or not this

10   is a business bad debt, basis, or capital loss, we are the only

11   party that submitted the defendant's own statements in

12   furtherance of the proof that it is a capital loss.

13         The defendant said it was a capital loss.  He said it

14   to Carol Nathan.  Now, he may be confused, as they're arguing

15   now, but that is the only evidence.  We have no indication that

16   there's a loan agreement.  There's no shareholder loan account.

17   We have no records to support a -- that these are capital

18   contributions, that there are -- we have bank records

19   certainly, but what they actually are, other than a capital

20   loss, there's -- there is absolutely -- the record is devoid of

21   anything to support that these are capital contributions.

22   There's no general ledger account which shows capital

23   contributions.  There's nothing.

24         All we have are the defendant's own statements that

25   he had a capital loss, and Carol Nathan telling him that you

1  can't carry it back.  And I think the Court is correct that we

2  are done.  We don't have any ability to call the defendant, and

3  so we have nothing further.  There's nothing that

4  Mr. Hollabaugh could offer to support that.

5          THE COURT:  I agree.  Mr. Hurford.

6          MR. HURFORD:  Yes, Your Honor.  I'd like to read from

7  your October 23rd order in this case for just a moment.

8          THE COURT:  Do you remember what they say about

9  consistency?

10          MR. HURFORD:  I'm going to try, Your Honor.  "Because

11  the Government bears the initial burden of proof for the tax

12  loss, it necessarily should bear the burden of proof of

13  defendant's taxable revenue for 2008 and 2009 including sales

14  proceeds of the defendant's JDFX stock.  It may not simply rely

15  upon the defendant's 1040xs as appearing to be consistent with

16  source documents.  The Government may not choose one of the

17  three because it most closely corresponds with the available

18  bank records.  It must prove what the bank records demonstrate.

19  The burden of proof lies with the Government to establish the

20  amount of the defendant's taxable income."

21          And we just heard Mr. DePorre say there's no evidence

22  of loans, there's no evidence of capital contribution.  Well,

23  absent those two things, Your Honor, there's no evidence of

24  income.  We have money going to JDFX, and that's it.  If they

25  want to call it income, they have to say why the money is still

 1    in JDFX.  They have to come up with what their theory of income

 2    is.  They have to come up and prove what the income is,

 3    according to your own order, and why Agent Hollabaugh is so

 4    important, Your Honor, is because what he says.  I've reviewed

 5    bank records showing Mr. Pieron got money in 2007, mostly in

 6    2007.

 7              THE COURT:  Uh-huh.

 8              MR. HURFORD:  I want to know what those records are,

 9    because they won't tell me.  I can't mount a defense at

10    sentencing if they don't tell me what the theory of income is

11    and they haven't done it.

12              THE COURT:  You've got your dressed-up version of

13    138, which pretty much establishes all of the relevant time

14    periods in which the revenue's received.

15              Now, I agree with you that they are relying on the

16    defendant's tax returns for the characterization of this as a

17    capital gains transaction, but they are acknowledging that he

18    reported 15 million and that the actual number received in the

19    2008/2009 period was 5,250,000.

20              And I agree with you, he either has no basis and has

21    a heck of a capital gain, or he has a high basis because we can

22    ascribe the 10 million contributed in 2007 to being his tax

23    basis, and we're rolling the dice, from the defense's

24    perspective, as to the ultimate tax loss and, therefore, the

25    advisory guideline range on that question.

1          MR. HURFORD:  Which question is that, Your Honor?

2          THE COURT:  Whether or not the 10 million contributed

3    by Cook in 2007 is to be contributed -- is to be included in

4    Mr. Pieron's tax basis for the transaction.

5          MR. HURFORD:  Well, we're not rolling the dice just

6    on that question, Your Honor.  There's two -- there's two

7    possibilities.  If the money stays in -- you have to account --

8    if they don't have income going directly to my client, you have

9    to -- you have to say the money going to JDFX is income to

10   Pieron.  That has to be their position.

11         THE COURT:  Sure.

12         MR. HURFORD:  And if that money that stays in JDFX is

13   income to Pieron, it has to be -- our expert says it has to be

14   one of two things.  It's either a loan creating a business bad

15   debt or a capital contribution.  They don't have any -- they

16   don't have -- they don't have a position otherwise.

17         THE COURT:  Well, the -- they have a good position.

18   They're just relying on multiple sets of returns.

19         MR. HURFORD:  Which you said was -- is --

20         THE COURT:  No.

21         MR. HURFORD:  -- not sufficient to meet their burden

22   here.

23         THE COURT:  I disagree.  I think it's sufficient to

24   address the characterization of the transaction, not the

25   empirical numbers, and they have agreed.

1          MR. HURFORD:  There was also one -- one statement

2    that was made today I'd also like to correct, and that was that

3    there was a suggestion that Cook signed the 2009 tax return,

4    and one of the other things --

5          THE COURT:  Not tax return.

6          MR. HURFORD:  I'm sorry, the 2009 share purchase

7    agreement, thank you.

8          THE COURT:  There you go.

9          MR. HURFORD:  And there's actually an interview memo

10   that was authored by Agent Hollabaugh where, again, I just want

11   to put this on the record, Cook says there was never a 2009

12   sale of stock.  He says that he didn't sign that tax return.

13         THE COURT:  Not tax return.

14         MR. HURFORD:  I'm sorry, share purchase agreement.

15         THE COURT:  There you go.

16         MR. HURFORD:  Thank you, Your Honor.

17         THE COURT:  So that takes us, it seems to me, back,

18   at least in my opinion, to the defense.

19         MR. HURFORD:  I -- Your Honor, and I don't know why

20   that is because the Government has put nothing other than the

21   tax returns on to establish their burden of income, and we've

22   addressed --

23         THE COURT:  They have placed their reliance on the

24   repeated position, not only of the defendant on those returns,

25   but in multiple sets of circumstances that these were capital

1  transactions.  They've agreed that the defendant's numbers on

2  his return were wrong for the particular years in question.

3  The legal significance of that they want to leave in my lap,

4  and I appreciate that.

5       But if we're going to go beyond any of these

6  transactions, if you really want us to treat the stock purchase

7  agreements, which, while internally inconsistent, nevertheless

8  corroborate the Government's perspective on the

9  characterization of the transaction, somebody's going to have

10  to explain what those documents are, who authored them, where

11  they came from, and why they falsely represent the

12  characterization of the underlying transaction.

13       And at some point somebody's got to explain why the

14  initial tax return preparer had such a strong perspective about

15  the capital character of these transactions that she was

16  prepared to prepare a return and sign her name on it, and that

17  to your point, not only Mr. Pavlik, who is under subpoena and

18  not here, could furnish a great deal of information, and is

19  there any evidence, other than your assertion, that Mr. Minns

20  failed to investigate the capital gains transaction and the

21  existence of a tax liability.  That is merely an allegation,

22  merely an allegation, it's not in evidence.

23       MR. HURFORD:  Well, it's correct it's not in evidence

24  right now because we haven't had a hearing on the motion for

25  new trial yet, Your Honor, and when we do have that hearing, I

1  will subpoena Minns, and I will subpoena Mr. Sasse to testify

2  so I can complete the record for ineffective assistance of

3  counsel for that motion.

4         THE COURT:  And do you think that that information is

5  not necessary with respect to the sentencing guideline

6  question?

7         MR. HURFORD:  No, I think it's a separate issue, Your

8  Honor.

9         THE COURT:  It is a different question, but --

10         MR. HURFORD:  I think --

11         THE COURT:  -- informed by much of the same factual

12  information.

13         MR. HURFORD:  The only issue for the trial counsel is

14  whether they investigated it or not.  The issue before the

15  Court at sentencing has nothing to do with whether the

16  attorneys investigated it for ineffective assistance purposes.

17  It's whether or not the Government has met its burden of

18  establishing income, and whether or not we've met our --

19         THE COURT:  So you're going to rely on the

20  Government's proofs?

21         MR. HURFORD:  There are no -- there are no proofs to

22  rely on.  They haven't done anything here.

23         THE COURT:  Well, they have -- they have furnished

24  substantial evidence of these being capital transactions.  Not

25  just your client's returns, not just the first one, not just

1    the second one, not just the proofs submitted during the course

2    of the trial by Mr. -- with Mr. Minns' assistance, but their

3    SEC counsel, his many email communications with capital

4    transaction written all over it.

5            They have relied on those plus agreeing to the

6    difference between the reported numbers and the actual revenue,

7    and it seems to me they have met their burden at this juncture

8    as to the characterization of the transaction and the actual

9    figures associated with it.

10           Now, to go beyond or behind that, we need a lot of

11   additional information.  I don't know why the initial return

12   preparer reached the conclusion there were -- this was a

13   capital transaction.  I don't know where the Swiss records were

14   with respect to the stock transfers.  I don't know who

15   communicated to the defendant or anyone else about Swiss tax

16   law.  I don't know what Mr. Pavlik received in the way of

17   information or representations from the defendant.  I don't

18   know what Mr. Minns, who was sufficiently bamboozled to, quote,

19   failed to investigate the capital gains transaction.  I don't

20   know.

21           MR. HURFORD:  And the Court also doesn't have

22   evidence that James Pieron received money, which is the

23   Government's burden.

24           THE COURT:  I disagree.  It is -- he is

25   constructively in receipt of that -- of that income if the

1    underlying characterization of the transaction was capital in

2    nature.  I understand there's a debate.  It's factual, but

3    nevertheless, he appears, for all intents and purposes, in

4    sufficient control to either put it in his own bank account or

5    to put it into JDFX --

6             MR. HURFORD:  I also --

7             THE COURT:  -- so I don't see that as a material

8    point.

9             MR. HURFORD:  I think what is a material point is

10   that everything that the Government is relying on right now,

11   the tax returns that they're asking this Court to accept as

12   true, they know aren't.  They know they're wrong.

13            THE COURT:  No, I disagree.  And you -- and that is

14   where you and I are disagreeing.  There is not only substantial

15   but right on the borderline of overwhelming evidence of

16   defendant's characterization of that transaction with a lot of

17   people relying on it, including the SEC, as well as the

18   Internal Revenue Service and probably the Department of

19   Justice.  And if there are reasons why we should believe that

20   Mr. Pavlik -- I'm sorry, I always forget the first return

21   preparer's name?  She did --

22            MR. PENDERY:  Carol Nathan, Your Honor.

23            THE COURT:  Yes.  Why we should believe that they all

24   got it wrong, and that they all received the right factual

25   information from the -- from the defendant, it's not

```
 1   information we have received, and I can't go down that road
 2   until those issues are addressed factually, in my view.  I
 3   think we need to find out where Mr. Pavlik is.
 4            MR. HURFORD:  I agree with that.
 5            THE COURT:  Do you want to make some phone calls?
 6            MR. PENDERY:  I will be happy to.
 7            THE COURT:  Let's take a break, about 10 minutes, and
 8   we'll return.
 9            (At 10:04 a.m., court recessed.).
10            (At 10:16 a.m., court resumed.)
11            THE COURT:  Any luck, sir?
12            MR. PENDERY:  Yes, sir.  I contacted Jeffrey
13   Hengeveld, H-E-N-G-E-V-E-L-D, who is an attorney at Plunkett
14   Cooney, and he represents Kim Pavlik, and he told me in
15   about -- I think he almost panicked.  He said, I am really
16   sorry, you did tell me that he had to be here on the 3rd, and I
17   didn't tell my client.
18            THE COURT:  He failed to investigate.
19            MR. PENDERY:  He failed -- he failed to tell his
20   client that he had to be here today, Your Honor, and he
21   apologized to me profusely.  The only thing I can think to do
22   is -- I don't know where Mr. Pavlik is.  I don't know if
23   he's -- I know he's retired now, so I don't know if he's even
24   in the state.  He didn't either, so he was going to try to
25   contact him right away, so we may have to, I'm sorry, have him
```

1  testify at another time.

2          THE COURT:  We have every reason to believe that the

3  chink in the communication was just counsel not -- forgetting

4  to inform him of the --

5          MR. PENDERY:  That's correct, Your Honor.  At least,

6  I think it was, two to three weeks ago I called Mr. Hengeveld

7  and I said new hearing date, December the 3rd, 9:00 a.m., he

8  has to be here.  He's under subpoena to be here.  He said, I'll

9  get ahold of him, and I'll make sure he's there.  That didn't

10 happen, and he's apologetic and he'll apologize to the Court he

11 says, but this wasn't Mr. Pavlik's fault is my point.

12         THE COURT:  Sure.  I understand.

13         MR. DEPORRE:  Your Honor, there is the matter of

14 Ms. Rebeck's testimony, and Ms. Rebeck is here today, and we

15 were in the midst of cross-examination.  There was one issue in

16 particular regarding a proposed purchase of a bank, Banque du

17 Bois, and Ms. Rebeck's conclusion was that the purchase of that

18 bank was the reason for the second --

19         THE COURT:  The second five --

20         MR. DEPORRE:  The second $5 million.

21         THE COURT:  The 5 million after the payments in 2007?

22         MR. DEPORRE:  Correct.

23         THE COURT:  Agreed.  Shall we continue with the

24 testimony?

25         MR. DEPORRE:  Well, we can either do that, or -- it's

1  clear that it's not.  There's a $2.5 million deposit that's

2  made towards the bank.

3          THE COURT:  I would just let you know that the -- the

4  witness -- your -- the witness you'd like to cross-examine is

5  sitting here listening to you.  Do you want to just ask her the

6  questions on the stand rather than giving her a dress

7  rehearsal?

8          MR. DEPORRE:  Certainly, I mean -- that would be

9  wonderful.  We would like to resume cross-examination, Your

10  Honor, of Chelsea Rebeck.

11          MR. HURFORD:  I -- just for the record, Your Honor, I

12  would like to say, I don't know why they have a right to

13  cross-examine the witness.

14          MR. DEPORRE:  Your Honor, and this is --

15          MR. HURFORD:  Can I -- I'm just going to finish this.

16  We came in here.  They proceeded by proffer.  We're not allowed

17  to cross-examine a proffer.  I tried to -- I tried to get their

18  own witness on the stand to get some testimony, they resisted

19  that, so we proceeded.  We had some proffer.  We put a witness

20  on the stand to answer some questions.

21          I'm not sure -- I'm not sure if the Government wants

22  to put any other information on, I'm not sure why they can do

23  it through cross-examination at this point in time.  The Rules

24  of Evidence don't apply.  If they have information that they

25  would like to set forth, I think they can use one of their own

 1  witnesses to do it.

 2          THE COURT:  So you don't want us to believe that the

 3  last 5 million was in conjunction with the acquisition of the

 4  bank?

 5          MR. HURFORD:  Well, she already testified to that,

 6  Your Honor.

 7          THE COURT:  Right, but -- and they have some

 8  questions, too.

 9          MR. HURFORD:  Again, they may have questions, but at

10  the same time, I think they're trying to advance their case

11  through cross-examination without putting up a single witness

12  that I can cross-examine, and we have testimony from her

13  already.

14          THE COURT:  Whatever the merits of it at this stage,

15  the characterization of the transaction is based on the returns

16  and the later representations, as well as the jury conviction.

17  The amounts that they have conceded, the times at which the

18  payments were made, and so far as the Court's concerned, that's

19  all you've asked for, other than just an opportunity to peek

20  behind the characterization of the transaction, and the source

21  of that information is exclusively in your client's control.

22          MR. HURFORD:  I'm not --

23          THE COURT:  So we're back to Ms. Rebeck.  You cannot

24  pierce the Government's characterization of these as capital

25  transactions from the sale of stock by your client without

1   explaining multiple representations to many different parties.

2   The reliance that they have made on the characterization of

3   those transactions is reasonable in the absence of information

4   to the contrary.

5           We'll have Ms. Rebeck back to the stand.  She looks

6   like she's excited and is actually looking forward to returning

7   to the witness chair.

8           Good morning, ma'am.

9           THE WITNESS:  Good morning, Your Honor.

10          THE COURT:  You're aware of the fact that you remain

11  under oath.

12          THE WITNESS:  Yes, Your Honor.

13          THE COURT:  Please have a seat.

14          MR. DEPORRE:  Your Honor, as an initial matter,

15  Mr. Pendery conducted the direct examination of Ms. Rebeck, and

16  it's my understanding that when there are multiple attorneys

17  representing a client, the attorney that conducts the direct

18  examination has the witness and is in charge of objecting and

19  conducting recross, not other attorneys.  That they can pass

20  notes, but it is the attorney that directs the cross -- directs

21  the witness --

22          THE COURT:  Rather than a chorus?

23          MR. DEPORRE:  Correct.  It certainly makes it easier

24  for me, and we've tried to abide by that rule.

25          THE COURT:  I'm sure you have no difficulty with

1  that?

2          MR. PENDERY:  No, Your Honor.  No.

3          THE COURT:  Okay.

4                   CHELSEA REBECK,

5        DEFENDANT'S WITNESS, PREVIOUSLY SWORN

6             CROSS-EXAMINATION, Cont'd

7  BY MR. DEPORRE:

8  Q.   Ms. Rebeck, you testified previously that the -- that

9  there was a -- that Mr. Pieron at some point tried to purchase

10 bank.  Do you recall that?

11 A.   Yes.

12 Q.   And that in connection with that, you came to the

13 conclusion that 5.25 million that was paid from Cook to Pieron

14 was for the purchase of that bank.  Do you recall that?

15 A.   I believe so.

16 Q.   All right.

17 A.   I would like to actually clarify that.  I don't recall

18 right now without reviewing the documents again if there was

19 just a portion of that money or the entire amount.

20 Q.   Okay.  Well, I do want to spend some time with the

21 documents; and, first of all, where did Mr. Pieron get the

22 money to purchase the bank?

23 A.   I believe it was from Mr. Cook.

24 Q.   Okay.  And when did he get those funds?

25 A.   I don't recall the date.  I believe there was some in 2008

1  and possibly in 2009 but, again, I'd have to go back and review

2  the documents to look at the exact dates.

3  Q.   Whose idea was it to purchase the bank?

4  A.   I don't know, off the top of my head.  I believe there's

5  some documents in there that reflect some of the parties'

6  intent though, interview notes from the Government.

7  Q.   Okay.  So all of the information you have about the

8  purchase of that Banque du Bois deal came from documents that

9  were shown to you, correct?

10 A.   Yes.

11 Q.   You have no information from anybody else about the nature

12 of that transaction?

13 A.   I have talked to Mr. Pendery about the transaction.

14 Q.   Have you spoken -- without getting into the contents of

15 the communication, have you spoken with Mr. Pieron about the

16 nature of that transaction?

17 A.   I don't believe that him and I had a discussion about the

18 bank transaction.  I -- I'm not 100 percent sure, but I don't

19 recall a conversation about that.

20 Q.   So nothing that you concluded was informed by that

21 conversation?  If you don't even remember it, that's not the

22 basis of your conclusion, is that fair?

23 A.   No, I don't think that that's fair.  I'm -- I've had a lot

24 of conversations with everyone on the defense team, and just

25 because I don't recall the specific conversation at this

1  moment, I don't want to say that it happened or didn't happen.

2  I don't think that I can say that under oath for any -- like

3  with any certainty.

4  Q.   So you can't say what the basis for your conclusion is?

5  A.   That's not what I said.  I said that the basis for my

6  conclusion was from reviewing the documents that were provided

7  to me by the defense and by the Government and, you know,

8  exhibits that were used at trial, and I don't -- I don't know

9  if there's anything in the trial transcript that talked about

10  it.  I just don't recall.  There's, again, a lot of information

11  that we had to go through.

12  Q.   Let's go to the documents.  Would you turn on the -- to

13  tab 28 in the defendant's exhibits.

14  A.   Okay.  I'm there.

15  Q.   What is Exhibit 28?  Could you describe it -- or tab 28,

16  could you describe that for us.

17  A.   It looks like a bank statement from Credit Suisse bank.

18  Q.   All right.  Towards the end, do you also see statements

19  from UBS?

20  A.   I'm sorry, towards the end of the tab or --

21  Q.   Yeah, flip through.  There's a statement from Credit

22  Suisse.  I believe that's the first three pages.

23  A.   Okay.  I see UBS in here.

24  Q.   And then you see there are account statements for UBS and

25  if you could flip past those.

1  A.   Okay.

2  Q.   And I'm going to hand you something.  I'm going to mark it

3  as Government Exhibit 217?

4           Would you go to tab 13?

5  A.   Okay.  I'm there.

6  Q.   All right.  This is tab 13 I've marked as Government

7  Exhibit 217.  Would you describe what this is.

8  A.   It says "UBS payment abroad."  If I were to guess, I would

9  say it's a wire transfer or some sort of payment confirmation,

10 and it says that the purpose of the payment is purchase of

11 Banque du Bois, first down payment.

12 Q.   First down payment?

13 A.   Yes.

14 Q.   What's the date of the transaction?

15 A.   December 1st, 2008.

16 Q.   And what's the originating account.  Where does the money

17 come from?

18 A.   I'm sorry, you'll have to tell me where to find it.

19 Q.   All right.  I'd direct your attention under the section in

20 the left-hand column that says "payment," there's something

21 that says "ordering customer."  Could you tell us what -- who

22 the ordering customer is?

23 A.   It says ordering customer is James Pieron.

24 Q.   And then debit account?

25 A.   Bunch of letters and numbers and then UBS personal

1 account.

2 Q.   All right.  And that's right above where it says the

3 execution date, correct, of December 1st, 2008?

4 A.   Correct.

5 Q.   All right.  This money you believe came from Cook?

6 A.   That's correct.

7 Q.   All right.  Ask you now to turn to --

8        MR. DEPORRE:  Your Honor, I would move for the

9 admission actually of Government Exhibit 217.

10       MR. PENDERY:  No objection, Your Honor.

11       THE COURT:  Received.

12 BY MR. DEPORRE:

13 Q.   I would ask you to turn to Government Exhibit 138.  It's

14 in the blue folder.  I'm sorry to be switching folders on you.

15 A.   Okay, I'm there.

16 Q.   And could you describe what Government Exhibit 138 is.

17 A.   Wells Fargo transaction reports.

18 Q.   They're wire transfer records, correct?

19 A.   Looks like it, yes.

20 Q.   All right.  Now, in the -- on the top, there are page ID

21 numbers.  Do you see those?

22 A.   Yes.

23 Q.   Would you turn to the document for page ID 2422.  It's

24 Bate stamped 10849.

25 A.   Okay.

1  Q.   You've seen this before, correct?

2  A.   Yes.

3  Q.   And could you describe what that -- what that shows.

4  A.   It looks like a wire transfer for $2.1 million.

5  Q.   Who's it from?

6  A.   From Market Shot, LLC.

7  Q.   You said it's 2.1 million?

8  A.   That's correct.

9  Q.   What's the date of that transaction?

10  A.   December 8th, 2017.  I'm sorry --

11  Q.   December 8th --

12  A.   -- I'm sorry, December 17th, 2008.  The numbers are always

13  switched around on the dates.

14  Q.   It's somewhat confusing, isn't it?

15        We can agree that's after the initial deposit is made

16  to the bank, correct?

17  A.   Yes.

18  Q.   All right.  Now I'd like you to turn to Government

19  Exhibit 215 -- or, excuse me -- yeah, Government Exhibit 215.

20  Would you describe what Government Exhibit 215 is.

21  A.   It's a letter from -- I think this is the attorneys that

22  are asking for repayment of the deposit on Banque du Bois.

23  Q.   And what -- what is the amount that they're asking for to

24  be repaid?

25  A.   2.5 million.

1  Q.    Did you review this letter?

2  A.    I did.

3  Q.    I'd like you to read the first sentence, if you would,

4  after "Dear colleague".

5  A.    "Reference is made to the correspondence between our firms

6  in the above-referenced matter of February 2009.  Your letters

7  to us dated February 9th and 17th, 2009, and our letter to you

8  dated February 12th, 2009, as well as the various discussions

9  held between representatives of your client, du Bois Holdings,

10 PTE Limited, Singapore and our client, James Pieron, Zurich,

11 and his representatives" -- and goes through various meeting

12 dates.

13 Q.    All right.  So those meeting dates are somewhat important,

14 and based on this letter, the -- there were other letters --

15 there was other correspondence between Mr. Pieron's attorneys

16 and the attorneys for -- on the other side of this sale of bank

17 transaction, correct?

18         There was correspondence -- was there correspondence

19 on February 12th, 2009 from Mr. Pieron's attorneys to the

20 representatives of the bank?

21 A.    I mean, that's referenced in this letter, but I don't have

22 any way of validating that.

23 Q.    Okay.  Because you don't have those records?

24 A.    Yeah, I don't believe that I've seen any other letters

25 related to this.

1  Q.   Did you request them?

2  A.   No.

3  Q.   All right.  December 12th -- excuse me, February 12th,

4  2009, there's a demand for repayment, is that fair, as

5  referenced in this letter?

6  A.   I have no idea what the February 12th letter said.

7  Q.   Well, it does say in this letter that -- let's go to the

8  next paragraph, the first sentence there, would you read that

9  out loud.

10 A.   "In each of these meetings, Mr. Pieron requested either

11 the repayment of the entire deposit in the amount of CHF

12 2.5 million, the deposit paid on December 1, 2008, or

13 reasonable settlement and the best effort to avoid litigation."

14 Q.   Okay.  So is it fair now to say that on December 12th,

15 2009 there was a request for repayment?

16 A.   December?

17 Q.   February.  Did I say December?  I'm sorry, February 12,

18 2009, a request for repayment.

19 A.   So, I mean, that sentence says, "In each of these

20 meetings," so the meetings are referenced in the last

21 paragraph, but the correspondence dated February 9th and 17 and

22 February 12, I have no idea what those say.

23 Q.   Fair enough.  There's a meeting referenced on

24 February 17th in that first paragraph, isn't there?

25 A.   Yes.

1          THE COURT:  Sir, we're kind of back to where we have

2     been which is you, Ms. Rebeck, and I have read the letter.  We

3     can reach some -- we can all reach some reasonable conclusions

4     based on what's in the letter, but neither you nor I nor the

5     witness has any understanding of any of this information other

6     than reading the letter that you, I and she can read.

7          We can all try to draw conclusions, try to figure out

8     what was occurring because it's recorded in the letter, but she

9     doesn't know.  You don't know, and I don't know.  I mean, all

10    we're doing is sort of reemphasizing portions of that letter to

11    each other in the absence of the author, the recipient or

12    anyone else that knows anything else about the transaction.

13         So I -- there's a point at which the effort to try to

14    have this witness draw conclusions from this letter, we all

15    can -- a certain number of us in the courtroom can, but we're

16    all speculating.

17         MR. DEPORRE:  I agree with your point, and that's my

18    point as well, is that to be able to conclude that the 5.2

19    million that happens from December 17th, 2008 onward, to

20    conclude that that 5.25 million is all for the purchase of a

21    bank, when several of those transactions occur after

22    February 17th, 2009, after the repayment request of the

23    2.5 million.  That the 2.5 million, that initial deposit, is

24    made before any of the 2008 and 2009 transactions, from

25    Mr. Pieron's personal account.

1          THE COURT:  And factually you can corroborate the

2   payment dates and the demands in the letter through this

3   witness, I agree.

4          MR. PENDERY:  Your Honor, I don't know that this

5   comes from Mr. Pieron's personal account, but the 5.25 million,

6   she testified already at the last hearing, comes from Cook's

7   interview by CID, because Mr. Cook said that 5.25 million was

8   for Banque du Bois.  It's right in No. 45.

9          MR. DEPORRE:  Mr. Cook was convicted of tax evasion

10  and fraud, and they want to use his statement in furtherance of

11  the nature of the transaction when the bank records clearly

12  contradict it.  It's not a reasonable way to base your opinion.

13         MR. PENDERY:  I would disagree with that.  That --

14  that statement was taken by their agent.  That's in the record.

15  We've got it.

16         THE COURT:  It was a --

17         MR. PENDERY:  There was a $2.1 million deposit -- or

18  transfer for Banque du Bois, and it says right in 13 that it

19  was for the deposit of the bank -- to buy the bank.  It says it

20  right in the exhibit.

21         MR. DEPORRE:  And perhaps Mr. Cook believed that,

22  perhaps he did.  I don't know if he did or not, but maybe he

23  was led to believe that the money that he received after there

24  was already a request for the reimbursement, the money that

25  Cook sent to Mr. Pieron after the request for reimbursement was

1  made, was in furtherance of the purchase of the bank.  If he

2  was led to believe that, I would assume that that would have

3  been by Mr. Pieron.

4           THE COURT:  I think you're at a juncture where you

5  can ask the witness a question.  She may or may not be able to

6  answer it.

7  BY MR. DEPORRE:

8  Q.  Would you go to tab 47.

9           MR. PENDERY:  In which book?

10          THE WITNESS:  Which book?

11 BY MR. DEPORRE:

12 Q.  In your book.

13 A.  In the defense book?

14 Q.  Yeah.

15 A.  Okay.

16 Q.  Who prepared this?

17 A.  I don't know.

18 Q.  Was it you?

19 A.  No.

20 Q.  You don't know who prepared it?

21 A.  Someone from the defense team.  I don't know who

22 specifically prepared it.

23 Q.  Do you know if Ruth Murphy prepared it?

24 A.  I literally just said I don't know who prepared it.

25 Q.  Do you know who Ruth Murphy is?

1   A.   It sounds familiar.

2   Q.   Who is she?

3   A.   I don't know.

4   Q.   Okay.  She -- she -- do you know any of the other experts

5   that have been retained by -- do you know Ron Graver?

6   A.   No.

7   Q.   Do you know Fred Gavin?

8   A.   No.

9   Q.   And you haven't spoken to them about Government Exhibit --

10  or, excuse me, the defense tab 47?

11  A.   I've never spoken with them at all --

12  Q.   Okay.

13  A.   -- about anything.

14  Q.   Well, I'd like to direct your attention to 2008 and 2009.

15  I think we already have the 2008 payment date, the wire from

16  Market Shot to JDFX as December 17th, 2008.  Could we get the

17  other two, the other two dates and their amounts?

18  A.   January 23rd, 2009, 2.125 million, and May 26th, 2009,

19  1.025 million.

20  Q.   Pardon my handwriting.  There's no way that those payments

21  were made, those payments on January 23rd, 2009 and May 26th,

22  2009, were made to purchase the bank, was there?

23  A.   Why not?  I think that's absolutely possible, and if you

24  look actually at the history of the payments that are being

25  made, it appears that Mr. Pieron's sending the deposit for the

1  bank and he's getting reimbursed by Mr. Cook, so it's after the

2  fact.

3  Q.   He's getting reimbursed for what?

4  A.   For the bank, for the down payment on the bank.

5  Q.   At this point has Mr. Pieron already made a payment to the

6  bank?

7  A.   At what point?

8  Q.   In -- on January 23rd, 2009, has Mr. Pieron already made a

9  payment for the bank?

10  A.   I would have to go back and look at the exact dates.  I

11  mean, I don't remember them off the top of my head, but I know

12  that you had one payment in there so if you can direct me to

13  the other ones.

14  Q.   Sure.  We talked about the down payment on 12/1/2008.

15  A.   Yes.

16  Q.   How much was that for?

17  A.   2.5 million.

18  Q.   And then there's a demand letter, correct, on February 17,

19  2009?

20  A.   Correct.

21  Q.   How much is that -- how much are they demanding to be

22  reimbursed?

23  A.   2.5 million.

24  Q.   Okay.  2.5 million paid, 2.5 million demanded back.

25  Explain the 5.2 as opposed to 2.5.

1  A.   Well, we're missing a lot of correspondence after this

2  point, so I can only make assumptions, but what I would assume

3  is that maybe the deal started going better.  I mean, I don't

4  want to make all these assumptions about things that we don't

5  have, right?

6  Q.   But you did make an assumption.  You assumed that the

7  payment, that all these payments, were for the purchase of a

8  bank?

9  A.   I did so because Mr. Cook specifically said that, and I

10 could not come up with any reason that he would tell someone

11 that in an interview, for any purpose, unless it was factual

12 and there was information to corroborate that.  There were

13 payments.  There was the letter for the demand.

14 Q.   Did Mr. Pendery tell you that the 5.25 million was for the

15 purchase of the bank?

16 A.   No, I read it in Mr. Cook's interview notes.

17 Q.   Did Mr. Pieron tell you that the 5.25 million was for the

18 purchase of a bank?

19 A.   No, I read it in Mr. Cook's interview notes.

20 Q.   So Mr. Cook's interview notes are the sole basis that you

21 reached that conclusion?

22 A.   Along with corroborating payments and a letter showing

23 that they were buying a bank.  At least Mr. Pieron was buying a

24 bank and Mr. Cook said he was funding it.

25 Q.   The deal had already blown up?

1  A.   And, again, we can all make a lot of assumptions about why

2  that continued, but --

3  Q.   I think that's the point.  We're making a lot of

4  assumptions.

5           MR. DEPORRE:  I have nothing further.

6           THE WITNESS:  Thank you.

7           THE COURT:  Redirect?

8           MR. PENDERY:  I don't have any redirect, Your Honor.

9           THE COURT:  Okay.  Additional witnesses, defense?

10          MR. HURFORD:  Your Honor, we would like another date,

11 set so that we can arrange Mr. Pavlik's attendance.

12          THE COURT:  Sort of assumed that was coming.  All

13 right.  Let's briefly assemble in chambers.  We'll work with

14 the case manager to see what we can do with dates.  We'll see

15 you in a couple minutes.

16          You're excused from the stand.

17          THE WITNESS:  Thank you, Your Honor.

18          (At 10:48 a.m., court recessed.).

19

20

21

22

23

24

25

1                          * * * * *

2                     C E R T I F I C A T E

3        I certify that the foregoing is a correct transcript
         from the proceedings in the above-entitled matter.
4

5                          _Carol M. Harrison_

6    Date: 12-10-2019      Carol M. Harrison, RMR, FCRR
                           Official Court Reporter
7                          United States District Court
                           Eastern District of Michigan
8                          1000 Washington Avenue
                           Bay City, MI  48708
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

US v. Pieron, Jr. - Hearing - December 3, 2019