

# DEPARTMENT OF THE TREASURY
## Internal Revenue Service
## Criminal Investigation

## Memorandum of Interview

| | | | |
|---|---|---|---|
| **Investigation #:** | ███████ | **Location:** | Andrews Hooper Pavlik, PLLC<br>5300 Gratiot Rd.<br>Saginaw, MI 48638 |
| **Investigation Name:** | JAMES D PIERON JR | | |
| **Date:** | May 15, 2013 | | |
| **Time:** | 10:00-11:40 AM | | |
| **Participant(s):** | Kim Pavlik, CPA<br>Jeff Hengeveld, Attorney or AHP<br>Daniel Vela, Special Agent<br>Scott Hollabaugh, Special Agent | | |

On the above date and time special agents Vela and Hollabaugh met with Kim Pavlik at his office to ask him questions regarding the investigation of JAMES PIERON. Jeff Hengeveld, an attorney representing Andrews Hooper Pavlik, PLLC (AHP) was also present. Agent Hollabaugh explained to Pavlik that he had some follow-up questions relating to their previous interview. Pavlik provided the following information:

1. Pavlik said his first contact with PIERON regarding his personal taxes was in December 2010. Pavlik said his conversations with PIERON related to the sale of JDFX stock. PIERON told Pavlik he had other people preparing his tax returns at the time, but he wanted to get Pavlik's advice on the treatment of the stock sale. Pavlik was shown a copy of an email and a spreadsheet sent to him by PIERON on December 17, 2010. Pavlik stated he didn't review the spreadsheet very closely and couldn't make sense of what PIERON was trying to show him on the spreadsheet. Pavlik stated he thought PIERON's 2007 return had already been prepared at this time.

2. Pavlik asked PIERON for more information regarding the sale of stock, and PIERON forwarded him copies of sales documents and another spreadsheet on December 22, 2010. Pavlik said PIERON just asked him what his thoughts were for reporting the sale. PIERON said he wanted to get current with his taxes and wanted to know how to report the transaction. Pavlik said PIERON didn't mention the amount of taxes he would owe based on the way his other preparer was going to prepare his returns. Pavlik said that based on the sales document, the closing date of the sale was January 1, 2008. Pavlik said PIERON told him he received some of the $10 million in 2007 and some in 2008. Pavlik said PIERON never told him he wanted to recognize the capital gain in 2008 instead of 2007.

3. Pavlik was asked what he meant in his email response to PIERON on December 22, 2010 when he stated "If the 2007 payments are treated as deposits, and the sale closed in 2008, the whip-saw effect may be mitigated." Pavlik stated he didn't know for sure if the 2007 payments PIERON received were held on deposit. He assumed they were because of the closing date and because PIERON said he received payments in 2008. Pavlik said "the whip-saw effect" meant that PIERON was going to have a capital gain in any year the transaction was reported. Pavlik said if you have a capital gain in one year and capital losses in the next year you can't carry the capital loss back. Pavlik said "in general terms" you can't carry capital losses back to 2007 to offset gains. Pavlik said he wasn't aware that PIERON forwarded the email to his other return preparer.

4. Pavlik said he doesn't recall PIERON telling him he received the full $10 million in 2007. Pavlik doesn't recall discussing if the deposits went into an escrow account. Pavlik stated he wasn't aware that most of the money went into PIERON's personal account. Pavlik was shown a copy of a Proxy Agreement signed by Trevor Cook stating he was a shareholder of JDFX in 2007. Pavlik said he doesn't recall seeing the Proxy Agreement. Pavlik said if he knew PIERON received all of the $10 million capital gain in 2007 and Trevor Cook was a shareholder in 2007, then the sale should have been reported in 2007.

5. Pavlik stated PIERON has since given him additional facts regarding the Trevor Cook Ponzi scheme and the money he received. Pavlik said he now believes the Claim of Right Doctrine applies to PIERON's situation. Pavlik said PIERON told him the court receiver in the Cook case has been attempting to recover the money that was Ponzi scheme proceeds. Pavlik said PIERON claims he didn't have the right to the money because it was from the Ponzi scheme, thus the capital gains for 2007-2009 are a mute point. Pavlik said he may prepare amended tax returns in the future with no capital gains and any taxes paid gets applied to current tax returns. Pavlik said PIERON may have to pay taxes on forgiveness of debt if he can't pay back the Ponzi scheme money based on his solvency.

6. Pavlik said PIERON contacted him in November 2011 because he didn't feel comfortable with his original returns and he wanted Pavlik's thoughts on them. Pavlik said it was clear at the time that PIERON had not paid all of the taxes due on his original returns. Pavlik said he doesn't recall if PIERON told him he didn't have the money to pay the taxes. Pavlik said he can't recall how the idea of the theft loss was brought up. He doesn't recall if PIERON had been researching theft losses prior to contacting him. Pavlik stated PIERON gave him information that all of his money was lost and it was all directly related to a Ponzi scheme. Pavlik said he doesn't know if PIERON invested in the Ponzi scheme. Pavlik described the theft loss as a "gray area".

7. Pavlik didn't know PIERON was looking to open business locations in Michigan as early as February 2009. Pavlik said PIERON told him there was $800,000

that went into both IB Technologies, Inc. and Komplique, Inc. that wasn't lost as a result of the Ponzi scheme. Pavlik stated he didn't verify if Trevor Cook was indicted on the date PIERON put in his letter. Pavlik stated PIERON never told him he closed down JDFX and Komplique in Switzerland and moved to the United States because it was cheaper to operate in the United States. Pavlik stated PIERON never told him he lost all of his loans because JDFX had a couple of bad years financially. Pavlik didn't know IB Technologies, Inc. was a company similar to JDFX, but he did know Komplique SA became Komplique, Inc. Pavlik said PIERON told him he shut the businesses down because of the indictment and Ponzi scheme. Pavlik said it wouldn't have been a theft loss if he knew Cook's indictment wasn't the reason JDFX closed down. Pavlik said he would have told PIERON that a theft loss would have a better tax result than a capital loss.

8. Pavlik was shown a copy of the 2007-2010 spreadsheet of expenses sent to him by PIERON. Pavlik said he thinks the spreadsheet was prepared by PIERON, and it is supposed to represent 100 percent of PIERON's cash transactions. When asked if he thought the payments PIERON made to his companies were loans, Pavlik said he didn't focus on the payments as loans. He treated the money that PIERON put back into his companies as capital contributions. Pavlik said he proved out PIERON's total income by what was spent privately by PIERON. When asked why he included money lost from Komplique SA in the theft loss, Pavlik said he thought all the Swiss entities were interrelated. He treated all payments to the Swiss entities as part of the theft loss. Pavlik said PIERON didn't tell him Komplique went under because of the Ponzi scheme, he just assumed it did.

9. Pavlik said PIERON never told him about any management or performance fees he earned from his management of JDFX Fund. Pavlik said PIERON was aware of the FBAR filing requirement when he first came to AHP because he told them he wanted to get current on his FBAR filings. Pavlik said it was clear that PIERON's other preparer didn't file FBAR's. Pavlik said as far as he knows, the list of foreign bank accounts PIERON gave him was complete. Pavlik said there was never any intent not to file the FBAR's, there were just issues for PIERON to accumulate the information. The completed FBAR's were mailed to PIERON and there was no other discussions regarding them since.

10. The interview ended at approximately 11:40 a.m. and Pavlik left the conference room. At approximately 12:18 p.m., Pavlik came back into the conference room to clarify that it didn't matter if the capital gain was reported in 2007 or 2008. He stated the theft loss would have reduced the gain in either year and the tax consequence would have been the same.

I prepared this memorandum on May 16, 2013, after refreshing my memory from notes made during and immediately after the interview with Kim Pavlik.

Scott Hollabaugh
Special Agent

Daniel Vela
Special Agent