```
 1                IN THE UNITED STATES DISTRICT COURT

 2                    EASTERN DISTRICT OF MICHIGAN

 3   UNITED STATES OF AMERICA        )Bay City, Michigan
                                     )December  20, 2019
 4      vs.                          )9:09 a.m.
                                     )
 5   JAMES D. PIERON, JR.,           )
                                     )Case No. 18-20489
 6      Defendant.                   )
     _____   )

 7

 8                      TRANSCRIPT OF HEARING
               BEFORE THE HONORABLE THOMAS L. LUDINGTON
 9                 UNITED STATES DISTRICT JUDGE

10   APPEARANCES:

11   For the Government:   JANET L. PARKER
                           JULES DEPORRE
12                         United States Attorney
                           Eastern District of Michigan
13                         101 First Street
                           Suite 200
14                         Bay City, MI 48708

15   For the Defendant:    PATRICK J. HURFORD
                           MARK S. PENDERY
16                         Honigman, LLP
                           660 Woodward Avenue
17                         Detroit, MI  48226

18

19

20

21   Court Reporter:    Carol M. Harrison, RMR, FCRR
                         1000 Washington Avenue
22                       Bay City, MI  48708

23

24            Proceedings reported by stenotype reporter.
           Transcript produced by Computer-Aided Transcription.
25
```

```
 1                          I N D E X

 2
    WITNESSES FOR THE DEFENDANT:
 3
    KIM PAVLIK
 4      Direct Examination By Mr. Hurford              9
        Cross-Examination By Mr. Deporre              81
 5


 6

 7  EXHIBITS:                                        RCVD

 8   DX 3     Initial 2008 Return                      15
     DX 4     Initial 2009 Return                      15
 9   DX 5     2008 Amended Return                      32
     DX 6     2009 Amended Return                      32
10   DX 24    Offer in Compromise                      65
     GX 48    2009 Amended Return                     100
11   GX 65    Saxo Bank Record                        121
     GX 66    Spreadsheet                             111
12   GX 201   2008 Stock Sales Transaction            83
     GX 202   2009 Stock Sales Transaction            83
13   GX 202A  Revised Share Purchase Agreement        94
     GX 203   Email from Pavlik to Pieron             84
14   GX 204   Letter from Pieron                      137
     GX 206   Amended 2011 Return                      65
15   GX 220   Letter                                 135

16

17

18

19

20

21

22

23

24

25
```

```
1              P R O C E E D I N G S

2          (At 9:09 a.m., proceedings commenced.)

3          (Defendant present.)

4          THE CLERK:  United States of America versus James

5  Pieron, Case No. 18-20489.

6          THE COURT:  Good morning, counsel.  If we could have

7  introductions, please.

8          MR. DEPORRE:  Good morning, Your Honor.  Jules

9  DePorre on behalf of the United States.

10         MS. PARKER:  Janet Parker also on behalf of the

11 United States and with us is Scott Hollabaugh, special agent

12 for the IRS.

13         THE COURT:  Good morning.

14         MR. HURFORD:  Patrick Hurford on behalf of defendant

15 James Pieron.  For the record, defendant James Pieron is

16 present.

17         THE COURT:  He is indeed.

18         MR. PENDERY:  Mark Pendery on behalf of the

19 defendant, James Pieron.  Good morning.

20         THE COURT:  Good morning.

21         MS. PARKER:  Judge, can we have identification of the

22 fourth person over there, please.

23         MS. DUGGAN:  Shannon Duggan on behalf of James

24 Pieron.

25         THE COURT:  Good morning to you.
```

US v. Pieron, Jr. - Hearing - December 20, 2019

1           MS. DUGGAN:  Good morning.

2           MR. HURFORD:  Ms. Duggan, for the record, is an

3    associate at the law firm of Honigman.

4           THE COURT:  Indeed.

5           Do we have a witness available?

6           MR. HURFORD:  We do have a witness available, Your

7    Honor.

8           THE COURT:  I did note that you had filed a motion

9    this last evening.

10          MR. HURFORD:  Yes.  And let me -- let me also

11   apologize, Your Honor.  The reason that I filed that motion was

12   based on things that happened on Monday of this week, and in a

13   perfect world, that brief should have been filed earlier than

14   last night, but I've been on the road and in federal court in

15   Detroit, and I got that brief filed as soon as I could.

16          THE COURT:  Whose courtroom?

17          MR. HURFORD:  I was -- I was -- yesterday I was in

18   front of Judge Magistrate Stafford and then -- on a detention

19   hearing, and then that was appealed to Judge Tarnow, so I was

20   in court from nine until about 4:30 yesterday.

21          THE COURT:  I'll let him know that you believe that

22   to be an imperfect world.

23          MR. HURFORD:  It's not, Your Honor.  I will tell you,

24   as a former prosecutor, that would have been an imperfect

25   world.  As a now defense attorney, it was not an imperfect

1  world yesterday.  The system worked remarkably well.

2          THE COURT:  Indeed.

3          Respectfully, I believe that, to a large extent, the

4  issue that you have raised will in substantial part be

5  addressed by your witness today.  Would you agree?

6          MR. HURFORD:  I don't agree, Your Honor, and it might

7  just be because I'm not understanding the Court's mindset right

8  now because --

9          THE COURT:  Well, my understanding is that your

10 client included the full 15 million and change in his 2008

11 return.

12         MR. HURFORD:  That's correct.

13         THE COURT:  But it's not right?  It's incorrect?

14         MR. HURFORD:  Well, I think that's what your order

15 said.

16         THE COURT:  Indeed.  All I'm explaining to you is the

17 fact that it seems to me that we need to learn why your client

18 reported it in 2008 if that's not right.

19         MR. HURFORD:  And that's where I'm having a hard

20 time, because all we're left -- all we have at this entire

21 theft loss hearing is the Government saying there's a 2008

22 capital gain of 10 million and the Government saying there's a

23 2009 capital gain of 5.25 million.  We know that there's not a

24 capital gain of 10 million in 2008.  All they're left with is a

25 $5.25 million capital gain in 2009.

1          And Ms. Rebeck testified that because there's a

2    liquidation event in 2009, there's no set of circumstances

3    where a 5.25 capital gain in 2009 creates tax liability.  So I

4    don't see why we need any information from Mr. Pavlik at this

5    point in time.  The Government hasn't met its burden, and theft

6    loss hasn't been -- the theft loss that they've proved is zero.

7          THE COURT:  Perhaps.

8          MR. HURFORD:  That's -- that's why I'm having a hard

9    time understanding why anything Mr. Pavlik says is relevant for

10   purposes today.

11          THE COURT:  Well, because it might explain why it

12   showed up on the return your client submitted to the Internal

13   Revenue Service.

14          MR. HURFORD:  And I guess if we're already saying

15   that he doesn't have a 2008 capital gain based on the

16   $10 million sale purchase agreement --

17          THE COURT:  I suspect that we will find that it's as

18   a result of a practical and pragmatic effort to capture the

19   transaction in 2008 because it was not included in the 2007

20   return, but I'm speculating.  We'll find out today.

21          Your first witness.

22          MR. HURFORD:  Mr. Pavlik.

23          THE COURT:  Please.

24          Good morning.

25          MR. HENGEVELD:  Good morning, Your Honor.  For the

1    record, I'm Jeff Hengeveld, attorney for Mr. Pavlik.

2              THE COURT:  Good morning, Mr. Pavlik.  Give you a

3    little bit of background on the way the courtroom operates.

4    This chair over here is the witness chair in this courtroom.

5    If you could stop for just a moment, raise your right hand.

6              (At 9:14 a.m., sworn by the Court.)

7              THE COURT:  Please have a seat.

8              MR. HURFORD:  Before we get just -- I just want to

9    get -- there's just a couple things before I start questioning

10   the witness.  Is there a Government exhibit binder that the

11   witness can use, because I will make reference to some of the

12   Government exhibits.  Thank you.

13             Also, Your Honor, before I get started today, we've

14   had a Government binder, and we've been referring to exhibit

15   tabs, and the defendants have a binder and they've been

16   referring to exhibit tabs, and we really haven't moved anything

17   into evidence at this hearing.  I know the Rules of Evidence

18   don't apply at this hearing, but for housekeeping, I want to

19   make sure that our record is clear.

20             I was going to -- as we go through with Mr. Pavlik,

21   most of the stuff that we actually wanted to make a clear

22   record of, I was just going to mark those exhibits.  I can

23   refer to what tab they're in, but I was going to mark those

24   exhibits and move them into evidence or whatever other manner

25   the Court thinks is appropriate for our circumstances.  I just

1  want to do it the right way.

2      THE COURT:  I just want to make sure that the record

3  referenced by the witness to a particular exhibit is clear.

4      MR. HURFORD:  I do, too.

5      THE COURT:  Yeah.

6      MR. DEPORRE:  We would have some concerns about

7  foundation for some of the proposed exhibits the defendant has

8  labeled and so, you know, there have been tabs that have been

9  marked where Ms. Rebeck testified, for instance, about I

10  believe tab 27.  No one's ever come in and explained who

11  prepared tab 27.  In fact, she didn't know, so we would have

12  strong reservations against the Court considering all of the

13  evidence that's been discussed so far.

14      THE COURT:  And any question with respect to the, for

15  example, authenticity of any materials we can raise document by

16  document as we receive the testimony.

17      The key thing from my perspective is that we have a

18  reference to the document that would enable the appellate court

19  to get to the exhibit.

20      MR. DEPORRE:  The Government is just concerned about

21  retroactive admission where --

22      THE COURT:  Sure.

23      MR. DEPORRE:  -- there's something mentioned and then

24  it's never -- it's never -- there's never any -- there's

25  mention of it, it's addressed as tab 27, and it's referenced

1  for the Court of Appeals, but there's never any connection

2  between that and the witness other than, you know, I looked at

3  the spreadsheet somebody else made.

4          THE COURT:  Something that someone gave me?

5          MR. DEPORRE:  Yes.

6          THE COURT:  I'm quite familiar with it.

7          You may proceed, sir.

8          MR. HURFORD:  Thank you.

9                         KIM PAVLIK,

10           DEFENDANT'S WITNESS, SWORN AT 9:14 A.M.

11                     DIRECT  EXAMINATION

12  BY MR. HURFORD:

13  Q.   Could you identify yourself for the record, please.

14  A.   Kim Pavlik.

15  Q.   And did -- I'm sorry, maybe I was -- was the witness

16  sworn, in, Your Honor?

17          THE COURT:  He was.

18          MR. HURFORD:  Thank you.

19  BY MR. HURFORD:

20  Q.   And are you employed?

21  A.   I'm currently retired.

22  Q.   And what are you retired from?  Can you just give us your

23  background.

24  A.   The accounting firm of Andrews, Hooper, Pavlik, and I --

25  do you want me to go through my career or just my firm.

1  Q.   Well, why don't you tell me what you did for a living and

2  how you got there and what your jobs were.

3  A.   I started out with a large accounting firm of Ernst &

4  Ernst in 1977, worked there, became the director of tax for the

5  Saginaw office of Ernst & Ernst.  Became a partner in what was

6  then Ernst & Young after various mergers in 1990, and then in

7  1993, I along with two other of my partners bought the Saginaw

8  and Lansing offices of Ernst & Young and formed our own firm,

9  Andrews, Hooper and Pavlik, and worked for that firm from 1993

10 until I retired at the end of 2018, other than any special

11 projects, such as this one.

12 Q.   And during the course of your career that you just

13 described, what kind of work were you doing?

14 A.   Again, I started out as director of tax, did various --

15 mostly tax work.  I started out doing audit work, but mostly

16 tax work, you know, fairly high level tax work, again, as the

17 director of tax of the Ernst office, and then a tax partner at

18 Andrews, Hooper & Pavlik.  Worked on corporate individual

19 returns, various IRS appeals cases, a lot of different cases

20 over the years in various tax matters, corporate and

21 individual.

22 Q.   And when you say IRS appeals tax cases, or -- I don't want

23 to put words in your mouth.  You said something about appeals

24 tax cases, what is that?

25 A.   Various times when a taxpayer is audited, and if you can't

1    come to a resolution of all the issues with the audit agent,

2    then you file for an appeals process and then it goes to -- it

3    would go to an appeals officer, and then gets argued at the

4    appeals level, and then the appeals officer makes a final

5    decision on the case, the merits of the case, and what happens

6    with the ultimate resolution.

7    Q.    And how often have you had that happen in the course of

8    your career?

9    A.    I don't have an exact number, but it would be, you know,

10   fairly significant number, 20 to 50, in that range.

11   Q.    Okay.  And during this appeals process, are you speaking

12   with the IRS?

13   A.    Yes.

14   Q.    How does that work?  Can you just describe that process to

15   the Court.

16   A.    Generally, you put your findings in a written document to

17   file the appeal and then have a face-to-face meeting with the

18   appeals officer discussing the various issues related to the

19   case, and, you know, make your argument, and the appeals

20   officer makes a final decision after hearing all the different

21   arguments that you make regarding your case.

22   Q.    And have you been successful in your appeals cases?

23   A.    I believe I've been very successful in those cases, yes.

24   Q.    Why do you say you've been "very successful?"

25   A.    Again, a lot of cases, and some of them were -- some of

1  them were small, some of them were significant, you know,

2  multimillion dollar cases, and I've never had a case that I

3  would have ever settled for less than -- anywhere less than

4  half of the original amount assessed.  And, again, there's only

5  one case in my career where we didn't settle an appeal.  It

6  went to tax court, and then it was settled before it actually

7  went to tax court, and that was a favorable settlement also.

8  Q.    Well -- you said that was only one case?

9  A.    Yes.

10 Q.    Well, but you're familiar with Mr. Pieron, right?

11 A.    Yes.

12 Q.    He's sitting right here, correct?

13 A.    Correct.

14 Q.    Is he not one of your cases that didn't get resolved?

15 A.    It didn't get resolved, but it never went to the appeals

16 process.  It went directly to the criminal case; and, again,

17 I've never had another one that was a criminal case -- I've

18 never had another one that didn't have the opportunity to go to

19 appeals to argue the merits of the case.

20 Q.    And did you -- did you try to go through that process for

21 Mr. Pieron?

22 A.    We were never given the opportunity.  We tried different

23 things, an offer in compromise, which would have -- would have

24 been the normal case where you would say, here is my offer to

25 try and settle the case and have the opportunity to meet with

1  an appeals officer, but that was not acted upon by the IRS.

2  They didn't act on that request of offer in compromise.

3  Q.   Okay.  Let's back up just a little bit.  You said you're

4  familiar with James Pieron.  How are you familiar with him?

5  A.   Started doing the work for a company that he had an

6  ownership, partial ownership, in in -- I don't remember the

7  year, and then he called me and asked me some individual tax

8  questions, and then I started to assist him on his individual

9  tax returns at that point.

10 Q.   Do you remember when he first contacted you?  I'm sorry,

11 do you remember when Mr. Pieron first contacted you?

12 A.   I -- to the best of my recollection it was in late 2010.

13 Q.   And do you -- sitting here today, do you know whether late

14 2010 was before or after he filed his initial returns for 2008

15 and 2009?

16 A.   I do not.

17 Q.   Okay.  Could you please turn -- I'm going to refer to two

18 exhibits.  It's going to be tabs 3 and tabs 4 of the black

19 binder in front of you; and, for the record, I'm going to

20 identify what they are.  Tab 3 is a 1040 2008 return signed by

21 James Pieron and Carol Nathan and dated January 7th of 2011.

22         MR. HURFORD:  For the record, for today's purposes,

23 I'm just going to mark this as Defense Exhibit 1, Your Honor.

24 Your Honor, would you rather me keep the numbering consistent

25 with the tabs in the binder?

1          THE COURT:  Yes.

2          MR. HURFORD:  So I'll call this Defense Exhibit 3.

3          THE COURT:  Please.

4          MR. HURFORD:  So we're going to refer to this as

5  Defense Exhibit 3, and I'm going to move this into evidence,

6  Your Honor.

7          MR. DEPORRE:  No objection.

8          MR. HURFORD:  And I'm also going to at the same time

9  move what I'm going to -- which is tab 4 which, for the record,

10 I'm going to identify as the initial 2009 return, and I'm going

11 to label that as Defense Exhibit No. 4 and move that into

12 evidence.

13         THE COURT:  Now, I don't have the exhibits

14 immediately in front me right now.  When you say "initial", are

15 you referring to the return that would have been completed

16 by -- I believe her name was Ms. Nathan?

17         MR. HURFORD:  Yes, Your Honor.  It's the 2009 amended

18 return -- I'm sorry, the 2009 initial return that was signed by

19 Mr. Pieron and Ms. Nathan and filed on January -- in January of

20 2011.

21         THE COURT:  Okay.  I'm with you.

22         MR. HURFORD:  I'm marking this as Defense Exhibit 4

23 and moving it into evidence.  Would you like a binder, Your

24 Honor.

25         THE COURT:  I'm actually fairly familiar with the

1  exhibits at this point.  I have looked at them before.

2          MR. DEPORRE:  We have no objection --

3          THE COURT:  Received.

4          MR. DEPORRE:  -- to Defense Exhibit 4.

5  BY MR. HURFORD:

6  Q.   Can you see that those -- Mr. Pavlik, do those returns --

7  I've said that those returns were filed in January of 2011.

8  Can you review those documents and confirm that's correct.

9  A.   That's when they were signed by the tax preparer.

10 Q.   Okay.  So if you spoke with Mr. Pieron in December of

11 2010, that would have been before his initial returns were

12 filed, is that fair?

13 A.   Yes.

14 Q.   Okay.  I'm going to switch binders on you.  Well, let's

15 back up before we go there.  Mr. Pieron first contacted you,

16 you said, in December of 2010?

17 A.   That's the best of my recollection, yes.

18 Q.   What do you remember him -- do you remember what he told

19 you at that time?

20 A.   It was just a generic case, that he believed that he had a

21 large capital gain and was trying to understand the

22 implications of a large capital gain and then a subsequent

23 large capital loss.

24 Q.   And did he express any concern with the people that were

25 preparing his initial tax returns?

1    A.    He seemed to not have confidence in the preparers.

2    Q.    Do you remember anything about that con -- you said he

3    seemed to not have confidence, but do you remember any

4    specifics?  I know it's a long time ago.

5    A.    I don't remember any more specifics than that.

6    Q.    Okay.  And what do you remember happening after this

7    initial phone call?

8    A.    Nothing happened until again I -- again, I believe, again

9    it's been a long time, late in the following year, 2011, where

10   he contacted me again and asked more specific questions and

11   wanted me to take a look at those tax returns.

12   Q.    Okay.  And you -- did you take a look at those tax

13   returns?

14   A.    Yes.

15   Q.    And do you remember what happened after you looked at

16   those tax returns?

17   A.    We subsequently, after discussions and getting information

18   from Mr. Pieron, we filed amended returns, and sometime in I

19   believe the first quarter of 2012 for --

20   Q.    In fairness, so you don't have to guess, I will show you

21   those.  I'm not trying to trick you today at all.

22          Okay.  So let's go back.  So you -- you get called in

23   December.  Tax returns are filed like a month -- about a month

24   later, January of 2011, or at least they're dated.  You don't

25   know exactly -- right, you weren't -- you're not a witness to

17

1  the actual filing?

2  A.    Right.

3  Q.    And then at some point later in 2012 he contacts you

4  again, gives you information and you amend his tax returns for

5  2008 and 2009?  Did I -- did I get that right?

6  A.    Yes, other than I think the initial contact was in late

7  2011, we filed the amended returns I believe in that -- in

8  2012.

9  Q.    I'm sorry, what part of the timeline did I get wrong?

10  A.    You said he contacted me in 2012.  I believe, I don't know

11  for sure, but I -- the contact, the subsequent contact, might

12  have been late 2011, and then accumulating information to file

13  amended returns in early 2012.

14  Q.    Understood.  But the first conversation we had was in

15  December of 2010 --

16  A.    Correct.

17  Q.    -- before the initial returns are filed?

18  A.    Right.

19  Q.    And then there's other conversations that happened

20  afterwards, culminating in amended returns?

21  A.    Correct.

22  Q.    Okay.  So let's just go back a little bit to the very

23  beginning when you -- the initial contact.  I'd like you to

24  turn to tab 56 in the Government's binder.  This is Government

25  Exhibit 56.  I don't have a record of them actually moving it

1   into evidence.

2            MR. PENDERY:  It was.

3            MR. HURFORD:  Was it moved into evidence?  I assume

4   you don't have an objection to this exhibit, but I don't want

5   to --

6            MR. PENDERY:  It was, Your Honor.  At the trial it

7   was admitted as an exhibit.

8            MR. DEPORRE:  I agree.  My records indicate it was an

9   exhibit at trial.  I have no objection.

10            MR. HURFORD:  Okay.  I'm sorry, I meant was it moved

11   as an exhibit for this hearing.  I'm sorry.  I didn't mean for

12   trial purposes, but -- so I'd like to move exhibit --

13   Government Exhibit 56 into evidence for purposes of this

14   hearing.

15            THE COURT:  Your partner indicated that it's been

16   admitted.

17            MR. HURFORD:  It has?  For this hearing?

18            MR. PENDERY:  No, I don't know.

19            MR. HURFORD:  He's saying for trial but not the

20   hearing.  I'm --

21            THE COURT:  It's admitted for purposes of the

22   hearing.

23            MR. HURFORD:  Thank you.

24   BY MR. HURFORD:

25   Q.   So this is a tricky one here, and it kind of goes in

1  reverse chronological order, so we're going to start at the

2  back.

3  A.   How many pages back?

4  Q.   Well, why don't you go to the very last page and we'll

5  work back.

6  A.   Page 23 is that -- am I --

7  Q.   Why don't you go to -- give me one moment, Your Honor, I

8  apologize.

9        Okay.  So do you see at the bottom of the page is

10  where there's an ATSI stamp?

11  A.   Yes.

12  Q.   Can you go to the one that's stamped 19, please.

13  A.   Okay.

14  Q.   There's an entry it's -- and for the record I'm -- I

15  believe these were entered into trial, and I don't want to

16  misstate what -- anything, so I'll have the Government correct

17  me, but I believe these are notes from ATS that were entered

18  into evidence at trial by the Government containing notes of

19  people that worked on Mr. Pieron's initial 2008, 2009 tax

20  returns, so I'll just clarify that for you for the record.

21        The 12 -- December 2nd, 2010 at 1:10 p.m. there's a

22  note here -- it's the page that's marked 19, ATS 19.

23        Client called -- it says -- I think it's an

24  abbreviation for client.  Client called, again discussing the

25  tax returns.  Big 15 million cap gain in 2007.  But to get

 1  Carol Nathan, and then it says -- I'm reading it verbatim.  I'm

 2  not sure it's correct English.  It says, but to get Carol

 3  Nathan that had to spend money through 2007, 2008 and 2009.

 4  Will owe big for 2007.  He wants to take losses in 2008 and

 5  2009 and carryback to 2007, but can't carryback capital losses,

 6  only business losses.  He still insists that it is a capital

 7  gain, but from what I know, he can only take the money put back

 8  to acquire the gain in 2007.  Can you read that?

 9  A.    Yes.

10  Q.    Do you understand that?

11  A.    I see that.

12  Q.    Did -- when were you working with James Pieron, did he

13  ever tell you that he received actual capital gain money, the

14  transfers of monies, in the year other than in 2008 or 2009?

15  A.    Not that I recall.

16  Q.    Do you recall whether you were aware of the fact that

17  money for stock transactions with Market Shot, LLC came in in

18  2006 and 2007?

19  A.    I didn't have the detail at that time.

20  Q.    Let me ask the question a different way.  Were you aware

21  that money -- there was -- there was capital gains in 2008

22  listed on the initial returns of $10 million; is that correct?

23  A.    There was -- I don't remember the amount but, yes, there

24  was a capital gain on the 2008 and 2009 returns.

25  Q.    So I just want to talk about 2008 for a second.  Did --

Pavlik – Direct

1  were you aware that the money for that 2008 capital gain

2  actually was received in 2007?

3  A.   Yes, I believe I became aware that some amount of that

4  money was received before the date of the transaction, which

5  was January 1st, 2008.

6  Q.   Okay.  There was -- there was some decision that was made

7  to put that money, that was received in 2007, as a capital gain

8  in 2008; is that correct?

9  A.   Yes.

10 Q.   Do you remember why that decision was made?

11 A.   Again, at that time, the documents that I was provided

12 showed the effective date of the transaction being January 1st,

13 2008 for one of the transactions and January 1st, 2009 for a

14 subsequent transaction.

15 Q.   Fair enough.  But in terms of -- that's the case, and I'll

16 say that.  Those documents I believe you've stated accurately.

17         Let me ask this question though:  Even though those

18 documents existed, was James Pieron telling you that he -- or

19 that he or JDFX actually got the money for those -- for those

20 sales of stock based on those share purchase agreements, did he

21 actually tell you he got the money in 2006 and 2007?

22 A.   I don't recall the 2006, but he did say that some of the

23 money was received prior to October -- or January 1st, 2008,

24 the effective date of the transaction.

25 Q.   Okay.  So I want to switch exhibits with you, and this is

1  going to be Government Exhibit 203, so it's going to be that

2  tab in your binder.

3          THE COURT:  Perhaps we can have the witness identify

4  the documents he was referring to as a predicate for inclusion

5  of those funds in the '08 return, because I don't believe that

6  you will find they're in your client's '07 return?

7          MR. HURFORD:  I would like to potentially get there,

8  Your Honor.

9          THE COURT:  But the -- the witness's reference is to

10 a particular set of documents, and for the record to be clear,

11 I think it's important that we know what he is referring to

12 because it's important to both not only the timing of the

13 transactions, but also the characterization of the

14 transactions.

15         MR. HURFORD:  I understand what the Court's saying.

16 I think there's two things here.  One, this witness has some

17 information based on things Mr. Pieron told him.

18         THE COURT:  Sure.  But he's also referring --

19         MR. HURFORD:  Yes -- I'm sorry.

20         THE COURT:  -- to some documents, and I'd like the

21 record to reflect what he is referring to.

22         MR. HURFORD:  Understood.  So let's do this for the

23 Court.  Although I think that the timing is a little askew in

24 terms of when he received documents.  I was actually going to

25 go really quickly to 2010, and if you give me just a little --

 1   a couple minutes, I can circle back and fill you this record.

 2            THE COURT:  Certainly.

 3            MR. HURFORD:  Thank you, Your Honor.

 4   BY MR. HURFORD:

 5   Q.   So Government Exhibit 203, I'm going to move that into

 6   evidence right now, Your Honor.

 7            Can you take a minute and look at Government

 8   Exhibit 203 and let me know when you've had a chance to review

 9   it.

10   A.   Okay, yes.

11   Q.   So I'd like you to look at the second paragraph, and first

12   let's talk about, this is an email from you to James Pieron; is

13   that correct?

14   A.   Yes.

15   Q.   And it's dated December 22nd of 2010?

16   A.   Correct.

17   Q.   And this is consistent, you said you had had conversations

18   with James Pieron in that time period?

19   A.   Yes.

20   Q.   This is before the 2008 and 2009 initial returns are

21   filed; is that right?

22   A.   Yes, based on the --

23   Q.   Okay.  You say --

24   A.   The date.

25   Q.   You say:  "However, I did have another idea.  Based on the

1  sale document you supplied, the closing date of the first sale

2  of 20 percent was January 1st, 2008."

3  A.    Correct.

4  Q.    "If the 2007 payments are treated as deposits, and the

5  sale closed in 2008, the whipsaw effect may be mitigated."

6  A.    That's what it says.

7  Q.    So there's a couple things I would like to talk to you

8  about in this paragraph, but the first thing is:  You're aware

9  in December of 2007 that there are 2007 payments that are

10 included in 2008 capital gains, correct?

11           MR. DEPORRE:  Objection, leading, Your Honor, and I

12 object because I think the question was not accurate.

13           MR. HURFORD:  Well, let me ask the question

14 accurately, and then maybe we can get to the leading objection.

15 At least let me get that part right, Your Honor.

16 BY MR. HURFORD:

17 Q.    So you're aware that in 2000 -- you're aware -- as of

18 December 2010, you're aware that money, 2007 payments, are made

19 and as a result of those 2007 payments, there's capital gains

20 being reported in 2008?

21 A.    Because the document was dated January 1st of 2008, and

22 that is correct.

23 Q.    I agree.  I get it.  The sale purchase agreement is dated

24 in 2008, but you're aware that payments, in accordance with

25 that sale, that share purchase agreement to sell stock, you're

 1  aware in December of 2010 that some of the payments for that,

 2  at least some of them, were in 2007?

 3  A.   Based on this, yes.

 4  Q.   Okay.

 5       THE COURT:  And you might ask the witness if he's

 6  aware of the fact that they had been included in the filed 2007

 7  return.

 8  BY MR. HURFORD:

 9  Q.   Were you aware of whether the payments that we're talking

10  about, these 2007 payments, were included in his 2007 return?

11  A.   I don't recall if I was aware of that specifically at that

12  time.

13  Q.   Okay.  Are you aware of it now?

14  A.   Yes.  They were not included in the 2007 return.

15  Q.   Okay.  And you said -- in the last sentence of that first

16  paragraph you said, "If the 2007 payments are treated as

17  deposits," was -- was the idea of treating 2007 payments as

18  deposits your idea?

19  A.   No, not specifically because, again, the transaction was

20  dated January 1st, 2008.  I assumed that anything received

21  before that had to have been a deposit.

22  Q.   You assumed it was a deposit -- had anyone -- had anyone

23  up until this point in time, in your mind, assumed they were

24  deposits?

25  A.   I don't know the answer to that.

1  Q.    Because the 2008 and 2009 tax returns hadn't been filed

2  yet, correct?

3  A.    I didn't know they hadn't been filed at the time of this.

4  Q.    So you didn't know that -- you didn't know that ATS had

5  taken any position as to whether capital gains were in 2007,

6  2008 or 2009?

7  A.    What is ATS the --

8  Q.    I'm sorry, yes, the service that did the first returns.

9  A.    I don't recall if I had that, you know, the information at

10  the time of this email.  I don't believe I did.

11  Q.    I guess what I'm trying to understand is, you're not aware

12  of -- it's one thing to say, hey, I've got these tax returns

13  and they claim this income -- these as 2008 capital gains and

14  now I'm kind of stuck with it, but you're saying you didn't

15  even know about this, so you're not even aware about that

16  position at this time.  So what made you come up with the

17  concept of taking 2007 money and calling it 2008 gains?

18  A.    Again, I don't know if I had preliminary versions of those

19  returns at this time or not.  I just don't recall the, you

20  know, the information I had at the point I did this email.

21  Q.    Okay.  The second thing that I wanted to talk -- maybe

22  it's the third, I'm sorry -- about this is why would you need

23  to characterize 2007 payments -- what advantage could it

24  possibly give you why -- in classifying these 2007 payments as

25  2008 capital gains?

1  A.   There would be no advantage of 2008 versus 2007.  As it

2  turned out, there would be no advantage of that.

3  Q.   Well, not as it turned out at the time.  Because you refer

4  to this whipsaw effect being mitigated, what I'm trying to

5  understand is, in December of 2010, what effect is being

6  mitigated by calling this a deposit?

7  A.   Again, at the time, I didn't have all the facts.  When I

8  wrote this email it was very preliminary in the stage of the

9  situation, and at that time I thought there were losses in 2008

10 that would -- you know, that would offset the gain that he had

11 on January 1st, 2008.  It turned out subsequently that the

12 losses were 2009 losses.

13 Q.   Okay.  If you were going to -- let's back up for just a

14 second, and let's take a pause to get the record straight at

15 the Court's suggestion.

16         You said, when we were talking about your initial

17 discussions with James Pieron, and then you had discussions

18 with him, I assume, or communications with him between that

19 first phone call you had and the time that the amended returns

20 were filed, correct?

21 A.   Yes.  Again, not for, you know, a fair -- again, based on

22 the -- nine years ago, based on my recollection, I didn't have

23 much, if any, contact with him from December of 2010 until late

24 2011 when he gave me more information.

25 Q.   Fair enough.  And I think the Court's question was, I was

1  asking you what did James Pieron tell you, but part of the

2  telling is him showing you documents, right?

3  A.    Correct.

4  Q.    So sitting here today, do you remember what documents --

5  so there's conversations James had with you, and then there's

6  documents that James gave you, right?

7  A.    Gave me late in 2000 -- late 2011 you're saying?

8  Q.    Yes.

9  A.    That's when he would -- and, again, I don't recall exactly

10  when I first saw every document.  You know, again, this many

11  years ago, I just don't recall that, but it would be the

12  spreadsheet that showed the cash activity that I would have

13  reviewed when I got the additional information in late 2011.

14  Q.    Okay.  Other than the spreadsheet, and conversations or

15  emails you had with him, you know, passing this spreadsheet

16  along, do you remember getting anything else from him?

17  A.    Again, I don't remember the specific -- I would have

18  received at some point -- again, I don't recall when in the

19  timeline I would have received the copies that were prepared by

20  the prior accountants.  I didn't have signed copies, so I

21  didn't know the date that those were filed, but I received

22  copies of the returns from the prior tax preparer.

23  Q.    And do you -- other than what you're describing, do you

24  remember anything else that you received?  What's forming the

25  basis of you saying, you know, James told me that, you know,

29

1   that there were 2007 payments for this 2008 capital gain?

2            What -- are you -- are you -- when you're saying that

3   in court today, are you saying that based on what James told

4   you, or are you saying that based on what James told you and

5   documents that he gave you, or just documents that he gave you,

6   which one is it?  I just want to be specific.

7   A.   I can't recall exactly how I became aware of the payments

8   in 2007.

9   Q.   Okay.  But you became aware of them?

10  A.   Yes.

11  Q.   Because otherwise, if there's not payments in 2007,

12  there's no need for a deposit theory?

13  A.   Correct.

14  Q.   Okay.  And so is it fair to say that as of December 22,

15  2010, you are aware that payments were made in 2007 for some of

16  the capital gains reported in 2008?

17  A.   Yes, based on this email.

18  Q.   Okay.  And those payments ended up being characterized all

19  as 2000 -- the 2007 payments, and you're now aware of some 2006

20  payments?

21  A.   Correct.

22  Q.   Those all became reported as capital gains to Mr. Pieron

23  in 2008, is that --

24  A.   Correct.

25  Q.   -- correct?

1          THE COURT:  On the amended return?

2          MR. HURFORD:  On the initial return and the amended

3    return, Your Honor.  Although the amended -- I'm sorry, you're

4    right.  Well, the amended -- the initial return has 9-million

5    and some dollars in it.  I'm -- I think it's -- what I'm trying

6    to just capture, just from a practical perspective, is I think

7    that's the 2010 -- I think that represents the capital gains,

8    whether it's the initial returns or the amended returns.  I

9    think the 2008 numbers is trying to capture capital gains based

10   on the 2008 share purchase agreement, the $10 million

11   transaction.

12          THE COURT:  Let's go there then.

13   BY MR. HURFORD:

14   Q.   And the only point I'm trying to make with this particular

15   witness is that for that particular transaction, Mr. Pavlik,

16   would you agree that there was -- the payments for that 2008

17   transaction came in 2007 and 2006?

18   A.   Yes.

19   Q.   And despite those payments being made in 2007 and 2006,

20   they were reported as 2008 capital gains?

21   A.   Yes.

22   Q.   Sitting here today, do you think that those capital gains

23   should have been reported in 2007?

24   A.   Based on information I've had since then, yes.

25   Q.   Okay.  Let's talk about that information that you've

1    gained since then.

2            THE COURT:  You might start with showing him the 2007

3    return that was filed by the defendant with the assistance of

4    his stepfather that omitted it and see if the -- if the witness

5    was furnished that when -- at the time he's trying to make a

6    decision about how to address the '08 return.

7            MR. HURFORD:  I was just going to do a couple things

8    before I circle back to that, if that's okay with the Court.

9    BY MR. HURFORD:

10   Q.   So before I get there, let's get the amended returns into

11   evidence.  So could you turn to your -- in your binder, it's

12   the Government's binder, can you please turn to tab 5 and tab

13   6.  I'm sorry, tab 5 and six in the black binder.

14   A.   I was going to say, there is no --

15   Q.   And can you just take a second and look at those and

16   explain what -- so tab 5 I'm going to mark as Defendant's

17   Exhibit No. 5; tab 6 I'm going to mark as Defendant's Exhibit

18   No. 6.  Could you just take a second and review those documents

19   and then explain to the Court what tab -- what Defendant's

20   Exhibit 5 and Defendant's Exhibit 6 are, please.

21   A.   Yes.  They were based on the returns that I received that

22   were prepared by the prior tax preparer.  These are amended

23   returns that our firm prepared, I prepared, and signed and

24   appears to be -- the one is signed and shows the signature date

25   of January 10th of 2012.  I presume the other one was signed at

1  the same time.

2  Q.   And can you confirm that, please.

3  A.   It's not showing on the return but, yeah, showing on the

4  other page.  Yes, it does show January 10th of 2012.

5  Q.   Okay.  So Defense Exhibit 5 is the 2008 amended return

6  that was filed with your assistance?

7  A.   Yes.

8  Q.   And that was in January of 2012?

9  A.   Correct.

10  Q.   And Defendant's Exhibit 6 is the 2009 amended return filed

11  with your assistance in January of 2012?

12  A.   Yes.

13         MR. HURFORD:  I would like to move Defendant's

14  Exhibits 5 and six into evidence.

15         MR. DEPORRE:  No objection I believe they already

16  are.

17         THE COURT:  Received.

18  BY MR. HURFORD:

19  Q.   Okay.  Now, Mr. Pavlik, I also want to -- want you to turn

20  to Government Exhibit 45 in the blue binder.

21  A.   Okay.

22  Q.   Thank you.  Can you take a second and look at Government

23  Exhibit 45 and let me know if you're familiar with it.

24         MR. DEPORRE:  Your Honor, I'm going to object.

25  Government Exhibit 45 -- and I'm objecting on relevance

1  grounds -- is an installment agreement request and a collection

2  information statement which really have nothing to do with the

3  calculation of the amount that defendant owes.  It has

4  everything to do with payments and items addressed at the

5  trial, at which Mr. Pavlik was not called by either party, and

6  this exhibit has nothing to do with the issues before the Court

7  today.

8              THE COURT:  Sir?

9              MR. HURFORD:  I wish I could say I disagree with

10  Mr. DePorre, Your Honor, but that was the point that I was

11  trying to make when we started today.  Was that I don't think

12  any of this information is relevant because of the Government's

13  positions in this case and the testimony by Chelsea Rebeck that

14  there's no tax liability in 2009, if their position is that he

15  has $5.25 million of capital gains in 2009.

16              But if we're going down the road of hearing from

17  Mr. Pavlik, this is the installment agreement request that he

18  submitted along with his amended returns.  It's marked as a

19  Government exhibit.  He processed it.  It's part of the story

20  of preparing and trying deal with the IRS, and understanding

21  the positions taken, and I think if we're going to hear from

22  Mr. Pavlik, we should hear about the installment agreement

23  request.  We should hear about the offer --

24              THE COURT:  Well, can we get a little bit more

25  focused here.  The question that we have initially is why these

Pavlik – Direct                                           34

 1   transactions are characterized as the sale of stock.  Your

 2   position has been, most recently having located someone in

 3   Switzerland, that these transactions actually never took place.

 4   There was a contribution of capital in exchange for treasury

 5   stock and that Mr. Pieron never sold any stock.  So the

 6   threshold question, in my view, for this witness, who picks up

 7   the initial returns that are completed, is why -- where did the

 8   notion come that there are capital transactions occurring?

 9          And then, secondly, what information did the

10   gentleman receive from your client that convinced him that the

11   initial set of returns were wrong, and that they should be

12   amended?  And so far we're not getting very far in that

13   direction.

14          MR. HURFORD:  I can --

15          THE COURT:  Stock transfer agreements that this

16   gentleman was obviously submitted, he's made reference to them,

17   and we don't know where they came from.

18          MR. HURFORD:  Could I ask the court reporter for a

19   little bit of assistance, Your Honor.  If you don't mind, could

20   you mind reading back the judge's first question.

21          THE COURT:  No.

22          MR. HURFORD:  I was just going to ask --

23          THE COURT:  Let's go.

24          MR. HURFORD:  I was just going to ask the witness

25   exactly what you asked.

Pavlik — Direct                                          35

 1            THE COURT:  Sir, you're wasting time.

 2            MR. HURFORD:  Okay.  And there was three questions

 3   the Court just gave.  I do not mean to waste time.  I just want

 4   to make sure that I'm precise and I ask the correct question

 5   that the Court wants to hear right now.  And I think the first

 6   question you asked was, why was there a decision to

 7   characterize this as a capital gain.

 8            THE COURT:  Correct.

 9            MR. HURFORD:  Okay.

10            THE COURT:  And let's begin with the idea, because

11   we've been living with this case a little bit longer than you,

12   that somebody created some stock purchase agreements that are

13   fundamentally inconsistent with every argument that you have

14   made since you've participated in the case.  We don't know

15   where they came from.  We don't know where the initial

16   characterization of these transactions as capital transactions

17   at all came from.  We have no idea.

18            This witness at least has the ability to tell you

19   something about why he concluded that they were, in fact,

20   capital transactions, that they should be reported and that the

21   earlier returns were wrong.  Can we get there?

22            MR. HURFORD:  I'm going to ask that question right

23   now.

24   BY MR. HURFORD:

25   Q.   Do you have any information -- or you just heard the

1  judge's question.  And what everyone wants to know right here

2  is --

3           THE COURT:  Why don't you show the gentleman the

4  stock transfer agreement.  See if he's familiar with those and

5  whether it had any influence over his opinion.

6           MR. HURFORD:  That's fair, Your Honor.  I was going

7  to ask him the general question as to what influence, if he

8  ever looked into the issue of a capital transaction and he

9  can --

10          THE COURT:  Good.

11          MR. HURFORD:  -- if he has those documents in his

12  mind we'll show them to him.

13  BY MR. HURFORD:

14  Q.   So let's step back.  We're talking about a capital gain

15  right now or capital gains right now.  There's an initial

16  decision to characterizes everything that's happened as a

17  capital gain.  Do you have any information as to why these

18  transactions were characterized as capital gains?

19  A.   Again, at the time I prepared the amended returns, the

20  concern was that not all the proceeds were reported by the

21  prior preparer, and I based it on the sales documents that said

22  there was a capital gain -- or a stock sale of January 1st,

23  2008, and another stock sale January 1st, 2009, from Mr. Pieron

24  individually.

25          Subsequently I found out that the transaction really

1   was a sale of stock from the company to the purchaser, which

2   would have changed the answer, but at the time that I prepared

3   the returns, I was basing those returns based on the stock

4   transaction that showed a sale of January 1st, 2008

5   individually, and a sale January 1st, 2009.  I didn't have the

6   information that I subsequently found out, you know, many, many

7   years later that the sale actually occurred between the company

8   and the purchaser directly.

9   Q.   Okay.  Can I get those two stock purchase agreements.  So

10  in that -- could you please turn to page -- tab -- or I'm

11  sorry, tabs 10 and 11 in the black binder, please.

12          So tab 11 -- tab 10, sorry, has a sticker on it that

13  says Government Exhibit 201.

14  A.   Uh-huh, yes.

15  Q.   Can you take a second and look at that document.

16  A.   Okay.

17  Q.   Do you recognize this?

18  A.   Yes.  This was the stock sales transaction that was

19  provided to me that I based my conclusion on.

20  Q.   This is the 2008 agreement you were talking about?

21  A.   Correct.

22  Q.   And can you --

23          THE COURT:  See if we can determine who furnished it

24  and the circumstances.

25          MR. HURFORD:  Yes, I was just going to move the -- I

1  was just going to get the other one out, so we can do them both

2  at the same time, Your Honor.

3  BY MR. HURFORD:

4  Q.    And then can you turn to tab 11, please, which is marked

5  Government Exhibit 202.  And could you -- if you recognize the

6  document, can you explain what it, is please.

7  A.    Subsequent sale, the 2009 sale.

8  Q.    Okay.  This is the 2009 sale and purchase agreement?

9  A.    Yes.

10  Q.    Okay.  And are these the agreements, the stock transaction

11  agreements, you were talking about?

12  A.    I believe so, to the best of my recollection, yes.

13  Q.    And that was in regard to the question of what made you or

14  influenced the decision to call these transactions capital

15  gains?

16  A.    Correct.

17  Q.    Okay.  And can you look at -- and who furnished these to

18  you?

19  A.    Mr. Pieron.

20  Q.    Okay.  Did he send them by email, mail, do you remember?

21  A.    I do not recall that.

22  Q.    You got these at some point before you filed the amended

23  returns?

24  A.    Correct.

25  Q.    And these referred to Government Exhibits 201 and 202?

1  A.    Yes.

2  Q.    Okay.  And can you take a quick look at Government

3  Exhibit 201, please.

4  A.    Okay.

5  Q.    And can you please read the first -- the paragraph under

6  object of sale.

7  A.    "Seller hereby agrees to sell to purchaser 2 million

8  shares representing 20 percent of the equity shares of JDFX

9  Holdings AG.  The shares -- the purchaser agrees to purchase

10  from the seller the shares and qualification for dividends for

11  the first time as of the beginning year 2007 of the company

12  beginning on March 1st, 2007."

13  Q.    Do you understand that to gave shareholder rights to the

14  purchaser as of 2007?

15  A.    I didn't get that specific into it, so I don't recall

16  analyzing that.

17  Q.    Okay.  But you did -- you did analyze that when Agent

18  Hollabaugh met with you?

19          THE COURT:  Well, sir, let's see if we can

20  substantiate if the witness has any knowledge of the author and

21  specifically what representations your client made to him

22  concerning the transaction as he's handing him these particular

23  documents.

24          MR. HURFORD:  Yes, Your Honor.

25  BY MR. HURFORD:

1  Q.    Did Mr. Pieron ever tell you who the author of these

2  documents were?

3  A.    No.

4  Q.    He just provided them to you?

5  A.    Correct.

6  Q.    And did you have any conversations with Mr. Pieron about

7  these documents or -- and/or the stock transactions?

8  A.    Not that I recall, no.

9  Q.    You don't recall or -- you don't recall having them or you

10 didn't have them?

11 A.    I don't recall having them.

12 Q.    Okay.  Fair enough.

13 A.    I can't swear that I didn't have a conversation, but I

14 certainly don't recall any conversations.

15 Q.    So the only thing that you recall today about the decision

16 to treat this, the capital gains resulting from Exhibit 201,

17 which is the 2008 share -- stock and -- sale and purchase

18 agreement, excuse me, the only thing you remember about that

19 characterization of those is gains in 2008 is this document?

20 A.    Correct.

21 Q.    And you agree with me that this document says that there

22 are shareholder rights given to the purchaser in 2007?

23 A.    Yes.

24 Q.    Okay.  And when Agent Hollabaugh -- Agent Hollabaugh

25 interviewed you a couple times; is that right?

1  A.    Seems like more, but I believe it was actually three

2  times.

3  Q.    Three times.  Do you remember one time being in 2012?

4  A.    Yes.

5  Q.    And another time sometime in 2013?

6  A.    I don't recall the dates but that sounds correct.

7  Q.    At one of those meetings did Agent Hollabaugh show you a

8  proxy agreement signed by Trevor Cook?

9  A.    I don't recall that.

10  Q.    Okay.  Let me -- I might have it here.

11          Could you turn to tab 66 in your binder.

12  A.    The black binder?

13  Q.    Yes, please.

14          THE COURT:  You could ask him when he learned that

15  these transactions actually never took place, that the stock

16  agreement -- stock sale agreements were effectively invalid,

17  and misdescribed the transactions completely.  He said he

18  learned at a later period of time that it was just the issuance

19  of treasury stock and that those agreements really had no

20  connection to reality.

21          MR. HURFORD:  I agree, Your Honor.  For that specific

22  purpose I just want to get the proxy agreement into evidence,

23  and then we can move forward.  I think that's an important

24  document.

25  BY MR. HURFORD:

1  Q.   So tab 66 has -- can you turn to that page?  Have you ever

2  seen this document before, or do you recall ever seeing this

3  document before?

4  A.   I don't recall it, no.

5  Q.   I'm just going to mark this, which was tab 66, as

6  defendant's Exhibit 66 for identification purposes only and

7  then --

8        THE COURT:  Because it can't be authenticated by the

9  witness.

10        MR. HURFORD:  Can't be authenticated by the witness,

11  and although this was produced --

12        THE COURT:  You can put that on a list of documents

13  that can't be authenticated because there's no witness to

14  authenticate it.

15        MR. HURFORD:  No.  There is an interview memo that I

16  will proffer for the record, Your Honor, that was conducted.

17  It's either the 2012 or 2013, and I'll get it straight before

18  we're done here today, where the interview -- it's an interview

19  memo from Agent Hollabaugh where he shows a proxy agreement to

20  Mr. Pavlik, and I believe it's this proxy agreement, and it's

21  signed and dated in 2007.  And it's Trevor Cook assigning

22  Market Shot, LLCs voting rights for JDFX shares to Mr. Pieron

23  so that they can be voted, which is consistent with the voting

24  rights provision of the 2008 sale and purchase agreement.

25        THE COURT:  Yes.

Pavlik - Direct                                                    43

```
 1        MR. HURFORD:  And also it's -- at least I'd also

 2   proffer that it's in Mr. -- in Agent Hollabaugh's notes that

 3   Mr. Pavlik, in response to seeing this, said if he realized

 4   that shareholder rights were being transferred in 2007, the

 5   capital gains should have been recorded in 2007.

 6   BY MR. HURFORD:

 7   Q.   The Court mentioned it just a moment ago, and you did

 8   testify earlier that you subsequently became aware that there

 9   was no sale of stock, that it was an issuance of treasury stock

10   for the stock that is involved in the 2008 share purchase

11   agreement.

12   A.   Correct.  It was -- matter of semantics, but it was a sale

13   of stock, but it was sold by the -- issued by the company and

14   not issued as a sale from Mr. Pieron.

15   Q.   And how did you subsequently find out about these things?

16   A.   In preparing for these -- you know, these hearings.

17   Q.   What was said or given to you that now gives you the

18   opinion there was no sale of stock?

19   A.   I don't have the document, but there was a document that

20   was fairly clear that it was a sale -- issuance of stock by the

21   company.

22   Q.   Was that the document with the share certificates numbers

23   one through three?

24   A.   Yes.

25   Q.   That said that they were issued in 2006?
```

1  A.    Yes.

2            THE COURT:   And maybe he can explain where the

3  hocus-pocus Exhibits 10 and 11 came from or if he subsequently

4  learned why those documents were created and why they are

5  wrong, which is your position.

6  BY MR. HURFORD:

7  Q.    So that's actually a great place to go.   Let's go back to

8  Exhibits 10 and 11 for a second, and let's start with exhibits

9  10?

10  A.    Is this in the black binder or the --

11  Q.    It's in the black binder, yeah, yes, excuse me.

12  A.    Okay.

13  Q.    When you saw -- so Exhibit 10 was Government Exhibit 201,

14  and when you saw Government Exhibit 201, when you were

15  preparing to file taxes here, did you have any concerns about

16  the document?

17  A.    There were inconsistencies between the 2008, 2009 document

18  that I noted, but I just pointed those out, but the indication

19  was that the effective dates were January 1st, 2008 and

20  January 1st, 2009.

21  Q.    And what were those inconsistencies?

22  A.    I don't recall right now.

23  Q.    Were you aware at the time that -- you were aware at the

24  time that for the Government Exhibit 201, the first sale and

25  purchase agreement -- and, again, just to make the record

```
 1  clear, do you have any idea how these documents were created?
 2  A.    No.
 3  Q.    Did you have any part in creating these documents?
 4  A.    No.
 5  Q.    Do you know if James Pieron created these documents?
 6  A.    No, I do not.
 7  Q.    Did you have any discussions with Mr. Pieron at all about
 8  how these documents were created?
 9  A.    No.
10  Q.    And you were aware at this time that the money that was
11  sent for the purchase of this -- for the stock being sold by
12  Exhibit 201, you were aware at the time that that money came in
13  in 2007?
14  A.    Correct.
15  Q.    Okay.  So did you see any documentation -- so we have
16  $10 million that's being transferred prior to the execution of
17  an agreement memorializing the transfer of that money; is that
18  correct?
19  A.    Correct.
20  Q.    Based on your experience as an accountant, and seeing
21  deals like this, does that strike you as odd?
22  A.    It would be unusual, yes.
23            THE COURT:  Odd?
24  BY MR. HURFORD:
25  Q.    Well, is that concerning?
```

1          THE COURT:  I think the question is is it accurate.

2    BY MR. HURFORD:

3    Q.   Well, I don't know that it's inaccurate in terms of when

4    this was dated.  I think my question is, an investor spends

5    $10 million, and there's no document memorializing anything

6    before the money is sent.  It's memorialized after all the

7    money is sent.

8          And for me, just being a lawyer, and I assume being

9    an accountant, you wouldn't want a client sending $10 million

10   without a written agreement.  Is that -- is that -- am I being

11   fair?

12          THE WITNESS:  That would be unusual, but that was the

13   information that I was provided at that time.

14   BY MR. HURFORD:

15   Q.   So sitting here today, what -- I just want to be clear,

16   the information that you're provided about the 2008 -- and this

17   is Government Exhibit 201 -- share purchase agreement is

18   nothing more than the agreement itself?

19   A.   Correct.

20   Q.   And based on this agreement, you've already said to me

21   that there's a problem with shareholder rights being in 2007,

22   in terms of claiming this as income in 2008, correct?

23   A.   Correct.

24   Q.   And if you were shown a proxy agreement, giving Trevor

25   Cook -- or signed by Trevor Cook in 2007 giving James Pieron

1  the right to vote Market Shot's shares in 2007, you would -- is

2  it -- is your testimony today the same as I proffered it was

3  when you spoke to Agent Hollabaugh and that had you had that

4  agreement and realized that, you would have characterized these

5  as 2007 capital gains?

6          MR. DEPORRE:  Objection, Your Honor, relevance and

7  leading.  And my relevance objection goes to the fact that this

8  has to do with what he received in 2012, and what the witness

9  is here to talk about is the information that he had when he

10 prepared the return.  What could have been -- he is not here as

11 an opinion witness, hasn't been noticed as an expert witness.

12         He's -- he has filed his returns, based on the

13 information that was provided to him by the defendant.  Whether

14 or not he received later information that would -- and then we

15 would engage in hypothetical questions, is not a matter that I

16 think is properly for this witness.

17         THE COURT:  And, frankly, I don't understand the

18 question.  The question about whether or not the proxy

19 agreements were signed in a particular year for the voting of

20 the shares of stock doesn't have anything to do with the

21 characterization of the underlying transaction.

22         MR. HURFORD:  Well, this is where I'm having a hard

23 time, Your Honor, and that's because Mr. Pavlik's saying right

24 now that the reason he characterized this as a 2008 capital

25 gain was the stock agreement that he was given; nothing more.

1          And the stock agreement says there are shareholder

2    rights in 2007, and he later tells Agent Hollabaugh that if he

3    knew that there was stockholder rights in 2007, it shouldn't

4    have been claimed as a 2008 capital gain.

5          So the document that Mr. Pavlik is relying on to

6    characterize these as 2008 capital gains, by his own logic,

7    suggests that they shouldn't be characterized as 2008 capital

8    gains.

9          THE COURT:  See what the witness says.  It doesn't

10   make sense to me, but --

11         MR. HURFORD:  But I -- can I -- for this one, can I

12   ask the court reporter to read my last question?

13         THE COURT:  You can formulate a question, sir.  You

14   don't need the stenographer to go to a large degree of work to

15   assist you in developing a question.

16         MR. HURFORD:  I'm sorry, I just don't know the last

17   question I asked and whether it was answered or not, Your

18   Honor.  I can't remember sitting right here.  I'm not trying to

19   be difficult.

20         And there was an objection to it, too, so should I

21   just ask the same question?

22         THE COURT:  Ask the same question.

23   BY MR. HURFORD:

24   Q.   Okay.  So does the -- let me just ask it this way:  Does

25   the document, Exhibit 201 that you relied on in characterizing

1  this as a 2008 capital gain, is there information in this

2  document that would suggest the gains are not properly

3  categorized as 2008 gains, based on this document alone?

4  A.   I didn't analyze that at the time but, in hindsight, it

5  appears that there were indications of shareholder rights and I

6  didn't ask more questions at that point that would have likely

7  led me to believe it should have been a 2007 capital gain,

8  which, again, would have had the -- relatively the same tax

9  effect, whether it was 2007 or 2008.

10  Q.   So -- and do you have any -- can you tell us, do you have

11  any ability to tell us why there was a decision made to take

12  the gains from the 2008 sale and purchase agreement and put

13  them in 2008?  Do you have any idea?

14  A.   Again, I did it based on the document and what the prior

15  preparer had and the fact that the result would be relatively

16  the same, whether it was a 2007 transaction or a 2008

17  transaction, was my -- was my conclusion at that time.

18  Q.   And when you filed the amended returns, you took -- for

19  2008 and 2009, you took theft loss exemptions?

20  A.   Correct.

21  Q.   Okay.  And theft loss exemptions, those are -- those are

22  an ordinary loss -- those are based on an -- that's an ordinary

23  loss, correct?

24  A.   Correct.

25  Q.   And so can you just describe to the Court the theft --

1  well, what is the theft loss here, like those exemptions that

2  you take.

3  A.    Deductions.

4  Q.    Thank you.

5  A.    Again, at the time I prepared this return there was a lot

6  of -- a lot of indications from the Madoff case and so forth.

7  There weren't cases being concluded at that point in time, but

8  there were a lot of indications that -- that the rules were

9  significantly more liberal for various reasons and that theft

10  loss would be appropriate if a significant loss was the direct

11  or indirect result of a Ponzi scheme.

12        And per the discussions with the -- Mr. Pieron,

13  these -- the money was all -- ended up never really went to

14  him, it was lost, and it was an indirect result of the fact

15  that it was Trevor Cook who was involved in a Ponzi scheme was

16  the purchaser of the stock.  So my conclusion at that time was

17  that we had a position for a theft loss, and our threshold at

18  the time was at least a one-third chance of success.

19        And we believed, we being myself and another partner

20  that I consulted on this matter, believed we had a position to

21  take a theft loss for the losses that were incurred, again,

22  because Mr. Pieron never received the cash from these

23  transactions individually.

24  Q.    Okay.  When you say "Mr. Pieron never received the cash

25  from these transactions individually," what do you mean by that

1  and how did you receive that information?

2  A.   Again, that was per Mr. Pieron.  All the proceeds went

3  either directly back in the company or directly to the company.

4  I didn't follow the actual cash transactions, but the money

5  stayed in the company JDFX at the time and didn't get taken out

6  of the company by Mr. Pieron.

7          So the cash all went back into the company, and when

8  the company failed in 2009, that would have created a

9  significant loss.  The only question is whether or not that's a

10  capital loss or if it's a theft loss, and we concluded that it

11  was a theft loss at that point in 2009.

12  Q.   And --

13          THE COURT:  Let's see if we can determine from the

14  witness what he was told that led him to believe that his

15  client was a victim of theft.

16  BY MR. HURFORD:

17  Q.   I would like to ask the same question, because it was -- I

18  can't say it better.

19  A.   And, again, the question is the -- Trevor Cook invested

20  $15 million in the company.  The money that he -- were he to

21  receive the $15 million was a Ponzi scheme, so I debated

22  whether or not the claim of right was the appropriate thing,

23  which I subsequently decided the claim of right was

24  appropriate, but at that time, the $15 million was from Trevor

25  Cook, but because when all the -- again, per Mr. Pieron, when

1  all of his customers and clients found out that Trevor Cook was

2  involved in the company, the clients took out their money and

3  the banks pulled all their relationships and that resulted in

4  the company failing in 2009, so I concluded that it was an

5  indirect result of the Ponzi scheme that the company went

6  under, therefore the loss could be categorized as a theft loss

7  versus a capital loss.

8  Q.   And what you said -- we were talking about money that

9  Mr. Pieron never received individually right now.  Was that

10 communicated to you by Mr. Pieron consistently, that he never

11 received money from the sale and purchase agreement?

12 A.   Yes.

13 Q.   Was it consistently communicated to you that the money,

14 that the proceeds of this sale purchase agreement, were in one

15 way or another put in JDFX?

16 A.   Yes.

17 Q.   Yes.  And your theft loss deduction --

18          THE COURT:  Can I --

19          MR. HURFORD:  Yes, please, Your Honor.

20          THE COURT:  -- focus on a couple of things that I

21 remain curious about.  The first of which is, in addition to

22 the stock purchase agreements, what other information was

23 furnished by your client to the witness that would have

24 corroborated the sale of stock?  My recollection is that the

25 gentleman had developed some spreadsheets that got furnished to

1    the witness that would have substantiated that.

2            The second thing that I remain unclear on is once the

3    15 million is invested in JDFX, has anyone ever created an

4    operating statement, an P & L, for that enterprise that would

5    have demonstrated where at least the 15 million went?  Was it

6    lost in conjunction with a simple operating loss as the

7    business was liquidated, or were there -- were there

8    transactions whereby your client received certain funds from

9    the entity after the initial contributions.

10           So two categories from my perspective; one, any

11   additional information furnished by your client that would have

12   become the predicate for the witness amending the returns but

13   based on the assumption that there were sales of stock; and,

14   secondly, is the witness at all familiar with any of the

15   operating statements that would have reflected the use of the

16   cash once received by JDFX and its ultimate disposition and

17   liquidation of the company.

18           MR. HURFORD:  Thank you, Your Honor.

19   BY MR. HURFORD:

20   Q.   So, first of all, let's talk about the first category the

21   judge just laid out.  I apologize for referring to you as the

22   judge, Your Honor.

23   A.   Can I answer that?

24   Q.   Yes.

25   A.   You alluded to the spreadsheet.  The spreadsheet was

1  merely cash transactions, so it wouldn't corroborate that there

2  was a -- whether or not there was -- the sale of stock occurred

3  from the company or Mr. Pieron because it just showed cash

4  activity, so it wouldn't corroborate or refute that, the

5  assumption that there was a sale of stock individually.  It was

6  simply all the cash activity that occurred, and all that cash

7  activity indicated on the spreadsheet that the cash went back

8  to -- back into JDFX for those transactions.

9  Q.  Just to be clear on that, did the spreadsheet indicate

10  that the cash was in JDFX or -- let me back up.

11       When you say the cash went into JDFX, did the

12  spreadsheet give evidence of separate transactions, money

13  coming to Pieron, Pieron putting money in JDFX, or was it just

14  the money was located in JDFX?

15  A.  To the best of my recollection, it was just indicated that

16  it was in JDFX.  It didn't physically go out and then go back

17  in.  It stayed in JDFX.

18  Q.  And did that spreadsheet indicate when money went to JDFX?

19  A.  Yes.

20  Q.  And did that spreadsheet indicate that money went to JDFX

21  in 2007?

22  A.  Yes.

23  Q.  And was it the $10 million -- did it indicate that

24  $10 million had been put into JDFX in 2007?

25  A.  Yes.

 1           MR. HURFORD:  Do you have -- does the Court have

 2   anymore questions on the spreadsheets?

 3           THE COURT:  Just to confirm that they are in

 4   evidence.

 5           MR. HURFORD:  They have not been -- can I get the

 6   spreadsheet?  We will move that -- before he's done, we'll get

 7   it.

 8           THE COURT:  And to substantiate whether there are any

 9   other documents furnished by your client to the witness.

10   BY MR. HURFORD:

11   Q.   Yes.  Other than the spreadsheet that we've talked about,

12   and the share purchase agreements that we talked about, do you

13   remember any other documents being furnished to you that are

14   relevant to this issue of capital gain or theft loss?

15   A.   Not other than the originally filed returns.

16   Q.   Okay.  While we're digging up the spreadsheets, let me --

17   let me go back to the theft loss for just a moment.

18           The theft loss, you said that -- the purpose of that

19   is to capture the money that was lost?

20   A.   Correct.

21   Q.   Is it fair to say -- so was that money that Mr. Pieron

22   told you were from these transactions but placed in JDFX and he

23   never received?

24   A.   Correct.

25   Q.   So the theft loss is a way to take -- let me -- so

1  there's -- the basic problem is is that, from your perspective,

2  when you're doing these amended returns, there's a capital

3  gains transaction, correct?

4  A.    Correct.

5          MR. DEPORRE:  Objection, Your Honor.  This has been

6  very, very leading, and the defendant is -- it's the

7  defendant's witness, and so I object on leading grounds.

8          MR. HURFORD:  I'm just trying to move forward.  I'm

9  trying to be fair to him.  I'm not trying to box him in, Your

10 Honor, to anything.

11          THE COURT:  Let's go first to the question, before we

12 characterize it as a theft, that there was a loss.  Where did

13 the 15 million plus go?  Do we have operating losses before the

14 business is liquidated?  Do we have any operating statement for

15 that enterprise at all that would explain the use of the

16 $15 million worth of capital?

17 BY MR. HURFORD:

18 Q.    Are you aware of any operating statements of JDFX that

19 explain the use of the capital in terms of the money that was

20 the proceeds of these agreements going into the company?  Do

21 you know, are there anything that explains what happened to

22 that money?

23 A.    Not that I recall receiving.  Again, I base that on the

24 cash spreadsheet that showed that the cash did not go to

25 Mr. Pieron and he had -- and I know it was reviewed by the IRS,

1  the cash activity, and there was never any indication that

2  there was any -- anything received by him individually and that

3  nothing got distributed out.  There was no -- nothing left for

4  JDFX when it was liquidated in 2000 -- late 2009.

5  Q.   Okay.  So I would like you to turn to Government

6  Exhibit 18, the blue binder.

7  A.   Okay.

8  Q.   Can you tell -- do you recognize Government Exhibit 18?

9  Do you know what it is?

10  A.   It's an account transcript, but I haven't analyzed it.

11  Q.   And what account transcript is it?

12  A.   For Mr. Pieron for 2008 tax year.

13  Q.   Okay.  And if you go to the second page, a little more

14  than halfway down in the left-hand column there's an entry that

15  starts with 977.  Do you see it says amended return filed?

16  A.   Right.

17  Q.   January 30th of 2012.  Is that the amended return you

18  filed for Mr. Pieron?

19  A.   I presume so.  We would have filed it in January of 2012.

20  Q.   And then if you go down to line -- it says 290, additional

21  tax assessed, and it says November 19th of 2012.  Do you see

22  that?

23  A.   Yes.

24  Q.   Do you know what that entry is?

25  A.   No, I do not.

Pavlik – Direct

1 Q. If you -- if an amended -- if an amended return is filed

2 and an additional tax is assessed --

3 A. Right, but I don't know -- without looking at the amended

4 return, I can't verify the number, but, yeah, that would be an

5 additional tax on an amended return, yes.

6 Q. Can you take a second and -- what I'm trying to figure out

7 is line 290, does that evidence the Government's acceptance of

8 an amended return?

9 A. They assessed additional tax, so I believe that is the

10 case but I -- I'm not sure how exactly the transcripts work as

11 far as the implications of assessing the tax.

12 Q. Do you know whether your 2008 amended return was accepted

13 by the IRS?

14 A. I'm assuming it was accepted because it was never

15 rejected; but, yes, I believe it was accepted based on this,

16 and I never -- I had a power of attorney for many years and

17 never received any indication that it was rejected.

18 Q. Okay. And that -- just I'd like you to assume -- I'm not

19 going to argue the fact of its acceptance -- just assume that

20 the 2008 amended return was accepted.

21 A. Okay.

22 Q. Can you take a second and find the amended return and tell

23 me what the theft loss deduction was that year.

24 A. Where would it be?

25 Q. This would be the 2008 amended return --

1  A.    I'm not sure where to find that.

2  Q.    -- and that would be Defense Exhibit 5.

3  A.    The loss is $7,008,651.

4  Q.    And, again, that was -- this is where I'm a little

5  confused with the 2011 amended return.  I just wanted to circle

6  back with you on.

7         If you add the theft loss from 2000 -- your amended

8  2008 returns -- I keep saying your -- Mr. Pieron's amended 2008

9  returns and 2009 returns, I think you get to right around

10 $11 million.  Could you take two seconds and confirm that, and

11 I'll give you the tabs, that's tabs 5 and 6, sir, defense

12 Exhibits 5 and 6.

13 A.    That'd be 11. -- 11,720,000 if I'm adding them right.

14 Q.    And that's the number that at the time, based on when you

15 were reviewing the documents provided to you, that's the amount

16 of money that you determined that Mr. Pieron -- well, I'm not

17 going to say never received, but that -- let's do this in the

18 best way.

19         MR. DEPORRE:  Objection, leading so --

20 BY MR. HURFORD:

21 Q.    Is that the money that you consider to be proceeds of the

22 sale and purchase agreements but never received -- but not

23 taken out of JDFX --

24 A.    Yes.

25 Q.    -- or at least left with JDFX --

```
 1  A.    Correct.
 2  Q.    -- by the time it went under?
 3  A.    Yes.
 4  Q.    Could you please for a moment turn to Government
 5  Exhibit 209.
 6  A.    That number again, 201?
 7          MR. PENDERY:   209.
 8  BY MR. HURFORD:
 9  Q.    Do you recognize Government Exhibit 209?
10  A.    I'm not there yet.   I didn't hear you before.
11  Q.    Oh, I'm sorry, sir.
12          THE COURT:   Actually, good place to take a break.   I
13  would note that I have had to squeeze in a sentencing at 11:30
14  I anticipate will take no more than 20 minutes, but let's take
15  a break.   We'll come back and work until approximately 11:30.
16          MR. HURFORD:   Thank you, Your Honor.
17          THE COURT:   Record's closed.   You may step down, sir.
18          (At 10:43 a.m., break taken.)
19          (At 10:56 a.m., break concluded.)
20  BY MR. HURFORD:
21  Q.    Mr. Pavlik, before we ended, we were talking about -- we
22  had some discussions about whether you'd ever seen a general
23  ledger for JDFX or anything showing you how the money was used
24  by the company, and you said you'd never seen anything?
25  A.    Not that I recall.
```

Pavlik - Direct                                                61

```
1   Q.   Do you remember ever asking for those documents?

2   A.   I don't recall whether I did or not.

3   Q.   Do you remember whether there were any documents you asked

4   for that were not provided by Mr. Pieron?

5   A.   He always provided anything that I asked for, if he had it

6   available, yes.

7   Q.   Do you -- do you have a recollection of asking for things

8   that you did not receive?

9   A.   No.

10  Q.   Can you turn to 209 in the Government exhibit binder.  Do

11  you recognize that document?

12  A.   Not specifically, no.

13  Q.   So the spreadsheets that you referred to as being provided

14  by Mr. Pieron, can you tell whether Exhibit 209 is one of those

15  or not?

16  A.   I don't recall a summary in this form for the payments

17  received.  They were really on a much larger spreadsheet, so I

18  don't remember this summary document.

19  Q.   Okay.  You filed an amended return -- you filed a 2011

20  amended return with a claim of right doctrine?

21  A.   Correct.

22  Q.   And you filed that in 2014?

23  A.   Correct.

24  Q.   And can you explain to the Court what the claim of right

25  theory is and why it was used in this case.
```

1           MR. DEPORRE:  Objection, Your Honor, relevance.  It's

2   my understanding, again, that this is about the tax liabilities

3   for the 2008 and 2009 years.  The claim of right return was a

4   return for a different tax year, 2011, that would have amended

5   '08 and '09 on a theory that has been rejected now by the

6   defense or conceded and it's no longer relevant.

7           THE COURT:  Well, the -- I'm not sure that the

8   witnesses would agree with you.

9           MR. DEPORRE:  I guess it's the Court's decision,

10  though, in terms of relevance --

11          THE COURT:  Agreed.

12          MR. DEPORRE:  -- rather than the witness.

13          THE COURT:  But I am interested in the witness's

14  opinion.

15          THE WITNESS:  Yes.  Again, when a lot of this

16  information was coming out that was various questions whether

17  or not if you suffered a loss as a result of a Ponzi scheme, if

18  it was an indirect loss, if that was really a theft loss, a

19  claim of right doctrine and there was a lot of literature that

20  kind of debated and said that you may be able to use either

21  one.

22          I subsequently concluded, when I found out that the

23  receiver for the Cook situation Ponzi scheme was actively

24  trying to collect that, the money from these -- from the

25  various investments they made, that the claim of right was

1   really the appropriate -- well, they're booth appropriate in my

2   opinion, but this was the more appropriate result for this

3   situation.

4           And under that argument, even though the amended

5   return is for 2011, the mechanics of it are you recalculate the

6   tax liability for the prior years, 2008, '09 and '10, or in

7   this case it was only effected 2008 and 2009, and under the

8   theory that Mr. Pieron never had -- if there was a sale

9   individually, he never had a right to that because it was from

10  a Ponzi scheme.

11          So we did a claim of right recalculation under

12  2000 -- for a 2011 amended return, and based on that, because

13  he didn't have a right to receive the income in 2008, 2009,

14  then those gains were no longer valid, which basically

15  eliminated the tax liability for those years and resulted in a

16  tax liability for the -- all the years involved being at or

17  less than what he had already paid in the form of estimated

18  payments, payments on the installment plan or withholdings.

19  BY MR. HURFORD:

20  Q.   And did you file also a document with the IRS at the same

21  time that stated you didn't think Mr. Pieron had any tax

22  liability to pay?

23  A.   We filed those amended returns that showed no tax

24  liability and also we filed an offer in compromise asking for a

25  conference with the IRS to talk about the liabilities, saying

 1  that there was a doubt as to the liability under the offer in

 2  compromise document.

 3  Q.   And what was your goal with the amended return and the

 4  offer in compromise document?

 5  A.   Well, the goal would be that I thought that I had a strong

 6  position for the offer in compromise position and that at a

 7  minimum, by filing the amended return and the offer in

 8  compromise, I felt that we would have the opportunity to sit

 9  down with the equivalent of an appeals officer to talk about

10  the liability for all the years involved, from 20008, '09,

11  '10 and '11.

12  Q.   And did you ever get that opportunity?

13  A.   No.

14  Q.   If you could just turn to tab 24 in the Government's

15  binder -- or, I'm sorry, in the -- I'm used to saying

16  Government.  In the defendant's binder, please.

17  A.   Okay.

18  Q.   Do you recognize that document?

19  A.   It would have been the offer in compromise document that

20  we filed in March of 2014.

21  Q.   You're on tab 24, correct?

22  A.   I believe so, yes.

23  Q.   All right.  I'm going to mark this as Defense Exhibit 24

24  and move it into evidence.

25            MR. DEPORRE:  Objection as to relevance, Your Honor.

Pavlik – Direct

65

1          THE COURT:  What is the document?

2          MR. HURFORD:  It's the offer in compromise that he

3  filed with the amended return for 2011, which I was also going

4  to move into evidence, and that's Government Exhibit 206.

5          THE COURT:  Overruled.

6  BY MR. HURFORD:

7  Q.   So at this time -- and at the time you filed the amended

8  returns in March of 2014 -- did I get that date right?

9  A.   Yes, the second amended return, yes.

10 Q.   You had met with Agent Hollabaugh a couple times prior to

11 you filing the amended 2011 return, correct?

12 A.   Correct.

13 Q.   And did you inform him prior to filing the 2011 amended

14 return that you were going to file it and assert the claim of

15 right doctrine?

16 A.   I don't recall the specific conversation.

17 Q.   So, Mr. Pavlik, I just want to do a couple more things.

18 It won't be long.

19          The first is, can you go back to -- well, let's do

20 Exhibit 204 first.  That's Government Exhibit 204.  Would you

21 take a minute and read 204 and let me know when you've had time

22 to do that, please.

23 A.   Okay.

24 Q.   Do you recognize Government Exhibit 204?

25 A.   Yes.

1  Q.   What is it?

2  A.   It's a draft of a letter from Mr. Pieron to me explaining

3  the situation.

4  Q.   Do you know why Mr. Pieron wrote this letter?

5  A.   I don't recall the background of the genesis of the

6  letter.

7  Q.   Do you recall asking Mr. Pieron at some point in time to

8  write this letter?

9  A.   I would have asked him to summarize the details behind the

10  situation so we had that in the file.

11  Q.   What situation -- when you -- could you just please

12  explain.

13  A.   The result of it, how the Ponzi scheme resulted in the

14  loss of his money, to document that this was the result of

15  the -- his loss was an indirect result of the Ponzi scheme.

16  Q.   This relates to the theft loss claim or the claim of right

17  claim?

18  A.   I'm not sure specifically.  It was really just to document

19  the situation.

20  Q.   But both of those claims are related, right?

21  A.   They're two different alternatives on how to treat the

22  loss that occurred.

23  Q.   And when we're talking about the loss that occurred, it's

24  the money that where proceeds of the sale purchase agreement

25  that, based on what you were told and what you saw, you

1  determined never went personally to James Pieron?

2  A.    That is correct.

3  Q.    And in -- if we can go back just to Exhibit 56 one more

4  time.  And I only have a few more questions, Your Honor.

5  A.    Fifty-six of?

6  Q.    It's Government Exhibit 56, so the blue binder.  I'm

7  sorry.

8  A.    Government 56?

9  Q.    Correct.

10         THE COURT:  While the gentleman's locating that, we

11  might inquire if the witness was aware of the fact that the

12  taxpayer never directly received the proceeds from the sale of

13  the stock, how one would characterize the transfer of the cash

14  to the entity.

15         MR. HURFORD:  Yes, Your Honor.

16  BY MR. HURFORD:

17  Q.    Are you at the -- sorry, Mr. Pavlik, you've got Exhibit 56

18  up, Government Exhibit 56?

19  A.    Yes.

20  Q.    Can you please go to that same page we were on before.  It

21  says ATSI 19 at the bottom.

22  A.    Okay.

23  Q.    The very last entry, could you please read -- it's

24  dated -- it appears to be dated 7/9/10, the 2:22 p.m.  Would

25  you please read that into the record, sir.

1    A.    Okay.  I'm not sure of the first part, and then it says,

2    "Hi, James.  I still have not received the documents you were

3    going to send me regarding the carryback of losses.  Losses

4    incurred in any year for business expenses can be carried back

5    for two years.  New rulings in 2008, and then again in 2009,

6    allowed for losses in those years to be carried back up to five

7    years.  You can choose five years or four years or three years

8    or two years.  That ruling is not in place for 2010 at this

9    point anyway --"

10   Q.    It continues on the next page, Mr. Pavlik.  Would you

11   continue reading, please.

12   A.    "We can complete this work by 12/31/2010, that would be

13   the best way, but if we have to file 2007 -- but we have to

14   file 2007, 2008 first.  Then when I do 2009 I add a form into

15   the 2009 return carryback that year's -- that carryback that

16   year's losses to 2007 and then 2008, but I would -- but if we

17   can get it done by 12/31, I just have to actually amend the

18   2007, 2008 returns so those have to be filed first.  I know you

19   said that it will take you a while to gather the expenses you

20   incurred for 2007, 2008, and 2009.  Let me know if you have any

21   other questions, Carol."

22   Q.    Thank you.  And then on the same page, we're at -- we're

23   on page 20 now.  Can you go down to the 2:54 p.m. entry on

24   July 7th of 2010.

25            MR. DEPORRE:  Objection, Your Honor.  There's no

69

```
 1   foundation whatsoever with this witness for anything in this

 2   document.   I don't know if this is being offered for the truth

 3   of the matter asserted.   I have no -- certainly isn't the

 4   correct witness for a document like this, and he seems to just

 5   be reading from what's in a record that was kept by somebody

 6   else's company and by a different CPA.

 7            THE COURT:  Not even a CPA.

 8            MR. DEPORRE:  A different tax -- circular 230 tax

 9   preparer.

10            MR. HURFORD:  Your Honor, I think the Government

11   already admitted this particular document into evidence.

12            THE COURT:  But this witness is not the author.

13            MR. HURFORD:  I agree.

14            THE COURT:  The witness has not identified the

15   material as something that he's ever even scene.   What do you

16   hope to accomplish in refreshing his recollection with somebody

17   else's notes.

18            MR. HURFORD:  No, I just want to ask him if he ever

19   thought about this.

20            THE COURT:  Ever thought about it?

21            MR. HURFORD:  Yes.

22            THE COURT:  Ever thought about what?

23            MR. HURFORD:  About using a business bad debt

24   deduction.

25            THE COURT:  Why don't you ask him?
```

1        MR. HURFORD:  That's what I was going to do.

2        THE COURT:  Instead of reading somebody else's notes

3   into the record, go ahead and ask him a question.

4        MR. HURFORD:  Okay.

5   BY MR. HURFORD:

6   Q.    Did you ever consider a business bad debt deduction?

7   A.    Not at that time.  We -- again, we debated between the

8   theft loss and the claim of right and elected the theft loss as

9   being the best option, and then subsequently decided that the

10  claim of right argument was a better argument which we -- when

11  we filed the amended return for 2011 in March of 2014, I did

12  not -- I did not research the business bad debt --

13  Q.    So you don't know --

14  A.    -- option.

15  Q.    You don't know if anything that was in that note from a

16  legal perspective is true because you didn't research it?

17  A.    Correct.

18  Q.    But in -- do you understand bad business -- based on your

19  experience, did you -- do you understand that bad business debt

20  creates an ordinary loss similar to a theft loss deduction?

21  A.    Yes.

22  Q.    And those losses, assuming they occurred in 2009, those

23  losses can be carried back to subsequent years?

24  A.    Right.

25  Q.    Back to 2007?

1  A.    Correct.

2  Q.    Assuming business bad debt works the same way, and you

3  haven't researched it?

4  A.    Yes, and as -- as any ordinary loss would, including a

5  theft loss would be able to be carried back to 2007 also.

6  Q.    So given the fact that you were using theft loss in

7  2000 -- in your 2008, 2009 amended returns, that could create

8  ordinary losses that go back to 2007.  Is there any -- I want

9  to ask this one more time.  Is there any reason to characterize

10 capital gains in 2008 instead of 2007?

11 A.    No.

12 Q.    From a tax perspective?

13 A.    No.

14         MR. HURFORD:  Just one quick proffer for the record,

15 Your Honor.

16         THE COURT:  Two remaining issues, at least from my

17 perspective.  We have not heard from the witness why he

18 believes -- or what led him to the conclusion that there was a

19 loss or that it was anyway proximately connected to the

20 so-called Ponzi scheme.  For there to be a loss, we need to

21 have some accounting that would reflect the disposition of the

22 funds for it to become a loss.

23         The second is, what was it that your client was

24 telling him that connected JDFX to the Ponzi scheme?

25         And, finally, based on my list, is the question for

72

1  the witness about how one would characterize the transaction

2  once Mr. Pieron received cash in exchange for the sale of

3  stock, but then invested it in JDFX.  How does that transaction

4  get characterized and, therefore, reported?

5  BY MR. HURFORD:

6  Q.   Okay.  Mr. Pavlik, we've been talking about theft loss and

7  claim of right doctrine trying to capture loss, and the first

8  question is what led you to the conclusion that there was a

9  loss in the first place?

10 A.   Again, the primary thing to answer your question is the

11 spreadsheet that Mr. Pieron provided showed all cash activity,

12 and when the company was liquidated, at first I thought nothing

13 was distributed to him upon final liquidation, so I thought it

14 was all a loss.

15          Mr. Pieron pointed out -- that actually increased my

16 calculation of his income, pointed out that -- that I was

17 missing one piece, and that was that cash was invested in two

18 new companies in the US, which I didn't know at that time, and

19 I don't recall exactly the names.  IB Tech I believe, and a

20 company called Komplique, a new Komplique in the US, and so

21 that was $1.6 million that was invested in those new companies,

22 but other than that, the spreadsheet showed that nothing else

23 was left upon final liquidation of JDFX.

24          So that's what I based the calculation of the losses

25 on would be that spreadsheet showing that that's the only thing

1  that was left, and that was really based on Mr. Pieron

2  indicating that I was missing this cash going to these two new

3  companies that I didn't know about at that point in time.

4  Q.  And those spreadsheets, combined with share purchase

5  agreements, are what led to the conclusion that there was a

6  capital gain in the first place?

7  A.  Right, and then a subsequent capital loss upon final

8  liquidation.

9  Q.  Okay.

10  A.  A loss, a theft loss, upon final liquidation depending on

11  how it was classified.  It was either a theft loss or a capital

12  loss upon final liquidation.  It was a loss one way or the

13  other, just the question is what was the appropriate

14  classification of the loss.

15  Q.  And then in connection with both your theft loss deduction

16  and the claim of right doctrine, both of those have in them a

17  requirement that this somehow be tied to a Ponzi scheme, that

18  the losses are a result of a Ponzi scheme --

19  A.  Correct.

20  Q.  -- breaking down, fair enough?

21  A.  Correct.

22  Q.  And so what led to your conclusion that the failure of

23  JDFX was due to the Ponzi scheme collapsing?

24  A.  It was based on communications with Mr. Pieron, summarized

25  in that letter that you referred to that we -- I don't know if

1  it was entered, but the one letter there was kind of a summary

2  of -- he put on paper what he had been telling me because I

3  asked him to at least document it so I had it in writing how

4  the two things were related.

5  Q.    Were there other events or other people or other activity

6  that was going on at this time that corroborated what

7  Mr. Pieron was saying to you in terms of the Ponzi scheme

8  collapse causing a liquidation or downfall of JDFX?

9  A.    There was various -- there were various things that,

10 again, I didn't have all the information when I filed the first

11 amended return, but subsequent to that I just did some research

12 on the Ponzi case and had it -- you know, found out that they

13 were, you know, trying to connect Mr. Pieron, which verified

14 the things that he had been telling me before that.  So I --

15 you know, I didn't do a tremendous amount of research but I

16 verified it based on the history of the receiver and then, you

17 know, them attempting to try to identify money that was lost

18 for the investors in the Ponzi scheme.

19 Q.    And did you have any part of that process, the dealing or

20 interacting with the SEC receiver at all or --

21 A.    No.

22 Q.    -- trying to identify --

23 A.    I'm sorry for not waiting for your question to finish,

24 but, no, I did not have any dealings.

25 Q.    What specifically -- in terms of the relationship between

Pavlik - Direct

1  JDFX and -- I'm sorry, the relationship between JDFX's downfall

2  and the downfall of the Ponzi scheme, do you remember anything

3  specifically that James Pieron told you about how those two

4  things were connected?

5  A.    Primarily that the downfall, because of the Ponzi

6  scheme -- the one thing I specifically remember is the banks

7  all pulled their activity, which he had no way to operate after

8  that, which resulted in the loss and failure of the company at

9  that point in time in 2009.

10 Q.    Okay.  So my last question, when you don't have -- you're

11 operating under assumptions when you're doing Mr. Pieron's

12 taxes, is that fair to say?

13 A.    Correct.

14 Q.    And one of the assumptions that you're operating under was

15 that -- based on what was told to you, was that money, proceeds

16 of the share purchase sale and purchase agreements went somehow

17 into JDFX?

18 A.    Correct.

19 Q.    And did you ever discuss with Mr. Pieron the specifics of

20 those transfers, where -- where -- which accounts the money

21 actually went to?

22 A.    No.

23 Q.    Did you ever inquire as to whether Mr. Pieron actually

24 received the money himself versus the money going directly to

25 the company?

1  A.  Again, based on the spreadsheet, it was clear that the

2  company -- the money went directly back into the -- to JDFX.

3  It was just treated, to answer the Honorable Judge's question

4  that -- it was -- and sometimes in tax and accounting you treat

5  things as though they happened, treat it as though they

6  received and loaned it or contributed it back to the company,

7  but there was never any indication from the spreadsheets that

8  he actually received the money individually.

9  Q.  Did you assume he received the money individually?

10  A.  No.

11  Q.  Okay.  So if you have -- I guess the Court's last question

12  is how you would characterize this transaction in terms of --

13  based on, you know, money -- and I -- I'm finding I'm having a

14  hard time understanding what series of facts we're asking him

15  to accept right now.

16          If I could have just one moment with my colleagues.

17          (Off-the-record discussion.)

18  BY MR. HURFORD:

19  Q.  So let's just play out both scenarios for a second.  If

20  the money went straight to JDFX and never went to Mr. Pieron

21  personally -- and let's look at Government Exhibit 209 for the

22  transfers.

23  A.  Okay.

24  Q.  So if these monies -- these funds went straight to JDFX,

25  and never went to James Pieron's personal account, how would

1  you treat this transaction or characterize this transaction?

2  A.    Again, if the transaction was -- if the transaction was

3  truly a stock sale between Mr. Pieron and Trevor Cook and as a

4  matter of convenience the money went directly into the company,

5  it would be treated as a capital gain.  If the stock sale was

6  really a sale from the company to Mr. Cook, then there would be

7  no capital gain.

8  Q.    Okay.  And does it matter in your characterization whether

9  or not James Pieron actually got the money into a personal

10  account?

11  A.    No.

12  Q.    Can you -- is it possible to -- let me ask you this:  If

13  you characterize the transaction as a capital gain, is it --

14  even if it's a capital gain, if he didn't receive the money, he

15  engaged in a sales transaction, but he never actually got the

16  money from the sales transaction, how would you record that?

17          MR. DEPORRE:  Objection, Your Honor.  This is

18  territory for an expert witness, not for this witness.  This

19  witness is a fact witness.  We're giving him hypotheticals that

20  are asking him to assume facts.

21          THE COURT:  Well, they're the facts of the case,

22  and -- I mean, we have a reported capital sale of stock which

23  would place the taxpayers in a position to be entitled to the

24  proceeds.  But then the taxpayer invests those funds in JDFX,

25  and the gentleman is simply asking what the effect of that

 1  later transaction is, because the tax return reports that he

 2  has received cash in exchange for the sale of the stock.  But

 3  then, in fact, once he is in possession of the cash, he

 4  invested in the company, and the examiner's trying to figure

 5  out what that transaction is and it's a good question.

 6           MR. DEPORRE:  I don't -- first of all, I think that

 7  the facts that are underlying that assumption are wrong.  I

 8  don't think that that's the -- I don't think it's correct that

 9  Mr. Pieron didn't receive any of those funds.

10           And, second of all, they had an expert witness, and

11  they presented testimony about hypotheticals and tax

12  treatments, and this defendant -- or, excuse me, this witness,

13  is not a -- is not here today as an expert.  He's here as a

14  fact witness to describe what did happen and what he was told

15  by the defendant.  If something which we now know or now --

16           THE COURT:  Ms. Parker is trying to get your

17  attention.  It's clearer to me probably than to you.

18           I guess the point that I think the examiner is

19  making, and that I think is sound, is that the witness is

20  familiar with the fact that there was a reported sale of JDFX

21  stock on the returns that he prepared reflecting Mr. Pieron's

22  exchange of his stock for cash.

23           But the witness is also familiar with the fact that

24  the taxpayer then, in fact, invests 100 percent of that cash in

25  the business, and that's a second transaction that the witness

1    is capable of furnishing a response on.

2            MR. DEPORRE:  And I guess my point is is that the

3    witness, when he prepares that 2009 -- 2008 and 2009 tax

4    returns, he does make a claim for basis on the 2008 return

5    based on the facts that he's aware of at that time.  And what

6    I -- what I understand brother counsel's question to be is to

7    inject a new set of facts that he was not aware of when he made

8    the basis claim on the 2008 return and ask him to take those

9    into consideration, and I don't even think that those --

10           THE COURT:  But you could ask the witness to explain

11    his basis calculations.  Where'd it come from?

12           MR. DEPORRE:  I think that would be a perfectly

13    reasonable question.  I'm just concerned about asking --

14    inserting new facts where there's some question as to whether

15    or not those facts are even accurate that the defendant -- or

16    this witness didn't have any knowledge of at the time and then

17    retrofitting that back.

18    BY MR. HURFORD:

19    Q.   I think that leaves us with a question that I had pending.

20    Do you remember the question, Mr. Pavlik, by any chance?

21    A.   Maybe you should repeat it.

22    Q.   Okay.  I mean, the question was how do you -- the question

23    that -- the last question that I had asked was, there's a

24    stock -- there's a stock sale agreement, and the money goes to

25    the company.  If Mr. Pieron never personally receives that

1  money, how do you characterize that?

2  A.   Again, I think that if it was treated as though the --

3  mechanically that it was assumed that he sold the stock

4  individually and that he received it and then put it back in,

5  whether or not the cash actually flowed that way, it would be a

6  capital gain and then a subsequent loss when the company went

7  under; either a theft loss, business bad debt or a capital loss

8  in 2009.  So if it was sold by him individually, then there

9  would be a capital gain in 2008; if it was sold by the company,

10  there would not be.

11  Q.   And given the fact that -- let me back up.

12       We have a transaction, and let's refer to the 2008

13  share purchase agreement -- or sale and purchase agreement,

14  excuse me.  We have a transaction that based on the records

15  you've seen.  I think we can agree we have payments of

16  $10 million prior to the execution of the contract for the --

17  for the sale.

18  A.   Correct.

19  Q.   So based on your understanding of tax law, can you

20  characterize a transaction after it happens to be something

21  different than it was?

22  A.   I don't understand the question.

23       MR. DEPORRE:  Objection.

24       MR. HURFORD:  I'll withdraw it.

25       I don't have anymore questions for Mr. Pavlik, Your

 1   Honor.  I was -- the last questions I was asking were -- of the

 2   characterization were all based on a question you had.

 3              THE COURT:  Yes.

 4              MR. HURFORD:  I tried to explore that a little bit.

 5   I'm done exploring that.  If you have further issues on that

 6   I'd be happy to ask the questions.

 7              THE COURT:  I think we're at a good place for us to

 8   take a break.  We'll complete our sentencing hearing, and then

 9   we'll come back for cross-examination.

10              You may step down, sir.

11              (At 11:33 a.m., break taken.)

12              (At 1:05 p.m., break concluded.)

13              THE COURT:  Please be seated.  Cross-examination.

14                        CROSS-EXAMINATION

15   BY MR. DEPORRE:

16   Q.   Good afternoon, Mr. Pavlik.

17   A.   Good afternoon.

18   Q.   I'd like you to take a -- open the blue binder there, if

19   you would.  Would you flip open to Government Exhibit 201 and

20   202.  Can you describe Government Exhibit 201.

21   A.   It's the stock closing agreement that we discussed

22   previously for 2008, January 1st, 2008.

23   Q.   And 202?

24   A.   The same agreement for the January 1st, 2009 transaction.

25   Q.   All right.  I'd like you to go to the last page of 202,

1  and do you see some signatures there?

2  A.   Yes.

3  Q.   All right.  Now, I'd also like you to go to Exhibit 202A.

4  Do you have that there?

5  A.   Okay.

6  Q.   And would you flip to the last page.

7  A.   Okay.

8  Q.   And you see some signatures there and also a date,

9  correct?

10 A.   Yes, on the --

11 Q.   The date is May 18th, 2009?

12 A.   Yes.

13 Q.   All right.  Where did you -- have you seen all these sale

14 and purchase agreements before?

15         MR. HURFORD:  Your Honor -- Your Honor, I don't want

16 to make an objection.  I just want to make a record for the

17 2009 share -- sale and purchase agreement, and that is that the

18 version marked A that the Government has provided today, the

19 sheet that's actually dated with the 2009, January 1, 2009 with

20 that actual date in there, was produced as a new page for that

21 exhibit, which is why they called it an A, and that happened

22 after the trial and sentencing.

23         So I just want to be clear when we're talking about

24 the 2009 share purchase agreement, the one that Mr. Pavlik

25 actually used and was given during the relevant periods.

Pavlik - Cross

1          THE COURT:  Consistent with your understanding, sir?

2          MR. DEPORRE:  I believe that that is correct, that

3    the 202A was produced to the defense afterwards.  What I'm

4    trying to figure out from this witness is whether or not he had

5    them all previously.

6          THE COURT:  Okay.

7    BY MR. DEPORRE:

8    Q.   Had you seen all of those before, 201, 202 and 202A?

9    A.   I don't recall, I only recall the 201 and 202.

10   Q.   Did you recall asking for Mr. -- asking Mr. Pieron to send

11   you a dated copy of 202 at any point?

12   A.   No.

13         MR. DEPORRE:  All right.  Your Honor, at this time I

14   would move for admission of 201 and 202.

15         MR. HURFORD:  No objection.

16         THE COURT:  Received.

17   BY MR. DEPORRE:

18   Q.   You got both of these from Mr. Pieron, correct?

19   A.   201 and 202?

20   Q.   201 and 202?

21   A.   Yes.

22   Q.   And when he sent them to you, was that before your e-mail

23   regarding the treatment of the 2007 payments as deposits in

24   2008?

25   A.   I don't recall when in the timeline these things -- that I

US v. Pieron, Jr. - Hearing - December 20, 2019

 1  would have received these.

 2  Q.    Had you had conversations with Mr. Pieron up and to that

 3  point?

 4  A.    I don't recall the specific conversations other than what

 5  was alluded to in the email.

 6  Q.    Okay.  Let's look at the email then.  Would you turn to

 7  203.

 8         Do you recognize Government Exhibit 203?

 9  A.    Yes.

10  Q.    And what is it?

11  A.    That's the email referred to previously from me to

12  Mr. Pieron.

13         MR. DEPORRE:  All right.  I move to admit Government

14  Exhibit 203.

15         MR. HURFORD:  No objection.

16         THE COURT:  Received.

17  BY MR. DEPORRE:

18  Q.    When's the email dated?

19  A.    December 22nd, 2010.

20  Q.    All right.  I'd like you to read the second paragraph,

21  beginning with "However, I have another idea."

22  A.    You want me to read that out loud?

23  Q.    Yes, please.

24  A.    "However, I did have another idea.  Based on the sale

25  document you supplied" -- so I must have had it -- "the closing

1  date for the sale was 20 percent, 1/1/2008.  If the 2007

2  payments were treated as deposits, and the sale closed in 2008,

3  the whipsaw effect may be mitigated."

4  Q.  All right.  Would you read the second paragraph -- or the

5  third paragraph, the next paragraph, as well?

6  A.  "One confusing item is that the 2009 document also says

7  the closing date was 1/1/2008 for the 15 percent sale.  I

8  assume that it is just an error because the first document was

9  used as a template, question mark."

10  Q.  All right.  Does that refresh your recollection as to

11  whether or not you had those documents at the time you wrote

12  this email on December 22nd, 2010?

13  A.  I likely had them to be able to have that in the email.

14  Q.  All right.  And prior to this conversation, you had spoken

15  to Mr. Pieron about the stock transaction, correct?

16  A.  I had some conversation leading up to this email, yes.

17  Q.  Do you recall anything regarding the nature of those

18  conversations?

19  A.  No.

20  Q.  You don't recall Mr. Pieron telling you that he personally

21  sold the stock?

22  A.  We -- I don't recall any of the specifics of the

23  conversation.

24  Q.  Did you -- did Mr. Pieron tell you that he was represented

25  in an SEC case at -- prior to the December 22nd, 2010 email?

1  A.   Again, I don't recall any conversations leading up to this

2  email.

3  Q.   Have you ever spoken with John Fetters?

4  A.   I don't believe I've ever spoken with him directly, no, to

5  the best of my recollection.

6  Q.   Was information conveyed between Mr. Fetters and you in

7  some other manner other than speaking directly?

8  A.   I know that Mr. Pieron had spoken with John Fetters, but I

9  don't remember any other communications other than discussions

10 with Mr. Pieron that he had had conversations with Mr. Fetters.

11 Q.   When you received the share purchase agreements, did --

12 Mr. Pieron didn't tell you who drafted those, did he?

13 A.   No.

14 Q.   Did you at any point come to find out who drafted the

15 share purchase agreements?

16 A.   No.

17 Q.   Did you at any point come to find out why they were

18 drafted?

19 A.   Other than documenting the transaction, no.

20 Q.   So as you sit here today, you believe they were drafted in

21 furtherance of a stock sale, correct?

22 A.   That was my understanding at the time.

23 Q.   You said many, many years later -- I believe this was on

24 questioning.  You said many, many, many years later you came to

25 understand that that may have not been the case?

1  A.    Correct.

2  Q.    Who did you talk to to explain -- to give you that

3  impression?

4  A.    Mr. Pieron's attorneys showed me documentation that the --

5  of the original sale of the stock by the company.

6  Q.    And which attorneys specifically?  The gentlemen here

7  today?

8  A.    Yes.

9  Q.    Any other attorneys ever talk to you about that?

10  A.    Not that I recall, no.

11  Q.    When did you speak with Mr. Pieron's current attorneys

12  about the nature of the stock transaction?

13  A.    I don't recall the date.

14  Q.    Do you recall whether or not it was before or after

15  Mr. Pieron's criminal trial?

16  A.    I believe it would be after the criminal trial, to the

17  best of my recollection.

18  Q.    Do you recall whether or not it was within the last three

19  months?

20  A.    I don't recall the date.

21  Q.    In the email you mentioned whipsaw effect.  This is the

22  email on Government Exhibit 203.  What did you mean by whipsaw

23  effect?

24  A.    It's been consistently discussed, the whipsaw effect is if

25  both a gain and a loss are capital transaction, if you have a

1  large capital gain one year and a large capital loss in the

2  following year, even though you may have very little total gain

3  over the two-year period, if it was a capital loss in the

4  second year, you would not be able to carry it back.  If it was

5  an ordinary loss, you would be able to carry it back.

6  Q.  Based on the information and the communications that you

7  had with Mr. Pieron, prior to December 22nd, 2010, did you

8  believe it was advantageous for him to elect to treat the

9  payments that were made in 2007 as income to him in 2008?

10 A.  Not based on the ultimate facts because the transaction --

11 Q.  That's not my question, sir.  Based on the information

12 that you had prior to December 22nd, 2010, did you believe it

13 was advantageous for Mr. Pieron to treat the wire transfers

14 that occurred in 2006 and '07 as income to him in 2008?

15 A.  I didn't make that determination.  My only determination

16 was if he had a large capital gain one year, and a large

17 capital loss in a following year, he wouldn't carry it back.  I

18 didn't get into the details of 2007 versus 2008, because I

19 didn't have all the information at that time.

20 Q.  You didn't have all the information, but based on the

21 information that you did have, you wrote "the whipsaw effect

22 may be mitigated."  Did you believe that it was advantageous,

23 based on the information that you had, for Mr. Pieron to

24 characterize those wire transfers as income to him in 2008?

25         MR. HURFORD:  Your Honor, I just object.

1          THE WITNESS:  Again, I've answered.

2          MR. HURFORD:  I think this is the same question

3    that's been asked and answered.

4          MR. DEPORRE:  It has not been answered, Your Honor.

5    It's been asked three times.

6          THE WITNESS:  Again, I don't recall the specific, you

7    know, what I -- what I was determining at that time.  I was

8    specifically only talking about a capital loss in a year

9    subsequent to a capital gain would not be able to be carried

10   back.

11   BY MR. DEPORRE:

12   Q.   So based on your conversations with Mr. Pieron, you

13   believed that he would have capital losses, correct?  Based on

14   your conversations --

15   A.   Yes.  There would be capital losses in some year and

16   capital gains in some year.  I didn't have all the information

17   at that point.

18   Q.   But you believed that the capital loss -- if it was in

19   2008, a capital gain for that same year would mitigate a

20   whipsaw effect?  He would be able to use, deduct the capital

21   loss against that capital gain; is that true?

22   A.   The -- to the point where if a capital gain and a capital

23   loss were -- occurred in the same year, they would offset each

24   other is what I, you know, was communicating to him.

25   Q.   And they wouldn't offset each other -- if there was a

1  capital loss in 2008, it wouldn't offset a capital gain from

2  2007, would it?

3  A.    Correct.

4  Q.    Prior to this email, December 22nd, 2010, did Mr. Pieron

5  express concerns regarding the tax preparer that was preparing

6  the original 2008 -- well, 2007, 2008 and 2009 returns?

7  A.    He didn't have confidence that they were -- didn't have

8  confidence in them would be my only recollection.

9  Q.    Did he tell you why?

10  A.    He just thought they were inexperienced preparers and

11  didn't have confidence, not specifically a reason why.

12  Q.    Did he come to you looking for advice as an experienced

13  preparer?

14  A.    Yes.

15  Q.    And when did you -- did you offer him other advice besides

16  what's documented in Government Exhibit 203?

17  A.    I don't recall what other conversations occurred at that

18  time.

19  Q.    Did you speak to him over the phone?  Did you tell him --

20  did you speak to him over the phone?

21  A.    Again, I don't recall the conversations that occurred

22  after this point in time.

23  Q.    I'm asking you before December 22nd, 2010.  Did he express

24  uncertainty in the abilities of his preparer prior to

25  December 22nd, 2010?

1    A.    I think I've answered that, yes, that he had some

2    reservations about their ability.

3    Q.    And was one of them that -- that he would have a large

4    capital gain that wouldn't be offset by a capital loss?

5    A.    That was not the reservation he expressed with the

6    preparers.  He just thought they were inexperienced preparers.

7    Q.    Okay.  Now, you mentioned in your email, one confusing

8    item is that the 2009 document also says the closing date was

9    1/1/08.  I'd like you to turn to Government Exhibit 202A.

10   A.    Okay.

11   Q.    And specifically, I'd like you to go to the second page of

12   that exhibit, under paragraph 3.1 where it says "closure date."

13   Do you see that?

14   A.    Yes.

15   Q.    And would you read aloud the closure date in Government

16   Exhibit 202A.

17   A.    You're talking about provision 3.1, is that the closure

18   date on 202A?

19   Q.    Yes, sir.

20   A.    "Closure of the purchase, the closure, shall take place on

21   January 1st, 2009, closure date, at the office of JDFX Holding

22   AG Switzerland or on such other date, time and place as the

23   parties may agree."

24   Q.    All right.  The closure date there is January 1st, 2009,

25   correct?

1  A.    Yes.

2  Q.    Did Mr. Pieron send you Government Exhibit 202A in

3  response to your concern that the closure date was wrong on

4  Government Exhibit 202?

5  A.    I don't recall if I received a new agreement or not.

6  Q.    Well, do you know that Government Exhibit 202A came from

7  Andrews Hooper Pavlik?

8  A.    No, I did not know that.

9  Q.    Did you have any input in the preparation of documents

10 responsive to grand jury subpoenas in this case?

11 A.    No.  Other than saying that we had to supply all the

12 documents that were requested.  I didn't go through -- there

13 were thousands of pages of documents.  I didn't go through all

14 the documents that were supplied.

15 Q.    All right.  How did you store the documents related to

16 James Pieron and your accounting work for Mr. Pieron?

17 A.    We had a paperless system, so it would have been either in

18 a system called GoFileRoom where it's a paperless system where

19 all the documentation is stored or in the email strings.

20         MR. DEPORRE:  All right.  May I approach, Your Honor?

21 I'm going to approach with an email that was --

22         MR. HURFORD:  Do you have an extra copy?

23         MR. DEPORRE:  I don't.

24         MR. HURFORD:  This was produced in discovery.

25         MR. DEPORRE:  Yeah, it's just to refresh.  I'm not

1  going to offer it as an exhibit.

2              MR. HURFORD:  Is that --

3              MR. DEPORRE:  May I approach the witness, Your Honor?

4              THE COURT:  Yes.

5  BY MR. DEPORRE:

6  Q.   Mr. Pavlik, I'm going to hand you this.  I want you to

7  take a look at it and see if it refreshes your recollection.

8  Please don't read it aloud.

9  A.   Okay.

10 Q.   Mr. Pavlik, having had an opportunity to look at that

11 email, does that refresh your recollection as to whether or not

12 Mr. Pieron emailed you Government Exhibit 202A?

13 A.   It looks as though -- I didn't recall that, but it looks

14 as though he did, yes.

15 Q.   Thank you.

16             MR. DEPORRE:  Your Honor, at this time I would move

17 for the admission of Government Exhibit 202A.

18             MR. HURFORD:  The only objection that I have is that

19 there's no attachment to the exhibit, so we're talking about an

20 email, and what was sent to Mr. Pavlik, but there's nothing on

21 the email that indicates there's an attachment, and there's no

22 attachment to the exhibit.  What we're actually talking about

23 remains a bit ambiguous and vague.  As to the first part of the

24 emailed, I agree, I have no objection --

25             THE COURT:  And it will be received.

1          MR. HURFORD:  -- but it's referring to a document

2    that's not attached.

3          MR. DEPORRE:  And to be clear, 202A is not the email.

4    202A is the revised share purchase agreement.  I believe that

5    the email has refreshed the witness's recollection that he

6    received the share purchase agreement, 202A, from Mr. Pieron.

7          THE COURT:  Yes.

8          MR. HURFORD:  And I think that's where we're -- I'm

9    having a fundamental problem is that we're using a document to

10   refresh a recollection, yes, he got another share purchase

11   agreement, but as to what exact piece of paper he got, it's --

12   we can't establish that unless it's actually attached to the

13   email.

14         THE COURT:  But the witness's testimony can do that

15   and I believe has.  You may continue.

16         MR. DEPORRE:  Thank you.

17   BY MR. DEPORRE:

18   Q.   After you received the share purchase agreements, did you

19   investigate whether Mr. Pieron actually sold the stock that was

20   reflected in the share purchase agreements?

21   A.   No -- no.

22   Q.   Why not?

23   A.   As a tax preparer I was relying on the documentation, the

24   representation that the sales occurred on January 1st, 2008 and

25   January 1st, 2009, supported by the documents.

Pavlik - Cross

1  Q.   And based on your conversations with Mr. Pieron, correct?

2  A.   Correct.

3  Q.   Did Mr. Pieron ever tell you anything prior to his

4  conviction that he hadn't sold stock personally to Mr. Cook's

5  company Market Shot?

6  A.   No, but he had consistently said he never received the

7  cash, so that's --

8  Q.   Right, and we'll get to that.  We'll get to that.

9       I believe your testimony was that in December of

10  2010, you had some initial conversations with Mr. Pieron and

11  then you began speaking with him again regarding preparation of

12  amended returns in late 2011; is that correct?

13  A.   That's the best of my recollection, yes.

14  Q.   All right.  In late 2011, did Mr. Pieron email you

15  documents reflecting a $10 million dollar capital gain in 2008?

16  A.   I don't recall the documents.

17       MR. DEPORRE:  All right.  May I approach, Your Honor?

18  BY MR. DEPORRE:

19  Q.   Mr. Pavlik, I'd like you to take a look at that, and I'm

20  going to ask you some questions that hopefully will refresh

21  your recollection about whether or not Mr. Pieron sent you

22  documents reflecting a $10 million capital gain for 2008.

23  A.   Please, I'm not sure what your question is.

24  Q.   All right.  My question was, did Mr. Pieron send you

25  documents to reflect a $10 million capital gain for 2008?

1  A.   Again, if you're going by the title of this, because I

2  don't recall the specifics.  If you're going by the title of

3  the email, again, the -- Mr. Pieron regularly talked about a

4  $10 million capital gain or a capital gain synonymously with

5  sale proceeds, which are two different things.  But the

6  document shows capital gain of $10 million, but his -- it would

7  really mean sales proceeds of $10 million in 2008 and

8  5.25 million in 2009.

9  Q.   What's the title of the PDF document?  There are two there

10 that are highlighted in green.  Would you read those aloud?

11 A.   Capital gain 2008, $10 million PDF.

12 Q.   Okay.  And then how about the other?

13 A.   And capital gain 2009, 5.25 million -- or thousand -- or

14 5.25 million PDF.

15 Q.   And what's the date of the email?

16 A.   November 3rd of 2011.

17 Q.   Is that about the time that you recall you began working

18 with Mr. Pieron again on the filing of amended returns?

19 A.   That would be consistent with my recollection, yes.

20 Q.   As you stand here today, sit here today, do you recall

21 what the contents of those PDF's --

22 A.   No.

23 Q.   If the stock was already issued prior to the effective

24 date of the -- or the closure date, excuse me, of the share

25 purchase agreements, would there be any reason -- if the stock

```
 1  had already been issued to Mr. Cook, or excuse me Market Shot,

 2  would there be any reason for a share purchase agreement?

 3  A.   I don't know the answer to that.  Again, it was -- at the

 4  time it was my understanding that they were documenting the

 5  sale transaction.

 6  Q.   But you don't know specifically why they drafted those

 7  purchase agreements, do you?

 8  A.   No.

 9  Q.   Did you ever speak to anybody besides Mr. Pieron about

10  those purchase agreements?

11  A.   Not to the best of my recollection, no.

12  Q.   Pieron told you that he personally sold JDFX stock,

13  correct?

14  A.   Yes.

15  Q.   And he also told you he had basis in JDFX stock; isn't

16  that true?

17  A.   Yes.

18  Q.   Did he provide you with a shareholder account?

19  A.   I don't recall the documentation related to that.

20  Q.   Well, you calculated basis for the amended return, so

21  maybe we can turn to that.  If you would, go to Government

22  Exhibit 41.  Do you recognize this?  It was previously admitted

23  by defense counsel.

24  A.   Yes.

25  Q.   And this is your amended return, isn't it?
```

Pavlik - Cross

1  A.   Correct.

2  Q.   It's the amended return -- I should be more precise when I

3  speak.   It's the amended return that you prepared for

4  Mr. Pieron?

5  A.   Yes.

6  Q.   Where in the amended return is the stock transaction

7  reflected?

8  A.   Shown on Schedule D.

9  Q.   And there -- there's a column for basis, correct?

10  A.   Right.

11  Q.   Is that Column E?

12  A.   Yes.

13  Q.   What is the basis that Mr. Pieron had in the $10 million

14  shares of stock that he sold in 2008?

15  A.   We reported $710,129, which would be 20 percent of his

16  total basis because he sold 20 percent, so the calculated basis

17  would be five times that or 3.5 million.

18  Q.   Well, he also sold stock in 2009, didn't he?

19  A.   Yes.

20  Q.   Well, let's look at the Schedule D from your 2009 amended

21  return.   It's Government Exhibit 42, if you'll pull that up.

22  Do you have it there?

23  A.   Yes.

24  Q.   All right.   And the Schedule D there.

25  A.   We showed -- and, again, I don't recall how this was

1   calculated.  We show $3,276,786.

2   Q.    In cost basis?

3   A.    Right.

4   Q.    And is that consistent with the 2008?  You know what, I

5   just realized Government Exhibit 42 wasn't -- I should have

6   done this right.  Is this the 1040X or the 1040?  If you'd look

7   at the first page of the exhibit.

8   A.    It looks to be the original return, so, yeah, I'm not

9   sure.

10  Q.    Okay.

11         THE COURT:  He's looking at the original return.

12         THE WITNESS:  I'm not sure where the amended return

13  is.

14  BY MR. DEPORRE:

15  Q.    Would you turn to Government Exhibit 48, please, sir.

16  A.    Could you repeat that?  I didn't hear what you said.

17  Q.    Forty-eight.

18  A.    Okay.

19  Q.    And would you describe, for the purpose of the record,

20  what Government Exhibit 48 is.

21  A.    This would be the amended return for 2009.

22         MR. DEPORRE:  Your Honor, this same return was

23  previously admitted, I believe as tab 6 of the defendant's --

24  of the defendant's -- in the defendant's case, and Government

25  moves for admission of Government Exhibit 48 as well.

1            THE COURT:  Received.

2    BY MR. DEPORRE:

3    Q.    Would you turn to the Schedule D for Government

4    Exhibit 48.

5    A.    Yes.

6    Q.    And there do you see a basis for the sale of stock of

7    JDFX?

8    A.    Correct.  We did not -- I did not record any basis, which

9    I should have.

10   Q.    All right.  How much was the reported sale amount?

11   A.    $5,250,000.

12   Q.    Why did you not record -- report any basis?

13   A.    I don't recall the specifics; but, again, what I was

14   trying to do at the time was prove out total income over the

15   two-year period, total reported income, to make sure that all

16   income in total was reported.  In hindsight, there should have

17   been 15 percent of his -- of his basis recorded consistent with

18   2008, which would have netted out against the ultimate theft

19   loss or other type of loss in 2009, so the total income would

20   have been the same, but in hindsight, basis should have been

21   reported here, which would have affected the capital gain.

22   Q.    Now, the basis in 2008, what were the contributions that

23   arose to the basis that was reported in 2008?

24   A.    Again, it was based on information provided by Mr. Pieron

25   that his total investment in the company was 3.5 million.

Pavlik - Cross

1  Q.   And where did you get that information?

2  A.   I don't recall exactly other than from Mr. Pieron.

3  Q.   That it was 3.5 million, not 10 million?

4  A.   At that point it would be -- it was 3.5 million, the

5  $10 million basis wouldn't occur until he had the -- had the

6  sale.

7  Q.   So you can't use proceeds from the sale to increase your

8  basis, can you?

9  A.   Ultimately you can, yes.

10  Q.   For a single transaction -- I should qualify that.  For

11  the 2008 -- the January 1st, 2008 stock sale transaction, can

12  Mr. Pieron use proceeds that he receives as part of that

13  transaction toward the basis that he reports for that very

14  transaction?

15  A.   It wouldn't be basis for that transaction, no.

16  Q.   Okay.  And you didn't report it as basis for the second

17  transaction, did you?

18  A.   No, because we reported net upon the ultimate liquidation

19  of the company, the ultimate loss upon the ultimate --

20  Q.   I'm just asking you about basis, sir.

21  A.   We didn't report it.  We should have reported 15 percent

22  of his basis at that time.

23  Q.   And as you sit here today, what would that have been?

24  A.   It's not a clear answer because it would have been -- you

25  could either use the original basis, 3.5 million, or if you --

1  depending on how you allocated the basis to all the remaining

2  shares, you could use a basis of the 3.5 minus the 710,000

3  you've already counted basis, plus the $10 million gain, and

4  then it would be a percentage of that, 15 out of his remaining

5  80 percent.

6  Q.   So you would allocate the contributions to all the shares,

7  correct?

8  A.   At that point in time, yes.

9  Q.   It would be -- and you would only be able to claim

10  15 percent of the basis, correct?

11  A.   Of however that was calculated at that -- for that

12  transaction, which ultimately -- ultimately all of it was

13  liquidated by the end of that year, though, so it would have

14  all been in 2009.

15  Q.   Let's use very basic math.  If there's a $10 million

16  transaction in 2008, and all of that money is reinvested into

17  the company, all 10 million, and he has -- he sells 15 percent

18  of his shares in 2009, what would his basis be for the

19  15 percent of shares that are sold in 2009?

20  A.   Again, we're mixing some math here, but if you -- it would

21  be 15 percent of the remaining 80 percent of the $10 million in

22  that example with just those two transactions before the

23  liquidation that occurred at the end of 2009.

24  Q.   Very good.  That makes sense.

25          THE COURT:  Sir, the one new fact in the last

1   colloquy with the witness that's new to me, my understanding is

2   that there was no capital contributed by the defendant based on

3   earlier conversations that we had.  This gentleman thinks that

4   he contributed $3.5 million, and I'm not clear why, or where

5   that number even came from.

6           MR. DEPORRE:  Very good.

7   BY MR. DEPORRE:

8   Q.   Do you still have that email in front of you, sir --

9   A.   Yes.

10  Q.   -- with the highlighted part at the top?

11  A.   Yes.

12  Q.   Do you see a part that is highlighted in yellow?

13  A.   Yes.

14  Q.   And it's an attachment, is it not?

15  A.   It looks to me it was an attachment.  It's not attached to

16  this, but --

17  Q.   What sort of document was it?

18  A.   It looks like it was an Excel -- I'm assuming that's an

19  Excel spreadsheet.

20  Q.   Very good.  I'm going to approach with what I've marked as

21  Proposed Government Exhibit 66.  This isn't in our folder.

22          If I might approach, Your Honor?

23          THE COURT:  Yes, sir.

24          Thank you.

25  BY MR. DEPORRE:

Pavlik - Cross

1  Q.   Do you recognize Government Exhibit 66?

2  A.   Yes.  It was at least one of the spreadsheets provided to

3  me by Mr. Pieron.

4  Q.   And what did this spreadsheet -- what information did this

5  spreadsheet provide to you?

6  A.   It showed the proceeds from the two sales and then a lot

7  of the other cash activity.  I don't recall, without analysis,

8  further details from the spreadsheet.

9  Q.   Did you use this spreadsheet to prepare Mr. Pieron's basis

10  calculation for the 2008 amended return where you provided an

11  amount of basis?

12  A.   I don't believe this was connected to the basis

13  calculation.  This was just activity that had occurred from

14  this period of time from 2007 on.

15  Q.   So what did you use to calculate the basis?

16  A.   Again, I don't recall.  It was some information provided

17  by Mr. Pieron that led me to believe that the -- that he

18  documented -- the basis would be three -- was -- again, I'm

19  using approximate numbers, 3.5 million of which I recorded

20  20 percent basis on the sale.

21  Q.   Did you review personal bank records from Mr. Pieron

22  showing capital contributions?

23  A.   No.

24  Q.   Did Mr. Pieron give you a shareholder ledger showing

25  capital contributions for JDFX?

Pavlik - Cross

1  A.   Again, I don't recall the -- what supported the

2  3.5 million calculation that he provided.  I don't remember the

3  details behind that.

4  Q.   But as you sit here today, you believe that information

5  came from Mr. Pieron, not some third party, is that fair?

6  A.   Correct.

7  Q.   Did Mr. Pieron tell you where he got three and a half

8  million dollars for capital contributions in JDFX Holding?

9  A.   No, not that I recall.

10  Q.   Did you review Mr. Pieron's returns from 2000 to 2007?

11  A.   No.

12  Q.   Did you review his 2007 return?

13  A.   I had a copy it.  I didn't review it in detail.

14  Q.   Did he report anywhere close to three and a half million

15  dollars of income on that return?

16  A.   Not in 2007.

17  Q.   Mr. Pieron was a US citizen, correct?

18  A.   That is my understanding, yes.

19  Q.   So any income that he received would have to be reported

20  to the IRS.  Is that your understanding?

21  A.   Yes.

22  Q.   And if he didn't have income prior to 2008 in the scale of

23  $3.5 million, would it have been possible for him to make

24  capital contributions of $3.5 million?

25  A.   That's not -- I've only looked at 2007.  He could have had

1  income, substantial income, years prior to 2007.  Again, I

2  didn't go back and this -- you know, 3.5 million could have

3  come from anywhere.  It wouldn't be -- it wouldn't be my

4  position to try to determine where -- where his money came to

5  invest in the company.

6  Q.   If he did, it would be reflected on his income tax return,

7  is that fair?

8  A.   If it came from income, or if he already had the money

9  before any of these years --

10  Q.   Fair enough.

11  A.   -- or if he got it from, you know, family members, I don't

12  know.  It could come from anywhere.  The 3.5 million, I

13  wouldn't have any knowledge of where that came from.

14  Q.   All you know is that Mr. Pieron told you he contributed

15  three and a half million?

16  A.   Correct.

17  Q.   Did you ask Mr. Pieron for his personal Swiss bank account

18  statements?

19  A.   No.

20  Q.   Did you ask him for corporate Swiss bank account

21  statements?

22  A.   No.  Again, those -- that wouldn't have been part of the

23  services I was preparing -- or performing for him, preparing

24  amended returns.  That wouldn't be part of that process.

25  Q.   The process would be that you would rely on information

```
 1  provided to you by Mr. Pieron --
 2  A.    Yes.
 3  Q.    -- correct?
 4          I'd like you to look again at the amended 2008 tax
 5  return.   It's Government Exhibit 41, that's been admitted into
 6  evidence, and I'd like you to turn your attention to Schedule
 7  D.
 8  A.    Okay.
 9  Q.    Are you using the blue binder?
10  A.    Yes.
11  Q.    All right.   I misspoke.   I'd actually like you to turn --
12  on the bottom right-hand corner there are what attorneys refer
13  to as Bates numbers, and I'd like you to turn to Form 6781 and
14  the Bates number for that is 00315 or Government Exhibit 41.
15  A.    Okay.
16  Q.    What is Form 6781?
17  A.    Gains and losses from Section 1256, contracts and
18  straddles.
19  Q.    Can you put that in lay terms for the lay folks.
20  A.    There are special rules for 1256 transactions that a
21  certain percentage are automatically treated as long-term, a
22  certain percentage as short-term if you sell straddles in an
23  account.
24  Q.    Now, would currency trading qualify as one of those -- as
25  a straddle?
```

1  A.    I don't know if -- I don't know the answer to that.

2  Q.    What is a straddle?

3  A.    I'm probably not in the best position to explain them, how

4  they mechanically work.  I know how the tax results work but

5  I'm not sure that I'm the person to explain a straddle.

6  Q.    Could you tell me what 1256 transactions are.

7  A.    Again, 1256 transactions are either futures or other

8  transactions that automatically -- or straddles automatically

9  60 percent are treated as long-term and 40 percent of the gain

10 or loss are treated as short-term.

11 Q.    And those gains or loss are investments gains, is that

12 fair?

13 A.    Of some form, yes.

14 Q.    Some form.  Here you reported an investment gain on the

15 6781 of $1,046,617, do you see that?

16 A.    Yes.

17 Q.    And that's from a JPMorgan account?

18 A.    Correct.

19 Q.    Was that in the original 2008 return?

20 A.    I don't recall without looking at that return.

21 Q.    All right.  Let's take a look at it real quick.

22 A.    And, again, there was a $600,000 loss from Saxo Bank that

23 same year also.

24 Q.    Oh, yeah.  Let's look at Government Exhibit 40 if you

25 would.  Is this the original return, sir?

1   A.   Looks to be, yes.

2   Q.   All right.  And is there a Form 6781 included in that

3   return?

4   A.   Does not appear to be, no.

5   Q.   So it's fair to say, maybe not, but would you say that you

6   prepared the Form 6781 for the amended 2008 return?

7   A.   Yes.

8   Q.   All right.  I'd like to direct your attention back to

9   Government Exhibit 66.

10  A.   I don't see a 66.  It goes from 75 to --

11  Q.   Oops, sorry.  It was one that I handed you loose.  It's

12  not in the binder?

13  A.   Which document is it?

14  Q.   It's the spreadsheet.

15  A.   Okay.

16  Q.   Left-hand column, it's the date column, if you go down

17  there to a transaction dated 2/7/2007.  Do you see that?

18  A.   Okay.

19  Q.   Do you see that transaction?

20  A.   There are a couple dated 2/7/2007, so I'm not sure what

21  you're referring to, but --

22  Q.   Okay.  Yeah, there are three.  Do you see the last one?

23  A.   Yes.

24  Q.   And what does that reflect?

25  A.   I can't read -- the trading investment something, opening,

 1   I don't know.

 2   Q.   All right.   Do you recognize Government Exhibit 66?

 3   A.   Yes.

 4   Q.   And is this a document that you used to prepare the

 5   numbers on Form 6781 of defendant's amended 2008 tax return?

 6   A.   We would not have used this document to prepare that form,

 7   no.

 8   Q.   Okay.   Well, I'd like you to look at the bottom of

 9   Government's Exhibit 66.   Do you recognize some handwritten

10   notes down there?

11   A.   Yes.

12   Q.   Whose handwriting is that?

13   A.   That looks to be my handwriting.

14   Q.   Okay.   Do you see the first number that says sum A.

15   A.   Uh-huh.

16   Q.   What's that number?

17   A.   1,046,617.10.

18   Q.   Okay.   Now I'd like you to look on Form 6781 where it says

19   JPMorgan, gain.

20   A.   Again, what exhibit is that?   Probably the same number,

21   but I wouldn't have -- I wouldn't have got -- this would have

22   been proving it out from here.   I would have received the

23   information from an annual reporting statement from the bank.

24   This would have just been proving it out --

25   Q.   But what if it's a Swiss bank?   Would you have received it

1  then?

2  A.   We had some documentation of it.  This was proving out

3  those numbers, but there was some documentation that calculated

4  the gain.  I don't recall what it was, but this would have been

5  a proof of that number, but it would have been -- it wouldn't

6  have been the number that I would have used to calculate that

7  number.

8  Q.   When you say "a proof of that number", you would use this

9  to insure the accuracy of the number on the 6781?

10 A.   Just confirming that that's -- that I've accounted for the

11 dollars, yes.

12 Q.   Okay.

13 A.   I'm not sure if it's proving the accuracy, it's just

14 reconciling the two reports.

15 Q.   Who prepared Government Exhibit 66?

16 A.   Mr. Pieron.

17 Q.   And you used it, correct, for your proofs?

18 A.   Yes.

19        MR. DEPORRE:  Your Honor, at this time I would move

20 for the admission of Government Exhibit 66.

21        THE COURT:  Any objection.

22        MR. HURFORD:  No objection, Your Honor.

23        THE COURT:  Received.

24        MR. DEPORRE:  Your Honor, I would like to use the --

25 I'm not a high tech guy, but if we can use the technology here.

1              THE COURT:  It should be on.

2    BY MR. DEPORRE:

3    Q.   Do you have a screen there, sir?

4    A.   Yes.

5    Q.   Do you have anything displayed on that screen?

6    A.   Not at this time, no.

7    Q.   How about now?

8    A.   Yes.

9    Q.   All right.  There's a group of transactions -- I'm going

10   to zoom in.  I'm going to try and zoom in.

11             Do you see a sum of $10 million --

12   A.   Yes.

13   Q.   -- on the exhibit?  And that's a sum of three separate

14   transactions, is that fair?

15   A.   Yes.

16   Q.   Are those the transactions that were the wire transfers

17   for the 2008 sale of stock?

18   A.   I assume that's the case, yes.

19   Q.   And why do you assume that?

20   A.   It's the -- it's $10 million from the JDFX Holding sale.

21   It says in the descriptions.

22   Q.   And it says in the -- in the final one, the $8 million

23   transaction, if says CI slash JDFX Holding slash 20 percent

24   sale, parens 2008 close, closed parens, is that fair?

25   A.   Yes.

Pavlik – Cross                                                    113

```
 1  Q.   After the July 2nd -- and, again, these are European

 2  dates, correct, so the day is first, then the month, then the

 3  year?

 4  A.   Right.

 5  Q.   After the July 2nd transaction, there's a transaction on

 6  July 3rd of 2007.  Do you see that, sir?

 7  A.   Yes.

 8  Q.   And what is that?

 9  A.   Whatever those first something slash trading investment

10  one opening.  It's blurry on here, so I'm not sure, but

11  opening.

12  Q.   Okay.  That's an investment account for Mr. Pieron,

13  correct?

14  A.   I'm not sure.

15  Q.   Does -- does he remove seven and a half million dollars or

16  does he put in seven and a half million dollars based on this?

17  A.   Remove.

18  Q.   He takes out seven and a half million dollars.  All right.

19  So we have seven and a half million dollars, maybe this --

20  I'll -- may I use the board, Your Honor?

21            THE COURT:  You may.

22            MR. DEPORRE:  Thank you.

23            THE COURT:  I haven't seen it used in a long time.

24  BY MR. DEPORRE:

25  Q.   Actually, I'll start with July 2nd.
```

Pavlik - Cross

1          July 2nd, 2007 he puts in $8 million, correct?

2   A.   Again, I don't know exactly what this spreadsheet was, but

3   yes, $8 million is going in.

4   Q.   All right.  And on July 3rd, excuse me, 2007, seven and a

5   half comes out?

6   A.   Correct.

7   Q.   And then there's some other amounts.  There's a -- that's

8   marked A, correct?

9   A.   Yes.

10  Q.   And it says trading investment one opening, correct?

11  A.   Yes.

12  Q.   It's marked A, and then on 7/12 or July 12th, 2007,

13  there's an increase of a million dollars; is that correct?

14  A.   Yes.

15  Q.   On -- then there's an increase of $5 million; is that

16  correct?

17  A.   Yes.

18  Q.   Would you give me the date for the -- the July increase of

19  a million dollars, has an A marked next to it.

20          MR. PENDERY:  It's off the screen.

21          THE WITNESS:  It went off the screen.

22          MS. PARKER:  I hit the wrong button.  There it's

23  back.

24          THE WITNESS:  So these are -- the first number is the

25  day, right, so it would be July 12th of 2007 I guess.

1   BY MR. DEPORRE:

2   Q.   And then the $5 million?

3   A.   November 23rd of 2007.

4   Q.   And then there's another one that's marked with A on the

5   next page.  Do you see that?

6   A.   Yes.

7   Q.   And how much money is there?

8   A.   2,546,617.10.

9   Q.   2,500,000?

10  A.   2,546, 617.10, I believe.

11  Q.   And what was the date of that?

12  A.   It's cut off on the screen so -- it looks to be

13  February 4th of 2008.

14  Q.   Do we have a calculator?  Would you see what

15  seven-point -- 7,500,000, minus $1 million, minus $5 million,

16  minus $2,546,617 equals.

17  A.   As shown on the sum of A on front page, a negative

18  1,046,617.10.

19  Q.   And that's the amount you report as a gain on the Form

20  6781, correct?

21  A.   Correct.

22  Q.   So that $7.5 million that James Pieron uses to trade on,

23  and he reports a gain on it as he should, where did he get that

24  seven and a half million dollars?

25          MR. HURFORD:  Object, Your Honor, the question that

 1  James -- assumes a fact not in evidence that James Pieron used

 2  $7.5 million to trade on.

 3           THE COURT:  Overruled.

 4           MR. HURFORD:  And it's compound, and the witness

 5  can't answer the question without accepting the facts that were

 6  asserted.

 7           THE COURT:  Overruled.  We'll take the witness's

 8  response.

 9           MR. PENDERY:  We didn't hear you, Your Honor.

10           THE COURT:  Overruled.  We'll take the witness's

11  response.

12           THE WITNESS:  Again, this was activity with ins and

13  outs, and I did everything as before I said based on a net

14  basis of anything net taken out of the -- net taken out based

15  on the spreadsheet.

16  BY MR. DEPORRE:

17  Q.   Mr. Pavlik, I'm not accusing you of anything.  I'm asking

18  you, if you know, where Mr. Pieron got the $7.5 million that he

19  used to trade for currency trading?

20  A.   It appears, based on this, that it would have been

21  borrowed from JDFX.

22  Q.   You say borrowed, but that was his money, wasn't it?  He

23  reported it as income on the amended 2008 tax return, didn't

24  he?

25  A.   You're mixing apples and oranges on that.  The 7.5 is

1  money taken out as a loan from JDFX, and then if it was

2  reinvested, it would be a gain or loss, but the fact that it

3  was taken out doesn't mean it was his money.

4  Q.   Why did he report it on his personal return then, the gain

5  from the transaction?

6  A.   Again, if he would have borrowed money from JDFX and

7  invested it, he would have reported on his personal return the

8  gain or loss on that activity and then he would have paid back

9  the proceeds.  So, again, he was, you know, based on this, was

10 taking money out of the company and putting it back in the

11 company over this period of time.

12 Q.   Did you ever see a loan document?

13 A.   No.

14 Q.   Did Mr. Pieron tell you that there was a loan?

15 A.   We always had the conversations that -- you know, that he

16 should have kept individual and everything separately and he

17 should document any loans, but there was activity going both

18 ways that were not clearly documented as far as what the intent

19 was at the time the money was either put in or taken out.

20 Q.   So what you knew was what he told you --

21 A.   Correct.

22 Q.   -- fair?  He didn't have contemporaneous records in

23 2000 -- November of 2011?  When he gives you that spreadsheet,

24 he doesn't give you any records from 2008, does he?

25 A.   Other than whatever the -- you asked bank account

1  statements, but we would have had some recording from Saxo Bank

2  and JPMorgan.  I don't remember what those documents looked

3  like, but we would have had some reporting at that time.

4  Q.    But that reporting would report the gain, correct, the

5  gain on the investment?  That reporting doesn't show the

6  shareholder loan, does it?

7  A.    Right.

8  Q.    Okay.  If you would turn to Government Exhibit 212,

9  please.  It's in the folder, okay.  Did Mr. Pieron produce to

10 you bank records from JPMorgan?

11 A.    I don't recall.

12 Q.    Well, can you describe what Government Exhibit 212 is?

13 A.    It says it's an account balance statement from JPMorgan.

14 Q.    And who's the -- what name is the account in?

15 A.    It looks to be JDFX Fund Limited.

16 Q.    What is the relationship between JDFX Fund Limited and

17 JDFX Holding, if there is any?

18 A.    I don't know.

19 Q.    You don't know.  Did Pieron ever tell you?

20 A.    We wouldn't have -- we -- my understanding that JDFX

21 was -- they were all part of the holding company is how I would

22 have understood it at the time, but I don't recall the

23 specifics.

24 Q.    Well, were you familiar with correspondence between

25 Mr. Fetters and the SEC saying that they were distinct

Pavlik - Cross

1    corporate entities with no relation to one another?

2    A.    No, I'm not familiar with that.

3    Q.    And Mr. Pieron didn't express that to you, to the best of

4    your recollection?

5    A.    Not that I recall.

6    Q.    You also mentioned that there was a loss on the form -- I

7    can never keep the name of it.

8    A.    6781.

9    Q.    Thank you, sir.  6781 on the amended return.

10   A.    I don't remember what exhibit that was, but --

11   Q.    It's Government Exhibit 41.  I think it was Bates number I

12   want to say 315.

13   A.    Okay.

14   Q.    What is the loss for, if you know?

15   A.    I know the amount of the loss is 600,141 but I don't know

16   the -- I don't recall the details of that loss.

17   Q.    Are those trading losses?

18   A.    I would assume so.

19   Q.    And, therefore, they can offset the gain from the

20   JPMorgan?

21   A.    Correct.

22   Q.    Where did the money come from that Mr. Pieron used to

23   trade in the Saxo Bank account?

24   A.    I don't know the answer to that.

25   Q.    Well, did you have any records from Saxo Bank?

1  A.   We had some form of records to support that loss, but I

2  don't recall what the record was.

3  Q.   All right.  I'd like you to turn to Government

4  Exhibit 212.

5  A.   Did you change your mind because that doesn't -- I'm not

6  sure what that is.  That's JPMorgan.

7  Q.   Well, this is one I don't have in the binder actually, so

8  let me find it here.  Do you recognize what's been marked as

9  Government Exhibit 65?

10 A.   I believe so, yes.

11 Q.   What is it?

12 A.   It would be some documentation from the Saxo Bank

13 regarding those transactions.

14        MR. DEPORRE:  All right.  I move for Exhibit 65 to be

15 admitted into evidence.  It was a trial exhibit.  Your Honor.

16        THE COURT:  Any objection?

17        MR. HURFORD:  I don't know exactly what rules we're

18 playing by with the evidence, Your Honor, but in terms of

19 moving this into evidence, if we were in trial, yes, I would

20 have some significant objections to it.  The fact that there's

21 no business record certificate or anybody telling us where this

22 came from, et cetera, but for purposes of today, I don't want

23 to put up a fight about that stuff.  I don't know if he's

24 actually used this in his tax calculations at all, so --

25        THE COURT:  You'll find it on Exhibit 66, and the

1  witness has substantiated the fact that it was a corroborating

2  bank balance, so it'll be received.

3            MR. DEPORRE:  Thank you.

4            THE WITNESS:  Again, I don't know what that -- I

5  don't know what it shows.  I just see that it's from Saxo Bank,

6  so I'm presuming that, but I -- it only goes through a little

7  bit of it so I don't know what the -- what this document is

8  actually showing.

9  BY MR. DEPORRE:

10 Q.   Okay.  Well, let's start with what we can read.  What sort

11 of fund would this be for?

12 A.   I don't know.

13 Q.   Is it for a capital market?

14 A.   Based on the title, I guess, yes, but, again, I don't know

15 any of the details.

16 Q.   Okay.  And who is it for, based on the name that's on

17 there?

18 A.   James Pieron.

19 Q.   When was the first deposit made?

20 A.   November 23rd of 2007.

21 Q.   I'm going to have you go back to Government Exhibit 41 and

22 that Bate stamp number 315.

23 A.   Okay.

24 Q.   Do you recall if you used Government Exhibit 65 to

25 determine a loss that's reflected here on the 6781 for the

1  amended 2008 return?

2  A.   Is this Exhibit 65?

3  Q.   Yeah, what's displayed on the screen, and you can't see

4  it --

5  A.   I don't know.  I can't see what it shows, so I don't know

6  if this was used for that purpose or not.  Is this 65?

7  Q.   I'll bring it up to you.

8  A.   Yeah, I can't tell from this exactly how it was used for

9  the calculating the $600,000 loss.

10  Q.   Okay.

11  A.   This says page 1 of 2, and there's only one page.  It's

12  not calculating based on this, so I don't know if there's more

13  to it than that, but I can't tell from this if that's the

14  documentation of the $600,000 loss or not.

15  Q.   Okay.  What I'd like you to do is turn to Government

16  Exhibit 66.

17  A.   Okay.

18  Q.   This is that spreadsheet, correct?

19  A.   Right.

20  Q.   Now, do you see at the bottom where it says sum B.?   I

21  didn't highlight this one.

22  A.   Yeah, so it's --

23  Q.   But I'll put a blue dot next to it because I have a blue

24  marker -- oh, I got a pink highlighter.

25          MR. HURFORD:  Your Honor, at some point in the next

1   couple minutes, may we take a very brief bathroom break?

2          THE COURT:  Yeah, I prefer doing that rather than

3   having to cleanup, so why don't we take about a five minute

4   break and we'll return.

5          MR. HURFORD:  Thank you, Your Honor.

6          (At 2:23 p.m., break taken.)

7          (At 2:35 p.m., break concluded.)

8          THE COURT:  You may continue.

9   BY MR. DEPORRE:

10  Q.   Mr. Pavlik, we were looking at what's been marked as

11  Government Exhibit 66.  And there it shows a -- the sum of B in

12  the amount of $682,754.16, and it's in parenthesis.  Is that to

13  note that it was a loss?

14  A.   Yes.

15  Q.   And that's a loss from an investment, from the purple

16  highlighted figure that's also marked with a B, correct?

17  A.   Yes.

18  Q.   All right.  So on September 23rd -- I'm going to go back

19  to Government Exhibit 65, which is the Saxo Bank record.  Here

20  it says November 23rd, 2007, there's an investment into a --

21  trading investment two, and here there's a two and a half

22  million dollar deposit into a trading account for James Pieron?

23  A.   Yes.

24  Q.   Is it fair that the $2.5 million on Government Exhibit 66

25  refers to the Saxo Bank record, Government Exhibit 65?

Pavlik - Cross

1  A.   Yes, that would be a fair assumption.

2  Q.   And you reviewed just the -- just reviewed the 2007 return

3  that was prepared by Ms. Carol Nathan, correct?

4  A.   Yes.

5  Q.   I'd like you to look at that return as well.  It's

6  Government Exhibit 39.  If you would, turn to page Bates number

7  280 there at the bottom, it's a Schedule D.

8  A.   Okay.

9  Q.   And there it says in part one Saxo Bank, do you see that?

10 A.   Yes.

11 Q.   And do you see a loss taken in 2007?

12 A.   Yes.

13 Q.   And is that the date acquired, 11/23/07, is that the same

14 date as the 2 million -- two and a half million dollar deposit

15 on Government Exhibit 65?

16 A.   It's the same date.

17 Q.   And it's the same amount?  Well, it doesn't say an amount,

18 it's just the date?

19 A.   Right.

20 Q.   Do you have reason to believe that that's the same Saxo

21 Bank trading account?

22 A.   Again, that would be an assumption, but I would assume

23 that is the case, yes.

24 Q.   Okay.  Did James Pieron tell you that's the case?

25 A.   I doubt it, not specifically, no.

1  Q.   Did he tell you where he got the two and a half million

2  dollars that he used to trade in the Saxo Bank account?

3  A.   Not specifically.  It was in the spreadsheet as a --

4  whether it was a loan or what other activity coming out of

5  this -- of this other account.

6  Q.   Well, he takes 5 million out, do you remember, of the

7  other account, the other trading account?  He takes $5 million

8  out on November 23rd, 2007 correct?

9  A.   I can't see that board, so I don't know.

10 Q.   I'm sorry.

11 A.   He was actually putting 5 million back in at that time.

12 Q.   Yeah, he says he's putting 5 million into his -- to JDFX,

13 right?

14 A.   Right.

15 Q.   Yeah, but that's the same day as two and a half million

16 going into the Saxo Bank account, the personal Saxo Bank

17 account, correct?

18 A.   Based on the spreadsheet, yes.

19 Q.   Same day?

20 A.   Yes.

21 Q.   Do you know where James Pieron would have gotten two and a

22 half million dollars from, if not from the withdrawal from the

23 other JDFX trading account?

24 A.   I don't understand the purpose of the question.  It's

25 showing on here that the 5 million went back into the JDFX and

1    two and a half million came out of the JDFX to go to Saxo Bank,

2    so I'm not sure what is not demonstrated by that.

3    Q.    It shows $5 million going in; two and a half coming out --

4    A.    Right.

5    Q.    -- right?  The two and a half, where is it coming out of?

6    A.    Presumably JDFX, the same one that it's going -- the

7    5 million went into.

8    Q.    JDFX Holding?

9    A.    I don't know the answer to that.

10   Q.    Okay.  May I approach, Your Honor?

11             THE COURT:  Yeah.  And I'll acknowledge that I am

12   trying to understand the legal significance of his trading with

13   funds borrowed from JDFX.  If he made or lost money, it would

14   feed into his personal return, but I don't understand there to

15   be anything impermissible, in effect, by essentially obtaining

16   bank loans from JDFX to trade with so long as he's returning

17   the funds.

18             MR. DEPORRE:  The legal significance in the

19   Government's view is that he is trading with funds that he

20   received from Trevor Cook pursuant to a sale of stock.  He has

21   documented those funds on Government Exhibit 66 as being

22   capital contributions into JDFX, but there are no -- there are

23   no share -- there are no other records, other than this

24   spreadsheet, and there are no loan agreements that would

25   indicate why he's taking money, other than the fact that that

1  was his money, that that -- the money that's being used to

2  trade in the Saxo Bank account is Mr. Pieron's personal money.

3  It does show his dominion over --

4          THE COURT:  I appreciate that in effect he's

5  utilizing it as a bank and he's a customer.

6          MR. DEPORRE:  Yeah, so that, I think, supports the

7  Government's position that those funds that he received from

8  Mr. Cook were received by him rather than deposits that

9  Mr. Cook made to --

10          THE COURT:  I mean, I don't think 66 substantiates

11  that.  I mean, 66 substantiates the fact that he's just

12  borrowing periodically but returning it to the company.

13          MR. DEPORRE:  Right.  It shows him using the money

14  from the company for his own personal trading.

15          THE COURT:  Uh-huh.

16          MR. DEPORRE:  That's all.

17          THE COURT:  Okay.

18  BY MR. DEPORRE:

19  Q.   Would you turn to Government Exhibit 212.

20  A.   Okay.

21  Q.   Do you see there a $5 million transaction on

22  November 23rd, 2007?

23  A.   Yes.

24  Q.   And where does the money come from for that transaction?

25  A.   I don't know the answer to that.

Pavlik - Cross                                                    128

1   Q.   Based on Government Exhibit 212?

2   A.   From whatever this -- the JDFX Fund, I guess.

3   Q.   So it's a JDFX Fund account, and there's $5 million and

4   where does it go to?

5   A.   Based on what?  I don't know.

6   Q.   Well, based on the statement.  The first line 5 million.

7   UBS, AG, Zurich.  Whose account does it go to, sir, at UBS, AG,

8   Zurich?

9   A.   Based on this document, James Pieron, I guess, if that's

10  your -- if that's what you're referring to.  Again, I'm not

11  familiar with this -- with this document.

12  Q.   Government Exhibit 212 is a bank statement from JPMorgan,

13  correct?

14  A.   Statement from JPMorgan, yes.

15  Q.   Is this something you received from Mr. Pieron?

16  A.   Not that I recall.  I may have, but I don't recall it.

17  Q.   You didn't necessarily rely on it, did you?

18  A.   Correct.

19  Q.   But it shows money, it shows $5 million going into

20  Mr. Pieron's personal account, correct?

21  A.   Yes.

22  Q.   And it shows that occurring on November 23rd, 2007.

23  A.   Yes.

24  Q.   There's also a payment from JDFX on February, 2008,

25  February 4th, 2008, also to James Pieron, correct?

US v. Pieron, Jr. - Hearing - December 20, 2019

1   A.   Appears so, yes.

2   Q.   And that's in what amount?

3   A.   2,546,617.10.

4   Q.   And was that amount reflected on Government Exhibit 66,

5   February 4th, 2008?

6   A.   Yes.

7   Q.   And where did it purport to be going to?

8   A.   Again, back to this account.  This was on a combined

9   basis, this analysis, so I don't -- it wasn't specifically

10  account by account.

11  Q.   Well, it looks like from Government Exhibit 66 that it's

12  going back into the company, correct?

13  A.   The group of companies, yes.

14  Q.   But at the very least it does pass through Mr. Pieron's

15  personal account, correct?

16  A.   It would appear so based on this other document that I'm

17  not familiar with.

18  Q.   This Government Exhibit 212?

19  A.   Right.  And, again, we did it -- we reviewed things based

20  on his information on a net basis, treating all the ins and

21  outs as loans back and forth from the companies.

22  Q.   Solely based on Exhibit 66; there were no loan documents,

23  correct?

24  A.   Correct.

25  Q.   There were no shareholder account reports, correct?

1  A.    Based on this spreadsheet.

2  Q.    I'd like to turn now to -- to the theft loss deduction,

3  and specifically I'd like to turn your attention to Government

4  Exhibit 204.

5  A.    Okay.

6  Q.    You said that Mr. Pieron had explained to you the

7  rationale for the theft loss deduction that you took; is that

8  correct?

9  A.    Correct.

10  Q.    And you wanted to have that in writing, correct?

11  A.    That's to the best of my recollection, yes.

12  Q.    And so you asked Mr. Pieron to write you a letter,

13  correct?

14  A.    Presumably, yes.

15  Q.    Is that what Government 204 reflects?

16  A.    I believe so, yes.

17  Q.    Well, take a look at it, and I'll put it up on the screen.

18  A.    Okay.

19  Q.    Is this something that Mr. Pieron sent to you?

20  A.    I believe so, yes.

21  Q.    All right.  I'm going to -- do you recall when he sent it

22  to you?

23  A.    No.

24         MR. DEPORRE:  May I approach the witness, Your Honor.

25         THE COURT:  You may.

Pavlik – Cross

1  BY MR. DEPORRE:

2  Q.   Mr. Pavlik, I handed you an email.  Does that reflect when

3  you received Government Exhibit 204 from Mr. Pieron?

4           MR. HURFORD:  Your Honor, I'm going to object.  I

5  keep getting these emails referring to attachments and they

6  don't contain attachments, and we're using the emails to ask

7  the witness to confirm they saw what the Government thinks the

8  attachment was without actually establishing what the

9  attachment is.  I don't know how that helps move the ball.

10          THE COURT:  Well, and I'm at a further additional

11  disadvantage because I've never seen the document.  I don't

12  know whether -- or where it came from, whether it was from AHP,

13  whether -- or some other source.

14          MR. DEPORRE:  Government Exhibit 204, Your Honor, was

15  received by the Government in response to a grand jury subpoena

16  to AHP and also the email that I've given to Mr. Pavlik to

17  refresh his recollection, they were not produced in native

18  format.  In other words, they were PDF files, and they were not

19  subsequent, so I need to marry up Government Exhibit 204 to

20  when he -- when the witness received it.

21          THE COURT:  Okay.

22          MR. DEPORRE:  It's an undated letter.

23          MR. HURFORD:  That's why we have record custodians

24  come to court and explain the documents they have produced.

25          MS. PARKER:  There's a certificate of authenticity

1    for all these records provided by AHP.

2            MR. HURFORD:  That does nothing to take --

3            THE COURT:  But this witness may be able to do that.

4            MR. HURFORD:  Perhaps.  I don't -- we haven't gotten

5    there yet.

6            THE WITNESS:  To -- I know there's a letter, and I

7    know there's an email.  I can't verify that this is the letter

8    that was attached to this email because the email just says,

9    please review the attached letter, so I don't know if this is

10   the letter that was attached to this particular email.  I'd

11   have no way of knowing that.

12           THE COURT:  The author of the email and the recipient

13   of the email are?

14           THE WITNESS:  It was from Mr. Pieron to me, the

15   email, saying please review the attached letter.  I had no idea

16   about the positioning and/or person of this letter, so I just

17   took a stab at let's review and get together on Monday.  I

18   don't know if this is the letter that he was referring to there

19   or not.

20   BY MR. DEPORRE:

21   Q.   Would he have sent you another letter?

22   A.   He could have sent me various letters.  This may have been

23   the letter, but I have no way of knowing it based on this.

24   Q.   And if he did send you another letter, when would it have

25   been?

1  A.   I would have no way of knowing when various letters were

2  sent over the last, you know, from 2010 to 2017.  Well, before,

3  you know, sometime before -- this shows November 26 of 2011, so

4  there -- this letter -- whatever was attached to this email was

5  November 26th, 2011, but I don't know if that's the same time

6  this letter was sent or not.

7  Q.   All right.  Government Exhibit 204, is that something that

8  you had before you filed the amended return for Mr. Pieron?

9  A.   I don't know that for sure.

10 Q.   Mr. Pavlik, do you recall your testimony in grand jury --

11 before the grand jury in this case?

12 A.   I recall --

13 Q.   Do you recall appearing and having a compact disk with you

14 when you appeared?

15 A.   I don't recall what I brought with me.

16 Q.   Did you -- okay.  Your discussions with Mr. Pieron

17 regarding the theft loss basis must have occurred before he --

18 before the amended return, is that fair?

19 A.   Correct, yes.

20 Q.   Was there any information in Government Exhibit 204 that

21 would have changed your analysis with respect to the theft

22 loss?

23 A.   I don't believe so.  I think this is -- this is consistent

24 with the position I took by taking the theft loss.

25 Q.   All right.  I'd like you to go to the third paragraph.  It

1  says in late 2009 the owner of Market Shot, LLC, namely

2  Mr. Trevor Cook, was federally indicted for running a

3  190 million US dollar Ponzi scheme, do you see that?

4  A.    Yes.

5  Q.    Did you verify that?

6  A.    Not specifically, no.

7  Q.    Do you know whether or not Mr. Cook was charged in 2009 or

8  in 2010?

9  A.    I don't know -- but I know that there was lots of activity

10  that occurred in 2009, so it was public information that he was

11  running this Ponzi scheme because I did verify that portion of

12  it.

13  Q.    And you knew in November, November 30th of 2009, that JDFX

14  Holding had commenced insolvency proceedings, did you not?

15  A.    Yes.

16  Q.    November 30th, 2009, correct?

17  A.    Correct.

18  Q.    Do you see in the letter it says, "As Cook was 35 percent

19  owner in JDFX, the minute the news hit the press, JDFX vendors

20  and customers began terminating relationships until finally

21  Deutsche Bank terminated the prime brokerage agreement, which

22  simultaneously terminated relationships with all banks and

23  liquidity providers.  Shortly thereafter JDFX was forced into

24  liquidation and my private loans became uncollectible and,

25  therefore, a personal loss."

1   A.   Yes.

2   Q.   When was the termination of the prime brokerage agreement?

3   A.   I don't know the exact date.

4   Q.   Did Mr. Pieron provide you with a copy of the prime

5   brokerage agreement?

6   A.   Not that I recall.

7   Q.   Did he provide you a copy of the termination letter to

8   support your theft loss deduction?

9   A.   I don't recall the documentation, but I know that I had a

10  document showing the liquidation of the company in late 2009,

11  and I verified that, again, Cook was -- it became public

12  information that he was under investigation for the Ponzi

13  scheme during 2009, but I didn't get further documentation than

14  that that I can remember.

15  Q.   I'm going to hand you a letter that's been -- that's dated

16  December 18th, 2009, I'm going to mark it as Government

17  Exhibit 220.

18          MR. HURFORD:  No objection.

19          THE COURT:  Received.

20          MR. DEPORRE:  And there's no jury.  May I just put it

21  on the ELMO, Your Honor?

22          THE COURT:  You may.

23  BY MR. DEPORRE:

24  Q.   Do you see the date on this letter?

25  A.   It's dated December 18th of 2009.

1  Q.   And does it refer to the termination of a foreign exchange

2  prime brokerage agreement?

3  A.   Part of its truncated, but it looks like it was effective

4  the end of the 20th day of January 2010, January 20th, 2010.

5  Q.   I was zooming -- or I was focusing, I should have been

6  zooming.  There we go.  It's all there now.

7          And when is the termination effective?

8  A.   I guess the January 21st, 2010.

9  Q.   So prior to the termination of the prime brokerage

10 account, Mr. Pieron had already commenced insolvency

11 proceedings for JDFX; isn't that true?

12 A.   The insolvency proceedings occurred in November of 2009,

13 that is correct.

14 Q.   Before the termination letter was sent?

15 A.   Before the official termination of this agreement

16 apparently based on this document, which I don't recall having

17 seen before.

18 Q.   All right.  But you have seen Government Exhibit 204

19 before, correct?

20 A.   Yes.

21          MR. DEPORRE:  Your Honor, I move for admission of

22 Government Exhibit 204.

23          THE COURT:  Any objection?

24          MR. HURFORD:  No, I think I moved that in myself,

25 Your Honor.

1          THE COURT:  Received.

2  BY MR. DEPORRE:

3  Q.   Do you know if the termination of the prime brokerage

4  account -- based on this letter, do you have any idea why it

5  was terminated?

6  A.   Not specifically other than as Mr. Pieron described in the

7  letter in Exhibit 204.

8  Q.   So the termination letter -- the information that you have

9  regarding the termination only came from Mr. Pieron, is that

10 fair?

11 A.   Yes.

12 Q.   Okay.  And you didn't know whether or not Mr. Pieron told

13 his employees that it was too expensive to operate in

14 Switzerland, do you?

15 A.   I would have no knowledge of that, any conversations.

16 Q.   And you wouldn't know if prior to the revelations of

17 Mr. Cook if Mr. Pieron told his stepfather that he planned to

18 return to the United States, do you?

19          MR. HURFORD:  Objection, Your Honor.  I think the

20 list of what he hasn't heard may be a closing argument.

21          THE COURT:  The witness can respond.

22          THE WITNESS:  I'm not aware of that.

23 BY MR. DEPORRE:

24 Q.   You're not aware that Mr. Cook was actually charged in

25 March of 2010?

Pavlik - Cross

1  A.   I subsequently became aware that the actual charge was

2  later, but it was, again, public information in the middle of

3  2009 when Mr. Pieron indicated that -- that everything related

4  to the company started falling apart.  And I did verify that,

5  you know, that it became public knowledge, and I don't recall

6  the date, but sometime in 2009, before November 30th.

7  Q.   Was there ever a theft from Mr. Pieron?

8  A.   Again, as stated before, the theory, as also stated in

9  this letter, that it wasn't a direct theft loss, and because

10 there was a lot of information being published that it didn't

11 have to be a direct theft loss regarding the Ponzi scheme as a

12 result of the Bernie Madoff case because there were so many

13 people that lost money that weren't affected by a direct theft

14 loss but they were allowed to take a theft loss if they had

15 a -- if a loss was indirectly related to the Ponzi scheme.

16 That was our position at that time.

17 Q.   And who were those people who were allowed to take money

18 under the rules adopted following the Madoff scheme?

19 A.   Various -- you'd have to go through a --

20 Q.   Were they investors?

21 A.   Presumably for the most part that case, but I don't know

22 all the details of all the different nuances.

23 Q.   Are you familiar with any situation where someone who

24 received an investment from Madoff was allowed a theft loss by

25 the IRS?

Pavlik - Cross

1   A.    I don't know the answer to that.

2   Q.    Well, that's the situation we had here, correct?

3   A.    Right.  It was an indirect result.  There was a lot of

4   information indirect, but they didn't go into all the details

5   of exactly what indirect losses were related to the --

6   Q.    What sort of things were you relying on when you created

7   the theft loss?

8   A.    Again, the information that was being provided at the time

9   regarding the Madoff case, that a lot of cases -- and they also

10  talked about the claim of right doctrine.  If somebody didn't

11  have a right to the income, it was either a claim of right loss

12  or a theft loss.  And our professional judgment at the time was

13  that we had enough information based on that to take the

14  position of a theft loss.

15  Q.    What's your professional judgment today?

16  A.    I don't think that's appropriate to opine on.  I didn't --

17  I did it based on my professional opinion at the time, which

18  was, you know, in the middle of the Madoff case.

19  Q.    You don't want to say that you would take it today?

20  A.    Presented with the same facts that I had at that time, I

21  would still take it.  Today, if I had the facts at the time and

22  the research I had at the time and not subsequent course cases.

23  Q.    You would still take a theft loss today?

24  A.    Again, you're asking me -- I'm saying I did my best

25  professional judgment at the time I had based on information

1  that I had at that time.  Based on subsequent information, and

2  subsequent results, the answer may change but based on the

3  information I had at that time.

4  Q.   It may change.  Would it change?  Based on what you know

5  today, would it change?

6  A.   I haven't continued to research the Madoff case since that

7  date so I don't know the answer to that, because I haven't had

8  the case come up again.  And I feel that the 2011 return, which

9  we took a claim of right doctrine, eliminated this from being

10  the final answer.

11       My final answer was the 2011 amended return saying

12  that he never had a right to this income in the first place so

13  there was no capital gain.  I consider that to be my final

14  analysis of the situation that superseded the returns taking a

15  theft loss, and I feel confident in that position of the claim

16  of right doctrine.

17  Q.   And you feel confident -- not so confident in the theft

18  loss?

19  A.   Less con -- again, at the time I used professional

20  judgment.  When our threshold is asked to have a one-third

21  chance of success, I believed we had that threshold based on

22  the information I had, based on the Madoff case.  I think I

23  have much more than a one-third chance of success on the claim

24  of right doctrine that I subsequently took on the 2011 return.

25  Q.   What do you mean by a one-third chance of success,

1  successful for whom?

2  A.   On IRS appeals that I would have a more than one-third

3  chance of success winning my -- winning my argument.

4  Q.   You had about a 50/50 chance of success for the theft

5  loss, right?  I mean, you got one theft loss claim in for

6  '08 and not for '09?

7  A.   Well, I guess I more than passed the threshold of

8  one-third, so, yes, I guess.

9  Q.   Is that how you judge what's accurate is whether or not

10 the -- it'll slip through the IRS?

11 A.   I don't appreciate that characterization.  Normally you

12 would have a chance -- if there was some gray area, you'd have

13 a chance -- an appeals officer, and you would sit down in front

14 of an appeals officer that has, you know, a lot of experience

15 in taking -- understanding IRS position versus your position

16 and making a determination.

17          Under that scenario, I believed I had more than a --

18 I have never prepared a return based on letting something slip

19 through the cracks.  I've done it based on because I had a

20 position that, upon appeal, what would be my chance of success,

21 not the chance of audit.  That's a whole different issue that

22 we're not allowed to do a tax return based on the chance of

23 audit.

24 Q.   So based on the information that Mr. Pieron had given you

25 at the time regarding the theft loss, you believed the theft

Pavlik – Cross

1  loss was appropriate?

2  A.   Yes.

3  Q.   And based on the information that Mr. Pieron gave you,

4  about the claim of right doctrine, you believed that that was

5  appropriate?

6  A.   Subsequently when I filed that return in 2011, yes.

7  Q.   And the offer in compromise?

8  A.   Yes.

9  Q.   If the defendant still had money that he had received and

10 he put it into IB Tech, or his other domestic enterprises,

11 would he be able to claim a theft loss for that?

12 A.   No.

13 Q.   And he wouldn't be able to claim it under the claim of

14 right doctrine either, correct?

15 A.   Again, you're mixing apples and oranges again.  It's more

16 complicated than that black or white scenario.  The theft loss,

17 he didn't take -- claim it as a theft loss because, again, as I

18 stated before, Mr. Pieron made the specific point that -- when

19 I did the first analysis, I understated his income because he

20 said money went into IB Tech and Komplique, 800,000 apiece

21 approximately, that I didn't account for that I should have

22 that meant that he had additional income, so I didn't take a

23 theft loss for that.

24      The claim of right doctrine is a little bit different

25 because that says he never had a right to the $15 million in

US v. Pieron, Jr. - Hearing - December 20, 2019

1   the first place, so that presumably would -- again, it's more

2   complicated than this, but would wipe out all of the income

3   because he never had a right to it in the first place.

4   Q.   Okay.  So how much did he keep?

5           THE COURT:  Sir, we're at about 3:15.  We've gone a

6   little bit longer than we originally planned.

7           MR. DEPORRE:  Could I ask two follow-up questions,

8   Your Honor?

9           THE COURT:  Sure.

10  BY MR. DEPORRE:

11  Q.   He transferred money to IB Tech, correct?

12  A.   Yes.

13  Q.   And the SEC receiver never claimed the funds or never

14  received the funds that he transferred to IB Tech and

15  Komplique, correct?

16  A.   They subsequently didn't attempt to go back because they

17  only went back to what was left in JDFX at that time.

18  Q.   But not the funds he took out of JDFX and took into his

19  new companies?

20  A.   He did not have to pay that back, no.

21  Q.   Okay.  But you claimed it on the claim of right doctrine,

22  under the claim of right doctrine, correct?  You claimed those

23  funds that the SEC was entitled to those --

24  A.   Again, you're mixing apples and oranges.  That's -- the

25  claim of right says he didn't have a right to the $15 million

144

 1  in the first place, so that's a different situation.  So, yeah,

 2  he didn't have a right to any of the $15 million.

 3  Q.   But he took -- so he didn't have a right to $15 million

 4  and he took a portion of that $15 million, and put it into his

 5  new company IB Tech, is that fair?

 6  A.   Yes.  And if they would have pursued it --

 7  Q.   And then you said the claim of right doctrine applies and

 8  he shouldn't have to pay taxes on the money that he took from

 9  JDFX Holding and into IB Tech?

10  A.   Again, you're mixing apples and oranges.  It's more

11  complicated than that because, again, there's -- the claim of

12  right said he didn't have a right to the $15 million.  There's

13  a separate calculation of what happens upon liquidation of the

14  company, but the claim of right says he doesn't have a right to

15  the $15 million because if he still had it in JDFX, he would

16  have had to pay it back so, again, you're mixing two different

17  things together.

18  Q.   Is it only if he still had it in JDFX?

19  A.   Presumably the receiver could have pursued it elsewhere,

20  but they tried to pursue it out of JDFX, and there was nothing

21  left in JDFX.

22  Q.   Why was there nothing left in JDFX?

23  A.   Because it was liquidated in November of 2009.

24  Q.   And because Mr. Pieron transferred over a million dollars

25  out of JDFX into his new company?

1   A.    He transferred a portion of the $15 million -- well,

2   again, whether it's that same $15 million or his initial

3   investment, it's not clear.  Again, that's why I can't speak to

4   that because you're asking me to give specifics on something

5   that's an extremely complicated situation.  Presumably he

6   already had money invested, so which money got transferred out?

7   His original investments, or part of the $15 million?  That's

8   not an answerable question at this point.

9            MR. DEPORRE:  Your Honor, I have a few more topics

10  but I understand that --

11           THE COURT:  The total amount, however, can be

12  calculated, and I think it's right about 1.6.  See if I'm

13  right, see if the witness agrees or disagrees.

14           THE WITNESS:  I'm sorry, sir, I didn't hear you.

15           THE COURT:  If my calculations are correct, the funds

16  that Mr. Pieron would have transferred out of JDFX prior to the

17  liquidation would have been about a million six?

18           THE WITNESS:  Yes.  Again, that doesn't necessarily

19  mean anything because you'd have to do the analysis of what his

20  original investment was, and then, you know, the -- the various

21  things we disclosed on the amended 2011 return.

22           THE COURT:  It all depends on your initial

23  characterization of the transactions themselves, which is

24  outlined in Government's 204, which is Mr. Pieron's letter to

25  our witness.

Pavlik - Cross                                          146

```
 1          We will identify another date.  Have we identified
 2   one?  We have.  We have Tuesday, January the 14, 2020 available
 3   for nine to one.
 4          MR. PENDERY:  For nine to one?
 5          THE COURT:  Yes.  If you folks could just double
 6   check your calendars, and out of concern for the witness's
 7   schedule and counsel's schedule, could we get an assessment of
 8   how much additional time that you would anticipate the witness
 9   would be testifying?
10          MR. DEPORRE:  It would be difficult, but I would say
11   about 45 minutes.
12          THE COURT:  And I assume that there will be a fair
13   amount of redirect.
14          MR. HURFORD:  I don't know about the next 45 minutes,
15   but I've got about five minutes based on what's happened so
16   far.
17          MR. HENGEVELD:  Your Honor, if I could observe,
18   again, Jeff Hengeveld, the lawyer for Kim Pavlik.  Mr. Pavlik,
19   doesn't have his calendar with him because he's not allowed to
20   bring his cell phone into the court, so I haven't asked Kim if
21   he's available on January 14th, but can I let the Court know if
22   we're not available.  I am available, but if we're not
23   available, I would let the Court know that immediately.
24          THE COURT:  Certainly.
25          MR. HENGEVELD:  Thank you.
```

US v. Pieron, Jr. - Hearing - December 20, 2019

1       THE COURT:  And there's -- probably the best way to

2  do this it just to convene in chambers in about 10 minutes,

3  after you've had a chance to double check both with your client

4  and he's had a chance to locate his schedule.

5       MR. HENGEVELD:  No problem.  That'll take him having

6  to go to his car and he'll have to come back up through

7  security -- or maybe he can call me, but I'm sure we can work

8  out the logistics quickly.

9       THE COURT:  Okay.  Let's just plan on meeting in

10 chambers about 2:30 or thereabouts.  Good.  Record's closed.

11      You're excused from the stand, sir.

12      (At 3:19 p.m., court recessed.)

13

14

15

16                   *  *  *  *  *

17                C E R T I F I C A T E

18      I certify that the foregoing is a correct transcript
        from the proceedings in the above-entitled matter.

19

20                        *Carol M. Harrison*

21  Date: 1-8-2019      Carol M. Harrison, RMR, FCRR
                        Official Court Reporter
22                      United States District Court
                        Eastern District of Michigan
23                      1000 Washington Avenue
                        Bay City, MI  48708
24

25