1     IN THE UNITED STATES DISTRICT COURT

2      EASTERN DISTRICT OF MICHIGAN

3 UNITED STATES OF AMERICA    )Bay City, Michigan
              )January 14, 2020
4   vs.          )9:10 a.m.
              )
5 JAMES D. PIERON, JR.,     )
              )Case No. 18-20489
6   Defendant.       )
 _____  )

7

8       TRANSCRIPT OF HEARING
    BEFORE THE HONORABLE THOMAS L. LUDINGTON
9     UNITED STATES DISTRICT JUDGE

10 APPEARANCES:

11 For the Government: JANET L. PARKER
         JULES DEPORRE
12        United States Attorney
         Eastern District of Michigan
13        101 First Street
         Suite 200
14        Bay City, MI 48708

15 For the Defendant: PATRICK J. HURFORD
         MARK S. PENDERY
16        Honigman, LLP
         660 Woodward Avenue
17        Detroit, MI  48226

18

19

20

21 Court Reporter:  Carol M. Harrison, RMR, FCRR
         1000 Washington Avenue
22        Bay City, MI  48708

23

24    Proceedings reported by stenotype reporter.
    Transcript produced by Computer-Aided Transcription.
25

```
 1                          I N D E X

 2
    WITNESSES FOR THE DEFENDANT:
 3
    KIM PAVLIK
 4      Cross-Examination, Cont'd By Mr. Deporre          4
        Redirect Examination By Mr. Hurford             72
 5      Recross-Examination By Mr. Deporre              89
        Redirect Examination By Mr. Hurford            99
 6      Recross-Examination By Mr. Deporre            104

 7

 8  EXHIBITS:                                         RCVD

 9   GX 222   Email Chain                              18
     GX 223   Share Certificate                        21
10   GX 224   Proxy                                    21
     GX 225   Email                                    56
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

US v. Pieron, Jr. - Hearing - January 14, 2020

```
 1                    P R O C E E D I N G S

 2              (At 9:10 a.m., proceedings commenced.)

 3              (Defendant present.)

 4              THE CLERK:  United States of America versus James

 5    Pieron, Case No. 18-20489.

 6              THE COURT:  Counsel ready to proceed?

 7              MR. DEPORRE:  We are, Your Honor.

 8              THE COURT:  Mr. Pavlik, I would note, is present.

 9    The gentleman was on the witness stand that last time we were

10    in court.  You were on cross-examination.

11              Sir, if you could rejoin us, please.  You're aware of

12    the fact that you remain under oath, sir?

13              THE WITNESS:  Yes.

14              THE COURT:  Please have a seat.  You may all have a

15    seat, and your witness, sir.

16              MR. DEPORRE:  Thank you, Your Honor.

17              Just at the outset, the Government sent a subpoena to

18    Andrews Hooper Pavlik regarding the production of documents and

19    for the testimony of a custodian of records, and Mr. Hurford

20    correctly noted at the outset of our prior hearing, this is a

21    case where the Rules of Evidence do not apply.  However, the

22    Government has lodged objections against certain documents,

23    which we preserve based on lack of authentication and the fact

24    that the documents were created presumably by someone who has

25    not testified.
```

1             We seek to preserve that.  We also seek to

2    preserve -- we seek to present and use certain emails today

3    with Mr. Pavlik that were part of the Andrews Hooper Pavlik

4    file and that were sent from Mr. Pieron -- the correspondence

5    between Mr. Pieron and Mr. Pavlik.  We believe he can

6    authenticate those emails and the attachments to those emails.

7             If that's not the case, however, we have subpoenaed a

8    records custodian from Andrews Hooper Pavlik, and I would ask

9    the Court if we could call that person first, if necessary, and

10   the defense may stipulate to the emails.

11            MR. HURFORD:  I don't have them.  I don't think we

12   need to call a records custodian, Your Honor.

13            THE COURT:  Good.

14                      KIM PAVLIK,

15         DEFENDANT'S WITNESS, PREVIOUSLY SWORN

16            CROSS-EXAMINATION, Cont'd

17   BY MR. DEPORRE:

18   Q.  All right.  Then I guess I'll begin again with Mr. Pavlik

19   by asking you to take a look at what's been marked as

20   Government Exhibit 221.  That's in the blue binder.  You have a

21   black binder on top, a blue binder, and it's tabbed.

22            Mr. Pavlik, when you were on the stand last time, I

23   believe you testified that you began communicating with

24   Mr. Pieron back in December of 2010 about -- predominantly

25   about business taxes, is that -- is that accurate?

1   A.   I think the -- I believe the conversation started in late

2   2010, but it was just generic questions on individual taxes.

3   Q.   And at that point, you had been retained by one of

4   Mr. Pieron's business entities to start preparing corporate

5   returns, but you hadn't actually been retained by him

6   personally; you were just speaking with him -- he was asking

7   you some questions about his personal returns, is that fair?

8   A.   Yes.

9          MR. HURFORD:  I'm sorry.  Your Honor, there was about

10  three questions in there, and I'm not sure what the "yes" is

11  to.

12         THE COURT:  And there was embedded in that question

13  an assertion that I'm not familiar with.  He had been retained

14  to do what returns, and then had questions about personal

15  returns?  If you could --

16         MR. DEPORRE:  I'll explore that, and I'll break it

17  down.

18         THE COURT:  Please.

19  BY MR. DEPORRE:

20  Q.   In December of 2010, is that around the time that you

21  first met and began speaking with James Pieron?

22  A.   I believe that's correct based on the prior email that we

23  talked about last time.

24  Q.   And what was the nature of your relationship with

25  Mr. Pieron?

1  A.   He was part owner of an entity that his controller had

2  contacted our firm, and we started doing some work on that

3  entity.   ILQ was the name of the entity that we had been doing

4  some work on, and then Mr. Pieron called with some general

5  individual tax questions.

6  Q.   All right.  So on the face of Government Exhibit 221,

7  there's an email that is purportedly sent from you to

8  Mr. Pieron.  What's the date on that email?

9  A.   It's November 3rd of 2011.

10 Q.   And we talked about that email at the last hearing.

11 That's the email where you talk about the whipsaw effect and

12 the categorization of income in -- in the different year, is

13 that fair?

14        MR. HURFORD:  I just want to be clear for the record,

15 he just referred to a November 2011 email, it's a chain, and

16 the questions about the whipsaw effect, just so that we're

17 clear, I think come in on a December 2010 email.

18        MR. DEPORRE:  Thank you.

19        THE WITNESS:  Right.  It's not this email.

20        MR. DEPORRE:  That's correct, Your Honor.  I agree

21 with that.

22        THE WITNESS:  Yeah, that was a -- you're referring to

23 a December, 2010 email.  This is November 11th.

24 BY MR. DEPORRE:

25 Q.   Right.  I'd like you to look at the part that's on the

1  screen, focus your attention there.  That portion of the email,

2  this is an email chain, so the top of the email is a

3  November 3rd, 2011 email.  It's a reply to an email that was

4  sent on December 22nd, 2010?

5  A.    Okay.

6  Q.    Is that fair?

7  A.    Yes.

8  Q.    And that first November -- or, excuse me, December 22nd,

9  2010 email, that's part of a series of communications that you

10  had with Mr. Pavlik in late 2010 -- or, excuse me, with

11  Mr. Pieron in late 2010, is that fair?

12  A.    Yes.

13  Q.    In addition to the communications you had about his

14  personal returns, you also asked him for information about ILQ,

15  the business entity that he was involved with, is that fair?

16  A.    That was being handled by -- it was primarily an audit

17  project, and it was being handled by our audit people, audit

18  partner and audit staff primarily, so I had limited

19  conversations with him regarding the business entity at that

20  time.

21  Q.    All right.  Most of your conversations were regarding the

22  personal returns in December of 2010, is that fair?

23  A.    The conversations with Mr. Pieron, yes.

24  Q.    Okay.  And in those conversations, Mr. Pieron expressed

25  some reservations to you about his return preparers, is that

8

1  fair?

2  A.    Yes.

3  Q.    And specifically regarding whether or not they had

4  included the correct amount of income in the returns?

5  A.    Yes.

6  Q.    All right.  Then in November of 2011, there's a period of

7  time where you don't really have much communication with

8  Mr. Pieron, is that fair?

9  A.    Yes.

10 Q.    And then you begin communicating with him again about his

11 personal returns in November of 2011?

12 A.    Yes.

13 Q.    Okay.  This email here that's been marked as Government

14 Exhibit 221, there are several attachments included on the --

15 on the email.  And the first one is a -- what I believe is a

16 stock purchase agreement.  Have you had an opportunity to look

17 at documents that were -- were prepared by AHP for the hearing

18 today?

19 A.    Documents printed by AHP you mean?

20 Q.    Yes, sir.

21 A.    Not prepared by, but printed by.

22 Q.    Yeah, but there were some marks made on the attachments

23 that correspond to the attachments on the email that correspond

24 to the substantive documents?

25 A.    They cross-referenced them so -- to confirm that the

1   attachments went to that email, yes.

2   Q.   Correct.  So in this case, there was a share purchase

3   agreement or a stock purchase agreement that was emailed to you

4   in November of 2011 is that fair, that there was at leasts one?

5   A.   Yes.

6   Q.   Okay.  And the SPA, it's entitled on this form SPA --

7   excuse me, it says capital gain 2008, 10,000,000 PDF?

8   A.   Yes.  Is the attachment attached here, I did look at it,

9   but I don't recall the details.

10  Q.   Okay.  What I'd like you to do is look at Government

11  Exhibit 201.  And would you describe Government Exhibit 201.

12  A.   That was the stock sale agreement.

13  Q.   What's the closure date in Section 3.1 of Government

14  Exhibit 201?

15  A.   January 1st, 2008.

16  Q.   And does Government Exhibit 201 -- was that what was being

17  sent as Attachment A to Exhibit 221?

18  A.   Again, I believe so, but I don't have that cross reference

19  schedule that actually cross references exactly what the

20  attachments were.

21           MR. DEPORRE:  May I approach the witness, Your Honor?

22           THE COURT:  Yes, sir.

23  BY MR. DEPORRE:

24  Q.   Sir, I have handed you some records that were produced by

25  AHP to help refresh your recollection.

1  A.   Yes, that's Attachment A, which would be the first

2  attachment per the email.

3  Q.   And then there's several attachments that were sent as

4  Government Exhibit 221.  Do you also see an attachment that

5  says capital gain 2009, 5.25 million, 5.25M dot PDF?

6  A.   I'm not sure where you're looking.

7  Q.   Okay.  I will point it out on the top of Government

8  Exhibit 221 under attachments, there's an attachment that's

9  titled capital gain 2009, 5.25M dot PDF.  I'm pointing to it

10 now on the screen?

11 A.   Okay.  Exhibit F.

12 Q.   And does that correspond with Government Exhibit 202?

13 A.   Yes.

14       MR. DEPORRE:  Your Honor, at this time I would move

15 to admit Government Exhibit 221.

16       MR. HURFORD:  I just would like some clarification on

17 exactly what Government Exhibit 221 is because -- are we -- are

18 we -- are we admitting the email with attachments A through I

19 or something less?

20       THE COURT:  And I don't know whether you're asking

21 the question to the person on the right or the person on the

22 left.

23       MR. HURFORD:  I'm sorry, Your Honor.  I would just

24 like to be clear as to what exactly we're admitting right now,

25 because there's 221 marked, and then there's all these

 1  attachments to 221, and some seem -- it's confusing to me

 2  what's actually being entered into evidence.

 3          MR. DEPORRE:  Perhaps I can clarify that, Your Honor.

 4          Government Exhibit 221, which has been given to

 5  defense counsel, consists just of two pages -- excuse me, it

 6  consists of three pages.  They're Bates marked at the bottom,

 7  00921, 00922 and 00923.  It does not include the attachments.

 8  It's just this email.

 9          MR. HURFORD:  Then I would object to the extent that

10  221 does not also contain the attachments to the email.

11          THE COURT:  Why is that significant?

12          MR. HURFORD:  The whole point of the email is the --

13          THE COURT:  That would be the point of the

14  attachments, not the point of the email.

15          MR. HURFORD:  The point of the attachment -- the

16  email contains attachments, Your Honor.  We're talking about

17  the attachments to the email, so if we're going to enter the

18  email, for purposes of talking about the attachments, I would

19  like to also have the attachments admitted into evidence.

20          THE COURT:  Well, he may get there, but the -- what

21  he's doing at this juncture is just trying to substantiate the

22  fact of the communication from your client to him.  When we get

23  to the attachments, that may be a separate issue, but --

24          MR. HURFORD:  And my objection would be the rule of

25  completeness, Your Honor.  If we're going to enter in a

 1  document, let's enter the whole thing in, but I can get to that

 2  on redirect if necessary.

 3         THE COURT:  Proceed.  Let me back up.  Is there any

 4  dispute concerning the fact that the email communication was

 5  from your client to Mr. Pavlik?

 6         MR. HURFORD:  No.  No, Your Honor.

 7         THE COURT:  Okay.  Proceed.

 8  BY MR. DEPORRE:

 9  Q.   Based on this email it's fair to say that on at least

10  November 3rd, 2011, you had received the stock purchase

11  agreements that are marked as Government Exhibits 201 and 202,

12  which are already admitted in evidence?

13  A.   Yes.

14  Q.   Along with this -- these attachments, the defendant also

15  sent you client copies of his 2008 and 2009 filed tax returns;

16  is that correct?

17  A.   Yes.

18  Q.   And did you ask him to send you all these documents?

19  A.   I don't recall.  I -- I don't -- I'm not sure.  I'm

20  assuming I did, but I can't recall specifically that I asked

21  him for that.

22  Q.   All right.  I'd like you to turn now to Government

23  Exhibit 222 in that book.  Government Exhibit 222 has an email

24  at the top which is from Mr. Pieron to you, is that fair?

25  A.   Yes.

13

1  Q.   And at the bottom part, the part that's displayed on the

2  screen, there's an email from you to Mr. Pieron, is that fair?

3  A.   Yes.

4  Q.   In that Government Exhibit 222 email at the bottom, the

5  part that's displayed on the screen, when was that email sent?

6  A.   November 7th, 2011.

7  Q.   And in that email, it's fair to say that you're asking

8  about the 2009 stock purchase agreement and some

9  inconsistencies that you found?

10 A.   Correct.

11 Q.   You're also asking whether or not there's a basis for an

12 argument that all of the stock was purchased, that the stock

13 transaction occurred, in 2009, is that fair?

14 A.   Correct.

15 Q.   What sort of questions would be relevant to whether or not

16 the stock transaction all occurred in 2009?

17 A.   When the actual closing date of the stock sale occurred,

18 and it turned out that it was really just an error on that

19 return is what I was told and it was -- the 20 percent was 2008

20 and the 15 percent was 2009.

21 Q.   And specifically, though, you're asking if there's an

22 argument to be made that all of the shares were -- the

23 transaction closed as to all of the shares in 2009, is that

24 fair?

25 A.   Yeah, that's what I'm asking in this email, yes.

1    Q.    Why were you asking that?

2    A.    Just because there were inconsistencies, and if there was

3    a position, which there wasn't, for sale to be in 2009, it

4    would have a different result, it would be recorded

5    differently.

6    Q.    And would that be important as to how you -- whether or

7    not a capital loss would be allowable for the year 2009 or

8    the -- at least the extent of a capital loss for 2009?

9    A.    No, it would not really have anything to do with a capital

10   loss in 2009.

11   Q.    If you have a capital gain in 2009, can you -- or excuse

12   me, if you have a capital gain in 2007, would you, back then,

13   have been able to deduct a capital loss from 2009?

14   A.    I don't understand what you're asking.  You would not be

15   able to carry a capital loss for 2009 back to 2007.  It would

16   only be -- all capital losses are only carried forward, they

17   can't be carried back.

18   Q.    And they can also offset the capital gain in the year in

19   which the gain occurs, is that fair?

20   A.    A capital loss can offset the gain -- a gain in the same

21   year, yes.

22   Q.    Okay.  So if there was a capital gain, if the deal had

23   closed in 2009, and there was also a loss in 2009, a capital

24   loss in 2009, that would have offset the capital gain, is that

25   fair?

1  A.   If there was a loss, yes.

2  Q.   Okay.  And your position was that there was, in fact, a

3  loss; is that correct?

4  A.   Again, I'm not sure where you're going or what your --

5  question you're asking.  There was a loss upon liquidation in

6  2009, yes.

7  Q.   And if -- so you're asking Mr. Pieron here if -- if the --

8  if there's an argument to be made that all those gains should

9  be categorized in 2009, is that fair?

10 A.   I'm making just a generic question, yes.

11 Q.   But I'm trying to drill down on why you're making that

12 question.  Why does it matter when the -- when the shares were

13 actually delivered?

14 A.   We were trying to determine what the correct time to

15 report the capital gain was, which -- you know, was it in 2008

16 or was it in 2009.  That's the question.  We were trying to

17 determine when should it be reported that the capital gain

18 related to these two transactions.

19 Q.   Okay.  So you're trying to figure out whether it should be

20 recorded in '08 or '09.

21 A.   Based on closing dates, yes.

22 Q.   Did it ever cross your mind that maybe it should be put in

23 2007?

24 A.   Again, I was going based on the closing dates, which were

25 2008 and 2009, so we decided to -- based on the prior

1   accountant reporting it in 2008 and 2009, that we were focusing

2   on those and amending those returns to adjust the capital gain

3   to whatever the correct capital gain was.

4   Q.   But you already had these documents.  You already had the

5   documents that said when the closing dates were.  What you're

6   asking for here is other information to determine whether or

7   not those -- those gains should be recognized in 2008, is that

8   fair?

9   A.   Yes, and we determined that the documents -- only the

10  second document was an error, and so the correct dates, based

11  on the documents, was January 1st, 2008 and January 1st, 2009,

12  and we didn't do anything.  It was just a generic question to

13  make sure we were doing it properly because the documents were

14  inconsistent.

15  Q.   Okay.  So there was some inconsistencies with the

16  documents, and you asked for additional documents from

17  Mr. Pieron and additional information, is that fair?

18  A.   Clarification of the documents.

19  Q.   Okay.  Did it ever cross your mind, or did you ever

20  consider, whether or not the wire transfers which had occurred

21  in 2007 should be put on Mr. Pieron's 2007 return?

22  A.   We decided earlier --

23  Q.   Did you ever -- did you ever consider it.  First answer

24  that question.

25  A.   I don't recall if I considered it.

1   Q.   So you don't know if that's an issue you looked at?

2   A.   Correct.

3   Q.   Did you ask Mr. Pieron whether or not they were included

4   in his 2007 return?

5   A.   I knew they had not been because I -- at some point I had

6   a copy of the 2007 return.

7   Q.   Okay.  In this email you're asking what year, essentially,

8   they should be -- those capital gains should be included, is

9   that fair?

10  A.   Yes.

11  Q.   And you asked him for additional documents, is that fair?

12  A.   I'm asking if there are -- if there was any additional

13  information.

14  Q.   Okay.  And now I'd like you to look at the top part of

15  that email, which is Mr. Pieron's response to you.  And if you

16  would, would you read it out loud.

17  A.   The shares were held in a safety deposit box.  I'm not

18  sure when the actual certificate was delivered.  However, as

19  stated in the 2007 agreement, distributions, although there

20  were none, would begin in 2007, March 2007.

21  Q.   Would you continue.

22  A.   Attached you'll find a copy of the final share

23  certificate.  In addition, please find the corrected/signed

24  2009 SPA that reflects the proper closure date of January 1st,

25  2009.

1   Q.    Continue.

2   A.    Concerning voting, there was a proxy agreement in which I

3   made all decisions.  See attached.

4           MR. DEPORRE:  All right.  Your Honor, at this point

5   the Government moves for the admission of Government

6   Exhibit 222.

7           MR. HURFORD:  Your Honor, no objection with the same

8   caveat as that it would be my -- I would ask that the entire

9   document, including the attachments, be admitted as well.

10          THE COURT:  Noted.  May I understand you have no

11  objection to the authentication by the witness of the -- of the

12  email and the identification of the author as your client?

13          MR. HURFORD:  I have no objection to the authenticity

14  of the email, Your Honor.

15          THE COURT:  Received.

16  BY MR. DEPORRE:

17  Q.    All right.  There's a -- an attachment on that email, the

18  email dated November 12th, 2011 and sent at 3:10:51 p.m.  The

19  second attachment said SPA Market Shot, 5.25, 15 PCT, 18-May-09

20  PDF.  Do you see that attachment?

21  A.    Which one am I looking for?

22  Q.    I'm sorry, sir.  I think it's marked on your copy, as B,

23  attachment B.  It's the second attachment to the email.  Do you

24  recognize that on Government Exhibit 222, the file name that I

25  just read?

1  A.   Okay, yes.

2  Q.   All right.  What I'd like you to do now is take a look at

3  Government Exhibit 202A?

4  A.   202A?

5  Q.   Yes, sir.

6  A.   Okay.

7  Q.   And my question is, is Government Exhibit 202A the

8  attachment -- the second attached PDF file on Government

9  Exhibit 222, that email that was sent to you?

10 A.   I believe so, yes.

11 Q.   Well, take your time, if you need to, so that you can

12 respond with certainty.

13 A.   Is that another email in here?

14 Q.   Absolutely, you can use that to refresh your recollection.

15 A.   Yes.

16 Q.   So on November 12, 2012 you received a revised copy of the

17 2009 share purchase agreement, is that fair?

18 A.   Yes.

19 Q.   And that has some markings on it which revise dates for

20 that -- the closure date as well as additional information

21 about when the date of execution.

22 A.   It changed the date to January -- the closing date to

23 January 1st, 2009, which was what was indicated originally.

24 Q.   Okay.  There are some other attachments that were sent in

25 that November 12th, 2011 email, Government Exhibit 222.  One of

1  them was a share certificate that's Attachment A.

2  A.    Okay.

3  Q.    What I'd like you to do now in the folder is take a look

4  at Government Exhibit 223.  Is Government 223 a share

5  certificate that was emailed to you in that email dated

6  November 12th, 2011?

7  A.    Yes.

8  Q.    And would you describe Government Exhibit 223.

9  A.    It's a certificate just issued indicating that Market Shot

10 is a registered holder of 3.5 million of the 10 million shares.

11 Q.    And when is it executed?

12 A.    It's not really executed, but it's given under the common

13 seal of the company, first day of June 2009 is when they

14 actually did this share certificate.

15 Q.    And who signed it?

16 A.    I can't verify that that's his signature, but it's

17 Mr. Pieron.

18         MR. DEPORRE:  Your Honor, at this time I'd move for

19 the admission of Government Exhibit 223.

20         MR. HURFORD:  No objection from defense.

21         THE COURT:  And we're in agreement that it is the

22 referenced attachment to the November 12 email from your client

23 to Mr. Pavlik?

24         MR. HURFORD:  Yes, Your Honor.

25         THE COURT:  Thank you.  Received.

```
 1  BY MR. DEPORRE:
 2  Q.   Sir, I'd now like you to look at Government Exhibit 224.
 3  Did you receive Government Exhibit 224 in the attachments to
 4  Government Exhibit 222, the email dated November 12th, 2011?
 5  A.   Yes.
 6  Q.   And could you describe what Government Exhibit 224 is for
 7  the record.
 8  A.   It's a proxy.  Again, I'm not very familiar with this,
 9  hereby appoints James Pieron and Dr. Felix Tschopp, both acting
10  individually, as his attorney to represent him at the
11  extraordinary general meeting of the shareholders to be held
12  the week of 10 December 2007 at the premises of the company,
13  and to vote all agenda items according to the proposal of the
14  board of directors of the company.
15          MR. DEPORRE:  Your Honor, at this time the Government
16  moves for the admission of Government's Exhibit 224.
17          MR. HURFORD:  No objection, Your Honor.
18          THE COURT:  224 is received.
19          Could 223 be displayed, please.
20          MS. PARKER:  Your Honor, we did provide a copy on
21  your -- a paper copy on the bench, too.
22          THE COURT:  Yes, I appreciate being able to look at
23  this quickly on the screen, rather than to dig into the large
24  number of documents.  It's helpful.  Thank you.
25  BY MR. DEPORRE:
```

1  Q.   Sir, is it fair to say that you had a copy of a proxy

2  agreement between -- that was executed by Market Shot, LLC in

3  the person of Trevor Cook back in November of 2011?

4  A.   Yes.

5  Q.   And even having all this information, you believed that

6  the income that -- the wire transfer income between Market Shot

7  and into a JDFX account for the purchase of Mr. Pieron's shares

8  of stock should be included in in -- as capital gain income for

9  2008; isn't that right?

10 A.   That's what we did.  In hindsight, if I would have -- I

11 probably didn't put enough credence on this particular

12 document.  In hindsight, after the fact, I would have done

13 2007, but when I -- when I realized that, I also realized that

14 it didn't make a difference whether it was 2007 or 2008 when

15 the capital gain occurred, and I made sure that I reported what

16 I believed to be all of the income.

17         And Mr. Pieron always, you know, in all this time has

18 never had a dollar of income that wasn't reported so my focus

19 was on reporting all of the income, and it didn't make any

20 difference if the capital gain occurred in 2008 or 2007 at that

21 point.

22 Q.   The important part was is that the income -- whether it

23 happened in '07 or '08, was at least reported to the IRS?

24 A.   That was my focus at that time.

25 Q.   Now you say it doesn't -- it didn't make a difference as

1  to whether or not it was reported in '07 or '08.  Could you

2  explain why not.

3  A.   Because the liquidation of the company didn't occur until

4  '09, which -- if it was a capital loss, if you focus it only as

5  a capital loss and not as a theft loss or some other type of

6  loss, it couldn't be carried back to '08 or '07 so it had no --

7  it made no difference.

8           And if it was an ordinary loss, it had a two-year

9  carryback so it could have been carried back to 2007 or 2008,

10 so that also wouldn't make a difference, so -- and the prior

11 tax preparer had reported in '08 and the closing date was '08

12 so we determined to leave it as a 2000 -- January 1st, 2008

13 transaction.

14 Q.   And you also left it as a January 1st, 2008 transaction

15 when you filed the 2011 amended returns, the claim of right

16 return, is that fair?

17 A.   Yes, because we didn't amend -- we didn't specifically

18 amend those returns, we said it never was -- the 2011 amended

19 return said it was never a gain to begin with so, again, it

20 didn't matter, and you wouldn't -- you wouldn't change it to

21 say that it's not a gain, and you're saying it's not a gain, so

22 it doesn't matter if you're saying it's not a gain in 2008 or

23 it's not a gain in 2007.  You're just on the amended '11 return

24 saying it's just not a gain period.

25           THE COURT:  You might want to walk through the actual

 1  later return with the gentleman.

 2          MR. DEPORRE:  The claim of right return.

 3          THE COURT:  I think his testimony would make more

 4  sense in conjunction with his explanation of the actual return.

 5          MR. DEPORRE:  All right.  If I could have a moment.

 6  BY MR. DEPORRE:

 7  Q.   Sir, would you turn to Government Exhibit 206.

 8  A.   Okay.

 9  Q.   And would you explain for the record what Government

10  Exhibit 206 is.

11  A.   It's an amended return Form 1040X for 2011.

12  Q.   Did you prepare this return?

13  A.   Yes.

14          MR. DEPORRE:  Your Honor, at this time I'd move, if

15  it has not already been admitted, for the admission of

16  Government Exhibit 206.

17          MR. HURFORD:  No objection, Your Honor.

18          THE COURT:  206 is received, and my notes reflect

19  that it was actually tendered at the trial.

20          MR. DEPORRE:  Thank you.

21  BY MR. DEPORRE:

22  Q.   Sir, I'd like you to say -- there's some page numbers at

23  the top, there's a banner, and there's something called a page

24  ID number.  Do you see that, sir?

25  A.   Yes.

1  Q.    I would like you to turn to page ID 1928 if you would.

2  A.    Okay.

3  Q.    Could you tell me what this page is.

4  A.    It's a summary of the -- I believe it's a summary of all

5  the changes made on this amended return in a spreadsheet

6  format.

7  Q.    And this amended return impacts the 2008 and '09 return,

8  is that fair?

9  A.    It changes the 2011 return and recalculates the tax for

10  2008 and 2009, yes.

11  Q.    And when you say it "recalculates the tax," why does it

12  recalculate the tax?

13  A.    Because under the claim of right doctrine, if Mr. Pieron

14  never had a right to receive the income in the first place,

15  there was no gain, so you recalculate the tax.  It's a little

16  bit of a strange form, but you recalculate the tax and then

17  adjust the payments and report it all on the 2011 return.

18  Q.    Have you done a claim of right return besides this one for

19  Mr. Pieron?

20  A.    Very limited but, yes, at least one other time.

21  Q.    What was the circumstance in which you prepared that

22  return?

23  A.    I don't remember.

24  Q.    Do you recall the taxpayer that you --

25  A.    No.

Pavlik - Cross                                                    26

1   Q.   -- paid it for --

2   A.   No, I don't.

3   Q.   -- or, excuse me, that you prepared the return for?

4   A.   It was more than 20 years ago, no, I don't.

5   Q.   When does the claim of right -- if you could explain, in

6   your own words, the claim of right doctrine and when it

7   applies.

8   A.   Again, this has been a long time.  The basic theory is if

9   something happens and you determine that you never had a right

10  to the income in the first place, you shouldn't have reported

11  it, you didn't have to report it.  If you -- and, again the --

12  so if you didn't have a right to the income, it was never

13  income in the first place.  That's really the claim of right

14  doctrine.

15  Q.   And why did you take the position that Mr. Pieron didn't

16  have a right to the income that you had reported in 2008 and

17  2009?

18  A.   Because based -- as the couple years went on, I didn't

19  know originally the situation with Trevor Cook, but it became

20  apparent as -- in subsequent years that the receiver for the

21  Trevor Cook Ponzi scheme was trying to recover assets from

22  whoever they could recover assets from, and this, the assets

23  going to Mr. Pieron, would have been recoverable assets.

24  Q.   Who told you that?  How did you come to that conclusion?

25  A.   I actually just Googled the Trevor Cook receivership and

1    looked at the things where they were trying to collect from,

2    you know, various sources and trying to get money back.

3    Q.   Mr. Pieron was represented in that action, correct?

4    A.   I don't know the answer to that.

5    Q.   Do you know who John Fetters is?

6    A.   I know the name.  I know that he worked with Mr. Pieron.

7    He was an attorney.  I don't know if he represented him in that

8    particular case or not.

9    Q.   Did you ever speak with Mr. Fetters about that case?

10   A.   I don't believe I did, no.

11   Q.   Did Mr. Pieron tell you that the receiver was trying to

12   claw back funds from Market Shot?

13   A.   I don't recall if we specifically talked about it.

14   Q.   As you Googled the case, did you ever read any SEC filings

15   against Mr. Pieron in the case?

16   A.   I know he was mentioned, but I didn't really see anything

17   more than the fact that he was mentioned in the case.

18   Q.   You never saw a judgment against Mr. Pieron, a money

19   judgment against Mr. Pieron, did you?

20   A.   I don't recall if I saw a specific money judgment against

21   him.

22   Q.   You don't recall whether or not you did, or you did not

23   see a money judgment against him?

24   A.   Correct.

25   Q.   Which is it?

1   A.   What's that?

2   Q.   You can't recall or you did not?

3   A.   I can't recall.

4           THE COURT:  Sir, before we get a little bit further

5   in the chronology, if you could inquire of the gentleman, given

6   the fact that he had received the revised SPA on November the

7   12th of 2011, and 223 reflecting the transactions all in 2009,

8   why he ultimately concluded that they were appropriately

9   reported in '08.  Because I believe Mr. Pieron had furnished

10  him a fair amount of information in conjunction with that email

11  that would possibly have substantiated a predicate for his

12  reporting in '09, but the witness has concluded to the

13  contrary.  I don't know why.

14  BY MR. DEPORRE:

15  Q.   We'll come back to claim of right.  And I'd like you to

16  direct your attention to the email that was sent on November

17  12th, 2011 from Mr. Pieron to you, Government Exhibit 222.

18  A.   Which one are we looking at, 222?

19  Q.   Yes, sir.  Based on the information that Mr. Pieron sent

20  you, you concluded that the income -- the -- the payments from

21  Market Shot to Mr. Pieron were taxable in 2008, correct?

22  A.   2008 and 2009 based on the closing dates.

23  Q.   So approximately 10 million in 2008; is that correct?

24  A.   Of sales price.

25  Q.   $10 million of funds were attributable to Mr. Pieron or

1    recognizable for 2008, is that fair?

2    A.    Yes.

3    Q.    And then 5.25 should have been recognized in 2009?

4    A.    Based on the closing dates of the sales price, yes.

5    Q.    Based on the closing date of the sales price and the stock

6    purchase agreements, correct?

7    A.    Correct.

8    Q.    Why did you come to that conclusion?

9    A.    Again, it was the original -- it was done that way on the

10   returns that I was amending.  The closing date said

11   January 1st, 2008 and, again, it was intended to be January

12   1st, 2009, which was corrected to that based on the closing

13   documents.

14          This email, to answer the honorable judge's question,

15   the stock certificate, it doesn't really say the closing date.

16   That just says the 3.5 million documented as June 1st of 2009.

17   That wouldn't be evidence that it would -- that the closing

18   occurred in 2009.

19          My information indicated that the closings were

20   January 1st, 2008, January 1st, 2009, and I would also observe

21   that, you know, based on this, Mr. Pieron would have known that

22   it would have been to his advantage to have this be 2009, but

23   he still indicated that it was January 1st, 2008 and

24   January 1st, 2009 and that's why we didn't change it to 2009,

25   which would -- which would clearly have been a better result,

1  but we didn't have enough facts to support that in this case.

2  Q.   You say that Mr. Pieron was adamant that there was a stock

3  transaction that occurred in 2008?

4  A.   I wouldn't say adamant.  He just concluded there wasn't

5  support for reporting it all in 2009.

6  Q.   So there was a discussion that you had with him?

7  A.   Again, there had to be some discussion based on follow-up

8  to this email, yes.

9  Q.   And at any point, was there any discussion that he didn't

10 actually sell the stock in November of 2011?

11 A.   During that discussion?

12 Q.   Did Mr. Pieron, in November of 2011, tell you that he

13 never sold the stock?

14 A.   No, he always maintained that he didn't keep the money.

15 All the money went back in.

16 Q.   I'm asking you a question, sir.  Did he tell you that he

17 didn't sell his stock?

18 A.   No.

19 Q.   Okay.  Now, you said he maintained that he kept the money;

20 is that correct?

21 A.   No, I said he maintained that he put all the money back in

22 the company.

23 Q.   And did he tell you what he did with the money once he put

24 it in the company?

25 A.   As we've talked last time, you know, we documented, you

1  know, the -- that he refreshed my -- or told me the first time,

2  because I didn't know it, that 1.6 million of the money

3  eventually went to US companies, but the rest of it was lost in

4  the liquidation of the company.

5  Q.   Mr. Pieron also told you that he personally invested about

6  3.5 million; is that correct?

7  A.   I believe that's right.

8  Q.   And you used that number to calculate the basis for what

9  you reported as the 2008 sale of stock?

10 A.   Correct.

11 Q.   So in total, there was 3.5 million plus 15.25 million that

12 Mr. Pieron represented went into JDFX Holding, is that fair?

13 A.   Reasonably fair, other than, you know, the money that was

14 repaid to family member investors and the money that went into

15 the US companies that we -- you know, based on the spreadsheet,

16 so I would not say that's totally fair, but reasonably fair,

17 other than the caveats that whatever money was repaid to family

18 members and whatever money went into the new companies would

19 not have gone back into that company.

20         MR. DEPORRE:  I'm going to use the white board again,

21 if I may, Your Honor.

22         THE COURT:  Yes, sir.

23         And, sir, at some point in your discussion of this

24 particular subject, see if the gentleman has ever been familiar

25 with the Banque du Bois.  Any time I try to say a word in

1  French it ends up with a German accent and unhappy people.

2  BY MR. DEPORRE:

3  Q.   All right.  On the board, which I know you can't see.

4          THE COURT:  Do you want to kick that one side around

5  so Mr. Pavlik can see the materials.

6  BY MR. DEPORRE:

7  Q.   Can you see that now?

8  A.   Yes.

9  Q.   On the top I put Pieron's claimed initial contribution

10  3.5 million.  Is that accurate?

11  A.   Yes.

12  Q.   And then I put 2008 SPA.  This is the money that Pieron

13  claimed to have received and reinvested in the company,

14  10.0 million.  Is that accurate?

15  A.   Yes.

16  Q.   And then 2009, SPA, 5.25 million, again that Pieron

17  claimed to have reinvested in the company.  Is that accurate?

18  A.   Yes.

19  Q.   And that, based on my math, is 18.75 million.  Do you

20  agree?

21  A.   Total going in, yes.

22  Q.   Total going in.  Now, we know that Mr. Pieron -- and

23  Mr. Pieron told you -- that he transferred about 1.6 of some of

24  these funds to a company called IB Tech and Komplique, two

25  different entities, is that fair?

33

1  A.    Yes.

2          THE COURT:   And the date of those communications,

3  sir?

4  BY MR. DEPORRE:

5  Q.    When did Mr. Pieron tell you about the 1.6 that he

6  transferred to IB Tech and to Komplique?

7  A.    I don't recall the exact timing of that.

8  Q.    Do you recall roughly, was it in response to the

9  preparation of the first amended returns that you did for 2008

10 and 2009?

11 A.    Yes.

12 Q.    So you certainly knew it by the time you filed the claim

13 of right return?

14 A.    Yes.

15 Q.    And then you mentioned that there was some other funds

16 that Mr. Pieron used to repay investors; is that correct?

17 A.    That's my understanding, yes.

18 Q.    And do you recall approximately how much?

19 A.    I do not.

20 Q.    Do you recall whether or not it was $10 million or in the

21 scope of more like a million dollars?

22 A.    It wasn't $10 million.  It was -- again, what I had

23 originally done, and has never been challenged to my knowledge

24 by, you know, the IRS or anything, was looked at all the cash

25 transactions over time and tried to prove out how much cash

Pavlik - Cross

1  went out.  The flaw -- I probably overstated as it turns out

2  because the flaw I had is what I thought were payments being

3  taken out by Mr. Pieron were actually being money going back to

4  family members paying for some of the original investments.

5          So some of that money would have -- the way I did the

6  returns, I proved it out that that was income, but a lot of

7  that would have been a return of capital.  So I believe if you

8  looked at those sheets, it totaled between -- including the 1.6

9  million, it included -- it totaled something in the

10  neighborhood of 3.2 million.

11 Q.   Okay.  So I'm going to add another 1.6 million to try to

12 get to about 3.2., and I'm going to just write next to it

13 "return of capital," is that fair?  Is that your understanding

14 essentially of the nature of that other 1.6?

15 A.   Yes.  And that's my understanding now.  I'm not sure I

16 understood that at that point in time when I was trying do

17 these returns, based on the information that I had.

18 Q.   Now, how did you come to that understanding now?

19 A.   I don't recall.  In subsequent meetings I realized that I

20 hadn't really fully considered his initial investment, and in

21 some of the meetings with Mr. Pieron's attorneys they indicated

22 that some of the cash that was taken out of the entities really

23 went back to family members as return of capital.

24 Q.   Now, did those meetings occur after Mr. Pieron was

25 convicted?

Pavlik - Cross

1  A.    I don't recall the timing.

2  Q.    Did they occur in 2019?

3  A.    I don't recall exactly when I -- when I realized that.

4  Q.    Approximately, I'm not asking you --

5  A.    I already told you I just don't remember.  I know I came

6  to that realization, but I can't say when.

7  Q.    But you can't tell me whether or not it was in 2011 or

8  2018 or 2019, approximately?

9  A.    Well, it wasn't in 2011, but it was 2018 or '19.  I don't

10 know.  This thing's been going on for seven years, so I can't

11 recall specific dates.  I know it was not in 2011.

12 Q.    Do you remember who the meeting was with?

13 A.    I don't.  I came to the realization but I don't remember,

14 you know, the circumstance.

15 Q.    You said it was with Mr. Pieron's attorneys, is that fair?

16 A.    Yes.

17 Q.    And do you remember if it was with these gentlemen?

18 A.    I don't recall if it was with the prior attorneys or with

19 these attorneys.

20 Q.    Now, you met with Mr. Pieron's prior attorneys on several

21 occasions, is that fair?

22 A.    Yes.

23 Q.    And you met with these gentlemen on several occasions?

24 A.    Yes, any time either side asked I've been able and willing

25 to meet, yes.

Pavlik - Cross                                                    36

1  Q.   And I was just going to say, and you met with the IRS

2  before, too?

3  A.   Right.

4  Q.   So this 1.6 was a return of capital to the 3.5, correct?

5  A.   I believe that is the case.

6  Q.   That's your understanding based on what Mr. Pieron's

7  attorneys told you after 2018 or 2019?

8  A.   Correct, but I didn't verify that, yes.

9          THE COURT:  Sir, can we determine if there's ever

10 been any accounting work for JDFX which would reflect a P & L

11 and a balance sheet that would also reflect capital

12 transactions with the owners as well as any other transaction,

13 because all we've looked at so far are generalized statements

14 and information about as it affected Mr. Pieron.  I have no

15 idea what the activity of the company was and how his ownership

16 or lending interest would have been affected by the operation

17 of that entity.  I don't know if there's any accounting work.

18 I've just never seen any.

19          Apparently the gentleman's firm was doing some

20 accounting work for an affiliated entity and was the predicate

21 for the initial contact.

22 BY MR. DEPORRE:

23 Q.   Sir, did you ever see a profit and loss statement for JDFX

24 Holding?

25 A.   No.

US v. Pieron, Jr. - Hearing - January 14, 2020

37

1  Q.    Did you ever see any accounting information for JDFX

2  Holding?

3  A.    No.

4  Q.    Did you see any shareholder ledger for JDFX Holding?

5  A.    No.

6  Q.    Do you know the legal relationship between JDFX Holding

7  and IB Technologies, if there is one?

8  A.    No.

9  Q.    Do you know whether or not there was a legal relationship

10 between JDFX Holding and JDFX Fund Management?

11 A.    No.

12 Q.    Do you know whether or not -- I think I covered profit and

13 loss.  Did you ever see a profit and loss statement for JDFX

14 Holding?

15 A.    No.

16           THE COURT:  Balance sheet.

17           MR. DEPORRE:  Anything else, Your Honor?

18           THE COURT:  Balance sheet, that would reflect --

19           MR. DEPORRE:  Thank you.

20           THE COURT:  -- the capital transactions.

21 BY MR. DEPORRE:

22 Q.    Did you see a balance sheet, sir?

23 A.    No.

24 Q.    Now, on the board I put down that there's a 15.15 million

25 between the amount that's contributed minus the amount that

1    goes to IB Tech and Komplique, and minus the return of capital

2    to the 3.5.

3    A.    I think you better check your math but --

4    Q.    What's the right answer for me?

5    A.    You just didn't do the math right.  I think it should be

6    15.55.

7    Q.    Thank you.  Thank you.  I appreciate that.  My third grade

8    math teacher would have been very disappointed.

9             All these numbers here; the 3.5, the 10, the 5.25,

10   and the 1.6 that went to IB Tech and Komplique, were those all

11   figures that you got from Mr. Pieron?

12   A.    Yes.  The money going to -- at this time I hadn't -- I

13   wasn't aware of IB Tech and Komplique.  We, subsequent to the

14   amended returns, did work for those, which also verified that

15   the amounts that he gave me were correct because that is the

16   amount that went into the new companies.

17   Q.    So you saw an initial contribution of capital into those

18   companies and you saw bank records reflecting a total of

19   1.6 million going in?

20   A.    Yes.

21   Q.    What did those companies do?  What did IB Tech do?

22   A.    I'm -- I don't really know exactly the operations of that

23   entity.

24   Q.    Was it a currency trading company?

25   A.    IB Tech was not, to my knowledge, no.

Pavlik - Cross                                                    39

1   Q.   It was a software company?

2   A.   I don't -- I don't know, but it wasn't currency trading.

3   Q.   How about Komplique?  Was it a swimwear company?

4   A.   It was a swimwear company, yes.

5   Q.   That leaves a total of 15.55-million, correct?

6   A.   Right.

7   Q.   Now that money comes in in 2007 -- well, a portion of it

8   comes in in 2006, fair?

9   A.   That small amount I believe based on prior discussions,

10  yes.

11  Q.   A small amount in -- now, you say it's a small amount, but

12  it's over a million dollars or approximately a million?

13  A.   I don't recall the timing.  I know the larger amount came

14  in 2007.

15          THE COURT:  About a half a million.

16  BY MR. DEPORRE:

17  Q.   About half million in 2006.  And then is there also --

18  when is the 3.5 million contributed, if you know?

19  A.   I don't know.  That had to be over time at the start of

20  the company, I presume.

21  Q.   And it would have had to have been before the closure date

22  of the stock transaction in 2008, is that fair --

23  A.   Yes.

24  Q.   -- because -- okay.

25          THE COURT:  See if we can substantiate the fact that

1   the 3.5 million was the represented contribution that in turn

2   formed the predicate for his basis calculation; and, secondly,

3   if the 1.6 million received by the defendant in the context of

4   the liquidation of JDFX was ever reported on the return.

5          I think the three -- we have received testimony that

6   the 3.5 million that was represented most recently was a figure

7   that Mr. Pavlik used for purposes of calculating the tax basis

8   on the amended return.

9          MR. DEPORRE:  I'll take those separate and in turn.

10  BY MR. DEPORRE:

11  Q.   The $3.5 million figure, that was the figure that you used

12  to calculate the basis for Mr. Pieron's 2008 amended return and

13  the sale of stock for that return; is that correct?

14  A.   Yes.

15  Q.   Where did you get the number 3.5 million?

16  A.   From Mr. Pieron.

17  Q.   Did you have bank records from Mr. Pieron's Swiss bank

18  accounts showing that money being deposited into JDFX Holding?

19  A.   No.

20  Q.   Did you review any bank records from JDFX Holding showing

21  3.5 million being deposited?

22  A.   No.  Again, just to answer the question, my approach was

23  saying all the cash transactions from beginning to end and how

24  much was lost and how much got taken out of the company in net,

25  and that's what I proved out -- everything out to when I

1  prepared the returns.  And I originally came up with about 1.6

2  million.  Mr. Pieron informed me that another 1.6 had gone to

3  US companies, so that really put the number up to 3.2 net and

4  that's what I -- that's what I proved out to as far as the

5  appropriate net income reported for the periods under question.

6  That was my approach.

7         The one flaw I made, again because I didn't know it

8  at the time, was part of that money that went out to him was

9  really return of capital 1.6 that shouldn't have been picked up

10  as income.

11 Q.  All right.  I need to break that into bites so that I can

12 understand it, and I apologize.

13        Let's start with the 3.5.  I want to really square

14 that up.  That money is money that Mr. Pieron told you he

15 invested in the company, but you saw no source documentation of

16 that, is that fair?

17 A.  Again, other than his spreadsheet that showed all cash

18 activity --

19 Q.  Other than --

20 A.  -- but it was Mr. Pieron's spreadsheet that showed all

21 cash activity, all the related entities in Switzerland over a

22 period of time.

23 Q.  Okay.  No bank records supported the 3.5 million that you

24 reviewed --

25 A.  Correct.

1   Q.    -- that you reviewed?

2            Then you talked about the $1.6 million, the return of

3   capital, I believe.  Was that a number that Mr. Pieron's

4   attorneys told you about in the last two or three years, or was

5   that a number that you calculated on your own?

6   A.   That was a number that I calculated on my own, not I -- I

7   did it -- I -- that was calculated based on Mr. Pieron's

8   spreadsheet.  Only in the last two or three years or whatever

9   it's been did I -- did I find out that that wasn't really --

10  that a lot of that was paid back to family members as a return

11  of, you know, loans and their capital, which shouldn't have

12  been -- when I proved out income, shouldn't have been taken as

13  income.  I treated it as though it was money taken out by

14  Mr. Pieron net of how much he put in.  That's how I prepared

15  the original returns or the amended returns.

16  Q.   Now, if the 1.6 is going into the 3.5, why -- why do you

17  say that the 1.6 was included in any sort of income at any

18  point?

19  A.   Again, I'm probably saying the same thing.  My approach

20  was looking at cash for all the years and saying how do I prove

21  the net income I'm reporting on tax returns, so I reported --

22  I -- based on Mr. Pieron's spreadsheet, it came out to be

23  originally 1.6 million he said didn't get lost; it got taken

24  out and paid out to other people.  I treated it as income.

25  That should have been probably payment of loan to family

1  members.

2          And then when I did that, I was ready to prove out

3  tax returns saying the total income net, whether it's capital

4  gain and loss or, you know, or if it's an ordinary loss upon

5  theft loss or whatever it is, here's the net income.

6  Q.   All right.

7  A.   Let me finish --

8  Q.   Okay.

9  A.   -- please, because I didn't finish my thought here.

10          I was ready to prove out 1.6, but Mr. Pieron said

11  you're missing the other 1.6 that went to US companies, which

12  increased the income I calculated from 1.6 to 3.2.

13  Q.   Okay.  Now, I want to be clear, when I ask a question, at

14  some points your thoughts maybe get ahead of what my question,

15  is, so you can only answer what I'm asking you.  Do you

16  understand that, sir?

17  A.   Okay.

18  Q.   I think I understand that you said the 1.6, you included

19  it as income for later years because it's -- it's going to

20  Mr. Pieron to later repay family members; is that right?  You

21  wrongly included it as income?

22  A.   Correct.

23  Q.   Okay.  What I want to know is what happened to the 15 plus

24  million dollars -- the 15 plus million dollars, if you know,

25  that was invested in JDFX Holding?

44

1  A.    It's presumably lost in the operations of the various

2  Swiss companies.

3  Q.    Did it go to pay wages?

4  A.    I don't know how -- what -- the details of the loss, since

5  I haven't seen a profit and loss statement.

6  Q.    How much do you know about JDFX Holding?

7  A.    Limited.

8  Q.    Did it have employees?

9  A.    I don't know the operations of the Swiss companies.

10 Q.    You have no idea how many employees it had?

11 A.    No.

12 Q.    Did it have a lease?

13 A.    I don't know any of the details about the Swiss companies.

14 Q.    Well, then how do you know whether or not there was a

15 loss?

16 A.    Again, I -- I'm restating the same thing that you asked me

17 not to answer, because I proved out net cash, how much cash was

18 put in and how much cash was taken out of the company.

19 Q.    So you saw $15.5 million leaving JDFX Holding?

20 A.    If it was lost in operation, it wouldn't leave.  I, again,

21 proved out to the net cash that was either put in or taken out

22 by Mr. Pieron is what I proved to -- income to be.  That's the

23 only way I can say it.  I know I've said it multiple times, but

24 that's the only way I can say it.

25 Q.    Where did you prove that out?

1  A.    In the spreadsheets that, you know, have been entered as

2  evidence previously, and Mr. Hollabaugh's, you know, spent

3  hundreds of hours looking at.

4  Q.    All right.

5          THE COURT:  That's a good place for a break so that

6  you might double-check those spreadsheets.

7          MR. DEPORRE:  Thank you.

8          THE COURT:  An additional question, at least from my

9  perspective, I'm trying to understand where the gentleman's use

10 of the proceeds of the JDFX cash in the amount of 1.6 million,

11 for the organization of the US companies, is reported, how it's

12 characterized and where it ultimately gets reported.

13          About five to eight minutes, and we'll pick up.

14          Thank you.

15          (At 10:25 a.m., break taken.)

16          (At 10:39 a.m., break concluded.)

17          THE COURT:  Mr. Pavlik, if you could return to the

18 stand we'd appreciate it.

19          Please be seated.  You may continue with the witness.

20 BY MR. DEPORRE:

21 Q.    Mr. Pavlik, you had mentioned that you used the

22 spreadsheet to prove out, I believe, income; is that correct?

23 A.    Yes.

24 Q.    What do you mean by "prove out?"

25 A.    Under the theory that whatever cash was taken out had to

1   ultimately be some form of income, so proving out the cash

2   would then allow you to prove out how much income is being

3   picked up on the tax returns.

4   Q.   So you -- it's essentially a reconciliation, is that fair?

5   A.   Yes.

6   Q.   And you insure that the numbers on the spreadsheet are

7   reflected with the tax return?

8   A.   Correct --

9   Q.   All right.  I'd like you to take a look at Government

10  Exhibit 66.

11  A.   -- is this in the blue binder.

12  Q.   Yes, sir.

13  A.   Mine goes from 65 to 91.

14          May I approach the witness?

15          THE COURT:  You may.

16  BY MR. DEPORRE:

17  Q.   Would you describe Government Exhibit 66.

18  A.   This is a detailed spreadsheet that goes through more

19  detail.  I was referring primarily to the summary spreadsheet.

20  This is a detailed spreadsheet prepared by Mr. Pieron with the

21  various cash activity.

22  Q.   Is -- is this the spreadsheet that you used to, in your

23  words, prove out the income?

24  A.   It was primarily the summary spreadsheet that would have

25  proved out the income.

1  Q.   Who gave you Government Exhibit 66?

2  A.   This was prepared by Mr. Pieron.

3  Q.   All right.  And when you say you sought to prove out the

4  income, was that prior to the submission of the amended 2008

5  tax return?

6  A.   Yes.

7  Q.   Thank you.  There's another $1.6 million that goes to IB

8  Tech and Komplique, correct?

9  A.   I don't know what you mean by "another," but there is

10 $1.6 million that --

11 Q.   Well, we were talking previously about the 1.6 that's

12 return of capital --

13 A.   Right.

14 Q.   -- in the form of family loans and so forth?

15 A.   Okay.

16 Q.   Additionally, there's the 1.6 that goes to IB Tech and

17 Komplique.  Do you report that on Mr. Pieron's tax return?

18 A.   Yes.  In effect because, again, that's a total based on

19 what I had done at the time of approximately $3.2 million that

20 didn't get lost and reinvested in the company, and that's what

21 I proved out to for the tax returns total net income of

22 $3.2 million, which includes both the 1.6 to IB Tech and

23 Komplique and the 1.6 which turns out should have more likely

24 been return of capital.

25 Q.   What return did that appear on?

1  A.   Again, it's a combination of the 2007, '08 and '09

2  returns.

3  Q.   All right.  I'd like you to take a look at the 2009 return

4  that you prepared.  I believe it's Government Exhibit 48.

5            THE COURT:  For the examiner's perspective, to the

6  extent that you're trying, in part, to educate me, I've got an

7  understanding that the witness has received a communication

8  from the defendant that his initial capital contribution to

9  JDFX was 3.5 million.  I don't believe the witness has been

10  able to identify any corroborating documentation for the 3.5.

11           Once the capital is allegedly contributed, the basis

12  is then, in turn, used for the amended returns.  The next

13  question from my point of view is the -- is there ever any

14  reporting for any return of capital, the 3.5 million, in any of

15  the later returns?  And I don't know the answer to that

16  question, at least at this juncture or, if so, how.

17  BY MR. DEPORRE:

18  Q.   Would Mr. Pieron be obligated to report a return of the

19  3.5 million in capital from JDFX Holding to Mr. Pieron --

20           THE COURT:  During the liquidation.

21           MR. DEPORRE:  -- during the liquidation?

22           THE WITNESS:  It would just be part of his basis upon

23  liquidation.  He would -- so the 3.5 million would be part of

24  his basis upon liquidation, so it wouldn't be reported

25  separately other than as part of whatever his basis was at that

1   point.

2   BY MR. DEPORRE:

3   Q.   And did you take that into account for his basis upon

4   liquidation?

5   A.   Again, hindsight I probably didn't make that as clear in

6   these returns because I was proving out to net income of

7   $3.2 million so I -- I probably didn't roll forward the basis

8   properly, in hindsight, for the 2009 return because, again, I

9   was proving out over the period of time all of the cash

10  activity which is shown on a summary sheet not on this detailed

11  sheet.

12  Q.   So you used 3.2 as -- you classified 3.2 million as

13  income, correct?

14  A.   Yes.   Again, I'm doing this all based on memory.

15  Q.   Just answer yes or no, sir.

16  A.   Yes.

17  Q.   And you did not include the 3.5 as basis, correct?

18  A.   I recorded 20 percent of the 3.5 as basis on that --

19  Q.   I just want a correct or not correct.   I need to

20  understand the answer.

21          MR. HURFORD:   Well, objection, Your Honor.   I think

22  the witness is saying he can't answer the question as it's

23  asked.

24          THE WITNESS:   It's not a yes or no question.

25          THE COURT:   Let's take the witness's response.

1          THE WITNESS:  20 percent of the 3.5 was considered as

2    basis on the 2008 return.  On 2009, I didn't correctly roll

3    forward basis.  I did it on a net basis in 2009.

4    BY MR. DEPORRE:

5    Q.    Did the claim of right return reflect or need to reflect

6    the fact that Mr. Pieron had deposited 3.5 into the company?

7    A.    Not specifically because the claim of right just said that

8    it was -- the sales never had income in the first -- never had

9    a capital gain in the first place, and based on the claim of

10   right, there's just no gain for either year, 2008 or 2009.

11   Q.    So the 3.5 -- was that ever reported in any return that

12   you prepared, other than the basis for 2008?

13   A.    Again, it was done on a net basis, and it would be a

14   deduction.  If it had been reported, it would be a loss, but I

15   did it on a net basis, so it's not like there's unreported

16   income because of that, it would be a loss, but I reported it,

17   again, on a net basis for 2007, '08 and '09.

18   Q.    What sort of loss would it be?

19   A.    It would be in isolation of everything else, if you had

20   $3.5 million basis and liquidated the company for zero and

21   there was no other activity, it would be a capital loss.

22   Q.    What if -- did you include the --

23          THE COURT:  Why keep 1.6 million if you don't have a

24   claim of right?

25          MR. HURFORD:  Your Honor --

 1            THE COURT:  Should it be forfeited?

 2            MR. HURFORD:  Could you repeat the question?  I just

 3    didn't hear it, Your Honor.

 4            MR. DEPORRE:  Could I --

 5            THE COURT:  Sure.

 6    BY MR. DEPORRE:

 7    Q.   You filed a return, sir?

 8            MR. HURFORD:  Your Honor, I'm sorry, I apologize.  I

 9    didn't hear what the Court just said.  Could you please repeat

10    it?

11            THE COURT:  I was trying to understand how one could

12    seek to protect a certain amount of revenue based on the fact

13    that one never had a claim of right to the revenue but retain

14    distributions worth 1.6 million in the context of the

15    liquidation.  I don't understand that.

16            MR. DEPORRE:  And if I may get back there --

17            THE COURT:  Sure.

18            MR. DEPORRE:  -- I'd appreciate it.

19    BY MR. DEPORRE:

20    Q.   There are 15 -- there's $15.5 million -- $15.55 million

21    that is invested into JDFX Holding, correct?

22    A.   Yes.

23    Q.   And it's fair to say that you have nothing showing the

24    disposal or the disposition of that 15.55 million, correct?

25    A.   No.

1   Q.    What do you have --

2   A.    No, you're not correct is my point.

3   Q.    Thank you.   What do you have that shows what happened to

4   the 15.55 million?

5   A.    The spreadsheet showed all activity for all entities net

6   basis from 2007 through 2009 upon liquidation.

7   Q.    And you got that spreadsheet from Mr. Pieron, correct?

8   A.    Yes, yes.

9   Q.    And you did not verify that spreadsheet with any other

10  accounting records or bank records, correct?

11  A.    Correct.

12  Q.    You claimed that in 2009 Mr. Pieron had a theft loss,

13  correct?

14  A.    Yes.

15  Q.    How much was stolen from Mr. Pieron?

16  A.    Again, we talked about this last time; and, again, this

17  was the original amended return which subsequently, in my mind,

18  got superseded by the claim of right return, and again the --

19  nothing got stolen from him directly, but the literature at the

20  time, based on the Madoff case, indicated that it didn't have

21  to be a direct loss because of the Ponzi scheme, it could be an

22  indirect loss, so I considered it to be an indirect loss.

23  Q.    How much was the loss that you used that you attributed to

24  the Ponzi?

25  A.    I don't recall the -- I don't recall the calculations for

 1    '08 and '09.

 2    Q.    How would you -- how would you have those?  Where would

 3    you have those?  In the tax returns?

 4    A.    Correct.

 5    Q.    Okay.  Would you look at the 2009 tax return, the amended

 6    return.  That's Government Exhibit 48.

 7    A.    We reported a theft loss in that year of 4.7 million.

 8    Q.    How did you determine that all 4.7 million was

 9    attributable to the Ponzi scheme?

10    A.    Again, as indicated before, we concluded that this was --

11    the losses incurred were an indirect loss of the Ponzi scheme

12    so the net loss we treated as a theft loss.

13    Q.    How did you -- and my question isn't what you did, but

14    it's how you came to that conclusion.

15    A.    I don't recall the thought process into that conclusion.

16    Q.    What were the factual underpinnings of the conclusion?

17    A.    Again, as we stated, upon liquidation there was a

18    significant loss, and Mr. Pieron's representation that the

19    liquidation occurred as an indirect result of the activity

20    because of the Ponzi scheme.

21    Q.    Okay.  So I think -- I think I got this.  Mr. Pieron told

22    you that the losses were indirectly attributable to the Ponzi

23    scheme, correct?

24    A.    Yes.

25    Q.    And that was the factual basis that you had for the

1  4.7 million loss in 2009?

2  A.    Right.

3          THE COURT:  And the gentleman had the defendant

4  commit that to an email summary.

5          MR. DEPORRE:  Yes, and we'll come back to it.

6  BY MR. DEPORRE:

7  Q.    There was also a loss taken in 2008, correct?

8  A.    Correct.  In hindsight, the correct way would have been

9  reported -- would have been reported --

10  Q.    I'm not -- just answer the question, sir.

11  A.    Okay.

12  Q.    2008, could you go to that return, the amended return that

13  you filed for 2008.

14  A.    What exhibit is it?

15  Q.    It's Government Exhibit, I believe, 41.

16  A.    Okay, yes.  We took a loss there also.

17  Q.    And what page do you see the loss on?  There's a Bates --

18  at the top there's a banner with page ID numbers.  Could you

19  tell me the page ID number that you see the loss?

20  A.    1841.

21  Q.    And did you take a $7 million loss?

22  A.    Yes.

23  Q.    And, again, that was attributable to the -- what

24  Mr. Pieron told you that was attributable to the Ponzi,

25  correct?

Pavlik - Cross                                                    55

1  A.    Yep.

2  Q.    Did you take any contemporaneous notes from your

3  conversation with Mr. Pieron?

4  A.    I don't recall.  It's now eight years ago.

5  Q.    You don't recall if you had notes.  If you had notes, what

6  would you have done with them after you had taken them?

7  A.    They'd be in the file.

8  Q.    Okay.  You would have put them in the AHP master file

9  that's digitally kept?

10  A.    Yes.

11  Q.    Okay.  Now, to document it, you also asked Mr. Pieron to

12  send you a letter; is that correct?

13  A.    Yes.

14  Q.    I'd like you to go to Government Exhibit 225.

15  A.    Okay.

16  Q.    Do you recognize Government Exhibit 225 as an email from

17  Mr. Pieron to you, sir?

18  A.    Yes.

19  Q.    And does it include at the top an attachment entitled

20  letter to IRS?

21  A.    Correct, yes.

22  Q.    And there's a date on that email, correct?

23  A.    Correct.

24  Q.    And that's November 26, 2011.

25  A.    Yes.

1              MR. DEPORRE:  Your Honor, at this point I would move

2    for the admission of Government Exhibit 225.

3              MR. HURFORD:  Does it have any attachments?

4              MR. DEPORRE:  The attachment is a separate exhibit.

5              MR. HURFORD:  No objection -- no objection, Your

6    Honor.

7              THE COURT:  Received.

8              And the attachment's already into evidence.

9              MR. DEPORRE:  Correct.

10   BY MR. DEPORRE:

11   Q.   Now I'd like you to take a look at Government Exhibit 204.

12   A.   Okay.

13   Q.   Is Government 204 the same as the attachment that was sent

14   to you in the email shown on Government Exhibit 225, dated

15   November 26th, 2011?  And if you need a moment to look, please

16   take a moment.

17   A.   Yes.

18   Q.   So it's fair, in November 26 of 2011, you had information

19   from Mr. Pieron that he sold shares of stock to Market Shot and

20   then there was a Ponzi that resulted in him losing the value of

21   his loans and stock?

22   A.   Correct.

23   Q.   And that was all based upon information that you obtained

24   from Mr. Pieron?

25   A.   Yes.

Pavlik - Cross

1  Q.   We can agree that the nature of the loss was indirect and

2  not a direct theft, correct?

3  A.   Yes.

4  Q.   How did you calculate, and what figures did you use to

5  calculate, the amount of -- the total amount of the loss that

6  you used on page 1841 and of the 2008 return?

7  A.   I don't recall the exact method of the calculation.

8  Q.   You don't remember the exact calculation.  What do you

9  remember in terms of how you calculated that figure?

10 A.   I don't recall the details.  Again, I recall proving out

11 to net income, but I don't recall the methodology I used to

12 determine the theft loss portion.

13 Q.   And you attributed all the theft loss -- you attributed

14 the entire loss, or the entire liquidation to the theft loss,

15 correct?

16 A.   Yes.

17 Q.   Was there any part of loss that you decided was not

18 attributable to the theft loss?

19 A.   I didn't allocate it.  I treated it as related to the

20 theft loss.

21 Q.   So if there were payments made -- if the money had -- if

22 there was some other cause to the loss, that was not reflected

23 in your return, is that fair?

24 A.   Correct.

25 Q.   Are you familiar with a bank called Banque du Bois?

1   A.   Not specifically, no.

2   Q.   You say "not specifically".  Are you generally familiar

3   with a bank called Banque du Bois?

4   A.   I've heard the name, but I don't know the context, no.

5   Q.   Where did you hear the name?

6   A.   Again, I do not recall.

7   Q.   Did Mr. Pieron ever tell you that he sought to invest

8   money to purchase Banque du Bois?

9   A.   I know that at some point he talked to me about investing

10  in a bank.  I don't remember if that's the one and when that

11  was discussed.

12  Q.   Do you know whether or not he received his deposit back

13  from attempting to purchase Banque du Bois?

14  A.   Again, I understand now that he did not receive that.  I'm

15  not sure if I knew that --

16  Q.   And I want to focus on what you knew at the time you were

17  preparing the return.

18  A.   I don't know when I found that out, so I can't say when I

19  knew that; if I knew it then or if I didn't know that until

20  subsequently.

21  Q.   You don't know back in 2011 that he did not receive a

22  portion of the deposit to purchase Banque du Bois?

23  A.   Again, I don't know when I came to that realization so I

24  don't know if it was before or after that.

25  Q.   If you had known it in 2011, would you have included that

1  amount in the theft loss for 2008 and 2009?

2  A.    Probably, yes.

3  Q.    Why?

4  A.    Because it was money that he never received back, even

5  though he tried to invest in a bank, but -- again, but I don't

6  think I -- I wouldn't have known that at the time.

7  Q.    How is that in anyway attributable to -- as an indirect or

8  a direct theft to the Ponzi scheme?

9  A.    It would have been -- not been part of this Ponzi scheme,

10  but it would have been a separate theft loss.  If you give

11  somebody money, and they don't -- and they don't give you what

12  you had coming to you, being a bank, then they -- and they had

13  no reason to hold that money, then that would be a theft loss,

14  but that's a separate theft loss that I didn't know about at

15  that time.

16  Q.    Okay.  So you didn't know about it at that time.  We've

17  established that, correct?  Can we agree on that?

18  A.    I mean, I don't think I knew it.  I don't know for sure

19  when I found that out, but it would be a separate theft loss.

20            THE COURT:  Was it a theft loss by the defendant or

21  was it a theft loss by Market Shot?

22  BY MR. DEPORRE:

23  Q.    If the defendant deposits money and does not receive a

24  return of that deposit, but there's no theft, is there a theft

25  loss?

1  A.   Well, I think there is a theft, if you have -- if you

2  deposit money --

3  Q.   Sir, just -- just answer the question.  If there -- if

4  there is --

5          MR. HURFORD:  Objection, Your Honor.  He's -- I think

6  he's not allowing the witness to answer his question and

7  getting a little aggressive here, so I'd ask the witness be

8  allowed to answer the question.

9          THE COURT:  We'll let the gentleman phrase his

10  question.

11          THE WITNESS:  I don't recall the question now.

12  BY MR. DEPORRE:

13  Q.   All right.  I'll phrase it differently.  If I go to

14  purchase a home, and I make a deposit towards the purchase, and

15  the purchase doesn't occur because I can't receive financing,

16  and I don't have a financing contingency and, therefore, I

17  don't receive my deposit back, is that a theft loss?

18  A.    If the person didn't have a right to -- a contractual

19  right to keep the money, I would think, yes, it would be a

20  theft loss.

21  Q.   Did you look at the contract or the -- any documents

22  surrounding the purchase agreement for Banque du Bois?

23  A.   No.

24  Q.   So how can you stand here today and say that that's a

25  theft loss?

Pavlik - Cross

1  A.   I'm just saying if you put money to purchase something and

2  never receive it back, again, I -- I haven't researched it.

3  I'm just saying that logic would say that that would be a theft

4  loss.  If you went to buy somebody [sic] and they had no

5  contractual right to keep the money, and they never paid it

6  back, that would be a theft loss.

7  Q.   But to know that, you would have to see the contract, can

8  we agree?

9  A.   Yes.

10 Q.   And you didn't see any contract for Banque du Bois?

11 A.   Correct.

12        THE COURT:  And the witness didn't know about it at

13 the time he prepared the return.

14 BY MR. DEPORRE:

15 Q.   Did you know about it at the time you prepared the

16 returns --

17 A.   No.

18 Q.   -- Banque du Bois?

19 A.   I do not believe I did, no.

20 Q.   Have you ever seen a contract for the purchase of Banque

21 du Bois?

22 A.   No.

23 Q.   So you said that subsequently you found out that there

24 should have been a theft loss, correct, for the purchase of

25 Banque du Bois?

1  A.   Again, based on limited information, that would be my

2  general understanding but, again, I didn't research that or do

3  it because it's not relevant.

4  Q.   Who did you get that information from?

5  A.   Again from Mr. Pieron's attorneys.

6  Q.   And was that his attorneys that are sitting here at

7  counsel table?

8  A.   I don't recall again.

9  Q.   Was it in the last two years?

10  A.   I believe so.

11  Q.   When do you believe it occurred?

12  A.   Sometime in the last two years, I believe.  But, again

13  I --

14  Q.   I have no question, sir.  You're just talking at this

15  point.  I'm not -- you're not answering a question.  You're

16  just speaking.

17           In 2011 you filed an amended return for the claim of

18  right amending the 2011 year, correct?

19  A.   Yes.

20  Q.   And you did not discuss that return with John Fetters,

21  correct?

22  A.   Correct.

23  Q.   You did Google research to determine that the receiver was

24  trying to get back funds from Market Shot, correct?

25  A.   Yes.

1  Q.   You did not see a judgment against Pieron by the receiver,

2  correct?

3  A.   Not that I recall, no.

4  Q.   And you don't recall any ruling, court order or otherwise,

5  stating that Pieron was obligated to return money to the SEC

6  receiver?

7  A.   I did not see a court order.

8  Q.   Was there any legal document that you saw at all that

9  reflected Pieron owing money to the receiver for Market Shot?

10 A.   Not that I recall.

11 Q.   The facts that you had to underlie the claim of right

12 return came from Pieron, correct?

13 A.   Yes.

14 Q.   The facts also came from your Google research, correct?

15 A.   Yes.

16 Q.   Were there any other facts that you relied on for the

17 claim of right return?

18 A.   Only that other people in similar situations were required

19 to return money that they had received based on reviewing the

20 receiver's documents.

21 Q.   I want to use an analogy with you of a car dealer.  You

22 said that other people had to repay the receiver for -- based

23 on the documents you reviewed, correct?

24 A.   Yes.

25 Q.   Imagine a car dealer sells a car to Trevor Cook.  The car

1  dealer reports that as income.  Can the receiver claw back that

2  income?

3  A.    I don't know the answer to that.

4  Q.    Because it's a legal answer, correct?

5  A.    Yes.

6  Q.    How do you know that the receiver was entitled to the

7  money that Market Shot transferred to JDFX?

8  A.    Again, based on other purchases Mr. Trevor Cook had made

9  that were -- that people were required to pay back the money.

10  That's what I based it on.

11  Q.    And based on Mr. Pieron's discussions with you?

12  A.    Yes.

13  Q.    Do you know whether or not JDFX was insolvent at the time

14  Trevor Cook was indicted?

15          MR. HURFORD:  Just for the record --

16          THE WITNESS:  I don't know the dates of either of

17  those items specifically.

18  BY MR. DEPORRE:

19  Q.    When did JDFX file -- claim insolvency?

20  A.    They were liquidated in November of 2009.

21  Q.    And at the time of liquidation, did JDFX have unpaid

22  creditors?

23  A.    I don't know the answer to that.

24  Q.    You don't know whether or not Swiss tax authorities were

25  owed money, do you?

1    A.    No.

2    Q.    Did Mr. Pieron ever tell you that at the time of

3    liquidation JDFX owed money to Swiss tax authorities?

4    A.    No.

5    Q.    Mr. Pieron told you that he transferred 1.6 million out of

6    JDFX and into IB Tech and Komplique, correct?

7    A.    Yes.

8    Q.    Did he tell you if that was ordered as part of the JDFX

9    liquidation?

10   A.    No.

11   Q.    Did the receiver for the SEC ever claim the 1.6 million

12   that was transferred out of JDFX and into IB Tech and

13   Komplique?

14   A.    No.

15   Q.    Was there ever a judgment against Mr. Pieron for that 1.6,

16   to your knowledge?

17   A.    To my knowledge, no.

18   Q.    Of the 15.55 million, who controlled that money?

19   A.    I understood it to be Mr. Pieron.

20   Q.    And Mr. Pieron used some of that money for personal

21   investment in straddles, correct?

22   A.    Based on our prior discussion, yes.

23   Q.    Specifically he used about seven and a half million,

24   correct?

25   A.    I don't recall the number.

Pavlik - Cross                                                    66

1  Q.   It was over a million?

2  A.   I don't recall the spreadsheet you put up before.

3  Q.   Who told Mr. Cook where to wire the 15.25 million that he

4  received?

5           MR. HURFORD:  Objection, Your Honor, he can't

6  possibly answer that question as to who told Mr. Cook where to

7  wire --

8           THE COURT:  He may have some hearsay knowledge of it.

9           MR. HURFORD:  At least lay a foundation before we get

10 to that question.

11          THE COURT:  Sure.

12          THE WITNESS:  I don't know.

13 BY MR. DEPORRE:

14 Q.   You don't know because Mr. Pieron didn't tell you, is that

15 fair?

16 A.   Yes.

17 Q.   You didn't tell anybody to wire money anywhere?

18 A.   No.

19 Q.   If -- in your experience, if money is wired into an

20 account, does the person who controls that account usually give

21 the account information for where the money is wired to?

22 A.   I don't know the details.

23 Q.   Do you know the details of where the money was actually --

24 for the first $10 million, where that money was actually wired

25 to, what account?

Pavlik - Cross                                                              67

1   A.   No, I do not.

2   Q.   Do you know the entity that held the account?

3   A.   No.

4   Q.   What do you believe, based on your conversations with

5   Mr. Pieron -- what entity do you believe held that account?

6   A.   It was either JDFX or one of the related entities that

7   were in Switzerland.

8   Q.   You believe that they were related entities in

9   Switzerland?

10  A.   Yes.

11  Q.   Did you believe Komplique was a related entity to JDFX?

12  A.   There are two Kompliques.  Are you talking about the US

13  Komplique?

14  Q.   Nope, the Swiss Komplique.

15  A.   I don't know specifically if there was any relation.

16  Again, the spreadsheet was done on a net basis including all

17  the entities, but I didn't analyze the relationship between the

18  various entities.

19  Q.   Do you know today that the $10 million was wired to JDFX

20  Fund Management?

21  A.   I don't -- I don't know the answer to that, no.

22  Q.   You didn't review that with Mr. Pieron's attorneys?

23  A.   No.

24  Q.   If Mr. Pieron never sold stock to JDFX -- never sold

25  personal stock to JDFX, would he have any reason to claim basis

1  related to the sale of stock for JDFX?

2         MR. HURFORD:  Just -- just objection.  I think you

3  said sold stock to JDFX instead of Market Shot.  I just want

4  the record to be clear.

5         MR. DEPORRE:  Thank you.  And I appreciate that.

6         THE WITNESS:  I don't understand the question.

7         MR. DEPORRE:  Fair enough.

8  BY MR. DEPORRE:

9  Q.   If Mr. Pieron never sold stock in JDFX to Market Shot,

10 would it make sense that Mr. Pieron would have told you what

11 his basis was for the purpose of a stock transaction?

12 A.   I would still need to know that information.

13 Q.   But you wouldn't put it on a return for Mr. Pieron, would

14 you?

15 A.   Not until liquidation.

16 Q.   Why would you need to know that information?  So that it

17 could show up on a subsequent return?

18 A.   Correct.

19        THE COURT:  I need to stop for just a moment because

20 I'm working from my notes.  In our very first post-conviction

21 sentencing hearing, I inquired of the defense team whether or

22 not the defendant had ever contributed capital in JDFX in its

23 inception.  The response that I received was no.  Am I correct

24 in my notes?

25        MR. PENDERY:  That is correct, Your Honor.

BY MR. DEPORRE:

Q.   Did you later become aware that -- in your meetings with Mr. Pieron's attorneys, that he did not make any initial capital contributions into JDFX stock?

A.   No.

Q.   You learned that today for the first time?

A.   Yes.

Q.   Before 2019, did Mr. Pieron ever tell you that he did not personally sell stock in JDFX to Market Shot?

A.   No.

            THE COURT:  Has the committee reached a conclusion?

            MS. PARKER:  Just a moment, Your Honor, please.

            (Off-the-record discussion.)

BY MR. DEPORRE:

Q.   You received a spreadsheet regarding the use of the 15.55 million from Mr. Pieron, correct?

A.   Spreadsheet showing all of the cash activity.

Q.   And is it fair to say that Mr. Pieron controlled the cash activity for the money in JDFX Holding?

A.   To my knowledge, but I don't know if there were other limitations on his control.

Q.   Do you know if there were any limitations on his ability to use the money that he received from Market Shot in 2006 and 2007?

A.   No.

1  Q.    You're not aware of any?

2  A.    Correct.

3  Q.    There may have been limitations?

4  A.    There may have been.

5  Q.    Did Mr. Pieron ever tell you whether or not there were?

6  A.    No.

7  Q.    The spreadsheet that you received on Government

8  Exhibit 66, if you would take a look at that.  It's not in the

9  book, I'm sorry.  It's a loose piece of paper.

10 A.    It's this one?

11 Q.    Yes, sir.

12 A.    Okay.

13 Q.    You said that this was a cash transaction spreadsheet; is

14 that correct?

15 A.    Yes.

16 Q.    In your view, does -- there are columns at the top that

17 say JDFX loan, JDFX cash, card center, parenthesis JDFX.  In

18 your view, were all those entities treated the same for

19 accounting purposes?

20 A.    Accounting or tax purposes?  For tax purposes, again, as

21 stated before, this is a detail sheet based on the summary

22 sheet.  I did it on a net basis, which included the activity

23 for all of the entities.

24 Q.    So you drew a distinction between accounting and tax and

25 that's because you didn't do the accounting work for the JDFX

1  entities, correct?

2  A.    Correct.

3  Q.    And, in fact, you never saw any accounting, other than

4  spreadsheets like this, for JDFX entities?

5  A.    Correct.

6  Q.    For tax purposes, you treated all JDFX entities together,

7  correct?

8  A.    Yes.

9  Q.    All right.  If Fetters told the SEC that all creditors

10 were paid at the time of JDFX's liquidation, did Pieron convey

11 that information to you?

12 A.    I don't recall that, such a conversation, no.

13 Q.    And you never had a conversation specifically with

14 Fetters, John Fetters, about that, correct?

15 A.    Correct.

16           MR. DEPORRE:  Pass the witness, Your Honor.

17           THE COURT:  Do you want a few minutes before

18 redirect?

19           MR. HURFORD:  Just for the restroom, Your Honor,

20 please.

21           THE COURT:  We will take a brief break.

22           Mr. Pavlik, you can step down from the stand.

23           (At 11:26 a.m., break taken.).

24           (At 11:39 a.m., break concluded.)

25           THE COURT:  Please be seated.  Redirect.

1      MR. HURFORD:  Thank you, Your Honor.

2                REDIRECT EXAMINATION

3   BY MR. HURFORD:

4   Q.   Hello again, Mr. Pavlik.

5   A.   Hello.

6   Q.   Would you please turn to defense -- is it Exhibit 6 in

7   that binder.  It's the 2009 amended tax return.

8   A.   The black binder?

9   Q.   The black binder.

10        And could you go to Schedule D, please.  I think it's

11  the seventh page.

12  A.   Okay.

13  Q.   When you were -- you testified at this hearing today and

14  the previous hearing that we were at that you didn't include

15  basis and you should have?

16  A.   Correct.

17  Q.   And you meant for this 2009 return?

18  A.   Correct.

19  Q.   And can you -- can you -- can we walk-through -- when you

20  say, we should have reported basis, can you tell us what basis

21  you should have reported?

22  A.   Based on the information I had, his original basis of 3.5,

23  he used up approximately $700,000 of that basis on the first

24  sale, so it would have been $2.8 million remaining basis, and

25  then -- and then he had $10 million of additional basis from

Pavlik - Redirect

1  the sale, so it'd be $12.8 million, then it would be a

2  proportionate amount of that, 15 divided by the 85 percent that

3  he still owned would be the correct basis.

4              MR. HURFORD:  May I approach the board, Your Honor?

5  BY MR. HURFORD:

6  Q.   And Mr. Pavlik, I'm going to ask you to do basis right

7  now, and I'm going to ask that we assume that there's not

8  3.5 million of initial basis.  Do you understand what I'm

9  saying?

10 A.   So zero initial basis is what you're assuming?

11 Q.   Correct.  Before -- so before the first stock transaction

12 there would be no basis.

13 A.   Correct.

14 Q.   So we have -- so we have one stock transaction that on the

15 share purchase agreement has a closing date in 2008, and is it

16 fair to say that that document there's $10 million in exchange

17 for 2 million shares of JDFX stock?

18 A.   Yes.

19 Q.   Okay.  So to determine basis -- and we're assuming that

20 the 10 million right now is reinvested into JDFX?

21 A.   Correct.

22 Q.   Okay.

23             THE COURT:  Could I ask a question.  I mean, why --

24 why is this at all relevant, given your legal posture in the

25 case, which is there was never a capital transaction, it was

1  all seed capital to JDFX being paid by Market Shot.  Why are we

2  even discussing this?  I thought you basically said, don't look

3  at that document.  For whatever reason, it's false, inaccurate

4  and we don't even need to look at it.

5          So I'm trying to understand why you would be

6  examining the witness about a document that you've already

7  taken the position is 100 percent inaccurate.

8          MR. HURFORD:  Well, the Court is not clear as to

9  whether I'm allowed to take that position, so I'm arguing an

10  alternative factual situation, Your Honor, and I think I'm

11  allowed to explore that.  If there is a share purchase

12  agreement, if there was a sale of stock, does he get basis for

13  it.

14          THE COURT:  So to be clear, the assertion is even if

15  you don't accept the notion that that document and the

16  information furnished to the witness was 100 percent wrong,

17  assume for purposes of discussion that it was 100 percent right

18  and you have some questions for the witness.

19          MR. HURFORD:  Correct.

20          THE COURT:  Okay.

21  BY MR. HURFORD:

22  Q.  So after -- and we're starting off with -- with -- in this

23  situation -- in this situation here, James Pieron owns

24  10 million shares on day one of JDFX.

25  A.  Under this alternative assumption, yes.

 1          MR. DEPORRE:  Your Honor, I'm going to object, too,

 2  at this point.  It seems like the witness is now testifying as

 3  almost an expert witness for the defense, assuming facts that

 4  are not part of what he actually calculated the basis.  He's

 5  stated that he did not include a basis calculation in the '09

 6  return, and now we have him assuming a hypothetical set of

 7  facts that probably would have been appropriate for Ms. Rebeck

 8  or somebody like that but seem inappropriate for this witness.

 9          MR. HURFORD:  Well, Your Honor, it's not a

10  hypothetical set of facts.  It's the facts that the Government

11  has proffered at this sentencing hearing.

12          THE COURT:  No, not just that.  It was facts that

13  were proffered by your client to the witness, and so that's why

14  I -- I would respectfully disagree with the Government on this

15  question.  You may proceed.

16          MR. HURFORD:  Thank you.

17  BY MR. HURFORD:

18  Q.   So when you determined basis for the first sale of stock,

19  when you're adding the $10 million and determining how much

20  basis he has, do you apportion that to the 8 million shares

21  that James Pieron has left after the first stock transaction?

22  A.   Yes.

23  Q.   Okay.  And I don't have a calculator with me, Your Honor.

24  I've done this beforehand.  I'm going to say that 10 million

25  over 8 million shares equals a $1.25 per share.  Does that

1  sound about right to you?

2  A.    Yes.

3  Q.    Okay.  So to determine what the basis is in 2009, against

4  the 5.25, the second sale of stock, there's a transfer of --

5  according to that share purchase agreement, would you agree

6  that there's 1.5 million shares sold?

7  A.    Yes.

8  Q.    In exchange for $5.25 million?

9  A.    Correct.

10  Q.    Okay.  So then we have -- and to determine the basis in

11  the 1.5 million shares that were being sold, would you multiple

12  1.5 million times 1.25?

13  A.    Yes.

14  Q.    And the math I did before that, gave me 1.875 million.

15  Does that sound about right to you?

16  A.    That sounds correct.

17  Q.    So for the -- so assuming --

18  A.    You put the wrong number I think.

19  Q.    1.875, thank you.

20          Okay.  And in 2000 -- so if you look at the 2009

21  amended return, Schedule D, if James Pieron owned 10 million

22  shares at the time he sold his stock to Trevor Cook, that basis

23  line should have been 1.875 million?

24  A.    Yes.

25  Q.    Okay.  And if James Pieron didn't own 10 million shares of

1   stock, if he owned something less than 10 million shares, say

2   9 million shares, his basis would increase here, correct?

3   Because you would be putting 10 million into something less

4   than 8 million?

5   A.   Yes.

6   Q.   Okay.  But whether it's -- in 2009, whether the basis is

7   1.875 million, or some number higher than that, it doesn't

8   matter, because you can take a capital loss in that year?

9   A.   Correct.

10  Q.   Okay.  And given the -- in 2009 -- in 2009, between basis

11  and capital -- knowing what you know today, in 2009, between

12  basis and capital loss --

13          MR. DEPORRE:  I'm going to object, Your Honor, based

14  on knowing what you know today.  I think there's a lack of

15  foundation.  I have no idea what the defendant knows today,

16  what that knowledge is based on.

17          MR. HURFORD:  I'll rephrase.

18          MR. DEPORRE:  Excuse me, what the witness knows.

19  BY MR. HURFORD:

20  Q.   Mr. Pavlik, there is a $5.25 million capital gain listed

21  in the 2009 return.  Is there a sufficient basis in capital

22  loss in 2009 to wipe out those gains?

23  A.   Yes.  May I clarify that?  Assuming we didn't take the

24  theft loss, you know -- assuming we didn't take the theft loss,

25  then, you know, that there's basis, and it changes the capital

1  gain.  Assuming we took the theft loss, it's a different

2  answer -- it's more the way that I've prepared the return.

3          So we're talking, you know, two different

4  alternatives here, but assuming that there was -- if you ignore

5  the theft loss for a minute then, yes, it would be -- there

6  would be a net loss in 2009.

7  Q.   And the theft loss and the capital loss -- the capital

8  loss that we're talking about in 2009 right now, and the theft

9  loss that you're talking about, those are -- the reason there's

10 an issue with that is because those are both counting dollars

11 that Mr. Pieron never got out of JDFX?

12 A.   Correct.

13 Q.   So it's loss to him in some way?

14 A.   Right.  As stated previously, I proved out total income.

15 The only question is the character of capital versus ordinary

16 in the two years.

17 Q.   And whether you call it theft loss or capital loss, is

18 there a tax liability in 2009?

19 A.   Not in 2009.

20 Q.   Let's talk about 2008 for a second.  The Government has

21 been talking about a number of emails that were sent by

22 Mr. Pieron to you with a number of attachments, so I would like

23 to look at one of those emails right now.  And that is the --

24          (Off-the-record discussion.)

25          MR. HURFORD:  I'm sorry, Your Honor.  I'm good, I'm

1   good, I'm good.  I got it.

2   BY MR. HURFORD:

3   Q.   Do you have Government Exhibit 223 -- 222 handy?

4   A.   That's the blue binder, right?

5   Q.   Yeah.

6   A.   What number?

7   Q.   I can give you my copy of it, if you'd like, just to make

8   matters easier.  May I approach, Your Honor?

9        THE COURT:  He could use the one that you have with

10  your notes.

11       MR. HURFORD:  I'm sure that would elicit an

12  objection.

13       THE WITNESS:  Okay.

14  BY MR. HURFORD:

15  Q.   So could you just describe what 222 -- what exhibit are

16  you looking at right now, sir?

17  A.   The email and then the attached.

18  Q.   Okay.  The email has a sticker on it that's Government

19  exhibit?

20  A.   222.

21  Q.   Okay.  And that email was sent on November 12th of 2011,

22  at least the top email?

23  A.   Yes.

24  Q.   Okay.  And then do you see where it says -- where you got

25  the attachments and the last one says JDFX Holding proxy?

1  A.    Yes.

2  Q.    And that's -- the JDFX Holding proxy attachment was

3  entered into evidence as Government Exhibit 224 which I'm going

4  to give to you right now.

5  A.    Okay.

6  Q.    So you testified on direct examination that had you had

7  that share purchase -- that proxy agreement, that provides

8  share -- that evidence is Cook having share ownership in 2007,

9  Market Shot having share ownership in 2007, that you should

10 have reported the capital gains from the share purchase

11 agreement dated 2008 in 2007; is that correct?

12 A.    Yes, based on this information which I had but I did not

13 consider fully at the point of preparing those returns.

14 Q.    So did you -- did you make a mistake by reporting the

15 gain -- the capital gain in 2008?

16 A.    In hindsight, yes.

17 Q.    You say "in hindsight, yes," but --

18 A.    Based on this documentation.

19 Q.    That you received before you filed --

20 A.    Correct.

21 Q.    -- the amended returns?

22 A.    Correct.

23 Q.    You should have claimed the gains in 2008 -- in 2007,

24 excuse me?

25 A.    Correct.

1  Q.   Didn't -- now, all these --

2        THE COURT:  But 2007 was already filed.  If I

3  understand accurately, you're asking the witness which year he

4  should have amended.

5        MR. HURFORD:  Thank you, Your Honor.  That's very

6  fair.  Let me rephrase the question.

7  BY MR. HURFORD:

8  Q.   Looking at this email today, should you have filed an

9  amended 2007 return claiming the $10 million of capital gains

10 in 2007?

11 A.   Yes.

12 Q.   And the emails -- I just want to step back for a second.

13 The emails that we've seen, that we've gone over today, all the

14 documents that we've gone over today, these are all documents

15 that were provided by James Pieron, correct?

16 A.   Correct.

17 Q.   Did he tell you -- did he tell you at any time that he

18 wanted you to report capital gains in a particular year?

19 A.   No.

20 Q.   Did he defer to your professional judgment?

21 A.   Yes.

22 Q.   And so he gave you all this stuff, and he didn't tell you

23 how he wanted it reported?

24 A.   Correct.

25 Q.   You made the decision as to when and how to report based

82

1  on the information that he gave you?

2  A.    Yes.

3  Q.    And you're saying today, based on the information that he

4  gave you, you should have amended the 2007 return to have the

5  first stock transaction capital gains placed in 2007?

6  A.    Yes.

7  Q.    And you're also saying today that he doesn't have tax

8  liability in 2009.

9  A.    Correct.

10          THE COURT:  Can we see if the witness had an

11  opportunity to talk or consult with the initial tax preparer

12  for the initial 2007 return.

13  BY MR. HURFORD:

14  Q.    Did you understand the judge's question?

15  A.    I didn't hear it all.

16  Q.    The judge asked if you had an opportunity to consult with

17  the tax preparer for the 2007 returns.

18  A.    I did not consult with them.

19          THE COURT:  Does he know who the preparer was?

20          THE WITNESS:  Based on the -- from Mr. Pieron, I

21  don't remember the name, but he gave me the name of who the

22  preparer was.

23  BY MR. HURFORD:

24  Q.    You don't remember it?

25  A.    The company.

Pavlik - Redirect                                                      83

```
 1  Q.   Does American Tax Solutions sound familiar?
 2  A.   That sounds correct.
 3           THE COURT:  I don't believe that was the case for the
 4  '07 return.
 5           MR. DEPORRE:  Your Honor, the Government agrees that
 6  the '07 return was prepared by ATSI.  It was prior returns
 7  prepared by Mr. Pieron's father-in-law.
 8  BY MR. HURFORD:
 9  Q.   And you had -- sitting here today, do you recall how many
10  face-to-face meetings you actually had with Mr. Pieron?
11  A.   No.
12  Q.   Do you -- do you remember when you had the meetings with
13  Mr. Pieron, was anybody else there or was it just him?
14  A.   I don't recall.  Likely had an assistant of mine in the
15  meetings.
16  Q.   Anybody else?  Do you remember if Mr. Pieron brought
17  anybody with him to the meetings?
18  A.   I don't recall that he did during that period of time, no.
19  Q.   Did you have any -- in your -- in your conversations in
20  person or over email or phone, were you able to determine
21  whether or not -- or were you able to assess whether or not
22  Mr. Pieron understood US tax law?
23           MR. DEPORRE:  Objection, Your Honor.
24           THE COURT:  Sustained.
25           MR. HURFORD:  What's the objection?
```

1          THE COURT:  He has a Ph.D. in mathematics, not tax

2     law.  It's a question that no one can -- can answer.  If you

3     want to be specific with respect to a particular tax law, then

4     the witness can answer the question.

5          MR. HURFORD:  Okay.

6     BY MR. HURFORD:

7     Q.   Did -- based on your interactions with Mr. Pieron, did he

8     seem knowledgeable concerning the aspects of capital gains?

9          MR. DEPORRE:  Objection, Your Honor, lack of

10    foundation and personal knowledge.

11         THE COURT:  Sustained.

12    BY MR. HURFORD:

13    Q.   You had conversations with Mr. Pieron?

14    A.   Yes.

15    Q.   You had email correspondence with Mr. Pieron?

16    A.   Yes.

17    Q.   You had telephone calls with Mr. Pieron?

18    A.   Yes.

19    Q.   Did you ever discuss issues of capital gains with

20    Mr. Pieron?

21    A.   Just in general, the whether he had capital gains or

22    losses in the years under question.

23    Q.   Did you have any conversations with Mr. Pieron concerning

24    capital gains that would allow you to assess whether he

25    understood the subject?

1   A.    I don't recall that.

2   Q.    Fair enough.  When -- when you were -- I'm going to

3   represent to you that you met with Agent Hollabaugh in June of

4   2012 --

5              MR. DEPORRE:  Objection, Your Honor.

6              MR. HURFORD:  -- and in May -- on May 15th of 2013.

7              THE WITNESS:  Sounds correct.

8              MR. HURFORD:  What's the objection?

9              MR. DEPORRE:  My objection is leading.

10             MR. HURFORD:  I haven't asked the question yet.

11             MR. DEPORRE:  And this is certainly beyond the scope

12  of -- well, you're making representations to the witness which

13  is exactly --

14             MR. HURFORD:  There's interview memos for May 12 --

15             MR. DEPORRE:  I'm not denying whether or not -- what

16  happened.  I believe it's leading and I believe it's beyond the

17  scope of my cross-examination.

18             THE COURT:  Overruled.  You may continue.

19             MR. HURFORD:  Thank you.

20  BY MR. HURFORD:

21  Q.    The first time you met with Agent Hollabaugh, do you

22  recall whether you were taking the view that the claim of right

23  doctrine applied as opposed to the civil theft -- I'm sorry, I

24  said civil theft -- theft loss deduction?

25  A.    At that point in 2012 we were focusing on the theft loss.

1  We had not concluded the claim of right doctrine, I don't

2  believe, at that time.

3  Q.    Okay.  Do you remember -- by the next time you meet with

4  Agent Hollabaugh in 2013, do you remember -- do you remember

5  whether you had a view as to the claim of right doctrine at

6  that time?

7  A.    I don't recall when that came up.  It was -- in my prior

8  testimony I said I Googled it, but I did more than just Google

9  the issue because I looked at the -- by Googling it I looked at

10  the receiver's activity, and the receiver was actively trying

11  to collect from various people, including Mr. Pieron, you know,

12  so it was -- it was a Google search, but it was really looking

13  at the receiver's activity.

14           But when I -- when I came to the conclusion that they

15  were actively trying to collect, that's when I determined that

16  the claim of right doctrine was a -- was the -- I could take

17  either theory, but that was a -- I thought was a stronger

18  position.

19  Q.    Do you remember when you came to that conclusion?

20  A.    I do not.

21  Q.    Do you remember telling Agent Hollabaugh that you had come

22  to that conclusion?

23  A.    I do not remember the conversation.

24  Q.    Would looking at the interview memo refresh your

25  recollection?

1  A.   Yes.

2            MR. HURFORD:  Your Honor, do you want me to mark this

3  for identification, or can I just hand it to him.

4            THE COURT:  You can hand it to him at this juncture

5  if you're just using it to refresh his recollection.

6  BY MR. HURFORD:

7  Q.   For the record, I'm handing the witness the May 15th,

8  2013, interview memo, and I can -- let me just point you to a

9  section of it.  It's not short.  Look at the page that's

10 stamped 10870.

11 A.   Okay.

12 Q.   Just take a second and read that page.

13 A.   The whole page?  There's not a --

14 Q.   Can you tell us -- the paragraph numbers on that page, can

15 you tell us what the paragraph numbers are so the Government

16 can --

17 A.   Three, four, five, six and a very limited amount of seven.

18       Okay.

19 Q.   Did that -- did that -- can I have the document back --

20 A.   Yes.

21 Q.   -- to do this the right way.

22       Did that refresh your recollection as to whether you

23 and -- you had a discussion with Agent Hollabaugh concerning

24 the application of the claim of right doctrine?

25 A.   Yes.  And I, at that point, concluded that the claim of

1  right doctrine did apply in this case.

2  Q.   And that was -- this interview was dated May of 2000 --

3  May 15th of 2013.

4  A.   Yes.

5  Q.   Did you communicate -- at that time, would you have

6  communicated your position with claim of right to Mr. Pieron?

7  A.   At some point after that, between that period and when I

8  actually filed the claim of right doctrine, we would have done

9  it.  I don't know specifically how soon after that

10  conversation.

11  Q.   Did you tell Mr. Pieron that he didn't have any tax

12  liability for 2008 and 2009?

13  A.   Based on the amended 2011 return that was done I believe

14  in March of 2014, so the following year, yes, we concluded that

15  his tax liability was satisfied based on the claim of right

16  doctrine.

17  Q.   And how many times did you attempt to contact the IRS to

18  resolve this tax issue after you had come to your conclusion?

19          MR. DEPORRE:  Objection, Your Honor, scope and -- far

20  beyond the scope of my cross-examination and not relevant

21  either.

22          THE COURT:  Overruled.

23          THE WITNESS:  Am I'm allowed to answer, I couldn't

24  hear that.

25  BY MR. HURFORD:

1  Q.   Yes, you can.

2  A.   It was something well over 10 times we contacted the IRS.

3  Another person in our office usually did the contacts, and we

4  documented each of the contacts, the contacts we made with the

5  IRS and their response to each of the contacts over a number

6  of -- over a number of years.  We started following up and

7  then, you know, a few times or a couple times a year, we would

8  contact it the IRS asking the status of that amended return.

9        MR. HURFORD:  No further questions, Your Honor.

10        THE COURT:  Recross.

11                    RECROSS-EXAMINATION

12  BY MR. DEPORRE:

13  Q.   When you met with Special Agent Hollabaugh in May, 2013,

14  had you already -- you had already been approached previously

15  by IRS criminal investigation, correct?

16  A.   It started sometime in 2012.  Is that what you're

17  referring to?

18  Q.   In May of 2013, you had previously been contacted by IRS

19  criminal investigation, correct?

20  A.   Meaning Mr. Hollabaugh?

21  Q.   Special Agent Hollabaugh.

22  A.   Yes.

23  Q.   And this was the second time you were contacted by Special

24  Agent Hollabaugh?

25  A.   Yes.

1  Q.   And Special Agent Hollabaugh asked you questions about one

2  client only, correct?

3  A.   Yes.

4  Q.   And that was James Pieron?

5  A.   Yes.

6  Q.   The first time you were contacted by Special Agent

7  Hollabaugh, approximately when was that?

8  A.   I don't recall.  I think that was stipulated in the prior

9  conversation, in 2012 at some point.

10  Q.   And at that point you contacted Mr. Pieron, correct?

11  A.   Yes.

12  Q.   And you told him that you had been contacted by an IRS

13  special agent, correct?

14  A.   I -- we followed the rules.  We --

15  Q.   I'm not accusing you of doing anything other than

16  following the rules.  Just answer the question, sir.  Did you

17  contact Mr. Pieron --

18  A.   Not before the meeting.

19  Q.   -- following -- following the meeting with Special Agent

20  Hollabaugh?

21  A.   You didn't say following before.  Following the meeting I

22  contacted Mr. Pieron, yes.

23  Q.   And I want to be clear, it's following the first meeting?

24  A.   Correct.

25  Q.   So by the time that you meet again with Special Agent

1  Hollabaugh, Mr. Pieron has already been contacted by you

2  regarding the IRS previously meeting with you?

3  A.   Yes.

4  Q.   When you first met with Special Agent Hollabaugh, did you

5  tell him whether or not you believed the claim of right

6  doctrine applied?

7  A.   I don't recall.

8  Q.   Why don't I ask you to look at your memorandum interview.

9  A.   At that point I --

10 Q.   Just a second, sir.  I'm trying to refresh your

11 recollection here.

12 A.   Is there a paragraph you're pointing to?

13 Q.   No.

14 A.   So what is your question?

15 Q.   My question is is on that June 6th, 2012 interview with

16 Special Agent Hollabaugh, did you tell him that you believed

17 that the claim of right doctrine applied?

18 A.   I would have to read this whole thing.  Do you want me to

19 read the whole document?

20 Q.   Does that -- if it would refresh your recollection.

21 A.   I don't see anything about claim of right.

22 Q.   All right.  You didn't talk about the claim of right

23 during that interview, correct?

24 A.   Correct.  Again, I didn't realize the receiver was trying

25 to collect from him until after that meeting.

1    Q.   So after your first meeting with the IRS, you told

2    Mr. Pieron that he was under IRS investigation with respect to

3    the returns that you previously filed for him, correct?

4    A.   Yes.

5    Q.   And at that point, you speak with Mr. Pieron, and

6    Mr. Pieron tells you that the court receiver in the Cook case

7    has been attempting to recover money that was Ponzi scheme

8    proceeds, is that fair?

9    A.   Start over.  That's in the 2013 meeting?

10   Q.   Yes, sir.

11   A.   Yes.

12   Q.   So Mr. Pieron knows that he's under investigation with

13   respect to the amended returns for 2008 and 2009.  Following

14   that he tells you that the Court receiver in the Cook case has

15   been attempting to recover money that was Ponzi scheme

16   proceeds; is that correct?

17   A.   Yes.

18   Q.   And so your timing is that you meet with the IRS, you

19   disclose the meeting to Mr. Pieron, Mr. Pieron tells you that

20   the SEC receiver is trying to collect funds, and then you file

21   the amended 2011 return; is that correct?

22   A.   Yes.

23   Q.   You said that your office tried to reach out to the IRS

24   over 10 times, correct?

25   A.   Yes.

Pavlik - Recross
                                                           93

1  Q.   Did you call Special Agent Hollabaugh?

2  A.   No.

3  Q.   You didn't call the person that had previously interviewed

4  you, who was with Special Agent Hollabaugh, Dan Bella?

5  A.   No.

6  Q.   Did you call anybody from criminal investigations?

7  A.   No, I didn't think it would have been appropriate for me

8  to call anybody from the investigation.

9  Q.   At some point did the IRS tell your firm that they

10  couldn't process the claim of right return due to other

11  investigations pending?

12  A.   I don't recall.  There were -- we also did an offer in

13  compromise at the same time, and on that one they made that

14  statement.  I don't know if they ever did on the amended

15  returns.

16  Q.   Why did you come to the belief that Mr. Pieron had

17  $10 million in basis for the -- in JDFX Holding?

18  A.   If there was $10 million sale, and it went back into the

19  company, that would mean that he has basis.

20  Q.   Is it a necessary and critical element that the money is

21  returned into JDFX Holding company?

22  A.   Again, I treated it on a combined basis so I -- I don't

23  know the answer to that.

24         THE COURT:  And respectfully, I guess I don't

25  understand the question.  I'm trying to understand that myself.

1   BY MR. DEPORRE:

2   Q.    You're not aware of whether or not the $10 million was --

3   actually went into JDFX Holding bank accounts, are you?

4   A.    No.

5   Q.    Mr. Pieron told you that it went back into the company,

6   correct?

7   A.    Correct.

8   Q.    And you're not aware of the legal relationship between

9   JDFX Holding and JDFX Fund Management, are you?

10  A.    No.

11  Q.    You don't know whether or not JDFX Fund Management

12  actually received the $10 million, do you?

13  A.    No.

14  Q.    If a separate entity, with no legal relationship to JDFX

15  Holding, received the $10 million, would Pieron have basis?

16  Would there be a capital contribution by Pieron into JDFX

17  Holding?

18  A.    No, it would be into the other company.

19           Which would still be a loss upon final liquidation --

20  Q.    I have no question pending, sir.

21  A.    I was finishing my answer.

22  Q.    If Mr. Pieron -- again, this is a hypothetical.  The

23  Government isn't conceding this is what happened, but if

24  Mr. Pieron initially contributed $10 million to JDFX Holding,

25  and then reclaimed his capital investment to the tune of

1  7.5 million, how much basis would he have after that?

2  A.    With that hypothetical, 2.5 million.

3  Q.    And continuing with that hypothetical, if he then sold

4  stock with his basis of 2.5 million, and he sold -- and I'll

5  give you the calculator -- if he had 2.5 million invested, and

6  he had a remaining 8 million shares, what would be the price

7  per share?

8  A.    31.25.

9  Q.    And then assuming that he sells an additional 1.5

10  shares -- 1.5 million, excuse me, what would his basis be for

11  that transaction?

12  A.    468,750.

13  Q.    And this is for 2009, correct?

14  A.    It was your hypothetical.  I'm not sure what you were

15  assuming there.

16  Q.    This is for the 1.5 million shares that sold in 2009,

17  correct?

18  A.    Right, assuming he, with your assumption, that he got back

19  seven and a half million of his basis.

20  Q.    And that's the year that he did not put any basis --

21  A.    Correct.

22  Q.    -- you didn't report any basis, correct?

23  A.    Correct.

24  Q.    Was that because you were unable to substantiate the

25  capital contributions that Mr. Pieron made?

96

1  A.    No.  It was because, again, I was doing it on a net basis

2  for the net income in total and didn't focus on the basis of

3  the second transaction.

4  Q.   When you prepared the 2008 returns, you did include basis,

5  correct?

6  A.    Repeat the question, please.

7  Q.   When you prepared the amended 2008 return, you did include

8  basis?

9  A.    Yes.

10  Q.   Were you also doing that on a net basis total?

11  A.    We did, but -- I considered that, but in 2009 I knew that

12  the net result was a significant loss so the -- so I didn't

13  focus on the breakdown of how much was basis and how much was

14  upon liquidation.

15  Q.   You prepared both returns at the same time, sir?

16  A.    I know it.  I just wasn't consistent on the two of them.

17  Q.    Mr. Pieron didn't give you information to substantiate the

18  basis for the 2008 share purchase agreement either, did he?

19  A.    He gave me the amount.

20  Q.   But no supporting documents to substantiate it?

21  A.    Correct.

22  Q.   And no supporting documents to substantiate basis for the

23  2009 transaction, correct?

24  A.    Correct, but there would have been basis based on the

25  first sale, in any event.

Pavlik - Recross

97

1  Q.   Assuming, as you correctly pointed out, that there was

2  capital contributed to the entity for which the stock was sold,

3  correct?

4  A.   Yes.

5  Q.   Now, you reviewed, in preparation for the 2008 return --

6  and this has to do with timing now, focused on the timing of

7  the transactions.  You reviewed the 2007 return prior to filing

8  your amended 2008 return, correct?

9  A.   Yes.

10 Q.   And you testified that you did not speak to the return

11 preparer of the original 2007 return; is that correct?

12 A.   Correct.

13 Q.   Was that person named Carol Nathan?

14 A.   Yes.

15 Q.   Did you ever speak directly with Carol Nathan?

16 A.   No.

17 Q.   Do you know if Mr. Pieron spoke directly with Ms. Nathan?

18 A.   I don't know for -- that for -- I don't have that

19 knowledge.

20 Q.   Did he tell you whether or not he spoke with Carol Nathan?

21 A.   I don't recall if he talked specifically about that.

22 Q.   Did you ever speak directly with Christopher Werwega?

23 A.   No, not that I recall.  I don't know who that is.

24 Q.   Do you recall ever speaking with Mr. Pieron's stepfather?

25 A.   No.

1  Q.   Did you speak with the person who prepared the 2006 tax

2  return for Mr. Pieron?

3  A.   No.

4  Q.   Did you ask either return preparer why they included the

5  amount of money, the transfers from Market Shot for the share

6  purchase agreements as income for 2008?

7  A.   No.

8  Q.   But you did speak to Mr. Pieron about it, correct?

9  A.   Yes.

10 Q.   And Mr. Pieron told you that the sale closed in 2008,

11 correct?

12 A.   Yes.

13 Q.   And you included it as income in 2008?

14 A.   Yes.

15 Q.   Besides Mr. Pieron, have you ever had a client who was

16 under investigation by the IRS, by IRS special agents?

17 A.   No.

18 Q.   I asked you about the capital contributions previously.

19 The $10 million from Market Shot that was paid for the 2008

20 share purchase agreement, the share purchase agreement with the

21 January 1st 2008 date, where did that money go?

22 A.   I don't know the answer to that.

23 Q.   Do you know who decided where that money would go?

24 A.   No.

25 Q.   And do you know if those accounts were used as trading --

Pavlik - Redirect                                            99

 1  currency trading accounts?

 2  A.    No.

 3  Q.    You don't know?

 4  A.    Correct.

 5          MR. DEPORRE:  All right, I have nothing further for

 6  the witness.

 7          THE COURT:  Sir?

 8          MR. HURFORD:  Your Honor, I have just one question.

 9          THE COURT:  Please.

10                      REDIRECT EXAMINATION

11  BY MR. HURFORD:

12  Q.   Mr. Pavlik, assuming the hypothetical that Mr. DePorre

13  just put up, and assuming the basis that should have been

14  reported on the 2009 amended return was $468,750, is there a

15  tax liability in 2009?

16  A.   I don't believe there would have been, no.

17          MR. HURFORD:  No further questions, Your Honor.

18          THE COURT:  Is the Government completed?

19          MR. DEPORRE:  Yes, Your Honor.

20          THE COURT:  Mr. Pavlik, I am better educated at this

21  point concerning the circumstances surrounding the reporting of

22  Mr. Pieron's sale of stock as reported in Schedule D on both

23  the original return and the later return, but if I understand

24  accurately, you've never seen or been provided a copy of any

25  kind of operating statement for JDFX; is that correct?

1            THE WITNESS:  Correct.

2            THE COURT:  So with respect to any transaction that

3    would have occurred between Mr. Pieron and JDFX after the sale

4    of the stock, what would the information be that would

5    summarize his either contributions or receipt of any kind of

6    income from JDFX after the last sale of stock?

7            THE WITNESS:  And, again, it would be my original

8    approach was to prove out net income in total, and it would

9    have been that spreadsheet that showed all the cash activity,

10   and I proved out to be picking up the income that wasn't lost,

11   which is the $1.6 million that went into the new US entities,

12   and I thought an initial $1.6 million that went to Mr. Pieron

13   until that time, but was really more likely a return of loans

14   and return of capital.

15           THE COURT:  So your understanding would be the 1.6

16   plus the 1.6 was either a return of capital or a return of a

17   loan?

18           THE WITNESS:  I would say the 1.6 that went to US

19   companies would have been an actual distribution, so, yes, it

20   would -- they would -- if you treat it as a distribution, it

21   would all be return of capital or return of a loan, or income.

22   It would have to be one of those three categories.

23           THE COURT:  You concluded it wasn't income?

24           THE WITNESS:  I prepared the return assuming it was

25   income.  That's how I proved out to the $3.2 million net income

1  for -- on a combined basis for 2008 and '09.

2          THE COURT:  And am I correct in understanding that

3  when you say that, you're referring to Government's Exhibit 66?

4          THE WITNESS:  There's one that is a different summary

5  spreadsheet that shows that detail; not that one, that one's --

6  this one is -- 66 or whatever is very detailed.  There's a

7  summary one that showed the $3.2 million.

8          THE COURT:  But there's -- on the Exhibit 66 that I

9  have, there are some calculations that are being made in

10 handwriting.  Does somebody have a copy of that?

11         THE WITNESS:  And that's -- those were my

12 handwritings.  Based on the detail of just looking, you know,

13 determining some of the transactions and concluding that the

14 summary had all the information in there, and that -- and that

15 handwriting of mine was proving out some of the individual

16 transactions.

17         THE COURT:  And could you briefly explain to us what

18 the calculations were that you were examining here to determine

19 the fact that the transactions tied up.

20         THE WITNESS:  That the total -- you know, the total

21 receipts were the 10 million and the 5,250,000 primarily, and

22 then there were some other -- I don't recall exactly, but there

23 were some other loss transactions, and so that -- that provided

24 some level of detail.  But the summary sheet that showed all

25 the years on a -- you know, one line for each year and showing

1  a net result of all the transaction -- cash activity is what I

2  balanced out to the returns to.

3          THE COURT:  And the summary document that you're

4  referring to is something other than 66.  If you could refresh

5  my memory as to what that document is.

6          THE WITNESS:  It's another document, but it's --

7          MR. HURFORD:  I might.  I'm not answering, I don't

8  know the answer to the question, but there's -- I think tab 67

9  might be fruitful in the defendant's binder.

10          THE WITNESS:  In the blue binder?

11          MR. HURFORD:  In the black one.

12          MR. PENDERY:  May I help him, Your Honor?

13          MR. HURFORD:  I could be wrong.

14          THE WITNESS:  Yes, this is a version of it.  This was

15  subsequently superseded, but this was a version of it where I

16  was trying to prove everything out and come to the appropriate

17  conclusions, and this is the one where --

18          MR. DEPORRE:  If I may, Your Honor, I only have up to

19  63.  These are the defense exhibits, and I don't have 67 yet,

20  so --

21          (Off-the-record discussion.)

22          MR. DEPORRE:  Your Honor, we don't know what 67 is,

23  may we approach?

24          MR. PENDERY:  It's right there, those three pages.

25          MR. HURFORD:  I just handed you 67.

Pavlik - Redirect

```
1            MR. PENDERY:  That's 67.  Those three pages.
2            MR. HURFORD:  This is -- all these are --
3            THE COURT:  Hold on.  You're going to make life
4  miserable for the reporter.
5            MR. PENDERY:  I'm sorry.  That is 67, those three
6  pages.  That's what he has in front of him right now.
7            THE COURT:  And can you walk us through the exhibit
8  just to explain what you did.
9            THE WITNESS:  Again, these are various versions and,
10  again, I don't recall all the details, but this is where I was
11  attempting to prove out the $3.2 million, and I'm not quite
12  seeing it jumping off the page here because there was another
13  spreadsheet, but I will point out that the third page is where
14  I was trying to prove it out and came up with -- do you have
15  that in front of you?
16            THE COURT:  I do not.  I'm actually looking at 66.
17            THE WITNESS:  Okay.  On the third page of this, I
18  come out and say that the net income -- or the net transactions
19  of all of the activity had a net income component or net cash
20  going out of 1,300,237, and that's where, in Mr. Pieron's
21  writing at the top of that page, he said that's not all of the
22  income because he's pointing out income going to Komplique,
23  Inc. and IB Tech.
24            He's mentioning that that has to go in there, and I
25  have notes down below that that shows 815,000, 870,000, another
```

1   147,000.  I don't remember what all that is, and that adds up

2   to be 3,132 -- 3,132,279, which is what I was trying prove out

3   based on how much income was being picked up, regardless of the

4   character between the years.  So this is an interim version of

5   the work paper where I was trying to prove out that amount of

6   income of 3,132,279.

7            THE COURT:  And if I understand accurately, it

8   should, for the most part, correspond to Government's

9   Exhibit 66?

10            THE WITNESS:  I believe so yes.

11            THE COURT:  Yeah.  Any additional questions, counsel?

12            MR. HURFORD:  Not from the defendant, Your Honor.

13            MR. DEPORRE:  I just have two lines.

14                       RECROSS-EXAMINATION

15   BY MR. DEPORRE:

16   Q.   The first, you had mentioned that -- the Court asked you

17   about whether or not you had seen a ledger showing shareholder

18   contributions and capital contributions, and correct me if I'm

19   wrong, but you replied no; is that correct?

20   A.   Not in support of the 3.5 initial basis that was applied

21   to Mr. Pieron.

22   Q.   I understood the Court's question to be broader than that,

23   that he was asking about shareholder contributions to JDFX

24   Holding the entire period of its existence.

25   A.   If you consider this that ledger, then that would be the

 1  case, but I understood the question to be was there anything in

 2  the ledger supporting that 3.5 million specifically.

 3  Q.    Okay.  And did you see any loan documents regarding loans

 4  between JDFX and Mr. Pieron?

 5  A.    No.

 6  Q.    The next question I have is that on the information that's

 7  contained within Government Exhibit 66, but included on

 8  Government -- or the tab 67 I believe you're looking at --

 9  A.    Uh-huh.

10  Q.    -- did you use this to calculate Mr. Pieron's initial

11  capital contribution?

12  A.    No.

13  Q.    What did you use?

14  A.    Again, the initial capital contribution was per

15  Mr. Pieron, but this spreadsheet, in effect, proved out that

16  wherever it came from, on a combined basis, I calculate on this

17  spreadsheet and there's a subsequent worksheet that's, again, a

18  superseded version that comes up with the $3,236,000 that we

19  determined as income.  So it was used to determine income.  It

20  wasn't used specifically to determine that one individual

21  number of 3.5 million.

22  Q.    All right.  I'd like you -- do you have three pages there?

23  A.    I have actually five pages, but I think I know which three

24  you're talking about.

25  Q.    All right.  I'm going to refer you to page with the Bate

```
 1  stamp at the bottom right-hand corner 01246.  Would you look at
 2  that?
 3  A.   Okay.
 4  Q.   Is this a spreadsheet -- do you have that in front of you,
 5  sir?
 6  A.   Yes.
 7  Q.   Is that a spreadsheet that you got from Mr. Pieron?
 8  A.   The computer generated part was from Mr. Pieron.
 9  Q.   And the handwritten notes are your handwriting, correct?
10  A.   On that page, yes.
11  Q.   All right.  On that page where it says basis slash theft,
12  Ponzi scheme parens loss, there's a -- right in the middle of
13  the page in the handwriting it says 2007.  Do you see that,
14  sir?
15  A.   Yes.
16  Q.   And do you see where it says 3,550,645?
17  A.   Yes.
18  Q.   Did you calculate that figure based on the information,
19  the typewritten information above it?
20  A.   I'd have to recalculate the number to figure out where
21  that came from.  I don't know.
22  Q.   Do you see where it says basis 20 percent?
23  A.   Yes.
24  Q.   And that's the amount of the basis that you used for -- on
25  the return, the amended 2008 return, correct?
```

Pavlik - Recross

1  A.    Correct, I think so.

2  Q.    Do you have my calculator up there, sir --

3  A.    Yeah.

4  Q.    -- Mr. Pavlik?  I'm going to give you four numbers to add

5  up.  They're from the typewritten portion in the column that

6  says JDFX loan, JDFX cash, JDFX card center, Komplique loan and

7  Komplique cash.  Would you add up the row for 2007 beginning

8  with 2,700,000 plus $162,523.98 plus 500,000, plus $188,121.50.

9  A.    Yeah, that does add up to the 3,550,645.

10 Q.    So that appears to be the numbers that you used to

11 calculate the basis that Mr. Pieron had for JDFX Holding; is

12 that correct?

13 A.    It looks to be that's what I did, yes.

14 Q.    And can you explain how the number for Komplique loan or

15 Komplique cash, why that's included as Mr. Pieron's basis for

16 JDFX Holding?

17 A.    Again, as I stated, I did this on a combined basis for all

18 the entities and proved out income in total between all the

19 entities, which I still believe is the appropriate approach.

20 Q.    Did Mr. Pieron sell shares of Komplique to Mr. Cook or

21 Market Share [sic]?

22 A.    I don't believe so.

23 Q.    So then why would his basis in Komplique have anything to

24 do whatsoever with the capital gains that he had from the sale

25 of JDFX Holding?

108

```
 1  A.   It may not have but, again, I did this on a combined basis
 2  and proved out the total for all the years combined so, yeah,
 3  you might say that the 700,000 is slightly overstated, but it
 4  would be not significant.
 5  Q.   Okay.  And it would be based on information from
 6  Mr. Pieron?
 7  A.   Correct.
 8            MR. DEPORRE:  I have nothing further.
 9            THE COURT:  Gentlemen?
10            MR. HURFORD:  Nothing.  Nothing, Your Honor.
11            THE COURT:  Mr. Pavlik, we appreciate your time.
12  You're excused from the witness stand.
13            THE WITNESS:  I didn't hear the last part, I'm sorry.
14            THE COURT:  Pardon me?
15            THE WITNESS:  I didn't hear what you said.
16            THE COURT:  I said you're excused from the witness
17  stand.
18            THE WITNESS:  Thank you.  That's what I wanted to
19  hear.
20            And if I could see counsel in chambers, I would
21  appreciate it.
22            MR. HURFORD:  Your Honor, my client has asked just to
23  speak with us before we go back to chambers.  Can I have a
24  couple minutes.
25            THE COURT:  Sure, yeah.
```

Pavlik - Recross                                                      109

 1             MR. HENGEVELD:  To clarify, Your Honor, do you need

 2   me back there?

 3             THE COURT:  No.  Your client is finished.

 4             MR. HENGEVELD:  Thank you.

 5             (At 12:53 p.m., court recessed.)

 6

 7

 8

 9

10

11

12

13

14                         *  *  *  *  *

15                     C E R T I F I C A T E

16        I certify that the foregoing is a correct transcript
        from the proceedings in the above-entitled matter.
17

18                         _Carol M. Harrison_____

19   Date: 1-24-2020      Carol M. Harrison, RMR, FCRR
                         Official Court Reporter
20                        United States District Court
                         Eastern District of Michigan
21                        1000 Washington Avenue
                         Bay City, MI  48708
22

23

24

25

                US v. Pieron, Jr. - Hearing - January 14, 2020