# EXHIBIT 18

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF MICHIGAN
2             SOUTHERN DIVISION-FLINT

3    _____
                              )
4    IN RE:                   )    No. 18-1-28
                              )
5    FEDERAL GRAND JURY        )
     PROCEEDINGS               )
6                             )
     _____)
7

8          Proceedings held and testimony taken in the above

9    entitled matter on Wednesday, July 18, 2018, at the Federal

10   Building, 600 Church Street, Flint, Michigan.

11

12

13   APPEARANCES:

14   For the Government:          JULES DEPORRE, ESQ. (P73999)
                                  Assistant U.S. Attorney
15                                Office of the United
                                  States Attorney
16                                210 Federal Building
                                  600 Church Street
17                                Flint, MI  48502
                                  810-766-5177
18
                                  JANET PARKER, ESQ. (P34931)
19                                Assistant U.S. Attorney
                                  Office of the United
20                                States Attorney
                                  101 First Street
21                                Suite 200
                                  Bay City, MI 48708
22                                989-895-5712

23

24

25

25401

1 | GJX1.     Installment Agreement Request                17

2 | GJX1A     Installment Agreement Request                18

3 |      Flint, Michigan

4 |      Wednesday, July 18, 2018 - 9:43 a.m.

5 |                    SCOTT HOLLABAUGH

6 |           THE FOREPERSON:  Can you raise your right hand,

7 | please?  Do you solemnly swear that the testimony you will

8 | give will be the truth, the whole truth, and nothing but the

9 | truth?

10 |          THE WITNESS:  I do.

11 |          THE FOREPERSON:  Thank you.  Can you, when you're

12 | seated, can you state and spell your name the Grand Jury?

13 |          THE WITNESS:  My name is Scott, S-c-o-t-t,

14 | Hollabaugh, H-o-l-l-a-b-a-u-g-h.

15 |                    EXAMINATION

16 | BY Mr. DEPORRE:

17 | Q    Mr. Hollobaugh, how are you currently employed?

18 | A    I am a Special Agent with the Internal Revenue Service,

19 | Criminal Investigation Division.

20 | Q    Can everybody hear him in the back?  I see some nods, so

21 | it looks like you're good.  And how long have you been a

22 | special agent with the IRS?

23 | A    Approximately 17 years.

24 | Q    What sort of -- prior to joining the IRS as a special

25 | agent what -- what was your background?

1  A    Prior to that I obtained an accounting degree, a

2  Bachelor's Degree in accounting.  And then that was right

3  after college.  And then I attended training at the federal

4  law enforcement training center in Georgia.  And then started

5  as a special agent in East Lansing, Michigan.

6  Q    And what sort of cases do you prosecute?

7  A    We prosecute all types of tax fraud, tax evasion, filing

8  of false tax returns, money laundering, bank fraud, anything

9  to do with financial investigations.

10  Q    Are you aware of an individual named James Pieron?

11  A    Yes.

12  Q    And what's your role in any investigation involving Mr.

13  Pieron?

14  A    I've been assigned as the lead investigator of the case

15  involving James Pieron since the beginning.

16  Q    And when -- when did your investigation begin?

17  A    Approximately 2012.

18  Q    Would you tell us a little bit about Mr. Pieron's

19  background beginning in the late 1990's?

20  A    Around 1998, Mr. Pieron moved from the United States to

21  Switzerland.  While in Switzerland he operated his own

22  business called JDFX.  And this business was involved in

23  developing computer software for the purpose of trading

24  foreign currencies.

25                         EXAMINATION

1  BY MS. PARKER:

2  Q    Was he a U.S. citizen?

3  A    He was a U.S. Citizen.

4                        EXAMINATION

5  BY MR. DEPORRE:

6  Q    And prior to going to Switzerland, did he file federal

7  income taxes?

8  A    Yes.

9  Q    What year did you say he went to Switzerland?

10 A    In 1998 approximately.

11 Q    And while he was in -- how long did he live over in

12 Switzerland?

13 A    He was there from 1998 until 2009.

14 Q    Where did he go after 2009?

15 A    He moved to Mt. Pleasant, Michigan.

16 Q    While he was in Switzerland, did he have an obligation to

17 file federal income tax returns?

18 A    Yes.  As a U.S. citizen he was required to file U.S. tax

19 returns.

20 Q    And during his time over there did he ever file any

21 federal income tax returns?

22 A    He filed a return for 2000, for the year 2000.  And then

23 after that he did not file any returns for 2001 through 2008.

24 Q    Did his 2000 -- year 2000 return, did that show negative

25 or positive income?

1   A    It reported negative income.

2   Q    And for the other years while he was over there, did he

3   earn any income?

4   A    Yes.

5   Q    What -- what sort of -- how did he earn income?   What

6   sort -- like what sort of payments would he receive as income

7   for his work?

8   A    He had -- he did receive wages from his company and then

9   later on in 2007, 2008, he had capital gains.

10  Q    And what was that based on?

11  A    That was based on he sold stock in his company JDFX to an

12  investor.

13  Q    And when was the -- when was the payment for the stock

14  that he sold?

15  A    The majority of the money that he -- he received as

16  payment was in 2007.

17                        EXAMINATION

18  BY MS. PARKER:

19  Q    How much money was that?

20  A    It was -- it was approximately $10,000,000.

21                        EXAMINATION

22  BY MR. DEPORRE:

23  Q    Did he also receive additional money in 2008 and 2009?

24  A    Yes.

25  Q    Additional income.  And when did he decide to return to

1  the United States?

2  A    In 2009, he -- he moved his companies, two of his

3  companies to Mt. Pleasant, Michigan.

4  Q    What were the names of those companies?

5  A    One company was named Komplique.

6  Q    Would you spell that?

7  A    K-o-m-p-l-i-q-u-e.

8  Q    What sort of company was that?

9  A    It was a corporation.  It was a -- they sold luxury swim

10 wear.

11 Q    And then you said there was another company as well?

12 A    There was another company called IB Technologies,

13 Incorporated.

14 Q    And what was the nature of that business?

15 A    That business was the -- the development of computer

16 software for currency trading.

17 Q    Do you know in December of 2008, did Mr. Pieron return to

18 the United States briefly?

19 A    Yes.

20 Q    And did he meet with anybody based on your investigation

21 while he was here?

22 A    Yes.  He met with his stepfather.

23 Q    What's his name?

24 A    Chris Werwega.

25 Q    Do you know how to spell that?

1   A      W-e-r-w-e-g-a.

2   Q      And what -- what did they discuss of note?

3   A      Pieron asked Chris to prepare his tax returns that he

4   hadn't filed for 2001 through 2008.

5   Q      And did he say anything about returning to the United

6   States at that point?

7   A      I don't recall if he actually told his stepfather if he

8   was planning to return.  He may have.

9   Q      Do you know in 2009, is that when he decided to return to

10  the U.S.?

11  A      Yes.  He incorporated the two businesses in Mt. Pleasant

12  in May of 2009.

13  Q      All right.  I'd like to turn your attention to July of

14  2009.  At -- at some point does he make a deposit into -- or

15  open an account with a financial group?

16  A      In July of 2009, he opened an account with Peregrine

17  Financial Group.

18  Q      And in the course of doing that, did he have to fill out

19  an application?

20  A      Yes.

21  Q      On that application did he put down his social security

22  number?

23  A      Yes.

24  Q      Did he identify himself as a U.S. person?

25  A      He -- he filed a IRS form and checked the box saying he

1   was not a U.S. person.

2   Q    Okay.  Did he also -- and I had asked if he had put his

3   social security number on that application.

4   A    He may have put it on the -- the account application, but

5   not the -- the IRS form that he checked as not a U.S. person.

6   Q    Okay.  So after filing the application to open the

7   account with Peregrine, he had to file a separate form with

8   the IRS?

9   A    Yes.

10  Q    And what's that form number?  Or what's that form called?

11  A    I believe it's a W-8 form.

12  Q    What does the IRS use the W-8 form for?

13  A    It's to determine if the person is subject to

14  withholding.

15  Q    And what would be the advantage to somebody not stating

16  that they're a U.S. person, or not putting down their social

17  security number?

18  A    Then they wouldn't be subject to tax withholding.

19  Q    So the IRS wouldn't withhold money from that account

20  then?

21  A    That's correct.

22  Q    For the year 2008, so that was July of 2009, in -- in --

23  for the year -- yeah.  Just to recap.  That form that he filed

24  with the IRS, was that made subject to penalty of perjury?

25  A    Yes.

1   Q     Going back to 2008, if -- if somebody has income in the

2   year 2008, when do they owe the taxes on that income?

3   A     They -- they would have to file by April 15th, 2009,

4   unless they did an extension.

5   Q     And in this case did Mr. Pieron file for an extension?

6   A     No.

7   Q     So when did his taxes become due?

8   A     April 15th, 2009.

9   Q     And then in July of 2009, he opens an account and he

10  doesn't put down his -- and he files a form to the IRS saying

11  he's not U.S. person?

12  A     Yes.

13  Q     At that point did he have plans to return to the United

14  States?

15  A     Yes.

16  Q     And at that point had he already had -- opened up

17  accounts for Komplique or Komplique, and Navitas or Navitas?

18  A     Yes.

19  Q     In -- later in 2009, does Mr. Pieron wire transfer any

20  money from Swiss accounts to -- and I said Navitas, maybe I

21  got ahead of myself.  Would -- would you tell us what Navitas

22  is, or Navitas?

23  A     That is another company that Mr. Pieron was a partner in

24  that he opened when he moved back to the United States.  And

25  it's a -- it's a holding company basically.

1  Q    And what's its relation to IB Tech, IB Technologies,

2  Incorporated if any?

3  A    IB Tech is the technology company developing the

4  software.  Then Navitas is a trading company where actually

5  customers could open accounts and trade currencies.

6  Q    In -- and is Navitas also -- does Mr. Pieron have some

7  sort of ownership relationship with Navitas or Navitas?

8  A    Yes.  He was one of the -- one of two partners.

9  Q    And who is the other partner?

10  A    The other partner is a person named Harry McPike.

11  Q    And where does Mr. McPike reside, or where did he reside?

12  A    In the Virgin Islands.

13  Q    Towards the end of 2009, does Mr. Pieron transfer any

14  funds from his accounts in Switzerland to the accounts in the

15  United States?

16  A    Yes.  He made a $750,000 transfer from a Swiss account to

17  the IB Technologies account in Mt. Pleasant.

18  Q    And then in April of 2010 -- well, does Mr. Pieron file

19  an extension for his 2009 taxes?

20  A    No.

21  Q    In April 2010, does he make an additional transfer from

22  the IB Technologies account to a personal bank account?

23  A    Yes.  He made a $250,000 transfer.

24  Q    And did he use that money to pay his taxes for 2009?

25  A    No.

1  Q    When does Mr. Pieron ultimately file his tax returns for

2  2008 and 2009?

3  A    He filed those returns in January of 2011.

4  Q    And prior to that had he made multiple wire transfers of

5  money between the time that the -- the tax returns were due,

6  and tax payment was owed, and prior to filing the returns?

7  A    Yes.

8  Q    Were they large dollar figures?

9  A    They were large transfers, a lot of them over $100,000.

10  Q    When he files the returns in January of 2011 for 2008 and

11  2009, does he submit payment with those returns?

12  A    He did not submit any payments for the 2008 and '09

13  returns.

14  Q    And just roughly how much does he claim he owes for 2008

15  when he files that initial return in 2011?

16  A    Roughly $268,000 in tax.

17  Q    In tax.  And then how much tax did he owe for 2009 when

18  he files that January '11 return?

19  A    Roughly $125,000.

20  Q    In February of 2011, does the IRS issue anything to

21  Pieron to advise him of the fact that he has a balance due?

22  A    Yes.  They issued a notice of balance due to him.

23  Q    And at that point how much money does he have in his bank

24  account for IB Technologies and for Komplique?

25  A    He had a total of approximately $1,000,000 between the

1  two accounts.

2  Q    And does he use that money to pay his taxes?

3  A    No.

4  Q    At some point -- who helps him file his first tax return?

5  A    A firm in Chicago.

6  Q    And what's the name of that firm?

7  A    American Tax Solutions.

8  Q    Does he have -- does he have a discussion with them

9  regarding when he can take a -- when he should categorize his

10  capital gains as being taxed?

11  A    Yes.  They advised him that he would have a large capital

12  gain in 2007 that should have been reported on his 2007

13  return.

14  Q    And on those initial returns, how did he report the --

15  the capital gain from -- and this is from the sale of stock,

16  correct?

17  A    That's correct.

18  Q    From JDFX?

19  A    Yes.

20  Q    Is it approximately $10,000,000?

21  A    Yes.

22  Q    How did he report it on his initial returns, the ones he

23  filed in January 2011?

24  A    He reported it on 2008 return.

25  Q    And -- and what was his reasoning for doing that?

1   A    To try and reduce the tax that he would have owed on his

2   2007 return.

3   Q    Did he have any documentation to support that?

4   A    He provided American Tax Solutions with spreadsheets.

5   Q    And what did those spreadsheets show?

6   A    They show that he had certain expenses that he would –

7   was able to deduct against his income in 2008.

8   Q    So by -- and I'm just trying to clarify this, by filing

9   the -- the capital gains in 2008, was Mr. Pieron able to

10  offset that with other expenses that he had incurred in 2008?

11  A    Yes.  Because a majority of the expenses were actually

12  paid in 2007 when he received the money.  But he -- Mr. Pieron

13  put it on a spreadsheet claiming that the capital gain was

14  actually in 2008 so that he could use the expenses on that

15  return.

16          MR. DEPORRE:  All right.

17                       EXAMINATION

18  BY MS. PARKER:

19  Q    Did you have reason to question the accuracy of that

20  spreadsheet?

21  A    Yes.

22  Q    What were some of the reasons?

23  A    Because I knew that the money had been received in 2007.

24  And that he -- it should have been reported in 2007.

25  Q    And you knew that from what type of records or

1 information?

2 A    I had bank records showing the wire transfers to Mr.

3 Pieron for the $10,000,000 capital gain in two thousand --

4 mostly in 2007.

5                              EXAMINATION

6 BY MR. DEPORRE:

7 Q    Between Mr. Pieron's return and his filing of the tax

8 returns in -- in January of 2011, did he spend money, sizable

9 amounts of money on other items?

10 A    Yes.

11 Q    Throughout 2010 and 2011, did Mr. Pieron purchase a

12 piano?

13 A    Yes.

14 Q    And do you recall roughly how much money that was for?

15 A    Total price was approximately $38,000.

16 Q    And in 2010, did he spend money for celebrity cruises?

17 A    Yes.

18 Q    Did he also spend money in 2011 on celebrity cruises?

19 A    Yes.

20 Q    And -- and what was the nature of those expenses?

21 A    They were paid for by his luxury swim wear company.  I

22 think he classified those as business expenses possibly, I

23 don't know for sure.

24 Q    And was that his -- that luxury swim wear company, he

25 wholly owned.  He was the only owner of that company, correct?

1  A    Yes.

2  Q    Did he also purchase a vehicle at some point in 2009?

3  A    Yes.  A -- he purchased a -- a Mercedes SUV for $110,000.

4  Q    And did he drive that vehicle throughout 2009, 2011, and

5  two thousand -- well, throughout 2009, 2010, and 2011?

6  A    Yes.

7  Q    Was that his principle means of transportation, his

8  principle vehicle?

9  A    Yes.

10  Q    In January of 2012 -- who is the vehicle titled to?

11  A    It was titled to the business, the Komplique business.

12  Q    And you said it was purchased for 110,000, correct?

13  A    Yes.

14  Q    In -- in 2012, January of 2012, does Mr. Pieron file

15  amended returns?

16  A    Yes, he did.

17  Q    And what did those returns -- were they for the years

18  2008 and 2009?

19  A    Yes.

20  Q    What do those returns show in terms of the amount of tax

21  that he owes?

22  A    Those returns show that he owed approximately $444,000 in

23  total tax between -- for both years combined.

24  Q    Does he file anything else along with the tax returns?

25  A    He filed an IRS request for an installment agreement.

1  Q    All right.  I'm going to hand you what's been marked as

2  Government -- do you have that -- Government Exhibit number 1

3  -- excuse me, Grand Jury Exhibit number 1.  Would you take a

4  look at this form?

5  A    Okay.

6  Q    What is this?

7  A    This is an IRS Form 9465 Installment Agreement Request.

8       (Grand Jury Exhibit 1 was identified)

9  Q    And what -- what does an installment agreement request

10 ask the IRS to do?

11 A    It's filed when an individual can't pay their total

12 amount of tax due and they request to get a monthly payment.

13 Q    On the -- on the next page, on the second page, is there

14 another form that's attached to the installment agreement?

15 A    Yes.  There is a Form 433-F.

16 Q    And what does 433-F do?

17 A    It's a collection information statement which is filed.

18 It helps the IRS determine a person's ability to pay their

19 taxes.

20 Q    So on the installment agreement request, what does Mr.

21 Pieron propose to pay as a monthly amount?

22 A    Fifteen hundred dollars a month.

23 Q    And along with that he files the collection information

24 statement, correct?

25 A    Yes.

1  Q    And it lists his assets?

2  A    Yes.

3  Q    And his income?

4  A    Yes.

5  Q    All right.  I'm now going to hand what's been marked as

6  Government Exhibit 1A.

7       Would you take a look at that?  Do you -- can you tell us

8  what Government Exhibit 1A is?

9  A    This is a copy of the Installment Agreement that Mr.

10 Pieron filled out for his CPA.

11      (Grand Jury Exhibit 1A was identified)

12 Q    All right.  On the second page of that, there's a place

13 where it says accounts, lines of credit.

14 A    Yes.

15 Q    And do you see two accounts listed there?

16 A    Yes.

17 Q    What are they?

18 A    Fifth Third checking and PNC checking.

19 Q    Do you personally recognize the handwriting from those

20 two accounts?

21 A    It looks like Mr. Pieron's handwriting.

22 Q    Have you reviewed prior Grand Jury testimony of Kim

23 Pavlic?

24 A    Yes.

25 Q    Who is Kim Pavlic?

1  A    He is a CPA who prepared Pieron's 2008 and 2009 amended

2  tax returns.

3  Q    And did he assist him in preparing the 433-F that's

4  before you?

5  A    Yes.

6  Q    Did Mr. Pavlic testify that that handwriting was Mr.

7  Pieron's handwriting?

8  A    Yes.

9  Q    At the bottom there is some different handwriting.  Where

10 it says Navitas Investments, LLC, and Komplique, Incorporated.

11 Do you see that?

12 A    Yes.

13 Q    And whose handwriting is that?

14 A    Mr. Pavlic's handwriting.

15 Q    And that's based on his testimony?

16 A    Yes.

17 Q    How much did he put down as the value for Navitas?

18 A    A thousand dollars.

19 Q    And how about for Komplique?

20 A    A thousand dollars.

21 Q    And at that point did both of those companies have assets

22 far greater than $1,000?

23 A    Yes.

24 Q    How do you know?

25 A    From bank records.

1  Q    All right.  Approximately what were the assets for

2  Navitas?  Were they above 1,000,000?

3  A    Yes.

4  Q    And how about for Komplique?  Was it above a half a

5  million?

6  A    I can't say if it was above a half a million.

7  Q    How about a quarter million?

8  A    Yes.

9  Q    He also lists a car in that same section.  And behind it

10 there are the initials -- or the letters VW?

11 A    Correct.

12 Q    Whose handwriting is that?

13 A    Mr. Pieron's.

14 Q    And is his SUV listed there?

15 A    No.

16 Q    Is the SUV technically in the -- the name of Komplique?

17 A    Yes.

18 Q    And in 2012 when this form is filed, does Komplique still

19 retain title to the Mercedes SUV?

20 A    Yes.

21 Q    What's the value?  At that point is the value of the SUV

22 over $1,000?

23 A    Yes.

24 Q    Approximately what is it?

25 A    I think at that point it was approximately $75,000.

1    Q     Okay.  And why do you think that?

2    A     Because he -- I have records from when he sold the SUV, I

3    think it was in 2013.  And he sold it for around $70,000.

4    Q     Okay.  So it's somewhere between the hundred and ten that

5    he paid for it in 2009, and the 70,000 that he sold it for in

6    2013?

7    A     Yes.

8    Q     Okay.  But throughout the -- on the collection

9    information statement, does he ever put down the Mercedes SUV?

10   A     No.

11   Q     And based on your analysis, is it reflected in the value

12   of Komplique?

13   A     No.

14   Q     Did Mr. Pavlic also help Mr. Pieron submit his tax

15   returns for -- amended tax returns, excuse me, for 2008 and

16   2009?

17   A     Yes.

18   Q     And at that point in -- in January of 2012 when he files

19   the amended returns, does he make full payment of those taxes?

20   A     No.

21   Q     Has he ever made full payment of those taxes?

22   A     No.

23   Q     Did he make any payment in January of 2012 towards the

24   taxes?

25   A     No.

1   Q    He does ask for an installment agreement, correct?

2   A    That's correct.

3   Q    And does he make some payments of 1,500 towards his tax

4   liability?

5   A    Yes, he did.  I believe it started at around April or May

6   of 2012.

7   Q    And eventually does the IRS reject the installment

8   agreement?

9   A    Yes.

10                        EXAMINATION

11  BY MS. PARKER:

12  Q    Did he have the means to pay at that time the taxes that

13  he reported on his amended returns?

14  A    Yes.

15  Q    Why do you think that?

16  A    Because he still had the Mercedes SUV that he could have

17  -- could have sold.  He also had over $200,000 cash in the

18  Komplique bank accounts that he solely owned and controlled.

19  Q    Who put that money there?

20  A    Mr. Pieron.

21  Q    Did he put money into other bank accounts for his other

22  business interests?

23  A    He also claimed to have loaned IB Technologies money.

24  And he wrote a check -- I'm trying to see what date.  He wrote

25  a check for $350,000 in July of 2011 from IB Technologies and

1  deposited that money into the Komplique account. Stating it

2  was a repayment -- repayment to shareholder.

3                              EXAMINATION

4  BY MR. DEPORRE:

5  Q    Does Mr. Pavlic also help Mr. Pieron file something

6  called FBARS?

7  A    Yes.

8  Q    Would you tell the Grand Jury what an FBAR is?

9  A    FBARS are reports of foreign bank accounts owned by a --

10 by a subject -- by an individual or business.

11 Q    And was Mr. Pieron required to file FBARS for 2009, 2010?

12 A    Yes.

13 Q    2008?

14 A    Yes.

15 Q    Did he do so at the time he was required to do them?

16 A    No.

17 Q    So in 2012, he enlists the help of Mr. Pavlic to file

18 FBARS. What does he send to Mr. Pavlic to help him -- to help

19 Mr. Pavlic create the report?

20 A    He gives him a spreadsheet listing his foreign accounts

21 with the balances.

22 Q    Does he list all the foreign accounts?

23 A    No.

24 Q    Which one -- which bank account does he leave off?

25 A    He leaves off an account --

1  Q    Is it an account for JDFX Fund Management?

2  A    I'm not positive on the name of the account.

3  Q    Do you know the name of the bank?

4  A    Banque Contonale Vaudiose.  I don't know how to pronounce

5  it.

6  Q    Would you spell those three words?

7  A    I don't have it up here in front of me.  I would just be

8  guessing on the spelling.

9         MR. DEPORRE:  Okay.

10                    EXAMINATION

11  BY MS. PARKER:

12  Q    Is that a foreign bank account?

13  A    Yes.

14                    EXAMINATION

15  BY MR. DEPORRE:

16  Q    And it's in Switzerland?

17  A    I believe so.

18                    EXAMINATION

19  BY MS. PARKER:

20  Q    How much money was in that account?

21  A    There was over $800,000 in the account.

22                    EXAMINATION

23  BY MR. DEPORRE:

24  Q    How do you know that?

25  A    Because Mr. Pieron wired $800,000 from the account to the

1  Komplique account in Mt. Pleasant in 2010.

2                          EXAMINATION

3  BY MS. PARKER:

4  Q    And that information was not given by Mr. Pieron to his

5  accountant, Mr. Pavlic?

6  A    Correct.

7                          EXAMINATION

8  BY MR. DEPORRE:

9  Q    So that account wasn't on the spreadsheet?

10  A    No.

11  Q    Does Pavlic prepare FBARS for Mr. Pieron to file?

12  A    Yes.

13  Q    Based on the spreadsheet?

14  A    Yes.

15  Q    And does Mr. Pieron immediately file them once he gets

16  them from Mr. Pavlic?

17  A    No.

18  Q    In August of 2012, does Mr. Pieron find out somehow about

19  the IRS investigation?

20  A    Yes.

21  Q    How does he find out?

22  A    Because of a subpoena that I served on Mr. Pavlic, and I

23  believe Mr. Pavlic contacted Mr. Pieron.

24  Q    And that subpoena requested information regarding taxes?

25  A    Yes.

25424

1   Q    At that point does Mr. Pieron file a -- his FBARS?

2   A    No.

3   Q    In August -- excuse me, of 2012, does he file?  So after

4   he's received notice does he file the FBARS?

5   A    He -- he filed them in August after he had received

6   notice from Mr. Pavlic.

7   Q    But he didn't file them until after he knew that there

8   was an IRS criminal investigation?

9   A    That's correct.

10   Q    And does the form that he file include the -- the account

11   at the Banque Contonale Vaudoise?

12   A    Yes.

13   Q    How much does he say is in that account in 2009?  What

14   was the maximum amount of the account in 2009?

15   A    I believe it was approximately 250,000.

16   Q    That he reports?

17   A    In two thousand -- well, let me take that back.  I'm not

18   -- in 2009, I'm not sure how much it was.

19   Q    Does he report that the account was more than $700,000?

20   A    In 2010 he did.

21   Q    How about for 2009?

22   A    No.

23   Q    He reports what, do you know?

24   A    I don't know right offhand.

25   Q    Okay.

1   A    But it was -- it was less than 700,000.

2   Q    Okay.  And -- go ahead.

3                           EXAMINATION

4   BY MS. PARKER:

5   Q    Were they nominally less or -- or considerably less?

6   A    I think it was around $20,000 in 2009 he reported in that

7   account.

8                           EXAMINATION

9   BY MR. DEPORRE:

10  Q    So it was considerably less?

11  A    And then in 2010 it was around 800,000.

12  Q    That he reported?

13  A    Yeah.

14  Q    Okay.  Yeah.  And those are approximations, correct?

15  A    Yeah.

16  Q    Okay.  You don't know exactly what he reported as you sit

17  here right now with no documents in front of you, regarding

18  his FBAR filings, you don't know what it -- what it was

19  exactly?

20  A    No, I don't.

21  Q    Okay.  In April of 2014, does he again file another

22  collection information statement, a 433-F?

23  A    Yes.

24  Q    And what was that for?  What was that in conjunction

25  with?

1  A    That was for an offer and compromise.

2  Q    And at that point does he include the -- the -- does he

3  drastically increase the amount of the value for Komplique and

4  for Navitas?

5  A    He increased the value of Komplique.

6  Q    And what does he put down there for Komplique?

7  A    Approximately $250,000.

8  Q    And at that point he knows he's under criminal

9  investigation, correct?

10 A    Yes.

11 Q    Do you know whether Mr. Pieron has filed any recent

12 FBARS?

13 A    Yes.

14 Q    And what did -- what did he recently file regarding

15 foreign bank accounts?

16 A    He filed an FBAR form in May of this year for one --

17 reporting one foreign bank account in Australia.

18 Q    And what was the balance of that account?

19 A    Approximately $11,000,000.

20 Q    And that's in the name of Navitas?

21 A    Yes.

22 Q    And that's a company that Mr. Pieron has a partnership

23 interest in?

24 A    Yes.

25 Q    Does Mr. Pieron as of today's date continue to owe the

25427

1   IRS?

2   A    Yes.

3   Q    And he has not fully paid his tax liabilities?

4   A    He has not.

5                         EXAMINATION

6   BY MS. PARKER:

7   Q    I'd like to just go back for a couple seconds.  You

8   originally testified that Mr. Pieron went to American Tax

9   Solutions in Chicago and they prepared 2008 and 2009 tax

10  returns, is that correct?

11  A    Yes.

12  Q    And the amount of tax that they computed for Mr. Pieron

13  was approximately one and a half million dollars?

14  A    Initially, yes.

15                        EXAMINATION

16  BY MR. DEPORRE:

17  Q    And is that --

18                        EXAMINATION

19  BY MS. PARKER:

20  Q    For -- for that time period combined?  For -- I'm sorry.

21  Finish your answer.  You said eventually yes?

22  A    I believe that's the approximate number they came up with

23  if he would have reported the capital gains in 2007.

24  Q    All right.  And did they tell him that?

25  A    Yes.

1  Q    And did they tell him based on the records they had that

2  he had the ability to pay that tax and he should make

3  arrangements to pay it?

4  A    Yes.

5  Q    When did that happen relative to his retaining the

6  services of Mr. Pavlic in Saginaw, Michigan?

7  A    That would -- would have been before he retained Mr.

8  Pavlic.

9  Q    How long did it take him to switch his business from ATSI

10 to Mr. Pavlic?

11 A    I'm sorry.  How -- what do you mean by how long?

12 Q    Let me -- let me ask it this way.  When he received that

13 information that we just described that he had a tax

14 obligation of -- combined -- for the combined years of

15 approximately a million and a half dollars, and then he had

16 the ability to pay that and he should pay that, isn't it a

17 fair statement almost immediately he decided to hire Mr.

18 Pavlic?

19 A    Yeah.  I would say within -- within months.

20 Q    And was there a difference in the information that he

21 provided, that is Mr. Pieron provided to Mr. Pavlic, regarding

22 some of the things that were components of his tax

23 obligations?

24 A    Yes.

25 Q    Such as when he received the capital gains and things of

1   that nature, is that a fair statement?

2   A    That's correct.

3   Q    And then when Mr. Pavlic relied on Mr. Pieron's

4   information, the taxes he computed were as I think you said

5   $400,000. So it was less than half a million.

6   A    Yes.

7   Q    And that is the tax amount that was used on the -- the

8   forms that are Grand Jury Exhibit 1 and 1A?

9   A    That's correct.

10  Q    But that's an amount that is still unpaid?

11  A    Yes.

12  Q    Somebody -- we don't have time really to go into all the

13  -- the things that might have been used to pay the taxes, but

14  you've described some wire transfers and things of that

15  nature. Could some of that money instead of having been put

16  into the businesses, been used by Mr. Pieron to pay his tax

17  obligations?

18  A    Yes.

19  Q    Same thing with some of the expenses you've described,

20  the piano, the cruises, things of that nature. Did he have

21  the ability to, instead of using the money in that fashion,

22  use it to pay his taxes?

23  A    Yes.

24  Q    At the same time did he also buy a -- a motorcycle?

25  A    Yes, he did.

1   Q    That was from Full Throttle for approximately $15,000?

2   A    Full Throttle Motor Sports.

3   Q    Okay.

4   A    I think it was -- the check was approximately $6,400.

5   Q    Okay.  Do you recall what the total purchase price was?

6   A    I don't recall.

7   Q    All right.  Then did Mr. Pieron provide to Mr. Pavlic the

8   information that was used by Mr. Pavlic to derive the

9   estimated value of Komplique or Komplique, and Navitas as

10  $1,000 each?

11  A    Yes.

12  Q    It's your understanding Mr. Pavlic didn't pick those

13  numbers out of the air, but instead was looking at information

14  provided by Mr. Pieron?

15  A    Mr. Pavlic said that he relied on what Mr. Pieron told

16  him.

17  Q    And at that time do you think that is an accurate

18  assessment of the value of those businesses?

19  A    No.

20  Q    You've testified, and I want to make sure I understand

21  this correctly, but at one point Mr. Pavlic prepared FBARS

22  that Mr. Pieron did not file until he became aware of the

23  investigation?

24  A    That's correct.

25  Q    Mr. Pieron in fact made changes to the information on at

1  least one of the FBAR regarding that bank account we're

2  talking about?

3  A    Yes.

4  Q    And in particular he understated the amount of money for

5  that bank account, you believe, because he had transferred

6  $800,000 out of that and into Komplique's bank account in Mt.

7  Pleasant?

8  A    Yes.

9  Q    But he, that is Mr. Pieron, had enough attention to

10 detail that he at least added that account so understating the

11 content?

12 A    Yes.

13 Q    He could have, I assume, and correct me if you disagree,

14 likewise made corrections to the information provided on Grand

15 Jury Exhibits 1 and 1A regarding his assets?

16 A    Yes, he could have.

17 Q    And to go back again to some of his other information.

18 You said early on that he had about a $10,000,000 gain from

19 the sale of his stock in -- in one of his other businesses?

20 A    Yes.

21 Q    Have you been able to figure out where all that money

22 went?

23 A    All I know is that some of it did come to -- get wired to

24 the business accounts in Michigan.

25 Q    All right.  But as a fair statement today, you can't

1   track down where all of that went?

2   A    No, I can't.

3   Q    And that -- yeah.  I was going to say why?

4   A    Because these are foreign bank accounts and it's

5   difficult to get records from foreign banks, especially Swiss

6   banks.

7   Q    Have you tried?

8   A    We requested the bank statements from Mr. Pieron.

9   Q    Did he provide them?

10  A    And he did provide some of the bank statements.

11  Q    But do they allow you to establish where all that

12  10,000,000 went?

13  A    But I can't see where the money went.

14  Q    All right.  And you subpoenaed records you said from his

15  accountant?

16  A    Yes.

17  Q    And ATSI?

18  A    Yes.

19  Q    That's the Chicago firm?

20  A    Yeah, yes.

21  Q    And you've looked at all those records and you still

22  can't figure out where all the money went?

23  A    No.

24  Q    So I don't want to put words in your mouth, but is it a

25  fair statement that you believe that Mr. Pieron has the assets

1  to pay his tax obligations?

2  A    I believe he -- he did have the assets to pay the tax due

3  when -- when it was due.

4        MR. DEPORRE:  Are there any questions from the Grand

5  Jury?  Yes, sir.

6        A JUROR:  I've got a few actually.  But on this form

7  you gave us where it's VW, unless were you saying that you

8  think that stands for like representing a Volkswagen or

9  something?

10  A    Yes.  We think it represents a Volkswagen that he -- Mr.

11  Pieron purchased.

12        A JUROR:  He owned a Volkswagen?

13  A    Yes.

14        A JUROR:  Okay.  To me it kind of looks like VIN, so

15  I just thought it could be VIN representing that there was a

16  number that represented the car he was putting down there.

17                       EXAMINATION

18  BY MR. DEPORRE:

19  Q    Based on your investigation you know that he did purchase

20  a Volkswagen?

21  A    Based on the investigation we know that yes, he did

22  purchase a Volkswagen in 2011 around that time frame.

23        A JUROR:  All right.  The $10,000,000 transaction,

24  is that the capital gain, or was that the amount of the sale

25  of the stock?

1  A    That was an amount -- the amount of the sale.

2        A JUROR:  Okay.  Do you -- do you know what the cost

3  basis was and how that was determined?

4  A    From our investigation he didn't have a basis in the

5  stock because the business was still in the development stage.

6  And all the money that he was using was from investors at that

7  point.

8        A JUROR:  So he traded stock basically for value or

9  they paid him money --

10 A    For ownership --

11       A JUROR:  -- and he gave them shares of stock

12 basically?

13 A    Yeah.  They paid him money to use his working capital, he

14 gave them stock.

15       A JUROR:  Okay.  And then did you guys ever counter

16 a monthly payment agreement with him?  So he offered 1,500 a

17 month, did you ever counter and say we want you to pay this

18 amount or did you just reject it basically?

19 A    They rejected it.  And at that point that he was under

20 criminal investigation.  So at that point usually civil

21 doesn't contact -- they're not allowed to contact the

22 taxpayer.

23       A JUROR:  Okay.  That's it.

24       MR. DEPORRE:  Any other questions?  All right.

25 Thank you.

1        (WITNESS SCOTT HOLLABAUGH WAS EXCUSED AT 10:33 A.M.)

2        (Proceedings Concluded at 10:33 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25