

# DEPARTMENT OF THE TREASURY
## Internal Revenue Service
## Criminal Investigation

# Memorandum of Interview

| | | | |
|---|---|---|---|
| **Investigation #:** | ▮▮▮▮▮ | **Location:** | 5300 Gratiot Rd. Saginaw, MI 48638 |
| **Investigation Name:** | JAMES D PIERON JR | | |
| **Date:** | June 6, 2012 | | |
| **Time:** | 9:00-11:30 AM | | |
| **Participant(s):** | Kim D. Pavlik, CPA | | |
| | Jeffrey Hengeveld, Attorney for AHP | | |
| | Frank Downey, Special Agent | | |
| | Scott Hollabaugh, Special Agent | | |

On the above date and time, special agents Downey and Hollabaugh introduced themselves to Kim Pavlik and Jeffrey Hengeveld as special agents with the Internal Revenue Service, Criminal Investigation and displayed their credentials. Agent Hollabaugh explained he is assisting in a grand jury investigation of JAMES PIERON, and he has questions regarding the records provided in response to the grand jury subpoena served to Andrews Hooper Pavlik PLC. Jeffrey Hengeveld stated he is an attorney representing Andrews Hooper Pavlik PLC. The following was discussed during the interview:

1. Pavlik stated he is a partner with Andrews Hooper Pavlik PLC (AHP). Pavlik has a Bachelor of Science degree in accounting with a minor in economics from Central Michigan University. He has been a CPA since 1979 and has no other professional licenses. Pavlik stated he worked for Ernst & Young for 16 years and became a partner. In 1993, he and two other partners purchased the Saginaw and Lansing offices of Ernst & Young and started AHP. Pavlik said he has been preparing taxes for 34 ½ years. He focuses mostly on tax planning and preparation. Pavlik said he has very little experience with auditing.

2. Pavlik stated he prepared PIERON's 2008, 2009, and 2010 Form 1040X U.S. Amended Individual Income Tax Returns, and his original 2011 Form 1040 U.S. Individual Income Tax Return. Pavlik said he didn't provide any tax planning services, but he did discuss Foreign Bank Account Reporting (FBAR) with PIERON and helped get him current with his FBAR filings.

3. Pavlik said he met PIERON through Bill Zehnder, controller for Institutional Liquidity LLC (ILQ). Zehnder sent him an email in July or August 2010 asking him for a bid for an audit of ILQ. PIERON was one of the owners of ILQ, and he asked Pavlik some questions in late 2010 about amending his personal tax

returns. Pavlik said he started working on PIERON's amended returns in November 2011. Pavlik stated he discussed FBAR filings with PIERON at this time, but PIERON didn't have complete information to file the FBAR's. Pavlik said PIERON was working on accumulating his foreign bank records between November 2011 and May 2012 so that FBAR's could be prepared and filed. Pavlik stated the only time he met with PIERON in person was on December 1, 2011. All of his other contacts with PIERON were by email or phone. Cheryl Chasnis and Dale VanConnett are the other AHP employees who worked on PIERON's tax returns. Pavlik said Chasnis and VanConnett may have had some phone contact with PIERON, but most of the time PIERON contacted him.

4. Pavlik said JDFX was a futures trading company that PIERON owned when he was a citizen of Switzerland. PIERON was the sole owner up until the sale of stock to Trevor Cook in 2008 and 2009. Pavlik said PIERON told him he was a dual citizen of the United States and Switzerland. Pavlik said PIERON is the sole owner of Komplique, Inc. which sells swimsuits. Pavlik said PIERON also owned Komplique SA based in Switzerland, and his understanding is that it is a separate company from Komplique, Inc. Pavlik said he doesn't know if any tax returns were prepared for Komplique, Inc. Pavlik said PIERON was the sole owner of IB Technologies, Inc., which is a defunct company that was liquidated in 2011. Pavlik said PIERON is the 49% owner of either ILQ or Navitas Investments, but he couldn't recall which one. Pavlik said whichever company is the holding company is the one PIERON has 49% ownership in. Pavlik stated he doesn't know PIERON's affiliation with I Trade FX or Security Management Ltd.

5. Pavlik was shown a copy of a letter from PIERON addressed to "Mr. Pavlik" that explained the reason JDFX was liquidated. Pavlik stated PIERON prepared the letter sometime between November 2011 and January 2012 at his request. Pavlik said he told PIERON he needed a written summary of what led to the liquidation of JDFX, the uncollectible loans, and the theft loss. Pavlik said it was his decision not to send the letter to the IRS with the amended tax returns because he didn't think it was appropriate for the situation. Pavlik stated the letter was consistent with what PIERON was telling him all along. Pavlik said he doesn't know the exact date when PIERON knew Cook was operating a Ponzi scheme. All he knows is what PIERON wrote in the letter. Pavlik said PIERON never explained how JDFX vendors, customers, and banks knew Cook was a 35% owner of JDFX, or when they terminated their relationship with JDFX. Pavlik said he never asked for records of JDFX's agreements with Deutsche Bank or other liquidity providers that PIERON claimed were terminated as a result of Cook's Ponzi scheme.

6. Pavlik was shown a copy of the JDFX liquidation document from the Swiss Commercial Registry that PIERON gave him. Pavlik stated he relied on this document to substantiate JDFX's liquidation date. When asked if he could read the document, Pavlik said it's written in Swiss and the only thing he can read is JDFX Holding in liquidation and the date of 11/30/2009. PIERON told him this

was the date JDFX filed for liquidation. Pavlik stated he did not request any other liquidation documents from PIERON. Pavlik said he doesn't know the specific date when PIERON moved his business operations from Switzerland to the United States. Pavlik stated PIERON didn't say anything to him about contacts he had with the court receiver in the Cook case.

7. Pavlik said PIERON came to him to get amended returns prepared because he wasn't confident his previous preparer handled the losses correctly on his original returns. PIERON also told Pavlik he had time to gather additional records that he didn't previously have to support the losses. Pavlik said he doesn't know why PIERON's previous preparer didn't report a theft loss. The completed returns were mailed to PIERON along with Pavlik's analysis showing how the amended income was computed. Pavlik was shown a copy of an IRS Installment Agreement that was provided in response to the grand jury subpoena. Pavlik said he believes PIERON filed the Installment Agreement with his amended tax returns and is making monthly payments. Pavlik stated PIERON was the person who came up with the figures written on the agreement.

8. Pavlik said he doesn't know where PIERON got the money to start JDFX. He doesn't know how the previous return preparer came up with the JDFX sales price and basis on PIERON's original returns. Pavlik said PIERON's $710,129 basis in JDFX on the 2008 amended return is 20% of PIERON's basis up until 2007. Since he only sold 20% of the company in 2008, he could only report 20% of his basis to offset his gain from the sale. Pavlik stated he doesn't know what bank accounts PIERON used to deposit the $10,000,000 from the 2008 portion of the sale.

9. Pavlik was shown a copy of PIERON's 2008 Amended U.S. Individual Income Tax Return that reported a theft loss of $7,008,651. Pavlik stated the theft loss was an indirect result of the Ponzi scheme. Pavlik said PIERON didn't invest in the Ponzi scheme, but it was because of the Ponzi scheme that he lost his money. Pavlik stated he felt it was either a theft loss or a business bad debt, but he thought it was more appropriately treated as a theft loss. Pavlik said the loss stemmed from loans that PIERON personally made to JDFX and became uncollectible when JDFX was forced into liquidation. Pavlik said the loss was recognized in 2009 and part of it was carried back to 2008. Pavlik said PIERON provided him with a sales document to backup the 35% sale of JDFX to Trevor Cook.

10. Pavlik was asked about a $1,046,616 gain from JP Morgan that was reported on PIERON's 2008 amended return but not on the original return. Pavlik said he took the number off the spreadsheet PIERON gave him. He didn't ask PIERON for any other documentation relating to the JP Morgan gain. Pavlik stated he doesn't know why PIERON didn't report the gain on his original return, and he doesn't know if it was a foreign account. Pavlik said PIERON told him he didn't earn interest income on his foreign accounts. Pavlik stated his didn't ask PIERON how much interest he earned on the loans he made to

JDFX and Komplique. Pavlik said his understanding was that all of PIERON's income from 2007 through 2010 was reflected in the spreadsheet he provided. Pavlik said he asked PIERON if the documents represented all of his income from U.S. and foreign sources, and PIERON said yes.

11. When asked what foreign bank accounts PIERON told him about, Pavlik said PIERON gave him a list of accounts. Pavlik provided a copy of the list that was not previously provided in response to the subpoena. Pavlik said PIERON told him he hadn't filed FBAR's because he didn't know he was required to when he was living in Switzerland. PIERON said he found out about the FBAR requirement when he came back to the United States. Pavlik said PIERON was given a memo in January 2012 that asked for missing information needed to complete his FBAR filings. PIERON responded by giving him a spreadsheet listing all of his foreign accounts and the highest balance in the account during each year. Pavlik said PIERON told him he didn't have any taxable income related to the foreign accounts. Pavlik said PIERON didn't need to file for the IRS Voluntary Disclosure Program because he didn't have any taxable income to report from the accounts. Pavlik said the FBAR's were prepared and mailed to PIERON around the end of May 2012. Pavlik stated he doesn't know if PIERON filed the FBAR's. Pavlik said he doesn't know if PIERON told American Tax Solutions about his foreign accounts, or if they prepared FBAR's.

12. Pavlik said he didn't file a Schedule B with PIERON's amended tax returns to report his ownership of foreign accounts. Pavlik said he was only focused on getting PIERON's income from the sale of JDFX stock reported properly and getting the FBAR's filed. Pavlik said it was an oversight on his part, and he should have filed a Schedule B and checked the "yes box" for foreign accounts. Pavlik said PIERON didn't ask him to not file the Schedule B. When asked why he didn't report PIERON's interest from the Saxo Bank account on the amended returns, Pavlik said he would have included the interest with the net gain or loss instead of separating it out.

13. Pavlik was shown a copy of PIERON's spreadsheet that was previously provided in response to the subpoena. Pavlik said the spreadsheet is a total summary of all the money that changed hands between PIERON, JDFX, Komplique, and IB Technologies. Pavlik said the "Capital Investment" column represents cash in and out of JDFX. The columns labeled "Private", "Cash", and "Forex Sale" are personal and not related to JDFX. Pavlik said he doesn't know what the "Card Center" column represents. The acronym "CI" stands for Capital Investment. Pavlik stated he doesn't know what bank accounts any of the money shown on the spreadsheet went into.

14. When asked if PIERON told him he closed all of his foreign accounts on 09/13/2010 as indicated on the spreadsheet, Pavlik said he didn't discuss it with him. Pavlik said he doesn't know what interest rate PIERON charged on the loans he made to JDFX and Komplique. Pavlik stated if there was any interest paid on the loans, his understanding is that it was included on the spreadsheet. Pavlik didn't request loan documents for any of the loans PIERON claimed to

make, and PIERON didn't provide any.

15. Pavlik said PIERON's amended tax returns claim a loss on all of the loans he made to JDFX, all cash contributed to JDFX, all JDFX card center payments, $2,132,958 in loans to Komplique SA, and $293,178.54 cash contributed to Komplique SA. The only loans PIERON had outstanding after 2010 was an $815,000 loan to Komplique, Inc. and an $870,000 loan to IB Technologies, Inc. Pavlik said the last time he talked to PIERON was on 06/04/2012. PIERON had left Pavlik a voicemail saying his prior return preparer, Tax Defenders, sent him a copy of a subpoena they received. PIERON called Pavlik to let him know he will probably be getting a subpoena also. Pavlik said he told PIERON he couldn't disclose whether or not he had received a subpoena.

I prepared this memorandum on June 7, 2012, after refreshing my memory from notes made during and immediately after the interview with Kim Pavlik.



Scott Hollabaugh
Special Agent

Frank Downey
Special Agent