```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 EASTERN DISTRICT OF MICHIGAN

 3   UNITED STATES OF AMERICA        )Bay City, Michigan
                                     )February  5, 2020
 4       vs.                         )9:06 a.m.
                                     )
 5   JAMES D. PIERON, JR.,           )
                                     )Case No. 18-20489
 6       Defendant.                  )
     _____ )
 7

 8                      TRANSCRIPT OF HEARING
             BEFORE THE HONORABLE THOMAS L. LUDINGTON
 9                 UNITED STATES DISTRICT JUDGE

10   APPEARANCES:

11   For the Government:  JANET L. PARKER
                          JULES DEPORRE
12                        United States Attorney
                          Eastern District of Michigan
13                        101 First Street
                          Suite 200
14                        Bay City, MI 48708

15   For the Defendant:   PATRICK J. HURFORD
                          MARK S. PENDERY
16                        Honigman, LLP
                          660 Woodward Avenue
17                        Detroit, MI  48226

18

19

20

21   Court Reporter:      Carol M. Harrison, RMR, FCRR
                          1000 Washington Avenue
22                        Bay City, MI  48708

23

24             Proceedings reported by stenotype reporter.
            Transcript produced by Computer-Aided Transcription.
25
```

US v. Pieron, Jr. - Hearing - January 14, 2020

```
 1                    P R O C E E D I N G S
 2              (At 9:06 a.m., proceedings commenced.)
 3              (Defendant present.)
 4              THE CLERK:  James Pieron versus United States of
 5    America, Case No. 18-20489.
 6              THE COURT:  Good morning.
 7              MS. PARKER:  Good morning, Your Honor.
 8              THE COURT:  If we could have your appearances,
 9    please.
10              MS. PARKER:  Thank you, Your Honor.  Janet Parker for
11    the United States.  With me is Jules DePorre, Assistant US
12    Attorney, and Scott Hollabaugh, IRS CI.
13              THE COURT:  Thank you.
14              MR. HURFORD:  Good morning, Your Honor.  Patrick
15    Hurford appearing on behalf of defendant James Pieron, who's
16    standing next to me.
17              MR. PENDERY:  Mark Pendery appearing on behalf of
18    James Pieron, Your Honor.  Good morning.
19              THE COURT:  Good morning.  When we were last in
20    session, we had had an informal conference following the
21    hearing.  One of the issues was to resolve whether or not we
22    had called all witnesses that the parties wished to call with
23    respect to the sentencing question on tax loss.  We provided
24    the defendant with a little bit more opportunity to consider
25    whether or not he wished to furnish any testimony as well as
```

1   any additional witness's testimony.  Have you arrived at a

2   conclusion, sir?

3           MR. HURFORD:  Yes, Your Honor.  As we indicated at

4   the conference, we have no additional witnesses to present.  We

5   had asked for the opportunity to put a couple more documents on

6   the record and provide a proffer for Agent Hollabaugh since we

7   were not allowed to call him to testify.

8           THE COURT:  Indeed.  My recollection is the one

9   proffer that you wanted to furnish or include in the record was

10  information authenticating the stock register from Switzerland.

11  Am I correct or incorrect?

12          MR. HURFORD:  I have two exhibits, Your Honor.

13          THE COURT:  Okay.

14          MR. HURFORD:  One exhibit is a declaration from Clive

15  Diethelm, who is one of the founders of JDFX, along with

16  Mr. Pieron, and he executed an affidavit, and his name -- his

17  signature appears.  He states his signature appears on the

18  stock certificates, one through three.  And he has -- that's

19  the declaration.

20          There's also a Swiss law declaration concerning the

21  operation of Swiss taxes and the effect it would have as a

22  capital contribution versus a stock sale.

23          THE COURT:  Where does Clive reside?

24          MR. HURFORD:  Cyprus.

25          THE COURT:  And what is the -- well, let's call it

1  the assertion in the document that we could call direct

2  examination.

3          MR. HURFORD:  I don't understand the question, Your

4  Honor.

5          THE COURT:  Well, he's not available for

6  cross-examination.

7          MR. HURFORD:  No.

8          THE COURT:  So if we refer to the affidavit as direct

9  examination, what is it that he says in direct examination in

10 that document?

11         MR. HURFORD:  He says -- I can give it to the Court

12 to read, but, Your Honor, he says --

13         THE COURT:  Read it into the record.

14         MR. HURFORD:  He says that -- can I -- do you want me

15 just to read the whole declaration?  It's two pages.

16         THE COURT:  I think that would be helpful.  I don't

17 know if the Government's had a chance to review it or not.

18         MR. HURFORD:  Declaration of Clive Diethelm.  I am

19 older than 18 years of age, have personal knowledge of the

20 facts regarding my ownership in JDFX Holding AG and am

21 competent to testify if called.

22         I am currently a resident of Cyprus and a citizen of

23 Switzerland.

24         In 2006, I was employed by JDFX Technologies AG in

25 Zurich, Switzerland.

1    I am familiar with James Pieron since we worked

2 together for several years when I did reside in Switzerland.

3    I recall forming JDFX Holding AG with James Pieron in

4 December of 2006 in accordance with the attached formation

5 document, and the attached formation document, Your Honor, is

6 in it's just -- it's a Swiss document.

7    THE COURT:  In German or French?

8    MR. HURFORD:  It's in German.

9    I recall Market Shot being issued 20 percent of the

10 shares of stock in JDFX Holding AG and verify my signature on

11 the attached Certificate No. 1.  And that was the certificate

12 that's dated 2006 providing 2 million shares of JDFX Holding to

13 Market Shot.

14    I recall being issued 10 percent of the shares of

15 stock in JDFX Holding AG and verify receiving the attached

16 Certificate No. 2, which is a certificate that provides

17 Mr. Diethelm 10 percent of the shares of JDFX in 2006.

18    And, C, I recall James being issued 70 percent of the

19 shares of stock in JDFX Holding AG and verify my signature on

20 the attached Certificate No. 3.

21    I recall the two share certificates belonging to

22 myself and James being held in a safety deposit box at UBS in

23 Zurich.  The bank was located a few meters from the JDFX

24 office.

25    I was later issued more stock of JDFX Holding AG and

1  owned 12.5 percent of its stock.

2          I recall being a board member and that material

3  decisions required the signatures of at least two board

4  members.  These permissions are found in the Swiss registrar,

5  and then he quotes a German word that I can't possibly

6  pronounce, Your Honor, next to each board member meaning joint

7  signatures are required for material decisions.

8          I recall the operational company JDFX Technologies AG

9  invoicing and receiving $7 million -- several million dollars,

10  excuse me, from the management company, JDFX Fund Management,

11  LTD, for services rendered in 2007.

12          And that's being marked as Government Exhibit -- or

13  excuse me, wow, that's a blast from the past -- Defense

14  Exhibit 68, Your Honor.

15          THE COURT:  It's its own message.

16          MR. HURFORD:  It's its own message.

17          And then Defendant's Exhibit 69, Your Honor, is a

18  Swiss law declaration.

19          MS. PARKER:  Your Honor, I ask they be referred to as

20  proposed objections.  We do have objections.

21          MR. HURFORD:  What I've marked as Defendant's

22  Exhibit 69, Your Honor, is a Swiss law declaration, which

23  states that if -- that there is no personal implication to

24  James Pieron if there was a sale of stock from him to Trevor

25  Cook or an issuance of treasury stock from the corporation to

1   Trevor Cook.

2          There is a stamp tax they call it, which is 1.5 --

3   the company would have to pay 1.5 percent of -- I'm sorry,

4   1 percent -- would have to pay 1 percent of the total capital

5   contributions that exceed $1 million -- 1 million Swiss francs.

6   So there would be -- for a -- let's call it a $15 million

7   capital contribution, there would be -- from a Swiss -- there

8   would be a 1.5 -- or $150,000 tax owed by the company.  James

9   Pieron's personal tax liability would be uneffected.

10          THE COURT:  Let's back up a little bit because I'm

11   not clear.  Are you talking about there being a tax on a

12   capital contribution in the formation of an entity, or are you

13   talking about a tax on the sale or transfer of securities in

14   that otherwise organized entity?

15          MR. HURFORD:  I'll just read the declaration, Your

16   Honor.

17          THE COURT:  Okay.

18          MR. HURFORD:  Giuseppe Sottile, the undersigned, is a

19   certified Swiss tax expert and has been in practice for 23

20   years.

21          He's 48 years old.

22          The next sentence talks about his degree.

23          He's been a certified Swiss tax expert since 2002.

24          He understands from James Pieron's lawyers that there

25   are questions pertaining to Swiss tax law.

1        In Switzerland, if a non-Swiss resident investor

2   contributes money into a Swiss corporation and gets newly

3   issued stock in return from that Swiss corporation in an

4   arms-length transaction, there is no tax due from the investor

5   in Switzerland or any other shareholders in the Swiss

6   corporation.

7        THE COURT:  Which is consistent with Section 351 of

8   the United States Internal Revenue Code, which is there's no

9   tax on the formation of a business entity.

10       MR. HURFORD:  However --

11       THE COURT:  Indeed.

12       MR. HURFORD:  -- there would be a 1 percent stamp tax

13   on the money contributed to the Swiss corporation.  The first

14   1 million Swiss francs, however, is exempt.  For example, if an

15   investor contributes 15 million US dollars in a Swiss

16   corporation, and gets newly issued stock in return, then there

17   is a 1 percent stamp tax on the money contributed, so $150,000

18   in tax would be paid to the Swiss authorities, taking as

19   assumption that there's a $1 million exemption that was somehow

20   applied, and there's no personal liability for taxes.

21       They do say, however, we would like to add that a

22   Swiss resident is subject to a yearly wealth tax at cantonal

23   and communal levels, therefore, the fair market value of shares

24   in a company held by a Swiss resident shareholder are part of

25   his wealth and subject to the yearly wealth tax.  The wealth

1  tax rate depends on the effective place of residence of the

2  Swiss taxpayer.

3          And then there's a line about --

4          THE COURT:  Does it address, after the formation of

5  the entity, the taxation of subsequent sale and transfer of the

6  securities?

7          MR. HURFORD:  Can you repeat the question?  I'm --

8  first of all --

9          THE COURT:  In our language we would say a subsequent

10  sale or transfer of the security would be subject to a capital

11  gain tax treatment.  Would you agree?

12          MR. HURFORD:  Your Honor --

13          THE COURT:  I'm distinguishing --

14          MR. HURFORD:  I know, I'm sorry.  I'm ill.  I'm

15  running a temperature today, so I'm having a really hard time

16  just understanding the question.  I'll turn it over to Mark

17  Pendery if I can't get it this time.

18          THE COURT:  Let's distinguish between capital

19  formation of a new entity, which you've been addressing,

20  correct?

21          MR. HURFORD:  Correct.

22          THE COURT:  Let's distinguish that.  Once our -- once

23  our new entity owners have formed their company, let's assume,

24  for purposes of the discussion, that they want to sell that

25  security.  In the United States that would be treated as though

1    it were a capital transaction, gain or loss, but it would be a

2    taxable transaction.  Is it under tax -- under Swiss tax law?

3              MR. HURFORD:  This doesn't address whether --

4              THE COURT:  That's what I thought.

5              MR. HURFORD:  Well, the reason is because, Your

6    Honor, the entire allegation of the Government has been he

7    structured it as a sale of stock because he was avoiding tax in

8    Switzerland.  So the underlying assumption of the Government, I

9    think they would concede, is that there's no capital gain tax

10   in Switzerland, otherwise their argument makes no sense.

11             THE COURT:  Objections to the proffers?

12             MS. PARKER:  Yes, Your Honor.  Starting with

13   Defendant's Proposed Exhibit 68, first of all, I would like to

14   note that both of these documents were handed to us at 9:00

15   this morning, notwithstanding the fact that the -- Clive

16   Diethelm purported affidavit is dated January 14th, 2020, which

17   I will note just happens to be the date of a hearing, and the

18   purported Swiss tax expert's letter.

19             THE COURT:  Have you had a chance to look at that

20   long enough to know whether it addresses the stock purchase

21   agreements?

22             MS. PARKER:  It does not.

23             THE COURT:  Oh.

24             MS. PARKER:  And the other thing I would note, Your

25   Honor, is, with regards to this document, there is several

 1    pages in German, no translation is provided, and this

 2    declaration is no more authenticated than the documents that it

 3    purports to authenticate.

 4              It -- I'm familiar with doing letters rogatory

 5    pursuant to multilateral assistance treaties, and when you get

 6    a declaration from a foreign national from a foreign country

 7    there are indicia of reliability that are -- in the terms of

 8    certification that are provided by the appropriate officials in

 9    that country.

10              This is a person who lives outside of the United

11    States and has no fear of prosecution for perjury.  There's not

12    even anything that I would consider the equivalent of a

13    recognition of culpability in that form if there were any false

14    statements.  This is just as reliable as -- or as unreliable as

15    the thing it purports to authenticate.  We have no idea that

16    this is this person's signature.

17              And I note it doesn't include one of the stock

18    certificates.  The stock certificate that is issued June of

19    2009, or dated June of 2009, which is Government's Exhibit 223,

20    is not part of this exhibit, and it was also marked as a

21    defense exhibit.  I don't recall the number, and I think those

22    duplicative numbers should not be admitted in any case.

23              But, frankly, Your Honor, those are some of the

24    objections.  I had German in college, but I graduated in

25    college in the '70's.  My German isn't good enough to translate

1  this document.  It's not subject to cross-examination, and

2  basically I think this document is irrelevant and inconsistent

3  with the record the defendant himself has made, and I object on

4  that grounds.

5          As to defendant's exhibit -- or purported --

6          THE COURT:  Let's stop.

7          MS. PARKER:  Sure.

8          THE COURT:  With respect to that one, I would like it

9  made part of the record.  I agree it should not be admitted

10  into evidence.  It's not authenticated.

11          MS. PARKER:  If I --

12          THE COURT:  Next exhibit.

13          MS. PARKER:  And I understand what I believe the

14  Court is saying, and with that understanding, I'll go forward

15  to the next one.

16          Defendant's Proposed Exhibit 69 is completely

17  irrelevant.  What is relevant in this proceeding is not what

18  Swiss tax law was.  It's what the defendant understood it to

19  be.  The defendant has stated, on the record, he understood

20  that the way he structured the transactions, as he described it

21  up until the point of the jury verdict, in which he sold the

22  stock to Market Shot slash Cook was a tax advantage way to

23  proceed under Swiss law.

24          THE COURT:  Now, the only reason we know that is

25  because there is a sentence in the letter that Mr. Pavlik

1  solicited from him, but I don't think that there is anything

2  else in the record that would support that, other than that

3  factual assertion.

4         MS. PARKER:  I respectfully disagree, Your Honor.

5  There was a statement that the defendant made on the record.

6  We cited it in previous briefings, and I will provide it to the

7  Court again.

8         THE COURT:  And when you say "on the record," what

9  record?

10        MS. PARKER:  On the record during the trial.  At one

11 point there was a colloquy between the Court and counsel in the

12 absence of the jury, and Mr. Minns was explaining --

13        THE COURT:  Okay.

14        MS. PARKER:  -- that it was conducted in a certain

15 way, and Mr. Pieron stood up and volunteered, yes, that was a

16 mistake now, or words approximating that, and I will provide

17 the record cite if you would like.

18        But one other thing is, as the Court's noted, this

19 document doesn't address the situation where the defendant sold

20 his own shares in the stock.  This -- the letter to the extent

21 that I understand it -- and, again, I've had no time to review

22 it, and it was in the possession of the defense counsel, by its

23 date, from December 20th, 2019, which incidentally, again, is

24 the date of another one of our hearings.  They've had this up

25 their sleeve, and they whip it out at the moment that the

1   hearing is supposed to start.  That, Your Honor, I think is

2   reprehensible.

3        But there's nothing in here that says this was tax

4   law during the decade of the 2000s.  It doesn't say whether --

5   you know, how long this has been the tax law; and, furthermore,

6   Your Honor, it doesn't address the situation where the

7   defendant, as he described it repeatedly up until the time of

8   the verdict, sold the stock he had acquired from the

9   corporation.  It doesn't address the taxability of that, plus

10  there's no evidence that the tax was ever paid, the -- the

11  stamp or --

12        THE COURT:  But wouldn't -- isn't the declaration

13  valuable to the Government in one sense because it

14  substantiates the fact that there was limited taxation on the

15  capital formation of the business, that there was every reason

16  in the world to form the business as the defendants have

17  suggested he should have, not as the defendants have suggested

18  that he reported?

19        MS. PARKER:  I agree with that observation, Your

20  Honor, but I think on balance this is misleading.  It

21  doesn't -- there's no indication that the taxes that were

22  recited in here were ever paid by the defendant, by Clive

23  Diethelm, by the corporation.  It doesn't even say who was

24  required to pay the -- the stamp tax or -- or that part of it,

25  or the defendant or, again, his claimed partner paid the

1    local -- what do they call it -- personal taxes I think was the

2    type of phrase.  I'm trying to find the word again.  Yeah, the

3    wealth tax, I guess, they called it in this.

4            Again, this is not in anyway authenticated having

5    been done before any sort of -- you know, anything the

6    equivalent of a notary or any judicial officer.  It purports to

7    have signatures.  Frankly, Your Honor, I mean, I think -- I

8    realize that there are -- I realize that the Court can consider

9    a wide range of things in the context of sentencing, but in

10   this regard, I think this is irrelevant and should not be

11   admitted.

12           Mr. DePorre has indicated to me that the colloquy

13   where Mr. Pieron addressed the issue of his understanding of

14   tax law, which I believe is the relevant point in these

15   proceedings, is in R53 page IDs 807-809.

16           THE COURT:  And respectfully, again, I would like

17   that made part of the record, but for the similar reasons, I

18   don't believe it's admissible.  It's unauthenticated.

19           Which takes us to the question of whether there's

20   anything else that you wish to submit into the record.

21           MR. HURFORD:  Why is it not authenticated, Your

22   Honor?

23           THE COURT:  I don't know where you got it.

24           MR. HURFORD:  Well, there's no requirement that

25   letter of rogatory be used to authenticate a foreign document.

```
 1  In fact, your clerk will know the statute better than I do, but
 2  17-- 716 -- there's language that can simply be put in a
 3  declaration that makes it as admissible as any other document
 4  that was in this country.  Letters rogatory's used to compel
 5  court orders from this country and another country or discovery
 6  requests.
 7          THE COURT:  Sure.  You would agree it's hearsay?
 8          MR. HURFORD:  Well, yes, Your Honor.
 9          THE COURT:  No --
10          MR. HURFORD:  That's what declarations are.
11          THE COURT:  -- no exception, and how do I know that
12  you didn't make that up in your basement, as opposed to it
13  being from someone someplace else in the world?  I don't know
14  that it's authentic.
15          MR. HURFORD:  Well, I didn't make it up in my
16  basement, Your Honor.  That would be a quick way for me to end
17  up in prison.
18          THE COURT:  It would.
19          MR. HURFORD:  So, no, this actually came from Clive
20  Diethelm.
21          THE COURT:  I reached the same conclusion,
22  respectfully.
23          MR. HURFORD:  Okay.
24          THE COURT:  Anything else that --
25          MR. HURFORD:  Yeah.  Had we been allowed -- I'm going
```

1  to make a proffer of what we'd expect Agent Hollabaugh's

2  testimony to be had we been allowed to call him, Your Honor.

3            THE COURT:  Yes, sir.

4            MR. HURFORD:  I expect Agent Hollabaugh would have

5  testified that he began his investigation no later than 2011

6  concerning James Pieron.

7            I'd expect him to testify that he has been the lead

8  investigator since the inception of the investigation.

9            I would expect him to testify that Pieron filed tax

10  returns in Switzerland from 1998 to 2010, excerpt for 2000,

11  when he lived and worked in the United States.

12            I expect him to testify that the transfer of JDFX

13  stock to Cook in exchange for $10 million took place in 2006

14  and 2007.

15            I'd expect him to testify that IRS Section 451

16  requires a taxpayer to report income in the year it was

17  received, not when the taxpayer wants to report it.

18            I'd expect him to testify that the $10 million was

19  not put in an escrow account or held as a deposit.  It was put

20  in JDFX entities for operational expenses.

21            I expect him to testify that the tax loss

22  calculations by the Government are incorrect because the

23  $10 million transaction did not create capital gain in 2008.

24            I expect him to testify that the $10 million capital

25  gain, if it existed, should have been reported before 2008,

1    i.e. in 2006 and '07.

2            When asked about capital gain, he did not -- he

3    testified -- Agent Hollabaugh testified only that there was a

4    $10 million capital gain in 2007.  I expect he would testify

5    that he did not include an additional $5.25 million in capital

6    gain because Trevor Cook, when interviewed by Agent Hollabaugh,

7    told him there was never a second sale of stock.  I quote from

8    his interview memo.  He never agreed to purchase more shares of

9    JDFX stock.

10            Approximately -- from that interview memo, I expect

11   Agent Hollabaugh to testify that the $5 million, according to

12   Trevor Cook, was sent to James Pieron, not for shares of stock

13   but to buy a bank.

14            Agent Hollabaugh testified at the grand jury that he

15   had bank records showing the wire transfers to Pieron for the

16   $10 million capital gain, mostly in 2007.  I expect if he was

17   asked he does not have -- he would testify that he does not

18   have records showing Mr. Pieron personally receiving the

19   $10 million.

20            I expect Agent Hollabaugh would testify that Pieron's

21   2008 amended tax return was accepted by the IRS and that that

22   amended tax return contained a theft loss deduction of over

23   $7 million.  And just as the Government, Your Honor, proffered

24   the tax returns, only the income portion of those tax returns,

25   or the capital gains portion of those tax returns of my

1  client's 2008 and 2009 tax returns, to meet their prima facie

2  burden of proving income, I hereby proffer the IRS acceptance

3  of a $7 million tax loss for my prima facie case to prove my

4  burden on deductions.

5          THE COURT:  Anything else, sir?

6          MR. HURFORD:  I'm sorry, Your Honor, no.

7          THE COURT:  Anything else?

8          MR. HURFORD:  No, Your Honor.

9          THE COURT:  Government, any rebuttal?

10         MS. PARKER:  Yes, Your Honor, briefly.

11         Judge, we disagree with the proffer, and we would say

12 that Scott Hollabaugh is a fine agent, but he has no personal

13 knowledge.

14         He would not agree that Mr. Cook's statements were

15 truthful.

16         He would not say that the Banque du Bois deal was as

17 the defendant attempted to portray it on the record before this

18 Court, contrary to the evidence that was presented on

19 cross-exam.  That if anything, that whole episode was an effort

20 at defrauding this Court and constitutes obstruction of

21 justice.

22         THE COURT:  How is that?

23         MS. PARKER:  Because the portrayal that was presented

24 by the defense was that the Banque du Bois deal was totally

25 paid for by Cook and that wasn't income to Mr. Pieron, when, as

1   Mr. DePorre demonstrated on cross-exam, and their own

2   exhibit shows, Mr. Pieron took money from his personal account,

3   it's Government's Exhibit 217.  Before he got the first of the

4   three installments from Cook, he took two and a half million

5   from his personal account and used that to pay the deposit on

6   the bank.  And their own exhibit -- and also it was -- part of

7   it was made an exhibit by the Government, shows that he

8   personally, in July of 2009, Mr. Pieron, was demanding the

9   return of his two and a half million dollars.

10          The other two installments were made by Mr. Cook, as

11  the Court noted, basically under false pretenses, because the

12  very letter, his demand letter Mr. Pieron sent in July of 2009,

13  reveals that the bank deal had fallen apart before those next

14  two transactions occurred.  So all three transactions, wire

15  transfers made by Mr. Cook, supposedly for the purpose of the

16  bank, were not for that purpose.  Mr. Pieron had already,

17  before those -- any of those three were made, had already paid

18  the two and a half million dollar deposit, which he sought to

19  get back for himself, returned to himself, Mr. Pieron.  So that

20  whole deal, that whole representation, was yet another revision

21  of history just as the stock transaction was.

22          THE COURT:  Well, let's look at what the history is.

23  I mean, whether or not there was a bank deal, he reported the

24  receipt of that -- those funds as revenue in conjunction with

25  the sale of JDFX stock.  It's part of the 15.25 million that

1  Mr. Pavlik included so, I mean, how is that obstructing

2  justice?  It might be silly, but it's not obstructing justice.

3           MS. PARKER:  Because they presented Rebeck's

4  testimony to say it was not income to him.  That was the -- one

5  of the major threads of her testimony, and Mr. Pieron stood

6  here with -- or sat here with his counsel and brought forward

7  that line of nonsense that somehow that should be excluded from

8  his income.

9           I'm not questioning that it ultimately was included

10 by Mr. Pavlik, but what I'm saying is he tried to convince the

11 Court, with a witness that he bought and paid for, and as the

12 Court noted, she had no knowledge of -- personal knowledge of

13 anything, she only was testifying to what she was fed, that

14 whole line of testimony was basically a misrepresentation as to

15 the propriety of including that 3.5 million in the income.

16 That's why it matters, Judge.  I'm not disputing the tax return

17 part of it.  I'm disputing that they used the courtroom here to

18 present that as a line of evidence.

19           The suggestion was that Agent Hollabaugh was the

20 agent since the inception of this case.  We've already

21 committed to that in a prior brief on the *Touhy* issue.  No, he

22 wasn't.  He wasn't even the second agent on this case; but, in

23 any case, he would not say, as proffered by Mr. Hurford, that

24 the Government's tax loss calculations are incorrect.

25           He would not say that he believed everything that

1  Mr. Pavlik said either during his interviews or from the

2  witness stand, but that his opinions on these matters are

3  irrelevant.  That's the Government's position and, finally,

4  what he would say, Your Honor, is that --

5          THE COURT:  When you say, Mr. Pavlik's opinions would

6  be irrelevant.

7          MS. PARKER:  No, no, I'm sorry, Mr. Hollabaugh's.

8  The proffer I'm addressing is the proffer of Mr. Hollabaugh's

9  testimony --

10          THE COURT:  Understood.

11          MS. PARKER:  -- and whatever his opinions are, and

12  those are basically what they're offering in large part, are

13  either undisputed facts or opinions that are not necessarily

14  his opinions or have any relevance.  But what he would say, to

15  the extent that his opinions are relevant, is the defendant was

16  duly convicted and -- of the charge in this case and should be

17  sentenced under the guidelines proposed by the Government.

18          THE COURT:  Any additional witnesses for the

19  Government?

20          MS. PARKER:  No, Your Honor.  Thank you.

21          THE COURT:  So we have a -- we have at least a closed

22  record with respect to the tax loss assessment.

23          But I think we do need to make some revisions

24  based -- in your initial tax loss assessment based on

25  information that we've learned here.  Would you agree or

1    disagree?

2              MR. PENDERY:  If you're asking us to brief the issue,

3    Your Honor, we would welcome that opportunity.

4              THE COURT:  Well, and more specifically you reached

5    diametrically opposed initial assessments of the tax loss.

6              MR. PENDERY:  Agreed.

7              THE COURT:  Focused, at least at that juncture,

8    largely on the funds being received by JDFX and the question of

9    whether or not Mr. Pieron was a party to those transactions or

10   it was merely a capitalization of JDFX by capital contributions

11   from Mr. Cook.  You have a difference of opinions about that.

12   It was reported in a way that's consistent with the Government

13   and in a way that you would suggest was incorrect?

14             MR. PENDERY:  That's correct, Your Honor.

15             THE COURT:  But since that period of time, we've also

16   had a chance to focus a little bit more, not only on the funds

17   being contributed to JDFX, but the use of those funds.  We

18   note, for example, at one point Mr. Pieron took a loan from

19   JDFX.  It was a little above 7 million, traded on the funds,

20   but he returned them.  It was a loan.

21             MR. PENDERY:  That's correct.

22             THE COURT:  But we also have an understanding on some

23   other factual information that would not be apparent from any

24   of the returns, but that Mr. Pavlik was able to clarify, and I

25   think that is going to have an effect on both the Government's

1    tax loss assessment as well as yours?

2              MR. PENDERY:  I understand, Your Honor.

3              THE COURT:  Specifically, Ms. Rebeck clarified that

4    Mr. Pieron made no capital contributions to JDFX.  Her

5    testimony was that his tax basis in the securities he received

6    was zero, and that, in effect, other than as an intermediary in

7    facilitating those transactions, he was a complete stranger to

8    the transaction from her perspective.  That was her testimony

9    at page 75.

10             I think we learned something different from

11   Mr. Pavlik, and let me quote him from page 104 and 5 of the

12   December 20 sentencing hearing:

13             "So what did you use to calculate the basis?

14             Answer:  Again, I don't recall.  It was some

15   information provided by Mr. Pieron that led me to believe

16   that -- that he documented -- the basis would be three.  I'm

17   using approximate numbers, 3.5, million of which I recorded a

18   20 percent basis on the sale."

19             That would have been his income sale of the stock.

20             "Did you review personal bank records from Mr. Pieron

21   showing capital contributions?

22             Answer:  No.

23             Did Mr. Pieron give you a shareholder ledger showing

24   you capital contributions for JDFX?

25             Answer:  Again, I don't recall what supported the

1   3.5 million calculation that he provided.  I don't remember the

2   details behind it.

3           But as you sit here today, you believe that

4   information came from Mr. Pieron and not some third party, is

5   that fair?

6           Correct.

7           Did Mr. Pieron tell you where he got the three and a

8   half million dollars for capital contributions in JDFX Holding?

9           Answer:  No, not that I recall."

10          That information, however, is important, as he

11  explained at pages 30 and 31 of his -- of the next hearing that

12  we had on January 14th.  Picking up at line 19:

13          "Question:  Okay.  Now you said he maintained that he

14  kept the money; is that correct?

15          Answer:  No, he maintained that he put all the money

16  back in the company.

17          Question:  Did he tell you what he did with the money

18  once he put it in the company?

19          Answer:  As we've talked last time, you know, we

20  documented that he refreshed -- he told me the first time,

21  because I didn't know it, that 1.6 million of the money

22  eventually went to US companies, but the rest of it was lost in

23  the liquidation of the company.

24          Question:  Mr. Pieron told you that he personally

25  invested about 3.5 million; is that correct?

1          Answer:  I believe that's right.

2          Question:  And you used that number to calculate the

3    basis for what you reported as the 2008 sale of stock?

4          Correct.

5          Question:  So in total -- in total there was

6    3.5 million plus 15.25 million that Mr. Pieron represented went

7    into JDFX Holding, is that fair?

8          Reasonably fair, other than, you know, the money that

9    was repaid to family member investors and the money that went

10   into the US companies that we -- you know, based on the

11   spreadsheet, so I would not say that's totally fair, but

12   reasonably fair, other than the caveats that whatever money was

13   repaid to family members and whatever money went into the new

14   companies would not have gone back into the company."

15          Now, later on, he explains a little bit further about

16   why the distinction is important.

17          "Do you recall whether or not it was 10 million or in

18   the scope of more like a million dollars?

19          It wasn't 10 million.  Again, what I had originally

20   done, and has never been challenged, to my knowledge, by, you

21   know, the IRS or anything, was looked at all the cash

22   transactions over time and tried to prove out how much cash

23   went out.  The flaw -- I probably overstated it as it turns

24   out, because the flaw I had is what I thought were payments

25   being taken out by Mr. Pieron were actually being money going

1  back to family members paying for some of the original

2  investments.

3       Some of that money, the way I did the returns, I

4  proved it out that was income, but a lot of that would have

5  been a return of capital.  So I believe if you look at those

6  sheets, it totaled between -- including the 1.6 million, it

7  included -- it totaled something in the neighborhood of 3.2

8  million."

9       But -- and this was the perplexing assertion so far

10  as I could determine it.  Mr. DePorre asked him:

11       "Did you later become aware that -- in your meetings

12  with Mr. Pieron's attorneys, that he not make any initial

13  capital contributions into JDFX?

14            Answer:  No.

15            Question:  You learned that today for the first time?

16            Answer:  Yes."

17       So it seems to me that the parties need to give some

18  thought to the taxation of those transactions in light of your

19  earlier attention to the taxation of the initial either capital

20  contributions to the formation of JDFX, the defendant's

21  explanation of those transactions, or the defendant's sale of

22  his securities to Mr. Cook with whatever associated basis you

23  believe is assignable to those transactions.  Does that make

24  sense?

25            MR. PENDERY:  I think it does, Your Honor.  I'm not

1   100 percent certain.  I have to reread Mr. Pavlik's testimony.

2   I understand you're pulling out snippets from his testimony.

3   I'd like to read the whole thing again, but I think I -- I'm

4   trying to understand where you're going, and that is did he

5   actually have any basis in the stock that was being sold in one

6   instance because I -- I'm still unclear about that.

7           And what about this 1.6 million and 3.2 million

8   issue, I think the Court wants us to address that, and I think

9   the Court wants us to go back and look at what we originally

10  filed, what our tax loss comps were in the beginning versus

11  what the two witnesses testified to and the documents that have

12  been admitted.  Is that fair?

13          THE COURT:  Yes.

14          Government?

15          MR. DEPORRE:  Your Honor, my recollection is that --

16  well, we have two points I guess.  First, that it -- our

17  central point is that the Court's focus in the guideline issue

18  is on the defendant's intended tax loss, and so even if we go

19  back as to what may have been or what could have been, what

20  should be looked at is what the defendant reported and then

21  what he failed to pay on.

22          Now, he did report a basis, initially, in his 2008

23  amended return --

24          THE COURT:  He did.

25          MR. DEPORRE:  -- of the 3.5, and we're challenging

1   that.

2         THE COURT:  And there's a reason for that, because

3   that's what he told his preparer.

4         MR. DEPORRE:  Correct.  It later -- we prepared our

5   return as though there was no basis, which we maintain is

6   correct.  However, we also calculated the tax loss range,

7   either way, with the basis or without the basis, it was

8   irrelevant that the tax --

9         THE COURT:  Well, under your theory, his tax basis

10  was equal to $10 million, so this later transaction for 3.5,

11  probably immaterial because he's got a basis that is far in

12  excess of his receipt of the proceeds.  So this later

13  transaction, from your perspective, probably does not increase

14  his tax bill.

15        MR. DEPORRE:  I think that's correct.

16        THE COURT:  Well, what does it do from the

17  defendant's perspective, and why would he have told Mr. Pavlik

18  that he had a 3.5 million basis in that stock, which he didn't?

19        MR. DEPORRE:  The Government simply cannot answer

20  that question.  The burden is on them as to -- with respect to

21  unclaimed deductions and credits.  We can simply say that he

22  did not have 3.5 in basis, and so at that point there's nothing

23  more -- we don't know why he didn't tell his accountant what

24  his actual basis was, and that he didn't actually have a basis.

25        THE COURT:  Okay.  So from my perspective it seems to

1  me that we take a little bit of time, and we'll provide you

2  with an opportunity to sort of update your assessment if you

3  have any changes at all with respect to the tax loss

4  assessment.

5          Fourteen days a reasonable period of time?

6          MR. DEPORRE:  Your Honor, 14 days is reasonable for

7  the Government.  I would ask a page limit, I believe that most

8  of these issues have been raised.  I know that the filing where

9  I referenced the basis was record number 128 beginning at page

10  ID 2873 of the Government's brief where we -- where we pointed

11  out that it would not be material to any change for the tax

12  loss amount for the guidelines calculation, so --

13          THE COURT:  The 3.5 million that the defendant

14  received in the liquidation?

15          MR. DEPORRE:  Whether or not he received it is simply

16  immaterial to the overall tax loss range.

17          THE COURT:  And the reason for that is because he had

18  a $10 million basis in the security?

19          MR. DEPORRE:  Because the range is so broad coupled

20  with --

21          THE COURT:  Referring to the tax bracket or referring

22  to the sentencing guidelines?

23          MR. DEPORRE:  The sentencing guidelines, yep,

24  correct.

25          THE COURT:  Sir, 14 days a reasonable period of time?

1          MR. PENDERY:  I think it's a reasonable period of
2    time, Your Honor.  If we could have 14 days after we receive
3    this transcript.  I don't know how long it will take to receive
4    it.  We have all the other transcripts, but I'd really like to
5    be able to look at the Court's questions so that we're
6    answering your questions.  And I think if I have the
7    transcript, say, in a week -- do you understand what I'm
8    saying?  We've been through a lot of your questions this
9    morning.  I just want to make sure I'm answering your
10   questions.
11          THE COURT:  And I -- I am a stranger to being able to
12   answer that question.  I will consult with the stenographer.
13          MR. PENDERY:  Okay.  Thank you.  That would be my
14   idea is 14 days from the date we get the transcript.  We would
15   be happy to brief this issue for you.  I just want to make sure
16   we're answering your questions is my point.
17          THE COURT:  And what I'm attempting to do with this
18   particular submission is to focus on the transactions that take
19   place between the defendant and JDFX that postdate its
20   capitalization and its impact on the tax bill, depending on
21   your relative positions with respect to the initial receipt of
22   the funds.
23          MR. PENDERY:  Okay.  Got it.
24          THE COURT:  But then at some point we've got to kind
25   of wrap-up.  We've got -- we now have a closed record with

 1   respect to the tax loss assessment, and there's a lot of

 2   additional data that's in the transcripts.  I've had a chance

 3   just to speed read them late yesterday afternoon, and it seems

 4   to me that we're at a juncture, notwithstanding the fact that

 5   we've done a lot of briefing, where we need to be doing a

 6   summary, based exclusively on the record that we have here as

 7   well as the trial record --

 8          MR. PENDERY:  All right.

 9          THE COURT:  -- in wrapping up because, frankly --

10   maybe I'm not speaking for you, but I've learned a lot as we

11   have proceeded along the way.

12          Please recall that the initial stock record from

13   Switzerland was introduced for the first time with respect to

14   your initial tax loss assessment; never heard about that

15   before.  At least I had never heard about the Banque du Bois

16   transaction until we got to sentencing issues.

17          MR. PENDERY:  There was no defense put on in the

18   case, Your Honor, so you wouldn't have received any of that

19   information.  I don't even know that the lawyers knew about

20   that information or even asked about that information.

21          THE COURT:  That may be the case but, nevertheless,

22   the point is I suspect that the Government didn't know that

23   when they did their tax loss assessment because, to use your

24   language, the defendants did not put on a defense.  So what

25   they think of the merits of the -- Ms. Rebeck's assessment,

1 what they think of the merits of the factual assertion

2 concerning the bank acquisition, what they think concerning the

3 defense's explanation for why those stock purchase agreements

4 were ever prepared, they may have a different perspective on

5 that now than they did before we began these hearings, and

6 that's why I think the wrap-up briefing is important.

7          MR. PENDERY:  Okay.  I agree, Your Honor.  I

8 understand.

9          THE COURT:  We end up with two different things; one

10 is just clarification on the tax loss assessment of the

11 transactions that postdate the receipt of the funds from Market

12 Shot and Mr. Cook, particularly with respect to funds coming

13 out of JDFX particularly to the defendant.

14          MR. PENDERY:  All right, Your Honor.

15          THE COURT:  And then after that updated tax loss

16 assessment, concluding briefs that summarize, based on the

17 record that we now have closed, your view of the merits of the

18 tax loss.  And I'm thinking that on that, because we have, as

19 you pointed out, all of the transcripts, and we can cite to the

20 record for factual propositions, 30 days?

21          MR. PENDERY:  Agreed.

22          MS. PARKER:  I'm sorry, Your Honor?

23          THE COURT:  Thirty days.

24          MS. PARKER:  Judge, certainly nothing longer than

25 that.  We would hope that it'd be completed by that.  Thirty

1   days from now, we will be more than a year past the verdict on

2   this case, and I think that we've had ample time to develop the

3   record, to be familiar with the record, and we should be able

4   to bring our calculations and assessments of that record to a

5   conclusion in a reasonable amount of time.

6           THE COURT:  Yeah, and you have the advantage of

7   having been here through the trial and defense counsel does

8   not.

9           MS. PARKER:  Well, that's not true, Your Honor,

10  Mr. Pendery was involved with the defense during the trial.

11  He's acknowledged that on the record.

12          MR. PENDERY:  Your Honor, I didn't attend the trial.

13          MR. DEPORRE:  The transcript's there, and he was a

14  participant behind the scenes and would be aware of what

15  developed there; ultimately a conviction.

16          MR. PENDERY:  Thirty days is fine, Your Honor.

17          THE COURT:  Fourteen and 30.  Anything else that we

18  need to cover today?

19          MR. HURFORD:  I'd just like to put one more thing on

20  the record, Your Honor.

21          THE COURT:  Sir.

22          MR. HURFORD:  I received a call from Central Michigan

23  University, and I also received information from my client's

24  brother.  Apparently Central Michigan University was served

25  with a subpoena for my client's academic records.  That was

1   returnable today.

2          Agents showed up at my client's employer and

3   delivered subpoenas to Mr. Pieron's brother to serve on the

4   employer and some other Australian company.  Those two

5   subpoenas that were served on the brother called for records

6   from 2010 to 2000 -- forward, and the academic record is the

7   academic record.

8          It appears to me, Your Honor, that the Government is

9   issuing subpoenas for a tax loss hearing that ended today, for

10  documents that aren't relevant to tax loss.  Maybe those are

11  sentencing documents, maybe they're something else, but I've

12  heard the words "reprehensible conduct" today from Ms. Parker,

13  and I've heard "obstruction of justice" from Ms. Parker, and at

14  the same time we're issuing subpoenas for a hearing for

15  documents that aren't relevant to the issue of tax loss, and I

16  would just ask --

17         THE COURT:  As I recall, the gentleman had quite a

18  distinguished academic record --

19         MR. HURFORD:  Oh, I have --

20         THE COURT:  -- and one would hope that that very

21  distinguished record would be included in the presentence

22  investigation report.

23         MR. HURFORD:  I would hope so, but we haven't gotten

24  to that point yet.  There's no other sentencing hearings set

25  yet, and when agents show up at my client's employer, with

1  additional subpoenas that are served on his brother for

2  documents that aren't relevant to a tax loss hearing, I start

3  to question the reasons why the Government is doing that. And

4  I just -- I wanted to make a record of it because I don't think

5  it's appropriate.

6          THE COURT: Let's distinguish the CMU subpoena from

7  what -- there's apparently a subpoena that had been issued to

8  the gentleman's brother?

9          MS. PARKER: No, Your Honor. It was issued to the

10  custodian of records for the two entities that the defendant

11  has said employs him. And, Your Honor, nothing has been

12  produced in compliance with that subpoena. The defendant has

13  told Pretrial Services that his employer is one entity.

14  Apparently he has reported his employer to the probation

15  officer as a different entity, which is an offshore company.

16  The other entity is basically a Grand Rapids entity.

17          Your Honor, I submit to the Court that relevant

18  conduct for purposes of intended tax loss includes all --

19  includes time frames outside of 2008 and 2009, and if the

20  subpoena had been complied with, which neither one was, then we

21  might have had some information relative to other years, and I

22  do think that will be relevant.

23          But I would just add that it was the defendant's

24  brother who was present at the listed address of the foreign

25  corporation and the domestic corporation which apparently was

1  exactly one in the same address.

2       THE COURT:  And located physically --

3       MS. PARKER:  In Grand Rapids.

4       THE COURT:  Okay.

5       MR. HURFORD:  And just for the record, Your Honor,

6  those subpoenas was served on Thursday for compliance today.

7       MS. PARKER:  They weren't that complex.  And besides,

8  the defendant filed a tax brief reciting the defendant's

9  academic record.  What's the objection, as the Court noted, to

10 obtaining that?

11      THE COURT:  Well, and not to that one.  The only

12 thing that I don't quite understand is the predicate for the

13 subpoenas concerning his current financial circumstance.  I'll

14 leave you to motion practice on the question of whether it's

15 subsumed by the concept of relevant conduct for purposes of

16 sentencing.

17      MR. HURFORD:  I just wanted to make a record, Your

18 Honor.  I don't represent the corporation that was subpoenaed

19 or the Australian corporation that was subpoenaed.  I'm not

20 going to make a statement on whether the service was proper,

21 but I don't represent them, so any motion practice or motion to

22 compel, I mean regarding that, have nothing to do with my

23 client or me unless I was hired by that company to respond to

24 the subpoena request.

25      My major concern is that I have federal agents going

1  into my client's current place of business issuing subpoenas to

2  his brother, and to me that borders on harassment when you

3  can't articulate relevance of those documents at a tax loss

4  hearing, especially based on dates alone.

5        THE COURT:  I appreciate your informing us.

6        We've got a schedule.  We'll summarize it by brief

7  order just to confirm it and get it docketed, and I do look

8  forward to your submissions.  The record's closed.  Thank you.

9        (At 10:07 a.m., court recessed.)

10

11

12

13              * * * * *

14           C E R T I F I C A T E

15      I certify that the foregoing is a correct transcript
        from the proceedings in the above-entitled matter.

16

17                    _Carol M. Harrison_

18   Date: 2-7-2020      Carol M. Harrison, RMR, FCRR
                         Official Court Reporter
19                       United States District Court
                         Eastern District of Michigan
20                       1000 Washington Avenue
                         Bay City, MI  48708

21

22

23

24

25