UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                         Case No. 18-20489

v.                                        Honorable Thomas L. Ludington

JAMES D. PIERON, JR.,

        Defendant.
_____/

**ORDER DIRECTING UPDATED TAX LOSS ASSESSMENT AND FINAL BRIEFING**

On July 18, 2018, an indictment was returned against the Defendant James D. Pieron for tax evasion. ECF No. 1. On March 7, 2019, a jury found the Defendant guilty of the offense.

**I.**

In April 2019, a status conference was conducted. The primary purpose for the conference was to address the Federal Sentencing Guideline issues that the parties anticipated would need to be resolved. Following the April status conference, the Government was directed to file a Tax Loss Assessment and the Defendant was directed to file a response. ECF No. 59.

The Government concluded that the Defendant's tax liability for 2008 and 2009 was as follows:

| | |
|---|---|
| 2008 criminal tax | $2,517,958.00 |
| 2008 tax penalties | $1,196,030.05 |
| 2008 interest | $1,243,822.90 |
| 2009 criminal tax | $777,320.00 |
| 2009 tax penalties | $369,227.00 |
| 2009 interest | $330,892.62 |
| Total Tax Loss | $6,435,250.57 |

ECF No. 60.

The Government's tax loss assessment relies on the accuracy of the income the Defendant reported on his form 1040s, income tax returns filed on January 16, 2012 for 2008 and 2009. They contend that the income reported is reasonably accurate (without reference to any source documents other than two Stock Purchase Agreements) – but reject the theft loss deduction and the basis for the sale of JDFX stock to Trevor Cook. ECF No. 60 at PageID.1097. The result was $15,250,000 of long-term capital gain for the Defendant's sale of the JDFX stock, reported by the Defendant to have occurred on January 4, 2008 and October 13, 2009. The Government's assessment assumes he had no offsetting basis for his sale of the JDFX stock. According to the Government, the tax due from the Defendant for 2008 and 2009 was $3,295,278 because he has acknowledged during the proceedings that he made no capital contribution to JDFX.

The Defendant concluded that the Government had no tax loss for 2008 and 2009. ECF No. 65. Defense counsel explained that this was traceable to three reasons, which notably, involved an entirely new and different explanation of the JDFX stock transaction(s) than that reported in any of his income tax returns or for that matter, during trial. First, Defense counsel explained that the revenue received for the sale of the stock was only $5,250,000 in 2008 and 2009 of the total $15,250,000 received from Cook. Second, counsel explained that Cook did not purchase the JDFX stock from the Defendant. On the contrary, counsel explained that Cook purchased treasury stock of JDFX and that the entity was organized under Swiss law in 2006. Third, the Defendant did not receive the proceeds from the sale of the JDFX stock. On the contrary again, the "bank records and source documents" proved that all of Cook's $15,250,000 were deposited into bank accounts owned solely by JDFX and not the Defendant's personal account.

Defense counsel has also offered one additional explanation during the course of the sentencing hearings. He argued that only $10,000,000 of Cook's funds were for the purchase of

the JDFX stock. He contends that the remaining approximately $5,250,000 was actually an advance by Mr. Cook to Pieron to be used as a deposit for the purchase of a bank, Banque DuBois. In making this suggestion, it is notable that Mr. Pieron has not explained how the transaction should be addressed under the United States tax code

## II.

Facing fundamentally inconsistent factual assertions, the Court sought additional information by supplemental briefing during the course of the sentencing hearings. The parties offered proofs over five days on November 14, 2019, December 3, 2019, December 20, 2019, January 14, 2020, and February 5, 2020. The Defendant presented two witnesses, Chelsea Rebeck and Kim Pavlik.

### A.

Chelsea Rebeck was qualified as an expert witness pursuant to Federal Rule of Evidence 702. She referred to numerous documents she had been furnished by the Defendant or his counsel corroborating the suggestion that the funds received from Cook were to capitalize a new JDFX entity. This included a "Share register" with a date of December 15, 2006 listing three JDFX shareholders: Market Shot LLC (Cook's company), the Defendant, and Clive Diethelm. ECF No. 117-16. According to the register and accompanying share certificates, JDFX had 10,000,000 registered shares. On December 15, 2006, 2,000,000 shares were issued to Market Shot LLC, 1,000,000 shares were issued to Clive Diethelm, and 7,000,000 shares were issued to the Defendant. She contended that the Defendant "sold no shares to Cook and thus no actual capital asset was sold." ECF No. 117 at PageID.2507.

Ms. Rebeck also relied on the Government's Exhibit 138 from trial. It consisted of a summary of various bank transaction reports from 2006 to 2009 documenting the receipt of funds

by JDFX. Ms. Rebeck contended that pursuant to Exhibit 138, the $10,000,000 of wire transfers in 2006 and 2007 cannot be characterized as a capital gain to Pieron because all the funds were received by JDFX, not Pieron. ECF No. 117 at PageID.2509. That is, Cook purchased the shares directly from JDFX. She further explained that contrary to the 2008 and 2009 tax returns, the Defendant did not receive $10,000,000 in 2008 and $5,250,000 in 2009. *Id.* Ms. Rebeck had no explanation for why Pieron reported his personal sale of the JDFX stock on his returns nor could she explain why the Stock Purchase Agreements which will be referred to hereafter were prepared and executed.

Defense counsel also had Ms. Rebeck read into evidence an interview between Cook and IRS Criminal Investigation agents in which Cook claimed that he never purchased more than 2,000,000 shares of JDFX stock. He characterized the transfers in 2006 and 2007 as purchasing his 2,000,000 shares. The remaining transfers of $5,250,000 were not for an additional 1,500,000 shares of stock (bringing his total shares to 3,500,000 consistent with the June 2009 Share Certificate), but instead for the attempted purchase of a bank. Cook claimed that:

> [H]e never agreed to purchase more shares of JDFX stock. Cook stated …he didn't sign the purchase agreement but he probably authorized Pieron to sign his name on it. Cook said Pieron told him that he had a chance to buy a bank in Zurich called Banque Du Bois. Pieron told Cook that if he bought the bank, he would be able to get other larger clients to invest in his hedge fund. Cook said Pieron told him he needed $5 million security deposit to lock in JDFX as the buyer and he would get the deposit back when the sale was completed. Cook sent one of his employees, Thomas Richardson, to Zurich to look at the bank before sending the money to Pieron. Richardson told Cook the bank did exist and had its own international bank number. Cook said he wired $2.1 million on 12/17/2008, 2.125 million on 1/23/2009, and 1.025 million on 5/26/2009 to JDFX to be used for the security deposit.

ECF No. 139 at PageID.3138-39.

It is unclear how Cook's testimony comports with the Defendant's argument. According to Cook, the final $5.25 million to JDFX were not for the purchase of additional shares of JDFX

stock, but rather, for a deposit on the purchase of Banque Du Bois. The situation is further complicated by the fact that one of the Defendant's previous briefs provides:

> In 2008, Pieron attempted to buy Banque DuBois, a bank in Zurich, Switzerland, so that his company could trade derivative and hedge funds through a bank. He put $2,500,000 down as a deposit.

ECF No. 117 at PageID.2513. In summary, it is unclear how much money was used for the deposit on the purchase of Banque Du Bois and who furnished the funds: Cook, Pieron, or JDFX.

### B.

The Defendant then called CPA Kim Pavlik as a witness, the preparer of the amended tax returns that Ms. Rebeck claimed were inaccurate.

The Defendant had previously filed returns with the assistance of another tax preparer, Carol Nathan of American Tax Preparers, who testified during the trial. In June 2010 after the Defendant had moved back to the United States, the Defendant hired Nathan to prepare his tax returns for 2007, 2008, and 2009. Nathan determined that the Defendant had sold shares of JDFX and consequently owed substantial taxes for the years 2008 and 2009, specifically:

|      | Acquired | Sold     | Price       | Basis       | Gain        |
|------|----------|----------|-------------|-------------|-------------|
| 2008 | 1/14/04  | 2/4/08   | $9,346,617  | $6,675,034  | $2,671,583  |
| 2009 | 1/14/04  | 10/13/09 | $4,450,460  | $3,276,786  | $1,173,674  |

In December 2010, the Defendant contacted Pavlik. ECF No. 144 at PageID.3314. The Defendant told Pavlik that "he believed he had a large capital gain and was trying to understand the implications of a large capital gain and then a subsequent large capital loss." *Id.* at PageID.3316. He also told Pavlik that he did not have confidence in Nathan as his tax preparer. Despite the Defendant's apparent dissatisfaction with Nathan, the next month, he filed the 2007, 2008, and 2009 tax returns prepared by Nathan, bearing both Nathan's signature and his own. ECF

Nos. 112-4, 112-5, 112-7. Pavlik was not involved in the preparation or filings of these initial returns. ECF No. 144 at PageID.3317-18.

Pavlik's next interaction with the Defendant was late the following year. The Defendant "asked more specific questions and wanted [Pavlik] to take a look at those tax returns." ECF No. 144 at PageID.3317. Pavlik subsequently assisted the Defendant prepare his amended tax returns for 2008 and 2009. *Id.* Like Nathan, he determined that the Defendant had sold shares of JDFX stock. However, he concluded that the Defendant owed more in tax from his sale of JDFX stock than Nathan had calculated.

|      | Acquired | Sold    | Price        | Basis     | Gain        |
|------|----------|---------|--------------|-----------|-------------|
| 2008 | 1/14/04  | 2/4/08  | $10,000,000  | $710,129  | $9,289,871  |
| 2009 | 1/14/04  | 10/13/09| $5,250,000   | $0        | $5,250,000  |

Pavlik testified that the Defendant had furnished him with two documents, both titled "JDFX Holding AG Equity Shares Sale and Purchase Agreement." *Id.* at PageID.3341-42. Both documents identified the Defendant as the seller of JDFX Holding AG shares and Market Shot as the Purchaser. ECF Nos. 112-11, 112-12. However, it was not until Pavlik was preparing for the Defendant's sentencing hearing that he was informed by the Defendant or Defendant's counsel that the Defendant had not in fact sold his JDFX stock, but instead, it was treasury stock issued by JDFX to Market Shot. *Id.* at PageID.3344-45.

> [A]t the time I prepared the amended returns, the concern was that not all the proceeds were reported by the prior preparer, and I based it on the sales documents that said there was a capital gain -- or a stock sale of January 1st, 2008, and another stock sale January 1st, 2009, from Mr. Pieron individually.
>
> Subsequently I found out that the transaction really was a sale of stock from the company to the purchaser, which would have changed the answer, but at the time that I prepared the returns, I was basing those returns based on the stock transaction that showed a sale of January 1st, 2008 individually, and a sale January 1st, 2009. I didn't have the information that I subsequently found out, you know, many, many

years later that the sale actually occurred between the company and the purchaser directly.

ECF No. 144 at PageID.3337-38.

According to Pavlik, the Defendant also told him that he contributed $3.5 million to JDFX. However, the Defendant did not tell him where he obtained the $3.5. million nor did he furnish information corroborating his assertion that he invested the $3.5 million with JDFX. *Id.* at PageID.3406-07.

Importantly however, once JDFX was organized and operational, the Government believes that the Defendant had a tax basis on his remaining shares of $15,250,000. The Defendant believed his tax basis to be zero (ECF No. 139 at PageID.3152) or $3,500,000. ECF No. 146 at PageID.3514.

### III.

Because the Defendant has no financial statements or other records of JDFX's business, it was difficult for either the Defendant or the Government to address the Defendant's business transactions with JDFX or the tax implications of that business before it was liquidated in approximately November 2009. For example, it appears that the Defendant at one point borrowed $7,500,000 from JDFX, utilized it for a currency trade, and returned the funds to JDFX. It is unknown or at least unclear whether his trades were profitable. ECF No. 144 at PageID.3416. However, when JDFX was ultimately liquidated, it appears that he received approximately $3,200,000 of liquidation proceeds. That is, approximately $800,000 was invested in IB Tech and approximately $800,000 in Komplique. ECF No. 144 at PageID.3373. The remaining $1,600,000 was salvaged to repay family loans and advisors. ECF No. 146 at PageID.3499-3550. Because it was Pavlik's understanding that Pieron had contributed approximately $3,500,000 when it was organized, his receipt of the liquidating distributions were reported as a return of capital, thereby

reducing his loss on the investment. ECF No. 144 at PageID.3405. To be clear, Pavlik believed that JDFX had been capitalized with the $15,250,000 from Cook/Market Shot and in addition, the $3,500,000 that Pieron told him he had contributed. *See* ECF No. 146 at PageID.3497; ECF No. 146 at PageID.3500.

## IV.

The hearings have provided the Court and the parties with a more detailed factual record of the Defendant's transactions though importantly, none of the principals of JDFX, its employees or any other third party involved with JDFX business have testified. The parties will be directed to update and revise their respective Tax Loss Assessments if appropriately based upon anything learned during the sentencing hearing.

Counsel will also be directed to furnish final briefing on the Defendant's guideline range based on the facts demonstrated during trial and in the course of the sentencing hearings. §2T1.1 addresses sentencing guidelines for crimes of tax evasion. It provides:

(a) Base Offense Level:

    (1) Level from § 2T4.1 (Tax Table) corresponding to the tax loss; or

    (2) 6, if there is no tax loss.

(b) Specific Offense Characteristics

    (1) If the defendant failed to report or to correctly identify the source of income exceeding $10,000 in any year from criminal activity, increase by 2 levels. If the resulting offense level is less than level 12, increase to level 12.

    (2) If the offense involved sophisticated means, increase by 2 levels. If the resulting offense level is less than level 12, increase to level 12…

The tax table at §2T4.1, as it is relevant, provides as follows:

| **Tax Loss** (apply the greatest) | **Offense Level** |
|---|---|
| (A) $2,500 or less | 6 |

| | | |
|---|---|---:|
| **(B)** | More than $2,500 | 8 |
| **(C)** | More than $6,500 | 10 |
| **(D)** | More than $15,000 | 12 |
| **(E)** | More than $40,000 | 14 |
| **(F)** | More than $100,000 | 16 |
| **(G)** | More than $250,000 | 18 |
| **(H)** | More than $550,000 | 20 |
| **(I)** | More than $1,500,000 | 22 |
| **(J)** | More than $3,500,000 | 24 |
| **(K)** | More than $9,500,000 | 26 |

## V.

Accordingly, it is **ORDERED** that the parties are directed to update and revise their Tax Loss Assessments by **February 21, 2020** together with a summary of the payments made by the Defendant for those two years.

It is further **ORDERED** that the parties are directed to file final briefing on the Defendant's guideline range by **March 9, 2020**.

Dated: February 10, 2020                              s/Thomas L. Ludington
                                                       THOMAS L. LUDINGTON
                                                       United States District Judge