UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,                    Case No. 18-CR-20489

                         Plaintiff,          Thomas L. Ludington
          v.                                 United States District Judge

                                             Patricia T. Morris
JAMES D. PIERON, JR.,                        United States Magistrate Judge

                         Defendant.
_____/

**GOVERNMENT'S FIFTH SUPPLEMENTAL BRIEF
ON INTENDED TAX LOSS ISSUES**

In the discussion below, the government will address the court's most recent

order for supplemental briefing on guidelines sentencing issues under USSG

§§2T1.1 and 2T4.1 in the aftermath of six evidentiary tax loss hearings.  The

resolution of the sentencing issues under USSG §2T must begin with determining

the tax loss intended by James D. Pieron, Jr.  (R. 152: Order, 3791-99).  Despite

the hearings afforded Pieron on the issue of intended tax loss, the government

submits that the correct calculation of the tax loss intended by Pieron has not

changed over the course of the hearings.[1]  Consequently, the intended tax loss falls

_____

[1] As directed by the court, detailed intended tax loss calculations were submitted
initially to the court, defense counsel and the probation office via email on March
21, 2019, and subsequently filed under seal on April 12, 2019.  See also R. 126:
Government's Response to Defendant James Pieron, Jr.'s Supplemental Brief,
2858-64, at 2864; R. 128: Government's Third Supplemental Brief, 2873-75.

1

within the more than $3,500,000 but not more than $9,500,000 range in USSG
§2T4.1(J), and results in a base offense level of 24 under USSG §2T1.1(a)(1).
(Government's Criminal Tax Loss Calculations, filed under seal on April 12, 2019;
R. 128: Government's Third Supplemental Brief on Tax-Loss Issues, 2873-75.
See also R. 131: Government's Fourth Supplemental Brief, 2891-2931).

## Analytical Framework

The issue before the court is the tax loss intended by Pieron before his crime
was discovered, not any tax loss that might be recomputed 10 years after the
transactions at issue by using incomplete and contradictory records that Pieron
withheld from his tax return preparers and the IRS.  The *intended* tax loss for
which James Pieron is responsible under the sentencing guidelines must be used in
determining Pieron's base offense level under USSG §2T1.1(a).  USSG
§2T1.1(c)(1) provides, "If the offense involved tax evasion or a fraudulent or false
return, statement, or other document, the tax loss is the total amount of loss that
was the object of the offense (*i.e*, the loss that would have resulted had the offense
been successfully completed)."  The Sixth Circuit has explained that "[t]he amount
of loss is based on the loss the defendant intended to inflict and not the
government's actual loss." *United States v. Daulton*, 266 F. App'x 381, 387 (6th
Cir.2008) (citing *United States v. Kraig*, 99 F.3d 1361, 1370–71 (6th Cir.1996)).
*See also*, *United States v. Tandon,* 111 F.3d 482, 490–91 (6th Cir.1997*)* (tax loss
based on understated tax on returns, not on whether government ultimately lost

2

money).  The focus on intended tax loss is particularly appropriate in this case, because Pieron stands convicted of *attempted* tax evasion.

Likewise, the court is not to approach the process of determining intended tax loss as if it were conducting a civil audit or computing the income taxes that would have been owed by Pieron if he had provided accurate and complete source documents to his return preparers and enabled the preparers to prepare his tax returns accurately.  The court is to make a reasonable estimate, not a precise determination, of the *intended* tax loss amount for which James D. Pieron, Jr. is responsible.  USSG §2T1.1, comment. (n. 1).  *E.g.*, *United States v. Olive*, 804 F.3d 747, 758 (6th Cir. 2015).  "[N]either the government nor the court has an obligation to calculate the tax loss with certainty or precision[,]" because "[r]equiring precise calculations which entail the gathering of documents that are diffuse and/or difficult to obtain would reward a defendant whose tax fraud was particularly complex and/or spanned a significant period of time."  *United States v. Spencer*, 178 F.3d 1365, 1368 (10th Cir.1999).

Additionally, the court is required to include relevant conduct in the calculation of the tax loss.  *United States v. Rankin*, 929 F.3d 399, 407-08 (6th Cir. 2019).  The Sixth Circuit has held that "in determining the tax loss attributable to the offense, 'all conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated.'"  *United States v. Edkins*, 421

3

F. App'x 511, 516 (6th Cir. 2010).  The Sixth Circuit also reiterated its prior holding that "the guidelines permit 'the use of tax loss resulting from uncharged [criminal] conduct' in calculating total tax loss[.]"  *Id*., citing *United States v. Pierce*, 17 F.3d 146, 150 (6th Cir. 1994) (bracket in original).  *Accord*, *United States v. Lombardo*, 582 F. App'x 601, 619 (6th Cir. 2014) (noting that it was irrelevant that the defendant was not charged regarding some years used in computing the tax loss and holding that the loss properly included interest and penalties for those uncharged years).  Consideration of Pieron's relevant conduct would become especially significant in this case if the court accepted Pieron's post-trial claim that the $15.25 million in wire transfers from Cook should have been reported and taxed when Pieron received the wired funds in 2006, 2007 and 2008, rather than when Pieron's stock sales to Cook/Market Shot were made effective under the sale purchase agreements, as Pieron reported on his 2008 and 2009 original and amended returns.

Because the guidelines require the court to focus on Pieron's intended tax loss, the court must look to the available evidence of Pieron's intent.  The best evidence of Pieron's intent is in the representations (including omissions) that Pieron made to his many tax return preparers, his many attorneys, the SEC, and to the IRS, when he was committing the offense.  From that evidence, the court can discern that Pieron was not concerned with concealing the income he received from Cook/Market Shot, because Pieron knew his receipt of that $15.25 million

4

would be revealed in the SEC investigation.  Rather, Pieron's intent was to find a way to avoid and evade paying taxes on that income by any means or theory that would negate his tax obligation on that income.  The evidence revealing that intent is far more credible than the unsworn, post-conviction narrative that Pieron has concocted for sentencing purposes.

Finally, it is undisputed that Pieron filed his initial and amended 2008 and 2009 federal income tax returns, subject to the penalties of perjury, acknowledging very substantial income and a resulting unpaid tax obligation.  (R. 112-5: Govt. ex 40, 2008 Form 1040, at 1819; R. 112-6: Govt. ex 41, 2008 Form 1040X, at 1831; R. 112-7: Govt. ex 42, 2009 Form 1040, at 1852; R. 112-8: Govt. ex 48, 2009 1040X, at 1863).  To the extent that Pieron has attempted, post-conviction, to impeach his own sworn statements regarding his income, relying in large part on information that he withheld from his tax return preparers, Pieron should not be permitted to do so.

## Post-Conviction Proceedings

It is appropriate to begin the intended tax loss analysis by assessing what critical information has, and some of what has not, been revealed since Pieron's trial was concluded and the sentencing process began.

In his written briefs and during the six evidentiary hearings, Pieron has told the court and the government:

The theft loss theory is indefensible.  (*E.g.*, R.177: Defendant's Supplemental Brief on Tax Loss, p. 7 (sealed)).  The court and the government agree.  (*E.g.*, R. 112: Government's Supplemental Brief on Tax Loss Issues, 1786-98, at 1791-93; R. 126: Government's Response to Defendant's Supplemental Brief, 2858-64, at 2861-62).

The claim of right theory is indefensible.  (*E.g.*, R.177: Defendant's Supplemental Brief on Tax Loss, p. 7 (sealed)).  The court and the government agree.  (*E.g.*, R. 112: Government's Supplemental Brief, at 1793-95; R. 126: Government's Response to Defendant's Supplemental Brief, 2858-64, at 2861-62).

Pieron did not make a capital contribution in JDFX Holdings at its inception. The government agrees.  (*E.g.*, R. 112: Government's Supplemental Brief, at 1795-97; R. 125: Government's Second Supplemental Brief, 2841-52, at 2843-47).  The reasons for the government's agreement will be discussed in further detail below.

Pieron did not contribute $3.5 million to JDFX Holdings prior to 2008.  The government agrees.

Pieron did not have any basis in the stock sold to Cook/Market Shot.  The government agrees.  The government also reiterates that even if Pieron had the basis claimed on his amended 2008 return, his base offense under the federal sentencing guidelines would be the same as that calculated without the basis, because the criminal tax amount total would still be within the same $3.5 million to $9.5 million range.  (R. 128: Government's Third Supplemental Brief, 2873-75).

Reflective consideration of the intended tax loss hearings gives rise to various conclusions regarding what was <u>not</u> provided to the court by Pieron during those six evidentiary hearings.  Among the most important observations are that Pieron failed to provide an explanation for his failure to present all relevant source documents reflecting his personal income to his tax return preparers.

Trial testimony given by Pieron's stepfather, Christopher Werewega, and by Carol Nathan (American Tax Solutions, Inc.) revealed that Pieron provided little to no source documentation regarding his income for the years for which they prepared Pieron's tax returns.  Kim Pavlik's post-trial testimony was similar.

During the post-trial hearings, CPA Kim Pavlik said at least 38 times that he tried to "proof" Pieron's "net" income using spreadsheets, rather than source documents, provided to him by Pieron.  It is apparent from Pavlik's testimony that his "net proof" procedure consisted of nothing more than confirming that the figures provided by Pieron, primarily on various spreadsheets, were accurately reflected on Pieron's amended 2008 and 2009 tax returns.  Pavlik had no way of knowing whether Pieron was actually disclosing all of his income because Pieron did not give Pavlik all source documents that revealed Pieron's actual income. Unfortunately, Pieron has put the court and the government in the same position.

Most fundamentally, during the post-trial evidentiary hearings, Pieron did not provide a legally and factually sound reason for disregarding the income information he did give to his tax preparers (Nathan and Pavlik), and the IRS, for

7

2008 and 2009.  Pieron alone controlled the information he gave to and withheld from his tax return preparers.  By controlling the flow of information to his return preparers, Pieron dictated what was (and was not) reported on his returns, including his attested 2007 return and his original and amended 2008 and 2009 returns.  Pieron's sworn tax returns cannot be discredited as the product of his return preparers' mistakes.

### Response to Observations in February 10, 2020 Order [R. 152]

The government's intended tax loss assessment does rely in part on the accuracy of the income reported on Pieron's amended 2008 and 2009 returns. Pieron's initial and amended 2008 and 2009 returns contain the only sworn evidence of Pieron's income for those years.  Moreover, Pieron personally chose to report the income from his sales of JDFX Holdings stock to Cook in 2008 and 2009 on both his original and amended returns, and to achieve that result on his amended 2008 and 2009 returns, Pieron gave Pavlik sale purchase agreements to support assigning the stock sale income to those years.

As discussed previously, Pieron's amended returns were more accurate than his original returns:  Pieron initially told Nathan that the stock sale prices were $9,346,617 in 2008 and $4,450,460 in 2009, but on Pieron's amended returns, he accurately reported sale prices of $10 million for 2008 and $5.25 million for 2009. Thus, Pieron's amended 2008 and 2009 returns were more accurate regarding his income, but false as to his claimed basis in 2008 for the stock he sold.  (R. 112:

8

Government's Supplemental Brief, 1786-98, at 1790-91; R. 125: Government's

Second Supplemental Brief, 2841-57, at 2843-48.  See also, R. 131: Government's

Fourth Supplemental Brief, 2891-2900, at 2899-2900, discussing additional

income not reported by Pieron on his 2008 and 2009 returns).

Pieron's recently-minted claim that $5.25 million of the money he received

from Cook was not income to Pieron because that sum "was actually an advance

by Mr. Cook to Pieron to be used as a deposit for the purchase of a bank, Banque

DuBois[,]" (R. 152: Order, 3792-93, 3794-95), has been proven false.  Pieron paid

the $2.5 million deposit **from his personal account** for the purchase of the bank

on **December 1, 2008** (Govt. ex 217, wire transfer confirmation, attached; R. 131-

7: Govt. ex 215, letter demanding return of bank purchase deposit, 2930-31).

Pieron's contemplated bank purchase collapsed by **February of 2009,** after which

he tried to get his deposit returned to him.  (*Id.*).

If one accepts the dubious proposition that Cook's statement to federal

criminal investigators should be believed, Pieron thereafter defrauded Cook of

$5.25 million by convincing the unwitting Cook to send Pieron a series of wire

transfers ($2.1 million on **December 18, 2008,** $2.125 million on **January 23,**

**2009**, and $1.025 million on **May 26, 2009**) for the purchase of the bank.  (R. 142:

Tr., 3272-80; R. 114-85: Govt. ex 138, at 2422).  However, until he was convicted

by a jury, Pieron maintained that he received that $5.25 million from Cook in

exchange for stock in JDFX Holdings, and presented documentation to substantiate

that explanation for the $5.25 million in wire transfers he had received from Cook. (*E.g.*, R. 131-2: Govt. ex 202(a), Sale and Purchase Agreement, 2914-17; R. 112-14: Govt. ex 204, Pieron letter to Pavlik, 1921; R. 112-17: Govt. ex 207, Offer in compromise, 1973-93, at 1977).

Under either scenario, the $5.25 million was income to Pieron and taxable as such.  Moreover, Pieron had no legitimate deduction in the form of JDFX Holdings stock basis to reduce the amount he owed the IRS on that income, whether it be from a stock sale to Cook or criminally derived income from a fraud on Cook.

Further discussion of the issue of Pieron's lack of basis is warranted, however.  One source of confusion seems to be Pieron's failure to differentiate between a variety of entities with names beginning with JDFX.

As the government demonstrated during the trial, Pieron controlled the financial accounts of his JDFX entities, such as JDFX Technology, Inc., JDFX RMS, JDFX Fund, JDFX Fund Management, and JDFX Holdings, as well as other entities he controlled, including Komplique, ILQ, IB Tech, and IB Tech Trading, and commingled his own funds with those of his various entities.  Pieron could and did move money between his entities at will, including JDFX Holdings.  (R. 145-7: Govt. ex 224, proxy agreement, 3463).  Indeed, due to his unlimited authority over the finances of his entities, Pieron did not find it necessary to maintain records accounting for his use of funds within his entities or of his movements of funds between his entities and his personal account.  Because Pieron did not recognize a

distinction between personal and corporate accounts, the court should not ascribe any benign significance to Pieron's insistence that certain funds went into Pieron's various corporate accounts rather than his personal financial accounts.

The distinction between JDFX Holdings and other entities controlled by Pieron is also helpful in discerning the absence of any basis for Pieron's stock sales to Cook/Market Shot.[2]  Pieron sold shares in JDFX Holdings, not any of his other JDFX entities, to Cook/Market Shot.  Pieron has conceded that he did not invest any capital in JDFX Holdings, and his concession is consistent with the evidence. As previously demonstrated, Pieron's 2000 to 2007 tax returns reveal that he did not have the means to make a significant financial contribution to JDFX Holdings during that 2000 to 2007 time period.  Rather, his total reported income for that eight year period was $386,092.  (R. 112: Government's Supplemental Brief, at 1797; R. 125: Government's Second Supplemental Brief, at 2845-46).  Similarly, Pieron has properly conceded that he did not contribute $3.5 million to JDFX

---

[2] The distinction between JDFX Holdings and JDFX Fund Management is also significant on another matter, should there be any lingering question regarding the legitimacy of Pieron's abandoned theft loss theory.  Though Kim Pavlik testified that he was unaware of any distinction between Pieron's various entities, in part because he did not do corporate returns for Pieron, the evidence shows that Deutsche Bank terminated JDFX Fund Management's foreign exchange trading account, not an account for JDFX Holdings.  (R. 145-3: Deutsch Bank letter, 3456).  This fact makes Pieron's desperate pursuit of a theft loss theory to eliminate the tax on his income from his sales of JDFX Holdings stock less sustainable, if possible, then would have been the case if the terminated account had belonged to JDFX Holdings.

Holdings prior to 2008.  In addition, as the court noted in its order, Pieron did not contemporaneously document such an investment for Pavlik before Pieron was convicted.  (R. 152: Order, at 3797).[3]

Finally, Govt. ex 138 must not be misinterpreted to suggest that Pieron ever made a capital investment in JDFX Holdings that gave Pieron any basis in the stock he sold to Cook.  Govt. ex 138 shows that Pieron had income, that he exercised control over the funds reflected in the transactions included in that exhibit, and that Pieron used the various transactions as part of his attempt to evade and defeat collection of the taxes he personally owed to the IRS.  The government certainly does not believe that Pieron "had a tax basis on his remaining shares of $15,250,000." (R. 152: Order, at 3797).  Rather, because Pieron "has no financial statements or other records" for his business entities, including JDFX Holdings (*id.*), no one, including Pieron, knows what funds, if any, were used by Pieron to make a capital investment specifically in JDFX Holdings.  What is known, as Pieron has now conceded, is that Pieron did not have any basis in the JDFX Holdings stock he sold to Cook/Market Shot, thereby generating considerable income for Pieron.

---

[3] Pavlik regularly, but unwisely, relied on Pieron's undocumented representations regarding the $3.5 million capital investment and other matters in preparing the amended 2008 and 2009 tax returns attested by Pieron.

## 2008 and 2009 Payments

In its order, the court asked for a summary of the payments made by Pieron for 2008 and 2009.  (R. 152: Order, at 3799).  Controlling Sixth Circuit authority and the federal sentencing guidelines make clear that payments made when the defendant is aware of the investigation may not be considered in determining the intended tax loss or the defendant's sentence.  Pieron made no payments on his 2008 and 2009 taxes until 2012, when he was well aware that he was under investigation by the IRS.

The guidelines provide, "The tax loss is not reduced by any payment of the tax subsequent to the commission of the offense."  USSG §2T1.1(c)(5).[4]  Likewise, the Sixth Circuit has held that for guidelines purposes, "the relevant point in time for determining loss is at the time the crime was detected, rather than at sentencing[.]"  *United States v. Flowers*, 55 F.3d 218, 221 (6th Cir. 1995) (determining loss in fraud context), and *United States v. Maddux*, 917 F.3d 437, 450 (6th Cir. 2019) (applying *Flowers* in tax fraud case).  Further, tax loss "is based on the amount by which the income was understated on the false tax returns and not on whether the government ultimately lost money." *United States v.*

---

[4] As previously stated, USSG §2T1.1(c)(1) provides, "If the offense involved tax evasion or a fraudulent or false return, statement, or other document, the tax loss is the total amount of loss that was the object of the offense (*i.e*, the loss that would have resulted had the offense been successfully completed)."

*Tandon,* 111 F.3d 482, 490–91 (6th Cir.1997).  Consequently, the Sixth Circuit has

observed that to allow a defendant like Pieron "to nullify much of the burden of his

crime simply by paying the tax liability once the IRS ha[s] begun to audit or

investigate" his crime would yield "perverse result[s]." *Tandon*, 111 F.3d at 490.

Pieron therefore cannot invoke payments made when he was aware of the IRS

investigation to reduce his guidelines score for his crime of conviction.

Nevertheless, the various "payments" made on Pieron's 2008 and 2009 tax

obligation – voluntarily and otherwise – are detailed in the footnote below.[5]

### Conclusions

First, the court need only estimate the tax loss intended by Pieron, not

determine the actual tax loss that may have been incurred by the IRS, in computing

Pieron's base offense score under USSG §§2T1.1(a) and 2T4.1.  *E.g.*, *United*

---

[5] Pieron first "payment" towards his 2008 and 2009 unpaid tax obligation was
made <u>involuntarily</u> in April of 2012, when the IRS applied Pieron's claimed 2011
refund of $17,196 to his unpaid tax obligation for 2008.  Similarly, Pieron's
claimed refunds for 2012, 2013, 2014, 2015 and 2017, totaling an additional
$42,254.54 were applied <u>involuntarily</u> to Pieron's 2008 and 2009 tax indebtedness
by the IRS.  Attempting to keep the IRS at bay, Pieron made four voluntary
installment payments of $1,500 between May and October of 2012, for a total of
$6,000.  In a further and very belated attempt at forestalling this prosecution, on
the eve of indictment (posted March 26, 2018), Pieron submitted a $627,244.62
check (with the notation "IRS bond") to the IRS, and after indictment (posted
October 3, 2018), submitted an additional $242,872.52 (with the same notation).
All of those funds were applied to Pieron's unpaid but self-reported taxes for 2008
and 2009.  Finally, on the day after he was found guilty, the IRS posted an
electronic payment of $2,789.59 to Pieron's account for his unpaid 2009 taxes.

*States v. Kraig*, 99 F.3d 1361, 1370-71 (6th Cir. 1996); *United States v. Daulton*, 266 F. App'x 381, 387 (6th Cir. 2008); *United States v. Tandon,* 111 F.3d 482, 490–91 (6th Cir.1997*)*.

Second, in *Raymond v. United States*, 511 F.2d 185, 189-91 (6th Cir. 1975), the Sixth Circuit placed the burden squarely on the non-paying taxpayer to present contemporaneous evidence, not testimony given years later, regarding the proper characterization of a transaction. The Sixth Circuit emphasized that the contemporaneous evidence requirement was essential to minimize the danger that people like Pieron will wait to characterize transactions until the tax consequences of the characterizations are known. Therefore, Pieron cannot use post-conviction, revisionist-analysis, based on information that was not made available to his tax preparers or the IRS while Pieron pursued his tax evasion scheme, to influence the intended loss for which he is responsible for sentencing purposes.

Finally, as a result of these established concepts, the tax loss for which James D. Pieron, Jr., must be held accountable remains within the $3.5 million to $9.5 million range previously calculated by the government,[6] and Pieron's base offense level under the sentencing guidelines is 24. Pieron's offense level should be raised 2 points pursuant to USSG 2T1.1(b)(1) for having failed to report or

---

[6] Though interest has accrued, and will continue to accrue, until Pieron's sentence is imposed, the additional interest does not alter Pieron's base offense level.

correctly identify the source of more than $10,000 obtained from criminal activity in 2008 and 2009.[7]  Pieron's offense level should also be increased by 2 points under USSG 2T1.1(b)(2) because he used sophisticated means, including off-shore bank accounts and other measures, to deceive his tax preparers, including CPA Kim Pavlik, and to evade and defeat collection by the IRS of Pieron's unpaid 2008 and 2009 taxes.

Respectfully submitted,

Date:  February 21, 2020

Matthew Schneider
United States Attorney

s/Jules M. DePorre
Jules M. DePorre (P73999)
Assistant U. S. Attorney
600 Church Street
Flint, Michigan 48502-1280
(810) 766-5026
jules.deporre@usdoj.gov

s/Janet L. Parker
Janet L. Parker (P34931)
Assistant U.S. Attorney
101 First Street, Suite 200
Bay City, MI 48708
(989) 895-5712
janet.parker2@usdoj.gov

Certificate

On February 21, 2020, I filed this pleading by using the Clerk of the Court's ECF system.  The ECF system will automatically serve counsel of record.

s/Janet L. Parker

---

[7] Pieron knew that Cook was under investigation by the SEC, and had reason to suspect that the same was true for himself, when Pieron transferred at least $1.6 million to his U.S. companies, and additional substantial sums to his family and advisors (R. 152: Order, 3797), while falsely telling the SEC that he did not have money left from his stock sales with Cook.  There is also a possibility that Pieron fraudulently obtained $5.25 million in 2008 and 2009 from Cook by using the Banque DuBois ploy.  USSG 2T1.1(b)(1) applies to either scenario.