# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# NORTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

JAMES D. PIERON, JR.,

        Defendant.

Case No. 18-cr-20489 (TLL)(PTM)
Hon. Thomas L. Ludington

## DEFENDANT'S BRIEF CONCERNING GUIDELINE RANGE

This Court has ordered final briefing on defendant James D. Pieron, Jr.'s guideline range "based on the facts demonstrated during trial and in the course of sentencing proceedings." (Order, Feb. 21, 2020: R. 152, at PgID 3791–99.)[1]

### Argument

Even assuming Pieron sold his personal shares of JDFX to Market Shot LLC, Pieron has no tax liability for tax years 2008 and 2009. Capital gains from

---

[1] As a preliminary matter, this Court has held that Pieron is judicially estopped from arguing that Cook/Market Shot LLC were issued treasury stock directly from JDFX. (Order, Oct. 23, 2019: R. 129, at PgID 2878.) Pieron continues to object to the application of the doctrine of judicial estoppel in a criminal proceeding. However, Pieron does not rely on that factual argument in this revised tax assessment to comply with the Court's order.

Accordingly, this brief assumes, *arguendo*, Pieron transferred his own shares of JDFX to Market Shot LLC.

any sale of stock evidenced by the 2008 Sale and Purchase Agreement (the "2008 SPA") result in income to Pieron prior to 2008.  And capital gains from any sale of stock evidenced by the 2009 Sale and Purchase Agreement (the "2009 SPA") are completely offset by Pieron's loss in the same year—whether the loss is characterized by capital loss or business bad debt.  The government has offered no argument or evidence to the contrary.

**A.     Tax loss**

At the outset of the tax loss hearings, this Court held that the government bears the burden to prove Pieron's taxable income in 2008 and 2009.  (Order, Oct. 23, 2019: R. 129, at PgID 2882.)  It may not rely on Pieron's tax returns "as appearing to be consistent with source documents.  It must prove what the bank records demonstrate." (Id.); *see also Gregory v. Helvering*, 293 U.S. 465, 469 (1935).

### 1. The government's tax loss proofs and position

The government's position continues to be that Pieron has tax liability based on a $10 million capital gain in 2008 and a $5.25 million capital gain in 2009. (Gov. Br.: R. 155, at PgID 3182–33.)[2]  Aside from Pieron's tax returns, the

---

[2] To arrive at this result, the government removed deductions from the returns—the amended 2008 tax return contained a theft loss deduction of $7,008,651 (Gov. Ex. 41: R. 112–6, at PgID 1832), and the 2009 tax return contained a theft loss deduction of $4,712,804 (Gov. Ex. 48: R. 112-8, at PgID *(footnote continued on following page)*

2

government presented no evidence that Pieron personally received funds from any sale of JDFX stock to Market Shot LLC. (Id., at PgID 3102.)

> Court: . . . You're relying on the return, not on the source documentation of the receipt of the revenue?
>
> Mr. DePorre: Correct.

(Id.)

The government did not prove what the bank records demonstrate. Instead, without putting on a single witness, the government did what this Court held would be insufficient—the government relied on Pieron's tax returns *alone* to prove taxable income in 2008 and 2009. (Hr'g. Tr., Nov. 14, 2019: R. 139, at PgID 2091–93.)

### 2. Pieron's tax loss proofs and position

At the tax loss hearings and in tax loss briefing, Pieron presented uncontested evidence and argument that he has no tax liability for 2008 or 2009.

    a.   <u>2008</u>

The documents entered into evidence at trial and at the tax loss hearing, as well as the testimony of Chelsea Rebeck and Kim Pavlik established Pieron has no

---

1865).
    It should be noted that the IRS accepted Pieron's 2008 amended tax return, containing the theft loss deduction of approximately $7 million. The IRS also rejected the 2009 amended tax return (a result that is logically inconsistent with the acceptance of the 2008 amended tax return).

3

capital gain in 2008.[3]

The following documents establish that any capital gains resulting from the 2008 SPA are income to Pieron in 2006 and 2007, not 2008:

- The 2008 SPA (Gov. Ex. 201: R. 112-11, at PgID 1911–14);

- The 2007 Proxy Agreement (Gov. Ex. 224: R. 145-7, at PgID 3463); and

- The Wells Fargo wire transfer records (Gov. Ex. 138: R. 114–85, at PgID 2420–31).

It is undisputed that payments made pursuant to the 2008 SPA agreement were made in 2006 and 2007. (Gov. Ex. 138: R. 114–85, at PgID 2420–31; Order, Dec. 6, 2019: R. 141, at PgID 3228.) It is undisputed that the 2008 SPA gave Market Shot LLC shareholder rights in 2007. (Gov. Ex. 201: R. 112-11, at PgID 1912 ("The Purchaser agrees to purchase from the Seller the (the 'Shares') and qualification for dividends for the first time as of the business year 2007 of the Company, beginning on March 1, 2007.").) And it is undisputed that Market Shot LLC executed a proxy agreement on September 26, 2007, allowing Pieron and Dr.

---

[3] Rebeck was qualified as a tax expert by this Court. (Order, Feb. 10, 2020: R. 152, at PgID 3793.) Pavlik prepared and filed Pieron's amended tax returns for tax years 2008 and 2009. Pavlik is a CPA. He started his accounting career with Ernst and Ernst in 1977, which became Ernst and Young in 1990. In 1993, he formed the accounting firm of Andrews, Hooper and Pavlik in Saginaw, Michigan and worked there until he retired in 2018. (Hr'g. Tr., Dec. 20, 2019: R. 144, at PgID 3311.)

Felix Tschopp to exercise Market Shot LLC's shareholder voting rights. (Gov. Ex. 224: R. 145-7, at PgID 3463.)

Given these undisputed facts, Chelsea Rebeck and Kim Pavlik both testified that any capital gains arising from the 2008 sale and purchase agreement did not result in income to Pieron in 2008.

Chelsea Rebeck testified as follows.

> [E]ven if we were to come up with a hypothetical that the money that the company received is going to be imputed to him, the actual years in which it was received are not in line with what was filed on the tax returns. . . .
>
> I just didn't see how . . . [the deposit theory] would be applicable in this case. And part of that was my review of the stock purchase agreement and the fact that the stock rights were granted on March 1st of 2007, so to me that would negate any potential deposit theory. . . .
>
> It appears that the purchaser would receive all the rights of a shareholder on the date listed in the agreement, so whatever consideration was paid for that, I just can't see how it would be treated as a deposit when he's already gotten his shareholder rights on that date. So the money that was given would be in exchange for the shares on that date.

(Hr'g. Tr., Nov. 14, 2019: R. 139, at PgID 2128–32.)

Kim Pavlik agreed with Chelsea Rebeck. Pavlik confirmed he received the 2008 sale and purchase agreement and the 2007 proxy agreement prior to filing Pieron's amended returns. (Hr'g. Tr., Jan. 14, 2020: R. 146, at PgID 3545–46.) Pieron did not tell Pavlik he wanted to report capital gains in a particular year—

5

Pieron deferred to Pavlik's judgment. (Id., at PgID 3548.) Indeed, Pavlik made the decision as to when and how to report capital gains income. (Id.)

<u>Pavlik testified he made a mistake placing income from the 2008 SPA in tax year 2008</u>, and Pieron has no income in 2008 based on capital gains from the 2008 SPA. (Id. at PgID 3545–48.)

      b.   <u>2009</u>

As noted above, it is the government's position that Pieron has $5.25 million of capital gains in 2009 as a result of the funds sent from Market Shot LLC to JDFX in accordance with the 2009 SPA.

Unlike the 2008 SPA, the 2009 SPA did not convey shareholder rights to Market Shot LLC prior to its closing date. (Gov. Ex. 202a: R. 131–2, at PgID 2915 ("The Purchaser agrees to purchase from the Seller the (the "Shares") and qualification for dividends for the first time as of the business year 2009 of the Company, beginning on June 1, 2009.").) Accordingly, Pieron agrees with the government's position that any capital gains from the 2009 SPA are income to Pieron in 2009.

It is undisputed that Market Shot LLC sent $15.25 million to JDFX entities between 2006 and 2009. (Gov. Ex. 138: R. 114–85, at PgID 2420–31.) All of these funds "were deposited into bank accounts owned solely by JDFX and not the defendant's personal account." (Order: R. 152, at PgID 3792.). With the possible

6

exception of $3.2 million, it is undisputed all of the $15.25 million was lost upon liquidation or (with respect to $2.1 million) Bank du Bois's refusal to return a down payment for its purchase. [4] It is undisputed that JDFX was dissolved in November 2009. (Def. Ex. 16: R. 148-6, at PgID 3601–03.)

Rebeck testified that "if you have to include something as income, and you didn't actually receive it, then you're going to have to get a corresponding deduction." (Hr'g. Tr., Nov. 14, 2019: R. 139, at PgID 3172-73.) Pavlik agreed. If there was a sale of stock and the proceeds of the sale were sent directly to JDFX, "it would be a capital gain and then a subsequent loss when the company went under; either a theft loss, business bad debt, or a capital loss in 2009." (Hr'g. Tr., Dec. 20, 2019: R. 144, at PgID 3381.)

Regardless of whether the money Pieron never received is classified as business bad debt or a capital loss, Chelsea Rebeck testified that Pieron has no 2009 tax liability as a result of Cook's $5.25 million transfers to JDFX entities. (E.g., Hr'g. Tr., Nov. 14, 2019: R. 139, at PgID 3139, 3155, 3170, 3172.)

With respect to business bad debt, "it's treated as an ordinary loss in the year that the company's dissolved." (Id., at PgID 3170.)

---

[4] Indeed, the IRS acknowledged that at least approximately $7 million was not received by Pieron or lost upon JDFX's liquidation in 2009 when it accepted Pieron's 2008 amended tax return that contained a theft loss deduction for this amount. The IRS did not accept Pierons 2009 amended tax return that also contained a theft loss deduction.

7

> [O]rdinary loss is different from a capital loss in that you can deduct the full amount in the year in which it's generated, and anything additional over your income amount for that year either gets carried forward or carried back. In this circumstance, it would carried back. If he has a loan, based on the computations that I did on the . . . corrected tax returns . . . , it would wipe out all of his income for 2009.

(Id.)

Both Rebeck and Pavlik agree that, if the money Pieron "directed" to JDFX and lost upon liquidation is treated as a capital loss, Pieron can deduct the full amount of the loss against the $5.25 million in 2009 and has no tax liability as a result of any capital gains from the 2009 SPA. (Hr'g. Tr., Nov. 14, 2019: R. 139, at PgID 3172; Hr'g. Tr., Jan. 14, 2020: R. 146, at PgID 3548.)[5]

**B.    Sentencing guideline range**

The government has not met its burden of proof concerning Pieron's receipt of income in 2008 or 2009.

The evidence presented at trial and at the tax loss hearings established that Pieron did not personally receive funds transferred to JDFX by Market Shot LLC pursuant to the 2008 SPA or the 2009 SPA. (Order, Feb. 10, 2020: R. 152, at PgID 3792 (finding "the 'bank records and source documents' proved that all of . . . [Market Shot LLC's] $15,250,000 were deposited into bank accounts owned solely

---

[5]    Even if Pieron salvaged $3.2 million from JDFX's liquidation, the amount of ordinary loss or capital loss he can deduct in 2009 is $12.05 million. This is an amount sufficient to offset $5.25 million in capital gains income.

8

by JDFX and not the Defendant's personal account").)[6] And even if the government met its burden of proof regarding Pieron's receipt of income resulting from the 2008 SPA or the 2009 SPA, Pieron still has no tax liability for tax years 2008 or 2009.

<u>Tax Year 2008</u>. With respect to the 2008 SPA, the government did not meet its burden of proving income in tax year 2008. To the contrary, as noted above, the documents and testimony presented at the tax loss hearing establish any income from the 2008 SPA was income to Pieron in tax years 2006 and 2007.

<u>Tax Year 2009</u>. With respect to the 2009 SPA, Pieron agrees with the government that any income resulting from this agreement is properly attributed to tax year 2009. Pieron met his burden of proof establishing these offsetting deductions by, as noted above, presenting uncontested testimony and arguments that any income in 2009 resulting from the 2009 SPA is completely offset by either capital loss or business bad debt deductions.

1. <u>Pieron's base offense level</u>

As noted above, there is no tax loss. Accordingly, Pieron's base offense level is 6 under U.S.S.G. § 2T1.1(a)(2).

---

[6] By responding to the Court's request for final briefing on sentencing guideline issues, Pieron does not waive his right to have the United States Probation Department conduct an investigation, generate a presentence investigation report calculating the sentencing guidelines, and object to such calculations if necessary.

    2.    <u>Specific Offense Characteristics</u>

Pieron's total offense level should not be increased under § 2T1.1(b).

    a.    <u>Failure to identify income source—U.S.S.G. § 2T1.1(b)(1)</u>

Under § 2T1.1(b)(1), the total offense level should be increased "[i]f the defendant failed to report or to correctly identify the source of income exceeding $10,000 in any year from criminal activity." U.S.S.G. § 2T1.1(b)(1). There is no evidence that Pieron failed to report any income or hid the source of any income. Nor is there any evidence that Pieron failed to correctly identify the source of income.

To the contrary, Pieron disclosed the receipt of $15.25 million from Cook/Market Shot LLC to all of his tax advisors and the government. The government suggests that the enhancement should apply based on Pieron transferring "at least $1.6 million to his U.S. companies, and additional substantial sums to his family and advisors." (Gov. Br.: R. 155, at PgID 3827.) Even if this is true, these funds were reported as income (part of the $15.25 million received by JDFX from Market Shot LLC between 2006 and 2009) and identified as income from Market Shot LLC/Cook. There is no basis in the record to support application of this enhancement.

10

     b. <u>Sophisticated means—U.S.S.G. § 2T1.1(b)(2)</u>

Next, the government argues that Pieron's total offense level should be increased under U.S.S.G. § 2T1.1(b)(2). (Id., at PgID 3827 (arguing Pieron used "off-shore bank accounts and other measures, to deceive his tax preparers, including CPA Kim Pavlik, and to evade and defeat collection by the IRS of pieron's unpaid 2008 and 2009 taxes").) This argument fails.

First, the government presented no evidence at trial or at any post-trial proceeding that Pieron's tax preparers were deceived. There is no evidence that money was hidden from any of his tax preparers. To the contrary, Pieron papered a transaction in a way that could create capital gains when it could have been documented in a way to avoid them.

Second, the sophisticated means enhancement refers to the offense of conviction—here, the evasion of payment of taxes for 2008 and 2009. There is no evidence that Pieron used offshore bank accounts to evade payment of taxes. To the contrary, Pieron sent money from offshore bank accounts to bank accounts in the United States during the relevant time period. (Bill of Particulars: R. 5, at PgID 9–15.) Moving money from offshore accounts to U.S. bank accounts makes it easier for the government to collect taxes—it does not frustrate collection efforts.

11

### 3. Relevant conduct

The government suggests that, if capital gains resulting from the 2008 SPA are found to be income to Pieron in tax years 2006 and 2007, any tax liability (plus penalties and interest) should be considered relevant conduct. (Gov. Br.: R. 155, at PgID 3815.) According to the government, this results in a tax loss exceeding $3.5 million, which is an 18-point increase in the base offense level. (Order, Feb. 10, 2020: R. 152, at PgID 3791.)

The difference between an offense level 6 and 24 is extreme. Under such circumstances, the government should be held to a heightened burden of proof. "[I]n extreme circumstances, relevant conduct that would dramatically increase the sentence must be based on clear and convincing evidence." *United States v. Daulton*, 266 F. App'x 381, 388 (6th Cir. 2008) (quoting *United States v. Watts*, 519 U.S. 148, 156, (1997) (per curiam)). In *Daulton*, the Sixth Circuit noted that it has affirmed the use of a preponderance-of-the-evidence standard for findings of loss that resulted in a base-level increase of sixteen points. *Id.* (citing *United States v. Triana*, 468 F.3d 308, 320–21 (6th Cir.2006)). But in *Triana*, use of the preponderance standard was not challenged. 468 F.3d at 319–23. Here, relevant conduct would propel the guideline range from 0 to 6 months to 51 to 63 months— relevant conduct would drive the sentencing guidelines. Accordingly, a heightened standard should apply.

Even under a preponderance of the evidence standard, the government cannot establish that tax loss concerning a $10 million capital gain in 2006 and 2007 should be relevant conduct. The government is correct that the guidelines permit the use of tax loss resulting from uncharged criminal conduct. (Gov. Br., R. 155, at PgID 3815.) But with respect to 2006 and 2007, there is no criminal conduct. With respect to traditional tax evasion, there is no evidence that Pieron intentionally underreported his income in 2006 and 2007. Indeed, as noted above, Pieron's tax preparer made the decision and the mistake to report the gains from the 2008 SPA in 2008.

And under an evasion of payment theory, given that his tax preparers determined gains from the 2008 SPA resulted in a 2008 tax liability, the government cannot establish that Pieron knew he had a 2006 or 2007 tax liability and took affirmative steps to frustrate collection efforts.

## Conclusion

Pieron has no tax liability for tax years 2008 and 2009. His total offense level is 6, resulting in a guideline range of 0 to 6 months.

Respectfully submitted,

/s/ Patrick J. Hurford
Patrick J. Hurford
Mark S. Pendery
Honigman LLP
660 Woodward Ave.
Detroit, MI  48226
(313) 465-7000
phurford@honigman.com

Dated:  March 9, 2020

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 9, 2020, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record.

    Respectfully submitted,

    /s/ Patrick J. Hurford
    Patrick J. Hurford
    Honigman LLP
    660 Woodward Ave.
    Detroit, MI  48226
    (313) 465-7000
    phurford@honigman.com