UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

                    Plaintiff,                   Case No. 18-20489

v.                                      Honorable Thomas L. Ludington

JAMES D. PIERON, JR.,

                    Defendant.

_____/

**ORDER ADOPTING THE GOVERNMENT'S TAX LOSS ASSESSMENT**

On July 18, 2018, an indictment was returned against Defendant James D. Pieron for tax evasion. ECF No. 1. Additionally, the Government furnished a seven-page Bill of Particulars containing 19 allegations supporting its claims that Defendant "willfully attempted to evade paying the federal income taxes he owed for 2008 and 2009, and that he committed affirmative acts of evasion in furtherance of his attempt to evade his tax obligations." ECF No. 5.

On March 7, 2019, a jury found Defendant guilty of the offense. During trial, the Defendant was represented by attorneys Michael Minns, Ashley Arnett, and Kenneth Sasse. After the verdict was returned, Minns, Arnett, and Sasse withdrew as Defendant's attorneys and attorneys Mark S. Pendery and Patrick Hurford filed appearances to represent the Defendant. ECF Nos. 50, 58, 71.

Defendant subsequently filed a motion for judgment of acquittal, arguing that the "government did not meet its burden to prove Pieron evaded or attempted to evade the payment of income tax within the statute of limitations period."[1] ECF No. 66 at PageID.1267. He also filed a motion for new trial. ECF No. 68. He argued that the Court improperly excluded a jury instruction,

_____

[1] Defendant had filed a previous motion for judgment of acquittal during trial that was rejected. ECF No. 41.

that his trial counsel was ineffective, and that the jury's verdict was against the weight of the evidence. The two motions remain pending.

Before addressing these motions, the tax loss assessment that has been the subject of a number of sentencing hearings will be addressed. It is accurate to observe that the sentencing hearings produced a great deal more information about the Defendant and his business, though hardly all of the information. Section 2T1.1 and §2T4.1 of the Federal Sentencing Guidelines outline the rules for crimes of tax evasion and are addressed in Section IV of the opinion.

This opinion is intentionally structured to introduce the facts more or less in the order that they were introduced to the Court first during trial and then later during the evidentiary hearings that followed.

## I.

Defendant is an American citizen who is a technology specialist that became engaged in foreign currency trading in Switzerland during the period in question. The Government has furnished Defendant's undated resume which provides:

> Mr. Pieron serves as the Chief Executive Officer of JDFX. In 2003 he wrote, tested and prototyped the stochastic based algorithms of the APBs (Automated Prime Brokerage System). In early 2004, these algorithms were patented by Swiss Authority (Eidgenoessisches Patentamt) and the project was launched.

> Mr. Pieron started writing code at age 12, and at age 17 was quickly recruited by the United States Department of Defense to build a secure transmission of classified data (U.C.A.S.). After the completion of the UCAS assignment he was sent to Central Michigan University to complete his studies. Immediately after graduation, he was recruited by the F.B.I. for the A.F.I.S. Project (Automated Fingerprint Identification System).

> In 1997, Mr. Pieron started moving from Communications and Security into Financial Enterprise Syems [*sic*]. In 1998, he was the Technical Lead for CaTs (UBS, Trading System). In 2000, he returned to United States [*sic*] and founded Pieron Technologies Inc., which was an IT (Financial Systems) supplier of the Daimler Chrysler/Mercedes merger.

> In 2001, Mr. Pieron returned to Zuerich where he designed and sold the 64-Bit Lifecycle project to UBS. After the completion of the UBS Project, Mr Pieron started a partnership with Swissforex, to build a forex pooli system (Forex Fund) to trade foreign currencies. In 2003, he left Swissforex and joined JDFX Technologies AG, a Software Development company and IT Provider of Automated Trading Systems.

ECF No. 36-2.

## A.

In 2006, Defendant met an individual by the name of Trevor Cook. A subsequent SEC interview of the Defendant during the investigation of Mr. Cook provides:

> Pieron met Cook thru Nolan S. from PFG, Inc of Chicago. Pieron got a telephone call from Nolan telling him Cook was in town (in Switzerland) and wanted to meet with him. Cook showed up in Zurich around Sept or Oct 2006. Pieron later met Beckman thru Cook in his office in St. Paul around 2007. Cook wanted to meet with Pieron because he was making a tour of several FX companies. There was no purpose for the meeting; Cook was looking at FX companies. They talked about technology and Pieron gave Cook a demonstration of the ITP which was 90% developed and Kontrol's prototype. Cook did not say why he was interested in Pieron's products. Pieron was trying to do business with PFG and met Cook as a favor. The meeting was around 10 PM, and it was very inconvenient for Pieron.

> Pieron doesn't recall when he spoke with Cook after than [*sic*] - sometime between Sept to December 2006. Cook was very impressed with the technology and was interested in trading in his platform and in investing in the company. At that time, Pieron was negotiating with FXOQ for an investment in the JDFX entities and they had done an evaluation. When Cook said he wanted to buy part of the company, Pieron had two deals on the table (Cook and FXOQ). The difference between the deals is that Cook wanted a bigger piece of the company and sent up a deposit immediately to show he was serious. The evaluation made for JDFX was for $50 million. [Per Fedders - the evaluation may be less; they don't know the value of JDFX as of today.]

> Cook's said he wanted to invest in JDFX because he wanted to personally diversify himself. Cook wanted to invest twice as much as FXOQ. There were no representation made by Cook, he was interested in trading in JDFX's platform because he will be savings millions per year. Cook's offer was $10 million for 20% ownership. Cook didn't say where the money was coming from - he sent half million deposit. [Per Fedders - the deposit came from UBS Diversified Growth ("UBS Diversified") account on 12/4/06.] There were several transfers after the initial deposit - it ended up being $10 million for 20% of company. From December 2006 (deposit) through the end of 2008 or early 2009 Cook invested $15.2 million to buy stock from Pieron in the name of Market Shot for its current ownership of

35%. [Per Fedders - most checks came from UBS Diversified, 2 from Cook and 2 from Market Shot.]

ECF No. 112-10 (*sic* throughout).

From 2006 to 2009, Cook and Market Shot transferred $15.25 million to JDFX as follows:

2006
|  | | |
|---|---|---|
| | December 1, 2006 | $500,000 |

2007
| | January 18, 2007 | $500,000 |
|---|---|---|
| | February 22, 2007 | $500,000 |
| | March 19, 2007 | $1,000,000 |
| | March 20, 2007 | $1,150,000 |
| | March 20, 2007 | $350,000 |
| | March 30, 2007 | $5,000,000 |
| | April 12, 2007 | $1,000,000 |
| | TOTAL | $9,500,000 |

2008
| | December 17, 2008 | $2,100,000 |
|---|---|---|

2009
| | January 23, 2009 | $2,125,000 |
|---|---|---|
| | May 26, 2009 | $1,025,000 |
| | TOTAL | $3,150,000 |

| 2006-2009 TOTAL: | $15,250,000 |
|---|---|

ECF No. 114-85.

On November 23, 2009, the SEC filed a complaint against Cook and an individual by the name of Patrick Kiley for operating a Ponzi scheme. The complaint provides:

From at least July 2006 through July 2009, Cook and Kiley, directly and indirectly through the Defendant Shell Companies, raised at least $190 million from at least 1,000 investors by selling investments in a purported foreign currency trading venture.

Cook and Kiley represented that they would deposit each investor's funds into a segregated account in the investor's name; that they would use each investor's funds to trade foreign currencies; and that the foreign currency trading would generate annual returns of 10% to 12%.

- 4 -

> Cook and Kiley also represented that their foreign currency trading venture involved little or no risk and that the investors' principal would be safe and could be withdrawn at any time.
>
> Cook and Kiley's representations were false.
>
> Cook and Kiley did not place each investor's money in a segregated account in the name of the investor.
>
> Instead, Cook and Kiley pooled the investors' funds in bank and trading accounts in the names of entities that they controlled.

*SEC v. Cook*, District of Minnesota, Case No. 09-cv-03333, ECF No. 1 at 2-3.

> Among other allegations, the complaint further provides:
>
> Cook used $15 million of investor funds to purchase a 35% interest in JDFX Holdings.
>
> Cook used the remaining $23 million of investor funds at the JDFX Holdings entities to trade foreign currencies. But contrary to his representations to investors, Cook engaged in risky trades involving highly volatile currencies of countries which are not members of the G-5 group of countries.
>
> Cook lost $9.6 million through his trading in the accounts with the JDFX Holdings entities. Eventually, only about $13 million was returned from the JDFX entities to UBS Diversified, Oxford FX Growth, L.P., and Cook's personal account.

*Id.* at 23-24.

On March 30, 2010, the Government filed a criminal complaint against Cook for one count of mail fraud and one count of tax fraud. *U.S. v. Cook*, District of Minnesota, Case No. 10-cr-00075, ECF No. 1. The factual allegations resembled those included by the SEC in its complaint against Cook. Cook pleaded guilty to both counts. On October 7, 2010, the court sentenced him to 25 years imprisonment to be followed by 3 years of supervised release. *Id.* at ECF No. 21.

**B.**

In 2008 prior to Defendant moving back to the United States, Defendant had a conversation with his stepfather, Chris Werwega, about his unpaid taxes.[2] ECF No. 53 at PageID.691. Werwega described the conversation as follows:

> Discussion came about, and I don't know how it originated, but discovered that he had not filed tax returns, and I -- you know, we discussed it, and I said -- you know, I volunteered to help him get his taxes in order. I thought that he should be -- get his taxes current.

*Id.* at PageID.691.

Werwega subsequently prepared Defendant's tax returns for 2001, 2003, 2004, 2005, and 2006.  ECF Nos. 114-9, 114-10, 114-11, 114-12, 114-13. He obtained much of his information for the returns from the IRS, not Defendant. Werwega testified during Defendant's trial. His testimony during the Government's direct examination provides:

> A. [W]hen I asked Jim for information to get these taxes filed, he didn't have any and didn't know when he'd filed his last tax return so he made me -- gave me power of attorney to try to get some financial information in place for him. He was overseas. I was here in the United States.
>
> Q. And did you get financial information from him?
>
> A. Some of it. I also requested the information from the IRS.
>
> Q. And you prepared the returns based on the information you got from both him and the IRS?
>
> A. Correct.
>
> Q. Was there any other source of information that you used to prepare these returns?
>
> A. I don't think so, no.
>
> Q. About how long did it take for you to get all that information?

---

[2] Werwega was not a CPA, but had an accounting degree. *Id.* at PageID.689. He never worked professionally as a tax preparer, but would prepare his own taxes and prepare his children's tax returns. *Id.* at PageID.689-90. At Defendant's trial, Werwega testified about the conversation that he had with Defendant regarding his taxes.

A. It was -- it took sometime, you know. I would say six to eight months before I got everything. That's just an estimate.

Q. So if this return is dated December 20th, 2008, your estimation is that you started working on it sometime six to eight months before then?

ECF No. 53 at PageID.694.

Defendant signed the returns on December 20, 2008. ECF No. 53 at PageID.693. However, the receipt stamps on the returns indicate that they were not received by the IRS until almost a year later on November 7, 2009 after Defendant had returned to the United States. *Id.* at PageID.695. Additionally, his 2006 return does not reference his receipt of $500,000 from Cook/Market Shot. ECF No. 114-13; ECF No. 114-85.

Werwega was not comfortable preparing Defendant's tax returns for those years following 2006. During Defendant's cross examination of Werwega, Werwega's testimony provides:

Q:  And you were able to prepare his tax returns up to 2006 with a reasonable confidence that they were -- they were complete and accurate; is that correct?

A:  I did, and -- and they didn't appear to be overly complicated at that point.

Q:  But when it got into 2007 and 2008, there was another dynamic which is that there had been a major investment in his firm and problems -- I won't get into the problems, but there was a lot of matters that you simply weren't sure what the answers were?

A:  Well, I didn't have the -- any information on the transaction itself. You know, there was -- we didn't get there the documentation, how it was structured. I didn't know the ownership of the company. I didn't know the manner it was handled accounting wise.

ECF No. 53 at PageID.705.

## C.

In 2009, Defendant moved back to the United States, purportedly to save on JDFX's operating costs. ECF No. 38 at PageID.221. On August 25, 2009, another of his companies, Komplique, purchased a 2009 G5 Mercedes from "Exotic Motors" in Rolling Meadows, IL for

over $100,000. ECF No. 114-39. The purchase form provides "c/o James Pieron." The purchase corroborates that by this point in time, Defendant was residing in the United States and attempting to grow Komplique. Komplique distributed high-end swimwear for women.

The Defendant's return to the United States corresponded in time to the discovery that Trevor Cook was involved in the Ponzi scheme. In November 2009 (the same month Defendant's tax returns for 2001 through 2006 were received by the IRS), the SEC brought suit against Cook and other entities involved in Cook's fraud. ECF No. 36-6 at PageID.182. According to Defendant, the exposure of Cook's Ponzi scheme was fatal to JDFX.

> The news resulted in the immediate termination of JDFX's prime brokerage account with Deutsche Bank, its credit lines with over a dozen money center banks, and its clearinghouse. Shortly thereafter, James lost his primary customer, chief programmer & partner, key employees, and operational vendors. James' own brother left the firm to work for a competitor.

*Id.*

Agents with the SEC, CFTC, FBI, IRS, and USAO interviewed Pieron on November 13, 2009 regarding his association with Cook. ECF No. 112-10. Notes from the interview indicate that Pieron was in the process of moving the company from Switzerland to Michigan. The interview notes provide:

> Pieron is moving his business to a technology park in Mt. Pleasant, MI owned by a Joint Venture (CMUR) between the Central Michigan University, Dell Chem and State of Michigan. JDFX will get human resources incentives to move to the tech park. Pieron moved from Switzerland because of the cost and because he failed in the acquisition of Bank DeMu. Pieron still [*sic*] wrapping up business in Switzerland, the company is moved completely. Pieron doesn't know if he is moving the Fund, will apply for registration with the NFA.

ECF No. 112-10 at PageID.1908. According to a Swiss government document, JDFX was dissolved on November 30, 2009.[3] ECF No. 117-26; *see also* ECF No. 144 at PageID.3435.

A letter from Deutsche Bank dated 18 December 2009 confirms that it formally severed its line of credit with JDFX.

> Dear sirs,
>
> We refer to the Foreign Exchange Prime Brokerage Agreement dated 5 December 2007 pursuant to which Deutsche Bank AG ("Deutsche") authorises JDFX Fund Management Ltd. (the "Agent") for and on behalf of the JDFX Fund Ltd. to act as Deutsche's agent in executing certain FX Transactions and Options (the "FX PB Agreement")…
>
> Pursuant to paragraph 12 of the FX PB Agreement, Deutsche is terminating the FX PB Agreement on twenty (20) business days' prior written notice, and such termination shall be effective at the end of such twentieth day, being 21 January 2010 (the "Termination Date"). This letter constitutes such notice of termination of the FX PB Agreement. As of the Termination Date, the Agent will have no authority to act as Deutsche's agent in executing certain FX Transactions and Options.

ECF No. 145-3.

In a letter later furnished to an accountant, Kim Pavlik (discussed below), Pieron described JDFX's end as follows:

> In late 2009 the owner of Market Shot LLC, namely Mr. Trevor Cook, was federally indicted for running a 190 Million USD Ponzi scheme. As Cook was a 35% owner in JDFX, the minute the news hit the press JDFX vendors and customers began terminating relationships until finally Deutsche Bank terminated the Prime Brokerage agreement which simultaneously terminated relationships with all banks and liquidity providers. Shortly thereafter JDFX was forced into liquidation and my private loans became uncollectable and therefore a personal loss.

ECF No. 112-14.

**D.**

---

[3] The document is in German. In his briefing, Defendant describes the document as a "Swiss Government document obtained by Special Agent Hollenbaugh showing JDFX Holding AG was dissolved on November 30, 2009." ECF No. 117 at PageID.2514. The date "30.11.2009" is highlighted in the form.

In June 2010 after Defendant had moved back to the United States and JDFX was purportedly liquidated in Switzerland, he retained Carol Nathan of American Tax Solutions to prepare his tax returns for 2007, 2008, 2009, and 2010. Nathan testified that Defendant provided her primarily with spreadsheets of information to prepare the returns and very few source documents. Nathan testified at Defendant's trial. Her testimony during the Government's direct examination provides:

Q. What kind of information did he provide to you?

A. His income and expenses.

Q. What form did he use to provide that?

A. He created his own spreadsheets.

Q. Did he give you source documents?

A. A few, but mostly it was his spreadsheets.

\*\*\*

Q. All right. What is a source document?

A. Oh, it would be like -- it could be a W-2, you know, bank statements, you know, stock statements.

Q. Okay. And a spreadsheet would be just a listing of information, not the documents it came from?

A. Right, just like a summary I guess you call it.

ECF No. 52 at PageID.526.

Nathan testified that she explained to Defendant that capital losses could not be carried back. She referenced an email she sent to Defendant as well as notes she made of her interactions with Defendant. It provides:

A. "Email to client. Hi, James. I still have not received the documents you were going to send to me regarding the carryback of losses. Losses incurred in any year for business expenses can be carried back for two years. New rulings in 2008 and then again in 2009 allowed for losses in those years to be carried back up to five

- 10 -

years. You can choose five years or four years or three years or two years. That ruling is not in place for 2010, at this point anyway."

Q. All right. So is that the actual text of the email that you sent Mr. Pieron?

A. Yes.

Q. And why were you sending him that?

A. Giving him information that -- I guess he wanted to carryback some losses, I assume. I remember. Wanted to carryback losses, but you can't unless they're business losses.

***

Q. So let's go on to an entry for December 13th, 2010 at 4:48.

***

A. "Client called. Is perpetually going over ways that we can try to reduce the tax he will owe for 2007. Such angst."

ECF No. 52 at PageID.542-543.

Nathan concluded that Defendant did not sell any JDFX stock in 2007. However, she did conclude that Defendant had sold JDFX stock in 2008 and 2009, specifically:

|      | Acquired | Sold     | Price       | Basis       | Gain        |
|------|----------|----------|-------------|-------------|-------------|
| 2007 | none     |          |             |             |             |
| 2008 | 1/14/04  | 2/4/08   | $9,346,617  | $6,675,034  | $2,671,583  |
| 2009 | 1/14/04  | 10/13/09 | $4,450,460  | $3,276,786  | $1,173,674  |

Gov. Ex. 39, 40, 42. Nathan explained:

Q. Were capital gains reported?

A. Yes.

Q. And this was, again, for what year?

A. 2008.

***

Q. Did he tell you -- well, did he -- did he provide you the amount that was on that form?

A. Yes, he provided me all the numbers.

- 11 -

Q. Did he have any discussion about wanting to take it in a different time frame?

A. Yes. I think that -- I believe he said he wanted to do that. It was an idea to carry it back.

Q. And what -- what was he suggesting to you?

A. To carry back the capital losses, well, capital gains. He can't do that, though.

Q. Did you tell him that he can't do that?

A. Right. It's just definitely not --

Q. And what was the amount of the tax owed by Mr. Pieron for 2008 in this tax return?

A. Are you asking me how much he owed?

Q. Yes.

A. Okay. 268,445.

Q. And, again, on that year did he have any withholdings?

A. No.

Q. So would that have been the amount of the payment that should have been made on that tax return?

A. Yes.

ECF No. 52 at PageID.548-49.

When asked about the 2009 return she prepared, Nathan testified:

Q. And on that one did you compute a tax owed?

A. Yes, a tax owed of 125,490.

Q. And were there capital gains and foreign earned income reported on that?

A. There were capital gains and foreign earned income, I think so. I did that for him. Foreign earned income in 2009, yes. There's a form.

*Id.* at PageID.550.

Nathan was also asked to read from notes she had taken from her communications with

Defendant:

- 12 -

A. "Client insists his $9 million in 2007 is capital gain. He says he sold shares of his company to an investor. He has the number of shares sold, sale price, and all the info to be entered on Schedule D. He will email his 2006 tax return."

\*\*\*

Q. Your client, James Pieron, is telling you that he made $9 million, right?

A. Right.

Q. And you're going to put that on the tax return because he told you he made $9 million?

A. In capital gain, yeah.

ECF No. 52 at PageID.573-74.

### E.

In December 2010, Defendant hired CPA Kim Pavlik to assist him with his 2008 and 2009 tax returns.[4] Defendant told Pavlik that "he believed he had a large capital gain and was trying to understand the implications of a large capital gain and then a subsequent large capital loss." ECF No. 144 at PageID.3316. He also told Pavlik that he did not have confidence in Nathan as his tax preparer. Despite Defendant's apparent dissatisfaction with Nathan, the next month, he filed the 2007, 2008, and 2009 tax returns prepared by Nathan, bearing both Nathan's signature and his own. ECF Nos. 112-4, 112-5, 112-7. The returns were received by the IRS on January 20, 2011. Pavlik was not involved in the preparation or filings of these initial returns. ECF No. 144 at PageID.3317-18.

Pavlik's next interaction with Defendant was late the following year. Defendant "asked more specific questions and wanted [Pavlik] to take a look at those tax returns." ECF No. 144 at PageID.3317. Pavlik subsequently assisted the Defendant prepare his amended tax returns for 2008

---

[4] Pavlik did not testify at trial, but did testify during Defendant's sentencing hearing. His testimony is useful in understanding the tax returns he prepared on Defendant's behalf.

and 2009. *Id.* Pavlik testified at Defendant's sentencing hearing. His testimony during Defendant's

direct examination provides:

> Q. So sitting here today, do you remember what documents--so there's conversations James had with you, and then there's documents that James gave you, right?
>
> A. Gave me late in 2000 -- late 2011 you're saying?
>
> Q. Yes.
>
> A. That's when he would -- and, again, I don't recall exactly when I first saw every document. You know, again, this many years ago, I just don't recall that, but it would be the spreadsheet that showed the cash activity that I would have reviewed when I got the additional information in late 2011.
>
> Q. Okay. Other than the spreadsheet, and conversations or emails you had with him, you know, passing this spreadsheet along, do you remember getting anything else from him?
>
> A. Again, I don't remember the specific -- I would have received at some point -- again, I don't recall when in the timeline I would have received the copies that were prepared by the prior accountants. I didn't have signed copies, so I didn't know the date that those were filed, but I received copies of the returns from the prior tax preparer.
>
> Q. And do you -- other than what you're describing, do you remember anything else that you received? What's forming the basis of you saying, you know, James told me that, you know that there were 2007 payments for this 2008 capital gain? What -- are you -- are you -- when you're saying that in court today, are you saying that based on what James told you, or are you saying that based on what James told you and documents that he gave you, or just documents that he gave you, which one is it? I just want to be specific.
>
> A. I can't recall exactly how I became aware of the payments in 2007.
>
> Q. Okay. But you became aware of them?
>
> A. Yes.
>
> Q. Because otherwise, if there's not payments in 2007, there's no need for a deposit theory?
>
> A. Correct.
>
> Q. Okay. And so is it fair to say that as of December 22, 2010, you are aware that payments were made in 2007 for some of the capital gains reported in 2008?

- 14 -

A. Yes, based on this email.

Q. Okay. And those payments ended up being characterized all as 2000 -- the 2007 payments, and you're now aware of some 2006 payments?

A. Correct.

Q. Those all became reported as capital gains to Mr. Pieron in 2008, is that --

A. Correct.

Q. -- correct?

ECF No. 144 at PageID.3329-3330.

According to Pavlik, Defendant also furnished him with two share purchase agreements. Both agreements identified the Defendant as the seller of JDFX Holding AG shares and Market Shot as the Purchaser. ECF Nos. 112-11, 112-12. Pavlik's testimony provides:

Q. Other than the spreadsheet that we've talked about, and the share purchase agreements that we talked about, do you remember any other documents being furnished to you that are relevant to this issue of capital gain or theft loss?

A. Not other than the originally filed returns.

ECF No. 144 at PageID.3357.

Like Nathan, he determined that the Defendant had sold shares of JDFX stock. However, he concluded that the Defendant owed more in tax from his sale of JDFX stock than Nathan had calculated:

|      | Acquired | Sold     | Price        | Basis     | Gain        |
|------|----------|----------|--------------|-----------|-------------|
| 2008 | 1/14/04  | 2/4/08   | $10,000,000  | $710,129  | $9,289,871  |
| 2009 | 1/14/04  | 10/13/09 | $5,250,000   | $0        | $5,250,000  |

Gov. Ex. 41, 48. Both Nathan and Pavlik characterized Cook's receipt of stock as a sale and thus a capital gain by Defendant. However, the basis amount differs between the two, indicating that Defendant furnished different information to each of the tax preparers. In January 2012, Defendant

- 15 -

filed a first amended tax return for 2008 and 2009, bearing both his signature and Pavlik's signatures.

Pavlik later determined that Defendant did not owe any taxes for 2008 and 2009 due to the application of what he referred to as the claim of right doctrine. In March 2014, Pavlik prepared and Defendant filed a second amended return, finding that Defendant did not owe any taxes for the years 2008 and 2009. Gov. Ex. 206.  In April 2014, Pavlik prepared and Defendant filed with the IRS an Offer of Compromise: Doubt as to Liability. In the offer, Pavlik explained that the claim of right doctrine applied because Defendant was a victim of Cook's Ponzi scheme. It provided:

> Under the claim of right doctrine a taxpayer who receives any income under a claim of right that is free of restrictions must include that income in gross income for the year of receipt. It does not matter that the taxpayer *is* not entitled to retain the income and might be obligated to return it.
>
> The Supreme Court has stated that if a taxpayer who included a receipt in gross income under the claim of right doctrine is required to repay it in a subsequent taxable year, the taxpayer is entitled to a deduction in the year of repayment.

ECF No. 36-7 at PageID.203 (emphasis in original).

The Offer in Compromise further provides:

> The IRS issued FAQs regarding the tax treatment of clawback repayments for amounts previously reported as income from a Ponzi scheme. The term *clawback* describes the power of a trustee to recoup profits earned by an innocent investor in a Ponzi scheme that should have been available as part of a bankruptcy estate. The FAQs indicate that the repayments are not additional theft loss deductions, but are repayments of claim of right income that result in either a nontheft investment loss deduction or a credit calculated under IRC Sec. 1341, whichever results in lower tax.
>
> The trustee in the Cook Ponzi scheme has continued to attempt to recover monies from various parties. If Pieron still had any liquid assets in 2011, the trustee would have tried to claw those funds back. Because Pieron had virtually no liquid assets, the debt was forgiven. We have recalculated Pieron's adjusted tax for the years 2008-2011, including the forgiveness of debt income, and excluding the JDFX gains under the claim of right rules.

> Based on the claim of rights calculations, Pieron's tax obligations for 2008 through 2011 total $38,601. His withholding and other tax payments related to those years totaled $36,283. Based on the above, there is substantial doubt as to Pieron's tax liability for the years 2008 through 2011.

ECF No. 36-7 at PageID.208.

**F.**

The accuracy of Defendant's report of Foreign Bank and Financial Accounts ("FBAR") was also at issue before and during trial. In its Bill of Particulars, the Government alleged that "[o]n his FBAR report for 2009, Pieron falsely stated that the maximum balance in a Swiss bank account for one of his businesses was $250,000 during 2009. In fact, the maximum balance in that account was at least $749,975 in 2009." ECF No. 5 at PageID.15.

Additionally, the Government produced an application submitted by Defendant to open a banking account with Peregrine Financial Group. ECF No. 114-55. Defendant had furnished a W-8BEN form as part of his application. The Government's expert witness Robert Miller, an IRS revenue agent, testified during the Government's direct examination at trial that only non-U.S. citizens submit W-8BEN forms.

> Q. What context is that form used?
>
> A. It is used for non-US persons who have US-sourced income. So somebody who doesn't live in the US and has no connection to the US, but has earned income from someplace in the US.
>
> ***
>
> Q. And when that form is completed, how is that used by the entity that obtains that form?
>
> A. The entity that obtains this form, so the banking institution that receives it, they need to know whether or not this individual is a US person or a foreign person, so the W-8BEN is filled out by non-US people to inform the bank that they potentially may need to be withheld against, but typically at a treaty or reduced rate.

ECF No. 51 at PageID.406-407.

Miller further explained the consequences of a non-US citizen filing a W-8BEN form.

Q. Let me ask you this question: If a person who is a US citizen uses a W-8BEN form in connection with a financial account, what is the impact of that on the IRS and its collection activities?

A. Well, if a US citizen filled out a W-8BEN and gave it to a US institution, the US Government would never know that they had an interest in it, never know that they had an interest in a financial account or whatever they're filing the W-8BEN for, so it would preclude the Government from knowing that asset really existed under that individual's name.

Q. And are there Social Security numbers on W-8BEN forms?

A. There are not.

Q. What about on W-9?

A. Yes, there is on W-9s.

Q. So if the IRS doesn't learn about someone's interest in an account, financial account here because they've used the W-8 instead of the W-9, does that affect the ability to assess a tax for the IRS?

A. It would -- it would certainly limit the ability for the IRS to assess a tax because the IRS would never be notified that there was income that had been earned.

ECF No. 51 at PageID.411-12.

In the W-8BEN form that Defendant submitted to Peregrine Financial Group, Defendant represented that he was a resident of Switzerland and did not have a United States Social Security number, which, of course, he did. ECF No. 114-55.

## II.

On April 10, 2019, the Court held a status conference to address the Federal Sentencing Guideline issues that the parties anticipated would need to be resolved. Following the April status conference, the Government was directed to file a Tax Loss Assessment and Defendant was

directed to file a response.[5] ECF No. 59. The parties were later directed to submit two sets of supplemental briefing at the direction of the Court as additional information about the Defendant, his businesses, and his tax loss arguments was learned. ECF Nos. 110, 123.

## A.

The Defendant's description of the transactions in his supplemental briefing authored by his recently retained attorneys on tax loss varied dramatically from the information reported in (all) of his tax returns. In his tax returns, Defendant represented that Mr. Cook or Market Shot purchased the JDFX stock that he owned, not treasury stock from JDFX. In his supplemental briefing however, he explained that he, Mr. Cook, and a Mr. Clive Diethelm each acquired treasury stock from the corporation.

Defendant further explained that while Cook paid for his stock in numerous payments, each shareholder received a single stock certificate issued by JDFX. More specifically, stock certificates were issued only once in December of 2006. They were issued to Trevor Cook (2,000,000 shares), Clive Diethelm (1,000,000 shares), and James Pieron (7,000,000 shares). ECF No. 117-16. Importantly, Defendant, or more specifically Defendant's counsel, sought to clarify that the Defendant never sold any JDFX stock to Cook. In fact, counsel suggested that Cook purchased his stock from JDFX.

Equally important to the Defendant was his further clarification that he never personally received any of the funds from Cook. This assertion appeared to be corroborated by the Government's Exhibit 138 reflecting that all of the funds Defendant received were deposited into a JDFX account and not a personal account.

---

[5] The parties were directed to file the Tax Loss Assessment and response under seal in order to protect Defendant's privacy. However, the briefs cannot be kept under seal indefinitely because they are necessary to adjudicate Defendant's sentence. Select portions are referenced and quoted throughout this opinion.

**B.**

On October 23, 2019, approximately three weeks before the Sentencing Hearing, the Court entered an opinion and order addressing the tax loss guideline. ECF No. 129. The order was based on the Government's tax loss assessment, Defendant's response to the tax loss assessment, and two sets of supplemental briefing related to tax loss issues. In the opinion, the Court suggested that Defendant was not entitled to advance his newly minted factual explanation, concluding that he was judicially estopped from claiming that Cook purchased his shares from JDFX rather than from him. The Court's reasoning was based on Defendant's numerous filed returns, statements made by Defendant to the SEC, and statements made by Defendant's counsel during trial.

In a letter to his accountant, Kim Pavlik for example Defendant stated

> I was a resident in Switzerland from 1998 to 2010. While in Switzerland I founded a company called JDFX Holding AG. JDFX specialized in high frequency trading technology. **In 2008, I sold 20% of JDFX to Market Shot LLC of Minnesota and received a capital gain of 10 Million USO. One year later (2009), I sold an additional 15% of JDFX to Market Shot and received a capital gain of 5.25 million USO.**
>
> During the period of 2007 through 2009, I loaned a substantial portion of the capital gains back to JDFX as working capital. In Switzerland there is no capital gain tax for a Swiss nationals [sic] and the aforementioned sale and loan vehicle was properly structured. However as a US citizen, the selling of corporate shares should have been done through the corporation itself.

*See* ECF No. 112-14 at PageID.1921 (emphasis added).

In a letter to the SEC, his attorney at the time, John Fedders, explained that Defendant had personally sold his JDFX stock to Market Stock. It provides

> Keep in mind what I have reported to you on several occasions, namely, **Cook did not purchase his interest in JDFX Holding from the entity, but he brought [sic] his interest in JDFX Holding from Mr. Pieron**…While I believe you already have the schedule reflecting Cook's payments to Mr. Pieron, I again will produce the schedule listing the Cook monies paid to Mr. Pieron.

ECF No. 125-1 at PageID.2856 (emphasis added).

During trial, Defendant's attorneys at the time, Michael Minns and Ashley Arnett, made similar acknowledgments on the Defendant's behalf. ECF No. 53 at PageID.806-808.

### III.

As earlier noted the parties offered additional proofs over five days on November 14, 2019, December 3, 2019, December 20, 2019, January 14, 2020, and February 5, 2020. The Defendant presented two witnesses, expert witness Chelsea Rebeck and Kim Pavlik, whose testimony has been referred to in part to explain the returns Pavlik prepared.

### A.

During the sentencing hearing, Chelsea Rebeck was qualified as an expert witness pursuant to Federal Rule of Evidence 702. Her testimony addressed two key matters. First, she sought to corroborate the argument being introduced by the Defendant's new attorneys that Cook did not purchase his shares of JDFX from Defendant, but instead received the shares as treasury stock directly from JDFX. Second, she introduced an additional new idea, that the last payment of $5.25 million from Cook was intended as an advance for the purchase of a bank, Banque Du Bois. Accordingly, she suggested that the Defendant's receipt of these funds was completely unrelated to the Defendant's sale of JDFX stock. She further explained that the initial capitalization of JDFX was not a taxable transaction at all, though Defendant's later transactions with JDFX might be taxable transactions.

Each matter will be addressed in turn.

### 1.

Rebeck referred to numerous documents she had been furnished by Defendant or his counsel that corroborated the suggestion that the funds received from Cook were to capitalize a new JDFX entity. This included a Swiss "Share register" with a date of December 15, 2006 listing

three JDFX shareholders: Market Shot LLC (Cook's company), the Defendant, and Clive Diethelm. ECF No. 117-16. According to the register and accompanying share certificates, JDFX had 10,000,000 registered shares. On December 15, 2006, 2,000,000 shares were issued to Market Shot LLC, 1,000,000 shares were issued to Clive Diethelm, and 7,000,000 shares were issued to the Defendant. She contended that Defendant "sold no shares to Cook and thus no actual capital asset was sold." ECF No. 117 at PageID.2507. As a result, she explained he would have had no tax liability, but he would also have no tax basis in the JDFX stock he received.

Rebeck also relied on the Government's Trial Exhibit 138 from trial. It consisted of a summary of various bank transaction reports from 2006 to 2009 documenting the receipt of funds by JDFX. Rebeck contended that pursuant to Exhibit 138, the $10,000,000 of wire transfers in 2006 and 2007 cannot be characterized as a capital gain to Pieron because all the funds were received by JDFX, not Pieron. ECF No. 117 at PageID.2509. That is, Cook purchased the shares directly from JDFX.

Rebeck went on to further explain that contrary to the 2008 and 2009 tax returns, the Defendant did not receive $10,000,000 in 2008 and $5,250,000 in 2009. *Id.*

During defense counsel's direct examination, Rebeck testified that even if Defendant had in fact sold his shares directly to Cook and then loaned the proceeds to JDFX, he still would not have any tax liability.

Q. So if it's classified as a loan by James Pieron, of 15.25 million, what's the analysis, in your opinion? What happens if that's the case?

A. At the time that the company shuts down, the loan becomes worthless.

***

A. On November 30th, 2009 -- the company is dissolved.

Q. So how does that factor into your analysis if the 15.25 million is treated as a loan…from James Pieron to JDFX?

- 22 -

A. At that point JDFX is no longer able to repay the loan, it becomes worthless. It's a business bad debt, and it's treated as an ordinary loss in the year that the company's dissolved.

\*\*\*

A. So the ordinary loss is different from a capital loss in that you can deduct the full amount in the year in which it's generated, and anything additional over your income amount for that year either gets carried forward or carried back. So in order for the carry forward to apply, there's an election that you would have to make on the original return by the due date or the extended due date or else you default to the carryback rule.

In 2009 the carryback period was only two years. Actually currently you can't even carry it back anymore, but for the law that applied then, you carry it back two years and whatever is left over will carry forward for future years.

So if he has a loan, based on the computations that I did…it would wipe out all of his income for '09. Goes back to '07, it wipes out any potential income in '07. Wipes out '08, and then whatever is left over gets carried forward, and I believe there was a small amount left over after '08 to go forward into tax year 2010.

Q. All right. So would he have a tax liability in 2008 or 2009?

A. No.

ECF No. 139 at PageID.3167-70.

Importantly, however, neither Rebeck nor current counsel have explained the origin of the Stock Purchase Agreements that Defendant provided to Pavlik. Nor have they furnished an explanation for why Defendant reported his personal sale of the JDFX stock on his numerous tax returns. During the Government's cross-examination, Rebeck explained that had she prepared Defendant's tax returns, she would have investigated the Defendant's transactions more carefully:

Q. Okay. So if you were Carol Nathan, and you wanted to know when stock was transferred or if there was a capital gain, you would talk to Mr. Pieron?

A. I would talk to Mr. Pieron and review documents because clients are inherently unreliable. No offense to any of my clients, but --

Q. Not all clients are inherently unreliable?

- 23 -

A. Again, it might just be a function of the work that I do, but I do see quite often that -- and, you know what, I think that in general people don't understand the nuances of the tax code, especially when it's changing all the time.

Q. No, they don't understand the nuances of the tax code for sure, but they know if they sold stock, fair enough?

A. They may or may not. I would hope that they would.

Q. Yeah, I would hope so.

ECF No. 139 at PageID.3193-94.

**2.**

Rebeck also testified that $5.25 million of the last funds received from Cook were not for JDFX stock, but were instead an advance or loan of funds for the attempted purchase of a bank in Switzerland, Banque Du Bois. A JDFX share certificate dated June 1, 2009 states that Market Shot owned a total of 3,500,000 shares. ECF No. 145-6. However, in an interview with IRS Criminal Investigation agents, Cook claimed that he never purchased more than 2,000,000 shares of JDFX stock. He characterized the transfers in 2006 and 2007 as purchasing his 2,000,000 shares. The remaining transfers of $5.25 million were not for an additional 1,500,000 shares of stock (bringing his total shares to 3,500,000 consistent with the June 2009 Share Certificate), but instead for the attempted purchase of Banque Du Bois. Cook claimed that:

> [H]e never agreed to purchase more shares of JDFX stock. Cook stated …he didn't sign the purchase agreement but he probably authorized Pieron to sign his name on it. Cook said Pieron told him that he had a chance to buy a bank in Zurich called Banque Du Bois. Pieron told Cook that if he bought the bank, he would be able to get other larger clients to invest in his hedge fund. Cook said Pieron told him he needed $5 million security deposit to lock in JDFX as the buyer and he would get the deposit back when the sale was completed. Cook sent one of his employees, Thomas Richardson, to Zurich to look at the bank before sending the money to Pieron. Richardson told Cook the bank did exist and had its own international bank number. Cook said he wired $2.1 million on 12/17/2008, 2.125 million on 1/23/2009, and 1.025 million on 5/26/2009 to JDFX to be used for the security deposit.

ECF No. 139 at PageID.3138-39.

Rebeck explained that this $5.25 million was erroneously reported on Defendant's returns as capital gains when in reality, it appeared to be a deposit for the purchase of Banque Du Bois. ECF No. 139 at PageID.3137 ("[I]n 2009 there was a little over 5 million that was reported as a capital gain, and it appears that these three transfers from Cook for the purchase of the bank are equal to the amount that was reported as a capital gain.").

**B.**

Later during the sentencing hearing, Pavlik testified, addressing two key matters. First, he described the information that Defendant provided to him to prepare Defendant's tax returns. Second, he testified that Defendant told him that he had originally contributed $3.2 million of his own funds or loaned funds to JDFX.

**1.**

During defense counsel's direct examination, Pavlik described the information furnished to him as follows:

Q. So I just want to talk about 2008 for a second. Did -- were you aware that the money for that 2008 capital gain actually was received in 2007?

A. Yes, I believe I became aware that some amount of that money was received before the date of the transaction, which was January 1st, 2008.

Q. Okay. There was -- there was some decision that was made to put that money, that was received in 2007, as a capital gain in 2008; is that correct?

A. Yes.

Q. Do you remember why that decision was made?

A. Again, at that time, the documents that I was provided showed the effective date of the transaction being January 1st, 2008 for one of the transactions and January 1st, 2009 for a subsequent transaction.

Q. Fair enough. But in terms of -- that's the case, and I'll say that. Those documents I believe you've stated accurately. Let me ask this question though: Even though those documents existed, was James Pieron telling you that he -- or that he or JDFX

- 25 -

actually got the money for those -- for those sales of stock based on those share purchase agreements, did he actually tell you he got the money in 2006 and 2007?

A. I don't recall the 2006, but he did say that some of the money was received prior to October -- or January 1st, 2008, the effective date of the transaction.

ECF No. 144 at PageID.3321-22.

However, it was not until Pavlik met with the Defendant or his legal counsel to prepare for his appearance at Defendant's sentencing hearing that he learned that the sale of stock between Defendant and Market Shot had not actually occurred, but instead had been the issuance of treasury stock from JDFX to Market Shot.

Q. The Court mentioned it just a moment ago, and you did testify earlier that you subsequently became aware that there was no sale of stock, that it was an issuance of treasury stock for the stock that is involved in the 2008 share purchase agreement.

A. Correct. It was -- matter of semantics, but it was a sale of stock, but it was sold by the -- issued by the company and not issued as a sale from Mr. Pieron.

Q. And how did you subsequently find out about these things?

A. In preparing for these -- you know, these hearings.

Q. What was said or given to you that now gives you the opinion there was no sale of stock?

A. I don't have the document, but there was a document that was fairly clear that it was a sale -- issuance of stock by the company.

Q. Was that the document with the share certificates numbers one through three?

A. Yes.

Q. That said that they were issued in 2006?

A. Yes.

*Id.* at PageID.3344-45.

Pavlik's testimony also provides:

[A]t the time I prepared the amended returns, the concern was that not all the proceeds were reported by the prior preparer, and I based it on the sales documents that said there was a capital gain -- or a stock sale of January 1st, 2008, and another stock sale January 1st, 2009, from Mr. Pieron individually.

Subsequently I found out that the transaction really was a sale of stock from the company to the purchaser, which would have changed the answer, but at the time that I prepared the returns, I was basing those returns based on the stock transaction that showed a sale of January 1st, 2008 individually, and a sale January 1st, 2009. I didn't have the information that I subsequently found out, you know, many, many years later that the sale actually occurred between the company and the purchaser directly.

*Id.* at PageID.3337-38.

## 2.

Pavlik testified further that Defendant also informed him that he initially contributed $3.5 million to JDFX. This was important because the information was used for his basis calculation and the Defendant's receipt of the funds merely reflected a return of his contributed capital. Pavlik's testimony from the Government's cross-examination provides:

Q. So what did you use to calculate the basis?

A. Again, I don't recall. It was some information provided by Mr. Pieron that led me to believe that the -- that he documented -- the basis would be three -- was -- again, I'm using approximate numbers, 3.5 million of which I recorded 20 percent basis on the sale.

Q. Did you review personal bank records from Mr. Pieron showing capital contributions?

A. No.

Q. Did Mr. Pieron give you a shareholder ledger showing capital contributions for JDFX?

A. Again, I don't recall the -- what supported the 3.5 million calculation that he provided. I don't remember the details behind that.

Q. But as you sit here today, you believe that information came from Mr. Pieron, not some third party, is that fair?

A. Correct.

- 27 -

Q. Did Mr. Pieron tell you where he got three and a half million dollars for capital contributions in JDFX Holding?

A. No, not that I recall.

ECF No. 144 at PageID.3405-06.

Pavlik's testimony at the next hearing provided additional information about the $3.5 million that Defendant told him he had initially invested in JDFX.

Q. Okay. Now, you said he maintained that he kept the money; is that correct?

A. No, I said he maintained that he put all the money back in the company.

Q. And did he tell you what he did with the money once he put it in the company?

A. As we've talked last time, you know, we documented, you know, the -- that he refreshed my -- or told me the first time, because I didn't know it, that 1.6 million of the money eventually went to US companies, but the rest of it was lost in the liquidation of the company.

Q. Mr. Pieron also told you that he personally invested about 3.5 million; is that correct?

A. I believe that's right.

Q. And you used that number to calculate the basis for what you reported as the 2008 sale of stock?

A. Correct.

Q. So in total, there was 3.5 million plus 15.25 million that Mr. Pieron represented went into JDFX Holding, is that fair?

A. Reasonably fair, other than, you know, the money that was repaid to family member investors and the money that went into the US companies that we -- you know, based on the spreadsheet, so I would not say that's totally fair, but reasonably fair, other than the caveats that whatever money was repaid to family members and whatever money went into the new companies would not have gone back into that company.

***

Q. Do you recall whether or not it was $10 million or in the scope of more like a million dollars?

- 28 -

A. It wasn't $10 million. It was -- again, what I had originally done, and has never been challenged to my knowledge by, you know, the IRS or anything, was looked at all the cash transactions over time and tried to prove out how much cash went out. The flaw -- I probably overstated as it turns out because the flaw I had is what I thought were payments being taken out by Mr. Pieron were actually being money going back to family members paying for some of the original investments. So some of that money would have -- the way I did the returns, I proved it out that that was income, but a lot of that would have been a return of capital. So I believe if you looked at those sheets, it totaled between -- including the 1.6 million, it included -- it totaled something in the neighborhood of 3.2 million.

ECF No. 146 at PageID.3496-3500.

Later in the hearing, Pavlik explained that he had only recently learned that Defendant did not make any initial capital contributions to JDFX. His testimony provides:

Q. Did you later become aware that -- in your meetings with Mr. Pieron's attorneys, that he did not make any initial capital contributions into JDFX stock?

A. No.

Q. You learned that today for the first time?

A. Yes.

*Id.* at PageID.3535

During defense counsel's direct examination, Rebeck had testified that according to the documents furnished to her, Defendant did not make any monetary contributions to JDFX at its inception.

Q. [W]hat was the basis of James Pieron and Clive Diethelm at the inception of JDFX Holding AG?

A. They did not have any basis initially.

***

A: I don't have any reason to believe it wasn't arm's length, and based on my experience with -- I won't say similar companies, but other businesses who bring in investors, I didn't find it unusual that one person is bearing a very large amount of the initial cost while the other ones are just going to be the ones working. It's quite common.

- 29 -

ECF No. 139 at PageID.3152-53.

It is unclear how funds ultimately left JDFX. Prior to JDFX's liquidation, Defendant told Pavlik that he retrieved at least $3.2 million when JDFX was liquidated.  He retained $1.6 million of the funds as a recoupment of his original $3.5 million investment.[6] ECF No. 146 at PageID.3373.  The remaining $1.6 million he told Pavlik was used to pay back family members who had invested in JDFX. ECF No. 146 at PageID.3500.

During the Government's cross-examination, Pavlik explained in his testimony how he accounted for the $3.5 million in Defendant's amended tax returns:

> Q. Would Mr. Pieron be obligated to report a return of the 3.5 million in capital from JDFX Holding to Mr. Pieron…during the liquidation?
>
> A: It would just be part of his basis upon liquidation. He would -- so the 3.5 million would be part of his basis upon liquidation, so it wouldn't be reported separately other than as part of whatever his basis was at that point.
>
> Q. And did you take that into account for his basis upon liquidation?
>
> A. Again, hindsight I probably didn't make that as clear in these returns because I was proving out to net income of $3.2 million so I -- I probably didn't roll forward the basis properly, in hindsight, for the 2009 return because, again, I was proving out over the period of time all of the cash activity which is shown on a summary sheet not on this detailed sheet.
>
> Q. So you…classified 3.2 million as income, correct?
>
> A. Yes. Again, I'm doing this all based on memory.
>
> Q. Just answer yes or no, sir.
>
> A. Yes.
>
> Q. And you did not include the 3.5 as basis, correct?
>
> A. I recorded 20 percent of the 3.5 as basis on that --

ECF No. 146 at PageID.3515.

---

[6] He used the $1.6 million to invest in two of his companies, IB Tech and Komplique.

When asked what happened to JDFX's capital after JDFX failed, Pavlik testified that to the best of his knowledge there was "nothing left for JDFX when it was liquidated." ECF No. 144 at PageID.3358.

C.

Though Defendant relied upon the claim of right doctrine prior to and during trial, he now disavows the legal validity of his Offer in Compromise and Pavlik's use of the claim of right doctrine to contend that he owed no U. S. tax. Defendant's trial counsel argued that the second amended returns "are based, in part, on a claim-of-right theory. If the return is ultimately upheld, and tax experts believe it may be, James Pieron did not owe anything for 2008-2009. He has significantly overpaid for those years." ECF No. 38 at PageID.225.

However, Defendant's new attorneys walked back Pavlik's application of the claim of right doctrine. In their first supplemental brief on tax loss, they represented:

> Pavlik admitted that it was he who developed the idea of reporting a theft loss on Pieron's amended 2008 and 2009 tax returns. **Based on research conducted by the undersigned, we do not believe that the theft loss claimed in the 2008 and 2009 amended tax returns for Pieron can be supported by law. In fact, Pavlik will testify that taking the position on theft loss was an aggressive position.**

> It was also Pavlik who developed and implemented the claim of right doctrine incorporated in the 2011 amended tax return that resulted in what Pavlik believed would be a sizeable tax credit to be used to essentially pay off the liabilities found in the 2008 and 2009 amended tax returns. **Again, the undersigned researched the use of the claim of right doctrine under 26 USC § 1341 in this matter and determined that it could not be supported by law.** Pavlik was attempting to be creative in an effort to minimize his client's tax liabilities. What he should have done is ask questions about the capital gains. When he learned the truth he should have amended the 2008 and 2009 tax returns to take out the capital gains.

ECF No. 117 at PageID.2512 (citations omitted) (emphasis in original).

During the sentencing hearing, defense counsel argued:

> There was a series of bad, bad, bad mistakes, and in my opinion, accounting malpractice in this case because Pavlik treats this -- comes up with this theft loss

- 31 -

and this claim of right doctrine, and what he should have done is treated it as a bad business debt, and the law is pretty clear on that.

ECF No. 139 at PageID.3113-14.

## IV.

As provided above, §2T1.1 of the Federal Sentencing Guidelines outlines the guidelines for crimes of tax evasion. It provides:

(a) Base Offense Level:

(1) Level from § 2T4.1 (Tax Table) corresponding to the tax loss; or

(2) 6, if there is no tax loss.

(b) Specific Offense Characteristics

(1) If the defendant failed to report or to correctly identify the source of income exceeding $10,000 in any year from criminal activity, increase by 2 levels. If the resulting offense level is less than level 12, increase to level 12.

(2) If the offense involved sophisticated means, increase by 2 levels. If the resulting offense level is less than level 12, increase to level 12…

The tax table at §2T4.1, as it is relevant, provides as follows:

| **Tax Loss** (apply the greatest) | **Offense Level** |
|---|---|
| **(A)** $2,500 or less | 6 |
| **(B)** More than $2,500 | 8 |
| **(C)** More than $6,500 | 10 |
| **(D)** More than $15,000 | 12 |
| **(E)** More than $40,000 | 14 |
| **(F)** More than $100,000 | 16 |
| **(G)** More than $250,000 | 18 |
| **(H)** More than $550,000 | 20 |
| **(I)** More than $1,500,000 | 22 |
| **(J)** More than $3,500,000 | 24 |
| **(K)** More than $9,500,000 | 26 |

## A.

The guidelines define a "tax loss" as follows:

> If the offense involved tax evasion or a fraudulent or false return, statement, or other document, the tax loss is the total amount of loss that was the object of the offense (i.e., the loss that would have resulted had the offense been successfully completed).

U.S.S.G. § 2T1.1(c)(1).

The government bears the burden of establishing the amount of tax loss by a preponderance of the evidence standard. *U.S. v. Daulton*, 266 Fed. Appx. 381, 388 (6th Cir. 2008). However, the guidelines address situations in which a tax loss is not readily ascertainable, providing that "[i]n these situations, the 'presumptions' set forth are to be used unless the government or defense provides sufficient information for a more accurate assessment of the tax loss. U.S.S.G. § 2T1.1, Application Note 1. The applicable "presumption" in this case provides:

> If the offense involved filing a tax return in which gross income was underreported, the tax loss shall be treated as equal to 28% of the unreported gross income (34% if the taxpayer is a corporation) plus 100% of any false credits claimed against tax, unless a more accurate determination of the tax loss can be made.

U.S.S.G. § 2T1.1(c)(1)(A).

## B.

Relevant conduct is addressed in U.S.S.G. § 1B1.3(a), which provides that, unless otherwise specified, the base offense level is to be determined based on:

> (1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were--
>
> > (i) within the scope of the jointly undertaken criminal activity,
> >
> > (ii) in furtherance of that criminal activity, and
> >
> > (iii) reasonably foreseeable in connection with that criminal activity;

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

(2) solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

(3) all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and

(4) any other information specified in the applicable guideline.

U.S.S.G. § 1B1.3(a).

The guidelines specifically address relevant conduct for tax evasion. They provide:

In determining the total tax loss attributable to the offense (see § 1B1.3(a)(2)), all conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated. The following examples are illustrative of conduct that is part of the same course of conduct or common scheme or plan: (A) there is a continuing pattern of violations of the tax laws by the defendant; (B) the defendant uses a consistent method to evade or camouflage income, e.g., backdating documents or using off-shore accounts; (C) the violations involve the same or a related series of transactions; (D) the violation in each instance involves a false or inflated claim of a similar deduction or credit; and (E) the violation in each instance involves a failure to report or an understatement of a specific source of income, e.g., interest from savings accounts or income from a particular business activity. These examples are not intended to be exhaustive.

U.S.S.G. § 2T1.1, Application Note 2.

## C.

The Government's latest brief on Defendant's sentencing guidelines provides:

[T]he tax loss for which James D. Pieron, Jr., is accountable remains within the $3.5 million to $9.5 million range previously calculated by the government, and Pieron's base offense level under the sentencing guidelines is 24. Pieron should receive 2 points pursuant to USSG §2T1.1(b)(1) for failing to report or correctly identify the source of more than $10,000 obtained from criminal activity in 2008 and 2009. Pieron's offense level should also be increased by 2 points under USSG §2T1.1(b)(2) because he used sophisticated means, including off-shore bank accounts and other measures, to deceive his tax preparers, including CPA Kim

Pavlik, and to evade and defeat collection by the IRS of Pieron's unpaid 2008 and 2009 taxes.

ECF No. 156 at PageID.3830. The Government further contends that Defendant "should be assessed 2 points under USSG §3C1.1 for obstruction of justice." *Id.*

In his latest sentencing guidelines brief, Defendant contends that his base offense level is 6 because according to him, there was no tax loss. ECF No. 157 at PageID.3848.

## V.

### A.

Several observations may be made about the evidence (or absence of evidence) before addressing the sentencing guidelines. First it is less than clear what the JDFX entities actually are. They may be separate but related entities under Swiss law. They also may be separate funds of a single entity. Different documents received during the trial and the later sentencing hearings furnish attributes of each alternative, but nothing that could be regarded as conclusive. Nevertheless, the spreadsheets furnished by the defendant to his accountants demonstrate that he had essentially unlimited access to each entity or fund and the ability to control all of the funds. All of the evidence demonstrated that the entities or funds operated to function as an integrated economic entity largely at the Defendant's direction.

Second, not a single witness with personal knowledge of the actual financial activity of JDFX testified during either the trial or the sentencing hearings. Accordingly, the Court's understanding of all the relevant transactions is limited to the reasonable inferences that might be drawn from the documents secured by the Government during discovery, the documents offered by the Defendant's expert witness without authentication, hearsay statements made by the Defendant to his tax return preparers, and Defendant's and his attorney's statements to various law enforcement officials.

The Court previously determined that Defendant was judicially estopped from continuing to pursue his argument that he did not sell his JDFX stock to Cook/Market Shot. ECF No. 129. The Court reasoned that judicial estoppel was appropriate because Defendant and his attorneys had represented on multiple occasions that Defendant sold his JDFX stock to Cook/Market Shot.

Defendant argued that the doctrine of judicial estoppel did not apply because "[t]rial courts have an obligation to rule on disputed factual matters to ensure sentences are based on accurate information" and "[t]he doctrine of judicial estoppel, which 'imping[es] on the truth-seeking function of the court,' runs in tension with these obligations. *Teledyne Indus., Inc. v. N.L.R.B.*, 911 F.2d 1214, 1218 (6th Cir. 1990)." ECF No. 132 at PageID.2940. Defendant further argued that judicial estoppel did not apply because "it applies only when a party attempts to take 'a position inconsistent with one successfully and unequivocally asserted by that same party in an earlier proceeding.' *Warda v. Comm'r*, 15 F.3d 533, 538 (6th Cir.1994)." *Id.* at PageID.2942.

Though Defendant's objections to the Court's use of the doctrine of judicial estoppel may have some merit, the fact remains that Defendant attested to the veracity of his tax returns when he signed and submitted his first return, his first amended return, and his second amended return. As the Court previously explained:

> Defendant argues that "[r]egardless of the filed tax returns or the tax positions taken by Pieron, his lawyers, and his accountants, this Court has an obligation to make its own findings based on *reliable* facts, concerning disputed sentencing issues." ECF No. 124 at PageID.2821 (emphasis in original). Such a claim is extraordinary. Where are reliable facts to be found if the Court may not consider assertions made by Defendant, his counsel, his accountants, and his tax returns? Defendant signed each of his tax returns, affirming that the information contained therein was accurate. He now attempts to reject them wholesale by contending that they are based on "erroneous facts." *Id.* at PageID.2822.

> Some or all of Defendant's three tax returns are necessarily based on erroneous factual assertions. The values vary dramatically from one return to the next. However, such inconsistencies do not obviate one fact consistent throughout the returns: Defendant sold his shares to Cook. Defendant's new argument made after

the eleventh hour that he did not sell the JDFX stock to Cook is untenable. Defendant's tax returns and statements to the SEC and the Court indicate that he did in fact sell his stock.

ECF No. 129 at PageID.2880-81. Defendant signed each of his returns, certifying that "[u]nder penalty of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete." *See* Defendant's Tax Returns.

The Fifth Amendment to the U.S. Constitution provides in part, "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Supreme Court has explained that the Fifth Amendment only applies "when the accused is compelled to make a Testimonial Communication that is incriminating." *Fisher v. United States*, 425 U.S. 391, 408 (1976). "Taxpayers have Fifth Amendment rights not to be forced to incriminate themselves by the compelled act of production." U.S. v. Zhong H. Chen, 815 F.3d 72, 74 (1st Cir. 2016). However, "[I]f a taxpayer wishes to invoke the fifth amendment privilege as a basis for refusing to provide information on his federal income tax return, the claim of privilege must be occasioned by an actual, substantial possibility of criminal prosecution and not by a conjectural or hypothetical possibility of prosecution." *Liljenfeldt v. United States*, 588 F. Supp. 966, 970 (June 5, 1984 E.D. Wis.). Requiring a taxpayer to attest to the accuracy of the information within their tax return is not a violation of the Fifth Amendment.

The information Defendant provided to the tax return preparers and later incorporated into his tax returns establishes at least a preliminary evidentiary basis for the Court to conclude that the information contained therein is accurate in the absence of evidence to the contrary.

Third, there were no financial documents or financial statements introduced for JDFX. Defendant introduced contradictory documents related to the initial capitalization of JDFX, but

did not furnish a single operating statement reflecting the operating activity of the enterprise. It appears to have been capitalized with $15 million, but there was no information provided indicating whether JDFX made or lost money.  Most importantly, Defendant did not furnish an accounting of the assets of JDFX when it was allegedly liquidated as a total loss.

## B.

### 1.

 Defendant reported his sale of JDFX stock as a capital transaction in his filed returns, in his statements made to the SEC, and statements made by Defendant's counsel during trial. *See supra* Section II.B. The only evidence to the contrary was from Ms. Rebeck's suggestion that a document tendered to her by the Defendant's attorney could be interpreted differently.

The Defendant's return is further corroborated by the Stock Purchase Agreements memorializing the sale of stock from Defendant to Market Shot. Neither Defendant, nor his counsel, nor his expert witness have explained why these agreements exist if such a transaction did not take place.

Defendant signed all three sets of returns, attesting to their validity. Defendant has not offered an adequate rebuttal to the Government's reliance on these returns. He has not explained why he claimed on his returns that the transfer of money from Cook was for the sale of JDFX stock. Nor has he explained why he continued to characterize the transaction as such to his attorneys and accountants. Nor has he explained why the Stock Purchase Agreements, memorializing the sale of stock to Cook, are inaccurate. Instead, Defendant has responded to the Government's argument with the testimony of an expert witness who received all of her information from Defendant and defense counsel, and who then hypothesized an alternate explanation.

**2.**

Defendant's tax loss will be determined according to the $15.25 million funds he received in 2007, 2008, and 2009. Specifically, $9.5 million in 2007, $2.1 million in 2008, and $3.15 million in 2009. The Government's indictment only charges Defendant for the years 2008 and 2009, but the 2007 funds will be included as relevant conduct. As explained by the Sixth Circuit,

> For sentencing purposes, the use of tax loss resulting from uncharged conduct is authorized by § 1B1.3, the "relevant conduct" provision of the Guidelines. For tax offenses, application note two to § 2T1.1 states that in determining a defendant's total tax loss, "all conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated."

*United States v. Pierce*, 17 F.3d 146, 150 (6th Cir. 1994). *See also United States v. Lombardo*, 582 F. App'x 601, 619 (6th Cir. 2014) (finding that prior uncharged conduct qualified as relevant conduct of tax evasion).

The Government's tax loss assessment will be adopted. It provides:

| | |
|---|---|
| 2008 criminal tax | $2,517,958.00 |
| 2008 penalties est. | $1,196,030.05 |
| 2008 interest est. | $1,243,822.90 |
| 2009 criminal tax | $ 777,320.00 |
| 2009 penalties est. | $ 369,227.00 |
| 2009 interest est. | $ 330,892.62 |
| Total Tax Loss | $6,435,250.57 |

ECF No. 60 at PageID.1098. Defendant falls within the more than $3.5 million and less than $9.5 million range provided in §2T4.1. *See supra* Section IV. His base offense level is 24.

As explained above, the Government bears the burden of establishing the amount of tax loss by a preponderance of the evidence standard. *U.S. v. Daulton*, 266 Fed. Appx. 381, 388 (6th Cir. 2008). The Government has met this standard by relying upon Defendant's tax returns in which he represented that he sold JDFX stock to Cook. Defendant did not present an adequate

rebuttal, instead presenting materials that sought to obfuscate the issues at question. The Government met its burden, but Defendant did not meet his.

**VI.**

Accordingly, it is **ORDERED** that Defendant's base offense level is 24.


Dated: June 9, 2020                                    s/Thomas L. Ludington
                                                       THOMAS L. LUDINGTON
                                                       United States District Judge