UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,       Case No. 18-CR-20489

v.              Honorable Thomas L. Ludington

JAMES D. PIERON, JR.,

     Defendant.

_____/

## ORDER DENYING DEFENDANT'S MOTION FOR
## A JUDGMENT OF ACQUITTAL AND MOTION FOR A NEW TRIAL

On March 7, 2019, a jury convicted Defendant James D. Pieron, Jr. of one count of tax evasion in violation of 26 U.S.C. § 7201. ECF No. 47. On May 15, 2019, Defendant moved for a judgment of acquittal or alternatively a new trial. ECF Nos. 66, 68. Response and reply briefs were filed. ECF Nos. 113, 118, 119. For the reasons stated below, the motions will be denied.

## I.

## A.

On July 18, 2018, a grand jury indicted Defendant with one count of tax evasion in violation of 26 U.S.C. § 7201. ECF No. 1. On August 1, 2018, Plaintiff, the United States of America (the "Government"), voluntarily filed a bill of particulars. ECF No. 5. The bill states, in relevant part:

> 17. In January of 2012, Pieron signed and submitted to the IRS amended tax returns for 2008 and 2009, both of which reported that he owed income tax for those years, but he did not submit any payment to the IRS with those returns. Instead, Pieron submitted to the IRS a request for an installment agreement and acknowledged that he owed $444,880 for his 2008 and 2009 federal income taxes. Pieron's request for an installment agreement included a collection information statement on which Pieron only reported an interest in one vehicle, a Volkswagen, claimed that he had $3,500 in bank accounts, and valued his equity interest in Komplique, Inc. and Navitas Investments, LLC at $1,000 per entity. At that time, Pieron's equity

interests in Komplique, Inc. and Navitas Investments, LLC, was far more than $1,000 per entity. When Pieron filed his collection information statement, the bank accounts for Komplique, Inc. held over $200,000. Pieron also failed to report that he had an interest in and use of a Mercedes Benz that he had purchased in 2009 for over $100,000 and titled in the name of Komplique, Inc.

18. In the spring of 2012, Pieron gave [his tax preparer] Pavlik a new spreadsheet that included incomplete information about Pieron's foreign bank accounts. In May of 2012, Pavlik mailed Pieron unsigned Foreign Bank Account Reports with instructions for Pieron to sign and file the reports with the IRS. Pieron did not file the reports until after he learned he was under criminal investigation. The reports that Pieron eventually did file with the IRS disclosed a bank account that Pieron had not included on the spreadsheet that he gave to Pavlik in the spring of 2012. On his FBAR report for 2009, Pieron falsely stated that the maximum balance in a Swiss bank account for one of his businesses was $250,000 during 2009. In fact, the maximum balance in that account was at least $749,975 in 2009.

19. In April 2014, Pieron submitted to the IRS an offer in compromise for his personal income taxes for 2007 to 2011, offering to pay a total of $30,000 to satisfy his tax liabilities for all of those years. Pieron's offer in compromise included a collection information statement on which Pieron did not fully disclose his assets and a supplemental statement that contained false and misleading information.

ECF No. 5 at PageID.13–15. After several months of motion practice, the parties proceeded to trial. The jury was empaneled on February 28, 2019. ECF No. 51. On March 7, 2019, the jury returned a guilty verdict. ECF No. 47.

### B.

The following is a summary of the pertinent evidence presented at trial.[1] Defendant, an accomplished computer engineer and entrepreneur, lived in Switzerland for roughly a decade before 2009. While in Switzerland, Defendant owned and operated various businesses but failed to report foreign bank account interests or file federal income tax returns. After he returned to the United States in 2009, Defendant transferred millions of dollars from foreign bank accounts to domestic accounts held by entities that he controlled. Some of these transferred funds came from

---

[1] Further discussion of this case and the evidence presented appears in this Court's order adopting the Government's tax loss assessment. *See* ECF No. 162 at PageID.3860–76.

the sale of Defendant's interest in JDFX Holding AG ("JDFX"), a currency trading company formed in Switzerland. ECF No. 52 at PageID.515–20. Between 2006 and 2009, Trevor Cook,[2] through his company Market Shot LLC, paid Defendant over $15,000,000 for part of Defendant's interest in JDFX.[3] *Id*; *see also* ECF Nos. 112-11, 112-12 (stock purchase agreements). Defendant, nonetheless, failed to file his 2008 and 2009 federal income tax returns when they were due.

By the spring of 2010, Defendant had six-figure balances in several foreign bank accounts. ECF No. 51 at PageID.412–18. Defendant failed to use any of these funds to pay his tax liability. For example, on April 15, 2010, the day his 2009 tax return was due, Defendant transferred $65,000 between two personal bank accounts. ECF No. 53 at PageID.768–69. Similarly, on November 26, 2010, Defendant withdrew $820,626.24 from a personal bank account. ECF No. 114-32. A few days later, on November 30, 2010, Defendant transferred $800,000 from a personal Swiss bank account to an account held by Komplique, Inc. ("Komplique"), his swimwear business. ECF No. 114-69 at PageID.2348. All of this occurred only weeks before January 2011, when Defendant filed his 2008 and 2009 federal tax returns. On his returns, Defendant reported a tax liability of $268,445 for 2008 and $125,490 for 2009. ECF No. 52 at PageID.548–50.

Defendant's curious behavior did not go unnoticed. After Defendant provided his personal accounting, composed primarily of spreadsheets he prepared, for 2007 and 2008 to American Tax Solutions, Carol Nathan, Defendant's assigned tax preparer, noted that he had not provided a "full accounting," had been "moving money around[,] and ha[d] an ability to pay." *Id.* at PageID.545.

---

[2] Cook was later convicted of operating a $158 million Ponzi scheme where he "solicited investors to participate in a fabricated foreign currency trading program." *See Zayed v. Buysse*, No. 11-CV-1042, 2012 WL 12893882, at *1 (D. Minn. Sept. 27, 2012) (discussing Cook and his Ponzi scheme). After Cook's scheme was revealed, Swiss institutions cut their ties with JDFX, apparently causing the company to liquidate.

[3] As discussed in Section IV.B.1., *infra*, Defendant now contends that he did not sell his interest in JDFX but that the "sale" was actually a nontaxable issuance of treasury stock between JDFX and Cook.

By February 14, 2011, Defendant had received IRS demands for payment claiming that he owed $379,617.86 for 2008 and $166,584.07 for 2009. ECF No. 114-36, 114-37. Through bank accounts held by his entities, Defendant controlled not less than $1,000,000 in cash by the winter of 2011. ECF No. 51 at PageID.420–21. During this timeframe, Defendant was lending hundreds of thousands of dollars to his entities and using the funds to make purchases for his personal enjoyment. For example, in March 2011, Defendant caused Komplique to purchase nearly $16,000 in wine. ECF No. 114-70 at PageID.2362. Similarly, on May 4, 2011, Defendant used $20,000 from a Komplique account to purchase a piano. ECF No. 114-79. And in April 2012, Defendant used $18,901 of Komplique funds to purchase a motorcycle. *See* ECF No. 114-95.

On January 30, 2012, Defendant submitted a Form 1040-X (Amended Personal Income Tax Return) for 2008 showing a tax liability of $365,082 and another 1040-X for 2009 showing a liability of $74,272. ECF No. 54 at PageID.856. Defendant did not include any payment for his 2008 and 2009 liabilities with the two amended income tax returns. He also failed to report his ownership of foreign corporate interests for those years. He did, however, submit a Form 9465 (Installment Agreement Request) and accompanying Form 433-F (Collection Information Statement), through which he offered to pay $1,500 per month for his 2008 and 2009 liabilities. ECF No. 114-15.

The Form 433-F was not entirely accurate, though. For instance, the form omitted any reference to Defendant's 2009 Mercedes-Benz automobile. Defendant had purchased the vehicle for $110,000 in August 2008 and caused it to be titled to Komplique. ECF No. 114-39. Defendant also appeared to understate the value of his business entities. In 2010, Defendant received a $250,000 payment from his corporation IB Technologies, Inc. ("IB Technologies"). The payment was allegedly intended to repay Defendant for a prior loan. ECF No. 114-34. Defendant deposited

the payment in a personal account but then immediately transferred it to his Navitas Investments, LLC ("Navitas") account. ECF No. 114-54 at PageID.2259. Defendant similarly deposited another $350,000 loan repayment from IB Technologies to an account held by Komplique. ECF No. 114-72. By December 2011, when Defendant's Form 433-F was prepared, Defendant had access to over $200,000 in an account held by Komplique. ECF No. 114-87. Even so, the Form 433-F states that Defendant held merely $500 in a Fifth Third Bank account, $3000 in a PNC Bank account, a Volkswagen automobile worth $25,000, and interests in Komplique and Navitas each worth $1,000. ECF No. 114-15.

On August 6, 2012, Defendant filed a Foreign Bank Account Report ("FBAR") for 2009 that provided a maximum balance of $250,000 for one of the JDFX accounts. ECF No. 114-5. However, a November 18, 2009 wire transfer from that account to IB Technologies reflected that the account balance was nearly $750,000. ECF No. 51 at PageID.387–88.

On April 3, 2014, Defendant submitted a Form 656-L (Offer in Compromise: Doubt as to Liability) to the IRS regarding his 2008 and 2009 liabilities, along with a Form 433-F. ECF Nos. 114-16, 114-17. The Form 433-F stated that Defendant had $108 in a PNC Bank account, a Volkswagen automobile worth $25,000, $20,000 in "used fitness equipment," and interests in Navitas and Komplique worth $1,000 and $250,000, respectively. Through the Form 656-L, Defendant offered to resolve all his tax liabilities for $30,000. ECF No. 114-16. The IRS did not accept his offer.

## C.

On May 15, 2019, after receiving an extension from the Court, Defendant moved for a judgment of acquittal or alternatively a new trial. ECF Nos. 66, 68. Defendant argues that he should be acquitted because no reasonable juror could find that he committed an affirmative act of evasion

between January 9, 2012 and July 31, 2018, the relevant statutory period. Defendant further argues for a new trial based on (1) the failure to instruct the jury on the statute of limitations, (2) the ineffective assistance of trial counsel, and (3) the manifest weight of the evidence. Timely response and reply briefs have been filed. ECF Nos. 113, 118, 119.

On April 10, 2019—a month before the pending motions were filed—the parties appeared in a status conference to discuss any anticipated issues with the Sentencing Guidelines. After the status conference, the Government was directed to file a tax loss assessment, and Defendant was directed to file a response. ECF No. 59. Over the following year, Defendant and his businesses were examined through several rounds of supplemental briefing and five days of evidentiary hearings. In the process, this Court heard evidence from several witnesses regarding Defendant's personal background, the structure and operation of his businesses, and his involvement with JDFX. Finally, on June 9, 2020, the Government's tax loss assessment was adopted. ECF No. 162.

Given the evidence presented since May 2019, the parties were directed on October 7, 2020 to file supplemental briefing addressing "the extent to which the evidence heard since May 2019 impacts Defendant's motions." ECF No. 167 at PageID.3908. In subsequently filed briefs, the Government argued that post-trial evidence should not be considered, particularly with respect to Defendant's Motion for a Judgment of Acquittal, while Defendant maintained that such evidence supports his motions, particularly the Motion for a New Trial. *See* ECF Nos. 170, 171. On November 20, 2020, the parties appeared before this Court by way of Zoom for oral argument addressing the pending motions.

## II.

Defendant's Motion for a Judgment of Acquittal and Motion for a New Trial are governed by Federal Rules of Criminal Procedure 29 and 33, respectively.

## A.

Rule 29(c) permits a defendant to move for a judgment of acquittal within 14 days after a guilty verdict has been rendered. If the court determines pursuant to its own review of the evidence that "the evidence is insufficient to sustain a conviction," the court must enter a judgment of acquittal. Fed. R. Crim. P. 29(a). This review is extremely favorable to the prosecution. "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). In reviewing the jury's verdict, "both circumstantial and direct evidence" must be viewed "in a light most favorable to the prosecution." *United States v. Humphrey*, 279 F.3d 372, 378 (6th Cir. 2002). "Circumstantial evidence alone, if substantial and competent, may support a verdict and need not remove every reasonable hypothesis except that of guilt." *United States v. Keeton*, 101 F.3d 48, 52 (6th Cir. 1996) (internal quotation marks omitted). "The government is entitled to the benefit of all reasonable inferences that can be drawn from the evidence." *United States v. Hofstatter*, 8 F.3d 316, 324 (6th Cir. 1993).

## B.

Pursuant to Rule 33(a), "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Such a motion may be granted if "the jury's verdict was against the manifest weight of the evidence." *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007). But "such motions are granted only 'in the extraordinary circumstance where the evidence preponderates heavily against the verdict.'" *Id.* at 592 (quoting *United States v. Turner*, 490 F.Supp. 583, 593 (E.D. Mich. 1979)).

"Furthermore, it is widely agreed that Rule 33's 'interest of justice' standard allows the grant of a new trial where substantial legal error has occurred." *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010). Accordingly, a new trial should be granted for failure to give a jury instruction "if that instruction is (1) a correct statement of the law, (2) not substantially covered by the charge actually delivered to the jury, and (3) concerns a point so important in the trial that the failure to give it substantially impairs the defendant's defense." *United States v. Williams*, 952 F.2d 1504, 1512 (6th Cir. 1991). Similarly, "to prevail on a motion for new trial based upon ineffective assistance of counsel, the defendant must show that: (1) counsel's performance was deficient; and (2) it prejudiced the defense in a manner which deprived the defendant of a fair trial." *United States v. Garcia*, 19 F.3d 1123, 1126 (6th Cir. 1994).

## C.

The treatment of post-trial evidence differs for each motion. Rule 29(a) specifically contemplates a review of the evidence presented at trial, which must be viewed, as the Sixth Circuit instructs, "in a light most favorable to the prosecution." *Humphrey*, 279 F.3d at 378. Accordingly, considering evidence that was not admitted at trial would be antithetical to Rule 29. Defendant has cited no legal authority to the contrary.

In contrast, a Rule 33 motion based on ineffective assistance of counsel may require consideration of evidence not introduced at trial. For example, while "[t]he failure to investigate or call a particular witness can constitute ineffective assistance of counsel in violation of the Sixth Amendment," the defendant must show "that the witness or witnesses whom counsel failed to investigate did, in fact, have favorable testimony to offer." *Sowell v. Collins*, 557 F. Supp. 2d 843, 883 (S.D. Ohio 2008), *aff'd sub nom. Sowell v. Anderson*, 663 F.3d 783 (6th Cir. 2011). However, post-trial evidence should not be considered when deciding whether the verdict was against the

manifest weight of the evidence. Doing so would confuse two distinct forms of review: manifest weight review, where the court "act[s] as a thirteenth juror, assessing the credibility of witnesses and the weight of the evidence," *Hughes*, 505 F.3d at 593, and "newly discovered evidence" review, where the court must apply a narrow, four-part test before ordering a new trial.[4] *See United States v. Carson*, 560 F.3d 566, 585 (6th Cir. 2009) ("[A] defendant must show the following: (1) the new evidence was discovered after the trial; (2) the evidence could not have been discovered earlier with due diligence; (3) the evidence is material and not merely cumulative or impeaching; and (4) the evidence would likely produce acquittal.") (internal quotation marks omitted). Absent binding authority to the contrary, this Court cannot conclude that the more discretionary form of review should displace the more stringent.[5] Consequently, this Court's consideration of post-trial evidence is properly confined to whether trial counsel was ineffective in violation of the Sixth Amendment.

## III.

Defendant's Motion for a Judgment of Acquittal challenges the legal sufficiency of the evidence at trial. Defendant was convicted of one count of tax evasion in violation of 26 U.S.C. § 7201. To convict a defendant of tax evasion, "the government must prove the following elements beyond a reasonable doubt: (1) that defendant made an affirmative attempt to evade or defeat a tax; (2) that defendant had a tax due and owing; and (3) that defendant acted willfully." *United States v. Fusero*, 106 F. Supp. 2d 921, 927 (E.D. Mich. 2000). The jury was instructed on the same

---

[4] This case presents a rare posture because defendants ordinarily wait until after direct appeal to raise ineffective assistance. *United States v. Reynolds*, 534 F. App'x 347, 372 (6th Cir. 2013) ("In general, a defendant may not raise a claim for ineffective assistance of counsel on direct appeal. The preferred route for raising such claims is in a post-conviction proceeding under 28 U.S.C. § 2255, so that the parties can develop an adequate record.") (internal citation omitted).

[5] Defendant does not allege that any of the post-trial evidence is "new." Indeed, he claims that such evidence should have been admitted at trial. *See* Section IV.B.1., *infra*.

elements at trial. ECF No. 48. The dispute here turns on the first element—an "affirmative act of evasion"—and whether the Government furnished evidence of such conduct within the statutory period. ECF No. 66 at PageID.1270. For the reasons stated below, Defendant's Motion for a Judgment of Acquittal will be denied.

## A.

For decades, federal courts have declined to read "affirmative act" narrowly. "Congress did not define or limit the methods by which a willful attempt to defeat and evade might be accomplished and perhaps did not define lest its effort to do so result in some unexpected limitation." *Spies v. United States*, 317 U.S. 492, 499 (1943). Consequently, an affirmative act "may be inferred" by "concealment of assets or covering up sources of income" or "handling of one's affairs to avoid making the records usual in transactions of the kind." *Id.* Essentially, "any conduct, the likely effect of which would be to mislead or to conceal," can constitute an affirmative act of evasion. *Id.*

According to Defendant, the Government's decision to furnish a bill of particulars "strictly limited" its proofs on the substantive elements of tax evasion to the evidence specified in the bill. *Id.* at PageID.1270. Defendant thus argues that the affirmative act element can only be demonstrated by three actions alleged in the bill: (1) submission of the Form 9465 and accompanying Form 433-F in January 2012; (2) submission of the FBARs in August 2012; and (3) submission of the Form 656-L and accompanying Form 433-F in April 2014. No rational juror, according to Defendant, could find that these actions constituted an affirmative act of evasion.

Two points should be made as a preliminary matter. First, each act should be evaluated in light of all the evidence. In many cases, an affirmative act of evasion is just one step in a larger plan to defraud the government—a fact reflected in the law governing the statute of limitations.

*See United States v. Dandy*, 998 F.2d 1344, 1355 (6th Cir. 1993) (holding that date of last affirmative act of evasion controls statute of limitations), *as amended* (Aug. 11, 1993). And because even lawful activity can constitute evasion "if the tax-evasion motive plays any part in such conduct," *Spies*, 317 U.S. at 499, the factfinder must often rely on circumstantial evidence.

Second, Defendant has not identified controlling authority that strictly limits the jury to matters within the bill of particulars. Defendant's reliance on *United States v. Haskins*, 345 F.2d 111 (6th Cir. 1965), is inapposite. *Haskins* merely holds that a prejudicial variance from the bill of particulars is reversible error. *Haskins*, 345 F.2d at 114. Accordingly, the jury had discretion to find an affirmative act of evasion within the statutory period based upon any relevant evidence at trial, and that discretion should be respected.[6] Regardless, even if the jury were so limited, the evidence specified in the bill of particulars, viewed in the light most favorable to the Government, supports a guilty verdict.

## 1.

Defendant contends that his filing of the 2012 Form 433-F was not an affirmative act of evasion because the Government did not demonstrate that Defendant misstated the value of his equity in Komplique and Navitas or wrongfully omitted the 2009 Mercedes. ECF No. 66 at PageID.1272–73. With respect to the valuations, Defendant emphasizes the lack of any expert testimony regarding the value of the entities. *Id.* at PageID.1272. Similarly, Defendant notes the lack of any evidence at trial proving that the 2009 Mercedes was a personal asset. *Id.* at PageID.1273.

Defendant misstates the role of the jury. First, it was not necessary for the jury to arrive at an expert-like valuation for Navitas and Komplique. The jury simply had to infer that by valuing

---

[6] The jury might, for example, have considered Defendant's April 2012 cash purchase of a motorcycle for $18,901 with funds from a Komplique account. *See* ECF No. 114-95.

his interest in each company at $1,000, Defendant engaged in "conduct, the likely effect of which would be to mislead or to conceal." *Spies*, 317 U.S. at 499. Such an inference was perfectly reasonable here. The Government introduced compelling evidence that, as part of his scheme, Defendant treated Komplique, Navitas, and other entities like personal checking accounts to shield substantial assets from collection.[7] Similarly, the uncontroverted evidence showed that Defendant caused Komplique to purchase the 2009 Mercedes. The lack of mileage evidence is irrelevant because no evidence indicated that anyone besides Defendant drove the vehicle.

In *United States v. Daniel*, 956 F.2d 540 (6th Cir. 1992), the defendant, owner of a theater-seat installation business, was convicted of tax evasion after failing to report his income for several consecutive years. On appeal, he "allege[d] that the government did not meet its burden in proving that he willfully and through affirmative acts, attempted to evade or defeat income tax." *Daniel*, 956 F.2d at 542. At trial, the government introduced various circumstantial evidence of evasion, including that the defendant "used cash extensively," "purchased investments under his second wife's name," "titled several business-related vehicles in his son's name," and "refused to keep checking or savings accounts in his own name." *Id.* at 543. Relying on *Spies*, the Sixth Circuit found that the evidence was legally sufficient. *Id.*

Here, like in *Daniel*, a set of acts, though individually benign, together paint a coherent picture of evasion that the jury was entitled to believe. To find otherwise would mean that *no*

---

[7] Like any taxpayer, Defendant was required to keep adequate records, *Keller v. Comm'r of Internal Revenue*, 770 F.2d 166 (6th Cir. 1985) (citing 26 U.S.C. § 6001). The jury was not obligated to ignore evidence that he failed to do so. Indeed, while the failure to keep adequate records is not itself an "act of evasion," the jury was instructed, consistent with *Spies*, that it could consider evidence that Defendant managed his affairs in such manner as to "avoid creating the usual type of records." ECF No. 55 at PageID.1021. Accordingly, the jury could have properly viewed Defendant's business practices as evasive in light of testimony that he failed to furnish his tax preparer with source documents and a "full accounting" of investments. *See* ECF No. 52 at PageID.526, 545. Defense counsel, in fact, acknowledged such testimony during closing argument but framed it innocently as "bad recordkeeping." ECF No. 55 at PageID.1049.

rational juror could infer that a $120,000 Mercedes-Benz driven exclusively by someone with a habit of commingling funds was a personal asset rather than the corporate asset of a swimwear company. Accordingly, the evidence supported a finding that Defendant affirmatively evaded his tax obligations by valuing his equity in Komplique and Navitas at $1,000 and omitting the 2009 Mercedes.

## 2.

Defendant next argues that his submission of the FBARs in August 2012 was not an affirmative act of evasion because "[t]here was no evidence as to how an incorrect 2009 maximum balance could affect the ability of the IRS to collect taxes in 2012 and beyond without evidence the 2010 FBAR was incorrectly stated." ECF No. 66 at PageID.1275. Defendant is directly contradicted by testimony—which he acknowledges—that false statements in an FBAR would negatively affect collectability. *See* ECF No. 51 at PageID.389. Defendant insists that the 2010 FBAR negates the effect of the 2009 FBAR, but this argument is premised on an inference that the witness did not make and is not now acceptable. Tax evasion cases often involve sophisticated webs of transactions and documents. Even if the 2010 FBAR was accurate, a rational juror could find that Defendant's misstatement in the 2009 FBAR was made to conceal his assets or otherwise mislead the IRS.

## 3.

Defendant's argument regarding the Form 656-L essentially reiterates his position on the Form 9465. The Form 656-L and accompanying Form 433-F, submitted in April 2014, state that Defendant had $108 in a PNC checking account, $250,000 in Komplique, $1,000 in Navitas, $20,000 in used fitness equipment, and a $25,000 Volkswagen vehicle. ECF No. 114-17.

According to Defendant, there is no evidence that any of these amounts were misstated or that he was required to list a previously purchased 2013 Mercedes vehicle as a personal asset.

As discussed in Section III.A.1., *supra*, a rational juror could conclude that the statements in Defendant's 2012 Form 433-F were misleading, and Defendant offers no reason to believe that the answer should be any different for the 2014 Form 433-F. The evidence showed that Defendant caused his company Krescent Media, LLC ("Krescent") to purchase the 2013 Mercedes priced at $139,500 by trading in the 2009 Mercedes and paying the balance in cash. ECF No. 114-88. Like he had with the 2009 Mercedes and Komplique, Defendant had the 2013 Mercedes titled to Krescent. ECF No. 114-89. There was no evidence that anyone other than Defendant drove the 2013 Mercedes. The evidence therefore readily supports a finding that Defendant's various misstatements and omissions were affirmative acts of evasion. Accordingly, Defendant's motion for a judgment of acquittal will be denied.

## IV.

Defendant raises three grounds in support of his Motion for a New Trial: (1) failure to instruct the jury on the statute of limitations; (2) ineffective assistance of counsel; and (3) manifest weight of the evidence. For the reasons stated below, Defendant's Motion for a New Trial will be denied.

## A.

Failure to give a jury instruction warrants a new trial "only if that instruction is (1) a correct statement of the law, (2) not substantially covered by the charge actually delivered to the jury, and (3) concerns a point so important in the trial that the failure to give it substantially impairs the defendant's defense." *Williams*, 952 F.2d at 1512. Defendant's proposed instruction read:

> To be guilty of the crime alleged, the defendant must have committed an affirmative act of tax evasion after January 9, 2012. If you do not find, beyond a reasonable

doubt, that the defendant committed an affirmative act of tax evasion after January 9, 2012, you must find him not guilty.

ECF No. 68 at PageID.1414. Even assuming the instruction was correct and not otherwise charged to the jury, Defendant cannot show that the failure substantially impaired his defense.

Relying on *United States v. Adams*, 583 F.3d 457 (6th Cir. 2009),[8] Defendant argues that his defense was substantially impaired "because the jury could have convicted on an improper basis—basing its verdict solely on affirmative acts of evasion occurring prior to January 9, 2012." ECF No. 68 at PageID.1415. However, *Adams* is readily distinguishable. In that case, the Sixth Circuit reversed the denial of a new trial motion premised on the failure to give a jury instruction. *Adams*, 583 F.3d at 460. The defendant was charged with being a felon in possession of a firearm. *Id.* At trial, the district court refused to instruct the jury that the defendant could not be convicted on his uncorroborated confession alone, even though the prosecutor commented on the confession and such an instruction was required by *United States v. Marshall*, 863 F.2d 1285 (6th Cir. 1988). *Adams*, 583 F.3d at 469–70. The Sixth Circuit held that "because the jury was never advised that corroboration of Adams's confession was required, it may have improperly convicted on the basis of the uncorroborated statement alone." *Id.* at 470 (citing *Marshall*, 863 F.2d at 1288).

In contrast, no binding authority required Defendant's proposed instruction, and there is nothing in the record to suggest that the jury reached its verdict improperly. This case is more analogous to *United States v. Gibson*, 409 F.3d 325 (6th Cir. 2005). In *Gibson*, the operator of a

---

[8] Defendant also quotes *Griffin v. United States*, 502 U.S. 46 (1991), for the proposition that when "jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error." *Griffin* 502 U.S. at 59. Despite rendering a favorable quote, Defendant's citation is inapposite. *Griffin* addressed a discrete due process issue; namely, whether a general guilty verdict was reversible on due process grounds because it failed to distinguish between two bases for conviction, one with sufficient evidence and one without. *Griffin*, 502 U.S. at 48–49. In the passage quoted by Defendant, the Supreme Court was clarifying the practical significance of the distinction between "legal error" and "insufficiency of proof"—not commenting on a rule of law relevant in this case. *Griffin*, 502 U.S. at 59.

coal mine and several employees were convicted of multiple offenses related to the Mining Health and Safety Act, including conspiracy. On appeal, the operator argued that it should be acquitted of the conspiracy count because "the jury's conviction might have been based on an act undertaken outside the statute of limitations." *Gibson*, 409 F.3d at 335. The trial court had failed to instruct the jury that it was required to find an overt act within the statutory period. *Id.* The Sixth Circuit rejected this argument, noting that "[a]lthough the jury did not specify the acts upon which it convicted [the operator], there was ample evidence that defendants violated the MHSA well beyond [the statutory period]." *Id.* at 336. Accordingly, the failure to instruct "had no 'substantial and injurious effect or influence on the verdict'" and was harmless. *Id.*

While *Gibson* concerned a motion for acquittal, the observation that a failure to instruct is harmless given "ample evidence" of relevant conduct within the statutory period is persuasive. As discussed in Section III., *supra*, the Government introduced compelling evidence that Defendant continued to evade his taxes after January 9, 2012. Defendant's suggestion that the jury might have found evasion before January 9, 2012, but not after, is essentially an invitation to second-guess the verdict that differs little from the argument in *Gibson*. Accordingly, the failure to give Defendant's proposed instruction did not substantially impair his defense, and he is not entitled to a new trial on that ground.

## B.

A new trial is warranted for ineffective assistance of counsel only where the defendant demonstrates "(1) counsel's performance was deficient; and (2) it prejudiced the defense in a manner which deprived the defendant of a fair trial." *Garcia*, 19 F.3d at 1126 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). With respect to the first prong, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that

- 16 -

counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Therefore, counsel's performance is only "deficient" if it is objectively unreasonable. *Hodge v. Hurley*, 426 F.3d 368, 385 (6th Cir. 2005). Regarding the prejudice prong, a defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Defendant argues that his trial counsel was ineffective for three reasons: (1) the failure to reasonably investigate the transactions underlying Defendants 2008 and 2009 tax liabilities; (2) the failure to object to inadmissible evidence; and (3) failure to object to prosecutorial misconduct. None of these purported deficiencies satisfy the *Strickland* test.

### 1.

Defendant argues that "[a] reasonable investigation, which [his] trial counsel failed to conduct, would have revealed that [he] never sold the stock to Cook." ECF No. 68 at PageID.1418. "Instead, Cook invested directly in JDFX, and the company, JDFX, issued stock directly to Cook." *Id.* Defendant supported this theory at the tax loss hearings with the testimony of Chelsea Rebeck, an accounting expert. Rebeck's testimony was summarized in this Court's order adopting the Government's tax loss assessment:

> Rebeck referred to numerous documents she had been furnished by Defendant or his counsel that corroborated the suggestion that the funds received from Cook were to capitalize a new JDFX entity. This included a Swiss "Share register" with a date of December 15, 2006 listing three JDFX shareholders: Market Shot LLC (Cook's company), the Defendant, and Clive Diethelm. ECF No. 117-16. According to the register and accompanying share certificates, JDFX had 10,000,000 registered shares. On December 15, 2006, 2,000,000 shares were issued to Market Shot LLC, 1,000,000 shares were issued to Clive Diethelm, and 7,000,000 shares were issued to the Defendant. She contended that Defendant "sold no shares to Cook and thus no actual capital asset was sold." ECF No. 117 at PageID.2507. As a result, she explained he would have had no tax liability, but he would also have no tax basis in the JDFX stock he received.

- 17 -

> Rebeck also relied on the Government's Trial Exhibit 138 from trial. It consisted of a summary of various bank transaction reports from 2006 to 2009 documenting the receipt of funds by JDFX. Rebeck contended that pursuant to Exhibit 138, the $10,000,000 of wire transfers in 2006 and 2007 cannot be characterized as a capital gain to Pieron because all the funds were received by JDFX, not Pieron. ECF No. 117 at PageID.2509. That is, Cook purchased the shares directly from JDFX.
>
> Rebeck went on to further explain that contrary to the 2008 and 2009 tax returns, the Defendant did not receive $10,000,000 in 2008 and $5,250,000 in 2009. *Id.* During defense counsel's direct examination, Rebeck testified that even if Defendant had in fact sold his shares directly to Cook and then loaned the proceeds to JDFX, he still would not have any tax liability.

ECF No. 162 at PageID.3879–80. Defendant also relies on the tax loss testimony of Kim Pavlik, the accountant who prepared Defendant's amended tax returns. Pavlik testified that the amended returns were "based on the sales documents" indicating a stock sale between Defendant, personally, and Market Shot LLC. ECF No. 144 at PageID.3337–38. Like Rebeck, however, Pavlik also testified that newly furnished evidence of a stock issuance meant that the amended returns were erroneous. *Id.* Rather than a sale by Defendant personally, the transaction "actually occurred between the company and the purchaser directly." *Id.*

As a threshold matter, Defendant has not shown that trial counsel failed to investigate his underlying tax liability. The fact that a defense theory is first articulated post-trial by freshly retained counsel does not mean that trial counsel was unaware. Moreover, Defendant offers no direct testimony as to the investigation undertaken by trial counsel. Defendant cites the affidavit of Fred Gavin, whom trial counsel retained as an expert, but Gavin states only that *he* was never asked to investigate the tax liability. ECF No. 68-5 at PageID.1451. Given their competent performance at trial, counsel likely investigated the underlying tax liability by other means. Accordingly, Gavin's averment that "trial counsel operated under the assumption that [Defendant] had capital gains in 2008 and 2009" is conclusory and without any apparent basis in personal knowledge.

The record suggests that trial counsel was, in fact, familiar with the structure of the JDFX transaction. During a sidebar at trial, Defendant and one of his attorneys, Michael Minns, confirmed to this Court that the transaction was structured as a personal sale of stock—but that such structuring was, as Defendant stated, a "mistake":

> Minns: The paperwork was in his name; the money went to the company. Is that correct?
>
> Defendant: That's correct.
>
> Minns: So he didn't take personal possession of the money, but the paperwork put the money in his name. The money went to the company.
>
> Court: Where did the stock go?
>
> Minns: The stock went to the investor, Cook.
>
> Court: From whom?
>
> Minns: It came from [Defendant]. It should have come from the company.
>
> Defendant: Yeah, yeah, that was a mistake.

ECF No. 53 at PageID.808. Even assuming that trial counsel was unaware, it is unclear that the Sixth Amendment would require trial counsel to distrust Defendant's repeated representations regarding the transaction's structure. *See United States v. Jordan*, 743 F. App'x 841, 843 (9th Cir. 2018) ("Jordan maintained for the first three years of his case that he had not been present during the robbery, despite the robbers having used his van as a getaway vehicle. Under Jordan's version of events, on which counsel was permitted to rely, there was no reason for counsel to thoroughly investigate what had happened at the scene.").

With respect to trial strategy, *Strickland* demands a "strong presumption" of reasonability. *Strickland*, 466 U.S. at 689. Despite Defendant's insistence to the contrary, the testimony offered by Pavlik and Rebeck seemed, at times, to obfuscate rather than clarify the facts, and such

testimony at trial might have prejudiced the defense by positing inconsistent accounts of the transaction. Indeed, the theory that Defendant never actually sold the stock at issue is contradicted by a variety of evidence, including Defendant's representations to his tax preparers and the SEC. This Court highlighted some of these inconsistencies when it rejected Defendant's theory for purposes of the tax loss assessment:

> Defendant reported his sale of JDFX stock as a capital transaction in his filed returns, in his statements made to the SEC, and statements made by Defendant's counsel during trial . . .
>
> The Defendant's return is further corroborated by the Stock Purchase Agreements memorializing the sale of stock from Defendant to Market Shot. Neither Defendant, nor his counsel, nor his expert witness have explained why these agreements exist if such a transaction did not take place.
>
> Defendant signed all three sets of returns, attesting to their validity. Defendant has not offered an adequate rebuttal to the Government's reliance on these returns. He has not explained why he claimed on his returns that the transfer of money from Cook was for the sale of JDFX stock. Nor has he explained why he continued to characterize the transaction as such to his attorneys and accountants. Nor has he explained why the Stock Purchase Agreements, memorializing the sale of stock to Cook, are inaccurate. Instead, Defendant has responded to the Government's argument with the testimony of an expert witness who received all of her information from Defendant and defense counsel, and who then hypothesized an alternate explanation.

ECF No. 162 at PageID.3896. Trial counsel had to formulate a story that was consistent with the evidence and believable to the jury. They decided to characterize Defendant as an innocent entrepreneur mislead and victimized by incompetent advisors and federal authorities, and to attack the Government's evidence of evasion as insufficient. *See e.g.*, ECF No. 55 at PageID.1040–69 (closing argument). Given the foregoing discussion, trial counsel's strategy, even if ultimately

ineffective, was not so erroneous "that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."[9] *Strickland*, 466 U.S. at 687.

Assuming, however, that trial counsel failed to investigate, and that such failure constituted deficient performance, there has been no adequate showing of prejudice. As discussed above, the evidence of tax liability—that Defendant had, in fact, structured the JDFX transaction as he claimed for years—was convincing. The bare possibility that the jury could have received Defendant's new theory positively is not a "probability sufficient to undermine confidence in the outcome." *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). Accordingly, Defendant is not entitled to a new trial on his failure to investigate theory.

## 2.

Defendant presents two categories of evidence to which he alleges trial counsel should have objected: (1) evidence of affirmative acts of evasion from before January 7, 2011; and (2) evidence not specified in the bill of particulars. ECF No. 68 at PageID.1423. According to Defendant, the first category of evidence is objectionable because an affirmative act of evasion requires that the evader know of his tax liability, and Defendant did not know of his liability until his tax preparer signed his 2008 and 2009 returns on January 7, 2011. *Id.* at PageID.1423–24 (relying on *United States v. Mal*, 942 F.2d 682 (9th Cir. 1991), and *Cheek v. United States*, 498

---

[9] This discussion applies equally to the allegation that counsel erred by not cross-examining Carol Nathan "concerning JDFX's receipt of Cook's direct investment" or calling Gavin to testify. ECF No. 68 at PageID.1421. Furthermore, Nathan testified that she prepared Defendant's returns based on documents and statements he provided to her, ECF No. 52 at PageID.526, 532–33, and trial counsel vigorously cross-examined her credibility as a tax preparer. *Id.* at PageID.577–79.

U.S. 192, 201 (1991)). Trial counsel, therefore, should have objected to evidence of conduct occurring before January 7, 2011.

Defendant's argument is unpersuasive for several reasons. First, Defendant knew of his liability for tax years 2008 and 2009 long before January 7, 2011. Defendant's stepfather testified that he spoke with Defendant about his obligation to pay taxes in 2008, and that, with Defendant's permission, he prepared Defendant's taxes for the years 2001, 2003, 2004, 2005, and 2006. ECF No. 53 at PageID.691–92. With respect to 2007 and 2008, Defendant's stepfather told him to seek expert assistance because the tax consequences for the JDFX transaction were complex. *Id.* at 696–97, 705–06. While Defendant first claimed that "the timing of this conversation is unclear from the record," ECF No. 119 at PageID.2794 n.2, he later confirmed in a tax loss brief that the conversation occurred "in 2008." ECF No. 132 at PageID.2935.

Assuming that Defendant was somehow unaware of his legal duty to pay taxes until January 7, 2011, evidence of his prior conduct might still have been relevant to show the motive for or means by which Defendant committed his future evasive acts. Furthermore, even if the evidence was inadmissible, Defendant has failed to overcome the "strong presumption" that trial counsel's failure to object was strategic. *Strickland*, 466 U.S. at 689. He has also not shown that he was prejudiced by this alleged deficiency. As discussed in Section III., *supra*, the Government's proffer regarding evasive conduct after January 9, 2012 was compelling.

Defendant's argument regarding the bill of particulars also falls short. As before, Defendant has not shown that trial counsel's performance was deficient. While a bill of particulars limits the prosecution's evidence at trial, "[i]t is well settled that a variance between the proof and the bill of particulars is not grounds for reversal unless the defendant was prejudiced by the variance." *United States v. Haskins*, 345 F.2d 111, 114 (6th Cir. 1965). "[A] variance is immaterial

if it does not impair the defendant's ability to defend himself through failing to identify the nature of the charge." *United States v. Green*, 202 F.3d 869, 873 (6th Cir. 2000) (internal quotation marks omitted).

Defendant provides a list of exhibits and testimony that apparently fell outside the bill of particulars, ECF No. 68 at PageID.1428–29, but it is difficult to characterize any of this evidence as "prejudicial variance."[10] The Government's evidence at trial was consistent with the nature of the charge as described in the bill of particulars and with the materials produced in discovery. Even if the evidence was inadmissible, Defendant's trial counsel might have decided not to object to soften its impact. *See Hodge*, 426 F.3d at 385 ("Decisions not to object to inadmissible evidence already heard by the jury can in many cases be classified as part of a deliberate strategy to avoid calling the jury's attention to that evidence."). Moreover, Defendant could not have been prejudiced by any failure to object given the weight of the evidence against him.

### 3.

Defendant's final basis for ineffective assistance—failure to object to prosecutorial misconduct—similarly fails to satisfy the *Strickland* test. Defendant focuses primarily on statements made during the Government's closing argument. ECF No. 68 at PageID.1431–32. These statements, according to Defendant, misstated the law by suggesting that Defendant could be convicted for tax evasion under 26 U.S.C. § 7201 based upon willful failure to pay taxes rather than willful evasion of taxes. *Id.* at PageID.1432.

Again, the threshold question is whether trial counsel's failure to object was "objectively unreasonable" under the circumstances. *Hodge*, 426 F.3d at 385. No such failure occurred here. In fact, most of the statements in question simply characterize the evidence as probative of

---

[10] The evidence largely concerns the relationship between him and his business entities, such as transactions, transfers, and account balances. *See* ECF No. 68 at PageID.1428–29.

willfulness. *See* ECF No. 68 at PageID.1431–32. Willfulness, of course, is an element of tax evasion, so the Government was not wrong to highlight evidence of willfulness for the jury. There is one instance where the Government seems to state the law too simply, but, in context, the statement was not so prejudicial or misleading as to make the failure to object unreasonable. *See* ECF No. 55 at PageID.1036 ("I'm not summarizing everything that was presented . . . But what you need to know is that defendant owed taxes, and that he willfully failed to pay them.").

Furthermore, even if trial counsel had vigorously objected to every statement complained of, no prejudice would have been avoided. The jury was clearly instructed on the elements of the crime, and the Government had already introduced conclusive evidence of tax evasion. *See* ECF No. 48 (jury instructions); Section III., *supra*. Accordingly, Defendant has not shown that a new trial is warranted based upon the ineffective assistance of his trial counsel.

## C.

Defendant finally argues that he is entitled to a new trial because the verdict was against the weight of the evidence. In support, Defendant refers to his Motion for a Judgment of Acquittal but correctly notes that the Government is not entitled to the same level of deference. ECF No. 68 at PageID.1434. "[S]uch motions are granted only in the extraordinary circumstance where the evidence preponderates heavily against the verdict." *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007) (internal quotation marks omitted).

Upon reviewing the evidence "as a thirteenth juror," there is no reason to doubt the verdict. *Id.* The evidence introduced at trial—which has been discussed throughout this opinion and previous orders—demonstrates beyond a reasonable doubt that Defendant had outstanding tax liabilities that he knew about and took affirmative steps to evade. *See* Section II., *supra*; ECF No.

162 at PageID.3860–76 (summarizing evidence). Accordingly, the jury's verdict was consistent with the great weight of the evidence.

Based on the foregoing, Defendant has failed to show that a new trial is warranted. His motions will thus be denied.

## V.

Accordingly, it is **ORDERED** that Defendant's Motion for a Judgment of Acquittal, ECF No. 66, is **DENIED**.

It is further **ORDERED** that Defendant's Motion for a New Trial, ECF No. 68, is **DENIED**.

Dated: December 15, 2020                             s/Thomas L. Ludington
                                                    THOMAS L. LUDINGTON
                                                    United States District Judge