5 December 2007

JDFX Fund Management Ltd.


## FOREIGN EXCHANGE PRIME BROKERAGE AGREEMENT

Gentlemen:

This Agreement describes the arrangement pursuant to which Deutsche Bank AG, acting through its London Branch ("DBAG") authorizes JDFX Fund Management Ltd. ("Agent") acting for and on behalf of the Funds specified on Annex C hereto, to act as its agent in executing spot, tom next and forward foreign exchange transactions with a maximum tenor of 12 months ("FX Transactions") and currency options (which shall consist of (i) puts and calls that do not have special features and (ii) single barrier options) with a maximum tenor of 12 months ("Options") (collectively, the "Counterparty Transactions") with the Counterparties listed in Annex A hereto (each, a "Counterparty") and on the terms set forth in Annex B hereto. Capitalized terms not defined herein shall have the meanings assigned to them in the 1998 FX and Currency Option Definitions (as published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee). Accordingly, the parties hereto agree as follows:

1.  This authority is expressly limited for each Counterparty in that (a) for any Settlement Date the Net Daily Settlement Amount for such Counterparty may not exceed the Settlement Limit as specified in Annex A hereto and (b) the Counterparty Net Open Position may not exceed at any time the Maximum Counterparty Net Open Position as specified in Annex A hereto. The Settlement Limit and the Maximum Counterparty Net Open Position shall apply to all Counterparty Transactions entered into between DBAG and the Counterparty branch specified in Annex B.

"Net Daily Settlement Amount" or "Give Up Net Daily Settlement Amount" means for any Settlement Date, the sum of the Dollar Countervalue for each currency for which the aggregate Dollar Countervalue results in a net amount owed to DBAG by a Counterparty or Give Up Party, as the case may be, excluding any Options prior to the exercise thereof.

"Counterparty Net Open Position" or "Give Up Net Open Position" means, with respect to a Counterparty or Give Up Party, as the case may be, the aggregate amount owed by such Counterparty or Give Up Party to DBAG, calculated as follows:

(A)  for each FX Transaction, determine the Dollar Countervalue for each currency (including U.S. Dollars) owed by such Counterparty or

#154951v8





DEFENDANT'S
EXHIBIT
1016
US v. PIERON

01302

    Give Up Party to DBAG or owed by DBAG to such Counterparty or Give Up Party under such FX Transaction;

(B) for each currency (including U.S. Dollars), determine the net Dollar Countervalue amount owed by such Counterparty or Give Up Party to DBAG or owed by DBAG to such Counterparty or Give Up Party by summing the Dollar Countervalue of all long and short positions in such currency as determined in clause (A) above;

(C) for each Option purchased or sold by the Counterparty, determine the Dollar Countervalue of the foreign exchange delta equivalent of such Option;

(D) determine the difference of (i) the sum of the Dollar Countervalue amounts determined pursuant to clause (C), minus (ii) the sum of the Dollar Countervalues of the foreign exchange delta equivalents of the Netted Options; and

(E) aggregate (i) the Dollar Countervalue amounts determined pursuant to clause (B) above for each currency with respect to which such Counterparty or Give Up Party owes a net aggregate amount to DBAG and (ii) the Dollar Countervalue amount determined pursuant to clause (D) above.

"Dollar Countervalue" means, with respect to an amount of currency at any time (i) if such currency is U.S. Dollars, such amount and (ii) in all other cases, the amount of U.S. dollars which could be purchased at the market rate prevailing at such time against delivery of such amount of currency on a specified Settlement Date. Such rate shall be determined by DBAG (in good faith and in a commercially reasonable manner) to be the mid-market rate available to DBAG at such time in the foreign exchange market reasonably selected by DBAG.

"Netted Option" means an Option sold by DBAG and owned by the Counterparty which may be discharged and terminated together with an Option sold by the Counterparty and owned by DBAG pursuant to the applicable master agreement upon satisfying the following criteria:

(i) each Option being with respect to the same Put Currency and Call Currency;
(ii) each having the same Expiration Date and Expiration Time;
(iii) each being of the same style, i.e. either both being American Style Options or both being European Style Options;



  (iv) each having the same Strike Price;
  (v) each being transacted by the same pair of Offices of Buyer and Seller; and
  (vi) neither of which shall have been exercised by delivery of a Notice of Exercise.

  In the case of a partial discharge and termination (i.e., where the relevant Currency Option Transactions are for different amounts of the Currency Pair), only the portion discharged and terminated shall be considered a Netted Option.

  2. Agent acknowledges and agrees that it shall monitor the Net Daily Settlement Amount and the Counterparty Net Open Position for each Counterparty and that DBAG shall not be responsible for any Counterparty Transaction executed by Agent on behalf of DBAG unless (i) giving effect to such Counterparty Transaction does not cause the Settlement Limit or the Maximum Counterparty Net Open Position to be exceeded (without DBAG's prior written consent or recorded verbal consent (confirmed by fax immediately thereafter)); and (ii) such Counterparty Transaction meets the criteria set forth in Annex B (an "Accepted Transaction"). DBAG agrees to provide Agent with a summary of the outstanding trades and the net exposure with respect to each Counterparty, up to two times on each Business Day during which there are Counterparty Transactions outstanding. Each Accepted Transaction shall be valid and binding upon DBAG, enforceable against DBAG in accordance with its terms. The dealing arrangement with respect to each Counterparty shall be set forth in a Foreign Exchange Prime Brokerage Counterparty Agreement (a "Counterparty Agreement"). Each such Counterparty Agreement is substantially in the form of a template which DBAG will send you on your request.

  In the event that DBAG and Agent agree to use an electronic trading system operated by a third party through which Agent may enter into foreign exchange or currency option transactions with one or more parties, including but not limited to certain Counterparties, to be given up to DBAG, the following provisions shall be applicable:

  (a) All such transactions shall be "Counterparty Transactions" hereunder and shall be subject to the terms of this Agreement, except to the extent provided in clauses (b) and (c) below. In connection with entering into each Counterparty Transaction, DBAG shall contemporaneously herewith enter into an equal and offsetting transaction with one or more of the Funds or Give Up Parties identified on Annex C hereto, as specified by Agent. Such transactions shall be "Fund Transactions" or "Give Up Transactions" subject to the terms of this Agreement and may be entered into through the system or otherwise;

  (b) If such electronic trading system permits transactions that may be executed by Agent to be given up to DBAG only if within credit limits monitored by such system, the Settlement Limit and Maximum Counterparty Net Open Position

- 3 -



01304

shall not be applicable to Counterparty Transactions entered into and given up through such system; and

(c) Any Counterparty Transaction executed by Agent through such electronic trading system shall be an Accepted Transaction for purposes of this Agreement when such give up to DBAG is treated as done or completed pursuant to the rules of such system.

3. Prior to entering into any Counterparty Transactions, DBAG shall have executed a Counterparty Agreement with such Counterparty. Agent shall promptly communicate trade details of each Counterparty Transaction by notifying via facsimile or other electronic means an area of DBAG separate from trading and marketing personnel. Each Counterparty Transaction between DBAG and a Counterparty shall be confirmed and settled in accordance with the terms of the applicable master agreement between DBAG and the Counterparty (a "Counterparty Master Agreement").

4. In connection with entering into each Counterparty Transaction, DBAG shall contemporaneously therewith enter into an equal and offsetting transaction or transactions with, at the discretion of Agent (i) one or more of the Funds identified on Annex C hereto (each a "Fund"), as specified by the Agent (each, a "Fund Transaction") and/or (ii) one or more of the give up parties listed in Annex C hereto (each a "Give Up Party" and each such transaction a "Give Up Transaction"), each such Give Up Transaction to be given up pursuant to the terms of a give up agreement between DBAG and such Give Up Party (each such agreement, the "Give Up Agreement"), <u>provided, however</u>, that Give Up Net Open Position for such Give Up Party does not, after giving effect to such Give Up Transaction, exceed the Maximum Give Up Net Open Position for such Give Up Party specified in Annex C and Give Up Net Daily Settlement Amount for such Give Up Party does not, after giving effect to such Give Up Transaction, exceed the Give Up Settlement Limit for such Give Up Party specified in Annex C.

Agent represents and warrants to DBAG that it has all power and authority to enter into any Fund Transaction for and on behalf of each Fund as is required by any law or regulation applicable to it or any agreement or instrument binding upon Agent. Each Fund Transaction shall be an FX transaction or option under, and subject to and governed by, the ISDA Master Agreement or other master agreement between Deutsche Bank AG and the applicable Fund specified on Annex C hereto, including the Credit Support Annex which is a part thereof (each, a "Fund Master Agreement"). Each Fund shall be required to post collateral with respect to its obligations under the Fund Master Agreement (including the Fund Transactions) in accordance with terms and provisions of the Credit Support Annex. DBAG and Agent on behalf of each Fund agree that any breach of this Agreement by Agent shall constitute an Event of Default under the Fund Master Agreement with such Fund.

Each Give Up Party shall have executed an agreement with DBAG in which such Give Up Party shall have authorized Agent to act as its agent in giving such directions to DBAG. Each Give Up Transaction shall be an FX transaction or option under, and

-4-



subject to and governed by, any applicable ISDA Master Agreement or other master agreement between DBAG and the relevant Give Up Party (each such master agreement, the "Give Up Master Agreement") and shall be further subject to the terms of the Give Up Agreement.

Each Fund Transaction and each Give Up Transaction shall be subject to and settled in accordance with any market practice applicable to, or adopted by, DBAG and the Counterparty in connection with the Counterparty Transaction for which it is offsetting notwithstanding any provision in a confirmation for a Fund Transaction or Give Up Transaction that may be to the contrary.

5.  (a) Notwithstanding any terms of a confirmation that may be to the contrary, if a Fund has entered into a Fund Transaction in which it is the owner of an Option, Agent on behalf of such Fund may exercise such Option only by delivery to Counterparty of a Notice of Exercise with respect to the corresponding Counterparty Transaction. Agent shall simultaneously deliver to DBAG a copy of such Notice of Exercise. If such Notice of Exercise constitutes effective exercise of the Option which is the subject of the corresponding Counterparty Transaction, it shall be deemed effective as to DBAG and the Option which is the subject of the Fund Transaction shall also be deemed exercised. In the event that the notice delivered by Agent to Counterparty is ineffective as exercise with respect to the Counterparty Transaction, Agent and the Fund shall indemnify jointly and severally DBAG against any losses sustained by it in connection therewith and DBAG may, at its discretion, treat such notice as effective with respect to the Fund Transaction.

(b) Notwithstanding any terms of a confirmation that may be to the contrary, if Agent has instructed DBAG to enter into an offsetting transaction with a Give Up Party in which such Give Up Party is the owner of an Option, Agent shall cause such Give Up Transaction to be automatically exercised by delivery to Counterparty of a Notice of Exercise with respect to the corresponding Counterparty Transaction. Agent shall simultaneously deliver to DBAG a copy of such Notice of Exercise and shall promptly copy such Notice of Exercise to Give Up Party together with details of the corresponding Give Up Transaction. In the event that the notice delivered by Agent to Counterparty is ineffective as exercise with respect to the Counterparty Transaction, Agent shall indemnify DBAG against any losses sustained by it in connection therewith and DBAG may, at its discretion, treat such notice as effective with respect to the Give Up Transaction.

(c) Notwithstanding any terms of a confirmation that may be to the contrary, if a Fund has entered into a Fund Transaction in which it is the grantor of an Option, such Option may be exercised by the Counterparty exercising the Option which is the subject of the corresponding Counterparty Transaction by giving notice to Agent and DBAG pursuant to the terms thereof.

(d) Notwithstanding any terms of a confirmation that may be to the contrary, if Agent has instructed DBAG to enter into an offsetting transaction with a Give Up Party

- 5 -



01306

in which such Give Up Party is the grantor of an Option, such Option shall be exercised by the Agent delivering on DBAG's behalf a Notice of Exercise to the Give Up Party following exercise by Counterparty of the corresponding Counterparty Transaction (which in the case of the latter shall be exercise by Counterparty giving notice to Agent and DBAG pursuant to the terms of the corresponding Counterparty Transaction). In the event that Agent fails to give such Notice of Exercise or the notice delivered by Agent to Give Up Party is ineffective as exercise with respect to the Give Up Transaction, Agent shall indemnify DBAG against any losses sustained by it in connection therewith.

"Notice of Exercise" means telex, telephonic or other electronic notification (excluding facsimile transmission), given by the owner of an Option prior to or at the expiration time on the expiration date as agreed to at the time the Option is entered into, as evidenced in a Confirmation.

(e) Notwithstanding any terms of a confirmation that may be to the contrary, as calculation agent under each Fund Transaction, or transaction with a Give Up Party, which is an Option, DBAG shall follow the determinations of the Counterparty to the applicable offsetting Counterparty Transaction with respect to knock in and knock out events and other similar events and shall not be liable to Agent or any Give Up Party in connection therewith.

6. In consideration for DBAG entering into this Agreement, the Agent shall pay to DBAG a fee for each calendar month (or part thereof) during the term of this Agreement equal to an aggregate amount equal to the sum of the following fees for Counterparty Transactions entered into during such month: per Counterparty Transaction, USD 6 per USD 1,000,000 of the Notional Amount of such Counterparty Transaction, provided that such fee shall reduce to (i) USD 5 per USD 1,000,000 of the Notional Amount of such Counterparty Transaction in the event that the aggregate Notional Amount of all Counterparty Transactions, and FX Transactions and Options entered into directly between DBAG and the Agent (including through DBAG's electronic platform currently called AutobahnFX) during the relevant calendar monthly period (or part thereof, as the case may be) is equal to or greater than USD 10,000,000,000 (but less than USD 20,000,000,000), and (ii) USD 4.75 per USD 1,000,000 of the Notional Amount of such Counterparty Transaction in the event that the aggregate Notional Amount of all Counterparty Transactions, and FX Transactions and Options entered into directly between DBAG and the Agent (including through DBAG's electronic platform currently called AutobahnFX) during the relevant calendar monthly period (or part thereof, as the case may be) is equal to or greater than USD 20,000,000,000.

DBAG shall provide a statement to Agent following the end of each calendar month specifying the fee for such month. Agent shall have 30 calendar days to review such statement and dispute any charges alleged to be in error. If not disputed within 30 days, the amount of the fee specified by DBAG in such statement shall be binding upon Agent. Agent shall pay such fee to DBAG in immediately available funds in USD no later than 30 calendar days following the date of such statement. No fees shall be



01307

payable for Fund Transactions (as defined in section 4 of this Agreement) or any other FX Transactions or Options between DBAG and the Agent.

"Notional Amount" of a Counterparty Transaction means the USD amount payable under the terms of the Counterparty Transaction (or, in the case of an Option, which would be payable if the Option were exercised), or if the Counterparty Transaction does not have any such USD amount, a USD amount equal to the USD equivalent of the amount of currency payable by DBAG to the Counterparty under the terms of the Counterparty Transaction (or, in the case of an Option, which would be payable if the Option were exercised), calculated based on the spot exchange rate for the sale of the other currency for USD as determined by DBAG in its discretion on the trade date of such Transaction.

7.   Agent shall indemnify DBAG against loss, fees or expenses resulting from any error or discrepancy in any information provided by Agent or a Fund.

8.   Upon 20 Business Days written notice, DBAG may at any time and from time to time in its sole discretion (a) amend the list of Counterparties set forth on Annex A, (b) modify the Settlement Limit and Maximum Counterparty Net Open Position with respect to each Counterparty set forth on Annex A, as in effect at such time, (c) modify the Maximum Give Up Net Open Position or Give Up Settlement Limit with respect to each Give Up Party set forth on Annex C, as in effect at such time and (d) modify the maximum tenor of FX Transactions and Options; provided that, DBAG may immediately amend Annex A with respect to a Counterparty in the event DBAG has reasonable grounds to believe that such Counterparty shall be unable to perform any of its obligations under the applicable Counterparty Master Agreement. Furthermore, DBAG may immediately amend Annex C with respect to a Give Up Party in the event DBAG has reasonable grounds to believe that such Give Up Party shall be unable to perform any of its obligations under the Give Up Master Agreements. Each such amendment and/or modification shall not affect any outstanding Accepted Transactions, and the provisions of this Agreement shall continue to apply until all the obligations of each party to the other under this Agreement have been fully performed with respect to Counterparty Transactions, Fund Transactions and Give Up Transactions.

9.   The parties to this Agreement agree that DBAG may tape record any and all telephone conversations between them concerning Counterparty Transactions, Fund Transactions and Give Up Transactions.

10.  DBAG is not acting as an advisor or fiduciary of Agent with respect to, and will have no liability or responsibility for, the selection of Counterparties, the execution of Counterparty Transactions with such Counterparties or any other matters relating to the relationship between Agent and Counterparty.

DBAG is authorised by the Bundesanstalt für Finanzdienstleistungsaufsicht and regulated by the Financial Services Authority ("FSA") for the conduct of UK business.



01308

DBAG shall treat Agent as a "professional client" / "eligible counterparty" for the purposes of the rules of the FSA.

DBAG will not be executing transactions on behalf of Agent and accordingly DBAG will not be subject to the obligation under the rules of the FSA to take all reasonable steps to obtain the best possible result for Agent.

Agent has read the risk warnings as set out in the Terms of Business and understands the risk associated with the Counterparty Transactions, Fund Transactions and Give Up Transactions.

As used herein, "Terms of Business" are the terms of business of DBAG which have been sent to Agent that apply to business carried out by Deutsche Bank AG, London Branch with, for the benefit of or on behalf of Agent.

If Agent has a complaint concerning its treatment by DBAG, Agent should in the first instance speak to its normal DBAG contact. The Financial Services Compensation Scheme does not apply to, amongst others, authorised persons and large companies so, therefore, Agent may not have the right to claim through the Financial Services Compensation Scheme for any losses that Agent may suffer in connection with this Agreement.

In asking DBAG to enter into any Give Up Transaction or Fund Transaction, Agent represents that it has been solely responsible for making, on behalf of the relevant Fund or Funds or Give-up Party, its own independent appraisal and investigations into the risk of the Give Up Transaction or Fund Transaction and it has sufficient knowledge and experience to make such evaluation of the merits and risks of any Give Up Transaction or Fund Transaction on behalf of the relevant Fund or Funds or Give-up Party.

11. Unless otherwise agreed and subject to section 3, all notices, instructions and other communications to be given to a party under this Agreement shall be given to the address, facsimile (confirmed if requested) or telephone number or otherwise electronically and to the individual or department specified below. Unless otherwise specified, any notice, instruction or other communication given in accordance with this section shall be effective upon receipt. Each party may change its notice address and details by notice given to the other party.



01309

<u>Deutsche Bank AG</u>

Deutsche Bank AG
FX Prime Brokerage
100 Plaza One, 2nd Floor
Mail Stop: NJY03-0250
Jersey City, NJ 07311-3901
Attention: Prime Broker Operations
Telephone: 201-593-2300
Telecopier: 201-593-6684

Singapore Branch (for telephonic communications from 7:00 p.m. to 6:00 a.m., New York time, (which may act on behalf of New York branch during such hours)):

Deutsche Bank AG
FX Prime Brokerage
6 Shenton Way
#15-08 DBS Tower 2
Singapore 068809
Attention: Fee-Leng Siow
Telephone: 65 423 5232
Telecopier: 65 883 0721

<u>JDFX Fund Management Limited</u>



      12.    Subject to the following sentence, each of the parties hereto may terminate this Agreement at any time by twenty (20) business days' prior written notice to the other party delivered as prescribed above, and such termination shall be effective at the end of such twentieth day (the "Termination Date"); provided that, DBAG may immediately terminate this Agreement if (i) an Event of Default or Additional Termination Event occurs under a Fund Master Agreement or (ii) Agent exceeds a Settlement Limit or a Maximum Counterparty Net Open Position without DBAG's prior consent as set forth in section 2. Any such termination shall not affect any outstanding Accepted Transactions (and, with respect to any termination caused as a result of the events set forth in clause (ii) above, such termination shall not be deemed to be a breach of this Agreement), and the provisions of this Agreement shall continue to apply until all the obligations of each party to the other under this Agreement have been fully performed with respect to Counterparty Transactions, Fund Transactions and Give Up Transactions; and provided further that any fee payment received by DBAG from Agent in advance shall be pro rated



and any amount allocable to a time period after the Termination Date shall be returned promptly to Agent.

13. No amendment, modification or waiver of this Agreement will be effective unless in writing executed by each of the parties, provided, however, that the parties may agree to an increase in Settlement Limit or Maximum Counterparty Net Open Position for a Counterparty without a written agreement.

14. This Agreement shall be governed by, and construed in accordance with, the laws of England and Wales.

15. Any action or proceeding relating in any way to this Agreement may be brought and enforced in the courts of England and Wales.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date and year first above written.

**DEUTSCHE BANK AG,**
acting through its London Branch

By _____
Name:
Title: CHRISTINE COOKE
       LEGAL COUNSEL

By _____
Name:
Title: YIEN HONG
       LEGAL COUNSEL

**JDFX FUND MANAGEMENT LTD.**

By _____
Name: JAMES PIERON
Title: DIRECTOR


JDFX Fund Management Ltd.

JDP

01311

**ANNEX A**

| Counterparties | Settlement Limit (in millions) | Maximum Counterparty Net Open Position (in millions) |
|---|---|---|
| Barclays Bank PLC | 200 | Unlimited |
| Bank of America N.A. | 200 | Unlimited |
| Dresdner Bank AG | 200 | Unlimited |
| Lehman Brothers Commercial Corp. | 200 | Unlimited |
| Morgan Stanley & Co. International | 200 | Unlimited |
| Morgan Stanley Capital Group | 200 | Unlimited |
| JPMorgan Chase | 200 | Unlimited |
| UBS AG | 200 | 200 |

JDP

## ANNEX B

### CRITERIA FOR COUNTERPARTY TRANSACTIONS AND GIVE UP TRANSACTIONS

1. All Counterparty Transactions entered into by Agent on behalf of DBAG shall be booked in the respective names of Deutsche Bank AG London and the Counterparty, acting through a branch permitted under any applicable Counterparty Agreement.

2. Each Counterparty shall have executed an ISDA Master Agreement or similar agreement governing foreign exchange and options trading between DBAG and such Counterparty.

3. All Give Up Transactions entered into at the instruction of Agent between DBAG and a Give Up Party shall be booked in the respective names of Deutsche Bank AG London and such Give Up Party, acting through a branch permitted under any applicable Give Up Master Agreement.

4. Each Give Up Party shall have executed an ISDA Master Agreement or similar agreement governing foreign exchange and options trading between DBAG and such Give Up Party.

5. Any Ceiling Limit (as defined in each Fund Master Agreement) or similar position limit specified in a Fund Master Agreement shall not be exceeded after giving effect to the Fund Transaction required in connection with any Counterparty Transaction.

6. With respect to Give Up Transactions, any position or trading limit as set out in a relevant Give Up Master Agreement and/or the relevant Give Up Agreement would not be exceeded by giving effect to Agent's instruction to give up the Give Up Transaction required in connection with a Counterparty Transaction.

7. The Counterparty and Agent have committed to the material terms (i.e. settlement date and amounts of each currency to be delivered by each party) of a Counterparty Transaction.



01313

**ANNEX C**

<u>FUNDS:</u>

JDFX FUND LTD.

<u>GIVE UP PARTIES</u>:

| Party | Give Up Settlement Limit (in millions) | Maximum Give Up Net Open Position (in millions) |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

- 13 -

01314