UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN  DIVISION

UNITED STATES OF AMERICA,
          Plaintiff,

                                          Case No. 18-CR-20489
-vs-                                      Judge Thomas L. Ludington

JAMES D. PIERON,  JR,
               Defendant.
_____/

### DEFENDANT'S SENTENCING MEMORANDUM

Defendant James D. Pieron, Jr., by and through his attorney, Kenneth R. Sasse, provides the following to the Court regarding issues concerning his sentencing in this matter.

## I.  Presentence Investigation Report

The Probation Department was faced with a monumentally difficult task in this matter.  The facts developed over a period of many years, thousands of documents have been generated, there was a highly contested trial, and a series of hearings have been conducted post-trial.  After all of this, the Probation Officer has attempted to determine the facts, clarify the issues, and present a balanced report to this Court.

Defendant filed one formal objection as well as a number of other objections that would not affect the sentencing guidelines.  These objections have

been considered by the Probation Officer and some changes resulted. Defendant here seeks to preserve his objection to the loss computation and to provide additional information as to some of the matters raised in the objections.

**Amount of Loss**

Defendant filed a formal objection regarding various matters relating to the loss calculation in the Presentence Report and to the ultimate determination of the amount of loss and resulting guideline adjustment. These include objections to matters contained in the revised PSR at paragraphs 10, 13, 19, 24, 29 & 32.

Defendant maintains his arguments made in the various post-conviction pleadings and hearings relating to these issues. The loss guideline calculations are not supported by the facts or the law. The facts do not support a finding that Defendant received, for guidelines or tax purposes, the amounts attributed to him by the Government in it's post-trial arguments. Nor does the law permit the use of losses which were not charged, nor shown to be the result of criminal activity, to be used for sentencing guideline purposes. Defendant recognizes, however, that this Court spent a considerable amount of time in consideration of the issues and has ruled on this matter.

**Evasion of Payments**

Defendant objected to several matters contained in the PSR relating to his evasion of payments. These items included discussions of his Installment

Agreement request, his Collection Information Statement, his purchase of items, his completion of FBAR forms, and his statements made in opening a personal account with Peregrine Financial (PFG).  See, PSR, ¶14, 15, 16, 18.

1. Purchases:  James Pieron clearly had access to funds with which he could have paid some or all of the taxes and penalties the IRS ultimately claimed were owed.  He purchased a VW Station Wagon, a piano to replace one he had in Switzerland, a motorcycle, and six cases of wine.

When Mr. Pieron purchased goods or services for his personal use the purchase was flagged and treated by his accountant as personal, not business, transactions.  This was done for the purchase of the piano, the wine and his personal vehicle. *See, Sentencing  Ex. 1, Transactions By Account*.  Mr. Pieron was assured there was nothing improper about doing this.

2. Mercedes SUV:  One asset that Mr. Pieron used for personal use was a Mercedes Benz station wagon.  The used vehicle was purchased  for use by Komplique in 2009 for $107,000. It was sold in 2013 for $70,000, costing the company approximately $37,000 for the four years of use.  It was kept at Mr. Pieron's business location and used for the business.  However, Mr. Pieron also used the vehicle for personal use. A split of 60/40 (business use/personal use) was kept on the books, records, and tax returns in accordance with IRS rules. *Sentencing Ex. 2, Komplique tax return excerpts*.

3. <u>Charter Flights:</u>  The government alleged, but never attempted to prove, that Mr. Pieron used his business to pay for luxury charter flights.  Mr. Pieron, employees, and contractors  took charter flights but they were hardly a "luxury." The charter business had one plane, a Cessna 310 (probably worth less than $20,000) that flew one route, from Mt. Pleasant to Chicago. The plane flew up to three passengers and was eventually grounded by the FAA for safety reasons. Mr. Pieron tried a second company but canceled the contract because it was just as cheap to fly commercial.

4. <u>Cruise Ships:</u>  The government  alleged, but never attempted to establish, that Mr. Pieron used cruises for private use.  Cruise ships were used by Komplique because they were extremely cost-efficient venues for photo shoots.  Food, accommodations, medical and security were all provided. A brochure provides an example of an event. *D. EX. 1023, ECF No. 191-22, PageID 4044*.

5. <u>Company Valuation:</u>  The government alleged that James Pieron did not fully disclose his assets on a Form 433-F, citing his use of the Mercedes and the alleged understatement of the value of his business entities. The Mercedes was an asset of Komplique and, as such, was not required to be reported on this form. Mr. Pieron's ownership of the company was reported.  However,  Mr. Pieron's companies had little, if any, value at this time.  The government's reliance on company bank balances is simply not a valid measure of value.  The valuation of

the companies was done by Mr. Pieron's accountant and  was not unreasonable given their financial condition. They were each given a nominal value of $1,000. Navitas, a company in which Mr. Pieron held a minority interest, had a total loss to its partners of $3,581,355 in 2011.  In 2012, the year the Form 433-F was filed, Navitas had a loss of $3,026,986. *Sentencing Ex. 3, Summary of Navitas Investments Tax Returns*.  Komplique, fully owned by Mr. Pieron, had loses of $719,596 in 2011 and $256,767 in 2012 before being liquidated in 2013. *Sentencing Ex.* 4, *Summary of Komplique, Inc. Tax Returns*.

      6. <u>FBAR Filings:</u>  The government alleged that James Pieron falsely stated the maximum value of one of his business bank accounts on an FBAR filing. Actually, he filed a form that proved to be incorrect.  In 2012 Mr. Pieron's accountant, Mr. Pavlik and tax attorney, Caroline Ciraolo (former AAG for the Tax Division for the Department of Justice) filed 30 FBARs for bank accounts for 2005-2011.  In preparing these reports, his representatives reviewed the bank statements for the applicable year to determine the highest balance of the account during the year.  As to one bank, the last quarterly statement was apparently missing, resulting in a lower amount ("at least $25,000") then was eventually determined to be accurate ("at least $75,000").  While this might appear to be significant in isolation, its lack of importance is apparent when all of the filings are considered.  If this filing had been correct, the total amount reported should

have been $89,600,000. Pieron's filing incorrectly totaled $89,100,000.

*Sentencing Ex. 5, FBAR Filing Summary;  See also, FBAR filings,  G. Ex. 13-15,*

*17, 19, 21; ECF No. 114-1 - ECF No. 114-6.*

      7. <u>W8-BEN</u>: The government alleged that James Pieron "hid $50,000 in a

Peregrine Financial Group account," that he evaded payment by "falsely telling

PFG that he was not a U.S. citizen and did not have a social security number" and

that he "falsely swore on a W8-BEN for that account that he was not a U.S.

citizen" and did not have a social security number.   Mr. Pieron did mistakenly

sign a W8-BEN form.  However,  the claim that he knowingly attempted to deny

his U.S. citizenship - a claim that is especially hurtful to one like James Pieron

who has honorably served his country - is clearly wrong.

      The W8-BEN was sent with a copy of James Pieron's passport. The W8-

BEN form was one page of a four page fax. *D EX 1032, ECF No. 191-1,*

*PageID4651-4654.*   The final page appears to be illegible.  On close inspection,

however, it appears that this document is a passport.  A questioned document

examiner has now established that this document is a copy of the U.S. passport of

James Pieron. *See, Affidavit of Rosemarie Urbanski, ECF No. 185, PageID4073.*

James Pieron sent the W8-BEN form to a company that already had many copies

of his U.S. Passport in its files as well as several copies of forms with Pieron's

social security number.  If any other evidence is necessary to prove that the W8-

BEN was not sent with the intent to fool anyone, it is found in an email sent three days after the original fax. In response to a request that Pieron "resend the photo ID", Pieron instructs his assistant that "if you have my passport on file (PDF) send via a <reply to all>." *D EX 1032, ECF No. 191-28, PageID.4527.*

James Pieron stands convicted of evasion of payment of his taxes. He did not pay taxes that, at one point, his own tax returns determined were owing. He spent funds on personal items. He did not attempt to dissolve his companies or otherwise take money from them to pay the IRS. Until 2018, he did not borrow money to pay his taxes. Assuming these actions constitute evasion of payment, Mr Pierson should be sentenced accordingly. However, he should not face punishment for allegations that were never proven and are simply not true.

### **Restitution**

The PSR recognizes that restitution is not allowable pursuant to 18 U.S.C. § 3663A. However, the report states that probation may be ordered as a condition of probation or supervised release. PSR, ¶82. Defendant agrees that restitution is not authorized by the statute but disputes whether it may be ordered as a probationary or supervised release condition in this case.

James Pieron has already made payment to the Internal Revenue Service of all back taxes, penalties and interests the agency claimed were owed. He should not be required to make any additional restitution payment.

When a defendant is convicted by a jury, "the scope of the scheme is defined by the indictment for purposes of restitution." *United States v. Jones, 641 F.3d 706, 714 (6th Cir. 2011)*. Here, the defendant was charged and convicted of claims that he evaded payment of the taxes owed according to the 2008 and 2009 amended returns filed in 2012. He has made full restitution on these amounts.

## II.   BACKGROUND OF MR. PIERON

James Pieron is a very unique individual. He is an inventor, entrepreneur, decorated military veteran, and now husband and father. He is a workaholic, very competitive and ambitious, yet he probably takes on too many projects and tends to ignore some matters while focusing on others.

James Pieron was born in Hartland, Michigan to teen-aged parents. His father who was a tool and dye worker. His mother, in addition to raising James and three younger siblings, worked part-time jobs to help support the family. At school, James was the youngest and smallest in his class. He enjoyed sports. In hockey, he soon became a goalie, a position he has continued to play in his adult life. In high school, James was on the football team for his junior year, playing little as a 4'11", 80 pound defensive back. James received his diploma from Brighton High School.

Throughout his school years, James Pieron was a very average student. He gave little thought to going to college. He could not afford to go away to school and no one in his family or extended family had ever attended college. Instead, James

enlisted in the National Guard and, shortly after his completion of basic training, he enlisted in the U.S. Army.

U.S. Military Service.  In the military James Pieron blossomed in many ways. Physically, he grew bigger and stronger. He was trained in combat and was on his way to the front lines of the war in the Middle East.  However, the commanders at the deployment center in German changed his plans.  They recognized his talents and work ethic would better serve this country in designing systems to increase the overall efficiency of the mission.

Stationed in Germany, James learned to play the piano. He learned to speak the native language.  In his work for the army, however, James Pieron really excelled.  He had to create a program, from scratch, to be used to deploy troops for the Gulf War.

In 1994, Mr. Pieron was selected to represent his base at the AUSA Conference in Washington, D.C.  There, he attended a dinner event with then President George H.W. Bush.  While on active duty, James Pieron graduated with honors from both the Military Police and Primary Leadership Academies. He received a letter of recommendation from Sergeant Major of the Army, Richard A. Kidd, at the Pentagon.  He was awarded the National Defense Medal, Good Conduct Medal, Army Commendation Medal, and three times received the Army Achievement Medal.  Mr. Pieron was promoted to Non-Commission Officer and

received an Honorable Discharge.  *Sentencing Ex. 6; U.S. Military Awards and Medals.*

University.  After his military service, James Pieron returned to Michigan and enrolled at Central Michigan University.  He worked the night shift at Meijers to pay for rent, tuition, and books.  He was recommended by a professor for a one year contract with the Ohio Attorney General.  Mr. Pieron became part of a small team tasked to build the Automated Fingerprint Identification System (AFIS).  In 1996, the system went online and immediately matched several hundred prints, taken from violent crime scenes, with latent prints historically collected by government agencies for decades.  After completion of this work, James Pieron returned to Central Michigan University where he still graduated within four years with a degree in Computer Science. *Sentencing Ex. 10; CMU diploma.*

Switzerland.  After graduation from CMU, James Pieron accepted a one year contract with Union Bank of Switzerland.  He was set to return to the United States at the end of this contract when he suffered an injury in a water skiing accident. Initially told that he would lose his right leg, he was flown to the University of Zuerich where the Swiss surgeons were able to save his leg. In the hospital, he met a Swiss nurse.  Their relationship resulted in his staying in Switzerland.

While in Switzerland, Mr. Pieron created a trading algorithm that eliminated the ability of  banks to manipulate market prices. Instead, it provided the purchaser

with, not only a fair price, but the best price available accurate to the millisecond. He sought  financial backing and received offers from JPM Morgan and Saxobank. Market Shot, a company from the U.S. headed by Trevor Cook, made an offer to purchase 20% of the new company for $10 million. The offer was not the highest but was accepted because it required the least equity percentage.

JDFX Holding was formed by three partners.  James Pieron built the infrastructure; Clive Diethelm, a Swiss engineer, built the software; and Market Shot provided financial backing. Market Shot eventually invested an additional $5.25 million in exchange for another 15% of the company.

In 2007 the trading system was delivered to hedge funds and other institutional traders of derivative markets. Cook was not only an investor, but also the first customer,  resulting in a volume of $132 billion in trades.  Over the next two years the company and its trading system were featured in financial publications throughout Europe. *Sentencing Ex. 12; JDFX Press and Product Reviews.*

The JDFX infrastructure consisted of a licensed entity, primary and secondary prime brokers, and 22 money center banks called "spoke banks."  Each bank was courted individually, approved, and configured.  Each bank had different technology, credit lines, and operating procedures.  At the time, JDFX was likely the only non-bank entity with 22 money center banks as trading counter-parties.

A company outside the core business was also formed.  Komplique was

started in 2007 to sell high-end swimwear and dresses.

In late 2009 James Pieron, and the general public, first learned that Trevor Cook was under investigation for fraud, i.e., operating a "Ponzie scheme."  Because of Cook's connection with JDFX, the company's license was suspended, bank accounts were temporarily frozen, and the prime brokers cancelled their agreement. The JDFX infrastructure became worthless virtually overnight.

Return To The United States.    James Pieron had planned to return to the United States even before the collapse of JDFX. He began moving operations in May, 2009.

James Pieron signed a joint venture with Central Michigan University Research Center in 2009 and founded IB Technologies.   Operations began with 15 employees.  A successor company,  Institutional Liquidity (ILQ), was formed in 2010. Mr. Pieron formed ILQ as a minority partner with Harrison Associates holding the majority interest.  This company provided the same cost-savings to individual investors that JDFX had previously provided to institutional investors.  ILQ would go on to create 70 jobs in Michigan, Illinois, and Texas.

Komplique was relocated to the United States.  The company designed, manufactured, and marketed dresses and swimwear.  In this country, Mr. Pieron relied upon the Central Michigan University Research Center staff as contractors to run operations and marketing. With the assistance of the CMU Research Center staff,

shows were planned and held to entice those in the industry to select the Komplique

products.  As a result of the company's  presentation,  Komplique was selected to

become the official sponsor of the 2012 Miss America competition.  *See*

https://www.youtube.com/watch?v=Bi5sdcatN10.  Komplique paid Miss America

$250,000 for the exposure provided by the exclusive use of its swimwear in the

competition.

Mr. Pieron's companies were not ultimately profitable.  ILQ failed in large

part because of difficulties resulting from actions of investigators in this case.

Komplique, nearly insolvent, was dissolved and Harrison Associates provided seed

money for a new company,  Krescent Media. Mr. Pieron remained as a minority

partner.  *Sentencing Ex. 11, 2013 Amended K-1.*  The Komplique brand merchandise

is still available for purchase.

The U.S.  companies created jobs and provide tax payments to the

government.  The companies paid over $15 million in salaries, generated over $4.4

million in tax revenues, and provided over $1 million in benefits for employees and

families.  *Sentencing Ex. 7, Summary of Payroll, Withholding and Benefits.*

Marriage And Family.  In 2013, James met his wife Viktoriia and the two

remained friends until they started a relationship in 2015.  James and Viktoriia

Pieron have now been married for three years.  They are the parents of a son, Kai

Pieron, now 16 months old.  Kai is a very energetic child and is the joy of his father's

world.  James credits fatherhood with having a significant calming effect on his life.

Victoriia's parents and family are in the Ukraine and James provides the only

support she has in this country.

### III.  TAX RETURNS AND PAYMENTS

While abroad, James Pieron did not file U.S. tax returns.  An exception was

2000 when he had returned to the U.S. and briefly worked here on an emergency

Y2K project.  Pieron lived in Switzerland, worked, and paid income taxes (40%) for

12 years.  He also paid Swiss social security, Swiss unemployment and into the

Swiss health insurance program, all mandatory payments.  (PSR, p. 5,¶11)

Tax Returns  In 2008 Mr. Pieron became aware of his obligation to file returns

in the U.S. from his stepfather, Chris Werwega.  He provided Mr. Werwega an IRS

Form 8821 to allow him to obtain necessary information to prepare the returns.  *D

EX 1030; ECF No. 191-25, PageID*.4420. Returns were filed for 2001-2006.  Mr.

Werwega, however, was unclear as to how funds obtained from Market Share/Trevor

Cook should be handled.  James Pieron eventually retained American Tax Solutions

to prepare additional returns.  Mr. Pieron had been told that the funds obtained from

Cook were "capital gains."  However, with little tax knowledge he did not know how

this would ultimately affect the tax returns.

In working with Carol Nathan of American Tax Solutions, Mr. Pieron became

concerned that she was not sufficiently knowledgeable to prepare his returns.  He

made inquiry about his personal tax issues with Kim Pavlik, the CPA who had been hired to handle his corporate accounting and tax matters.  In January, 2011, Mr. Pieron filed the returns prepared by ATS for 2007, 2008 and 2009, following Mr. Pavlik's advise. Mr. Pieron was told it was better to file the returns because if was determined that the computations were incorrect the returns could be amended. Eventually, Mr. Pavlik did prepare and file amended returns on behalf of James Pieron that affected the tax liabilities for 2008 and 2009.  The first amendment, in 2012, resulted in a higher amount being due for 2008 and a lower amount for 2009. In 2014, following Mr. Pavlik's advise, Pieron filed an amended return that resulted in his owing no taxes for 2008 or 2009. *ECF No. 191-30, PageID.4573.*

Tax Payments  When James Pieron initially filed his tax returns for 2007-2009 he paid the taxes determined due for 2007 ($5,777) but did not pay the taxes for 2008 ($268,445) or for 2009 ($125,490).  When his returns were amended in 2012, following the advise of Mr. Pavlik, James Pieron attempted to set up a payment schedule with a requested payment of $1500 per month.  He paid this amount for six months but stopped the payments when the IRS failed to respond to the request to set up a payment schedule.  During the following years, Mr. Pieron received periodic payments from his corporations which were non-taxable returns of capital. Nevertheless, he had taxes withdrawn to be used as credits against any ultimate determination as to his tax liability.  From 2012-2014, payments totaling $61,744

were credited towards any 2008-2009 tax liability.

In 2017, Mr. Pieron hired tax attorney Jan Geht to review the filings of CPA Pavlik. In 2018, Mr. Geht advised Mr. Pieron to borrow funds and pay the tax on record. At this time, however, the IRS had not provided any notice to Mr. Pieron as to the amount claimed to be due.  Mr. Pieron was eventually able to obtain this information through the IRS hotline. James Pieron eventually borrowed and paid $870,117 to the agency in 2018. *Sentencing Ex. 8, Summary of IRS Tax Payments*.

## IV.  SENTENCING GUIDELINE CALCULATIONS

This Court has held extended hearings and ultimately adopted the government's position that the total tax loss in this matter is $6,435,250.57.  The Court has determined that Mr. Pieron's base offense level is 24.  As a result of this Court's loss determination, James Pieron's guideline range is 51-63 months which becomes 51-60 months because of the statutory maximum.

## V.  NON-GUIDELINE FACTORS IN SENTENCING

In *United States v. Booker*, 543 U.S. 220 (2005) the Supreme Court invalidated the mandatory use of the sentencing guidelines, holding that the guidelines are "effectively advisory."   Because the guidelines are now advisory, a district court is permitted to vary from the guidelines in order to impose a sentence which fits the mandate of 18 U.S.C. §3553(a)(2), i.e., to impose "a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in

[section 3553(a)(2)]." *See United States v. McBride*, 434 F.3d 470, 476 (6ᵗʰ Cir.

2006); *United States v. Collington*, 461 F.3d 805, 807-808 (6ᵗʰ Cir. 2006).  18 U.S.C.

§3553(a) provides a number of factors, in addition to the sentencing guidelines,  that

courts are directed to consider when imposing sentencing.   These

include the nature and circumstances of the offense, the history and characteristics of

the defendant, the seriousness of the offense, the need to promote respect for the law

and provide just punishment, the need to provide educational or vocational

training, medical care, or psychiatric or substance abuse treatment, the kinds of

sentences available, the need to avoid sentencing disparity, the need to provide

 restitution, and the possibility of rehabilitation. *Id.*

### A.  The Nature and Circumstances of the Offenses

James Pieron admittedly did not make timely payment of his taxes.  He used

some money that could have gone for payment of taxes on personal items and

arguably allowed funds to be used by his corporations instead of paying the Internal

Revenue Service.  Likewise, he did not borrow money to pay his taxes until criminal

charges were looming.

Other circumstances of this offense serve to differentiate it from the usual tax

payment evasion  offense.

1. There was no collection process by the IRS.  Unlike most payment evasion

cases, the IRS made no attempt to collect money from him.  They did not even notify

him of what, if anything, he owed.

2.   There was no active hiding of assets by Mr. Pieron from the IRS.  No
attempt was made to move money, outside or inside the country, to hide it. To the
contrary, James Pieron actually moved all his assets from Switzerland into the
United States.

3.   James Pieron disclosed all assets and income - including income that he did
not personally receive.

4.   Although Mr. Pieron spent some money on personal items, most of the
money that arguably could have been used to pay the IRS went into his corporations.
The funds kept the companies going and provided employment.  The personal items
purchased were relatively minor compared to the amounts used to keep his
companies afloat.

5.   Mr. Pieron's case is different because he hired and  followed the advise of
his professional advisor.  With the filing of the April 2014 amended return Mr.
Pieron's accountant told him that he had no tax liability for 2008 or 2009. "[W]e
concluded that his tax liability was satisfied based on the claim of right doctrine."
*Sentencing Hrg. Testimony of Kim Pavlik; ECF No. 146, PageID*.554. In fact, Pavlik
had determined that Mr. Pieron likely owed no taxes for 2008 or 2009 nearly a year
before this filing, as he acknowledged when interviewed by the IRS.  *Sentencing Ex.
9,  Memorandum of Interview of Kim Pavlik, CPA, 5/15/2013.*  Mr. Pavlik's reliance

on the "claim of right doctrine" may have been totally in error.  However, there has been no suggestion as to why James Pieron would not rely upon him at the time. Pavlik's co-worker testified, as to Kim Pavlik's reputation in the accounting community, that "[h]e is highly respected, very knowledgeable, very experienced." *Testimony of Dale VanConett, ECF No. 54, PageID.864.*

6.  James Pieron had no experience in taxes or in corporate structuring. The claim of taxes owed by Mr. Pieron arise primarily from the determination that money received from Cook was not from the sale of Treasury Stock.  Had he been more sophisticated, or at least known enough to employ more knowledgeable professionals,  Mr. Pieron would likely have avoided most of the claimed tax liability.

7.  Finally, it must be recognized that, as a result of the advise he was given by Mr. Pavlik, James Pieron believed that he did not owe any taxes for the years in question.  This belief was allowed to continue by the failure of the IRS to provide Mr. Pieron the basic rights it was required to provide to all taxpayers.  In sentencing James Pieron, his failure to pay taxes must be considered in light of the fact that he did not know that he even owed any taxes.

### B.  The History and Characteristics of the Defendant

James Pieron grew up with little expectations.  His family did not go to college and it was not a big part of his plans.  After high school, he eventually joined the

U.S. Army.

Mr. Pieron provided exceptional service to this country.  He received medals and accommodations for his work in the military.  He then attended college, pausing only to work on a fingerprint automation program which has been very beneficial to law enforcement.

He is a creator and an entrepreneur.   His computer programs have helped thousands of individual investors save when investing in the capital  markets. He has created companies, created jobs, and generated tax revenue for governments.

He is now a husband and a father. He has a loving wife and a baby son who is the joy and pride of his life.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

The seriousness of the offense cannot be disputed.  Evasion of payment is a serious offense.  However, lengthy incarceration, for acts which resulted in little if any personal profit, of someone who has led an exemplary life, does not provide just punishment.   "The punishment should fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949); *United States v. Musgrove*, 647 Fed.Appx. 529, 533 (6th Cir. 2016).

<u>Costs of the Case to James Pieron</u>.  Mr. Pieron and his family have suffered

enormously and now he stands a convicted felon.  The government's seven year investigation, trial, and now conviction of Mr. Pieron have been costly.  The pay to accountants, attorneys, and for other defense related costs has been enormous.  Mr. Pieron is insolvent, heavily in debt, and his license to operate within his chosen career has been permanently revoked.  He has lost his good reputation.

Promotion of Respect for the Law   In sentencing James Pieron, the Court must consider the need to promote respect for the law.  It must be acknowledged, however, that Mr. Pieron's uncertainty as to his tax obligation, if any, resulted in large part from the agency's lack of respect for the law that granted rights to Mr. Pieron.  He was not granted a hearing, not allowed an appeal, never given a final determination, never even told that his filings would not be considered.  This Court has held that these matters do not rise to a defense to the charge.  However, they surely can be considered in sentencing Mr. Pieron.

## D.    The Need for the Sentence Imposed to Afford Adequate Deterrence

It would seem unlikely that James Pieron  would need a custodial sentence to be deterred from  evading payment of taxes.   He understands, however, that the Court must consider deterrence of others in fashioning a sentence.  It  should also be recognized, however, that there are several factors already present in this case that would serve as a deterrence to others: (1) the loss of his reputation; (2) the

permanent loss of license to own, direct, or face customers in the financial industry;

(3) the loss of business and business opportunities; (4) the enormous cost of legal

representation in this case which Mr. Pieron has and will pay long into the future; (5)

the stigma that a felony conviction brings to one who otherwise has led an exemplary

life; and, (6) the personal hardship that this case has caused to Mr. Pieron and his

family.   James Pieron has already suffered far more than  most who have been

convicted of a criminal offense.

> ### E.   The Need to Avoid Unwarranted Sentence Disparities Among Defendants With Similar Records Who Have Been Found Guilty of Similar Conduct

On a broad scale, the sentencing guidelines provide guidance with respect to an

appropriate sentence.  However, this is a unique case with unique facts.  It should be

judged accordingly.

## VI.  SUBSTANTIAL VARIANCE SHOULD BE GRANTED

Many factors support a variance from the guidelines in this case.  They include

the following:

1.   James Pieron came from humble beginnings. There were no discussions of

business operations, much less of tax law, at the Pieron dinner table. He joined the

military and served his country with extraordinary achievements for six years during

a time of war.  He assisted Ohio law enforcement in building an AFIS system for

fingerprint identification.  He graduated from college. He formed businesses in

Europe and this country that were recognized for unique value propositions and

superior products and services.   James Pieron's personal background sets him apart

from most, perhaps all, defendants who have appeared before this Court.

2.  This case is unlike most tax payment evasion cases.  There were no

collection efforts.  There was no hiding of assets. He invested  funds in his

corporations to provide jobs that resulted in income to employees and tax payments

to the government.

3.  Had the payments from Market Shot been handled correctly, there would

have been little, if any,  tax liability to James Pieron.  It was only because of his lack

of business sophistication that the transactions were handled in a manner that has led

to the determination that he personally received this large amount as income.

4.  James Pieron has paid U.S. taxes.  He was making payments before his

accountant said he owed nothing.  He eventually paid the full amount the IRS  said

he owed in back taxes, $418,347, and additionally,  the amount they said he owed for

penalties and interest, $451,781.

5.  Mr. Pieron relied upon the advice of a Certified Public Accountant.  He

followed his advise in filing amended tax returns, an installment agreement request,

a request to compromise, and in not paying  taxes the accountant determined he did

not owe.  There has been no suggestion as to why Mr. Pieron would have known not

to follow the professional advise of Mr. Pavlik.

6.   The Internal Revenue Service repeatedly and continuously failed to provide James Pieron with his most basic rights.  Every taxpayer expects to receive notice of the agency's positions.  Yet, they never issued James Pieron any notice and ignored the dozens of requests for information about the status of his tax returns.  He was denied the fundamental rights to be informed, to have quality service, to be heard, and to challenge the agency's position.

7.   James Pieron's accountant told him that he owed no taxes.  The accountant then prepared and filed an amended return which, if correct, meant he owed no taxes.  The IRS failed to respond.  The lack of any response from the IRS left Mr. Pieron with only his accountant's position to rely upon.  While he understood that the agency might ultimately reject his position, and require him to pay taxes,  James Pieron did not expect that his failure to pay, without any notice that a determination had been made, would be considered a criminal offense.  Mr. Pieron was not offered the rights the agency affords to most citizens and the rights he assumed when making decisions.

8.   The costs to Mr. Pieron have been enormous.  His license to operate has been permanently revoked.  He has paid substantial sums in the defense of his case.  He is deeply in debt.

9.   Incarceration for Mr. Pieron will not be particularly difficult for him

personally.  He is a veteran and has learned to handle circumstances.  The greatest

impact will be felt, not by James Pieron, but by his wife and child. His wife will be

without significant support.  His greatest fear in being incarcerated are his wife's

inability to navigate the normal problems of life while he is away and in the long

term harm that results to a child without a father in the household.

**Conclusion**  These factors, individually and collectively, are grounds for a

substantial variance from the guidelines in imposing sentence in this matter.

> s/Kenneth R. Sasse
> Kenneth R. Sasse
> Attorney for James D. Pieron
> Kenneth R Sasse PLLC
> 27 E. Flint St., 2nd Floor
> Lake Orion, Michigan 48362
> (248) 821-7325
> (P24365)

August 12, 2021

CERTIFICATE OF SERVICE

I hereby certify that on this date I electronically filed the attached

Memorandum with the Clerk of the Court using the ECF system which will

send notification of such filing to all counsel of record.

> s/Kenneth R. Sasse
> Kenneth R. Sasse

Dated: August 12, 2021