<pre>
 1                  IN THE UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2
   UNITED STATES OF AMERICA              )Bay City, Michigan
 3                                       )August  19, 2021
        vs.                             )11:15 a.m.
 4                                       )
   JAMES PIERON, JR.,                    )
 5                                       )Case No. 18-20489
        Defendant.                       )
 6   _____ )

 7
                        TRANSCRIPT OF SENTENCING
 8             BEFORE THE HONORABLE THOMAS L. LUDINGTON
                    UNITED STATES DISTRICT JUDGE
 9
   APPEARANCES:
10
   For the Government:   JULES DEPORRE
11                       United States Attorney
                         101 First Street
12                       Suite 200
                         Bay City, MI  48708
13

14   For the Defendant:   KENNETH SASSE
                         Attorney at Law
15                       27 E. Flint Street; 2nd Floor
                         Lake Orion, MI  48362
16                       (248) 821-7325

17

18

19

20

21   Court Reporter:     Carol M. Harrison, RMR, FCRR
                         1000 Washington Avenue
22                       Bay City, MI  48708

23

24            Proceedings reported by stenotype reporter.
             Transcript produced by Computer-Aided Transcription.
25
</pre>

US v. Pieron, Jr. - Sentencing - August 19, 2021

P R O C E E D I N G S

1

2          (At 11:15 a.m., proceedings commenced.)

3          (Defendant present.)

4          THE CLERK:  United States of America versus James

5   Pieron, Jr., Case No. 18-20489.

6          THE COURT:  Good morning, counsel.  If we could have

7   your introductions, please.

8          MR. DEPORRE:  Good morning, Your Honor.  Jules

9   DePorre appearing on behalf of the United States.

10         THE COURT:  Good morning, sir.

11         MR. SASSE:  Good morning, Your Honor.  Kenneth Sasse

12   appearing on behalf of James Pieron, who is with me at counsel

13   table.

14         THE COURT:  Good morning, Mr. Sasse.

15         Good morning, Mr. Pieron.

16         THE DEFENDANT:  Good morning, sir.

17         THE COURT:  We are assembled for Mr. Pieron's

18   sentencing hearing.  The Court's records reflect the fact that

19   he is present as a result of a jury verdict back in March of

20   2019, a long time ago.

21         The jury reached their conclusion finding him

22   responsible for the offense of tax evasion, which is a Class B

23   felony offense under federal law.  It's punishable by a term of

24   not greater than 60 months in custody, supervised release term

25   following the term of custody of up to three years, as well as

1  a fine of up to $100,000.

2            After the gentleman was convicted by the jury, he was

3  interviewed by Probation Officer Marvin Burns, who actually

4  joins us today.

5            Good afternoon, Mr. Burns.

6            MR. BURNS:  Good afternoon, Your Honor.

7            THE COURT:  Good morning -- not afternoon yet.

8            The presentence investigation report was prepared

9  initially, as I recall, and updated as a result of later

10 sentencing hearings addressing the amount of the tax loss that

11 was involved with respect to the case.

12            My review of the pre-investigation report reflects it

13 was most recently completed in February of this year and

14 revised and completed on April the 9th.

15            Mr. Sasse, any objections to the accuracy or

16 completeness of the presentence investigation report that have

17 not been resolved directly with Mr. Burns?

18            MR. SASSE:  Your Honor, I filed one formal objection

19 and that has to do with the Court's loss determination and, of

20 course, the Court had extended hearings and briefings and so on

21 on that issue, and I did not expect that the Court would

22 revisit it, and I have not asked the Court to revisit that, but

23 I am -- have filed an objection to preserve that objection for

24 the record, Your Honor.

25            THE COURT:  Certainly.  And that's noted.

1              Anything else, sir?

2              MR. SASSE:  Yeah, the other matters don't go to the

3     guidelines, Your Honor, and there are a series of things in the

4     presentence report which basically are concerning the acts of

5     evasion of payments which were alleged in this case.  Some of

6     them were not even -- the Government didn't even attempt to

7     prove them, but they appeared in the presentence report.

8              Now, I do credit the probation officer with changing

9     a few things that we suggested and also putting in the

10    presentence report that we -- that we did not agree with it,

11    which was certainly -- I didn't want to be on record as having

12    accepted those things in the presentence report.

13             I have outlined in my sentencing memorandum our

14    position, some of which is to say we think you're wrong, some

15    of it is to say, hey, I think there's some more things you got

16    to consider about this.  I'm not sure that I can do much more

17    than to reread what I've already written, and if the Court

18    understands -- unless the Court has questions on those matters

19    I will rest on what's in my sentencing memorandum, Your Honor.

20             THE COURT:  Which I read with care, so thank you.

21             Mr. Pieron, I would like to verify that you have had

22    a chance to review the presentence investigation report?

23             THE DEFENDANT:  Yes, Your Honor.

24             THE COURT:  Did it appear accurate and complete to

25    you, sir?

```
 1              THE DEFENDANT:  Yes, Your Honor.
 2              THE COURT:  With the notations that Mr. Sasse has
 3  identified here?
 4              THE DEFENDANT:  Yes, Your Honor.
 5              THE COURT:  Thank you, sir.
 6              Mr. DePorre, is the Government satisfied with the
 7  presentence investigation report?
 8              MR. DEPORRE:  Yes, Your Honor.  I have also reviewed
 9  it and we have no objections or corrections.
10              THE COURT:  Thank you.
11              Mr. Sasse, any remarks that you'd like to make on
12  behalf of Mr. Pieron?
13              MR. SASSE:  Yes, Your Honor.
14              As the Court is aware, I've had a lot of sentencing
15  hearings, many in this courtroom.  Had quite a few before Your
16  Honor, and some before you became a judge here and, of course,
17  many other ones in Flint and Detroit.  And when I started doing
18  this a long time ago, I hated sentencings.  I mean, it was the
19  one part of my job that I just hated.  I've kind of grown to
20  accept it as time has gone on, but I still don't like it.  It's
21  not something I look forward to.
22              And this particular case, I would say, is very
23  difficult, and it's difficult, I think, in part because there's
24  a lot of things I could say about this case, and feel that
25  maybe should be said about this case, but which, frankly, are
```

1    not going to do me any good or my client any good at this stage

2    of the proceeding, and in answering the question that this

3    Court has to answer, which is what is a just sentence based on

4    what he did in this case.

5            What he did do is he didn't pay his taxes for a long

6    time.  He ultimately paid what they said he owed, but he didn't

7    pay for a long time.  What he did do was spend at least some

8    money on other things during that period of time.  He spent

9    money on a motorcycle out of -- by the way, that was out of his

10   personal account.  I think the Court's order denying his

11   judgment of acquittal indicated it was his business account.

12           The motorcycle itself came out of his personal

13   account.  I think there were some other matters that he bought

14   at the same time that he originally charged and then credited

15   to him, but he bought the motorcycle.  He bought wine.  He

16   bought a vehicle.  He bought a piano.

17           He put money or left money in his corporations, which

18   arguably he could have taken out and used to pay taxes, and he

19   didn't borrow the money, which he probably could have done.

20   That's what he ultimately did when he did pay the taxes, so he

21   owed the money and he didn't pay the money, and that -- we

22   can't argue with that.  We can't argue -- that's -- that's

23   fact.

24           So now he sits here ready to be sentenced on a

25   conviction for tax evasion and, of course, I can't argue that

1    issue before the Court at this time.

2             Over the last three years, I've gotten to know James

3    pretty well.  As the Court, I'm sure, is aware, he's a very

4    bright guy, extremely bright guy.  He's tried to explain to me

5    in the past how his corporations worked and how they -- what it

6    was that was unique to his corporations and how they were able

7    to save investors money because they were able to, to the

8    second or mini-second, get the best prices for commodities and

9    so on that that were available.

10            I would kind of pretend I understood it.  I really

11   didn't.  Very bright guy, very intelligent guy, but there are

12   things that he didn't know, lots of things I'm sure he still

13   doesn't know, but certainly there are things he didn't know

14   back when those corporations were formed back in Switzerland.

15            One of the things he didn't know was the US tax laws

16   and his responsibilities under the US tax laws and how to set

17   up a corporation so it would avoid having to pay taxes under US

18   tax laws.  And when he ultimately found out about his

19   responsibilities, he tried to find professional help to figure

20   out what it was he owed, what he was responsible for.

21            And the Court has commented, at least a couple times

22   I think -- I think once in an order -- about the fact that he

23   has changed his position from time to time as to his tax

24   liability and tax theory and so on, and that's true.  That's

25   absolutely true.  I mean, he changed it from the time he filed

1    his first tax return with Carol Nathan to the time he filed his

2    amended with Mr. Pavlik, to the additional amendment with

3    Mr. Pavlik to what Mr. Minns' position was at trial, to what

4    Mr. Hurford's position was in the sentencing hearing.

5          I mean, it did change.  It constantly changed.  It

6    was a fair criticism of the defense, but I guess the point I

7    would like to make is this is not a man that's going around

8    looking for people who will agree with what he wants them to

9    do.  This is a man who's trying to find competent advice and is

10   following what he believes he should be at the time.

11         Now, he had -- certainly when he filed the original

12   tax returns with Carol Nathan, he had some real questions as to

13   whether it was accurate, and I don't know if the Court recalls

14   her testimony, but she's probably very good tax returner, but

15   she was in over her head here, and I don't think anybody would

16   dispute that.

17         Mr. Pavlik said, no, she's wrong here, and then

18   Mr. Pavlik later changed his mind and said, no, this is -- you

19   really don't owe any taxes on this.  In trial, of course, he

20   had other attorneys who took different positions, but I never

21   saw this man try to convince any of them that this is what we

22   should do, and none of them, I don't think, would have been

23   convinced by him.  He did change his position, but it was a

24   result of a change of the different people who were

25   representing him.

1       Now, if he's to be criticized as -- for changing,

2  first of all, tax people -- he went from Carol Nathan to Kim

3  Pavlik -- and, second, from lawyers after he was convicted but,

4  not -- I don't think he changed lawyers because he didn't like

5  their position on the tax thing.

6       Our sentencing memorandum sets out a number of

7  grounds which I think should -- the Court should consider in

8  granting a variance from the guidelines in this case, and a lot

9  of cases I don't have any grounds, and I just ask the Court to

10 sentence within the guidelines, sentence at the lower end of

11 the guidelines.

12      Sometimes I've had a ground or two to say, Judge,

13 consider this to get below the guidelines to grant a variance.

14 In this case I would suggest there's an abundance of grounds.

15 The Court doesn't have to agree with all of them, or even most

16 of them, but I hope that the Court will agree that there are

17 significant grounds for a variance in this case.

18      And I'm not going to go through all of the things in

19 the order that I listed in there, but I do want to highlight a

20 couple of them.  First of all, obviously his background.  He's

21 got a sterling background.  He's got a good educational

22 background.  He's got a terrific military background.  He's got

23 a background that, frankly, I have never seen before in

24 representing people.  I'm sure there are people of better

25 background than him, but they're few and far between.

1          He's been of assistance to this country.  He's been

2   assistance to law enforcement.  He's built corporations that

3   have employed people that have paid taxes.  He has an excellent

4   background, Your Honor.

5          Secondly, to kind of piggyback on what I was saying

6   earlier, he was following professional advice.  When he -- when

7   Kim Pavlik told him, I don't think you owe any taxes -- well,

8   we didn't have that testimony before the jury; maybe we should

9   have; we didn't, but Kim Pavlik did testify at a sentencing

10  hearing before you, and he was very clear that this was my

11  determination that he didn't owe taxes, and that's what I told

12  him.

13         Now, was Kim Pavlik right?  Probably not.  You know,

14  just about everybody, including the Court, would say, no, he

15  wasn't right, but that's what the advice that he was given back

16  then was.  And it may not be a defense, certainly at trial,

17  particularly since we didn't offer that direct testimony, but

18  certainly is something that this Court can consider.  He was

19  told back -- years before this indictment, back in 2013 by Kim

20  Pavlik, and the filing was in 2014, that he owed no taxes.

21         Up until then he had started to make some payments

22  towards what he assumed was going to be a tax thing.  Even

23  after then, he allowed them to take tax money from him because

24  he knew that they might disagree with him ultimately, but --

25  but he -- he was following the advice of Mr. -- of Mr. Pavlik.

1          Another factor is -- and I -- I don't want to try to

2   make the victim the -- you know, jump on the victim here, but

3   the Internal Revenue Service in this case, their actions, or

4   more accurately their inactivity in this case, certainly

5   contributed to where we are today.

6          This is not -- this takes this case, I think, out of

7   virtually any tax payment case, evasion payment case.  This is

8   not a case where they were out looking for his property and he

9   was hiding it.  This is not even a case where they ever gave

10  him notice that he owed money.  Throughout this period of time,

11  they never sent him notices.  They never said you still owe

12  this money, you owe this.  In fact, his accountant's efforts to

13  find out where things were were met with nothing, with

14  muteness.

15         So he was in a position where his accountant is

16  telling him, you don't owe taxes, and the Internal Revenue

17  Service, instead of saying that 2014 tax return is wrong, you

18  do owe taxes, they say nothing.  It just sits there and sits

19  there and sits there and sits there, and I think the Court

20  should consider not so much their activities in isolation, but

21  the effect on him and the failure of them to give him any

22  notice that he still owed taxes.

23         He ultimately does pay this, those taxes that they

24  say, the taxes they didn't give him notice of.  He finally gets

25  ahold of them, and this happens after Jan Geht -- who I think

1    the Court remembers, good tax lawyer, brilliant tax lawyer by

2    my estimation -- takes a look at this, and this is after -- I

3    think after the Government indicates that they're planning to

4    indict him or likely to indict him.

5           And Mr. Geht takes a look at these tax returns and

6    says, James, I don't think -- I don't think he was right.  I

7    don't think Pavlik is right.  I think you better find out what

8    they owe -- what you owe, and you better pay it.  He on his own

9    goes around his accountant, is able to determine an amount, and

10   he ultimately pays this 800 some thousand dollars, including

11   about half of which is penalty and interest and half is taxes,

12   but he does pay it and I think, again, that's something the

13   Court should consider.

14          As I've already mentioned, I think the Court should

15   consider his lack of sophistication when this whole thing got

16   started as to how these -- and I am -- I'm less of a tax expert

17   than anybody, but I -- my understanding is he probably could

18   have set these corporations up, and he probably could have

19   moved them to the United States without -- without any tax

20   liability on his behalf.

21          Now, when he took draws from them, obviously, it

22   would have been income and taxable, but he certainly, I

23   believe -- and I could be wrong on this -- I believe he could

24   have.  If it had been done properly, he wouldn't be in this

25   situation to start with.

1          This case has taken an enormous toll on this man.

2    He -- he's heavily in debt.  He's -- a felony conviction is

3    going to keep him from doing what he knows best.  I -- I would

4    hope the Court would consider that as to how much more

5    punishment is needed in this case.

6          James Pieron is now a father.  He got married three

7    years ago.

8          THE COURT:  His baby is just outside the courtroom.

9          MR. SASSE:  I think his baby's here somewhere, Judge.

10   And when I got back involved in this case, I talked to James

11   pretty regular over the last few months, and every -- almost

12   every conversation I had with him he would -- had to tell me

13   about his baby, about his boy, what was going on with his boy.

14         He's got some physical problems, which he had to see

15   specialists, which are still going on.  It really -- it really

16   is the highlight of his life.  I think it's probably the best

17   thing, the marriage and the child, that ever happened to him.

18   It slowed him down.  It's -- he's a perpetual motion guy, he

19   probably always will be, but it's added an element to his life.

20         And if he gets time, if he gets serious time in this

21   case, he can do it.  He can do it.  He's been in the military.

22   He can take orders.  He'll do what the guards tell him to do,

23   but it's going to be the toughest on his wife and on his

24   daughter and -- son, I'm sorry, on his son, and they're the

25   ones that are going to have to suffer the most from this.

1            I don't think I have anything further to add.

2            Thank you, Judge.

3            THE COURT:  Thank you, Mr. Sasse.

4            Mr. Pieron, you and I have been looking at each other

5    for over two years.

6            THE DEFENDANT:  Yes, sir.

7            THE COURT:  Anything that you would like to add to

8    Mr. Sasse's remarks on your behalf?

9            THE DEFENDANT:  I couldn't do better than that, sir.

10   I just want to provide for my family, and I'm going to do that

11   however I can.  That's really all I'm looking to do.

12           Mr. Sasse is right.  I've slowed down a lot.  I

13   actually can thank you, Mr. DePorre, because I wouldn't have a

14   wife and a child without -- without what I've been through.  It

15   took an enormous force to slow me down.

16           I had four, five companies running at the same time.

17   I worked hard on those companies.  I took them all to market,

18   employed hundreds of people.  I don't know if Your Honor had a

19   chance to look at the spreadsheet, just the tax and salaries

20   and benefits alone were 21 million, so -- so -- on a very small

21   investment.

22           THE COURT:  So give us a little bit of an

23   understanding of what you're going to do.  You're going to do a

24   term of custody.  What is it that you anticipate doing once you

25   serve a federal prison sentence?

1        THE DEFENDANT:  I'm sorry, Your Honor, once I'm

2  finished with serving the sentence?

3        THE COURT:  Yes, sir.

4        THE DEFENDANT:  I'm going to do what I need to do.  I

5  might not be able to work with technology.  I might not be able

6  to write code or be innovative.  I might have to, you know,

7  work with my hands, which I did with my father my whole life,

8  so whatever I got to do to provide, that's exactly what I'm

9  going to do.

10        THE COURT:  What types of business are you involved

11  in right now?

12        THE DEFENDANT:  Right now, sir, I'm just shutting

13  down all of the companies and intellectual property and

14  documenting code, documenting IP structures, and I'm trying to

15  negotiate with the people I owe for pennies on the dollar so

16  that I owe them less, and that -- obviously they're very

17  aggressive and they're very concerned.

18        So what I do on a daily basis is I try to provide

19  them as much value as I can while I'm here so that some of that

20  debt gets taken off.  It's not all going to get taken off, not

21  even close, but I'm doing the best I can to serve several

22  masters that I owe.

23        THE COURT:  I appreciate your remarks.  Thank you,

24  sir.

25        THE DEFENDANT:  Yes, sir.

1     THE COURT:  Mr. DePorre, remarks on behalf of the

2  Government.

3     MR. DEPORRE:  I have just three points that I'd like

4  to cover, Your Honor.  The first, in response, Mr. Sasse has

5  raised the point that Mr. Pieron has consistently relied on

6  professional advice, and it is true that there have been a

7  number of positions taken.  There have been a number of

8  professional opinions that have been -- have come into this

9  courtroom.  Professionals that sat there and said that

10  Mr. Pieron owes no tax, and the common element for all of them

11  is that they used the information that Mr. Pieron gave them to

12  make those determinations.

13     And so when Mr. Pieron told Carol Nathan and Kim

14  Pavlik -- and this is just one example -- that he had basis in

15  stock that he personally sold to a company called Market Shot,

16  they testified, based on the factual implications of the

17  information that he provided them.

18     And when he told Chelsea Rebeck that he never sold

19  any stock, and that she came in and was an expert witness with

20  Mr. Pendery and Mr. Hurford, and that it was the corporate

21  entity that sold stock, she came to the conclusion that he

22  didn't owe taxes for a very different reason.

23     And so, yes, it's true that he's relied on

24  professionals, but the information that he's provided those

25  professionals has changed dramatically over time, and that is

1   why he stands convicted of the offenses today.

2         My other two points:  In the defendant's sentencing

3   memorandum he asked the Court to forgo restitution, and it is

4   correct -- correctly laid out in the PSR, and in the

5   defendant's sentencing memorandum, that restitution is not

6   mandatory in this case.  It can only be imposed as a condition

7   of supervised release, and that is what we're asking for today.

8         The defendant has fully paid the amounts on his 2008

9   and 2009 returns that he filed, but what's very, very important

10   is that those returns based his tax due and owing on an

11   inaccurate theory that he was entitled to a theft loss

12   deduction.

13         The defendant no longer -- and I can cite their own

14   statements disavowing that theory.  The Court has cited it in

15   its order adopting the Government's tax loss on, I believe,

16   page 26 of that order, page ID is 3897, and the Court has

17   determined the tax loss to be over $6 million:  $6,435,250.57.

18         The defendant has paid a portion of his tax

19   liability.  That's laid out in Exhibit 8 of his sentencing

20   memorandum, and it shows that he's paid just under a million

21   dollars, $942,353.51, leaving an outstanding balance of

22   $5,492,897.06.

23         The Government does believe that this is a case where

24   the Court should impose restitution as a condition of

25   supervised release.  I agree with Mr. Sasse that the defendant

1    is very smart.  He has the ability to earn money.  He has the

2    ability to earn trust of investors and lenders who are willing

3    to lend him millions of dollars.  Some of those lenders are

4    overseas, some of them have connections to international

5    finance, but this is a situation where should the defendant

6    have access to significant funds, he should absolutely have to

7    pay restitution to the Government for -- for those amounts.

8            And then, lastly, I am requesting that the defendant

9    be remanded following sentencing today, and that's precisely

10   because he has access to lenders and to investors that are

11   overseas.  He has connections to investors in the British

12   Virgin Islands, Harrison & Associates, to Clive Diethelm.  He

13   owes $2.5 million to him, and he is in Cyprus.  He has

14   connections to Australia where he had a company broker mate,

15   and I believe another company, ILQ.  He has previously lived in

16   Switzerland, lived elsewhere abroad, and he has a wife who is a

17   foreign national as well from Ukraine.

18           And so in summary, Your Honor, the Government does

19   believe in this case that a remand is justified given the risk

20   of flight should the Court impose a custodial sentence.  We

21   also ask that the Court impose a sentence within the guideline

22   range, which we agree the PSR correctly determined to be 51 to

23   60 months.

24           That's all.

25           THE COURT:  Thank you very much, Mr. DePorre.

1        We will return -- or I will return shortly to the

2   fact that this gentleman has paid approaching a million dollars

3   of tax related to this transaction that's been the subject of a

4   great deal of attention over the last couple of years.

5        I had a hard time understanding the case initially

6   because my impression was similar to that of Ms. Rebeck, which

7   is why in the heck would you ever structure this transaction as

8   a taxable transaction when it didn't have to be?  Under US law,

9   capitalization of new business is not a taxable transaction.

10  It's only taxable after a disposition of the security, and it

11  didn't make any sense to me as to the approach that he was

12  taking.  Nevertheless, he did and, as a result, he's paid just

13  short of a million dollars in taxation for a transaction that

14  he owed no tax on, and that has sort of astounded me throughout

15  the course of the whole case.

16       Chelsea Rebeck was correct.  There was any number of

17  ways of lawfully structuring the transaction so that it was a

18  non-taxable transaction.  And I think that's important

19  ultimately, not with respect to the conviction, but certainly,

20  from the Court's perspective, with respect to the sentence.

21       That is not to say that Mr. Pieron is to be excused

22  for the conduct that the jury ultimately concluded was the

23  predicate for his conviction.  There are a couple of very brief

24  sentences that I think summarize something about him in this

25  unusual situation that I've been in, and that he's in, looking

1  at each other over the course of the last couple years, and yet

2  knowing very little about the gentleman other than what I'm

3  told by third parties.

4          This is the lead sentence in Mr. Burns' presentence

5  investigation report summary:

6          "James Pieron has led a fairly exceptional life."  He

7  has, and that, too, is something that ought to be considered as

8  we address sentencing.

9          Also received a letter from his wife and signed in

10  part referencing his son's name.  This was the introductory

11  paragraph there:

12          "James is an innovator, the one who writes on every

13  mirror in the house, records notes on his phone, and works

14  continuously without sleep or food.  His identity was

15  supporting his family, customers, and employees.  Someone who

16  was always in need of his attention."

17          Two very brief paragraphs that I think summarize

18  something about this gentleman, notwithstanding that there are

19  legitimate concerns about his behavior that have come up during

20  the course of the evidence.  He did not pay any income tax

21  between 2001 and 2006 until his stepfather stepped in and said,

22  James, you are going to owe US tax.  Happens to be that the

23  United States is one of four countries in the world that impose

24  a tax on US citizens worldwide.

25          But Mr. Werwega -- I believe I am saying his name

1    correctly -- assisted him not from source information that he

2    got from Mr. Pieron, but from information that he had to

3    solicit from the Internal Revenue Service because Mr. Pieron

4    did not have the documentation to support it.  He got those

5    returns prepared, but Mr. Werwega also informed him that his

6    receipt of the $15 million was not a transaction that he knew

7    exactly what to do with, how to report it, how to -- to the

8    Internal Revenue Service.

9          But it's nearly two years later -- not two months --

10   when returns are actually prepared for 2007 and 2008 and 2009,

11   and they're all predicated on the very information which

12   Mr. Pieron furnished to those tax return preparers,

13   spreadsheets, explaining this transaction to be a capital

14   transaction and the sale of securities to Market Shot.

15         That was his self-reporting of his understanding of

16   the transaction, and it's supported by two share purchase

17   agreements that have -- he, in turn, furnished directly to the

18   tax return preparers.  No explanation for why that sort of

19   documentation was ever created or why it was relevant.

20         Moreover, ultimately, as he has retained counsel, and

21   I don't know the significance of this, but -- in terms of

22   securities law, but this is John Fedders, an attorney

23   representing him at the time saying, in correspondence:  "Keep

24   in mind what I have reported to you on several occasions,

25   namely Cook did not purchase his interest in JDFX Holding from

1  the entity, but he bought his interest in JDFX Holding from

2  Mr. Pieron."

3          Now Mr. Fedders is making that argument for some

4  reason.  I don't know what it is, but, nevertheless, it is

5  consistent with the way he reported these transactions all

6  along.  Moreover, he's made the representation consistently to

7  every tax return preparer that he engaged in addressing these

8  transactions, notwithstanding the fact that the statistical

9  information, the amount of the capital gain, varied

10  dramatically.

11          So how do you sentence a man where a guideline is

12  driven by the amount of the tax loss when we're relying on his

13  self-reporting of a transaction for which he could have owed no

14  tax.  It's a bizarre situation, but it is relevant to the

15  sentencing consideration in assessing his responsibility for

16  the transactions, and for the tax loss, to consider the fact

17  that there could lawfully have been no tax loss, and it's for

18  that reason that I believe a variance is appropriate in

19  assessing the term of custody.

20          We have addressed the Sentencing Reform Act

21  extensively with respect to the amount of the tax loss, largely

22  based on the self-reporting of the defendant.  I've also sought

23  to highlight a number of the additional factors that I think

24  are relevant in applying the 3553(a) factors, and, as a result,

25  would commit Mr. Pieron to the custody of the United States

1   Bureau of Prisons for a term of 15 months.

2            Upon his release from custody, he's to be placed on

3   supervised release for a term of two years.  He's ordered to

4   pay the statutory assessment of $100, which will be due

5   immediately.  We will waive the imposition of a fine, costs of

6   incarceration and costs of supervision.  He lacks the financial

7   resources to do so, and, indeed, I would point out the -- he

8   has paid in excess of a million dollars worth of taxation,

9   which was largely not required by the tax law, insofar as he

10  could have structured this transaction any number of ways as a

11  nontaxable transaction.

12           Indeed, if the Court was to impose a fine, according

13  to the statute, it would be limited to the amount of $100,000

14  in the context of the circumstance where he's paid nearly a

15  million.

16           Drug testing is ordered.

17           He is also directed to cooperate with the collection

18  of a DNA sample as directed by his probation officer.  While

19  he's on supervision, he is to abide by the standard conditions

20  of supervised release that have been adopted by the United

21  States District Court for the Eastern District of Michigan.

22  He's also to comply with the following additional special

23  conditions:

24           He is to submit to substance abuse testing to

25  determine if he's used a prohibited substance.

24

1              He's not to incur new credit charges or open

2    additional lines of credit without the approval of his

3    probation officer.  He is to provide the probation officer with

4    access to any requested financial information and authorize the

5    release of any financial information.  His probation officer

6    may share financial information with the United States

7    Attorney's Office.

8              He is to make arrangements with the Internal Revenue

9    Service regarding the monthly payment to address the payment of

10   back taxes, plus any penalties or interest that may accrue.  He

11   is to provide payment arrangements scheduled with the Internal

12   Revenue Service with the probation officer.

13             He is to make arrangements with the IRS regarding the

14   filing of an amended tax return for the affected tax years and

15   any monthly payment plan concerning the payment of back taxes,

16   plus any interest or penalties which may accrue.  He is to

17   provide a payment information schedule to the Internal Revenue

18   Service to his probation officer.

19             I would note, my prior experience with other cases,

20   particularly tax cases, that the coordination between the

21   financial unit for the court, the civil collection agency of

22   the Internal Revenue Service is often, for lack of a better

23   word, discoordinated, and it seems unnecessary in the context

24   of this circumstance to order restitution or a condition of

25   supervised release where the gentleman is going to be amenable

1    to the Internal Revenue Service in any event on the civil side,

2    and for that reason I don't see a justification for adding that

3    as a condition of restitution.

4            The Court would have no additional conditions.

5            Any questions concerning the terms of the sentence or

6    objections from the Government?

7            MR. DEPORRE:  No, Your Honor.

8            THE COURT:  Mr. Sasse?

9            MR. SASSE:  None other than those we've already

10   voiced, Your Honor.

11           THE COURT:  With that understanding, I have no

12   objection to the gentleman's voluntary surrender.  I appreciate

13   the remarks that Mr. DePorre has made.  On the other hand, I

14   believe this gentleman understands the coercive power of the

15   Federal Government and understands that opportunity for flight

16   in this circumstance would only compound his ability to act as

17   a father and act as a husband.  I'm satisfied that voluntary

18   surrender is appropriate here.

19           MR. SASSE:  Your Honor, one thing did occur to me,

20   which he had asked me about, would the Court consider

21   recommendation to the prison camp at Duluth?  It's one of the

22   closer ones to us, and also his wife may try to relocate to be

23   near him and gain employment there.

24           I understand the Bureau of Prisons lots of times

25   doesn't follow those anymore, but I would ask for that

1 recommendation.

2            THE COURT:  Mr. Sasse, why Duluth?

3            THE DEFENDANT:  The cost of living, Your Honor.

4            MR. SASSE:  Yeah.  It's not somewhere I would want to

5 go, Your Honor, but maybe -- maybe this time of year, but not

6 later in the year.

7            THE COURT:  Any opposition from the Government,

8 Mr. DePorre?

9            MR. DEPORRE:  I have no opposition to a

10 recommendation.  I will echo Mr. Sasse's statement that the

11 decision ultimately will be made by BOP, and it may be based on

12 factors aside from the Court's recommendation.

13            THE COURT:  Certainly.  And we will make the

14 recommendation, understanding that I don't think we've ever

15 recommended to the Bureau of Prisons that someone be lodged in

16 a place further north than Minnesota.

17            One concluding matter, Mr. Pieron, and that is your

18 appellate rights.  You are entitled to have the Court of

19 Appeals review the decisions that have been made during the

20 course of the case.  I want to be sure that you understand that

21 in order to begin that process, you'll need to file a claim of

22 appeal within 14 days of today's date.

23            Mr. Sasse, have you had a chance to review that

24 issue?

25            MR. SASSE:  Yeah.  We have talked about that, Your

```
 1    Honor.  I will certainly make sure that if he decides to
 2    appeal, that it's timely filed and will file it for him.  I
 3    think I have indicated earlier to the Court that because of
 4    some allegations that were made post-trial of a possible
 5    ineffective assistance of counsel issue that I would
 6    probably -- in fact, I don't believe I can represent him on
 7    appeal, and I would be asking to withdraw, but I think then at
 8    that point it would be up to the Court of Appeals to deal with
 9    that.
10              THE COURT:  Indeed.
11              Mr. Pieron, good luck, sir.
12              THE DEFENDANT:  Thank you, Your Honor.
13              THE COURT:  Record's closed.
14              (At 11:56 a.m., court recessed.)
15
16                      * * * * *
17                  C E R T I F I C A T E
18        I certify that the foregoing is a correct transcript
          from the proceedings in the above-entitled matter.
19
20                           _Carol M. Harrison_
21    Date: 11-12-2021      Carol M. Harrison, RMR, FCRR
                            Official Court Reporter
22                          United States District Court
                            Eastern District of Michigan
23                          1000 Washington Avenue
                            Bay City, MI  48708
24
25
```

US v. Pieron, Jr. - Sentencing - August 19, 2021